# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CAROL WILD SCOTT                          :

      Plaintiff,                         :

      v.                                 :

                          Case No. 22-cv-00601 (CRC)

WASHINGTON METROPOLITAN                   :
AREA TRANSIT AUTHORITY,
                                          :
      Defendant.                         :

                          :

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT AND
### CROSS-MOTION FOR SUMMARY JUDGMENT AS TO
### DEFENDANT'S NEGLIGENCE AND AFFIRMATIVE DEFENSE(S)

On September 23, 2019, a WMATA subway train operator stopped her train at the McPherson Square station platform, then—after passengers including Carol Scott had begun standing up to disembark—violently jerked the train forward without providing any warning to her passengers. Ms. Scott was thrown to the floor, suffering injuries including a left proximal femur fracture that required surgical repair.



Ms. Scott's injuries have left her with a permanent limp, as well as pain, weakness, and fatigability in the left leg.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

Within literal minutes of the incident, WMATA knew exactly what had happened.  Ms. Scott and three other passengers—strangers to Ms. Scott—provided written statements confirming the course of events.  WMATA also knew that its train operator was at fault—WMATA's own Standard Operating Procedures explicitly require that if a train operator intends to reposition a train after it has stopped at a station platform, she must first warn all passengers of the impending movement via intercom announcement: **"Attention customers, this train will move forward; please hold on."**

So what did WMATA do?  Did it accept responsibility, apologize to its longtime passenger Ms. Scott, and attempt to evaluate the claim, pay fair compensation, and let Ms. Scott move on with her life?  It did not.  Having refused to entertain any such discussion, it forced her to file this lawsuit.  Then, after discovery had closed, WMATA for the first time notified Ms. Scott's counsel that it believed it had come up with an argument by which to blame Ms. Scott for what happened to her.

For the reasons set forth herein, Ms. Scott respectfully requests that the Court DENY Defendant's Motion for Summary Judgment and (2) GRANT Plaintiff's Cross-Motion for Summary Judgment as to Defendant's Negligence and Affirmative Defense(s).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

# Table of Contents

**I. Introduction** ......................................................................................... 1

**II. Factual Background: Negligent WMATA train operator injures passenger doing exactly what WMATA expects reasonable passengers to be doing.** ......................................................................... 2

**III. Legal Standard** ................................................................................... 7

**IV. WMATA's Negligence:  Summary judgment should be entered for Plaintiff as to WMATA's negligence because the undisputed facts establish that WMATA's train operator did not warn passengers before violently jerking the berthed train forward, in violation of the standard of care.** ...........................................................................7

**V. Assumption of Risk:  WMATA's Motion should be denied; summary judgment should be entered for Plaintiff as to WMATA's affirmative defense of assumption of risk.** ................................................................... 9

A. The cases upon which WMATA relies are inapposite because they all concern above-ground transportation rather than subway trains. ..................11

B. Sudden movements that may be naturally attendant to travel by bus are NOT naturally attendant to travel by subway train. ..................................... 13

C. Summary judgment should be entered for Plaintiff because no reasonable jury could find that Ms. Scott knowingly assumed the risk that the train operator would violently jolt the train forward in direct violation of the standard of care, WMATA's own Standard Operating Procedures, and the common knowledge and expectations of regular riders of the Metro. ............ 15

**VI. Contributory Negligence:  Summary judgment should be entered for Plaintiff as to WMATA's affirmative defense of contributory negligence (if still asserted).** ...............................................................................18

A. The Court should grant Plaintiff summary judgment because across the 13 months discovery was open, WMATA never identified any basis for a contributory negligence defense, despite Plaintiff's direct contention interrogatory. ......................................................................................19

B. In the alternative, the Court should grant Plaintiff summary judgment because the lone fact upon which WMATA now attempts to rely—that she was not holding onto something when the train operator suddenly and without warning jerked the train forward—does not amount to contributory negligence. ...............................................................................................23

**VII. Conclusion** ...................................................................................... 26

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036
——————
202-463-3030

## I.    Introduction

Minutes before the July 26, 2023, post-discovery status conference, counsel for WMATA notified Plaintiff's counsel that WMATA intended to move for summary judgment on the basis of its affirmative defense that Ms. Scott was contributorily negligent.  The Motion ultimately filed by WMATA[1] does not explicitly identify its basis; however, it appears[2] to move on the basis of a different affirmative defense, assumption of risk.  **No material facts are in dispute; the parties simply disagree on the law.**

In support of its Motion, WMATA does not cite a single case involving a subway train. Instead, it relies on nine cases pertaining to the many starts, stops, jerks, jolts, or jars, swerves, and other motions that might be considered naturally attendant to above-ground travel by bus (6 cases), streetcar (2), or taxicab (1).  In addition to relying on inapplicable law, WMATA neglects to mention a great many undisputed facts that are material to the questions presented in its Motion.  But there is a common-sense reason that WMATA could not find a subway train case to support its position—reasonable passengers have markedly different expectations about jolting starts and stops on a subway train than on a bus (or streetcar, or taxicab).

In contrast to the many starts, stops, jerks, jolts, or jars, swerves, and other motions that might be considered naturally attendant to bus travel, there are only two starts and stops naturally attendant to subway travel: the first when the train pulls out of a station,

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[1]    Defendant's Motion for Summary Judgment (ECF No. 24), filed 10/2/2023.
[2]    No form of the word "contributory" appears in WMATA's Motion; instead, WMATA argues that "Plaintiff assumed the risk that the train would move as she was standing."  (Def.'s Mot. at 5).

and the second when the train berths at the next station.  There are no other drivers, cyclists, pedestrians, and others with whom to share the road and to whose actions to react. No—the starts and stops of subway travel are 100% within the control of the train operator. The dangers knowingly accepted by ordinary passengers and the reasonableness of those passengers' actions must both be judged against this backdrop.

For the reasons set forth herein, Ms. Scott respectfully requests that the Court DENY Defendant's Motion for Summary Judgment (whatever its basis) and (2) GRANT Plaintiff's Cross-Motion for Summary Judgment as to Defendant's Negligence and Affirmative Defense(s).

## II.    Factual Background: Negligent WMATA train operator injures passenger doing exactly what WMATA expects reasonable passengers to be doing.

At approximately 6:30 PM on September 23, 2019, Carol Scott, was a passenger on Orange Line subway train pulling into the McPherson Square station.  (SUMF ¶ 16 (Ex. 1, WMATA Incident/Accident Report; *see also* Compl.)).  As of September 2019, WMATA's Standard Operating Procedures required that train operators berth their trains at station platforms, then wait 5 seconds before opening the doors.  (SUMF ¶ 17 (Ex. 2, WMATA Dep. (Henry) at 30:6-15)).  As of September 2019, WMATA's Standard Operating Procedures mandated that if a train operator had to reposition her train after it has stopped at a station platform, she was required to first warn all passengers of the impending movement via intercom announcement: "Attention customers, this train will move forward; please hold on." (SUMF ¶ 18 (Ex. 2 at 47:3-16; Ex. 3, WMATA SOP 50.5.1.1)).  As testified to by both the train operator and WMATA's Rule 30(b)(6) corporate designee, the explicit purpose of the

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

announcement is to allow the customers to grab ahold of something before the train moves, so they don't get hurt:

> A.  Why do we make an announcement?
>
> BY MR. REGAN:
>
> Q.  Correct.
>
> A.  Just so that people are on the platform and on the train are aware.
>
> **Q.  Okay. I don't want to put words into your mouth. But is one reason that people need to know the train is going to move forward again so that they can be prepared and not fall?**
>
> MR. CHANDONNET: Objection. You can answer.
>
> **A.  Correct.**

(SUMF ¶ 19 (Ex. 7, Johnson Dep., at. 11:14-12:18 (emphasis added))).

> Q.  If you stop short, are you allowed to move the train forward again?
>
> A.  You're allowed to reposition the train until you're properly berthed.
>
> Q.  That's with that warning, you must give the verbal warning that's set forth in SOP 50-point-something that we looked at earlier; right?
>
> MR. CHANDONNET: Objection.
>
> BY MR. REGAN:
>
> Q.  Alerting the passengers that you're going to move the train so they don't get hurt; right?
>
> MR. CHANDONNET: Objection.
>
> A.  Yeah, according to 50.5, yes.
>
> BY MR. REGAN:
>
> **Q.  And that is the purpose, by the way; right? I think you said the purpose was so they can hold on. The worry is they're going to get hurt if they're not warned about what's happening; right?**
>
> MR. CHANDONNET: Objection.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

> **A. They could, if they're not paying attention, they could get hurt. Most times, people feel the train stop so they automatically get up thinking the doors are going to open.**

(SUMF ¶ 19 (Ex. 2 at 47:3-16, 66:1-67:4 (emphasis added))).

On September 23, 2019, after the train came to a stop at the station platform, Ms. Scott stood up to exit the train. (SUMF ¶ 20). After Ms. Scott had stood up, the train operator suddenly "jerked," "launched," or "lurched" the train forward, as confirmed not only by Ms. Scott, but by every single one of the three eyewitnesses identified in WMATA's Incident/Accident Report:

> As Ms. Scott was reaching for the center pole for support while she waited for the doors to open, suddenly, and without any warning whatsoever, **the train launched forward**. This abrupt movement threw Ms. Scott multiple feet through the air, forcing her to land violently on the ground on her left hip.

(SUMF ¶ 21 (Ex. 5 at No. 11 (emphasis added)));

WMATA Incident/Accident Report Witness A.E. stated:

> "Woman stood up because the train stopped at McPherson Sq. **The train then jerked forward** and the woman fell into the [aisle]. I stayed with her until paramedics arrived."

(SUMF ¶ 21 (Ex. 1 at 5 (emphasis added)));

WMATA Incident/Accident Report Witness S.S. stated:

> "**Train jerked** at station I heard loud thump then a scream. People trying to move her after that. I called emergency in on box in car 3144 asking for emergency assistance then screamed for no one to move her till medics arrive. Then put jacket under Ms. Carol's head and tried to calm her down till medic arrive."

(SUMF ¶ 21 (Ex. 1 at 5 (and transcribed at page 4) (emphasis added) (all spellings, punctuation, and syntax in original)));

WMATA Incident/Accident Report Witness D.P. stated:

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

> "Saw the lady in question stand up when the train stopped at McPherson Sq. **Unexpectedly, the train lurched forward** and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again."

(SUMF ¶ 21 (Ex. 1 at 7 (emphasis added))).

Before jerking the train forward, WMATA's train operator did **not** warn the train passengers that she was going to move the train forward, let alone do so violently.  (SUMF ¶ 22).  In addition to the above-listed witness statements WMATA has explicitly admitted (at the deposition of its Rule 30(b)(6) corporate designee) that WMATA is not aware of any evidence to the contrary:

> Q. One of the witnesses explicitly noted that the train operator never made any announcement that the train was going to be in motion again. Do you remember that or do you want me to pull it up?
>
> A. I remember -- I remember seeing that, yes.
>
> Q. Is WMATA aware of any evidence that would contradict that; in other words, is there any evidence that WMATA is aware of that the train operator announced the train would be moving before she moved it forward again?
>
> A. No.

(SUMF ¶ 22 (Ex. 6, WMATA Dep. (Bennett) at 31:17-32:7)).

WMATA's train operator has testified under oath that she has no recollection of what happened that day.  (SUMF ¶ 23).  The train operator's signed statement in WMATA's official Incident/Accident Report does not address how the incident occurred.  (SUMF ¶ 24).

Transportation safety engineering expert Carl Berkowitz, Ph.D., P.E., has explained that the incident was caused by, among others things, the following failures by WMATA and its train operator:

> This incident was the direct result of the following failures by the train operator and WMATA:
>
> - Failed to stop the train properly and safely at McPherson Square Metro Station.
>
> - Failed to make an announcement warning passengers before the sudden, unexpected and violent movement of the train and subsequently informing passengers when it was safe to stand-up from their seats and exit the train.
>
> - Failed to warn passengers of the risk of the sudden, unexpected and violent movements of the train. WMATA was aware of this hazard but failed to fix the issue or warn passengers. It was common practice for train operators to stop short of the station and then abruptly accelerate forward to the station.

(SUMF ¶ 25 (Ex. 4, Berkowitz Report, at 15, 22). Dr. Berkowitz further explained that as of September 2019, the WMATA train operator's decision to "suddenly, unexpectedly and violently accelerated the train forward without providing passengers any advance warning" violated the national standard of care, as well:

> Based on the information presented in this draft safety report and with a reasonable degree of engineering certainty, it is my professional engineering opinion that the WMATA and the train operator failed to comply with the national standards of care when berthing the train at McPherson Square Station at the time of the incident. Failure to properly and safely berth the train at the station directly caused Ms. Scott to fall and break her hip. The train operator suddenly, unexpectedly and violently accelerated the train forward without providing passengers any advance warning. In fact, moments before the sudden jerk of the train, there was a PA announcement indicating the station name and that the doors were opening to the left. This announcement led passengers to believe that it was safe to get up from their seats and exit the train.

(SUMF ¶ 26 (Ex. 4 at 22)). WMATA has not designated any liability expert. (SUMF ¶ 27).

### III. Legal Standard

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). While the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, "[o]nce the moving party has done so, the burden shifts to the nonmoving party [] to identify and properly support the specific facts showing that there is a genuine issue for trial." *Cureton v. Duke*, 272 F. Supp. 3d 56, 62 (D.D.C. 2017) (internal quotations omitted). "Simply put, 'conclusory allegations unsupported by factual data will not create a triable issue of fact.'" *Aguado v. SunTrust Bank*, 744 F. Supp. 2d 124, 126 (D.D.C. 2010) (quoting *Pub. Citizen Health Research Grp. v. FDA,* 185 F.3d 898, 908 (D.C. Cir. 1999)).

### IV. WMATA's Negligence:  Summary judgment should be entered for Plaintiff as to WMATA's negligence because the undisputed facts establish that WMATA's train operator did not warn passengers before violently jerking the berthed train forward, in violation of the standard of care.

Ms. Scott's injuries were caused by an unannounced and violent acceleration, well outside the permissible bounds of safe train operation in terms of both timing and force. As Ms. Scott described, "the train launched forward. This abrupt movement threw Ms. Scott multiple feet through the air, forcing her to land violently on the ground on her left hip." (SUMF ¶ 21 (Ex. 5 at No. 11)).

It is undisputed that WMATA's train operator did not provide her passengers any warning before jerking the train forward. Both Ms. Scott and passenger-witness D.P. were

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

clear that no warning announcement was made. (SUMF ¶ 22). WMATA has conceded that

it is not aware of a single piece of evidence that would suggest otherwise:

> Q. One of the witnesses explicitly noted that the train operator never made any announcement that the train was going to be in motion again. Do you remember that or do you want me to pull it up?

> A. I remember -- I remember seeing that, yes.

> Q. Is WMATA aware of any evidence that would contradict that; in other words, is there any evidence that WMATA is aware of that the train operator announced the train would be moving before she moved it forward again?

> A. No.

(SUMF ¶ 22). Against the backdrop of that factual record, any contrary argument WMATA

might now attempt to cobble together could not suffice to avoid summary judgment. *See Scott*

*v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of

which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment.").

It is likewise undisputed that the national standard of care required that WMATA's

train operator warn her passengers before moving a berthed train. As noted above (*supra*,

Sec. II), Plaintiff has retained transportation safety expert Carl Berkowitz, Ph.D., P.E., to

educate the jurors on that issue; WMATA has not designated any liability experts. In his

report, Dr. Berkowitz explained that the incident was caused by, among others things, the fact

that WMATA's train operator "[f]ailed to make an announcement warning passengers before

the sudden, unexpected and violent movement of the train and subsequently informing

passengers when it was safe to stand up from their seats and exit the train." (SUMF ¶ 25).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

He further opined that those failures amounted to violations of the applicable national standard of care:

> Based on the information presented in this draft safety report and with a reasonable degree of engineering certainty, it is my professional engineering opinion that the WMATA and the train operator failed to comply with the national standards of care when berthing the train at McPherson Square Station at the time of the incident. Failure to properly and safely berth the train at the station directly caused Ms. Scott to fall and break her hip. The train operator suddenly, unexpectedly and violently accelerated the train forward without providing passengers any advance warning. In fact, moments before the sudden jerk of the train, there was a PA announcement indicating the station name and that the doors were opening to the left. This announcement led passengers to believe that it was safe to get up from their seats and exit the train.

(SUMF ¶ 26).

In sum, there is no dispute regarding the duty WMATA owed to its passengers (including specifically Ms. Scott), nor is there any dispute regarding the fact that WMATA breached that duty. In other words, there is no genuine dispute as to any fact material to the issue of whether WMATA was negligent, and those undisputed facts entitle Ms. Scott to judgment as a matter of law. Plaintiff respectfully requests that the Court grant her motion for summary judgment with respect to the issue of WMATA's negligence.

## V. Assumption of Risk: WMATA's Motion should be denied; summary judgment should be entered for Plaintiff as to WMATA's affirmative defense of assumption of risk.

With respect to assumption of risk, this Court has explained as follows:

> [T]he elements of the assumption of risk defense are the same: (1) the plaintiff must have knowledge of the danger; and (2) the plaintiff must voluntarily expose herself to that known danger.

*Bell v. Elite Builders*, 949 F. Supp. 2d 143, 148 (D.D.C. 2013), *aff'd on other grounds*, 634 F. App'x 802 (D.C. Cir. 2015).  The *Bell* Court also explained that "[t]o establish the first element, the court must find that the plaintiff had a 'full comprehension and appreciation of the danger'; a showing that the plaintiff was simply aware of the risk is insufficient."  *Id*. at 148 (quoting *Morrison v. MacNamara*, 407 A.2d 555, 566 (D.C. 1979)).  It has long been fundamental to an assumption of risk defense that the defendant prove that the plaintiff "**subjectively** [knew] of the existence of the risk and appreciate[d] its unreasonable character."  *Sinai v. Polinger Co.*, 498 A.2d 520, 524 (D.C. 1985) (emphasis added); *see also Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985) (assumption of risk "operates only when the party actually knows the full scope and magnitude of the danger and thereafter voluntarily exposes himself to it") (internal quotation omitted).

Here, WMATA asks the Court to declare that Ms. Scott subjectively knew of and chose to expose herself to a danger that **WMATA has conceded should not be one that is naturally attendant to travel by subway train**.  Indeed, what WMATA asks of this Court is even more extraordinary than that—its boilerplate motion is not even limited to Ms. Scott.  To grant summary judgment in WMATA's favor, the Court would need to find that **all Metro passengers** are as a matter of law charged with having knowingly exposed themselves to a danger not naturally attendant to travel by subway train.

As discussed below, WMATA has admitted that (as a result of prior mass-casualty events and safety lapses), its Standard Operating Procedures in effect at the time of this incident required train operators to pull into a station, stop the train at the correct point along the platform, wait for five seconds, and only **then** manually open the doors.  WMATA has admitted that during those five seconds, it is perfectly ordinary—indeed, entirely expected—

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

that passengers will stand up and prepare to disembark. WMATA has admitted that, consequently, its Standard Operating Procedures required that if a train operator needed to reposition a train at that time, then he or she was ineluctably obligated to first warn passengers. The undisputed facts establish that in violation of both the standard of care and WMATA's Standard Operating Procedures, the train operator in question instead caused an unannounced and violent acceleration, well outside the permissible bounds of safe train operation in terms of both timing and force.

In its Motion, WMATA does not identify any facts from which reasonable jurors could find that Ms. Scott (or, really, all Metro passengers) assumed the risk of the danger in question. Accordingly, not only should Defendant's Motion for Summary Judgment be denied; Plaintiff's Counter-Motion for Summary Judgment should be granted as it pertains to WMATA's assumption of risk affirmative defense.

### A. The cases upon which WMATA relies are inapposite because they all concern above-ground transportation rather than subway trains.

In support of its argument, WMATA cites nine cases.[3] Not a single one of them involves a train, let alone a subway train. In order of appearance, and with vehicle type in bold, those cases: *D.C. Transit Sys., Inc. v. Perry*, 337 A.2d 224 (D.C. 1975) (plaintiff injured when **bus** started after she had boarded but before she had found seat); *Sullivan v. Yellow Cab Co.*, 212 A.2d 616 (D.C. 1965) (plaintiff injured while entering **taxicab**); *Wiggins v. Cap. Transit Co.*, 122 A.2d 117 (D.C. 1956) (plaintiff injured when **bus** started after she had boarded but before she had found seat); *Endicott v. Philadelphia Rapid Transit Co.*, 318 Pa.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[3]    Excluding those cited only in Sectio B, in which Defendant summarizes the legal standard for summary judgment.

12, 177 A. 17, 18 (1935) (plaintiff injured when **streetcar** started after she had boarded but before she had found seat); *Fells v. WMATA*, 357 A.2d 395 (D.C. 1976) (plaintiff injured while attempting to change seat while **bus** was in motion); *Connor v. Washington Ry. & Elec. Co.*, 43 App. D.C. 329, 333 (D.C. Cir. 1915) (injured boarding **streetcar**); *Scott v. Cunningham*, 161 Va. 367, 367, 171 S.E. 104 (1933) (bus) (injured "due to a sudden stop of the **bus** in an intersection, caused by [a] motorist making a right-hand turn"); *WMATA v. Djan*, 187 Md. App. 487, 979 A.2d 194 (2009) (plaintiff injured when **bus** started after she had boarded but before she had found seat); *Mass Transit Admin. v. Miller*, 271 Md. 256, 315 A.2d 772 (1974) (plaintiff injured while boarding **bus**).

It might also be noted that WMATA's presentation of those cases to the Court raises questions. WMATA represents that *Connor* held that "'it is a matter of common knowledge … [that a common carrier has no] duty to see that passengers are seated before [moving the bus].'" (Def.'s Mot. at 4). But it requires quite a bit of imagination to create that quotation from the *Connor* Court's actual words:

> **It is a matter of common knowledge that the conductor gives the signal to the motorman to start the car by ringing a bell.** It is not the practice, nor is it his duty, to give each passenger personal notice that he is about to start the car. Nor is it his duty to see that passengers are seated before giving the signal to start.

*Connor*, 43 App. D.C. at 333 (emphasis added).

In addition, reading *Connor* in full, it becomes apparent that to whatever extent a 1915 streetcar case can shed light on a subway train case more than a century later, the case supports Ms. Scott's position, not WMATA's. The *Connor* Court explained as follows:

> It was not negligence to start the car suddenly. **All starts are made suddenly after the starting bell has been sounded.** It is well understood by passengers accustomed to ride on

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

> electric cars that they start with a more or less sudden movement, and passengers may be said to assume that risk. Had the car been started with an unusually violent jerk or jolt the plaintiff could, under leave of the court, have amended her declaration and so alleged. She failed to avail herself of the right.

*Connor*, 43 App. D.C. at 333-34. Just as in 1915 it was apparently a "matter of common knowledge" that a bell was rung before a streetcar started up, in 2019, it was a "matter of common knowledge" (as well as duty of care and Standard Operating Procedure) that a Metro train would stop at a station, then wait five seconds, and only **then** open the train's doors, (SUMF ¶ 17), and that the berthed train would not be moved without first alerting passengers over the intercom system, (SUMF ¶ 18). Additionally, in contrast to the *Connor* streetcar, the Metro train in this case **did** move "with an unusually violent jerk or jolt." (SUMF ¶ 21). The outcome in *Connor* would have been different (1) had the bell not sounded a warning to the plaintiff **or** (2) had the streetcar started with an unusually violent jerk or jolt. In this case, **both** parallel facts occurred: the customary and required warning was not given, and the train was moved with an unusually violent jerk or jolt.

But, stepping back from *Connor* to consider the bigger picture, why is it that WMATA has been unable to marshal even one subway train case to support its Motion?

### B. Sudden movements that may be naturally attendant to travel by bus are NOT naturally attendant to travel by subway train.

In its argument, WMATA glosses over critical distinctions between buses and trains—distinctions that explain why courts have not extended to trains the law applicable to buses. Under District of Columbia law:

> WMATA is not liable for the normal jerks or jars that occur during city **bus** rides. Because jerks occur often in the normal

> operation of a **bus**, evidence of a jerk that resulted in injury is
> not usually enough for a jury to infer negligence.  If it were,
> WMATA could be held liable for many common accidents that
> are no fault of the driver.  Instead, a plaintiff may recover against
> the **bus** company only by showing that the jerk or sudden start
> was of such unusual and extraordinary force that it could not
> reasonably be said to have happened in the ordinary operation of
> the vehicle.

*Robinson v. WMATA*, 774 F.3d 33, 42 (D.C. Cir. 2014) (emphasis added) (internal citations

omitted).  But subway trains are not buses (or streetcars, or taxicabs).

On a bus, sudden and unexpected "jerks or jars," starts, stops, swerves, or moves in

any direction may well be considered to be foreseeable.  Bus operators must stop (and

therefore restart) at not only every bus stop along their routes, but also every stop sign and

red light.  In addition, they must contend with and react to the movements (expected and

unexpected) of all other drivers,[4] cyclists, pedestrians, and others they encounter on their

routes.  It might reasonably be said that they do not control even a majority of the variables

surrounding each of their own starts and stops—there are times when sudden starts, stops,

swerves, and other maneuvers are simply unavoidable.  The law has developed in recognition

of this reality.

But again: subway trains are not buses (or streetcars, or taxicabs).

In contrast to the many starts, stops, jerks, jolts, or jars, swerves, and other motions

that might be considered naturally attendant to bus travel, there are only two starts and stops

naturally attendant to subway travel: the first when the train pulls out of a station, and the

second when the train berths at the next station.  There are no other drivers, cyclists,

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[4]    *See, e.g.*, *Scott*, 161 Va. 367, 171 S.E. 104 (injured "due to a sudden stop of the **bus** in an intersection, caused by [a] motorist making a right-hand turn").

pedestrians, and others with whom to share the road and to whose actions to react. Consequently, the starts and stops of subway travel are 100% within the control of the train operator. Passengers may reasonably assume that their trains will be competently driven. They cannot be deemed to have expected and accepted the risk of violent jolts at any moment—least of all a moment when it is a matter of common knowledge that the train will not be moved without first providing a warning.

> **C.** **Summary judgment should be entered for Plaintiff because no reasonable jury could find that Ms. Scott knowingly assumed the risk that the train operator would violently jolt the train forward in direct violation of the standard of care, WMATA's own Standard Operating Procedures, and the common knowledge and expectations of regular riders of the Metro.**

At the time of her injury, Ms. Scott was not acting was doing exactly what WMATA expects its passengers to be doing. WMATA's Standard Operating Procedures mandated that in order to pull into a station and unload passengers, train operators were required to stop the train at the correct point, then wait five seconds, and only **then** open the train's doors. (SUMF ¶ 17). During those five seconds, regular passengers (such as Ms. Scott) would have had every reason to believe that the doors were about to open, and no reason to believe the train was about to suddenly and violently lurch back into motion.

WMATA knows as much. The explicit purpose of the required "Attention customers, this train will move forward; please hold on" announcement is the obvious one—it is intended to allow the customers to grab ahold of something before the train moves, so they do not get knocked down and hurt. (SUMF ¶ 18). Both the train operator in question and WMATA's Rule 30(b)(6) corporate designee conceded as much at their depositions:

**Q. If you're going to move the train forward again after it's stopped, do you announce that to the passengers?**

**A. Yes.**

Q. Why is that?

MR. CHANDONNET: Objection. You can answer.

A. Why do we make an announcement?

BY MR. REGAN:

Q. Correct.

A. Just so that people are on the platform and on the train are aware.

**Q. Okay. I don't want to put words into your mouth. But is one reason that people need to know the train is going to move forward again so that they can be prepared and not fall?**

MR. CHANDONNET: Objection. You can answer.

**A. Correct.**

(SUMF ¶ 18 (Ex. 7, Johnson Dep., at. 11:14-12:18 (emphasis added)));

Q. If you stop short, are you allowed to move the train forward again?

A. You're allowed to reposition the train until you're properly berthed.

Q. That's with that warning, you must give the verbal warning that's set forth in SOP 50-point-something that we looked at earlier; right?

MR. CHANDONNET: Objection.

BY MR. REGAN:

Q. Alerting the passengers that you're going to move the train so they don't get hurt; right?

MR. CHANDONNET: Objection.

A. Yeah, according to 50.5, yes.

BY MR. REGAN:

**Q. And that is the purpose, by the way; right? I think you said the purpose was so they can hold on. The worry is they're going to get hurt if they're not warned about what's happening; right?**

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

MR. CHANDONNET: Objection.

**A. They could, if they're not paying attention, they could get hurt. Most times, people feel the train stop so they automatically get up thinking the doors are going to open.**

(SUMF ¶ 18 (Ex. 2 at 47:3-16, 66:1-67:4 (emphasis added))).

The final sentence of WMATA's corporate designee's testimony bears repeating: "Most times, people feel the train stop so they automatically get up thinking the doors are going to open." WMATA **knows** that when its trains stop at a platform, its passengers "automatically get up" and prepare to disembark; WMATA **knows** those passengers are "thinking the doors are going to open." In that situation, the danger of putting the train back in motion—even smoothly, to say nothing of the violent jerk that all witnesses agree occurred in this case—is blindingly obvious. It is for that very reason that WMATA's Standard Operating Procedures prohibit its train operators from repositioning the train without first warning the passengers.

The final three words of the required warning—"please hold on"—are instructive, as well. WMATA knows full well that once a train has stopped in a station, its passengers (1) expect that the doors are about to open for them to disembark and (2) do **not** expect that the train will jolt forward without warning; accordingly, they in all likelihood will not be holding onto grab bars in fear of an imminent movement. It is for that reason that the warning required before repositioning the train specifically advises passengers to hold onto something.

In sum, subway train operators are 100% in control of the motions of their vehicles in a way that bus drivers can only dream of. Subway passengers are entitled to rely on train operators to do their job competently—passengers need not be constantly on guard for sudden starts, stops, jerks, jolts, or jars the way they might be on a bus. At the moment WMATA's

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

train operator jolted the train forward and threw her to the ground, Ms. Scott was doing exactly what WMATA expects its passengers to be doing.  WMATA knows that, in Ms. Scott's position, "Most times, people feel the train stop so they automatically get up thinking the doors are going to open." (SUMF ¶ 18).  And WMATA further knows that passengers in that position, not anticipating sudden, unannounced train movements, are not likely to be braced for impact—it is for that reason that before moving berthed trains, WMATA requires its train operators to explicitly warn customers, including explicit advice to "please hold on." (SUMF ¶ 18).

In sum, the undisputed facts demonstrate no basis from which a reasonable jury could find that Ms. Scott knowingly exposed herself to the danger in question—a danger that **WMATA has conceded should not be one that is naturally attendant to travel by subway train** and that only exists when WMATA's train operators negligently violate WMATA's own Standard Operating Procedures.  Ms. Scott respectfully requests that the Court enter judgment in her favor with respect to WMATA's assumption of risk affirmative defense.

## VI.  Contributory Negligence:  Summary judgment should be entered for Plaintiff as to WMATA's affirmative defense of contributory negligence (if still asserted).

As noted above (*supra*, Sec. I), minutes before the July 26, 2023, post-discovery status conference, counsel for WMATA notified Plaintiff's counsel that WMATA intended to move for summary judgment on the grounds that Ms. Scott was contributorily negligent for not holding onto something at the time the train lurched forward.  On the basis of WMATA's Motion, this argument appears to have been abandoned; however, out of an abundance of caution, Plaintiff addresses it nonetheless.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

**A.  The Court should grant Plaintiff summary judgment because across the 13 months discovery was open, WMATA never identified any basis for a contributory negligence defense, despite Plaintiff's direct contention interrogatory.**

Discovery opened on June 3, 2022.  (*See* Sched. Order (ECF No. 10)).  On June 21, 2022, Plaintiff served on WMATA her First Set of Interrogatories.  (SUMF ¶ 29).  On October 14, 2022,[5] WMATA provided answers; in relevant part, they included the following:

> 6.  If you contend that Plaintiff was contributorily negligent, please state all facts upon which you intend to rely in order to support this contention, and identify all witnesses that have knowledge of these facts.
>
> ANSWER: Objection.  Calls for a legal conclusion.  Calls for mental impressions of counsel and trial strategy. Furthermore, discovery is ongoing and WMATA is still in the process of gathering facts.  WMATA intends to rely on any and all information revealed and/or exchanged through discovery in its defense.

(SUMF ¶ 30).  The depositions of the WMATA train operator and Ms. Scott were both taken on November 9, 2022.  (SUMF ¶ 31).  Discovery ultimately closed on July 14, 2023. (10/26/2022 Minute Order).  At the parties' July 26, 2023, status hearing, WMATA revealed that it intended to move for summary judgment, on the grounds that Ms. Scott was allegedly contributorily negligent for not having been holding onto something at the time of her injury.

At no point between October 14, 2022, and the July 14, 2023, close of discovery did WMATA ever amend or supplement its Answer to Plaintiff's Interrogatory No. 6.  (Indeed, as of the date of this filing, it still never has.)  Instead, Plaintiff's counsel only learned of the purported factual basis for WMATA's defense at the same time the Court did—when defense counsel was obligated to answer the Court's questions at the July 26, 2023, status conference.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[5]  Several months overdue, and only after repeated inquiries from undersigned counsel.

**Contention interrogatories are proper and do not encroach on attorney mental impressions or trial strategy.**  Contention interrogatories are an accepted and valuable discovery tool.  They are explicitly endorsed by Rule 33, which provides in relevant part that "[a]n interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact."  FED. R. CIV. P. 33(a)(2); *see also United States ex rel. Landis v. Tailwind Sports Corp.*, 317 F.R.D. 592, 594 (D.D.C. 2016) (Cooper, J.) (noting with approval the use of contention interrogatories and citing cases).

WMATA's objection that Interrogatory No. 6 "[c]alls for mental impressions of counsel and trial strategy" withers under even cursory scrutiny.  As this Court has explained, "well-established caselaw in this District makes clear that contention interrogatory answers 'only giv[e] the factual specifics which the party contends supports a claim, and this in no way impinges on the attorney's impressions or analysis as to how the attorney will endeavor to apply the law to the facts.'"  *Inova Health Care Servs. for Inova Fairfax Hosp. & Its Dep't, Life with Cancer v. Omni Shoreham Corp.*, No. CV 20-784 (JDB), 2021 WL 6503725, at *4 (D.D.C. Jan. 29, 2021) (quoting *Barnes v. Dist. of Columbia*, 270 F.R.D. 21, 24 (D.D.C. 2010) (quoting *King v. E.F. Hutton & Co.*, 117 F.R.D. 2, 5 n.3 (D.D.C. 1987)); *Saint-Jean v. Dist. of Columbia*, 2014 WL 12792681, *5 (D.D.C. Sept. 8, 2014); *In re R. Freight Fuel Surcharge Antitrust Litig.*, 281 F.R.D. 1, 4 (D.D.C. 2011).

Courts have noted that litigants who refuse to respond in good faith to contention interrogatories effectively "hide the ball" from their opponents.  *See, e.g., Oelrich Constr., LLC v. PRC Precast, LLC*, No. 1:20CV169-RH-GRJ, 2020 WL 12309028, at *1 (N.D. Fla. Sept. 3, 2020) ("And in any event, the defendant should expect to respond fully and on time to contention interrogatories or other discovery requests intended to learn the precise basis for

the alleged defenses. Any attempt to hide the ball will not end well."); *Anderson v. State Farm Mut. Auto. Ins. Co.*, No. 4:08CV345-RH/WCS, 2008 WL 11343598, at *1 (N.D. Fla. Dec. 22, 2008) ("State Farm should expect to respond fully and without delay to contention interrogatories or other discovery designed to learn precisely what State Farm alleges. Hiding the ball will not be tolerated."); *Auto Owners Ins. Co. v. Triple P. Const., Inc.*, No. 4:08CV154-RH/WCS, 2008 WL 4571878, at *1 (N.D. Fla. Oct. 10, 2008) ("The builder should expect to serve prompt and comprehensive answers to contention interrogatories or similar discovery requests; it will not be permitted to hide the ball.")

**When appropriate, a court may permit a party to delay its response to a contention interrogatory; however, Rule 26(e)(1)(A) still applies—all the more so in the absence of such an order.** Due to the nature of the information sought by contention interrogatories, the second half of Rule 33(a)(2) recognizes that a court may permit a party to provide a delayed response:

> An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.

FED. R. CIV. P. 33(a)(2) (emphasis added). Accordingly, Plaintiff's counsel understood from WMATA's answer that it was staking out precisely this position (that it needed more time to respond to the contention interrogatory) and would provide a supplemental, substantive answer **if** and when it proved appropriate:

> 6. If you contend that Plaintiff was contributorily negligent, please state all facts upon which you intend to rely in order to support this contention, and identify all witnesses that have knowledge of these facts.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

21

> ANSWER: Objection. Calls for a legal conclusion. Calls for mental impressions of counsel and trial strategy. <u>Furthermore, discovery is ongoing and WMATA is still in the process of gathering facts. WMATA intends to rely on any and all information revealed and/or exchanged through discovery in its defense.</u>

(SUMF ¶ 30 (emphasis added)). Of course, pursuant to Rule 26, supplementation must be done "in a timely manner." FED R. CIV P. 26(e)(1)(A). The portion of WMATA's answer underlined above suggested that WMATA understood its obligation to do so.

**A nonexistent supplement cannot be a timely supplement.** Here, there is no gray area concerning whether a supplement was "timely" or not—there has been no supplement at all. But it bears noting, at last, that based on the representations made to the Court at the July 26, 2023, status conference, it is inconceivable that WMATA learned of the facts upon which it wishes to rely for its defense any later than Ms. Scott's deposition on November 9, 2022.

In sum, if WMATA wished to pursue a contributory negligence affirmative defense, it was obligated to squarely respond to Plaintiff's Interrogatory No. 6 "in a timely manner" after Ms. Scott's November 9, 2022, deposition. Reasonable minds might disagree over whether supplementation in November, December, or even January would have been "timely." A supplement at any of those times would have permitted the parties to engage in additional discovery on the matter. But reasonable minds will agree that a nonexistent supplement is not a timely supplement.

By choosing never to respond to Plaintiff's Interrogatory No. 6, WMATA has waived the ability to pursue a contributory negligence affirmative defense. On that basis, Plaintiff respectfully requests that the Court grant summary judgment in her favor on the issue of WMATA's desired contributory negligence affirmative defense.

**B.  In the alternative, the Court should grant Plaintiff summary judgment because the lone fact upon which WMATA now attempts to rely—that she was not holding onto something when the train operator suddenly and without warning jerked the train forward—does not amount to contributory negligence.**

At the July 26 status conference, WMATA explained in response to the Court's questioning that the sole fact upon which it intends to rely in support of its desired contributory negligence affirmative defense is that Ms. Scott was not holding onto something at the time the train jerked forward.  WMATA's argument fails as a matter of law for reasons similar to those relevant to assumption of risk (*supra*, Sec. V): (1) it misapprehends the law by ignoring critical differences between buses and subway trains and (2) at the time of her injury, Ms. Scott was not acting unreasonably; she was doing exactly what WMATA expects its passengers to be doing.

As discussed above, (*supra*, Sec. V), WMATA has admitted that (as a result of prior mass-casualty events and safety lapses), its Standard Operating Procedures in effect at the time of this incident required train operators to pull into a station, stop the train at the correct point along the platform, wait for five seconds, and only **then** manually open the doors. (SUMF ¶ 17).  WMATA has admitted that during those five seconds, it is perfectly ordinary—indeed, entirely expected—that passengers will stand up and prepare to disembark.  (SUMF ¶ 18).  WMATA has admitted that, consequently, its Standard Operating Procedures required that if a train operator needed to reposition a train at that time, then he or she was obligated to first warn passengers.  (SUMF ¶ 18).

The explicit purpose of the required "Attention customers, this train will move forward; please hold on" announcement is the obvious one—it is intended to allow the

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

customers to grab ahold of something before the train moves, so they do not get knocked down and hurt.  (SUMF ¶ 18).  Both the train operator in question and WMATA's Rule 30(b)(6) corporate designee conceded as much at their depositions:

> **Q. If you're going to move the train forward again after it's stopped, do you announce that to the passengers?**
>
> **A. Yes.**
>
> Q. Why is that?
>
> MR. CHANDONNET: Objection. You can answer.
>
> A. Why do we make an announcement?
>
> BY MR. REGAN:
>
> Q. Correct.
>
> A. Just so that people are on the platform and on the train are aware.
>
> **Q. Okay. I don't want to put words into your mouth. But is one reason that people need to know the train is going to move forward again so that they can be prepared and not fall?**
>
> MR. CHANDONNET: Objection. You can answer.
>
> **A. Correct.**

(SUMF ¶ 18 (Ex. 7, Johnson Dep., at. 11:14-12:18 (emphasis added)));

> Q. If you stop short, are you allowed to move the train forward again?
>
> A. You're allowed to reposition the train until you're properly berthed.
>
> Q. That's with that warning, you must give the verbal warning that's set forth in SOP 50-point-something that we looked at earlier; right?
>
> MR. CHANDONNET: Objection.
>
> BY MR. REGAN:
>
> Q. Alerting the passengers that you're going to move the train so they don't get hurt; right?
>
> MR. CHANDONNET: Objection.
>
> A. Yeah, according to 50.5, yes.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

24

BY MR. REGAN:

**Q. And that is the purpose, by the way; right? I think you said the purpose was so they can hold on. The worry is they're going to get hurt if they're not warned about what's happening; right?**

MR. CHANDONNET: Objection.

**A. They could, if they're not paying attention, they could get hurt. Most times, people feel the train stop so they automatically get up thinking the doors are going to open.**

(SUMF ¶ 18 (Ex. 2 at 47:3-16, 66:1-67:4 (emphasis added))).

In sum, subway passengers are entitled to rely on train operators to do their job competently—reasonable passengers need not be constantly on guard for sudden starts, stops, jerks, jolts, or jars the way they might be on a bus. At the moment WMATA's train operator jolted the train forward and threw her to the ground, Ms. Scott was not acting unreasonably; she was doing exactly what WMATA expects ordinary passengers to be doing. WMATA knows that, in Ms. Scott's position, "Most times, people feel the train stop so they automatically get up thinking the doors are going to open." (SUMF ¶ 18). And WMATA further knows that passengers in that position, not anticipating sudden, unannounced train movements, are not likely to be braced for impact—it is for that reason that before moving berthed trains, WMATA requires its train operators to explicitly warn customers, including explicit advice to "please hold on." (SUMF ¶ 18).

Under the circumstances, no reasonable jury could find Ms. Scott to have been contributorily negligent. Ms. Scott respectfully requests that the Court enter judgment in her favor with respect to WMATA's contributory negligence affirmative defense.

## VII.  Conclusion

For the reasons set forth above, Ms. Scott respectfully requests that the Court DENY Defendant's Motion for Summary Judgment and (2) GRANT Plaintiff's Cross-Motion for Summary Judgment as to Defendant's Negligence and Affirmative Defense(s).

Respectfully submitted,

REGAN ZAMBRI LONG PLLC

By:    /s/ *Christopher J. Regan*
      Patrick M. Regan          #336107
      pregan@reganfirm.com
      Christopher J. Regan      #1018148
      cregan@reganfirm.com
      1919 M Street, N.W., Suite 350
      Washington, D.C. 20036
      PH:  (202) 463-3030
      FX:  (202) 463-0667
      *Counsel for Plaintiff*