UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAROL WILD SCOTT** | : |
| **Plaintiff,** | : |
| v. | : Case No. 22-cv-00601 (CRC) |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,** | : |
| | : |
| **Defendant.** | |

## I. Plaintiffs' Responses to Defendant's Statement of Undisputed Material Facts

1. On September 23, 2019, Plaintiff boarded a WMATA orange line train at the Vienna metrorail station. *See Exhibit A*, Pl's Depo at 17-18.

   **Response:**   Undisputed.

2. Plaintiff's intended destination was McPherson Square. *Id.* at 17.

   **Response:**   Undisputed.

3. Plaintiff was travelling alone. *Id.* at 19.

   **Response:**   Undisputed.

4. Upon boarding, Plaintiff found a seat and remained seated, for the duration of her trip, until she arrived at her destination. *Id.* at 23.

   **Response:**   Undisputed.

5. When Plaintiff boarded the train, she selected a forward-facing seat, on the right side of the train, adjacent to the inward-facing priority seats. *Id.* at 24-25.

   **Response:**   Undisputed.

6. She was initially in a window seat, but switched to an aisle seat when the train approached McPherson Square. *Id.*

   **Response:**   **Undisputed, except to the extent that the word "switched" might be interpreted as more of a move than it was. Ms. Scott testified as follows:**

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

"I was in a window until I knew that McPherson Square was next. And then I slid over [one] to the aisle." (Ex. 11, Scott Dep., at 25:1-3).

7. Plaintiff was carrying a purse and a cane. *Id.* at 25.

**Response:** **Undisputed.**

8. Plaintiff carried the purse on her left shoulder and the cane with her right hand. *Id.* at 25-26.

**Response:** **Undisputed that Ms. Scott carried her purse on her left shoulder; disputed to the extent that it at least oversimplifies—if not misstates—the record by suggesting that she "carried" the cane:**

> Q. Were you holding on to the cane or were you using it to ambulate?
>
> **A. I was holding onto it certainly. And had I not been tossed around, it would have -- I would have used it to ambulate.**

**(Ex. 11 at 34:14-18).**

9. When the train arrived at the station, the train stopped. *Id.* at 27.

**Response:** **Undisputed.**

10. There were no customers between Plaintiff and the exit door. *Id.* at 28.

**Response:** **Undisputed.**

11. Plaintiff stood up before the doors opened. *Id.* at 30.

**Response:** **Undisputed.**

12. At some point, before the doors opened the train moved forward. *Id.* at 31.

**Response:** **Undisputed.**

13. Prior to the train moving forward, Plaintiff was not holding on to the seat back, anything overhead or the center pole. *Id.* at 30-31.

**Response:** **Undisputed that Ms. Scott was not holding anything at the time the train jerked forward; disputed to the extent that it suggests she should—or even could—have been. In full, the cited portion of her testimony reads as follows:**

> Q. Prior to the train moving, were you holding on to anything?

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

- 2 -

> A. No. There was nothing to hold on to.
>
> Q. You weren't holding on to your seat back or anything overhead?
>
> A. No.

**(Ex. 11 at 30:21-31:4 (emphasis added)).**

14. Plaintiff was not using her cane to ambulate when she stood up and was only half using the cane to maintain her balance. *Id.* at 34-35.

**<u>Response</u>:** Disputed to the extent that it at least oversimplifies—if not misstates—the record. In full, she testified as follows:

> Q. Let me ask you some questions about how you fell. When the train moved, can you tell me what happened to your body physically?
>
> A. It flew through the air.
>
> Q. Were you balancing on your cane prior to falling -- or balancing with your cane? I apologize.
>
> A. When I stood up, I brought my cane with me.
>
> Q. But you weren't using it?
>
> A. When I first stood up, I would have had my cane in my right hand.
>
> Q. Were you holding on to the cane or were you using it to ambulate?
>
> **A. I was holding onto it certainly. And had I not been tossed around, it would have -- I would have used it to ambulate.**
>
> But the reason I had the cane with me was because I knew that the sidewalk where I was going may not be real level and because I do not trust DC at night. And my cane is also a weapon.
>
> Q. I a hundred percent appreciate that.
>
> I was just trying to understand from a logistical standpoint where the cane was in vis-a-vis you when you had stood up.
>
> A. In my right hand.
>
> Q. You were holding on to the top of it?
>
> A. Yes.
>
> Q. You used it to help you stand up?
>
> A. That's the cane.

- 4 -

> Q. That actually kind of looks like a shillelagh. We have one at my house that my grandmother had brought back from Ireland.
>
> A. It's a copperhead.
>
> Q. I --
>
> A. (indiscernible) sassafras.
>
> Q. It's beautiful. So you had used it to stand up. And then were you using it to maintain your balance as you were standing up?
>
> A. Half and half.

**(Ex. 11 at 34:2-35:19 (emphasis added)).**

15.   When the train moved forward, Plaintiff fell to the ground. *Id.* at 25-26.

**Response:**   Undisputed in terms of the sequence of events; disputed on the grounds that the words "moved" and "fell" understate the record.  When the train suddenly jerked forward, without any warning whatsoever, Ms. Scott was thrown to the ground.  (Ex. 11 at 28:20-21, 32:3-13, 34:2-5 (stating that her body "flew through the air"), 35:22 ("I fell.  I was thrown backward.")

## II. Plaintiff's Statement of Undisputed Material Facts in Support of Her Motion for Summary Judgment[1]

Pursuant to Rule 56, Plaintiff submits the following statement of material facts as to which Plaintiff contends there is no genuine issue:

16. At approximately 6:30 PM on September 23, 2019, Plaintiff, Carol Scott, was a passenger on Orange Line subway train pulling into the McPherson Square station. (Ex. 1, WMATA Incident/Accident Report; *see also* Compl.).

17. As of September 2019, WMATA's Standard Operating Procedures required that train operators berth their trains at station platforms, then wait 5 seconds before opening the doors.

> Q. Okay. So then would it be fair to say -- circling back, would it be fair to say for the train operator controlling the train on which Ms. Scott was hurt, as she pulled into the station, she was supposed to bring the train to a stop then wait five seconds and look out the window and then open the doors to the train; is that the policy and procedure that she was expected to follow at that point?
> A. Yes.

(Ex. 2, WMATA Dep. (Henry) at 30:6-15).

18. As of September 2019, WMATA's Standard Operating Procedures mandated that if a train operator had to reposition her train after it has stopped at a station platform, she was required to first warn all passengers of the impending movement via intercom announcement: "Attention customers, this train will move forward; please hold on." (Ex. 2 at 47:3-16; Ex. 3, WMATA SOP 50.5.1.1):

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[1] For ease of reference, and in light of the fact that the facts relied upon by WMATA are largely undisputed, Plaintiff continues WMATA's numbering for undisputed facts.



(Screenshot from WMATA SOP 50.5 (red box added)).

19. The explicit purpose of the required "Attention customers, this train will move forward; please hold on" announcement is to allow the customers to grab ahold of something before the train moves, so they don't get hurt.

> Q. After you've come to a complete stop at the platform, are you ever allowed to move the train forward again?
>
> A. Yes.
>
> Q. Under what circumstances? When are you allowed to do that?
>
> A. If your train is not properly berthed at the eight car marker.
>
> Q. If you're going to move the train forward again after it's stopped, do you announce that to the passengers?

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

  A. Yes.

  Q. Why is that?

  MR. CHANDONNET: Objection. You can answer.

  A. Why do we make an announcement?

  BY MR. REGAN:

  Q. Correct.

  A. Just so that people are on the platform and on the train are aware.

  Q. Okay. I don't want to put words into your mouth. But is one reason that people need to know the train is going to move forward again so that they can be prepared and not fall?

  MR. CHANDONNET: Objection. You can answer.

  A. Correct.

(Ex. 7, Johnson Dep., at. 11:14-12:18).

  Q. If you stop short, are you allowed to move the train forward again?

  A. You're allowed to reposition the train until you're properly berthed.

  Q. That's with that warning, you must give the verbal warning that's set forth in SOP 50-point-something that we looked at earlier; right?

  MR. CHANDONNET: Objection.

  BY MR. REGAN:

  Q. Alerting the passengers that you're going to move the train so they don't get hurt; right?

  MR. CHANDONNET: Objection.

  A. Yeah, according to 50.5, yes.

  BY MR. REGAN:

  Q. And that is the purpose, by the way; right? I think you said the purpose was so they can hold on. The worry is they're going to get hurt if they're not warned about what's happening; right?

  MR. CHANDONNET: Objection.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

    A. They could, if they're not paying attention, they could get hurt. Most times, people feel the train stop so they automatically get up thinking the doors are going to open.

(Ex. 2 at 47:3-16, 66:1-67:4).

  20.  On September 23, 2019, after the train came to a stop at the station platform, Ms. Scott stood up to exit the train.  (Ex. 5, Pl.'s Answers to Def.'s Interrogs., at No. 11).

  21.  After Ms. Scott had stood up, the train operator suddenly "jerked," "launched," or "lurched" the train forward, as confirmed not only by Ms. Scott, but by every single one of the three eyewitnesses identified in WMATA's Incident/Accident Report.

    (Ex. 5 at No. 11 ("As Ms. Scott was reaching for the center pole for support while she waited for the doors to open, suddenly, and without any warning whatsoever, the train launched forward. This abrupt movement threw Ms. Scott multiple feet through the air, forcing her to land violently on the ground on her left hip.")).

    WMATA Incident/Accident Report Witness A.E. stated:

    "Woman stood up because the train stopped at McPherson Sq. The train then jerked forward and the woman fell into the [aisle]. I stayed with her until paramedics arrived."



    (Ex. 1 at 5 (and transcribed at page 4)).

    WMATA Incident/Accident Report Witness S.S. stated:

    "Train jerked at station I heard loud thump then a scream. People trying to move her after that. I called emergency in on box in car 3144 asking for emergency assistance then screamed for no one to move her till medics arrive. Then put jacket under Ms. Carol's head and tried to calm her down till medic arrive."



(Ex. 1 at 5 (and transcribed at page 4) (all spellings, punctuation, and syntax in original)).

WMATA Incident/Accident Report Witness D.P. stated:

"Saw the lady in question stand up when the train stopped at McPherson Sq. Unexpectedly, the train lurched forward and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again."

(Ex. 1 at 7 (and transcribed[2] at page 3)).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[2] Actually mis-transcribed, errantly substituting "lost power" for "lurched forward." No party contends that the train ever lost power during the course of the incident.

22. Before jerking the train forward, WMATA's train operator did <u>not</u> warn the train passengers that she was going to move the train forward, let alone do so violently.

(Ex. 5 at No. 11 ("As Ms. Scott was reaching for the center pole for support while she waited for the doors to open, suddenly, and without any warning whatsoever, the train launched forward.")).

WMATA Incident/Accident Report Witness D.P. stated:

"Saw the lady in question stand up when the train stopped at McPherson Sq. Unexpectedly, the train lurched forward and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. <u>I did not hear the train conductor the train was moving again</u>."

(Ex. 1 at 7 (and transcribed[3] at page 3) (emphasis added)).

WMATA's Rule 30(b)(6) corporate designee confirmed that WMATA is not aware of any evidence to the contrary:

Q. One of the witnesses explicitly noted that the train operator never made any announcement that the train was going to be in motion again. Do you remember that or do you want me to pull it up?

A. I remember -- I remember seeing that, yes.

Q. Is WMATA aware of any evidence that would contradict that; in other words, is there any evidence that WMATA is aware

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[3] Actually mis-transcribed, errantly substituting "lost power" for "lurched forward." No party contends that the train ever lost power during the course of the incident.

- 10 -

of that the train operator announced the train would be moving before she moved it forward again?

    A.  No.

(Ex. 6, WMATA Dep. (Bennett), at 31:17-32:7).

23.     WMATA's train operator has testified under oath that she has no recollection[4] of what happened that day:

    Q.  Do you remember that incident as we sit here today?

    A.  From my memory, no. I do have the statement though.

    Q. Okay. Which statement are you referring to?

    A. The statement from the incident that I completed, my incident report [the statement she provided as part of Ex. 1, WMATA's Incident/Accident Report].

(Ex. 7 at 23:9-16).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[4]   Despite the fact that she remembered clearly two "station overrun" incidents that had happened in the months leading up to September 23, 2019.

24. The statement that WMATA's train operator provided in the WMATA Incident/Accident Report does not address how the incident occurred.

> **DESCRIBE THE INCIDENT:** Include what you did to correct the problem and who you notified and when. Describe any property damage and the extent of any injuries.
>
> Upon servicing the platform at McPherson Sq a customer punched me up to inform me a elderly customer had fallen + could not get up. I notified ROCC of the incident in which Unit 33 who was at McPherson Sq heard responded + proceeded to check on the customer. Shortly after was instructed to off load the tran train. Medical arrived to attend to customer after about 30-40mins the customer was removed. I was then instructed to continue on + lay the train up + in New Carrolton yard.
>
> Employee Completing Report
> Employee Name: (print) Domenic Johnson
> Employee Signature: (sign) [signature]
> Employee #: 624639
> Date: 9/23/19
> Division: West Falls Church
> Run #: 530/2
> Block: 919
> Assigned Days: Th/F

(Ex. 1 at 1).

25. Transportation safety engineering expert Carl Berkowitz, Ph.D., P.E., has explained that the incident was caused by, among others things, the following failures by WMATA and its train operator:

> This incident was the direct result of the following failures by the train operator and WMATA:
>
> • Failed to stop the train properly and safely at McPherson Square Metro Station.
>
> • Failed to make an announcement warning passengers before the sudden, unexpected and violent movement of the train and subsequently informing passengers when it was safe to stand-up from their seats and exit the train.

- Failed to warn passengers of the risk of the sudden, unexpected and violent movements of the train. WMATA was aware of this hazard but failed to fix the issue or warn passengers. It was common practice for train operators to stop short of the station and then abruptly accelerate forward to the station.

(SUMF 5 (Ex. 4, Berkowitz Report, at 15, 22).

26. Transportation safety engineering expert Carl Berkowitz, Ph.D., P.E., has explained that as of September 2019, the WMATA train operator's decision to "suddenly, unexpectedly and violently accelerated the train forward without providing passengers any advance warning" violated the national standard of care, as well:

> Based on the information presented in this draft safety report and with a reasonable degree of engineering certainty, it is my professional engineering opinion that the WMATA and the train operator failed to comply with the national standards of care when berthing the train at McPherson Square Station at the time of the incident. Failure to properly and safely berth the train at the station directly caused Ms. Scott to fall and break her hip. The train operator suddenly, unexpectedly and violently accelerated the train forward without providing passengers any advance warning. In fact, moments before the sudden jerk of the train, there was a PA announcement indicating the station name and that the doors were opening to the left. This announcement led passengers to believe that it was safe to get up from their seats and exit the train.

(Ex. 4, Berkowitz Report, at 22).

27. WMATA has not designated any liability expert. (*See* Def. WMATA's Expert Witness Disclosure (ECF No. 19)).

28. Discovery opened on June 3, 2022. (*See* Sched. Order (ECF No. 10)).

29. On June 21, 2022, Plaintiff served on WMATA her First Set of Interrogatories. (Ex. 8, Pl.'s 1st Interrogs' to Def. (COS Only)).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

- 13 -

30. On October 14, 2022,[5] WMATA provided answers; in relevant part, they included the following:

> 6. If you contend that Plaintiff was contributorily negligent, please state all facts upon which you intend to rely in order to support this contention, and identify all witnesses that have knowledge of these facts.
>
> ANSWER: Objection. Calls for a legal conclusion. Calls for mental impressions of counsel and trial strategy. Furthermore, discovery is ongoing and WMATA is still in the process of gathering facts. WMATA intends to rely on any and all information revealed and/or exchanged through discovery in its defense.

(Ex. 9, Def.'s Answers to Pl.'s 1st Interrogs' to Def., at No. 6).

31. WMATA deposed Ms. Scott on November 9, 2022. (Ex. 10, Transcript Cover Page).

32. Discovery ultimately closed on July 14, 2023. (10/26/2022 Minute Order).

                                                          Respectfully submitted,

                                                          REGAN ZAMBRI LONG PLLC

By: **/s/ *Christopher J. Regan***
Patrick M. Regan     #336107
pregan@reganfirm.com
Christopher J. Regan     #1018148
cregan@reganfirm.com
1919 M Street, N.W., Suite 350
Washington, D.C. 20036
PH: (202) 463-3030
FX: (202) 463-0667
*Counsel for Plaintiff*

---

[5] Several months overdue, and only after repeated inquiries from undersigned counsel.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030