Exhibit 4

Carl Berkowitz, Ph.D., PE

# Draft Safety Report
# Scott v. WMATA



**Figure**: McPherson Square Station WMATA Orange Line

**Prepared by:**
**Carl Berkowitz, Ph.D., PE**
**March 16, 2023**

Carl Berkowitz, Ph.D., PE

# **Table of Contents**

1.    Incident Overview.................................................................................................3

2.    Incident Timeline ................................................................................................4

3.    Personal Information and Qualifications ..............................................................5

4.    Specific Findings ................................................................................................5

    A.    Falling .........................................................................................................5

    B.    Walking and Falling.....................................................................................6

    C.    Jerk Rate ...................................................................................................10

    D.    Failures......................................................................................................15

    E.    National Standards of Care .......................................................................15

5.    Conclusion ........................................................................................................22

6.    Appendices........................................................................................................23

    A.    Depositions ...............................................................................................23

    B.    General Information ...................................................................................41

    C.    Redacted document....................................................................................42

    D.    Train Inspection ........................................................................................43

Carl Berkowitz, Ph.D., PE

## 1. Incident Overview[1]

On September 23, 2019 at approximately 6:37 pm, Ms. Carol Scott,[2] an elderly woman using a cane for physical support, fell on the floor of a WMATA rail car after the train suddenly, unexpectedly and violently jerked forward.  Upon falling onto the floor of the railcar, Ms. Scott struck her head, injured her leg and hip on her left side.  Ms. Scott was a passenger on the WMATA Metro Orange Line, train # 919, car #3144. Ms. Scott boarded at the Vienna Metro Station with the intended destination of McPherson Square Metro Station; and she sat in the first-row window seat on the right-side of the train car, in one of the middle-to-front cars (approximately 10 feet from the left-front door that she would be exiting.) After riding through eleven Metro stops, the train arrived at the McPherson Square Metro Station, came to a complete stop and then played the announcement: "McPherson Square, doors opening on the left." After the announcement Ms. Scott stood up from her seat and then walked towards the nearest door to exit the train. Just as she started to reach for the center pole in the railcar for support the train suddenly, unexpectedly and violently jerked forward. This forward motion of the train threw Ms. Scott multiple feet, causing her to land on her left hip on the railcar floor.

## Cause of the sudden acceleration

It is not clear from the incident reports what caused the train to suddenly accelerate forward at McPherson Square Station at the time of the incident.  However, based on the Deposition of Simone Henry (Supervisor, Road Transportation Training, WMATA) the sudden acceleration was likely caused by the train operator repositioning the train when it stopped short of the required berthing position at the station.  According to the Deposition of Simone Henry, train operators typically stop short of the station to avoid the punitive consequences of overrunning the station.  Stopping short then requires the train operator to accelerate forward to reach the station.  Furthermore, WMATA standard operating procedure No. 40, if the train is not properly berthed, the following announcement must be made over the PA: "Your attention please, this train will move forward." There is no evidence that this announcement was made at the time of the incident. The train operator was not disciplined for this violation of WMATA standard operating procedures.

---

[1] WMATA/RTRA Incident/Accident Report,
[2] Born December 14, 1940

Carl Berkowitz, Ph.D., PE

**Incident Details**

- Weather was clear
- Witness Mr. Phillip Don stated that he saw Ms. Scott "standup wait train stopped at McPherson Square, unexpectantly the train lost power and [Ms. Scott] fell on the aisle floor." The train started moving again after the incident.
- Witness Mr. Al Emond stated: "Women stood up because the train stopped at McPherson Square, the train jerked forward and the woman fell into the aisle.
- WMATA Maintenance and Material Management System Incident Details: Customer fell aboard train. Single tracking between McPherson Square and Federal track #2.
- Metro Transit Police Department Event Report: While on board an Orange Line in the direction of New Carrolton (car # 3144).   As the train serviced McPherson Square Ms. Scott stood up from her seat.  As the train stopped it abruptly moved forward at which time she fell on the ground.
- Inspection of the train after the incident concluded the train had "no defect, normal services performed."
- Train operator does not have recollection of the incident, and states: "I don't really remember what happened that day."

## 2.  Incident Timeline
**Figure: Timeline of events**

| Step | Description | Time |
|------|-------------|------|
| 1 | Ms. Scott boards one of the middle-to-front cars at the Vienna Metro Station and sits in the first-row window seat on the right side of the train. | |
| 2 | The train arrives at McPherson Square Metro Station and comes to a complete stop. | |
| 3 | PA announces: "McPherson Square, doors opening on the left." | |
| 4 | Ms. Scott stands up from her seat and walks towards the door to exit, | Approximately 2 to 3 seconds |
| 5 | Ms. Scott then reaches toward the center pole for additional support. | |
| 6 | The train suddenly, unexpectedly and violently lurches forward. | Unexpected event approximately less than 1 second |
| 7 | Ms. Scott is thrown in the air. | |
| 8 | Ms. Scott lands on her hip on the railcar floor | |
| 9 | The train comes to a final stop | |

Carl Berkowitz, Ph.D., PE

### 3. Personal Information and Qualifications

As fully laid out in my attached Curriculum Vitae, an accurate copy of which is attached and fully incorporated herein, I have extensive experience working in the transportation industry, including the government, private and academic sectors. I have comprehensive multi-modal experience in transportation planning, design, engineering, safety, security, construction, maintenance, operations, and management. In addition to my work experience, I have conducted research, consulted, and given presentations on transportation safety, including specifically rail passenger safety. I have worked as a transportation engineer for over fifty-five years, including four years as the highest ranking civil-service engineer in the New York City Transportation Department. I have multiple degrees, including a Ph.D. in Transportation Planning and Engineering from the Polytechnic Institute of New York (NYU-Tandon), have held numerous teaching positions, have published academic and news articles, transportation safety commentator for television, radio and newspapers; and I am a member of various industry and professional organizations, including the American Public Transportation Association (APTA) Department of Homeland Security Surface Transportation Security Advisory Committee (STSAC), American Railway Engineering and Maintenance-of-Way Association (AREMA) and the International Association of Public Transport (UITP).

I am familiar with the professional standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety and design. I have been requested to review this case, and based upon my knowledge, education, training, experience, familiarity with professional standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety and design, give my opinions with respect to whether WMATA complied with the national standards of care, good and accepted practices, procedures and principles of engineering, mass transit and subway systems safety, design and operation.

### 4. Specific Findings

The findings and opinions in this report are based on information provided in discovery, depositions and technical references listed here and in the Appendices.

### A. Falling

Falling against any part of a railcar interior is one of the leading causes of passenger related personal injuries.  This type of injury occurs when the passenger is thrown off balance the result of some kind of unintended or unexpected change in the trains' operating environment.  An example of this type of event is the premature acceleration (exceeding the safe jerk rate) and/or sudden braking (exceeding the safe jerk rate) of the train.

Carl Berkowitz, Ph.D., PE

The Washington Metropolitan Area Transportation Authority (WMATA) offers transportation services knowing that their passengers will be exposed to certain foreseeable risks. In general terms, they must manage and control any potential fall hazards.

A loss of balance will occur whenever the body's movement shifts and is too far off its center of balance.  A railcar occupant injury can be prevented if there is an understanding of how a loss of balance happens and the railroad acts diligently to prevent it from occurring.  It is important to note that poor training of the operational personnel will produce a hazard point for the train passenger.  Training of the Metro operating personnel is one of the most important levels of preventing a fall injury type of injury caused by the sudden, unexpected and violent change in acceleration.  At the time of this incident, the Metro was required to comply with the currently accepted national industry standards and practices.  The national standard of care embraces known preventive measures to eliminate the danger that could be expected under the circumstances, namely the train making a sudden, violent and unexpected movement.

Of interest in the analysis of this case, was an assessment of unexpected change in movement that did not offer Mrs. Scott an obvious cue to attract her attention that the train was going to suddenly, unexpectedly and violently move forward from a stop position.

## B.  Walking and Falling

**Falling**
Fall incidents occur when a person's center of gravity is suddenly and forcefully thrown out of balance.

Fall incidents can result in serious injuries.  This type of incident results in broken bones, bruises and sometimes death caused by the impact of the body against an unyielding surface and the sudden shock to the musculoskeletal system.  The average person is unaware and unappreciative of the enormous forces that are unleashed when a fall occurs.

Walking
Walking is a form of controlled falling with the body teetering on the brink of catastrophe as each leg swings through to save the ever-falling body mass.  A fall occurs when there is a sudden change between the weight-bearing legs and the walking area.

The Figure below outlines the key concerns for fall hazard prevention.

Carl Berkowitz, Ph.D., PE

**Figure: Preventing Fall Accidents**

| Item | Action | Description |
|---|---|---|
| 1 | Determine Root Causes | It involves the search for those factors that cause fall incidents (to seek from among the available data the nature of the causes that leads to these undesired consequences). |
| 2 | Identify Causation | Determine factors present where incidents occur. |
| 3 | Undertake Incident Investigation | • Collect hard facts to consider which elements, if removed, would prevent an incident.<br>• Ensure a thorough analysis and take the necessary steps to create a clearer picture of previous incidents (incident prevention measures could be derived from these investigations). |
| 4 | Conduct Safety Inspection Practices | • Ensure frequent inspections during active use conditions.<br>• Ensure that inspections are not interrupted until completed.<br>• Ensure that the inspector is sufficiently trained in knowing what to look for. |
| 5 | Review Operation | Had the system been operated effectively incident factors might have been identified and corrected before they take on significance. |
| 6 | Develop Written Procedures | • Ensure that adequate procedures are in place as inadequate procedures are a common cause of incidents.<br>• Remember that similar situations produce recurrent incident patterns.<br>• Remain sensitive to safety operations and maintain capabilities to respond to changes in the systems' safety. |
| 7 | Incidents | Be concerned with recurring incidents and trying to articulate incidents and assess the likelihood that a new strategy is necessary to decrease the risk of slip and fall incidents. |
| 8 | Review Safety Program | • Ensure that the safety process is well understood and does not require coordinated action.<br>• Safety issues should be corrected the first time because there are not a lot of opportunities to improvise when things go wrong. |

Inman, Ralston and Todd in their book Human Walking (1989) define walking as "a rhythmic displacement of bodily parts that maintain the animal in constant forward

Carl Berkowitz, Ph.D., PE

progression over a level surface." And "in the act of walking, there are two basic requisites: 1) continuing ground reaction forces that support the body and 2) periodic movement of each foot from one position of support to the next in the direction of progression."

<u>Information and Safety</u>
To accommodate safety information needs, it is important to provide the types of knowledge that can be rapidly assimilated using more than one sense.  Information provided to a person needs to be redundant and in multiple formats increasing the likelihood that the passenger will be able to make an informed decision which includes, but should not be limited to, audible means alone.

<u>Human Factors Walking</u>
Walking is virtually an automatic series of body movements linking together a continuous series of steps.  There is little, if any, conscious thought to the process.  The brain processes information so quickly that most people can easily accommodate changes in surface continuity in the way if they see or anticipate it.  What are of concern are the unseen and the unanticipated change that causes a loss of balance.

When a person begins walking, the brain adjusts the gait and stride to accommodate anticipated walking conditions.  Sensory feedback from the feet, eyes, and so on defines the conditions.  During the first few steps, the brain, after processing the feedback, measures any anticipated surface changes.  The brain then sets the stride and gait to accommodate the anticipated conditions. When anticipated conditions change significantly, the potential for a fall greatly increases.

<u>Human Factors Falling</u>
The human gait cycle is divided into two regions representing the period when the foot is in contact with a surface (stance phase) and the period when the foot is not in contact with a surface (swing phase), as it moves forward for the next cycle of events.  Falls occurring during walking typically occur when a person's gait cycle is disrupted.  The direction of the fall either forward or backward is in part dependent on where in the gait cycle the disruption occurs.  The stance phase begins when the foot initially meets a surface.  It is at this point, that the potential for a fall due to the interface is the greatest.  During a fall event, the forward motion of the foot results in a shift of the body's center of gravity relative to its base of support, leading to a loss of dynamic equilibrium and a fall.

This type of fall leads to the likelihood of contacting the ground with the back and side of the body.  Additionally, during a fall event, arm movements are elicited through the

Carl Berkowitz, Ph.D., PE

body's neuromuscular system to both assist in balance recovery, as well as to protect the body during the fall.

The swing phase of the normal gait cycle begins at toe-off, which is defined as the point at which the stance foot is lifted off the surface. The swing phase continues as the foot swings forward, preparing for the subsequent foot contact. During mid-swing, while the leg is perpendicular to a surface, the foot drops down close to the surface. As the foot continues to swing forward, it elevates again during late swing, in preparation for the subsequent foot contact.

<u>Human Factor Perception-Reaction Time</u>
A person walking needs time to react to the presence or sudden occurrence of a hazard. The time she needed to respond to prevent a fall can be divided into four steps: 1. Time it takes to recognize this situation; 2. Understand this situation; 3. Decide what action to take; and 4. Take the necessary action. This time sequence is referred to as the perception-reaction time and involves detection, identification, decision and reaction.

- Detection of information is the visual awareness that the person is going to be aware of the hazard;
- Identification is the gathering of enough information to make an appropriate decision as to what is happening, is there a danger and whether the situation calls for an immediate response;
- Decision involves making a choice as to the appropriate action to take for the current emergency; and
- Reaction occurs when the brain orders the appropriate muscle groups to implement the response action that has been decided upon to prevent a fall.

This perception-reaction process does not guarantee that the correct decision will follow detection. Delay in one of the four steps will result in a possible fall. Because the person must interpret information, recognize a situation, anticipate system performance and make important decisions to walk, any condition that degrades these tasks will serve as an antecedent to injury by increasing reaction time.

MIT research on perception-reaction time has shown that this time can be as little as 1.6 seconds for unexpected events (this number is based on laboratory studies).[3] It would be expected that an older person would require even more perception-reaction time. American Association of State Highway and Transportation Officials recommends 2.5 seconds perception-reaction time for older persons.

---

[3] Massachusetts Institute of Technology, July 2005 (DOT/FRA/ORD-04/12), p28.

Carl Berkowitz, Ph.D., PE

## C. Jerk Rate
### Sudden Movement due to Acceleration or Deceleration (Jerk or Jolt)

Trains are meant to move people as quickly, safely, and comfortably as possible from stop to stop. The train moves within the operating constraints imposed by safety and comfort considerations, as well as by the physical limitations of the train itself. The train parameters considered are the distances traveled, the speed, the acceleration or deceleration, suspension system, track configuration and the allowable jerk rate.

Jerk rate is the rate of change of sustained acceleration or deceleration, and this cannot increase or decrease at greater than this rate. The rapid, sudden, and uneven acceleration, deceleration of the train and railcar side-sway can cause passenger momentum to go in one direction and then to be thrown back in the opposite direction, causing the passenger to loss balance. The maximum jerk rate parameter prevents the toppling of the standing passenger.

When the train is put into sudden acceleration or deceleration, this initial movement results in a sudden jerk of the railcars. Within the train industry, there are standards to determine whether such train motion is safe or unsafe. The American Society of Civil Engineers studied the entire issue of jerk rate to determine what a safe or an unsafe degree of change in vehicle movement. In 1998, after several years of research and discussion, this Society released the first industry standard for jerk rate. Although these standards were developed specifically for automated people movers, the principles are applicable to all types of rail vehicles. These standards are well-known and were in use at the time of this incident.

### Newton's First Law

Everybody persists in its state of being at rest or of moving uniformly straight forward, except insofar as it is compelled to change its state by force impressed.

Newton's first law states that if the net force (the vector sum of all forces acting on an object) is zero, then the velocity of the object is constant. Velocity is a vector quantity which expresses both the object's speed and the direction of its motion; therefore, the statement that the object's velocity is constant is a statement that both its speed and the direction of its motion are constant.

Therefore, an object that is at rest will stay at rest unless a force acts upon it. An object that is in motion will not change its velocity unless a force acts upon it. This is known as uniform motion. An object continues to do whatever it happens to be doing unless a force is exerted upon it. If it is at rest, it continues in a state of rest (demonstrated

Carl Berkowitz, Ph.D., PE

when a tablecloth is skillfully whipped from under dishes on a tabletop and the dishes remain in their initial state of rest). If an object is moving, it continues to move without turning or changing its speed. This is evident in space probes that continuously move in outer space. Changes in motion must be imposed against the tendency of an object to retain its state of motion. In the absence of net forces, a moving object tends to move along a straight-line path indefinitely.

According to Newton's first law of motion an object will remain at rest or in uniform motion in a straight line unless acted upon by an external force. In summary, a body in motion remains in motion. For example, if a train is traveling at 10 mph and there is a sudden movement (acceleration, deceleration), at that instant in time, that person is traveling also at 10 mph will continue to move at that speed.

### Background, Jerk Rate as a cause of passenger accidents[4]

Higher levels of longitudinal acceleration/deceleration can compromise passenger comfort, and ultimately safety too if they are sufficient to cause passengers to lose their balance.

This has been highlighted as a significant cause of injury for passengers with research suggesting that accelerations/decelerations that are commonly encountered in public transportation in practice appear to be impossible to endure without support. Although bus accelerations are typically higher than trains, passengers in a railway vehicle are more likely to be standing unsupported, or moving around within the vehicle. In Great Britain, the Rail Safety and Standards Board estimate that around 15 % of on-board harm in the railway network in the last 10 years (measured by fatalities and weighted injuries) can be attributed to 'injuries attributable to sudden movements of the train due to lurching or braking.

### *Passenger Balance and Stability*

Where the jerk rate is very high, passengers will not have sufficient time to react, and their behavior can be approximated by a static rigid body. This will topple when the line of action of the resultant force (due to external accelerations acting on it) lies outside of the base of support. This force that acts through the body's center of gravity

The minimum time for muscles to react against external forces is typically 0.12–0.13 seconds and for the body to make larger movements to retain balance takes around 1 second.

---

[4] Passenger Stability Within Moving Railway Vehicles: Limits on Maximum Longitudinal Acceleration (J. P. Powell, R. Palacín)- 2015

Carl Berkowitz, Ph.D., PE

For a lower jerk rate levels, the maximum tolerable acceleration/deceleration is greater as the muscles have more time to actuate and resist the force. Where the jerk rate is very low, the strength of the individual will be the only important human factor, as the acceleration/deceleration is changing slowly enough for the body to fully react and change posture as required.

Within a given population, there will be significant variation in the ability of individual passengers to balance under the influence of a given level of acceleration/deceleration and jerk rate, in accordance with their physiology. This variation means that it is difficult to set universal acceleration/ jerk limits for passenger safety. It also means that, depending on their individual reactions to maintain balance, different passengers will have different perceptions of how uncomfortable a particular level of acceleration/jerk is.

Jerk Rate Analysis
The standard that establishes the allowed level and jerk in trains was published by ANSI/ASCE in 2008[5] and are shown in the Figure below.

**Figure: Maximum Acceleration and jerk (ANSI/ASCE standard)** [6]

| Direction | Acceleration [g] | |
|---|---|---|
| | **Standing** | **Seating** |
| Lateral | ±0.1 | ±0.25 |
| Vertical | ±0.05 | ±0.25 |
| Longitudinal Normal | ±0.16 | ±0.35 |
| Longitudinal Normal | ±0.32 | ±0.60 |
| | **Jerk [g/s]** | |
| Lateral | ±0.06 | ±0.25 |
| Vertical | ±0.04 | ±0.25 |
| Longitudinal | ±0.10 | ±0.25 |

[5] ANSI/ASCE Standard 21.2-08, Automatic People Mover Standards – Part 2, Vehicle Propulsion and Braking, 2008.
[6] ibid

Carl Berkowitz, Ph.D., PE

The figure below provides experimental results of tests in which human subjects were exposed to accelerations in different directions.[7] The results, given in [g's] are the mean value of the acceleration for which the subjects-maintained balance.

**Figure: Experimental results for the maximum mean acceleration exposure [g] where human still retains balance**

| Direction | | |
|---|---|---|
| **Forward** | **Sideway** | **Backward** |
| 0.0489 | 0.0336 | 0.0774 |
| 0.0550 | 0.0458 | 0.0621 |
| 0.0616 | 0.0509 | 0.0708 |

The Association of Train Operating Companies (ATOC)[8], one of the requirements for the braking system is that "Brake blending shall give a barely discernible change between dynamic and friction braking in order to give a comfortable ride. A maximum jerk rate of 0.5m/s3 (0.05 [g/s]) is recommended, but a facility should be provided to adjust this to suit operational needs."

In [Martin and Litwiler][9] the risk of fall was modeled and verified by the experimental results provided in [Jongkees and Groen][10]. It was estimated that for acceleration of 0.203[g] and jerk of [0.387[g/s] there is no risk of falling. At acceleration of 0.406[g] and jerk of 0.254[g/s] the risk is 38% and for acceleration of 0.815[g] and jerk of 0.234[g/s] the risk is 77%.

Supporting evidence to the problem of balance retention under acceleration and jerk exposure are given in studies of injury caused by non-collision accidents of public transportation means. In [Halpern, et al.][11] the authors observed 120 injuries over six months. From these, 14.2% of cases were admitted to the hospital. The majority of injuries occurred during acceleration/deceleration pulses (51.2% of all cases). In

[7] Jongkees I. B. W and Groen J. J., "The Stability of Human Body",Nederlands Tiidschrift voor Geneeskunde, 1947, 86, pp. 1401-1407;  Graaf B. De. "Acceleration and Balance: An Investigation into the Limits of Acceleration which the Human Body withstand without losing Equilibrium", 1993, Amsterdam Safety Institute; Bernd De Graaf, "The Retention of Balance: An Exploratory Study into the Limits of Acceleration the Human Body Can Withstand without Losing Equilibrium", Human Factors, 1997, 39(1), 111-118.
[8] ATOC Key Train Requirements, issue 4, www.atoc.org.
[9] Delton Martin, Dale Litwiler, "An investigation of acceleration and jerk profiles of public transportation-vehicles", American Society for Engineering Education, AC 2008-1330.
[10] Jongkees I. B. W and Groen J. J., "The Stability of Human Body",Nederlands Tiidschrift voor Geneeskunde, 1947, 86, pp. 1401-1407
[11] P. Halpern, M. I. Siebzehner, D. Aladgem, P. Sorkine, R. Bechar, "Non-collision injuries in public buses: a national survey of a neglected problem", Downloaded from http://emj.bmj.com/ on June 8, 2017 - Published by group.bmj.com

Carl Berkowitz, Ph.D., PE

particular, 56% occurred in standing passengers, 25% in passengers walking from one place to another, and 19.2% in those sitting. The most common site of injury was the limbs (33.3%), followed closely by head (29%) and spine (22%). Similar results were reported in [Albertson, et al.][12] where out of 284 injured occupants 154 were not related to collision. Two types were identified: alighting/boarding while the vehicle was stationary (37%) and balance loss while the vehicle was moving (17%). Of these, 28% occurred during harsh braking and 27% in acceleration from standstill. In [Kirk, et al.][13] it was reported that more than half (54%) of the surveyed were injured because the vehicle was braking or accelerating and most of the remaining 46% were injured due to balanced loss while moving.

A survey by Loughborough University[14] pointed out what might cause passengers to lose their balance: 1) Due to timetable constraints the vehicle can often start to accelerate away before passengers, especially the less mobile, have the time to reach a seat or find a place to stand safely and hold on; 2) Passengers can also feel under pressure to stand up before the vehicle has halted at a stop as they fear that they will not be able to get off in time, or the driver may not stop at all.  In all cases, passengers are exposed to acceleration, and jerk.

Additional information can be found in [Powell and Palaci][15] and many others. The large number of reports and paper indicate that non-collision train injuries partially due to the exposure of standing passengers to acceleration and jerk is not a minor problem.

[12] Albertsson, P., Björnstig, U., Björnstig, J., Bylund, P.-O., Falkmer, T., Petzäll, J., "Injury events among bus and coach occupants—non crash injuries as important as crash injuries", IATSS Res. 2005 29 (1).

[13] Kirk, A., Grant, R., Bird, R., 2001. Bus and Coach Passenger Casualties in Non-Collision Incidents. Ed. V.S.R.C.I. Ergonomics, Loughborough University.

[29] Alan Kirk, Rachel Grant, Richard Bird, "Passenger Causalities in Non-Collision Incidents on Buses and Coaches in Great Britain", Loughborough University, United Kingdom, Paper No. 296.

[30] J. P. Powell, R. Palacı´n, "Passenger Stability Within Moving Railway Vehicles: Limits on Maximum Longitudinal Acceleration", Urban Rail Transit (2015) 1(2):95–103;  Thommen Karimpanal George, Harit Maganlal Gadhia, Ruben S/O Sukumar, John-John Cabibihan, "Sensing discomfort of standing passengers in public rail transportation systems using a smart phone", 2013 10th IEEE International Conference on Control and Automation (ICCA, Hangzhou, China, June 12-14, 2013;  Alejandro Palacioa, Giuseppe Tamburroa, Desmond O'Neillb and Ciaran K Simmsa*, "Non-collision Injuries in Urban Buses– Strategies For Prevention, Accident Analysis and Prevention 41 (2009) 1–9;  Ulf BJÖRNSTIG, et al, " Injury Events Among Bus and Coach Occupants - Non-crash Injuries as Important as Crash Injuries"  IATSS RESEARCH Vol.29 No.1, 2005;  Thomas Robert, Philippe Beillas, Alain Maupas and Jean-Pierre Verriest, "Conditions of possible head impacts for standing passengers in public transportation: an experimental study", International Journal of Crashworthiness, TCRS 2007 Vol. 12 No. 3 pp. 319–327;  Verriest, J.P., M. Hétier, M. C. Chevalier, T. Robert and P. Beillas, "Kinematics of a Standing Passenger Subjected to an Emergency Braking Deceleration Pulse," 6thWorld Congress of Biomechanics, Singapore, Volume 31, Part 1, pp. 87-90, August 1-6, 20102.

Carl Berkowitz, Ph.D., PE

## D. Failures

This incident was the direct result of the following failures by the train operator and WMATA:

- Failed to stop the train properly and safely at McPherson Square Metro Station.
- Failed to make an announcement warning passengers before the sudden, unexpected and violent movement of the train and subsequently informing passengers when it was safe to stand-up from their seats and exit the train.
- Failed to warn passengers of the risk of the sudden, unexpected and violent movements of the train.  WMATA was aware of this hazard but failed to fix the issue or warn passengers. It was common practice for train operators to stop short of the station and then abruptly accelerate forward to the station.[16]
- Failed to measure the jerk rate produced by the sudden, unexpected and violent accelerations to determine if the jerk rate was safe for passengers.
- Failed to design support devices to ensure passengers were protected in the case of sudden, unexpected and violent movements of the train.
- Failed to provide evidence as to whether the sudden, unexpected and violent movement of the train was due to mechanical issues or train operator error.
- Failed to check the safety of his passengers after the train sudden, unexpected and violent moved.
- Failed to properly train the train operating personnel in the standard operating procedures for safely and properly starting and stopping the train.

## E. National Standards of Care

- Common Carrier Law
- United States Occupational Safety and Health Act (OSHA)
- WMATA Standard Operating Procedures
- Hazard Management
- Training

**Standard 1:** Common Carrier Law

<u>Compliance:</u> WMATA is considered a common carrier and is required by law to make sure passengers are safe and do not become injured.  WMATA violated their responsibilities as a common carrier by compromising the safety of their passengers on the incident train.  WMATA owes a higher degree of care to ensure that their passengers are not injured. WMATA and their employees must make sure that their passengers are always protected.

---

[16] Deposition of Simone Henry

Carl Berkowitz, Ph.D., PE

Background:

Train transportation is an essential part of many peoples' lives. Passengers essentially put their lives into the hands of those transporting them to a destination; and it is their belief that they will arrive safely because safe train systems are taken for granted.

Pursuant to the United States Code,[17] a common carrier is liable for damages during transit. Liability arises not only because a person was injured but was injured due to the carrier's negligence. Common carriers are held to a higher standard of care for their passengers than a typical driver. The special duties of the passenger carrier are said to arise from the fact that passengers have entrusted their safety to the custody and safekeeping of the carrier. Under the law, transportation companies such as WMATA are referred to as "common carriers."

Public policy recognizes that people should be able to trust WMATA and the employees they hire to transport them in a safe manner. To further this concept, common carriers are strictly regulated to make sure that they are compliant with safety regulations and financial responsibility laws. Common carriers must obey strict safety procedures. When a passenger sustains an injury while using rail transportation, the transportation provider (WMATA) may be held legally responsible for the passenger's injuries.

WMATA and their employees must use the utmost care and diligence for passengers' safety and must provide everything necessary for that purpose and must exercise to that end a reasonable degree of skill. As part of this heightened standard of care, common carriers owe many duties to their passengers, including:

- Safely transport passengers to their final destinations;
- Provide a safe place for passengers to enter and exit their railcars;
- Take reasonable steps to protect passengers from harm, including harm by other passengers;
- Provide safe passenger railcars and maintain the safety of those vehicles; and
- Hire qualified employees and properly train those employees.

The duties' common carriers owe to their passengers begins before the passenger steps foot onto the train. So long as the common carrier has accepted a person as a passenger and the passenger has placed himself or herself in the carrier's care, then the carrier has a duty to take every reasonable step to ensure the safety of the passenger.

---

[17] 47 U.S.C. I – Common Carrier Regulation
(http://uscode.house.gov/view.xhtml?path=/prelim@title47/chapter5/subchapter2/part1&edition=prelim)

Carl Berkowitz, Ph.D., PE

When a common carrier fails to uphold its duties to its passengers and are hurt as a result, the carrier is clearly responsible for these injuries. Most carrier accidents relate to operator negligence, operations and control negligence, poor training, or employee failure to properly discharge their duties.

**Standard 2: United States Occupational Safety and Health Act (OSHA)**
<u>Compliance:</u> According to the General Duty Clause of OSHA the employer, WMATA, has the responsibility to identify and correct any hazards that may harm employees **or others**. WMATA failed to comply with this requirement.

The OSHA general duty clause responsibilities apply not only to employees but also to others present at the workplace.  In this case the workplace is the train and the others are the passengers. It is the duty and responsibility of WMATA to protect all passengers from injury on their passenger vehicles.

<u>Background:</u>
According to the General Duty Clause of the United States Occupational Safety and Health Act, the Employer has the following requirements:

Each employer shall furnish to each of his employees' employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.

It is incumbent upon the employer to actively examine the workplace and workplace practices to determine possible hazards and/or practices that can cause harm to their employees or others. That is, the responsibility is upon the employer to initiate the search for and correction of all hazards that are found in the workplace in order to provide for the safety of all personnel. These regulations are to be followed by the employer to ensure the safety of their employees and all individuals who enter that workplace.

**Standard 3**: WMATA Standard Operating Procedures
<u>Compliance:</u> WMATA failed to comply with their SOP #40 and SOP #50, specifically:
- Train Operators are responsible for the safe movement of trains
- If not properly berthed, announce over PA, "Your attention please, this train will move forward"
- Train Operators are responsible for making the appropriate P.A. announcements in conjunction with the standard operational procedures that require communications with customers.  For example, when entering next station and repositioning train,

Carl Berkowitz, Ph.D., PE

announce over PA: "Attention customers, the train will move forward, please hold on."

<u>Background:</u>

**SOP #40: Door Operations / Station Servicing Procedures**

40.1 Purpose

The purpose of this Standard Operating Procedure is to establish procedures for Train Operators to follow while servicing a station (i.e., berthing train, opening doors, loading train and closing doors).

40.4 Responsibilities

40.4.1 Supervisor's Responsibility:

Supervisors shall ensure that all train operators within their sector are familiar with this SOP and inspect daily to ensure operators are in place.

40.4.2 Train Operator's Responsibility:

Train Operators are responsible for the safe movement of trains and the safe loading and unloading of customers.

40.5 Procedures

40.5.1.3.3 If not properly berthed, announce over PA, "Your attention please, this train will move forward";

40.5.4 Station Overrun Procedures:

In the event that you fail to stop within the platform limits with front end of the train beyond the 8-car maker, Operators of trains shall:

40.5.4.1 Immediately advise customers that the train will be holding momentarily with doors closed.

40.5.4.2 Call ROCC and report exact locations of train and number of doors if any beyond platform limits.

40.5.1.5.2 Verify the platform side of the train by placing your head out of the cab window and first look and identify the platform. Then look at the doors on the platform side of the train to observe any activity in front of the doors, with your hands to your side for five (5) seconds, before reaching up to touch the manual door opening button and then;

**SOP# 50: Train Operator Standard Baseline Announcements**

50.1 Purpose

The purpose of this Standard Operating Procedure is to provide Train Operators, and those with train operations responsibilities, guidance on the P.A. announcements that shall be made when performing standard operational procedures requiring routine communications with customers.

18

Carl Berkowitz, Ph.D., PE

50.4 Responsibilities

50.4.1 Rail Supervisors shall ensure that all train operators within their sector are familiar with this SOP and periodically monitor operators for compliance.

50.4.2 Train Operators are responsible for making the appropriate P.A. announcements in conjunction with the standard operational procedures that require communications with customers.

50.4.3 Train Operators are also responsible for the safe movement of trains and the safe loading and unloading of customers.

50.5 Procedures

Procedure# Content

50.5.1 Train Operator Standard Baseline Announcements

52.5.2 Train Operator Standard Delay Announcements

50.5.1 Train Operator Standard Baseline Announcements:

50.5.1.1 Train Operators shall make the following announcements that correspond with the standard operational procedures performed by Operators when leaving terminals, servicing stations, and approaching terminal stations (Refer to the Standard Baseline Announcement Table see below).

### Standard Baseline Announcement Table

| Standard operational procedures requiring communications with customers | | Standard Baseline Announcements (SBAs) |
|---|---|---|
| Departing terminal | Keyed up 2 minutes before departure | This is a (color) Line train to (destination). |
| | 30 seconds before departure | Good (morning/afternoon/evening), and welcome aboard Metrorail (color) Line to (destination), by way of downtown Washington D.C. The next station is (station name). Doors are closing. |
| Entering next station | When train is berthing on platform Ref. (50.5.1.5) | This is (station name); doors will open on the left/right. |
| | Repositioning train | Attention customers, this train will move forward; please hold on. |
| Announcement on platform | While train doors are open | This is a (color) Line train to (destination). The next station is (station name). |
| Station prior to terminal | While train doors are open | This is a (color) Line train to (destination). The next station is the last station on the (color) Line. |
| | If train will lay-up | This is a (color) Line train to (destination). The next station is the last station on the (color) Line at which time this train will be out of service. |
| Arriving at terminal | When train is berthing on platform Ref. (50.5.1.5) | This is (station name); doors will open on the left/right. Please take all personal items and newspapers when exiting the train. Thank you for riding Metrorail; have a (pleasant day/good night). |

19

Carl Berkowitz, Ph.D., PE

**Standard 4: Hazard Management**

Once the hazard is identified, proper hazard and safety analysis requires the assessment to learn the probability of occurrence, and the severity of the injuries sustained by the hazard. A Risk Assessment Matrix is used for the necessary comparative analysis, a required step in perform of a proper hazard analysis. Proper methodology requires that any ameliorative or corrective action that may be used undergo this same comparative analysis.

By following this well-established standardized procedure, one can objectively evaluate and compare the frequency and severity injuries from the system "as is" (with no changes), with the frequency and severity of injuries determined to exist for each of the proposed corrective actions. Then an objective comparative analysis reveals what method results in the fewest number of catastrophic injuries. WMATA then must either act and take proper corrective action in a proper and adequate System Safety Plan ("SSP") or System Safety Program Plan ("SSPP"), which must be periodically reviewed by reviewing the SPI data for effectiveness of the plan, and possibly revised. Corrective action must be taken until the hazard is removed or reduced to an acceptable level. If a hazard is frequent or probable, and can result in a catastrophic or serious/critical injury, it must be corrected. A comparison may require exchanging a possible or even probable minor injury for a catastrophic injury that is frequent or probable.

**Hazard management process standard: Military Standard 882E**

Good and accepted transportation standards requires WMATA to perform a proper hazard analysis. The national standard of care for hazard analysis, which has also been adopted by USDOT is the Military Standard 882E. This analysis requires WMATA to classify hazards by assessing the severity (effects) of the hazard and the probability (likelihood) of hazard occurrence. The hazard resolution for each risk level is determined in a Hazard Assessment Matrix. For example, a fall from a sudden, unexpected and violent change in acceleration is of serious concern. This hazard is a high hazard which is unacceptable and requires immediate corrective actions.

*Hierarchy of Safety Solutions*

Good and accepted transportation standards requires the application of the hierarchy of control to immediately correct the hazardous conditions. The hierarchy of control is a step-by-step approach to eliminating or reducing risks and it ranks risk controls from the highest level of protection and reliability through to the lowest and least reliable protection.

Carl Berkowitz, Ph.D., PE



**Elimination**

Step one is elimination of the hazard. Elimination removes the hazard at the source,

**Engineering Controls**

If the hazard cannot be eliminated then engineering controls should be implemented to reduce or prevent hazards from coming into contact with passengers, such as sudden, unexpected and violent changes of acceleration of the train.

**Administrative Controls**

If engineering controls cannot reduce or prevent the hazards, then administrative controls should be established to reduce the duration, frequency, or intensity of exposure to the hazards.   Examples of administrative controls include operation changes to the train and timely information.

**Standard 5:** Training

<u>Compliance:</u> There is no evidence that WMATA properly trained their operational staff. Training is a critical part of the proper execution of the duties of the operating personnel, and this also applies to protecting passengers from the high risk of sudden, unexpected and violent changes of acceleration of the train/

*Standards for Training*

a)  APTA RT-S-OP-013-03, Authorized September 28, 2003, Operating Practices, 13. Standard for Training of Rail Operations and Station Operations Personnel

This Standard outlines the basic elements required for a comprehensive rail and station operations employee training and retraining program. This Standard is intended to provide the training requirements for rail and station operations

Carl Berkowitz, Ph.D., PE

employees. The rail system should also have a system to track performance to measure the effectiveness of training.

The purpose of a comprehensive training program is to ensure the consistent and complete training of all appropriate rail and station operations employees covered by this Standard. Such a program requires employees to have a base knowledge that is consistent with their particular job. The program also ensures that the rail system provides initial certification and refresher training.

b) APTA RT-S-OP-011-04, July 26, 2004, Volume 4 - Operating Practices, 11-Standards for Rule Compliance and Implementation. This standard provides minimum rule compliance requirements for rail systems to ensure their approved operating rules are implemented and followed according to the standard stated within their rules and guidelines. Operating rules are created to promote safe, efficient, timely, and customer-oriented operations.

## 5. Conclusion

Based on the information presented in this draft safety report and with a reasonable degree of engineering certainty, it is my professional engineering opinion that the WMATA and the train operator failed to comply with the national standards of care when berthing the train at McPherson Square Station at the time of the incident. Failure to properly and safely berth the train at the station directly caused Ms. Scott to fall and break her hip. The train operator suddenly, unexpectedly and violently accelerated the train forward without providing passengers any advance warning. In fact, moments before the sudden jerk of the train, there was a PA announcement indicating the station name and that the doors were opening to the left. This announcement led passengers to believe that it was safe to get up from their seats and exit the train.

Carl Berkowitz, Ph.D., PE

## 6. Appendices

## A. Depositions
- Carol Wild Scott, November 9, 2022
- Clev Bernard Ibanez Bennett, February 9, 2023
- Keisha Simone Henry, February 9, 2023
- Domenic Johnson, November 19, 2022

### Summary of Testimony Related to the Incident

| Question | Answer |
|---|---|
| **Examination of Carol Wild Scott (Plaintiff) 11/9/22** ||
| Any issues with your legs as a result of the taking the statin? | Not so far. |
| How long have you been on the statin? | Probably 10 years. |
| How long have you been on the Bupropion? | About the same. |
| But I think it would help us if we got generally an idea of how you remember the incident occurring. | I drove from Linden to Vienna and, took the orange line train to McPherson Square. All the way in at several of the stations, the train would stop and then move forward. At no time was there an advisory announcement that the train would be moving forward, but when it finally stopped, the announcement of the doors opening would come over. And when we got to McPherson Square, I sat in my seat for several – some period of time to make sure that the train was going to stay where it stopped. And the announcement was made doors – McPherson Square. Doors opening on the left. Because the announcement had been made. I still waited a bit and then got up to go to the doors. And there was a center pole in that car. And so I reached for it. And my fingers were right at it. The train jerked forward and I fell back into the aisle. When I landed, I was immediately aware that something was wrong. And the pain was far greater than anything I had ever experienced before, even with three sessions of childbirth. And I remember screaming. And I don't think I stopped screaming until I got enough to knock me out. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| So you entered the Metro rail system at Vienna? | Yes. |
| Do you remember what time approximately this incident occurred? | I think a little after 6:00. |
| So you were riding in during weekday rush hour but reverse commute, correct? | Yes. |
| Was the train crowded? | I don't think so. |
| Do you remember if there were a lot of passengers standing? | No. |
| When you were riding the train in from Vienna, were you seated or standing? | Seated. |
| Were you seated the entire time until you got to McPherson Square? | Yes. |
| As the train was moving forward, were you seated on the left side or the right side of the car? | The right. |
| Were you seated in a priority seat? And by that I mean an inward facing seat, or were you in a seat that was facing forward? | I was in a seat facing forward. |
| Were you in a window or were you in an aisle seat? | I was in a window until I knew that McPherson Square was next. And then I slid over once to the aisle. |
| So you were seated directly behind – you were in the seats directly behind the priority seats? | That is correct. |
| Were you carrying anything with you? | A purse and my cane. |
| This may seem like an odd question, but what size purse? | That one it was a regular Coach. |
| Do you wear it – were you wearing it cross body or were you carrying it? | Shoulder. |
| Which shoulder do you carry your purse on? | The left. |
| You were using your cane with your right hand? | Yes. |
| For how long had you been using a cane prior to this incident? | Probably a year. |
| We'll get into this a bit more later. But just generally, for what condition were you using the cane? | I used it for support when I had to walk long distances. Otherwise I didn't need it. |
| Was there a particular medical condition that caused you to require the cane? | Old age. |
| Did the train operator say anything as the train approached the station? | Not until it stopped. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| So it's your testimony that the train stopped before any announcement was made? | The train stopped. And then after some period, the announcement was made. |
| Can you tell me what that announcement was? | "McPherson Square, doors opening on the left." |
| What happened next? | I waited a bit longer. And then when I waited a bit longer. And then when I got up and started toward the door. |
| Do you know if the announcement regarding arriving at the station happened before or after the train stopped in those circumstances? | I think that the train stopped and then moved forward. And then the stations were announced. At no time was there an advisory this train is moving forward. |
| You indicated that the train doors had not opened before you stood up, correct? | I don't believe so, no. |
| And then at some point, you stood up, correct? | Yes. |
| And you indicated that you attempted to hold on to the center pole that was in front of you? | When I felt the train move, I grabbed for the center pole. |
| Prior to the train moving, were you holding on to anything? | No. There was nothing to hold on to. |
| And then at some point, the train moved forward, correct? | Yes. |
| Did the tram move forward in the same way it had the previous times on the trip that day? | No. |
| Can you describe how -- | Previous times the train had moved forward. And then when it came to a stop the second time, there would be the announcement of the doors opening. This one was different. |
| Just in general in your time riding Metro Train, in your experience, was it common for a train to enter a station, come to a stop, and then have to move forward again? | Occasionally. But there was always an announcement. "This train will move forward." |
| It's your testimony that on this particular – at this particular stop, that announcement was not made? | That was not made either at that stop or at any others. |
| Do you know how many people were on your car that day with you? | I only know of the three that stayed to help me. Everybody else was behind me. |
| Let me ask you some questions about how you fell. When the train moved, can you tell me what happened to your body physically? | It flew through the air. |
| Were you holding on to the cane or were you using it to ambulate? | I was holding onto it certainly. And had I not been tossed around, it would have – I would have used it to ambulate. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
| --- | --- |
| | But the reason I had the cane with me was – because I knew that the sidewalk where I was going may not be real level and because I do not trust DC at night. And my cane is also a weapon. |
| So you had used it to stand up. And then were you using it to maintain your balance as you were standing up? | Half and half. |
| And then the train moved forward and you moved backward? | I fell. I was thrown backward. |
| And did you – did you land on the seats or on the ground? | I landed on the aisle. |
| What part of your body hit the aisle floor? | My left side. |
| Did you hit your head at all? | No. |
| Did you begin feeling pain immediately? | Yes. |
| In what part of your body did you begin feeling pain? | My left leg. |
| Can you tell me where in your left leg? | Near the hip. |
| Then what happened next? | I started screaming. I was out of my head with pain. |
| Did anyone from Metro come to see if you were injured? | Not immediately. |
| Who was the next – aside from those three witnesses, who was the next person to approach you? | Someone from Metro with an orange vest and a substantial backside. |
| Were the paramedics the next people to arrive? | I think so. It was a long time. |
| Did you remain in the aisle of the train until the paramedics got there? | Yes. I couldn't move. |
| How did the paramedics get you out of the train? | With a lot of difficulty. |
| Using – did they put you on a hoard or a carrier or did they strap you to a gurney? | They didn't have a gurney. I think they used a board. |
| And you went to GW? | Yes. |
| For what generally were you treated at GW over those seven days? | My femur was fractured approximately three inches distal from the hip. |
| 'When you say were it not for Al and Don. What did Al and Don do to prevent your injuries from being worse? | They held my leg in an appropriate position. |
| How did you know which way your leg needed to be held? | I was a paramedic for 10 years. |
| Other than the fractured femur, were there any other injuries to your leg or any other parts of your body that you sustained? | Bruises. |

26

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| Prior to this incident, did any doctor advise you that you should be using a cane to assist in movement? | No. |
| **Examination of Clev Bernard Ibanez Bennett (WMATA) 2/9/23** | |
| It says, "Woman stood up because the » train stopped at McPherson Square. The train then jerked forward and the woman fell into the aisle, then jerked forward and the woman fell into the aisle. I read that correctly; right? | Yes. |
| Then we come down to the next one, Stacy Swain [ph.]. It says, "Train jerked at station. I heard loud thump then a scream. People trying to move her after that. I called emergency in intercom in [something] box in car 3144 asking for emergency assistance then screamed for no one to move her until medics arrive. Then put jacket under Ms. Carol head and tried to calm her down until medics arrived." Pretty close anyway; right? | Yes. |
| Coming down here to page WMATA 8, Q. Okay. Coming down here to page WMATA lady in question stand up when the train stopped "lady in question stand up when the train stopped, I lurched forward and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again." I read that correctly; right? | Yes. |
| That's Safety Management System? What's the purpose of an SMS report? | That's when any type of incidents or accidents or unusual occurrences are documented into this system, for better way of tracking and keeping up with all documents. |
| And here it says, "Operator was attempting to berth the train on the platform when the tram jerked. Customer attempted to stand while the train was in motion causing her to fall while the tram was in That's not accurate; agree? | "Train platform-train jerked. Customer attempted to stand." Based on the reports that I read, the incident reports, it's the same. |
| And then Stacy Swain down at the bottom of this same page, back at WMATA 6, she – well, she may not have seen anything. "Train | Yes. |

27

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| jerked at station. I heard a loud thump and then a scream." <br> Maybe she doesn't say one way or the other. But she certainly doesn't say that Ms. Scott stood up while the train was in motion; can we agree on that? | |
| And then if we come down to WMATA 8, where we've got Don Phillips' statement, "Saw the lady in question stand up when the train stopped at McPherson Square. Unexpectedly, the train lurched forward and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again. Don Phillips." <br> So again, that statement, the train stopped, then she stands up, and the train jerks forward, lurched forward? | Yes. |
| Washington Metropolitan Safety Committee. Roughly speaking, what role does play with respect to WMATA? | Well, with WMATA, they have oversight over WMATA's safety, safety issues and safety protocols within WMATA, just assure that wing all protocols and procedures and policies that are set in place and they also make recommendations for WMATA to follow. |
| And so as I'm looking at this e-mail, this is an e-mail that effectively WMATA is obligated to send to WMSC reporting what happened to Ms. Scott? | Yes. |
| And I can pull them if we need to, but I think I've been provided three violation forms for Ms. Johnson, the train operator who was operating the train on which Ms. Scott was injured. <br> And those are for an April 20th incident, April 28th, and this one on the screen October 4th, 2020; is that right? I can try to pull those or we can go through them one-by-one. <br> My question is going to be this: I think I've got three of these violation reports, but I don't have a document that looks like this for the September 23, '29 [sic] incident | This violation form is normally issued when an operator has broken some type of rule, violations of policy or procedure. This is actually a disciplinary action form, violation form. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| involving Ms. Scott, and I want to know why that is. | |
| So the — the implication being that WMATA did not find that Ms. Johnson had violated an explicit policy or procedure in relation to the September 23, 2019 incident, and that's why there's no form of this shape? | Correct. |
| Mr. Bennett, about two-thirds of the way down WMATA 64. It mentions "Action Taken, and it says that Ms. Johnson has been assessed eight  performance points and two days' suspension. I think two days' suspension speaks for itself, but what are eight performance points? | Those performance points, WMATA had come up with, with the union, is what they call a "DAP program," which stood for Disciplinary Action program.<br>And certain violations was given a point value. If you exceeded 24 points within – or if you ever reached 24 points within a two-year period, then the possibility would be grounds for termination if you reached that level. |
| Bringing all that together, I'm wondering why the train operator was never faulted for violating SOP 50.5, "Repositioning train." Right there in that table. | Well, there's no reason to say the operator did not make the announcement. That person, that witness might not have heard it. |
| So does this show that Ms. Johnson went through the same kind of recertification on 5/20/22? | Yes. |
| And then obviously – well, these are-train operators have to be recertified every two years; right? | Yes. |
| These are the only two documents I've been provided for Ms. Johnson. You're not aware of any documents indicating that she was recertified any time between February 2019 and May 2022, are you? | No. |
| This books like a similar document except instead of being certification for trains, this is for auto doors. So far so good? | Yes. |
| It's obviously dated 3/21/2019; yes? | Yes. |
| I see a practical score, but zero for rules and secondary exam. Are there any rules exam or secondary exam for this certification or no? | No. |
| So this is practical exam only, I take it? | Yes. |
| Is that a hands-on exam? | Yes. |

**Examination of Keisha Simone Henry (Supervisor, Road Transportation Training, WMATA) 2/9/23**

29

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| How long have you worked in that position? | Three years. |
| When did you first start working for WMATA? | August 22, 2005. |
| What are your job responsibilities in your current role? | I supervise rail training instructors who instruct all of the positions on the rail. |
| So you don't know whether the — whether the train operator who was operating the tram on which Ms. Scott was injured was on manual mode or automatic tram operation mode at the time of the incident? | I can't say what mode the operator was in. I was not in the cab with her. I do not know. |
| If you assume that Ms. – that the operator of the train on which Ms. Scott was operator of the train on which Ms. Scott was explain to us what she was supposed to do pursuant to WMATA standard operating procedures as she pulled into the station and opened the doors and let passengers off the train? | Okay. So when a train operator in manual mode is berthing the train on the platform, they are to make an announcement, They make an announcement entering the platform, letting the customers know what station they're at and what side the doors would open on.\nWhen the train is properly berthed, they when the train is properly berthed, they make an announcement that the doors are opening. Then they – and that's when they're fully berthed on the platform; correct? That's what you're asking? |
| So it looks to me like SOP 40.5.1.2 applies to situations where the train 40.5.1.2 applies to situations where the train operator is going to automatically open the doors. What does the word "automatically" mean in that SOP? | When the doors are open ~ when the doors open automatically, that's that has to do with 40.5.1.1. If the train is in ATO, the doors are in automatic as well. |
| So to automatically open the doors, that means the train knows where it is on the platform and the doors automatically open. It's not when an operator has to push a button to open the doors. Am I understanding you correctly? | Yes, that's correct. |
| If the operator of a tram – and again, if you assume with me that the operator of this train in September of 2019 was operating in manual mode, both for driving the train and for opening the doors - - when she pulled into a station, as she went to berth in a station. What would she have been supposed to do, WMATA standard operating procedures? | Berth the train, she's supposed to make berthing the train at the - depending on how many cars consist, the six-car mark or the eight-car mark. And then she would automatically open the doors once properly berthed on the platform. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| Does that describe how a train should be operated when it's in manual mode and manual door mode? | If the train is in manual mode and the door mode selector switch is in manual, the doors will not open automatically. |
| …does that mean the train stops where it's supposed to stop along the platform; right? | Yes, when it's properly placed on the platform. |
| And then at that point, the doors will automatically open. | If the door mode selector switch is in auto. |
| And was that the prevailing practice for train operators as of September 2019? | Yes, if the door mode selector switch is in manual and you're operating in manual mode, you have to get out of the seat on the left and press the button to open the doors. |
| In other words, pre-2009. And you're not aware of that at any time after 2009? | After 2009, the trains were operated in manual mode and so were the door mode selector switches, were in manual mode as well. |
| Is one of the reasons that WMATA was trying to return to auto doors' functionality in 2019, that that would remove human error from the equation? | Oh, I don't know why WMATA would – the reasoning behind it. |
| Well, I'm referring to the actual – to the actual policy and procedures in place at that point, whether they were written down or not.<br> I don't see that on the document either, but it's my understanding that was Metro's formal practice, policy, procedure, whatever we want to call it, as of September 2019; is that your understanding as well? | Okay, so train operators were told to wait five seconds — once they stick their head I out the window to verify that they see the platform, they were asked to wait five seconds before opening the doors. |
| So then would it be fair to say-circling back, would it be fair to say  - circling back, would it be fair to say for Ms. Scott was hurt, as she pulled into the station, she was supposed to bring the train to a stop then wait five seconds and look out the window and then open the doors to the train: is that the policy and procedure that she was expected to follow at that point? | Yes. |
| How many people reported to you in that position? | About 75, 80. |
| What job positions were those? | Train operators, station managers, interlocking operators, depot clerks, and the rail operations supervisors in the division. |
| From your experience in that position through to the present, do you know whether everything in Metro's press release | This press release says that they were testing the doors in March of 2019, but in September of |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| that is Exhibit 5 is accurate; in other words, is there anything in that press release that you think is wrong as we sit here today? | 2019, those doors were not opening automatically. |
| Do you agree that Metro was testing auto doors as of March 2019? | I remember them testing the doors. The exact date, I do not know. |
| Let's look at paragraph 3: "Returning to automatic door operations has two significant benefits. First, it enhances safety by removing the potential for human error resulting in 'wrong side' door opening. Metrorail operators" ~ well, let's stop at that sentence.<br>Would You agree with that, that returning to automatic door operations would enhance safety by "removing the potential for human error resulting in 'wrong side' door opening? | No. |
| So, "Use of the automatic system also improves the customer experience. Following a series of wrong-side door incidents several years ago, Metro began training operators to pause several seconds, prior to opening the doors." Accurate? Yes? | Yes, that is accurate. |
| "The pause was meant as a behavioral safety check to reduce the risk of a mistake." Also accurate? | That's what it was meant to do. |
| The next sentence: "However, for customers, there is now a delay of several seconds between the train arriving at the station and the doors opening." Also accurate obviously, yes? | Five seconds isn't a delay. We wouldn't cause a delay. Five seconds. |
| Well, no, I understand, but how about the next sentence, let's read them together. "When using the automatic system, doors will open as soon as the tram is stopped at the proper location." Is that accurate? | That's what they did.<br>They would open automatically, whether it's the right side or the wrong side, which was the problem. |
| That's a WMATA press release dated June 19, 2019.<br>Title is, "Doors opening automatically starting July 7 on Red Line trains." Do you see that? | I don't remember. |
| "Returning to automatic door operations has two significant benefits. First, it enhances safety by removing the potential for human | Yes, the five-second rule, mm-hmm. |

32

Carl Berkowitz, Ph.D., PE

| Question | Answer |
| --- | --- |
| error resulting in the accidental 'wrong side' door opening. In addition, use of the automatic system also is expected to improve the customer experience, because the doors will open as soon as the train is stopped at the proper location. When operated manually, Metro requires that train operators pause for several seconds prior to opening the doors as a safety measure." Again, that same policy of pausing for five seconds, that's, I guess, still in effect as of the date this was released, June 19, 2019; correct? | |
| Can we agree that nowhere m those – procedures is there any mention of the five-second rule written down? | No, it's not there. |
| And that's – so when it says, "When training is berthing on platform. does it – where precisely is the train position when that announcement is made or does it matter? | Well, it says as the — while entering the station, while the train is going down to berth to the eight-car marker. |
| Next one down, "Repositioning train." It says, "Attention, customers. This train will move forward. Please hold on." See that? | Yes. |
| Again, I don't want to ask obvious questions too much, but what's going on there? | If the train stops short on the platform and the operator has to reposition the train. To announce to customers – they make that announcement to customers that the train will be moving forward. |
| We talked a little bit about eight-car trains versus six-car trains, et cetera, but what's a station overrun? | A station overrun is when a train overshoots the platform. |
| Ms. Henry, WMATA has a special form that it uses just to track station overruns: correct? | There is a form that the operator fills out when they have an overrun. |
| I think we agreed that WMATA kind of switched the system over to manual mode in I late 2009; is that right? | Immediately after the accident, WMATA went to manual mode. |
| What's a red signal? | A signal is giving – if it's a red signal, the train has no speed commands. They cannot cross it, like a red light in the car, and on a lunar signal, they can go. |
| The train on which Ms. Scott was injured was operating in Go, Al; right? | I don't know. |

33

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| I was actually asking something different. I'll come to that. Let me ask it this way: Does one of these forms have to be filled out by the train operator every single time there's a station overrun? | Yes, that is the report that the train » operator fills out. |
| So then I guess I will ask your question, which is: Is there a time period within h the operator must complete the report: same day, next day, or something different? | Before they leave. They're typically — it has to be done immediately because they're removed from service most of the time. |
| The train is removed from service? | The operator. |
| And why is that? | It's an incident. |
| "Today we're curious about why trains come to a stop at a station and then lurch forward a few inches or feet. What difference does it make?" This has the date June 26, 2018; right? See that? | Yes. |
| Let me ask you first; I there anything in that that jumps out as just wrong to you, any sentence? | This is a news article. It was written by someone that does not work for WMATA. |
| When station overrun happens, WMATA standard operating procedures, protocols, whatever we want to call them, anything else, is the operator ever allowed to back that train up to the platform? | An operator will never back a train up. |
| Because WMATA standard operating procedures absolutely do not allow that any time since the Fort Totten incident; correct? | It has always been WMATA's procedure that a train is not to back up on the platform. Trains are not allowed to go in reverse. |
| How about here, the next paragraph where I've highlighted two sentences for you. Is it accurate to say, I mean, would that I have been WMATA's guidance to its train operators as of 2019, that it's better for a train to stop a little bit short than too far at a station? | If you stop too short, your back end will be off the platform. It's still the issue. Have to be perfectly on the platform  before you open the doors. |
| If you stop short, are you allowed to move the train forward again? | You're allowed to reposition the train until you're properly berthed. |
| Coming back to this – I guess we just said if the train overshoots a platform, it's trouble; right? There's paperwork, the operator's taken off the system for the day, the train is inspected for any mechanical malfunctions; right? It's a big mess and the whole line is clogged up, by the way, right, because it takes a couple minutes to get everybody off | When there's a station overrun and the train cannot be serviced, once the operator contacts ROCC and lets them know they had a station overrun, ROCC would probably instruct them; to continue on to the next station so he can drop off the customers, so that the train can be removed from service, as well as the operator, |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| the train or take them to the next station; is that a fair summary? | and taken to the nearest yard for an investigation. |
| And then conversely, when there's a short stop, so the tram stops before the point at which it's supposed to stop on the platform, it's really no big deal; right?<br>The operator has to warn the passengers that she's about to move again, but then she can go ahead and move the train to where it's supposed to be. There's no paperwork, she's not suspended for the day, the train doesn't go get inspected at the yard; right? | Yeah, that's correct. |
| Would you agree, maybe this refreshes you, as of September 2019. It was WMATA's policy to have both eight-car trains and six-car trains stop at the eight-car marker; right? | I'm not quite sure of the date, but I know that at a certain point, they did have all cars go to the eight-car marker. I'm just not sure of the date. |
| Ms. Henry, I think what I was asking is: "What would somebody have to do to figure out if Metro had a policy, procedure, practice, anything » that governed what would happen to a train » operator whose error caused three station overruns within a six-month period? | You would go to personnel who managed train operators. |
| If they're a half a car short of the eight-car marker, nothing happens except they have to move the tram forward again; right? | Yes, to the eight-car marker. |

**Examination of Domenic Johnson (Train Operator, WMATA) 11/19/22**

| | |
|---|---|
| And you've held that position since well, the first half of 2019 at some point? | Yes. |
| When did you first take that position as a train operator? In other words, what time – a month would be just fine. | September 2018. · |
| Can you just walk me through at least broadly speaking what the training process looked like for you? | We have a six-month training that goes over- a portion is classroom where we're learning about the train. A portion is practical where we're learning how to work the train. A portion is practical where we're learning how to work on the train. And then a portion is operating the train. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| So the six-month start in September 2018 and then end I guess in roughly March of 2019? | Correct. |
| Other than hands-on stuff during training? | I was operating probably about December of 2018. But officially on my own, I could say March of 2019. |
| So what's the difference in those three months? What would you have been doing between December 2018 and March 2019? | Nothing really other than the fact they have an LPI ride along with you. A line platform instructor. |
| Describe for me, please, every step that you were trained to take as a train operator as you pulled into a station and came to a stop at a platform. | We are to enter the station – well, initially we were to enter the station between 37 to 42 miles per hour. Once you reach the last ATO 7 marker, your train should be brought down to 20 miles per hour to properly berth the eight-car marker, |
| Does that mean – essentially is that the marker where you're supposed to stop for an eight-car long train? | Essentially yes. We stop two cars, six cars. All cars stop at the eight marker. |
| Then what happens? | You open the doors. |
| Do you announce that the doors are opening? | Yes. You make an announcement as you're entering the station, pretty much say in the station that you're entering and what side the doors will open on. |
| You don't make an announcement then after you stop but before the doors open? | No. |
| After you've come to a complete stop at the platform, are you ever allowed to move the train forward again? | Yes. |
| Under what circumstances? When are you allowed to do that? | If your train is not properly berthed at the eight-car marker. |
| If you're going to move the train forward again after it's stopped, do you announce that to the passengers? | Yes. |
| Why is that? | Just so that people are on the platform 1 and on the train are aware. |
| I don't want to put words But is one reason that people need to know the train is going | Correct. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| to move forward again so that they can be prepared and not fall? | |
| How are you – are you supposed to start the train up slowly if it's going to be adjusted or quickly, or does it matter at all? | There isn't a proper procedure on how to ' adjust your train as long as you're able to stop at the eight-car marker within the platform limits. So typically, yes, if I stop on the train, you will bump your train up unless you're within 10 feet of the eight-car marker. If you're within 10 feet of the eight-car marker, you're supposed to coast to car wash, pretty much keep the train under three miles per hour. |
| I understand that on April 20th, 2019. There was an incident where your train overran the platform at the Arlington Cemetery station; is that right? | Correct. |
| What exactly happened there? | The platform was overran by a door leaf. |
| What does that mean that the train overran the platform by a door leaf? | It means that one door leaf was off the platform. |
| So that one door – what's a door leaf? Is that just half a door or is that a full set of doors? | It's the Metro has two doors at every set. So it's just one – half a door. It's a half a door. |
| So what happened – what did you do after the train came to a stop with one door leaf past the eight-car marker? | I more likely dropped my left and rights and serviced the platform. You drop your associated door circuit breakers on that car and open the door – and service the platform, open the doors. |
| Again, not to put words in your mouth. But if I'm understanding you correctly, does that mean you were basically – it was not a l perfect stop, but it was close enough so you let people out anyway? | Correct. But you can't exit on that car. |
| People would have had to get off the second car? | I mean they can open. But per policy, we aren't allowed to open any doors off the platform. So if you have one leaf off the platform, when you go to open the doors, every door will open. So when we drop-we're required to drop the circuit breakers so that no doors open. If any |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| | customers are on that car, they go to the next car to exit. |
| You didn't back it up to get to the platform? | Correct. |
| I understand that on April 28th, 2019, so eight days later there was a second incident where your train overran the platform, this time at Braddock Road; is that right? | Correct. |
| What happened that time? | I had a door leaf off the platform. |
| This time was there any particular reason that the train came to a stop a little hit too far forward? | No in particular reason, |
| So Ms. Johnson, it looks like statement that says that the train basically wasn't responding to you trying to apply the brakes.<br>But does that jog your memory at all about what happened that day? | Yes. |
| But I wonder if you can explain to me what this statement means now that you're looking at it ». or now that you sort of remember a little bit about that day. | It means as stated in my report, that I into a braking mode. And it did not resend right away, so I went back to a coast, and then went back to a B5 to slow the train down. And it stopped with half of a first door leaf on the platform. |
| You started to mention that the train can be heavier at rush hour. Is that your belief that that was why you had a problem stopping it that day? | Yes. |
| What is a B2 mode? | It's just a lower braking mode. |
| How many braking modes are there? | Five. |
| Are they Bl through B5? | Yes. |
| Five is the most, one is the least? | Yes. |
| Obviously we're here to primarily talk about an incident that happened on September 23rd, 2019.<br>I understand that at roughly 6:30 p.m. that day, you were driving an orange line train at McPherson Square; is that right? | Yes. |
| So had you driven this same route that had you at McPherson Square on September | No. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| 23rd. 2010 every single day since March of that year or every single day that you were working since March of that year? | So at one point I was on the yellow line. In between March to September, I was on the yellow line that does not go to McPherson Square. |
| During that time, roughly how often were you on the orange line? | Paring that time, I was on the orange line every day. I'm just not sure when exactly that pick started. Initially you asked me had I been on that line from March until September |
| The first sentence there says, "Upon servicing the platform at McPherson Square, a customer punched me up to inform me an elderly customer had fallen and could not get up." Did I read that correctly? | Correct. |
| It mean that a customer quote,' "punched you up"? | We have emergency call buttons in each so they can contact the train operator. |
| So somebody in the car where Ms. Scott had been hurt bussed you on the intercom. Is that what that means? | Yes. |
| The next sentence says, "I notified ROCC of the incident in which Unit 33 who was at McPherson Square responded and on the customer." First of all, I read that right, right? | Yes. |
| What's ROCC? | Rail operations control center. |
| What's Unit 33? | A supervisor. |
| And Unit 33, that supervisor proceeded to check on the customer who had been hurt. Is that – am I understanding that correctly? | Yes. |
| Next sentence. "Medical arrived to attend to customer. After about 30 to minutes, the customer was removed." I think that one is pretty straightforward. The final sentence. "I was then instructed to continue on and lay the train up in New Carrollton yard." | We went straight to the yard and parked the train. |
| You're aware that there are a number of witness statements from that day that | I'm aware of the witness statements. |

Carl Berkowitz, Ph.D., PE

| Question | Answer |
|---|---|
| indicate that the train suddenly and harshly jerked forward after it had come to a stop on the platform; is that accurate? | |
| "Ms. Carol Scott was on the train Number 919, Car Number 3144. She stated the train gave a hard jerk." <br> You told us earlier you don't remember anything outside your own statement. <br> Would I be correct to understand that you don't dispute that the train gave a hard jerk that day? | Can't say that because I don't have a - I don't really remember what happened that day. I only know my statement that I wrote. |
| We're looking now at WMATA 4, a statement by Don Phillip it looks like. If you look with me, it says, "Don Phillip stated, Saw the lady in question stand up, wait. Train stopped at McPherson Square. Unexpectedly the train lost power and the lady fell hard on the aisle floor." <br> So he's saying something about the train power. Do you have any recollection one way or the other about the train losing power or not? | No. |

Carl Berkowitz, Ph.D., PE

## B. General Information
## Rail Transit Safety Action Plan

Federal Transit Administration (FTA), Office of Safety and Security, US Department of Transportation, Washington, DC, September 2006.  The plan focuses attention on those safety incidents of greatest concern in the rail transit industry.

The objectives of the Rail Transit Safety Action Plan are to:

- Target the most frequent, highest risk causes of rail transit accidents;
- Direct FTA's oversight and technical assistance resources to address these high-risk causes; and
- Accelerate industry awareness, spotlighting activities and practices that have the potential to mitigate the largest risks.

To accomplish these objectives, FTA has conducted an extensive analysis of available safety data from the National Transit Database (NTD) and the State Safety Oversight Annual Reporting Program.  This data has been analyzed to determine the number and types of safety incidents that are occurring in the rail transit industry, the impacts of these incidents in terms of fatalities, injuries and property damage, and the probable causes of a select sub-set of the most serious of these incidents. In this plan, FTA uses the results of this analysis to establish:

- The most common causes of rail transit accidents;
- Top ten priorities to guide FTA's safety program and focus industry attention;
- FTA initiatives to support accident reduction and to address FTA's top ten priorities;
- Performance measures to track the rail transit industry's safety record and to monitor progress in addressing FTA's priorities and achieving target goals; and
- Performance measures and target goals for the State Safety Oversight Program to support implementation of FTA safety initiatives.

Carl Berkowitz, Ph.D., PE

## C. Redacted document

*Note: Redacted is the Accident's Key Factors and Route Cause.*



Washington Metropolitan Area Transit Authority

Incident Number 20190923#83165

### *Terence Graves*
### *Manager of Rail Safety and Facilities*

## INVESTIGATION

### General

| Equipment Involved | Rail Car |
|---|---|
| Known Facts | Operator was attempting to berth the train on the platform when the train jerked, Customer attempted to stand while the train was in motion causing her to fall injuring herself. |
| DriveCam Event # | E19500 |
| Key Factors | ███████████████████ |
| Root Causes | ███████████████████ |

Carl Berkowitz, Ph.D., PE

## D. Train Inspection



**Washington Metropolitan Area Transit Authority**
Maintenance and Material Management System
**Work Order Details**

Page 1 of 1
MX76PROD

Work Order #: 15285701
Type: CM



Status: CLOSE
11/18/2019 15:46

**Work Description:** Customer fell aboard train. Single tracking between McPherson Square and Federal Triangle track #2. Gap train placed in service. Medical dispatched, single tracking

**Job Plan Description:**

| Work Information | | |
|---|---|---|
| Asset: R3144 | 3144, RAIL CAR, BREDA, 3000 AC, A CAR | Owning Office: CMNT-CMNT-CMNT | Parent: |
| Asset Tag: R3144 | | Maintenance Office: CMNT-WFCH-INSP | Create Date: 09/23/2019 20:19 |
| Asset S/N: 3144 | | Labor Group: CMNT | Actual Start: 09/23/2019 20:19 |
| Location: 2494 | K99, WEST FALLS CHURCH YARD | Crew: | Actual Comp: 09/24/2019 06:39 |
| Work Location: 1230 | D99, NEW CARROLLTON YARD | Lead: | Item: L18050002 |
| Failure Class: CMNT001 | RAIL CAR | GL Account: WMATA-02-33370-50499160-041-***************-*****-OPR** | |
| Problem Code: 2649 | PASSENGER RELATED PROBLEM | Supervisor: E015776 | Target Start: |
| Requested By: | | Requestor Phone: 301/955-2230 | Target Comp: |
| Chain Mark Start: | | Chain Mark End: | Scheduled Start: |
| Create-Mileage: 2563574.0 | | Complete-Mileage: 2563885.0 | |

**Task IDs**

**Task ID**
10  SEE DETAILS.
IN YARD, INSPECTED THIS CAR FOR ANY SIGNS OF SLIPPING OR TRIPPING HAZARDS,NONE FOUND. ALL CARPET AND STANCHIONS SECURE. IN ADDITION PROPULSION AND FRICTION BRAKE INFORMATION SHOW NO SPEED VARIATIONS OR BRAKING ISSUE'S WITH THIS CAR.DOWNLOADED ALL FRA &amp; EXTENDED FILES ASSOCIATED WITH CAR ( 3144 ) ON 9/23/2019, NO DISCREPANCIES FOUND.

**Component:** 000-300 RAIL CAR; 2K/3K/6K/7K **Work Accomp:** RECORDED DATA **Reason:** NO TROUBLE FOUND **Status:** CLOSE **Position:** **Warranty?:** N

**Actual Labor**

| Task ID | Labor | Start Date | End Date | Start Time | End Time | Approved? | Regular Hours | Premium Hours | Line Cost |
|---|---|---|---|---|---|---|---|---|---|
| 10 | E009378 | Fashaw, Zachary O | 09/23/2019 | 09/23/2019 | 20:00 | 21:30 | Y | 01:30 | 00:00 | $53.24 |

| | | | | | Total Actual Hour/Labor: | 01:30 | 00:00 | $53.24 |

**Related Incidents**

| Ticket | Description | Class | Status | Relationship |
|---|---|---|---|---|
| 8450415 | Customer fell aboard train. Single tracking between McPherson Square and Federal Triangle track #2. Gap train placed in service. Medical dispatched, single tracking | SR | CLOSED | ORIGINATOR |

**Failure Reporting**

| Cause | | Remedy | Supervisor | Remark Date |
|---|---|---|---|---|
| 2476 | NO DEFECT; NORMAL SERVICES PERFORMED | 3192 TESTED / INSPECTED | E015776 Nunez, Justin D | 09/24/2019 |
| Remarks: INSPECTED CAR FOR SLIPPING AND TRIPPING HAZARDS, NONE FOUND. REVIEWED LOGS. NTF. | | | | |

WT_plus1_woprint2pdesign

WMA14/2020/11:36