**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CAROL WILD SCOTT** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Case No. 22-cv-00601 (CRC)** |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,** | : | |
| | : | |
| **Defendant.** | | |

<u>**PLAINTIFF'S REPLY RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**</u>

**I.     A recent WMATA press release gives the lie to the position WMATA has taken with the Court.**

As explained in Ms. Scott's initial brief (ECF No. 25), it is undisputed that WMATA's train operator pulled the train into a station, stopped at the platform, and then—as passengers stood to disembark—violently jerked the train forward without first warning passengers over the intercom, as required by both the standard of care and WMATA's own Standard Operating Procedures.  As such, summary judgment should be entered in Ms. Scott's favor because (1) WMATA was negligent, (2) it was not unreasonable for Ms. Scott not to be holding onto something at that time, and (3) Metro riders do not inherently assume the risk of violent jerks forward after a train has stopped at a platform but before the doors have been opened.

WMATA disagrees, arguing that sudden jerks after a train has stopped at a platform but before it has opened its doors are not only permissible, but normal; therefore, its train operator was not negligent, Ms. Scott was unreasonable for not bracing herself for such a jerk, and/or that all Metro riders must be deemed to assume the risk of such jerks because they are naturally attendant to subway train travel.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

- 1 -

In the time since Ms. Scott filed her initial brief, however, WMATA itself issued a press release that reveals WMATA's position for what it is: an opportunistic, disingenuous argument, **not something even WMATA genuinely believes**. In full, the October 18, 2023, press release reads as follows:

> This week, customers may notice doors opening faster on some Red Line trains when they stop at stations. On Wednesday, Metro will begin certifying operators who have been trained to use Metro's Auto Doors function.
>
> The feature enables doors to open automatically when the train stops at the platform. **Not only is it safer and more reliable, but it also eliminates the delay of operators manually opening the doors.**
>
> Currently, operators are required to open and close train doors manually. **They're instructed to stick their head out the window, take a few seconds to verify they are opening the doors on the correct side of the train, and then press a button to open the doors. The process can take up to 15 seconds** and happens more than 20,000 times a day across the system.
>
> With Auto Doors, signals at the platform tell the train which side to open automatically when it arrives at each station platform. Operators will still put their head out of the window to make sure everyone has exited or boarded safely before manually closing the doors.
>
> "Using Auto Doors eliminates human error from the process of operating our train doors, meaning a safer, smoother trip," **Brian Dwyer Chief Operations Officer said. "Anyone who uses Metrorail has experienced the wait, standing at the door wondering when the doors will open.** Our customers tell us they want Auto Doors back and this change will improve customer experience and safety."
>
> Metro has been testing Auto Doors during off-hours for months and the system performed without any safety issues more than 2,500 times. Metro worked closely with the Washington Metrorail Safety Commission to move forward with this step in its automation program. We thank them for their work.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

- 2 -

Ex. 1, WMATA, "Doors opening… faster! Metro preparing for Auto Doors," Oct 18, 2023[1] (emphasis added).    That article links to WMATA's webpage about Automatic Train Operation,[2] which, in turn, offers another link: "Here's a side-by-side video showing how fast auto doors open compared with manual open."    In that video, a woman on the train with manually operated doors is clearly visible through one of the door windows (circled in red, below).    When the train stops, she steps up right to the doors, adjusts her coat, and stands there, not holding onto anything, for 15 seconds before the doors open:



MetroForward, "Auto Doors: How fast do they open?" (screenshot) (red circle added).[3]

        How best to explain the dissonance between WMATA's representations to the public and the positions taken in this Court?    Is WMATA likely being more forthright in its press

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[1]    https://www.wmata.com/about/news/ADO-operator-certification.cfm.
[2]    https://www.wmata.com/initiatives/plans/Automatic-Train-Operation-ATO/index.cfm.
[3]    https://www.youtube.com/watch?v=ANkwtF2hT7A;    also    available    on    WMATA's website:        https://www.wmata.com/initiatives/plans/Automatic-Train-Operation-ATO/ATO-Videos.cfm.

releases, where it has nothing to lose, or in this litigation, where the statements made in its press releases would expose it to liability?

The undisputed facts of the record plainly establish that, as of September 2019, when a train operator pulled into a station, she was required to stop the train at the correct point along the platform, wait for five seconds (and sometimes the wait was substantially longer, as noted in WMATA's press release), and **only then** manually open the doors.  And regular Metro riders knew that—as WMATA's Chief Operations Officer, Brian Dwyer,[4] put it, "**Anyone who uses Metrorail has experienced the wait, standing at the door wondering when the doors will open.**"  (Ex. 1 at 1-2 (emphasis added)).

In light of those facts—established by the record and confirmed by no lesser a figure than WMATA's own COO—WMATA's position crumbles.  WMATA cannot be heard to argue that one of its passengers acted unreasonably (contributory negligence) by standing up after the train has stopped at the platform but before the doors open, when its COO concedes that "anyone" who rides the Metro has done precisely that, and the model videos it posts online show passengers doing the same.  WMATA's assumption-of-risk defense fares no better—it can hardly argue in good faith that all its passengers subjectively knew of the risk that a train would violently jerk forward after stopping, but before opening doors, appreciated its unreasonable character, and voluntarily exposed themselves to it.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[4]    As COO, Mr. Dwyer is "responsible for managing and overseeing the daily operations of Metro including our Rail, Bus, Paratransit and police departments."  (Ex. 2, WMATA, "Leadership," https://www.wmata.com/about/leadership/, visited 11/1/2023).

## II.    With respect to Section 1 of WMATA's Reply Brief, Ms. Scott stands on the analysis set forth in her Initial Brief.

In Section 1 of its Reply Brief, WMATA doubles down on its argument that the Court should apply bus/streetcar/taxi cases to the facts of this case.  In the course of one paragraph that runs for less than one page, WMATA suggests its argument should be credited because it is "common knowledge that WMATA trains operate above ground."  (Def.'s Reply/Opp. at 2).  In response to that argument, Ms. Scott stands on the analysis set forth at Section V.B of her Initial Brief:  "Sudden movements that may be naturally attendant to travel by bus are NOT naturally attendant to travel by subway train."  (Pl.'s Initial Brief at Sec. V.B).  Briefly: In contrast to the many starts, stops, jerks, jolts, or jars, swerves, and other motions that might be considered naturally attendant to bus travel, there are only two starts and stops naturally attendant to subway travel: the first when the train pulls out of a station, and the second when the train berths at the next station.  There are no other drivers, cyclists, pedestrians, and others with whom to share the road and to whose actions to react.  Consequently, the starts and stops of subway travel are 100% within the control of the train operator.

Beyond that, WMATA adds only one argument: that "the DC Circuit has specifically identified trains in the context of long-standing DC jerk jolt law," (Def.'s Reply/Opp. at 2), citing one case for that proposition:  *Adams v. Washington & G.R. Co.*, 9 App. D.C. 26, 29 (D.C. Cir. 1896).  The problem with that representation is that it is simply not true.[5]

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[5]    In a similar vein, WMATA also declines to offer any explanation or apology for having in its Motion significantly misrepresented to the Court the holding of the *Connor* Court, (*see* Pl.'s Initial Brief (ECF No. 25) at 12-13).

Contrary to WMATA's representation, ***Adams* did not involve a train; it involved a streetcar** operated by the Washington and Georgetown Railroad Company.  The very first line of the opinion reads as follows:

> This is an action for damages for personal injuries.  Whilst riding as a passenger on the front platform of a **cable car** on his way to the Baltimore and Ohio Railway station, about 11 o'clock at night, the plaintiff, Frank C. Adams, was thrown from the car, about the intersection of Seventh street and Pennsylvania avenue, and severely injured by a car going in the opposite direction upon the adjoining track.

Adams, 9 App. D.C. at 30.  At the time, the nomenclature for new methods of transportation had not yet matured, and the company was referred to as a "street-railroad company."  *See Adams*, 9 App. D.C. at 27 (citing BOOTH ON STREET RAILWAYS); *Adams*, West Headnote 1 (calling defendant a "street-railway company"); *Adams*, West Headnote 2 ("cable car"); *Adams*, West Headnote 3 ("cable car"); *Adams*, West Headnote 4 ("cable car").  One might assume that, given its function and history, WMATA would be aware that the Washington and Georgetown Railroad Company operated streetcars, not trains[6]; even if not, it is difficult to understand how the *Adams* opinion's myriad references to cable cars could have gone unnoticed.  In any event, the *Adams* case is inapposite for the same reasons as were the nine cases originally relied upon by WMATA.  (*See* Pl.'s Initial Brief at Sec. V.B.)

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[6]    A fun historical trivia fact: It was actually the **first** streetcar company in the District of Columbia.  https://en.wikipedia.org/wiki/Washington_and_Georgetown_Railroad.

**III.  With respect to Section 2 of WMATA's Reply Brief, the undisputed facts establish that WMATA's train operator did not warn passengers before violently jerking the berthed train forward.  Accordingly, WMATA is not entitled to summary judgment, and Ms. Scott is.**

As discussed in Ms. Scott's Initial Brief, her injuries were caused by an unannounced and violent acceleration, well outside the permissible bounds of safe train operation in terms of both timing and force.  As described in Ms. Scott's answers to interrogatories, "the train launched forward.  This abrupt movement threw Ms. Scott multiple feet through the air, forcing her to land violently on the ground on her left hip."  (SUMF ¶ 21 (Ex. 5 at No. 11)).

**A.   It is irrelevant whether or not the witness statements contained within WMATA's Incident Report would be hearsay, because WMATA has in its own sworn testimony explicitly adopted those statements as its own understanding of how the incident happened.**

In its Reply/Opposition, WMATA attempts to disown the witness statements its own employees incorporated into its incident report on the grounds that they are hearsay.  (Def.'s Reply/Opp. at 3).  But WMATA omits from its discussion of those statements the critical fact: WMATA's Rule 30(b)(6) corporate designee explicitly adopted them as WMATA's understanding of the truth of how the incident occurred:

> Q.  Okay. Well, so let's look at them anyway. I guess let's start with this statement by an Al Omondi [ph.]. You can read along with me.
>
> It says, "Woman stood up because the train stopped at McPherson Square. The train then jerked forward and the woman fell into the aisle. I stayed with her until paramedics arrived."
>
> I read that correctly; right?
>
> A.  Yes.
>
> Q.  Then we come down to the next one, Stacy Swain [ph.]. It says, "Train jerked at station. I heard loud thump then a scream. People trying to move her after that. I called emergency

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

in intercom in [something] box in car 3144, asking for emergency assistance then screamed for no one to move her until medics arrive. Then put jacket under Ms. Carol head and tried to calm her down until medics arrived."

Pretty close anyway; right?

A. Yes.

Q. Okay. Coming down here to page WMATA 8, we have a statement from Don Phillips. "Saw the lady in question stand up when the train stopped at McPherson Square. Unexpectedly, the train lurched forward and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again."

I read that correctly; right?

A. Yes.

Q. And that one has got -- even Don Phillips signed his name underneath it. There's a signature underneath that statement; right?

A. Yes.

**Q. Does WMATA have any reason to doubt the truthfulness of any of the three statements that we just walked through?**

**A. No.**

**Q. So as far as WMATA is concerned, is that WMATA's understanding of exactly what happened that day?**

MR. CHANDONNET: Objection. You can answer.

A. Can you repeat the question? I'm sorry.

BY MR. REGAN:

Q. Sure. So let's talk in broad strokes here. All three of those things say the same thing to me; all right?

And tell me if you disagree, but it says the lady stood up when the train stopped; right? And then unexpectedly, the train jerks forward again and that causes the lady to fall; "the lady" being Carol Scott. **Is that WMATA's understanding of exactly what happened that day?**

MR. CHANDONNET: Objection.

THE WITNESS: Can I answer that?

MR. CHANDONNET: Unless I tell you not to answer.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

**A.  Okay, yeah.**

BY MR. REGAN:

**Q.  Yes?**

**A.  Yes.**

Q.  Okay. Fair to say, WMATA is not aware of any witness statement that contradicts the three that we just looked at?

A.  Out of the three, no.

Q.  I'm sorry?

A.  No.

Q.  No, it's not fair to say that or no, no such statements exist?

A.  You said out of the three pages, do I see a contradictory, no.

Q.  Okay. And it might have been -- I think we might have both been talking about two different things and I talk too fast.

Are there any other witness statements that WMATA is aware of that contradict what these three witnesses said in their statements?

A.  I wouldn't be able to answer that one. Because I don't -- I'm just having what's available to me.

Q.  Okay. And so you -- you're in the unenviable position of testifying on behalf of WMATA and on behalf of all information available to WMATA, which is why I'm asking questions that go beyond what you may or may not know. I have to at least ask.

Well, maybe we've already answered this a different way, which is: **WMATA effectively does not doubt any of those three statements; right? You said that is WMATA's understanding of how this thing unfolded?**

**A.  Yes.**

(Ex. 3, WMATA Dep. (Bennett) at 13:10-17:15 (emphasis added)).  In sum, the Court need not rely on the statements themselves for the purposes of the pending motions—WMATA itself has testified under oath that its understanding is that this incident unfolded precisely as outlined by those witnesses.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

WMATA argues that even if the Court considers them, the witness statements cannot prove negligence, citing one case: *Wiggins v. Cap. Transit Co.*, 122 A.2d 117, 118 (D.C. 1956). Again, however, WMATA's reliance is misplaced.  Unsurprisingly, *Wiggins* is a bus case, in which a woman was injured when the bus started moving at precisely the expected moment: "Plaintiff, a 71-year-old woman, testified that after she boarded the bus 'went to step over the white line' and before she could grasp the hand rail, the bus 'started suddenly' and threw her to the floor."  *Id*. at 117.  But the distinctions run deeper yet.  Not only did the bus begin moving at the expected (or at least a reasonably expectable) time; there was also a great deal of dispute regarding the nature of the bus's movement:

> A neighbor, who boarded the bus just ahead of plaintiff, testified that the bus started with a 'little jerk,' and that she did not fall 'because the bus was so crowded there was no place to fall.'
>
> The bus operator testified that he waited a few seconds after plaintiff boarded before starting, that 'he did not start suddenly, but that it was a normal start.' He said he put his arm out to prevent plaintiff from falling and denied that she fell to the floor or struck her head or back.
>
> A third passenger testified that she was sitting immediately behind the driver and that plaintiff fell against her first and then toward the front of the bus.  She thought the bus made a normal start.

*Id*. at 118.

In this case, as opposed to *Wiggins*, it is undisputed that the train moved forward with a violent "jerk" or "lurch" and that the violent movement came at a time when no reasonable passenger would have expected it.  Again, the witness statements in question are not just words in a document (even when that document happens to be the WMATA's Incident Report, its definitive record of what happened that day); rather, as described above, WMATA has

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

testified under oath that it understands this incident to have occurred exactly as outlined in those statements.  WMATA cannot now disclaim them.

### B.   By declaration under penalty of perjury, Stacey Swain has reaffirmed the substance of her witness statement.

In the seven days' time afforded by the summary-judgment briefing schedule, undersigned counsel were able to reconnect with only one of the three witnesses, Stacey Swain.  By declaration under penalty of perjury,[7] Ms. Swain has reaffirmed the substance of her witness statement, including the following:

> 2.  After the train came to a full stop at the platform, but before the doors opened, several passengers, including a woman I later learned to be Carol Scott, stood up in preparation to disembark.
>
> 3.  During that time, after the train had been stopped for several seconds, the train suddenly and violently jerked forward.
>
> 4.  The train operator did not provide any warning to passengers before jerking the train forward.

(Ex. 4, Swain Aff., at ¶¶ 2-4).

### IV.   With respect to Section 3 of WMATA's Reply Brief, WMATA has waived the arguments therein by not raising them in its initial motion; even if it had not, those arguments would fail, because the fact of the matter is that the other major mass transit agencies <u>do</u> adhere to the national standard of care.

### A.   WMATA has waived the arguments in Reply Section 3.

"It is entirely inappropriate to raise arguments for the first time in a concluding brief."

*Halvonik v. Dudas,* 398 F. Supp. 2d 115, 127 n.22 (D.D.C. 2005); *see also Lewis v. District of*

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

7    *See* 28 U.S.C.A. § 1746; *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011) ("[A declaration under § 1746 is equivalent to an affidavit for purposes of summary judgment.") (citing cases).

*Columbia,* 791 F. Supp. 2d 136, 139 n. 4 (D.D.C. 2011) ("'[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief.'") (quoting *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne,* 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008)). Consequently, when a moving party chooses to raise in a reply brief, those arguments are waived. *See Zuza v. Office of the High Representative,* 107 F. Supp. 3d 90, 95 n.5 (D.D.C. 2015) (citing *Walker v. Pharm. Research & Mfrs. of Am.,* 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006)); *see also Atlanta Channel, Inc. v. Solomon,* 2020 WL 1508587, at *11 n.7 (D.D.C. Apr. 27, 2020) ("Courts in this Circuit have 'generally held that issues not raised until the reply brief are waived.'") (quoting *Sitka Sound Seafoods, Inc. v. N.L.R.B,* 206 F.3d 1175, 1181 (D.C. Cir. 2000)).

Here, the "Argument" portion of Defendant's Motion for Summary Judgment (ECF No. 24-1) spanned barely three pages. Of those three pages, the first two and one-half contained little more than a boilerplate recitation of District of Columbia law and cases relating to jolts and jerks on buses and streetcars; only the final one paragraph even mentioned the case at hand. In the whole of WMATA's Motion, the words "standard of care" did not appear even a single time. The word "expert" did not appear even a single time. Dr. Berkowitz's name did not appear even a single time. Now, in its reply brief, WMATA dedicates more than four pages to arguing that Dr. Berkowitz did not describe in his report with sufficient specificity the basis for his opinion that WMATA's applicable Standard Operating Procedures reflect,[8] as opposed to exceed, the standard of care.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[8]    Of course, WMATA's Standard Operating Procedures may be considered as evidence of the standard of care. *Robinson v. WMATA*, 941 F. Supp. 2d 61, 68 (D.D.C. 2013), *aff'd*, 774 F.3d 33 (D.C. Cir. 2014) ("While a plaintiff's expert may point to rules or guidelines set forth in a defendant's own guidebook or its standard operating procedures as evidence of the standard of

The D.C. Circuit has not been shy about calling that what it is, nor has it hesitated to impose the proper remedy:

> In its opening brief before this court the Company merely refers to this argument; only in its reply brief does it actually argue the point. As a result the Board, in its brief, understandably does not respond to the argument. **In order to prevent "this sort of sandbagging of appellees and respondents, we have generally held that issues not raised until the reply brief are waived." So we hold again.**

*Sitka*, 206 F.3d at 1181.

If WMATA believed that it was entitled to judgment on the basis that Dr. Berkowitz's report did not lay out in sufficient detail the many sources that serve to establish the standard of care, that argument properly belonged in its Motion, not its Reply. The arguments set forth in Section 3 of WMATA's Reply should be disregarded as waived.

**B.    The arguments set forth in Reply Section 3 fail on their merits, as well, because in addition to WMATA, the mass transit authorities of New York, Philadelphia, and Chicago—to name a few—recognize and adhere to the national standard of care.**

It cannot have come as a surprise to WMATA that Dr. Berkowitz opined that the national standard of care requires that before restarting/repositioning an improperly berthed subway train, a train driver must first warn passengers so that they are not caught off guard by the movement and injured. Indeed, some inferences might be drawn from WMATA's course of conduct since receiving Dr. Berkowitz's report on March 17, 2023:

- WMATA chose not to depose Dr. Berkowitz.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

care, the expert must adequately demonstrate that those rules or guidelines reflect or embody a national standard of care.") (citing cases).

- WMATA chose not to designate any liability expert who could opine that Dr. Berkowitz's identification of the standard of care was incorrect.

- In its Reply/Opposition, WMATA dedicates its argument not so much to the substantive assertion that the standard of care is not the standard of care, but instead to the technical assertion that Dr. Berkowitz did not identify enough sources in support of the standard.

The fact of the matter is that not only is the standard well founded in common sense; it is followed by major mass transit agencies nationwide. On even the short notice afforded by the current briefing schedule, Dr. Berkowitz immediately identified the subway-operating agencies of New York, Philadelphia, and Chicago as also adhering to the national standard of care. (Ex. 5, Berkowitz Aff., at ¶ 4-6).

Of course, WMATA (nominally) adheres to the national standard of care, as well. While WMATA argues that "Plaintiff cannot use WMATA's standard operating procedures and internal policies to establish or serve as the standard of care necessary to prove negligence," (Def.'s Reply/Opp. at 5), WMATA is mistaken. A plaintiff cannot use a defendant's own policies as the **sole basis** to establish the standard of care, but the law is clear that such policies (and WMATA's Standard Operating Procedures specifically) may be relied upon as **a such basis**. *Robinson v. WMATA*, 774 F.3d 33, 39 (D.C. Cir. 2014) ("[A]lthough internal agency manuals such as WMATA's standard operating procedures may provide evidence bearing on the standard of care, they do not, on their own, establish the national standard."). In sum, there is no merit to WMATA's contention that Dr. Berkowitz does not properly articulate the applicable national standard of care.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

**V.    With respect to WMATA's Opposition to Plaintiff's Cross-Motion for Summary Judgment, Plaintiff stands on the analysis set forth in her Initial Brief.**

The only section of its filing that WMATA classifies as in opposition to Plaintiff's summary-judgment motion is Section B.  (Def.'s Reply/Opp. at 8).  In it, WMATA calls it "puzzling" that Ms. Scott moved for summary judgment with respect to its asserted contributory negligence affirmative defense, on the grounds that it is not really pursuing that defense . . . but then, WMATA proceeds to argue that it is indeed pursuing contributory negligence as a defense.  Also puzzling.  A riddle wrapped in a mystery inside an enigma.  But in any event, Ms. Scott stands on her initial briefing with regard to contributory negligence.

As outlined in her Initial Brief, the Court would be well within its rights to grant summary judgment on this issue on the basis of WMATA's failure to abide by the discovery rules.  (Pl.'s Initial Brief at Sec. VI.A).  But the Court could also choose to simply look past WMATA's conduct and grant judgment on the merits.

In brief: subway passengers are entitled to rely on train operators to do their job competently—reasonable passengers need not be constantly on guard for sudden starts, stops, jerks, jolts, or jars the way they might be on a bus.  As the District of Columbia Court of Appeals has explained,

> A reasonable person need not go through life timidly, seeking to guard against that which is only remotely probable and not to be feared except by the overly cautious.
>
> "As a general proposition, a plaintiff is not bound to anticipate negligent conduct on the part of others.  Rather, he may assume that others will fulfill their duties."

*Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985) (quoting J. DOOLEY, MODERN TORT LAW § 4.18 at 115 & n. 1 (1982)) (citing cases).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

At the moment WMATA's train operator jolted the train forward and threw her to the ground, Ms. Scott was not acting unreasonably; she was doing exactly what WMATA expects ordinary passengers to be doing.  WMATA knows that, in Ms. Scott's position, "Most times, people feel the train stop so they automatically get up thinking the doors are going to open." (SUMF ¶ 18).  And WMATA further knows that passengers in that position, not anticipating sudden, unannounced train movements, are not likely to be braced for impact—it is for that reason that before moving berthed trains, WMATA requires its train operators to explicitly warn customers, including explicit advice to "please hold on."  (SUMF ¶ 18).  In the time since Ms. Scott filed her Initial Brief, WMATA's own public statements, including direct quotations from its COO, have only buttressed those undisputed record facts.  (*See generally* Exs. 1, 2).

## VI.    A Brief Reply to Four of WMATA's Responses to Undisputed Material Facts.

WMATA's responses to four of the undisputed material facts Ms. Scott identified in support of her Counter-Motion for Summary Judgment merit a brief discussion.  Each will be examined in turn, beginning with the full text of the fact and WMATA's response thereto, for ease of reference.

### A.    Fact No. 17

17.    As of September 2019, WMATA's Standard Operating Procedures required that train operators berth their trains at station platforms, then wait 5 seconds before opening the doors.

> Q. Okay. So then would it be fair to say -- circling back, would it be fair to say for the train operator controlling the train on which Ms. Scott was hurt, as she pulled into the station, she was supposed to bring the train to a stop then wait five seconds and look out the window and then open the doors to the train; is

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

that the policy and procedure that she was expected to follow at
that point?

A. Yes.

(Ex. 2, WMATA Dep. (Henry) at 30:6-15).

**Response:**  There is no dispute as to the content of Ms. Henry's Testimony.

**Analysis.**  WMATA's response is nonresponsive because it does not address the fact.

It is not merely undisputed that WMATA's Rule 30(b)(6) designated representative spoke

those words under oath; also undisputed is the fact itself.  The Court should deem Fact No.

17 undisputed for purposes of the pending motions.  FED. R. CIV. P. 56(e)(2).

### B.   Fact No. 19

19.    The explicit purpose of the required "Attention customers, this train will move
forward; please hold on" announcement is to allow the customers to grab ahold of something
before the train moves, so they don't get hurt.

Q. After you've come to a complete stop at the platform, are
you ever allowed to move the train forward again?

A. Yes.

Q. Under what circumstances? When are you allowed to do
that?

A. If your train is not properly berthed at the eight car marker.

Q. If you're going to move the train forward again after it's
stopped, do you announce that to the passengers?

A. Yes.

Q. Why is that?

MR. CHANDONNET: Objection. You can answer.

A. Why do we make an announcement?

BY MR. REGAN:

Q. Correct.

A. Just so that people are on the platform and on the train are
aware.

Q. Okay. I don't want to put words into your mouth. But is one reason that people need to know the train is going to move forward again so that they can be prepared and not fall?

MR. CHANDONNET: Objection. You can answer.

A. Correct.

(Ex. 7, Johnson Dep., at. 11:14-12:18).

Q. If you stop short, are you allowed to move the train forward again?

A. You're allowed to reposition the train until you're properly berthed.

Q. That's with that warning, you must give the verbal warning that's set forth in SOP 50-point-something that we looked at earlier; right?

MR. CHANDONNET: Objection.

BY MR. REGAN:

Q. Alerting the passengers that you're going to move the train so they don't get hurt; right?

MR. CHANDONNET: Objection.

A. Yeah, according to 50.5, yes.

BY MR. REGAN:

Q. And that is the purpose, by the way; right? I think you said the purpose was so they can hold on. The worry is they're going to get hurt if they're not warned about what's happening; right?

MR. CHANDONNET: Objection.

A. They could, if they're not paying attention, they could get hurt. Most times, people feel the train stop so they automatically get up thinking the doors are going to open.

(Ex. 2 at 47:3-16, 66:1-67:4).

**Response:**  Disputed in that it is not a factual contention and relies on the opinion of a rail operator as opposed to a 30b6 witness.

**Analysis.**  WMATA's response is improper.  First, the fact is, indeed, a fact capable of being responded to by an opposing party.  Second, the material facts relied upon in support of a summary-judgment motion are not required to be party admissions; frankly, they rarely are.

But third, in this case, the testimony cited by Ms. Scott in support of this fact **actually is the**

**testimony of WMATA's Rule 30(b)(6) designated representative.**  The first quotation (Ex.

7) is that of the train operator, Ms. Johnson; the second quotation (Ex. 2) is that of WMATA's

designated representative Keisha Henry.  The Court should deem Fact No. 19 undisputed for

purposes of the pending motions.  FED. R. CIV. P. 56(e)(2).

### C.   Fact No. 21

21.    After Ms. Scott had stood up, the train operator suddenly "jerked," "launched,"
or "lurched" the train forward, as confirmed not only by Ms. Scott, but by every single one of
the three eyewitnesses identified in WMATA's Incident/Accident Report.

> (Ex. 5 at No. 11 ("As Ms. Scott was reaching for the center pole
> for support while she waited for the doors to open, suddenly, and
> without any warning whatsoever, the train launched forward.
> This abrupt movement threw Ms. Scott multiple feet through the
> air, forcing her to land violently on the ground on her left hip.")).

WMATA Incident/Accident Report Witness A.E. stated:

"Woman stood up because the train stopped at McPherson Sq.
The train then jerked forward and the woman fell into the [aisle].
I stayed with her until paramedics arrived."



(Ex. 1 at 5 (and transcribed at page 4)).

WMATA Incident/Accident Report Witness S.S. stated:

"Train jerked at station I heard loud thump then a scream. People
trying to move her after that. I called emergency in on box in car
3144 asking for emergency assistance then screamed for no one
to move her till medics arrive. Then put jacket under Ms. Carol's
head and tried to calm her down till medic arrive."

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030



(Ex. 1 at 5 (and transcribed at page 4) (all spellings, punctuation, and syntax in original)).

WMATA Incident/Accident Report Witness D.P. stated:

"Saw the lady in question stand up when the train stopped at McPherson Sq. Unexpectedly, the train lurched forward and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again."



(Ex. 1 at 7 (and transcribed[9] at page 3)).

**Response:** WMATA does not dispute that is what the witnesses stated, however disputes the description of the trains movement as there is no objective evidence in the record regarding the actual movement of the train. Further, this statement is hearsay and cannot be

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

[9]    Actually mis-transcribed, errantly substituting "lost power" for "lurched forward."  No party contends that the train ever lost power during the course of the incident.

used to oppose a motion for summary judgment. Ragsdale v. Holder, 668 F. Supp 2d 7, 23-24 (D.D.C. 2009).

**Analysis.** Even if the only evidence of the train's movement were Ms. Scott's testimony that the train suddenly jerked forward, launching her through the air (in other words, ignoring the witness statements collected in WMATA's own business record), that would be sufficient to establish the train's movement. WMATA has not produced—and cannot—any record evidence tending to contradict that testimony. More importantly, WMATA's Rule 30(b)(6) corporate designee explicitly adopted the foregoing witness statements as WMATA's understanding of the truth of how the incident occurred. (*See supra*, Sec. III.A). Further, the one witness with whom undersigned counsel were able to reconnect on seven days' notice, Stacey Swain, has already confirmed (by declaration under penalty of perjury) the substance of her statement. (*See supra*, Sec. III.B). For the foregoing reasons, Fact No. 19 is undisputed.

### D.    Fact No. 22

22.    Before jerking the train forward, WMATA's train operator did <u>not</u> warn the train passengers that she was going to move the train forward, let alone do so violently.

> (Ex. 5 at No. 11 ("As Ms. Scott was reaching for the center pole for support while she waited for the doors to open, suddenly, and without any warning whatsoever, the train launched forward.")).
>
> WMATA Incident/Accident Report Witness D.P. stated:
>
> "Saw the lady in question stand up when the train stopped at McPherson Sq. Unexpectedly, the train lurched forward and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. <u>I did not hear the train conductor the train was moving again</u>."

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030



SAW THE LADY IN QUESTION STAND UP WHEN THE TRAIN STOPPED AT MC PHERSON SQ. UNEXPECTEDLY, THE TRAIN LURCHED FORWARD AND THE LADY FELL HARD ON THE AISLE FLOOR. SHE IMMEDIATELY CRIED OUT IN PAIN AND SAID SHE BROKE HER LEG. I DID NOT HEAR THE TRAIN CONDUCTOR THE TRAIN WAS MOVING AGAIN.

(Ex. 1 at 7  (and transcribed[10] at page 3) (emphasis added)).

WMATA's Rule 30(b)(6) corporate designee confirmed that WMATA is not aware of any evidence to the contrary:

> Q. One of the witnesses explicitly noted that the train operator never made any announcement that the train was going to be in motion again. Do you remember that or do you want me to pull it up?
>
> A. I remember -- I remember seeing that, yes.
>
> Q. Is WMATA aware of any evidence that would contradict that; in other words, is there any evidence that WMATA is aware of that the train operator announced the train would be moving before she moved it forward again?
>
> A. No.

(Ex. 6, WMATA Dep. (Bennett), at 31:17-32:7).

**Response:**  Disputed.  WMATA's train operator only states that she does not remember making the statement, not that it wasn't made.  Further, WMATA disputes all descriptive contentions regarding the movement of the train.  Further, this statement is hearsay and cannot be used to oppose a motion for summary judgment.  Ragsdale v. Holder, 668 F. Supp 2d 7, 23-24 (D.D.C. 2009).

**Analysis.**  With respect to the first sentence of WMATA's response, the fact that (1)

Ms. Scott (again, even if we overlook for the moment the statements of every single other

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

---

10    Actually mis-transcribed, errantly substituting "lost power" for "lurched forward."  No party contends that the train ever lost power during the course of the incident.

witness, all of whom agree with Ms. Scott) has testified that the required verbal warning was NOT provided, (2) the train operator cannot say whether she gave it or not, and (3) WMATA is at a corporate level unaware of ANY evidence that the required warning was given means that there is no genuine dispute regarding this fact.

With respect to the second sentence of WMATA's response, it is not enough for WMATA to merely say that it "disputes all descriptive contentions regarding the movement of the train." As Rule 56 explains,

> A party asserting that a fact [] is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56 (c)(1).

With respect to the third sentence of WMATA's response, it is both irrelevant and wrong. Fact No. 19 can be established and deemed undisputed through Ms. Scott's testimony alone, and her testimony is undisputedly not hearsay. In addition, as previously noted, WMATA's Rule 30(b)(6) corporate designee explicitly adopted the foregoing witness statements as WMATA's understanding of the truth of how the incident occurred. (*See supra*, Sec. III.A). Further, the one witness with whom undersigned counsel were able to reconnect on seven days' notice, Stacey Swain, has already confirmed (by declaration under penalty of perjury) the substance of her statement. (*See supra*, Sec. III.B).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030

In sum, the Court should deem Fact No. 22 undisputed for purposes of the pending motions.  FED. R. CIV. P. 56(e)(2).

## VII.  Conclusion

For the reasons set forth above, as well as in her Initial Brief, Ms. Scott respectfully requests that the Court DENY Defendant's Motion for Summary Judgment and (2) GRANT Plaintiff's Cross-Motion for Summary Judgment as to Defendant's Negligence and Affirmative Defense(s).

Respectfully submitted,

REGAN ZAMBRI LONG PLLC

By:   /s/ Christopher J. Regan
Patrick M. Regan          #336107
pregan@reganfirm.com
Christopher J. Regan      #1018148
cregan@reganfirm.com
1919 M Street, N.W., Suite 350
Washington, D.C. 20036
PH:  (202) 463-3030
FX:  (202) 463-0667
*Counsel for Plaintiff*

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, D.C. 20036

202-463-3030