

# Transcript of Clev Bernard Ibanez Bennett, Designated Representative

**Date:** February 9, 2023
**Case:** Scott -v- Washington Metropolitan Area Transit Authority

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

## Page 1

```
         UNITED STATES DISTRICT CIRCUIT COURT
              FOR THE DISTRICT OF COLUMBIA
------------------------X
CAROL WILD SCOTT,
        Plaintiff,
    vs.              Civil Action No.
WASHINGTON METROPOLITAN    22-cv-00601 (CRC)
AREA TRANSIT AUTHORITY,
        Defendant.
------------------------X


    30(b)(6) DEPOSITION OF CLEV BERNARD IBANEZ BENNETT
                   Conducted Remotely
              Thursday, February 9, 2023
                   2:58 p.m. Eastern


Job No.: 480571
Pages 1 - 54
Reported by: Cynthia Powers
```

## Page 2

```
                  A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
        Christopher J. Regan, Esquire
        Regan, Zambri & Long, PLLC
        1919 M Street, N.W., Suite 350
        Washington, D.C. 20036
        (202) 463-3030
        cregan@reganfirm.com

ON BEHALF OF THE DEFENDANT:
        Brendan H. Chandonnet, Esquire
        Nicholas L. Phucas, Esquire
        Washington Metropolitan Area Transit
        Authority
        Office of General Counsel
        300 7th Street, S.W.
        Washington, D.C. 20004
        (202) 962-1234
        bchandonnet@wmata.com
```

## Page 3

```
                    I N D E X
                                              Page
Examination by Mr. Regan                        5


                    E X H I B I T S
                      (Attached)
Number                                          Page
Exhibit 1    Amended Notice of 30(b)(6)         5
             Deposition
Exhibit 2    Incident/Accident Report,          5/8
             9/23/19
Exhibit 3    Incident Report, 9/23/19           5/18
Exhibit 4    E-Mail, Graves to WMATA            5/24
             WMSC Notification, 9/23/19
Exhibit 5    Press Release, 3/4/19              5
Exhibit 6    Press Release, 6/19/19             5
Exhibit 7    E-Mail, 3/2/19, Bates              5/51
             No. WMATA000060
Exhibit 8    Rail Signal Safety Updates         5
Exhibit 9    Station Overrun Report,            5
             4/20/19
```

## Page 4

```
                    E X H I B I T S
                     (Continued)
Number                                          Page
Exhibit 10   Station Overrun Report,            5
             4/28/19
Exhibit 11   RTRA Training Request Form         5
Exhibit 12   Investigation Report               5/34
Exhibit 13   E-Mail, Bumbry to Alston           5/46
             and others, 2/26/19
Exhibit 14   Trains Certification Result        5/49
Exhibit 15   Standard Operating Procedue        5
             Nos. 40.5 and 50.5
Exhibit 16   Washington Post Article,           5
             6/26/18
```

Page 5

```
 1           P R O C E E D I N G S
 2        (Whereupon, WMATA Deposition Exhibits 1
 3  through 16 were premarked electronically for
 4  identification.)
 5        THE COURT REPORTER:  Will counsel please
 6  stipulate that in lieu of formally swearing in the
 7  witness in person, the reporter will instead ask
 8  the witness to acknowledge that their testimony
 9  will be true under the penalties of perjury and
10  that counsel will not object to the admissibility
11  of the transcript based on proceeding in this way.
12        MR. REGAN:  On behalf of the plaintiff,
13  yes.
14        MR. CHANDONNET:  I'm fine with that.
15        MR. PHUCAS:  That's fine.
16         CLEV BERNARD IBANEZ BENNETT
17
18      having been satisfactorily identified
19       and duly sworn by the Notary Public,
20      was examined and testified as follows:
21
22        EXAMINATION BY COUNSEL FOR PLAINTIFF
```

Page 6

```
 1  BY MR. REGAN:
 2     Q.  Good afternoon, Mr. Bennett.  We met
 3  just a couple seconds ago off the record.  Again,
 4  my name is Chris Regan and I represent the
 5  plaintiff, Carol Scott, in this case.
 6        Would you please state your full name
 7  for the record?
 8     A.  Clev Bernard Ibanez Bennett.
 9     Q.  And Mr. Bennett, let me show you what's
10  been marked Exhibit 1.  This is a notice of
11  deposition for today's deposition.  Do you see
12  that on your screen?
13     A.  Yes.
14     Q.  My understanding -- just scrolling down
15  to the second page.  My understanding is that
16  you're going to be talking with us today about
17  areas of testimony 1, 2, and 7.  Is that your
18  understanding as well?
19     A.  Yes.
20        MR. REGAN:  And Brendan, 6, sort of
21  subject to what we discussed in the last
22  deposition; right?  We're not, but we discussed it
```

Page 7

```
 1  last time?
 2        MR. CHANDONNET:  Yes.
 3  BY MR. REGAN:
 4     Q.  All right.  So Mr. Bennett, I know that
 5  Mr. Chandonnet is on a short timer today, so I'm
 6  going to try to move quickly.
 7     A.  Okay.
 8     Q.  Have you ever had your deposition taken
 9  before?
10     A.  Yes.
11     Q.  You probably know most of the rules and
12  I'm not going to waste time.  The most important
13  one is just that if I ever ask a question at some
14  point over the course of the next two hours that
15  you're not sure you understand or just doesn't
16  make sense, which I'm bound to do at some point,
17  let me know and I'm always going to be happy to
18  rephrase it.
19        The important thing is for us to both
20  make sure we're talking about the same thing and
21  understanding each other.  Okay?
22     A.  All right.
```

Page 8

```
 1     Q.  All right.  Let's take a look at
 2  Exhibit 2, please.  On your screen should be
 3  Exhibit 2, and with this and any exhibit that I
 4  put up there today, I'm happy to scroll up and
 5  down, show you all the pages, zoom in, zoom out,
 6  whatever you need to make sure you can read it
 7  and --
 8        MR. CHANDONNET:  Chris, if you just give
 9  him the Bates number, he has it in front of him.
10        MR. REGAN:  This is Bates WMATA 2
11  through 9.
12        MR. CHANDONNET:  Got it.  We're good.
13        MR. REGAN:  The only catch, Brendan, I
14  might be referring to stuff on the screen, but
15  I'll describe it as I go through anyway.
16        (Introduced Exhibit 2)
17  BY MR. REGAN:
18     Q.  Mr. Bennett, whatever is easier for you
19  is fine with me.
20     A.  Okay.
21     Q.  First of all, Mr. Bennett, what is this
22  document that we're looking at?
```

**Page 13**

from, but what I would note in reading these, all of them are written in the first person and in different handwriting.

What it looks like to me is like the responding MTPD officer got people to write down their own statements here and sign them. Does that help you put anything together? Do you know if that's what we're looking at or not?

A. No.

Q. Okay. Well, so let's look at them anyway. I guess let's start with this statement by an Al Omondi [ph.]. You can read along with me.

It says, "Woman stood up because the train stopped at McPherson Square. The train then jerked forward and the woman fell into the aisle. I stayed with her until paramedics arrived."

I read that correctly; right?

A. Yes.

Q. Then we come down to the next one, Stacy Swain [ph.]. It says, "Train jerked at station. I heard loud thump then a scream. People trying

**Page 14**

to move her after that. I called emergency in intercom in [something] box in car 3144, asking for emergency assistance then screamed for no one to move her until medics arrive. Then put jacket under Ms. Carol head and tried to calm her down until medics arrived."

Pretty close anyway; right?

A. Yes.

Q. Okay. Coming down here to page WMATA 8, we have a statement from Don Phillips. "Saw the lady in question stand up when the train stopped at McPherson Square. Unexpectedly, the train lurched forward and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again."

I read that correctly; right?

A. Yes.

Q. And that one has got -- even Don Phillips signed his name underneath it. There's a signature underneath that statement; right?

A. Yes.

**Page 15**

Q. Does WMATA have any reason to doubt the truthfulness of any of the three statements that we just walked through?

A. No.

Q. So as far as WMATA is concerned, is that WMATA's understanding of exactly what happened that day?

MR. CHANDONNET: Objection. You can answer.

A. Can you repeat the question? I'm sorry.

BY MR. REGAN:

Q. Sure. So let's talk in broad strokes here. All three of those things say the same thing to me; all right?

And tell me if you disagree, but it says the lady stood up when the train stopped; right? And then unexpectedly, the train jerks forward again and that causes the lady to fall; "the lady" being Carol Scott. Is that WMATA's understanding of exactly what happened that day?

MR. CHANDONNET: Objection.

THE WITNESS: Can I answer that?

**Page 16**

MR. CHANDONNET: Unless I tell you not to answer.

A. Okay, yeah.

BY MR. REGAN:

Q. Yes?

A. Yes.

Q. Okay. Fair to say, WMATA is not aware of any witness statement that contradicts the three that we just looked at?

A. Out of the three, no.

Q. I'm sorry?

A. No.

Q. No, it's not fair to say that or no, no such statements exist?

A. You said out of the three pages, do I see a contradictory, no.

Q. Okay. And it might have been -- I think we might have both been talking about two different things and I talk too fast.

Are there any other witness statements that WMATA is aware of that contradict what these three witnesses said in their statements?

**17**

1    A.   I wouldn't be able to answer that one.
2  Because I don't -- I'm just having what's
3  available to me.
4    Q.   Okay.  And so you -- you're in the
5  unenviable position of testifying on behalf of
6  WMATA and on behalf of all information available
7  to WMATA, which is why I'm asking questions that
8  go beyond what you may or may not know.  I have to
9  at least ask.
10       Well, maybe we've already answered this
11 a different way, which is:  WMATA effectively does
12 not doubt any of those three statements; right?
13 You said that is WMATA's understanding of how this
14 thing unfolded?
15   A.   Yes.
16       MR. CHANDONNET:  Objection.
17 BY MR. REGAN:
18   Q.   Bear with me one moment here.  I'm going
19 to look at one other document with this.  Easiest
20 way to do it is like this.
21       All right.  On your screen ought to be
22 both Exhibit 2 with the yellow page still up, and

**18**

1  then Exhibit 3, which is WMATA pages 18 through
2  29.
3        (Introduced Exhibit 3)
4  BY MR. REGAN:
5    Q.   Do you see both of those?
6    A.   I see it on your screen.  I'm just
7  trying to...
8    Q.   Okay.  It's the second document,
9  Exhibit 3, begins at page WMATA 18.
10   A.   All right.
11   Q.   All right.  And do you have that in
12 front of you now?
13   A.   Yes.
14   Q.   All right.  What is that document,
15 Exhibit 3 starting at WMATA 18?
16   A.   This is a -- what we call a Maximo entry
17 for this incident.
18   Q.   All right.  What's a Maximo entry?
19   A.   It's when they have an incident, they
20 just -- another way of tracking incidents.  It's
21 just like a system, a maintenance system that
22 WMATA uses.

**19**

1    Q.   Okay.  So it has the incident report
2  date there on the third line; right?
3    A.   Third line.
4    Q.   Yeah, third line from the top, the first
5  line says, "Department Incident Date," and then it
6  says, "Incident Report Date"; right?
7    A.   Yes.  Make sure of something.
8    Q.   And so is that referring back to
9  Exhibit 2, which is actually, I guess, multiple
10 versions of incident reports as you told us?
11   A.   I'm sorry, let me --
12   Q.   Let me ask you this way.
13   A.   I'm sorry.  I got my words mixed up.
14 It's SMS, not Maximo, SMS tracking system.
15   Q.   Okay.  That's Safety Management System?
16   A.   Yes.
17   Q.   What's the purpose of an SMS report?
18   A.   Okay.  That's when any type of incidents
19 or accidents or unusual occurrences are documented
20 into this system, for better way of tracking and
21 keeping up with all documents.
22   Q.   Okay.  Is all of the information in

**20**

1  Exhibit 3 taken from the incident reports in
2  Exhibit 2, which was Metro pages 2 through 9?
3    A.   Two through 9.
4    Q.   Does my question make sense to you?
5    A.   You asked me if the information that is
6  on page 18 come from pages 2 through -- 2 through
7  5, yes, some of that information comes from those
8  incident reports.
9    Q.   Some but not all?
10   A.   I'd have to look at the rest.  It's not
11 verbatim, but that information does come from
12 reports received and it is put in the SMS.
13   Q.   Okay.  And maybe this is the -- maybe
14 the most basic question is:  They don't go out and
15 separately interview witnesses or investigate the
16 scene or the train or anything to come up with the
17 SMS report, do they?
18   A.   No.
19   Q.   Okay.  I have a question about this.
20 I'm looking at WMATA page 28.  Why don't you flip
21 to that page in your copy and let us know when
22 you're there.