**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAROL WILD SCOTT**, | |
| Plaintiff, | |
| v. | Case No. 22-cv-601 (CRC) |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Carol Scott, then 79 years old, was riding an Orange Line Metrorail train to McPherson Square in Washington, D.C., on a September evening in 2019. When the train pulled into her station, Scott heard an announcement over the intercom that the doors would be opening on the lefthand side. After waiting a few moments, but before the doors had opened, Scott rose from her seat and made her way toward the exit. Then, without advance notice, the train suddenly lurched forward. Scott lost her balance and fell to the floor, fracturing her femur upon impact.

Three years later, Scott filed this lawsuit against the Washington Metropolitan Area Transit Authority ("WMATA") for one count of negligence. Following discovery, WMATA moved for summary judgment arguing that there is no evidence that the train's acceleration was anything more than a routine jerk which should be expected while traveling on public transit. It thus maintains that there is no evidence that the train was operated in a negligent manner. Scott cross-moved, contending that the train's operator violated WMATA's internal policies—and, in turn, the applicable standard of care—by repositioning the train after it had improperly berthed at McPherson Square Station without first notifying passengers and directing them to hold on for

safety. Having considered both sides' briefs, the Court finds that neither is entitled to summary judgment at this juncture.

## I. Background

On the evening of September 23, 2019, Scott boarded a WMATA Orange Line train in Vienna, Virginia, en route to McPherson Square. Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶¶ 1–3. Scott, who was then pushing 80 years old, was no stranger to the train; she typically used the metro to commute into D.C. "once or twice a month." WMATA MSJ, Ex. A ("Scott Dep.") at 19:13–16. That day, Scott was travelling alone and carrying a purse and cane that she had begun using the year before to "support [her] when [she] had to walk long distances" and, if need be, as a handy defensive tool should anything go awry while strolling through the city at night. Id. at 25:1–26:18; 34:19–22.

Once onboard, Scott sat in a front-facing window seat adjacent to the inward-facing "priority seats," which were unoccupied. Id. at 24:17–25:7. When the train pulled into her station and had come to a complete stop, Scott reports hearing an announcement: "McPherson Square, doors opening on the left." Id. at 27:1–13. After waiting a few seconds, but before the doors had swung open, Scott says she stood up from her seat to depart. Id. at 17:19–18:4; 27:1–6; 30:6–12. Her cane was in hand, but it is unclear whether (and to what extent) Scott used the shillelagh-styled walking stick to ambulate and maintain her balance as she strode toward the doors. See id. at 34:2–35:19; ECF No. 25-1, Pl.'s Resp. to DSUMF ("Pl.'s Resp.") ¶¶ 8, 14. It's undisputed, however, that Scott did not hold onto any seatback, center poles, or overhead support as she waited for the doors to open. See Pl.'s Resp. ¶ 13; Scott Dep. at 30:21–31:4.

Then, without prior notice, Scott claims "[t]he train jerked forward." Scott Dep. at 18:7. Scott describes trying to reach for the center pole, but the force of the movement caused her to

"f[a]ll back into the aisle." Id. at 18:5–8. Upon hitting the ground, Scott says she felt an immediate pain in her left leg "far greater than anything [she] had ever experienced before" and began screaming. Id. at 18:9–15; 36:17–21. She remained on the ground for 30 to 40 minutes until paramedics arrived and carried her off the train. Scott MSJ, Ex. 4 ("Berkowitz Rep.") at 26; Scott MSJ, Ex. 1 ("WMATA Accident Rep.") at 1. Scott was then transported to George Washington University Hospital, where doctors determined that she had suffered a proximal femur fracture that required surgery. See Berkowitz Rep. at 26.

WMATA's accident report tracks Scott's account of the events leading to her injury. Three eyewitnesses interviewed for the report all told similar stories: After the train had fully stopped at McPherson Square Station, it suddenly "jerked," "launched," or "lurched" forward without a warning to passengers. See WMATA Accident Rep. The train operator also provided a statement for the accident report, but she primarily focused on the accident's aftermath and did not address how it occurred in the first place. See id. at 1. Later, in her deposition, the operator testified that she could no longer recall the events of that day. See Scott MSJ, Ex. 7 ("Johnson Dep.") at 23:9–16. WMATA's corporate designee, meanwhile, testified that he was unaware of any evidence contradicting Scott's account of the accident or indicating that "the train operator announced the train would be moving before she moved it forward again." Scott MSJ, Ex. 6 ("Bennett Dep.") at 31:17–32:7.

Scott filed the present action in March 2022, alleging one count of negligence. See Compl. ¶¶ 20–25. In particular, Scott claimed that the train operator acted negligently by repositioning the train without prior notice after it had made a complete stop at McPherson Square Station and announced over the intercom that the doors were opening on the left, making it appear safe to alight. See id. ¶¶ 11–13, 22. In support of this claim, Scott submitted a report

3

prepared by a "[t]ransporation safety engineering expert," Dr. Carl Berkowitz. See Scott MSJ at 5. Dr. Berkowitz opined that the operator's apparent decision to reposition the fully stopped train at the station without advance notice violated the applicable national standard of care, as reflected in WMATA's Standard Operating Procedure ("SOP") ¶ 50.5.1.1, which instructs operators to first make an advisory warning before repositioning trains that have been improperly berthed at a station. See Berkowitz Rep. at 3, 17–18, 22.

Before the Court are both sides' dueling motions for summary judgment. WMATA contends that Scott's claim fizzles at the outset because she cannot show that the train moved in an unusual way beyond the ordinary jerks and jolts that are incident to public transportation—and, thus, implicitly accepted by all metro passengers. Scott retorts that the undisputed facts show that the operator breached the national standard of care by repositioning the train after it had arrived at McPherson Square Station without any prior warning.

## II. Legal Standards

To grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, a court must find that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (citation omitted). "Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. However, "mere allegations" or conclusory statements are not enough to create a genuine issue of material fact. Swanson Grp. Mfg. LLC v. Jewell, 790 F.3d 235, 240 (D.C. Cir. 2015).

### III. Analysis

Neither side has sufficiently proven that it is entitled to judgment as a matter of law. WMATA relies on the longstanding and widespread rule that a common carrier is not liable for sudden movements that are "no more than the necessary or usual incidents of [its] operation." D.C. Transit Sys., Inc. v. Perry, 337 A.2d 224, 225 (D.C. 1975). But this line of precedent does not resolve whether it is "necessary" or "usual" for a train to surge forward after it has arrived at a station and indicated to passengers that it is safe to alight. Scott, for her part, does focus on the unique issues posed by a train suddenly moving while passengers are preparing to disembark. In particular, she contends that WMATA violated its own internal policies that September evening by repositioning the train at McPherson Square Station, after it had come to a complete stop, without first warning passengers. Even if true, though, that's not enough to prove negligence under D.C. law because Scott has failed to demonstrate that this internal guidance reflects a national standard of care. The Court will first elaborate on WMATA's motion before turning to Scott's.

#### A. WMATA's Motion for Summary Judgment

WMATA contends it is entitled to summary judgment because, in the District, it is "well established that passengers assume the risk of jerks, jars, sudden starts and/or stops as an incident of their travel on the conveyances of common carriers" and there is no requirement that carriers wait until all "passengers are seated before a conveyance is moved." WMATA MSJ at 1–2.

5

That is an accurate statement of the law, and the Court generally agrees with WMATA that these principles apply to train travel. But that settled law does not resolve this particular case.

An unbroken line of cases spanning over a century has held that "WMATA is not liable under District law for the normal jerks and jolts commonly associated with" the ordinary operation of a common carrier. Robinson v. WMATA, 774 F.3d 33, 42 (D.C. Cir. 2014). Plaintiffs instead must show "that the 'jerk' or 'sudden start' was of such unusual and extraordinary force that it could not reasonably be said to have happened in the ordinary operation of the vehicle." Id. (quoting Boyko v. WMATA, 468 A.2d 582, 583–84 (D.C. 1983)). The District is not alone in imposing this restriction; it mirrors the general rule that lurches or jerks that occur in the normal operation of a common carrier do not give rise to liability. See, e.g., Negligence Case: Res Ipsa Loquitur § 12:19 ("A presumption or inference of negligence from the sudden jerking or jolting of a conveyance arises only in the event the movement is of such violence that it would not be one likely to occur in the ordinary operation of the conveyance, as where the start or stop of a conveyance is unusually sudden or the jerk or jolt is of unusual severity or violence."); Grant v. N.Y.C. Transit Auth., 61 A.D. 3d 422, 422 (N.Y. 2009) (applying the "unusual and violent force" test). The rationale behind this rule is simple and sensible: Because sudden jerks and jolts are commonplace in city transit, "evidence of a jerk that resulted in injury is not usually enough for a jury to infer negligence." Johnson v. WMATA, 946 F.2d 127 (D.C. Cir. 1991) (per curiam). Only when the movement is "of such unusual and extraordinary force" is it fair to assume, under the doctrine of *res ipsa loquitor*, that it could not "have happened in the ordinary operation of the vehicle." Wiggins v. Cap. Transit Co., 122 A.2d 117, 118 (D.C. 1956). By the same token, "[p]assengers are said to assume" the risks of usual lurches "as an incident of their travel" and therefore cannot ground a negligence claim on such

6

quotidian movements. Id. That rule resolves this case, WMATA says, because Scott cannot show that the supposed lurch that caused her to tumble to the ground was anything out of the ordinary for subway travel.

Scott attempts to distinguish this line of cases by observing that they deal primarily with buses and streetcars, which are expected to stop and start repeatedly as they navigate through the bustling city streets. See Scott MSJ at 11–15. For underground subways, however, Scott argues that passengers need not assume the risk that their train will suddenly stop and start in an erratic manner. See id. The Court cannot but accept the truism that "subway trains are not buses (or streetcars, or taxicabs)." Id. at 14. Still, there is good reason to believe that the same general rule applies in both contexts, even if some applications may differ. Though D.C. Courts have not addressed this precise issue, they unflinchingly have held that the same "unusual and extraordinary force" test applies to a wide variety of common carriers. See, e.g., Wiggins, 122 A.2d at 118 ("We mention in passing that though some of the cases we have cited deal with streetcars rather than buses, the basic rules of liability are the same with reference to both types of carriers."). Other jurisdictions that employ this same test, meanwhile, have extended it to both trains and subways. See, e.g., 14 Am. Jur. 2d Carriers § 996; Delgiudice v. Metro. Transp. Auth., 36 A.D. 3d 649, 649 (N.Y. App. Ct. 2007). For good reason: As any frequent subway rider knows well, some lurching and jerking is expected during transit. Thus, absent contrary authority, the Court will presume that the "unusual and extraordinary force" test generally applies to commutes on the metro.

Applying that test, it is debatable whether the evidence Scott has proffered would clear the bar. The D.C. Court of Appeals has held that "'unusual and extraordinary force' . . . cannot be inferred from 'mere descriptive adjectives and conclusions' alone." Boyko, 468 A.2d at 584

(quoting Wiggins, 122 A.2d at 118). "Rather, reviewing courts must focus on 'the substance of the testimony, not on its grammatical form.'" Robinson, 774 F.3d at 42 (quoting Boyko, 468 A.2d at 584). "The critical question 'is whether the testimony, in whatever form it is offered, describes movement that is 'consistent with proper operation of the [common carrier].'" Id. (same). How Scott's evidence measures up against this standard is a difficult question. Some of her evidence is plainly insufficient. Her own testimony that the train suddenly "jerked forward," for example, does not reveal whether that movement was so strong as to be inconsistent with the proper operation of a subway. See Scott Dep. at 18:7. Third-party witness accounts captured in the accident report are no more informative, as they contain similarly vague language that D.C. courts have held do not justify putting the issue of negligence before a jury. See, e.g., Wiggins, 122 A.2d at 118. Scott did suffer serious injuries from the fall, to be sure, and "[i]n some cases a doctor's testimony about the severity of the motion necessary to cause an injury, coupled with evidence of a jerk . . . , can be sufficient for a jury to infer negligence." Johnson, 946 F.2d at 127. Yet these medical records shed little light on the matter because Scott's injuries are largely consistent with a person of advanced age falling down, irrespective of the gravity of the force that caused her to lose balance. And while Dr. Berkowitz discusses "jerk rates" in his report, he did not estimate the jerk rate in this accident, instead faulting WMATA for not doing so. See Berkowitz Report at 10–14.

At the same time, other strands of evidence indicate that the train's sudden movement here may have been unusually powerful. In her interrogatory responses, Scott claimed that the train "launched forward" in an "abrupt movement" that "threw [her] multiple feet through the air." Pl.'s Answers to Def.'s Interrog. and Resps. to Req. for Produc. of Docs at 7. To state the obvious, properly operated trains normally do not send passengers flying through the air. One

witness, Stacey Swain, also averred that the train "suddenly and violently jerked forward" after it had stopped for several seconds. Scott Reply, Ex. 4 ("Swain Aff.") ¶ 3. While D.C. courts have been somewhat uneven on this point over the years, more recent cases have held that "testimony that the motion of the [carrier] was 'abrupt' and 'violent' clearly transcends" the vaguer language excerpted above to identify conduct that is "not consistent with the ordinary operation" of a train. Boyko, 468 A.2d at 584. This suggests that, here, the train may have started with "such unusual and extraordinary force that it could not have happened in the ordinary operation of the vehicle." Id. at 584.

The Court need not decide whether this evidence is enough to pass the "unusual and extraordinary force" test, however, because the Court is unconvinced that this rule applies when passengers are reasonably attempting to alight from a train that has stopped at a station.

Although D.C. courts have not addressed this issue, other jurisdictions that follow the general law for common-carrier liability—including the "unusual and extraordinary force" test— have fashioned more specific rules governing operators' duties when passengers are alighting. As leading treatises show, courts often look first to whether the "acts or representations of the operator or conduct" have made it appear "safe and proper to alight at that time." 38 Am. Jur. Proof of Facts 2d 677. As usual, this is measured by "what an ordinarily prudent person would do under the circumstances." 14 Am. Jur. 2d Carriers § 954. If a reasonably prudent person would believe it is safe to alight, these jurisdictions have held that common carriers may be liable for sudden and unexpected movements because passengers should be able to disembark from the train without fear that it will abruptly pull forward. See, e.g., Duty of Carrier as to Notifying Passenger of Approach to or Arrival at Destination, 58 A.L.R. 1064 (listing cases across jurisdictions); 38 Am. Jur. Proof of Facts 2d 677 ("The [*res ipsa*] doctrine has been

applied in some cases to hold a carrier liable for injuries sustained by the passenger when, as the passenger was alighting from the carrier's stationary conveyance, the conveyance moved forward, causing the passenger to fall.")

This more specific rule for alighting makes sense when viewed against the policy concerns animating the doctrine.  As discussed, the general rule that a jerk or lurch must be "unusual and extraordinary" to support a negligence claim is built on the dual theory that (1) there is no basis for inferring negligence unless the movement was dramatic and atypical and (2) passengers assume the risk of ordinary lurches when boarding a bus or train.  The calculus changes when a reasonably prudent person would think that it safe to begin exiting the vehicle, however.  In those instances, negligence may be inferred from the mere fact that the vehicle moved when passengers were heading for the exits, and those passengers do not necessarily assume the risk that the vehicle will move forward after the operator has given the impression that it is safe to stand up and make one's way toward the doors.

A starker example proves the point.  If a train suddenly moved forward after it had arrived at the station and opened its doors, a passenger who fell to the ground while trying to exit should not have to show that the jerk was especially forceful to prove negligence.  The fact that the train moved forward with its doors open is itself sufficient evidence that something had gone wrong.  The present case, of course, is less clear cut because the doors remained closed as Scott headed to the exit. But the principle remains:  If a reasonable person would have believed that it was safe to alight, it might be unnecessary for the plaintiff to prove that the subsequent acceleration was especially forceful to make her case.  Depending on the standard practices, as understood by the reasonable passenger, the train suddenly moving forward without prior notice could be enough to prove negligence.

That would not conflict with the established rule in the District that common carriers need not wait until every passenger is seated before departing. See Connor v. Washington Ry. & Elec. Co., 43 App. D.C. 329, 333 (D.C. Cir. 1915). This rule is also shared across jurisdictions, as courts generally have recognized that requiring "bus and street car companies in cities to wait until all normal passengers are seated before starting their vehicles would unnecessarily delay the users of these means of transportation in reaching their destinations, without appreciably adding to their safety." Scott v. Cunningham, 171 S.E. 104, 104 (Va. 1933). Even while holding that carriers need not wait until every last passenger finds his or her seat, however, other jurisdictions typically have held that they "must stop for a reasonable length of time to afford . . . passengers an opportunity to alight, and they will be held liable for injuries suffered by alighting passengers when their conveyances are put in motion or jerked before their passengers have had such opportunity to alight." 14 Am. Jur. 2d Carriers § 938 (footnotes omitted). The two rules are thus in harmony, not conflict. Though operators need not wait until every passenger is seated before departing, it can nonetheless be negligent to move the train after it has stopped at the station and appears safe to head for the exit. Sudden movements in those moments may be a risk that passengers do not assume—and one they need not shoulder to prevent unnecessary delays in travel.[1]

---

[1] In fact, when articulating the rule that carriers do not need to wait until every passenger is seated, courts in this jurisdiction have emphasized the "common knowledge" of the warnings passengers can reasonably expect before departure. See Connor, 3 App. D.C. at 333 ("It is a matter of common knowledge that the conductor gives the signal to the motorman to start the car by ringing a bell. It is not the practice, nor is it his duty, to give each passenger personal notice that he is about to start the car."). But while those boarding a bus may know that the vehicle will not wait for them to be seated before departure, passengers may not realize that they should grasp for the support rails when disembarking on the off chance that the train might pull forward.

The Court will, accordingly, deny WMATA's motion for summary judgment. From the Court's vantage, the central question is whether a reasonable person in Scott's shoes would have believed it was safe to begin alighting after the train had come to a complete stop at the station and announced: "McPherson Square, doors opening on the left." Scott Dep. at 27:1–6. If yes, then the "unusual and extraordinary force" test may not apply, and Scott may be able to recover for the train operator's negligence in violating that expectation by suddenly advancing the train while she was preparing to exit. As other courts have recognized, however, this is a fact-intensive inquiry well within the jury's bailiwick. See, e.g., 7 Ill. Law and Prac. Carriers § 354 ("Questions of fact necessarily involved in the determination of the liability of the carrier in the particular case are for the jury[.]").

Regardless of whether WMATA acted negligently when moving the train forward in these circumstances, there is a separate question as to whether Scott was contributorily negligent by failing to take appropriate precautions. Generally, "[w]hen a conveyance comes to a stop to permit passengers to alight and while a passenger is in the act of alighting, the conveyance is suddenly started, the passenger is not guilty of contributory negligence for his or her resulting injuries." 14 Am. Jur. 2d Carriers § 956. Yet this too is a highly fact-intensive inquiry that turns on whether a "reasonably prudent person placed in the same situation would have apprehended the danger of the sudden start." Id.

As things currently stand, it is not evident that a reasonably prudent person would have expected the train to lurch forward after it stopped at McPherson Square Station and announced that the doors would be opening, and Scott appears to have hewed to standard practice in this scenario. In a 2023 press release announcing that train doors would henceforth open faster upon arrival at a station, WMATA wrote: "Anyone who uses Metrorail has experienced the wait,

standing at the door wondering when the doors will open." Scott Reply, Ex. 1. WMATA also has recognized that, while standing by the doors, many passengers will not brace themselves for a sudden movement. That's why, as discussed in greater detail below, WMATA SOP ¶ 50.5.1.1 directs operators who are repositioning a train that has arrived at a station to announce over the intercom: "Attention customers, this train will move forward; *please hold on*." Scott MSJ, Ex. 3 ("WMATA SOP") at 2 (emphasis added). WMATA's designee reinforced this point when explaining that, "[i]f the train stops short on the platform and the operator has to reposition the train," SOP ¶ 50.5.1.1 directs her to "announce . . . to customers that the train will be moving forward . . . [s]o they can hold on if they need to." Scott MSJ, Ex. 2 ("Simone Dep.") at 47:9–15. This suggests that, in the ordinary case, passengers may not be negligent for following this common practice and failing to hold on for support while preparing to disembark. See Washington Ry. & Elec. Co. v. Kramer, 44 App. D.C. 154, 157 (D.C. Cir. 1915) ("Many times have we ruled that it is not contributory negligence per se for a passenger to ride upon the platform or running board of a street railway car when in so doing he is following a common practice acquiesced in by the railway company.").[2]

But this may not be an ordinary case. Given Scott's age and mobility issues, one may fairly question why she decided not to avail herself of the open priority seat or use the train's poles (or perhaps her cane) to balance herself in case of a lurch. Moreover, on her own account, Scott observed the train "stop and then move forward" at four to five stations during her trip to McPherson Square that day. See Scott Dep. 17:11–14; 28:22–29:4. In those other instances, Scott says, this stop-and-go occurred prior to the announcement of the station. See id. at 17:9–

---

[2] This too is far from clear, however, as frequent metro riders may know to hold on for safety because some lurching after the train has pulled into the station is routine.

21; 30:8–15. Scott therefore may have been justified in thinking that it was safe to get up after she had waited a few beats following the announcement that the train had arrived at McPherson Square and the doors would soon be opening on the left. See id. at 30:6–9. Still, from her own experience riding the Orange Line that day, perhaps she should have been on notice that the train might move forward even after it had stopped at McPherson Square and, as a result, taken greater precautions while making her way to the door. WMATA has not moved for summary judgment on this basis, however. See WMATA Reply at 8 (explaining it is "seeking summary judgment based on assumption of the risk, not contributory negligence"). In any case, this question is likely best left for a jury as well. Cf. Contributory Negligence or Assumption of Risk of Passenger Leaving Seat Before Conveyance Stops, 52 A.L.R. 2d 585 ("The majority of the cases have taken the position that the plaintiff was not guilty of negligence as a matter of law in leaving his seat before the conveyance stopped, and that the question must be determined by the jury.")

For now, the Court finds that WMATA is not entitled to summary judgment because its motion failed to acknowledge the unique issues presented when a train suddenly moves forward during a period when reasonable passengers would believe that it is safe to alight.

B.  Scott's Cross-Motion for Summary Judgment

Scott is not entitled to summary judgment either. She contends that the train operator breached her duty, codified in WMATA SOP ¶ 50.5.1.1, to warn passengers over the intercom that the train would be moving forward after it had improperly berthed at McPherson Square Station. This reliance on SOP ¶ 50.5.1.1 is insufficient, however, because WMATA's internal policy does not establish the existence of a *national* standard of care, as required under D.C. law.

14

And regardless, even if Scott had established a national standard of care, her current motion still would not show that she is entitled to judgment as a matter of law.

"Under District of Columbia law, the plaintiff in a negligence action bears the burden of establishing three elements: 'an applicable standard of care, a deviation from that standard by the defendant, and injury resulting from that deviation.'" Robinson v. WMATA, 941 F. Supp. 2d 61, 67 (D.D.C. 2013) (quoting Scott v. Dist. of Columbia, 101 F.3d 748, 757 (D.C. Cir.1996)). "Ordinarily, the applicable standard of care is the traditional reasonable person standard, which the jury can ascertain without the aid of expert testimony." Robinson, 774 F.3d at 39 (cleaned up). "But where the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson, the plaintiff must proffer expert testimony to establish the applicable standard of care." Id. (same). Applying this test, other courts in this District at times have required expert testimony to "establish standards regarding the specific procedures that public transit . . . operators should follow." Robinson, 941 F. Supp. 2d at 67; accord Frick v. Amtrak, 54 F. Supp. 3d 1, 4 (D.D.C. 2014). The D.C. Circuit has expressed skepticism over any such ironclad requirement, however, doubting whether safety standards for public transit are always "outside the realm of common knowledge and everyday experience of average jurors." Robinson, 774 F.3d at 39 (cleaned up). The Court agrees that, in some cases, jurors can decide whether a common carrier acted negligently without input from experts. But even if they are not required in every public-transit case, expert reports remain an available route to proving negligence in such cases.

When a plaintiff does submit an expert report, that report must "clearly articulate and reference a standard of care by which the defendant's actions can be measured." Varner v. District of Columbia, 891 A.2d 260, 265 (D.C. 2006) (quotation marks omitted). "Especially in

cases involving safety standards, the expert must also show that the particular practice at issue reflects a *national* standard of care." Robinson, 774 F.3d at 39 (emphasis added). Violations of procedures prescribed by internal manuals are insufficient in themselves, as "a defendant cannot be held liable for aspiring to efforts beyond an applicable national standard." Varner, 891 A.2d at 269–70.

Scott has attempted to establish the applicable standard of care via her expert, Dr. Berkowitz, but his report failed to articulate any national standard of care. The report focused on WMATA SOP ¶ 50.5.1.1 which, as discussed, mandates that if an operator seeks to reposition a train after improperly berthing at the station, she must first announce: "Attention customers, this train will move forward; please hold on." Dr. Berkowitz determined that the operator's failure to follow SOP ¶ 50.5.1.1 by not warning passengers before repositioning the train at McPherson Square led to Scott's injuries. See Berkowitz Rep. at 22. "Based on the information presented in this draft safety report and with a reasonable degree of engineering certainty," he concluded, "it is my professional engineering opinion that the WMATA and the train operator failed to comply with the national standards of care when berthing the train at McPherson Square Station at the time of the incident." Id.

This analysis does not establish a national standard of care. Dr. Berkowitz places more weight on SOP ¶ 50.5.1.1 than it can hold. "[A]lthough internal agency manuals such as WMATA's standard operating procedures may provide evidence bearing on the standard of care, they do not, on their own, establish the national standard." Robinson, 774 F.3d at 39. "Rather, the expert must show that the practices to which the agency has committed reflect 'the national standard of care and not a higher, more demanding one.'" Id. (quoting Clark v. District of Columbia, 708 A.2d 632, 635 (D.C. 1997)). Dr. Berkowitz failed to do so. He instead treated

16

SOP ¶ 50.5.1.1 as the applicable standard without identifying any other transit authority that had the same or similar policy.  As other courts have held when confronted with similarly deficient expert reports drafted by Dr. Berkowitz, that oversight is fatal to establishing a national standard of care.  See Robinson, 941 F. Supp. 2d 61 at 68–69.  Apart from these internal policies, Dr. Berkowitz offered no other evidence, beyond his own say-so, that there actually is a national standard that operators must warn passengers before moving improperly berthed trains.  And, of course, an "expert's personal opinions or 'unsupported assertion[s] as to the national standard of care' are insufficient."  Robinson, 774 F.3d at 39 (quoting Clark, 708 A.2d at 636).  Reasoned analysis, not *ipse dixit*, is required.

After WMATA identified these shortcomings, Scott attempted to cure the problem by submitting a supplemental affidavit from Dr. Berkowitz as an attachment to her reply brief.  See Scott Reply, Ex. 5 ("Berkowitz Aff.").  In that new affidavit, Dr. Berkowitz explained that transit authorities in New York, Philadelphia, and Chicago "adhere[] to the same national standard of care with respect to restarting/repositioning an improperly berthed train" as reflected in SOP ¶ 50.5.1.1.  Id. ¶¶ 3–6.  Scott boasts that Dr. Berkowitz located these three examples on "the short notice afforded by the current briefing schedule."  Scott Reply at 14.  But that only highlights the problem:  Scott is filling in the gaps of her flawed expert report after discovery closed and during summary-judgment briefing.  That's no way to run a railroad.

Under Federal Rule of Civil Procedure 26(a)(2)(B), expert witnesses must provide a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them."  The purpose of that requirement is to "prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal reports, to depose the expert in advance of trial, and to prepare for depositions and cross-examinations at trial."  Minebea Co. v. Papst,

17

231 F.R.D. 3, 5–6 (D.D.C. 2005).  To be sure, Rule 26(e) "provides a limited exception to the deadlines provided under Rule 26(a)(2) by requiring an expert witness to supplement his report if the report is 'incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.'" Richardson v. Korson, 905 F. Supp. 2d 193, 199 (D.D.C. 2012).  But that exception is restricted to "correcting inaccuracies or adding information that was not available at the time of the initial report" and "does not grant a license to supplement a previously filed expert report because a party wants to."  Id. (citations omitted).  Scott has not argued that Dr. Berkowitz's affidavit fits within this narrow window.  And, from the Court's vantage, it would be unfair to allow Scott to rely on this supplemental affidavit when WMATA has not had the opportunity to depose Dr. Berkowitz about its contents or retain its own expert.[3]

Even if the Court were to consider this supplemental affidavit and accept its conclusions, Scott still would not be entitled to summary judgment for two reasons.  First, although Scott surmises that the operator must have violated SOP ¶ 50.5.1.1 by moving the train forward after it had improperly berthed at McPherson Square Station, the record does not conclusively show that this is in fact what occurred.  Dr. Berkowitz acknowledged this uncertainty in his expert report. "It is not clear from the incident reports what caused the train to suddenly accelerate forward at McPherson Square Station at the time of the incident," he wrote.  Berkowitz Rep. at 3.  Based on WMATA's accident report and its designees' deposition, Dr. Berkowitz concluded, "the sudden acceleration was *likely* caused by the train operator repositioning the train when it stopped short

---

[3] To be sure, WMATA could have retained its own liability expert and deposed Dr. Berkowitz during discovery.  It opted not to do either based on the existing draft of Dr. Berkowitz's report, however, and it would be unfair to hold WMATA to that earlier litigation decision while allowing Scott to further develop her expert testimony after the fact.

of the required berthing position at the station." Id. (emphasis added). But that is by no means a definitive account of what happened that September evening.[4] Second, proving that WMATA was negligent is only half the battle because, to recover, Scott also must prove that she was not contributorily negligent in her accident—a defense that WMATA expressly raised in its Answer. Scott seeks to sidestep the issue by claiming that WMATA waived this defense by refusing to respond to her "contention interrogatory" requesting that WMATA disclose all information and witnesses upon which it intended to rely to prove contributory negligence. See Scott MSJ at 19–22 (citing PSUMF ¶ 30). She rightly questions WMATA's objection to this request—that it intruded upon defense counsel's strategy and called for speculation because WMATA was still gathering facts—as contrary to the holdings of many courts in this District. See, e.g., Inova Health Care Servs. for Inova Fairfax Hosp. & Its Dep't, Life with Cancer v. Omni Shoreham Corp., No. 20-cv-784 (JDB), 2021 WL 6503725, at *4 (D.D.C. Jan. 29, 2021) (finding that contention requests are proper and usually do not impinge on attorney work product). But that deficiency would have been best presented in a motion to compel WMATA to supplement its response. It does not mean that WMATA waived its contributory negligence defense altogether or that judgment should be entered in Scott's favor. If anything, it supports reopening discovery so that this issue can be more fully developed and resolved by the ultimate arbiter of the dispute over what a reasonable person in Scott's position would have done: a jury of her peers.

\*   \*   \*

---

[4] The doctrine of *res ipsa loquitur* may suggest that, unless WMATA provides an alternative explanation, the Court should assume this version of events. See Bell v. May Dep't Stores Co., 866 F.2d 452, 455 (D.C. Cir. 1989) (describing the *res ipsa* doctrine); Berkowitz Rep. at 3 (noting WMATA "[f]ailed to provide evidence as to whether the sudden, unexpected and violent movement was due to mechanical issues or train operator error"). Scott did not make this argument in her brief, however, so the Court is not well positioned to decide that matter now.

With neither side prevailing on its respective motion for summary judgment, the next question is where to go from here. Based on the new evidence and arguments advanced during this round of briefing, the parties may wish to seek leave to reopen discovery so that (1) Scott can supplement her expert report on the standard of care, and WMATA, in turn, can depose Dr. Berkowitz and potentially retain its own expert; and (2) WMATA can correct any deficiencies in its interrogatory response on contributory negligence. Alternatively, the parties may decide to proceed to trial or attempt to resolve the dispute through alternative means with the benefit of today's ruling. Given these divergent tracks, the Court directs the parties to confer and, within the next thirty days, file a joint status report proposing next steps in the case.

IV. **Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 24] WMATA's Motion for Summary Judgment is DENIED; it is further

**ORDERED** that [Dkt. No. 25] Scott's Cross-Motion for Summary Judgment is DENIED; it is further

**ORDERED** that the parties confer and file a joint status report by July 31, 2024, proposing next steps in this proceeding.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: July 1, 2024