# Transcript of Carol Wild Scott
## November 9, 2022

1 (1 to 4)

**Exhibit A**

---

### Page 1

```
UNITED STATES DISTRICT CIRCUIT COURT
       FOR THE DISTRICT OF COLUMBIA
--------------------------x
CAROL WILD SCOTT,           :
          Plaintiff,        :
    -v-                     :Civil No.
WASHINGTON METROPOLITAN     :22-cv-00601 (CRC)
AREA TRANSIT AUTHORITY,     :
          Defendant.        :
--------------------------x

        Remote Deposition of CAROL WILD SCOTT
             Wednesday, November 9, 2022
                  11:22 a.m. EST




Job No. 470483
Pages 1 - 51
Reported by:  Tina D. McComb
```

### Page 2

```
    Deposition of CAROL WILD SCOTT, held remotely:









    Pursuant to Notice, before Tina D. McComb,
Reporter and Notary Public of the State of
Maryland.
```

### Page 3

```
             A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
    PATRICK M. REGAN, ESQUIRE
    REGAN, ZAMBRI & LONG, PLLC
    1919 M Street, NW
    Suite 350
    Washington, DC 20036
    (202) 463-3030
    pregan@reganfirm.com

ON BEHALF OF THE DEFENDANT:
    BRENDAN H. CHANDONNET, ESQUIRE
    NICHOLAS L. PLUCAS, ESQUIRE
    OFFICE OF GENERAL COUNSEL - WMATA
    300 7th Street, SW
    Washington, DC 20004
    (202) 962-1234
    bchandonnet@wmata.com
```

### Page 4

```
             C O N T E N T S
EXAMINATION OF CAROL WILD SCOTT           PAGE
By Mr. Chandonnet                           5





             E X H I B I T S
           (No exhibits marked)
```

Page 5

```
 1           P R O C E E D I N G S
 2              CAROL WILD SCOTT
 3  having been duly sworn, testified as follows:
 4       EXAMINATION BY COUNSEL FOR THE DEFENDANT
 5  BY MR. CHANDONNET:
 6     Q.   Hi, Ms. Scott.  Is it Ms. Scott?  Is that
 7  fine to refer to you?
 8     A.   Ms. is fine.
 9     Q.   Ms. Scott?
10     A.   Yeah.
11     Q.   Wonderful.  My name is Brendan Chandonnet.
12  And I'm an attorney for the Washington Metropolitan
13  Area Transit Authority.  Or you may know us
14  colloquially at WMATA or Metro.
15          And today I'm going to be asking you some
16  questions about the incident that occurred on
17  September 23rd of 2019.
18          Is that the date you recall this incident
19  occurring on?
20     A.   Yes.
21     Q.   Have you ever had your deposition taken
22  before?
```

Page 6

```
 1     A.   I can't remember.  It may have been 50
 2  years ago.
 3     Q.   I'm correct that you have taken
 4  depositions before though, correct?
 5     A.   Rarely.
 6     Q.   Rarely.  Okay.  Then why don't I go
 7  through some brief ground rules that I'd ask that
 8  we follow throughout the course of this proceeding
 9  so that it goes smoothly.
10          The court reporter, she's taking down
11  everything we say.  Especially because we are over
12  Zoom and not in person, gestures, things like that
13  are very difficult to translate.
14          So if you could please give verbal
15  answers.  No nodding of the head or uh-huh or
16  huh-uh type if you wouldn't mind.
17          And again, especially important because we
18  are over Zoom, in normal conversation people tend
19  to talk over one another.  She can only take down
20  one voice at a time.  So even if you know where my
21  question is going, which you may at some point, if
22  you would please wait until I finish asking my
```

Page 7

```
 1  question before you provide a response.  And I will
 2  do my best to make sure that I wait for you to
 3  provide your response before I ask my next
 4  question.  Okay?
 5     A.   Fine.
 6     Q.   All right.  If you don't understand a
 7  question, let me know and I'll be happy to rephrase
 8  that question.
 9          This is an important rule because if you
10  answer a question, both myself and your attorney
11  are going to assume that you understood the
12  question.
13          Don't be offended if I say something like
14  Is that a yes.  I'm just trying to make sure that
15  everything is clear for the court reporter.
16  Because all of this, as I'm sure your attorney
17  explained to you, is going to go into a deposition
18  transcript, which can then be used at trial if
19  necessary.  And we obviously want that transcript
20  to be as accurate as possible.
21          I don't anticipate many of these, but --
22  or if any at all.  But some of the questions today
```

Page 8

```
 1  I ask may be personal in nature.  I'm not trying to
 2  offend you.  I'm just trying to get as much
 3  information as possible concerning the incident and
 4  any of the injuries and damages that you've
 5  sustained.  Okay?
 6     A.   Works for me.
 7     Q.   All right.  Another important rule.  This
 8  is not a test or a guessing game.  We'd ask that
 9  you wouldn't guess today.  If you need to make an
10  approximation or an estimate, that's fine.  Just
11  please let me know that you're doing so.
12          And if you don't know the answer to a
13  question, "I don't know" is a perfectly acceptable
14  response.
15          If you think of anything at anytime, feel
16  free to jump in.  And then we can always have the
17  court reporter go back and get us back on track
18  with regard to what question we were on previously.
19          Now, we are not going to be here too long
20  today I hope.  But if you need to take a break for
21  any reason, need to use the restroom, drink of
22  water, speak to your attorney, that's perfectly
```

**Page 9**

1  fine. The only thing I would ask that if there's a
2  question pending, that you just answer the question
3  before you take your break. Does that sound good?
4     A.   Sounds all right.
5     Q.   Are you on -- Ms. Scott, are you on any
6  medication today that would affect your ability to
7  answer my questions truthfully and accurately?
8     A.   No.
9     Q.   Are you on any medication at all today?
10    A.   My normal meds.
11    Q.   Could you please tell me what your normal
12 meds are?
13    A.   I'm trying to think what the names of them
14 are.
15    Q.   Even at a minimum, if you can tell me
16 what -- because my next question was going to be,
17 do you have any medical conditions that would
18 affect your ability to answer my questions
19 truthfully and accurately?
20    A.   No.
21    Q.   Do you know -- even if you don't know the
22 names of the medications, do you know what medical

**Page 10**

1  conditions you're currently taking medication for?
2     A.   I take blood thinners. I take some
3  supplements.
4     Q.   By supplements, do you mean like vitamins?
5     A.   Yeah. I take blood pressure meds. That
6  happens when you get old.
7     Q.   I can appreciate that.
8     A.   Let me see, what else? I take a med
9  called Buproprion.
10    Q.   Do you know what that's for?
11    A.   I'm bipolar.
12    Q.   Okay.
13    A.   But not radically so.
14    Q.   Okay.
15    A.   And I take a statin.
16    Q.   That's for cholesterol, right?
17    A.   Yeah.
18    Q.   Did you -- do you have any -- or does the
19 statin cause you any side effects?
20    A.   No.
21    Q.   No issues with your legs from the statin?
22    A.   Huh?

**Page 11**

1     Q.   Any issues with your legs as a result of
2  the taking the statin?
3     A.   Not so far.
4     Q.   How long have you been on the statin?
5     A.   Probably 10 years.
6     Q.   How long have you been on the Buproprion?
7     A.   About the same.
8     Q.   Are you on any other medication for mental
9  health in addition to the Buproprion?
10    A.   No.
11    Q.   So here's how this is going to work today.
12 I'm going to get some background information from
13 you. Then I'm going to ask about the incident.
14 Then I'm going to ask about any damages.
15       It should be fairly straightforward, but
16 that's the path that I would like to take.
17       So why don't we get started with some
18 background into. May I have your full name,
19 please.
20    A.   Carol Wild Scott.
21    Q.   May I have your date of birth?
22    A.   12/14/40.

**Page 12**

1     Q.   That makes you how old today?
2     A.   81.
3     Q.   Sorry. I just need to, as I said before,
4  some of the questions. I'm trying to make
5  everything clear.
6        Can I have your current address?
7     A.   My home address?
8     Q.   Yes.
9     A.   Street address?
10    Q.   Yes.
11    A.   4145 Cherry Hill Road in Linden, Virginia
12 22642.
13    Q.   And for how long have you lived at that
14 address?
15    A.   32 years.
16    Q.   With whom do you live at that address?
17    A.   Repeat.
18    Q.   I'm sorry. With whom do you live at that
19 address?
20    A.   My extended family.
21    Q.   How many members of your extended family
22 live at that address with you?

**Page 13**

1  A. Three.
2  Q. Can you tell me their names and how they
3  are related to you?
4  A. My husband, Michael Del Allen, my
5  daughter, Rebecca Hunter, my youngest grandchild,
6  Dakota Hunter.
7  Q. How many children do you have?
8  A. Three.
9  Q. And how many grandchildren?
10  A. Seven.
11  Q. Congratulations.
12  A. Nine great-grandchildren.
13  Q. Nine great-grandchildren. I wasn't even
14  going to go there, but that's even better.
15     What is the highest level of education
16  you've attained?
17  A. A JD.
18  Q. Where did you get your JD?
19  A. University of Florida, 1970.
20  Q. Sorry, I forgot to ask. How long have you
21  and your husband been married?
22  A. Roughly 13 years.

**Page 14**

1  Q. Were you married prior?
2  A. Yeah, many years ago.
3  Q. At the time that this incident occurred in
4  September in 2019, were you working?
5  A. Yes.
6  Q. I should say were you employed?
7  A. I was an independent contractor.
8  Q. Where were you an independent contractor?
9  A. Since 2018.
10  Q. And for whom would you do independent
11  contracting work?
12  A. Bergmann & Moore.
13  Q. Is that a law firm?
14  A. Yes.
15  Q. What is the nature of their practice if
16  they have a dedicated practice?
17  A. Veterans law.
18  Q. Did you practice veterans law as an
19  independent lawyer with Bergmann & Moore?
20  A. Not really. I did other things.
21  Q. Can you tell me what other things you did?
22  A. I traveled to Indian country.

**Page 15**

1  Q. New Mexico?
2  A. New Mexico, Arizona, North and South
3  Dakota, Minnesota.
4     MR. CHANDONNET: Can we go off the record
5  for one second.
6     MR. REGAN: Sure.
7     (Discussion off the record.)
8  BY MR. CHANDONNET:
9  Q. And when traveling to those states, what
10  type of work were you doing?
11  A. Meeting with tribal leadership, veterans
12  groups doing benefits workshops, because the VA
13  ignores. They still don't get it. And
14  establishing relationships.
15  Q. Prior -- I'm sorry. Following this
16  incident, did you continue to do independent
17  contracting work with Bergmann & Moore?
18  A. No.
19  Q. Have you done any work following this
20  incident in any capacity?
21  A. I do housebound from home.
22  Q. Is that a result of the injuries you

**Page 16**

1  sustained in this incident or a result of the
2  pandemic?
3  A. A combination.
4  Q. Since the pandemic restrictions have
5  lessened, have you returned to any of your
6  traveling?
7  A. Yes.
8  Q. Are you asserting a lost wage claim as a
9  result of the injuries you've sustained in this
10  incident?
11  A. No.
12  Q. I probably should have asked that question
13  first.
14  A. Yes.
15     MR. REGAN: I meant to address it at the
16  beginning.
17     MR. CHANDONNET: Note that I asked your
18  attorney before we started.
19     Can we stop for one second? I'm sorry.
20     MR. REGAN: Sure.
21     (Discussion off the record.)
22  BY MR. CHANDONNET:

**Page 17**

1  Q.  Why don't we move on to part two here.
2  Let's talk about the incident.
3      What I think would be best is, Ms. Scott,
4  if you could just generally tell me what happened
5  on the day of the incident regarding the incident
6  in your own words.  And then I'll go back and ask
7  some more specific questions.
8      But I think it would help us if we got
9  generally an idea of how you remember the incident
10 occurring.
11  A.  All right.  I drove from Linden to Vienna
12 and, took the orange line train to McPherson
13 Square.  All the way in at several of the stations,
14 the train would stop and then move forward.
15      At no time was there an advisory
16 announcement that the train would be moving
17 forward.  But when it finally stopped, the
18 announcement of the doors opening would come over.
19      And when we got to McPherson Square, I sat
20 in my seat for several -- some period of time to
21 make sure that the train was going to stay where it
22 stopped.

**Page 18**

1      And the announcement was made doors --
2  McPherson Square.  Doors opening on the left.
3  Because the announcement had been made, I still
4  waited a bit and then got up to go to the doors.
5      And there was a center pole in that car.
6  And so I reached for it.  And my fingers were right
7  at it.  The train jerked forward and I fell back
8  into the aisle.
9      When I landed, I was immediately aware
10 that something was wrong.  And the pain was far
11 greater than anything I had ever experienced
12 before, even with three sessions of childbirth.
13     And I remember screaming.  And I don't
14 think I stopped screaming until I got enough to
15 knock me out.
16  Q.  Thank you for that description.  Let me go
17 through.  I'm going to ask a series of more
18 specific questions just so we can get a more
19 complete grasp of what occurred.
20     So you entered the Metro rail system at
21 Vienna?
22  A.  Yes.

**Page 19**

1  Q.  And you were coming from your home?
2  A.  Yes.
3  Q.  Were you -- you were intending to get off
4  at McPherson Square?
5  A.  Yes.
6  Q.  Was anyone with you?
7  A.  No.
8  Q.  Is this -- coming in on the orange line
9  train from Vienna, is that something you would do
10 frequently?
11  A.  I did it for probably 20 out of the 22
12 years I commuted.
13  Q.  How frequently were you commuting on the
14 orange line train from Vienna at the time of this
15 incident?
16  A.  Probably once or twice a month.
17  Q.  For how long had your commute dropped to
18 one to two times a month prior to the incident?
19  A.  I don't understand the question.
20  Q.  You said that you -- your commute over the
21 20 years, was that something that was being done
22 daily?

**Page 20**

1  A.  Yes.
2  Q.  At some point, you -- your commuting
3  frequency diminished, correct?
4  A.  Yes.
5  Q.  Prior to this incident occurring, for how
6  long had your commuting frequency been lessened?
7  A.  Two years.
8  Q.  So for the two years prior to the
9  incident, you were only commuting to DC one to two
10 times a month?
11  A.  That is correct.
12  Q.  And would you always -- when you would
13 commute in using Metro rail, would you always take
14 the orange line from Vienna?
15  A.  Yes.
16  Q.  And where would you typically get off?
17  A.  Daily?
18  Q.  Daily, yes, during the period leading up
19 to the incident.
20  A.  Either McPherson Square or Capitol Hill.
21  Q.  So you were familiar with McPherson
22 Square?

**21**

1    A.   Very.
2    Q.   At what times would you typically take
3    Metro rail from Vienna into the District?
4    A.   The morning.
5    Q.   On this occasion, it was different,
6    however, right, because you were heading in for
7    dinner?
8    A.   Correct.
9    Q.   Do you remember what time approximately
10   this incident occurred?
11   A.   I think a little after 6:00.
12   Q.   So it was -- did this happen during the
13   weekday or was it on a weekend?
14   A.   Weekday.
15   Q.   So you were riding in during weekday rush
16   hour but reverse commute, correct?
17   A.   Yes.
18   Q.   Was the train crowded?
19   A.   I don't think so.
20   Q.   Do you remember if there were a lot of
21   passengers standing?
22   A.   No.

**22**

1    Q.   No, you don't remember?
2    A.   No.
3    Q.   Do you remember the number of the rail car
4    that you were on?
5    A.   Repeat.
6    Q.   Do you remember the number of the rail car
7    that you were on?
8    A.   No.
9    Q.   Do you remember if it was a six car or an
10   eight car train?
11   A.   No.
12   Q.   Do you remember going -- starting at the
13   beginning where the rail operator is going back to
14   the end which car you were in, first, second,
15   third, fourth?
16   A.   No.
17   Q.   Were you in the first car on the train?
18   A.   No.
19   Q.   Were you in the last car of the train?
20   A.   No.
21   Q.   When you were riding the train in from
22   Vienna, were you seated or standing?

**23**

1    A.   Seated.
2    Q.   Were you seated the entire time until you
3    got to McPherson Square?
4    A.   Yes.
5    Q.   Were you in the same seat from the time
6    you boarded the train until you got to McPherson
7    Square?
8    A.   Yes.
9    Q.   When you -- let me ask you this.
10        Do you remember what series the train was,
11   whether it was 3,000, 4,000?
12   A.   Not a clue.
13   Q.   Do you know if it was one of the newer
14   trains or it was one of the older trains?
15   A.   I have no idea.
16   Q.   When you boarded your particular train
17   car, did you board in the front, the middle or the
18   back of the car?
19   A.   In the front.
20   Q.   When you selected your desired seat, were
21   you towards the front, but were you in -- by those
22   -- the front doors that you boarded?

**24**

1    A.   Close.
2    Q.   When you entered those -- that front door,
3    did you turn to your right or your left to select a
4    seat?
5    A.   You had to turn right.
6    Q.   Got it.  So if the train is moving
7    forward, you boarded on the left side of the train?
8    A.   In Vienna, the trains can be on either
9    side.  And I don't remember.
10   Q.   You do remember entering the door at the
11   front of the car and turning right, however?
12   A.   Yes.
13   Q.   As the train was moving forward, were you
14   seated on the left side or the right side of the
15   car?
16   A.   The right.
17   Q.   Were you seated in a priority seat?  And
18   by that I mean an inward facing seat, or were you
19   in a seat that was facing forward?
20   A.   I was in a seat facing forward.
21   Q.   Were you in a window or were you in an
22   aisle seat?

25

1  A.  I was in a window until I knew that
2  McPherson Square was next.  And then I slid over
3  once to the aisle.
4  Q.  Was there a seat back directly in front of
5  you?  Or was it open in front of you to where the
6  priority seats are?
7  A.  It was open.
8  Q.  So you were seated directly behind -- you
9  were in the seats directly behind the priority
10 seats?
11 A.  That is correct.
12 Q.  Were you carrying anything with you?
13 A.  A purse and my cane.
14 Q.  This may seem like an odd question, but
15 what size purse?
16 A.  That one it was a regular Coach.
17 Q.  Do you wear it -- were you wearing it
18 cross body or were you carrying it?
19 A.  Shoulder.
20 Q.  You carried it on one shoulder?
21 A.  Yes.
22 Q.  Which shoulder do you carry your purse on?

26

1  A.  The left.
2  Q.  You were using your cane with your right
3  hand?
4  A.  Yes.
5  Q.  For how long had you been using a cane
6  prior to this incident?
7  A.  Probably a year.
8  Q.  We'll get into this a bit more later.  But
9  just generally, for what condition were you using
10 the cane?
11 A.  I used it for support when I had to walk
12 long distances.  Otherwise I didn't need it.
13 Q.  Was there a particular medical condition
14 that caused you to require the cane?
15 A.  Old age.
16 Q.  Any specific part of your body that was
17 giving you problems?
18 A.  No.
19 Q.  I believe you stated that when you began
20 approaching McPherson Square, you slid over from
21 the window to the aisle; is that correct?
22 A.  Yes.

27

1  Q.  Did you do anything else to prepare
2  yourself for arrival at McPherson?
3  A.  No.
4  Q.  Did the train operator say anything as the
5  train approached the station?
6  A.  Not until it stopped.
7  Q.  So it's your testimony that the train
8  stopped before any announcement was made?
9  A.  The train stopped.  And then after some
10 period, the announcement was made.
11 Q.  Can you tell me what that announcement
12 was?
13 A.  "McPherson Square, doors opening on the
14 left."
15 Q.  What happened next?
16 A.  I waited a bit longer.  And then when I
17 was fairly sure that it was safe to get up, I got
18 up and started toward the door.
19 Q.  Had the doors begun to open at that point?
20 A.  I can't remember.
21 Q.  Do you know if at any point before the
22 train moved, did the doors open?

28

1  A.  I don't remember.  But I'm not -- I don't
2  think they had.
3  Q.  Were there any customers in the way
4  between you and the doors on the left of the train?
5  A.  No.
6  Q.  Do you know if any other passengers were
7  preparing to depart at McPherson Square who were in
8  the car with you?
9  A.  No.  I didn't look.
10 Q.  I think you stated that the -- on that
11 particular day, that at previous stops, the car --
12 the train had stopped and then started up again; is
13 that correct?
14 A.  Yes.
15 Q.  Do you know if the announcement regarding
16 arriving at the station happened before or after
17 the train stopped in those circumstances?
18 A.  I think that the train stopped and then
19 moved forward.  And then the stations were
20 announced.  At no time was there an advisory this
21 train is moving forward.
22 Q.  But it happened numerous other times on

**Page 29**

1 that journey?
2  A.  Yes.
3  Q.  Do you know how many times?
4  A.  Four or five maybe.
5  Q.  How many stops are there between Vienna
6 and McPherson Square, do you know? I should know
7 this. I'm sorry I don't. I haven't taken the
8 orange line in a while.
9  A.  I have no idea.
10     MR. CHANDONNET: Okay. I think it's been
11 a half hour if your client needs a break. It's up
12 to her and you obviously.
13     MR. REGAN: Yeah, sure. If this is a good
14 spot, let's do that. Take a couple of minutes?
15 Five minutes?
16     MR. CHANDONNET: I just lost my spot. So
17 yeah, this is good. Five minutes is fine. Thank
18 you.
19     (A recess was taken.)
20 BY MR. CHANDONNET:
21  Q.  So we are now at -- so you indicated that
22 the train approached the station. Then the train

**Page 30**

1 stopped. Then the train operator made an
2 announcement that the doors would be opening on the
3 left; is that correct?
4  A.  Yes.
5  Q.  What happened next?
6  A.  I waited for some period of time. I'm not
7 sure how long. But I waited long enough to assure
8 myself that there would not be another jerk forward
9 as there had been coming in.
10  Q.  You indicated that the train doors had not
11 opened before you stood up, correct?
12  A.  I don't believe so, no.
13  Q.  And then at some point, you stood up,
14 correct?
15  A.  Yes.
16  Q.  And you indicated that you attempted to
17 hold on to the center pole that was in front of
18 you?
19  A.  When I felt the train move, I grabbed for
20 the center pole.
21  Q.  Prior to the train moving, were you
22 holding on to anything?

**Page 31**

1  A.  No. There was nothing to hold on to.
2  Q.  You weren't holding on to your seat back
3 or anything overhead?
4  A.  No.
5  Q.  And then at some point, the train moved
6 forward, correct?
7  A.  Yes.
8  Q.  Did the train move forward in the same way
9 it had the previous times on the trip that day?
10  A.  No.
11  Q.  Can you describe how --
12  A.  Previous times the train had moved
13 forward. And then when it came to a stop the
14 second time, there would be the announcement of the
15 doors opening. This one was different.
16  Q.  Was the physical movement of the train
17 different this time than it had been the previous
18 times on that trip?
19  A.  There was a mixture. Sometimes it was not
20 as pronounced. But a couple of times it was a real
21 jerk.
22  Q.  Would you put this time into that

**Page 32**

1 category?
2  A.  Yes.
3  Q.  Just in general in your time riding Metro
4 rail, in your experience, was it common for a train
5 to enter a station, come to a stop, and then have
6 to move forward again?
7  A.  Occasionally. But there was always an
8 announcement. "This train will move forward."
9  Q.  It's your testimony that on this
10 particular -- at this particular stop, that
11 announcement was not made?
12  A.  That was not made either at that stop or
13 at any others.
14  Q.  Do you know how many people were on your
15 car that day with you?
16  A.  I only know of the three that stayed to
17 help me. Everybody else was behind me.
18  Q.  So there were three witnesses?
19  A.  Yes.
20  Q.  And those witnesses all gave statements;
21 is that correct?
22  A.  Are what?

33

1  Q. All three of those witnesses gave
2  statements, correct?
3  A. I am assuming so. I have no knowledge.
4  Q. So you don't independently know if those
5  witnesses gave statements?
6  A. No.
7  Q. Do you know the names of any of those
8  witnesses?
9  A. I don't remember the woman's name. The
10 two men, one was Al and I think the other was Don.
11 Q. How long did they -- did those witnesses
12 stay with you?
13 A. Until the medics arrived.
14 Q. And after the medics arrived, did those
15 witnesses leave?
16 A. After they got me out of the way, I assume
17 they did. I don't know.
18 Q. While you were aboard the train, did
19 anyone say anything when you fell?
20 A. Probably. I can't remember.
21 Q. Do you know how the paramedics were
22 notified that you were injured?

34

1  A. No.
2  Q. Let me ask you some questions about how
3  you fell. When the train moved, can you tell me
4  what happened to your body physically?
5  A. It flew through the air.
6  Q. Were you balancing on your cane prior to
7  falling -- or balancing with your cane? I
8  apologize.
9  A. When I stood up, I brought my cane with
10 me.
11 Q. But you weren't using it?
12 A. When I first stood up, I would have had my
13 cane in my right hand.
14 Q. Were you holding on to the cane or were
15 you using it to ambulate?
16 A. I was holding onto it certainly. And had
17 I not been tossed around, it would have -- I would
18 have used it to ambulate.
19    But the reason I had the cane with me was
20 because I knew that the sidewalk where I was going
21 may not be real level and because I do not trust DC
22 at night. And my cane is also a weapon.

35

1  Q. I a hundred percent appreciate that.
2     I was just trying to understand from a
3  logistical standpoint where the cane was in
4  vis-a-vis you when you had stood up.
5  A. In my right hand.
6  Q. You were holding on to the top of it?
7  A. Yes.
8  Q. You used it to help you stand up?
9  A. That's the cane.
10 Q. That actually kind of looks like a
11 shillelagh. We have one at my house that my
12 grandmother had brought back from Ireland.
13 A. It's a copperhead.
14 Q. I --
15 A. (indiscernible) sassafras.
16 Q. It's beautiful. So you had used it to
17 stand up. And then were you using it to maintain
18 your balance as you were standing up?
19 A. Half and half.
20 Q. And then the train moved forward and you
21 moved backward?
22 A. I fell. I was thrown backward.

36

1  Q. Correct. And did you -- did you land on
2  the seats or on the ground?
3  A. I landed on the aisle.
4  Q. Before landing on the aisle, did any part
5  of your body hit any of the seats or any poles or
6  anything?
7  A. I don't know.
8  Q. What part of your body hit the aisle
9  floor?
10 A. My left side.
11 Q. Did you hit your head at all?
12 A. No.
13 Q. Did you lose consciousness at all?
14 A. No.
15 Q. Did you begin feeling pain immediately?
16 A. Repeat.
17 Q. Did you begin feeling pain immediately?
18 A. Yes.
19 Q. In what part of your body did you begin
20 feeling pain?
21 A. My left leg.
22 Q. Can you tell me where in your left leg?

**Page 37**

1  A. Near the hip.
2  Q. Anywhere else besides near the hip?
3  A. That was where the pain was.
4  Q. At that point, did anyone come to see if
5  you were injured?
6  A. Explain.
7  Q. Did anyone on the train come to see if you
8  were injured?
9  A. Passengers?
10 Q. Yes.
11 A. The three that stayed.
12 Q. Then what happened next?
13 A. I started screaming. I was out of my head
14 with pain.
15 Q. Did anyone from Metro come to see if you
16 were injured?
17 A. Not immediately.
18 Q. Who was the next -- aside from those three
19 witnesses, who was the next person to approach you?
20 A. Someone from Metro with an orange vest and
21 a substantial backside.
22 Q. I'm trying not to chuckle here. That's

**Page 38**

1  quite a description.
2      Do you know -- do you know approximately
3  how long it was between when you fell and that
4  particular individual came?
5  A. No.
6  Q. Was that particular individual a man or a
7  woman?
8  A. Female.
9  Q. Do you know what role or what job title
10 that person had or held?
11 A. No.
12 Q. Did that person ask you any questions?
13 A. I can't remember.
14 Q. Did that person have any responsibility in
15 getting the paramedics?
16 A. I have no idea.
17 Q. Were the paramedics the next people to
18 arrive?
19 A. I think so. It was a long time.
20 Q. A long time. When you say a long time,
21 can you give me an estimate of how long?
22 A. Just a very long time. I was in a lot of

**Page 39**

1  pain. I was screaming. I remember I was screaming
2  my head off.
3  Q. I apologize. The computer keeps making
4  noises and interrupting us. I apologize.
5      It was a very long time between when you
6  were injured and the paramedics came?
7  A. Yes.
8  Q. And how did the paramedics -- strike that.
9      Did you remain in the aisle of the train
10 until the paramedics got there?
11 A. Yes. I couldn't move.
12 Q. How did the paramedics get you out of the
13 train?
14 A. With a lot of difficulty.
15 Q. Using -- did they put you on a board or a
16 carrier or did they strap you to a gurney?
17 A. They didn't have a gurney. I think they
18 used a board.
19 Q. Then they took you -- they took you via
20 ambulance, correct?
21 A. Yes.
22 Q. And you went to GW?

**Page 40**

1  A. Yes.
2  Q. Was that your preferred hospital or is
3  that just where they took you?
4  A. They are required to go to the closest
5  hospital.
6  Q. Were you satisfied with being taken to GW?
7  A. Yes.
8  Q. Have you ever given a recorded statement
9  to anyone about this incident?
10 A. No.
11 Q. Other than your attorney or attorneys,
12 have you ever met with anyone else to discuss this
13 incident formally?
14 A. Physicians.
15 Q. Aside from your medical professionals.
16 A. No.
17 Q. On the day of the incident, did you take
18 any medication other than the medications that you
19 described to me earlier today?
20 A. No.
21 Q. Did you have any alcoholic beverages on
22 the day of the incident?

**41**

1    A.    I don't drink.
2    Q.    Okay. So you first noticed the pain in
3 your -- around your left hip, correct?
4    A.    That's correct.
5    Q.    And you were taken to GW. And from review
6 of your Answers to Interrogatories, it appears that
7 you were in the hospital for seven days; is that
8 correct?
9    A.    At this point, I'm not sure. Several
10 days.
11   Q.    Does that sound generally correct?
12   A.    Generally.
13   Q.    For what generally were you treated at GW
14 over those seven days?
15   A.    My femur was fractured approximately three
16 inches distal from the hip. And the biggest danger
17 was severance of the femoral artery, which runs
18 alongside the bone. Were it not for Al and Don, I
19 would not have survived.
20   Q.    When you say were it not for Al and Don,
21 what did Al and Don do to prevent your injuries
22 from being worse?

**42**

1    A.    They held my leg in an appropriate
2 position.
3    Q.    Do you know -- did either of them have
4 medical training?
5    A.    No.
6    Q.    Do you know how --
7    A.    They had no idea.
8    Q.    Do you know how they knew to hold your leg
9 in a particular position?
10   A.    I told them.
11   Q.    Can you explain that to me.
12   A.    I told them.
13   Q.    How did you know which way your leg needed
14 to be held? Sorry, just trying to understand.
15   A.    I was a paramedic for 10 years.
16   Q.    That would explain it. In what particular
17 way did your leg need to be held to avoid pressure
18 on the femoral artery?
19   A.    As straight as possible.
20   Q.    Did you have surgery while you were in the
21 hospital to repair the fracture?
22   A.    Oh, yes.

**43**

1    Q.    Various pins, screws, etcetera were
2 inserted?
3    A.    I'm now titanium from my hip to my knee,
4 one long bar and two cross-bars.
5    Q.    Did you need to have a hip replacement as
6 a result of this as well?
7    A.    No.
8    Q.    But your femur has been strengthened via
9 the addition of a titanium rod lengthwise and two
10 additional rods horizontally, correct?
11   A.    Correct.
12   Q.    Other than the fractured femur, were there
13 any other injuries to your leg or any other parts
14 of your body that you sustained?
15   A.    Bruises.
16   Q.    Anything of any significance other than
17 the obviously significant fracture?
18   A.    No. That took the brunt.
19   Q.    Okay. Any injuries to your knees?
20   A.    I landed on my left side.
21   Q.    But you didn't injure your knee. You
22 injured merely the femur?

**44**

1    A.    Yes.
2    Q.    Did you have any -- did you have any knee
3 issues prior to this incident on either the left or
4 the right side?
5    A.    Did I have what?
6    Q.    Any issues with your knees, either left or
7 right prior to this incident?
8    A.    I had one many years ago, synovial.
9    Q.    Was that to the left or right knee?
10   A.    Right.
11   Q.    For how long did you receive treatment?
12   A.    One injection.
13   Q.    And never any other injections?
14   A.    I can't remember. I don't think so.
15   Q.    You said you were first -- was the cane
16 prescribed to you or is that something you started
17 doing on your own?
18   A.    It was not prescribed. I did it on my
19 own.
20   Q.    Prior to this incident, did any doctor
21 advise you that you should be using a cane to
22 assist in movement?

**Page 45**

1  A.  No.
2  Q.  Subsequent to this incident, have any
3  doctors indicated that you should be using a cane
4  to assist in your movement?
5  A.  They knew I already had one.  So --
6  Q.  Has the frequency with which you use the
7  cane increased following this accident?
8  A.  Markedly.
9  Q.  Could you describe that change for me.
10  A.  My left leg is now a bit shorter than the
11  right.  I even with the cane cannot walk my
12  mountain.  I live on top of a mountain.  I even
13  with the cane can only walk for certain distances.
14  Wal-Mart wears me out.  My balance is not as it
15  was.
16  Q.  How often -- prior to this incident, how
17  often would you walk the mountain?
18  A.  Frequently.
19  Q.  By frequently, do you mean weekly,
20  multiple times a week?
21  A.  Depended on my schedule.
22  Q.  What other activities of yours have been

**Page 46**

1  altered as a result of your injuries?
2  A.  If I go to the hill now that it's reopen
3  to the point where we can go to the offices, I will
4  need my scooter.  I will have to have the scooter.
5  Q.  For how long have you had a scooter?
6  A.  For about -- I got it about four months
7  after this happened.
8  Q.  How often do you use that scooter now?
9  A.  I haven't been to the hill, so --
10  Q.  Is that a result of COVID, or is that a
11  result of the injuries that you sustained?
12  A.  More COVID because the hill is just now
13  beginning to open up.
14  Q.  Have you ridden Metro rail again since
15  this incident?
16  A.  Twice.
17  Q.  Is that pre-COVID or post -- I don't mean
18  post COVID as if it's over.  But I think you can
19  appreciate my question.
20  A.  Twice since it opened up again.  I mean --
21  Q.  So twice in the past six months maybe?
22  A.  Yeah.

**Page 47**

1       MR. CHANDONNET:  Can you just give me two
2  minutes, please, to confer with my colleague.  I
3  think I may only have one or two more questions.
4       MR. REGAN:  Take your time.
5       MR. CHANDONNET:  thanks, Pat.
6       (A recess was taken.)
7  BY MR. CHANDONNET:
8  Q.  Ms. Scott, I just have a couple more
9  questions left.  Did you have medical insurance or
10  Medicare at the time of this incident?
11       MR. REGAN:  Obviously we will have an
12  objection, but she'll answer the question.
13       MR. CHANDONNET:  Thank you, Pat.
14  A.  Yeah.  I'm over 65.
15  BY MR. CHANDONNET:
16  Q.  Was Medicare your primary form of medical
17  insurance?  Or was it your exclusive form of
18  medical insurance?
19  A.  I have Medigap.
20  Q.  Medigap, okay.  Medigap in addition to
21  Medicare?
22  A.  Yeah.

**Page 48**

1  Q.  Do you have any liens as a result of the
2  treatment in this case?
3       MR. REGAN:  Yes.
4  BY MR. CHANDONNET:
5  Q.  Has Medicare and/or Medigap been notified
6  that the injuries you sustained were sustained in
7  an accident?
8       MR. REGAN:  Yeah.  We have lien
9  information in the file.
10       MR. CHANDONNET:  Was that already provided
11  to me, Pat?
12       MR. REGAN:  I don't know the answer to
13  that.  But I just looked this morning, so -- but
14  obviously I'm not at my desk.  But we'll get it to
15  you.
16       MR. CHANDONNET:  I'm not going to ask how
17  much it is.  But to the extent that you have that
18  information, would you mind sending it over so that
19  I can add it to the file?
20       MR. REGAN:  Uh-huh.
21       MR. CHANDONNET:  Thank you very much for
22  your time.  I really appreciate it.  Pat, thank

49

1  you.
2  (Reporter requested transcript orders.)
3  MR. CHANDONNET: E-tran is fine for me.
4  MR. REGAN: This is Pat. I would like an
5  E-transcript too.
6  (Signature having not been waived, the
7  remote deposition of CAROL WILD SCOTT concluded at
8  12:44 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

50

1  ACKNOWLEDGMENT OF DEPONENT
2
3  I, CAROL WILD SCOTT, do hereby acknowledge that
4  I have read and examined the foregoing testimony,
5  and the same is a true, correct and complete
6  transcription of the testimony given by me and any
7  corrections appear on the attached Errata sheet
8  signed by me.
9
10
11
12  _____   _____
13  (DATE)            (SIGNATURE)
14        ------
15
16
17
18
19
20
21
22

51

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2  I, Tina D. McComb, Court Reporter, the officer
3  before whom the foregoing proceedings were taken,
4  do hereby certify that the foregoing transcript is
5  a true and correct record of the proceedings; that
6  said proceedings were taken by me stenographically
7  and thereafter reduced to typewriting under my
8  supervision; that review was as appropriate, and
9  that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13    IN WITNESS WHEREOF, I have hereunto set my hand
14 and affixed my notarial seal this 13th day of
15 November 2022.
16 My commission expires:
17 November 14, 2025
18
19 _Tina D. McComb_
20 NOTARY PUBLIC IN AND FOR THE
21 STATE OF MARYLAND
22        ---------