Transcript of Carl Berkowitz, Ph.D.

1 (1 to 4)

Conducted on January 28, 2025

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3   CAROL WILD SCOTT,          :
4         Plaintiff,    :   Civil Action No.:
5   v.                   :   2022-cv-00601 (CRC)
6   WASHINGTON METROPOLITAN   :
7   AREA TRANSIT AUTHORITY,   :
8         Defendant.    :
9   ------------------------X
10
11              Deposition of
12          CARL BERKOWITZ, Ph.D.
13          Conducted Virtually
14        Tuesday, January 28, 2025
15            10:00 a.m. EST
16
17
18
19
20  Job No.:  566725
21  Pages:  1 - 153
22  Reported by:  Linda M. Bahur, RPR
```

**Page 2**

```
1          Deposition of CARL BERKOWITZ, Ph.D.,
2   conducted virtually.
3
4
5
6
7
8
9
10
11      Pursuant to Notice, before Linda M. Bahur,
12  Registered Professional Reporter and Notary Public of
13  the State of Maryland.
14
15
16
17
18
19
20
21
22
```

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

   Patrick M. Regan, Esquire

   Regan, Zambri & Long, PLLC

   1919 M Street, NW, Suite 350

   Washington, D.C. 20036

   (202) 463-3030

ON BEHALF OF THE DEFENDANT:

   Jason R. Waters, Esquire

   Lauren Gilman, Esquire

   Wilson Elser Moskowitz Edelman & Dicker, LLP

   8444 Westpark Drive - Suite 510

   McLean, VA 22102-5102

   (703) 245-9300

   (703) 245-9301 (Fax)

     -and-

   Laurie Hand, Esquire

   Washington Metropolitan Area Transit Authority

   Legal Department 7E

   P.O. Box 23768

   Washington, D.C. 20006

   (202) 962-5063

   (202) 962-2550 (Fax)

Exhibit C

**Page 4**

I N D E X

E X A M I N A T I O N

Witness Name               Page

Carl Berkowitz, Ph.D.

   By Mr. Waters ............................ 5

E X H I B I T S

(Attached to the transcript)

Exhibit   Description           Page

Exhibit 1  Notice of Deposition .............. 15

Exhibit 2  Curriculum vitae ................. 19

Exhibit 3  Draft Safety Report, 3/16/23 ...... 55

Exhibit 4  Affidavit, 11/6/23 ............... 56

Exhibit 5  Supplemental report, 11/2/24 ...... 56

Transcript of Carl Berkowitz, Ph.D.

2 (5 to 8)

Conducted on January 28, 2025

---

**5**

1          P R O C E E D I N G S
2  Whereupon,
3          CARL BERKOWITZ, Ph.D.
4  having been first duly sworn, was examined and
5  testified as follows:
6                EXAMINATION
7  BY MR. WATERS:
8      Q    Thank you.  Good morning, Dr. Berkowitz.
9      A    Good morning.
10     Q    My name is Jason Waters.  We haven't had
11 the pleasure of meeting before, but I represent the
12 defendant, Washington Metropolitan Area Transit
13 Authority in the Scott case.
14         I understand you've been designated as an
15 expert witness in this matter?
16     A    Yes.
17     Q    I'm sure you've done this many times.  As
18 you know, if at any time you need a break, please let
19 me know and I'd be glad to accommodate you.
20     A    Thank you.
21     Q    If that's okay.  All right?
22     A    Yes.  Thank you.

---

**6**

1      Q    Would you state please state your full
2  name?
3      A    Carl Berkowitz.
4      Q    And Dr. Berkowitz, how are you employed?
5      A    Pardon me?
6      Q    How are you employed?
7      A    I'm self-employed.
8      Q    And do you have a company?
9      A    Yes, Carl Berkowitz.
10     Q    Okay.  How are you employed?  What is your
11 job?
12     A    What is my job?  Primarily being a
13 grandfather.  Secondarily, many other activities.  I
14 spend a good deal of time working out and swimming in
15 the gym, things of that nature.  And then I also do
16 consulting work and expert witness work.
17     Q    I am here to ask you about your consulting
18 and expert witness work.  Can you please explain what
19 type of consulting work you do.
20     A    Well, from time to time, I asked to look at
21 a situation and to write a report about that
22 situation.  I do both plaintiff and defendant work for

---

**7**

1  the insurance industry.  They ask me to analyze
2  situations and file a report, including reviewing
3  reports that are done for them by others, and I also
4  --
5      Q    What types of situations -- I'm sorry.  I
6  didn't mean to cut you off.  Go ahead.
7      A    And I also review situations and make
8  recommendations and try to understand the situations.
9  The work I do as an expert is based upon scientific
10 methods and scientific and engineering methods that I
11 was taught in high school, college, and as contractors
12 in the industry.  I try to do everything that I do
13 based upon the scientific method approach that was
14 additionally he developed by -- it seems weird to talk
15 about it.  It was originally developed by Leonardo da
16 Vinci and more improved upon by Galileo and Isaac
17 Newton.  And even though they were way back a couple
18 hundred years, that's what we basically do today.
19     Q    Okay.  What types of situations are you
20 asked to look at?
21     A    All kinds of situations.  Rail situations,
22 bus situations.  My focus is primarily on people.

---

**8**

1  Pedestrians, passengers in public transportation,
2  pedestrians in the public transportation environment
3  and workplace safety and people that work in the
4  workplace in transportation.  So my focus is always
5  people.
6      Q    What is your expertise, sir?
7      A    What do you mean expertise?
8      Q    Do you have an area of expertise in which
9  you hold yourself out as an expert for consulting
10 matters?
11     A    Transportation, engineering and safety I
12 would say and as an educator in the field of
13 transportation.
14     Q    I'm sorry?
15     A    And as an educator.
16     Q    Okay.  Do you divide your time between
17 expert work and consulting work or do you see that it
18 as the same thing?
19     A    It's intermingled.  I can't basically
20 separate it.  I'm asked to do the work because of my
21 education, background and experience.  So, I mean --
22     Q    How much of the work is involving

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

9

1 litigation like what brings us here today?
2     A    This type of litigation? I really couldn't
3 tell you. I don't know.
4     Q    Is it most of what you do?
5     A    No. Like I said, most of what I do is I'm
6 a grandfather. I do a lot of community service work
7 and I spend about two hours a day either swimming and
8 gym or combination --
9     Q    Sir, I'm not asking about your personal
10 activities. I'm asking about your professional
11 activities. In terms of your consulting work --
12     A    My professional activities are divided
13 amongst this and I'm active in a lot of professional
14 organizations like the American Transportation
15 Association, AREMA, Human Factors Society. I'm active
16 in, you know, over, you know, more than a dozen
17 professional organizations. So I spend a lot of time.
18 Also from time to time, I present papers at
19 conferences sponsored by these organizations.
20     Q    Of all of your professional activities,
21 again, I'm not asking about swimming or
22 grandparenting, sir, of your professional activities,

10

1 what percentage of time relates to litigation and
2 cases like this?
3     A    I really can't -- I don't segment my time.
4 I couldn't really tell you.
5     Q    Do you have the ability to tell me how much
6 of your professional time is involved in professional
7 organizations like AREMA and others that you
8 mentioned?
9     A    I really don't. You know, we have
10 meetings. Also, my term just ended. I also was a
11 member of a congressional committee where we meet
12 quite frequently on surface transportation, safety and
13 security.
14     Q    Sir, my question was very specific about
15 how you spend your professional time. Do you have the
16 ability to estimate how much of your professional time
17 is doing nonlitigation activities for professional
18 organizations?
19     A    I don't keep track of the -- I don't have a
20 percentage that I -- I just do the things I do and I
21 don't keep track of how much time every day I spend on
22 each of the activities. As the opportunity comes up,

11

1 I work on it. And I don't track how much time I spend
2 on each of the activities that I'm -- professional
3 activities that I'm involved in.
4     Q    I understand you are compensated for the
5 work that you do as an expert; correct?
6     A    I'm compensated for my time. Yes.
7     Q    Are you compensated for your time? How
8 much of your compensation for professional activities
9 relates to consulting and litigation such as this as
10 compared to other activities?
11     A    I don't have a breakdown. I don't keep
12 track of that.
13     Q    Are you involved in consulting activities
14 that are not connected with litigation such as cases
15 like this?
16     A    Yes. A few. Few situations. Yeah.
17     Q    Okay. And what percentage of your time is
18 dedicated to those activities?
19     A    I couldn't tell you. I don't break it
20 down.
21     Q    What percentage of your income is dedicated
22 to those activities?

12

1     A    The bulk of my income is my pensions.
2     Q    Okay. Aside from your pensions, what
3 percentage of your active revenue comes from
4 litigation versus nonlitigation activities?
5     A    I don't have a breakdown. Sorry.
6     Q    Okay. And when you are engaged to serve as
7 an expert witness by a party in litigation, you said
8 you work for both defendants and plaintiffs?
9     A    Yes, I do.
10     Q    What percentage of your time is working for
11 plaintiffs as opposed to defendants?
12     A    I don't have an exact number, but in terms
13 of number of assignments, it's about 50-50. And I
14 would say that more recently it's leaning a little bit
15 more to defendant.
16     Q    Have you been engaged by a -- let me ask
17 you this. Have you ever served as an expert witness
18 for the defense for a regional transit authority?
19     A    Yes.
20     Q    Which authority?
21     A    New Jersey Transit, New York State Attorney
22 General, representing state agencies. Cleveland,

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

13

1    Greater Cleveland MTA, Los Angeles MTA, Seattle Light
2    Rail. I forget what they call it. And there may be a
3    couple others.
4        Q    And you were retained in litigation to
5    serve as a defense expert for those authorities?
6        A    Yes, I have.
7        Q    Have you ever served as an expert witness
8    for Washington Metropolitan Area Transit Authority?
9        A    No. They called me a couple times and I
10   indicated to them that I had a number of situations on
11   the plaintiff's side, so they passed on.
12       Q    Sir, I'm going to --
13       A    This is an additional point of information.
14   In New Jersey, for example, I do work for New Jersey
15   Transit and also both plaintiff and defendant. I work
16   for and against them, working primarily defense
17   working for the New Jersey Attorney General. So there
18   was a number of situations where I'm retained on both
19   sides, plaintiff and defendant in matters.
20       Q    How is it that you were retained on both
21   sides?
22       A    Pardon me?

14

1        Q    How is it that you were retained on both
2    sides? In what circumstances?
3        A    They were impressed by my work and they
4    asked if I would, you know -- if they had no
5    objection, I have no objection either. Also, I do
6    plaintiff, defendant for SEPTA. I also do for a
7    number of the large bus companies like First Transit,
8    MV Transportation. There are many companies that I do
9    both plaintiff and defendant. Because of my
10   reputation and my integrity, they reach out to me.
11       Q    I meant -- sorry. I don't want to cut you
12   off. When you're -- are you currently -- well, strike
13   that.
14           On approximately how many litigated
15   personal injury matters have you been retained to
16   serve as an expert by the defense?
17       A    I don't keep track of the numbers.
18       Q    Sir, do you keep a list of your testimonial
19   history in which you've given testimony either at
20   trial or at depositions?
21       A    I have a Rule 26, a list that I maintain.
22       Q    Sir, I'm going to bring up a copy of your

15

1    notice of deposition in this case and which I'm going
2    to mark as Exhibit No. 1.
3            (Exhibit 1 was marked for
4            identification and attached to the
5            transcript.)
6        Q    Are you seeing the notice of deposition
7    duces tecum?
8        A    I see it. I can't read it.
9        Q    I'll make it a little bigger for you.
10       A    Thank you.
11       Q    How's that?
12       A    Yes.
13       Q    Have you seen this document before, sir?
14       A    Yeah. Wilson Elser, I think I've also
15   worked with them as well.
16       Q    Did you see this document before?
17       A    I think so. I scheduled the deposition. I
18   must have.
19       Q    Okay. When you --
20           MR. REGAN: I'm sorry to interrupt, but I
21   don't think we sent it to him, but maybe we did.
22       A    I don't recall.

16

1        Q    All right. The document asks you to bring
2    a number of items, including a current copy of your
3    professional resume, listing items 1 through 7. Have
4    you pulled these materials together?
5        A    I wasn't asked to. I don't recall. No.
6    But I did --
7        Q    So when we sent this out to you, you didn't
8    pull the materials together? Have you been asked to
9    --
10       A    I submitted my CV.
11       Q    Sir, we can't talk over top of each other.
12       A    No. I wanted to finish the previous
13   question.
14       Q    All right. I thought you had finished my
15   question.
16           My question to you is have you been asked
17   to provide a copy of your professional resume or
18   curriculum vitae for this matter?
19       A    I provide that to all of my clients.
20       Q    All right. Were you asked to provide a
21   copy of all scientific or technical publications
22   authored by you or relied on you in rendering your

**17**

1  opinions in this case?
2      A  No, but my CV contains all my peer-reviewed
3  and all the presentations that all my work is -- my CV
4  is about 30 pages.
5      Q  My question was specifically as to the
6  materials that you relied in forming your opinions in
7  this case. Have you provided those or have the
8  ability to provide those to your attorney or to
9  Mr. Regan?
10     A  Whatever I had I provided it already. It's
11  annotated in my reports.
12     Q  Number 3, have you pulled these materials,
13  your time records, diaries, list of expenses, bills?
14     A  I apologize, but the gardener has a lawn
15  mower right in front of the house. I apologize. If
16  we could take a one-minute --
17     Q  Number 3, have you pulled the items
18  requested in number 3?
19     A  I can't hear. The lawn mower is in front
20  of my house.
21         MR. REGAN: Let's just wait a minute. And
22  Jason, sorry, but it's my fault we didn't send that to

**18**

1  him, so I apologize.
2         MR. WATERS: I understand, Counsel.
3      Q  I'm going to ask that the materials
4  requested in our notice of deposition be provided to
5  you and shared with us at your earliest possible
6  convenience.
7      A  That's fine.
8      Q  I think we can stipulate that the materials
9  that we requested in our notice of deposition have not
10  been requested of you or provided today in preparation
11  for this deposition. Is that agreed?
12     A  Do I have to agree or the attorney agrees?
13         MR. REGAN: No. It's my fault. We didn't
14  send it to you.
15         THE WITNESS: Okay. So I don't know.
16     Q  There's no question pending, sir.
17     A  Pardon me?
18     Q  There's no question pending, sir.
19     A  Okay. I don't have to answer anything?
20         MR. REGAN: No. You're all set.
21     A  Okay.
22     Q  I'm going to bring up what we have as being

**19**

1  the curriculum vitae for you that was provided with
2  your expert disclosure in this case and mark this as
3  Exhibit 2.
4         (Exhibit 2 was marked for
5          identification and attached to the
6          transcript.)
7      Q  Dr. Berkowitz, this is a 27-page document.
8  My question to you, I have one very simple question.
9  Is this a current version of your curriculum vitae or
10  if there's anything that you would add or supplement
11  to it or change? It's a very simple question with a
12  very long document. I apologize.
13     A  No, no. What is the date? What is the
14  date?
15     Q  The disclosure was provided to us --
16         MR. REGAN: No. There should be a date on
17  the CV.
18         MR. WATERS: I'm not sure if there was.
19         MR. REGAN: But there's nothing. We don't
20  have anything on the screen, Jason.
21         MR. WATERS: Oh, I'm sorry. I'll bring it
22  up. I apologize.

**20**

1         THE WITNESS: Can we hold again? The lawn
2  mower is coming by again. Sorry.
3      Q  I'm not seeing a date on it.
4      A  Okay. I don't think that this is my most
5  current.
6      Q  Okay. The version of the CV that we have
7  was filed on March 17, 2023. Do you have an updated
8  version since --
9      A  I do, around January 1, 2025.
10     Q  -- March 17, 2023?
11         THE REPORTER: Doctor, let him finish. I'm
12  sorry. I'm not sure I got the last part. Do you have
13  an updated version of March 17th?
14         MR. WATERS: March 17, 2023.
15     A  And my answer is yes, I have one January 1,
16  2025.
17     Q  I'm going to ask that you provide that to
18  Mr. Regan and share that with us.
19     A  Sure. Let me take some notes. Do I need
20  to take notes on all this?
21         MR. REGAN: No. I'll do it. I'll take
22  care of it.

---

21

1    THE WITNESS:  Okay.  Thank you.
2    Q    What, to your knowledge -- and, obviously,
3    I'll request and review your supplemental resume.  Is
4    there anything in particular that stands out to you
5    that you recall supplementing from March of 2023 until
6    earlier this month?
7    A    Well, I think that there may have been a
8    paper or two that I presented and also my term -- my
9    appointment to the Surface Transportation Safety and
10   Security Committee expired in January, so I might have
11   indicated that my term ended under Appointments.  Is
12   there a section Appointments?
13   Q    This one doesn't contain it.
14   A    So this one is -- I was appointed to that
15   committee two years ago, sir.
16   Q    What committee are you referring to?
17   A    Pardon me?
18   Q    What committee are you referring to?
19   A    The Surface Transportation Safety and
20   Security.
21   Q    Of what agency?  Is it of an agency or is
22   it a --

22

1    A    It was created by Congress, and it's
2    chaired by the administrator of TSA, and my term was
3    supposed to end in October but they went through some
4    kind of DEA?  Whatever that DEI stuff.  They asked me
5    to stay on until January because they were going
6    through a whole new process of selecting -- I was one
7    of the 25 voting members on this committee.  There
8    were 50 members, but I was one of the 25 that voted.
9    So that's not in there, for example.
10   Q    Okay.
11   A    It was a committee created by Congress.
12   And I served on that committee, supposed to be for two
13   years, but because of whatever they call that stuff --
14   I think it's DEI -- they had a hard time appointing
15   replacements for those whose terms had expired, so
16   they asked me to stay on.
17   Q    What was your involvement in the committee?
18   What was the purpose of the committee?
19   A    I can't tell.  Some of it is confidential.
20   But, in general, we set standards for safety and
21   security, the antiterrorism, cybersecurity.  All sorts
22   of security of surface transportation include

23

1    everything about aviation.  There was a parallel
2    committee, which I was not on, for aviation.  So
3    aviation was one committee that Congress set up, and
4    the other committee was for surface transportation,
5    all modes.  Intermodal.
6    Q    Exhibit 2 includes a summary of your fee
7    structure.  I understand that you charged an
8    engagement fee for $7,125 for this amount, and then
9    you charge $475 an hour; is that correct?
10   A    Yes, I do.
11   Q    Okay.  Do you know how much time you have
12   spent on this particular case?
13   A    No, not off the top of my head.
14   Q    Have you billed more than the initial
15   retainer of 7,125?
16   A    I believe I did.
17   Q    Okay.  Do you know how much more you
18   billed?
19   A    No.
20       MR. WATERS:  I will request a current
21   billing statement for Dr. Berkowitz's work on this
22   matter, please.

24

1        MR. REGAN:  Okay.
2    Q    Sir, can you take me through or explain to
3    me your educational background.  I think you explained
4    a little bit.  I'm asking about your undergraduate and
5    graduate training.
6    A    Sure.  I have a Bachelor's of Civil
7    Engineering from City College of New York where I
8    majored in civil engineering, minored in mechanical
9    and electrical engineering.  And also, I was in the
10   ROTC and I also completed the military engineering
11   training program.  That was sponsored by the ROTC.  So
12   that was a separate educational program in
13   engineering.
14   Q    Did you accept a commission in the
15   military, sir?
16   A    No.  I took alternate service.
17   Q    Your graduate training?
18   A    As part of the program, in the
19   undergraduate, it was a dual degree program.  So when
20   I completed the undergraduate work, I transitioned
21   into an MBA, industrial management for engineers from
22   City College

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

25

1    Q    The same school?

2    A    -- and business school.  Pardon me?

3    Q    You answered my question.  And I understand

4  you also have a second master's degree in

5  transportation planning?

6    A    Yes.  I decided to change directions and I

7  decided I wanted to pursue a Ph.D. in transportation,

8  engineering and planning.  And I had to take an

9  additional 30 courses and some 30 credits, and I

10  earned a master's, and that also qualified me to take

11  the comprehensives for the Ph.D.

12    Q    Did you do a dissertation as part of your

13  Ph.D.

14    A    It's a requirement.  Yes, I did.

15    Q    What was your dissertation?

16    A    It was a model to -- at the time, I was

17  finishing up my Ph.D., I was also the Executive

18  Director, System Commission for the Staten Island

19  Ferry, and I did my Ph.D. on why people selected the

20  Staten Island Ferry over alternate modes of

21  transportation because there were other options.  You

22  could either go by SIRTOA.  You can go by bus into the

26

1  city, things like that.  So I built a model to

2  determine how people selected one mode over another

3  mode.

4    Q    Sir, in connection with your studies, did

5  you distinguish at all between engineering from the

6  math and sciences perspective or from the policy

7  perspective of why people select one particular mode

8  of transportation or another?

9    A    That is what I did my Ph.D on.

10    Q    Okay.  And was your focus for your master's

11  and your Ph.D more on the policy side with respect to

12  transportation issues and safety?

13    A    They dealt with certain areas of policy,

14  but my MBA also had a dissertation.

15    Q    I'm asking you, sir, as an expert in

16  transportation safety and engineering, have you

17  designed transportation systems like audio frequency

18  track circuits or positive train control?

19    A    No, but I worked on automatic train

20  control, which is a CBTC system that predated the

21  positive train control.  And --

22    Q    What was your working connection with that?

27

1    A    When I worked for the City of New York, one

2  of my tasks was to oversee expenditures for the New

3  York City Transit Authority.  And in those early days,

4  we were looking into ways that we might be able to

5  automate sections of the system.  And ultimately, it

6  was done after I left, and that was for the Canarsie

7  line, the L line.

8    THE REPORTER:  What line?  Canarsie?

9    THE WITNESS:  Yes, the Canarsie L line,

10  which is --

11    THE REPORTER:  Can you spell that for me

12  because I am not familiar with that.

13    THE WITNESS:  C-A-R-N-S-I-E [sic],

14  Canarsie.

15    Q    So I worked on a lot of policies.  For

16  example, I had a position in the Department of

17  Transportation where I was in charge of planning and

18  development.  So that was strictly a policy area.

19  I've always been involved in policies and also heavy

20  emphasis in safety, especially in pedestrian safety.

21    I worked with -- in my graduate work, I

22  worked with Dr. John Fruin, who, like, is considered

28

1  the father of pedestrian safety in America.  And his

2  seminal work, which I worked on, is still, even though

3  it was done in the 70s, it's still considered the

4  benchmark work for safety for pedestrians.  And I

5  worked with him.

6    I also was president for a number of years

7  of the Metropolitan Association of Urban Designers and

8  Environmental Planners, which was created by the

9  American Society of Civil Engineers, the American

10  Society of Landscape Architects, the American Planning

11  Association, and a number of other organizations, and

12  we addressed the pedestrian safety and also bicycle

13  safety.

14    I've been heavily involved in policy.  I

15  worked with Governor Nelson Rockefeller in my career,

16  and I worked in policy and in development with

17  Governor Rockefeller.  I was his transportation

18  advisor.  And I was a young man in my 20s.  I

19  interfaced with most of the agencies that were

20  involved with transportation and the governor and

21  heavily involved in planning, design policy and

22  funding for some of those policies.

---

29

1     Q    Would you say that most of your experience

2 has been on the transportation safety side in terms of

3 policy, planning and development as opposed to

4 engineering from the sense of designing like an

5 automatic train control system or positive train

6 control system on a particular form of transportation?

7     A   I didn't do the engineering work. I was

8 more in an administrative role, but I was involved on

9 committees both in government and in the private

10 sector that dealt with those subjects, especially

11 positive train control. Been involved with that for I

12 would say maybe 20, 25 years.

13     Q   Dr. Berkowitz, I just want to try to

14 understand. Are you on the transportation side from

15 the systems development perspective like engineering a

16 railroad for a train system or are you more on the

17 policy safety side with respect to budgetary issues

18 and planning and development?

19     A   Well, I've had a little bit of both. For

20 example, in terms of development, you know that buses,

21 the leaning buses -- you know, buses lean? When they

22 come to a bus stop, they lean?

---

30

1     Q   Yeah.

2     A   Well, I worked in actually hands-on

3 development with that in the City of New York. There

4 are a lot of things I worked on hands-on development.

5 Light rail, bridge maintenance, improving

6 transportation access, bridge design. It's a mix.

7 I've been involved.

8       I don't do the graphics. I don't do the

9 drafting, the design. I'm more in a role where I help

10 evaluate technology and implement technology.

11     Q   Okay.

12     A   Including the intelligent transportation

13 systems. I was very active with that one time,

14 implementation of ITS in public transportation and

15 intermodal transportation.

16     Q   Have you ever designed a rail car?

17     A   Actually, I played around with it a little

18 bit when I was with the City of New York because we

19 had a -- we developed a container port in South

20 Richmond. I think it was South Richmond. It was a

21 long time ago. And there were bridge clearance

22 issues. Of course, we were starting to get into what

---

31

1 we call the double stack, and I got involved with

2 Mr. McLean, who is the father of containerization, in

3 trying to come up with some kind of solution to be

4 able to use these current existing rail bridges that

5 bring in double-stacked trains into the container port

6 so they can be shipped overseas.

7     Q   Have you ever designed a rail car for mass

8 transit?

9     A   Rail car for mass transit? I was on -- or

10 the -- I think it was the R140, which was a 75-foot

11 car for the New York City Transit Authority. I was

12 intimately involved in all aspects of that. And also

13 I was involved in the inspection and the approval of

14 that car. That car replaced traditional 60-foot cars

15 and the Transit Authority, they wanted to reduce from

16 a 10-car train to an 8-car train. So we developed

17 this R140 with the help of Uncter (phonetic) at the

18 time. And I was up on the committee and was involved

19 in, you know, what would be included in this -- I

20 think they called it a new technology car. I think at

21 that time they called it new technology car. And I

22 was involved in all aspects of the development of that

---

32

1 and also --

2     Q   Have you ever operated a transit rail car?

3     A   Yes, I have.

4     Q   Okay. When did you do that?

5     A   I did that -- I was doing consulting work

6 for the London Transport, and they invited me to

7 operate the Victoria line from the end station to the

8 yard. And I remember that very vividly because when I

9 took control of the train, it was not a revenue

10 service. When I took control of the train and I

11 announced myself to the train controller of the

12 Victoria line, which was a new model line that had

13 just recently opened, the train controller said is

14 this train hijacked? You sound like an American. So

15 I remembered that distinctly.

16       When I worked for the City of New York and

17 I was involved with the development of New York City

18 Transit Yard, any capital program, they invited me to

19 pilot a train within the Canarsie yard, and one of the

20 trains was one that was designated to the transit

21 museum, which I was also involved in the development

22 of. And I did operate twice nonrevenue transit

33

1 vehicles in the Canarsie yard.
2     Q    You ever operate a train on the Washington
3 Metro system?
4     A    No, I haven't. The only other train I
5 operated was the maglev that goes from Shanghai
6 Airport to Pudong in Shanghai.
7     Q    Have you ever ridden on the Washington
8 Metro system?
9     A    Many, many times. When I worked for the
10 City of New York, I was the liaison for funding from
11 -- I would say from 1970 to 1985. I was amongst -- I
12 was liaison to the Department of Transportation, and I
13 worked closely with the Secretary of Transportation
14 Volpe, for example, and the assistant.
15        I was in Washington, I would say, every two
16 weeks during the year as a liaison. I was the prime
17 factor in bringing federal grants and including many
18 grants directly from Secretary Volpe to the City of
19 New York.
20     Q    Dr. Berkowitz, my question was simply about
21 your experience riding the Washington Metro. I
22 appreciate that you want to give me color and context,

34

1 but we have a limited amount of time. I want to be
2 able to --
3     A    I have a --
4        THE REPORTER: One at a time; okay?
5     A    I answered it.
6     Q    My question was very specific, sir. Have
7 you ever ridden the Washington Metro?
8     A    And I said --
9     Q    If you don't filibuster, this will go a lot
10 faster, sir.
11     A    All right. Many times.
12     Q    That's all I was asking.
13        Okay. I don't have with your disclosure in
14 this case a copy of your testimonial history for the
15 last four years. How long have you been testifying as
16 an expert witness?
17     A    I believe since 1997.
18     Q    1997? Do you have any estimate as to how
19 many cases you've testified or served as an expert in?
20     A    No.
21     Q    Do you have any estimate as to how many
22 times you have given depositions like this one today?

35

1     A    All my work was in New York, New Jersey,
2 Pennsylvania. And New York and Pennsylvania, they
3 rarely, other than federal court, ever take
4 depositions. So most -- you know, most times a
5 deposition is not required unless it's outside that
6 area or in federal court. And most -- 95 or more
7 percent of my cases are settled before trial. So
8 rarely do I go to trial.
9     Q    My question was do you have an estimate as
10 to how many times you've given a deposition?
11     A    No.
12     Q    Do you have an estimate as to how many
13 times you've testified at trial?
14     A    No.
15     Q    To your knowledge, has your testimony ever
16 been challenged or stricken?
17     A    My testimony has been restricted, and I
18 just learned from a deposition the other day that
19 there was summary judgment on one of the cases that I
20 worked on.
21     Q    Okay. Do you know how many times your
22 testimony has been excluded, meaning a judge has

36

1 determined that you are not qualified or that your
2 opinions should not be admitted in evidence?
3     A    I don't know about that exactly, but I do
4 know that my testimony has been restricted, limited.
5     Q    Sir, my understanding is that you were
6 excluded as a witness in the Hayes versus Washington
7 Metropolitan Area Transit Authority case. Do you
8 remember that?
9     A    I remember the case, but I never was told
10 that I was excluded.
11     Q    My understanding is that you were also
12 excluded as an expert witness in Mahnaz Sheikh versus
13 Chugh in Suffolk County, New York in 2022?
14     A    What case is that?
15     Q    Sheikh versus Chugh, C-H-U-G-H.
16     A    I don't recall that case at all.
17     Q    You don't recall that case?
18     A    There may be another person. It's not
19 me.
20     Q    Singh versus Long Island Railroad in Queens
21 County, New York in 2022?
22     A    Singh? Sounds familiar. Is that somebody

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

---

37

1  got hurt on a platform or something?

2    Q    Well, the judge found that -- "The Court

3  further finds that Dr. Berkowitz's findings that the

4  surround circumstances, including pedestrian hurrying

5  to catch a train, increased the risk associated with

6  the alleged defect is speculative and conclusory."

7  Have you ever read that opinion?

8    A    No.  The attorney never told me anything

9  about that.

10    Q    Are you aware that your testimony was

11 excluded in Robinson versus WMATA --

12    A    No.

13    Q    -- in 2014?

14    A    That's incorrect.

15    Q    Okay.

16    A    And WMATA, it was a plaintiff decision in

17 that case.  Plaintiff was awarded 550,000 and WMATA

18 came back and said that their standards of care that I

19 referenced in my work was aspirational and the judge

20 reversed the jury's decision.  I testified and my

21 testimony was never excluded.

22    Q    Do you recall reading that the court found

---

38

1  in some -- "Dr. Berkowitz failed to link or relate the

2  purported standards, checking the internal center

3  mirror before releasing the brakes, making an

4  announcement before pulling away from the bus stop,

5  and failing to start the bus gradually and stop

6  smoothly to national standards of care."  Do you

7  recall that?

8    A    Yes, I do recall that, and that is not my

9  fault.  If the attorney asked me what the national

10 standards of care in other cities, I could have

11 indicated that and I could have presented that, but I

12 was not asked that question.

13    Q    Were you aware that you were excluded in

14 Perdomo versus Washington Metro in 2019?

15    A    Which case?

16    Q    Perdomo, P-E-R-D-O-M-O?

17    A    No.

18    Q    Are you aware that your testimony was

19 limited in Colon versus Metro-North Computer Rail in

20 2017?

21    A    No.

22    Q    Were you aware that your testimony was

---

39

1  limited in Love versus Metro Atlanta Rta in Fulton

2  County, Georgia in 2023?

3    A    No.

4    Q    Were you aware that your testimony was

5  limited in Tramontano versus New Jersey Transit Rail

6  in 2023?

7    A    I have it the trial is next week.  I wasn't

8  told anything about that.  The trial was yet to come

9  next week.

10    Q    Were you aware that your testimony was

11 limited in Jason versus National Railroad Passenger

12 Corporation in New Jersey in 2022?

13    A    Yes, I was.

14    Q    Are you aware of any other cases in which

15 your testimony was excluded, limited, or criticized?

16    A    I know there was a case involving British

17 Airways where the judge determined that the statutory

18 requirements were not applicable because it was an

19 open and obvious situation, and I believe the judge

20 made a mistake in that case.  It was British Airways

21 versus an individual who fell.

22    Q    Rodriguez?

---

40

1    A    I don't remember the name, but I do

2  remember it was British Airways, and the judge erred

3  because I don't believe that an open and obvious

4  supersedes a standard -- a statutory standard

5  requirement.

6    Q    I'm assuming you're referring --

7    A    And the lawyer for that case had to make a

8  decision whether to appeal or not to appeal.  And

9  since it was such a small value case, he decided to

10 just pass it on.

11    Q    If you're referring to Rodriguez in 2017 in

12 the Eastern District in New York, the court stated,

13 "In sum, what Dr. Berkowitz has done is take a number

14 of safety standards that are either inapplicable, or

15 at best, hortatory and vague, and conclude that the

16 height differential here was excessive.  It is a

17 conclusion looking for grounds rather than grounds

18 leading to a conclusion.  This is wholly inadequate

19 on which to present his opinion to a finder-of-fact."

20        Do you recall reading that in the British

21 Airways case?

22    A    No.  I never read that, but I do know there

---

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

---

41

1 is a statutory requirement for the height differential
2 between two parallel surfaces and the airport violated
3 -- British Airways violated that. Normally, they put
4 a bridge plate to overcome that. They didn't do this
5 in that case, but because this woman was a cleaning
6 woman and was doing this work for many years, the
7 judge, as I was told, considered it open and obvious,
8 and that open and obvious superseded statutory
9 requirement, an OSHA requirement, and also other
10 statutory requirements in that area.
11    Q   Sir, are you aware that you were also
12 excluded in Houser versus Norfolk Southern in the
13 Western District of New York in 2017?
14    A   No.
15    Q   When the court found that your opinion was
16 not supported by the record and that there appears to
17 be no support in any of the documents reviewed by Dr.
18 Berkowitz for his assertions?
19    A   I wrote a draft report and then I never
20 heard anything else from the attorney. I was unaware
21 of that.
22    Q   All right. Would you agree with me, sir,

---

42

1 that there have been multiple challenges to your
2 qualifications and the sufficiency of your opinions in
3 U.S. courts in cases in which you've testified or been
4 designated as an expert?
5    A   No, I don't agree. Based on law, my
6 testimony was limited because of legal -- I'm not a
7 lawyer, I'm am engineer, and the courts, you know,
8 make decisions based upon legality. My work is done
9 on the scientific method, and I don't -- I don't feel
10 that I did anything incorrect in any of those cases.
11    Q   I'm not asking you if you feel you did
12 anything incorrect, but has a court ever told you that
13 your opinion was speculative?
14    A   They never told me personally.
15    Q   In an opinion excluding or limiting your
16 testimony, has a court ever indicated that it had
17 found your opinion to be speculative?
18    A   You're reading things that I'm not privy
19 to. I would like to read them in full detail.
20    Q   Okay.
21    A   You were just excerpting from a decision.
22 I need to look at the whole document to comment on

---

43

1 what you are saying because you're picking sentences
2 out. I've got to look at the full decision of judge
3 and see exactly what the judge is talking about.
4    Q   Well, sir, these are available online.
5 You're welcome to read them. I'll be glad to provide
6 them. But I have at least ten opinions in which your
7 testimony was criticized by the court, excluded,
8 limited, and for a variety of different reasons. Are
9 you aware of that, that these opinions exist out
10 there?
11    A   Well, you just -- I haven't read those
12 opinions, but if you send them to me, I would become
13 aware of them. But I think you are -- you know, in
14 the legal world, there are certain things that are
15 permitted and not permitted in court, and I'm not a
16 lawyer, so I can't differentiate what should be or not
17 admitted.
18    Q   You'd agree with me, you just said, you're
19 not an attorney; correct?
20    A   No, I'm not.
21    Q   All right. Do you have any medical
22 training?

---

44

1    A   Medical training?
2    Q   Yeah.
3    A   Well, I don't know if you would call, you
4 know, when I was a young man, I was a scuba diver and
5 I received medical training from Civil Defense and the
6 Red Cross. Paramedical I guess you would call it.
7    Q   Do you consider yourself a biomedical
8 engineer?
9    A   I have training in biomedical
10 engineering.
11    Q   What is your training in biomedical
12 engineering?
13    A   Basically, it was in school and graduate
14 school attending conferences. I'm a member of the
15 Biomedical Engineering Society.
16    Q   Do you have any degrees in any medical
17 field?
18    A   No.
19    Q   Do you have any degrees that focus on human
20 factors in engineering?
21    A   Do I have a degree?
22    Q   In human factors?

---

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

45

1    A    When I went to school, there were only four
2    degrees.  There was civil, mechanical, electrical and
3    chemical.  Now there's hundreds of degrees.  Human
4    factors was an integral part of my education at the
5    undergraduate level and the graduate level.
6        When I went to school, human factors was a
7    key component in everything you do in transportation
8    engineering.
9    Q    Do you hold yourself out as a biomechanical
10   engineer?
11   A    Pardon me?
12   Q    Do you hold yourself out as a biomechanical
13   engineer?
14   A    I have training in biomechanical
15   engineering.  I don't have a degree.
16   Q    Have you practiced as a biomechanical
17   engineer?
18   A    I do work in biomechanical engineering, and
19   I don't have a degree in biomechanical engineering,
20   but I do have training.
21   Q    Okay.  How much training do you have?  What
22   percentage of your undergraduate training involved

46

1    biomechanical engineering?
2    A    It was in graduate training and also
3    attending conferences and meetings and online --
4    Q    Did you do a course in biomechanical
5    engineering?  Did you do a sequence of courses in
6    biomechanical engineering?
7    A    Pardon me?
8    Q    Did you do a sequence of courses in
9    biomechanical engineering?
10   A    I took some basic courses.  As you know,
11   the foundation of biomechanical engineering is
12   physics.  And I have 15 years of -- 15 courses in
13   physics.  The foundation of biomechanics is physics,
14   primarily Newton's laws.  So I have the training for
15   biomechanics through my education and physics as well
16   as courses that was specifically focused on those and
17   conferences and organizations that I belong to,
18   nationally and internationally, biomechanics and
19   biomedical and human factors.
20   Q    Have you ever taken a class in anatomy and
21   physiology?
22   A    I took a class in anatomy.

47

1    Q    And in what capacity?  As part of your
2    education or subsequent?
3    A    Continuing education to develop --
4    Q    And how long was the course?
5    A    Pardon me?
6    Q    How long was the course?
7    A    I don't recall.
8    Q    Who offered the course?
9    A    One of the professional engineering
10   societies.
11   Q    When did you take the course?
12   A    When did I take it?  I don't remember
13   exactly.
14   Q    Was the course longer than a --
15   A    We focused on such things as head trauma,
16   whiplash, natural problems related to the spinal
17   column, the impact of the human body from an airbag.
18   Things of that nature.  So it was basically -- the
19   anatomy that I took was basically related to the
20   causes of jerk rate, the impact from an external
21   source of collision, things of that nature.  They were
22   taught by schools like -- trying to remember.  Maybe

48

1    one of them was University of Wisconsin.  I had
2    several continuing education programs.
3    Q    Was the course longer than a day?
4    A    Pardon me?
5    Q    Was the course longer than a day?
6    A    I don't hear what you're saying.
7    Q    Was the course longer than one day?
8    A    It was conducted online and the continuing
9    education --
10   Q    You didn't answer my question, sir.  Was
11   the course longer than one day?
12   A    Yeah, it was longer than one day.  I don't
13   remember how long.
14   Q    Was it longer than a week?
15   A    I take so many courses and I do so much
16   continuing education, I can't really tell you.  One of
17   the requirements to maintain my professional
18   engineering license is I have to take 32 continuing
19   education credits every two -- over every two years.
20   So I take advantage of that to learn new subjects.
21   And the courses that I take are approved by the state
22   of New York and the state of New Jersey for continuing

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

13 (49 to 52)

49

1 engineering education.

2    Q   Okay.  So you took this as part of your

3 continuing education as an engineer; correct?

4    A   Pardon me?

5    Q   You took this as part of your continuing

6 education requirements for your licensures in

7 engineering?

8    A   Yes.

9    Q   Okay.  How many credit hours did you get

10 for this class?

11    A   I don't recall.

12    Q   Was it the entirety of your 32 hours

13 requirement for that year?

14    A   I can't recall.  It wouldn't be all 32.  It

15 would be a portion.

16    Q   Okay.  So it was less than 32 hours of

17 continuing education?

18    A   I really don't know how many hours I spent

19 on accident reconstruction related to biomedical

20 engineering.

21    Q   Okay.

22    A   Biomechanic.

50

1    Q   Aside from the continuing education

2 courses, have you taken other educational requirements

3 for biomechanical engineering?

4    A   Like I said, this was an integral part of

5 the -- when I went to school, those were not separate

6 degrees.  It's part of the transportation engineering

7 program at Poly.  We dealt with biomechanical issues

8 involving train and plane and intermodal, land, sea

9 and air accidents.

10        One of the things we focused on such things

11 as jerk rate and whiplash, the effects of airbags.

12 These are all areas that transportation engineers work

13 in in order to be able to provide an understanding and

14 also to help improve the system.

15    Q   Did you ever take --

16    A   Pardon me?

17    Q   Go ahead.  I'm sorry.

18    A   That's why, you know, you have to take

19 continuing education, so you can keep current with

20 what's going on and what affects and doesn't affect

21 safety.

22    Q   Do you consider yourself a biomechanical

51

1 engineer, sir?

2    A   You don't give me a chance to finish.  Can

3 I finish?

4    Q   You're filibustering.  You keep talking --

5        MR. REGAN:  He's not filibustering.  He's

6 answering your questions.

7        MR. WATERS:  He's not answering my

8 questions.

9    A   You know, I didn't have a script and your

10 question to prepare for, so I'm doing it off the cuff.

11 So you have to give me an opportunity to go do it off

12 the cuff.  If you don't want me to give me an answer,

13 tell me so.

14    Q   I'd like you to listen to me.

15    A   I answered this question before, and I'm

16 doing it to the best of my ability to tell you a 30

17 -- you know, a career that's 60-plus years of all of

18 the things I've done over 60 years.  My resume is only

19 a summary of all the things that I've worked on.  This

20 isn't even a detail of everything I worked on.  I

21 worked on so many things and, you know, I probably

22 forgot more of what I learned than I, you know, than I

52

1 should have.  You know, I did so much.

2        So as we talk, things come to mind.  It may

3 not be in an orderly structure because I was not

4 prepared for your question.

5    Q   Okay.  Doctor, please listen to the

6 questions that I'm asking and answer the questions

7 that I'm asking.

8        MR. REGAN:  He's answering your questions.

9 Let's keep going here.

10        MR. WATERS:  He's not, Pat.

11        MR. REGAN:  Yes, he is.

12    Q   Dr. Berkowitz, do you hold yourself out

13 professionally as a biomechanical engineer?

14    A   I hold myself out that I have the knowledge

15 of biomedical engineering, biomechanical engineering,

16 and --

17    Q   That's not what I asked you.

18    A   -- I hold a degree in that area.

19    Q   My question is do you hold yourself out as

20 an expert in biomechanical engineering?

21        MR. REGAN:  He has answered your

22 question.

Transcript of Carl Berkowitz, Ph.D.

14 (53 to 56)

Conducted on January 28, 2025

---

53

1    MR. WATERS:  No, he's not.

2    MR. REGAN:  Yes, he has.  Maybe it's not

3  the answer you want, but it's his answer, not yours.

4    MR. WATERS:  He's not answering my

5  question.

6    **A    The areas that I work in, I hold myself out**

7  **to be knowledgeable in biomechanical, biomedical**

8  **engineering in the areas that I've been trained in.**

9    Q    I'm not asking if you hold yourself out as

10 knowledgeable.  I'm asking if you hold yourself out as

11 an expert in biomechanical engineering.

12   **A    I hold myself out to be an expert in**

13 **transportation engineering safety.**

14   Q    Thank you.

15       THE REPORTER:  Okay.  We need to keep this

16 cross-talking to a minimum because I had three people

17 talking at once.

18       So Mr. Regan, I did not hear what you said.

19 Did you object?

20       MR. REGAN:  I think we're moving on,

21 hopefully.

22       MR. WATERS:  We are.

---

54

1    Q    Dr. Berkowitz, have you been retained by --

2    **A    I'm sorry.  The gardeners are out.  I can't**

3  **hear.  If you'd wait another -- I wish they'd go away,**

4  **but they don't seem to.**

5    Q    Do you have any head phones that might

6  help?

7    **A    No, I don't.  I didn't expect that they**

8  **would be here today.  I think you might be able to**

9  **hear it.**

10   Q    I can't hear it, but I'm doing my best.

11 Dr. Berkowitz --

12   **A    They're right smack outside.  I'll ask him**

13 **if he can leave.**

14   Q    Hold on.  Do you want to take a break,

15 sir?

16   **A    I'll ask him if he can leave.  Okay?**

17       MR. WATERS:  Let's take a break.  Let's go

18 off for five minutes.

19       (Break taken, 10:57 - 11:03 a.m.)

20 BY MR. WATERS:

21   Q    Dr. Berkowitz, I want to mark some exhibits

22 here real fast.  I want to start with what I have as

---

55

1  being your report in this matter.

2    **A    That's the --**

3    Q    Yes.  So I'll be marking this as Exhibit 3.

4  This is Draft Safety Report, Scott v. WMATA, prepared

5  by Carl Berkowitz, Ph.D., P.E. on March 16, 2023.

6  This document is 43 pages.

7        I'm scrolling through it slowly.  Does this

8  appear to be the report you prepared in this matter?

9    **A    I printed out a copy.  Let me just double**

10 **check.  I'm pretty sure.  Yes, that's -- what's the**

11 **date on that?**

12   Q    This is the March 16, 2023.

13   **A    Right.**

14   Q    And that's going to be Exhibit 3.

15       (Exhibit 3 was marked for

16       identification and attached to the

17       transcript.)

18   Q    Oh, I'm sorry.  2023.

19   **A    Right.**

20   Q    And then I'm going to bring up an affidavit

21 that you gave, dated November 6, 2023 as Exhibit 4.

22       (Exhibit 4 was marked for

---

56

1        identification and attached to the

2        transcript.)

3    Q    Do you recall giving this affidavit?

4    **A    It looks like that I did an electronic**

5  **submission.**

6    Q    Yes.  Do you recall giving this affidavit,

7  sir?

8    **A    Yes.**

9    Q    And then Exhibit 5 is a supplemental report

10 that we received from you?

11   **A    Yes.**

12   Q    Dated November 21, 2024?

13   **A    Yes.**

14   Q    This document is 11 pages.  Do you recall

15 giving this report?

16   **A    Yes.**

17       (Exhibit 5 was marked for

18       identification and attached to the

19       transcript.)

20   Q    I'd like to start with Exhibit 3 and go

21 through this with you.

22   **A    Can you blow it up?  I really can't --**

---

Transcript of Carl Berkowitz, Ph.D.                15 (57 to 60)
Conducted on January 28, 2025

---

57

1    Q    Oh, of course.  Of course.  Did that help?
2    **A    Yes, it does.**
3    Q    Okay.  In your incident overview -- so
4  first of all, the factual background in the incident
5  overview, what is the source for this information?
6    **A    Whatever documents I received.  I don't**
7  **remember exactly at this moment.  But it's whatever**
8  **documents I received.**
9    Q    Okay.  I should have asked this before.  Do
10 you recall what documents you received?  Are they
11 listed in your report?
12   **A    I don't think so.**
13   Q    Okay.  Do you recall what documents you
14 received in this matter to review?
15   **A    I know I received several depositions,**
16 **report.  Well, WMATA reports.  WMATA standard**
17 **operating procedures, witness statements.  And there**
18 **may be other documents.  That's all I remember, off**
19 **the top of my head.**
20   Q    Did you review any additional documents in
21 preparation for today's deposition?
22   **A    No, I haven't.  Just actually, I didn't**

---

58

1  **even review this report.  I just reviewed the**
2  **supplemental report.**
3    Q    Okay.  Did you have any conversations with
4  anybody in preparation for today's deposition?
5    **A    Yes.  I spoke to the attorney.  We had a**
6  **conversation.**
7    Q    Okay.  Without getting into -- did that
8  conversation relate to any additional factual material
9  upon which you were basing your opinions in this case?
10   **A    No.**
11   Q    Aside from the additional materials you
12 received in preparing the report that is Exhibit 3,
13 did you receive any additional documents to review, or
14 materials?
15   **A    Since then?**
16   Q    Yes.
17   **A    Yeah.  I did the affidavit.**
18   Q    Well, I'm asking, did you -- I know you
19 generated the affidavit, which is Exhibit 4.  I'm
20 asking did you receive any additional documentation to
21 review after you prepared the March 2023 report?
22   **A    Not that I recall.**

---

59

1    Q    Okay.
2    **A    I was asked to do a supplemental report.**
3    Q    Right.  Were you given any additional
4  document in preparation with the supplemental report?
5    **A    Not that I recall.**
6    Q    Okay.  Do you have an understanding of what
7  caused -- we're here to talk about Ms. Scott in an
8  accident that happened on September 23, 2019; correct?
9    **A    Yes.**
10   Q    Okay.  Have you ever spoken with Ms. Scott?
11   **A    No.**
12   Q    Okay.  What is your understanding of what
13 happened that resulted in Ms. Scott's injury?
14   **A    Basically, the train came to a stop at**
15 **the -- not the normal stop on the platform at**
16 **McPherson.  And the train stopped.  Ms. Scott got up,**
17 **gathered her belongings, got up and started walking**
18 **towards the door.  And as she starts walking towards**
19 **the door to exit, the train certainly unexpectedly and**
20 **violently lurched forward.  The train was then**
21 **proceeding to move to another location on the platform**
22 **and that --**

---

60

1    Q    And what is the basis, the factual basis
2  for that information?  What are the records that
3  you're relying on for that?
4    **A    Well, I understand that there's no dispute**
5  **on that because there are three independent witnesses.**
6  **And also the WMATA report indicates, you know, that**
7  **this happened, that the train stopped and then started**
8  **again.**
9    Q    Okay.  Were you aware whether the train on
10 the same trip prior to this particular station had
11 stopped short of the final berthing location on prior
12 occasions?
13   **A    No.**
14   Q    Okay.  Were you aware -- do you have any
15 understanding as to whether this operator testified as
16 to whether he or she remembered giving an announcement
17 that the doors would be opening on the left as they
18 were arriving at the station?
19   **A    There was a document from WMATA where the**
20 **train driver/conductor, the multifaceted individual**
21 **failed to make the announcement.  He was cited by**
22 **WMATA for not making the announcement.**

---

61

1    Q    Do you recall whether the operator
2  testified whether he or she remembered giving
3  announcement that the train would move?
4    A    I don't recall.
5    Q    Do you know whether there was any
6  announcement as the train was arriving at McPherson
7  Square?
8    A    According to the witnesses and Ms. Scott,
9  no announcement was made.
10   Q    Okay.  Of any sort whatsoever?
11   A    That's a -- I thought that was an
12 uncontested accepted situation because he was -- the
13 train driver -- I don't know exactly the title you
14 give the individual train driver/conductor.
15   Q    Operator.
16   A    Pardon me?
17   Q    Operator.
18   A    Operator.  Was cited for not making the
19 announcement.
20   Q    Do you know whether the operator remembered
21 making the announcement or not?
22   A    I don't remember.

62

1    Q    Okay.  Do you know whether this train had
2  stopped on prior stops on the same line before this
3  injury short of the final berthing location on the
4  platform on prior occasions?
5    A    I don't know.
6    Q    Do you know how long Ms. Scott had been on
7  the train before this accident?
8    A    I don't know if I have in my notes that
9  I -- she boarded at the Vienna Metro station.
10   Q    And do you know how many stops were between
11 Vienna and McPherson?
12   A    I used to know but I don't remember
13 anymore.
14   Q    Was there ever an announcement that the
15 doors were opening on the left prior to the train
16 stopping?
17   A    Pardon me?  You broke up.
18   Q    Was there ever an announcement that the
19 doors were going to open on the left?
20   A    No.  According to the witnesses, there was
21 no announcement prior to this incident occurring.
22   Q    Okay.  Do you have any understanding of

63

1  what caused the train to move and reposition?
2    A    Well, this is -- you know, this is
3  something that is not totally uncommon where trains
4  end up stopping at the wrong location and then have to
5  then restart either going forward or going backward to
6  the proper position so that all cars are properly
7  platformed and in the right locations.
8    Q    Do you know whether this operator
9  deliberately stopped short of the final location or
10 whether there was a loss of speed commands or
11 something that happened with the train that caused it
12 to stop short at this location?
13   A    No, I do not, but that's a possibility.
14   Q    You said that it's fairly common that a
15 train will stop short of the final location and then
16 reposition?
17   A    Well, it's not like an everyday occurrence.
18 You know, it occurs, and that's the reason we have
19 standards of care to deal with this situation.  When a
20 train does not stop at its proper position, we have,
21 you know, standards of care, national standards of
22 care, which can apply -- which are being used by all

64

1  the major train -- we call them subways because some
2  of them are all -- like Washington Metro is above and
3  below ground.  So I think metros.  Maybe we'll just
4  describe the train systems in the United States as
5  metros.  And as you know, there are about 16 metros in
6  the United States of which 11 are underground and
7  over, above ground, and five that are above ground for
8  their whole operation.
9    Q    Are you aware of whether this train stopped
10 short of the final berthing location on the platform
11 on several occasions on this particular run while Ms.
12 Scott was on the train?
13   A    I don't know.  All I know is the situation
14 at McPherson, the train stopped short of the final
15 location and then restarted and then moved to the
16 final location.
17   Q    So you give a timeline of events in
18 paragraph 2 on page 4 of your report where you
19 estimate from items 4 to number 5, Ms. Scott stands up
20 from her seat and walks toward the door to exit.  Ms.
21 Scott then reaches toward the center pole for
22 additional support and you state approximately two to

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

65

1 three seconds. What is the basis for the
2 approximately two to three seconds?
3    **A    Because I viewed videos of -- a lot of the**
4 **transit trains today have internal videos, cameras,**
5 **and I looked at a lot of these videos. And generally**
6 **speaking, people sit down and it generally takes two**
7 **to three seconds to, you know, to reach the areas near**
8 **the door on most cases.**
9    Q    Those are on video in this case; correct?
10    **A    And the sudden and unexpected change in**
11 **acceleration usually occurs less than a second, and**
12 **that's -- it means a level of difficulty because the**
13 **event recorder generally is recording in the seconds,**
14 **so we don't really get that information from the event**
15 **recorder, but we can get it if there are clever**
16 **devices used like in trolleys where we can get that**
17 **sudden, unexpected and violent move forward.**
18    Q    So there was no -- a video of the inside of
19 this train; correct?
20    **A    That is correct.**
21    Q    And there was no event recorder for this
22 train; correct?

66

1    **A    No, not that I saw.**
2    Q    And we don't have video seeing the train at
3 the actual platform; correct?
4    **A    I have not seen one. No.**
5    Q    So you're basing this on your experience of
6 videos in other cases involving other people on other
7 transit systems; correct?
8    **A    That is correct.**
9    Q    Okay. So you don't know whether it was
10 approximately two or three seconds in this particular
11 incident?
12    **A    No, I don't. That's why I said --**
13    Q    And you don't know that the train
14 unexpectedly and violently lurched forward. Ms. Scott
15 is thrown in the air, Ms. Scott lands on her head,
16 items 6, 7 and 8 in your report, that it was
17 approximately less than one second from evidence in
18 this particular case; correct?
19    **A    I do know that falls take place in that**
20 **amount of time. And we've done a lot of studies in**
21 **that area because we know that a person needs time to**
22 **perceive, understand and take actions. We call it**

67

1 perception reaction time. And if a person -- we know
2 the length of time it takes for a person to react and
3 we know that, you know, that takes -- that's usually
4 one and a half to two and a half seconds. And all the
5 videos that I reviewed where people fall on trains or
6 getting off trains has always been less than a half
7 second.
8    Q    Again, that's not based on videos --
9    **A    I'm sorry. Less than a second.**
10    Q    Again, that's not based on videos --
11    THE REPORTER: Hold on. Hold on. Okay.
12    **A    And the reason for this is that we know**
13 **when a person falls, they fall at the rate of gravity,**
14 **32 feet per second, which would be less than a half**
15 **second. But I --**
16    Q    And that's not based on --
17    **A    -- want to be approximate, so I said less**
18 **than a second.**
19    THE REPORTER: Okay. Doctor, you're still
20 talking when he's asking the question and then I'm not
21 getting --
22    THE WITNESS: I was answering the question.

68

1 I'm still working on the question.
2    Q    That's not based on video in this case or
3 testimony in this case. That's based on other
4 incidents; is that correct?
5    **A    It's based on many, many incidents that I**
6 **reviewed on video of people falling on trains on the**
7 **train car and getting on and off the train car.**
8    Q    But it's not based on video or evidence
9 relates to Ms. Scott; correct?
10    **A    That's correct.**
11    Q    Are you aware of whether Ms. Scott was
12 carrying anything when she fell?
13    **A    You broke up. I'm sorry.**
14    Q    Was Ms. Scott carrying anything in her
15 hands when she fell?
16    **A    I don't recall.**
17    Q    Do you recall whether she had an ambulatory
18 device with her, a cane of sort or a walking stick?
19    **A    I don't recall.**
20    Q    Do you recall whether Ms. Scott indicated
21 whether she was holding onto one of the rails on the
22 seats that are on the Washington Metro?

Transcript of Carl Berkowitz, Ph.D.

Conducted on January 28, 2025

---

**69**

1     A    I don't recall reading anything about that.

2     Q    Do you recall whether she was holding on to

3 any of the vertical hand holds on the train?

4     A    What's she indicated that she was trying to

5 reach the -- hold the other door.

6     Q    Did she indicate when she was holding on to

7 any of above-head handles on the train?

8     A    I don't recall.

9     Q    I'm turning to Section B of your report.

10 I'm sorry, Section 4 of your report beginning on page

11 5.  And this is, again, Exhibit 3.  Beginning with the

12 -- I think the heading is Walking and Falling?

13    A    Yes.

14    Q    You give a description of falling and then

15 B is walking and falling.  And there's a discussion of

16 jerk rate in your report.  Can you explain what you

17 mean to me by jerk rate?

18    A    Absolutely.  It's the -- if you take the

19 derivative of velocity, it's acceleration and

20 calculus.  And if you take the derivative and

21 acceleration, you get jerk rate with jolt, which is

22 the instantaneous change in the rate of acceleration

---

**70**

1 or deceleration in a nutshell.

2     Q    There's a statement here I'm a little

3 confused by in your report on page 10.  Jerk rate is

4 the rate of change of sustained acceleration or

5 deceleration and this cannot increase or decrease at

6 greater than that rate.

7     A    Right.

8     Q    I'm not sure I understand that sentence.

9 Can you explain to me what you mean there?

10    A    Yes.  The American Society of Civil

11 Engineers has a committee of standards.  It was for --

12 actually, it was for people movers, but it doesn't

13 change the concept basically that people, when you're

14 on a vehicle and the vehicle is going 40 miles an

15 hour, how fast are you going?

16    Q    40 miles an hour.

17    A    You're going 40 miles an hour; right?  So

18 if a vehicle makes a sudden change in its rate of

19 speed by decelerating or reactive decelerating, how

20 fast are you traveling?  At that instant in time,

21 you're traveling 40 miles an hour and the vehicle may

22 be traveling 20 miles an hour or 60 miles an hour.

---

**71**

1 But in that instant in time when that changes, it

2 causes a disruption in the person's ability to

3 maintain stability and balance, and that's what the

4 jerk is.  It's that sudden instantaneous change in the

5 rate of acceleration, deceleration or a change in

6 normal velocity of a vehicle.

7     Q    I guess what I'm asking about -- I'm sorry.

8     A    This applies to all vehicles.  You know,

9 bus, train, light rail.

10    Q    What I'm trying to understand here is this

11 phrase "and this cannot increase or decrease at

12 greater than this rate."

13    A    Right.

14    Q    What cannot increase or decrease at greater

15 than what rate?

16    A    The jerk rate.

17    Q    The jerk rate cannot increase or decrease

18 at greater than what rate?

19    A    It's in there.  It's in the report

20 somewhere where the table of what the American Society

21 of Civil Engineers determined is what is the

22 acceptable jerk rate.

---

**72**

1         Now, from what I understand on buses, that

2 the buses are designed so they cannot exceed the jerk

3 rate in terms of acceleration.  This is not

4 necessarily the case with light rail and with subway

5 cars, trains.

6     Q    So are you saying here -- so when you're

7 saying "and this cannot increase or decrease at

8 greater than this rate," what you're referring to is

9 the modality of transportation cannot increase or

10 decrease at greater than the jerk rate.  Is that what

11 you're saying?

12    A    No.  That when a vehicle is accelerated or

13 decelerated, the change in acceleration or

14 deceleration cannot exceed the jerk rate.

15    Q    Okay.

16    A    If it exceeds the jerk rate, then a person

17 that's using that vehicle will lose stability and

18 balance whether they're seated or standing.

19    Q    Okay.  So if the vehicle changes its

20 acceleration or deceleration at greater than the jerk

21 rate, what happens to a standing passenger?

22    A    Generally, they will fall.

---

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

73

1    Q   Okay.  Is it your expectation that every
2   freestanding passenger, if the change in deceleration
3   or acceleration is greater than the jerk rate will
4   fall?
5    A   No.  Sometimes the people who are --
6   doesn't affect everybody equally, and a lot of other
7   factors come into effect.  Age, physical condition.
8    Q   Okay.  So how is it determined what is an
9   acceptable jerk rate and what's not an acceptable jerk
10  rate?
11   A   The American Society of Civil Engineers
12  formed a committee, a standards committee, and they
13  formed this ANSI ASCE standard, which is accepted by
14  the entire industry, and the American Public
15  Transportation Association also accepts that standard.
16  Well that's it.
17   Q   This is the standard?
18   A   Yes.
19   Q   Okay.  And this standard is -- the standard
20  you're referring for ANSI ASCE Standard 21.2-08, that
21  is for automatic people movers; right?
22   A   No.  It was done for automatic people

74

1   movers, but it applies to all types of vehicles.
2    Q   Okay.  This was prepared for automatic
3   people movers; correct?
4    A   Well, that's where the study was originally
5   done, because they had the automatic people mover in
6   Las Vegas gave us free time to do these
7   measurements.
8    Q   Okay.  So automatic people movers, are we
9   talking about kind of like the -- kind of like the
10  horizontal escalators in an airport?
11   A   No.  It's the train that operates in Las
12  Vegas between the hotels along the strip.
13   Q   Okay.  So has this --
14   A   They call it -- that's their title for it.
15  I would call it a, you know, a monorail or a -- I
16  don't know.  But it's a train that operates along the
17  strip in -- it's actually a train that operates in Las
18  Vegas along the strip.
19   Q   Okay.  So you're saying that the Standard
20  21.2-08 applies to automatic people movers in the
21  sense of the trainments or the trainments in place in
22  Las Vegas between hotels?

75

1    A   No.  That's what the research was
2   conducted, but it applies to all modes of
3   transportation.  Buses, trains.
4    Q   Okay.  So your testimony is that ANSI
5   21.2-08 applies to trains?
6    A   That's correct.  You can read APTA
7   standards.  They confirm that.
8    Q   And APTA is a voluntary organization;
9   correct?
10   A   APTA is a voluntary organization.
11   Q   And ANSI are voluntary standards; is that
12  correct?
13   A   ANSI is voluntary standards.
14   Q   Has this been adopted by the FRA?
15   A   The FRA?  I don't believe so.
16   Q   Has it been adopted by the Department of
17  Transportation?
18   A   I've seen studies where they recommend this
19  for new construction, new equipment.
20   Q   For new construction equipment.  Has it
21  been adopted for new construction and equipment?
22   A   No.  It's been around for a long time.  The

76

1   jerk rate is controlled by the operator of the vehicle
2   by them not doing something suddenly and unexpectedly.
3   By doing something -- you know, one of the basic
4   standards for operating the vehicle is that you
5   accelerate smoothly and decelerate smoothly, and if
6   you don't accelerate or decelerate smoothly, you are
7   in jeopardy of exceeding the jerk rate.
8    Q   I understand that.
9    A   For example, in the WMATA bus system, you
10  cannot exceed the jerk rate on accelerating the bus.
11  It's built in.
12   Q   Is there a Federal Railway Administration
13  regulation that makes the jerk rate --
14   A   You can exceed the --
15   Q   -- that is outlined in ANSI and ASCE
16  Standard 21.2-08 a requirement of transit systems in
17  the United States?
18   A   Well, if you consider the active
19  specifications for trains as a standard that all --
20  which WMATA is one of the members of the -- what do
21  they call it?  The Operating Committee of Standards,
22  the operating practice working group that WMATA is

Transcript of Carl Berkowitz, Ph.D.

Conducted on January 28, 2025

**77**

1  very active, they have generated standards for jerk
2  rate, and that standard is a national standard of
3  care.  It's not statutory, but it's the national
4  standard of care for all moving vehicles be they buses
5  or trains or light rail, people movers, moving walks,
6  whatever.
7      Q    This does not appear in any Federal
8  Railways Administration regulation; right?
9          (Reporter clarification.)
10     Q    This does not appear in any statute of the
11  United States with respect to railways; correct?
12     A    I don't recall seeing it in any regulation.
13  No.
14     Q    That was my next question.  It does not
15  appear in any regulatory authority that this is a
16  required limitation on any transit authority; correct?
17     A    That's correct.
18     Q    And it does not appear in any DOT
19  regulation; correct?
20     A    There is reference to it in DOT ADA
21  standards.
22     Q    Okay.  This is not an ADA case?

**78**

1      A    No.
2      Q    It is not a requirement of any DOT
3  regulation; correct?
4      A    Not of any statutory regulation.
5      Q    Right.  And APTA standards are voluntary;
6  correct?
7      A    That's correct.
8      Q    And ANSI are voluntary; correct?
9      A    Yes.
10     Q    And in many instances, they are
11  aspirational; correct?
12     A    No.
13     Q    Meaning this is what the transit industry
14  is hoping to accomplish; correct?
15     A    No.  It's the national standard of care.
16  This is what the industry has decided is the national
17  standard of care.  It's not --
18     Q    You're saying that the industry has decided
19  that voluntary standards under APTA are the national
20  standard of care?
21     A    That's right.
22     Q    Okay.  Have you seen anything from a

**79**

1  specific transit authority that has adopted the jerk
2  rates for automatic people movers as being the
3  acceleration deceleration standards for either a bus
4  or a rail?
5      A    Yes, I've seen it in bus design.  Yes, the
6  bus stats.
7      Q    I'm not asking about bus design.
8      A    And I've also seen it in train car
9  specifications.
10     Q    I'm asking about specific authorities.  Has
11  a transit authority in the United States, to your
12  knowledge, adopted this ANSI standard for jerk rate on
13  its transit systems?  As a single --
14     A    The City of Chicago, Philadelphia SEPTA;
15  Philadelphia; Atlanta; PATH in New York, New Jersey;
16  BART in San Francisco; SEPTA in Philadelphia; MARTA in
17  Atlanta; Los Angeles; MTA Miami-Dade; SIRTOA in Long
18  Island, Staten Island; PATCO in New Jersey; Greater
19  Cleveland MTA; Tren Urbano in Puerto Rico; MTA
20  Baltimore, and the new Skyline in Honolulu all have
21  adopted the jerk rate.
22     Q    What is your basis for stating that?

**80**

1  Because they're members of APTA?
2      A    They're members of APTA and I've seen the
3  specs of their equipment.
4      Q    And the specs of their equipment you say
5  don't exceed the jerk rate?
6      A    They even spell out the jerk rate, but the
7  jerk rate --
8      Q    Of specific existing equipment?
9      A    They actually give a number for the jerk
10  rate?
11     Q    On new equipment or existing equipment?
12     A    Well, it was whatever equipment that I had
13  a chance to review.
14     Q    What equipment did you have a chance to
15  review?
16     A    I don't remember exactly, but it's -- and
17  all of this, all these standards come from the
18  American Public Transit Association.  We have a
19  standard for a bus.  We have a standard for subway
20  cars.
21     Q    For each of the authorities that you
22  reference, can you give me a specific reference to a

Transcript of Carl Berkowitz, Ph.D.

Conducted on January 28, 2025

---

**81**

1  document that says that that particular authority has
2  adopted this jerk rate as an instruction for its
3  operators with respect to how fast they can accelerate
4  or decelerate?
5      A  Well, in terms of the buses, the buses are
6  **governed, so they don't exceed the jerk rate. All**
7  **buses --**
8      Q  Do you have a document that reflects
9  that?
10     A  **Pardon me?**
11     Q  Is there a document in each of these
12  authorities that reflects that?
13     A  **I'm sure there is.**
14     Q  Have you looked that up as part of this
15  opinion in this case?
16     A  **No, because I serve on committees where**
17  **this has been discussed, and that these companies have**
18  **indicated that they have adopted the jerk rate as a**
19  **governing for accelerating the bus.**
20     Q  So you're telling me that those authorities
21  have told you in connection with your service on
22  committees that they have adopted this jerk rate?

**82**

1      A  **That's correct.**
2      Q  Aside from what they told you on these
3  committees about their acceptance of the jerk rate, is
4  there documentation you can point to that tells me
5  that yes, each of those authorities has adopted the
6  jerk rate with respect to not only its equipment, but
7  instructions on drivers and operators with respect to
8  their acceleration and deceleration?
9      A  **We, as a country, we've adopted the APTA**
10  **standards for new bus -- for buses. And in that**
11  **standard, you can go to jerk rate and it spells it out**
12  **clearly that -- this has been accepted by the industry**
13  **and all buses that are built or purchased or operating**
14  **in the United States follow this specification, and**
15  **this specification has been around for a long time and**
16  **it spells out jerk rate.**
17     Q  Well, it's been adopted in 2008. I'm
18  assuming there's equipment that's still on the system
19  that was developed before 2008. And look, I'm just
20  talking about --
21     A  **Well, most equipment doesn't last. Most**
22  **buses last maximum ten years, sir.**

**83**

1      Q  I'm not asking about buses. I'm asking
2  about rail. Have you seen this adopted --
3      A  **The rail specifications talk about jerk**
4  **rate, that a bus, a train should not exceed -- should**
5  **accelerate smoothly and should not exceed the jerk**
6  **rate. And a number of --**
7      Q  What rail specifications are you talking
8  about? Is this APTA?
9      A  **Through APTA, yes, and AREMA.**
10     Q  Have you seen a document that you can point
11  to for the agencies that used -- the transit
12  authorities that you have pointed to that said this is
13  the maximum jerk rate that we will tolerate on our
14  railroad?
15     A  **No. I don't have a document. I don't have**
16  **a specific document I can point you to.**
17     Q  Okay.
18     A  **I can only tell you what we've done in**
19  **committee, and what the national standard of care is**
20  **in terms of acceleration and deceleration.**
21     Q  You've testified against a wide variety of
22  the different transit authorities; correct? Including

**84**

1  some of the ones you've listed? SEPTA, for example?
2      A  **Yes.**
3      Q  Have you testified about in cases involving
4  them exceeding the jerk rate?
5      A  **I don't recall.**
6      Q  Do you recall giving an opinion about other
7  transit authorities that have -- and giving the same
8  opinion that their transit authorities weren't
9  violating -- that were violating the maximum jerk
10  rate?
11     A  **I have.**
12     Q  Okay. So --
13     A  **I don't recall which specifically.**
14     Q  Okay. Do you recall if it was more than
15  one authority that you've said has violated the jerk
16  rate?
17     A  **In certain instances, yes.**
18     Q  Okay. Is it more than five?
19     A  **I don't recall.**
20     Q  Okay. So if these major transit
21  authorities are violating the jerk rate and the
22  transit authorities are the national standard of care,

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

22 (85 to 88)

85

1  then the jerk rate is not actually the standard of
2  care, is it?
3      A    No.  It's still the standard of care.  You
4  know, each individual operator has discretion, and
5  like I said, for example, on buses, that the bus is
6  governed on acceleration, but it's not governed on
7  deceleration because we didn't want to impose a
8  deceleration standard because of emergency braking.
9  If there's an emergency, you want the vehicle to be
10  able to stop as soon as possible.
11      Q    So the buses actually aren't regulated on
12  jerk rate for deceleration?
13      A    No, they're not.
14      Q    Okay.  So the deceleration jerk rate --
15      A    The operator is trained -- the operator is
16  trained not to exceed, to operate smoothly and not to
17  exceed the jerk rate as well as the operator is in
18  trains as well -- trained in that area as well.
19      Q    Okay.  So is it your opinion that the jerk
20  rate issue is really about training the operators not
21  to exceed the jerk rate in terms of how they
22  accelerate or decelerate?

86

1      A    That's correct.
2      Q    Okay.  So it's a training issue for them;
3  correct?
4      A    That's where -- you know, separate in buses
5  where they have a governor.
6      Q    Our case here involves a train.  So in
7  terms of the train operator, whether they exceed the
8  jerk rate in terms of moving the train or stopping the
9  train is really is a -- it's a training instruction
10  issue for the operators; correct?
11      A    It could be.  Yes.
12      Q    All right.  I just want to be clear.  Is it
13  your testimony that ANSI 21.2-08 has been adopted by
14  APTA?
15      A    Yes.
16      Q    Okay.
17      A    And by the -- it's the national standard of
18  care.  It's also been adopted by the European Union,
19  Israel, couple other places.
20      Q    My question was specific, sir.  Has it been
21  adopted by APTA for public transit systems?
22      A    That's correct.

87

1      Q    And when was it adopted by APTA?
2      A    In the specifications for transit vehicles
3  that they generate.
4      Q    Okay.  So this is for new transit vehicles;
5  correct?
6      A    Pardon me?
7      Q    This is for new transit vehicles; correct?
8      A    In case of buses is what the governor on
9  the buses in terms of controlling acceleration.
10      Q    Okay.  So this is for buses?
11      A    No.  Would you give me -- let me finish?
12      Q    I'm sorry.  I'm just trying to break it
13  down.
14      A    No.  I'm trying to explain it.  Part of the
15  training is that we learned from these studies on jerk
16  rate, and there's much research, and I think I have
17  much more of it in here, that the train drivers, the
18  operators of vehicles and even automatic vehicles have
19  to be so designed so that they operate in a smooth
20  manner not to exceed the jerk rate.
21      Q    Okay.
22      A    We want to avoid a sudden, unexpected and

88

1  violent change of acceleration to deceleration in the
2  operation.
3      Q    Okay.  Is that only for buses?
4      A    No.  It's for all vehicles.
5      Q    Okay.  So APTA adopted this for all
6  vehicles?
7      A    Yes.
8      Q    Okay.  And --
9      A    All transit vehicles.
10      Q    Okay.  All transit vehicles?
11      A    We don't have a jerk rate for cars.
12      Q    Okay.
13      A    That could very well apply there as well.
14      Q    So I'm just trying to understand.  Is the
15  jerk rate adopted as being a design characteristic on
16  the bus itself, meaning the bus cannot accelerate
17  faster than the jerk rate?
18      A    That's correct.
19      Q    Okay.  So APTA is adopting this insofar as
20  it's relating to the design of the bus for
21  acceleration purposes; correct?
22      A    That's correct.

**89**

1    Q    Okay.  It did not adopt the jerk rate for
2  deceleration design of the bus; correct?
3      **A    Yes or no.  What it didn't do is it**
4  **indicated to the driver that they have to operate in**
5  **the steady, constant acceleration or deceleration to**
6  **avoid the jerk rate.  So the operators knows about the**
7  **jerk rate and knows that they're not governed because**
8  **if there's an emergency, a serious emergency and the**
9  **vehicle has to apply the emergency brake, applying the**
10 **braking in the emergency manner, that you get full**
11 **braking and that the braking is not reduced in any**
12 **manner.**
13   Q    So the use of the jerk rate for a bus
14 operator is a training issue on deceleration because,
15 like you said, you don't want to apply the jerk rate
16 in a mechanical way that limits the ability to stop
17 the bus in an emergency; right?
18     **A    That's correct.**
19   Q    Okay.  And on the acceleration side, it's
20 about putting a limiter on the acceleration capacity
21 of the bus in terms of the design of the vehicle;
22 correct?

**90**

1      **A    Yes.**
2    Q    Okay.  Does the same hold true for rail,
3  that it's a design issue for new equipment in terms of
4  how fast a train can accelerate and a training issue
5  for the operator in terms of how fast it can
6  decelerate?
7      **A    Most transit vehicles do not have a**
8  **limiter.  The only limit is their rate of acceleration**
9  **which they are designed for, which is generally less**
10 **than -- I think it's 2.8 miles per hour per second,**
11 **which, if you accelerate within that range, you don't**
12 **exceed the jerk rate.**
13   Q    Okay.
14     **A    But the skill of the operator of the**
15 **vehicle -- I'm not talking about automated vehicles**
16 **now because they self-control the situation.  But in**
17 **terms of a manually-operated vehicle, the train**
18 **operators train either through on-the-job training**
19 **with another operator or through simulation to**
20 **maintain a steady acceleration rate and a steady**
21 **deceleration rate.  And in addition to that, you're**
22 **trained about the territory.  So before a train**

**91**

1  **operator goes into a station, definitely with the**
2  **station, they know where they have to stop.  That's**
3  **why they are trained.**
4      **So what we learn from jerk rate is that if**
5  **the operator maintained a steady acceleration or**
6  **deceleration, that the jerk rate doesn't come into**
7  **play.  It's when they're -- as I mentioned, the jerk**
8  **rate is the differential -- is the derivative of**
9  **acceleration.  It's an instantaneous sudden change in**
10 **the rate of acceleration and deceleration.**
11     **Most train operators have a master**
12 **controller which they operate and they learn how to**
13 **give power and take power so they maintain the skill.**
14 **This is a 99 out of a hundred times that every train**
15 **operator has that skill to keep the train within that**
16 **jerk rate.**
17   Q    Okay.  So it's a training issue for the
18 operator?
19     **A    In England and the rest of the world, we**
20 **call it a jolt rate.**
21   Q    So it's a training issue for the operator
22 in terms of how to accelerate and decelerate?

**92**

1      **A    How to use the master controller to**
2  **accelerate and decelerate within the range of the**
3  **train.  The train has a limitation on how fast it can**
4  **stop or how fast it can travel.**
5    Q    It's a big object?
6    **A    Correct.**
7    Q    Considering the size of the train and the
8  weight, do I understand you correctly that that train
9  typically can't exceed the jerk rate on acceleration?
10     **A    If the train operator is operating the**
11 **train, the master controller properly, it wouldn't.**
12 **Because the train operator, one of the things they're**
13 **taught is to not do anything that's sudden, unexpected**
14 **or violent because we know about jerk rate and we know**
15 **that jerk rate is the sudden, instantaneous change.**
16 **And if you do something gradually, it's not sudden.**
17 **It's not instantaneous.  You have to do everything in**
18 **a slow -- train drivers, you know, are trained, you**
19 **know, from day one, to operate smoothly because --**
20 **especially in passenger trains -- even freight trains**
21 **operate.  Because in a freight train, they're**
22 **concerned about jerk rate for another reason.**

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

93

1  Because, you know, you have crew, crew on the freight
2  train sometimes.  And also you don't want to reduce
3  the slack.  You know, you could cause certain problems
4  by increasing and reducing slack by having the sudden,
5  unexpected and violent change in acceleration and
6  deceleration.
7        So everybody in the transit industry and
8  the rail industry knows about jerk rate and knows how
9  important it is to maintain a steady constant rate of
10  acceleration and deceleration.
11        This is an industry practice even before
12  the ANSI study came out because the ANSI study took
13  place over many years and tried to codify, give
14  guidance to the developers of equipment and to the
15  trainers on what is safe and what is unsafe.  And jerk
16  rate not only deals with lateral movement, it also
17  deals with movement in the other directions, to the
18  right or the left, the operations.  So if you're going
19  around the curve, for example, there's a different
20  kind of jerk rate.
21    Q    Did you calculate a jerk rate in this case?
22    A    No, I did not.

94

1    Q    Okay.  So you don't know what the jerk rate
2  was on the forces operating on Ms. Scott at the time?
3    A    No, but we had a very good indicator by the
4  sudden, unexpected and violent action that was
5  reported by the witnesses, Mrs. Scott, and also by the
6  WMATA report, which indicated that the driver did not
7  do the job correctly.
8    Q    Okay.  Well, by "the driver not doing the
9  job correctly," you're saying that -- you're referring
10  to whether the driver announced that the train is
11  going to move correctly; correct?
12    A    And whether or not -- it seems that that's
13  one part of it.  The other part is that he suddenly,
14  unexpectedly and violently moved the train, so that's
15  what caused the fall.
16    Q    Okay.
17    A    If he moved the train in a different
18  manner, then it would have exceeded the jerk rate and
19  none of the people on the train would have felt this
20  sudden, unexpected and violent change in motion to the
21  train because regardless of --
22    Q    That's basically the testimony --

95

1    A    -- the jerk rate, there always should be
2  announcements to advise people what's going on.  And
3  that's the national standard of care, is to advise
4  people.  It's common sense.  You want to avoid unsafe
5  conditions.  You want to make sure that everybody is
6  safe and it doesn't hurt.  It costs time in the
7  operation to make an announcement that the train is
8  temporarily stopped.  This is not where we're going to
9  exit.  Please remain seated or hold onto something if
10  you have -- if you're forced to stand, that the train
11  is going to redeploy to another location.
12        You know, that's the typical thing that's
13  done.  You know.  It's part of the communication
14  between passenger and company personnel.  You know, we
15  always want to keep people informed to make them safe.
16  It's common sense.
17    Q    Dr. Berkowitz, what was my last question?
18    A    Whatever it was.
19    Q    What was the question that I asked you?
20    A    The question that I answered.
21    Q    No, it wasn't, sir.  My question, sir --
22  strike that.

96

1        What is it you're basing your belief that
2  the train moved suddenly and unexpectedly and
3  violently?  What is the evidence that you're relying
4  on to support that statement?
5    A    Three independent witnesses, Mrs. Scott,
6  and the WMATA report on the operator's performance.
7    Q    And the WMATA report on the operator
8  performance indicated that the WMATA report did what?
9  The operator did what?
10    A    Did not make an announcement.
11    Q    Did not make an announcement.  Was there
12  anything in the WMATA report about how the operation
13  was made when the train was moved in terms of whether
14  it deviated from normal operation?
15    A    I don't recall.
16    Q    So the only thing that you have based on
17  your opinion that the train moved violently, suddenly
18  and unexpectedly is the reports of the other witnesses
19  in the case; correct?
20    A    That's correct.
21    Q    You do not have a jerk rate that you've
22  calculated; correct?

97

1    A    That's correct.

2    Q    And you do not know anything about how the
3    train was actually operated from a mechanical
4    perspective inside the cab; correct?

5    A    No, that's not correct, because we do know
6    from the witnesses' testimony that the train suddenly
7    and unexpectedly and violently moved and caused
8    everybody to feel that sudden change in the jerk rate,
9    which is the derivative of acceleration, which is the
10    instantaneous change in acceleration which took place.

11    Q    So you're basing this on the witness
12    testimony only and nothing else with regard to how the
13    train actually moved and what the actual change in the
14    velocity of the train was?

15    A    Did I do a physics calculation?

16    Q    Yeah.

17    A    No, I did not. I based it on two things.
18    That there was no announcement and that there was a
19    sudden, unexpected and violent change in the movement
20    of the train, which is indicative of exceeding the
21    jerk rate.

22    Q    You're aware the operator doesn't remember

98

1    whether an announcement was given or not; correct?

2        MR. REGAN:  Well, you've already asked him
3    and he said he didn't remember.

4    Q    Have you ever seen the circumstance where
5    somebody testified that a train moved suddenly and
6    unexpectedly and concluded that it did not exceed the
7    jerk rate?

8    A    How would an individual know about jerk
9    rate? The only people that know about jerk rate are
10    the people in the industry.

11    Q    That's what I'm asking.

12    A    Pardon me?

13    Q    What's what I'm asking you. Have you seen
14    a situation where a witness said -- let me finish my
15    question, sir. I'm not going to do this. Please let
16    me finish my question.

17        Have you seen a situation in your
18    consulting experience where a witness said "I felt the
19    train move suddenly and unexpectedly" and you
20    concluded that the train actually did not exceed the
21    jerk rate?

22    A    As I said before, and that's a hypothetical

99

1    that I cannot answer. What I said is that if a train
2    -- a person feels the train is moving suddenly,
3    unexpectedly and violently and causes them to move
4    from where they're standing, then it exceeds the jerk
5    rate, because the jerk rate is designed so that a
6    person standing or sitting remains stable at any rate
7    of acceleration or deceleration that the vehicle --

8    Q    So any --

9    A    So if the person has the ability, then we
10    automatically define that as exceeding the jerk
11    rate.

12    Q    Okay. So any time a passenger says "I felt
13    the train move suddenly, unexpectedly," then it
14    necessarily exceeded the jerk rate. Is that what your
15    testimony is, sir?

16    A    No, that's not what I said. I said if an
17    individual is standing or sitting and it causes them
18    to move because of a sudden and unexpected and violent
19    acceleration and deceleration, that's a change in the
20    stability of the individual, and for that individual,
21    it exceeds the jerk rate.

22    Q    Is it your testimony and your opinion, sir,

100

1    that any time a transit authority in any mode of
2    operation, right, either bus or train, exceeds the
3    jerk rate, that they've violated the national standard
4    of care?

5    A    That's correct.

6    Q    All right. So there's no movement of a
7    vehicle or a rail transit system --

8    A    Let me finish. I'm not finished yet.
9    Except for an emergency braking.

10    Q    Okay. Except in an emergency braking,
11    there's no movement on a rail transit system or a bus
12    system that exceeds the jerk rate that is also within
13    the standard of care?

14    A    The national standard of care is that
15    vehicles should accelerate in a smooth manner so that
16    they don't exceed the jerk rate so that a person
17    standing or sitting doesn't lose stability like fall
18    forward. There's been cases where people had fallen
19    out of their seats, and in many cases and many studies
20    that have been done, most of them have been done in
21    Israel. That if the jerk rate is exceeded both
22    laterally and based upon super elevation or lack of

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

---

101

1  super elevation, going around a curve, if that jerk
2  rate is exceeded, then it causes an instability on the
3  part of the person and in many cases it results in
4  injury to that person.
5      Q    And at any time a person sustains an injury
6  on a transit system due to a sudden, unexpected change
7  in acceleration or deceleration, is it your opinion
8  that the transit authority is responsible, legally
9  responsible to that person for violating the standard
10 of care?
11     A    Of course.
12     Q    Okay.  I'm going to go back to sharing a
13 document.  I'm looking at page 15 of your report.
14 Understand Standard 1, common carrier law, you state
15 that "WMATA is considered a common carrier and is
16 required by law to make sure passengers are safe and
17 do not become injured."  Did I read that correctly?
18     A    Yes.
19     Q    Is it your understanding that WMATA's legal
20 obligation is to ensure the safety of all of its
21 passengers at all times and that if any passenger
22 becomes injured, that WMATA is responsible for it?

---

102

1      A    If they do something that caused that
2  person to be injured, yes.
3      Q    Regardless of whether they were acting
4  reasonably under the circumstances?
5      A    Well, I don't know what circumstances
6  you're referring to.
7      Q    You state that WMATA owes a higher degree
8  of care to ensure that their passengers are not
9  injured.  What's your basis for that?
10     A    I think it goes back to 1903 of the New
11 Orleans trolley that goes down Bourbon Street -- I'm
12 not sure -- where there was a federal, a Supreme Court
13 case that indicated that the common carrier is
14 responsible for the highest standard of care for their
15 passengers and those who interact with their system.
16     In the state of New York, they passed
17 legislation that says that the New York City transit
18 system is only required to meet an ordinary standard
19 of care, and that's not been challenged in the court.
20 Probably if it was challenged in the court, it would
21 go to that higher standard.
22     Q    Do you know what the standard is in D.C.?

---

103

1      A    The standard, to my knowledge, is that
2  WMATA is a common carrier and a state carrier and that
3  they have an obligation of the higher standard of care
4  to the people that they're charged and responsible.
5      Q    So if it has a passenger on its transit
6  system who is injured, WMATA is liable?  Is that your
7  --
8      A    If they did something to cause that person
9  to be injured.
10     Q    You state here "WMATA and their employees
11 must make sure that their passengers are always
12 protected."
13     Again, what is your basis for making that
14 statement under D.C. law?
15     A    It's not just D.C. law, it's common sense.
16 It's common sense.  If you're going to be a carrier of
17 passengers, you don't want to keep them safe?  I mean,
18 that's common sense to keep people safe.
19     Q    Is it your opinion that WMATA, as a common
20 carrier, is a guarantor of safety of everybody on its
21 transit system?
22     A    In terms of whatever they do in their

---

104

1  operation, as long as they operate safely, then nobody
2  gets hurt.  If they do something in their operation to
3  cause injury to somebody, they're responsible.  Yes.
4      Q    Turning to page 16.  Pursuant to United
5  States Code, footnote 17, a common carrier is liable
6  for damages during transit.  And footnote 17 cites
7  Title 47 of the U.S. Code for common carrier
8  regulations.  Does Title 47 relate to public transit
9  systems?
10     A    Refers to common carriers.  And to my
11 understanding --
12     Q    Common carriers in public transit systems,
13 sir?
14     A    Well, they're a common carrier.
15     Q    Common carriers in public transit systems,
16 sir?
17     A    They're a common carrier.
18     Q    No, they're not under Title 17.  Have you
19 looked at 47 -- have you looked at Title 47, sir?
20     A    Pardon me?
21     Q    Have you looked at Title 47?  Do you know
22 what Title 47 is?

---

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

105

1    A    47 U.S.C. 1, common carrier regulations?
2 Yes.
3    Q    Have you read the entirety of Title 47?
4    A    I don't know if I read the entirety, but I
5 know it's related to passengers.  I did review it.
6    Q    How is Title 47 related to transit systems?
7 Is it related to passengers on rail or bus?
8    A    It said -- it refers to common carrier.  To
9 my knowledge, that WMATA is a common carrier.
10    Q    How is common carrier defined under Title
11 47?
12    A    A common carrier is somebody moves goods.
13 People in goods.  Same thing.
14    Q    Is WMATA engaged in interstate foreign
15 communications by wire or radio, interstate foreign
16 radio transmissions of energy?
17    A    I don't understand the question.
18    Q    Sir, are you aware that Title 47 relates to
19 telegraphs, submarine cables, radio telegraphs, the
20 Radio Act of 1927, wire or radio communications,
21 communication satellite systems, campaign
22 communications, the National Telecommunications and

106

1 Informations Administration, interception of digital
2 and other communications, satellite carrier
3 retransmission eligibility, commercial mobile service
4 alerts, broadband, public safety communications and
5 electromagnetic spectrum options, broadband
6 investment, secure and trusted communication networks
7 or broadband access?
8    A    No.
9    Q    Okay.  And in Section 153 of Title 47
10 relating to those subjects, a common carrier -- the
11 term common carrier or carrier means any person
12 engages a common carrier for hire in interstate or
13 foreign communication by wire or radio or interstate
14 or foreign radio transmission of energy.  Is that what
15 WMATA does?
16    A    No.
17    Q    Is that what any transit system does?
18    A    No.  They move people.  Public rail systems
19 move people and goods.
20    Q    A common carrier under Title 47 --
21    A    Well, I may have quoted the -- I may have
22 accidentally put the wrong number in, but it doesn't

107

1 change what the common carrier regulations are related
2 to the movement of passengers and goods.
3    Q    You do more than that.  You say
4 specifically what you believe that the liability of a
5 common carrier is under Title 47 in your report, sir.
6    A    Well, I apologize if I'm --
7    Q    You agree with me that Title 47 doesn't
8 apply; right?
9    A    -- typing down the wrong section.  But the
10 material is still what it is.  So I may have written
11 down the wrong U.S. code, but that doesn't change the
12 facts that I described.
13        You know, I may have made a typo error.  As
14 you know, this is a draft report.  I never got to
15 finish it.
16    Q    Well, this is the only report that was
17 disclosed to me as carrying your opinions.
18    A    No.  No, no --
19    Q    Well, the additional -- I mean, in March
20 2023.  I don't see a correction in your supplemental
21 report to this.
22    A    No.  That's the report -- that was my draft

108

1 report.  It was not my final report whereas --
2    Q    This was what was produced to me.  I don't
3 have --
4    A    This is a final report.
5    Q    This is what was produced to me.  I don't
6 have a final report other than this.
7    A    I didn't go beyond this report.
8    Q    Would you agree with me --
9    A    I may have made a typo here and there.  It
10 doesn't change the content.
11    Q    Can you see my screen?
12    A    Yeah.  I may have -- I haven't looked at
13 that, but I may have incorrectly cited the wrong U.S.
14 code, but it's a common carrier regulation.
15    Q    So you cited, to be clear --
16    A    Moving people and goods.
17    Q    47 U.S.C., Part 1, common carrier
18 regulation, and you provide the website URL for that;
19 right?
20    A    I may have made a mistake in my copy.
21    Q    All right.  So are you acknowledging that
22 the citations you --

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

109

1    A    I didn't know -- as I said, this is a draft
2  report and there are probably other mistakes in the
3  report.  But it's a draft report.  But the content
4  does not change just because the footnote is
5  incorrect.
6    Q    All right.  Are you admitting that the
7  reference to Part 47 was a typo?
8    A    I can't admit it until I look at it.
9    Q    Have you cited Title 47 in other reports
10 that you've given in opinions against rail transit
11 authorities?
12   A    I don't recall, but I could have made an
13 error in the copy.
14   Q    Okay.
15   A    I'm human.
16   Q    Looking down here, "WMATA and their
17 employees must use the utmost care and diligence for
18 passenger safety and must provide everything necessary
19 for that purpose and must exercise to that end a
20 reasonable degree of skill"; correct?
21   A    Yes.
22   Q    Is it your standard or your view that the

110

1  national standard of care is that a transit authority
2  must again be the guarantors of passenger safety?
3    A    That they must operate the system in a safe
4  manner to guarantee the safety of their passengers.
5  That's common sense.
6    Q    And you would agree that the standard is
7  that they have to exercise a reasonable degree of
8  skill; correct?
9    A    That's correct.
10   Q    And that that's not -- a reasonable degree
11 of schedule isn't a heightened standard of care, is
12 it?
13   A    No.  It's reasonable under the
14 circumstances.
15   Q    You think a reasonable standard of care for
16 a transit authority is a heightened standard of care?
17   A    I believe so.  But in this case, they
18 didn't even meet an ordinary standard of care.  Forget
19 about a heightened standard of care.  Here we're
20 talking about ordinary care.  Forget about the
21 heightened standard of care.  I would accept even an
22 ordinary standard of care.  They didn't even meet

111

1  that.
2    Q    That's not the opinion you gave us, sir.
3        MR. REGAN:  Well, he's giving his
4  deposition testimony today.  He just gave it to you.
5        MR. WATERS:  Well, I'm working from his
6  report.  That's all I had before today.
7        MR. REGAN:  You asked him a question and
8  he's answering it.
9        MR. WATERS:  Well, let's continue our
10 deposition, Pat.
11   Q    Standard 2, you cite OSHA.  You state that
12 "According to the general duty clause of OSHA, the
13 employer, WMATA, has a responsibility to identify and
14 correct any hazards that may harm employees or
15 others."
16   A    Right.
17   Q    What is the general duty clause of OSHA?
18   A    That's the clause which the past
19 administration in Washington was going to use to
20 require everybody in the workplace to be vaccinated
21 for COVID-19.  It's provided to ensure a safe
22 workplace.  Statutory is the home of employees.

112

1  Standard of care is others.  And others, WMATA
2  describes other as being customers, visitors, guests.
3    Q    Are you referring to Section 654(a) of 29
4  U.S.C.?  I think you're actually quoting it here.  The
5  OSHA general duty clause responsibilities apply not
6  only to employees, but also to others.
7        I think -- no.  I think it's down here.
8  The general duty clause of OSHA, "Each employer shall
9  furnish to each of his employees employment and a
10 place of employment which are free from recognized
11 hazards that are causing or are likely to cause death
12 or serious physical harm to his employees."
13   A    Right.
14   Q    And you infer from that that the duty
15 isn't just to employees; it's to others?
16   A    It's not a statutory to meet.  It's a
17 standard of care that, according to OSHA, that the
18 guest, visitors and others who visit a workplace
19 should be afforded, at a minimum, the standard of care
20 that an employer provides an employee.
21   Q    Where in the Occupational Safety Hazard Act
22 does it state that the duties under OSHA apply to

113

1  people other than employees?
2      A   In their opinion section on the OSHA
3  website.
4      Q   Have you seen the OSHA regulations?
5      A   The OSHA, it's not -- the regulation deals
6  strictly with the employee. The employer and the
7  employee. But OSHA said that this is a standard of
8  care that the guest, customer, a visitor or others
9  visiting the workplace are entitled to at a minimum.
10 That doesn't seem unreasonable.
11      If OSHA says that this is the way to keep a
12 safe workplace, you're going to say that anybody else
13 that comes to the workplace it not entitled to the
14 same level of care that an employer gives to an
15 employee, that a customer is only entitled to a lower
16 standard of care? Come on. It's common sense. OSHA
17 indicated --
18     Q   Sir, you're not a lawyer.
19     A   -- it's not statutory. It's a standard of
20 care.
21     Q   You're aware of the fact that the OSHA
22 regulations specifically state that they do not apply

114

1  to people other than employees, aren't you, sir?
2      A   I'm just giving you an opinion about the
3  standard of care that is established by OSHA.
4      Q   You're citing OSHA. I want to know what
5  your understanding of OSHA is, sir. OSHA regulations
6  specifically state that its standards do not apply to
7  people other than employees, don't they?
8      A   Then the statute says that. But OSHA also
9  says that it's a standard of care and that guests,
10 customer, visitors and others are entitled to the same
11 -- at least that same level of care.
12     Q   You understand that Congress speaks through
13 the acts that it enacts and the president signs;
14 correct?
15     A   And also agencies within the government
16 have been criticized by the Supreme Court for
17 executing the rules and regulations that are put on
18 their duties and responsibility, that Congress said
19 that organizations cannot create their own
20 regulations. It's only Congress.
21     Q   You agree with me that the Occupational
22 Safety and Hazard Act applies to employees?

115

1      A   OSHA says that they are creating a standard
2  of care. Now, their standard of care, they mention
3  specific industries, but they don't list the 63,000
4  different industries in the United States. They
5  indicate whether it is not an employee,
6  employer-employee relationship. A customer, a guest,
7  a visitor is entitled to at least that standard of
8  care. If you don't agree with that, that's your
9  problem but that's not mine.
10     Q   Well, actually, it's what the law says,
11 sir.
12      I want you to tell me where in the
13 Occupational Safety Act the text of the statute, that
14 it says what you just said, that it says that the
15 standards for a workplace apply to persons other than
16 employees. Tell me where it said that in the statute.
17     A   OSHA, in their divine wisdom, has stated
18 that the standards are being developed for loading
19 docks, marine terminals. They don't have it for every
20 particular service. They indicate that others should
21 be protected as well when they visit the workplace.
22 And this has been expanded in terms of work zone

116

1  safety. OSHA indicates that MUTCD shall be used for
2  work zone safety.
3      Q   Okay.
4      A   It is a work zone.
5      Q   So to answer my question, you can't say
6  that it's in the statute.
7      A   I'm answering your question. OSHA
8  indicates that, but it's been determined by OSHA that
9  the MUTCD applies and all standards involving
10 pedestrians, bicyclists, motorists are also protected
11 because they're entering that work zone. So there's
12 the justification to expand any work zone or
13 workplace, anybody who enters that workplace has
14 already been established by OSHA should be protected
15 work zone safety, workplace safety, and also the
16 Manual on Uniform Traffic Control Devices in terms of
17 highway work and things of that nature. But OSHA has
18 already established that their standard of care
19 applies beyond just the statutory between the employer
20 and the employee.
21     Q   Dr. Berkowitz, my question was specific.
22 Does the statute specifically apply to persons other

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

117

1  than employers and employees?

2      A   The statute is specific to employer and

3  employee.

4      Q   Do the regulations state anything that

5  expands that beyond employers and employees?

6      A   OSHA's interpretation of work zone safety,

7  workplace safety does expand that definition.

8      Q   Which regulation are you referring to?

9      A   Workplace, work zone safety.  OSHA has --

10     Q   Is there a specific regulation you're

11  citing to?

12     A   It's the implementation of the regulation.

13  OSHA has the power -- unless that Supreme Court

14  changes, they have the power to indicate how their

15  statutory requirements are implemented.

16         The statute doesn't give you a menu of how

17  you implement the requirements.  It doesn't tell you

18  the size of a flag or a flagman.  It doesn't tell you

19  where the flagman -- that is -- the implementation of

20  any statute of any governmental agency is left to the

21  governmental agency to spell out how that statute is

22  implemented.

118

1      Q   And it spells it out by adopting

2  regulations; correct?

3      A   OSHA and workplace safety, they've

4  indicated that in workplace and work zones, that

5  pedestrians, bicycles, motor vehicles, customers,

6  others should be equally protected under the same

7  standard.  And then statutory —

8      Q   And the agency integrates a statute by

9  adopting regulations; correct?

10     A   I am not a lawyer expert on how statutory

11  and nonstatutory works, but I do know that almost

12  every governmental agency that I've interacted with,

13  the Department of Transportation, the Federal Highway

14  Administration, the FAA, OSHA, state agencies, all

15  indicate that they've gone beyond the regulation and

16  they implement the regulation.  The regulation gives

17  the guidelines on which they implement.  And in the

18  case of OSHA and workplace safety, they've implemented

19  guidelines that everybody in the workplace should be

20  protected.

21     Q   Are you familiar with 29 C.F.R. 1910.5(d)?

22     A   I'm not an expert on the law nor do I know

119

1  --

2      Q   That standard, which is an OSHA regulation

3  --

4      A   I wouldn't remember -- if I read it, I

5  would never remember it anyway.  I have dyslexia and I

6  can't remember numbers, first of all.

7      Q   Okay.  Well, that regulation states "In the

8  event a standard protects on its face a class of

9  persons larger than employees, the standard shall be

10  applicable under this part only to employees and to

11  their unemployment and places of employment."

12     A   That's what it might say there, but they

13  say something otherwise for workplaces.

14     Q   Okay.  So the statute doesn't say what you

15  want it to say.  The regulation doesn't say what you

16  want it to say.  But how they implement it, in your

17  opinion, says what you want to say?  Is that what

18  you're saying?

19     A   Yes, and it's the standard of care.  OSHA

20  has established a minimum standard of care.

21     Q   Let's be clear here.  Ms. Scott was not an

22  employee of WMATA; correct?

120

1      A   That's correct.  She was a customer --

2      Q   WMATA was not her employer and the train

3  was not her workplace; correct?

4      A   It was the workplace of WMATA's crew and

5  personnel and she's a visitor to the workplace.  That

6  train is the workplace for the train crew.  It's their

7  workplace.

8      Q   Was there any train crew on the car with

9  her?

10     A   Pardon me?

11     Q   Was there any train crew that was on that

12  particular car with her?

13     A   They don't have to.  The train itself is

14  the workplace of the train driver.

15     Q   So in your view, pretty much anywhere

16  anybody works is a workplace?

17     A   Can I finish, please?  You're talking about

18  the bus is the workplace of a bus driver.

19     Q   So any time anybody who visits anything

20  that could be characterized as a workplace, they fall

21  within OSHA; correct?  So if somebody trips and falls

22  in my office who is a visitor, then OSHA is

121

1  implicated?
2      A  OSHA's standards of care would be
3  implicated. They have standards for walking surfaces,
4  for holes in walking surfaces, the lighting. They
5  have all sorts of standards. Yes. If that workplace
6  does not meet the OSHA standards, then it would be a
7  violation of the OSHA standard for workplace.
8      Q  Do you know of an instance in which OSHA
9  has investigated and cited an agency for an OSHA
10 violation that resulted in a passenger or customer
11 injury?
12     A  No, I do not.
13     Q  Okay. Who knew OSHA was so powerful?
14     A  Pardon me?
15     Q  Who knew OSHA was so powerful?
16     A  I do.
17     Q  Apparently.
18     A  It's an integral part of most of our
19 transportation engineering work. Most primarily on
20 the roadways.
21         MR. WATERS:  We've gone an hour and 20
22 minutes since we last stopped. Let's take a quick

122

1  break here. Five, ten minutes?
2          MR. REGAN:  Fine.
3          THE WITNESS:  How long after the break are
4  we going to go?
5          MR. WATERS:  I still have a ways to go, but
6  I'm making progress.
7          THE WITNESS:  So do you want to break for
8  lunch?
9          (Lunch break taken, 12:22 - 1:02
10 p.m.)
11 BY MR. WATERS:
12     Q  Good afternoon, Dr. Berkowitz. I used the
13 break to try to consolidate my notes here a little bit
14 from what we've already covered, so, hopefully, I'll
15 be able to streamline here a little bit.
16     I'm going to bring you back to Exhibit 3,
17 which is your report.
18     A  I have a copy.
19     Q  What's that?
20     A  I have a copy.
21     Q  Well, I don't know if Mr. Regan does, so I
22 just wanted to bring it up for everybody to take a

123

1  look at.
2          MR. REGAN:  Thank you.
3      Q  We're at page 20. This discussion here
4  begins a conversation about hazard management. Your
5  discussion with hazard management with regard to this
6  cases, are you referring to things that you would be
7  expecting that WMATA management to be doing with
8  regard to policy with regard to identifying hazards
9  and safety analysis?
10     A  Well, it's a requirement of the FTA,
11 actually.
12     Q  Is this something that --
13     A  -- as part of the system safety plan. If
14 you have an area that is causing injuries to
15 passengers or safety issues involving operations,
16 that's supposed to be included in the system safety
17 plan.
18         Now, this hierarchy of control, as you
19 know, was developed originally by OSHA, but it's
20 something that's been around for decades, even before
21 that. They just created the triangle.
22     Q  I guess what I'm asking -- I'm sorry. It's

124

1  hard for me to when you're done with an answer, Dr.
2  Berkowitz.
3          I guess what I'm asking is this is
4  something that relates to WMATA management as a policy
5  matter and not something that relates to the operator
6  that was driving this train; is that correct?
7      A  No. The operator is not involved in this.
8  It's the management of this.
9      Q  Okay. You have it referenced here that the
10 national standard of care for hazard analysis which
11 has also been adopted by U.S. DOT is the Military
12 Standard 882E. U.S. DOT, Department of
13 Transportation, I'm assuming?
14     A  Yes.
15     Q  What is the source for your statement that
16 U.S. DOT adopted the Military Standard 882E?
17     A  It's in the seminars and the brochures that
18 they developed for the risk analysis and system safety
19 planning for the transit --
20     Q  Give us -- sorry. Do you have a specific
21 document that you're referring to?
22     A  I can't give you a specific document, but

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

125

1 you can go to the U.S. DOT, and there's a whole myriad
2 of -- they offered a seminar on the -- they offer
3 every week a seminar. But this is -- when you do your
4 system safety plan, they recommend that you follow the
5 standards of 88, military standard of having -- this
6 is a way of ranking one hazard, ranking hazards and
7 making decisions on system safety.
8    Q   Okay. Is it a recommendation that transit
9 authorities follow 882E for their system safety plans
10 or is it a requirement?
11    A   The system safety plan is a requirement.
12 I'm not sure if you to use that or you use something
13 similar.
14    Q   Doctor, the reason I'm asking about this is
15 I did go to U.S. DOT and looked up Military Standard
16 882E, but I did not find anything that they had
17 adopted. I did find a NHTSA, a National Highway
18 Transportation Safety Act document evaluating its
19 strengths and weaknesses with paradigms that other
20 agencies use, but nothing specifically adopting
21 Military Standard 882E in terms of U.S. DOT
22 regulations with respect to local transit.

126

1    So that's what I'm asking you. Is there a
2 document in which, that you're aware of, in which the
3 Department of Transportation adopts and requires
4 Military Standard 882E?
5    A   They present that as a way to do a risk
6 assessment or hazard assessment. That the method
7 they recommend. I mean, you can use alternative
8 methods, but that's one they recommend. And that -- I
9 found that recommendation in taking the seminars that
10 they present with -- they provide guidance with
11 FTA-governed agencies plus in training.
12    Q   In their recommendation --
13    A   Pardon me?
14    Q   I'm sorry. I didn't mean to cut you off.
15    A   It's a recommendation. I don't remember it
16 being statutory. It's a recommendation.
17    Q   Is the recommendation that you're referring
18 to the National Highway Transportation Act Assessment
19 of Safety Standards for Automotive Electronic Control
20 Systems?
21    A   No.
22    Q   Okay.

127

1    A   I'm referring to the FTA and the FRA system
2 safety risk management plans that their transit
3 agencies and computer railroads have to do every year.
4    Q   Okay. So the system safety plans that they
5 have to do every year, they can use different -- they
6 are different paradigms to use in addition to Military
7 Standard 882E; correct?
8    A   Right. There are other ways of ranking and
9 assessing hazards. Yes.
10    Q   And this particular standard is not
11 required of any particular agency; correct?
12    A   No, but it's recommended because it's very
13 simple.
14    Q   But my statement is correct. It's not
15 required of any agency; correct?
16    A   I didn't see it. The system safety plan is
17 a requirement. How you get from A to B, there's a
18 little latitude.
19    Q   WMATA is not required to follow 882E;
20 correct?
21    A   They all do, though. From what I gathered,
22 every system safety plan I looked at, they do follow

128

1 it.
2    Q   They're not required to; correct?
3    A   I don't think it's statutory, but it's a
4 standard of care that everybody --it's a simple
5 process that the military developed with matrices and
6 charts and stuff. Make life easy. It helps you --
7    Q   There are -- my point is there are other
8 paradigms and this one is not required?
9    A   I wouldn't call it a paradigm. I would
10 just say operating a method, a scientific method to
11 get from A to B?
12    Q   Right. And there are other scientific
13 methods other than 882E?
14    A   Yes, there are, but this is the easiest,
15 and everybody recommends it. And I'm pretty sure
16 WMATA probably does use it.
17    Q   What do you base that on?
18    A   That the meetings I attended, American
19 Public Transit Association on rail safety, and when we
20 talked about system safety plans, most of them
21 mentioned that they followed this procedure because
22 it's so easy.

129

1        You know, the military standards are the
2    easiest standards to follow.  They assume that
3    everybody who reads the military standards has a first
4    grade education.  So it's pretty easy.  Some of the
5    others are much more complicated.  They involve
6    complicated software, data collection.  This makes a
7    lot of the data collection and the analysis of the
8    data -- I guess it's all going to change with AI.  I
9    guess artificial intelligence will just supersede all
10   of this.  Right now, this is what we're doing.
11       Q    Okay.  But you agree with me that this
12   hazard management process, the system safety program
13   plan is a matter for policymakers at the transit
14   authorities.  It's not about something that the
15   individual operators would be doing; correct?
16       A    No.  And then the goal is to follow the
17   prior cue safely.  You know, basically, this has been
18   adopted, I think, back in the 1920s.  I think it goes
19   back that far.
20       Q    This is, again, a management issue?
21       A    Yes, it's management.
22       Q    On page 21, you talk about training.  You

130

1    begin with your statement "There is no evidence that
2    WMATA properly trained their operational staff."  What
3    is your basis for that statement?
4        A    Well, then this incident wouldn't have
5    occurred if they properly trained their staff.
6        Q    So the fact that that incident occurred is
7    the basis for your opinion that WMATA is not training
8    sufficiently?
9        A    Well, it looks that way from when they
10   don't take this -- they didn't seem to take this as
11   seriously as it should be taken.  And you indicated to
12   me, which I wasn't aware of, that this train made
13   several other station stops within that stop with the
14   correct location, that they made a stop at a location
15   that wasn't the official stopping location on various
16   other locations.
17        So this is, you know, kind of an indication
18   that this needs more work and there needs to be more
19   training in this area to make sure that trains, you
20   know, makes the proper announcement, stop at the
21   proper place, avoid the jerk rate, they don't exceed
22   the jerk rate, and that they operate the system as

131

1    safely as possible.
2        In terms of transportation, engineers are
3    taught safety, safety, safety.  So everything that is
4    done, we'd be having zero tolerance for never
5    following standards in the transit industry.
6        (Reporter clarification.)
7        A    We have a zero tolerance for not following
8    standards and rules and regulations in the transit
9    industry.
10       Q    All right, Doctor.  I'm going to bring up
11   Exhibit 4, which is the affidavit we talked about.  Do
12   you recall giving this affidavit?
13       A    I don't remember exactly.  It seems
14   familiar.
15       Q    Okay.  So paragraphs 4, 5 and 6 --
16       A    Can you blow it up, please?  I didn't make
17   a copy.
18       Q    Of course.  Of course.  Is that good?
19       A    Yeah.  I can see it now.  Thank you.
20       Q    Okay.  So actually starting back at 3.  I
21   should give you a chance to read the entire affidavit.
22   So why don't you take a chance to look at this since

132

1    you don't have it.
2        A    Thank you.
3        Q    Let me know when you want me to move on.
4        A    Okay.  Go up a little bit more.
5        Q    All right.
6        MR. REGAN:  I'm going to keep my camera on.
7    I just want to get a drink of water; okay?
8        MR. WATERS:  Okay.
9        MR. REGAN:  It will literally take me one
10   minute while he reads that.
11       MR. WATERS:  Okay.
12       A    Okay.  Okay.
13       Q    I want to wait for Pat to get back before I
14   ask my next question.
15       Turning to section 4, paragraph 4, you
16   state "The New York Transit Authority also adheres to
17   the national standard of care with respect to
18   restarting repositioning an improperly-berthed train."
19   And that's referring back to what you defined as the
20   statute standard of care in paragraph 1; correct?
21       A    Rate.
22       Q    Okay.  What is your basis for stating that

133

1  the New York Transit Authority adheres to that
2  standard of care identified in paragraph 1?
3      **A    From my work experience with the New York**
4  **City Transit Authority.**
5      Q    Do you have a particular document that you
6  can refer to with regard to policy at the New York
7  Transit Authority that you're citing to?
8      **A    I think I do but I didn't use it.  I think**
9  **I do.**
10     Q    I think you answered my question, but did
11 you refer to that document or rely on that document in
12 preparing this affidavit?
13     **A    No, because I knew the information because**
14 **I, you know, I've been involved with it.  So I knew**
15 **about it.**
16     Q    Okay.  Same question for number 5.  What is
17 the basis of your statement with respect to Chicago
18 Transit Authority?
19     **A    From my working with them.**
20     Q    Okay.  Do you have any specific document
21 that you were referring to as being the basis for
22 their practice with regard to the policy stated in

134

1  paragraph 1?
2      **A    I don't believe so.**
3      Q    Okay.  Did you do any research as to what
4  their policies are or their procedures are with
5  respect to the policy that you identified or the
6  standard you identified in paragraph 1?
7      **A    From my working with Chicago Transit and**
8  **people who were from Chicago, I knew it as well as I**
9  **knew from SIRTOA and also other transit companies.**
10     Q    Well, when you prepared this affidavit --
11 I'm sorry.
12     **A    Okay.  This I only mentioned a couple, but**
13 **others that I could have mentioned as well.**
14     Q    Did you call anybody at Chicago Transit
15 Authority to confirm that this is their practice and
16 policy?
17     **A    No, because I knew it was.**
18     Q    Same question for paragraph 6.  Is there a
19 specific document that you're referring to with
20 respect to the statement in paragraph 6?
21     **A    No.  In that case, I did chat with somebody**
22 **from SEPTA.**

135

1      Q    Who was it you contacted at SEPTA?
2      **A    No, I didn't.  I belong to committees and I**
3  **just asked people, you know, how do you handle this?**
4  **In fact, which I didn't include in my report, I did a**
5  **summary of all of the people I spoke to on various**
6  **committees as to how they deal with this situation.  I**
7  **prepared something general, but I didn't include it in**
8  **my report.  And I think in my report I did include**
9  **SEPTA, but I did include MBTA.**
10     Q    So you have a separate summary of people
11 you've spoken with or authorities?
12     **A    No.  I just prepared some notes on what was**
13 **the step-by-step process at the various metros.**
14 **There's 16.  As you know, there was 16 metros in the**
15 **United States, 11 underground --**
16     Q    Did you prepare that?
17     **A    In general --**
18     Q    Did you prepare that before you gave this
19 affidavit in November of 2023?
20     **A    No.**
21     Q    Did you prepare that in connection with
22 this affidavit for November 2023?

136

1      **A    No.  I prepared it in conjunction with the**
2  **supplemental safety report.**
3          MR. WATERS:  Okay.  I believe that's the
4  document we requested would have been available to us
5  for today.  Again, I'm going to repeat my request that
6  the materials that we requested in our subpoena were
7  provided to us.
8          MR. REGAN:  This is the fourth thing.  But
9  you and I can check it later.
10     Q    All right.  I'm going to bring up Exhibit
11 5.  I believe this is your supplemental report of
12 November 21, 2024?
13     **A    Right.**
14     Q    You indicated that you received and
15 reviewed an affidavit from Stacey Swain, dated
16 November 26, 2023?
17     **A    Yes.**
18     Q    Did you receive any other documents in
19 connection with this case in preparation of your
20 supplemental report?
21     **A    I think I had a lot of the other documents**
22 **prior to this supplement.**

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

137

1    Q    Just to be clear, the paragraphs in 4
2  through 6 of your affidavit in Exhibit 4, that
3  information was not included in your original report;
4  correct?
5    A    No.  Some of it was.
6    Q    You identified Southeast Pennsylvania
7  Transit Authority, Chicago Transit Authority, and New
8  York City Transit Authority in your original report
9  compared to that statement?
10    A    What I started doing is I started with
11  largest -- the largest system is New York City.  The
12  second largest is WMATA.  The third largest is CTA.
13  The fourth is MBTA.  So I was just going in the order.
14    Q    Okay.
15    A    I stopped at --
16    Q    My question is very specific, sir.
17  Regarding the standard of care that you've offered in
18  paragraph 1 of your complaint, this information is new
19  in your affidavit that was not provided in your
20  original report; correct?
21    A    Yes, that's correct.
22    Q    Okay.  Going on in your supplemental

138

1  report.
2    A    I'm going to refer to mine because it's
3  easier for me to read.  Is that all right?
4    Q    Yeah.  That's fine.  I can make it a little
5  larger for everybody.
6    A    No.  It's just easier for me to read from
7  my report.
8    Q    Of course.  Did anything change in incident
9  overview from your original report to your
10  supplemental report?
11    A    No, but there was a question of what the
12  national standard of care was, and I think that wasn't
13  addressed sufficiently to meet the requirements of
14  Washington, D.C.  So that's why I prepared the
15  supplemental report, to indicate that WMATA's standard
16  operating procedures are just a repeat of the national
17  standard of care that's used by all -- you know,
18  generally for this particular situation, are used by
19  all the public transit agencies which are considered
20  metros in the United States.  And I didn't list every
21  single one of them.  I just picked the top three
22  biggest.

139

1    Q    And is that correct, that that's the reason
2  you provided the supplemental report, was to address
3  the national standard of care that wasn't to the
4  extent it wasn't addressed in your original report?
5    A    Yes.
6    Q    Okay.
7    A    There is some things I can duplicate like
8  the timeline.
9    Q    Yeah.
10    A    There are a few -- you know, the standard
11  operating procedure I think are in both.  So there is
12  some repetition.
13    Q    So I'm going down here to page 8.  New York
14  City Transit, you have a discussion with regard to New
15  York City Transit?
16    A    Right.
17    Q    Again, from the affidavit until here, did
18  you pull any documentation or review any policies from
19  New York City Transit in preparation of your
20  supplemental report, the section beginning on page
21  8?
22    A    There are documents, but I didn't refer to

140

1  them because I was very familiar with their
2  procedures.
3    Q    This is based on your familiarity with New
4  York City Transit procedures?
5    A    Yes.
6    Q    When was the last time you worked with New
7  York City Transit?
8    A    For or against them?
9    Q    For them.
10    A    I haven't worked lately for them, but I
11  worked quite a bit to make them safer by working
12  against them.
13    Q    When was the last time you were employed by
14  New York City Transit?
15    A    Employed by them?  I was employed by the
16  MTA, which is the parent of the New York City Transit.
17    Q    And when was the last time you were
18  employed by MTA?
19    A    I was teaching transportation safety and
20  management at the MBA level I guess when I retired
21  from teaching.  I was -- 20 years ago.
22    Q    Okay.  Were you employed -- I mean, when

141

1  you were teaching, were you employed directly by the
2  MTA or were you an independent contractor?
3      A  The college that I was teaching at, I was
4  retained by the MTA Long Island Railroad, Metro North,
5  New York City Transit Authority, Cargo Bridge and
6  Tunnel Authority to teach our MBA and intermodal
7  transportation to their managerial employees and I was
8  the — I wrote the curricula and I taught most of the
9  courses.
10     Q  You next cite the Massachusetts Bay
11 Transportation Authority.  Did you pull any
12 documentation or review any policies in connection
13 with your statements here?
14     A  I had previously had cases involving the
15 MBTA and dealt with this subject, and this is the
16 information that I learned from the various documents
17 that they provided.
18     Q  And you're pulling this from your knowledge
19 of another case?
20     A  No.  My knowledge of the operate — I've
21 done many cases involving the MBTA, but my general
22 knowledge of their operation announcements, what have

142

1  you, most of the cases that I had involve pedestrian
2  injuries in stations and on the train.
3      Q  Okay.  So is there a specific -- I'm just
4  trying to understand what you're saying.  Your
5  knowledge of the MBTA that's reflected in this report,
6  Exhibit 5, is that based on a specific case that you
7  were involved in?
8      A  No.  This is general knowledge that I have
9  in addition.  They served with me on various APTA
10 committees.  I'm not on the operating practice
11 committee, but I've spoken to people on the operating
12 practice committee about this subject matter and they
13 just confirmed a lot of what I printed and written in
14 here as evidence of the standard of care.
15     Q  Did you speak with them specifically in
16 connection with providing this report?
17     A  I think it was -- initially, it was on
18 another case that I dealt with where a person in the
19 New York City subway system fell when the train made a
20 sudden unexpected —
21      (Reporter clarification.)
22     A  Initially, I started my work in this area

143

1  with a matter involving New York City Transit
2  Authority.
3      Q  How is it that a New York Transit Authority
4  case helped you develop knowledge about MBTA's
5  procedures on the team?
6      A  My knowledge of each of the systems is
7  independent of each other.  It's a national standard
8  of care.  This is common sense.  These are common
9  sense things that are required to do.  And the point
10 is that this is an area which WMATA has done an
11 excellent job.  Their operating procedures that cover
12 this area do an excellent job.  I was asked to
13 determine was WMATA unique or is WMATA similar to what
14 everybody else in the industry does.
15     I would say that New York City Transit does
16 a little more than WMATA.  Maybe if we were ranking,
17 grading WMATA, maybe I'd give them a B for this area
18 and I would give New York City Transit an A.  It's not
19 the most perfect system, but then New York City
20 Transit puts a lot of time and energy into safety
21 standards.  And they have a lot of impact on the
22 industry on what the industry does, and a lot of the

144

1  national standards of care come from the work that's
2  been done by the New York City Transit Authority and
3  the committees of APTA and AREMA.
4      Q  Here I'm asking you specifically about
5  MBTA.
6      A  That's why I'm working --
7      Q  What is the basis for your knowledge of
8  their standards on the team?
9      A  I have documents from previous cases which
10 I read in the past.  I didn't refer to them because I
11 did know exactly what they were doing and I just wrote
12 it up from my knowledge.
13     Q  Did you consult those --
14     A  If I (indiscernible) the report, I would
15 have referenced the report.  I'm quoting my knowledge
16 of how they conduct when a train does the stop at its
17 proper spot on the platform, whether it overshot the
18 platform or undershoots the platform, what is the
19 national standard of care?  What is the industry?  The
20 16 metros in United States, what do they do?
21     Basically what they do is describe those,
22 but I also found out in general that the first thing

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

37 (145 to 148)

145

1 they do when a train stops at the wrong location, the
2 train operator communicates to the control center, you
3 know, exactly the situation. And the control center
4 will tell them what to do next. And generally, you
5 know, we don't know whether trains stopped in that
6 location. So the operator performs basically the
7 national standard of care. They do safety checks to
8 ensure that if they reposition the train, that it's
9 done without harming the passengers or the equipment.
10 And that may require a positioning going backwards or
11 forwards. We don't like going backwards. So if it's
12 necessary to go backwards to reverse to the station,
13 this has to be done with careful coordination with
14 train control, that there isn't a train in back of the
15 train that's doing the repositioning.
16        And one of the key things I found in
17 talking to people in the industry, that when in doubt,
18 always make an announcement. Always make
19 announcements to ensure that the customers know
20 everything that's going on. There's no doubt in their
21 minds. You make an announcement to keep them informed
22 and safe and the why they're delayed and may not be on

146

1 schedule. That kind of stuff.
2    Q   Doctor, did you review --
3    A   And then once the service is resumed and
4 the correct position is taken, then the service
5 resumes as normal. So that's the background I have
6 generally in this area. And based upon my working in
7 the industry -- and, in fact, the Chicago Transit, I
8 did some work with them years and years ago when I was
9 a college professor at City College of New York. I
10 was the visiting -- I began as visiting professor at
11 City College. My boss there was the former CTA
12 chairman, and we always used to talk all about he was
13 the founding chairman of the CTA and also of the
14 regional transportation agency under the original
15 Mayor Daley. So we always chatted a lot about safety
16 and how things are done.
17        So I know from my working in Chicago and
18 from my riding the systems and all my education,
19 background, experience with the various transit
20 companies in the United States and around the world,
21 that these are what they do and that's why I
22 articulated it.

147

1    Q   May I ask a question now?
2    A   Sure.
3    Q   Okay. I am looking for the basis of your
4 specific knowledge with regard to this. I heard your
5 answer. My question is very specific. With respect
6 to New York City Transit, Massachusetts Bay Transit
7 Authority and Chicago Transit Authority, in your
8 supplemental report, in preparing the report that is
9 up in front of you, did you consult any specific
10 documents to prepare this summary?
11    A   No. No.
12    Q   Did you speak to any specific individuals
13 for the express purpose of confirming your
14 understanding of their policies for the purpose of
15 preparing this report?
16    A   Yes.
17    Q   Who did you speak with?
18    A   I spoke to train operators, people
19 operating the trains on the New York City transit, and
20 he introduced me to people on the other transit
21 systems because he was involved in union work and he
22 knew the other transit companies. And I spoke to a

148

1 few train operators as to how they performed their
2 duty. Plus I remember reading, you know, in the past,
3 various operating procedures and training manuals
4 which also covered these areas which I couldn't get my
5 hands on, couldn't find them, but I do remember what I
6 read. And the New York City Transit, I actually
7 reconfirmed with a friend of mine who is a retired
8 operator who works in transit.
9    Q   What was the name of the train
10 operator that you ---
11    A   Orlando --
12    Q   Please let me finish my question, sir.
13        What was the name of the train operator you
14 confirmed with specifically for the purpose of
15 preparing this report?
16    A   Not specifically. I asked -- I used my
17 background, education and experience, and then I ran
18 it by him and then he confirmed that I was correct.
19    Q   What's his name?
20    A   Orlando Jimenez.
21    Q   How do you spell it, please?
22    A   O-R-L-A-N-D-O J-I-M-E-N-E-Z.

149

1    Q    Is Mr. Jimenez -- did you say he's an
2 operator?
3    A    **He's a retired train operator and union**
4 **representative and also a trainer for the New York**
5 **Transit Authority. He's retired.**
6    Q    Did he ever set policy for New York City
7 Transit?
8    A    **What do you mean, set policy?**
9    Q    Set policy. Did he ever set policies for
10 operators --
11    A    **I don't think the train operator, that's**
12 **not their pay grade level, to set policy.**
13    Q    Did he ever operate a train on any other
14 system?
15    A    **Yes, he has.**
16    Q    Which system?
17    A    **I don't remember, but he mentioned that he**
18 **did.**
19    Q    Do you have an address or a phone number
20 for Mr. Jimenez?
21    A    **Sure.**
22    Q    Would you please provide that?

150

1    A    **If I'm required to.**
2    Q    I request that you do.
3         MR. REGAN: I'll talk with Mr. Berkowitz
4 afterwards.
5    Q    Anybody else that you spoke with in
6 connection with either MBTA, Chicago Transit or New
7 York City --
8    A    **Yes. I spoke about --**
9    Q    -- for the specific purpose of preparing
10 this report?
11    A    **No. He was the most specific person that I**
12 **spoke to.**
13    Q    When did that conversation --
14    A    **The others were general conversations.**
15    Q    When did that conversation occur?
16    A    **Somewhere between 2000 and 2024, many**
17 **times.**
18         MR. WATERS: Can we just pause for a few
19 minutes? I want to reorganize, see if I have anything
20 further. Trying to move this along.
21         MR. REGAN: Do you want to take a
22 five-minute break or not? Too much time?

151

1         MR. WATERS: Yeah. Let's take five
2 minutes.
3         MR. REGAN: Okay. I've got 1:36.
4         THE WITNESS: So five minutes for 1:41?
5         MR. WATERS: Correct. 1:41.
6         (Break taken, 1:36 - 1:41 p.m.)
7         MR. WATERS: Dr. Berkowitz, I think we were
8 able to expedite what I thought I had left over when
9 we broke for lunch. So at this point, I have no other
10 questions unless Mr. Regan has anything he wants to
11 ask you. That's all I have.
12         MR. REGAN: Thank you very much, Jason. I
13 have no questions.
14         Linda, how did we do? Okay the last hour?
15         THE REPORTER: Much better.
16         MR. REGAN: All right. Do you need
17 anything from the witness or from any of us?
18         THE REPORTER: Just his reports so I can
19 look up spellings or abbreviations.
20         MR. WATERS: Yeah. I'll send you all five
21 of the exhibits that I noticed or actually, Kaylan
22 just sent his email address, so I'll copy and paste

152

1 that. I'll try to at least. It's not working for me.
2         MR. REGAN: And Jason, I'll follow up with
3 what my notes show and then we'll get those documents.
4         Linda, I have a standard order, so.
5         MR. WATERS: We should probably advise Dr.
6 Berkowitz. I'm glad to do it if you'd like me to.
7         MR. REGAN: Sure. Dr. Berkowitz, I don't
8 know what your pleasure is in terms of reading and
9 signing versus waiving.
10         THE WITNESS: I trust Linda.
11         MR. REGAN: Okay. That means waiver.
12         MR. WATERS: Linda, my order is what we
13 discussed before. I'd like a rough. If you can't do
14 an expedited by tomorrow -- my preference would be
15 expedited tomorrow. Mini, electronic is perfectly
16 fine.
17         THE REPORTER: Sure.
18         PD TECHNICIAN: And counsel, if you afford
19 me those emails, I'll send those over to Linda.
20         (The deposition of CARL BERKOWITZ,
21         Ph.D. was concluded at 1:42 p.m.)
22

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

153

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Linda M. Bahur, Registered

3   Professional Reporter, the officer before whom the

4   foregoing proceedings were taken, do hereby

5   certify that the foregoing transcript is a true

6   and correct record of the proceedings; that said

7   proceedings were taken by me stenographically and

8   thereafter reduced to typewriting under my

9   supervision; and that I am neither counsel for,

10  related to, nor employed by any of the parties to

11  this case and have no interest, financial or

12  otherwise, in its outcome.

13        IN WITNESS WHEREOF, I have hereunto set

14  my hand and affixed my notarial seal this 29th day

15  of January, 2025.

16

17  My commission expires August 27, 2027.

18

19

20

21  NOTARY PUBLIC IN AND FOR

22  THE STATE OF MARYLAND