**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAROL WILD SCOTT,** | : |
| **Plaintiff,** | : |
| v. | :    Case No. 22-cv-00601 (CRC) |
| **WMATA,** | : |
| **Defendant.** | : |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION *IN LIMINE* (ECF NO. 43)**

On September 23, 2019, a WMATA subway train operator stopped her train at the McPherson Square station platform, then—after passengers including Carol Scott had begun standing up to disembark—violently jerked the train forward without providing any warning to her passengers. In doing so, she violated the national standard of care, as well as WMATA's own explicit Standard Operating procedures, which require that if a train operator intends to reposition a train after it has stopped at a station platform, she must first warn all passengers of the impending movement via intercom announcement: **"Attention customers, this train will move forward; please hold on."** Ms. Scott was thrown to the floor, suffering injuries including a left proximal femur fracture that required surgical repair.



Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

1

Ms. Scott's injuries have left her with a permanent limp, as well as pain, weakness, and fatigability in the left leg.

WMATA moves *in limine* to exclude (1) reference to "unrelated" WMATA Standard Operating Procedures (without articulating what it means by that), (2) reference to other incidents caused by WMATA's negligence, and (3) reference to other incidents involving the at-fault train operator specifically. For the reasons set forth herein, WMATA's Motion should be denied.

## I.   Factual Background

### A.   WMATA knows the danger of repositioning trains at station platforms without warning passengers.

As of September 2019, WMATA's Standard Operating Procedures required that train operators berth their trains at station platforms, then wait 5 seconds before opening the doors. (Ex. 1, WMATA Dep. (Henry) at 30:6-15). On October 18, 2023, WMATA itself issued a press release that underscores its awareness of the fact that its passengers are accustomed to waiting up to **15 seconds** after a train has stopped at a station before the doors open:

> This week, customers may notice doors opening faster on some Red Line trains when they stop at stations. On Wednesday, Metro will begin certifying operators who have been trained to use Metro's Auto Doors function.
>
> The feature enables doors to open automatically when the train stops at the platform. **Not only is it safer and more reliable, but it also eliminates the delay of operators manually opening the doors.**
>
> Currently, operators are required to open and close train doors manually. **They're instructed to stick their head out the window, take a few seconds to verify they are opening the doors on the correct side of the train, and then press a button**

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

2

**to open the doors. The process can take up to 15 seconds** and happens more than 20,000 times a day across the system.

With Auto Doors, signals at the platform tell the train which side to open automatically when it arrives at each station platform. Operators will still put their head out of the window to make sure everyone has exited or boarded safely before manually closing the doors.

"Using Auto Doors eliminates human error from the process of operating our train doors, meaning a safer, smoother trip," **Brian Dwyer Chief Operations Officer said. "Anyone who uses Metrorail has experienced the wait, standing at the door wondering when the doors will open.** Our customers tell us they want Auto Doors back and this change will improve customer experience and safety."

Metro has been testing Auto Doors during off-hours for months and the system performed without any safety issues more than 2,500 times. Metro worked closely with the Washington Metrorail Safety Commission to move forward with this step in its automation program. We thank them for their work.

Ex. 2, WMATA, "Doors opening… faster! Metro preparing for Auto Doors," Oct 18, 2023[1] (emphasis added). That article links to WMATA's webpage about Automatic Train Operation,[2] which, in turn, offers another link: "Here's a side-by-side video showing how fast auto doors open compared with manual open." In that video, a woman on the train with manually operated doors is clearly visible through one of the door windows (circled in red, below). When the train stops, she steps up right to the doors, adjusts her coat, and stands there, not holding onto anything, for 15 seconds before the doors open:

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

---

[1] https://www.wmata.com/about/news/ADO-operator-certification.cfm.
[2] https://www.wmata.com/initiatives/plans/Automatic-Train-Operation-ATO/index.cfm.

3



MetroForward, "Auto Doors: How fast do they open?" (screenshot) (red circle added).[3]

If instead of opening the doors (in line with reasonable passenger expectations) the train operator instead found it necessary to move the train forward before opening the doors, then WMATA's Standard Operating Procedures mandated that the train operator first warn all passengers of the impending movement via intercom announcement: "Attention customers, this train will move forward; please hold on."  (Ex. 1 at 47:3-16; Ex. 3, WMATA SOP 50.5.1.1).  As testified to by both the train operator and WMATA's Rule 30(b)(6) corporate designee, the explicit purpose of the announcement is to allow the customers to grab ahold of something before the train moves, so they don't get hurt:

> A.  Why do we make an announcement?
> BY MR. REGAN:

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

---

[3]     https://www.youtube.com/watch?v=ANkwtF2hT7A;  also  available  on  WMATA's website:     https://www.wmata.com/initiatives/plans/Automatic-Train-Operation-ATO/ATO-Videos.cfm.

4

> Q. Correct.
>
> A. Just so that people are on the platform and on the train are aware.
>
> **Q. Okay. I don't want to put words into your mouth. But is one reason that people need to know the train is going to move forward again so that they can be prepared and not fall?**
>
> MR. CHANDONNET: Objection. You can answer.
>
> **A. Correct.**

(Ex. 4, Johnson Dep., at. 11:14-12:18 (emphasis added))).

> Q. If you stop short, are you allowed to move the train forward again?
>
> A. You're allowed to reposition the train until you're properly berthed.
>
> Q. That's with that warning, you must give the verbal warning that's set forth in SOP 50-point-something that we looked at earlier; right?
>
> MR. CHANDONNET: Objection.
>
> BY MR. REGAN:
>
> Q. Alerting the passengers that you're going to move the train so they don't get hurt; right?
>
> MR. CHANDONNET: Objection.
>
> A. Yeah, according to 50.5, yes.
>
> BY MR. REGAN:
>
> **Q. And that is the purpose, by the way; right? I think you said the purpose was so they can hold on. The worry is they're going to get hurt if they're not warned about what's happening; right?**
>
> MR. CHANDONNET: Objection.
>
> **A. They could, if they're not paying attention, they could get hurt. Most times, people feel the train stop so they automatically get up thinking the doors are going to open.**

(Ex. 1 at 47:3-16, 66:1-67:4 (emphasis added)).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

5

### B. WMATA train operator's history of prior station overruns incentivizes her to err on the side of stopping short and repositioning—despite danger to passengers—to the point that it felt mundane to her.

At the time of the incident, WMATA's train operator in question, Domenic Johnson, had been operating trains for less than six months, having started in March 2019. (Ex. 4 at 9:4-8). In that short span of time, Ms. Johnson[4] had already committed two station platform "overruns." An overrun occurs when a train operator fails to stop the train at the designated point on the platform. (Ex. 1 at 48:9-16). When that happens, it is a big deal. All passengers are either evacuated through doors rearwards from those that overshot the mark or taken to the next station and offloaded there, the train and train operator are taken out of service for the day, the train is inspected, and the train operator must fill out a special form that is kept as part of her personnel file and may trigger retraining or other disciplinary actions. (Ex. 1 at 49:6-9, 67:6-68:2). In sum:

> Q. [] We agree that as of that point in time, as of September 2019, every train on the WMATA system was supposed to be stopping on the eight-car marker; right?
>
> A. Yes.
>
> Q. And so if they blew past the eight-car marker by half a car --
>
> A. Mm-hmm.
>
> Q. -- it's a station overrun, there's paperwork, they're done for the day, the train is inspected, it's going in their record; right?
>
> A. Mm-hmm.
>
> Q. If they're a half a car short of the eight-car marker, nothing happens except they have to move the train forward again; right?
>
> A. Yes, to the eight-car marker.

---

[4] In its Motion, WMATA incorrectly refers to its train operator Ms. Johnson as "Mr. Johnson."

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

6

(Ex. 1 at 78:6-21).

After beginning to operate trains for WMATA in March 2019, Ms. Johnson almost immediately committed two station overruns. (Ex. 5, Station Overrun Report 4/20/19; Ex. 6, Station Overrun Report 4/28/19). This necessitated that she undergo retraining. (Ex. 7, RTRA Training Request Form). Ms. Johnson would have gotten the obvious message—if you can't stop the train where you're supposed to, better to miss short than long. WMATA was not shy about discussing this obvious conclusion with the press. A June 2018 Washington Post Express article explained as follows:

> **Question: Today we're curious about why trains come to a stop at a station and then lurch forward a few inches or feet. What difference does it make?**
>
> **Answer:** It goes back to the deadly June 22, 2009, crash of a Red Line train into a stopped train between the Fort Totten and Takoma Metro stations.
>
> Metro suspended its automated train system after federal investigators determined a faulty track circuit module led to the moving train not automatically stopping for the stationary train in front of it.
>
> Metro is paying a consultant $1 million to study bringing back automated train operations, but since the crash, trains have been run manually.
>
> The main problem with this, <u>WMATA spokesman Dan Stessel[5] tells us</u>, is that if the operator overshoots the end of the platform, some of the doors in the front car will be past the platform, inside the tunnel — obviously not a great place for people to get on or off.
>
> An operator couldn't back up without walking through all the cars and running the train the other way from the cab at the other end. And even if they were to try, the system would shut down to prevent the train from going the wrong way.

---

   [5]   WMATA's designated representative testified that she did not know who Dan Stessel was. (Ex. 1 at 62:2-3). Dan Stessel was WMATA's Chief Communications Officer for nearly a decade, from May 2011 through December 2020. https://www.linkedin.com/in/danielstessel/.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

7

> <u>So it's a lot better to stop a little short than go too far</u>. But the new eight-car trains are 600 feet long — the same length as the platforms. So the operator has to inch up, or the back cars will be short of the platform.
>
> Even though six-car trains, which run about 450 feet long, could stop before the far end of the platform and still have room in the back to clear the tunnel, operators of the shorter trains are still supposed to go as far as they can on the platform without re-entering the tunnel.
>
> The reason for that, Stessel says, is that operators might run both eight- and six-car trains over the course of a shift. So it's better to have the trains stop at the same point regardless of the length of the train, so that operators who might mistakenly think they're driving a shorter train don't stop their longer trains with the rear cars still in the tunnel

(Ex. 8, Washington Post, "DC Rider's Answer Line: What's with the Metro lurch?," Jun 26, 2018 (bold in original; underlining added)). At its deposition, WMATA proved substantially shyer about whether its train operators would have been made aware of the obvious conclusion:

> Q. Was that WMATA's official position as of September 2019, that it was better to stop a little bit short than go a little too far in on a platform?
>
> A. That wasn't a -- that's not a written rule, I didn't -- uh-uh.
>
> Q. What about unwritten?
>
> A. I can't -- I can't -- I don't know what was told to this -- to the operator, but I know that that's not policy. So no one in management would tell her that.

(Ex. 1 at 69:8-18).

### C. WMATA train operator injures passenger doing exactly what WMATA expects reasonable passengers to be doing.

At approximately 6:30 PM on September 23, 2019, Carol Scott, was a passenger on Orange Line subway train pulling into the McPherson Square station. (Ex. 9, WMATA Incident/Accident Report; *see also* Compl.)). After the train came to a stop at the station

platform, Ms. Scott stood up to exit the train. After Ms. Scott had stood up, the train operator suddenly "jerked," "launched," or "lurched" the train forward, as confirmed not only by Ms. Scott, but by every single one of the three eyewitnesses identified in WMATA's Incident/Accident Report:

> WMATA Incident/Accident Report Witness A.E. stated:
>
> "Woman stood up because the train stopped at McPherson Sq. **The train then jerked forward** and the woman fell into the [aisle]. I stayed with her until paramedics arrived."

(Ex. 9 at 5 (emphasis added));

> WMATA Incident/Accident Report Witness S.S. stated:
>
> "**Train jerked** at station I heard loud thump then a scream. People trying to move her after that. I called emergency in on box in car 3144 asking for emergency assistance then screamed for no one to move her till medics arrive. Then put jacket under Ms. Carol's head and tried to calm her down till medic arrive."

(Ex. 9 at 5 (and transcribed at page 4) (emphasis added) (all spellings, punctuation, and syntax in original));

> WMATA Incident/Accident Report Witness D.P. stated:
>
> "Saw the lady in question stand up when the train stopped at McPherson Sq. **Unexpectedly, the train lurched forward** and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again."

(Ex. 9 at 7 (emphasis added)).

Before jerking the train forward, WMATA's train operator did **not** warn the train passengers that she was going to move the train forward, let alone do so violently. In addition to the above-listed witness statements, WMATA has explicitly admitted that it is not aware of any evidence to the contrary:

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

9

> Q. Is WMATA aware of any evidence that would contradict that; in other words, is there any evidence that WMATA is aware of that the train operator announced the train would be moving before she moved it forward again?
>
> A. No.

(Ex. 10, WMATA Dep. (Bennett), at 31:17-32:7).

WMATA's train operator has testified under oath that she has no recollection of what happened that day. (Ex. 4 at 23:9-16). The train operator's signed statement in WMATA's official Incident/Accident Report does not address how the incident occurred. (Ex. 9 at 1).

### D. Transportation engineering and safety expert Carl Berkowitz, Ph.D., PE, explains that WMATA's train operator violated not only WMATA's explicit SOPs, but also the national standard of care.

Dr. Carl Berkowitz, a transportation engineering and safety expert retained by Plaintiff, prepared a supplemental report dated November 21, 2024. It is discussed in detail in Plaintiff's opposition to WMATA's other motion *in limine*; for the instant Motion, it is enough to note the following:

> **Excerpts from Relevant WMATA Standard Operating Procedures**
> <u>Compliance</u>: WMATA failed to comply with their SOP #40 and SOP #50; specifically:
>
> - Train Operators are responsible for the safe movement of trains
>
> - If not properly berthed, announce over PA, "Your attention please, this train will move forward." SOP 40.5.1.3.3.
>
> - Train Operators are responsible for making the appropriate P.A. announcements in conjunction with the standard operational procedures that require communications with customers. For example, when entering next station and repositioning train, announce over PA, "Attention customers, the train will move forward, please hold on." SOP 50.5.1.1.
>
> \*\*\*

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

10

> This obvious risk of unwarned repositioning of a berthed train is recognized nationwide and accordingly reflected in the nationwide practices that constitute the national standard of care. The national standard of care requires that before restarting/repositioning an improperly berthed subway train, a train driver must first warn passengers so that they are not caught off guard by the movement and injured. The standard practices of the New York City Metropolitan Transportation Authority, Chicago Transit Authority, Massachusetts Bay Transit Authority (Boston), and the Southeastern Pennsylvania Transportation Authority (Philadelphia), among others (and in addition to WMATA's own SOPs, of course), adhere to the same standard and rule.
>
> \*\*\*
>
> **7. Conclusion**
>
> It remains my professional opinion that based on the information currently available and with a reasonable degree of engineering certainty, it is my professional engineering opinion that the WMATA and the train operator violated WMATA's own SOP 50.5.1.1, which is consistent with the national standard of care, when entering McPherson Square Station, stopping the train, and then repositioning it without warning the train's passengers. The safety risk that passengers will be thrown to the ground and injured by unexpected and unwarned movement of a train that has stopped at a station platform is long- and well-known, which is precisely why common carriers such as WMATA are required to warn passengers before doing so. Failure to properly and safely berth the train at the station directly caused Ms. Scott's injury. The train operator suddenly, unexpectedly accelerated the train forward without providing passengers any advance warning. In fact, moments before the sudden jerk of the train, there was a PA announcement indicating the station name and that the doors were opening to the left. This announcement misled passengers to believe that it was safe to get up from their seats and exit the train

(Ex. 11, Berkowitz Supp. Report, at 5, 8, 10).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

11

## II. Argument

### A. WMATA's Motion should be denied as it pertains to WMATA Standard Operating Procedures.

WMATA first asks that the Court bar any reference at trial to "unrelated SOPs." (Def.'s Mot. at Sec. III.A). But it does not specify any SOPs to which it refers. It seems to implicitly allow that at least SOPs 40 and 50, which WMATA does not seriously dispute were violated by its train operator, are fair game. Both are evidence of the standard of care; both were cited by Dr. Berkowitz in his report. It is well established that WMATA's SOPs may be admitted as evidence of the standard of care. *See Robinson v. WMATA*, 941 F. Supp. 2d 61, 68 (D.D.C. 2013), *aff'd*, 774 F.3d 33 (D.C. Cir. 2014) ("While a plaintiff's expert may point to rules or guidelines set forth in a defendant's own guidebook or its standard operating procedures as evidence of the standard of care, the expert must adequately demonstrate that those rules or guidelines reflect or embody a national standard of care.") (citing cases); *see also English v. WMATA*, 323 F.R.D. 1, 24 (D.D.C. 2017) ("WMATA correctly states that the policies may not be sufficient, standing alone, to establish the national standard of care. But that does not render the policies or documents regarding driver training undiscoverable.") (internal citations omitted).

To the extent that WMATA might seek to have admitted only precise subsections of SOPs 40 and 50 (presumably SOP 40.5.1.3.3 and SOP 50.5.1.1, the subsections explicitly mentioned in its Motion), Plaintiff would object on the grounds of the doctrine of completeness. Prior to WMATA filing its Motion, the undersigned asked WMATA's counsel to please provide a proposed redacted version of SOPs 40 and 50 so the parties could discuss the matter in good faith; WMATA declined to do so. (Ex. 12, Counsel Emails, at 1). It has

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

12

provided no discussion of that topic in its Motion. Were WMATA to attempt to engage in that discussion in a reply brief, the Court should disregard it. (*See infra*, Sec. II.D). Particularly in light of counsel's explicit request before WMATA filed its motion, WMATA's decision not to discuss the matter in its Motion is just that: a conscious decision. In sum, under the doctrine of completeness, SOPs 40 and 50 should be admitted in their entirety.

With regard to any redactions WMATA might propose, Plaintiff also notes that "A party seemingly responsible for cloaking something has reason for apprehension []." *Old Chief v. United States*, 519 U.S. 172, 188 (1997). While the Supreme Court penned those words in in reference to a defendant trying to hide **facts** from the jurors, as opposed to portions of partially redacted documents, the underlying logic holds true here, as well. Were any portion of WMATA's SOPs 40 and 50 to be redacted, it would—at a minimum—need to be clear that WMATA was the party insisting on hiding information from the jurors. But again, because WMATA declined to have that conversation with the undersigned prior to filing its Motion and did not include any specific details in its Motion, it is difficult to intelligently discuss precisely what WMATA wants from the Court.

Beyond the above, it is unclear whether WMATA intends its Motion to encompass other SOPs beyond SOPs 40 and 50. As counsel for WMATA knows, the undersigned is amply familiar with WMATA's **full** set of SOPs from prior cases (and even other cases currently pending before this Court and others). Dr. Berkowitz is equally familiar with WMATA's SOPs. At trial, were WMATA to take any position that contradicted its own SOPs, it is certainly conceivable that some mention of SOPs beyond Nos. 40 and 50 would prove necessary, but at this time, the undersigned can represent that only SOPs 40 and 50 are expected to be introduced through Plaintiff's case in chief.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

13

### B. *WMATA's Motion should be denied as it pertains to other WMATA incidents.*

Again, WMATA is not clear about what precisely it seeks from the Court. The Motion could be denied on that basis alone. But even if the undersigned and the Court were to try to imagine what other incidents it is that WMATA is seeking to hide, (and again, it is not incumbent upon either Plaintiff or the Court to do so—WMATA bears the burden of bringing its Motion), WMATA's Motion should still be denied.

Every turn in the journey from the original automated operation of WMATA's train doors to the practice prevailing at the time of this incident—stopping a train manually, waiting 5 to 15 seconds, while passengers stand and mill about, waiting for the doors to open, and then manually opening the doors—is marked by but was actively driven by a serious safety incident. The initial switch from automatic to manual train operation? The 2009 Red Line crash at Fort Totten. The "5-second rule" between stopping and manually opening doors? Repeated incidents in which WMATA train operators opened doors on the wrong side of the train. Those facts are no secret—WMATA willfully discussed the former with the Washington Post through its official spokesman, (*see supra* Sec. I.B; Ex. 8), and trumpeted the latter to the world at large in a press release quoting its own Chief Operations Officer, (*see supra* Sec. I.A; Ex. 2). The jurors are entitled to fully understand WMATA's train-door-operation policy that was in place at the time of the incident, and a full understanding requires mention of the underlying rationale.

WMATA also knows that in recent years the combination of (1) its train-door-operation policy and (2) its short-stop versus platform-overrun policies/incentives have caused a spate of incidents eerily similar to the one that caused Ms. Scott's injuries. WMATA knows that

one such case (in which the plaintiff is also represented by the undersigned) is set for trial in the Eastern District of Virginia two weeks after the trial of this case. Dr. Berkowitz will testify in that case, as well. WMATA has also recently received notice that this law firm represents yet another victim of a similar incident, although suit has not yet been filed.

The mere fact that in its Motion WMATA sketches out only a request that the Court bar mention of any prior WMATA incidents, without deigning to discuss any such incidents in detail, is reason enough to deny the request. But even from a 30,000-foot view, imagining the most relevant incidents that come to mind, it is clear that there are incidents that could properly come into evidence at trial. For those reasons, WMATA's Motion should be denied as it pertains to prior WMATA incidents.

### C. WMATA's Motion should be denied as it pertains to its at-fault train operator's history of prior incidents.

As described above, (*see supra*, Sec. I.B), in just her first few weeks on the job (and less than 6 months before her negligence injured Ms. Scott), WMATA's train operator racked up two citations for station overruns, had that documented in her personnel file, and had to undergo additional training as a result. She would have been well aware of the starkly different ways in which WMATA treated station overruns and short-stops:

> Q. [] We agree that as of that point in time, as of September 2019, every train on the WMATA system was supposed to be stopping on the eight-car marker; right?
>
> A. Yes.
>
> Q. And so if they blew past the eight-car marker by half a car --
>
> A. Mm-hmm.
>
> Q. -- it's a station overrun, there's paperwork, they're done for the day, the train is inspected, it's going in their record; right?
>
> A. Mm-hmm.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

15

> Q. If they're a half a car short of the eight-car marker, nothing happens except they have to move the train forward again; right?
>
> A. Yes, to the eight-car marker.

(Ex. 1 at 78:6-21). As WMATA's spokesman put it, "[I]t's a lot better to stop a little short [and then have to reposition the train] than go too far." (*See supra*, Sec. I.B; Ex. 8). Even if WMATA tries to deny to the jurors that it explicitly adopted the same messaging internally, (1) the jurors could still find that the implicit nudging and the appreciation of which errant platform stops would get her in trouble versus which would not was sufficient motivation and (2) the jurors are not obligated to believe WMATA.

The fact that WMATA's train operator was repeatedly and consciously trying to err on the side of stopping trains short is relevant because it helps establish (1) that short-stops were commonplace for the train operator and, correspondingly, (2) that it would have proven incredibly monotonous and onerous for her to keep having to repeat the required warning to passengers before repositioning the train. Logically, a train operator who stops short once a year would not feel overburdened or bored by the requirement of warning passengers before moving the train at the platform. On the other hand, a train operator who stops short thirty times per shift might well feel that way.

On that point, it should be noted that WMATA wants to have its cake and eat it, too. In its supplemental answer to Plaintiff's interrogatory concerning contributory negligence (finally provided on January 24, 2025), WMATA argues in relevant part as follows:

> [Ms. Scott] further testified that on the day of the alleged incident she boarded an Orange Line WMATA train at the Vienna station and traveled on the train to McPherson Square station. Scott Dep. 17:11-13. Ms. Scott testified that at several stations during the trip, the train would stop and then move

> forward. Scott Dep. 17:13-17; 28:15-21. She described the physical movement of the train when it would move forward at the stations as a mixture, "[b]ut that a couple of time it was a real jerk." Scott Dep. 31:16-21.
>
> [] Ms. Scott had a notice of the train reberthing at prior stations along her route prior to her fall, and she failed to use available handholds or her cane to support herself or prevent her fall

(Ex. 13, WMATA Supp. Answer to Pl.'s Interrog. 6). WMATA cannot be entitled to argue to the jurors that its train operator had developed a habit of stopping short and that Ms. Scott was contributorily negligent for not noticing it, while hiding from the jurors the reason **why** its train operator had developed that habit and preventing Plaintiff from arguing to the jurors the logical outgrowth of that habit: the burden and boredom of continuing to give the required warning to passengers before moving trains.

### D.   A Note on Sandbagging

For each of its three requests, WMATA puts before the Court only a two-paragraph perfunctory recitation of boilerplate argument, with no real analysis or application to facts. WMATA is a plenty sophisticated litigant. It understands what should ordinarily be included in a motion and what is and is **not** proper to raise for the first time in a reply brief. But the form of WMATA's Motion (specifically, its repeated refusal to delve into the specifics of what it seems to be requesting of the Court) compels the undersigned to preemptively note the oddity of WMATA's approach.

It is well established that a party cannot present new argument or evidence in a reply. *Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 277 (D.C. Cir. 2014) ("We decline to entertain this argument because . . . it was not raised by Appellants until reply."); *S. Coast Air Quality Mgmt. Dist. v. EPA*, 554 F.3d 1076, 1081 n.* [unnumbered footnote] (D.C. Cir.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

17

2009) ("[I]n order to prevent sandbagging of appellees and respondents, we do not consider arguments that were raised neither in the opening brief nor by respondents.").

No doubt WMATA might argue that its short paragraphs at least "raise" arguments even if they do not discuss those arguments in any detail. Plaintiff respectfully suggests that would be a meaningless distinction—if an argument is not raised in sufficient detail for the opposing party to respond to it in an educated manner, than it is not really "raised" in any meaningful sense of the word. To the extent WMATA might in its reply brief attempt to delve into detailed discussion of the arguments sketched out in its Motion for the first time, that would be inappropriate even in a vacuum. Here, where Plaintiff's counsel had repeatedly asked WMATA's counsel to substantively discuss the issues prior to filing its Motion but WMATA declined to do so, it would be all the more brazen. If WMATA attempts detailed discussions of its arguments for the first time in a reply brief, the Court should not entertain such arguments.

## III.   Conclusion

For the reasons set forth above, Ms. Scott respectfully requests that the Court DENY Defendant's Motions *in Limine*.

Respectfully submitted,

REGAN ZAMBRI LONG PLLC

By:   /s/ *Christopher J. Regan*
    Patrick M. Regan          #336107
    pregan@reganfirm.com
    Christopher J. Regan      #1018148
    cregan@reganfirm.com
    1919 M Street, N.W., Suite 350

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

18

Washington, D.C. 20036
Ph: (202) 463-3030
Fx: (202) 463-0667
*Counsel for Plaintiff*

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030