UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAROL WILD SCOTT,                :

    Plaintiff,              :

    v.                          :   Case No. 22-cv-00601 (CRC)

WMATA,                            :

    Defendant.             :

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION *IN LIMINE* RE: DR. BERKOWITZ (ECF NO. 42)**

On September 23, 2019, a WMATA subway train operator stopped her train at the McPherson Square station platform, then—after passengers including Carol Scott had begun standing up to disembark—violently jerked the train forward without providing any warning to her passengers. In doing so, she violated the national standard of care, as well as WMATA's own explicit Standard Operating procedures, which explicitly require that if a train operator intends to reposition a train after it has stopped at a station platform, she must first warn all passengers of the impending movement via intercom announcement: **"Attention customers, this train will move forward; please hold on."** Ms. Scott was thrown to the floor, suffering injuries including a left proximal femur fracture that required surgical repair.



Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

Ms. Scott's injuries have left her with a permanent limp, as well as pain, weakness, and fatigability in the left leg.

WMATA moves *in limine* to exclude the testimony of transportation engineering and safety expert Carl Berkowitz, Ph.D., PE.  For the reasons set forth herein, WMATA's Motion should be denied.

**I.    Factual Background and Procedural History**

### A.    WMATA knows the danger of repositioning trains at station platforms without warning passengers.

As of September 2019, WMATA's Standard Operating Procedures required that train operators berth their trains at station platforms, then wait 5 seconds before opening the doors. (Ex. 1, WMATA Dep. (Henry) at 30:6-15).  On October 18, 2023, WMATA itself issued a press release that underscores its awareness of the fact that its passengers are accustomed to waiting up to **15 seconds** after a train has stopped at a station before the doors open:

> This week, customers may notice doors opening faster on some Red Line trains when they stop at stations.  On Wednesday, Metro will begin certifying operators who have been trained to use Metro's Auto Doors function.
>
> The feature enables doors to open automatically when the train stops at the platform.  **Not only is it safer and more reliable, but it also eliminates the delay of operators manually opening the doors.**
>
> Currently, operators are required to open and close train doors manually.  **They're instructed to stick their head out the window, take a few seconds to verify they are opening the doors on the correct side of the train, and then press a button to open the doors.  The process can take up to 15 seconds** and happens more than 20,000 times a day across the system.
>
> With Auto Doors, signals at the platform tell the train which side to open automatically when it arrives at each station platform. Operators will still put their head out of the window to make sure

> everyone has exited or boarded safely before manually closing the doors.
>
> "Using Auto Doors eliminates human error from the process of operating our train doors, meaning a safer, smoother trip," **Brian Dwyer Chief Operations Officer said. "Anyone who uses Metrorail has experienced the wait, standing at the door wondering when the doors will open.** Our customers tell us they want Auto Doors back and this change will improve customer experience and safety."
>
> Metro has been testing Auto Doors during off-hours for months and the system performed without any safety issues more than 2,500 times. Metro worked closely with the Washington Metrorail Safety Commission to move forward with this step in its automation program. We thank them for their work.

Ex. 2, WMATA, "Doors opening… faster! Metro preparing for Auto Doors," Oct 18, 2023[1] (emphasis added). That article links to WMATA's webpage about Automatic Train Operation,[2] which, in turn, offers another link: "Here's a side-by-side video showing how fast auto doors open compared with manual open." In that video, a woman on the train with manually operated doors is clearly visible through one of the door windows (circled in red, below). When the train stops, she steps up right to the doors, adjusts her coat, and stands there, not holding onto anything, for 15 seconds before the doors open:

---

[1] https://www.wmata.com/about/news/ADO-operator-certification.cfm.
[2] https://www.wmata.com/initiatives/plans/Automatic-Train-Operation-ATO/index.cfm.

3



MetroForward, "Auto Doors: How fast do they open?" (screenshot) (red circle added).[3]

If instead of opening the doors (in line with reasonable passenger expectations) the train operator instead found it necessary to move the train forward before opening the doors, then WMATA's Standard Operating Procedures mandated that the train operator first warn all passengers of the impending movement via intercom announcement: "Attention customers, this train will move forward; please hold on." (Ex. 1 at 47:3-16; Ex. 3, WMATA SOP 50.5.1.1). As testified to by both the train operator and WMATA's Rule 30(b)(6) corporate designee, the explicit purpose of the announcement is to allow the customers to grab ahold of something before the train moves, so they don't get hurt:

> A. Why do we make an announcement?
> BY MR. REGAN:

---

[3] https://www.youtube.com/watch?v=ANkwtF2hT7A; also available on WMATA's website: https://www.wmata.com/initiatives/plans/Automatic-Train-Operation-ATO/ATO-Videos.cfm.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

Q. Correct.

A. Just so that people are on the platform and on the train are aware.

**Q. Okay. I don't want to put words into your mouth. But is one reason that people need to know the train is going to move forward again so that they can be prepared and not fall?**

MR. CHANDONNET: Objection. You can answer.

**A. Correct.**

(Ex. 4, Johnson Dep., at. 11:14-12:18 (emphasis added))).

Q. If you stop short, are you allowed to move the train forward again?

A. You're allowed to reposition the train until you're properly berthed.

Q. That's with that warning, you must give the verbal warning that's set forth in SOP 50-point-something that we looked at earlier; right?

MR. CHANDONNET: Objection.

BY MR. REGAN:

Q. Alerting the passengers that you're going to move the train so they don't get hurt; right?

MR. CHANDONNET: Objection.

A. Yeah, according to 50.5, yes.

BY MR. REGAN:

**Q. And that is the purpose, by the way; right? I think you said the purpose was so they can hold on. The worry is they're going to get hurt if they're not warned about what's happening; right?**

MR. CHANDONNET: Objection.

**A. They could, if they're not paying attention, they could get hurt. Most times, people feel the train stop so they automatically get up thinking the doors are going to open.**

(Ex. 1 at 47:3-16, 66:1-67:4 (emphasis added)).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

5

### B. WMATA train operator's history of prior station overruns incentivizes her to err on the side of stopping short and repositioning—despite danger to passengers—to the point that it felt mundane to her.

At the time of the incident, WMATA's train operator in question, Domenic Johnson, had been operating trains for less than six months, having started in March 2019. (Ex. 4 at 9:4-8). In that short span of time, Ms. Johnson[4] had already committed two station platform "overruns." An overrun occurs when a train operator fails to stop the train at the designated point on the platform. (Ex. 1 at 48:9-16). When that happens, it is a big deal. All passengers are either evacuated through doors rearwards from those that overshot the mark or taken to the next station and offloaded there, the train and train operator are taken out of service for the day, the train is inspected, and the train operator must fill out a special form that is kept as part of her personnel file and may trigger retraining or other disciplinary actions. (Ex. 1 at 49:6-9, 67:6-68:2). In sum:

> Q. [] We agree that as of that point in time, as of September 2019, every train on the WMATA system was supposed to be stopping on the eight-car marker; right?
>
> A. Yes.
>
> Q. And so if they blew past the eight-car marker by half a car --
>
> A. Mm-hmm.
>
> Q. -- it's a station overrun, there's paperwork, they're done for the day, the train is inspected, it's going in their record; right?
>
> A. Mm-hmm.
>
> Q. If they're a half a car short of the eight-car marker, nothing happens except they have to move the train forward again; right?
>
> A. Yes, to the eight-car marker.

---

[4] In its Motion, WMATA incorrectly refers to its train operator Ms. Johnson as "Mr. Johnson."

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

6

(Ex. 1 at 78:6-21).

After beginning to operate trains for WMATA in March 2019, Ms. Johnson almost immediately committed two station overruns. (Ex. 5, Station Overrun Report 4/20/19; Ex. 6, Station Overrun Report 4/28/19). This necessitated that she undergo retraining. (Ex. 7, RTRA Training Request Form). Ms. Johnson received the obvious message—if you can't stop the train where you're supposed to, better to miss short than long. WMATA was not shy about discussing this obvious conclusion with the press, either. A June 2018 Washington Post Express article explained as follows:

> **Question: Today we're curious about why trains come to a stop at a station and then lurch forward a few inches or feet. What difference does it make?**
>
> **Answer:** It goes back to the deadly June 22, 2009, crash of a Red Line train into a stopped train between the Fort Totten and Takoma Metro stations.
>
> Metro suspended its automated train system after federal investigators determined a faulty track circuit module led to the moving train not automatically stopping for the stationary train in front of it.
>
> Metro is paying a consultant $1 million to study bringing back automated train operations, but since the crash, trains have been run manually.
>
> The main problem with this, <u>WMATA spokesman Dan Stessel[5] tells us</u>, is that if the operator overshoots the end of the platform, some of the doors in the front car will be past the platform, inside the tunnel — obviously not a great place for people to get on or off.
>
> An operator couldn't back up without walking through all the cars and running the train the other way from the cab at the other end. And even if they were to try, the system would shut down to prevent the train from going the wrong way.

---

[5] WMATA's designated representative testified that she did not know who Dan Stessel was. (Ex. 1 at 62:2-3). Dan Stessel was WMATA's Chief Communications Officer for nearly a decade, from May 2011 through December 2020. https://www.linkedin.com/in/danielstessel/.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

7

> <u>So it's a lot better to stop a little short than go too far</u>. But the new eight-car trains are 600 feet long — the same length as the platforms.  So the operator has to inch up, or the back cars will be short of the platform.
>
> Even though six-car trains, which run about 450 feet long, could stop before the far end of the platform and still have room in the back to clear the tunnel, operators of the shorter trains are still supposed to go as far as they can on the platform without re-entering the tunnel.
>
> The reason for that, Stessel says, is that operators might run both eight- and six-car trains over the course of a shift.  So it's better to have the trains stop at the same point regardless of the length of the train, so that operators who might mistakenly think they're driving a shorter train don't stop their longer trains with the rear cars still in the tunnel

(Ex. 8, Washington Post, "DC Rider's Answer Line: What's with the Metro lurch?," Jun 26, 2018 (bold in original; underlining added)).  At its deposition, WMATA proved substantially shyer about whether its train operators would have been made aware of the obvious conclusion:

> Q. Was that WMATA's official position as of September 2019, that it was better to stop a little bit short than go a little too far in on a platform?
>
> A. That wasn't a -- that's not a written rule, I didn't -- uh-uh.
>
> Q. What about unwritten?
>
> A. I can't -- I can't -- I don't know what was told to this -- to the operator, but I know that that's not policy.  So no one in management would tell her that.

(Ex. 1 at 69:8-18).

### C. WMATA train operator injures passenger doing exactly what WMATA expects reasonable passengers to be doing.

At approximately 6:30 PM on September 23, 2019, Carol Scott, was a passenger on Orange Line subway train pulling into the McPherson Square station.  (Ex. 9, WMATA Incident/Accident Report; *see also* Compl.)).  After the train came to a stop at the station

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

8

platform, Ms. Scott stood up to exit the train. After Ms. Scott had stood up, the train operator suddenly "jerked," "launched," or "lurched" the train forward, as confirmed not only by Ms. Scott, but by every single one of the three eyewitnesses identified in WMATA's Incident/Accident Report:

> WMATA Incident/Accident Report Witness A.E. stated:
>
> "Woman stood up because the train stopped at McPherson Sq. **The train then jerked forward** and the woman fell into the [aisle]. I stayed with her until paramedics arrived."

(Ex. 9 at 5 (emphasis added));

> WMATA Incident/Accident Report Witness S.S. stated:
>
> "**Train jerked** at station I heard loud thump then a scream. People trying to move her after that. I called emergency in on box in car 3144 asking for emergency assistance then screamed for no one to move her till medics arrive. Then put jacket under Ms. Carol's head and tried to calm her down till medic arrive."

(Ex. 9 at 5 (and transcribed at page 4) (emphasis added) (all spellings, punctuation, and syntax in original));

> WMATA Incident/Accident Report Witness D.P. stated:
>
> "Saw the lady in question stand up when the train stopped at McPherson Sq. **Unexpectedly, the train lurched forward** and the lady fell hard on the aisle floor. She immediately cried out in pain and said she broke her leg. I did not hear the train conductor the train was moving again."

(Ex. 9 at 7 (emphasis added)).

Before jerking the train forward, WMATA's train operator did **not** warn the train passengers that she was going to move the train forward, let alone do so violently. In addition to the above-listed witness statements, WMATA has explicitly admitted that it is not aware of any evidence to the contrary:

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

9

> Q. Is WMATA aware of any evidence that would contradict that; in other words, is there any evidence that WMATA is aware of that the train operator announced the train would be moving before she moved it forward again?
>
> A. No.

(Ex. 10, WMATA Dep. (Bennett), at 31:17-32:7).

WMATA's train operator has testified under oath that she has no recollection of what happened that day.  (Ex. 4 at 23:9-16).  The train operator's signed statement in WMATA's official Incident/Accident Report does not address how the incident occurred.  (Ex. 9 at 1).

### D. The Court finds that Dr. Berkowitz's initial expert report did not sufficiently establish national standard of care and timing of curative affidavit in context of summary judgment briefing did not allow WMATA fair opportunity to respond, reopens discovery to remedy any potential unfairness.

In its July 1, 2024, denial of the parties' dueling motions for summary judgment, the Court concluded that transportation engineering and safety expert Carl Berkowitz, Ph.D., PE's initial expert report did not sufficiently establish the existence of a national standard of care (by identifying other mass transit agencies that also required that train operators warn passengers before repositioning trains stopped at stations).  (7/1/24 Order (ECF No. 34) at 16-17 ("Rather, the expert must show that the practices to which the agency has committed reflect 'the national standard of care and not a higher, more demanding one.  Dr. Berkowitz failed to do so.  He instead treated SOP ¶ 50.5.1.1 as the applicable standard without identifying any other transit authority that had the same or similar policy.") (internal quotation and citation omitted)).  In response to WMATA having raised this argument in its summary judgment Motion, Dr. Berkowitz supplied an affidavit in which he explained that "transit authorities in New York, Philadelphia, and Chicago adhere to the same national standard of care with respect to restarting/repositioning an improperly berthed train as reflected in SOP ¶ 50.5.1.1."

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

10

(7/1/24 Order at 17 (internal quotation marks omitted)).  But the Court concluded that "it would be unfair to allow Scott to rely on this supplemental affidavit when WMATA has not had the opportunity to depose Dr. Berkowitz about its contents or retain its own expert." (7/1/24 Order at 18).  Accordingly, the Court invited the parties to proceed as follows:

> Based on the new evidence and arguments advanced during this round of briefing, the parties may wish to seek leave to reopen discovery so that (1) Scott can supplement her expert report on the standard of care, and WMATA, in turn, can depose Dr. Berkowitz and potentially retain its own expert [].

(7/1/24 Order at 20).  After an unsuccessful private mediation and a status hearing, the parties ultimately proceeded down that path.  (*See* 11/26/24 Scheduling and Pretrial Order).

### E.   Dr. Berkowitz explains that WMATA's train operator violated not only WMATA's explicit SOPs, but also the national standard of care.

Dr. Berkowitz prepared a supplemental report dated November 21, 2024.  His report explicitly addressed the concerns raised in the Court's July 1, 2024, order denying the parties' summary judgment motions.  Among its most relevant parts:

> **5. The National Standard of Care Requires Announcements When a Subway Train Stops Short of the Proper Platform Stop Location and Needs to Move Again**
>
> As background, the national standard of care is the standard of care that is followed by the majority of subway systems in the United States. If a train stops short and needs to move again to the proper stop location, the operator should announce the reason for the stop and the subsequent movement. This helps passengers understand the situation and reduces confusion or concern. This protects passengers from the obvious risk of being thrown to the ground and hurt if the train were to move when they would not reasonably expect it to. WMATA's Standard Operating Procedures recognize this obvious truth, requiring that before repositioning a train, the train operator warn all passengers by intercom announcement: "Attention

customers, this train will move forward; please hold on." (WMATA SOP 50.5.1.1).

**Excerpts from Relevant WMATA Standard Operating Procedures**

<u>Compliance</u>: WMATA failed to comply with their SOP #40 and SOP #50; specifically:

- Train Operators are responsible for the safe movement of trains

- If not properly berthed, announce over PA, "Your attention please, this train will move forward." SOP 40.5.1.3.3.

- Train Operators are responsible for making the appropriate P.A. announcements in conjunction with the standard operational procedures that require communications with customers. For example, when entering next station and repositioning train, announce over PA, "Attention customers, the train will move forward, please hold on." SOP 50.5.1.1.

\*\*\*

This obvious risk of unwarned repositioning of a berthed train is recognized nationwide and accordingly reflected in the nationwide practices that constitute the national standard of care. The national standard of care requires that before restarting/repositioning an improperly berthed subway train, a train driver must first warn passengers so that they are not caught off guard by the movement and injured. The standard practices of the New York City Metropolitan Transportation Authority, Chicago Transit Authority, Massachusetts Bay Transit Authority (Boston), and the Southeastern Pennsylvania Transportation Authority (Philadelphia), among others (and in addition to WMATA's own SOPs, of course), adhere to the same standard and rule.

\*\*\*

**7. Conclusion**

It remains my professional opinion that based on the information currently available and with a reasonable degree of engineering certainty, it is my professional engineering opinion that the WMATA and the train operator violated WMATA's own SOP 50.5.1.1, which is consistent with the national standard of care, when entering McPherson Square Station, stopping the train, and then repositioning it without warning the train's passengers. The safety risk that passengers will be

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

> thrown to the ground and injured by unexpected and unwarned movement of a train that has stopped at a station platform is long- and well-known, which is precisely why common carriers such as WMATA are required to warn passengers before doing so. Failure to properly and safely berth the train at the station directly caused Ms. Scott's injury. The train operator suddenly, unexpectedly accelerated the train forward without providing passengers any advance warning. In fact, moments before the sudden jerk of the train, there was a PA announcement indicating the station name and that the doors were opening to the left. This announcement misled passengers to believe that it was safe to get up from their seats and exit the train

(Ex. 11, Berkowitz Supp. Report, at 5, 8, 10).

### F. WMATA has not designated any expert to refute the national standard of care set forth in Dr. Berkowitz's 11/21/24 Report.

It has been fifteen months since Plaintiff filed Dr. Berkowitz's affidavit certifying that "transit authorities in New York, Philadelphia, and Chicago adhere to the same national standard of care as set forth in WMATA SOP ¶ 50.5.1.1. (Berkowitz Aff., ECF No. 29-5). It has been seven months since the Court's July 1, 2024, Order explicitly stated that WMATA would be allowed time to retain an expert to rebut Dr. Berkowitz's opinions. WMATA has known for a long time that this moment was coming. It has not designated any expert.

Which begs the question: If WMATA seriously believes that the national standard of care does **not** require that before restarting/repositioning an improperly berthed subway train, a train driver must first warn passengers so that they are not caught off guard by the movement and injured, **why has it not designated an expert to say so?** WMATA is in the business of operating a subway system. How many phone calls could it possibly take WMATA to find a qualified expert on the subject? If there existed a qualified expert who would support WMATA's argument, how much cheaper would that short report have been for WMATA than the legal fees associated with preparing the instant Motion?

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

13

The answer suggests itself: No qualified expert would sign his or her name to WMATA's litigation position. The rule at issue in this case is not some arcane point that only train aficionados can understand and appreciate. This rule—like the danger against which it is intended to guard—is a common-sense, obvious one. As Dr. Berkowitz put it:

> This obvious risk of unwarned repositioning of a berthed train is recognized nationwide and accordingly reflected in the nationwide practices that constitute the national standard of care. The national standard of care requires that before restarting/repositioning an improperly berthed subway train, a train driver must first warn passengers so that they are not caught off guard by the movement and injured.

(Ex. 11 at 8). When a danger is obvious and the simple rule to guard against it is equally obvious, it should not be surprising that subway operators across the nation follow the same rule.

## II. Argument

### A. At trial, Dr. Berkowitz will offer testimony on precisely one subject: the national standard of care that WMATA's train operator violated, thereby injuring Ms. Scott.

As described above, the very purpose of reopening discovery in this case was to allow Dr. Berkowitz to formally present, via supplemental report, the only expert opinion that mattered in the parties' summary judgment briefing—that the national standard of care requires that before restarting/repositioning an improperly berthed subway train, a train driver must first warn passengers—and allow WMATA a fair opportunity to respond to it. But instead of substantively engaging with that opinion, WMATA has done everything it can to **avoid** engaging with the relevant opinion. WMATA's counsel spent perhaps 10 minutes of his three-hour deposition of Dr. Berkowitz on the subject.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

14

Similarly, WMATA devotes the majority of its Motion to the topics of jerk rates, workplace safety laws, hazard management, and Dr. Berkowitz's understanding of common carrier law.[6] All of those subjects were (superfluously) referenced in Dr. Berkowitz's initial report, true. But none of them have anything to do with whether the national standard of care requires that before restarting/repositioning an improperly berthed subway train, a train driver must first warn passengers (which is precisely why they do not appear in Dr. Berkowitz's Supplemental Report). Had WMATA's counsel engaged in a serious attempt to meet and confer before filing the instant Motion, the briefing could have been drastically streamlined. Relatedly, WMATA also attempts to smear Dr. Berkowitz on the basis that his testimony has previously been limited by a handful of courts on unrelated topics—but again, **not** on the sole topic relevant to the present case. Whether the inclusion of these items in the instant Motion is the result of mere good-faith ignorance or a conscious attempt to make some other point,[7] WMATA's decision to include them is not a productive use of the Court's or parties' time.

### B.  Dr. Berkowitz's Supplemental Report adequately describes the relevant national standard of care that WMATA's train operator violated, thereby injuring Ms. Scott.

In its summary judgment briefing, WMATA complained that Dr. Berkowitz had not identified other subway operators that adhered to the national standard of care. Now, having

---

[6] WMATA's characterization of Dr. Berkowitz's citation in a footnote to the wrong section of the United States Code perhaps deserves special mention—even after bizarrely dwelling on the matter for roughly thirty minutes across two separate depositions, (the second deposition having been taken February 3, 2025, in the eerily similar case *Thurston v. WMATA*, Case No. 1:24-cv-00832 (PTG-WBP) (E.D. Va.)), WMATA's counsel simply refused to believe that Dr. Berkowitz—a non-lawyer—could possibly have accidentally cited the wrong portion of the Code.

[7] As perhaps suggested by, for example, heading III.b: "Dr. Berkowitz's testimony regarding jerk rates demonstrates the unfounded nature of his expert opinions." At risk of stating the obvious, even if this is the intent, the logical underpinnings of such an argument leave something to be desired. "Mr. A is wrong about X; therefore, Mr. A must also be wrong about Y" is not logically sound.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

15

been provided with a list of five of the nation's largest subway operators, each of which does, in fact, adhere to the national standard of care, WMATA tries to move the goalposts, complaining that "Dr. Berkowitz failed to cite to a single specific policy document from any of those transit systems in support of this assertion." (Def.'s Mot. at 7). (In so arguing, WMATA perhaps forgets that its own written policy, which is competent evidence of the standard of care, is already record evidence.) But, more importantly, that is not what the law requires. WMATA cites no authority for its proposition that an expert must supply copies of written policies codifying other entities' adherence to the national standard of care. And for good reason—were that the rule, it would set an impossibly high bar for an expert to describe the national standard of care in almost any type of case.

As Dr. Berkowitz explained to WMATA's counsel at his deposition, there are only approximately[8] 16 "metro"-style transit authorities in the United States, only roughly 11 of which operate underground subway systems akin to WMATA's. (Ex. 12, Berkowitz Dep., at 135:12-15). In preparing his Supplemental Report, Dr. Berkowitz started with the largest and worked his way down. (Ex. 12 at 137:10-138:22). Through the art of selective quotation, WMATA attempts to paint Dr. Berkowitz's knowledge of those five subway operators' adherence to the national standard of care as flimsy and uninformed. (*See generally* Def.'s Mot. at 6-8). But that is an illusion. As Dr. Berkowitz explained at great length in his deposition, (Ex. 12 at 132:15-150:17), through a full career's worth of experience, work for various of the subway operators at issue, work against some of them as a retained expert,

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

---

[8]    Depending on the details of how one counts light versus heavy rail, what percentage of track must be underground to count as a subway, etc. This was not addressed in full because WMATA's counsel twice interrupted Dr. Berkowitz's testimony as he was beginning to explain this. (Ex. 12 at 135:12-19).

16

designing and teaching training courses for the MTA's managerial employees, belonging to various professional organizations, serving on myriad committees of the same (among other things), Dr. Berkowitz is able to state with authority that the subway operators of New York City, Chicago, Boston, and Philadelphia, among others (and in addition to WMATA's own SOPs, of course), adhere to the national standard of care. (Ex. 11 at 8). And, as repeatedly noted, this particular nationally recognized rule is not a complicated one; it is a "common sense" rule, (Ex. 12 at 143:6-8), to guard against an "obvious" risk, (Ex. 11 at 8, 10).

Imagine a lawyer who has been in practice for forty years in the field of civil litigation. She is barred in several states, has practiced *pro hac vice* in several others during her career, and has professional acquaintances in many more. She is a member of various national organizations related to her field of practice; she has served on committees and taught CLEs. She has taught law school classes on the subject of civil discovery and mentored young lawyers. Does she have sufficient knowledge, skill, and experience to testify that she is certain that the prevailing national practice is to stenographically record depositions taken during the civil discovery process? Or would she need to obtain written documentation of from law firms across the country that that is indeed their practice? Obviously, that is an imperfect metaphor and reasonable minds could quibble over its particulars. But it may help illustrate the absurdity of the situation here. To an expert in Dr. Berkowitz's field, the national standard of care that governs here is blindingly obvious. (And again, perhaps nothing underscores this better than the conspicuous absence of a liability expert for WMATA.)

The law does not requite that Dr. Berkowitz obtain copies of other subway operators' written internal policies and procedures. The Rules simply require that the Court be satisfied that Dr. Berkowitz, by dint of his knowledge, skill, experience, training, or education,

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

17

possesses sufficient specialized knowledge to assist the trier of fact. FED. R. EVID. 702. Beyond that point, WMATA's recourse lies in cross-examination, not exclusion. For the reasons set forth above, Dr. Berkowitz does possess such specialized knowledge, and the Court should deny WMATA's request that the Court bar him from testifying as to the national standard of care applicable to WMATA's train operator.

### C. WMATA's complaint regarding its non-possession of Dr. Berkowitz's case list is a red herring.

Dr. Berkowitz was designated as an expert nearly two full years ago, on March 17, 2023. (Pl.'s Prelim. Expert Desig. (ECF No. 18) at 6-7). Plaintiff's Preliminary Expert Designation stated as follows:

> Dr. Berkowitz's education, training, qualifications, and experience are set forth more fully in his curriculum vitae (including case list and fee schedule), attached as Exhibit 1. Dr. Berkowitz has prepared a preliminary report, Exhibit 2, which is incorporated herein by reference.

(Pl.'s Prelim. Expert Desig. at 7). Obviously, the fact that a case list was not provided at that time was an oversight. While undersigned counsel apologize for the oversight, they would also respectfully suggest that under the circumstances, the appropriate course of action would be to pick up the phone, call opposing counsel, and request the case list. Less appropriate, on the other hand (or at least not the prevailing practice among members of the bar, nor the professionally courteous one) would be to lie in wait for two years, raise it for the first time on the record at a deposition, and cry prejudice in a motion filed immediately thereafter.

WMATA has chosen the path less traveled. Over the course of the twenty-two months between Dr. Berkowitz's designation and his January 28, 2025, deposition, WMATA did not ever, even once, advise the undersigned that a case list was missing. Instead, it chose to raise

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

18

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

...

it for the very first time at Dr. Berkowitz's deposition. Undersigned counsel immediately asked Dr. Berkowitz to provide an up-to-date case list; it was received and forwarded to WMATA's counsel earlier today.

It is difficult to imagine that WMATA has suffered any prejudice from not having previously received Dr. Berkowitz's case list. If that proves not to be the case, Plaintiff is of course willing to discuss with defense counsel how best to address the matter. But it has to be said that WMATA's handling of the matter thus far is less suggestive of a party interested in collegially obtaining a discovery document and more suggestive of a party trying to leverage a minor, honest mistake to its litigation advantage. The undersigned respectfully suggest that WMATA's choice is not the best use of either the parties' or the Court's resources.

## III.  Conclusion

For the reasons set forth above, Ms. Scott respectfully requests that the Court DENY Defendant's Motion *in Limine* re: Dr. Berkowitz.

Respectfully submitted,

REGAN ZAMBRI LONG PLLC

By:   /s/ *Christopher J. Regan*
      Patrick M. Regan     #336107
      pregan@reganfirm.com
      Christopher J. Regan   #1018148
      cregan@reganfirm.com
      1919 M Street, N.W., Suite 350
      Washington, D.C. 20036
      PH: (202) 463-3030
      Fx: (202) 463-0667
      *Counsel for Plaintiff*

Regan Zambri Long, 1919 M Street, NW, Suite 600, Washington, DC 20036 — 202-463-3030