# Exhibit 1



# Planet Depos
## We Make It Happen

# Transcript of Keisha Simone Henry, Designated Representative

**Date:** February 9, 2023
**Case:** Scott -v- Washington Metropolitan Area Transit Authority

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

Transcript of Keisha Simone Henry, Designated Representative
February 9, 2023

1 (1 to 4)

```
                                1
 1      UNITED STATES DISTRICT CIRCUIT COURT
 2           FOR THE DISTRICT OF COLUMBIA
 3  ------------------------X
 4  CAROL WILD SCOTT,
 5        Plaintiff,
 6        vs.            Civil Action No.
 7  WASHINGTON METROPOLITAN    22-cv-00601 (CRC)
 8  AREA TRANSIT AUTHORITY,
 9        Defendant.
10  ------------------------X
11
12
13    30(b)(6) DEPOSITION OF KEISHA SIMONE HENRY
14             Conducted Remotely
15           Thursday, February 9, 2023
16               1:10 p.m. Eastern
17
18
19
20  Job No.:  480571
21  Pages 1 - 80
22  Reported by:  Cynthia Powers
```

```
                                2
 1         A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4        Christopher J. Regan, Esquire
 5        Regan, Zambri & Long, PLLC
 6        1919 M Street, N.W., Suite 350
 7        Washington, D.C. 20036
 8        (202) 463-3030
 9        cregan@reganfirm.com
10
11  ON BEHALF OF THE DEFENDANT:
12        Brendan H. Chandonnet, Esquire
13        Nicholas L. Phucas, Esquire
14        Washington Metropolitan Area Transit
15        Authority
16        Office of General Counsel
17        300 7th Street, S.W.
18        Washington, D.C. 20004
19        (202) 962-1234
20        bchandonnet@wmata.com
21
22
```

```
                                3
 1              I N D E X
 2                                   Page
 3  Examination by Mr. Regan           5
 4
 5
 6           E X H I B I T S
 7              (Attached)
 8  Number                             Page
 9  Exhibit 1   Amended Notice of 30(b)(6)   5
10              Deposition
11  Exhibit 2   Incident/Accident Report,    5
12              9/23/19
13  Exhibit 3   Incident Report, 9/23/19     5
14  Exhibit 4   E-Mail, Graves to WMATA      5
15              WMSC Notification, 9/23/19
16  Exhibit 5   Press Release, 3/4/19        5/31
17  Exhibit 6   Press Release, 6/19/19       5/38
18  Exhibit 7   E-Mail, 3/2/19, Bates        5
19              No. WMATA000060
20  Exhibit 8   Rail Signal Safety Updates   5/53
21  Exhibit 9   Station Overrun Report,      5/57
22              4/20/19
```

```
                                4
 1           E X H I B I T S
 2              (Continued)
 3  Number                             Page
 4  Exhibit 10  Station Overrun Report,      5
 5              4/28/19
 6  Exhibit 11  RTRA Training Request Form   5
 7  Exhibit 12  Investigation Report         5
 8  Exhibit 13  E-Mail, Bumbry to Alston     5
 9              and others, 2/26/19
10  Exhibit 14  Trains Certification Result  5
11  Exhibit 15  Standard Operating Proceduce 5/13
12              Nos. 40.5 and 50.5
13  Exhibit 16  Washington Post Article,     5/62
14              6/26/18
15
16
17
18
19
20
21
22
```

**Page 5**

P R O C E E D I N G S

(Whereupon, WMATA Deposition Exhibits 1 through 16 were premarked electronically for identification.)

THE COURT REPORTER: Will counsel please stipulate that in lieu of formally swearing in the witness in person, the reporter will instead ask the witness to acknowledge that their testimony will be true under the penalties of perjury and that counsel will not object to the admissibility of the transcript based on proceeding in this way.

MR. REGAN: On behalf of the plaintiff, yes.

MR. CHANDONNET: I'm fine with that.

MR. PHUCAS: That's fine.

KEISHA SIMONE HENRY

having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

**Page 6**

BY MR. REGAN:
Q. Good afternoon, Ms. Henry.
A. Good afternoon.
Q. We met a little bit off the record. Again, my name is Chris Regan and I represent the plaintiff, Carol Scott, in this case.
    Would you please state your full name for the record?
A. Keisha Simone Henry.
Q. And what's your current business address, Ms. Henry?
A. It is 3500 Pennsy Drive, Landover, Maryland.
Q. Ms. Henry, I take it you currently work for WMATA.
A. Yes.
Q. What's your job title?
A. Supervisor, road transportation training.
Q. How long have you worked in that position?
A. Three years.

**Page 7**

Q. Okay. And before that time, what were you doing?
A. I was assistant superintendent for Brentwood rail division.
Q. Also with WMATA?
A. Yes.
Q. Before that -- how long were you in that position?
A. Two years.
Q. And before that -- well, broadly speaking, what were your job responsibilities in that position?
A. I assisted the superintendent with the day-to-day operations of the rail divisions.
Q. How many rail divisions are there at WMATA?
A. Ten.
Q. Got it. So before you were the assistant supervisor for the Brentwood rail division, what were you doing for work?
A. I was still with WMATA as a rail operations supervisor.

**Page 8**

Q. Okay.
A. Mm-hmm.
Q. And how long were you doing that?
A. About three years.
Q. Let me ask you this: When did you first start working for WMATA?
A. August 22, 2005.
Q. What was your first job with WMATA?
A. Bus operator.
Q. All right. Can you just big-picture walk us through your progression from bus operator up to, well, where we just left off, rail ops supervisor?
A. Okay, 2005 until 2007, I was a bus operator. 2007 until 2013, I was a train operator. 2013 until 2016, I was a rail operations supervisor. 2016 to 2019, I was assistant superintendent of Brentwood division, and from 2019 up until now, I am supervisor, rail transportation training.
Q. Got it. What are your job responsibilities in your current role?

45

1  what the other five pages are?
2      A.  Not offhand, no.
3      Q.  This version says it was approved
4  9/24/18. Do you know what the version either
5  immediately before then or the one in effect now
6  looked like?
7      A.  No.
8      Q.  Okay. Let's take a look at this table
9  then on page 2 of Exhibit 15.
10     A.  Mm-hmm.
11     Q.  So when train is berthing on platform,
12 of course, this references 50.5.1.5, which has not
13 been provided to us here; right? Do you see that?
14     A.  Yeah.
15     Q.  Do you know what SOP 50.5.1.5 is?
16     A.  I can't say what it -- it's not in front
17 of me, so no, I don't know what it says.
18         MR. REGAN: Brendan, I'm going to
19 request we get all the pages and all the versions
20 for these two SOPs.
21         MR. CHANDONNET: I will review that and
22 get back to you.

46

1  BY MR. REGAN:
2      Q.  Let's look at, "Entering next station."
3  It says, "When train is berthing on platform, the
4  standard baseline announcement"; what's a standard
5  baseline announcement?
6      A.  The announcement that the operator makes
7  to the customers on the train.
8      Q.  And so the operators are supposed to
9  say, "This is [station name]," whatever station it
10 is. "Doors will open on [whichever side they open
11 on]"?
12     A.  Yes.
13     Q.  All right. And that's -- so when it
14 says, "When training is berthing on platform,"
15 does it -- where precisely is the train position
16 when that announcement is made or does it matter?
17     A.  Well, it says as the -- while entering
18 the station, while the train is going down to
19 berth to the eight-car marker.
20     Q.  It's sort of when the front of the train
21 has just begun entering the station and before it
22 comes to a stop, that's the standard announcement;

47

1  am I understanding that right?
2      A.  Yes.
3      Q.  Next one down, "Repositioning train."
4  It says, "Attention, customers. This train will
5  move forward. Please hold on." See that?
6      A.  Yes.
7      Q.  Again, I don't want to ask obvious
8  questions too much, but what's going on there?
9      A.  If the train stops short on the platform
10 and the operator has to reposition the train, to
11 announce to customers -- they make that
12 announcement to customers that the train will be
13 moving forward.
14     Q.  Got it.
15     A.  So they can hold on if they need to.
16     Q.  Okay.
17         MR. CHANDONNET: Chris, how much longer
18 do you have left because I need to let the next
19 deponent know that we're still alive.
20         MR. REGAN: Probably ten minutes.
21         MR. CHANDONNET: Can we take a quick
22 restroom break then?

48

1          MR. REGAN: Yep.
2          (Whereupon, a recess was taken.)
3  BY MR. REGAN:
4      Q.  Ms. Henry, on the last sort of topics I
5  wanted to ask you a little bit about is going back
6  to sort of train positioning on the platform and
7  what Metro's policies or standard operating
8  procedures were for that as of September 2019.
9          We talked a little bit about eight-car
10 trains versus six-car trains, et cetera, but
11 what's a station overrun?
12     A.  A station overrun is when a train
13 overshoots the platform.
14     Q.  In other words, it goes past to where
15 it's supposed to come to a stop; right?
16     A.  Past the end of platform, yes.
17     Q.  Got it. Fair to say, those are a pretty
18 big deal? Tell you what, that's not a helpful
19 question.
20         MR. CHANDONNET: I agree.
21         MR. REGAN: I'll withdraw that question.
22     Q.  WMATA has a special form that it uses to

**Page 49**

1  track station overruns; right?
2      MR. CHANDONNET: Objection to any
3  questions about station overruns. You can answer.
4  To the extent there is a question pending.
5  BY MR. REGAN:
6   Q. Ms. Henry, WMATA has a special form that
7  it uses just to track station overruns; correct?
8   A. There is a form that the operator fills
9  out when they have an overrun.
10  Q. Go ahead.
11  A. There's a process that happens after the
12 overrun.
13  Q. Yeah, and WMATA keeps track of those
14 forms, they keep a tally every year?
15  A. I wouldn't have knowledge to that. The
16 numbers and how they keep it, no.
17  Q. Okay.
18  A. Mm-hmm.
19  Q. Do you know how many times a year
20 station overruns happen?
21  A. No, I do not.
22  Q. Not even ballpark; could be tens, could

**Page 50**

1  be hundreds, could be thousands?
2   A. I don't know.
3   Q. When was the five-second rule first
4  adopted?
5   A. I can't give you an exact timeframe or a
6  date. I just know that it was, it was implemented
7  as the stopping procedure when you're in manual
8  mode, taking that time to look out the window five
9  seconds to verify that you are properly berthed on
10 the platform.
11  Q. Got it. I think we agreed that WMATA
12 kind of switched the system over to manual mode in
13 late 2009; is that right?
14  A. Immediately after the accident, WMATA
15 went to manual mode.
16  Q. Right. So from your answer, would it be
17 fair to understand that, it's your belief anyway,
18 that WMATA adopted the five-second rule shortly
19 after it switched everybody to manual mode?
20  A. No, it wasn't right after.
21  Q. Okay. Was it within a year?
22  A. No, no, because when they implemented

**Page 51**

1  that, I was a supervisor so no. Rail operations
2  supervisor.
3   Q. That was from 2013 to 2016?
4   A. Yes.
5   Q. So the five-second rule was adopted
6  sometime between 2013 and 2016.
7   A. I remember telling operators when I
8  dispatched trains about the five-second rule.
9   Q. That was in that position as a rail
10 operations supervisor?
11  A. Yes, the exact date, I cannot tell you
12 that, but I remember telling operators about the
13 five seconds.
14  Q. So at least by 2016 -- you'd be
15 comfortable saying that by at least 2016, WMATA
16 had adopted the five-second rule?
17  A. Yeah.
18  Q. All right. So by September 2019, three
19 years later, fair to assume that all train
20 operators should have been familiar with it?
21  A. By 2019, yes.
22  Q. All right. And actually, all passengers

**Page 52**

1  were pretty familiar with it, yeah?
2      MR. CHANDONNET: Objection.
3  BY MR. REGAN:
4   Q. You can go ahead. Let me ask you this:
5  Am I understanding you correctly for at least
6  three years, it could be a lot more than that, but
7  you're comfortable saying at least three years,
8  2016 to 2019, that every single train all day long
9  on WMATA's system is operating under the
10 five-second rule, with the small exception of
11 however many trains they tested on the red line
12 with auto doors, but every other train for at
13 least three years is following the five-second
14 rule; right?
15     MR. CHANDONNET: Objection. You can
16 answer.
17  A. Yes, the -- yes, they were told.
18 BY MR. REGAN:
19  Q. "They" being train operators?
20  A. Yes, train operators were instructed to
21 do that whenever they left the end-of-the-line
22 terminal, supervisor, as they dispatched the

**Page 61**

1  sample. They're taken out of service.
2  Q. Urine sample, I assume, to make sure
3  drugs or alcohol didn't contribute to the event?
4  A. Right.
5  Q. Is there anything else that's
6  automatically triggered pursuant to WMATA
7  protocols and procedures by a station overrun
8  report?
9  A. I'm not quite sure what you mean by
10 "automatically triggered."
11 Q. Yeah, you know, I think in some jobs if
12 you come in late to work one day, you
13 automatically have to go talk to HR; right? If
14 you come in late to work two days, then, you know,
15 you might get something in your file. You come
16 into work three days, and you might get suspended.
17    I don't know, but is there anything
18 built into the system like that for WMATA with
19 respect to station overruns or is it
20 discretionary, left to the supervisors?
21 A. It's discretionary after investigation
22 because not all station overruns are operator

**Page 62**

1  fault.
2  Q. Got it. Do you know who Dan Stessel is?
3  A. No.
4  Q. On the screen is Exhibit -- no longer
5  15, that's Exhibit 16.
6     (Introduced Exhibit 16)
7  BY MR. REGAN:
8  Q. It's a Washington Post article, or
9  Washington Post Express maybe, called, "DC Rider's
10 Answer Line: What's with the Metro lurch." Do
11 you see that?
12 A. I see it.
13    MR. CHANDONNET: Object to the form.
14 BY MR. REGAN:
15 Q. The question pitched at the top is:
16 "Today we're curious about why trains come to a
17 stop at a station and then lurch forward a few
18 inches or feet. What difference does it make?"
19 This has the date June 26, 2018; right? See that?
20 A. Yes.
21 Q. All right. And then I think you can see
22 the full article on this screen, so if you want,

**Page 63**

1  why don't you just take a second and read that and
2  let us know when you're done. All right?
3  A. Okay.
4     Okay, I'm done.
5  Q. All right. Let me ask you first: Is
6  there anything in that that jumps out as just
7  wrong to you, any sentence?
8  A. This is a news article. It was written
9  by someone that does not work for WMATA.
10 Q. I understand that; right?
11 A. Uh-huh.
12 Q. I can take a photograph of my house and
13 you can take a photograph of my house, I live
14 there, but you could still say it's probably a
15 good photo of my house; right?
16 A. Mm-hmm.
17 Q. What I'm curious about is: Is there
18 anything in this that's inaccurate?
19 A. The sentence about, "An operator
20 couldn't back up without walking through all the
21 cars and running the train the other way from the
22 cab at the other end."

**Page 64**

1  Q. Okay.
2  A. "Even if they were to try, the system
3  would shut down to prevent the train from going
4  the wrong way." What does that mean?
5  Q. Oh, well, I was hoping you were going
6  tell me what's wrong with that. You're saying
7  you're not sure what it means?
8  A. Doesn't looks like it's written based on
9  facts.
10 Q. Okay. What's inaccurate about that
11 summary?
12 A. I'm trying to figure out what does it
13 mean that "the system would shut down to prevent
14 the train from going the wrong way." I don't know
15 what that means.
16 Q. When station overrun happens, WMATA
17 standard operating procedures, protocols, whatever
18 we want to call them, anything else, is the
19 operator ever allowed to back that train up to the
20 platform?
21 A. An operator will never back a train up.
22 Q. Because WMATA standard operating

**Page 65**

```
 1  procedures absolutely do not allow that any time
 2  since the Fort Totten incident; correct?
 3      A.  It has always been WMATA's procedure
 4  that a train is not to back up on the platform.
 5  Trains are not allowed to go in reverse.
 6      Q.  So if a train operator overshoots,
 7  overruns the station platform --
 8      A.  Uh-huh.
 9      Q.  -- they cannot back the train up; right?
10  Not allowed?
11      A.  Exactly.
12      Q.  Okay.  How about here, the next
13  paragraph where I've highlighted two sentences for
14  you.  Is it accurate to say, I mean, would that
15  have been WMATA's guidance to its train operators
16  as of 2019, that it's better for a train to stop a
17  little bit short than too far at a station?
18      A.  If you stop too short, your back end
19  will be off the platform.  It's still the issue.
20      Q.  Right.
21      A.  Have to be perfectly on the platform
22  before you open the doors.
```

**Page 66**

```
 1      Q.  If you stop short, are you allowed to
 2  move the train forward again?
 3      A.  You're allowed to reposition the train
 4  until you're properly berthed.
 5      Q.  That's with that warning, you must give
 6  the verbal warning that's set forth in SOP
 7  50-point-something that we looked at earlier;
 8  right?
 9          MR. CHANDONNET:  Objection.
10  BY MR. REGAN:
11      Q.  Alerting the passengers that you're
12  going to move the train so they don't get hurt;
13  right?
14          MR. CHANDONNET:  Objection.
15      A.  Yeah, according to 50.5, yes.
16  BY MR. REGAN:
17      Q.  And that is the purpose, by the way;
18  right?  I think you said the purpose was so they
19  can hold on.  The worry is they're going to get
20  hurt if they're not warned about what's happening;
21  right?
22          MR. CHANDONNET:  Objection.
```

**Page 67**

```
 1      A.  They could, if they're not paying
 2  attention, they could get hurt.  Most times,
 3  people feel the train stop so they automatically
 4  get up thinking the doors are going to open.
 5  BY MR. REGAN:
 6      Q.  Coming back to this -- I guess we just
 7  said if the train overshoots a platform, it's
 8  trouble; right?  There's paperwork, the operator's
 9  taken off the system for the day, the train is
10  inspected for any mechanical malfunctions; right?
11  It's a big mess and the whole line is clogged up,
12  by the way, right, because it takes a couple
13  minutes to get everybody off the train or take
14  them to the next station; is that a fair summary?
15          MR. CHANDONNET:  Objection.  You can
16  answer.
17      A.  When there's a station overrun and the
18  train cannot be serviced, once the operator
19  contacts ROCC and lets them know they had a
20  station overrun, ROCC would probably instruct them
21  to continue on to the next station so he can drop
22  off the customers, so that the train can be
```

**Page 68**

```
 1  removed from service, as well as the operator, and
 2  taken to the nearest yard for an investigation.
 3  BY MR. REGAN:
 4      Q.  Got it.  And then conversely, when
 5  there's a short stop, so the train stops before
 6  the point at which it's supposed to stop on the
 7  platform, it's really no big deal; right?
 8          The operator has to warn the passengers
 9  that she's about to move again, but then she can
10  go ahead and move the train to where it's supposed
11  to be.  There's no paperwork, she's not suspended
12  for the day, the train doesn't go get inspected at
13  the yard; right?
14          MR. CHANDONNET:  Objection.
15      A.  Yeah, that's correct.
16  BY MR. REGAN:
17      Q.  So is it accurate, looking back at
18  Exhibit 16, that WMATA's procedures at the time --
19  WMATA would have advised its train operators, such
20  as the woman operating the train on which
21  Ms. Scott was injured, that it's a lot better to
22  stop a little short than to go too far on the
```

Page 77

1  A. How close to the eight-car marker?
2  Q. Yes, ma'am.
3  A. They have to be right in line, right --
4  the eight-car marker is underneath, well, right
5  there. They have to stop right there at the --
6  they have to be right there.
7  Q. Like within a -- are we talking within a
8  foot, or within 10 feet or --
9  A. No. You have -- if you're looking at
10 the eight-car marker, you're not fully on the
11 platform. You have to be aligned with that
12 eight-car marker.
13 Q. So like dead on it, essentially?
14 A. Right.
15 Q. Okay. And so coming back -- I mean,
16 Exhibit 16 may or may not help with it, but at
17 least according to Mr. Stessel -- well, according
18 to the author of this Washington Post article,
19 according to Mr. Stessel, all trains at that
20 point -- strike that.
21     All the trains operating at that point
22 are supposed to stop at the eight-car marker;

Page 78

1  right?
2  A. According to the person who wrote the
3  article that's quoting a WMATA employee?
4  Q. Yeah, well, okay. So forget the
5  article.
6      We agree that as of that point in time,
7  as of September 2019, every train on the WMATA
8  system was supposed to be stopping on the
9  eight-car marker; right?
10 A. Yes.
11 Q. And so if they blew past the eight-car
12 marker by half a car --
13 A. Mm-hmm.
14 Q. -- it's a station overrun, there's
15 paperwork, they're done for the day, the train is
16 inspected, it's going in their record; right?
17 A. Mm-hmm.
18 Q. If they're a half a car short of the
19 eight-car marker, nothing happens except they have
20 to move the train forward again; right?
21 A. Yes, to the eight-car marker.
22     MR. REGAN: Ms. Henry, thank you for

Page 79

1  your time. Sorry it took a little longer than
2  expected, but those are all the questions I have
3  for you.
4      (Whereupon, the deposition concluded at
5      2:47 p.m.)

Page 80

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, Cynthia Powers, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 20th day of February, 2023.

My Commission Expires: February 29, 2024

_____
Cynthia Powers