# Exhibit 12



# Transcript of Carl Berkowitz, Ph.D.

**Date:** January 28, 2025
**Case:** Scott -v- Washington Metropolitan Area Transit Authority

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
www.planetdepos.com
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
 1    IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF COLUMBIA
 3  CAROL WILD SCOTT,          :
 4         Plaintiff,          : Civil Action No.:
 5  v.                         : 2022-cv-00601 (CRC)
 6  WASHINGTON METROPOLITAN    :
 7  AREA TRANSIT AUTHORITY,    :
 8         Defendant.          :
 9  -------------------------X
10
11              Deposition of
12         CARL BERKOWITZ, Ph.D.
13          Conducted Virtually
14       Tuesday, January 28, 2025
15            10:00 a.m. EST
16
17
18
19
20  Job No.: 566725
21  Pages:  1 - 153
22  Reported by:  Linda M. Bahur, RPR
```

**Page 2**

```
 1       Deposition of CARL BERKOWITZ, Ph.D.,
 2  conducted virtually.
 3
 4
 5
 6
 7
 8
 9
10
11       Pursuant to Notice, before Linda M. Bahur,
12  Registered Professional Reporter and Notary Public of
13  the State of Maryland.
```

**Page 3**

```
 1              A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF:
 3       Patrick M. Regan, Esquire
 4       Regan, Zambri & Long, PLLC
 5       1919 M Street, NW, Suite 350
 6       Washington, D.C. 20036
 7       (202) 463-3030
 8  ON BEHALF OF THE DEFENDANT:
 9       Jason R. Waters, Esquire
10       Lauren Gilman, Esquire
11       Wilson Elser Moskowitz Edelman & Dicker, LLP
12       8444 Westpark Drive - Suite 510
13       McLean, VA 22102-5102
14       (703) 245-9300
15       (703) 245-9301 (Fax)
            -and-
16       Laurie Hand, Esquire
17       Washington Metropolitan Area Transit Authority
18       Legal Department 7E
19       P.O. Box 23768
20       Washington, D.C. 20006
21       (202) 962-5063
22       (202) 962-2550 (Fax)
```

**Page 4**

```
 1              I N D E X
 2            E X A M I N A T I O N
 3  Witness Name                        Page
 4  Carl Berkowitz, Ph.D.
 5    By Mr. Waters ........................... 5
 6
 7            E X H I B I T S
 8        (Attached to the transcript)
 9  Exhibit   Description                 Page
10  Exhibit 1  Notice of Deposition .............. 15
11  Exhibit 2  Curriculum vitae .................. 19
12  Exhibit 3  Draft Safety Report, 3/16/23 ...... 55
13  Exhibit 4  Affidavit, 11/6/23 ................ 56
14  Exhibit 5  Supplemental report, 11/2/24 ...... 56
```

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

2 (5 to 8)

---

Page 5

```
1            P R O C E E D I N G S
2   Whereupon,
3            CARL BERKOWITZ, Ph.D.
4   having been first duly sworn, was examined and
5   testified as follows:
6                 EXAMINATION
7   BY MR. WATERS:
8       Q   Thank you.  Good morning, Dr. Berkowitz.
9       A   Good morning.
10      Q   My name is Jason Waters.  We haven't had
11  the pleasure of meeting before, but I represent the
12  defendant, Washington Metropolitan Area Transit
13  Authority in the Scott case.
14          I understand you've been designated as an
15  expert witness in this matter?
16      A   Yes.
17      Q   I'm sure you've done this many times.  As
18  you know, if at any time you need a break, please let
19  me know and I'd be glad to accommodate you.
20      A   Thank you.
21      Q   If that's okay.  All right?
22      A   Yes.  Thank you.
```

Page 6

```
1       Q   Would you state please state your full
2   name?
3       A   Carl Berkowitz.
4       Q   And Dr. Berkowitz, how are you employed?
5       A   Pardon me?
6       Q   How are you employed?
7       A   I'm self-employed.
8       Q   And do you have a company?
9       A   Yes, Carl Berkowitz.
10      Q   Okay.  How are you employed?  What is your
11  job?
12      A   What is my job?  Primarily being a
13  grandfather.  Secondarily, many other activities.  I
14  spend a good deal of time working out and swimming in
15  the gym, things of that nature.  And then I also do
16  consulting work and expert witness work.
17      Q   I am here to ask you about your consulting
18  and expert witness work.  Can you please explain what
19  type of consulting work you do.
20      A   Well, from time to time, I asked to look at
21  a situation and to write a report about that
22  situation.  I do both plaintiff and defendant work for
```

Page 7

```
1   the insurance industry.  They ask me to analyze
2   situations and file a report, including reviewing
3   reports that are done for them by others, and I also
4   --
5       Q   What types of situations -- I'm sorry.  I
6   didn't mean to cut you off.  Go ahead.
7       A   And I also review situations and make
8   recommendations and try to understand the situations.
9   The work I do as an expert is based upon scientific
10  methods and scientific and engineering methods that I
11  was taught in high school, college, and as contractors
12  in the industry.  I try to do everything that I do
13  based upon the scientific method approach that was
14  additionally he developed by -- it seems weird to talk
15  about it.  It was originally developed by Leonardo da
16  Vinci and more improved upon by Galileo and Isaac
17  Newton.  And even though they were way back a couple
18  hundred years, that's what we basically do today.
19      Q   Okay.  What types of situations are you
20  asked to look at?
21      A   All kinds of situations.  Rail situations,
22  bus situations.  My focus is primarily on people.
```

Page 8

```
1   Pedestrians, passengers in public transportation,
2   pedestrians in the public transportation environment
3   and workplace safety and people that work in the
4   workplace in transportation.  So my focus is always
5   people.
6       Q   What is your expertise, sir?
7       A   What do you mean expertise?
8       Q   Do you have an area of expertise in which
9   you hold yourself out as an expert for consulting
10  matters?
11      A   Transportation, engineering and safety I
12  would say and as an educator in the field of
13  transportation.
14      Q   I'm sorry?
15      A   And as an educator.
16      Q   Okay.  Do you divide your time between
17  expert work and consulting work or do you see that it
18  as the same thing?
19      A   It's intermingled.  I can't basically
20  separate it.  I'm asked to do the work because of my
21  education, background and experience.  So, I mean --
22      Q   How much of the work is involving
```

---

129

1   You know, the military standards are the
2   easiest standards to follow. They assume that
3   everybody who reads the military standards has a first
4   grade education. So it's pretty easy. Some of the
5   others are much more complicated. They involve
6   complicated software, data collection. This makes a
7   lot of the data collection and the analysis of the
8   data -- I guess it's all going to change with AI. I
9   guess artificial intelligence will just supersede all
10  of this. Right now, this is what we're doing.
11      Q   Okay. But you agree with me that this
12  hazard management process, the system safety program
13  plan is a matter for policymakers at the transit
14  authorities. It's not about something that the
15  individual operators would be doing; correct?
16      A   No. And then the goal is to follow the
17  prior cue safely. You know, basically, this has been
18  adopted, I think, back in the 1920s. I think it goes
19  back that far.
20      Q   This is, again, a management issue?
21      A   Yes, it's management.
22      Q   On page 21, you talk about training. You

130

1   begin with your statement "There is no evidence that
2   WMATA properly trained their operational staff." What
3   is your basis for that statement?
4       A   Well, then this incident wouldn't have
5   occurred if they properly trained their staff.
6       Q   So the fact that that incident occurred is
7   the basis for your opinion that WMATA is not training
8   sufficiently?
9       A   Well, it looks that way from when they
10  don't take this -- they didn't seem to take this as
11  seriously as it should be taken. And you indicated to
12  me, which I wasn't aware of, that this train made
13  several other station stops within that stop with the
14  correct location, that they made a stop at a location
15  that wasn't the official stopping location on various
16  other locations.
17          So this is, you know, kind of an indication
18  that this needs more work and there needs to be more
19  training in this area to make sure that trains, you
20  know, makes the proper announcement, stop at the
21  proper place, avoid the jerk rate, they don't exceed
22  the jerk rate, and that they operate the system as

131

1   safely as possible.
2           In terms of transportation, engineers are
3   taught safety, safety, safety. So everything that is
4   done, we'd be having zero tolerance for never
5   following standards in the transit industry.
6           (Reporter clarification.)
7       A   We have a zero tolerance for not following
8   standards and rules and regulations in the transit
9   industry.
10      Q   All right, Doctor. I'm going to bring up
11  Exhibit 4, which is the affidavit we talked about. Do
12  you recall giving this affidavit?
13      A   I don't remember exactly. It seems
14  familiar.
15      Q   Okay. So paragraphs 4, 5 and 6 --
16      A   Can you blow it up, please? I didn't make
17  a copy.
18      Q   Of course. Of course. Is that good?
19      A   Yeah. I can see it now. Thank you.
20      Q   Okay. So actually starting back at 3. I
21  should give you a chance to read the entire affidavit.
22  So why don't you take a chance to look at this since

132

1   you don't have it.
2       A   Thank you.
3       Q   Let me know when you want me to move on.
4       A   Okay. Go up a little bit more.
5       Q   All right.
6           MR. REGAN: I'm going to keep my camera on.
7   I just want to get a drink of water; okay?
8           MR. WATERS: Okay.
9           MR. REGAN: It will literally take me one
10  minute while he reads that.
11          MR. WATERS: Okay.
12      A   Okay. Okay.
13      Q   I want to wait for Pat to get back before I
14  ask my next question.
15          Turning to section 4, paragraph 4, you
16  state "The New York Transit Authority also adheres to
17  the national standard of care with respect to
18  restarting repositioning an improperly-berthed train."
19  And that's referring back to what you defined as the
20  statute standard of care in paragraph 1; correct?
21      A   Rate.
22      Q   Okay. What is your basis for stating that

Transcript of Carl Berkowitz, Ph.D.
Conducted on January 28, 2025

34 (133 to 136)

---

133

1  the New York Transit Authority adheres to that
2  standard of care identified in paragraph 1?
3      A    From my work experience with the New York
4  City Transit Authority.
5      Q    Do you have a particular document that you
6  can refer to with regard to policy at the New York
7  Transit Authority that you're citing to?
8      A    I think I do but I didn't use it. I think
9  I do.
10     Q    I think you answered my question, but did
11 you refer to that document or rely on that document in
12 preparing this affidavit?
13     A    No, because I knew the information because
14 I, you know, I've been involved with it. So I knew
15 about it.
16     Q    Okay. Same question for number 5. What is
17 the basis of your statement with respect to Chicago
18 Transit Authority?
19     A    From my working with them.
20     Q    Okay. Do you have any specific document
21 that you were referring to as being the basis for
22 their practice with regard to the policy stated in

---

134

1  paragraph 1?
2      A    I don't believe so.
3      Q    Okay. Did you do any research as to what
4  their policies are or their procedures are with
5  respect to the policy that you identified or the
6  standard you identified in paragraph 1?
7      A    From my working with Chicago Transit and
8  people who were from Chicago, I knew it as well as I
9  knew from SIRTOA and also other transit companies.
10     Q    Well, when you prepared this affidavit --
11 I'm sorry.
12     A    Okay. This I only mentioned a couple, but
13 others that I could have mentioned as well.
14     Q    Did you call anybody at Chicago Transit
15 Authority to confirm that this is their practice and
16 policy?
17     A    No, because I knew it was.
18     Q    Same question for paragraph 6. Is there a
19 specific document that you're referring to with
20 respect to the statement in paragraph 6?
21     A    No. In that case, I did chat with somebody
22 from SEPTA.

---

135

1      Q    Who was it you contacted at SEPTA?
2      A    No, I didn't. I belong to committees and I
3  just asked people, you know, how do you handle this?
4  In fact, which I didn't include in my report, I did a
5  summary of all of the people I spoke to on various
6  committees as to how they deal with this situation. I
7  prepared something general, but I didn't include it in
8  my report. And I think in my report I did include
9  SEPTA, but I did include MBTA.
10     Q    So you have a separate summary of people
11 you've spoken with or authorities?
12     A    No. I just prepared some notes on what was
13 the step-by-step process at the various metros.
14 There's 16. As you know, there was 16 metros in the
15 United States, 11 underground --
16     Q    Did you prepare that?
17     A    In general --
18     Q    Did you prepare that before you gave this
19 affidavit in November of 2023?
20     A    No.
21     Q    Did you prepare that in connection with
22 this affidavit for November 2023?

---

136

1      A    No. I prepared it in conjunction with the
2  supplemental safety report.
3      MR. WATERS: Okay. I believe that's the
4  document we requested would have been available to us
5  for today. Again, I'm going to repeat my request that
6  the materials that we requested in our subpoena be
7  provided to us.
8      MR. REGAN: This is the fourth thing. But
9  you and I can check it later.
10     Q    All right. I'm going to bring up Exhibit
11 5. I believe this is your supplemental report of
12 November 21, 2024?
13     A    Right.
14     Q    You indicated that you received and
15 reviewed an affidavit from Stacey Swain, dated
16 November 26, 2023?
17     A    Yes.
18     Q    Did you receive any other documents in
19 connection with this case in preparation of your
20 supplemental report?
21     A    I think I had a lot of the other documents
22 prior to this supplement.

---

137

1  Q  Just to be clear, the paragraphs in 4
2  through 6 of your affidavit in Exhibit 4, that
3  information was not included in your original report;
4  correct?
5  A  No.  Some of it was.
6  Q  You identified Southeast Pennsylvania
7  Transit Authority, Chicago Transit Authority, and New
8  York City Transit Authority in your original report
9  compared to that statement?
10  A  What I started doing is I started with
11  largest -- the largest system is New York City.  The
12  second largest is WMATA.  The third largest is CTA.
13  The fourth is MBTA.  So I was just going in the order.
14  Q  Okay.
15  A  I stopped at --
16  Q  My question is very specific, sir.
17  Regarding the standard of care that you've offered in
18  paragraph 1 of your complaint, this information is new
19  in your affidavit that was not provided in your
20  original report; correct?
21  A  Yes, that's correct.
22  Q  Okay.  Going on in your supplemental

138

1  report.
2  A  I'm going to refer to mine because it's
3  easier for me to read.  Is that all right?
4  Q  Yeah.  That's fine.  I can make it a little
5  larger for everybody.
6  A  No.  It's just easier for me to read from
7  my report.
8  Q  Of course.  Did anything change in incident
9  overview from your original report to your
10  supplemental report?
11  A  No, but there was a question of what the
12  national standard of care was, and I think that wasn't
13  addressed sufficiently to meet the requirements of
14  Washington, D.C.  So that's why I prepared the
15  supplemental report, to indicate that WMATA's standard
16  operating procedures are just a repeat of the national
17  standard of care that's used by all -- you know,
18  generally for this particular situation, are used by
19  all the public transit agencies which are considered
20  metros in the United States.  And I didn't list every
21  single one of them.  I just picked the top three
22  biggest.

139

1  Q  And is that correct, that that's the reason
2  you provided the supplemental report, was to address
3  the national standard of care that wasn't to the
4  extent it wasn't addressed in your original report?
5  A  Yes.
6  Q  Okay.
7  A  There is some things I can duplicate like
8  the timeline.
9  Q  Yeah.
10  A  There are a few -- you know, the standard
11  operating procedure I think are in both.  So there is
12  some repetition.
13  Q  So I'm going down here to page 8.  New York
14  City Transit, you have a discussion with regard to New
15  York City Transit?
16  A  Right.
17  Q  Again, from the affidavit until here, did
18  you pull any documentation or review any policies from
19  New York City Transit in preparation of your
20  supplemental report, the section beginning on page
21  8?
22  A  There are documents, but I didn't refer to

140

1  them because I was very familiar with their
2  procedures.
3  Q  This is based on your familiarity with New
4  York City Transit procedures?
5  A  Yes.
6  Q  When was the last time you worked with New
7  York City Transit?
8  A  For or against them?
9  Q  For them.
10  A  I haven't worked lately for them, but I
11  worked quite a bit to make them safer by working
12  against them.
13  Q  When was the last time you were employed by
14  New York City Transit?
15  A  Employed by them?  I was employed by the
16  MTA, which is the parent of the New York City Transit.
17  Q  And when was the last time you were
18  employed by MTA?
19  A  I was teaching transportation safety and
20  management at the MBA level I guess when I retired
21  from teaching.  I was -- 20 years ago.
22  Q  Okay.  Were you employed -- I mean, when

141

1  you were teaching, were you employed directly by the
2  MTA or were you an independent contractor?
3     A   The college that I was teaching at, I was
4  retained by the MTA Long Island Railroad, Metro North,
5  New York City Transit Authority, Cargo Bridge and
6  Tunnel Authority to teach our MBA and intermodal
7  transportation to their managerial employees and I was
8  the -- I wrote the curricula and I taught most of the
9  courses.
10    Q   You next cite the Massachusetts Bay
11 Transportation Authority. Did you pull any
12 documentation or review any policies in connection
13 with your statements here?
14    A   I had previously had cases involving the
15 MBTA and dealt with this subject, and this is the
16 information that I learned from the various documents
17 that they provided.
18    Q   And you're pulling this from your knowledge
19 of another case?
20    A   No. My knowledge of the operate -- I've
21 done many cases involving the MBTA, but my general
22 knowledge of their operation announcements, what have

142

1  you, most of the cases that I had involve pedestrian
2  injuries in stations and on the train.
3     Q   Okay. So is there a specific -- I'm just
4  trying to understand what you're saying. Your
5  knowledge of the MBTA that's reflected in this report,
6  Exhibit 5, is that based on a specific case that you
7  were involved in?
8     A   No. This is general knowledge that I have
9  in addition. They served with me on various APTA
10 committees. I'm not on the operating practice
11 committee, but I've spoken to people on the operating
12 practice committee about this subject matter and they
13 just confirmed a lot of what I printed and written in
14 here as evidence of the standard of care.
15    Q   Did you speak with them specifically in
16 connection with providing this report?
17    A   I think it was -- initially, it was on
18 another case that I dealt with where a person in the
19 New York City subway system fell when the train made a
20 sudden unexpected --
21        (Reporter clarification.)
22    A   Initially, I started my work in this area

143

1  with a matter involving New York City Transit
2  Authority.
3     Q   How is it that a New York Transit Authority
4  case helped you develop knowledge about MBTA's
5  procedures on the team?
6     A   My knowledge of each of the systems is
7  independent of each other. It's a national standard
8  of care. This is common sense. These are common
9  sense things that are required to do. And the point
10 is that this is an area which WMATA has done an
11 excellent job. Their operating procedures that cover
12 this area do an excellent job. I was asked to
13 determine was WMATA unique or is WMATA similar to what
14 everybody else in the industry does.
15        I would say that New York City Transit does
16 a little more than WMATA. Maybe if we were ranking,
17 grading WMATA, maybe I'd give them a B for this area
18 and I would give New York City Transit an A. It's not
19 the most perfect system, but then New York City
20 Transit puts a lot of time and energy into safety
21 standards. And they have a lot of impact on the
22 industry on what the industry does, and a lot of the

144

1  national standards of care come from the work that's
2  been done by the New York City Transit Authority and
3  the committees of APTA and AREMA.
4     Q   Here I'm asking you specifically about
5  MBTA.
6     A   That's why I'm working --
7     Q   What is the basis for your knowledge of
8  their standards on the team?
9     A   I have documents from previous cases which
10 I read in the past. I didn't refer to them because I
11 did know exactly what they were doing and I just wrote
12 it up from my knowledge.
13    Q   Did you consult those --
14    A   If I (indiscernible) the report, I would
15 have referenced the report. I'm quoting my knowledge
16 of how they conduct when a train does the stop at its
17 proper spot on the platform, whether it overshot the
18 platform or undershoots the platform, what is the
19 national standard of care? What is the industry? The
20 16 metros in United States, what do they do?
21        Basically what they do is describe those,
22 but I also found out in general that the first thing

---

**145**

1  they do when a train stops at the wrong location, the
2  train operator communicates to the control center, you
3  know, exactly the situation. And the control center
4  will tell them what to do next. And generally, you
5  know, we don't know whether trains stopped in that
6  location. So the operator performs basically the
7  national standard of care. They do safety checks to
8  ensure that if they reposition the train, that it's
9  done without harming the passengers or the equipment.
10 And that may require a positioning going backwards or
11 forwards. We don't like going backwards. So if it's
12 necessary to go backwards to reverse to the station,
13 this has to be done with careful coordination with
14 train control, that there isn't a train in back of the
15 train that's doing the repositioning.
16        And one of the key things I found in
17 talking to people in the industry, that when in doubt,
18 always make an announcement. Always make
19 announcements to ensure that the customers know
20 everything that's going on. There's no doubt in their
21 minds. You make an announcement to keep them informed
22 and safe and the why they're delayed and may not be on

**146**

1  schedule. That kind of stuff.
2     Q   Doctor, did you review --
3     A   And then once the service is resumed and
4  the correct position is taken, then the service
5  resumes as normal. So that's the background I have
6  generally in this area. And based upon my working in
7  the industry -- and, in fact, the Chicago Transit, I
8  did some work with them years and years ago when I was
9  a college professor at City College of New York. I
10 was the visiting -- I began as visiting professor at
11 City College. My boss there was the former CTA
12 chairman, and we always used to talk all about he was
13 the founding chairman of the CTA and also of the
14 regional transportation agency under the original
15 Mayor Daley. So we always chatted a lot about safety
16 and how things are done.
17        So I know from my working in Chicago and
18 from my riding the systems and all my education,
19 background, experience with the various transit
20 companies in the United States and around the world,
21 that these are what they do and that's why I
22 articulated it.

**147**

1     Q   May I ask a question now?
2     A   Sure.
3     Q   Okay. I am looking for the basis of your
4  specific knowledge with regard to this. I heard your
5  answer. My question is very specific. With respect
6  to New York City Transit, Massachusetts Bay Transit
7  Authority and Chicago Transit Authority, in your
8  supplemental report, in preparing the report that is
9  up in front of you, did you consult any specific
10 documents to prepare this summary?
11    A   No. No.
12    Q   Did you speak to any specific individuals
13 for the express purpose of confirming your
14 understanding of their policies for the purpose of
15 preparing this report?
16    A   Yes.
17    Q   Who did you speak with?
18    A   I spoke to train operators, people
19 operating the trains on the New York City transit, and
20 he introduced me to people on the other transit
21 systems because he was involved in union work and he
22 knew the other transit companies. And I spoke to a

**148**

1  few train operators as to how they performed their
2  duty. Plus I remember reading, you know, in the past,
3  various operating procedures and training manuals
4  which also covered these areas which I couldn't get my
5  hands on, couldn't find them, but I do remember what I
6  read. And the New York City Transit, I actually
7  reconfirmed with a friend of mine who is a retired
8  operator who works in transit.
9     Q   What was the name of the train
10 operator that you ---
11    A   Orlando --
12    Q   Please let me finish my question, sir.
13       What was the name of the train operator you
14 confirmed with specifically for the purpose of
15 preparing this report?
16    A   Not specifically. I asked -- I used my
17 background, education and experience, and then I ran
18 it by him and then he confirmed that I was correct.
19    Q   What's his name?
20    A   Orlando Jimenez.
21    Q   How do you spell it, please?
22    A   O-R-L-A-N-D-O J-I-M-E-N-E-Z.

149

1  Q  Is Mr. Jimenez -- did you say he's an
2  operator?
3  A  He's a retired train operator and union
4  representative and also a trainer for the New York
5  Transit Authority.  He's retired.
6  Q  Did he ever set policy for New York City
7  Transit?
8  A  What do you mean, set policy?
9  Q  Set policy.  Did he ever set policies for
10 operators --
11 A  I don't think the train operator, that's
12 not their pay grade level, to set policy.
13 Q  Did he ever operate a train on any other
14 system?
15 A  Yes, he has.
16 Q  Which system?
17 A  I don't remember, but he mentioned that he
18 did.
19 Q  Do you have an address or a phone number
20 for Mr. Jimenez?
21 A  Sure.
22 Q  Would you please provide that?

150

1  A  If I'm required to.
2  Q  I request that you do.
3     MR. REGAN:  I'll talk with Mr. Berkowitz
4  afterwards.
5  Q  Anybody else that you spoke with in
6  connection with either MBTA, Chicago Transit or New
7  York City --
8  A  Yes.  I spoke about --
9  Q  -- for the specific purpose of preparing
10 this report?
11 A  No.  He was the most specific person that I
12 spoke to.
13 Q  When did that conversation --
14 A  The others were general conversations.
15 Q  When did that conversation occur?
16 A  Somewhere between 2000 and 2024, many
17 times.
18    MR. WATERS:  Can we just pause for a few
19 minutes?  I want to reorganize, see if I have anything
20 further.  Trying to move this along.
21    MR. REGAN:  Do you want to take a
22 five-minute break or not?  Too much time?

151

1     MR. WATERS:  Yeah.  Let's take five
2  minutes.
3     MR. REGAN:  Okay.  I've got 1:36.
4     THE WITNESS:  So five minutes for 1:41?
5     MR. WATERS:  Correct.  1:41.
6     (Break taken, 1:36 - 1:41 p.m.)
7     MR. WATERS:  Dr. Berkowitz, I think we were
8  able to expedite what I thought I had left over when
9  we broke for lunch.  So at this point, I have no other
10 questions unless Mr. Regan has anything he wants to
11 ask you.  That's all I have.
12    MR. REGAN:  Thank you very much, Jason.  I
13 have no questions.
14    Linda, how did we do?  Okay the last hour?
15    THE REPORTER:  Much better.
16    MR. REGAN:  All right.  Do you need
17 anything from the witness or from any of us?
18    THE REPORTER:  Just his reports so I can
19 look up spellings or abbreviations.
20    MR. WATERS:  Yeah.  I'll send you all five
21 of the exhibits that I noticed or actually, Kaylan
22 just sent his email address, so I'll copy and paste

152

1  that.  I'll try to at least.  It's not working for me.
2     MR. REGAN:  And Jason, I'll follow up with
3  what my notes show and then we'll get those documents.
4     Linda, I have a standard order, so.
5     MR. WATERS:  We should probably advise Dr.
6  Berkowitz.  I'm glad to do it if you'd like me to.
7     MR. REGAN:  Sure.  Dr. Berkowitz, I don't
8  know what your pleasure is in terms of reading and
9  signing versus waiving.
10    THE WITNESS:  I trust Linda.
11    MR. REGAN:  Okay.  That means waiver.
12    MR. WATERS:  Linda, my order is what we
13 discussed before.  I'd like a rough.  If you can't do
14 an expedited by tomorrow -- my preference would be
15 expedited tomorrow.  Mini, electronic is perfectly
16 fine.
17    THE REPORTER:  Sure.
18    PD TECHNICIAN:  And counsel, if you afford
19 me those emails, I'll send those over to Linda.
20    (The deposition of CARL BERKOWITZ,
21    Ph.D. was concluded at 1:42 p.m.)
22