```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    CAROL WILD SCOTT,
                                     CA No:  1:22-cv-00601-CRC
 4              Plaintiff,
                                     Washington, D.C.
 5    v.                             Tuesday, April 22, 2025
                                     9:10 a.m.
 6
      WASHINGTON METROPOLITAN AREA
 7    TRANSIT AUTHORITY,

 8              Defendant.
      - - - - - - - - - - - - - - - x
 9

10    _____

11                    TRANSCRIPT OF JURY TRIAL
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
12                 UNITED STATES DISTRICT JUDGE
      _____
      APPEARANCES:
13    For the Plaintiff:        PATRICK MICHAEL REGAN, ESQ.
                                CHRISTOPHER REGAN, ESQ.
14                              REGAN ZAMBRI & LONG, PLLC
                                1919 M Street, NW, Suite 350
15                              Washington, DC 20036
                                (202) 463-3030
16                              pregan@reganfirm.com
                                cregan@reganfirm.com
17


18    For the Defendant:       JASON R. WATERS, ESQ.
                                LAUREN GILMAN, ESQ.
19                              WILSON ELSER
                                8444 Westpark Drive, Suite 510
20                              McLean, VA 22102
                                (703) 245-9300
21                              jason.waters@wilsonelser.com
                                lauren.gilman@wilsonelser.com
22
      Court Reporter:           Lisa A. Moreira, RDR, CRR
23                              Official Court Reporter
                                U.S. Courthouse, Room 6718
24                              333 Constitution Avenue, NW
                                Washington, DC  20001
25                              (202) 354-3187
```

1                              I N D E X

2

3    <u>WITNESS</u>                                             <u>PAGE</u>

4    **CAROL WILD SCOTT, Resumed**
          (By Mr. P. Regan)...................................246
5          (By Mr. Waters)....................................250

6    **ANDREW BISHOP, M.D.**
          (By Mr. P. Regan)...................................275
7          (By Mr. Waters)....................................286

8    **CARL M. BERKOWITZ, Ph.D.**
          (By Mr. P. Regan)...................................315
9          (By Mr. Waters)....................................347
          (By Mr. P. Regan)...................................359
10         (By Mr. Waters)....................................362

11   **RAJKUMA RAO, M.D. (by video)**

12   **CLEV BERNARD IBANEZ BENNETT (by video)**

13   **ALFRED EMONDI (by video)**

14   **DOMINIC JOHNSON**
          (By Mr. Waters)....................................389
15         (By Mr. C. Regan)..................................397

16

17

18

19

20

21

22

23

24

25

```
 1                        P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  We are on the record in
 3     Civil Action 22-601, Carol Wild Scott v. Washington
 4     Metropolitan Transit Authority.
 5              Starting with plaintiff's counsel, please approach
 6     the podium and state your appearance for the record.
 7              MR. P. REGAN:  Yes.  Good morning, Your Honor;
 8     Patrick Regan and Christopher Regan for Carol Scott, who is
 9     seated at counsel table.
10              THE COURT:  Good morning, everybody.
11              MR. WATERS:  Good morning once again, Your Honor;
12     Jason Waters and Lauren Gilman for defendant, Washington
13     Metropolitan Transit Authority, along with Laurie Hand from
14     Metro.
15              THE COURT:  Okay.  Good morning, everyone.  I hope
16     you all had a nice evening.
17              Why don't we start where we left off yesterday.
18     If I could ask Ms. Scott just to step outside the courtroom
19     briefly since we'll be discussing her testimony.
20              All right.  So just for the record, I haven't
21     gone back through all of the transcript, but, as I recall,
22     Mr. Regan showed her Plaintiff's Exhibit 16, the itemization
23     of the expenses.  He did not move Exhibit -- he did not seek
24     the admission of the exhibit himself, but he asked her if
25     she recognized it.  She said yes.  She commented that she
```

1    was surprised by the amount of the bills.

2              And then he asked her what the figure was at the

3    bottom.  She said the number.  Mr. Waters lodged an

4    objection.  The Court overruled that objection, and then Mr.

5    Regan passed the witness.

6              Is that basically what happened?

7              MR. P. REGAN:  Except I did offer the exhibit.

8              THE COURT:  Did you offer the exhibit?

9              MR. P. REGAN:  I did.

10             THE COURT:  And I did not rule on it.

11             MR. P. REGAN:  No.  You said "I'll rule later,"

12   so --

13             THE COURT:  I reserved on it, okay.

14             MR. P. REGAN:  So subject to --

15             THE COURT:  So Mr. Waters obviously filed

16   something this morning reiterating the objection to I

17   suppose the question and the answer as well as the admission

18   of the summary under Rule 1006.

19             MR. WATERS:  That's correct, Your Honor.  I

20   believe it's inappropriate for this witness to be

21   authenticating and laying the foundation for her own medical

22   bills.

23             THE COURT:  Mr. Regan, do you want to respond to

24   what Mr. Waters filed this morning?

25             MR. P. REGAN:  Yes, Your Honor.

```
1              First of all, the case that the defense cites

2      from this courthouse about the actual person who prepared

3      it, Ms. Scott has been a lawyer a lot longer than I have --

4              THE COURT:  I'll tell you what.  Before we get to

5      foundation, WMATA also lodged an authenticity objection in

6      the pretrial statement, and while Mr. Waters didn't state

7      the bases for his objections, I don't believe, yesterday, I

8      think it's fair to permit them to object on both

9      authenticity grounds and foundation grounds.  Okay?

10              Usually I get a stipulation as to the authenticity

11      of voluminous records like medical records or phone records

12      or invoices and things like that.

13              Here, there was no stipulation.  And as I

14      understand from the email traffic attached to Mr. Waters's

15      motion, the actual records were withdrawn after having been

16      designated in the pretrial statement.  And obviously there's

17      been no testimony from any sort of records custodian or

18      people who prepared those invoices.

19              So I guess the threshold question is, if 1006

20      summaries only relate to admissible evidence, how can you

21      get a 1006 summary in at all if there's no -- if there's

22      been no ruling on the admissibility of the underlying

23      records?

24              MR. P. REGAN:  Well, Judge, first of all, the

25      records are one thing.  The records were withdrawn because
```

```
1    nobody's using them, okay?  And they were 300 pages.  Those
2    are the medical records.
3              THE COURT:  There was an authenticity objection.
4    We didn't resolve that at the pretrial.  Maybe I didn't
5    appreciate that -- you know, that this was going to be an
6    issue, but there was an objection on authenticity grounds.
7    There was no stipulation, as I would expect there to be.
8              MR. P. REGAN:  But, Judge, this is different.
9    We're talking about bills now, okay?  So medical bills, not
10   medical records.
11             The medical records had nothing.  They didn't have
12   a single dollar figure in them.
13             THE COURT:  Okay.
14             MR. P. REGAN:  Okay?  They were just operative
15   reports, x-ray reports, nursing records.
16             THE COURT:  Got it.  Got it.  Okay.
17             MR. P. REGAN:  Okay.
18             THE COURT:  Did you designate the bills?
19             MR. P. REGAN:  We designated the summary
20   judgment --
21             THE COURT:  That's not my question.
22             MR. P. REGAN:  I know.
23             THE COURT:  Did you designate the bills?
24             MR. P. REGAN:  No, we designated a summary for
25   this reason, Your Honor.
```

```
 1                 THE COURT:  Okay.

 2                 MR. P. REGAN:  We would have been happy -- we

 3       produced every one of these bills in June of 2022 in

 4       discovery, okay?

 5                 THE COURT:  Okay.

 6                 MR. P. REGAN:  There's never been an objection to

 7       the figure of the bills.

 8                 Putting in medical bills is never done, in my

 9       experience, because they have to be redacted so heavily to

10       remove collateral source information that they look silly.

11                 THE COURT:  Okay.

12                 MR. P. REGAN:  You end up with 100 pages of bills

13       that are redacted all over the place to remove Cigna and

14       Optima and all those things.

15                 THE COURT:  Understood.

16                 MR. P. REGAN:  And at the end of the day it's a

17       waste of time.

18                 I can put a paralegal on the stand from my

19       office --

20                 THE COURT:  I know.

21                 MR. P. REGAN:  -- to say this is what we did, but

22       there's never been -- so authenticity is one thing.

23                 THE COURT:  Okay.

24                 MR. P. REGAN:  But accuracy is not disputed.

25                 THE COURT:  Well, let's stop there.
```

1              There was an authenticity objection to the medical

2      records, but is Mr. Regan correct that that objection just

3      goes to the records as opposed to the bills?

4              MR. WATERS:  Your Honor, at the outset I want to

5      be clear.  I am not trying to sandbag counsel or be

6      officious in how I'm handling this.

7              There were two exhibits identified in the pretrial

8      submission from the plaintiffs.  Exhibit 16 was the summary

9      of medical bills, and Exhibit 17 was just medical records.

10             THE COURT:  Okay.

11             MR. WATERS:  I reached out to counsel and -- on

12     two occasions to ask, "Tell me what it is that you consider

13     to be the medical records to be included in Exhibit 17."

14     Paranoid defense lawyer.  I just want to make sure that

15     there's no late or previously unproduced medical record that

16     they're including as Exhibit 17 in what they're calling

17     medical records.

18             The response to that was to withdraw that exhibit,

19     so we find ourselves in this weird -- my expectation was if

20     that was identified to me, I'd review the bills, I'd compare

21     that with the summary, and I probably would have at that

22     time stipulated to the medical summary.  Okay?  That is my

23     normal practice and not to make an issue of that in a

24     courtroom setting like this.

25             But we now find ourselves in a weird evidentiary

1    situation where we weren't able to stipulate to that because

2    the exhibit was withdrawn instead of giving me the clarity

3    as to what bills they're talking about, what medical records

4    they're talking about, what is the volume that they consider

5    to be Exhibit 16.

6         So we never did get to a point where there was a

7    stipulation with regard to her medical bills, and now we're

8    in trial, and I think what we're -- what's the problem here

9    is that we don't have the bills authenticated in any

10   evidentiary sufficient way.

11        THE COURT:  But you've been provided the bills.

12        MR. WATERS:  We were provided the bills in

13   discovery.

14        THE COURT:  Do you dispute their authenticity at

15   all, or you just want to put them through their paces?

16        MR. WATERS:  I don't dispute their authenticity,

17   but we find ourselves in an unusual situation here because

18   there was never that stipulation.  The bills have not been

19   offered as an exhibit.

20        It is still the plaintiff's burden to prove their

21   case, and it's an element of their proof, and we find

22   ourselves in a position where we don't have any medical

23   records certificate.  We don't have a stipulation among

24   counsel.  There were no requests to admit to me with regard

25   to the foundational elements as frequently happens in cases

1    like this.

2         So I'm in a position where I don't feel like I can

3    but object.

4         THE COURT:  Okay.

5         All right.  So let's move to foundation then.

6         MR. P. REGAN:  Okay.  Judge, I have the exact

7    date.  These bills were furnished on the 30th day of June

8    2022, okay?  If Mr. Waters had asked me ever, said "Send me

9    a copy of the bills again, we've lost them, we don't have

10   them," I would have sent them to him.  He never asked for

11   them.

12        The medical records don't have one single figure

13   in them.  There were 200 or 300 pages that were also

14   produced.  They were Bates-stamped.  We just decided we're

15   not going to clutter the record with them.  Why put medical

16   records in them when they're not needed?

17        Dr. Rao testified from his operative notes in his

18   examinations, so those are separate.  We withdrew those.

19   But if he wants to see the ones we intended to offer, we

20   would, of course, give them to him, but the medical bills

21   are separate.

22        And I did move that exhibit before, and if you --

23   then I would ask to put my client back on because the Court

24   reserved --

25        THE COURT:  Hold on.

1          MR. P. REGAN:  -- ask her a couple of questions,

2     and then that will be it.

3          THE COURT:  Let's move to foundation, okay?

4          The case Mr. Waters cited says the witness should

5     -- the person who prepared the summary should introduce the

6     summary.  That's been consistent with, you know, general

7     practice.  You get a case agent.  You get a forensic

8     accountant.  You get a paralegal.  You know, whoever

9     prepared the plaintiff, if she prepared it, can testify to

10    that.

11         The bottom line is, you know, I don't think you

12    laid that foundation.  I precipitously ruled on the

13    objection, and so you're right.  I think you should be able

14    to recall her and lay a foundation, if you can, for the

15    document.  If you can't, you can certainly ask her, "Did you

16    receive bills from, you know, these providers?  Did you pay

17    those bills?"

18         MR. P. REGAN:  We will.

19         THE COURT:  "And do you recall what the total

20    was?"  And if she says no, you can refresh her, including

21    with the summary, right?

22         So I think you can get it in, but to sort of play

23    according to *Hoyle*, I don't think you laid a proper

24    foundation yet.

25         MR. P. REGAN:  That's fine.  I apologize.  We'll

1    put her on.

2         THE COURT:  I think the solution and actually not

3    doing it through the summary sort of solves the authenticity

4    or the admissibility issue.  I mean, I don't think there's a

5    dispute, really, about authenticity at the end of the day,

6    but I think Mr. Waters is probably technically right.

7    There's no stipulation.  There's no custodian.  There's

8    nothing to authenticate the bills.

9         So I just want to have a good record here.

10        MR. P. REGAN:  Thank you.

11        THE COURT:  Okay.

12        MR. P. REGAN:  Can we bring her in?

13        THE COURT:  So doing it through just testimony and

14   refreshing, if necessary, that gets the number in.

15        MR. P. REGAN:  Okay.

16        THE COURT:  Which I think is the right result

17   because I don't think there's any dispute, right?

18        MR. P. REGAN:  Okay.

19        THE COURT:  Okay.

20        Yes, bring her back.  Yes, let's bring her back.

21   Just wait until she gets back.

22        MR. P. REGAN:  Your Honor, would you like

23   Ms. Scott to take the stand?

24        THE COURT:  Why don't we have her take the stand.

25        Good morning, ma'am.

1          THE WITNESS:  Good morning.

2          THE COURT:  How are you feeling?

3          All right.  Welcome back.

4          Mr. Waters, did you have one more preliminary

5     matter?

6          MR. WATERS:  Well, yes, Your Honor.  I'm not sure

7     if Your Honor wants to take this up at this point.  There

8     was an open issue with regard to the opening statement issue

9     that we briefed last night.

10          THE COURT:  Yes.  I don't want to take it up, but

11     we did take a look at this briefly, and Mr. Regan has not

12     had a chance to respond, but take a look at a Ninth Circuit

13     case, *Merced v. McGrath*, 157 Federal Appendix 7, Ninth

14     Circuit, 2005, where this -- a very related issue came up,

15     and it was appealed.

16          "The trial court did not err in permitting the

17     prosecution to comment on the failure of the defense to call

18     an expert witness.  The Court sees why the same should not

19     be true in civil cases.  Additionally, any resulting

20     prejudice was cured when the Court instructed the jury that

21     statements and arguments by counsel were not evidence.  When

22     defendants argued that they did not have the" -- "defendants

23     did not argue that they did not have the burden of proof or

24     were not required to call an expert, and when plaintiff's

25     counsel, in his rebuttal, clarified that, he was not saying

1       that defendants did not have a burden of proof."

2               In other words, that was a situation where an

3       argument was made that the reference to the failure to call

4       an expert impermissibly shifted the burden of proof, and the

5       Court found that that was not the case, and the Ninth

6       Circuit said that the District Court's ruling was not an

7       abuse of discretion.

8               So I think that case cuts against you; but take a

9       look at it, and we can renew this later.

10              MR. WATERS:  Okay.

11              THE COURT:  Also ask yourself whether you're

12      better off with the record that stands where the Court has

13      already instructed the jury that statements of counsel are

14      not evidence as opposed to redrawing their attention to

15      this.

16              MR. WATERS:  Very well, Your Honor.

17              THE COURT:  Okay.  Are we ready?

18              MR. P. REGAN:  We are ready, Your Honor.

19              THE COURT:  All right.

20              MR. P. REGAN:  Your Honor, may I give this water

21      up there?  Thanks.

22              (To Ms. Scott) Make sure you have that, okay?

23              THE WITNESS:  Thank you.

24              (Jury enters courtroom)

25              THE COURT:  All right.  Please be seated.

1          Good morning, ladies and gentlemen.  You all came

2     back.  Thank you.  Hope you all had a good evening.  We are

3     ready to resume the trial.

4          When we -- at the end of the day yesterday, there

5     was a series of questions from Mr. Regan, and Ms. Scott was

6     shown what Mr. Regan described as an itemization of medical

7     expenses.  Do you all recall that?  That document was not

8     admitted into evidence, but Mr. Regan asked Ms. Scott what

9     the figure was, the total figure was, at the bottom, and

10    Ms. Scott gave a number.

11         The Court will now sustain the objection to that

12    answer.  So you are to disregard Ms. Scott's answer to that

13    question, but I'm going to allow Mr. Regan to re-question

14    Ms. Scott on that issue.

15         So the floor is yours, sir.

16         MR. P. REGAN:  Thank you.

17         Good morning, Your Honor.

18                   CAROL WILD SCOTT, Resumed

19                   DIRECT EXAMINATION, Continued

20    BY MR. P. REGAN:

21    Q.  Good morning, Ms. Scott.

22    A.  Good morning.

23    Q.  So I was a little too quick in my questions yesterday,

24    so let's go back over that.

25    A.  Okay.

 1   Q.  So have you had a chance to look at Plaintiff's Exhibit

 2   16?

 3   A.  Yes, I have.

 4   Q.  And does that contain the medical expenses, the medical

 5   bills that you -- an itemization of the bills that you

 6   received as a result of the medical treatment that you

 7   received for the fractured femur?

 8   A.  Yes.

 9   Q.  All right.  Let's go through, and I'm going to ask you a

10   -- just, if you would, on the left-hand side of that exhibit

11   there is the --

12              THE COURT:  Counsel, let's go to the phones.

13              (The following is a bench conference

14               held outside the hearing of the jury)

15              THE COURT:  Okay.  I thought you were just going

16   to ask her whether she received bills from the relevant

17   places, and then, without the exhibit in front of her, ask

18   her if she recalls what the total amount was, and that if

19   she did not recall, then attempt to refresh her, including

20   with the document, if she says that she once had a memory of

21   it but her memory might be refreshed if she were to see the

22   document.

23              Let's do it that way.

24              (This is the end of the bench conference)

25              THE COURT:  Ms. Scott, if you could close your

1    exhibit binder, please.

2    BY MR. P. REGAN:

3    Q.  So, Ms. Scott, at the time that you were receiving the

4    medical treatment, did you receive bills from the various

5    providers; the emergency room, GW, the rehab, et cetera, et

6    cetera?

7    A.  Yes.

8    Q.  Do you remember what the total of those bills were?  Not

9    the individual bills.  Do you remember what the total of the

10    bills were?

11    A.  $229,000 and I believe 518 and 63 cents.

12    Q.  Okay.  Well, let's --

13          MR. P. REGAN:  Rather than guess, Your Honor, may

14    I have the witness --

15    Q.  Would the itemization that we provided to you earlier

16    refresh your recollection as to the precise figure?

17          MR. WATERS:  Objection.  I think the witness

18    testified as to the precise figure.

19          THE COURT:  Overruled.

20    Q.  The itemization that was prepared of the summary of the

21    medical bills, would that refresh your recollection as to

22    the precise figure as opposed to your estimate a minute ago?

23    A.  Yes.

24    Q.  All right.  Would you look at Plaintiff's Exhibit No.

25    16, please, in that exhibit book.

```
1    A.  Yes, sir.

2    Q.  Okay.  And let me ask.  A minute ago on the left-hand

3    column we have every single provider that treated you,

4    correct, on Page 1 and Page 2?

5    A.  Yes, that's everybody.

6    Q.  Okay.  If you look at the total on Page 2, would you

7    please tell us the precise figure as to how much medical --

8              THE COURT:  Mr. Regan, let me.

9              Ma'am.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  After having read that summary, does

12   it refresh your recollection what the precise number is?

13             THE WITNESS:  Yes.

14             THE COURT:  And what is that number?

15             THE WITNESS:  $229,541.63.

16             THE COURT:  Okay.  Thank you.

17             MR. P. REGAN:  Okay.  Your Honor, I have no

18   further questions of the witness.

19             THE COURT:  Mr. Waters.

20             MR. P. REGAN:  I renew my motion, but we can

21   discuss it later to admit it, to admit the exhibit.

22             MR. WATERS:  And renew our objection.

23             THE COURT:  Excuse me?

24             MR. WATERS:  And renew our objection to the

25   admission of the summary.
```

```
 1              THE COURT:  So the document has not been admitted.
 2    Plaintiff's Exhibit 16 is not in evidence.
 3              So he's tendered the witness to you, Mr. Waters.
 4              MR. WATERS:  Thank you.
 5                        CROSS-EXAMINATION
 6    BY MR. WATERS:
 7    Q.  Good morning, Ms. Scott.
 8    A.  Good morning.
 9    Q.  When you testified yesterday, I recall that your
10    testimony was, when you were at McPherson Square and the
11    train was stopped, you knew the operator would stop and then
12    jerk, so you waited.  Do you recall that testimony?
13    A.  Yes.
14    Q.  Okay.  So based on your experience riding in on the
15    Orange Line that day, you expected that the operator would
16    stop short and then reposition the train, correct?
17    A.  I thought that there was a possibility of that happening
18    because intermittently -- she had not done it at every stop.
19    So every once in a while.  So I thought, well, she just may
20    do the same mistake this time.
21    Q.  Okay.
22    A.  So I waited.
23    Q.  So you indicated that you came in from Vienna to
24    McPherson Square, correct?
25    A.  That's correct.
```

```
 1   Q.  And there are 11 stops from Vienna to McPherson Square?

 2   A.  I haven't counted them.  Even the many years that I rode

 3   that line.

 4   Q.  Okay.  That's fair enough.

 5            I recall you testified previously that the stop

 6   and then repositioning happened at five or six of the

 7   stations on the way in.

 8   A.  It was a good many.

 9   Q.  So it was more than half of the stations where the --

10   A.  I wouldn't say it was more than half, but it was

11   several.

12   Q.  Okay.  But it was five or six of them?

13   A.  That's possible, but it may have been as few as four.

14   Q.  Okay.  But you knew that the operator was stopping short

15   and then repositioning, so you waited, when you arrived at

16   McPherson Square, to get up, correct?

17   A.  Yes.  I waited probably six, seven, eight -- anywhere

18   between six and ten seconds.

19   Q.  Okay.  Did you hear the chimes on the doors signaling

20   that the doors were opening?

21   A.  When they opened, I heard them.  By that time I was flat

22   on my back screaming my head off.

23   Q.  Right.  Of course.

24            When you were sitting there waiting before you got

25   up, though, did you hear the chimes?
```

1    A.  I heard nothing.

2    Q.  Okay.

3    A.  They did not chime at that time.  And they usually do

4    when the door opens.

5    Q.  Okay.  So there was no chime signaling the door was

6    opening while you were sitting there waiting to get up,

7    correct?

8    A.  No.

9    Q.  The doors did not open before you got up, correct?

10   A.  No.

11   Q.  Just to be clear.  Was my statement correct that the

12   doors did not open before you got up?

13   A.  They hadn't opened yet, but I knew that they would open

14   very quickly.

15   Q.  Okay.  So when you got up and before you fell -- is the

16   cane that you have with you today the same cane that you had

17   with you on the train that day?

18   A.  Yes.

19   Q.  Okay.  Were you balancing yourself with the cane when

20   you got up?

21   A.  I leaned on it when I got up, and then I reached for

22   that center pole.

23   Q.  Were you leaning on it when you reached for the center

24   pole?

25   A.  I think -- I don't -- I wouldn't say I was leaning on

1    it, but I was using it to steady me.

2    Q.  Okay.  Did you hold on to any of the poles overhead?

3    A.  I beg your pardon?

4    Q.  Were you holding on to any of the poles overhead?

5    A.  No, because I don't think -- if I recall, there may or

6    may not have been those overhead rails; and had they been,

7    they wouldn't have helped me reach that center pole because

8    even with my long arms it wasn't going to happen.

9    Q.  And you hadn't reached the center pole yet when the

10   train repositioned, correct?  You were reaching for it when

11   you fell, but you weren't holding on to it?

12   A.  No.  My fingers -- the pole -- my fingers literally -- I

13   will never forget that my fingers were within an inch, two

14   inches of that pole when that train jerked.

15   Q.  So were you holding on to any of the poles on the back

16   rest -- or the back rest of any of the chairs?

17   A.  No.

18   Q.  Okay.

19   A.  Because I wouldn't have normally.

20   Q.  Okay.  Was this one of the trains that has a partition

21   next to the doors, next to the accessible seating?

22   A.  I can't remember.

23   Q.  Okay.  When you testified in your deposition, you

24   indicated that you heard the operator give an announcement

25   after the train had stopped but before it moved.

```
 1    A.   No.

 2    Q.   I recall you -- you did not hear an announcement?

 3    A.   I did not hear any announcement.  If I had heard her

 4    recite the words that I have been hearing for 20 years on

 5    that train, "Please hold on, this train is going to move," I

 6    would have stayed in my seat.

 7    Q.   I'm sorry, ma'am.  I want to be clear.

 8              I recall that your testimony was that the

 9    announcement you heard was "McPherson Square, doors

10    opening."

11    A.   Yes, that I heard.

12    Q.   Okay.  That's what I wanted -- that's what I was going

13    to ask you about.

14    A.   But nothing else.

15    Q.   Do you recall hearing the operator make the announcement

16    "Doors" -- "McPherson Square, doors opening," I think you

17    said left side after the train stopped but before it

18    repositioned; is that correct?

19    A.   Yes.

20    Q.   Okay.  Did you hear Ms. Swain's testimony yesterday that

21    she heard the announcement when the train was arriving at

22    the platform?

23    A.   Yes, I did.

24    Q.   Okay.  And you disagree with Ms. Swain's testimony that

25    the announcement was made while the train was arriving at
```

1   the platform?

2   A.  She had testified that it was a right.  I testified that

3   it was at the left.  And if I think about it, when those

4   trains leave Vienna, they're on two tracks going in, and

5   depending on which side that track is on is which side winds

6   up opening.

7   Q.  Okay.

8   A.  So -- and it doesn't make any difference right or left.

9   It was the fact that the doors were opening.

10  Q.  I agree.  What I'm asking you about is when the

11  announcement was made.  Ms. Swain testified the announcement

12  was made as the train was arriving at the station, and I

13  understand your testimony to be that you recall the

14  announcement being made after the train stopped and before

15  it repositions.

16  A.  No, it was before it stopped the first time.

17  Q.  Okay.  Before it stopped the first time is when the

18  announcement was made?

19  A.  Yes.

20  Q.  And that's what Ms. Swain testified to, correct?

21  A.  I think so.

22          MR. WATERS:  Indulgence, Your Honor.

23          THE COURT:  Sure.

24          (Pause)

25  Q.  Ma'am --

1          MR. WATERS:  Counsel, I'm looking at Page 27 of

2     Ms. Scott's deposition at Line 7.

3     Q.  Ms. Scott, do you recall giving the following testimony

4     in your deposition?  Do you recall giving a deposition in

5     this case?

6     A.  Yes.

7     Q.  Okay.  And on Page 27, Line 7, you were asked, "So it's

8     your testimony that the train stopped before any

9     announcement was made?"

10         "ANSWER:  The train stopped and then, after some

11     period, the announcement was made."

12         Do you recall giving that answer?

13     A.  If I said that, I was wrong --

14     Q.  What's that?

15     A.  -- because the announcement was made as they were

16     pulling into the station.

17     Q.  Okay.  But you'd agree with me that in your deposition

18     testimony you said the train stopped and then an

19     announcement was made.

20     A.  I may have.

21     Q.  Okay.

22     A.  But it's incorrect.

23     Q.  Okay.  The testimony you gave in your deposition was

24     incorrect, and what you recall is that the announcement was

25     made as the train was arriving, correct?

1    A.  Yes.

2    Q.  Okay.  So is it your testimony today that, after the

3    train stops before it repositioned, you don't recall hearing

4    any announcement whatsoever?

5    A.  No.

6    Q.  Okay.

7    A.  It should have been, "The train is moving; please hold

8    on."  And there was nothing.

9    Q.  Ma'am, I just want to be clear.  So in your deposition

10   you told us the train stopped, an announcement was made, and

11   then it repositioned.  And today you're telling us the

12   announcement was made before the train stopped, there was no

13   further announcement, and then the train moved, correct?

14   A.  That's correct.

15   Q.  Okay.  You would agree with me that your testimony today

16   is inconsistent with your deposition testimony, would you

17   not?

18   A.  Yes, obviously.

19   Q.  Okay.  You alluded to, a little bit earlier, that you're

20   an experienced Metro rider?

21   A.  I rode Metro from 1995 or '96; for a good 10, 15, almost

22   20 years.

23   Q.  Every day?

24   A.  Most of the workdays, yeah.  I mean, come on.

25   Q.  And you're familiar with the fact that passengers

1  frequently stand while the Metro is moving?

2  A.  When the train is crowded, yeah, people are standing up

3  because there's nowhere to sit.

4  Q.  And sometimes they stand because they want to stand,

5  correct?

6  A.  I have no idea what their motivation may be.

7  Q.  Did you always sit?

8  A.  I got on in Vienna, so there was always a seat.

9  Q.  When you were going back to Vienna from McPherson

10  Square?

11  A.  I didn't go to McPherson Square every day.

12  Q.  I'm sorry?

13  A.  I switched trains and went to Judiciary or Archives.  I

14  went to Archives because I worked at the Consortium, not the

15  VA.

16  Q.  Okay.  So when you got on the train going home, was

17  there always a place to sit?

18  A.  Yeah.

19  Q.  Okay.

20  A.  Almost always.

21  Q.  Did you ever stand on Metro?

22  A.  I probably did it sometimes, but I don't remember.

23  Q.  Okay.  You would agree with me that it's important to

24  keep yourself stable on Metro when you're riding the train,

25  correct?

1    A.  I would agree that one would keep oneself stable, but

2    that doesn't mean that one does not consider and take proper

3    cautions.

4    Q.  And proper precautions include listening to

5    announcements, correct?

6    A.  And listening for announcements.

7    Q.  Correct.  And holding on to something when there's a

8    possibility that the train may move, correct?

9    A.  When you're advised that this train may move, please

10   hold on, absolutely.

11   Q.  And you understand, when you're on Metro, you're on a

12   train that is going to move, correct?  The entire purpose is

13   to move you from one part of our town to the other part of

14   our town?

15   A.  Well, obviously.

16   Q.  Correct.

17   A.  But that doesn't mean that one should always -- this is

18   silly because, yes, you're sitting in a seat.  Yes, when the

19   train begins to pull into a station, the announcement is

20   made what the station is and which -- on which side the

21   doors will open.  And that's what happened.

22          MR. WATERS:  Your Honor, move to strike as

23   nonresponsive.

24          THE COURT:  Sustained.

25   Q.  You understand, when you're on Metro, that the train is

```
1    going to accelerate?

2    A.  Yeah, the train's going to move.

3    Q.  And the train's going to brake at stations and come to a

4    stop?

5    A.  Yeah.

6    Q.  And that the train may stop on the rails when there's

7    traffic ahead?

8    A.  Yeah.

9    Q.  And that the trains move side to side as they make turns

10   and move through the tracks?

11   A.  Not that radically, no.

12   Q.  But do they make turns?

13   A.  Oh, yeah.

14             (A gentleman enters the courtroom)

15             MR. WATERS:  Your Honor, I believe this is a

16   witness.

17             MR. P. REGAN:  It's an expert.

18             THE COURT:  Mr. Regan, if you could have him sit

19   outside.

20             MR. P. REGAN:  Okay.

21             THE COURT:  Please proceed.

22             MR. WATERS:  Thank you, Your Honor.

23   BY MR. WATERS:

24   Q.  And have you been on trains before where they stopped

25   and repositioned?
```

1    A.  Once in a very great while, not very often.

2    Q.  And you recall, when that happens, that the operator is

3    going to announce that the train is going to reposition?

4    A.  Yes.

5    Q.  And sometimes the trains are moving at speeds over 50

6    miles an hour, correct?

7    A.  I have no idea how fast they're going.

8    Q.  They're moving quickly though, right?

9    A.  It seems so at times, as I'm sure every Metro rider

10   knows.

11   Q.  Are you familiar that some trains make automatic

12   announcements on the Metro system?

13   A.  I have no idea.

14   Q.  Okay.  You are familiar with the chimes when the doors

15   are opening, correct, and closing?

16   A.  Yes.

17   Q.  And you didn't hear those on September 23rd before you

18   got out of your seat, correct?

19   A.  No.

20   Q.  So when the train was stopped and when you got up, the

21   chimes had not rung, and the doors had not opened.  Were

22   there other people standing in the area of the doors?

23   A.  The train -- I have no idea how many people were in that

24   car, but between me and the door and in the opposite seats,

25   no, there wasn't anyone.

1    Q.  Well, I guess what I'm asking is did you see anybody

2    else who was getting ready to get off at McPherson Square

3    between you and the door?

4    A.  No.

5    Q.  Okay.  So you were the only one who was planning to get

6    off at that station that you're aware of or saw?

7    A.  As far as I know.  There may have been people behind me.

8    There probably were.

9    Q.  Okay.  At that point nobody had gotten off the train

10   because the doors hadn't opened, right?  Nobody was getting

11   off or getting on at that point?

12   A.  No.

13   Q.  Okay.  And so you were -- and you were a seated

14   passenger from Vienna until you got to McPherson Square?

15   A.  Yes, I was.

16   Q.  Okay.  And you were seated at the window.  Was it the

17   first row next to the accessible seating, next to the doors?

18   A.  No.  I was on the other side of the train from the

19   doors.

20   Q.  Okay.  What do you mean by that, the other side of the

21   train?

22   A.  There are accessible seats that I never sit in because I

23   have no place to put this that doesn't risk tripping

24   somebody; so I always sit, if possible, in the first row of

25   seats next to the window, if I can, because I can just prop

1    this on the window and the accessibles.

2              And I was -- at this time I was opposite where the

3    doors were.

4    Q.  Okay.

5    A.  If I had been in the seats on the same side, I could --

6    I would have had that pole.  I would have had it.

7    Q.  Okay.  So I just want to make sure that I understand

8    where you were positioned.  You were on the seated -- seated

9    in a forward-facing position, meaning in the direction of

10   travel of the train?

11   A.  Yes.

12   Q.  In one of the first row seats but not the accessible

13   seats?

14   A.  No.  I was sitting directly behind.  There's two rows of

15   seats.  Here are the accessible seats.  I was here.

16   Q.  Okay.

17   A.  The pole was there.

18   Q.  Was the pole in the middle of the exit area of the

19   train?

20   A.  Not really in the middle.  It was -- those poles, as I

21   recall, were a tad closer to the seats.

22   Q.  Okay.  About how far away from you was the pole?

23   A.  I had -- when she announced that the -- it was

24   "McPherson Square, doors opening," whether it was right or

25   left, I slid from the window seat over.

1    Q.  Okay.  So you slid from the window seat over.  The pole

2    was a few feet away.  You used your cane to get up, correct?

3    A.  I had -- the cane was probably in my right hand, and I

4    would have pushed myself off up out of the seat probably

5    with my left hand, and then I would have grabbed this to

6    make sure I was steady, and then -- and at the same time

7    reached for the pole --

8    Q.  Okay.

9    A.  -- with my left hand because it was my left hand that

10   was so close to that blessed pole.

11   Q.  Had you fully stood up before the train repositioned as

12   you were reaching for the pole?

13   A.  Probably.

14   Q.  Okay.  Did you take a few steps to reach the pole before

15   the train repositioned?

16   A.  Well, I had to have taken at least one step.

17   Q.  Okay.  So at that point you had -- I believe you were

18   carrying a purse in your left hand or left arm?

19   A.  It was on my left shoulder.

20   Q.  Okay.  And your cane was in your right hand.  And you

21   stood up, and you were moving toward the pole.  At this

22   point you had not heard the chimes, correct?

23   A.  No.

24   Q.  You had not seen the doors open, correct?

25   A.  No.

1    Q.  There was nobody else who was getting off the train at

2    that time, correct?

3    A.  I don't know whether there was somebody behind me, but I

4    do know that before I got up, just in case, I just sat there

5    a whole lot longer than I would have otherwise.

6    Q.  I understand that.  But you still didn't hear the chimes

7    or see the doors open, correct?

8    A.  No.

9    Q.  And you weren't holding on to the rest of the chair or

10   an overhead pole, if there was one, correct?

11   A.  Yeah.

12   Q.  Okay.  Do you know if there were overhead straps?

13   A.  I have no idea.

14   Q.  Okay.  But you were not using one, correct?

15   A.  I don't think there were ever straps on Metro.

16   Q.  Okay.  You've spoken a little bit about the pole -- or,

17   I'm sorry, the cane that you use.  You brought that with you

18   to McPherson Square.  Did you bring that with you every time

19   you went on the Metro?

20   A.  No.

21   Q.  Okay.  Let's say in the two or three years before this

22   accident happened, would you bring it with you every time

23   you went on Metro?

24   A.  Sometimes I did, if I were going to the Hill and I knew

25   that I would be walking the halls that are nearly half a

1    mile long.

2    Q.  Okay.  And you brought it with you, I think you said,

3    because the pavement at McPherson Square at or around

4    Georgia Brown's is uneven?

5    A.  Yeah.

6    Q.  Okay.  How often did you use the pole -- or, I'm sorry,

7    the cane?  I apologize.  How often did you use the cane on a

8    daily basis at that point?

9    A.  If I were going into town, I would take it with me

10   depending on what I was doing.  But otherwise I only used it

11   occasionally.

12   Q.  Okay.  You talked about gardening on your mountain.

13   A.  Yes.

14   Q.  Did I understand you correctly that the garden patch,

15   the plot that you used for gardening, is at a pitch?

16   A.  Yes.

17   Q.  Did you use your cane while you were gardening?

18   A.  No.

19   Q.  No, you didn't, okay.

20          I understand that prior to the accident you were

21   diagnosed with degenerative joint disease in your knees.  Do

22   you recall that?

23   A.  I don't know whether I was diagnosed with DJD, but I do

24   know that they got creaky and particularly -- yeah, I had

25   injections in both knees at one time.

1    Q.  And you treated with Dr. Bishop for that?

2    A.  Yes.

3    Q.  Okay.  And he did the injections in both knees?

4    A.  Yes.  Yes, he did.

5    Q.  And --

6    A.  As I recall.

7    Q.  And do you recall when that was?

8    A.  He treated me both before and after the accident.

9    Q.  Do you recall treating with Dr. Bishop in August of 2017

10   for degenerative joint disease?

11   A.  If that's an injection into my knee, yes.

12   Q.  Okay.  Do you recall ever having what's called a DEXA

13   scan?

14   A.  A what?

15   Q.  DEXA scan, a bone density scan?

16   A.  Oh.  Probably 20 years ago, 30 years or more than that.

17   Kaiser did one.  Nobody else has done one that I know of or

18   can remember.

19   Q.  Did you have a DEXA scan with Dr. Koenig at Fauquier

20   Hospital on June 26, 2017?

21   A.  I don't recall.

22   Q.  And do you recall being diagnosed with osteopenia?

23   A.  Osteopenic.  I know at Kaiser they told me that perhaps

24   I was osteopenic, but since that time I got into a gym and I

25   have no idea now.  I'm pretty strong.

1  Q.  Do you have an idea of what "osteopenia" means?

2  A.  Oh, yeah.

3  Q.  What's that?

4  A.  It means that the density of the bone is lessening as

5  frequently happens with old age, which is one of the reasons

6  I stayed sat.

7  Q.  Do you recall a fall in December of 2017 that you

8  treated with Dr. Olson?  I think the description is that you

9  tripped over Christmas lights?

10  A.  Probably.

11  Q.  Do you recall at that time injuring your knees or your

12  right knee?

13  A.  I probably bruised it.

14  Q.  Okay.

15  A.  How is that relevant?

16  Q.  Ms. Scott, you testified about your advocacy work with

17  indigenous American veterans.

18  A.  Yes.  That's my mission.

19  Q.  And I believe you indicated that your treatment from

20  your hip injury lasted until I think it was around -- well,

21  it was ongoing, but I think you indicated there was a point

22  in April of 2020?

23  A.  It was pretty close to the end of April when I finished

24  outpatient PT.

25  Q.  Okay.  It was outpatient PT that you finished in April

1    of 2020?

2    A.   Yeah.

3    Q.   Okay.  At that point during the pandemic, was your -- I

4    guess the firm that you were an independent contractor with

5    or the organizations you worked with, were they still doing

6    the clinics that you talked about in the various

7    reservations and properties?

8    A.   No.

9    Q.   No?

10   A.   Everything shut down, absolutely.  I mean, you couldn't

11   -- you didn't travel.  And I had difficulty traveling at

12   that point anyway, but everything shut down.  The Hill shut

13   down.  We learned to use Zoom.

14   Q.   Were you participating in those presentations via Zoom?

15   A.   Which ones?

16   Q.   The ones that you were talking about with regard to

17   the clinics that were offering resources for American

18   indigenous --

19   A.   No, we did not set those up at that time.  Everything in

20   that regard just stopped.

21   Q.   Okay.  Did you continue to work and advocate for

22   American indigenous veterans during the pandemic in a way

23   that was --

24   A.   That required me to go anywhere?

25   Q.   Not required you to go anywhere, but during the

1    pandemic, when nobody could go anywhere, did you continue to

2    work on that?

3    A.  Yes, with staffers from the Senate committee and the

4    House committee.

5    Q.  Okay.  And what did that work consist of?

6    A.  It consisted of advising them that there were certain

7    needs of indigenous veterans that were not being met by the

8    VA, and specifically we talked about a whole range of

9    things; healthcare, mental health care, cultural --

10   culturally competent mental health care, education, and

11   particularly the lack of any availability of adequate

12   training for tribal veteran service officers.

13        That was what they needed more than anything else

14   because none of the major VSOs would go.  None of them would

15   go with the res; and with nothing, there was no way for

16   advocacy that was culturally competent.

17        So that was what I talked about with the staffs of

18   both the Senate and the House; that and the lack of tribal

19   veterans treatment courts.

20   Q.  I want to be clear that that was -- that was work that

21   was ongoing during the pandemic?

22   A.  It was ongoing when we would get a Zoom.

23   Q.  Okay.  Were you continuing to work with indigenous

24   veterans directly during that time, either via Zoom or

25   otherwise?

```
 1    A.  No.

 2    Q.  Okay.

 3    A.  I was advocating for them, but I didn't -- NCA -- I

 4    didn't go to NCAI during the pandemic.

 5    Q.  NCAI, I'm sorry?

 6    A.  National Congress of American Indians.

 7    Q.  Okay.  Do you recall seeing Dr. Rao in connection with

 8    your injuries?

 9    A.  He was the first person I saw.

10    Q.  When you woke up in the hospital?

11    A.  When I went to GW.

12    Q.  And he was your surgeon?

13    A.  Yes.

14    Q.  Do you recall seeing him in 2000, I think it was

15    October?

16    A.  I went back for follow-up, yes.

17    Q.  And how were you doing at that time?

18    A.  Oh, the first couple of times we had to use -- I think

19    one time we had to use a wheelchair, and it was extremely

20    difficult because there's no parking anywhere around.  You

21    have to really try and find parking and then get to the

22    medical building.

23    Q.  Do you recall -- oh, go ahead.  I don't want to cut you

24    off.

25    A.  It was just very extremely difficult.
```

1    Q.  Okay.  Do you recall seeing him October 26, 2020?  I

2    think that was the last time you saw him.

3    A.  I can't remember the date.

4    Q.  Okay.  Do you recall Dr. Rao concluding that you were

5    doing extremely well in October of 2020?

6    A.  Yes.  He was very pleased with the progress I had made.

7    Q.  And the surgery was well-performed, correct?

8    A.  If it hadn't been, I'd be in deep trouble.  He was an

9    extraordinary surgeon.

10   Q.  He did a great job on your surgery?

11   A.  Yes, of course.

12   Q.  All right.  And did you tell him that you were

13   ambulating with a cane, the cane that you were using prior

14   to your injury?

15   A.  I probably did.  I probably had the cane with me at

16   least one or two of the times, probably the last time I saw

17   him.

18   Q.  And to be fair, you told him you were using the cane

19   more now than you were before, correct?

20   A.  I have no idea what I told him.

21   Q.  Okay.  Do you recall telling him that you wanted to

22   return to physical exercise?

23   A.  I probably did, yes.

24   Q.  Okay.  And he agreed that that was a good idea with some

25   caution and restrictions?

1    A.  A lot of restrictions.

2    Q.  Okay.  Did you go back to physical exercise?

3    A.  I went to outpatient PT immediately after.  I continued

4    that until sometime towards the end of April, and the

5    therapist I had more or less told me I could go back to the

6    gym.

7    Q.  Okay.  And did you?

8    A.  Yes.

9    Q.  Okay.  Do you continue to?

10   A.  Yes.

11   Q.  Okay.

12          All right.  When was the last time you saw

13   Dr. Bishop?

14   A.  What?  The last time I saw Dr. Bishop?

15   Q.  Yes, ma'am.

16   A.  I think it was sometime this past fall.  I remember I

17   went, and he did an injection in my right knee.

18   Q.  Okay.

19   A.  And he told me he wasn't taking insurance anymore so I

20   haven't been back.

21   Q.  So when you saw him this last fall, it was for your

22   right knee?

23   A.  Yes.

24   Q.  And he did an injection?

25   A.  Yes.

```
 1   Q.  What was the problem you were experiencing with your
 2   right knee?
 3   A.  It was creaky.
 4   Q.  Okay.  Do you remember the last time you saw him for the
 5   femur fracture as being August 25, 2021?
 6   A.  That sounds about right.
 7   Q.  Okay.  And you indicated to him at that point that you
 8   were still having pain in your hip, you could not lie on
 9   your left side, and that you fatigued easily?
10   A.  Yes.
11   Q.  Okay.  Since seeing Dr. Bishop in August of 2021 and
12   Dr. Rao in October of 2020, have you seen any of your
13   surgeons with connection to -- either of those surgeons in
14   connection with your hip?
15   A.  No.
16   Q.  Okay.
17   A.  I see my primary.
18   Q.  Okay.  But you're not currently treating with your
19   orthopedic surgeons for your hip, correct?
20   A.  No.
21   Q.  Okay.
22   A.  There's nothing they can do at this point.  I'm stuck
23   with it.
24              MR. WATERS:  Those are all my questions, Your
25   Honor.
```

```
1              MR. P. REGAN:  No questions, Your Honor.

2              THE COURT:  Okay.  Ms. Scott, you are excused.

3     You can have a seat at counsel's table.

4              THE WITNESS:  Thank you, sir.

5              Should I take this away?

6              THE COURT:  Just leave it there.

7              MR. P. REGAN:  Your Honor, our next witness is

8     Dr. Andrew Bishop.

9              THE COURT:  Good morning, sir.

10             THE WITNESS:  Good morning.

11             THE COURT:  Step right up and remain standing and

12    raise your right hand, please.

13                     ANDREW BISHOP, M.D., Sworn

14                        DIRECT EXAMINATION

15    BY MR. P. REGAN:

16    Q.  Good morning, Dr. Bishop.  If you would, introduce

17    yourself to the jury, please.

18    A.  My name's Dr. Andrew Bishop.  Do you want my background

19    or --

20    Q.  Yeah, sure.

21    A.  I'm an orthopedic surgeon currently living in

22    Middleburg.

23    Q.  Okay.

24             THE COURT:  Mr. Bishop, if you could move a little

25    closer to that microphone just to make sure everybody can
```

1    hear you.  Okay?

2              THE WITNESS:  Sorry.

3    Q.  How long have you been practicing as an orthopedic

4    surgeon?

5    A.  38 years.

6    Q.  You're board-certified in orthopedic surgery?

7    A.  Correct.

8    Q.  And, Dr. Bishop, I understand at one time for 15 years

9    you served as the orthopedic surgeon for the NFL Atlanta

10   Falcons?

11   A.  Yes.  I was the head team physician for the Falcons for

12   many years, yes.

13   Q.  Tell us about that, if you would.

14   A.  Well, I was in private practice.  I joined the guy that

15   was the doctor at the time.  They eventually asked me to

16   take over, and I was responsible for, you know, all of the

17   player care, evaluating injuries, every game, home and away,

18   training camps, practices, et cetera.  I also had a private

19   practice at the same time.

20   Q.  Okay.  And when did you -- you did that for what period

21   of time?

22   A.  From about, let's see, 1991 or so to 2006.

23   Q.  Okay.  And when did you move to Northern Virginia?

24   A.  2008.

25   Q.  And you've had a private practice in Northern Virginia

```
 1    since that time?

 2    A.  Correct.

 3    Q.  And then at some point in 2017 you began treating the

 4    plaintiff in this case, Ms. Carol Scott, who is sitting at

 5    the table?

 6    A.  I'm presuming that's the correct date, yes.  I don't

 7    have the notes in front of me.

 8    Q.  And have you formulated certain opinions within a

 9    reasonable degree of medical certainty about the care that's

10    been rendered to Ms. Scott that you're prepared to share

11    with us today?

12    A.  Yes.

13              MR. P. REGAN:  Your Honor, at this time I'd submit

14    Dr. Bishop as an expert in the field of orthopedic surgery.

15              MR. WATERS:  No objection.

16              THE COURT:  So moved.

17              Dr. Bishop will be permitted to testify as an

18    expert in the field of orthopedic surgery.  He's the

19    treating physician as well, correct?

20              MR. P. REGAN:  Correct.

21              THE COURT:  Okay.

22    BY MR. P. REGAN:

23    Q.  Doctor, let's talk about -- so when you first began

24    treating Ms. Scott in 2017, what were you treating her for?

25    A.  When I first saw her -- and, again, I don't have my
```

1    notes in front of me -- it was for a problem with her knee,

2    which is unrelated to the really current problem that we're

3    talking about.

4    Q.  And at that point there was an indication that she was

5    dealing with a degenerative joint disease.  Explain to the

6    members of the jury what that is, please.

7    A.  Basically she had some mild arthritis.  I've seen her

8    for both of these.  I can't remember which one was first,

9    but she had some early mild arthritis in her knee.

10   Q.  Okay.  And what did you do for her at that time?

11   A.  I believe I gave her a cortisone shot and sent her to

12   some rehab.

13   Q.  Okay.  What is -- would you -- what is osteopenia?

14   A.  Osteopenia is, quote, softening of the bones.  You lose

15   calcium, and your bones become a little bit brittle and

16   soft.

17   Q.  What's the difference between osteoporosis and

18   osteopenia?

19   A.  Osteoporosis is just a more severe form.  Osteopenia is

20   sort of -- as you go from normal healthy bone to

21   osteoporosis, you go through a period of osteopenia, which

22   could last, you know, a long time, and it could actually

23   arrest at that point.  It's just a matter of degree.

24   Q.  Okay.  And when did you first see Ms. Scott in

25   connection with her left hip?  Do you recall?

1   A.  Yeah, I'd have to look at my notes, to be honest with

2   you.  I meant to bring them.  I forgot.

3   Q.  October -- I'm sorry, August 4, 2021, is what the

4   records indicate.  Does that sound consistent?

5   A.  That sounds right, yes.

6   Q.  What was her condition at that time when you saw her?

7   A.  She had sustained what's called a subtrochanteric femur

8   fracture, which was treated surgically, and she came to see

9   me for follow-up care.

10  Q.  Okay.  And at my request, did you review certain medical

11  illustrations that have been prepared by a medical

12  illustrator?

13  A.  I did.

14  Q.  And the illustrations are Exhibits 5, 6, and 7 in the

15  binder in front of you.  I'm just going to ask you a

16  question.  Are those the illustrations you reviewed?

17  A.  Yes.

18  Q.  Will those medical illustrations help you explain your

19  testimony to the jury?

20  A.  Yes, I believe they will.

21          MR. P. REGAN:  Your Honor, at this time, pursuant

22  to Rule 107, I would ask that the Court accept for

23  illustrative purposes Plaintiff's Exhibits 5, 6, and 7.

24          MR. WATERS:  The same objection that we previously

25  raised with regard to the authentication.

 1              THE COURT:  Overruled, and so moved.

 2              MR. P. REGAN:  Judge, if I can, I'd like to set up

 3      the easel with the illustrations and have Dr. Bishop come

 4      down with a portable mic and explain the surgeries.

 5              THE COURT:  You don't have them electronically?

 6              MR. P. REGAN:  We do have them electronically.

 7              THE COURT:  I see.  Go ahead.

 8              MR. P. REGAN:  They're very small.  They're very

 9      small.

10              May I have him come down with the microphone?

11              THE COURT:  Sure.

12              MR. P. REGAN:  Okay.

13              MR. WATERS:  Your Honor, may I position myself so

14      I can see what's being shown to the jury?

15              THE COURT:  Yes, if we could do that in a way that

16      Mr. Waters can observe.

17              THE WITNESS:  Upside down.

18              THE COURT:  They're upside down.

19              THE WITNESS:  Upside down.

20      BY MR. P. REGAN:

21      Q.  All right.  Doctor, what I'm going to do is have you

22      come down and stand in a way that you're not blocking

23      anybody's view and explain this.  I'm going to have you put

24      this microphone on.

25              THE COURTROOM DEPUTY:  It's currently muted, so

1    you need to unmute it.

2              MR. WATERS:  May I stand next to the door?

3              THE WITNESS:  Can you all see that okay?

4    A.  Okay.  I think I'll start first with sort of the normal

5    anatomy.

6              So this is the right hip.  This is the left hip.

7    This is the hip joint here.

8              These are called the trochanters.  This is the

9    greater trochanter.  This is the lesser trochanter.  Those

10   are where big muscles attach to the thigh.  So hip fractures

11   occur typically in one of three places, either from the

12   neck, which is here, an intertroch, which is here, or a

13   subtroch, which is down below the trochanters.

14             So now I'll come over to the injury.  And this is

15   an x-ray of the exact same thing.  And so this is an example

16   of what's called a subtrochanteric femur fracture, so the

17   fracture occurred below the trochanters.  It's a significant

18   fracture which requires surgical intervention always.

19   Q.  And for the Court's purposes, we're looking at

20   Plaintiff's Exhibit No. 5 right now.  Okay.  Anything else

21   that's significant about that, Dr. Bishop?

22   A.  No, I don't think so.

23   Q.  All right.  Let me put Exhibit No. 6 up there.

24             Would you explain what Exhibit No. 6 shows.

25   A.  This is showing the surgical treatment of the

1    subtrochanteric femur fractures.  These are very unstable

2    fractures and require solid internal fixation.  We do what's

3    called a closed reduction.

4         So we don't open it up and put the pieces back

5    together.  We use traction and other devices and have an

6    x-ray.  So we line the fractures up in a closed fashion, and

7    then we do what's called an internal fixation.

8         So in this particular fracture, it requires two

9    fixation points, or three really.  This is a big rod or a

10   nail.  So we drill a hole in the top of the trochanter,

11   which is right here, the normal trochanter.  We drill a hole

12   there, and we go through -- the bone is like a tube.  It's

13   not completely hollow, but it's soft on the inside.  It's

14   very hard on the outside.  But we take what are called

15   reamers that sort of ream out that softer part.  So we get a

16   nail that goes down inside that fits nice and snug, so it

17   sort of shish kabobs the fracture.

18        But this particular fracture -- if you broke the

19   femur here, that's probably all you would need.  But when

20   it's a subtrochanteric fracture, it's highly unstable, so we

21   actually have to use a second point of fixation.

22        So after the nail goes in, we put --

23   Q.  Let me ask you this.  Let me show you what's been marked

24   as Plaintiff's Exhibit No. 8.  And what is that?

25   A.  This is the nail or rod that goes down inside the femur.

1     Q.   Okay.

2     A.   And these -- this hole here, as you can see, is -- in

3     this particular fracture, because they're unstable, we have

4     to take a second point of fixation.  So you take this guide

5     and use an x-ray and put a second screw through this hole up

6     the femoral neck, which is here, and into the femoral head

7     to give that secure fixation.

8           The third point of fixation is because this will

9     keep any bending side to side, front to back, but it won't

10    stop rotation.  I think if you had a shish kabob, and you

11    had something on it, you could spin it, right?

12          So we take another screw -- there's another hole

13    down here.  Several.  You usually just pick one of them, and

14    put another screw in here, and that will stop any rotation

15    of this lower piece of bone.

16    Q.   And this is a surgery you've performed throughout your

17    -- during the course of your orthopedic surgery career?

18    A.   Yes.

19    Q.   All right.  And then let me show you what's marked as

20    Plaintiff's Exhibit No. 7, and explain what that is, if you

21    would, please.

22    A.   So the illustration just shows -- after all the implants

23    have been in place, the nail, the femoral neck screw, and

24    the rotational screw down here, this is an x-ray of the

25    basically exact same thing.  This is after everything's been

1    said and done.  You can obviously -- on the illustration

2    there's a fracture obvious -- you can see the fracture line

3    here.  It's a little harder to see on this view here, but

4    it's all through this area.

5            And, again, it's called the subtroch because

6    here's the trochanter and trochanter, and this is below the

7    trochanter.

8    Q.  And that's immediately after surgery.  That picture on

9    the right shows the surgery when the surgeons finished on

10   September 24, 2019?

11   A.  Correct.  That's correct.

12   Q.  Okay.

13           Okay.  Doctor, I think you can resume the stand.

14   Thank you.

15           MR. P. REGAN:  I didn't realize there was a

16   witness here.

17           THE COURT:  I'm sorry?

18           MR. P. REGAN:  I didn't realize there was a

19   witness here.

20           THE COURT:  Ladies and gentlemen, just for

21   potential clarification, there are two types of witnesses,

22   right?  There are witnesses who we call percipient

23   witnesses.  Those are the folks that saw or heard something

24   about an event and have firsthand knowledge.  And there are

25   also expert witnesses, who testify based on their experience

1    and background on things like scientific or medical issues.

2    And Dr. Bishop is testifying here as both kinds of

3    witnesses.  He's a treating physician, but he's also been

4    qualified to testify as an expert on certain surgical

5    procedures.  Okay?

6            MR. P. REGAN:  Thank you, Judge.

7            THE COURT:  Go ahead.

8    BY MR. P. REGAN:

9    Q.  All right.  Let's talk about when you examined Ms. Scott

10   in 2021 in connection with her fractured femur.

11           Actually, let me ask you, you've seen Ms. Scott

12   since 2021, but not in connection with the femur fracture,

13   correct?

14   A.  That's correct.

15   Q.  Okay.  So the last time you saw her, in fact, the only

16   time you saw her for the femur fracture, was in 2021?

17   A.  That's correct.

18   Q.  What was her condition at that time?

19   A.  She was -- the fracture radiographically had actually

20   healed fairly nicely, but any hip fracture, particularly in

21   elderly folks -- and most of them are in elderly folks --

22   are serious significant injuries.

23           And it's not just the bone.  There's soft tissue

24   injuries that you really can't see on an x-ray.

25           She was having some complaints of, you know, just

1    ongoing pain, weakness, loss of motion of the hip, and those

2    are all things consistent with the injury that she had had.

3    I mean, even though the bone had healed nicely.  And then

4    she was doing okay, but she still had some problems from it.

5    Q.  And in your opinion within a reasonable degree of

6    medical certainty, are those problems that you saw in 2021

7    permanent?

8    A.  Yes.

9    Q.  Doctor, just let me circle back.  Are the opinions

10   you've testified to today opinions you hold within a

11   reasonable degree of medical certainty?

12   A.  Yes.

13          MR. P. REGAN:  Thank you very much.  No further

14   questions, Your Honor.

15          THE COURT:  Mr. Waters.

16          MR. WATERS:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18   BY MR. WATERS:

19   Q.  Good morning, Dr. Bishop.

20   A.  Good morning.

21   Q.  We met outside in the hallway earlier this morning?

22   A.  Yes.

23   Q.  I think you answered this from counsel.  The only time

24   that you saw Ms. Scott with respect to the hip fracture or

25   the femur fracture was in August of 2021, correct?

```
 1    A.  Correct.

 2    Q.  You were not her surgeon?

 3    A.  No.

 4    Q.  And she treated with Dr. Rao surgically and post-

 5    operatively?

 6    A.  I presume that's who.  I don't know who operated on her.

 7    I can't remember that, but I'll take your word for it.

 8    Q.  Okay.  Have you ever seen Dr. Rao's records?

 9    A.  No.

10    Q.  Okay.  Did you -- so you're not aware of Dr. Rao's

11    assessment of her in October of 2020?

12    A.  No.

13    Q.  Okay.  Are you aware that he indicated that at that time

14    she was doing extremely well?

15    A.  I'm not aware of that.

16    Q.  Okay.  Did you discuss with her Dr. Rao's encouragement

17    that she go back to physical exercise?

18    A.  I don't remember, but it was important that she try to

19    do some exercise as much as possible to try to regain any

20    strength that she may have lost.

21    Q.  So you agree that it would have been a good thing for

22    her to do to return -- resume physical exercise and to

23    continue doing that?

24    A.  To the degree that she could, yes.

25    Q.  Right.  And that was when you saw her in August of 2021?
```

1    A.  Yes.

2    Q.  Did you discuss that with her at that time?

3    A.  I'm sure I did.  I don't recall specifically.

4    Q.  So when you saw her at that time, would you say, at

5    least from a surgical perspective, that she had an excellent

6    surgical outcome?

7    A.  Yeah, he did a very nice job.  The bone had healed.

8    Yes, I think it was as good as it could possibly be.

9    Q.  The instrumentation was properly placed?

10   A.  Correct.

11   Q.  And I think you said it was as good as it could possibly

12   be, correct?

13   A.  Yes.

14   Q.  When you had otherwise seen her, you had seen her for

15   her knees; is that correct?

16   A.  Correct.

17   Q.  And you'd seen her prior to the accident with respect to

18   degenerative joint disease in both knees?

19   A.  I think I had seen her for one knee before that, and I

20   saw her for the other knee after that, I believe.

21   Q.  Do you recall doing injections of both knees prior to

22   the accident?

23   A.  I'm not sure if I did both knees prior.  It's possible.

24   I know I did one, and I know I did one after.  It's possible

25   I did both before.

1    Q.  When you had seen her before, was she using a cane to

2    ambulate in the office?

3    A.  I don't believe so.

4    Q.  Okay.  When you saw her after, was she using a cane to

5    ambulate in the office?

6    A.  I believe she was, yes.

7    Q.  Okay.  Did you discuss with her her activity levels with

8    regard to her knees and how it was affecting her?

9    A.  At the time when I saw her for her hip or when I saw her

10   for her knees?

11   Q.  When you saw her for her knees before the accident.

12   A.  I mean, I'm sure we discussed the general activity

13   levels.  She had an arthritic knee, and we did something to

14   try to relieve the discomfort so she could be more active,

15   yes.

16   Q.  Could you explain what an arthritic knee means.

17   A.  It's just some early wear of the cartilage.  Every bone

18   in your joint -- or every joint in your body has cartilage.

19         If you've ever seen the end of a chicken bone

20   before it gets cooked, that white glistening stuff, every

21   joint in your body is covered with that.  And as we age

22   certain joints, it will start wearing out.  You know, just

23   like gray hair and wrinkles, it just happens.

24   Q.  So as it's happening in an arthritic knee, would a

25   patient be experiencing pain or discomfort?

1    A.  Yes.  I mean, it just depends.  I mean, some people have

2    very little discomfort.  Some people have a lot.  It's all

3    over the board.

4    Q.  Would it affect their ability to ambulate?

5    A.  Only if it was severe, I think.

6    Q.  Do you recall what Ms. Scott shared with you as to why

7    she was -- what she was experiencing with her knees?

8    A.  She was just having some discomfort in her knees.

9    Q.  Okay.  Did you ever see the results of a DEXA scan in

10   June of 2017?

11   A.  I don't believe I did, no.

12   Q.  Okay.  Were you aware that she had -- that her DEXA scan

13   had been interpreted as osteopenic?

14   A.  I don't.  It doesn't surprise me at all.  Most Caucasian

15   elderly females do have that.

16   Q.  Okay.  So this -- it's not uncommon with somebody of

17   Ms. Scott's age that they would be experiencing osteopenia

18   and some --

19   A.  I would say it's the rule rather than the exception.

20   Q.  Okay.  At the time when Ms. Scott saw Dr. Rao, she was

21   not taking any pain medications for her hip.  Were you aware

22   of that?

23   A.  No.

24   Q.  Okay.  When she saw you, did she indicate whether she

25   was taking any pain medications for her hip?

1    A.  I don't recall.

2    Q.  Okay.  Do you remember prescribing any pain medications

3    for her hip?

4    A.  I doubt that I prescribed, you know, serious pain

5    medications.  I might have put her on an anti-inflammatory.

6    Q.  Okay.  Do you recall discussing with her whether she was

7    able to ambulate without her cane for short distances after

8    the accident?

9    A.  I don't recall specifically discussing that.

10   Q.  Did you recall discussing with her a comparison of

11   whether she was using her cane more or less now than after

12   the accident?

13   A.  I think she was not using the cane before the accident,

14   and she was using the cane then so...

15   Q.  Okay.  In your understanding she wasn't using the cane

16   at all before the accident?

17   A.  That is my understanding.

18   Q.  Okay.

19            MR. WATERS:  Indulgence, Your Honor.

20            (Pause)

21            THE COURTROOM DEPUTY:  What's the exhibit?

22            MR. WATERS:  I think it's Exhibit 7 we're bringing

23   up electronically.

24            THE COURTROOM DEPUTY:  Defendant or plaintiff's?

25            MR. WATERS:  Plaintiff's.

1    BY MR. WATERS:

2    Q.   Okay.  I believe, Dr. Bishop, you have in front of you

3    one of the images that was just shown to you.

4    A.   Correct.

5    Q.   The image here from this illustration -- did you prepare

6    this illustration, by the way?

7    A.   No.

8    Q.   Okay.  Did you review the illustration before you

9    testified here today?

10   A.   Yes.

11   Q.   Were you involved in consulting with the service that

12   prepared the illustration?

13   A.   No.

14   Q.   Okay.  The title on the illustration is "Carol Scott's

15   September 24, 2019, Intramedullary Rodding Surgery, Part 2."

16   Did I read that correctly?

17   A.   You did.

18   Q.   Okay.  And it said -- but it's -- just below the x-rays

19   that it's based on x-rays from November 18, 2019, correct?

20   A.   That's what they're labeled, yes.

21   Q.   And I believe the illustration, which I think

22   superimposes some animation over the x-ray, also indicates

23   November 18, 2019, correct?

24   A.   That's -- yes, that appears to be correct.

25   Q.   Okay.  So while the title says that this is September

1    24, 2019, the x-ray it's based on is November 18, 2019,

2    correct?

3    A.   That appears to be correct.

4    Q.   So approximately two months later?

5    A.   Yes.

6    Q.   And I think the purpose of this illustration is to show

7    the proper placement of the instrumentation?

8    A.   I presume that's correct, yes.

9    Q.   Okay.  So a patient who has a hip fracture over the

10   course of 60 days following a significant fracture to the

11   proximal end of the femur, would they be experiencing or be

12   showing radiographic signs of healing, remodeling of the

13   bone?

14   A.   Probably not remodeling.

15        You may or may not be seeing healing.  At that

16   point bones actually see healing more in bones that do not

17   have internal fixation.  Internal fixation is fairly rigid,

18   and the healing is actually slower.

19        The fracture is held stable.  Don't get me wrong.

20   I'm not saying that.  But the actual healing of the bone is

21   somewhat slower when there's rigid internal fixation as

22   opposed to if you broke your arm and they just put you in a

23   cast, you would see healing sooner.

24        You may see some healing, but you may not.

25   Q.   Would you agree with me that the illustrated part of

1    this still shows an acute fracture?

2    A.  Yes.  I think for demonstration purposes, that shows the

3    acute fracture.

4    Q.  And that may have been the case the day after the

5    accident when she was injured, correct?

6    A.  It wouldn't look like that until it got surgery, but

7    yeah.

8    Q.  But after the surgery and after several -- after two

9    months there would be healing of the bone?

10   A.  I mean, you probably would expect some healing, yes.

11   But you may or may not see it on the radiographs.

12   Q.  Okay.

13            MR. WATERS:  Those are all my questions, Your

14   Honor.

15            MR. P. REGAN:  No redirect, Your Honor.

16            THE COURT:  All right.  Dr. Bishop, thank you very

17   much for your testimony.  You are excused.  Please don't

18   discuss your testimony with anyone until the end of the

19   case.  All right?

20            THE WITNESS:  Thank you.

21            THE COURT:  All right.

22            Okay.  Ladies and gentlemen, it's about 10:35.

23   Why don't we take our customary morning break, about 15

24   minutes.  We will be ready to go at 10:50, okay?

25            (Jury exits courtroom)

```
 1              THE COURT:  All right.  Who is up next?  Who is up
 2     next?
 3              MR. C. REGAN:  Up next, Your Honor -- we might
 4     talk about that for a moment, Your Honor, but it would be
 5     either Dr. Berkowitz --
 6              THE COURT:  Have a seat.
 7              MR. P. REGAN:  I think we'll have a two-minute
 8     video from the 30(b)(6) witness, and then Dr. Berkowitz.
 9     Literally a two-minute video.
10              THE COURT:  Okay.  And no surprises.
11              What's the video?  Will there be any objections?
12     Do we need to resolve it now rather than when the jury comes
13     back?
14              MR. C. REGAN:  Your Honor, I'll talk it over with
15     Mr. Waters right now.  I don't think there will be any
16     surprise.  It's five lines from the deposition that were not
17     objected to.  Two minutes is too long.
18              MR. WATERS:  Your Honor, I do have one preliminary
19     issue with Dr. Berkowitz.  I apologize.  I know the Court
20     wants to take a break, too.
21              THE COURT:  That's all right.  Have a seat.
22              Go ahead.
23              MR. WATERS:  So there was a -- Mr. Regan commented
24     during our pretrial conference with regard to the objections
25     that we had raised with regard to Dr. Berkowitz in terms of
```

1    the scope of voir dire on him, including cross-examination,

2    based on his prior exclusions.  I don't think that there was

3    a ruling on that issue with the Court, but I want to be

4    clear and wanted to anticipate a potential issue with

5    counsel.

6            I fully intend to cross-examine him on his prior

7    exclusions and limitations.  I believe that directly goes to

8    his credibility as a witness, and I would probably prefer to

9    do that on a voir dire of the witness when he's tendered as

10   an expert, but I wanted to raise that issue with Your Honor

11   so as to avoid any potential problem.

12           THE COURT:  In the presence of the jury?

13           MR. WATERS:  In the presence of the jury.

14           THE COURT:  Mr. Regan.

15           MR. P. REGAN:  Judge, I would vehemently object to

16   that.  That is not something that is at -- for instance,

17   your ruling in this case could be used by opposing counsel.

18   We're going to file a motion for reconsideration because we

19   were never offering --

20           THE COURT:  Which ruling?

21           MR. P. REGAN:  Your ruling on Dr. Berkowitz, okay.

22   Your ruling is titled "Granted in Part and Denied in Part."

23   And, in fact, we were never offering him on jerk rates,

24   okay?  So the point is, there are many, many instances where

25   counsel misrepresented in the deposition the ruling, and it

1    was where counsel proffering Mr. Berkowitz was not offering

2    him that way.

3               So, in other words, in your ruling, I don't think

4    it's proper to grant a motion that now could be used on

5    cross-examination to say you weren't allowed to testify to

6    jerk rates.  We didn't even try to qualify him that way.

7               MR. WATERS:  No, no, I need to clarify, Mr. Regan.

8    I apologize.

9               THE COURT:  Are you seeking to voir dire

10   Dr. Berkowitz to establish that he's not qualified to

11   testify about the national standard of care?

12              MR. WATERS:  Yes, and part of that --

13              THE COURT:  Would your questions be limited to

14   that issue?

15              MR. WATERS:  The cross-examination was going to be

16   based on not the ruling in this case, Your Honor.  I wasn't

17   going to cross-examine him on your ruling with regard to

18   jerk rates.

19              Now, I disagree with counsel.  He's very much

20   offered on jerk rates.  It's very much a part of his initial

21   disclosure.  But I accept Your Honor's ruling with regard to

22   the exclusion of that portion of his testimony.

23              THE COURT:  Well, just to be clear, I believe the

24   ruling was denied in part --

25              MR. WATERS:  Granted.

1          THE COURT:  -- granted in part on mootness grounds

2     because the testimony on that issue had been withdrawn.

3          MR. WATERS:  Right.  My point is --

4          THE COURT:  I never made any findings as to the

5     validity of his conclusions on jerk rates, et cetera.

6          MR. WATERS:  What I think is fair game on cross-

7     examination and voir dire of the witness is the fact that

8     other Courts repeatedly have excluded him or limited him,

9     characterized his testimony and his opinions as speculative

10    and conclusory.

11         And that is something I think is fair game for

12    cross-examination both in terms of his overall credibility

13    or his overall qualifications as an expert as well as his

14    credibility as an expert.

15         THE COURT:  On that issue, Mr. Regan, what's your

16    position?

17         MR. P. REGAN:  And I stand by what I said before.

18    I knew that's what he was going to do, and that is not

19    proper.  He is not -- he's being offered on one thing here,

20    and that is the national standard of care.

21         This isn't a criticism, Your Honor, but as written

22    your ruling could be used --

23         THE COURT:  He's not going to use my ruling.  This

24    is a different issue.

25         MR. P. REGAN:  No, no, I understand.  I'm using a

1    hypothetical.

2            I'm saying, two weeks from now, when we try this

3    exact same thing before Judge Porter, hypothetically on

4    cross-examination he could use your ruling to say "you were

5    excluded in federal court" because while we all know it was

6    denied on mootness, it's not clear in the order.  And so

7    what I'm saying is it's also not clear in those other orders

8    that have nothing to do with the national standard of care

9    in this case.

10            I would agree that if some Court had ruled that he

11    could not testify on the issue in this case, it would be

12    relevant.  It is not relevant when another Court excludes

13    him on a jerk rate that's not relevant in this case.  All

14    that's going to do is confuse the jury, and it's not proper.

15    And that's why I raised it a week ago.

16            So if it's on the national standard of care as it

17    pertains to giving warnings before moving a subway or light

18    rail train, fine.  Fair game, because that's the issue in

19    this case.

20            But if it's on anything else, it's not because

21    -- we don't know.  We don't know what the lawyer did in that

22    case --

23            THE COURT:  Well, you could, you know, ask him

24    about that and he could be prepared to respond or you could

25    rehabilitate him certainly.

1          MR. P. REGAN:  Excellent point.  Excellent point.

2    In his deposition Mr. Waters offered to send him the

3    opinions because he had no idea about 90 percent of them,

4    and he never received them.

5          So yes, hypothetically he could, but he doesn't

6    have them.  Counsel said he would send them to him.  He

7    doesn't have those opinions --

8          THE COURT:  Okay.  But let's take a step back.

9          MR. P. REGAN:  -- so --

10          THE COURT:  In a normal situation, if an expert is

11   proffered to give an opinion on an area of technical or

12   medical expertise, all right, and there's a voir dire to

13   challenge the qualification of the expert, in general, the

14   opponent of the evidence is able to go into the times that

15   Courts have excluded that expert.  Right?

16          And the question is, is it on that exact question

17   that it's going to be at issue, or generally in the field

18   that the expert is being proffered on, which is

19   transportation?

20          MR. P. REGAN:  And I would say -- well, I would

21   say --

22          THE COURT:  Or somewhere in between, right?  It's

23   a judgment call.

24          MR. P. REGAN:  Well, when this Court has already

25   ruled he's qualified, it's not proper to go into that

1    because it has no bearing on this issue.

2            He is qualified, by this Court's ruling, to offer

3    an opinion on what's relevant in this case.  He is not

4    offered as an accident reconstructionist, which he was asked

5    about.  He's not offered as a biomechanical engineer, which

6    he was asked about in his deposition.  He was asked about

7    literally 10 different fields that have nothing to do with

8    what is involved in this case.

9            THE COURT:  All right.  So he's next up?

10           MR. P. REGAN:  He's next up, but I just want to

11   make sure it's not in front of the jury.

12           He can -- if he wants to waste all our time in

13   doing it outside the presence of the jury, that's fine.

14           THE COURT:  All right.  Let us take a look.  We'll

15   come back and give a ruling.

16           MR. P. REGAN:  Okay.

17           (Recess taken)

18           THE COURT:  Before we bring the jury back, the

19   subject of the Court's ruling was whether there was a

20   sufficient factual basis in Dr. Berkowitz's supplemental

21   report to support testimony, expert testimony, that the

22   failure to make an announcement before repositioning

23   violated a national standard of care.  That's all I believe

24   the ruling held.  It did not qualify Dr. Berkowitz or say

25   that Dr. Berkowitz would be qualified as an expert in the

 1   general field of public transport or whatever field he's

 2   being offered as an expert in.  Okay?

 3        Mr. Regan obviously can seek to admit him as an

 4   expert in that field and then to offer the opinion on

 5   national standard of care.

 6        Mr. Waters, if you would like to voir dire him

 7   using whatever information you'd like as to whether he

 8   should be qualified as an expert in the field of X, you're

 9   entitled to do that obviously, but that's outside the

10   presence of the jury.  Okay?

11        So if you want to do it to make your record,

12   whatever, you can do it.  The Court will make a ruling as to

13   whether Dr. Berkowitz is qualified to testify as an expert

14   in his field, the relevant field, and then we -- if the

15   Court rules that he is, he would come in and testify as to

16   the national standard of care on direct, and your cross

17   would be limited to the scope of the direct.

18        MR. WATERS:  So, just to be clear, I will not be

19   permitted to cross-examine him on credibility grounds based

20   on the prior exclusions from other courts?

21        THE COURT:  No.  I think that goes to whether he's

22   qualified as an expert or not.

23        MR. WATERS:  Okay.

24        THE COURT:  I think the -- it depends on what

25   Mr. Regan gets into, but if other Courts have found that he

 1    has lied -- I mean, if there's something that goes to his

 2    credibility or truthfulness, I think that's fair game.  But

 3    if we're just dealing with Courts that have found his --

 4    have not qualified him to testify as an expert on certain

 5    topics, I think that goes to the voir dire.

 6              MR. WATERS:  Very well, Your Honor.

 7              THE COURT:  Okay.

 8              MR. C. REGAN:  Your Honor --

 9              THE COURT:  We're going to start with the

10    30(b)(6)?

11              MR. C. REGAN:  I'd like to, Your Honor, and if I

12    could just briefly summarize, it seems like there actually

13    is some dispute.  I don't think it will take more than three

14    minutes.

15              THE COURT:  What's the dispute, Mr. Waters?

16              MR. C. REGAN:  Thank you, Your Honor.

17              Does the Court have the plaintiff's submission of

18    depositions, the binder?  I think it will make things easier

19    to be able to refer to that, Your Honor.  And we'll be

20    looking at the deposition of WMATA's 30(b)(6)

21    representative, Clev Bennett.

22              THE COURT:  Yes.

23              MR. C. REGAN:  Okay.  So the only portion of that

24    that the plaintiff would put in right now by audio

25    recording -- and that's one of the things I can talk about.

1    We've tried to remove any problems here.

2            There was an exhibit on the screen of the video

3    recording, so we will play only the audio recording with

4    just a still frame sort of title page, nothing -- not -- no

5    exhibits in the video, Your Honor.

6            But it's only Lines -- it's Page 32, Lines 2

7    through 7, Your Honor.  And that is a clean exchange --

8            THE COURT:  Wait.  Hold on.

9            MR. C. REGAN:  Sure.

10           THE COURT:  32.

11           MR. C. REGAN:  2 through 7, Your Honor.

12           THE COURT:  Okay.

13           MR. C. REGAN:  I know the Court's just read it

14   right now, but I think that is a pretty clean exchange.

15           The defense has taken the position -- so initially

16   we had also designated -- in the pretrial statement we had

17   also designated Page 12, Line 8, through Page 17, Line 5.

18   If the Court feels it's necessary --

19           THE COURT:  One more time.

20           MR. C. REGAN:  Of course, Your Honor.

21           THE COURT:  12.

22           MR. C. REGAN:  12:8 through 17:5.  In that portion

23   Mr. Waters pointed out to me that it's sort of --

24           MS. GILMAN:  That's not us.  That's not the

25   correct --

1                  MR. C. REGAN:  No, that's what I designated

2       previously in the pretrial statement, Your Honor.

3                  MR. WATERS:  Oh, yes.

4                  MR. C. REGAN:  And Mr. Waters pointed out that

5       that does -- my questions refer to statements that are not

6       coming into evidence in this case based on the Court's

7       pretrial ruling, so the questions are problematic.

8                  We've withdrawn that portion, but the defense had

9       also counter-designated the two pages leading into that

10      portion.  They counter-designated 10:6 through 12:7, Your

11      Honor, in which the WMATA witness talks about the incident

12      report and specifies which pages are part of it, which pages

13      are not, whether the witness statements are part of it.

14                 I obviously was unaware -- because of my

15      representations to the Court ten minutes ago, I did not

16      think this counter-designation could be interpreted to apply

17      to our designation at Page 32, 2 through 7, but that is the

18      position the defense has now taken.

19                 My position, of course, Your Honor, is that 32, 2

20      through 7, is about as clean a statement of the critical

21      issue in this case as exists.  And this business about what

22      different pages of an incident report that is not coming

23      into evidence concern just has no bearing on it.

24                 Of course, WMATA can call Mr. Bennett back

25      tomorrow live to the witness stand, if it wants to, in its

1    case-in-chief.  It can try to run from this.  But he

2    testified under oath that they're not aware of any evidence.

3                THE COURT:  Okay.  Mr. Waters.

4                MR. WATERS:  Your Honor, this entire exchange

5    concerns the incident report; the witness statements that

6    were taken and the substance of WMATA's knowledge of this

7    accident.

8                THE COURT:  Let's start with what Mr. Regan says

9    he wants to ask.

10               "Is WMATA aware of any evidence that would

11   contradict that?  In other words, is there any evidence that

12   WMATA is aware of that the train operator announced the

13   train would be moving before she moved it forward again.

14               "ANSWER:  No."

15               Okay.  So is there anything under the rule of

16   completeness, I guess is the question, that you would want

17   to cross-designate now --

18               MR. WATERS:  Yes.

19               THE COURT:  -- given that you're going to be able

20   to call the witness live and clarify any -- or ask him or

21   her anything you want to tomorrow?

22               MR. WATERS:  Yes, Your Honor.  And I think that

23   that's the portion from 10:6 through 12:7, because this

24   entire --

25               THE COURT:  Wait, 10:6.

```
 1              MR. WATERS:  Yes, Your Honor.

 2              THE COURT:  Okay.  It starts -- I'm not going to

 3    read the whole thing, but it talks about an incident report.

 4    What in the incident report contradicts what -- the answer

 5    that Mr. Bernard gave at the deposition?

 6              MR. WATERS:  I think it gives context to the

 7    answer that he gives later, and the context is that WMATA's

 8    knowledge is based on the incident report.  And I think the

 9    critical part of that exchange is:

10              "Is this incident report that is Exhibit 2

11    supposed to basically be the record on what happened that

12    day?

13              "ANSWER:  It is the record by one employee."

14              So I think it puts it into context.

15              THE COURT:  And that's all you want to play?

16              MR. WATERS:  That's all I want to play, is 10:6

17    through 12:7.

18              THE COURT:  Okay.  Well, 12:7 goes on another two

19    pages.

20              So is your point that Mr. Bernard's answer in the

21    clip that Mr. Regan wants to play in context qualified by

22    the fact that the only evidence he's referring to or that he

23    has knowledge of is the incident report, so therefore

24    there's no evidence in the incident reports that an

25    announcement was made?
```

1          MR. WATERS:  That's correct, Your Honor.  And I

2     think, in the absence of that context, the answer is going

3     to be presented to the jury that's going to be misleading

4     and unfairly prejudicial.

5          THE COURT:  Okay.  Mr. Regan.

6          MR. C. REGAN:  Thank you, Your Honor.

7          If that is true, then WMATA has violated its

8     discovery obligations.  Mr. Bennett was a 30(b)(6) witness.

9     He was designated on topic -- I think it's Area of Testimony

10    1, Your Honor, which would be, I think, Exhibit 2 in your --

11    Exhibit 1 to the deposition in the binder in front of Your

12    Honor.  He was designated to testify as to all information

13    available to WMATA about this incident.

14          We have the right to ask WMATA, the party, through

15    its designated representatives, what knowledge do you

16    possess?  He can't say it's limited to this.

17          And I would also say it's clear from his answer

18    there, Your Honor, my question was not limited.  My question

19    doesn't say "Does the incident report say anything?"  The

20    question, of course, that Mr. Waters just referenced saying

21    "Is this incident report supposed to be basically the

22    record?"  That is -- that's not a full -- I hope I asked

23    more questions, but that's establishing the fact that it's a

24    business record.  It's completely contemporaneously by the

25    people with the requisite knowledge, and it's attempting to

1    be an authoritative source of what happened that day.

2    That's unrelated.

3              THE COURT:  Okay.

4              MR. C. REGAN:  So he doesn't -- you know, the

5    witness here at Page 32, that is not intended to be a

6    question for the witness.  That is me asking WMATA does

7    WMATA have any information.  Because there is nothing in the

8    incident report.  That's what Pages 12 through 15 concern,

9    Your Honor.  That is me going step by step through every

10   incident -- every part of that incident report asking am I

11   missing something.

12             What is being contested here?  WMATA doesn't

13   seriously dispute this, do they?

14             And by the way, all the answers come back no, we

15   don't dispute that witness statement.  We don't dispute this

16   one.  We don't dispute this one.  We don't have any

17   knowledge outside that.

18             But at Page 32, Your Honor, we are entitled, as

19   the plaintiff in this case, to ask the defendant do you have

20   any evidence that this critical piece of the case, that this

21   warning, was actually given?  And he's speaking as the voice

22   of WMATA designated on that topic and says no.

23             They can't come back now and say, no --

24             THE COURT:  Now, look, if he were here live and

25   you asked him that question and Mr. Waters cross-examined

```
1    him, Mr. Waters could say, "What's the basis for that

2    answer?  You know, are you referring to the incident report

3    or anything else?"  And if he says the incident report, then

4    that's the answer.

5              So if you want to -- if you want to ask him that

6    question, I'm going to give Mr. Waters an opportunity to

7    place it in context to allow him to explain in a sense

8    what's the basis for your answer.  Okay?

9              If you want to, you know, withdraw it, and we'll

10   deal with it all live tomorrow, then we can do that, too.

11   So your choice.

12             MR. C. REGAN:  I guess -- and just to make sure,

13   Your Honor, I want to make sure that I'm not

14   misunderstanding or that I haven't confused the issue for

15   the Court.

16             If we can't rely on the under oath testimony of

17   WMATA's representative on that point, he can't limit -- as I

18   understand the rules, Your Honor, and of course I defer to

19   the Court, but he can't limit that to saying, "Well, I

20   actually only talked about one document."  He has to show

21   up to that deposition understanding the full body of

22   knowledge --

23             THE COURT:  But he did limit it in the deposition,

24   right?

25             MR. C. REGAN:  Respectfully, Your Honor, no.  That
```

1    is not how the deposition reads.  I could not disagree with

2    that more strongly.

3            THE COURT:  Well, why is there a problem if he

4    didn't limit it to that?

5            MR. C. REGAN:  Because, Your Honor, I think that

6    if we're forced to play this portion that Mr. Waters wants

7    ahead of time, it makes it sound like he's allowed to do

8    that, unless the Court is going to explain and say as a

9    30(b)(6) he can say he only knows about the incident report.

10   But WMATA has an obligation, under our rules of discovery,

11   to produce someone with its full knowledge, and I don't --

12   if the Court wanted to give an instruction like that, I

13   suppose there's a way around it, but otherwise, it

14   drastically waters down the --

15           THE COURT:  Well, the witness -- he wasn't

16   required to go out and conduct a new investigation, right?

17           MR. C. REGAN:  Well, Your Honor, I think he is

18   obligated to be aware of all information available to WMATA

19   on the subject.  So he doesn't have to go out there and

20   measure the train station or something, but he does have to

21   show up competently prepared by WMATA's counsel.  At that

22   point staff counsel, not Mr. Waters, but he has to be

23   competently prepared, and he has to have reviewed any and

24   all information that would be relevant so that when that --

25   and as I say, Your Honor, it's there.  The deposition notice

1    is Exhibit 1.  All information available --

2             THE COURT:  I know what a 30(b)(6) is.

3             Mr. Waters, do you want to respond briefly?

4             MR. WATERS:  This is gotcha litigation, right?  He

5    wants to play one question and one answer without any

6    context.

7             The witness was prepared, answered the question,

8    and those questions, including the one that counsel wants to

9    play, falls in the context of a discussion about this

10   incident report and the bases of information that form his

11   knowledge.

12            THE COURT:  Okay.

13            MR. WATERS:  And what we want to have designated

14   is just the bases of that information.  So playing one

15   question and one answer is a gotcha game that puts this out

16   of context.

17            THE COURT:  Address his response, which is that,

18   as I understand it, he was required to go beyond the

19   incident report; and therefore his answer to Mr. Regan's

20   question ought to have been -- ought to have encompassed

21   everything he was required to learn as a 30(b)(6) witness

22   and not simply the investigation report.

23            MR. WATERS:  As Mr. Regan pointed out, this was

24   handled by prior counsel, but my understanding is he

25   prepared with the information that was available to him.

```
 1              THE COURT:  Okay.
 2              MR. WATERS:  And that information includes the
 3   accident report and the witness statements, and the portion
 4   that we designate puts that information into the universe
 5   context.
 6              THE COURT:  Okay.
 7              MR. WATERS:  So to say that he had an additional
 8   obligation I think is inappropriate.
 9              THE COURT:  All right.  I'll stand by my ruling.
10   If you want to play that clip, I'll give the defense an
11   opportunity to put it in context with the cross-designation.
12              So if you want to consult for a minute.
13              MR. P. REGAN:  Yes, Your Honor.
14              (Pause)
15              MR. C. REGAN:  WMATA had previously offered to
16   produce the witness.  Can you have him here this afternoon
17   still?
18              MR. WATERS:  He was released yesterday, Mr. Regan.
19   I could have him here tomorrow.
20              THE COURT:  And WMATA's going to call him
21   tomorrow?
22              MR. C. REGAN:  We would call him in our case-in-
23   chief, Your Honor.  We'll take him first thing in the
24   morning.  If that's the soonest WMATA will provide him now,
25   that's what we'd like to do, Your Honor.
```

```
 1                THE COURT:  Okay.  We'll do that.

 2                Are we ready?

 3                MR. P. REGAN:  I will go get the witness while

 4      you're doing that.

 5                THE COURT:  So we're ready for Dr. Berkowitz.  Are

 6      we going to do a voir dire outside the presence of the jury?

 7                MR. WATERS:  Your Honor, I'm satisfied with the

 8      record that we made on our motion --

 9                THE COURT:  Okay.

10                MR. WATERS:  -- with respect to the bases for our

11      challenges for Dr. Berkowitz.

12                THE COURT:  Very well.

13                MR. WATERS:  I'd note my objection to the Court's

14      ruling, and if the Court's satisfied with that, I don't

15      think the voir dire is necessary.  When he's offered as an

16      expert, I will object simply for the reasons previously

17      stated.

18                THE COURT:  And I'll just say "subject to your

19      prior objection," if I decide to qualify him.

20                MR. WATERS:  Yes.

21                THE COURT:  Very well.  Okay.  Thank you.

22                Let's get the jury.

23                (Jury enters courtroom)

24                THE COURT:  All right.  Welcome back, ladies and

25      gentlemen.  We're ready to get started.
```

```
1              Mr. Regan.
2              MR. P. REGAN:  Yes, Your Honor.  At this point
3     we'd call one of our expert witnesses, Dr. Carl Berkowitz.
4              THE COURT:  Dr. Berkowitz, come on up.
5              THE WITNESS:  Thank you, sir.
6              THE COURT:  If you could step up and remain
7     standing and raise your right hand.
8              THE WITNESS:  Thank you, Your Honor.
9                   CARL BERKOWITZ, Ph.D., Sworn
10                      DIRECT EXAMINATION
11    BY MR. P. REGAN:
12    Q.  So, Dr. Berkowitz, if you would, just get that
13    microphone.  You need to be fairly close to it, okay, so
14    just adjust it properly.  There you go.
15             Dr. Berkowitz, if you would, please introduce
16    yourself to the jury and state your address.
17    A.  My name is Carl Berkowitz, and I live at 239 Lands End
18    Court, Miroches, New York.
19    Q.  Okay.  And what is your area of expertise that brings
20    you into the courtroom today?
21    A.  Transportation engineering with a focus on safety.
22    Q.  How long have you -- well, first of all, tell us what a
23    transportation safety engineer does.
24    A.  Well, that's kind of a misnomer because in
25    transportation engineering, like in real estate, it's
```

1    location, location, location, and transportation engineering

2    it's safety, safety, safety.  So it's just an integral --

3    everything we do, safety is the key component.

4    Q.  Keep the microphone as close to you as you can so

5    everybody can hear it.  There you go.

6              Who do you currently work for?

7    A.  Myself.

8    Q.  You have your own consulting firm?

9    A.  Yes.

10   Q.  Where do you work out of?

11   A.  I work out of my home, and the name of the firm is me,

12   Carl Berkowitz.

13   Q.  Let me show you what we've previously marked as

14   Plaintiff's Exhibit No. 20.

15             MR. P. REGAN:  May I approach the witness?

16             THE COURT:  You may.

17   Q.  Is that your current curriculum vitae?

18   A.  Yes.  I believe so, yes.

19   Q.  All right.  It's approximately 30 pages long.  What's

20   included in your CV?

21   A.  Well, it's just a summary because of -- I would need an

22   Encyclopedia Britannica to put everything in that I've

23   worked on.  It has my work experience, places I've worked,

24   the schools I went to, where I taught, the research I've

25   done, the organizations I belong to, the awards that I've

1    received, my public service, my community service.

2         It doesn't mention that I'm a grandfather of 11.

3    I didn't put that in.

4         All the papers and articles that I've written, the

5    TV stations that I've appeared on, things -- you know,

6    everything.

7         The reason it's so long is, when I was a college

8    professor, to apply for tenure you had to write your life

9    experience, so this is actually my tenure application, and

10    it became my CV.

11         MR. P. REGAN:  Your Honor, at this point, rather

12    than go through the 30 pages, I would offer the exhibit,

13    Plaintiff's Exhibit No. 20, and that way I can do a summary

14    of it.  But if it's going to be a problem, I'll go through

15    it in detail.

16         THE COURT:  It's inadmissible hearsay.

17         MR. P. REGAN:  Okay.

18         THE COURT:  So hit a few of the highlights

19    sufficient to meet your burden.

20         MR. P. REGAN:  All right.

21    Q.  So, Doctor, let's go through that in a little bit of

22    chronological order, if we can.

23    A.  Sure.

24    Q.  You have your undergraduate degree in civil engineering,

25    correct?

1    A.   It's kind of unusual.  I went to City College School of

2    Engineering.  In those days there were four engineering

3    degrees; so I have a major in civil engineering, a minor in

4    mechanical engineering, and a minor in electrical

5    engineering.  It was a five-year program, and I was an ROTC

6    so I also have military engineering training as well.

7    Q.   And when did you receive your engineering degree, your

8    initial engineering degree?

9    A.   You're going to know how old I am.  1963.

10   Q.   Okay.  And then what -- so you received that degree.

11   What was the next degree you received?

12   A.   Well, I was in a joint degree program.  It was a

13   sequential program where I was also -- from engineering I

14   went into an MBA program at that time at Baruch College.  It

15   was part of City College, and they had a joint degree

16   program.  Very early -- I think it was the first MBA for

17   engineers, and it was called Industrial Management for

18   Engineers, and it was -- I loved it because it was easy

19   compared to engineering school.  I loved business school.

20         And then from there I went on to pursue a PhD in

21   transportation engineering and planning at Polytech --

22   Brooklyn Polytech, which has changed its name, and now it's

23   part of NYU.  And I earned a PhD in transportation

24   engineering and planning.

25   Q.   Let's talk about that.  So transportation planning and

1    engineering.  Explain to the members of the jury, if you

2    would, what is that field?

3    A.  It's really simple.  It's to -- it's to move people and

4    goods safely.  That's our goal.  We call it intermodal

5    transportation.  That's all modes, ALANC, safely.

6    Q.  Does it include automobiles, trains, buses, airplanes?

7    A.  Everything, balloons.

8    Q.  Let's talk about your consulting business.  When did you

9    first go into the field of safety -- transportation safety

10    consulting?

11    A.  When I -- I got a -- could I mention where I worked?

12    Q.  Yes, I was going to say -- never mind.  I jumped ahead.

13    A.  Okay.  When I graduated from City College with the

14    engineering degree, I was recruited by the State Department

15    of Transportation because they were starting the Eisenhower,

16    you know, Defense Highway System.  And there was like a

17    60,000 shortage of engineers.

18          So I went to work for them, and I spent my first

19    two and a half years in training, because when you go to

20    engineering school you really don't know much about

21    practical stuff.  So I spent two and a half years in

22    training -- so I'm a perpetual student, as you can see --

23    learning all about transportation, all aspects of

24    transportation, including railroad.  I even worked in the

25    legal department, and I also had like the third chair on

1    condemnation cases.  It was really great experience, even

2    building docks and groins on beaches, everything you can

3    think of.

4           And from there I was recruited by Governor Nelson

5    Rockefeller, who was the governor at the time, to be his

6    assistant in transportation.  And I'm in my 20s.  I was

7    ecstatic.  And that was his -- not for the whole state, but

8    from Dutchess County in New York, both sides of the Hudson

9    River, including New York City and all the way out to

10   Montauk Point.  And it was a great experience to represent

11   the governor at meetings and things of that nature.  I got

12   to meet people like Robert Moses.  I got to meet everybody.

13   It was -- because I was the governor's right hand in his

14   office.

15          And from there, I was recruited by the city of New

16   York.  They were starting a department of transportation.

17   They had a transportation administration.  They were going

18   to start a department of transportation, and they wanted to

19   set up a planning department and a recent planning, and they

20   recruited me to head that up because they wanted to get rid

21   of me because working for the governor I was a thorn in

22   their side.  They wanted to build a highway in the middle of

23   Manhattan; I stopped it.  They wanted to build a highway

24   through Chinatown; I stopped it.  Things like that.  These

25   were all Robert Moses projects.  And so I went to work for

1     the governor, and that was quite a great experience.

2           And then to the city of New York, and there was a

3     great experience where I got involved in every aspect of

4     transportation, approving the budget.  In the city of New

5     York, the transit system is operated by an authority, but

6     the authority doesn't own the property.  It's the only place

7     where the city owns the property, and the authority does the

8     management.  And any expenditure related to our property,

9     the city's property, had to go through my office.

10          So I was intimately involved in all aspects of the

11    New York City -- oh, I forgot to mention.  When I was in

12    college, I was given an internship with the New York City

13    Transit Authority, so my first introduction to subways was

14    when I was in college as an intern.  Any time I was off from

15    school, I worked as an engineer for transit.

16          Sorry for jumping around.

17    Q.  I'm sorry, let me put some dates on this.

18          So you were -- the period you're talking about

19    with the New York City Department of Transportation was 1970

20    to 1988, right, for those?

21    A.  About that time.  I also was the executive director of

22    the Staten Island Ferry.  I was also the head of the Bureau

23    of Transit.

24          New York City had five bus lines.  They went

25    bankrupt on the same day, if you could believe it, and we

1    had no choice but to take it over, and I was -- I was a very

2    -- I was a grants person.  I had a very good relationship

3    with the USDOT and the secretary of transportation from my

4    days working for the governor, and I was able to get grants,

5    $50 million, to save the bus lines.  So I became a bus

6    operator; ferry operator, a bus operator.

7            Then I was offered -- during this process I was

8    getting my PhD.  It took me about 17 years.  Slow learner.

9    My alma mater invited me back as a visiting professor, so I

10   retired from government and I became the IBM visiting

11   professor at my alma mater, which was just a great honor,

12   and that began my education career.

13           One of the requirements -- when you're an educator

14   in engineering, Friday is not a class day.  It's a

15   consulting day, so you have to go out and do consulting work

16   or research.  It's compulsory.  You know, it's not an

17   option.  So that's why I started consulting work.  The

18   school forced me into it.

19   Q.  All right.  Well, let me talk about schools for a

20   minute.  So on your resume you list --

21           THE COURT:  Counsel, can we go to the phones

22   briefly?

23               (The following is a bench conference

24                held outside the hearing of the jury)

25           THE COURT:  All right.  I don't mean to cut you

1   off, Mr. Regan, but Mr. Waters, any objection to his

2   qualifications and experience and prior work in terms of

3   being qualified as an expert in transportation safety

4   engineering?

5           MR. WATERS:  In terms of educational experience,

6   employment history, no.

7           THE COURT:  So, I mean, are your only objections

8   the ones that you've previously lodged about his reception

9   by other courts and whatnot?

10          MR. WATERS:  Those that we -- and those that we

11  raised -- those that we raised in our motion.

12          THE COURT:  Okay.

13          MR. WATERS:  Yes.

14          THE COURT:  Mr. Regan, I don't want to cut you

15  off, and you can, you know, establish whatever you want to

16  establish, but in light of the fact that there are no

17  objections to some of these things, why don't you lead him a

18  little bit more efficiently.

19          MR. P. REGAN:  My pleasure.

20          THE COURT:  Okay.

21          (This is the end of the bench conference)

22  BY MR. P. REGAN:

23  Q.  We're going to try to do this a little quicker,

24  Dr. Berkowitz, in terms of getting to this case.

25  A.  I'm sorry about it.

1    Q.  No, that's all right.  Not your fault.

2              On your resume, you list about six or seven

3    colleges or universities that you've taught.  Have these all

4    been in the field of transportation safety?

5    A.  Engineering and safety, yes, all of them.

6    Q.  And that's over the period from -- well, from the 1970s

7    until the last ten years or so?

8    A.  Yes.  It's about ten years I stopped.  About ten years

9    ago.

10   Q.  You also list, you know, about 30 or 40 professional

11   affiliations.  What are those?  Not naming them

12   individually, but what are the professional affiliations?

13   Just describe for the jury's --

14   A.  They're engineering societies in civil, mechanical,

15   electrical, biomechanics, biomedical, all the fields that I

16   worked in, assisted transportation for the accessibility of

17   the disabled.  And I was honored to be appointed to --

18   elected to memberships in foreign organizations.

19              The UITP, which is the European -- the world

20   organization in transit, I was elected to their academic

21   committee.  So I'm -- and the CILT in England, I was elected

22   to membership in their transportation national society.

23              I can put all these initials after my name, but I

24   don't.

25   Q.  Okay.  You list -- again, I just want you to describe

1    what they are.  The scholarly activities, publications, and

2    presentations -- and there's about 70 of those -- what are

3    those?

4    A.  My focus from graduate school, I worked with Dr. John

5    Fruin, who is the father of pedestrian safety.  He

6    unfortunately passed away in February.  But everything I

7    focused on was pedestrian, bicycle safety.

8            I was like an environmentalist in a sense.  I

9    resented the fact that everything we did in engineering was

10   motor vehicle oriented, and I wanted to see the pedestrian

11   and the bicyclists get equal treatment, and so I was even a

12   president of a national organization that was focused on

13   that, an engineering organization.

14   Q.  And have you continued to take continuing legal

15   education -- sorry, continuing education programs over

16   the -- over your career in engineering?

17   A.  It's compulsory.  I have to do 16 hours of continuing

18   education to maintain my license every year.  I do more.  I

19   do maybe 50 to 100 hours.

20   Q.  Let's talk about your consulting business.

21            When you're testifying in cases like this

22   involving someone who is getting injured on a subway or

23   train system, do you work for both the injured person, like

24   Ms. Scott, as well as the transit system like Metro?

25   A.  Well, I've worked for the MTA in New York, the New

1    Jersey transit in New Jersey, Cleveland in Cleveland, in

2    Seattle, in Oregon, in Los Angeles.  Probably other -- a

3    couple of other -- in Boston.  I've worked on both sides,

4    and with their knowledge, they know I'm involved in suits

5    against them, and they also retain me to help them on

6    matters that they have on the defense side.

7    Q.  Have you also been contacted by WMATA, the Washington

8    Metropolitan Transit Authority, to serve as an expert in

9    their cases?

10   A.  Several times, but every time I told -- in fact, one

11   time was a case that I was working against them that they

12   asked me if I would be interested in working for them.  But

13   every time I indicate to them that I'm working, you know,

14   cases against them, they decline.  Other transit companies

15   don't decline, but they have declined.

16   Q.  In this case, Mr. Waters and Ms. Gilman are with the

17   firm of Wilson Elser.  Have you worked for that law firm?

18   A.  Yes, for many years.

19            MR. WATERS:  Objection.

20            THE COURT:  Sustained.

21   A.  Yes, for many years.

22            MR. WATERS:  Objection.

23            MR. P. REGAN:  Withdrawn.

24            THE COURT:  The jury will disregard

25   Dr. Berkowitz's last answer.

1    Q.  On how many occasions have you been retained as an

2    expert on transportation safety issues in your career?

3    A.  Nationally?  Internationally?

4    Q.  Career.

5    A.  A couple of hundred maybe.  I don't keep track.

6    Q.  You know, Dr. Berkowitz, this case involves a subway

7    train and the issue of whether a safety warning is required

8    by the national standard of care.  Let's talk about your

9    experience with respect to that.

10          With respect to subway systems, explain to the

11   jury your experience over your career with issues that

12   involve transportation engineering safety only with subways.

13   A.  Well, it started when I worked for the city of New York.

14   I was involved in the design of the R-140 -- I think it was

15   called the new technology car -- back in the '70s.  I was

16   intimately involved in train operations in the city of New

17   York because any funding that came from the -- from the city

18   in terms of capital investments I had to approve that

19   expenditure.  So I had to be very familiar with, you know,

20   what was going on.  Some of the projects that I approved

21   hadn't been even built yet.

22          But I've been involved in almost every aspect of

23   transportation in my career.  I've worked for all the major

24   -- for and against every major transit company in the United

25   States except for Skyline in Hawaii.  I'd love to, but

 1    nobody's invited me to work there, in Skyline.

 2            I've worked for Tren Urbano in San Juan, Puerto

 3    Rico.  I've been involved in Boston, Chicago, Philadelphia,

 4    New Jersey, New York, Washington, Atlanta, Miami,

 5    Cleveland -- I don't know if I mentioned Chicago -- Los

 6    Angeles.  Just about every major transit company.

 7            And internationally I've worked for London

 8    transport.  I've worked for the train systems in China.  I

 9    worked at the train -- Light Rail in Dubai and in Abu Dhabi

10    and Qatar in the Middle East.  In fact, I received an award

11    for innovation, third place.  First place was a million;

12    third place was only $20,000.  But I won an award for

13    innovation in transportation.

14    Q.  When were you first contacted about this case?

15    A.  I think it was around '22/'23.

16    Q.  Okay.  What were you asked to do generally?

17    A.  I was asked to look at the file, look at the records,

18    and see if that -- whether or not WMATA followed the

19    national standard of care in terms of providing information

20    to passengers in terms of passenger safety.

21    Q.  All right.  Did you review certain deposition

22    transcripts that were taken in the case?

23    A.  Yes.  I remember there was Mr. Harris, Mrs. -- I can't

24    -- whether it was Ms. -- it was Harris, Johnson, the train

25    driver, Mr. Bennett, I think.  Mrs. Bennett?  I forget.

1    Pardon me for not remembering the genders.  Ms. Scott.  And

2    also there was an incident report where there were

3    eyewitnesss that I reviewed.

4    Q.  Okay.  And you reviewed the incident report, witness

5    statements, everything in Metro's incident report?

6    A.  Yes, I did, as well as their SOPs, standard operating

7    procedures.

8    Q.  As you know, in this case the issue is when a train

9    operator stops the train too short in a station and then has

10   to reposition it in the proper location so that the doors

11   are in the proper place, whether an audible warning is

12   required to the passengers by the national standard of care,

13   correct?  You understand that issue?

14   A.  Yes, and that is the standard of care.

15   Q.  When we talk about the national standard of care,

16   explain to the members of the jury what we're talking about.

17   A.  It's not something that's aspiration --

18               MR. WATERS:  Objection, Your Honor.

19               THE COURT:  Counsel, do you want to qualify him

20   first, before we start getting into the substance?

21               MR. P. REGAN:  Your Honor, I'm happy to do that.

22   I was going to have him describe in general what he did, but

23   I can save that for the direct, if you prefer.  I can

24   qualify him right now, if you want.

25               THE COURT:  Why don't you -- if you think you have

1   a foundation for record purposes, why don't you qualify him

2   before -- if you're going to get into the --

3           MR. P. REGAN:  I was going to ask him what he did

4   in order to determine the standard of care; not what it was,

5   but --

6           THE COURT:  Okay.  Fine.

7           MR. P. REGAN:  Okay.

8   Q.  Okay.  I don't know, did you finish that answer?

9           When we were talking about the national standard

10  of care, just -- I don't want to be repetitive here, but

11  just explain to the members of the jury what is the national

12  standard of care when we're talking about this issue?  And

13  that is subway train safe operation.

14  A.  It doesn't matter what the area is, the national

15  standard of care is what the industry has chosen as the

16  correct way of doing things, and everybody does it that way,

17  or very close to that way, because every transit system is a

18  little different.  So they have to modify it a little bit to

19  their -- you know, to their particular situation.

20          But it's what we accept in the industry is what --

21  and it's based upon studies, research, lots of work.  The

22  national standard doesn't -- you know, somebody doesn't flip

23  a coin.  It's the result of hard work, volunteer work, on

24  the part of engineers.

25  Q.  Explain to the jury, if you would, what are the major

1    subway systems in the country.  You sort of described it --

2    A.  Well, we have 16 subway systems.  I think 11 are subways

3    and five are what we call elevated subways.  The biggest

4    ones are -- I have to do it looking at the map in my mind.

5    That's MBTA in Boston; New York City's and -- New York City

6    Transit Authority, which is the biggest.  Then we have

7    Philadelphia, SEPTA; and we have Washington, WMATA.  We have

8    Miami; it's called Miami Transit.  Then we have Chicago,

9    CTA, and then we have Cleveland, C -- I forget if it's

10   CLAMTA.  Then we have San Francisco, BART, and we have Los

11   Angeles, LACMTA, and we have Skyline in Hawaii, which is

12   elevated, beautiful.  I keep asking to go.  Nobody sends me.

13   And then Tren Urbano, which is a kind of outdoor kind of

14   service with some portions underground that serves San Juan.

15          I think that's -- did I hit 16?  I'm not sure.

16   Q.  All right.  So let me ask you this.  When we talk about

17   the national standard of care for subway systems, can I go

18   to Google and ask that question?

19   A.  No.

20   Q.  Okay.  Why not?

21   A.  Well, because -- I don't understand it, but the transit

22   companies consider all their internal documents top secret,

23   and most of the time when I get to review them I have to

24   sign a nondisclosure agreement.  And sometimes they say it

25   has to do with Homeland Security, but I don't -- I don't

1    understand that.

2            I worked for Homeland Security, so I don't

3    understand that at all.

4    Q.  So what are standard operating procedures?  What do they

5    cover?

6    A.  They cover everything.

7            MR. WATERS:  Objection, Your Honor.  We're getting

8    into opinion here.

9            THE COURT:  Hold on.  Excuse me?

10            MR. WATERS:  We're getting into opinion.  He

11    hasn't been qualified.

12            MR. P. REGAN:  I don't mean to -- I was asking

13    generally.

14            THE COURT:  Generally speaking, describe to the

15    jury what --

16    A.  Yes. Well, generally speaking --

17            THE COURT:  -- standard operating procedures are.

18            THE COURT REPORTER:  The judge is still speaking.

19            THE WITNESS:  I'm sorry.

20            THE COURT:  Go ahead.  What are standard operating

21    procedures?

22    A.  Everything.  As mundane as overtime and sick leave to

23    how do you maintain the elevator, the escalator; how do you

24    change the oil; how do you sweep the station; how do you

25    clean the bathroom; how do you operate the trains; how do

1    you train the train drivers; how do you train the personnel.

2    Anything you can imagine that an agency has to do.

3           In the transportation industry we leave nothing to

4    chance because we have an organization called the American

5    Public Transportation Association, and we set up standards

6    for everything you can think of.  You pick a subject, and we

7    have a document on that subject and the best way, you know,

8    to handle that particular subject.  It's kind of universal.

9    Q.  Can I go to Metro's website and get their standard

10   operating procedures?

11   A.  No.

12   Q.  All right.  As part of your work in this case, did you

13   determine the standard operating procedures with respect to

14   the issue in this case; that is, the safety warning that has

15   to be provided to passengers when the operator fails to stop

16   the train at the right position in the station and has to

17   move it forward?

18   A.  Well, as part of your discovery, we received the SOPs,

19   which I indicated are very difficult to get unless you get

20   them through some legal matter.  And in there they clearly

21   spell out and even they give a sample of what you should

22   say.  In the standard operating procedure, they say that if

23   you misstop at the station, you say this, or you could say

24   more.  It's a minimum.

25          Standard operating procedures in terms of safety

1    are minimum standards.  You could always do more, but we

2    don't want you to do less.  But you could always do more.

3    You could always be safer.  We don't want you to be less

4    safe.

5    Q.  So with respect to this case, did you determine what the

6    standard operating procedures were for the subway systems in

7    New York, Chicago, Philadelphia, Washington?

8    A.  I tried to, and I did.  As you pointed out, you can't go

9    to AI or Google or any search engine to find that

10   information, so I went to people I know who work in these

11   agencies.

12        And I started off with a colleague of mine, whose

13   name is Orlando Jiminez, who started off working as a

14   conductor for the New York City Transit, then became a train

15   driver, and then became a trainer of train drivers, and

16   became a national rep, labor rep, for the New York City

17   Transit Authority.  And he provided me with copies --

18   Q.  We're not going to get into that yet, but you talked to

19   someone who got information to you, and then we're going to

20   get to your opinions in one minute.  Okay?  I'm sorry to

21   cut you off --

22   A.  I'm sorry.

23   Q.  -- but we've got to do this in order.

24        MR. P. REGAN:  Your Honor, at this time I would

25   offer Dr. Berkowitz as an expert in transportation safety

1    engineering with respect to the particular issue in this

2    case, whether the national standard of care requires Metro

3    to provide a safety warning under the circumstances of

4    Ms. Scott's injury on September 23, 2019.

5                MR. WATERS:  We object for the reasons previously

6    stated, Your Honor.

7                THE COURT:  Very well.  Subject to your

8    objections, which are noted, the Court will qualify

9    Dr. Berkowitz to testify as an expert in the field of

10    transportation and safety engineering and, in particular,

11    the question that Mr. Regan just posed regarding national

12    standard of care related to the relevant warnings in this

13    case.

14                MR. P. REGAN:  Okay.  Thank you, Your Honor.

15    BY MR. P. REGAN:

16    Q.  Is there an exhibit notebook up there, Doctor?  I can't

17    see behind there.  No?

18    A.  No.  I don't see one.  Just I have my CV.

19    Q.  Okay.  Let's do this.  Dr. Berkowitz, let me show you

20    what we've marked as -- previously --

21                MR. P. REGAN:  May I approach the witness?

22                THE COURT:  You may.

23    Q.  -- marked as Exhibit No. 19 and ask you if that's your

24    supplemental report dated sometime last year?  I don't know,

25    November.

1    A.  Yes, November 21st of last year.

2    Q.  Okay.  And is that your supplemental report concerning

3    your opinions and conclusions in this case?

4    A.  Yes, it is.

5    Q.  Are you prepared to talk about those today?

6    A.  Pardon me?

7    Q.  Sorry, that's my fault.  And you're prepared to discuss

8    those opinions with us today?

9    A.  Yes.

10   Q.  All right.

11        Let me ask you, Doctor, if you would, to -- let's

12   go back for a minute.  I was right the first time.  Let me

13   ask you to turn to Page 5 under Section 5 and read the

14   caption and the first paragraph in your supplemental report.

15        MR. WATERS:  Objection, Your Honor.

16        THE COURT:  Sustained.  He's not going to read in

17   the report.  You can ask him his opinions and refer to the

18   report.

19        MR. P. REGAN:  Okay.

20        THE COURT:  Okay.

21   Q.  Doctor, what is your opinion about what the national

22   standard of care requires with respect to announcements

23   under the circumstances of this case?

24   A.  That you always should make an announcement to ensure

25   that passengers are always safe.

1    Q.  Okay.

2    A.  Without exception.

3    Q.  So before a train operator -- well, let me ask you this

4    question.

5            Do you have an opinion within a reasonable

6    degree of certainty in your field as to whether the

7    national standard of care requires a train operator, such as

8    Ms. Johnson on September 23, 2019, to provide an audible

9    warning to passengers if she stops the train at the wrong

10   spot and has to move it forward in order to get to the place

11   where the doors will open?  Does the national standard of

12   care require an audible warning in your opinion?

13   A.  Yes.

14           MR. WATERS:  Objection; leading.

15           THE COURT:  Overruled.

16   Q.  Okay.  Explain why an audible warning is required to

17   passengers under those circumstances.

18   A.  Safety -- remember I said engineering is safety, safety,

19   safety, and people will have accidents if they don't have

20   themselves prepared to avoid a particular situation.

21           We have a premise in engineering that if there's a

22   hazard, you have to eliminate it.  If you can't eliminate

23   it, then you have to remediate it.  And if you can't

24   remediate it, then you have to provide enough information so

25   a person can personally protect themselves.

1          And one way a person can protect themselves is by

2     having information.  And we know that announcements on the

3     trains are very key to ensuring the safety of passengers on

4     the train.

5     Q.  And as part of the work in this case, did you review

6     Metro's Standard Operating Procedure 50?

7     A.  50, others as well; 50.5, yes.

8     Q.  All right.  And that standard operating procedure

9     requires a standard audible warning before repositioning a

10    train?

11    A.  They spell out a minimum -- you can do more, but they

12    have a minimum recommended announcement.

13          MR. P. REGAN:  Your Honor, with your permission

14    may we put that exhibit, which I will give you in a minute,

15    on the screen?  It's Plaintiff's Exhibit No. 1.

16          THE COURT:  Sure.

17          THE WITNESS:  That's pretty.

18          MR. P. REGAN:  Just one second.  It will be there

19    in one second.

20          THE WITNESS:  Your Honor, I'm sorry, I don't

21    hear --

22          THE COURT:  You're fine.  You're doing fine.

23    Q.  You can see at the top.  Is this one of the standard

24    operating procedures that you --

25    A.  Yes, it is.

1           MR. P. REGAN:  That's Plaintiff's Exhibit No. 1.

2      If you could go to Page 2, please, and if you scroll up.

3      Well, am I seeing the same thing?  Yes, scroll up to the

4      announcements.

5           All right.  So I'm going to ask if we can

6      highlight the repositioning of the train.

7      Q.  All right.  While we're doing that, Dr. Berkowitz,

8      you've seen this before, right?

9      A.  Yes.

10     Q.  What does the Metro standard operating procedure require

11     the train operator to say before repositioning a train?

12     A.  They should say at least this:  "Attention customers,

13     this train will move forward; please hold on."

14          They can say more than that, but that's the

15     minimum.

16     Q.  And is that consistent with the national standard of

17     care based upon your research in this case?

18     A.  Each system uses slightly different language, but in

19     general, it's the same message.

20     Q.  So the message is -- and why do you give that message?

21     What's the reason?

22     A.  When a train stops at a station, the inclination of

23     people on the train is that they're going to get off,

24     especially if an announcement is made "We're coming into

25     McPherson Station.  Doors will open on the left."  The train

1    stops.  What do you expect?  You're going to get up, and

2    you're going to start walking towards the train doors.

3            And so if that -- if the train -- now you're

4    walking, with no place to hold on or anything, and if the

5    train suddenly starts to move, you're going to start moving

6    at what you were walking at.  And if the train is moving at

7    a faster speed, you know, this can create a situation where

8    a person could lose their balance and fall.

9            So this is why the statement's important.  You

10   know, you want people to either stay in their seats, if

11   there's enough seats for everybody.  If there are not enough

12   seats for everybody, you want to ask people to hold on to

13   something, hold on to a pole, hold on to a strap, hold on to

14   something.

15           But you want people to be prepared.  When people

16   are prepared, we avoid these kinds of unsafe situations.

17   Q.  And is Metro's standard operating -- Exhibit No. 1, is

18   that consistent with the national standard of care?

19   A.  Yes, it is.  Like I said, that every system uses

20   different terminology.  For example, like some systems say

21   "Mind the gap," some say "Watch the gap."  The same message,

22   but different format.

23           MR. P. REGAN:  Your Honor, at this point I'd move

24   in Plaintiff's Exhibit No. 1.

25           MR. WATERS:  Objection.  Same objection we

1    previously articulated.

2         THE COURT:  Okay.  So moved.

3    Q.  Okay.  All right.  Let's talk about the work that you

4    did in terms of determining what the standard of care was in

5    New York, in Chicago, in Boston, et cetera.  And it's

6    discussed in your report on Page 8, but I'm going to ask you

7    about it, if you will.

8         What did you do to determine -- explain to the

9    Court, if you would, what you did to determine the type of

10   warnings that were given in those transit organization --

11   systems that I just described.

12   A.  As we pointed out earlier, I can't go to Google or to AI

13   or to any search engine to find out what's the internal

14   documents, but I'm very fortunate to have this colleague who

15   works with me on other cases, Orlando Jiminez, who started

16   off as a conductor, then he worked his way up to a train

17   driver, then he became a train driver trainer, then he

18   became the union representative where he got to meet all the

19   other metro systems' in the United States people.

20        So my first effort was to try to find out what the

21   MTA, you know, the New York City transit is doing, so I

22   contacted him, and he told me what they were doing.

23        MR. WATERS:  Objection as to what he said, Your

24   Honor.

25        THE COURT:  Sustained.

1    Q.  Okay.  Just don't mention what he told you, okay?

2    A.  Pardon me?

3    Q.  Don't mention what people told you.  It's hearsay.  In

4    other words, just describe what you did.

5    A.  Anyway, I asked him for whatever the internal documents

6    were for the New York City transit, and he sent me like the

7    SOPs for Washington Metro.  He sent me them for the New York

8    City transit.  And then he also gave me names of people that

9    he worked with in other transit systems.

10          In the MBTA in Boston, I had my own personal

11   experiences because I worked for the MBTA and also cases in

12   opposition to them, so I rode the trains quite a bit and was

13   very familiar, and I accidentally heard, you know, these

14   types of announcements being made.  You know, unfortunately

15   one of them was a bad one.  We went too far.  The train

16   overshot the station, and they made an announcement that the

17   train overshot the station and we can't go backwards.  But,

18   you know, they were now going to go to the next station, and

19   if you have to come back to this station, you know, you have

20   to take the train in the next direction.  So I had

21   familiarity, personal experience and familiarity with the

22   Boston system.

23          I spoke to people at CTA, and they confirmed to

24   me --

25          MR. WATERS:  Objection.

1    A.  -- that they do factually the same thing.

2            THE COURT:  Hold on.  Hold on, sir.  Go to the

3    phones for a second.

4            (The following is a bench conference

5             held outside the hearing of the jury)

6            THE COURT:  All right.  So experts can rely on

7    hearsay.  The question is whether he can directly convey

8    what he was told.

9            MR. WATERS:  Your Honor, experts can rely on

10   hearsay if it's the type of hearsay that is -- or the

11   information that is ordinarily used by experts in their

12   field.  A foundation has not been laid.

13           I also think that it's inappropriate for him to be

14   talking about agencies when we cannot cross-examine them.

15           THE COURT:  All right.  Lay a better foundation,

16   but I think he can say what he relied on even if it's

17   hearsay, and if what he relied on is what he was told by

18   other people, then, you know, I think that's fair game.

19           MR. WATERS:  Your Honor, I think it's -- not to be

20   argumentative, I think he can say he can -- he relied on

21   conversations with other people, but getting into the

22   content of what specific information they shared I think is

23   inappropriate.

24           MR. P. REGAN:  Yes, but he's able to go one step

25   further, who confirmed what the --

1           THE COURT:  I'll tell you what, just to stay on

2    the safe course ask him who he spoke to based on your

3    conversations with that person, what did you conclude the

4    policies were of Boston, San Francisco, New York, et cetera.

5    Is that fair?

6           MR. P. REGAN:  Okay.

7           (This is the end of the bench conference)

8    BY MR. P. REGAN:

9    Q.  You spoke to the gentleman you just mentioned.  Who were

10   the people that you spoke to I think you were saying in

11   Chicago?  I don't remember where you were, though, in that

12   -- don't talk about what they told you, but just who they

13   were.

14   A.  They were his counterpart at the CTA.

15   Q.  And is this the type of information that experts in your

16   field typically rely upon in terms of determining what the

17   standard operating procedures are in transit systems?

18   A.  Well, I know that if Washington Metro and New York City

19   Transit both have the exact same documentation, that it's

20   pretty guaranteed that all the other systems are going to

21   follow suit because New York City Transit and Washington

22   Metro are among the leaders in innovation in transportation,

23   although they've had a bad rap lately in terms of safety.

24   But they still have been a very innovative -- their station

25   designs, their train designs, everything, have been very

1     innovative.

2     Q.  And the other people that you spoke with in the

3     industry, did they confirm for you what the standard

4     operating procedure was in each of these jurisdictions?

5     A.  That I spoke to, yes.  And also I had contacts of my

6     own.  I'm active in the American Public Transportation

7     Association, and I'm on the safety committees, and there's a

8     work -- I'm not a member of it, but there's a working group

9     on berthing, and I spoke to some of those members as well.

10    Q.  Explain what that committee is.  I'm sorry, I know I

11    should have asked you that earlier.  But explain.  That is

12    an important committee.  Tell us what that is.

13    A.  The American Publication Transportation Committee back

14    in I guess it was 1995, early '90s, formed a working group

15    to study train berthing.  The problem wasn't this particular

16    problem they're talking about.  That wasn't the main

17    problem.

18            The main problem was trains were stopping at

19    stations, and the doors were not platformed, and doors are

20    open and people stepped off the trains into the oblivion.

21    Very serious problem.  So this was the concern.

22            So when we started addressing that concern, all

23    these other secondary concerns came up about mis -- you

24    know, misstopping, overshooting, things of that nature.  So

25    the working group was formed.

1          In fact, I remember there were -- on that group

2     there were at least five people from WMATA.  It was like 50

3     transit people from, you know, CTA, all the ones that I

4     mentioned, all those railroads are reps on this working

5     committee.  And then they -- and by 1999 they published --

6     before a standard is approved, it's circulated to all the

7     membership.  You know, we get a chance to review it, make

8     comment.

9          So in 1999 [sic], about the time of this incident,

10    the standard, which would eventually come out, was sent

11    around to the professionals in the organization because

12    every -- none of us are paid; it's all volunteer work -- to

13    review and offer comment.  And we -- I had an opportunity to

14    review and offer comment, and the following year it was made

15    an official standard of the American Public Transportation

16    Association, and it's called berthing.

17         Not children, trains.

18    Q.  B-E-R?

19    A.  Hmm?

20    Q.  B-E-R?

21    A.  Right.

22    Q.  Yes, not B-I-R.

23         Dr. Berkowitz, based upon your work on this case,

24    did you make -- did you form an opinion within a reasonable

25    degree of engineering safety as to whether the WMATA train

1    operator violated this national standard of care by failing

2    to give the safety warning under the circumstances of the

3    incident which resulted in Ms. Scott's injury on September

4    23, 2019?

5    A.  Yes.

6    Q.  And what is that opinion?

7            MR. WATERS:  Objection, Your Honor.

8            THE COURT:  Overruled.

9    A.  That the national standard of care for the care of

10   passengers on trains when there's a misberthing was

11   violated.

12   Q.  Okay.

13           MR. P. REGAN:  Your Honor, if I can have one

14   minute, actually less?

15           (Pause)

16           MR. P. REGAN:  No further questions.

17           THE COURT:  Mr. Waters.

18           MR. WATERS:  Thank you, Your Honor.

19                       CROSS-EXAMINATION

20   BY MR. WATERS:

21   Q.  It's still morning.  Good morning, Dr. Berkowitz.

22   A.  Good morning again.  We met in the hall.

23   Q.  We have.

24   A.  Live this time.  First time was on Zoom.

25   Q.  I just met you in the hallway.  It was a pleasure to

```
 1     meet you.

 2     A.  Yes.

 3     Q.  So I want to ask you some specifics of your familiarity

 4     with this particular accident.

 5             You indicated that you read some deposition

 6     transcripts.

 7     A.  Yes.

 8     Q.  And you read the WMATA accident report?

 9     A.  I'm sorry?  I didn't hear.

10     Q.  The WMATA accident report?

11     A.  Incident report?

12     Q.  Yes.

13     A.  Yes.

14     Q.  And you read WMATA's SOPs?

15     A.  Yes.

16     Q.  Is that correct?

17             Okay.  Did you read Ms. Scott's testimony with

18     regard to how the incident happened?

19     A.  Her deposition?

20     Q.  Yes.

21     A.  Yes.

22     Q.  And you understood that she was coming in on the Orange

23     Line?

24     A.  Yes.  She came from Vienna to McPherson.

25     Q.  And along the ride from Vienna to McPherson the train
```

1    was stopping short at several of the platforms and then

2    repositioning?

3    A.  I know there were 11 stops between Vienna and McPherson.

4    Q.  Do you recall reading the testimony where she indicated

5    that the train had stopped short and then repositioned on

6    several prior stops?

7    A.  I don't recall that.

8    Q.  Okay.  Do you recall Ms. Scott indicating at her

9    deposition that the train stopped at McPherson and then the

10   operator made an announcement indicating "McPherson Square,

11   doors opening left side," before the train moved?

12   A.  She mentioned that there was an announcement that the

13   train was coming into McPherson and the doors are going to

14   open; and I forget whether it's the right or the left side,

15   but on one of the two sides.

16   Q.  And do you recall her testimony where she indicated she

17   was a forward-facing passenger seated in the direction of

18   travel of the train up until McPherson Square?

19   A.  Yes.

20   Q.  And that she got up from her seat, correct?

21   A.  Yes.

22   Q.  She got up from her seat before the doors opened,

23   correct?

24   A.  That's correct.

25   Q.  She was not holding on to a pole or any overhead

1    support?

2    A.  Well, from what I remember, that the pole was ahead of

3    her.  When she got up, there was no pole within the vicinity

4    where she got up.

5    Q.  Okay.  And do you understand she wasn't holding onto the

6    chair that she had just gotten up from to support herself?

7    A.  She was past that point.

8    Q.  Okay.  So at the time when Ms. Scott fell, you do

9    understand that, at least based on her deposition testimony,

10   the train came to McPherson, stopped at McPherson; the

11   operator made an announcement announcing the station, and

12   that the doors were opening; and then she got up before the

13   doors opened, before any of the chimes go off on the doors;

14   and then, when the train repositioned, she fell, correct?

15   A.  Yes.

16   Q.  And she wasn't holding on to anything, correct?

17   A.  That's correct.

18   Q.  And she was carrying a cane?

19   A.  Yes.

20   Q.  And she also had with her a purse?

21   A.  Over her shoulder, yes.

22   Q.  All right.  Would you agree with me, Doctor, that it is

23   important for passengers on public transit to make sure that

24   they are ensuring their own safety?

25   A.  Yes.

1    Q.  That they need to hold on to something to make sure that

2    they're keeping themselves stable?

3    A.  If they're -- if the train is moving, of course.

4    Q.  And they need to be cognizant of their own physical

5    capabilities, whether they're able to stand on a train, for

6    example, when it's moving or whether they need to be seated?

7    A.  I don't understand the question.

8    Q.  Well, would you agree that a passenger needs to be aware

9    of their own physical capabilities and limitations as to how

10   they're using public transit?

11   A.  Yes.

12   Q.  And the passengers have responsibilities too, correct?

13   A.  Everybody has responsibilities, yes.

14   Q.  All right.  Do you recall testifying in this case that

15   it was your -- well, do you recall giving a deposition in

16   this case?

17   A.  Yes.

18   Q.  Doctor, is it your opinion generally for public transit

19   that any time somebody is injured on public transit that the

20   public transit authority is responsible for that injury?

21   A.  It depends on what we're talking about.

22   Q.  Okay.

23   A.  If somebody jumps in front of a train, I don't know if I

24   could say that the train was responsible.  If somebody walks

25   between cars and jumps between the two cars to the -- I

1    don't think the train -- you know, it depends on the

2    situation.

3    Q.  I'm looking at your testimony from your deposition on

4    Page 103, Line 19.

5              THE COURT:  Hold on, Counsel.

6              Go ahead.

7    Q.  So do you remember this testimonial exchange?

8              My question:  "Is it your opinion that WMATA, as a

9    common carrier, is the guarantor of safety of everybody in

10   its transit system?"

11             And you answered:  "In terms of whatever they do

12   in their operation, as long as they operate safely, then

13   nobody gets hurt.  If they do something in their operation

14   to cause injury to somebody, they're responsible, yes."

15             Do you recall that question and answer?

16   A.  No, but if it's in my deposition, I guess I said it.  I

17   don't recall.

18   Q.  Okay.  Is it an accurate summary of your opinion with

19   regard to the responsibilities of public transit?

20   A.  I don't -- I have that same opinion, yes.

21   Q.  Okay.  So if somebody -- if the public transit authority

22   is doing something in its operation to cause injury, then

23   they're responsible?

24   A.  Yes, if they cause injury to somebody.  If I cause

25   injury to somebody, I'm responsible.  If a person causes

1    injury to somebody, they're responsible for that injury.

2    Q.  Okay.  So any time somebody gets hurt on public transit,

3    the Authority's responsible?

4    A.  I'm sorry?

5    Q.  I'm sorry, I apologize.

6        So any time somebody gets hurt on public transit,

7    the Authority is responsible?

8    A.  That's -- I didn't say that.  I said if somebody causes

9    somebody to be injured, they should be responsible.

10   Q.  Okay.

11   A.  If somebody injures themselves, you know, and inflicts

12   an injury upon themselves, how can you blame anybody?

13   That's self-imposed -- a self-imposed injury.

14   Q.  But you stand by the opinion that you gave in your

15   deposition testimony, correct?

16   A.  Yes.

17   Q.  Okay.

18        All right.  So you were asked a number of

19   questions about your investigation into this matter.

20   A.  Yes.

21   Q.  And one of the things you mentioned is that the -- well,

22   first of all, you agree that WMATA's standard operating

23   procedures are consistent with the national standard of

24   care, correct?

25   A.  I'm sorry, every time you walk away from the

1    microphone --

2    Q.  I apologize.  It's a bad habit.

3    A.  It's senior ears, you know.  Sorry.

4    Q.  You agreed in your direct examination that WMATA's

5    standard operating procedures are consistent with the

6    national standard of care.

7    A.  Yes.

8    Q.  All right.  But you understand that they don't set the

9    national standard of care themselves, right?

10   A.  No, but they were party to setting the national standard

11   -- all the transit agencies in the country, through the

12   various committees that we have, that's -- they were part of

13   setting the national standard.  They were --

14   Q.  Now, are you aware that WMATA considers its standard

15   operating procedures to be aspirational?

16   A.  They're definitely not aspirational.  They're -- to be

17   aspirational, it has to be something that's higher than a

18   national standard of care.  You can always be higher.

19          But in general, everything I've read that's in

20   WMATA's standard of care, in their SOPs, is the national

21   standard of care, which is not aspirational.  It's what

22   everybody in the industry does.

23   Q.  Sir, I'm asking you if you WMATA considers its SOPs

24   aspirational.  Are you aware of that?

25   A.  They can consider anything they want.  I can't speak for

1    WMATA.  If they want to call themselves aspirational, I

2    can't -- from the professional side, if you asked the people

3    on the APTA committees, they will tell you that their

4    national standard of care is consistent with the industry's

5    standards of care.

6    Q.  Okay.  But you agree that WMATA's SOPs are consistent

7    with the national standard of care?

8    A.  Yes.

9    Q.  Okay.  You indicated that you -- let's be clear.  You

10   talked about several different transit authorities.  I think

11   specifically for the purpose of this case that you were

12   looking at -- let me know if I'm missing any of them --

13   Philadelphia, San Francisco, Boston, Chicago, and WMATA.

14   Those are the ones you looked at for this case?

15   A.  Well, WMATA I had the SOPs.

16   Q.  Sure.

17   A.  Did you mention New York?

18   Q.  Oh, I'm sorry, New York as well.

19          So New York, Philadelphia, San Francisco, Boston,

20   Chicago, and Metro, correct?

21   A.  Yes.  I contacted each of those, yes.

22   Q.  Okay.  So you saw the Metro SOPs, right?

23   A.  Right.

24   Q.  You indicated that -- have you seen the current New York

25   transit SOPs?

1    A.  Yes.  It was given to me, yes.

2    Q.  And those were given to you by Mr. Jiminez?

3    A.  Yes.

4    Q.  Okay.  Have you seen the Philadelphia SEPTA?

5    A.  No, I couldn't -- they said I couldn't have it, you

6    know; that I wasn't entitled to it.

7    Q.  Okay.  Because they consider them to be --

8    A.  Confidential.

9    Q.  -- confidential, proprietary, right?

10   A.  Yes.

11   Q.  And same for San Francisco, did you see theirs?

12   A.  San Francisco never got back to me.  Basically I spoke

13   to a friend of mine who retired from them.  He said that --

14   Q.  I'm not asking what he said.

15   A.  Okay.  Anyway, they have -- they're sort of automated

16   when they come into the station, so the likelihood of not

17   berthing correctly is almost impossible.

18   Q.  I'm going to get to that.  I promise.

19   A.  Oh, okay.

20   Q.  But my question is, did you see their SOPs?

21   A.  No.

22   Q.  And because they consider them proprietary and

23   confidential?

24   A.  Yes.

25   Q.  Boston, did you see Boston's SOPs?

1    A.  On the ones that they -- sections related to the cases I

2    worked on.

3    Q.  Okay.  But not as part of your work for this particular

4    case?

5    A.  No.

6    Q.  Okay.  Chicago, did you see Chicago's SOPs?

7    A.  No.

8    Q.  Okay.  And the SOPs that you didn't see, you didn't see

9    them because the agencies considered them to be proprietary,

10   confidential to themselves, correct?

11   A.  Correct.

12   Q.  Okay.  You indicated, in terms of the work that you did

13   to determine the national standard of care, you spoke with

14   Orlando Jiminez.

15   A.  Jiminez, yes.

16   Q.  Mr. Jiminez was a driver or an operator?

17   A.  He started off as a conductor, then got promoted to

18   train driver, then got promoted to in charge of training,

19   and then he became the union representative for all the

20   train drivers.

21   Q.  Is he retired?

22   A.  Yes.

23   Q.  How long has he been retired?

24   A.  I don't recall.

25   Q.  Okay.  Has it been more than 10 years?  More than 20?

1    A.  I'm not sure.  I don't know.

2    Q.  Okay.  Was Mr. Jiminez ever in management at New York

3    Transit?

4    A.  Blue collar management in terms of union representative.

5    Q.  Was he ever a policy-setting officer of New York

6    Transit?

7    A.  No.

8    Q.  Okay.  And when was your conversation with him?

9    A.  I don't remember the exact date.  It was in preparation

10   for this supplement, so it was sometime before November.

11   Q.  Okay.  You said that you spoke to a counterpart at CTA.

12   A.  He gave me the name of a person he knew at the CTA.

13   Q.  Do you remember the name of that person?

14   A.  I probably do, but I don't have it with me.

15   Q.  Okay.  Did you speak to that person?  Not getting into

16   what you spoke with him about, did you speak to that person?

17   A.  Yes, I did speak to that person.

18   Q.  When you say he was a counterpart, what was the person's

19   role?

20   A.  He was a union rep for the train drivers.

21   Q.  He was a union rep for the train drivers.  Was he ever a

22   policy-setting individual at CTA?

23   A.  No, he worked his way up; conductor, train driver,

24   trainer.  You know, same as Orlando.  He worked his way up.

25   Q.  So neither the individual at CTA or Mr. Jiminez would

```
 1    have written SOPs for the authorities?

 2    A.  No, they did not write SOPs.

 3    Q.  Okay.  I'm sorry if I asked this.  Do you recall when

 4    Mr. Jiminez retired?

 5    A.  Pardon me?

 6    Q.  Do you recall when Mr. Jiminez retired?

 7    A.  No, I don't.

 8              MR. WATERS:  Indulgence, Your Honor.

 9              (Pause)

10              MR. WATERS:  Those are all my questions, Your

11    Honor.  Thank you.

12              THE COURT:  All right.  Mr. Regan.

13              MR. P. REGAN:  Thank you, Your Honor.

14              I promise just a few questions, Dr. Berkowitz.

15                      REDIRECT EXAMINATION

16    BY MR. P. REGAN:

17    Q.  Mr. Waters asked you a number of questions about

18    Ms. Scott's actions.  I've put a statement up on the screen

19    right now, or I will in a second.

20              THE COURTROOM DEPUTY:  Which document number,

21    Counsel?

22              MR. P. REGAN:  I don't have it written.  It's from

23    opening statement yesterday.

24              THE COURTROOM DEPUTY:  Sorry, a demonstrative?

25              MR. P. REGAN:  It's a slide.  I want to ask him a
```

1    question about it.

2            THE COURT:  I don't see the document.  I don't

3    hear an objection.

4            MR. P. REGAN:  I can't help that.  It's not

5    working.

6            THE COURTROOM DEPUTY:  It does work, but you have

7    to let me know what's happening so I can --

8            MR. P. REGAN:  Oh, I know.  I have it here, Your

9    Honor.

10           MR. WATERS:  We object, Your Honor.  I think this

11   was a slide that was used in support of the opening

12   statement.

13           MR. P. REGAN:  Judge, this is the type of

14   statement I could write on a whiteboard.

15           THE COURT:  Overruled.  Go ahead.

16           MR. P. REGAN:  Okay.

17   BY MR. P. REGAN:

18   Q.  So, Dr. Berkowitz, do you have it in front of you?

19   A.  Yes.

20   Q.  Okay.  So it says, "What can public reasonably expect

21   from WMATA?"

22           "Once a train is stopped at a train" -- "at a

23   station platform, passengers are allowed to get off the

24   train without fear that it will abruptly jerk forward again

25   with no warning."

```
1              In your experience, are passengers allowed to get
2      off the train without worrying about it jerking forward?
3              MR. WATERS:  Objection; scope of direct.
4              THE COURT:  I'll give you an opportunity.
5              You can answer, Dr. Berkowitz.
6              THE WITNESS:  Pardon me?  I'm sorry.
7              THE COURT:  You can answer.
8              THE WITNESS:  Thank you.
9      A.  This is a true statement.
10     Q.  Okay.  You agree with this statement?
11     A.  Absolutely.
12     Q.  By the way, is there anything about WMATA's Standard
13     Operating Procedure 50 with respect to the warning that you
14     read that is not common sense?
15     A.  Everything in --
16             MR. WATERS:  Objection as to common sense, Your
17     Honor.
18             THE COURT:  Sustained.
19     Q.  Mr. Waters asked you about whether Ms. Scott was holding
20     on to anything at the time that the train violently jerked
21     forward.  Can passengers exit a Metro train and always be
22     holding on to something until they're out on the platform?
23             MR. WATERS:  Objection.
24             THE COURT:  Sustained.
25             THE WITNESS:  Can I answer?
```

```
 1                THE COURT:  Sustained.
 2                MR. P. REGAN:  No.
 3                THE COURT:  No.
 4   Q.  Let me rephrase that.  Is it possible, in your
 5   experience, for passengers to exit a subway train and always
 6   be holding on to something until they get out to the
 7   platform?
 8                MR. WATERS:  Objection.
 9                THE COURT:  I think you opened the door, so
10   overruled.
11   Q.  You can answer that one.
12   A.  It's impossible because the way the train is designed
13   it's -- there is -- we don't have handrails in the train.
14   The only way that somebody can have something to hold on is
15   when you're going down a staircase or a ramp, we have a
16   handrail.  It would be impossible to put handrails on the
17   train.
18                MR. P. REGAN:  No further questions, Judge.
19                MR. WATERS:  Cross?
20                THE COURT:  Do you want a brief recross?
21                MR. WATERS:  Very briefly.
22                        RECROSS EXAMINATION
23   BY MR. WATERS:
24   Q.  Sir, you are aware that there are rails above --
25   overhead on a Metro train?
```

```
1    A.  Yes.

2    Q.  And there's a pole that's in the middle of the entry/

3    exitway?

4    A.  Yes.

5    Q.  Sir, do you have any understanding of how far the train

6    moved when it repositioned?

7    A.  Pardon me?

8    Q.  Do you have any understanding of how far the train moved

9    when it repositioned?

10   A.  No.

11   Q.  It wouldn't be more than the length of the platform,

12   would it?  Because the train, we know, stopped at the

13   platform and repositioned.

14   A.  It could be -- it could not be -- a couple of car

15   lengths maybe.

16   Q.  Okay.

17            MR. WATERS:  That's all I have.  Thank you.

18            THE COURT:  Okay.  Dr. Berkowitz, thank you for

19   your testimony.  You are excused.

20            THE WITNESS:  Thank you, Your Honor.

21            THE COURT:  Please don't discuss your testimony in

22   this case until the case is over.  Okay?

23            THE WITNESS:  Whoops.  I almost took the

24   microphone with me.

25            THE COURT:  Have a good day.
```

```
 1              MR. P. REGAN:  Depending on what the Court
 2    would like to do, we can call another witness or take a
 3    break.
 4              THE COURT:  How are you folks doing?  It's only
 5    12:15.  Next witness?
 6              Next witness.
 7              MR. P. REGAN:  All right.  We're going to play
 8    Dr. Rao, and then we can just break whenever the Court
 9    wants.  I think it's about 40 minutes, 45 minutes.
10              THE COURT:  Okay.  Ladies and gentlemen, the next
11    witness's testimony will be presented via video from a
12    deposition that he sat for.
13              Is that correct?
14              MR. P. REGAN:  About a week ago.
15              THE COURT:  Okay.
16              All right.  And why don't we plan on -- it's how
17    long?  It's about 45 minutes?
18              MR. P. REGAN:  I think so.
19              MR. WATERS:  I don't think it was that long.
20              MR. P. REGAN:  It might not be that long.
21              THE COURT:  Okay.  Why don't we go for 15 or 20
22    minutes, then we'll take our lunch break, and then we'll
23    finish it after lunch.  Does that make sense?
24              Mr. Waters, does that make sense?
25              MR. WATERS:  Oh, absolutely.
```

```
 1                  (Whereupon the deposition of Dr. Rajkumar
 2               Rao was played to the jury)
 3           THE COURT:  All right.  This is a good stopping
 4      point for our lunch break.  Have a nice lunch.  No
 5      discussion about the case.  No research about the case.
 6      We'll see you back here at 1:45.
 7                  (Jury exits courtroom)
 8           THE COURT:  All right.
 9           MR. P. REGAN:  In case you're interested --
10           THE COURT:  Yes.
11           MR. P. REGAN:  -- we probably have -- we have two
12      short witnesses after this, and then we're done subject to
13      the Metro people.  So, you know, depending on what defense
14      goes on this afternoon, we will -- we're very close to done.
15           THE COURT:  Okay.  Hold on.  So who is after this?
16      One of the witnesses?
17           Mr. Regan, so who are the two short witnesses?
18           MR. P. REGAN:  Okay.  We've got Rebecca, the
19      daughter, and we have Mr. Emondi by deposition.  And I think
20      that's it.  And then we -- the WMATA people are apparently
21      coming tomorrow, but, you know, any of the witnesses that go
22      today, we don't need to do direct of them.  We'll just
23      cross-examine.
24           MR. WATERS:  We were asked -- may I, Your Honor?
25           THE COURT:  Yes.  There was an objection to the
```

1    daughter, correct?

2              MR. WATERS:  Actually, Lauren is going to handle

3    that, and we were asking to have the operator, Dominic

4    Johnson, available today.

5              THE COURT:  So you're going to call her in your

6    case?

7              MR. WATERS:  My understanding is the plaintiffs

8    wanted her so they could call her.

9              MR. P. REGAN:  We won't do that, but she'll

10   testify.

11             THE COURT:  So either you'll rest and WMATA will

12   call her, or you will call her in your case?

13             MR. P. REGAN:  Correct.

14             MR. WATERS:  There was one scheduling issue, and

15   my appreciation to my colleagues.  We were asked to have

16   Keisha Henry available this morning.  Ms. Henry reported to

17   me around 6:30 this morning that she was experiencing an

18   illness, various symptoms, allergies and nausea.  Counsel

19   agreed to put her on tomorrow.

20             My question is whether -- I was going to put her

21   on, too -- whether they would like to reopen their case-in-

22   chief and then put her on as part of their case-in-chief, or

23   we put her on in our case?  I'll defer to counsel.

24             MR. P. REGAN:  I think in all likelihood we'll

25   rest subject to Mrs. Bennett -- no, who was -- Henry, three

1      names, but one way or the other.  We'll figure -- if we

2      rest, it will be subject to her coming in when she's feeling

3      better.

4              THE COURT:  Okay.  I mean, I would prefer not to

5      reopen the plaintiff's case to call a witness that the

6      defense is going to call anyway.  That doesn't make much

7      sense to me.  So we'll work that out.

8              MR. P. REGAN:  Okay.

9              THE COURT:  The daughter?

10             MS. GILMAN:  Yes, Your Honor.  We would just renew

11     our objection to the daughter testifying.  She was not

12     disclosed to defendant's counsel during discovery and

13     pursuant to 26(a)(1), pursuant to 26(e), there was no

14     supplement to that disclosure, so under 37(c) she should be

15     not allowed to testify.

16             THE COURT:  Okay.  Did I reserve on this at the

17     pretrial?  Remind me.

18             MS. GILMAN:  Yes, Your Honor.

19             THE COURT:  Okay.

20             MS. GILMAN:  You did ask if she -- if we asked

21     anything in our interrogatories.  We did not ask about the

22     daughters in our answers -- questions to interrogatories to

23     the plaintiff.

24             And she did come up during the deposition, but in

25     one question to plaintiff, which was "Where do you live and

```
 1    who do you live with?"  And she gave the address and the
 2    people in her household, but that did not indicate to
 3    defense counsel that she had discoverable information and
 4    that they intended to call her.
 5              THE COURT:  Okay.  Mr. Regan.
 6              MR. P. REGAN:  Judge, we did not name her in an
 7    initial disclosure.  We were not asked in interrogatory
 8    about her.  She did come up in the deposition.  I don't
 9    think there's any prejudice to WMATA, but the Court has all
10    the facts.
11              THE COURT:  Okay.  The Court will exclude the
12    daughter because there was no disclosure.  WMATA was not on
13    notice that she would be appearing as a witness.  Okay?
14              MR. P. REGAN:  Okay.
15              THE COURT:  So we're down to one.
16              MR. P. REGAN:  That shortens us.
17              THE COURT:  That shortens us.  So we'll take stock
18    when we get back as to where things stand.  Okay?
19              (Lunch recess taken)
20
21
22
23
24
25
```

```
 1                  A F T E R N O O N   S E S S I O N

 2              THE COURT:  All right.  Are you folks ready for

 3    the jury?

 4              MR. WATERS:  Yes, sir.

 5              THE COURTROOM DEPUTY:  Your Honor, I think the

 6    laptop isn't connected.  It's not showing on the screen.

 7              MR. C. REGAN:  Yes, one second.

 8              (Jury enters courtroom)

 9              THE COURT:  All right.  Welcome back, everybody.

10    Did you have a nice lunch?  Everybody get outside and enjoy

11    this nice weather?

12              All right.  We will continue with Dr. Rao's

13    videotaped deposition testimony.

14              (Whereupon the videotaped deposition of

15               Dr. Rao was played before the jury)

16              THE COURT:  All right.  We've concluded Dr. Rao's

17    video testimony, and the testimony is now in evidence just

18    as if he were to have testified live.  Again, you heard a

19    lot of bantering back and forth amongst the lawyers on the

20    video.  The statements of the lawyers are not evidence,

21    although Dr. Rao's testimony is.  Fair enough?  Okay.

22              MR. P. REGAN:  Judge, we have two other witnesses.

23    They're short.

24              THE COURT:  Very well.

25              MR. P. REGAN:  Also same way.
```

```
1                    THE COURT:  By video?

2             Okay.  Two more video witnesses.

3                    MR. P. REGAN:  Judge, do you want to explain the

4    Rule 30(b)(6), or have us explain it?

5                    THE COURT:  Hold on.  Let's go to the phones.

6                    (The following is a bench conference

7                     held outside the hearing of the jury)

8                    THE COURT:  Okay.  Mr. Waters, any objection to

9    this 30(b)(6) witness?  I did not understand that we were

10   going to do --

11                   MR. WATERS:  Yes, this is news to me.  We had a

12   brief conversation about this over lunch, whether this was

13   going to happen or not.  This is the witness that we were

14   talking about before with regard to the designation that we

15   had.

16                   MR. C. REGAN:  I apologize, Your Honor.  I can

17   update the Court very quickly.

18             I hadn't realized that that was covered when

19   everybody came back.  We talked about it at length.  I told

20   Mr. Waters this includes all the portions that he had

21   requested, so we said in lieu of bringing Mr. Bennett,

22   trying to rush him in here today, or something like that, we

23   will just play it exactly the modifications that you --

24                   THE COURT:  I thought you said before you weren't

25   going to do that, but you've now changed your mind.
```

```
 1                    MR. C. REGAN:  I know, Your Honor.

 2                    THE COURT:  So it's with the full designations

 3       that we discussed prior to the break?

 4                    MR. C. REGAN:  Correct, Your Honor.  Every single

 5       line that Mr. Waters requested be read with it.

 6                    And I apologize for not updating the Court prior

 7       to now.  Thank you, Your Honor.

 8                    THE COURT:  Okay.

 9                    (This is the end of the bench conference)

10                    THE COURT:  Instead of playing his entire

11       deposition, the parties have selected a limited number of

12       excerpts from the deposition, which will be played.  This is

13       a witness who I understand is a corporate representative of

14       WMATA, and his deposition was taken prior to trial in that

15       capacity.  I understand that we may hear from this witness

16       in WMATA's case, but the plaintiff has elected to admit

17       certain statements within his deposition, and we're playing

18       the following excerpts from the deposition, and it should be

19       relatively brief.

20                    Is that fair?

21                    Mr. Waters, anything to add?

22                    MR. WATERS:  I'm sorry, Your Honor?

23                    THE COURT:  Anything to add?

24                    MR. WATERS:  No.

25                    MR. C. REGAN:  Your Honor, could the plaintiff
```

 1      just request, would the Court like to provide a brief

 2      instruction about the significance of a 30(b)(6) party

 3      deposition of WMATA?

 4                  THE COURT:  Why don't you play it first.  Okay?

 5                  MR. C. REGAN:  Understood.

 6                  THE COURT:  And then we'll talk about that.

 7                  (Whereupon the video deposition of Clev Bernard

 8                   Ibanez Bennett was played to the jury)

 9                  MR. C. REGAN:  Your Honor, that concludes the

10      testimony of Mr. Bennett as a representative of WMATA.

11                  THE COURT:  Okay.  Next witness.

12                  MR. C. REGAN:  Your Honor, the plaintiff's next

13      witness is also by video.  Unfortunately that's Al Emondi, a

14      fellow passenger on the train.

15                  MR. WATERS:  Your Honor, may we go to the phones?

16                  THE COURT:  Sure.

17                  (The following is a bench conference

18                   held outside the hearing of the jury)

19                  MR. WATERS:  Thank you, Your Honor.

20                  During the redirect of Al Emondi, Counsel read

21      into the record a portion of the accident report that

22      consisted of I think Mr. Emondi's statement that he gave to

23      WMATA.  I think that that statement is hearsay, and I think

24      it was improper essentially bolstering a prior consistent

25      statement in how counsel is using it.  I don't think it's

1    appropriate to use that portion of Mr. Emondi's deposition

2    at this time.

3              MR. C. REGAN:  Yes, Your Honor.  Mr. Waters

4    touched on the important question, which is basically just

5    whether it is a proper or improper, as he just asserted,

6    prior consistent statement, evidence of a prior consistent

7    statement.  So pursuant to Rule 801.1, it is admissible,

8    Your Honor, because Mr. Waters insinuated that the witness

9    had been untruthful during his cross-examination of the

10   witness.  If the Court will bear with me for one moment, I

11   can try to find those pages.

12              And in addition to what Mr. Waters noted, I'm

13   confident this is something we should talk about at this

14   point.  I believe that in addition to reading it through

15   with the witness, the plaintiff also -- I move that it be

16   admitted into the record, and I think it's shown on the

17   screen at the end, Your Honor.  So it's certainly worth our

18   time to discuss.

19              MR. WATERS:  I don't believe that I was

20   insinuating that he was being dishonest, only that a

21   statement or an assertion that Mr. Regan was making was not

22   in the report.

23              MR. C. REGAN:  Okay.

24              THE COURT:  All right.  So, fellows, how can I

25   possibly rule on what is in the indirect based on -- or the

1    redirect based on what you all are saying happened at the

2    depo without the transcript, without -- I mean, we should

3    have teed this up beforehand, you know.

4           MR. WATERS:  I believe, Your Honor --

5           THE COURT:  I have no basis to rule on this.  I

6    mean, if he's reading in a hearsay statement -- for what

7    purpose is he reading in the hearsay statement?

8           MR. WATERS:  In my opinion, he was bolstering and

9    improperly trying to rehabilitate the witness.

10          MR. C. REGAN:  And, Your Honor, insofar as he says

11    bolstering, yes, that is accurate because, as I mentioned

12    before, it's because Mr. Waters's line of questions

13    suggested that the witness had not been honest in his

14    statement or that he omitted something.

15          THE COURT:  Okay.  So for me to rule on this, I

16    need to look at the transcript.  I need time to do that, all

17    right?

18          MR. C. REGAN:  I think that's correct, Your Honor.

19          THE COURT:  Okay.

20          All right.  We're going to take a brief break.

21          (This the end of the bench conference)

22          THE COURT:  Ladies and gentlemen, we have to

23    resolve an evidentiary issue so we're going to take a brief

24    break.  If you could retire to the jury room, it shouldn't

25    take too long.  We'll let you know when we're ready for you.

```
 1                  (Jury exits courtroom)
 2            THE COURT:  All right.  For me to hit it, you guys
 3       have got to tee it up.  Right?
 4            MR. WATERS:  I apologize, Your Honor.  We had
 5       addressed this with Mr. Bennett, but I think we left out
 6       Mr. Emondi when we were having that same conversation.
 7            THE COURT:  Okay.  What is the --
 8            MR. WATERS:  I can --
 9            THE COURT:  So first of all, would we be
10       playing the entirety of Mr. Emondi's deposition, or just
11       excerpts?
12            MR. C. REGAN:  We would be playing the entirety,
13       Your Honor, but I think the entirety -- I think my direct
14       was seven minutes and Mr. Waters's might have been ten
15       minutes.
16            THE COURT:  Okay.  So what is the relevant part
17       for -- for just this evidentiary ruling, what is the
18       relevant portion of the direct?
19            MR. C. REGAN:  Well, it was actually -- it was
20       never brought up on direct.  It's all in response to cross-
21       examination by Mr. Waters.
22            The first time the issue comes up is on Page 18,
23       Line 11.  And then, Your Honor, you could effectively read
24       straight to the end.  I think that was the end of his cross,
25       and that's the only thing I did on redirect.
```

1          THE COURT:  Okay.

2          MR. C. REGAN:  So, again, that's Page 18 --

3          THE COURT:  And the defense's position is that

4    this is inappropriate hearsay because it's reading in his

5    statement from the investigation report and the plaintiff's

6    position that this is a proper consistent statement --

7          MR. C. REGAN:  Correct, Your Honor.

8          THE COURT:  -- coincident with a consistent

9    statement under 803 -- what's the letter?

10         MR. C. REGAN:  Your Honor, I believe it's actually

11   801(a)(1)(B).

12         THE COURT:  801.

13         MR. C. REGAN:  A witness's prior statement that is

14   consistent with his prior testimony and is offered to rebut

15   an express or implied charge --

16         THE COURT:  Okay.  We'll take a look.

17         MR. C. REGAN:  Understood.

18         MR. WATERS:  One point is I believe the video

19   actually brings up the actual statement and would show it to

20   the jury.  Counsel, correct me if I'm wrong.

21         MR. C. REGAN:  No, that's correct.

22         MR. WATERS:  The actual statement that he hand

23   wrote --

24         THE COURT:  Okay.

25         MR. WATERS:  -- would be actually shown.

```
 1                    THE COURT:  Okay.  Well -- and he's reading from

 2     it?

 3                    MR. WATERS:  Yes.  Counsel was asking him about

 4     that and having him read that.

 5                    THE COURT:  Okay.  So in the depo that will be

 6     shown?

 7                    MR. C. REGAN:  Correct, Your Honor.

 8                    THE COURT:  The statement comes up as an exhibit,

 9     not as an -- it's not being introduced at trial, but it

10     comes up on the screen, and he reads from it; is that right?

11                    MR. C. REGAN:  Correct, Your Honor.  I would say

12     plaintiff moved to admit it into evidence at this

13     deposition.  It's a trial deposition from last week.

14                    So yes, it is not --

15                    THE COURT:  So you're moving to introduce the

16     writing.

17                    MR. C. REGAN:  Correct, Your Honor.

18                    THE COURT:  Not just a deposition where he reads

19     from the writing.

20                    MR. C. REGAN:  Correct, Your Honor.

21                    THE COURT:  Okay.  All right.

22                    (Recess taken)

23                    THE COURT:  Okay.  I don't think the statement

24     comes in.  All right?  It doesn't strike me as being a prior

25     consistent statement admissible under 801(d)(1)(B) because I
```

1    don't -- from the context of the transcript, I didn't

2    understand Mr. Waters to be suggesting that the witness was

3    fabricating his testimony, and so for that witness I think

4    it falls under that hearsay rule.

5             I take it -- I didn't read the first part of the

6    direct, but Mr. Emondi said what he basically says in the

7    statement.  Is that fair?

8             MR. C. REGAN:  That's fair, Your Honor.

9             THE COURT:  So you're going to get that in.

10            So the question then is what to do with this

11   deposition if the statement is going to -- is embedded in

12   the video.  We could stop at that point, and you can read

13   the rest in without showing the video.

14            MR. C. REGAN:  I was going to suggest something,

15   Your Honor.  I also, I guess -- just to make sure that

16   the point -- so the point is that the question by

17   Mr. Waters suggests that there's something not quite right

18   about the statement or that further information was supplied

19   that's not been relayed to them in the deposition, but I

20   understand --

21            THE COURT:  The Court ruled.

22            MR. C. REGAN:  Understood.

23            THE COURT:  So how are we going to deal with this

24   logistically?

25            MR. C. REGAN:  I'm not a very high-tech person,

1    but if we minimize the video window would be a way to let

2    the audio keep playing while the video is no longer on the

3    screen.

4              THE COURT:  Are you okay with that, Mr. Waters?

5              MR. WATERS:  Yes, I'm fine with that.

6              THE COURT:  Okay.  Let's do it that way.

7              MR. WATERS:  As long as that shot doesn't come up.

8              MR. C. REGAN:  And, Your Honor, the Court may be

9    planning to do this already, but it might be helpful to let

10   the jurors know, either before or after, just that the final

11   portion of the video is not a tech problem, but that it's

12   pursuant to the ruling of the Court.

13             THE COURT:  I will do that.

14             (Jury enters courtroom)

15             THE COURT:  All right.  Ladies and gentlemen, we

16   have sorted that out.  Apologies for the delay.

17             We will proceed with the videotaped deposition

18   testimony of the next witness, and towards the end I believe

19   that the video will cease and the remainder will be audio

20   only.  That is not a technical glitch.  The video had an

21   exhibit that the Court has ruled inadmissible, and so we're

22   going to conceal that exhibit and proceed with the audio.

23   And there we go.

24             Mr. Regan.

25             MR. C. REGAN:  Thank you, Your Honor.

```
 1              (Whereupon the videotaped deposition of

 2          Mr. Al Emondi was played to the jury)

 3              THE COURT:  Okay.  I believe that concludes

 4      Mr. Emondi's testimony.

 5              Mr. Regan.

 6              MR. P. REGAN:  Judge, we have just a couple of

 7      loose ends to take up with the Court, and otherwise we are

 8      resting.

 9              THE COURT:  Okay.  Do you want to take up the

10      loose ends first, or do you want to rest first?

11              MR. P. REGAN:  Well, I think I -- we need to take

12      up the loose ends to make sure that everybody's comfortable

13      with the testimony tomorrow coming in from Ms. Henry.

14              THE COURT:  Okay.  Ladies and gentlemen, the

15      defense is prepared to rest.  We're going to wrap up a

16      couple of loose ends before we do that technically, so we're

17      going to send you back to the jury room, and I believe that

18      we will begin the -- sorry, the plaintiff is prepared to

19      rest.  I believe we will begin the defense's case, okay?  So

20      just give us a few minutes.  All right?

21              (Jury exits courtroom)

22              THE COURT:  All right.  What do we have?

23              MR. P. REGAN:  All right.  So, Judge, the first

24      thing is just judicial notice of life expectancy.  I think

25      we have an agreement that a woman 84 years old has a future
```

```
 1      life expectancy -- I have the HHS -- well, I don't think

 2      they're called "HHS" anymore.  They're called whatever they

 3      are.  Yeah, they are HHS tables, 7.1 years.

 4              THE COURT:  Okay.  So you want me to read that as

 5      a stipulated --

 6              MR. P. REGAN:  In the jury instructions.

 7              THE COURT:  -- fact -- well, a fact of judicial

 8      notice that will be admissible, and then include it in the

 9      jury instruction?

10              MR. P. REGAN:  Correct.

11              THE COURT:  Mr. Waters?

12              MR. WATERS:  Counsel gave me a chart, but I don't

13      think it shows her age cohort.

14              MR. C. REGAN:  There's two pages.

15              MR. WATERS:  Ah, very well.  Thank you, Chris.

16              No objection to that, Your Honor.

17              THE COURT:  Okay.  If you could pass it up to me,

18      and I'll read it for the jury when they come back.

19              MR. P. REGAN:  And the only other loose end,

20      Judge, is that we're fine with Ms. Henry coming on tomorrow,

21      and we don't have to reopen the plaintiff's case, but we do

22      want this stipulation, that our cross-examination of her is

23      included in our case-in-chief for appellate purposes.

24              So -- I mean, we can do it two ways.  We can have

25      that stipulation, and we'll just go forward with it, or we
```

1    would reopen.  As you know, she was going to come today.

2    She got sick --

3            Do I have the sex right, the gender?  Okay.

4            She was going to come today, got sick.  We said

5    fine.  Tomorrow's fine.  We would just put her on out of

6    order.  But if it's cleaner, we're fine with that as long as

7    it's understood that her cross-examination is counted for

8    appellate purposes as part of our case-in-chief.

9            THE COURT:  Mr. Waters?

10            MR. WATERS:  I don't have a problem with that,

11    Your Honor, and I'm appreciative of the courtesy of counsel

12    with my witness's illness.  My only kind of procedural

13    question is if they're going to formally rest now, will the

14    Court like to take up our Rule 50 motion at this time?

15            THE COURT:  I was going to allow you to make a

16    Rule 50 motion orally, and I would reserve on it so that you

17    could -- that it's preserved.

18            MR. WATERS:  Okay.

19            THE COURT:  I mean, I think the rule says any time

20    after the close of the opponent's -- let's see exactly what

21    the rule says.

22            MR. WATERS:  I wouldn't want to play it close,

23    Your Honor.  I really want to make it as close as --

24            THE COURT:  Maybe you should, you know, make it

25    now and then renew it after the cross-examination given the

1    stipulation we've just made for appellate purposes.

2              MR. P. REGAN:  We're fine with that.

3              MR. WATERS:  Okay.  That would be fine.

4              THE COURT:  Just to be safe.

5              Would you like to take up the Rule 50 motion now,

6    or do you want to do it after counsel formally rests?

7              Why don't we do it after counsel rests.  We can

8    just do it on the phone.  Just be brief.  Hit the high

9    points.  You know, just preserve it.  That's all.

10             MR. WATERS:  Very well, Your Honor.

11             THE COURT:  Okay.  You can get the jury.

12             (Jury enters courtroom)

13             Okay.  Welcome back, ladies and gentlemen.  Again,

14   thank you for your patience.

15             In addition to the facts that are in evidence

16   through testimony or documents, the rules allow Courts to

17   take what's called judicial notice of facts that are

18   essentially beyond dispute, okay?  And the parties have

19   agreed that the Court can take judicial notice of the

20   following fact.

21             Based on the official life tables published by the

22   United States Department of Health and Human Services, as an

23   84-year-old woman, Carol Scott has a future life expectancy

24   of 7.1 years.

25             Okay.  So that fact is in evidence as are the

 1    other facts that have been shown through the testimony and

 2    the documents.  Okay?

 3                With that...

 4                MR. P. REGAN:  Your Honor, at this point the

 5    plaintiff rests subject to what we discussed earlier.

 6                THE COURT:  Okay.  The plaintiff has now rested

 7    its case.  We're going to go to the phones briefly.

 8                (The following is a bench conference

 9                 held outside the hearing of the jury)

10                MR. WATERS:  Yes, thank you, Your Honor.

11                Defendant moves for a directed verdict pursuant to

12    Rule 50 of the Federal Rules of Civil Procedure.  We believe

13    plaintiffs have failed to make their prima facie case of

14    liability against WMATA.  I think we have four primary bases

15    that I would like to assert and make sure that we make a

16    record on.

17                The first and most important is the jerk/jolt

18    defense assumption of the risk that we argued in our motion

19    for summary judgment.  I think it's particularly notable

20    that there is an absence of any evidence that there was any

21    reasonable belief or basis to believe that it was safe to

22    alight at the time when Ms. Scott stood up.  There were --

23    she testified that there were no other individuals that she

24    can recall who were about to leave, and she changed her

25    testimony from her deposition where she had previously

1    indicated that the train stopped, the operator made the

2    announcement, and then she got up.  And now she's testifying

3    that she recalls hearing that announcement as the train was

4    arriving and that there was no announcement for when it

5    stopped until it moved.  I think all of that changes the

6    dynamic and Your Honor's ruling with regard to summary

7    judgment on that issue.  We move for directed verdict on

8    that ground.

9         We also move for a directed verdict on

10   contributory negligence.  Ms. Scott testified specifically

11   that she knew that the train would move again.  She

12   testified that she did not hear the chimes.  She did not see

13   the door open.  Even knowing that the door was going -- that

14   the train would move again, she still got up and failed to

15   secure herself, and I think that that's contributory

16   negligence as a matter of law.

17        Another important ground here is with regard to

18   the testimony with regard to the announcement.  I believe

19   the testimony in that regard was rather inconsistent with

20   regard to whether an announcement was made or not made.  I

21   think it's -- and with regard to when the announcement was

22   made.  We just heard Al Emondi, who did not recall the

23   announcement, and the question I had was with regard to

24   that particular issue is the consistency with regard to

25   Ms. Scott's testimony at first saying there was an

1    announcement made and then saying the announcement was made

2    at a different time.  I think that that raises a question of

3    whether this made their burden with regard to that

4    particular issue.

5         I think the next ground relates to Dr. Carl

6    Berkowitz.  We believe the Court should have excluded him

7    for all the reasons stated in our motion in limine.  The

8    only thing that the Court allowed him to testify to in this

9    case was the testimony regarding the national standard of

10   care.  And as Your Honor remembers, the national standard of

11   care, the evidence that he offered, only came into play in

12   opposition to our motion for summary judgment.  The

13   testimony that was allowed in this courtroom was not what he

14   had disclosed previously, and it was not disclosed to us

15   prior to the close of discovery.  It was only raised in

16   response to the summary judgment motion.

17        The disclosure that he did give timely was

18   entirely excluded, and for all of the reasons with regard to

19   the -- I think the insufficiency of his efforts, we believe

20   that he should have been excluded, and summary judgment

21   would have followed.  And for that reason I think there is a

22   basis for the Court to grant our JOV, I'm sorry, directed

23   verdict.

24        And the final issue I would raise is that we would

25   ask for a partial directed verdict on the issue with regard

1    to the summary of damages.  Medical bills have not been

2    offered.  The medical records have not been offered.  I

3    believe that the arguments that we made this morning with

4    regard to those issues indicate that the evidence has not

5    been waived with regard to that particular component of the

6    case, and to that extent, we would ask for a partial

7    directed verdict.

8         THE COURT:  Okay.  The Court will take the motion

9    under advisement and reserve on it, submit the case to the

10   jury, and you may renew the motion in the event of an

11   adverse jury verdict.

12        MR. WATERS:  Very well.  Thank you, Your Honor.

13        (This is the end of the bench conference)

14        THE COURT:  All right.  The floor is all yours.

15        MR. WATERS:  Your Honor, at this time we would

16   like to call Dominic Johnson.  May we step out to get our

17   witness?

18        THE COURT:  You may.

19        (Pause)

20        MR. WATERS:  Your Honor, it appears our witness,

21   who was here, is not at the office where we -- may I propose

22   that we take the afternoon break while we try to

23   ascertain --

24        THE COURT:  My apologies, ladies and gentlemen.

25   It appears that the defense's first witness is not here

```
1    presently.  Let's see what we can do about that as soon as

2    we can.  Okay?

3              So we'll take our -- we'll take a ten-minute break

4    and give you further instructions.

5                   (Jury exits courtroom)

6              MR. WATERS:  My apologies to the Court, Your

7    Honor.  She was in the building two hours ago.

8              THE COURT:  Why did she leave?

9              MR. WATERS:  We're trying to figure that out right

10   now.

11                  (Pause)

12             MR. P. REGAN:  I know you want to get off and out

13   of here.  This is the only witness today, so if it makes

14   sense -- I don't know what your plans are, but if we wanted

15   to spend a little bit of time doing instructions, I think we

16   have somewhere around two or two and a half hours of

17   testimony tomorrow, and then we can jump to closing.

18             THE COURT:  Hold on.  Do we have our witness?

19             MR. WATERS:  We have our witness.

20             THE COURT:  Well, we're in the process of coming

21   up with a set of proposed instructions to give you folks to

22   review before we have our charge conference.  We had thought

23   that we would have it tomorrow at some point, but let's see

24   where we are.  And we might be able to get it to you today,

25   but let's see how long this witness takes.
```

```
 1                    MR. WATERS:  I don't expect to be long with the

 2          witness.

 3                    THE COURT:  Okay.  Well, let's take stock once we

 4          are done with the witness.  We can dismiss the jury after

 5          this witness.

 6                    MR. WATERS:  Okay.  We're still on break, Your

 7          Honor?  May I step out for one moment?

 8                    (Recess taken)

 9                    THE COURT:  Ms. Johnson, you can approach.

10                    Good afternoon.

11                    THE WITNESS:  How are you doing?

12                    THE COURT:  Come on up.  You can have a seat.

13          Just stand up when the jury comes in.  Okay?

14                    THE WITNESS:  Okay.

15                    (Jury enters courtroom)

16                    THE COURT:  All right.  Welcome back, everyone.

17                    Mr. Waters.

18                    MR. WATERS:  Thank you, Your Honor.

19                              DOMINIC JOHNSON

20                            DIRECT EXAMINATION

21          BY MR. WATERS:

22          Q.  Good afternoon.

23          A.  Good afternoon.

24          Q.  Would you please introduce yourself to our jurors.

25                    THE COURT:  Before we do that, could you stand and
```

```
 1    raise your right hand.
 2              MR. WATERS:  Oh, right.  Sorry.
 3              (Witness sworn).
 4    BY MR. WATERS:
 5    Q.  Good afternoon.
 6    A.  Good afternoon.  Hello, I'm Dominic Johnson.
 7    Q.  And, Ms. Johnson, how are you employed?
 8    A.  By WMATA.
 9    Q.  And how long have you been employed by Metro?
10    A.  Since 2016.
11    Q.  Okay.  How did you first start to work for Metro?
12    A.  As a bus operator.
13    Q.  And how long were you a bus operator?
14    A.  About a year, a year and a -- a year and a couple of
15    months.
16    Q.  Okay.  And then what did you do after you were a bus
17    operator?
18    A.  A train operator.
19    Q.  You were a train operator?
20    A.  Correct.
21    Q.  And how long were you a train operator?
22    A.  Roughly around five years, five, six years.
23              THE COURT:  Can everyone hear Ms. Johnson?
24              Ms. Johnson, if you could keep your voice up just
25    a little bit so that the jurors can hear you, that would be
```

```
 1    great.
 2              MR. WATERS:  Can you pull the mic closer to you.
 3    It may help.
 4              THE COURT:  There you go.
 5              MR. WATERS:  Is that better?  Can you speak up?
 6    A.  Roughly around -- a train operator, roughly around five
 7    and a half, six years.
 8    Q.  Okay.  So just to rewind.  You started as a bus
 9    operator?
10    A.  Yes, in 2016.
11    Q.  In 2016.  And then in 2017 was it when you became a rail
12    operator?
13    A.  It was 2018.
14    Q.  Okay.  And then you did that for five or six years?
15    A.  Correct.
16    Q.  Okay.  And after you were -- and how are you currently
17    employed at WMATA?
18    A.  As a rail supervisor.
19    Q.  Okay.  And what is involved in being a rail supervisor?
20    A.  Assisting with emergency situations, responding to
21    incidents, dealing with customers that have complaints or
22    issues with station managers or to alleviate anything that
23    goes on with the trains.  If a train breaks down, if an
24    operator needs a personal, we would leave trains and operate
25    when needed.
```

1    Q.  And how long have you been in that role?

2    A.  Since June of last year.

3    Q.  Okay.  Have you had any other employments at WMATA?

4    A.  No.

5    Q.  Okay.  This case involves an accident that happened on

6    September 23, 2019.  At that time what were you -- how were

7    you employed or how were you working at WMATA?

8    A.  As a train operator.

9    Q.  Okay.  And do you recall what line you were working on

10   at that time?

11   A.  The Orange Line.

12   Q.  Okay.  So can you walk me through the process.

13           One of the issues in this case relates to train

14   operation and the berthing procedures and announcements that

15   are made.  Can you walk me through the process of berthing a

16   train and announcements that you make as a rail operator.

17   A.  Okay.  As you enter a station, you make an announcement

18   of this station's name, which side the platform doors will

19   open on.  If you're -- when we're properly berthing the

20   8-car marker and the doors open, you make the announcement

21   of which line it is and what the next stop would be.

22   Q.  What does "properly berth at the 8-car marker" mean?

23   A.  When the train is at the gate.

24   Q.  What does it mean in terms of the doors with respect to

25   the location -- their location on the platform?

 1    A.  We can't open the doors without the train being at the

 2    8-car marker.

 3    Q.  Okay.  And is that so to ensure that all of the doors

 4    are opening to the platform and none of the doors are

 5    opening, say, into the tunnel?

 6    A.  Correct.

 7    Q.  Okay.  Have there been any circumstances as an operator

 8    when you may -- the train may stop short of the 8-car marker

 9    and you have to reposition the train?

10    A.  Correct.

11    Q.  How often does that happen?

12    A.  Often.

13    Q.  What are the types of reasons why the train might stop

14    short of the 8-car marker and require repositioning?

15    A.  It can be a red signal.  It can be a train that's in the

16    same circuit as that train, which will cause the train to

17    stop behind it.  It could be a track circuit.  It could be

18    various reasons.

19    Q.  What do you mean by it could be a track circuit or a red

20    signal?

21    A.  A red signal is like if you have a red light, and the

22    trains -- once -- when you have a red signal, the train is

23    going to stop so far away from the signal to avoid running a

24    red signal, so the train automatically stops.

25    Q.  Okay.  And what does it mean when you have a track

1    circuit issue?

2    A.  If you have a track circuit issue, the train loses

3    readouts.  And when you don't have readouts, your train

4    stops as well.

5    Q.  Okay.  What are you supposed to do when you reposition

6    the train?  If the train stops for a red signal or a track

7    circuit issue, and the train stops short of the 8-car

8    marker, what are you supposed to do as the operator?

9    A.  We contact central control and request permission to

10   continue on to properly berth at the 8-car or wherever

11   you're trying to get to next.

12   Q.  Do you make any announcements to customers?

13   A.  Yes.

14   Q.  And what are the announce -- what's the announcement you

15   make to the customer?

16   A.  "Stand clear, train moving."

17   Q.  Okay.  And you make that before you move the train?

18   A.  Yes.

19   Q.  Do you recall the events of September 23, 2019, when

20   Ms. Scott was injured?

21   A.  I don't recall the events, but I am refreshed on the

22   incident report that was completed at that time.

23   Q.  Okay.  You were operating --

24         THE COURT:  I'm sorry, just for the record,

25   Mr. Waters asked you what the announcement was that you make

1    to the customer if the train stopped short.  Could you

2    repeat your answer.

3              THE WITNESS:  The announcement is "Stand clear,

4    train moving."

5              THE COURT:  "Stand clear, train moving."

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  Thank you.

8    BY MR. WATERS:

9    Q.  And is that something that's part of a standard

10   operating procedure for WMATA rail operators?

11   A.  Yes.

12   Q.  Okay.  What do you recall, having refreshed your

13   recollection, about the events of September 23rd?

14   A.  Per my incident report, I recall being -- a customer

15   used the emergency button to contact the operator, which was

16   me, and informed me that someone had injured theirself in

17   the train.

18              I contacted central, and I believe I stayed in my

19   cab because the supervisor was already at the station.

20   Q.  Okay.

21   A.  So I never left my cab.

22   Q.  Do you recall the events leading up to that particular

23   station stop, meaning anything particular about that station

24   stop that you remember?

25   A.  No.

1  Q.  Do you remember stopping short of the 8-car marker and

2  repositioning at that station stop?

3  A.  I don't remember it, but it was -- I don't remember it,

4  but it happens.

5  Q.  Okay.  Does it happen regularly as you're operating?

6  A.  It can.

7  Q.  Okay.  You said that there was a supervisor already on

8  scene at McPherson Square?

9  A.  Correct.

10  Q.  So you were instructed to stay in the cab?

11  A.  Correct.

12  Q.  Did you ever have any contact with Ms. Scott?

13  A.  No.

14  Q.  The person who rang you up in the cab using the phone in

15  the train, did they tell you anything about Ms. Scott's

16  injury, or did they just say somebody was hurt?

17  A.  I don't remember what was said verbatim.  I don't recall

18  them mentioning any injury per se; just that I believe

19  someone was hurt or someone had fallen.

20  Q.  Okay.  And what did you do when you learned that

21  somebody had fallen?

22  A.  I contacted central control.

23  Q.  Okay.  But you stayed in your cab.  Did you have any

24  contact with Ms. Scott or any of the EMTs?

25  A.  No.

1    Q.  Okay.  Do you -- you indicated that you don't recall

2    stopping short and then repositioning at that particular

3    stop.

4    A.  No.

5    Q.  Do you have any recollection of making an announcement,

6    "Stay clear, train's about to move"?

7    A.  I don't have a recollection of it, but I know that it's

8    the policy to -- what we usually do.

9    Q.  And do you follow that policy?

10   A.  Yes.

11   Q.  Okay.  Do you have any specific recollection of not

12   making that announcement or not following that policy?

13   A.  No.

14   Q.  Okay.  On the way in that night, there's been testimony

15   that the train stopped short of the 8-car marker at several

16   different platforms along the Orange Line.  Do you have a

17   recollection of that, of whether the train was stopping

18   short at five or six platforms from Vienna to McPherson

19   Square?

20   A.  No.

21   Q.  Okay.

22           MR. WATERS:  Thank you, ma'am.  Those are all of

23   the questions I have.

24                       CROSS-EXAMINATION

25   BY MR. C. REGAN:

1    Q.  Good afternoon, Ms. Johnson.  Nice to see you again.

2    A.  How are you doing?

3    Q.  I'd just like to clarify at least a couple of quick

4    things.

5         Mr. Waters asked questions about your memory that

6    day.  Fair to say you have absolutely no memory of what

7    happened that day as we sit here today other than what

8    had written down in your statement to WMATA back then?

9    A.  Correct.

10   Q.  In your statement to WMATA, it starts with the push of

11   the button notifying you there had been an emergency, right?

12   A.  Correct.

13   Q.  You didn't write anything in your statement about what

14   caused the incident that day, right?

15   A.  No.

16   Q.  So still, as we sit here today, you don't know why the

17   train stopped short that day at all, right?  We can agree on

18   that?

19   A.  A direct reason, no.  I don't -- it happens pretty

20   often, so it doesn't really stand out when it does happen.

21   Q.  Okay.

22   A.  If there's a train's too close or anything, the train

23   will stop.

24   Q.  Do you know what the most likely reason is?  Is there a

25   prevailing reason why the train stops short in your

1   experience?

2   A.  It could have been we were in rush hour, and there were

3   more frequent trains, so the train ahead of me may not have

4   been cleared if it was stopping at several stations prior.

5   It could have been the fact that we were just too close to

6   another train.  But I can't say that that's what was the

7   issue.

8   Q.  Ordinarily speaking, are you supposed to stop two times

9   at a station, or just the one time?

10  A.  One time.

11  Q.  At the 8-car marker, right?

12  A.  Correct.

13  Q.  And we can agree that any time the train has to be

14  repositioned, you have to not only warn the people outside

15  the train, I think you mentioned "Stand clear, train's

16  moving," right?

17  A.  Correct.

18  Q.  That's a warning for people outside the train, right?

19  A.  The announcement is played throughout the train, and you

20  can hear it on the outside as well.  It's announced over the

21  PA in the train.

22          MR. WATERS:  Your Honor, may I request that

23  counsel use the microphone?  I'd appreciate it.

24          THE COURT:  I'll give it a boost.  Fair enough?

25  He's a tall guy.

1          MR. WATERS:  Thank you, Counsel.

2          MR. C. REGAN:  It doesn't come up, Your Honor,

3    does it?

4    BY MR. C. REGAN:

5    Q.  The announcement you mentioned was "Stand clear, trains

6    moving," right?

7    A.  Yes.

8    Q.  Who is supposed to stand clear of what?

9    A.  Any customers, anyone that's near the train, or anyone

10   that's standing or anything.  It's just an announcement that

11   the train is moving.

12   Q.  Understood.  So that would be people outside the train

13   then, right?

14   A.  Outside and inside the train.

15   Q.  And so I don't want to belabor the point, but what do

16   the people inside the train -- they can't stand clear of the

17   train, right?

18   A.  They can't stand clear of the train, but if they're

19   standing or doing anything, it's just to let them know that

20   the train is about to move.

21   Q.  Okay.  Is it your understanding that there's a separate

22   obligation to provide a warning to the people inside the

23   train --

24   A.  No.

25   Q.  -- before the train moves?

```
 1    A.   No.  It's one announcement.

 2    Q.   Okay.

 3    A.   That goes for inside and outside.

 4    Q.   So your understanding is there's no second announcement,

 5    for example -- well, strike that.

 6              Your understanding is there's no second

 7    announcement that needs to be made before the train is

 8    repositioned on a platform?

 9    A.   No.

10              MR. WATERS:  Objection.

11    Q.   Only "Stand clear, trains moving"?

12    A.   Correct.

13              THE COURT:  Overruled.

14              MR. C. REGAN:  I apologize, Your Honor.

15    Q.   As a train operator, Ms. Johnson, you're familiar with

16    Metro's SOP 50, right?

17    A.   Correct.

18    Q.   All train operators get their own set of the SOPs, full

19    set?

20    A.   Correct.

21    Q.   Do you know whether SOP 50 requires a specific

22    announcement to warn people, passengers on the train, before

23    the train starts moving again once it's berthed at a

24    platform?

25    A.   Yes.  "Stand clear, train moving."
```

1    Q.   Okay.  No other announcement that you're aware of?

2    A.   No.

3              MR. P. REGAN:  The Court's indulgence one moment.

4              (Pause)

5              MR. C. REGAN:  Can I put up the video feed for a

6    moment?

7    BY MR. C. REGAN:

8    Q.   Ms. Johnson, on the screen in front of you is WMATA's

9    SOP 50, the red mark --

10              THE COURT:  Hold on, is this in evidence?

11              MR. C. REGAN:  I'm sorry, Your Honor, Exhibit 1.

12   It is in evidence, Your Honor, SOP 50.

13   Q.   The red markings are mine just to help direct a couple

14   of questions.  So the red markings are not on the document.

15   They're there to guide us for the next couple of minutes.

16   Okay?

17   A.   Okay.

18   Q.   And this is a procedure I believe that you stated that

19   you're familiar with, right, SOP 50?

20   A.   Correct.

21   Q.   The purpose of this procedure is to provide train

22   operators, among others, guidance on the PA announcements

23   that shall be made when performing standard operational

24   procedures regarding routine communications to the

25   customers, right?

1    A.  Right.

2    Q.  And then if we come down together to Page 2, SOP

3    50.5.1.1 here in the red box, it's the intro to a table of

4    announcements the train operators shall give, right?

5    A.  Correct.

6    Q.  In other words, they must be given.  These are not

7    optional?

8    A.  Correct.

9    Q.  If we come down here to reposition the train at the

10   platform, there's an announcement, a standard baseline

11   announcement, that says:  "Attention customers, this train

12   will move forward; please hold on."

13          Is that an announcement that you believe must be

14   given to passengers on a train before it's repositioned at a

15   platform, or no?

16   A.  This is the announcement that is made on the 7K.  It's

17   just the automatic announcement that's already programmed.

18          But when we verbally make announcements, every --

19   you can tell -- several operator -- every operator has a

20   different announcement.  We just have to make an

21   announcement that the train is moving.

22   Q.  Help me understand what you just said.  You're telling

23   me this is an automated announcement.  Not one that

24   operators have to give?

25   A.  Correct.

1    Q.   Okay.  When does this automated announcement get made?

2    A.   When you push the button on a newer series train.

3    Q.   On a which series train?

4    A.   The newer series train.

5    Q.   Are those the 8000 series now?

6    A.   The 7000.

7    Q.   7000.

8         All right.  And what about on older trains?

9    A.   You had to physically make an announcement.

10   Q.   Okay.  Do you have to still physically make this

11   announcement?

12   A.   My announcement would have been, "Stand clear, train

13   moving."  I wouldn't have -- I would have never said this

14   announcement.  It would have been "Stand clear, train

15   moving."

16   Q.   Okay.  Is it -- well, you don't know whether you gave

17   that announcement just before Ms. Scott was injured, right?

18   A.   I can't say I made it clearly, but per policy I would

19   have made an announcement.  But I can't say that I recall

20   anything about that day to say if I did or didn't, if that

21   makes any sense.

22   Q.   I think I understand.

23        On that same basis, would it be your belief, based

24   on your usual practice, that you would have given that

25   announcement at all the stations coming in on the Orange

```
 1    Line that day prior to McPherson Square if the train had had
 2    to be repositioned at the platform?
 3    A.  Correct.
 4    Q.  Has anybody from WMATA told you that in this case WMATA
 5    doesn't think you made those announcements?
 6    A.  No.
 7    Q.  Would you agree that whichever announcement is given,
 8    it's critical that passengers on the train receive warning
 9    before a train is repositioned once it's stopped for the
10    first time at a platform?
11    A.  Yes.
12    Q.  Why is it critical?
13    A.  So that they're aware that the train is about to move.
14    Q.  And if they're not aware, what's the fear of what would
15    happen?
16    A.  Anything.
17    Q.  And help me understand that.
18    A.  I mean, anything can happen.  You can have someone
19    standing too close to the train.  You can have -- some
20    people like to stand in between the doors on the train, and
21    they can fall off the train or they can fall on the train.
22    Q.  Is one of the fears that if people on the train are
23    waiting for the doors to open, and they don't realize that
24    the train is about to move under their feet, they could get
25    knocked down?
```

```
1     A.  Is that one of my fears?

2     Q.  Yes, ma'am.

3     A.  Yes.

4     Q.  One of the reasons that the announcement is critical?

5     A.  Yes.

6              MR. C. REGAN:  Thank you, Ms. Johnson.  Those are

7     all the questions I have for you.

8              MR. WATERS:  No redirect.

9              THE COURT:  Okay.  Ms. Johnson, just a point of

10    clarification.  When the train approaches the station and a

11    short stop is required because of one of those conditions

12    you mentioned, a red signal, the train ahead is too close,

13    or there's a track circuit issue, does the train stop on its

14    own automatically, or does the operator have to physically

15    stop it?

16             THE WITNESS:  It stops on its own.

17             THE COURT:  It stops on its own.

18             THE WITNESS:  You'll lose readouts, and it will

19    automatically go into a braking mode.

20             THE COURT:  Okay.  And when the train starts again

21    in order to be repositioned so that people can get off, is

22    that automatic, or does the driver, the operator, do that?

23             THE WITNESS:  The operator does that.  That's

24    manual.

25             THE COURT:  And depending on whether it's a 7000
```

1    series train or an older train, that's either a verbal

2    announcement by SOP or an automated announcement that you

3    hit with a button?

4                    THE WITNESS:  Correct.

5                    THE COURT:  Okay.

6                    Any follow-up, Counsel?

7                    MR. WATERS:  No, Your Honor.

8                    THE COURT:  Okay.  Thank you very much.

9                    You are excused.  Thank you very much for your

10   testimony.  Please don't discuss your testimony with anyone

11   until the case is over.

12                   THE WITNESS:  Thank you.

13                   THE COURT:  All right.  Have a good day.

14                   MR. WATERS:  Your Honor, I believe that concludes

15   the witnesses we have available for the day.

16                   THE COURT:  Okay.  Ladies and gentlemen, that was

17   our last witness today.  I know that there were some stops

18   and starts today, but I want to assure you that we are on

19   schedule, and we are still planning to conclude the evidence

20   tomorrow, perhaps as early as midday depending on where

21   things stand.  So I'm going to excuse you for the evening.

22                   Have a great evening.  No discussions about the

23   case.  No research about the case.  And we'll see you at

24   9:00 tomorrow morning, and we're going to try to use this

25   time as efficiently as we can to resolve any legal issues

1      that may come up tomorrow.  Okay?

2               All right.  Have a good evening.

3               (Jury exits courtroom)

4               THE COURT:  Okay.  So who do we have tomorrow?

5               MR. WATERS:  Judge, we have -- Dr. Harris will be

6      testifying in the morning.  We also have Keisha Henry.  The

7      open question for me to decide tonight is whether we're

8      going to call Mr. Bennett, but I'm leaning toward leaving it

9      to Keisha Henry and Dr. Harris.

10              THE COURT:  Okay.

11              All right.  We are pretty close on the

12     instructions.  I think it's probably too late in the day to

13     do a charge conference.  We will polish those up and then

14     probably by email send you proposed final jury instructions,

15     and we can do our charge conference probably -- let's see

16     when we finish up.  Maybe before lunch.  And then probably

17     do instructions -- any rebuttal case?

18              You don't know, but probably no rebuttal case?

19              MR. P. REGAN:  Correct.

20              THE COURT:  We will instruct after lunch, so if we

21     do that you should be prepared to close tomorrow afternoon.

22              MR. P. REGAN:  Judge, that's fine.  I think that

23     we've talked, and it's probably an hour and a half of

24     testimony in the morning; so if that helps you, we --

25              THE COURT:  So probably concluding the testimony

1    and the charge conference before lunch, instructions after

2    lunch, closings in the afternoon.

3              MR. P. REGAN:  Yes.  We can take an early lunch

4    and start and --

5              THE COURT:  Let's see how it goes.

6              MR. P. REGAN:  Okay.

7              THE COURT:  All right.  Have a good night.

8              MR. P. REGAN:  Thank you.

9              MR. WATERS:  Thank you, Your Honor.

10             MR. P. REGAN:  You too.

11                  (Whereupon the hearing was

12                   adjourned at 4:09 p.m.)

13

14            **CERTIFICATE OF OFFICIAL COURT REPORTER**

15

16             I, LISA A. MOREIRA, RDR, CRR, do hereby

17   certify that the above and foregoing constitutes a true and

18   accurate transcript of my stenographic notes and is a full,

19   true and complete transcript of the proceedings to the best

20   of my ability.

21        Dated this 6th day of May, 2025.

22

23
                              /s/Lisa A. Moreira, RDR, CRR
24                            Official Court Reporter
                              United States Courthouse
25                            Room 6718
                              333 Constitution Avenue, NW

1              Washington, DC 20001

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$20,000** [1] - 328:12
**$229,000** [1] - 248:11
**$229,541.63** [1] - 249:15
**$50** [1] - 322:5

## '

**'22/'23** [1] - 328:15
**'70s** [1] - 327:15
**'90s** [1] - 345:14
**'96** [1] - 257:21

## /

**/s/Lisa** [1] - 409:23

## 1

**1** [9] - 249:4, 308:10, 308:11, 312:1, 338:15, 339:1, 340:17, 340:24, 402:11
**10** [3] - 257:21, 301:7, 357:25
**100** [2] - 238:12, 325:19
**1006** [3] - 235:18, 236:19, 236:21
**103** [1] - 352:4
**107** [1] - 279:22
**10:35** [1] - 294:22
**10:50** [1] - 294:24
**10:6** [4] - 305:10, 306:23, 306:25, 307:16
**11** [5] - 251:1, 317:2, 331:2, 349:3, 375:23
**12** [3] - 304:17, 304:21, 309:8
**12:15** [1] - 364:5
**12:7** [4] - 305:10, 306:23, 307:17, 307:18
**12:8** [1] - 304:22
**15** [5] - 257:21, 276:8, 294:23, 309:8, 364:21
**157** [1] - 244:13
**16** [9] - 234:22, 239:8, 240:5, 247:2, 248:25, 250:2, 325:17, 331:2, 331:15
**17** [5] - 239:9, 239:13, 239:16, 304:17, 322:8
**17:5** [1] - 304:22

## 2

**18** [5] - 292:19, 292:23, 293:1, 375:22, 376:2
**19** [2] - 335:23, 352:4
**1919** [1] - 232:14
**1963** [1] - 318:9
**1970** [1] - 321:19
**1970s** [1] - 324:6
**1988** [1] - 321:20
**1991** [1] - 276:22
**1995** [2] - 257:21, 345:14
**1999** [2] - 346:5, 346:9
**1:22-cv-00601-CRC** [1] - 232:3
**1:45** [1] - 365:6

## 2

**2** [11] - 249:4, 249:6, 292:15, 304:6, 304:11, 305:17, 305:19, 307:10, 308:10, 339:2, 403:2
**20** [7] - 254:4, 257:22, 267:16, 316:14, 317:13, 357:25, 364:21
**200** [1] - 241:13
**2000** [1] - 271:14
**20001** [2] - 232:24, 410:1
**20036** [1] - 232:15
**2005** [1] - 244:14
**2006** [1] - 276:22
**2008** [1] - 276:24
**2016** [3] - 390:10, 391:10, 391:11
**2017** [7] - 267:9, 267:20, 268:7, 277:3, 277:24, 290:10, 391:11
**2018** [1] - 391:13
**2019** [11] - 284:10, 292:15, 292:19, 292:23, 293:1, 335:4, 337:8, 347:4, 392:6, 394:19
**202** [2] - 232:15, 232:25
**2020** [6] - 268:22, 269:1, 272:1, 272:5, 274:12, 287:11
**2021** [9] - 274:5, 274:11, 279:3, 285:10, 285:12, 285:16, 286:6, 286:25, 287:25
**2022** [2] - 238:3, 241:8
**2025** [2] - 232:5,

409:21
**20s** [1] - 320:6
**21st** [1] - 336:1
**22** [1] - 232:5
**22-601** [1] - 234:3
**22102** [1] - 232:20
**23** [5] - 335:4, 337:8, 347:4, 392:6, 394:19
**239** [1] - 315:17
**23rd** [2] - 261:17, 395:13
**24** [3] - 284:10, 292:15, 293:1
**245-9300** [1] - 232:20
**25** [1] - 274:5
**26** [2] - 267:20, 272:1
**26(a)(1** [1] - 367:13
**26(e** [1] - 367:13
**27** [2] - 256:1, 256:7

## 3

**30** [4] - 267:16, 316:19, 317:12, 324:10
**30(b)(6** [10] - 295:8, 303:10, 303:20, 308:8, 311:9, 312:2, 312:21, 370:4, 370:9, 372:2
**300** [2] - 237:1, 241:13
**30th** [1] - 241:7
**32** [6] - 304:6, 304:10, 305:17, 305:19, 309:5, 309:18
**333** [2] - 232:24, 409:25
**350** [1] - 232:14
**354-3187** [1] - 232:25
**37(c** [1] - 367:14
**38** [1] - 276:5

## 4

**4** [1] - 279:3
**40** [2] - 324:10, 364:9
**45** [2] - 364:9, 364:17
**463-3030** [1] - 232:15
**4:09** [1] - 409:12

## 5

**5** [6] - 279:14, 279:23, 281:20, 304:17, 336:13
**50** [15] - 261:5, 325:19, 338:6, 338:7, 346:2, 361:13, 382:14, 382:16, 383:5, 384:12, 401:16, 401:21, 402:9,

402:12, 402:19
**50.5** [1] - 338:7
**50.5.1.1** [1] - 403:3
**510** [1] - 232:19
**518** [1] - 248:11

## 6

**6** [4] - 279:14, 279:23, 281:23, 281:24
**60** [1] - 293:10
**60,000** [1] - 319:17
**63** [1] - 248:11
**6718** [2] - 232:23, 409:25
**6:30** [1] - 366:17
**6th** [1] - 409:21

## 7

**7** [11] - 244:13, 256:2, 256:7, 279:14, 279:23, 283:20, 291:22, 304:7, 304:11, 305:17, 305:20
**7.1** [2] - 381:3, 383:24
**70** [1] - 325:2
**7000** [3] - 404:6, 404:7, 406:25
**703** [1] - 232:20
**7K** [1] - 403:16

## 8

**8** [3] - 282:24, 304:17, 341:6
**8-car** [10] - 392:20, 392:22, 393:2, 393:8, 393:14, 394:7, 394:10, 396:1, 397:15, 399:11
**8000** [1] - 404:5
**801** [1] - 376:12
**801(a)(1)(B)** [1] - 376:11
**801(d)(1)(B** [1] - 377:25
**801.1** [1] - 373:7
**803** [1] - 376:9
**84** [1] - 380:25
**84-year-old** [1] - 383:23
**8444** [1] - 232:19

## 9

**90** [1] - 300:3
**9:00** [1] - 407:24
**9:10** [1] - 232:5

## A

**a.m** [1] - 232:5
**ability** [2] - 290:4, 409:20
**able** [10] - 240:1, 242:13, 291:7, 300:14, 303:19, 306:19, 322:4, 343:24, 351:5, 388:24
**abruptly** [1] - 360:24
**absence** [2] - 308:2, 384:20
**absolutely** [5] - 259:10, 269:10, 361:11, 364:25, 398:6
**Abu** [1] - 328:9
**abuse** [1] - 245:7
**academic** [1] - 324:20
**accelerate** [1] - 260:1
**accept** [3] - 279:22, 297:21, 330:20
**accessibility** [1] - 324:16
**accessible** [5] - 253:21, 262:17, 262:22, 263:12, 263:15
**accessibles** [1] - 263:1
**accident** [19] - 265:22, 266:20, 267:8, 288:17, 288:22, 289:11, 291:8, 291:12, 291:13, 291:16, 294:5, 301:4, 306:7, 313:3, 348:4, 348:8, 348:10, 372:21, 392:5
**accidentally** [1] - 342:13
**accidents** [1] - 337:19
**according** [1] - 242:23
**accountant** [1] - 242:8
**accuracy** [1] - 238:24
**accurate** [3] - 352:18, 374:11, 409:18
**Action** [1] - 234:3
**actions** [1] - 359:18
**active** [2] - 289:14, 345:6
**activities** [1] - 325:1
**activity** [2] - 289:7, 289:12
**actual** [5] - 236:2, 236:15, 293:20, 376:19, 376:22

412

**acute** [2] - 294:1, 294:3
**add** [2] - 371:21, 371:23
**addition** [3] - 373:12, 373:14, 383:15
**additional** [1] - 313:7
**additionally** [1] - 244:19
**address** [3] - 312:17, 315:16, 368:1
**addressed** [1] - 375:5
**addressing** [1] - 345:22
**adequate** [1] - 270:11
**adjourned** [1] - 409:12
**adjust** [1] - 315:14
**administration** [1] - 320:17
**admissibility** [2] - 236:22, 243:4
**admissible** [4] - 236:20, 373:7, 377:25, 381:8
**admission** [3] - 234:24, 235:17, 249:25
**admit** [6] - 240:24, 249:21, 302:3, 371:16, 377:12
**admitted** [3] - 246:8, 250:1, 373:16
**adverse** [1] - 387:11
**advised** [1] - 259:9
**advisement** [1] - 387:9
**advising** [1] - 270:6
**advocacy** [2] - 268:16, 270:16
**advocate** [1] - 269:21
**advocating** [1] - 271:3
**affect** [1] - 290:4
**affecting** [1] - 289:8
**affiliations** [2] - 324:11, 324:12
**afternoon** [11] - 313:16, 365:14, 387:22, 389:10, 389:22, 389:23, 390:5, 390:6, 398:1, 408:21, 409:2
**age** [4] - 268:5, 289:21, 290:17, 381:13
**agencies** [4] - 334:11, 343:14, 354:11, 357:9
**agency** [1] - 333:2
**agent** [1] - 242:7
**ago** [8] - 248:22, 249:2, 267:16,

299:15, 305:15, 324:9, 364:14, 388:7
**agree** [16] - 255:10, 256:17, 257:15, 258:23, 259:1, 287:21, 293:25, 299:10, 350:22, 351:8, 353:22, 355:6, 361:10, 398:17, 399:13, 405:7
**agreed** [4] - 272:24, 354:4, 366:19, 383:19
**agreement** [2] - 331:24, 380:25
**ahead** [13] - 260:7, 271:23, 280:7, 285:7, 295:22, 311:7, 319:12, 332:20, 350:2, 352:6, 360:15, 399:3, 406:12
**AI** [2] - 334:9, 341:12
**airplanes** [1] - 319:6
**AI** [4] - 372:13, 372:20, 380:2, 385:22
**ALANC** [1] - 319:5
**ALFRED** [1] - 233:13
**alight** [1] - 384:22
**allergies** [1] - 366:18
**alleviate** [1] - 391:22
**allow** [4] - 246:13, 310:7, 382:15, 383:16
**allowed** [7] - 297:5, 311:7, 360:23, 361:1, 367:15, 386:8, 386:13
**alluded** [1] - 257:19
**alma** [2] - 322:9, 322:11
**almost** [5] - 257:21, 258:20, 327:22, 356:17, 363:23
**ambulate** [1] - 289:2, 289:5, 290:4, 291:7
**ambulating** [1] - 272:13
**American** [8] - 268:17, 269:17, 269:22, 271:6, 333:4, 345:6, 345:13, 346:15
**amount** [2] - 235:1, 247:18
**anatomy** [1] - 281:5
**Andrew** [2] - 275:8, 275:18
**ANDREW** [2] - 233:6, 275:13

**Angeles** [3] - 326:2, 328:6, 331:11
**animation** [1] - 292:22
**announce** [2] - 261:3, 394:14
**announced** [3] - 263:23, 306:12, 399:20
**announcement** [74] - 253:24, 254:2, 254:3, 254:9, 254:15, 254:21, 254:25, 255:11, 255:14, 255:18, 256:9, 256:11, 256:15, 256:19, 256:24, 257:4, 257:10, 257:12, 257:13, 259:19, 301:22, 307:25, 336:24, 338:12, 339:24, 342:16, 349:10, 349:12, 350:11, 385:2, 385:3, 385:4, 385:18, 385:20, 385:21, 385:23, 386:1, 392:17, 392:20, 394:14, 394:25, 395:3, 397:5, 397:12, 399:19, 400:5, 400:10, 401:1, 401:4, 401:7, 401:22, 402:1, 403:10, 403:11, 403:13, 403:16, 403:17, 403:20, 403:21, 403:23, 404:1, 404:9, 404:11, 404:12, 404:14, 404:17, 404:19, 404:25, 405:7, 406:4, 407:2
**announcements** [14] - 259:5, 259:6, 261:12, 336:22, 338:2, 339:4, 342:14, 392:14, 392:16, 394:12, 402:22, 403:4, 403:18, 405:5
**announcing** [1] - 350:11
**answer** [23] - 235:17, 246:12, 256:12, 307:4, 307:7, 307:20, 308:2, 308:17, 310:2, 310:4, 310:8, 312:5,

312:15, 312:19, 326:25, 330:8, 352:15, 361:5, 361:7, 361:25, 362:11, 395:2
**ANSWER** [3] - 256:10, 306:14, 307:13
**answered** [3] - 286:23, 312:7, 352:11
**answers** [2] - 309:14, 367:22
**anti** [1] - 291:5
**anti-inflammatory** [1] - 291:5
**anticipate** [1] - 296:4
**anyway** [4] - 269:12, 342:5, 356:15, 367:6
**apologies** [3] - 379:16, 387:24, 388:6
**apologize** [10] - 242:25, 266:7, 295:19, 297:8, 353:5, 354:2, 370:16, 371:6, 375:4, 401:14
**appealed** [1] - 244:15
**appearance** [1] - 234:6
**APPEARANCES** [1] - 232:12
**appeared** [1] - 317:5
**appearing** [1] - 368:13
**appellate** [3] - 381:23, 382:8, 383:1
**Appendix** [1] - 244:13
**application** [1] - 317:9
**apply** [2] - 305:16, 317:8
**appointed** [1] - 324:17
**appreciate** [2] - 237:5, 399:23
**appreciation** [1] - 366:15
**appreciative** [1] - 382:11
**approach** [4] - 234:5, 316:15, 335:21, 389:9
**approaches** [1] - 406:10
**appropriate** [1] - 373:1
**approve** [1] - 327:18
**approved** [2] - 327:20, 346:6
**approving** [1] - 321:4
**April** [5] - 232:5, 268:22, 268:23, 268:25, 273:4
**APTA** [1] - 355:3
**Archives** [2] - 258:13,

258:14
**Area** [1] - 308:9
**area** [6] - 261:22, 263:18, 284:4, 300:11, 315:19, 330:14
**AREA** [1] - 232:6
**argue** [1] - 244:23
**argued** [2] - 244:22, 384:18
**argument** [1] - 245:3
**argumentative** [1] - 343:20
**arguments** [2] - 244:21, 387:3
**arm** [2] - 264:18, 293:22
**arms** [1] - 253:8
**arrest** [1] - 278:23
**arrived** [1] - 251:15
**arriving** [5] - 254:21, 254:25, 255:12, 256:25, 385:4
**arthritic** [3] - 289:13, 289:16, 289:24
**arthritis** [2] - 278:7, 278:9
**articles** [1] - 317:4
**articulated** [1] - 341:1
**ascertain** [1] - 387:23
**aspect** [2] - 321:3, 327:22
**aspects** [2] - 319:23, 321:10
**aspiration** [1] - 329:17
**aspirational** [6] - 354:15, 354:16, 354:17, 354:21, 354:24, 355:1
**assert** [1] - 384:15
**asserted** [1] - 373:5
**assertion** [1] - 373:21
**assessment** [1] - 287:11
**assistant** [1] - 320:6
**assisted** [1] - 324:16
**assisting** [1] - 391:20
**Association** [3] - 333:5, 345:7, 346:16
**assumption** [1] - 384:18
**assure** [1] - 407:18
**Atlanta** [2] - 276:9, 328:4
**attach** [1] - 281:10
**attached** [1] - 236:14
**attempt** [1] - 247:19
**attempting** [1] - 308:25
**attention** [3] - 245:14,

339:12, 403:11
**audible** [5] - 329:11,
337:8, 337:12,
337:16, 338:9
**audio** [5] - 303:24,
304:3, 379:2,
379:19, 379:22
**August** [6] - 267:9,
274:5, 274:11,
279:3, 286:25,
287:25
**authenticate** [1] -
243:8
**authenticated** [1] -
240:9
**authenticating** [1] -
235:21
**authentication** [1] -
279:25
**authenticity** [11] -
236:5, 236:9,
236:10, 237:3,
237:6, 238:22,
239:1, 240:14,
240:16, 243:3, 243:5
**authoritative** [1] -
309:1
**authorities** [2] -
355:10, 359:1
**AUTHORITY** [1] -
232:7
**Authority** [7] - 234:4,
234:13, 321:13,
326:8, 331:6,
334:17, 353:7
**authority** [5] - 321:5,
321:6, 321:7,
351:20, 352:21
**Authority's** [1] - 353:3
**automated** [4] -
356:15, 403:23,
404:1, 407:2
**automatic** [3] -
261:11, 403:17,
406:22
**automatically** [3] -
393:24, 406:14,
406:19
**automobiles** [1] -
319:6
**availability** [1] -
270:11
**available** [7] - 308:13,
311:18, 312:1,
312:25, 366:4,
366:16, 407:15
**Avenue** [2] - 232:24,
409:25
**avoid** [4] - 296:11,
337:20, 340:16,

393:23
**award** [2] - 328:10,
328:12
**awards** [1] - 316:25
**aware** [17] - 262:6,
287:10, 287:13,
287:15, 290:12,
290:21, 306:2,
306:10, 306:12,
311:18, 351:8,
354:14, 354:24,
362:24, 402:1,
405:13, 405:14

# B

**B-I-R** [1] - 346:22
**background** [2] -
275:18, 285:1
**backwards** [1] -
342:17
**bad** [3] - 342:15,
344:23, 354:2
**balance** [1] - 340:8
**balancing** [1] - 252:19
**balloons** [1] - 319:7
**bankrupt** [1] - 321:25
**bantering** [1] - 369:19
**BART** [1] - 331:10
**Baruch** [1] - 318:14
**based** [18] - 250:14,
284:25, 292:19,
293:1, 296:2,
297:16, 302:19,
305:6, 307:8,
330:21, 339:17,
344:2, 346:23,
350:9, 373:25,
374:1, 383:21,
404:23
**baseline** [1] - 403:10
**bases** [5] - 236:7,
312:10, 312:14,
314:10, 384:14
**basis** [8] - 266:8,
301:20, 310:1,
310:8, 374:5,
384:21, 386:22,
404:23
**Bates** [1] - 241:14
**Bates-stamped** [1] -
241:14
**bathroom** [1] - 332:25
**beaches** [1] - 320:2
**bear** [1] - 373:10
**bearing** [2] - 301:1,
305:23
**beautiful** [1] - 331:12
**became** [10] - 317:10,
322:5, 322:10,

334:14, 334:15,
334:16, 341:17,
341:18, 357:19,
391:11
**become** [1] - 278:15
**BEFORE** [1] - 232:11
**beforehand** [1] - 374:3
**beg** [1] - 253:3
**began** [3] - 277:3,
277:23, 322:12
**begin** [2] - 380:18,
380:19
**begins** [1] - 259:19
**behind** [5] - 262:7,
263:14, 265:3,
335:17, 393:17
**belabor** [1] - 400:15
**belief** [2] - 384:21,
404:23
**belong** [1] - 316:25
**below** [4] - 281:13,
281:17, 284:6,
292:18
**bench** [12] - 247:13,
247:24, 322:23,
323:21, 343:4,
344:7, 370:6, 371:9,
372:17, 374:21,
384:8, 387:13
**bending** [1] - 283:9
**BENNETT** [1] - 233:12
**Bennett** [11] - 303:21,
305:24, 308:8,
328:25, 366:25,
370:21, 372:8,
372:10, 375:5, 408:8
**BER** [2] - 346:18,
346:20
**Berkowitz** [31] - 295:5,
295:8, 295:19,
295:25, 296:21,
297:1, 297:10,
301:24, 301:25,
302:13, 314:5,
314:11, 315:3,
315:4, 315:12,
315:15, 315:17,
316:12, 323:24,
327:6, 334:25,
335:9, 335:19,
339:7, 346:23,
347:21, 359:14,
360:18, 361:5,
363:18, 386:6
**BERKOWITZ** [2] -
233:8, 315:9
**Berkowitz's** [2] -
301:20, 326:25
**Bernard** [2] - 307:5,
372:7

**BERNARD** [1] - 233:12
**Bernard's** [1] - 307:20
**berth** [2] - 392:22,
394:10
**berthed** [1] - 401:23
**berthing** [7] - 345:9,
345:15, 346:16,
356:17, 392:14,
392:15, 392:19
**best** [2] - 333:7,
409:19
**better** [4] - 245:12,
343:15, 367:3, 391:5
**between** [9] - 251:18,
261:24, 262:3,
278:17, 300:22,
349:3, 351:25,
405:20
**beyond** [2] - 312:18,
383:18
**bicycle** [1] - 325:7
**bicyclists** [1] - 325:11
**big** [2] - 281:10, 282:9
**biggest** [2] - 331:3,
331:6
**bills** [34] - 235:1,
235:22, 237:9,
237:18, 237:23,
238:3, 238:7, 238:8,
238:12, 239:3,
239:9, 239:20,
240:3, 240:7, 240:9,
240:11, 240:12,
240:18, 241:7,
241:9, 241:20,
242:16, 242:17,
243:8, 247:5,
247:16, 248:4,
248:8, 248:9,
248:10, 248:21,
387:1
**binder** [4] - 248:1,
279:15, 303:18,
308:11
**biomechanical** [1] -
301:5
**biomechanics** [1] -
324:15
**biomedical** [1] -
324:15
**Bishop** [18] - 267:1,
267:9, 273:13,
273:14, 274:11,
275:8, 275:16,
275:18, 275:24,
276:8, 277:14,
277:17, 280:3,
281:21, 285:2,
286:19, 292:2,
294:16

**BISHOP** [2] - 233:6,
275:13
**bit** [9] - 257:19,
265:16, 278:15,
317:21, 323:18,
330:18, 342:12,
388:15, 390:25
**blame** [1] - 353:12
**blessed** [1] - 264:10
**blocking** [1] - 280:22
**blue** [1] - 358:4
**board** [2] - 276:6,
290:3
**board-certified** [1] -
276:6
**body** [3] - 289:18,
289:21, 310:21
**bolstering** [3] -
372:24, 374:8,
374:11
**bone** [13] - 267:15,
268:4, 278:20,
282:12, 283:15,
285:23, 286:3,
288:7, 289:17,
289:19, 293:13,
293:20, 294:9
**bones** [4] - 278:14,
278:15, 293:16
**book** [1] - 248:25
**boost** [1] - 399:24
**Boston** [6] - 326:3,
328:3, 331:5, 341:5,
342:10, 342:22,
344:4, 355:13,
355:19, 356:25
**Boston's** [1] - 356:25
**bottom** [3] - 235:3,
242:11, 246:9
**box** [1] - 403:3
**brake** [1] - 260:3
**braking** [1] - 406:19
**break** [12] - 294:23,
295:20, 364:3,
364:8, 364:22,
365:4, 371:3,
374:20, 374:24,
387:22, 388:3, 389:6
**breaks** [1] - 391:23
**brief** [7] - 362:20,
370:12, 371:19,
372:1, 374:20,
374:23, 383:8
**briefed** [1] - 244:9
**briefly** [7] - 234:19,
244:11, 303:12,
312:3, 322:22,
362:21, 384:7
**bring** [7] - 243:12,
243:20, 265:18,

265:22, 279:2, 301:18
**bringing** [2] - 291:22, 370:21
**brings** [2] - 315:19, 376:19
**Britannica** [1] - 316:22
**brittle** [1] - 278:15
**broke** [2] - 282:18, 293:22
**Brooklyn** [1] - 318:22
**brought** [3] - 265:17, 266:2, 375:20
**Brown's** [1] - 266:4
**bruised** [1] - 268:13
**budget** [1] - 321:4
**build** [2] - 320:22, 320:23
**building** [3] - 271:22, 320:2, 388:7
**built** [1] - 327:21
**burden** [6] - 240:20, 244:23, 245:1, 245:4, 317:19, 386:3
**Bureau** [1] - 321:22
**bus** [8] - 321:24, 322:5, 322:6, 390:12, 390:13, 390:16, 391:8
**buses** [1] - 319:6
**business** [5] - 305:21, 308:24, 318:19, 319:8, 325:20
**button** [4] - 395:15, 398:11, 404:2, 407:3
**BY** [24] - 246:20, 248:2, 250:6, 260:23, 275:15, 277:22, 280:20, 285:8, 286:18, 292:1, 315:11, 323:22, 335:15, 344:8, 347:20, 359:16, 360:17, 362:23, 389:21, 390:4, 395:8, 397:25, 400:4, 402:7

**C**

**CA** [1] - 232:3
**cab** [5] - 395:19, 395:21, 396:10, 396:14, 396:23
**calcium** [1] - 278:15
**camps** [1] - 276:18
**cane** [22] - 252:16, 252:19, 264:2, 264:3, 264:20, 265:17, 266:7,

266:17, 272:13, 272:15, 272:18, 289:1, 289:4, 291:7, 291:11, 291:13, 291:14, 291:15, 350:18
**cannot** [1] - 343:14
**capabilities** [2] - 351:5, 351:9
**capacity** [1] - 371:15
**capital** [1] - 327:18
**caption** [1] - 336:14
**car** [3] - 261:24, 327:15, 363:14
**care** [45] - 270:9, 270:10, 276:17, 277:9, 279:9, 297:11, 298:20, 299:8, 299:16, 301:23, 302:5, 302:16, 327:8, 328:19, 329:12, 329:14, 329:15, 330:4, 330:10, 330:12, 330:15, 331:17, 335:2, 335:12, 336:22, 337:7, 337:12, 339:17, 340:18, 341:4, 347:1, 347:9, 353:24, 354:6, 354:9, 354:18, 354:20, 354:21, 355:4, 355:5, 355:7, 357:13, 386:10, 386:11
**career** [7] - 283:17, 322:12, 325:16, 327:2, 327:4, 327:11, 327:23
**Carl** [4] - 315:3, 315:17, 316:12, 386:5
**CARL** [2] - 233:8, 315:9
**CAROL** [3] - 232:3, 233:4, 246:18
**Carol** [5] - 234:3, 234:8, 277:4, 292:14, 383:23
**carrier** [1] - 352:9
**carrying** [2] - 264:18, 350:18
**cars** [2] - 351:25
**cartilage** [2] - 289:17, 289:18
**case** [78] - 236:1, 240:21, 242:4, 242:7, 244:13, 245:5, 245:8, 256:5,

265:4, 277:4, 294:4, 294:19, 296:17, 297:16, 299:9, 299:11, 299:13, 299:19, 299:22, 301:3, 301:8, 305:6, 305:21, 306:1, 309:19, 309:20, 313:22, 323:24, 326:11, 326:16, 327:6, 328:14, 328:22, 329:8, 333:12, 333:14, 334:5, 335:2, 335:13, 336:3, 336:23, 338:5, 339:17, 346:23, 351:14, 351:16, 355:11, 355:14, 357:4, 363:22, 365:5, 365:9, 366:6, 366:12, 366:21, 366:22, 366:23, 367:5, 371:16, 380:19, 381:21, 381:23, 382:8, 384:7, 384:13, 386:9, 387:6, 387:9, 392:5, 392:13, 405:4, 407:11, 407:23, 408:17, 408:18
**case-in** [2] - 313:22, 366:21
**case-in-chief** [4] - 306:1, 366:22, 381:23, 382:8
**cases** [9] - 240:25, 244:19, 320:1, 325:21, 326:9, 326:14, 341:15, 342:11, 357:1
**cast** [1] - 293:23
**Caucasian** [1] - 290:14
**caused** [1] - 398:14
**causes** [2] - 352:25, 353:8
**caution** [1] - 272:25
**cautions** [1] - 259:3
**cease** [1] - 379:19
**center** [4] - 252:22, 252:23, 253:7, 253:9
**central** [3] - 394:9, 395:18, 396:22
**cents** [1] - 248:11
**certain** [8] - 270:6, 277:8, 279:10, 285:4, 289:22, 303:4, 328:21,

371:17
**certainly** [3] - 242:15, 299:25, 373:17
**certainty** [4] - 277:9, 286:6, 286:11, 337:6
**certificate** [1] - 240:23
**CERTIFICATE** [1] - 409:14
**certified** [1] - 276:6
**certify** [1] - 409:17
**cetera** [6] - 248:5, 248:6, 276:18, 298:5, 341:5, 344:4
**chair** [3] - 265:9, 319:25, 350:6
**chairs** [1] - 253:16
**challenge** [1] - 300:13
**challenges** [1] - 314:11
**chance** [4] - 244:12, 247:1, 333:4, 346:7
**change** [1] - 332:24
**changed** [3] - 318:22, 370:25, 384:24
**changes** [1] - 385:5
**characterized** [1] - 298:9
**charge** [6] - 357:18, 376:15, 388:22, 408:13, 408:15, 409:1
**chart** [1] - 381:12
**Chicago** [9] - 328:3, 328:5, 331:8, 334:7, 341:5, 344:11, 355:13, 355:20, 357:6
**Chicago's** [1] - 357:6
**chicken** [1] - 289:19
**chief** [6] - 306:1, 313:23, 366:22, 381:23, 382:8
**children** [1] - 346:17
**chime** [2] - 252:3, 252:5
**chimes** [8] - 251:19, 251:25, 261:14, 261:21, 264:22, 265:6, 350:13, 385:12
**China** [1] - 328:8
**Chinatown** [1] - 320:24
**choice** [2] - 310:11, 322:1
**chosen** [1] - 330:15
**Chris** [1] - 381:15
**Christmas** [1] - 268:9
**CHRISTOPHER** [2] - 232:11, 232:13

**Christopher** [1] - 234:8
**chronological** [1] - 317:22
**Cigna** [1] - 238:13
**CILT** [1] - 324:21
**circle** [1] - 286:9
**circuit** [7] - 393:16, 393:17, 393:19, 394:1, 394:2, 394:7, 406:13
**Circuit** [3] - 244:12, 244:14, 245:6
**circulated** [1] - 346:6
**circumstances** [5] - 335:3, 336:23, 337:17, 347:2, 393:7
**cited** [1] - 242:4
**cites** [1] - 236:1
**city** [7] - 320:15, 321:2, 321:4, 321:7, 327:13, 327:16, 327:17
**City** [16] - 318:1, 318:15, 319:13, 320:9, 321:11, 321:12, 321:19, 321:24, 331:5, 334:14, 334:16, 341:21, 342:6, 342:8, 344:18, 344:21
**City's** [1] - 331:5
**city's** [1] - 321:9
**Civil** [2] - 234:3, 384:12
**civil** [4] - 244:19, 317:24, 318:3, 324:14
**CLAMTA** [1] - 331:10
**clarification** [2] - 284:21, 406:10
**clarified** [1] - 244:25
**clarify** [3] - 297:7, 306:20, 398:3
**clarity** [1] - 240:2
**class** [1] - 322:14
**clean** [4] - 304:7, 304:14, 305:20, 332:25
**cleaner** [1] - 382:6
**clear** [25] - 239:5, 252:11, 254:7, 257:9, 270:20, 296:4, 297:23, 299:6, 299:7, 302:18, 308:17, 355:9, 394:16, 395:3, 395:5, 397:6, 399:15, 400:5,

415

400:8, 400:16, 400:18, 401:11, 401:25, 404:12, 404:14
**cleared** [1] - 399:4
**clearly** [2] - 333:20, 404:18
**CLEV** [1] - 233:12
**Clev** [2] - 303:21, 372:7
**Cleveland** [4] - 326:1, 328:5, 331:9
**client** [1] - 241:23
**clinics** [2] - 269:6, 269:17
**clip** [2] - 307:21, 313:10
**close** [17] - 247:25, 264:10, 268:23, 315:13, 316:4, 330:17, 365:14, 382:20, 382:22, 382:23, 386:15, 398:22, 399:5, 405:19, 406:12, 408:11, 408:21
**closed** [2] - 282:3, 282:6
**closer** [3] - 263:21, 275:25, 391:2
**closing** [2] - 261:15, 388:17
**closings** [1] - 409:2
**clutter** [1] - 241:15
**cognizant** [1] - 351:4
**cohort** [1] - 381:13
**coin** [1] - 330:23
**coincident** [1] - 376:8
**collar** [1] - 358:4
**collateral** [1] - 238:10
**colleague** [2] - 334:12, 341:14
**colleagues** [1] - 366:15
**college** [3] - 317:7, 321:12, 321:14
**College** [4] - 318:1, 318:14, 318:15, 319:13
**colleges** [1] - 324:3
**COLUMBIA** [1] - 232:1
**column** [1] - 249:3
**comfortable** [1] - 380:12
**coming** [11] - 305:6, 305:22, 339:24, 348:22, 349:13, 365:21, 367:2, 380:13, 381:20, 388:20, 404:25

**comment** [4] - 244:17, 346:8, 346:13, 346:14
**commented** [2] - 234:25, 295:23
**Committee** [1] - 345:13
**committee** [6] - 270:3, 270:4, 324:21, 345:10, 345:12, 346:5
**committees** [3] - 345:7, 354:12, 355:3
**common** [3] - 352:9, 361:14, 361:16
**communications** [1] - 402:24
**community** [1] - 317:1
**companies** [1] - 326:14, 331:22
**company** [2] - 327:24, 328:6
**compare** [1] - 239:20
**compared** [1] - 318:19
**comparison** [1] - 291:10
**competent** [2] - 270:10, 270:16
**competently** [2] - 311:21, 311:23
**complaints** [2] - 285:25, 391:21
**complete** [1] - 409:19
**completed** [1] - 394:22
**completely** [2] - 282:13, 308:24
**completeness** [1] - 306:16
**component** [2] - 316:3, 387:5
**compulsory** [2] - 322:16, 325:17
**conceal** [1] - 379:22
**concern** [4] - 305:23, 309:8, 345:21, 345:22
**concerning** [1] - 336:2
**concerns** [2] - 306:5, 345:23
**conclude** [2] - 344:3, 407:19
**concluded** [1] - 369:16
**concludes** [3] - 372:9, 380:3, 407:14
**concluding** [2] - 272:4, 408:25
**conclusions** [2] - 298:5, 336:3

**conclusory** [1] - 298:10
**condemnation** [1] - 320:1
**condition** [2] - 279:6, 285:18
**conditions** [1] - 406:11
**conduct** [1] - 311:16
**conductor** [4] - 334:14, 341:16, 357:17, 358:23
**conference** [17] - 247:13, 247:24, 295:24, 322:23, 323:21, 343:4, 344:7, 370:6, 371:9, 372:17, 374:21, 384:8, 387:13, 388:22, 408:13, 408:15, 409:1
**confident** [1] - 373:13
**confidential** [4] - 356:8, 356:9, 356:23, 357:10
**confirm** [1] - 345:3
**confirmed** [2] - 342:23, 343:25
**confuse** [1] - 299:14
**confused** [1] - 310:14
**Congress** [1] - 271:6
**connected** [1] - 369:6
**connection** [6] - 271:7, 274:13, 274:14, 278:25, 285:10, 285:12
**consider** [7] - 239:12, 240:4, 259:2, 331:22, 354:25, 356:7, 356:22
**considered** [1] - 357:9
**considers** [2] - 354:14, 354:23
**consist** [1] - 270:5
**consisted** [2] - 270:6, 372:22
**consistency** [1] - 385:24
**consistent** [16] - 242:6, 279:4, 286:2, 339:16, 340:18, 353:23, 354:5, 355:4, 355:6, 372:24, 373:6, 376:6, 376:8, 376:14, 377:25
**Consortium** [1] - 258:14
**constitutes** [1] - 409:17

**Constitution** [2] - 232:24, 409:25
**consult** [1] - 313:12
**consulting** [8] - 292:11, 316:8, 319:8, 319:10, 322:15, 322:17, 320:20
**contact** [4] - 394:9, 395:15, 396:12, 396:24
**contacted** [6] - 326:7, 328:14, 341:22, 355:21, 395:18, 396:22
**contacts** [1] - 345:5
**contain** [1] - 247:4
**contemporaneously** [1] - 308:24
**content** [1] - 343:22
**contested** [1] - 309:12
**context** [12] - 307:6, 307:7, 307:14, 307:21, 308:2, 310:7, 312:6, 312:9, 312:16, 313:5, 313:11, 378:1
**continue** [6] - 269:21, 270:1, 273:9, 287:23, 369:12, 394:10
**continued** [2] - 273:3, 325:14
**Continued** [1] - 246:19
**continuing** [4] - 270:23, 325:14, 325:15, 325:17
**contractor** [1] - 269:4
**contradict** [1] - 306:11
**contradicts** [1] - 307:4
**contributory** [2] - 385:10, 385:15
**control** [2] - 394:9, 396:22
**conversation** [3] - 358:8, 370:12, 375:6
**conversations** [2] - 343:21, 344:3
**convey** [1] - 343:7
**cooked** [1] - 289:20
**COOPER** [1] - 232:11
**copies** [1] - 334:17
**copy** [1] - 241:9
**corporate** [1] - 371:13
**correct** [111] - 235:19, 239:2, 249:4, 250:16, 250:24, 250:25, 251:16, 252:7, 252:9, 252:11, 253:10,

254:18, 255:20, 256:25, 257:13, 257:14, 258:5, 258:25, 259:5, 259:7, 259:8, 259:12, 259:16, 261:6, 261:15, 261:18, 264:2, 264:22, 264:24, 265:2, 265:7, 265:10, 265:14, 272:7, 272:19, 274:19, 276:7, 277:2, 277:6, 277:19, 277:20, 284:11, 285:13, 285:14, 285:17, 286:25, 287:1, 288:10, 288:12, 288:15, 288:16, 292:4, 292:19, 292:23, 292:24, 293:2, 293:3, 293:8, 294:5, 304:25, 308:1, 317:25, 329:13, 330:16, 348:16, 349:20, 349:23, 349:24, 350:14, 350:16, 350:17, 351:12, 353:15, 353:24, 355:20, 357:10, 357:11, 364:13, 366:1, 366:13, 371:4, 374:18, 376:7, 376:20, 376:21, 377:7, 377:11, 377:17, 377:20, 381:10, 390:20, 391:15, 393:6, 393:10, 396:9, 396:11, 398:9, 398:12, 399:12, 399:17, 401:12, 401:17, 401:20, 402:20, 403:5, 403:8, 403:25, 405:3, 407:4, 408:19
**correctly** [3] - 266:14, 292:16, 356:17
**cortisone** [1] - 278:11
**counsel** [35] - 234:5, 234:9, 239:5, 239:11, 240:24, 244:21, 244:25, 245:13, 247:12, 256:1, 286:23, 296:5, 296:17, 296:25, 297:1, 297:19, 300:6,

311:21, 311:22,
312:8, 312:24,
322:21, 329:19,
366:18, 366:23,
367:12, 368:3,
372:25, 376:20,
377:3, 381:12,
382:11, 383:6,
383:7, 399:23
**Counsel** [5] - 352:5,
359:21, 372:20,
400:1, 407:6
**counsel's** [1] - 275:3
**counted** [2] - 251:2,
382:7
**counter** [3] - 305:9,
305:10, 305:16
**counter-designated**
[2] - 305:9, 305:10
**counter-designation**
[1] - 305:16
**counterpart** [3] -
344:14, 358:11,
358:18
**country** [2] - 331:1,
354:11
**County** [1] - 320:8
**couple** [11] - 242:1,
271:18, 326:3,
327:5, 363:14,
380:6, 380:16,
390:14, 398:3,
402:13, 402:15
**course** [12] - 241:20,
251:23, 272:11,
283:17, 293:10,
304:20, 305:19,
305:24, 308:20,
310:18, 344:2, 351:3
**COURT** [299] - 232:1,
234:10, 234:15,
235:8, 235:10,
235:13, 235:15,
235:23, 236:4,
237:3, 237:13,
237:16, 237:18,
237:21, 237:23,
238:1, 238:5,
238:11, 238:15,
238:20, 238:23,
238:25, 239:10,
240:11, 240:14,
241:4, 241:25,
242:3, 242:19,
243:2, 243:11,
243:13, 243:16,
243:19, 243:24,
244:2, 244:10,
245:11, 245:17,
245:19, 245:25,

247:12, 247:15,
247:25, 248:19,
249:8, 249:11,
249:14, 249:16,
249:19, 249:23,
250:1, 255:23,
259:24, 260:18,
260:21, 275:2,
275:6, 275:9,
275:11, 275:24,
277:16, 277:21,
280:1, 280:5, 280:7,
280:11, 280:15,
280:18, 284:17,
284:20, 285:7,
286:15, 294:16,
294:21, 295:1,
295:6, 295:10,
295:21, 296:12,
296:14, 296:20,
297:9, 297:13,
297:23, 298:1,
298:4, 298:15,
298:23, 299:23,
300:8, 300:10,
300:22, 301:9,
301:14, 301:18,
302:21, 302:24,
303:7, 303:9,
303:15, 303:22,
304:8, 304:10,
304:12, 304:19,
304:21, 306:3,
306:8, 306:19,
306:25, 307:2,
307:15, 307:18,
308:5, 309:3,
309:24, 310:23,
311:3, 311:15,
312:2, 312:12,
312:17, 313:1,
313:6, 313:9,
313:20, 314:1,
314:5, 314:9,
314:12, 314:18,
314:21, 314:24,
315:4, 315:6,
316:16, 317:16,
317:18, 322:21,
322:25, 323:7,
323:12, 323:14,
323:20, 326:20,
326:24, 329:19,
329:25, 330:6,
332:9, 332:14,
332:17, 332:18,
332:20, 335:7,
335:22, 336:16,
336:20, 337:15,
338:16, 338:22,
341:2, 341:25,

343:2, 343:6,
343:15, 344:1,
347:8, 347:17,
352:5, 359:12,
360:2, 360:15,
361:4, 361:7,
361:18, 361:24,
362:1, 362:3, 362:9,
362:20, 363:18,
363:21, 363:25,
364:4, 364:10,
364:15, 364:21,
365:3, 365:8,
365:10, 365:15,
365:25, 366:5,
366:11, 367:4,
367:9, 367:16,
367:19, 368:5,
368:11, 368:15,
368:17, 369:2,
369:9, 369:16,
369:24, 370:1,
370:5, 370:8,
370:24, 371:2,
371:8, 371:10,
371:23, 372:4,
372:6, 372:11,
372:16, 373:24,
374:5, 374:15,
374:19, 374:22,
375:2, 375:7, 375:9,
375:16, 376:1,
376:3, 376:8,
376:12, 376:16,
376:24, 377:1,
377:5, 377:8,
377:15, 377:18,
377:21, 377:23,
378:9, 378:21,
378:23, 379:4,
379:6, 379:13,
379:15, 380:3,
380:9, 380:14,
380:22, 381:4,
381:7, 381:11,
381:17, 382:9,
382:15, 382:19,
382:24, 383:4,
383:11, 384:6,
387:8, 387:14,
387:18, 387:24,
388:8, 388:18,
388:20, 389:3,
389:9, 389:12,
389:16, 389:25,
390:23, 391:4,
394:24, 395:5,
395:7, 399:24,
401:13, 402:10,
406:9, 406:17,
406:20, 406:25,

407:5, 407:8,
407:13, 407:16,
408:4, 408:10,
408:20, 408:25,
409:5, 409:7, 409:14
**court** [2] - 244:16,
299:5
**Court** [48] - 232:22,
232:23, 235:4,
241:23, 244:18,
244:20, 245:5,
245:12, 246:11,
279:22, 295:19,
296:3, 299:10,
299:12, 300:24,
302:12, 302:15,
303:17, 304:18,
305:15, 310:15,
310:19, 311:8,
311:12, 315:18,
335:8, 341:9, 364:1,
364:8, 368:9,
368:11, 370:17,
371:6, 372:1,
373:10, 378:21,
379:8, 379:12,
379:21, 380:7,
382:14, 383:19,
386:6, 386:8,
386:22, 387:8,
388:6, 409:24
**Court's** [9] - 245:6,
281:19, 301:2,
301:19, 304:13,
305:6, 314:13,
314:14, 402:3
**courtesy** [1] - 382:11
**courthouse** [1] - 236:2
**Courthouse** [2] -
232:23, 409:24
**courtroom** [17] -
234:18, 239:24,
245:24, 260:14,
294:25, 314:23,
315:20, 365:7,
369:8, 375:1,
379:14, 380:21,
383:12, 386:13,
388:5, 389:15, 408:3
**COURTROOM** [8] -
234:2, 280:25,
291:21, 291:24,
359:20, 359:24,
360:6, 369:5
**courts** [3] - 270:19,
302:20, 323:9
**Courts** [5] - 298:8,
300:15, 302:25,
303:3, 383:16
**cover** [2] - 332:5,

332:6
**covered** [2] - 289:21,
370:18
**creaky** [2] - 266:24,
274:3
**create** [1] - 340:7
**credibility** [5] - 296:8,
298:12, 298:14,
302:19, 303:2
**cregan@reganfirm.**
**com** [1] - 232:16
**critical** [6] - 305:20,
307:9, 309:20,
405:8, 405:12, 406:4
**criticism** [1] - 298:21
**cross** [22] - 296:1,
296:6, 297:5,
297:15, 297:17,
298:6, 298:12,
299:4, 302:16,
302:19, 306:17,
309:25, 313:11,
343:14, 362:19,
365:23, 373:9,
375:20, 375:24,
381:22, 382:7,
382:25
**CROSS** [4] - 250:5,
286:17, 347:19,
397:24
**cross-designate** [1] -
306:17
**cross-designation** [1]
- 313:11
**cross-examination** [9]
- 296:1, 297:5,
297:15, 298:12,
299:4, 373:9,
381:22, 382:7,
382:25
**CROSS-**
**EXAMINATION** [4] -
250:5, 286:17,
347:19, 397:24
**cross-examine** [5] -
296:6, 297:17,
302:19, 343:14,
365:23
**cross-examined** [1] -
309:25
**crowded** [1] - 258:2
**CRR** [3] - 232:22,
409:16, 409:23
**CTA** [8] - 331:9,
342:23, 344:14,
346:3, 358:11,
358:12, 358:22,
358:25
**cultural** [1] - 270:9
**culturally** [2] - 270:10,

417

270:16
**cured** [1] - 244:20
**current** [3] - 278:2,
316:17, 355:24
**curriculum** [1] -
316:17
**custodian** [2] -
236:17, 243:7
**customary** [1] -
294:23
**customer** [3] - 394:15,
395:1, 395:14
**customers** [6] -
339:12, 391:21,
394:12, 400:9,
402:25, 403:11
**cut** [4] - 271:23,
322:25, 323:14,
334:21
**cuts** [1] - 245:8
**CV** [3] - 316:20,
317:10, 335:18

# D

**D.C** [1] - 232:4
**daily** [1] - 266:8
**damages** [1] - 387:1
**date** [4] - 241:7, 272:3,
277:6, 358:9
**dated** [1] - 335:24
**Dated** [1] - 409:21
**dates** [1] - 321:17
**daughter** [5] - 365:19,
366:1, 367:9,
367:11, 368:12
**daughters** [1] - 367:22
**days** [3] - 293:10,
318:2, 322:4
**DC** [3] - 232:15,
232:24, 410:1
**deal** [2] - 310:10,
378:23
**dealing** [3] - 278:5,
303:3, 391:21
**December** [1] - 268:7
**decide** [2] - 314:19,
408:7
**decided** [1] - 241:14
**decline** [2] - 326:14,
326:15
**declined** [1] - 326:15
**deep** [1] - 272:8
**defendant** [4] -
234:12, 291:24,
309:19, 384:11
**Defendant** [2] - 232:8,
232:18
**defendant's** [1] -
367:12

**defendants** [3] -
244:22, 245:1
**defense** [13] - 236:1,
239:14, 244:17,
304:15, 305:8,
305:18, 313:10,
326:6, 365:13,
367:6, 368:3,
380:15, 384:18
**Defense** [1] - 319:16
**defense's** [3] - 376:3,
380:19, 387:25
**defer** [2] - 310:18,
366:23
**definitely** [1] - 354:16
**degenerative** [4] -
266:21, 267:10,
278:5, 288:18
**degree** [15] - 277:9,
278:23, 286:5,
286:11, 287:24,
317:24, 318:7,
318:8, 318:10,
318:11, 318:12,
318:15, 319:14,
337:6, 346:25
**degrees** [1] - 318:3
**delay** [1] - 379:16
**demonstration** [1] -
294:2
**demonstrative** [1] -
359:24
**denied** [2] - 297:24,
299:6
**Denied** [1] - 296:22
**density** [2] - 267:15,
268:4
**Department** [3] -
319:14, 321:19,
383:22
**department** [4] -
319:25, 320:16,
320:18, 320:19
**depo** [2] - 374:2, 377:5
**deposition** [52] -
253:23, 256:2,
256:4, 256:17,
256:23, 257:9,
257:16, 295:16,
296:25, 300:2,
301:6, 303:20,
307:5, 308:11,
310:21, 310:23,
311:1, 311:25,
328:21, 348:5,
348:19, 349:9,
350:9, 351:15,
352:3, 352:16,
353:15, 364:12,
365:1, 365:19,

367:24, 368:8,
369:13, 369:14,
371:11, 371:12,
371:14, 371:17,
371:18, 372:3,
372:7, 373:1,
375:10, 377:13,
377:18, 378:11,
378:19, 379:17,
380:1, 384:25
**depositions** [1] -
303:18
**DEPUTY** [8] - 234:2,
280:25, 291:21,
291:24, 359:20,
359:24, 360:6, 369:5
**describe** [5] - 324:13,
324:25, 329:22,
332:14, 342:4
**described** [3] - 246:6,
331:1, 341:11
**description** [1] - 268:8
**design** [1] - 327:14
**designate** [4] - 237:18,
237:23, 306:17,
313:4
**designated** [13] -
236:16, 237:19,
237:24, 304:16,
304:17, 305:1,
305:9, 305:10,
308:9, 308:12,
308:15, 309:22,
312:13
**designation** [4] -
305:16, 305:17,
313:11, 370:14
**designations** [1] -
371:2
**designed** [1] - 362:12
**designs** [2] - 344:25
**detail** [1] - 317:15
**determine** [6] - 330:4,
333:13, 334:5,
341:8, 341:9, 357:13
**determining** [2] -
341:4, 344:16
**devices** [1] - 282:5
**DEXA** [5] - 267:12,
267:15, 267:19,
290:9, 290:12
**Dhabi** [1] - 328:9
**diagnosed** [3] -
266:21, 266:23,
267:22
**difference** [2] - 255:8,
278:17
**different** [12] - 237:8,
298:24, 301:7,
305:22, 330:18,

339:18, 340:20,
340:22, 355:10,
386:2, 397:16,
403:20
**difficult** [3] - 271:20,
271:25, 333:19
**difficulty** [1] - 269:11
**dire** [9] - 296:1, 296:9,
297:9, 298:7,
300:12, 302:6,
303:5, 314:6, 314:15
**direct** [12] - 302:16,
302:17, 329:23,
354:4, 361:3,
365:22, 375:13,
375:18, 375:20,
378:6, 398:19,
402:13
**DIRECT** [4] - 246:19,
275:14, 315:10,
389:20
**directed** [6] - 384:11,
385:7, 385:9,
386:22, 386:25,
387:7
**direction** [3] - 263:9,
342:20, 349:17
**directly** [4] - 263:14,
270:24, 296:7, 343:7
**director** [1] - 321:21
**disabled** [1] - 324:17
**disagree** [2] - 254:24,
297:19, 311:1
**disclosed** [3] - 367:12,
386:14
**disclosure** [5] -
297:21, 367:14,
368:7, 368:12,
386:17
**discomfort** [4] -
289:14, 289:25,
290:2, 290:8
**discoverable** [1] -
368:3
**discovery** [7] - 238:4,
240:13, 308:8,
311:10, 333:18,
367:12, 386:15
**discretion** [1] - 245:7
**discuss** [9] - 249:21,
287:16, 288:2,
289:7, 294:18,
336:7, 363:21,
373:18, 407:10
**discussed** [4] -
289:12, 341:6,
371:3, 384:5
**discussing** [4] -
234:19, 291:6,
291:9, 291:10

**discussion** [2] - 312:9,
365:5
**discussions** [1] -
407:22
**disease** [4] - 266:21,
267:10, 278:5,
288:18
**dishonest** [1] - 373:20
**dismiss** [1] - 389:4
**dispute** [11] - 240:14,
240:16, 243:5,
243:17, 303:13,
303:15, 309:13,
309:15, 309:16,
383:18
**disputed** [1] - 238:24
**disregard** [2] - 246:12,
326:24
**distances** [1] - 291:7
**DISTRICT** [3] - 232:1,
232:1, 232:11
**District** [1] - 245:6
**DJD** [1] - 266:23
**docks** [1] - 320:2
**doctor** [6] - 276:15,
277:23, 284:13,
286:9, 336:21,
351:18
**Doctor** [5] - 280:21,
317:21, 335:16,
336:11, 350:22
**document** [10] -
242:15, 246:7,
247:20, 247:22,
250:1, 310:20,
333:7, 359:20,
360:2, 402:14
**documentation** [1] -
344:19
**documents** [5] -
331:22, 341:14,
342:5, 383:16, 384:2
**dollar** [1] - 237:12
**DOMINIC** [2] - 233:14,
389:19
**Dominic** [3] - 366:3,
387:16, 390:6
**done** [8] - 238:8,
250:18, 267:17,
284:1, 316:25,
365:12, 365:14,
389:4
**door** [8] - 252:4,
252:5, 261:24,
262:3, 281:2, 362:9,
385:13
**Doors** [1] - 254:16
**doors** [39] - 251:19,
251:20, 252:9,
252:12, 253:21,

254:9, 254:16,
255:9, 259:21,
261:14, 261:21,
261:22, 262:10,
262:17, 262:19,
263:3, 263:24,
264:24, 265:7,
329:10, 337:11,
339:25, 340:2,
345:19, 349:11,
349:13, 349:22,
350:12, 350:13,
392:18, 392:20,
392:24, 393:1,
393:3, 393:4,
405:20, 405:23
**doubt** [1] - 291:4
**down** [22] - 269:10,
269:12, 269:13,
280:4, 280:10,
280:17, 280:18,
280:19, 280:22,
281:13, 282:16,
282:25, 283:13,
283:24, 311:14,
362:15, 368:15,
391:23, 398:8,
403:2, 403:9, 405:25
**Dr** [67] - 241:17, 267:1,
267:9, 267:19,
268:8, 271:7, 272:4,
273:13, 273:14,
274:11, 274:12,
275:8, 275:16,
275:18, 276:8,
277:14, 277:17,
280:3, 281:21,
285:2, 286:19,
287:4, 287:8,
287:10, 287:16,
290:20, 292:2,
294:16, 295:5,
295:8, 295:19,
295:25, 296:21,
297:10, 301:20,
301:24, 301:25,
302:13, 314:5,
314:11, 315:3,
315:4, 315:12,
315:15, 323:24,
325:4, 326:25,
327:6, 334:25,
335:9, 335:19,
339:7, 346:23,
347:21, 359:14,
360:18, 361:5,
363:18, 364:8,
365:1, 369:12,
369:15, 369:16,
369:21, 386:5,
408:5, 408:9

**drastically** [1] - 311:14
**drill** [2] - 282:10,
282:11
**Drive** [1] - 232:19
**driver** [8] - 328:25,
334:15, 341:17,
357:16, 357:18,
358:23, 406:22
**drivers** [5] - 333:1,
334:15, 357:20,
358:20, 358:21
**Dubai** [1] - 328:9
**during** [13] - 269:3,
269:22, 269:25,
270:21, 270:24,
271:4, 283:17,
295:24, 322:7,
367:12, 367:24,
372:20, 373:9
**Dutchess** [1] - 320:8
**dynamic** [1] - 385:6

**E**

**early** [6] - 278:9,
289:17, 318:16,
345:14, 407:20,
409:3
**earned** [1] - 318:23
**ears** [1] - 354:3
**easel** [1] - 280:3
**easier** [1] - 303:18
**easily** [1] - 274:9
**East** [1] - 328:10
**easy** [1] - 318:18
**ecstatic** [1] - 320:7
**education** [5] -
270:10, 322:12,
325:15, 325:18
**educational** [1] -
323:5
**educator** [1] - 322:13
**effectively** [1] - 375:23
**efficiently** [2] - 323:18,
407:25
**effort** [1] - 341:20
**efforts** [1] - 386:19
**eight** [1] - 251:17
**Eisenhower** [1] -
319:15
**either** [8] - 270:24,
274:13, 281:11,
295:5, 340:10,
366:11, 379:10,
407:1
**elderly** [3] - 285:21,
290:15
**elected** [4] - 324:18,
324:20, 324:21,
371:16

**electrical** [2] - 318:4,
324:15
**electronically** [3] -
280:5, 280:6, 291:23
**element** [1] - 240:21
**elements** [1] - 240:25
**elevated** [2] - 331:3,
331:12
**elevator** [1] - 332:23
**eliminate** [2] - 337:22
**Elser** [1] - 326:17
**ELSER** [1] - 232:19
**email** [2] - 236:14,
408:14
**embedded** [1] -
378:11
**emergency** [4] - 248:5,
391:20, 395:15,
398:11
**Emondi** [7] - 365:19,
372:13, 372:20,
375:6, 378:6, 380:2,
385:22
**EMONDI** [1] - 233:13
**Emondi's** [4] - 372:22,
373:1, 375:10, 380:4
**employed** [4] - 390:7,
390:9, 391:17, 392:7
**employee** [1] - 307:13
**employment** [1] -
323:6
**employments** [1] -
392:3
**EMTs** [1] - 396:24
**encompassed** [1] -
312:20
**encouragement** [1] -
287:16
**Encyclopedia** [1] -
316:22
**end** [20] - 238:12,
238:16, 243:5,
246:4, 247:24,
268:23, 273:4,
289:19, 293:11,
294:18, 323:21,
344:7, 371:9,
373:17, 374:21,
375:24, 379:18,
381:19, 387:13
**End** [1] - 315:17
**ends** [4] - 380:7,
380:10, 380:12,
380:16
**engine** [2] - 334:9,
341:13
**engineer** [3] - 301:5,
315:23, 321:15
**engineering** [31] -
315:21, 315:25,

316:1, 317:24,
318:2, 318:3, 318:4,
318:5, 318:6, 318:7,
318:8, 318:13,
318:19, 318:21,
318:24, 319:1,
319:14, 319:20,
322:14, 323:4,
324:5, 324:14,
325:9, 325:13,
325:16, 327:12,
335:1, 335:10,
337:18, 337:21,
346:25
**Engineering** [1] -
318:2
**engineers** [3] -
318:17, 319:17,
330:24
**Engineers** [1] - 318:18
**England** [1] - 324:21
**enjoy** [1] - 369:10
**ensure** [2] - 336:24,
393:3
**ensuring** [2] - 338:3,
350:24
**enter** [1] - 392:17
**enters** [7] - 245:24,
260:14, 314:23,
369:8, 379:14,
383:12, 389:15
**entire** [4] - 259:12,
306:4, 306:24,
371:10
**entirely** [1] - 386:18
**entirety** [3] - 375:10,
375:12, 375:13
**entitled** [2] - 302:9,
309:18, 356:6
**entry** [1] - 363:2
**environmentalist** [1] -
325:8
**equal** [1] - 325:11
**err** [1] - 244:16
**escalator** [1] - 332:23
**especially** [1] - 339:24
**ESQ** [4] - 232:13,
232:13, 232:18,
232:18
**essentially** [2] -
372:24, 383:18
**establish** [3] - 297:10,
323:15, 323:16
**establishing** [1] -
308:23
**estate** [1] - 315:25
**estimate** [1] - 248:22
**et** [6] - 248:5, 276:18,
298:5, 341:5, 344:4
**European** [1] - 324:19

**evaluating** [1] - 276:17
**evening** [5] - 234:16,
246:2, 407:21,
407:22, 408:2
**event** [2] - 284:24,
387:10
**events** [4] - 394:19,
394:21, 395:13,
395:22
**eventually** [2] -
276:15, 346:10
**evidence** [26] - 236:20,
244:21, 245:14,
246:8, 250:2,
300:14, 305:6,
305:23, 306:2,
306:10, 306:11,
307:22, 307:24,
309:20, 369:17,
369:20, 373:6,
377:12, 383:15,
383:25, 384:20,
386:11, 387:4,
402:10, 402:12,
407:19
**evidentiary** [4] -
239:25, 240:10,
374:23, 375:17
**exact** [7] - 241:6,
281:15, 283:25,
299:3, 300:16,
344:19, 358:9
**exactly** [2] - 370:23,
382:20
**examination** [12] -
296:1, 297:5,
297:15, 298:7,
298:12, 299:4,
354:4, 373:9,
375:21, 381:22,
382:7, 382:25
**EXAMINATION** [10] -
246:19, 250:5,
275:14, 286:17,
315:10, 347:19,
359:15, 362:22,
389:20, 397:24
**examinations** [1] -
241:18
**examine** [5] - 296:6,
297:17, 302:19,
343:14, 365:23
**examined** [2] - 285:9,
309:25
**example** [4] - 281:15,
340:20, 351:6, 401:5
**excellent** [3] - 288:5,
300:1
**except** [2] - 235:7,
327:25

**exception** [2] - 290:19, 337:2
**excerpts** [3] - 371:12, 371:18, 375:11
**exchange** [5] - 304:7, 304:14, 306:4, 307:9, 352:7
**exclude** [1] - 368:11
**excluded** [6] - 298:8, 299:5, 300:15, 386:6, 386:18, 386:20
**excludes** [1] - 299:12
**exclusion** [1] - 297:22
**exclusions** [3] - 296:2, 296:7, 302:20
**excuse** [3] - 249:23, 332:9, 407:21
**excused** [4] - 275:2, 294:17, 363:19, 407:9
**executive** [1] - 321:21
**exercise** [5] - 272:22, 273:2, 287:17, 287:19, 287:22
**Exhibit** [28] - 234:22, 234:23, 239:8, 239:9, 239:13, 239:16, 240:5, 247:1, 248:24, 250:2, 281:20, 281:23, 281:24, 282:24, 283:20, 291:22, 307:10, 308:10, 308:11, 312:1, 316:14, 317:13, 335:23, 338:15, 339:1, 340:17, 340:24, 402:11
**exhibit** [20] - 234:24, 235:7, 235:8, 239:18, 240:2, 240:19, 241:22, 247:10, 247:17, 248:1, 248:25, 249:21, 291:21, 304:2, 317:12, 335:16, 338:14, 377:8, 379:21, 379:22
**Exhibits** [2] - 279:14, 279:23
**exhibits** [2] - 239:7, 304:5
**exists** [1] - 305:21
**exit** [3] - 263:18, 361:21, 362:5
**exits** [6] - 294:25, 365:7, 375:1,

380:21, 388:5, 408:3
**exitway** [1] - 363:3
**expect** [5] - 237:7, 294:10, 340:1, 360:20, 389:1
**expectancy** [3] - 380:24, 381:1, 383:23
**expectation** [1] - 239:19
**expected** [1] - 250:15
**expenditure** [2] - 321:8, 327:19
**expenses** [3] - 234:23, 246:7, 247:4
**experience** [17] - 238:9, 250:14, 284:25, 316:23, 317:9, 320:1, 320:10, 321:1, 321:3, 323:2, 323:5, 327:9, 327:11, 342:21, 361:1, 362:5, 399:1
**experienced** [1] - 257:20
**experiences** [1] - 342:11
**experiencing** [6] - 274:1, 289:25, 290:7, 290:17, 293:11, 366:17
**expert** [30] - 244:18, 244:24, 245:4, 260:17, 277:14, 277:18, 284:25, 285:4, 296:10, 298:13, 298:14, 300:10, 300:13, 300:15, 300:18, 301:21, 301:25, 302:2, 302:4, 302:8, 302:13, 302:22, 303:4, 314:16, 315:3, 323:3, 326:8, 327:2, 334:25, 335:9
**expertise** [2] - 300:12, 315:19
**experts** [4] - 343:6, 343:9, 343:11, 344:15
**explain** [20] - 278:5, 279:18, 280:4, 280:23, 281:24, 283:20, 289:16, 310:7, 311:8, 319:1, 327:10, 329:16, 330:11, 330:25, 337:16, 341:8, 345:10, 345:11,

370:3, 370:4
**express** [1] - 376:15
**extent** [1] - 387:6
**extraordinary** [1] - 272:9
**extremely** [4] - 271:19, 271:25, 272:5, 287:14
**eyewitnesss** [1] - 329:3

---

## F

**fabricating** [1] - 378:3
**facie** [1] - 384:13
**facing** [2] - 263:9, 349:17
**fact** [17] - 255:9, 257:25, 285:15, 296:23, 298:7, 307:22, 308:23, 323:16, 325:9, 326:10, 328:10, 346:1, 381:7, 383:20, 383:25, 399:5
**facts** [4] - 368:10, 383:15, 383:17, 384:1
**factual** [1] - 301:20
**factually** [1] - 343:1
**failed** [2] - 384:13, 385:14
**failing** [1] - 347:1
**fails** [1] - 333:15
**failure** [3] - 244:17, 245:3, 301:22
**fair** [15] - 236:8, 251:4, 272:18, 298:6, 298:11, 299:18, 303:2, 343:18, 344:5, 369:21, 371:20, 378:7, 378:8, 398:6, 399:24
**fairly** [3] - 285:20, 293:17, 315:13
**Falcons** [2] - 276:10, 276:11
**fall** [6] - 268:7, 273:16, 273:21, 340:8, 405:21
**fallen** [2] - 396:19, 396:21
**falls** [2] - 312:9, 378:4
**familiar** [7] - 257:25, 261:11, 261:14, 327:19, 342:13, 401:15, 402:19
**familiarity** [3] - 342:21, 348:3

far [6] - 262:7, 263:22, 342:15, 363:5, 363:8, 393:23
**fashion** [1] - 282:6
**fast** [1] - 261:7
**faster** [1] - 340:7
**father** [1] - 325:5
**fatigued** [1] - 274:9
**fault** [2] - 324:1, 336:7
**Fauquier** [1] - 267:19
**fear** [2] - 360:24, 405:14
**fears** [2] - 405:22, 406:1
**February** [1] - 325:6
**Federal** [2] - 244:13, 384:12
**federal** [1] - 299:5
**feed** [1] - 402:5
**feet** [2] - 264:2, 405:24
**fell** [4] - 252:15, 253:11, 350:8, 350:14
**fellow** [1] - 372:14
**fellows** [1] - 373:24
**females** [1] - 290:15
**femoral** [3] - 283:6, 283:23
**femur** [12] - 247:7, 274:5, 279:7, 281:16, 282:1, 282:19, 282:25, 285:10, 285:12, 285:16, 286:25, 293:11
**Ferry** [1] - 321:22
**ferry** [1] - 322:6
**few** [6] - 251:13, 264:2, 264:14, 317:18, 359:14, 380:20
**field** [16] - 277:14, 277:18, 300:17, 302:1, 302:4, 302:8, 302:14, 319:2, 319:9, 324:4, 335:9, 337:6, 343:12, 344:16
**fields** [2] - 301:7, 324:15
**figure** [12] - 235:2, 237:12, 238:7, 241:12, 246:9, 248:16, 248:18, 248:22, 249:7, 367:1, 388:9
**file** [2] - 296:18, 328:17
**filed** [2] - 235:15, 235:24

**final** [3] - 379:10, 386:24, 408:14
**findings** [1] - 298:4
**fine** [14] - 242:25, 299:18, 301:13, 330:6, 338:22, 379:5, 381:20, 382:5, 382:6, 383:2, 383:3, 408:22
**fingers** [3] - 253:12, 253:13
**finish** [3] - 330:8, 364:23, 408:16
**finished** [3] - 268:23, 268:25, 284:9
**firm** [5] - 269:4, 316:8, 316:11, 326:17
**first** [40] - 236:1, 236:24, 255:16, 255:17, 262:17, 262:24, 263:12, 271:9, 271:18, 277:23, 277:25, 278:8, 278:24, 281:4, 313:23, 315:22, 318:16, 319:9, 319:18, 321:13, 328:11, 328:14, 329:20, 336:12, 336:14, 341:20, 347:24, 353:22, 372:4, 375:9, 375:22, 378:5, 380:10, 380:23, 384:17, 385:25, 387:25, 390:11, 405:10
**firsthand** [1] - 284:24
**fits** [1] - 282:16
**five** [12] - 251:6, 251:12, 295:16, 318:5, 321:24, 331:3, 346:2, 390:22, 391:6, 391:14, 397:18
**five-year** [1] - 318:5
**fixation** [10] - 282:2, 282:7, 282:9, 282:21, 283:4, 283:7, 283:8, 293:17, 293:21
**flat** [1] - 251:21
**flip** [1] - 330:22
**floor** [2] - 246:15, 387:14
**focus** [2] - 315:21, 325:4
**focused** [2] - 325:7, 325:12
**folks** [6] - 284:23,

420

285:21, 364:4,
369:2, 388:21
**follow** [5] - 271:16,
279:9, 344:21,
397:9, 407:6
**follow-up** [3] - 271:16,
279:9, 407:6
**followed** [2] - 328:18,
386:21
**following** [12] -
247:13, 256:3,
293:10, 322:23,
343:4, 346:14,
370:6, 371:18,
372:17, 383:20,
384:8, 397:12
**FOR** [1] - 232:1
**forced** [2] - 311:6,
322:18
**foregoing** [1] - 409:17
**foreign** [1] - 324:18
**forensic** [1] - 242:7
**forget** [2] - 253:13,
328:25, 331:9,
349:14
**forgot** [2] - 279:2,
321:11
**form** [3] - 278:19,
312:10, 346:24
**formally** [2] - 382:13,
383:6
**format** [1] - 340:22
**formed** [2] - 345:14,
345:25
**formulated** [1] - 277:8
**forth** [1] - 369:19
**fortunate** [1] - 341:14
**forward** [11] - 263:9,
306:13, 333:17,
337:10, 339:13,
349:17, 360:24,
361:2, 361:21,
381:25, 403:12
**forward-facing** [2] -
263:9, 349:17
**foundation** [11] -
235:21, 236:5,
236:9, 241:5, 242:3,
242:12, 242:14,
242:24, 330:1,
343:12, 343:15
**foundational** [1] -
240:25
**four** [3] - 251:13,
318:2, 384:14
**fracture** [23] - 274:5,
279:8, 281:16,
281:17, 281:18,
282:8, 282:17,
282:18, 282:20,

283:3, 284:2,
285:12, 285:16,
285:19, 285:20,
286:24, 286:25,
293:9, 293:10,
293:19, 294:1, 294:3
**fractured** [2] - 247:7,
285:10
**fractures** [4] - 281:10,
282:1, 282:2, 282:6
**frame** [1] - 304:4
**Francisco** [6] -
331:10, 344:4,
355:13, 355:19,
356:11, 356:12
**frequent** [1] - 399:3
**frequently** [3] -
240:25, 258:1, 268:5
**Friday** [1] - 322:14
**friend** [1] - 356:13
**front** [11] - 247:17,
277:7, 278:1,
279:15, 283:9,
292:2, 301:11,
308:11, 351:23,
360:18, 402:8
**Fruin** [1] - 325:5
**full** [6] - 308:22,
310:21, 311:11,
371:2, 401:18,
402:8
**fully** [2] - 264:11,
296:6
**funding** [1] - 327:17
**furnished** [1] - 241:7
**future** [2] - 380:25,
383:23

## G

**game** [7] - 276:17,
298:6, 298:11,
299:18, 303:2,
312:15, 343:18
**gap** [2] - 340:21
**garden** [1] - 266:14
**gardening** [3] -
266:12, 266:15,
266:17
**gate** [1] - 392:23
**gender** [1] - 382:3
**genders** [1] - 329:1
**general** [6] - 242:6,
289:12, 300:13,
302:1, 329:22,
339:19, 354:19
**generally** [6] - 300:17,
328:16, 332:13,
332:14, 332:16,
351:18

**gentleman** [2] -
260:14, 344:9
**gentlemen** [11] -
246:1, 284:20,
294:22, 314:25,
364:10, 374:22,
379:15, 380:14,
383:13, 387:24,
407:16
**Georgia** [1] - 266:4
**Gilman** [2] - 234:12,
326:16
**GILMAN** [5] - 232:18,
304:24, 367:10,
367:18, 367:20
**given** [11] - 306:19,
309:21, 321:12,
341:10, 356:1,
356:2, 382:25,
403:6, 403:14,
404:24, 405:7
**glistening** [1] - 289:20
**glitch** [1] - 379:20
**goal** [1] - 319:4
**goods** [1] - 319:4
**Google** [3] - 331:18,
334:9, 341:12
**gotcha** [2] - 312:4,
312:15
**government** [1] -
322:10
**Governor** [1] - 320:4
**governor** [5] - 320:5,
320:11, 320:21,
321:1, 322:4
**governor's** [1] -
320:13
**grabbed** [1] - 264:5
**graduate** [1] - 325:4
**graduated** [1] - 319:13
**grandfather** [1] -
317:2
**grant** [2] - 297:4,
386:22
**granted** [2] - 297:25,
298:1
**Granted** [1] - 296:22
**grants** [1] - 322:2,
322:4
**gray** [1] - 289:23
**great** [9] - 261:1,
272:10, 320:1,
320:10, 321:1,
321:3, 322:11,
391:1, 407:22
**greater** [1] - 281:9
**groins** [1] - 320:2
**ground** [3] - 385:8,
385:17, 386:5
**grounds** [5] - 236:9,

237:6, 298:1, 302:19
**group** [4] - 345:8,
345:14, 345:25,
346:1
**guaranteed** [1] -
344:20
**guarantor** [1] - 352:9
**guess** [9] - 236:19,
248:13, 262:1,
269:4, 306:16,
310:12, 345:14,
352:16, 378:15
**guidance** [1] - 402:22
**guide** [2] - 283:4,
402:15
**guy** [2] - 276:14,
399:25
**guys** [1] - 375:2
**GW** [2] - 248:5, 271:11
**gym** [2] - 267:24,
273:6

## H

**habit** [1] - 354:2
**hair** [1] - 289:23
**half** [8] - 251:9,
251:10, 265:25,
319:19, 319:21,
388:16, 391:7,
408:23
**hall** [1] - 347:22
**halls** [1] - 265:25
**hallway** [2] - 286:21,
347:25
**Hand** [1] - 234:13
**hand** [13] - 247:10,
249:2, 264:3, 264:5,
264:9, 264:18,
264:20, 275:12,
315:7, 320:13,
376:22, 390:1
**handle** [2] - 333:8,
366:2
**handled** [1] - 312:24
**handling** [1] - 239:6
**handrail** [1] - 362:16
**handrails** [2] - 362:13,
362:16
**happy** [2] - 238:2,
329:21
**hard** [2] - 282:14,
330:23
**harder** [1] - 284:3
**Harris** [4] - 328:23,
328:24, 408:5, 408:9
**Hawaii** [2] - 327:25,
331:11
**hazard** [1] - 337:22
**head** [5] - 251:22,

276:11, 283:6,
320:20, 321:22
**healed** [3] - 285:20,
286:3, 288:7
**healing** [9] - 293:12,
293:15, 293:16,
293:18, 293:20,
293:23, 293:24,
294:9, 294:10
**health** [2] - 270:9,
270:10
**Health** [1] - 383:22
**healthcare** [1] - 270:9
**healthy** [1] - 278:20
**hear** [17] - 251:19,
251:25, 254:2,
254:3, 254:20,
261:17, 265:6,
276:1, 316:5,
338:21, 348:9,
360:3, 371:15,
385:12, 390:23,
390:25, 399:20
**heard** [12] - 251:21,
252:1, 253:24,
254:3, 254:9,
254:11, 254:21,
264:22, 284:23,
342:13, 369:18,
385:22
**hearing** [11] - 247:14,
254:4, 254:15,
257:3, 322:24,
343:5, 370:7,
372:18, 384:9,
385:3, 409:11
**hearsay** [11] - 317:16,
342:3, 343:7,
343:10, 343:17,
372:23, 374:6,
374:7, 376:4, 378:4
**heavily** [1] - 238:9
**held** [8] - 247:14,
293:19, 301:24,
322:24, 343:5,
370:7, 372:18, 384:9
**HELD** [1] - 232:11
**hello** [1] - 390:6
**help** [7] - 279:18,
326:5, 360:4, 391:3,
402:13, 403:22,
405:17
**helped** [1] - 253:7
**helpful** [1] - 379:9
**helps** [1] - 408:24
**Henry** [7] - 366:16,
366:25, 380:13,
381:20, 408:6, 408:9
**hereby** [1] - 409:16
**herself** [2] - 350:6,

385:15
**HHS** [3] - 381:1, 381:2, 381:3
**high** [2] - 378:25, 383:8
**high-tech** [1] - 378:25
**higher** [2] - 354:17, 354:18
**highlight** [1] - 339:6
**highlights** [1] - 317:18
**highly** [1] - 282:20
**Highway** [1] - 319:16
**highway** [2] - 320:22, 320:23
**Hill** [2] - 265:24, 269:12
**himself** [1] - 234:24
**hip** [17] - 268:20, 274:8, 274:14, 274:19, 278:25, 281:6, 281:7, 281:10, 285:20, 286:1, 286:24, 289:9, 290:21, 290:25, 291:3, 293:9
**history** [1] - 323:6
**hit** [5] - 317:18, 331:15, 375:2, 383:8, 407:3
**Hmm** [1] - 346:19
**hold** [24] - 241:25, 253:2, 254:5, 257:7, 259:10, 286:10, 304:8, 332:9, 339:13, 340:4, 340:12, 340:13, 343:2, 351:1, 352:5, 362:14, 365:15, 370:5, 388:18, 402:10, 403:12
**holding** [1] - 253:4, 253:11, 253:15, 259:7, 265:9, 349:25, 350:5, 350:16, 361:19, 361:22, 362:6
**hole** [5] - 282:10, 282:11, 283:2, 283:5, 283:12
**hollow** [1] - 282:13
**home** [3] - 258:16, 276:17, 316:11
**Homeland** [2] - 331:25, 332:2
**honest** [2] - 279:1, 374:13
**Honor** [149] - 234:7, 234:11, 235:19, 235:25, 237:25, 239:4, 243:22,

244:6, 244:7, 245:16, 245:18, 245:20, 246:17, 248:13, 249:17, 255:22, 259:22, 260:15, 260:22, 274:25, 275:1, 275:7, 277:13, 279:21, 280:13, 286:14, 286:16, 291:19, 294:14, 294:15, 295:3, 295:4, 295:14, 295:18, 296:10, 297:16, 298:21, 303:6, 303:8, 303:11, 303:16, 303:19, 304:5, 304:7, 304:11, 304:20, 305:2, 305:11, 305:19, 306:4, 306:22, 307:1, 308:1, 308:6, 308:10, 308:12, 308:18, 309:9, 309:18, 310:13, 310:18, 310:25, 311:5, 311:17, 311:25, 313:13, 313:23, 313:25, 314:7, 315:2, 315:8, 317:11, 329:18, 329:21, 332:7, 334:24, 335:6, 335:14, 336:15, 338:13, 338:20, 340:23, 341:24, 343:9, 343:19, 347:7, 347:13, 347:18, 359:8, 359:11, 359:13, 360:9, 360:10, 361:17, 363:20, 365:24, 367:10, 367:18, 369:5, 370:16, 371:1, 371:4, 371:7, 371:22, 371:25, 372:9, 372:12, 372:15, 372:19, 373:3, 373:8, 373:17, 374:4, 374:10, 374:18, 375:4, 375:13, 375:23, 376:7, 376:10, 377:7, 377:11, 377:17, 377:20, 378:8, 378:15, 379:8, 379:25, 381:16, 382:11, 382:23,

383:10, 384:4, 384:10, 386:10, 387:12, 387:15, 387:20, 388:7, 389:7, 389:18, 399:22, 400:2, 401:14, 402:11, 402:12, 407:7, 407:14, 409:9
**honor** [1] - 322:11
**Honor's** [2] - 297:21, 385:6
**HONORABLE** [1] - 232:11
**honored** [1] - 324:17
**hope** [3] - 234:15, 246:2, 308:22
**Hospital** [1] - 267:20
**hospital** [1] - 271:10
**hour** [3] - 261:6, 399:2, 408:23
**hours** [4] - 325:17, 325:19, 388:7, 388:16
**House** [2] - 270:4, 270:18
**household** [1] - 368:2
**Hoyle** [1] - 242:23
**Hudson** [1] - 320:8
**Human** [1] - 383:22
**hundred** [1] - 327:5
**hurt** [5] - 352:13, 353:2, 353:6, 396:16, 396:19
**hypothetical** [1] - 299:1
**hypothetically** [2] - 299:3, 300:5

**I**

**IBANEZ** [1] - 233:12
**Ibanez** [1] - 372:8
**IBM** [1] - 322:10
**idea** [10] - 258:6, 261:7, 261:13, 261:23, 265:13, 267:25, 268:1, 272:20, 272:24, 300:3
**identified** [2] - 239:7, 239:20
**illness** [2] - 366:18, 382:12
**illustrated** [1] - 293:25
**illustration** [9] - 283:22, 284:1, 292:5, 292:6, 292:8, 292:12, 292:14, 292:21, 293:6

**illustrations** [5] - 279:11, 279:14, 279:16, 279:18, 280:3
**illustrative** [1] - 279:23
**illustrator** [1] - 279:12
**image** [1] - 292:5
**images** [1] - 292:3
**imagine** [1] - 333:2
**immediately** [2] - 273:3, 284:8
**impermissibly** [1] - 245:4
**implants** [1] - 283:22
**implied** [1] - 376:15
**important** [8] - 258:23, 287:18, 340:9, 345:12, 350:23, 373:4, 384:17, 385:17
**imposed** [1] - 353:13
**impossible** [3] - 356:17, 362:12, 362:16
**improper** [2] - 372:24, 373:5
**improperly** [1] - 374:9
**IN** [1] - 232:1
**inadmissible** [2] - 317:16, 379:21
**inappropriate** [5] - 235:20, 313:8, 343:13, 343:23, 376:4
**inch** [1] - 253:13
**inches** [1] - 253:14
**incident** [30] - 305:11, 305:22, 306:5, 307:3, 307:4, 307:8, 307:10, 307:23, 307:24, 308:13, 308:19, 308:21, 309:8, 309:10, 310:2, 310:3, 311:9, 312:10, 312:19, 329:2, 329:4, 329:5, 346:9, 347:3, 348:11, 348:18, 394:22, 395:14, 398:14
**incidents** [1] - 391:21
**inclination** [1] - 339:22
**include** [3] - 259:4, 319:6, 381:8
**included** [3] - 239:13, 316:20, 381:23
**includes** [2] - 313:2, 370:20

**including** [7] - 239:16, 242:20, 247:19, 296:1, 312:8, 319:24, 320:9
**inconsistent** [2] - 257:16, 385:19
**incorrect** [2] - 256:22, 256:24
**independent** [1] - 269:4
**Indians** [1] - 271:6
**indicate** [5] - 279:4, 290:24, 326:13, 368:2, 387:4
**indicated** [15] - 250:23, 253:24, 268:19, 268:21, 274:7, 287:13, 333:19, 348:5, 349:4, 349:16, 355:9, 355:24, 357:12, 385:1, 397:1
**indicates** [1] - 292:22
**indicating** [2] - 349:8, 349:10
**indication** [1] - 278:4
**indigenous** [5] - 268:17, 269:18, 269:22, 270:7, 270:23
**indirect** [1] - 373:25
**individual** [3] - 248:9, 358:22, 358:25
**individually** [1] - 324:12
**individuals** [1] - 384:23
**indulgence** [4] - 255:22, 291:19, 359:8, 402:3
**Industrial** [1] - 318:17
**industry** [5] - 330:15, 330:20, 333:3, 345:3, 354:22
**industry's** [1] - 355:4
**inflammatory** [1] - 291:5
**inflicts** [1] - 353:11
**information** [22] - 238:10, 302:7, 308:12, 309:7, 311:18, 311:24, 312:1, 312:10, 312:14, 312:25, 313:2, 313:4, 328:19, 334:10, 334:19, 337:24, 338:2, 343:11, 343:22, 344:15, 368:3, 378:18

**informed** [1] - 395:16
**initial** [3] - 297:20, 318:8, 368:7
**initials** [1] - 324:23
**injection** [3] - 267:11, 273:17, 273:24
**injections** [3] - 266:25, 267:3, 288:21
**injured** [8] - 294:5, 325:22, 325:23, 351:19, 353:9, 394:20, 395:16, 404:17
**injures** [1] - 353:11
**injuries** [4] - 271:8, 276:17, 285:22, 285:24
**injuring** [1] - 268:11
**injury** [17] - 268:20, 272:14, 281:14, 286:2, 335:4, 347:3, 351:20, 352:14, 352:22, 352:24, 352:25, 353:1, 353:12, 353:13, 396:16, 396:18
**innovation** [3] - 328:11, 328:13, 344:22
**innovative** [2] - 344:24, 345:1
**inside** [7] - 282:13, 282:16, 282:25, 400:14, 400:16, 400:22, 401:3
**insinuated** [1] - 373:8
**insinuating** [1] - 373:20
**insofar** [1] - 374:10
**instance** [1] - 296:16
**instances** [1] - 296:24
**Instead** [1] - 371:10
**instead** [1] - 240:2
**instruct** [1] - 408:20
**instructed** [3] - 244:20, 245:13, 396:10
**instruction** [3] - 311:12, 372:2, 381:9
**instructions** [8] - 381:6, 388:4, 388:15, 388:21, 408:12, 408:14, 408:17, 409:1
**instrumentation** [2] - 288:9, 293:7
**insufficiency** [1] - 386:19
**insurance** [1] - 273:19
**integral** [1] - 316:2

**intend** [1] - 296:6
**intended** [3] - 241:19, 309:5, 368:4
**interested** [2] - 326:12, 365:9
**intermittently** [1] - 250:18
**intermodal** [1] - 319:4
**intern** [1] - 321:14
**internal** [8] - 282:2, 282:7, 293:17, 293:21, 331:22, 341:13, 342:5
**internationally** [2] - 327:3, 328:7
**internship** [1] - 321:12
**interpreted** [2] - 290:13, 305:16
**interrogatories** [2] - 367:21, 367:22
**interrogatory** [1] - 368:7
**intertroch** [1] - 281:12
**intervention** [1] - 281:18
**intimately** [2] - 321:10, 327:16
**Intramedullary** [1] - 292:15
**intro** [1] - 403:3
**introduce** [5] - 242:5, 275:16, 315:15, 377:15, 389:24
**introduced** [1] - 377:9
**introduction** [1] - 321:13
**investigation** [4] - 311:16, 312:22, 353:19, 376:5
**investments** [1] - 327:18
**invited** [2] - 322:9, 328:1
**invoices** [2] - 236:12, 236:18
**involve** [1] - 327:12
**involved** [10] - 292:11, 301:8, 321:3, 321:10, 326:4, 327:14, 327:16, 327:22, 328:3, 391:19
**involves** [2] - 327:6, 392:5
**involving** [1] - 325:22
**Island** [1] - 321:22
**issue** [40] - 237:6, 239:23, 243:4, 244:8, 244:14, 246:14, 295:19,

296:3, 296:4, 296:10, 297:14, 298:2, 298:15, 298:24, 299:11, 299:18, 300:17, 301:1, 305:21, 310:14, 327:7, 329:8, 329:13, 330:12, 333:14, 335:1, 366:14, 374:23, 375:22, 385:7, 385:24, 386:4, 386:24, 386:25, 394:1, 394:2, 394:7, 399:7, 406:13
**issues** [7] - 285:1, 327:2, 327:11, 387:4, 391:22, 392:13, 407:25
**itemization** [5] - 234:22, 246:6, 247:5, 248:15, 248:20

## J

**JASON** [1] - 232:18
**Jason** [1] - 234:12
**jason.waters@ wilsonelser.com** [1] - 232:21
**jerk** [8] - 250:12, 296:23, 297:6, 297:18, 297:20, 298:5, 299:13, 360:24
**jerk/jolt** [1] - 384:17
**jerked** [2] - 253:14, 361:20
**jerking** [1] - 361:2
**Jersey** [3] - 326:1, 328:4
**Jiminez** [10] - 334:13, 341:15, 356:2, 357:14, 357:15, 357:16, 358:2, 358:25, 359:4, 359:6
**job** [2] - 272:10, 288:7
**John** [1] - 325:4
**JOHNSON** [2] - 233:14, 389:19
**Johnson** [14] - 328:24, 337:8, 366:4, 387:16, 389:9, 390:6, 390:7, 390:23, 390:24, 398:1, 401:15, 402:8, 406:6, 406:9
**joined** [1] - 276:14

**joint** [10] - 266:21, 267:10, 278:5, 281:7, 288:18, 289:18, 289:21, 318:12, 318:15
**joints** [1] - 289:22
**JOV** [1] - 386:22
**Juan** [2] - 328:2, 331:14
**Judge** [7] - 236:24, 237:8, 285:6, 299:3, 362:18, 380:23, 381:20
**JUDGE** [1] - 232:11
**judge** [11] - 241:6, 280:2, 296:15, 332:18, 360:13, 368:6, 369:22, 370:3, 380:6, 408:5, 408:22
**judgment** [7] - 237:20, 300:23, 384:19, 385:7, 386:12, 386:16, 386:20
**judicial** [4] - 380:24, 381:7, 383:17, 383:19
**Judiciary** [1] - 258:13
**jump** [1] - 388:17
**jumped** [1] - 319:12
**jumping** [1] - 321:16
**jumps** [2] - 351:23, 351:25
**June** [5] - 238:3, 241:7, 267:20, 290:10, 392:2
**jurisdictions** [1] - 345:4
**jurors** [3] - 379:10, 389:24, 390:25
**jury** [60] - 244:20, 245:13, 245:24, 247:14, 275:17, 278:6, 279:19, 280:14, 294:25, 295:12, 296:12, 296:13, 299:14, 301:11, 301:13, 301:18, 302:10, 308:3, 314:6, 314:22, 314:23, 315:16, 319:1, 322:24, 326:24, 327:11, 329:16, 330:11, 330:25, 332:15, 343:5, 365:2, 365:7, 369:3, 369:8, 369:15, 370:7, 372:8, 372:18, 374:24,

375:1, 376:20, 379:14, 380:2, 380:17, 380:21, 381:6, 381:9, 381:18, 383:11, 383:12, 384:9, 387:10, 387:11, 388:5, 389:4, 389:13, 389:15, 408:3, 408:14
**JURY** [1] - 232:10
**jury's** [1] - 324:13

## K

**kabob** [1] - 283:10
**kabobs** [1] - 282:17
**Kaiser** [2] - 267:17, 267:23
**keep** [8] - 258:24, 259:1, 283:9, 316:4, 327:5, 331:12, 379:2, 390:24
**keeping** [1] - 351:2
**Keisha** [3] - 366:16, 408:6, 408:9
**key** [2] - 316:3, 338:3
**kind** [6] - 315:24, 318:1, 331:13, 333:8, 382:12
**kinds** [2] - 285:2, 340:16
**knee** [12] - 267:11, 268:12, 273:17, 273:22, 274:2, 278:1, 278:9, 288:19, 288:20, 289:13, 289:16, 289:24
**knees** [13] - 266:21, 266:25, 267:3, 268:11, 288:15, 288:18, 288:21, 288:23, 289:8, 289:10, 289:11, 290:7, 290:8
**knocked** [1] - 405:25
**knowing** [1] - 385:13
**knowledge** [11] - 284:24, 306:6, 307:8, 307:23, 308:15, 308:25, 309:17, 310:22, 311:11, 312:11, 326:4
**knows** [2] - 261:10, 311:9
**Koenig** [1] - 267:19

# L

**labeled** [1] - 292:20
**labor** [1] - 334:16
**lack** [2] - 270:11, 270:18
**LACMTA** [1] - 331:11
**ladies** [11] - 246:1, 284:20, 294:22, 314:24, 364:10, 374:22, 379:15, 380:14, 383:13, 387:24, 407:16
**laid** [3] - 242:12, 242:23, 343:12
**Lands** [1] - 315:17
**language** [1] - 339:18
**laptop** [1] - 369:6
**last** [16] - 244:9, 272:2, 272:16, 273:12, 273:14, 273:21, 274:4, 278:22, 285:15, 324:7, 326:25, 335:24, 336:1, 377:13, 392:2, 407:17
**lasted** [1] - 268:20
**late** [2] - 239:15, 408:12
**lately** [1] - 344:23
**Lauren** [2] - 234:12, 366:2
**LAUREN** [1] - 232:18
**lauren.gilman @ wilsonelser.com** [1] - 232:21
**Laurie** [1] - 234:13
**law** [2] - 326:17, 385:16
**lawyer** [3] - 236:3, 239:14, 299:21
**lawyers** [2] - 369:19, 369:20
**lay** [2] - 242:14, 343:15
**laying** [1] - 235:21
**lead** [1] - 323:17
**leaders** [1] - 344:22
**leading** [3] - 305:9, 337:14, 395:22
**leaned** [1] - 252:21
**leaning** [3] - 252:23, 252:25, 408:8
**learn** [1] - 312:21
**learned** [2] - 269:13, 396:20
**learner** [1] - 322:8
**learning** [1] - 319:23
**least** [7] - 264:16, 272:16, 288:5,

339:12, 346:2, 350:9, 398:3
**leave** [7] - 255:4, 275:6, 332:22, 333:3, 384:24, 388:8, 391:24
**leaving** [1] - 408:8
**left** [21] - 234:17, 247:10, 249:2, 254:17, 255:3, 255:8, 263:25, 264:5, 264:9, 264:18, 264:19, 274:9, 278:25, 281:6, 339:25, 349:11, 349:14, 375:5, 395:21
**left-hand** [2] - 247:10, 249:2
**legal** [4] - 319:25, 325:14, 333:20, 407:25
**length** [2] - 363:11, 370:19
**lengths** [1] - 363:15
**less** [5] - 273:5, 291:11, 334:2, 334:3, 347:14
**lessening** [1] - 268:4
**lesser** [1] - 281:9
**letter** [1] - 376:9
**levels** [2] - 289:7, 289:13
**liability** [1] - 384:14
**license** [1] - 325:18
**lie** [1] - 274:8
**lied** [1] - 303:1
**lieu** [1] - 370:21
**life** [5] - 317:8, 380:24, 381:1, 383:21, 383:23
**Light** [1] - 328:9
**light** [3] - 299:17, 323:16, 393:21
**lights** [1] - 268:9
**likelihood** [2] - 356:16, 366:24
**likely** [1] - 398:24
**limine** [1] - 386:7
**limit** [4] - 310:17, 310:19, 310:23, 311:4
**limitations** [2] - 296:7, 351:9
**limited** [6] - 297:13, 298:8, 302:17, 308:16, 308:18, 371:11
**Line** [11] - 250:15, 256:2, 256:7,

304:17, 348:23, 352:4, 375:23, 392:11, 397:16, 405:1
**line** [8] - 242:11, 251:3, 282:6, 284:2, 371:5, 374:12, 392:9, 392:21
**Lines** [2] - 304:6
**lines** [3] - 295:16, 321:24, 322:5
**Lisa** [1] - 232:22
**LISA** [1] - 409:16
**list** [4] - 322:20, 324:2, 324:10, 324:25
**listening** [2] - 259:4, 259:6
**literally** [3] - 253:12, 295:9, 301:7
**litigation** [1] - 312:4
**live** [9] - 305:25, 306:20, 309:24, 310:10, 315:17, 347:24, 367:25, 368:1, 369:18
**living** [1] - 275:21
**location** [6] - 316:1, 329:10, 392:25
**lodged** [3] - 235:3, 236:5, 323:8
**logistically** [1] - 378:24
**London** [1] - 328:7
**LONG** [1] - 232:14
**look** [15] - 238:10, 244:11, 244:12, 245:9, 247:1, 248:24, 249:6, 279:1, 294:6, 301:14, 309:24, 328:17, 374:16, 376:16
**looked** [1] - 355:14
**looking** [6] - 256:1, 281:19, 303:20, 331:4, 352:3, 355:12
**loose** [5] - 380:7, 380:10, 380:12, 380:16, 381:19
**Los** [3] - 326:2, 328:5, 331:10
**lose** [2] - 278:14, 340:8, 406:18
**loses** [1] - 394:2
**loss** [1] - 286:1
**lost** [2] - 241:9, 287:20
**love** [1] - 327:25
**loved** [2] - 318:18, 318:19
**lower** [1] - 283:15

**Lunch** [1] - 368:19
**lunch** [11] - 364:22, 364:23, 365:4, 369:10, 370:12, 408:16, 408:20, 409:1, 409:2, 409:3

# M

**M.D** [3] - 233:6, 233:11, 275:13
**ma'am** [8] - 243:25, 249:9, 254:7, 255:25, 257:9, 273:15, 397:22, 406:2
**main** [2] - 345:16, 345:18
**maintain** [2] - 325:18, 332:23
**major** [6] - 270:14, 318:3, 327:23, 327:24, 328:6, 330:25
**Management** [1] - 318:17
**management** [2] - 321:8, 358:2, 358:4
**managers** [1] - 391:22
**Manhattan** [1] - 320:23
**manual** [1] - 406:24
**map** [1] - 331:4
**mark** [1] - 402:9
**marked** [5] - 282:23, 283:19, 316:13, 335:20, 335:23
**marker** [9] - 392:20, 392:22, 393:2, 393:8, 393:14, 394:8, 396:1, 397:15, 399:11
**markings** [2] - 402:13, 402:14
**mater** [2] - 322:9, 322:11
**matter** [6] - 244:5, 278:23, 330:14, 333:20, 353:19, 385:16
**matters** [1] - 326:6
**MBA** [2] - 318:14, 318:16
**MBTA** [3] - 331:5, 342:10, 342:11
**McGrath** [1] - 244:13
**McLean** [1] - 232:20
**McPherson** [26] - 250:10, 250:24, 251:1, 251:16,

254:9, 254:16, 258:9, 258:11, 262:2, 262:14, 263:24, 265:18, 266:3, 339:25, 348:24, 348:25, 349:3, 349:9, 349:10, 349:13, 349:18, 350:10, 396:8, 397:18, 405:1
**mean** [25] - 243:4, 257:24, 259:2, 259:17, 262:20, 269:10, 286:3, 289:12, 290:1, 294:10, 303:1, 322:25, 323:7, 332:12, 367:4, 374:2, 374:6, 381:24, 382:19, 392:22, 392:24, 393:19, 393:25, 405:18
**meaning** [2] - 263:9, 395:23
**means** [3] - 268:1, 268:4, 289:16
**meant** [1] - 279:2
**measure** [1] - 311:20
**mechanical** [2] - 318:4, 324:14
**medical** [38] - 235:21, 236:11, 237:2, 237:9, 237:10, 237:11, 238:8, 239:1, 239:9, 239:13, 239:15, 239:17, 239:22, 240:3, 240:7, 240:22, 241:12, 241:15, 241:20, 246:6, 247:4, 247:6, 248:4, 248:21, 249:7, 271:22, 277:9, 279:10, 279:11, 279:18, 285:1, 286:6, 286:11, 300:12, 387:1, 387:2
**medications** [4] - 290:21, 290:25, 291:2, 291:5
**meet** [5] - 317:19, 320:12, 341:18, 348:1
**meetings** [1] - 320:11
**member** [1] - 345:8
**members** [5] - 278:6, 319:1, 329:16, 330:11, 345:9

membership [2] - 324:22, 346:7
memberships [1] - 324:18
memory [4] - 247:20, 247:21, 398:5, 398:6
mental [2] - 270:9, 270:10
mention [6] - 317:2, 319:11, 321:11, 342:1, 342:3, 355:17
mentioned [9] - 328:5, 344:9, 346:4, 349:12, 353:21, 374:11, 399:15, 400:5, 406:12
mentioning [1] - 396:18
Merced [1] - 244:13
message [4] - 339:19, 339:20, 340:21
met [4] - 270:7, 286:21, 347:22, 347:25
metro [1] - 341:19
Metro [26] - 234:14, 257:20, 257:21, 258:1, 258:21, 258:24, 259:11, 259:25, 261:9, 261:12, 265:15, 265:19, 265:23, 325:24, 335:2, 339:10, 342:7, 344:18, 344:22, 355:20, 355:22, 361:21, 362:25, 365:13, 390:9, 390:11
Metro's [5] - 329:5, 333:9, 338:6, 340:17, 401:16
METROPOLITAN [1] - 232:6
Metropolitan [3] - 234:4, 234:13, 326:8
Miami [3] - 328:4, 331:8
mic [2] - 280:4, 391:2
MICHAEL [1] - 232:13
microphone [8] - 275:25, 280:10, 280:24, 315:13, 316:4, 354:1, 363:24, 399:23
midday [1] - 407:20
middle [4] - 263:18, 263:20, 320:22, 363:2
Middle [1] - 328:10

Middleburg [1] - 275:22
might [8] - 247:21, 291:5, 295:3, 364:20, 375:14, 379:9, 388:24, 393:13
mild [2] - 278:7, 278:9
mile [1] - 266:1
miles [1] - 261:6
military [1] - 318:6
million [2] - 322:5, 328:11
mind [3] - 319:12, 331:4, 370:25
Mind [1] - 340:21
mine [3] - 334:12, 356:13, 402:13
minimize [1] - 379:1
minimum [5] - 333:24, 334:1, 338:11, 338:12, 339:15
minor [2] - 318:3, 318:4
minute [11] - 248:22, 249:2, 295:7, 295:9, 313:12, 322:20, 334:20, 336:12, 338:14, 347:14, 388:3
minutes [12] - 294:24, 295:17, 303:14, 305:15, 364:9, 364:17, 364:22, 375:14, 375:15, 380:20, 402:15
Miroches [1] - 315:18
mis [1] - 345:23
misberthing [1] - 347:10
misleading [1] - 308:3
misnomer [1] - 315:24
misrepresented [1] - 296:25
missing [2] - 309:11, 355:12
mission [1] - 268:18
misstop [1] - 333:23
misstopping [1] - 345:24
mistake [1] - 250:20
misunderstanding [1] - 310:14
mode [1] - 406:19
modes [1] - 319:5
modifications [1] - 370:23
modify [1] - 330:18
moment [5] - 295:4, 373:10, 389:7,

402:3, 402:6
Montauk [1] - 320:10
months [3] - 293:4, 294:9, 390:15
mootness [2] - 298:1, 299:6
Moreira [2] - 232:22, 409:23
MOREIRA [1] - 409:16
morning [31] - 234:7, 234:10, 234:11, 234:15, 235:16, 235:24, 243:25, 244:1, 246:1, 246:17, 246:21, 246:22, 250:7, 250:8, 275:9, 275:10, 275:16, 286:19, 286:20, 286:21, 294:23, 313:24, 347:21, 347:22, 366:16, 366:17, 387:3, 407:24, 408:6, 408:24
Moses [2] - 320:12, 320:25
most [6] - 257:24, 285:21, 290:14, 331:23, 384:17, 398:24
motion [16] - 236:15, 249:20, 286:1, 296:18, 297:4, 314:8, 323:11, 382:14, 382:16, 383:5, 384:18, 386:7, 386:12, 386:16, 387:8, 387:10
motivation [1] - 258:6
motor [1] - 325:10
mountain [1] - 266:12
move [32] - 234:23, 241:5, 241:22, 242:3, 254:5, 259:8, 259:9, 259:12, 259:13, 259:22, 260:2, 260:9, 260:10, 275:24, 276:23, 319:3, 333:17, 337:10, 339:13, 340:5, 340:23, 373:15, 385:7, 385:9, 385:11, 385:14, 394:17, 397:6, 400:20, 403:12, 405:13, 405:24
moved [11] - 253:25,

257:13, 277:16, 280:1, 306:13, 341:2, 349:11, 363:6, 363:8, 377:12, 385:5
moves [2] - 384:11, 400:25
moving [24] - 257:7, 258:1, 261:5, 261:8, 264:21, 299:17, 306:13, 340:5, 340:6, 351:3, 351:6, 377:15, 394:16, 395:4, 395:5, 399:16, 400:6, 400:11, 401:11, 401:23, 401:25, 403:21, 404:13, 404:15
MR [348] - 234:7, 234:11, 235:7, 235:9, 235:11, 235:14, 235:19, 235:25, 236:24, 237:8, 237:14, 237:17, 237:19, 237:22, 237:24, 238:2, 238:6, 238:12, 238:16, 238:21, 238:24, 239:4, 239:11, 240:12, 240:16, 241:6, 242:1, 242:18, 242:25, 243:10, 243:12, 243:15, 243:18, 243:22, 244:6, 245:10, 245:16, 245:18, 245:20, 246:16, 246:20, 248:2, 248:13, 248:17, 249:17, 249:20, 249:22, 249:24, 250:4, 250:6, 255:22, 256:1, 259:22, 260:15, 260:17, 260:20, 260:22, 260:23, 274:24, 275:1, 275:7, 275:15, 277:13, 277:15, 277:20, 277:22, 279:21, 279:24, 280:2, 280:6, 280:8, 280:12, 280:13, 280:20, 281:2, 284:15, 284:18, 285:6, 285:8, 286:13, 286:16, 286:18, 291:19,

291:22, 291:25, 292:1, 294:13, 294:15, 295:3, 295:7, 295:14, 295:18, 295:23, 296:13, 296:15, 296:21, 297:7, 297:12, 297:15, 297:25, 298:3, 298:6, 298:17, 298:25, 300:1, 300:9, 300:20, 300:24, 301:10, 301:16, 302:18, 302:23, 303:6, 303:8, 303:11, 303:16, 303:23, 304:9, 304:11, 304:13, 304:20, 304:22, 305:1, 305:3, 305:4, 306:4, 306:18, 306:22, 307:1, 307:6, 307:16, 308:1, 308:6, 309:4, 310:12, 310:25, 311:5, 311:17, 312:4, 312:13, 312:23, 313:2, 313:7, 313:13, 313:15, 313:18, 313:22, 314:3, 314:7, 314:10, 314:13, 314:20, 315:2, 315:11, 316:15, 317:11, 317:17, 317:20, 323:5, 323:10, 323:13, 323:19, 323:22, 326:19, 326:22, 326:23, 329:18, 329:21, 330:3, 330:7, 332:7, 332:10, 332:12, 334:24, 335:5, 335:14, 335:15, 335:21, 336:15, 336:19, 337:14, 338:13, 338:18, 339:1, 340:23, 340:25, 341:23, 342:25, 343:9, 343:19, 343:24, 344:6, 344:8, 347:7, 347:13, 347:16, 347:18, 347:20, 359:8, 359:10, 359:13, 359:16, 359:22, 359:25, 360:4, 360:8, 360:10, 360:13,

425

360:16, 360:17,
361:3, 361:16,
361:23, 362:2,
362:8, 362:18,
362:19, 362:21,
362:23, 363:17,
364:1, 364:7,
364:14, 364:18,
364:19, 364:20,
364:25, 365:9,
365:11, 365:18,
365:24, 366:2,
366:7, 366:9,
366:13, 366:14,
366:24, 367:8,
368:6, 368:14,
368:16, 369:4,
369:7, 369:22,
369:25, 370:3,
370:11, 370:16,
371:1, 371:4,
371:22, 371:24,
371:25, 372:5,
372:9, 372:12,
372:15, 372:19,
373:3, 373:19,
373:23, 374:4,
374:8, 374:10,
374:18, 375:4,
375:8, 375:12,
375:19, 376:2,
376:7, 376:10,
376:13, 376:17,
376:18, 376:21,
376:22, 376:25,
377:3, 377:7,
377:11, 377:17,
377:20, 378:8,
378:14, 378:22,
378:25, 379:5,
379:7, 379:8,
379:25, 380:6,
380:11, 380:23,
381:6, 381:10,
381:12, 381:14,
381:15, 381:19,
382:10, 382:18,
382:22, 383:2,
383:3, 383:10,
384:4, 384:10,
387:12, 387:15,
387:20, 388:6,
388:9, 388:12,
388:19, 389:1,
389:6, 389:18,
389:21, 390:2,
390:4, 391:2, 391:5,
395:8, 397:22,
397:25, 399:22,
400:1, 400:2, 400:4,
401:10, 401:14,

402:3, 402:5, 402:7,
402:11, 406:6,
406:8, 407:7,
407:14, 408:5,
408:19, 408:22,
409:3, 409:6, 409:8,
409:9, 409:10
**MS** [4] - 304:24,
367:10, 367:18,
367:20
**MTA** [2] - 325:25,
341:21
**mundane** [1] - 332:22
**muscles** [1] - 281:10
**must** [2] - 403:6,
403:13
**muted** [1] - 280:25

## N

**nail** [5] - 282:10,
282:16, 282:22,
282:25, 283:23
**name** [9] - 315:17,
316:11, 318:22,
324:23, 334:13,
358:12, 358:13,
368:6, 392:18
**name's** [1] - 275:18
**names** [2] - 342:8,
367:1
**naming** [1] - 324:11
**national** [41] - 271:6,
297:11, 298:20,
299:8, 299:16,
301:23, 302:5,
302:16, 324:22,
325:12, 327:8,
328:19, 329:12,
329:15, 330:9,
330:11, 330:14,
330:22, 331:17,
334:16, 335:2,
335:11, 336:21,
337:7, 337:11,
339:16, 340:18,
347:1, 347:9,
353:23, 354:6,
354:9, 354:10,
354:13, 354:18,
354:20, 355:4,
355:7, 357:13,
386:9, 386:10
**nationally** [1] - 327:3
**nature** [2] - 320:11,
345:24
**nausea** [1] - 366:18
**NCA** [1] - 271:3
**NCAI** [2] - 271:4, 271:5
**near** [1] - 400:9

nearly [1] - 265:25
**necessary** [3] -
243:14, 304:18,
314:15
**neck** [3] - 281:12,
283:6, 283:23
**need** [13] - 281:1,
282:19, 295:12,
297:7, 315:13,
316:21, 351:1,
351:4, 351:6,
365:22, 374:16,
380:11
**needed** [3] - 241:16,
270:13, 391:25
**needs** [4] - 270:7,
351:8, 391:24, 401:7
**negligence** [2] -
385:10, 385:16
**Nelson** [1] - 320:4
**never** [17] - 238:6,
238:8, 238:22,
240:6, 240:18,
241:10, 253:13,
262:22, 296:19,
296:23, 298:4,
300:4, 319:12,
356:12, 375:20,
395:21, 404:13
**new** [2] - 311:16,
327:15
**New** [35] - 315:18,
320:8, 320:9,
320:15, 321:2,
321:4, 321:11,
321:12, 321:19,
321:24, 325:25,
326:1, 327:13,
327:16, 328:4,
331:5, 334:7,
334:14, 334:16,
341:5, 341:21,
342:6, 342:7, 344:4,
344:18, 344:21,
355:17, 355:18,
355:19, 355:24,
358:2, 358:5
**newer** [2] - 404:2,
404:4
**news** [1] - 370:11
**next** [25] - 253:21,
262:17, 262:25,
275:7, 281:2, 295:1,
295:2, 295:3, 301:9,
301:10, 318:11,
342:18, 342:20,
364:5, 364:6,
364:10, 372:11,
372:12, 379:18,
386:5, 392:21,

394:11, 402:15
**NFL** [1] - 276:9
**nice** [7] - 234:16,
282:16, 288:7,
365:4, 369:10,
369:11, 398:1
**nicely** [2] - 285:20,
286:3
**night** [3] - 244:9,
397:14, 409:7
**Ninth** [3] - 244:12,
244:13, 245:5
**nobody** [7] - 262:9,
262:10, 265:1,
267:17, 270:1,
331:12, 352:13
**nobody's** [2] - 237:1,
328:1
**nondisclosure** [1] -
331:24
**none** [4] - 270:14,
346:12, 393:4
**nonresponsive** [1] -
259:23
**normal** [5] - 239:23,
278:20, 281:4,
282:11, 300:10
**normally** [1] - 253:19
**Northern** [2] - 276:23,
276:25
**notable** [1] - 384:19
**note** [1] - 314:13
**notebook** [1] - 335:16
**noted** [2] - 335:8,
373:12
**notes** [5] - 241:17,
277:7, 278:1, 279:1,
409:18
**nothing** [12] - 237:11,
243:8, 252:1,
254:14, 257:8,
270:15, 274:22,
299:8, 301:7, 304:4,
309:7, 333:3
**notice** [6] - 311:25,
368:13, 380:24,
381:8, 383:17,
383:19
**notifying** [1] - 398:11
**November** [6] -
292:19, 292:23,
293:1, 335:25,
336:1, 358:10
**nowhere** [1] - 258:3
**number** [9] - 235:3,
243:14, 246:10,
249:12, 249:14,
353:18, 359:17,
359:20, 371:11
**nursing** [1] - 237:15

**NW** [3] - 232:14,
232:24, 409:25
**NYU** [1] - 318:23

## O

**oath** [2] - 306:2,
310:16
**object** [6] - 236:8,
241:3, 296:15,
314:16, 335:5,
360:10
**objected** [1] - 295:17
**objection** [40] - 235:4,
235:16, 236:5,
237:3, 237:6, 238:6,
239:1, 239:2,
242:13, 246:11,
248:17, 249:22,
249:24, 277:15,
279:24, 314:13,
314:19, 323:1,
326:19, 326:22,
329:18, 332:7,
336:15, 337:14,
340:25, 341:23,
342:25, 347:7,
360:3, 361:3,
361:16, 361:23,
362:8, 365:25,
367:11, 370:8,
381:16, 401:10
**objections** [6] - 236:7,
295:11, 295:24,
323:7, 323:17, 335:8
**obligated** [1] - 311:18
**obligation** [3] -
311:10, 313:8,
400:22
**obligations** [1] - 308:8
**oblivion** [1] - 345:20
**observe** [1] - 280:16
**obvious** [1] - 284:2
**obviously** [8] - 235:15,
236:16, 257:18,
259:15, 284:1,
302:3, 302:9, 305:14
**occasionally** [1] -
266:11
**occasions** [2] -
239:12, 327:1
**occur** [1] - 281:11
**occurred** [1] - 281:17
**October** [6] - 271:15,
272:1, 272:5,
274:12, 279:3,
287:11
**OF** [3] - 232:1, 232:10,
409:14
**offer** [9] - 235:7,

426

235:8, 241:19,
301:2, 302:4,
317:12, 334:25,
346:13, 346:14
**offered** [14] - 240:19,
297:20, 298:19,
300:2, 301:4, 301:5,
302:2, 313:15,
314:15, 322:7,
376:14, 386:11,
387:2
**offering** [4] - 269:17,
296:19, 296:23,
297:1
**office** [6] - 238:19,
289:2, 289:5,
320:14, 321:9,
387:21
**officer** [1] - 358:5
**officers** [1] - 270:12
**Official** [1] - 232:23
**OFFICIAL** [1] - 409:14
**official** [3] - 346:15,
383:21, 409:24
**officious** [1] - 239:6
**often** [6] - 261:1,
266:6, 266:7,
393:11, 393:12,
398:20
**oil** [1] - 332:24
**old** [3] - 268:5, 318:9,
380:25
**older** [2] - 404:8, 407:1
**Olson** [1] - 268:8
**omitted** [1] - 374:14
**once** [9] - 234:11,
247:20, 250:19,
261:1, 360:22,
389:3, 393:22,
401:23, 405:9
**one** [77] - 236:25,
238:3, 238:22,
241:12, 244:4,
253:20, 259:1,
259:2, 259:13,
259:17, 262:5,
263:12, 264:16,
265:10, 265:14,
266:25, 267:17,
268:5, 271:19,
272:16, 276:8,
278:8, 281:11,
283:13, 288:19,
288:24, 292:3,
295:18, 298:19,
303:25, 304:19,
307:13, 309:16,
310:20, 312:5,
312:8, 312:14,
312:15, 315:3,

322:13, 326:10,
334:20, 335:18,
338:1, 338:18,
338:19, 338:23,
342:15, 343:24,
347:13, 349:15,
353:21, 362:11,
365:16, 366:14,
367:1, 367:25,
368:15, 369:7,
373:10, 376:18,
389:7, 392:13,
399:9, 399:10,
401:1, 402:3,
403:23, 405:22,
406:1, 406:4, 406:11
**ones** [8] - 241:19,
269:15, 269:16,
323:8, 331:4, 346:3,
355:14, 357:1
**oneself** [1] - 259:1
**ongoing** [4] - 268:21,
270:21, 270:22,
286:1
**open** [18] - 244:8,
252:9, 252:12,
252:13, 259:21,
264:24, 265:7,
282:4, 337:11,
339:25, 345:20,
349:14, 385:13,
392:19, 392:20,
393:1, 405:23, 408:7
**opened** [7] - 251:21,
252:13, 261:21,
262:10, 349:22,
350:13, 362:9
**opening** [15] - 244:8,
251:20, 252:6,
254:10, 254:16,
255:6, 255:9,
261:15, 263:24,
349:11, 350:12,
359:23, 360:11,
393:4, 393:5
**opens** [1] - 252:4
**operate** [3] - 332:25,
352:12, 391:24
**operated** [2] - 287:6,
321:5
**operating** [21] - 329:6,
332:4, 332:17,
332:20, 333:10,
333:13, 333:22,
333:25, 334:6,
338:8, 338:24,
339:10, 340:17,
344:17, 345:4,
353:22, 354:5,
354:15, 394:23,

395:10, 396:5
**Operating** [2] - 338:6,
361:13
**operation** [5] - 330:13,
352:12, 352:13,
352:22, 392:14
**operational** [1] -
402:23
**operations** [1] -
327:16
**operative** [2] - 237:14,
241:17
**operatively** [1] - 287:5
**operator** [42] - 250:11,
250:15, 251:14,
253:24, 254:15,
261:2, 306:12,
322:6, 329:9,
333:15, 337:3,
337:7, 339:11,
347:1, 349:10,
350:11, 357:16,
366:3, 385:1,
390:12, 390:13,
390:17, 390:18,
390:19, 390:21,
391:6, 391:9,
391:12, 391:24,
392:8, 392:16,
393:7, 394:8,
395:15, 401:15,
403:19, 406:14,
406:22, 406:23
**operators** [5] - 395:10,
401:18, 402:22,
403:4, 403:24
**opinion** [17] - 286:5,
300:11, 301:3,
302:4, 332:8,
332:10, 336:21,
337:5, 337:12,
346:24, 347:6,
351:18, 352:8,
352:18, 352:20,
353:14, 374:8
**opinions** [10] - 277:8,
286:9, 286:10,
298:9, 300:3, 300:7,
334:20, 336:3,
336:8, 336:17
**opponent** [1] - 300:14
**opponent's** [1] -
382:20
**opportunity** [4] -
310:6, 313:11,
346:13, 361:4
**opposed** [4] - 239:3,
245:14, 248:22,
293:22
**opposing** [1] - 296:17

**opposite** [2] - 261:24,
263:2
**opposition** [2] -
342:12, 386:12
**Optima** [1] - 238:14
**option** [1] - 322:17
**optional** [1] - 403:7
**orally** [1] - 382:16
**Orange** [5] - 250:15,
348:22, 392:11,
397:16, 404:25
**order** [7] - 299:6,
317:22, 330:4,
334:23, 337:10,
382:6, 406:21
**orders** [1] - 299:7
**ordinarily** [2] - 343:11,
399:8
**Oregon** [1] - 326:2
**organization** [6] -
324:20, 325:12,
325:13, 333:4,
341:10, 346:11
**organizations** [3] -
269:5, 316:25,
324:18
**oriented** [1] - 325:10
**Orlando** [4] - 334:13,
341:15, 357:14,
358:24
**orthopedic** [8] -
274:19, 275:21,
276:3, 276:6, 276:9,
277:14, 277:18,
283:17
**Osteopenia** [1] -
278:19
**osteopenia** [7] -
267:22, 268:1,
278:13, 278:14,
278:18, 278:21,
290:17
**osteopenic** [3] -
267:23, 267:24,
290:13
**osteoporosis** [3] -
278:17, 278:19,
278:21
**otherwise** [6] - 265:5,
266:10, 270:25,
288:14, 311:13,
380:7
**ought** [2] - 312:20
**ourselves** [4] - 239:19,
239:25, 240:17,
240:22
**outcome** [1] - 288:6
**outdoor** [1] - 331:13
**outpatient** [3] -
268:24, 268:25,

273:3
**outset** [1] - 239:4
**outside** [21] - 234:18,
247:14, 260:19,
282:14, 286:21,
301:13, 302:9,
309:17, 314:6,
322:24, 343:5,
369:10, 370:7,
372:18, 384:9,
399:14, 399:18,
399:20, 400:12,
400:14, 401:3
**overall** [2] - 298:12,
298:13
**overhead** [7] - 253:2,
253:4, 253:6,
265:10, 265:12,
349:25, 362:25
**overruled** [8] - 235:4,
248:19, 280:1,
337:15, 347:8,
360:15, 362:10,
401:13
**overshooting** [1] -
345:24
**overshot** [2] - 342:16,
342:17
**overtime** [1] - 332:22
**own** [12] - 235:21,
316:8, 321:6,
342:10, 345:6,
350:24, 351:4,
351:9, 401:18,
406:14, 406:16,
406:17
**owns** [1] - 321:7

## P

**p.m** [1] - 409:12
**PA** [2] - 399:21, 402:22
**paces** [1] - 240:15
**Page** [18] - 249:4,
249:6, 256:1, 256:7,
304:6, 304:17,
305:17, 309:5,
309:18, 336:13,
339:2, 341:6, 352:4,
375:22, 376:2, 403:2
**page** [1] - 304:4
**PAGE** [1] - 233:3
**pages** [12] - 237:1,
238:12, 241:13,
305:9, 305:12,
305:22, 307:19,
316:19, 317:12,
373:11, 381:14
**Pages** [1] - 309:8
**paid** [1] - 346:12

**pain** [7] - 274:8, 286:1, 289:25, 290:21, 290:25, 291:2, 291:4
**pandemic** [5] - 269:3, 269:22, 270:1, 270:21, 271:4
**papers** [1] - 317:4
**paragraph** [1] - 336:14
**paralegal** [2] - 238:18, 242:8
**paranoid** [1] - 239:14
**pardon** [7] - 253:3, 329:1, 336:6, 342:2, 359:5, 361:6, 363:7
**parking** [2] - 271:20, 271:21
**part** [25] - 259:13, 282:15, 293:25, 297:12, 297:20, 297:24, 298:1, 305:12, 305:13, 307:9, 309:10, 318:15, 318:23, 330:24, 333:12, 333:18, 338:5, 354:12, 357:3, 366:22, 375:16, 378:5, 382:8, 395:9
**Part** [3] - 292:15, 296:22
**partial** [2] - 386:25, 387:6
**participating** [1] - 269:14
**particular** [17] - 282:8, 282:18, 283:3, 330:19, 333:8, 335:1, 335:10, 337:20, 345:15, 348:4, 357:3, 385:24, 386:4, 387:5, 395:22, 395:23, 397:2
**particularly** [4] - 266:24, 270:11, 285:20, 384:19
**parties** [2] - 371:11, 383:18
**partition** [1] - 253:20
**party** [3] - 308:14, 354:10, 372:2
**pass** [1] - 381:17
**passed** [2] - 235:5, 325:6
**passenger** [5] - 262:14, 328:20, 349:17, 351:8, 372:14
**passengers** [18] - 257:25, 328:20,

329:12, 333:15, 336:25, 337:9, 337:17, 338:3, 347:10, 350:23, 351:12, 360:23, 361:1, 361:21, 362:5, 401:22, 403:14, 405:8
**past** [2] - 273:16, 350:7
**patch** [1] - 266:14
**patience** [1] - 383:14
**patient** [2] - 289:25, 293:9
**PATRICK** [1] - 232:13
**Patrick** [1] - 234:8
**Pause** [8] - 255:24, 291:20, 313:14, 347:15, 359:9, 387:19, 388:11, 402:4
**pavement** [1] - 266:3
**pay** [1] - 242:16
**pedestrian** [3] - 325:5, 325:7, 325:10
**people** [41] - 236:18, 258:2, 261:22, 261:23, 262:7, 290:1, 290:2, 308:25, 319:3, 320:12, 334:10, 337:19, 339:23, 340:10, 340:12, 340:15, 341:19, 342:3, 342:8, 342:23, 343:18, 343:21, 344:10, 345:2, 345:20, 346:2, 346:3, 355:2, 365:13, 365:20, 368:2, 399:14, 399:18, 400:12, 400:16, 400:22, 401:22, 405:20, 405:22, 406:21
**per** [3] - 395:14, 396:18, 404:18
**percent** [1] - 300:3
**percipient** [1] - 284:22
**performed** [2] - 272:7, 283:16
**performing** [1] - 402:23
**perhaps** [2] - 267:23, 407:20
**period** [5] - 256:11, 276:20, 278:21, 321:18, 324:6
**permanent** [1] - 286:7
**permission** [2] -

338:13, 394:9
**permit** [1] - 236:8
**permitted** [2] - 277:17, 302:19
**permitting** [1] - 244:16
**perpetual** [1] - 319:22
**person** [17] - 236:2, 242:5, 271:9, 322:2, 325:23, 337:25, 338:1, 340:8, 344:3, 352:25, 358:12, 358:13, 358:15, 358:16, 358:17, 378:25, 396:14
**person's** [1] - 358:18
**personal** [3] - 342:10, 342:21, 391:24
**personally** [1] - 337:25
**personnel** [1] - 333:1
**perspective** [1] - 288:5
**pertains** [1] - 299:17
**Ph.D** [2] - 233:8, 315:9
**PhD** [3] - 318:20, 318:23, 322:8
**Philadelphia** [6] - 328:3, 331:7, 334:7, 355:13, 355:19, 356:4
**phone** [3] - 236:11, 383:8, 396:14
**phones** [6] - 247:12, 322:21, 343:3, 370:5, 372:15, 384:7
**physical** [6] - 272:22, 273:2, 287:17, 287:22, 351:4, 351:9
**physically** [3] - 404:9, 404:10, 406:14
**physician** [3] - 276:11, 277:19, 285:3
**pick** [2] - 283:13, 333:6
**picture** [1] - 284:8
**piece** [2] - 283:15, 309:20
**pieces** [1] - 282:4
**pitch** [1] - 266:15
**place** [12] - 238:13, 258:17, 262:23, 283:23, 310:7, 321:6, 328:11, 328:12, 329:11, 337:10, 340:4
**placed** [1] - 288:9
**placement** [1] - 293:7
**places** [3] - 247:17, 281:11, 316:23
**Plaintiff** [2] - 232:4,

232:13
**plaintiff** [13] - 242:9, 277:4, 303:24, 309:19, 367:23, 367:25, 371:16, 371:25, 373:15, 377:12, 380:18, 384:5, 384:6
**plaintiff's** [10] - 234:5, 240:20, 244:24, 291:24, 291:25, 303:17, 367:5, 372:12, 376:5, 381:21
**Plaintiff's** [13] - 234:22, 247:1, 248:24, 250:2, 279:23, 281:20, 282:24, 283:20, 316:14, 317:13, 338:15, 339:1, 340:24
**plaintiffs** [2] - 239:8, 366:7, 384:13
**plan** [1] - 364:16
**planning** [8] - 262:5, 318:21, 318:24, 318:25, 320:19, 379:9, 407:19
**plans** [1] - 388:14
**platform** [16] - 254:22, 255:1, 360:23, 361:22, 362:7, 363:11, 363:13, 392:18, 392:25, 393:4, 401:8, 401:24, 403:10, 403:15, 405:2, 405:10
**platformed** [1] - 345:19
**platforms** [3] - 349:1, 397:16, 397:18
**play** [14] - 242:22, 304:3, 307:15, 307:16, 307:21, 311:6, 312:5, 312:9, 313:10, 364:7, 370:23, 372:4, 382:22, 386:11
**played** [6] - 365:2, 369:15, 371:12, 372:8, 380:2, 399:19
**player** [1] - 276:17
**playing** [6] - 312:14, 371:10, 371:17, 375:10, 375:12, 379:2
**pleased** [1] - 272:6
**pleasure** [2] - 323:19,

347:25
**PLLC** [1] - 232:14
**plot** [1] - 266:15
**podium** [1] - 234:6
**Point** [1] - 320:10
**point** [40] - 240:6, 244:7, 262:9, 262:11, 264:17, 264:22, 266:8, 268:21, 269:3, 269:12, 274:7, 274:22, 277:3, 278:4, 278:23, 282:21, 283:4, 283:8, 293:16, 296:24, 298:3, 300:1, 307:20, 310:17, 311:22, 315:2, 317:11, 340:23, 350:7, 365:4, 373:14, 376:18, 378:12, 378:16, 384:4, 388:23, 400:15, 406:9
**pointed** [5] - 304:23, 305:4, 312:23, 334:8, 341:12
**points** [2] - 282:9, 383:9
**pole** [24] - 252:22, 252:24, 253:7, 253:9, 253:12, 253:14, 263:6, 263:17, 263:18, 263:22, 264:1, 264:7, 264:10, 264:12, 264:14, 264:21, 265:10, 265:16, 266:6, 340:13, 349:25, 350:2, 350:3, 363:2
**poles** [4] - 253:2, 253:4, 253:15, 263:20
**policies** [1] - 344:4
**policy** [6] - 358:5, 358:22, 397:8, 397:9, 397:12, 404:18
**policy-setting** [2] - 358:5, 358:22
**polish** [1] - 408:13
**Polytech** [2] - 318:21, 318:22
**portable** [1] - 280:4
**Porter** [1] - 299:3
**portion** [12] - 297:22, 303:23, 304:22, 305:8, 305:10,

428

306:23, 311:6,
313:3, 372:21,
373:1, 375:18,
379:11
**portions** [2] - 331:14,
370:20
**posed** [1] - 335:11
**position** [11] - 240:22,
241:2, 263:9,
280:13, 298:16,
304:15, 305:18,
305:19, 333:16,
376:3, 376:6
**positioned** [1] - 263:8
**possess** [1] - 308:16
**possibility** [2] -
250:17, 259:8
**possible** [5] - 251:13,
262:24, 287:19,
288:23, 288:24,
362:4
**possibly** [3] - 288:8,
288:11, 373:25
**post** [1] - 287:4
**potential** [3] - 284:21,
296:4, 296:11
**practical** [1] - 319:21
**practice** [6] - 239:23,
242:7, 276:14,
276:19, 276:25,
404:24
**practices** [1] - 276:18
**practicing** [1] - 276:3
**precautions** [1] -
259:4
**precipitously** [1] -
242:12
**precise** [5] - 248:16,
248:18, 248:22,
249:7, 249:12
**prefer** [3] - 296:8,
329:23, 367:4
**pregan@reganfirm.
com** [1] - 232:16
**prejudice** [2] - 244:20,
368:9
**prejudicial** [1] - 308:4
**preliminary** [2] -
244:4, 295:18
**premise** [1] - 337:21
**preparation** [1] - 358:9
**prepare** [1] - 292:5
**prepared** [22] - 236:2,
236:18, 242:5,
242:9, 248:20,
277:10, 279:11,
292:12, 299:24,
311:21, 311:23,
312:7, 312:25,
336:5, 336:7,

337:20, 340:15,
340:16, 380:15,
380:18, 408:21
**prescribed** [1] - 291:4
**prescribing** [1] - 291:2
**presence** [5] - 296:12,
296:13, 301:13,
302:10, 314:6
**presentations** [2] -
269:14, 325:2
**presented** [2] - 308:3,
364:11
**presently** [1] - 388:1
**preserve** [1] - 383:9
**preserved** [1] - 382:17
**president** [1] - 325:12
**presume** [2] - 287:6,
293:8
**presuming** [1] - 277:6
**pretrial** [9] - 236:6,
236:16, 237:4,
239:7, 295:24,
304:16, 305:2,
305:7, 367:17
**pretty** [7] - 267:25,
268:23, 304:14,
338:17, 344:20,
398:19, 408:11
**prevailing** [1] - 398:25
**previously** [13] -
239:15, 251:5,
279:24, 305:2,
313:15, 314:16,
316:13, 323:8,
335:5, 335:20,
341:1, 384:25,
386:14
**prima** [1] - 384:13
**primary** [2] - 274:17,
384:14
**private** [3] - 276:14,
276:18, 276:25
**problem** [14] - 240:8,
274:1, 278:1, 278:2,
296:11, 311:3,
317:14, 345:15,
345:16, 345:17,
345:18, 345:21,
379:11, 382:10
**problematic** [1] -
305:7
**problems** [3] - 286:4,
286:6, 304:1
**procedural** [1] -
382:12
**procedure** [7] -
333:22, 338:8,
339:10, 345:4,
395:10, 402:18,
402:21

**Procedure** [3] - 338:6,
361:13, 384:12
**procedures** [16] -
285:5, 329:7, 332:4,
332:17, 332:21,
333:10, 333:13,
333:25, 334:6,
338:24, 344:17,
353:23, 354:5,
354:15, 392:14,
402:24
**proceed** [3] - 260:21,
379:17, 379:22
**proceedings** [1] -
409:19
**process** [4] - 322:7,
388:20, 392:12,
392:15
**produce** [2] - 311:11,
313:16
**produced** [2] - 238:3,
241:14
**professional** [3] -
324:10, 324:12,
355:2
**professionals** [1] -
346:11
**professor** [3] - 317:8,
322:9, 322:11
**proffered** [2] - 300:11,
300:18
**proffering** [1] - 297:1
**program** [5] - 318:5,
318:12, 318:13,
318:14, 318:16
**programmed** [1] -
403:17
**programs** [1] - 325:15
**progress** [1] - 272:6
**projects** [2] - 320:25,
327:20
**promise** [2] - 356:18,
359:14
**promoted** [2] - 357:17,
357:18
**proof** [4] - 240:21,
244:23, 245:1, 245:4
**prop** [1] - 262:25
**proper** [12] - 242:23,
259:2, 259:4, 293:7,
297:4, 298:19,
299:14, 300:25,
329:10, 329:11,
373:5, 376:6
**properly** [5] - 288:9,
315:14, 392:19,
392:22, 394:10
**properties** [1] - 269:7
**property** [1] - 321:6,
321:7, 321:8, 321:9

**propose** [1] - 387:21
**proposed** [2] - 388:21,
408:14
**proprietary** [3] -
356:9, 356:22, 357:9
**prosecution** [1] -
244:17
**protect** [2] - 337:25,
338:1
**prove** [1] - 240:20
**provide** [7] - 313:24,
335:3, 337:8,
337:24, 372:1,
400:22, 402:21
**provided** [5] - 240:11,
240:12, 248:15,
333:15, 334:17
**provider** [1] - 249:3
**providers** [2] - 242:16,
248:5
**providing** [1] - 328:19
**proximal** [1] - 293:11
**PT** [3] - 268:24,
268:25, 273:3
**Public** [3] - 333:5,
345:6, 346:15
**public** [12] - 302:1,
317:1, 350:23,
351:10, 351:18,
351:19, 351:20,
352:19, 352:21,
353:2, 353:6, 360:20
**Publication** [1] -
345:13
**publications** [1] -
325:1
**published** [2] - 346:5,
383:21
**Puerto** [1] - 328:2
**pull** [2] - 259:19, 391:2
**pulling** [1] - 256:16
**purpose** [5] - 259:12,
293:6, 355:11,
374:7, 402:21
**purposes** [7] - 279:23,
281:19, 294:2,
330:1, 381:23,
382:8, 383:1
**purse** [2] - 264:18,
350:20
**pursuant** [6] - 279:21,
367:13, 373:7,
379:12, 384:11
**pursue** [1] - 318:20
**push** [2] - 398:10,
404:2
**pushed** [1] - 264:4
**put** [29] - 238:18,
240:15, 241:15,
241:23, 243:1,

262:23, 280:23,
281:23, 282:4,
282:22, 283:5,
283:14, 291:5,
293:22, 303:24,
313:11, 316:22,
317:3, 321:17,
324:23, 338:14,
359:18, 362:16,
366:19, 366:20,
366:22, 366:23,
382:5, 402:5
**puts** [3] - 307:14,
312:15, 313:4
**putting** [1] - 238:8

**Q**

**Qatar** [1] - 328:10
**qualification** [1] -
300:13
**qualifications** [2] -
298:13, 323:2
**qualified** [12] - 285:4,
297:10, 300:25,
301:2, 301:25,
302:8, 302:13,
302:22, 303:4,
307:21, 323:3,
332:11
**qualify** [7] - 297:6,
301:24, 314:19,
329:19, 329:24,
330:1, 335:8
**questions** [25] - 242:1,
246:5, 246:23,
249:18, 274:24,
275:1, 286:14,
294:13, 297:13,
305:5, 305:7,
308:23, 312:8,
347:16, 353:19,
359:10, 359:14,
359:17, 362:18,
367:22, 374:12,
397:23, 398:5,
402:14, 406:7
**quick** [2] - 246:23,
398:3
**quicker** [1] - 323:23
**quickly** [3] - 252:14,
261:8, 370:17
**quite** [3] - 321:1,
342:12, 378:17
**quote** [1] - 278:14

**R**

**R-140** [1] - 327:14
**radically** [1] - 260:11
**radiographic** [1] -

293:12
**radiographically** [1] -
285:19
**radiographs** [1] -
294:11
**rail** [6] - 299:18,
391:11, 391:18,
391:19, 392:16,
395:10
**Rail** [1] - 328:9
**railroad** [1] - 319:24
**railroads** [1] - 346:4
**rails** [3] - 253:6, 260:6,
362:24
**raise** [5] - 275:12,
296:10, 315:7,
386:24, 390:1
**raised** [6] - 279:25,
295:25, 299:15,
323:11, 386:15
**raises** [1] - 386:2
**RAJKUMA** [1] - 233:11
**Rajkumar** [1] - 365:1
**ramp** [1] - 362:15
**rang** [1] - 396:14
**range** [1] - 270:8
**RAO** [1] - 233:11
**Rao** [9] - 241:17,
271:7, 272:4,
274:12, 287:4,
290:20, 364:8,
365:2, 369:15
**Rao's** [6] - 287:8,
287:10, 287:16,
369:12, 369:16,
369:21
**rap** [1] - 344:23
**rate** [1] - 299:13
**rates** [5] - 296:23,
297:6, 297:18,
297:20, 298:5
**rather** [5] - 248:13,
290:19, 295:12,
317:11, 385:19
**ray** [8] - 237:15,
281:15, 282:6,
283:5, 283:24,
285:24, 292:22,
293:1
**rays** [2] - 292:18,
292:19
**RDR** [3] - 232:22,
409:16, 409:23
**re** [1] - 246:13
**re-question** [1] -
246:13
**reach** [2] - 253:7,
264:14
**reached** [5] - 239:11,
252:21, 252:23,

253:9, 264:7
**reaching** [2] - 253:10,
264:12
**read** [20] - 249:11,
292:16, 304:13,
307:3, 336:13,
336:16, 348:5,
348:8, 348:14,
348:17, 354:19,
361:14, 371:5,
372:20, 375:23,
377:4, 378:5,
378:12, 381:4,
381:18
**reading** [6] - 349:4,
373:14, 374:6,
374:7, 376:4, 377:1
**readouts** [3] - 394:3,
406:18
**reads** [3] - 311:1,
377:10, 377:18
**ready** [10] - 245:17,
245:18, 246:3,
262:2, 294:24,
314:2, 314:5,
314:25, 369:2,
374:25
**real** [1] - 315:25
**realize** [3] - 284:15,
284:18, 405:23
**realized** [1] - 370:18
**really** [11] - 243:5,
263:20, 271:21,
278:2, 282:9,
285:24, 319:3,
319:20, 320:1,
382:23, 398:20
**ream** [1] - 282:15
**reamers** [1] - 282:15
**reason** [7] - 237:25,
317:7, 339:21,
386:21, 398:19,
398:24, 398:25
**reasonable** [6] -
277:9, 286:5,
286:11, 337:5,
346:24, 384:21
**reasonably** [1] -
360:20
**reasons** [6] - 268:5,
314:16, 335:5,
386:7, 386:18,
393:13, 393:18,
406:4
**Rebecca** [1] - 365:18
**rebut** [1] - 376:14
**rebuttal** [3] - 244:25,
408:17, 408:18
**receive** [4] - 242:16,
248:4, 318:7, 405:8

**received** [9] - 247:6,
247:7, 247:16,
300:4, 317:1,
318:10, 318:11,
328:10, 333:18
**receiving** [1] - 248:3
**recent** [1] - 320:19
**reception** [1] - 323:8
**Recess** [3] - 301:17,
377:22, 389:8
**recess** [1] - 368:19
**recite** [1] - 254:4
**recognized** [1] -
234:25
**recollection** [8] -
248:16, 248:21,
249:12, 395:13,
397:5, 397:7,
397:11, 397:17
**recommended** [1] -
338:12
**reconsideration** [1] -
296:18
**reconstructionist** [1] -
301:4
**record** [18] - 234:2,
234:6, 234:20,
239:15, 241:15,
243:9, 245:12,
302:11, 307:11,
307:13, 308:22,
308:24, 314:8,
330:1, 372:21,
373:16, 384:16,
394:24
**recording** [3] - 303:25,
304:3
**records** [25] - 236:11,
236:15, 236:17,
236:23, 236:25,
237:2, 237:10,
237:11, 237:15,
239:2, 239:3, 239:9,
239:13, 239:17,
240:3, 240:23,
241:12, 241:16,
279:4, 287:8,
328:17, 387:2
**recross** [1] - 362:20
**RECROSS** [1] - 362:22
**recruited** [4] - 319:14,
320:4, 320:15,
320:20
**red** [12] - 393:15,
393:19, 393:21,
393:22, 393:24,
394:6, 402:9,
402:13, 402:14,
403:3, 406:12
**redacted** [2] - 238:9,

238:13
**redirect** [5] - 294:15,
372:20, 374:1,
375:25, 406:8
**REDIRECT** [1] -
359:15
**redrawing** [1] - 245:14
**reduction** [1] - 282:3
**refer** [3] - 303:19,
305:5, 336:17
**reference** [1] - 245:3
**referenced** [1] -
308:20
**referring** [2] - 307:22,
310:2
**refresh** [5] - 242:20,
247:19, 248:16,
248:21, 249:12
**refreshed** [3] - 247:21,
394:21, 395:12
**refreshing** [1] - 243:14
**regain** [1] - 287:19
**REGAN** [204] - 232:13,
232:13, 232:14,
234:7, 235:7, 235:9,
235:11, 235:14,
235:25, 236:24,
237:8, 237:14,
237:17, 237:19,
237:22, 237:24,
238:2, 238:6,
238:12, 238:16,
238:21, 238:24,
241:6, 242:1,
242:18, 242:25,
243:10, 243:12,
243:15, 243:18,
243:22, 245:18,
245:20, 246:16,
246:20, 248:2,
248:13, 249:17,
249:20, 260:17,
260:20, 275:1,
275:7, 275:15,
277:13, 277:20,
277:22, 279:21,
280:2, 280:6, 280:8,
280:12, 280:20,
284:15, 284:18,
285:6, 285:8,
286:13, 294:15,
295:3, 295:7,
295:14, 296:15,
296:21, 298:17,
298:25, 300:1,
300:9, 300:20,
300:24, 301:10,
301:16, 303:8,
303:11, 303:16,
303:23, 304:9,

304:11, 304:13,
304:20, 304:22,
305:1, 305:4, 308:6,
309:4, 310:12,
310:25, 311:5,
311:17, 313:13,
313:15, 313:22,
314:3, 315:2,
315:11, 316:15,
317:11, 317:17,
317:20, 323:19,
323:22, 326:23,
329:21, 330:3,
330:7, 332:12,
334:24, 335:14,
335:15, 335:21,
336:19, 338:13,
338:18, 339:1,
340:23, 343:24,
344:6, 344:8,
347:13, 347:16,
359:13, 359:16,
359:22, 359:25,
360:4, 360:8,
360:13, 360:16,
360:17, 362:2,
362:18, 364:1,
364:7, 364:14,
364:18, 364:20,
365:9, 365:11,
365:18, 366:9,
366:13, 366:24,
367:8, 368:6,
368:14, 368:16,
369:7, 369:22,
369:25, 370:3,
370:16, 371:1,
371:4, 371:25,
372:5, 372:9,
372:12, 373:3,
373:23, 374:10,
374:18, 375:12,
375:19, 376:2,
376:7, 376:10,
376:13, 376:17,
376:21, 377:7,
377:11, 377:17,
377:20, 378:8,
378:14, 378:22,
378:25, 379:8,
379:25, 380:6,
380:11, 380:23,
381:6, 381:10,
381:14, 381:19,
383:2, 384:4,
388:12, 397:25,
400:2, 400:4,
401:14, 402:3,
402:5, 402:7,
402:11, 406:6,
408:19, 408:22,

409:3, 409:6, 409:8, 409:10
**Regan** [34] - 234:8, 234:22, 235:5, 235:23, 239:2, 244:11, 246:5, 246:6, 246:8, 246:13, 249:8, 260:18, 295:23, 296:14, 297:7, 298:15, 302:3, 302:25, 306:8, 307:21, 308:5, 312:23, 313:18, 315:1, 323:1, 323:14, 335:11, 359:12, 365:17, 368:5, 373:21, 379:24, 380:5
**Regan's** [1] - 312:19
**Regan**)......................
............**246** [1] - 233:4
**Regan**)......................
............**275** [1] - 233:6
**Regan**)......................
............**315** [1] - 233:8
**Regan**)......................
............**359** [1] - 233:9
**Regan**)......................
............**397** [1] - 233:15
**regard** [27] - 240:7, 240:24, 244:8, 269:16, 269:20, 279:25, 289:8, 295:24, 295:25, 297:17, 297:21, 348:18, 352:19, 370:14, 385:6, 385:17, 385:18, 385:19, 385:20, 385:21, 385:23, 385:24, 386:3, 386:18, 386:25, 387:4, 387:5
**regarding** [3] - 335:11, 386:9, 402:24
**regularly** [1] - 396:5
**rehab** [2] - 248:5, 278:12
**rehabilitate** [2] - 299:25, 374:9
**reiterating** [1] - 235:16
**relate** [1] - 236:20
**related** [4] - 244:14, 321:8, 335:12, 357:1
**relates** [2] - 386:5, 392:13
**relationship** [1] - 322:2

**relatively** [1] - 371:19
**relayed** [1] - 378:19
**released** [1] - 313:18
**relevant** [11] - 247:16, 268:15, 299:12, 299:13, 301:3, 302:14, 311:24, 335:12, 375:16, 375:18
**relied** [3] - 343:16, 343:17, 343:20
**relieve** [1] - 289:14
**rely** [4] - 310:16, 343:6, 343:9, 344:16
**remain** [2] - 275:11, 315:6
**remainder** [1] - 379:19
**remediate** [2] - 337:23, 337:24
**remember** [25] - 248:8, 248:9, 253:22, 258:22, 267:18, 272:3, 273:16, 274:4, 278:8, 287:7, 287:18, 291:2, 328:23, 337:18, 344:11, 346:1, 350:2, 352:7, 358:9, 358:13, 395:24, 396:1, 396:3, 396:17
**remembering** [1] - 329:1
**remembers** [1] - 386:10
**remind** [1] - 367:17
**remodeling** [2] - 293:12, 293:14
**remove** [3] - 238:10, 238:13, 304:1
**rendered** [1] - 277:10
**renew** [7] - 245:9, 249:20, 249:22, 249:24, 367:10, 382:25, 387:10
**reopen** [4] - 366:21, 367:5, 381:21, 382:1
**rep** [4] - 334:16, 358:20, 358:21
**repeat** [1] - 395:2
**repeatedly** [1] - 298:8
**repetitive** [1] - 330:10
**rephrase** [1] - 362:4
**report** [37] - 301:21, 305:12, 305:22, 306:5, 307:3, 307:4, 307:8, 307:10, 307:23, 308:19, 308:21, 309:8, 309:10, 310:2, 310:3, 311:9,

312:10, 312:19, 312:22, 313:3, 329:2, 329:4, 329:5, 335:24, 336:2, 336:14, 336:17, 336:18, 341:6, 348:8, 348:10, 348:11, 372:21, 373:22, 376:5, 394:22, 395:14
**reported** [1] - 366:16
**Reporter** [2] - 232:22, 232:23, 409:24
**REPORTER** [2] - 332:18, 409:14
**reports** [3] - 237:15, 307:24
**reposition** [6] - 250:16, 261:3, 329:10, 393:9, 394:5, 403:9
**repositioned** [18] - 253:10, 254:18, 257:3, 257:11, 260:25, 264:11, 264:15, 349:5, 350:14, 363:6, 363:9, 363:13, 399:14, 401:8, 403:14, 405:2, 405:9, 406:21
**repositioning** [10] - 251:6, 251:15, 301:22, 338:9, 339:6, 339:11, 349:2, 393:14, 396:2, 397:2
**repositions** [1] - 255:15
**represent** [1] - 320:10
**representations** [1] - 305:15
**representative** [7] - 303:21, 310:17, 341:18, 357:19, 358:4, 371:13, 372:10
**representatives** [1] - 308:15
**reps** [1] - 346:4
**request** [4] - 279:10, 372:1, 394:9, 399:22
**requested** [2] - 370:21, 371:5
**requests** [1] - 240:24
**require** [4] - 282:2, 337:12, 339:10, 393:14
**required** [10] - 244:24, 269:24, 269:25,

311:16, 312:18, 312:21, 327:7, 329:12, 337:16, 406:11
**requirements** [1] - 322:13
**requires** [7] - 281:18, 282:8, 335:2, 336:22, 337:7, 338:9, 401:21
**requisite** [1] - 308:25
**res** [1] - 270:15
**research** [6] - 316:24, 322:16, 330:21, 339:17, 365:5, 407:23
**resented** [1] - 325:9
**reservations** [1] - 269:7
**reserve** [3] - 367:16, 382:16, 387:9
**reserved** [2] - 235:13, 241:24
**resolve** [4] - 237:4, 295:12, 374:23, 407:25
**resources** [1] - 269:17
**respect** [11] - 286:24, 288:17, 314:10, 327:9, 327:10, 333:13, 334:5, 335:1, 336:22, 361:13, 392:24
**respectfully** [1] - 310:25
**respond** [4] - 235:23, 244:12, 299:24, 312:3
**responding** [1] - 391:20
**response** [4] - 239:18, 312:17, 375:20, 386:16
**responsibilities** [3] - 351:12, 351:13, 352:19
**responsible** [10] - 276:16, 351:20, 351:24, 352:14, 352:23, 352:25, 353:1, 353:3, 353:7, 353:9
**rest** [11] - 253:16, 265:9, 366:11, 366:25, 367:2, 378:13, 380:10, 380:15, 380:19, 384:2
**rested** [1] - 384:6
**resting** [1] - 380:8

**restrictions** [2] - 272:25, 273:1
**rests** [3] - 383:6, 383:7, 384:5
**result** [3] - 243:16, 247:6, 330:23
**resulted** [1] - 347:3
**resulting** [1] - 244:19
**results** [1] - 290:9
**resume** [5] - 246:3, 284:13, 287:22, 322:20, 324:2
**Resumed** [2] - 233:4, 246:18
**retain** [1] - 326:5
**retained** [1] - 327:1
**retire** [1] - 374:24
**retired** [6] - 322:10, 356:13, 357:21, 357:23, 359:4, 359:6
**return** [2] - 272:22, 287:22
**review** [10] - 239:20, 279:10, 292:8, 328:21, 331:23, 338:5, 346:7, 346:13, 346:14, 388:22
**reviewed** [4] - 279:16, 311:23, 329:3, 329:4
**rewind** [1] - 391:8
**Rico** [1] - 328:3
**rid** [1] - 320:20
**ride** [1] - 348:25
**rider** [2] - 257:20, 261:9
**riding** [2] - 250:14, 258:24
**rigid** [2] - 293:17, 293:21
**risk** [2] - 262:23, 384:18
**River** [1] - 320:9
**Robert** [2] - 320:12, 320:25
**Rockefeller** [1] - 320:5
**rod** [2] - 282:9, 282:25
**Rodding** [1] - 292:15
**rode** [3] - 251:2, 257:21, 342:12
**role** [2] - 358:19, 392:1
**Room** [2] - 232:23, 409:25
**room** [2] - 248:5, 374:24, 380:17
**rotation** [2] - 283:10, 283:14
**rotational** [1] - 283:24
**ROTC** [1] - 318:5
**roughly** [3] - 390:22,

391:6
**routine** [1] - 402:24
**row** [3] - 262:17, 262:24, 263:12
**rows** [1] - 263:14
**rule** [10] - 235:10, 235:11, 290:19, 306:15, 373:25, 374:5, 374:15, 378:4, 382:19, 382:21
**Rule** [8] - 235:18, 279:22, 370:4, 373:7, 382:14, 382:16, 383:5, 384:12
**ruled** [5] - 242:12, 299:10, 300:25, 378:21, 379:21
**rules** [4] - 302:15, 310:18, 311:10, 383:16
**Rules** [1] - 384:12
**ruling** [27] - 236:22, 245:6, 296:3, 296:17, 296:20, 296:21, 296:22, 296:25, 297:3, 297:16, 297:17, 297:21, 297:24, 298:22, 298:23, 299:4, 301:2, 301:15, 301:19, 301:24, 302:12, 305:7, 313:9, 314:14, 375:17, 379:12, 385:6
**run** [1] - 306:1
**rung** [1] - 261:21
**running** [1] - 393:23
**rush** [2] - 370:22, 399:2

**S**

**safe** [6] - 330:13, 334:4, 336:25, 344:2, 383:4, 384:21
**safely** [3] - 319:4, 319:5, 352:12
**safer** [1] - 334:3
**safety** [33] - 315:21, 315:23, 316:2, 316:3, 319:9, 323:3, 324:4, 324:5, 325:5, 325:7, 327:2, 327:7, 327:12, 328:20, 333:14, 333:25, 334:25, 335:3, 335:10, 337:18, 337:19, 338:3,

344:23, 345:7, 346:25, 347:2, 350:24, 352:9
**sample** [1] - 333:21
**San** [8] - 328:2, 331:10, 331:14, 344:4, 355:13, 355:19, 356:11, 356:12
**sandbag** [1] - 239:5
**sat** [3] - 265:4, 268:6, 364:12
**satisfied** [2] - 314:7, 314:14
**save** [2] - 322:5, 329:23
**saw** [25] - 262:6, 271:9, 272:2, 272:16, 273:12, 273:14, 273:21, 274:4, 277:25, 279:6, 284:23, 285:15, 285:16, 286:6, 286:24, 287:25, 288:4, 288:20, 289:4, 289:9, 289:11, 290:20, 290:24, 355:22
**scan** [6] - 267:13, 267:15, 267:19, 290:9, 290:12
**scene** [1] - 396:8
**schedule** [1] - 407:19
**scheduling** [1] - 366:14
**scholarly** [1] - 325:1
**School** [1] - 318:1
**school** [6] - 318:19, 319:20, 321:15, 322:18, 325:4
**schools** [2] - 316:24, 322:19
**scientific** [1] - 285:1
**scope** [3] - 296:1, 302:17, 361:3
**SCOTT** [3] - 232:3, 233:4, 246:18
**Scott** [38] - 234:3, 234:8, 234:18, 236:3, 243:23, 245:22, 246:5, 246:8, 246:10, 246:14, 246:21, 247:25, 248:3, 250:7, 256:3, 268:16, 275:2, 277:4, 277:10, 277:24, 278:24, 285:9, 285:11,

286:24, 290:6, 290:20, 325:24, 329:1, 349:8, 350:8, 361:19, 383:23, 384:22, 385:10, 394:20, 396:12, 396:24, 404:17
**Scott's** [10] - 246:12, 256:2, 290:17, 292:14, 335:4, 347:3, 348:17, 359:18, 385:25, 396:15
**screaming** [1] - 251:22
**screen** [6] - 304:2, 338:15, 359:18, 369:6, 373:17, 377:10, 379:3, 402:8
**screw** [5] - 283:5, 283:12, 283:14, 283:23, 283:24
**scroll** [2] - 339:2, 339:3
**se** [1] - 396:18
**search** [2] - 334:9, 341:13
**seat** [13] - 254:6, 258:8, 259:18, 261:18, 263:25, 264:1, 264:4, 275:3, 295:6, 295:21, 349:20, 349:22, 389:12
**seated** [8] - 234:9, 245:25, 262:13, 262:16, 263:8, 349:17, 351:6
**seating** [2] - 253:21, 262:17
**seats** [12] - 261:24, 262:22, 262:25, 263:5, 263:12, 263:13, 263:15, 263:21, 340:10, 340:11, 340:12
**Seattle** [1] - 326:2
**second** [10] - 282:21, 283:4, 283:5, 338:18, 338:19, 343:3, 359:19, 369:7, 401:4, 401:6
**secondary** [1] - 345:23
**seconds** [1] - 251:18
**secret** [1] - 331:22
**secretary** [1] - 322:3
**Section** [1] - 336:13
**sections** [1] - 357:1
**secure** [2] - 283:7, 385:15

**Security** [2] - 331:25, 332:2
**see** [43] - 241:19, 247:21, 262:1, 265:7, 274:17, 276:22, 278:24, 279:8, 280:7, 280:14, 281:3, 283:2, 284:2, 284:3, 285:24, 290:9, 293:16, 293:23, 293:24, 294:11, 319:22, 325:10, 328:18, 335:17, 335:18, 338:23, 356:11, 356:20, 356:25, 357:6, 357:8, 360:2, 365:6, 382:20, 385:12, 388:1, 388:23, 388:25, 398:1, 407:23, 408:15, 409:5
**seeing** [6] - 271:7, 271:14, 272:1, 274:11, 293:15, 339:3
**seek** [2] - 234:23, 302:3
**seeking** [1] - 297:9
**sees** [1] - 244:18
**selected** [1] - 371:11
**self** [2] - 353:13
**self-imposed** [2] - 353:13
**Senate** [1] - 270:3, 270:18
**Send** [1] - 241:8
**send** [4] - 300:2, 300:6, 380:17, 408:14
**sends** [1] - 331:12
**senior** [1] - 354:3
**sense** [9] - 310:7, 325:8, 361:14, 361:16, 364:23, 364:24, 367:7, 388:14, 404:21
**sent** [5] - 241:10, 278:11, 342:6, 342:7, 346:10
**separate** [3] - 241:18, 241:21, 400:21
**SEPTA** [2] - 331:7, 356:4
**September** [10] - 261:17, 284:10, 292:15, 292:25, 335:4, 337:8, 347:3, 392:6, 394:19,

395:13
**sequential** [1] - 318:13
**series** [6] - 246:5, 404:2, 404:3, 404:4, 404:5, 407:1
**serious** [3] - 285:22, 291:4, 345:21
**seriously** [1] - 309:13
**serve** [1] - 326:8
**served** [1] - 276:9
**serves** [1] - 331:14
**service** [5] - 270:12, 292:11, 317:1, 331:14
**Services** [1] - 383:22
**set** [8] - 269:19, 280:2, 320:19, 333:5, 354:8, 388:21, 401:18, 401:19
**setting** [5] - 239:24, 354:10, 354:13, 358:5, 358:22
**seven** [3] - 251:17, 324:2, 375:14
**several** [10] - 251:11, 283:13, 294:8, 326:10, 349:1, 349:6, 355:10, 397:15, 399:4, 403:19
**severe** [2] - 278:19, 290:5
**sex** [1] - 382:3
**shall** [2] - 402:23, 403:4
**share** [1] - 277:10
**shared** [2] - 290:6, 343:22
**shifted** [1] - 245:4
**shish** [2] - 282:17, 283:10
**short** [20] - 250:16, 251:14, 291:7, 329:9, 349:1, 349:5, 365:12, 365:17, 369:23, 393:8, 393:14, 394:7, 395:1, 396:1, 397:2, 397:15, 397:18, 398:17, 398:25, 406:11
**shortage** [1] - 319:17
**shortens** [2] - 368:16, 368:17
**shot** [2] - 278:11, 379:7
**shoulder** [2] - 264:19, 350:21
**show** [8] - 282:23, 283:19, 293:6,

310:20, 311:21, 316:13, 335:19, 376:19
**showed** [1] - 234:22
**showing** [4] - 281:25, 293:12, 369:6, 378:13
**shown** [7] - 246:6, 280:14, 292:3, 373:16, 376:25, 377:6, 384:1
**shows** [6] - 281:24, 283:22, 284:9, 294:1, 294:2, 381:13
**shut** [3] - 269:10, 269:12
**sic** [1] - 346:9
**sick** [3] - 332:22, 382:2, 382:4
**side** [19] - 247:10, 254:17, 255:5, 259:20, 260:9, 262:18, 262:20, 263:5, 274:9, 283:9, 320:22, 326:6, 349:11, 349:14, 355:2, 392:18
**sides** [3] - 320:8, 326:3, 349:15
**sign** [1] - 331:24
**signal** [8] - 393:15, 393:20, 393:21, 393:22, 393:23, 393:24, 394:6, 406:12
**signaling** [2] - 251:19, 252:5
**significance** [1] - 372:2
**significant** [4] - 281:17, 281:21, 285:22, 293:10
**signs** [1] - 293:12
**silly** [2] - 238:10, 259:18
**simple** [1] - 319:3
**simply** [2] - 312:22, 314:16
**single** [4] - 237:12, 241:12, 249:3, 371:4
**sit** [8] - 258:3, 258:7, 258:17, 260:18, 262:22, 262:24, 398:7, 398:16
**sitting** [5] - 251:24, 252:6, 259:18, 263:14, 277:4
**situation** [8] - 240:1, 240:17, 245:2, 300:10, 330:19,

337:20, 340:7, 352:2
**situations** [2] - 340:16, 391:20
**six** [9] - 251:6, 251:12, 251:17, 251:18, 324:2, 390:22, 391:7, 391:14, 397:18
**Skyline** [3] - 327:25, 328:1, 331:11
**slid** [2] - 263:25, 264:1
**slide** [2] - 359:25, 360:11
**slightly** [1] - 339:18
**slow** [1] - 322:8
**slower** [2] - 293:18, 293:21
**small** [2] - 280:8, 280:9
**snug** [1] - 282:16
**so..** [1] - 291:14
**societies** [1] - 324:14
**society** [1] - 324:22
**soft** [3] - 278:16, 282:13, 285:23
**softening** [1] - 278:14
**softer** [1] - 282:15
**solid** [1] - 282:2
**solution** [1] - 243:2
**solves** [1] - 243:3
**someone** [7] - 311:11, 325:22, 334:19, 395:16, 396:19, 405:18
**sometime** [4] - 273:4, 273:16, 335:24, 358:10
**sometimes** [5] - 258:4, 258:22, 261:5, 265:24, 331:24
**somewhat** [1] - 293:21
**somewhere** [2] - 300:22, 388:16
**soon** [1] - 388:1
**sooner** [1] - 293:23
**soonest** [1] - 313:24
**SOP** [7] - 401:16, 401:21, 402:9, 402:12, 402:19, 403:2, 407:2
**SOPs** [17] - 329:6, 333:18, 342:7, 348:14, 354:20, 354:23, 355:6, 355:15, 355:22, 355:25, 356:20, 356:25, 357:6, 357:8, 359:1, 359:2, 401:18
**sorry** [33] - 254:7,

258:12, 265:17, 266:6, 271:5, 276:2, 279:3, 284:17, 321:16, 321:17, 323:25, 325:15, 332:19, 334:20, 334:22, 336:7, 338:20, 345:10, 348:9, 353:4, 353:5, 353:25, 354:3, 355:18, 359:3, 359:24, 361:6, 371:22, 380:18, 386:22, 390:2, 394:24, 402:11
**sort** [11] - 236:17, 242:22, 243:3, 278:20, 281:4, 282:15, 282:17, 304:4, 304:23, 331:1, 356:15
**sorted** [1] - 379:16
**sound** [2] - 279:4, 311:7
**sounds** [2] - 274:6, 279:5
**source** [2] - 238:10, 309:1
**speaking** [5] - 309:21, 332:14, 332:16, 332:18, 399:8
**specific** [3] - 343:22, 397:11, 401:21
**specifically** [5] - 270:8, 288:3, 291:9, 355:11, 385:10
**specifics** [1] - 348:3
**specifies** [1] - 305:12
**speculative** [1] - 298:9
**speed** [1] - 340:7
**speeds** [1] - 261:5
**spell** [2] - 333:21, 338:11
**spend** [1] - 388:15
**spent** [2] - 319:18, 319:21
**spin** [1] - 283:11
**spoken** [1] - 265:16
**spot** [1] - 337:10
**Square** [18] - 250:10, 250:24, 251:1, 251:16, 254:9, 254:16, 258:10, 258:11, 262:2, 262:14, 263:24, 265:18, 266:3, 349:10, 349:18, 396:8, 397:19, 405:1
**stable** [4] - 258:24, 259:1, 293:19, 351:2

**staff** [1] - 311:22
**staffers** [1] - 270:3
**staffs** [1] - 270:17
**staircase** [1] - 362:15
**stamped** [1] - 241:14
**Stand** [6] - 395:3, 399:15, 400:5, 401:11, 404:12, 404:14
**stand** [27] - 238:18, 243:23, 243:24, 258:1, 258:4, 258:21, 280:22, 281:2, 284:13, 298:17, 305:25, 313:9, 351:5, 353:14, 368:18, 389:13, 389:25, 394:16, 395:5, 398:20, 400:8, 400:16, 400:18, 401:25, 405:20, 407:21
**Standard** [2] - 338:6, 361:12
**standard** [66] - 297:11, 298:20, 299:8, 299:16, 301:23, 302:5, 302:16, 327:8, 328:19, 329:6, 329:12, 329:14, 329:15, 330:4, 330:9, 330:12, 330:15, 330:22, 331:17, 332:4, 332:17, 332:20, 333:9, 333:13, 333:22, 333:25, 334:6, 335:2, 335:12, 336:22, 337:7, 337:11, 338:8, 338:9, 338:23, 339:10, 339:16, 340:17, 340:18, 341:4, 344:17, 345:3, 346:6, 346:10, 346:15, 347:1, 347:9, 353:22, 353:23, 354:5, 354:6, 354:9, 354:10, 354:13, 354:14, 354:18, 354:20, 354:21, 355:4, 355:7, 357:13, 386:9, 386:10, 395:9, 402:23, 403:10
**standards** [3] - 333:5, 334:1, 355:5

**standing** [7] - 258:2, 261:22, 275:11, 315:7, 400:10, 400:19, 405:19
**stands** [1] - 245:12
**start** [11] - 234:17, 281:4, 289:22, 303:9, 306:8, 320:18, 329:20, 340:2, 340:5, 390:11, 409:4
**started** [9] - 314:25, 322:17, 327:13, 334:12, 334:13, 341:15, 345:22, 357:17, 391:8
**starting** [3] - 234:5, 319:15, 320:16
**starts** [6] - 307:2, 340:5, 398:10, 401:23, 406:20, 407:18
**State** [1] - 319:14
**state** [4] - 234:6, 236:6, 315:16, 320:7
**statement** [38] - 236:6, 236:16, 244:8, 252:11, 304:16, 305:2, 305:20, 309:15, 359:18, 359:23, 360:12, 360:14, 361:9, 361:10, 372:22, 372:23, 372:25, 373:6, 373:7, 373:21, 374:6, 374:7, 374:14, 376:5, 376:6, 376:9, 376:13, 376:19, 376:22, 377:8, 377:23, 377:25, 378:7, 378:11, 378:18, 398:8, 398:10, 398:13
**statement's** [1] - 340:9
**statements** [9] - 244:21, 245:13, 305:5, 305:13, 306:5, 313:3, 329:5, 369:20, 371:17
**Staten** [1] - 321:22
**States** [4] - 327:25, 341:19, 383:22, 409:24
**STATES** [2] - 232:1, 232:11
**station** [27] - 255:12, 256:16, 259:19, 259:20, 262:6, 311:20, 329:9,

433

332:24, 333:16,
333:23, 339:22,
342:16, 342:17,
342:18, 342:19,
344:24, 350:11,
356:16, 360:23,
391:22, 392:17,
395:19, 395:23,
396:2, 399:9, 406:10
**Station** [1] - 339:25
**station's** [1] - 392:18
**stations** [7] - 251:7,
251:9, 260:3, 317:5,
345:19, 399:4,
404:25
**stay** [3] - 340:10,
344:1, 396:10
**Stay** [1] - 397:6
**stayed** [4] - 254:6,
268:6, 395:18,
396:23
**steady** [2] - 253:1,
264:6
**stenographic** [1] -
409:18
**step** [10] - 234:18,
264:16, 275:11,
300:8, 309:9, 315:6,
343:24, 387:16,
389:7
**stepped** [1] - 345:20
**steps** [1] - 264:14
**still** [16] - 240:20,
265:6, 269:5, 274:8,
286:4, 294:1, 304:4,
313:17, 332:18,
344:24, 347:21,
385:14, 389:6,
398:16, 404:10,
407:19
**stipulate** [1] - 240:1
**stipulated** [2] -
239:22, 381:5
**stipulation** [10] -
236:10, 236:13,
237:7, 240:7,
240:18, 240:23,
243:7, 381:22,
381:25, 383:1
**stock** [2] - 368:17,
389:3
**stood** [3] - 264:11,
264:21, 384:22
**stop** [25] - 238:25,
250:11, 250:16,
250:18, 251:5,
260:4, 260:6,
283:10, 283:14,
333:15, 378:12,
392:21, 393:8,

393:13, 393:17,
393:23, 395:23,
395:24, 396:2,
397:3, 398:23,
399:8, 406:11,
406:13, 406:15
**stopped** [28] - 250:11,
253:25, 254:17,
255:14, 255:16,
255:17, 256:8,
256:10, 256:18,
257:10, 257:12,
260:24, 261:20,
269:20, 320:23,
320:24, 324:8,
349:5, 349:9,
350:10, 360:22,
363:12, 385:1,
385:5, 395:1,
397:15, 398:17,
405:9
**stopping** [8] - 251:14,
345:18, 349:1,
365:3, 396:1, 397:2,
397:17, 399:4
**stops** [16] - 251:1,
257:3, 329:9, 337:9,
339:22, 340:1,
349:3, 349:6,
393:24, 394:4,
394:6, 394:7,
398:25, 406:16,
406:17, 407:17
**straight** [1] - 375:24
**strap** [1] - 340:13
**straps** [2] - 265:12,
265:15
**Street** [1] - 232:14
**strength** [1] - 287:20
**strike** [3] - 259:22,
377:24, 401:5
**strong** [1] - 267:25
**strongly** [1] - 311:2
**stuck** [1] - 274:22
**student** [1] - 319:22
**studies** [1] - 330:21
**study** [1] - 345:15
**stuff** [2] - 289:20,
319:21
**subject** [12] - 235:14,
301:19, 311:19,
314:18, 333:6,
333:7, 333:8, 335:7,
365:12, 366:25,
367:2, 384:5
**submission** [2] -
239:8, 303:17
**submit** [2] - 277:13,
387:9
**substance** [2] - 306:6,

329:20
**subtroch** [2] - 281:13,
284:5
**subtrochanteric** [4] -
279:7, 281:16,
282:1, 282:20
**subway** [10] - 299:17,
325:22, 327:6,
327:10, 330:13,
331:1, 331:2,
331:17, 334:6, 362:5
**subways** [4] - 321:13,
327:12, 331:2, 331:3
**suddenly** [1] - 340:5
**sufficient** [3] - 240:10,
301:20, 317:19
**suggest** [1] - 378:14
**suggested** [1] -
374:13
**suggesting** [1] - 378:2
**suggests** [1] - 378:17
**suit** [1] - 344:21
**Suite** [2] - 232:14,
232:19
**suits** [1] - 326:4
**summaries** [1] -
236:20
**summarize** [1] -
303:12
**summary** [23] -
235:18, 236:21,
237:19, 237:24,
239:8, 239:21,
239:22, 242:5,
242:6, 242:21,
243:3, 248:20,
249:11, 249:25,
316:21, 317:13,
352:18, 384:19,
385:6, 386:12,
386:16, 386:20,
387:1
**superimposes** [1] -
292:22
**supervisor** [4] -
391:18, 391:19,
395:19, 396:7
**supplement** [2] -
358:10, 367:14
**supplemental** [4] -
301:20, 335:24,
336:2, 336:14
**supplied** [1] - 378:18
**support** [4] - 301:21,
350:1, 350:6, 360:11
**suppose** [2] - 235:17,
311:13
**supposed** [6] -
307:11, 308:21,
394:5, 394:8, 399:8,

400:8
**surgeon** [6] - 271:12,
272:9, 275:21,
276:4, 276:9, 287:2
**surgeons** [4] - 274:13,
274:19, 284:9
**surgeries** [1] - 280:4
**Surgery** [1] - 292:15
**surgery** [11] - 272:7,
272:10, 276:6,
277:14, 277:18,
283:16, 283:17,
284:8, 284:9, 294:6,
294:8
**surgical** [5] - 281:18,
281:25, 285:4,
288:5, 288:6
**surgically** [2] - 279:8,
287:4
**surprise** [2] - 290:14,
295:16
**surprised** [1] - 235:1
**surprises** [1] - 295:10
**sustain** [1] - 246:11
**sustained** [8] - 259:24,
279:7, 326:20,
336:16, 341:25,
361:18, 361:24,
362:1
**Swain** [2] - 255:11,
255:20
**Swain's** [2] - 254:20,
254:24
**sweep** [1] - 332:24
**switched** [1] - 258:13
**Sworn** [2] - 275:13,
315:9
**sworn** [1] - 390:3
**symptoms** [1] - 366:18
**system** [9] - 261:12,
321:5, 325:23,
325:24, 330:17,
339:18, 340:19,
342:22, 352:10
**System** [1] - 319:16
**systems** [11] - 327:10,
328:8, 331:1, 331:2,
331:17, 334:6,
340:20, 341:11,
342:9, 344:17,
344:20
**systems'** [1] - 341:19

---

**T**

**table** [4] - 234:9,
275:3, 277:5, 403:3
**tables** [2] - 381:3,
383:21
**tad** [1] - 263:21

**talks** [2] - 305:11,
307:3
**tall** [1] - 399:25
**taught** [2] - 316:24,
324:3
**team** [1] - 276:11
**tech** [2] - 378:25,
379:11
**technical** [2] - 300:11,
379:20
**technically** [2] - 243:6,
380:16
**technology** [1] -
327:15
**tee** [1] - 375:3
**teed** [1] - 375:3
**ten** [7] - 251:18,
305:15, 324:7,
324:8, 375:14, 388:3
**ten-minute** [1] - 388:3
**tendered** [2] - 250:3,
296:9
**tenure** [2] - 317:8,
317:9
**terminology** [1] -
340:20
**terms** [16] - 295:25,
298:12, 323:2,
323:5, 323:24,
327:18, 328:19,
328:20, 333:25,
341:4, 344:16,
344:23, 352:11,
357:12, 358:4,
392:24
**testified** [17] - 241:17,
248:18, 250:9,
251:5, 253:23,
255:2, 255:11,
255:20, 268:16,
286:10, 292:9,
306:2, 369:18,
384:23, 385:10,
385:12
**testify** [15] - 242:9,
277:17, 284:25,
285:4, 297:5,
297:11, 299:11,
302:13, 302:15,
303:4, 308:12,
335:9, 366:10,
367:15, 386:8
**testifying** [6] - 285:2,
325:21, 351:14,
367:11, 385:2, 408:6
**testimonial** [1] - 352:7
**Testimony** [1] - 308:9
**testimony** [58] -
234:19, 236:17,
243:13, 250:10,

434

250:12, 254:8,
254:20, 254:24,
255:13, 256:3,
256:8, 256:18,
256:23, 257:2,
257:15, 257:16,
279:19, 294:17,
294:18, 297:22,
298:2, 298:9,
301:21, 310:16,
348:17, 349:4,
349:16, 350:9,
352:3, 353:15,
363:19, 363:21,
364:11, 369:13,
369:17, 369:21,
372:10, 376:14,
378:3, 379:18,
380:4, 380:13,
383:16, 384:1,
384:25, 385:18,
385:19, 385:25,
386:9, 386:13,
388:17, 397:14,
407:10, 408:24,
408:25
**that..** [1] - 384:3
**THE** [339] - 232:1,
232:1, 232:11,
234:2, 234:10,
234:15, 235:8,
235:10, 235:13,
235:15, 235:23,
236:4, 237:3,
237:13, 237:16,
237:18, 237:21,
237:23, 238:1,
238:5, 238:11,
238:15, 238:20,
238:23, 238:25,
239:10, 240:11,
240:14, 241:4,
241:25, 242:3,
242:19, 243:2,
243:11, 243:13,
243:16, 243:19,
243:24, 244:1,
244:2, 244:10,
245:11, 245:17,
245:19, 245:23,
245:25, 247:12,
247:15, 247:25,
248:19, 249:8,
249:10, 249:11,
249:13, 249:14,
249:15, 249:16,
249:19, 249:23,
250:1, 255:23,
259:24, 260:18,
260:21, 275:2,
275:4, 275:6, 275:9,

275:10, 275:11,
275:24, 276:2,
277:16, 277:21,
280:1, 280:5, 280:7,
280:11, 280:15,
280:17, 280:18,
280:19, 280:25,
281:3, 284:17,
284:20, 285:7,
286:15, 291:21,
291:24, 294:16,
294:20, 294:21,
295:1, 295:6,
295:10, 295:21,
296:12, 296:14,
296:20, 297:9,
297:13, 297:23,
298:1, 298:4,
298:15, 298:23,
299:23, 300:8,
300:10, 300:22,
301:9, 301:14,
301:18, 302:21,
302:24, 303:7,
303:9, 303:15,
303:22, 304:8,
304:10, 304:12,
304:19, 304:21,
306:3, 306:8,
306:19, 306:25,
307:2, 307:15,
307:18, 308:5,
309:3, 309:24,
310:23, 311:3,
311:15, 312:2,
312:12, 312:17,
313:1, 313:6, 313:9,
313:20, 314:1,
314:5, 314:9,
314:12, 314:18,
314:21, 314:24,
315:4, 315:5, 315:6,
315:8, 316:16,
317:16, 317:18,
322:21, 322:25,
323:7, 323:12,
323:14, 323:20,
326:20, 326:24,
329:19, 329:25,
330:6, 332:9,
332:14, 332:17,
332:18, 332:19,
332:20, 335:7,
335:22, 336:16,
336:20, 337:15,
338:16, 338:17,
338:20, 338:22,
341:2, 341:25,
343:2, 343:6,
343:15, 344:1,
347:8, 347:17,

352:5, 359:12,
359:20, 359:24,
360:2, 360:6,
360:15, 361:4,
361:6, 361:7, 361:8,
361:18, 361:24,
361:25, 362:1,
362:3, 362:9,
362:20, 363:18,
363:20, 363:21,
363:23, 363:25,
364:4, 364:10,
364:15, 364:21,
365:3, 365:8,
365:10, 365:15,
365:25, 366:5,
366:11, 367:4,
367:9, 367:16,
367:19, 368:5,
368:11, 368:15,
368:17, 369:2,
369:5, 369:9,
369:16, 369:24,
370:1, 370:5, 370:8,
370:24, 371:2,
371:8, 371:10,
371:23, 372:4,
372:6, 372:11,
372:16, 373:24,
374:5, 374:15,
374:19, 374:22,
375:2, 375:7, 375:9,
375:16, 376:1,
376:3, 376:8,
376:12, 376:16,
376:24, 377:1,
377:5, 377:8,
377:15, 377:18,
377:21, 377:23,
378:9, 378:21,
378:23, 379:4,
379:6, 379:13,
379:15, 380:3,
380:9, 380:14,
380:22, 381:4,
381:7, 381:11,
381:17, 382:9,
382:15, 382:19,
382:24, 383:4,
383:11, 384:6,
387:8, 387:14,
387:18, 387:24,
388:8, 388:18,
388:20, 389:3,
389:9, 389:11,
389:12, 389:14,
389:16, 389:25,
390:23, 391:4,
394:24, 395:3,
395:5, 395:6, 395:7,
399:24, 401:13,

402:10, 406:9,
406:16, 406:17,
406:18, 406:20,
406:23, 406:25,
407:4, 407:5, 407:8,
407:12, 407:13,
407:16, 408:4,
408:10, 408:20,
408:25, 409:5, 409:7
**theirs** [1] - 356:11
**theirself** [1] - 395:16
**themselves** [9] -
337:20, 337:25,
338:1, 351:2,
353:11, 353:12,
354:9, 355:1, 357:10
**therapist** [1] - 273:5
**therefore** [2] - 307:23,
312:19
**they've** [1] - 344:23
**thigh** [1] - 281:10
**third** [4] - 283:8,
319:25, 328:11,
328:12
**thorn** [1] - 320:21
**three** [5] - 265:21,
281:11, 282:9,
303:13, 366:25
**threshold** [1] - 236:19
**throughout** [2] -
283:16, 399:19
**timely** [1] - 386:17
**tissue** [1] - 285:23
**title** [3] - 292:14,
292:25, 304:4
**titled** [1] - 296:22
**today** [21] - 252:16,
257:2, 257:11,
257:15, 277:11,
286:10, 292:9,
315:20, 336:5,
336:8, 365:22,
366:4, 370:22,
382:1, 382:4,
388:13, 388:24,
398:7, 398:16,
407:17, 407:18
**together** [2] - 282:5,
403:2
**tomorrow** [16] -
305:25, 306:21,
310:10, 313:19,
313:21, 365:21,
366:19, 380:13,
381:20, 388:17,
388:23, 407:20,
407:24, 408:1,
408:4, 408:21
**tomorrow's** [1] - 382:5
**tonight** [1] - 408:7

**took** [2] - 322:8,
363:23
**top** [3] - 282:10,
331:22, 338:23
**topic** [2] - 308:9,
309:22
**topics** [1] - 303:5
**total** [6] - 242:19,
246:9, 247:18,
248:8, 248:9, 249:6
**touched** [1] - 373:4
**toward** [2] - 264:21,
408:8
**towards** [3] - 273:4,
340:2, 379:18
**town** [3] - 259:13,
259:14, 266:9
**track** [8] - 255:5,
327:5, 393:17,
393:19, 393:25,
394:2, 394:6, 406:13
**tracks** [2] - 255:4,
260:10
**traction** [1] - 282:5
**traffic** [2] - 236:14,
260:7
**train** [207] - 250:11,
250:16, 252:17,
253:10, 253:14,
253:25, 254:5,
254:17, 254:21,
254:25, 255:12,
255:14, 256:8,
256:10, 256:18,
256:25, 257:3,
257:7, 257:10,
257:12, 257:13,
258:2, 258:16,
258:24, 259:8,
259:9, 259:12,
259:19, 259:25,
260:6, 261:3,
261:20, 261:23,
262:9, 262:18,
262:21, 263:10,
263:19, 264:11,
264:15, 265:1,
299:18, 306:12,
306:13, 311:20,
325:23, 327:7,
327:16, 328:8,
328:9, 328:24,
329:8, 329:9,
330:13, 333:1,
333:16, 334:14,
334:15, 337:3,
337:7, 337:9, 338:4,
338:10, 339:6,
339:11, 339:13,
339:22, 339:23,

435

339:25, 340:2,
340:3, 340:5, 340:6,
341:16, 341:17,
342:15, 342:17,
342:20, 344:25,
345:15, 346:25,
348:25, 349:5,
349:9, 349:11,
349:13, 349:18,
350:10, 350:14,
351:3, 351:5,
351:23, 351:24,
352:1, 357:18,
357:20, 358:20,
358:21, 358:23,
360:22, 360:24,
361:2, 361:20,
361:21, 362:5,
362:12, 362:13,
362:17, 362:25,
363:5, 363:8,
363:12, 372:14,
385:1, 385:3,
385:11, 385:14,
390:18, 390:19,
390:21, 391:6,
391:23, 392:8,
392:13, 392:16,
392:23, 393:1,
393:8, 393:9,
393:13, 393:15,
393:16, 393:22,
393:24, 394:2,
394:3, 394:6, 394:7,
394:16, 394:17,
395:1, 395:4, 395:5,
395:17, 396:15,
397:15, 397:17,
398:17, 398:22,
398:25, 399:3,
399:6, 399:13,
399:15, 399:18,
399:19, 399:21,
400:9, 400:11,
400:12, 400:14,
400:16, 400:17,
400:18, 400:20,
400:23, 400:25,
401:7, 401:15,
401:18, 401:22,
401:23, 401:25,
402:21, 403:4,
403:9, 403:11,
403:14, 403:21,
404:2, 404:3, 404:4,
404:12, 404:14,
405:1, 405:8, 405:9,
405:13, 405:19,
405:20, 405:21,
405:22, 405:24,
406:10, 406:12,

406:13, 406:20,
407:1
**train's** [5] - 260:2,
260:3, 397:6,
398:22, 399:15
**trainer** [3] - 334:15,
341:17, 358:24
**training** [6] - 270:12,
276:18, 318:6,
319:19, 319:22,
357:18
**trains** [22] - 253:20,
255:4, 258:13,
260:9, 260:24,
261:5, 261:11,
319:6, 332:25,
338:3, 342:12,
345:18, 345:20,
346:17, 347:10,
391:23, 391:24,
393:22, 399:3,
400:5, 401:11, 404:8
**TRANSCRIPT** [1] -
232:10
**transcript** [6] - 234:21,
374:2, 374:16,
378:1, 409:18,
409:19
**transcripts** [2] -
328:22, 348:6
**TRANSIT** [1] - 232:7
**Transit** [13] - 234:4,
234:13, 321:13,
321:23, 326:8,
331:6, 331:8,
334:14, 334:17,
344:19, 344:21,
358:3, 358:6
**transit** [30] - 321:5,
321:15, 324:20,
325:24, 326:1,
326:14, 327:24,
328:6, 330:17,
331:21, 341:10,
341:21, 342:6,
342:8, 342:9,
344:17, 346:3,
350:23, 351:10,
351:18, 351:19,
351:20, 352:10,
352:19, 352:21,
353:2, 353:6,
354:11, 355:10,
355:25
**transport** [2] - 302:1,
328:8
**Transportation** [6] -
319:15, 321:19,
333:5, 345:6,
345:13, 346:15

**transportation** [30] -
300:19, 315:21,
315:23, 315:25,
316:1, 318:21,
318:23, 318:25,
319:5, 319:9,
319:23, 319:24,
320:6, 320:16,
320:17, 320:18,
321:4, 322:3, 323:3,
324:4, 324:16,
324:22, 327:2,
327:12, 327:23,
328:13, 333:3,
334:25, 335:10,
344:22
**travel** [3] - 263:10,
269:11, 349:18
**traveling** [1] - 269:11
**treated** [6] - 249:3,
267:1, 267:8, 268:8,
279:8, 287:4
**treating** [7] - 267:9,
274:18, 277:3,
277:19, 277:24,
285:3
**treatment** [6] - 247:6,
248:4, 268:19,
270:19, 281:25,
325:11
**Tren** [2] - 328:2,
331:13
**TRIAL** [1] - 232:10
**trial** [6] - 240:8,
244:16, 246:3,
371:14, 377:9,
377:13
**tribal** [2] - 270:12,
270:18
**tried** [2] - 304:1, 334:8
**tripped** [1] - 268:9
**tripping** [1] - 262:23
**trochanter** [7] - 281:9,
282:10, 282:11,
284:6, 284:7
**trochanters** [3] -
281:8, 281:13,
281:17
**trouble** [1] - 272:8
**true** [5] - 244:19,
308:7, 361:9,
409:17, 409:19
**truthfulness** [1] -
303:2
**try** [12] - 271:21,
287:18, 287:19,
289:14, 297:6,
299:2, 306:1,
323:23, 341:20,
373:11, 387:22,

407:24
**trying** [5] - 239:5,
370:22, 374:9,
388:9, 394:11
**tube** [1] - 282:12
**Tuesday** [1] - 232:5
**tunnel** [1] - 393:5
**turn** [1] - 336:13
**turns** [2] - 260:9,
260:12
**TV** [1] - 317:5
**two** [31] - 239:7,
239:12, 253:13,
255:4, 263:14,
265:21, 272:16,
282:8, 284:21,
293:4, 294:8, 295:7,
295:9, 295:17,
299:2, 305:9,
307:18, 319:19,
319:21, 349:15,
351:25, 365:11,
365:17, 369:22,
370:2, 381:14,
381:24, 388:7,
388:16, 399:8
**two-minute** [2] -
295:7, 295:9
**type** [4] - 341:9,
343:10, 344:15,
360:13
**types** [3] - 284:21,
342:14, 393:13
**typically** [2] - 281:11,
344:16

# U

**U.S** [1] - 232:23
**UITP** [1] - 324:19
**unaware** [1] - 305:14
**uncommon** [1] -
290:16
**under** [16] - 235:18,
306:2, 306:15,
310:16, 311:10,
335:3, 336:13,
336:23, 337:17,
347:2, 367:14,
376:9, 377:25,
378:4, 387:9, 405:24
**undergraduate** [1] -
317:24
**underground** [1] -
331:14
**underlying** [1] -
236:22
**Understood** [1] -
378:22
**understood** [6] -

238:15, 348:22,
372:5, 376:17,
382:7, 400:12
**uneven** [1] - 266:4
**unfairly** [1] - 308:4
**unfortunately** [3] -
325:6, 342:14,
372:13
**union** [5] - 341:18,
357:19, 358:4,
358:20, 358:21
**UNITED** [2] - 232:1,
232:11
**United** [4] - 327:24,
341:19, 383:22,
409:24
**universal** [1] - 333:8
**universe** [1] - 313:4
**universities** [1] -
324:3
**unless** [2] - 311:8,
333:19
**unmute** [1] - 281:1
**unproduced** [1] -
239:15
**unrelated** [2] - 278:2,
309:2
**unsafe** [1] - 340:16
**unstable** [3] - 282:1,
282:20, 283:3
**untruthful** [1] - 373:9
**unusual** [2] - 240:17,
318:1
**up** [93] - 238:12,
244:7, 244:10,
244:14, 245:21,
251:16, 251:25,
252:6, 252:9,
252:12, 252:15,
252:20, 252:21,
255:6, 258:2,
261:20, 264:2,
264:4, 264:11,
264:21, 265:4,
269:19, 271:10,
271:16, 275:11,
279:9, 280:2,
281:23, 282:4,
282:6, 283:5,
291:23, 295:1,
295:3, 301:9,
301:10, 310:21,
311:21, 315:4,
315:6, 320:19,
320:20, 333:5,
335:16, 339:2,
339:3, 340:1,
341:16, 345:23,
349:18, 349:20,
349:22, 350:3,

350:4, 350:6,
350:12, 358:23,
358:24, 359:18,
367:24, 368:8,
374:3, 375:3,
375:20, 375:22,
376:19, 377:8,
377:10, 379:7,
380:7, 380:9,
380:12, 380:15,
381:17, 382:14,
383:5, 384:22,
385:2, 385:14,
388:21, 389:12,
389:13, 390:24,
391:5, 395:22,
396:14, 400:2,
402:5, 407:6, 408:1,
408:13, 408:16
**update** [1] - 370:17
**updating** [1] - 371:6
**upside** [3] - 280:17,
280:18, 280:19
**Urbano** [2] - 328:2,
331:13
**USDOT** [1] - 322:3
**uses** [2] - 339:18,
340:19
**usual** [1] - 404:24

**V**

**VA** [3] - 232:20,
258:15, 270:8
**validity** [1] - 298:5
**various** [5] - 248:4,
269:6, 354:12,
366:18, 393:18
**vehemently** [1] -
296:15
**vehicle** [1] - 325:10
**verbal** [1] - 407:1
**verbally** [1] - 403:18
**verbatim** [1] - 396:17
**verdict** [7] - 384:11,
385:7, 385:9,
386:23, 386:25,
387:7, 387:11
**veteran** [1] - 270:12
**veterans** [5] - 268:17,
269:22, 270:7,
270:19, 270:24
**via** [3] - 269:14,
270:24, 364:11
**vicinity** [1] - 350:3
**video** [24] - 233:11,
233:12, 233:13,
295:8, 295:9,
295:11, 304:2,
304:5, 364:11,

369:17, 369:20,
370:1, 370:2, 372:7,
372:13, 376:18,
378:12, 378:13,
379:1, 379:2,
379:11, 379:19,
379:20, 402:5
**videotaped** [4] -
369:13, 369:14,
379:17, 380:1
**Vienna** [10] - 250:23,
251:1, 255:4, 258:8,
258:9, 262:14,
348:24, 348:25,
349:3, 397:18
**view** [2] - 280:23,
284:3
**violated** [4] - 301:23,
308:7, 347:1, 347:11
**violently** [1] - 361:20
**Virginia** [2] - 276:23,
276:25
**visiting** [2] - 322:9,
322:10
**vitae** [1] - 316:17
**voice** [2] - 309:21,
390:24
**voir** [9] - 296:1, 296:9,
297:9, 298:7,
300:12, 302:6,
303:5, 314:6, 314:15
**volume** [1] - 240:4
**voluminous** [1] -
236:11
**volunteer** [2] - 330:23,
346:12
**VSOs** [1] - 270:14

**W**

**wait** [3] - 243:21,
304:8, 306:25
**waited** [4] - 250:12,
250:22, 251:15,
251:17
**waiting** [1] - 251:24,
252:6, 405:23
**waived** [1] - 387:5
**walk** [3] - 353:25,
392:12, 392:15
**walking** [4] - 265:25,
340:2, 340:4, 340:6
**walks** [1] - 351:24
**wants** [11] - 241:19,
244:7, 295:20,
301:12, 305:25,
306:9, 307:21,
311:6, 312:5, 312:8,
364:9
**warn** [2] - 399:14,

401:22
**warning** [15] - 309:21,
327:7, 329:11,
333:14, 335:3,
337:9, 337:12,
337:16, 338:9,
347:2, 360:25,
361:13, 399:18,
400:22, 405:8
**warnings** [3] - 299:17,
335:12, 341:10
**Washington** [13] -
232:4, 232:15,
232:24, 234:3,
234:12, 326:7,
328:4, 331:7, 334:7,
342:7, 344:18,
344:21, 410:1
**WASHINGTON** [1] -
232:6
**waste** [2] - 238:17,
301:12
**Watch** [1] - 340:21
**water** [1] - 245:20
**WATERS** [148] -
232:18, 234:11,
235:19, 239:4,
239:11, 240:12,
240:16, 244:6,
245:10, 245:16,
248:17, 249:22,
249:24, 250:4,
250:6, 255:22,
256:1, 259:22,
260:15, 260:22,
260:23, 274:24,
277:15, 279:24,
280:13, 281:2,
286:16, 286:18,
291:19, 291:22,
291:25, 292:1,
294:13, 295:18,
295:23, 296:13,
297:7, 297:12,
297:15, 297:25,
298:3, 298:6,
302:18, 302:23,
303:6, 305:3, 306:4,
306:18, 306:22,
307:1, 307:6,
307:16, 308:1,
312:4, 312:13,
312:23, 313:2,
313:7, 313:18,
314:7, 314:10,
314:13, 314:20,
323:5, 323:10,
323:13, 326:19,
326:22, 329:18,
332:7, 332:10,

335:5, 336:15,
337:14, 340:25,
341:23, 342:25,
343:9, 343:19,
347:7, 347:18,
347:20, 359:8,
359:10, 360:10,
361:3, 361:16,
361:23, 362:8,
362:19, 362:21,
362:23, 363:17,
364:19, 364:25,
365:24, 366:2,
366:7, 366:14,
369:4, 370:11,
371:22, 371:24,
372:15, 372:19,
373:19, 374:4,
374:8, 375:4, 375:8,
376:18, 376:22,
376:25, 377:3,
379:5, 379:7,
381:12, 381:15,
382:10, 382:18,
382:22, 383:3,
383:10, 384:10,
387:12, 387:15,
387:20, 388:6,
388:9, 388:19,
389:1, 389:6,
389:18, 389:21,
390:2, 390:4, 391:2,
391:5, 395:8,
397:22, 399:22,
400:1, 401:10,
406:8, 407:7,
407:14, 408:5, 409:9
**Waters** [49] - 234:12,
235:3, 235:15,
235:24, 236:6,
241:8, 242:4, 243:6,
244:4, 249:19,
250:3, 280:16,
286:15, 295:15,
300:2, 302:6,
303:15, 304:23,
305:4, 306:3,
308:20, 309:25,
310:1, 310:6, 311:6,
311:22, 312:3,
323:1, 326:16,
347:17, 359:17,
361:19, 364:24,
370:8, 370:20,
371:5, 371:21,
373:3, 373:8,
373:12, 375:21,
378:2, 378:17,
379:4, 381:11,
382:9, 389:17,
394:25, 398:5

**waters** [1] - 311:14
**Waters's** [3] - 236:14,
374:12, 375:14
**waters)**.....................
..............**250** [1] -
233:5
**Waters)**.....................
..............**286** [1] -
233:7
**Waters)**.....................
..............**347** [1] -
233:9
**Waters)**.....................
..............**362** [1] -
233:10
**Waters)**.....................
.............**389** [1] -
233:14
**ways** [1] - 381:24
**weakness** [1] - 286:1
**wear** [1] - 289:17
**wearing** [1] - 289:22
**weather** [1] - 369:11
**website** [1] - 333:9
**week** [3] - 299:15,
364:14, 377:13
**weeks** [1] - 299:2
**weird** [2] - 239:19,
239:25
**welcome** [5] - 244:3,
314:24, 369:9,
383:13, 389:16
**well-performed** [1] -
272:7
**Westpark** [1] - 232:19
**whatnot** [1] - 323:9
**whatsoever** [1] - 257:4
**wheelchair** [1] -
271:19
**whichever** [1] - 405:7
**white** [1] - 289:20
**whiteboard** [1] -
360:14
**whole** [4] - 265:5,
270:8, 307:3, 320:7
**whoops** [1] - 363:23
**WILD** [3] - 232:3,
233:4, 246:18
**Wild** [1] - 234:3
**WILSON** [1] - 232:19
**Wilson** [1] - 326:17
**window** [6] - 262:16,
262:25, 263:1,
263:25, 264:1, 379:1
**winds** [1] - 255:5
**withdraw** [2] - 239:18,
310:9
**withdrawn** [6] -
236:15, 236:25,
240:2, 298:2, 305:8,

326:23
**withdrew** [1] - 241:18
**WITNESS** [32] - 233:3,
244:1, 245:23,
249:10, 249:13,
249:15, 275:4,
275:10, 276:2,
280:17, 280:19,
281:3, 294:20,
315:5, 315:8,
332:19, 338:17,
338:20, 361:6,
361:8, 361:25,
363:20, 363:23,
389:11, 389:14,
395:3, 395:6,
406:16, 406:18,
406:23, 407:4,
407:12
**witness** [65] - 235:5,
235:20, 242:4,
244:18, 248:14,
248:17, 249:18,
250:3, 260:16,
275:7, 284:16,
284:19, 295:8,
296:8, 296:9, 298:7,
305:11, 305:13,
305:25, 306:5,
306:20, 308:8,
309:5, 309:6,
309:15, 311:15,
312:7, 312:21,
313:3, 313:16,
314:3, 316:15,
329:4, 335:21,
364:2, 364:5, 364:6,
367:5, 368:13,
370:9, 370:13,
371:13, 371:15,
372:11, 372:13,
373:8, 373:10,
373:15, 374:9,
374:13, 378:2,
378:3, 379:18,
387:17, 387:20,
387:25, 388:13,
388:18, 388:19,
388:25, 389:2,
389:4, 389:5, 390:3,
407:17
**witness's** [3] - 364:11,
376:13, 382:12
**witnesses** [13] -
284:21, 284:22,
284:23, 284:25,
285:3, 315:3,
365:12, 365:16,
365:17, 365:21,
369:22, 370:2,

407:15
**WMATA** [48] - 236:5,
305:11, 305:24,
306:10, 306:12,
308:7, 308:13,
308:14, 309:6,
309:7, 309:12,
309:22, 311:10,
311:18, 313:15,
313:24, 326:7,
328:18, 331:7,
346:2, 346:25,
348:8, 348:10,
352:8, 354:14,
354:23, 355:1,
355:13, 355:15,
360:21, 365:20,
366:11, 368:9,
368:12, 371:14,
372:3, 372:10,
372:23, 384:14,
390:8, 391:17,
392:3, 392:7,
395:10, 398:8,
398:10, 405:4
**WMATA's** [14] -
303:20, 306:6,
307:7, 310:17,
311:21, 313:20,
348:14, 353:22,
354:4, 354:20,
355:6, 361:12,
371:16, 402:8
**woke** [1] - 271:10
**woman** [2] - 380:25,
383:23
**won** [1] - 328:12
**word** [1] - 287:7
**words** [6] - 245:2,
254:4, 297:3,
306:11, 342:4, 403:6
**workdays** [1] - 257:24
**works** [1] - 341:15
**world** [1] - 324:19
**worrying** [1] - 361:2
**worth** [1] - 373:17
**wrap** [1] - 380:15
**wrinkles** [1] - 289:23
**write** [4] - 317:8,
359:2, 360:14,
398:13
**writing** [2] - 377:16,
377:19
**written** [5] - 298:21,
317:4, 359:1,
359:22, 398:8
**wrote** [1] - 376:23

**X**

**x-ray** [8] - 237:15,
281:15, 282:6,
283:5, 283:24,
285:24, 292:22,
293:1
**x-rays** [2] - 292:18,
292:19

**Y**

**year** [9] - 318:5,
325:18, 335:24,
336:1, 346:14,
390:14, 392:2
**years** [25] - 251:2,
254:4, 257:22,
265:21, 267:16,
276:5, 276:8,
276:12, 319:19,
319:21, 322:8,
324:7, 324:8,
326:18, 326:21,
357:25, 380:25,
381:3, 383:24,
390:22, 391:7,
391:14
**yesterday** [8] - 234:17,
236:7, 246:4,
246:23, 250:9,
254:20, 313:18,
359:23
**York** [32] - 315:18,
320:8, 320:9,
320:16, 321:2,
321:5, 321:11,
321:12, 321:19,
321:24, 325:25,
327:13, 327:17,
328:4, 331:5, 334:7,
334:14, 334:16,
341:5, 341:21,
342:6, 342:7, 344:4,
344:18, 344:21,
355:17, 355:18,
355:19, 355:24,
358:2, 358:5
**yourself** [6] - 245:11,
252:19, 258:24,
275:17, 315:16,
389:24

**Z**

**ZAMBRI** [1] - 232:14
**Zoom** [5] - 269:13,
269:14, 270:22,
270:24, 347:24