```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     CAROL WILD SCOTT,
                                      CA No:  1:22-cv-00601-CRC
 4                  Plaintiff,
                                      Washington, D.C.
 5     v.                            Wednesday, April 23, 2025
                                      9:20 a.m.
 6
       WASHINGTON METROPOLITAN AREA
 7     TRANSIT AUTHORITY,

 8                  Defendant.
       - - - - - - - - - - - - - - - x
 9

10     _____

11                     TRANSCRIPT OF JURY TRIAL
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
12                  UNITED STATES DISTRICT JUDGE
       _____
       APPEARANCES:
13     For the Plaintiff:        PATRICK MICHAEL REGAN, ESQ.
                                 CHRISTOPHER REGAN, ESQ.
14                               REGAN ZAMBRI & LONG, PLLC
                                 1919 M Street, NW, Suite 350
15                               Washington, DC 20036
                                 (202) 463-3030
16                               pregan@reganfirm.com
                                 cregan@reganfirm.com
17

18     For the Defendant:        JASON R. WATERS, ESQ.
                                 LAUREN GILMAN, ESQ.
19                               WILSON ELSER
                                 8444 Westpark Drive, Suite 510
20                               McLean, VA 22102
                                 (703) 245-9300
21                               jason.waters@wilsonelser.com
                                 lauren.gilman@wilsonelser.com
22
       Court Reporter:           Lisa A. Moreira, RDR, CRR
23                               Official Court Reporter
                                 U.S. Courthouse, Room 6718
24                               333 Constitution Avenue, NW
                                 Washington, DC  20001
25                               (202) 354-3187
```

1                          I N D E X

2

3    WITNESS                                          PAGE

4      KEISHA SIMONE HENRY
           (By Mr. Waters)...................................446
5           (By Mr. C. Regan)................................454
           (By Mr. Waters)...................................465

6    DENIS HARRIS, M.D.
           (By Ms. Gilman)..................................467
7           (By Mr. P. Regan)...............................473

KEISHA SIMONE HENRY
(By Mr. Waters) ... 446
(By Mr. C. Regan) ... 454
(By Mr. Waters) ... 465

DENIS HARRIS, M.D.
(By Ms. Gilman) ... 467
(By Mr. P. Regan) ... 473

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  We are back on the record
3     with Civil Matter 22-601, Carol Wild Scott v. Washington
4     Metropolitan Transit Authority.
5              Starting with plaintiff's counsel, please identify
6     yourselves for the record.
7              MR. P. REGAN:  Yes.  Good morning, Your Honor;
8     Patrick Regan and Christopher Regan for the plaintiff, Carol
9     Scott, who is with us.
10             THE COURT:  Good morning.
11             MR. C. REGAN:  Good morning, Your Honor.
12             MR. WATERS:  Good morning, Your Honor; Jason
13    Waters, along with Lauren Gilman, for Washington
14    Metropolitan Transit Authority, along with Laurie Hand from
15    Metro.
16             THE COURT:  All right.  Good morning, Mr. Waters.
17    Good morning, everybody.
18             Okay.  Mr. Waters, who do we have?
19             MR. WATERS:  We have Keisha Simone Henry from
20    Metro.
21             THE COURT:  Uh-huh.
22             MR. WATERS:  And we have Dr. Denis Harris this
23    morning.  I don't expect either of them will be particularly
24    long.
25             THE COURT:  Okay.  And not Mr. Bennett?
```

```
 1              MR. WATERS:  Not Mr. Bennett.

 2              THE COURT:  Okay.

 3              All right.  Are we ready?

 4              MR. WATERS:  We are ready.

 5              THE COURT:  Okay.  Get the jury.

 6              MR. P. REGAN:  Are you calling Ms. Harris first?

 7              MR. WATERS:  I'm calling Ms. Harris first.

 8              MR. C. REGAN:  Your Honor, there may be one

 9     exhibit issue that might be worth addressing before the

10     witness takes the stand.

11              THE COURT:  What's that?

12              MR. C. REGAN:  I expect I may well use Plaintiff's

13     Exhibit 15, which is a video exhibit, Your Honor, a video

14     created by Metro and put on its website.  Mr. Waters

15     objected to that, and I don't think the Court took up the

16     matter at the pretrial conference.

17              THE COURT:  This is the video that -- remind me

18     what it is.

19              MR. C. REGAN:  Yes, Your Honor, and I could play

20     it for the Court certainly.  It's only -- it's about a 20-

21     second video, tops, but it's a video in which WMATA shows

22     exactly how a train pulls into a station, stops, waits for

23     15 full seconds as people stand around not holding on to

24     anything right inside the doors.  You can see them in the

25     windows.  There's a timer on the bottom.
```

```
 1            THE COURT:  What's the purpose?

 2            MR. C. REGAN:  Yes, Your Honor, so WMATA has

 3    argued -- and will continue to argue in closing today, no

 4    doubt -- that Ms. Scott's actions were unreasonable by doing

 5    what she did to stand up and move towards the doors at that

 6    point.  So the video is highly relevant because it's WMATA's

 7    own video showing that this is exactly what they expect

 8    people to do.  No one's holding on to anything, and it takes

 9    15 full seconds for the doors to open.

10            So if they're going to argue anything about the

11    length of time or the fact that she's not holding on to

12    stuff, the fact that they've put a video on their own

13    website saying this is how it works, this is --

14            THE COURT:  The question's admissibility.  What's

15    the objection?

16            MR. WATERS:  I think there are a number of

17    objections, Your Honor, particularly relevance with regard

18    to this.  It is my understanding that the video is

19    highlighting -- and that counsel wants to use the video to

20    highlight the difference between ATO operations, automatic

21    train operations, and manual train operations.  ATO is not

22    an issue in this case.  They were not operating in an ATO at

23    that point so a video showing ATO operations is irrelevant.

24            I think that there's also -- the fact that this is

25    a video showing a train stopping under those circumstances I
```

```
1    think is -- it's not probative of really anything here, Your

2    Honor.

3              THE COURT:  So your objection is relevance?

4              MR. WATERS:  Relevance, and it has a propensity to

5    confuse the jurors.

6              THE COURT:  403.

7              MR. WATERS:  If my understanding is correct, this

8    is really highlighting the difference between ATO and manual

9    operation.

10             THE COURT:  Okay.  Well, this may not be

11   pertinent, but didn't Ms. Johnson testify yesterday that the

12   trains stop automatically when there's a red light issue or

13   a congestion issue or a track circuit issue?  Is that

14   something different than ATO?

15             MR. WATERS:  That is something different, Your

16   Honor.  When a train operates on track circuits -- which is

17   basically an audio frequency end circuit from one end of the

18   track to the other -- they require speed commands to either

19   enter into the next circuit or to stop in the next circuit.

20             If the preceding circuit is shunted, meaning that

21   the signal is not perfectly received in the train control

22   room, trains coming in from the behind will lose speed

23   commands, and what it means is, to the operator, they'd lose

24   their speed commands, and the trains will come to a stop.

25   That's kind of part of the manual operation.
```

```
 1                 THE COURT:  Okay.

 2                 MR. WATERS:  Automatic train control, or ATO, is

 3      when the entire system is operating automatically, including

 4      announcements on 7 series, stops, and things of that nature.

 5                 THE COURT:  Okay.  Why don't you play the video.

 6      Let's see it.

 7                 MR. C. REGAN:  I was going to say, Your Honor, I

 8      think I actually might be able to simplify that.  I think it

 9      makes sense for the Court to view it no matter what, but we

10      have a redacted version that makes no mention of automated

11      anything.  It just totally blacks out the half of the screen

12      so it literally will just be --

13                 THE COURT:  Let's see what you intend to play.

14                 MR. WATERS:  Ms. Gilman also pointed out to me,

15      Your Honor, that the video is posted after September 2023.

16      In 2019 my understanding is that all trains were still in

17      manual operation on the Metro system.

18                 THE COURT:  Okay.

19                 MR. C. REGAN:  And, Your Honor, I'm realizing that

20      I misspoke.  This is Plaintiff's 14, not 15.

21                 (Video playing)

22                 THE COURT:  All right.  Let's get through the

23      direct, and I'll make a ruling before cross.  Let's see what

24      he gets into on direct.  Okay?

25                 But the objection is relevance?
```

```
1              MR. WATERS:  Yes, Your Honor.

2              THE COURT:  Okay.

3              MR. WATERS:  I think its relevance tends to

4    confuse.

5              THE COURT:  Okay.  Thank you.

6              MR. P. REGAN:  Judge, the only point I would make

7    is regardless of direct, remember, this -- the cross is part

8    of our case-in-chief, so we're not going to be limited by

9    the direct on that point.

10             That's the only thing I wanted to say, is that

11   that was the stipulation yesterday, so that -- because the

12   witness got sick.

13             THE COURT:  I thought the stipulation was with

14   respect to Mr. Bennett.

15             MR. P. REGAN:  No, it was with respect to this

16   witness.

17             MR. WATERS:  Mr. Regan is correct.  It was with

18   respect to Ms. Henry.

19             THE COURT:  Okay.  Got it.  Thank you, Mr. Regan.

20             (Pause)

21             THE COURT:  All right.  With that caveat, if the

22   plaintiff had called a corporate representative of WMATA,

23   they could certainly play a WMATA video and ask the witness

24   "Is this generally how" -- "Is this consistent with how

25   people operate when a train is approaching a station and the
```

```
 1    train stops and they're waiting for the doors to open?"  I
 2    think that's fair game.
 3                   Okay.  Go ahead.  So objection overruled.
 4                   MR. WATERS:  Okay.  Thank you, Your Honor.
 5                   (Jury enters courtroom)
 6                   THE COURT:  All right.  All eight of you.
 7    Everyone have a good evening?
 8                   JURY IN UNISON:  Yes.
 9                   THE COURT:  Welcome back.  Ready to get started?
10                   All right.  Mr. Waters, please call your next
11    witness.
12                   MR. WATERS:  Yes, Your Honor.  WMATA calls Keisha
13    Simone Henry to the stand.
14                   THE COURT:  Okay.  Good morning, ma'am.  If you
15    could remain standing and raise your right hand to be sworn
16    in.
17                   THE WITNESS:  Okay.
18                      KEISHA SIMONE HENRY, Sworn
19                         DIRECT EXAMINATION
20    BY MR. WATERS:
21    Q.  Good morning, Ms. Henry.
22    A.  Good morning.
23    Q.  Could you pull the microphone close to you so we can all
24    hear you.
25    A.  Better now?
```

1    Q.   That's great.   Thank you.

2         Would you please introduce yourself to our jury.

3    A.   Hi.   My name is Keisha Simone Henry with WMATA.

4    Q.   And how are you employed by WMATA?

5    A.   I am the assistant director of rail quality training.

6    Q.   And what does that mean?

7    A.   I oversee the day-to-day operations in the training

8    department under every -- everything that's under rail

9    trains, stations, interlocking rail traffic controllers.

10   Q.   So when you're turning to address the jurors, the

11   microphone, can you bring it a little bit closer.

12   A.   Okay.

13   Q.   Is that okay?

14   A.   Yes.

15   Q.   Thank you.

16        Could you repeat your answer.   I don't know if

17   everybody was able to hear you.

18   A.   Okay.   Under my position with WMATA -- it is assistant

19   director of rail quality training.   Under that I oversee the

20   day-to-day operations of the training department as it

21   relates to train operations, station managers, interlocking

22   rail traffic controllers.

23   Q.   And how long have you been doing that?

24   A.   This position I've had for the last two years.   I have

25   20 years with WMATA.

1   Q.  Okay.  How did you begin your career with WMATA 20 years

2   ago?

3   A.  I began my career as a bus operator.  Then I

4   transitioned to a train operator and a rail operations

5   supervisor and an assistant superintendent; then supervisor

6   of training, and now assistant director of training.

7   Q.  A number of positions.

8   A.  Uh-huh.

9   Q.  How long were you a rail operator?

10  A.  Between 2007 and 2013.

11  Q.  So six years experience -- six or seven years as a rail

12  operator?

13  A.  Yes.

14  Q.  Okay.  We're here to talk today about some specific

15  issues that are relevant to this case.  Do you recall giving

16  a deposition in this matter where you were a corporate

17  designee for WMATA?

18  A.  I do.

19  Q.  Okay.  One of the things I'd like to talk to you about,

20  just generally, is can you describe the process in September

21  of 2019 of berthing a train at a station on the Metro

22  system?  How does an operator stop the train as they're

23  coming into a station?

24  A.  Okay.  On approach to the station the operator will

25  announce that they are approaching the station and what side

1   the doors will be opening.  When they're properly berthed on

2   the platform, a door chime will sound, and the doors will

3   open on the side.

4   Q.  Is there a particular location where operators are

5   supposed to stop their trains?

6   A.  All the way to the 8-car marker, the other end of the

7   platform.

8   Q.  What is the 8-car marker?  Can you explain what that

9   means.

10   A.  That is a -- when you're operating the train, you can

11   see where -- that is your guide for how you stop the train

12   without overshooting the platform.

13   Q.  And what does it mean when the train stops at the 8-car

14   marker?  What does that mean in terms of the doors'

15   relationship to the platform?

16   A.  All the doors are safely on the platform.

17   Q.  Okay.  And if the train were to stop short of the 8-car

18   marker, what happens?

19   A.  The operator is then to alert to the customers to stand

20   clear, the train will be moving forward --

21   Q.  Okay.

22   A.  -- on the platform.

23   Q.  How fast is an operator moving the train as they're

24   coming -- are there speed commands or -- I'm sorry, are

25   there -- is there -- how quickly does the train operator

```
1    bring it to a stop, or does it -- strike that.

2              Does the operator stop the train him or herself?

3    A.  Yes.

4    Q.  Okay.  And, again, we're talking September 2019.

5    A.  Uh-huh.

6    Q.  Were the -- the trains were -- so the train operator

7    brings the train to a stop him or herself, correct?

8    A.  Yes.

9    Q.  Does it happen on occasion that trains stop short of the

10   8-car marker and have to reposition?

11   A.  Yes.

12   Q.  Okay.  And how often does that happen?

13   A.  You can't really tell.  There are a lot of -- there will

14   be a lot of reasons why it would happen.

15   Q.  Okay.

16   A.  Okay.

17   Q.  For example?

18   A.  One example would be they could lose speed commands and

19   approach the 8-car marker.

20   Q.  What does it mean when the train loses speed commands?

21   A.  It means the speed readouts go to zero so the train

22   won't move.  It will stop.

23   Q.  Why would the train lose speed commands?

24   A.  I couldn't give you a definite answer because it could

25   be the wayside equipment.  It could be -- it could be a
```

1    train in front of that train so the train is -- won't -- you

2    know, they can't go further until they get --

3    Q.  Is it fair to say that there are a variety of reasons

4    why a train would stop short of the 8-car marker and need to

5    reposition?

6    A.  Yes.

7    Q.  Okay.  And rail operators -- what is the announcement

8    they give when they have to reposition?

9    A.  "Stand clear, train moving forward."

10   Q.  Okay.  So let's say the train is stopped on the

11   platform.  What does the train operator do, then, to open

12   the doors?  Again, September 2019 in manual operation.

13   A.  Once the train is properly berthed?

14   Q.  Yes, ma'am.

15   A.  The operator would get up, stick their head out the

16   window, look to the left and to the right, make sure that

17   they are properly berthed on the platform, and then open the

18   doors.

19   Q.  Is there a time frame that they're supposed to make sure

20   when they look out the window that they're properly berthed?

21   A.  Not to -- okay, when they properly berth, their

22   directive is to stick their head out the window, wait five

23   seconds before making a move, look left and right, and then

24   open the door.

25   Q.  When they open the door, do the doors open

1    automatically, or do they push a button to open the doors?

2    A.   They push a button.

3    Q.   Okay.  When they push the button, what happens on the

4    train with the doors?  Do they just open, or what happens

5    when they push --

6    A.   A chime sounds.

7    Q.   Okay.

8    A.   And the doors open.

9    Q.   Okay.  How long are the doors open?

10   A.   Until the operator closes the doors.

11   Q.   Okay.  And the operator closes the doors him or herself?

12   A.   Yes.

13   Q.   Okay.  When the doors are open, what does the operator

14   do?

15   A.   They're still looking down the platform to make sure,

16   when it's time to close the door, there's no one running for

17   the doors or they can get caught in the doors.  Just make

18   sure it's clear before they close the doors.

19   Q.   The doors don't have a kind of like a light curtain that

20   detects somebody in the doors, do they?

21   A.   No.  The operator will most likely receive a note "All

22   Doors Closed."

23   Q.   Okay.  What does it mean when an operator receives that

24   code?

25   A.   The doors aren't securely closed.

1    Q.  Okay.  So the operators look down the platform -- the

2    doors are opened -- and determines that it's time to close

3    the doors and move on to the next station.  What does the

4    operator do?

5    A.  Once the doors are closed, the operator will go back to

6    their seat, make an announcement alerting the customers what

7    the next station is and what side the doors are open or

8    closed.

9    Q.  Okay.  When the operator closes the doors, does the

10   operator close the doors manually, or do they automatically

11   close?

12   A.  Manually.

13   Q.  Do they push the same button or a different button?

14   A.  It's a different button.

15   Q.  Different button.

16        What happens when they press that button?

17   A.  The doors open -- the doors -- the chime will come on

18   again, and then the doors will close.

19   Q.  Okay.  So we talked about announcements a little bit.  I

20   think you mentioned some.

21        What is the announcement that is made when the

22   train is arriving at the station?

23   A.  "Attention customers, we're approaching the station.

24   Doors will be opening on the left."

25   Q.  Okay.  And what is the announcement that's made when an

1    operator determines that he or she has to reposition the

2    train?

3    A.  "Stand clear, the train will be moving forward."

4    Q.  Okay.  Do operators use their own language, or is it a

5    script that's -- we've talked a little bit about the

6    standard operating procedures in this case.

7    A.  Uh-huh.

8    Q.  And there's some language that's there.

9            Do operators say those exact words, or do they

10   sometimes say it differently?

11   A.  They sometimes say it differently.

12   Q.  Okay.  Ms. Henry, are you familiar with Ms. Scott's

13   case?

14   A.  Not before the deposition.

15   Q.  Okay.  You weren't the supervisor who responded to this

16   incident?

17   A.  No.

18   Q.  And do you have a personal knowledge about Ms. Scott's

19   case other than -- insofar as it relates to train operation?

20   A.  No.

21   Q.  Okay.

22           MR. WATERS:  Your Honor, that's all I have.

23           THE COURT:  Okay.

24                         CROSS-EXAMINATION

25   BY MR. C. REGAN:

1    Q.  Good morning, Ms. Henry.

2    A.  Good morning.

3    Q.  Is it fair to say that if the train stops -- as of 2019,

4    when this incident happened, if the train stops short of the

5    8-car marker for any reason, the train operator absolutely

6    must warn passengers before moving the train again?

7    A.  Correct.

8              MR. C. REGAN:  Can I have the display, please.

9    Q.  Ms. Henry, are you able to see that in front of you?

10   A.  Yes.

11   Q.  And has it been --

12             MR. C. REGAN:  Your Honor, this is just a

13   whiteboard list, a visual representation of the testimony

14   that I'd like to use with the witness, if I may?

15             THE COURT:  Okay.

16             MR. C. REGAN:  May I have the Court's permission

17   to publish that?

18             MR. WATERS:  No objection, Your Honor.

19             THE COURT:  Fine.  It's not in evidence, but you

20   can publish it.

21             MR. C. REGAN:  Correct.

22   BY MR. C. REGAN:

23   Q.  Ms. Henry, on the screen is what I hope is a list of

24   effectively the ordinary berthing procedures.

25             MR. WATERS:  I'm sorry to interrupt, Your Honor.

1    Can we put this in presentation mode, Counsel?  I think your

2    other slides are also visible, and I don't think those are

3    before the jury.

4              MR. C. REGAN:  They will be in a moment,

5    Mr. Waters.

6              MR. WATERS:  Okay.

7              MR. C. REGAN:  I don't think they're visible --

8    legible at least.

9              THE COURT:  Go ahead.

10   Q.  Ms. Henry, is it accurate that Step 1 is effectively

11   what you just testified to, announce the station, "Entering

12   McPherson Square, doors opening right side," right?

13   A.  Uh-huh.

14   Q.  Step 2, stop the train at the 8-car marker?  Yes?

15   A.  Yes.

16   Q.  Step 3, wait five seconds looking out the window before

17   opening the doors?

18   A.  Yes.

19   Q.  And then Step 4, open the doors, right?

20   A.  Yes.

21   Q.  And I said five seconds.  It's really at least five

22   seconds, sometimes substantially longer than that, right?

23   A.  No less than five seconds.

24   Q.  Okay.

25              MR. C. REGAN:  Your Honor, this is Plaintiff's

1    Exhibit 1 that's already in evidence.

2            THE COURT:  Very well.

3    Q.  Ms. Henry, on your screen is Plaintiff's Exhibit 1,

4    WMATA's SOP No. 50.  You're familiar with that, right?

5    A.  Yes.

6    Q.  And that's the version of SOP 50 in effect as of 2019,

7    September 2019, right?

8    A.  Uh-huh.

9    Q.  Was that a yes, Ms. Henry?

10   A.  I'm sorry, say it again.

11   Q.  Yes.  That's the version of SOP 50 in effect governing

12   train operations as of 2019, right?

13   A.  That was the version at that time, yes.

14   Q.  I'd like to come down to the second page --

15   A.  Uh-huh.

16   Q.  -- and look at some of the standard baseline

17   announcements with you.  And if you need me to slow down

18   scrolling, tell me, but what I'd like to look at here is in

19   the red box.  The red boxes are mine, of course, not in the

20   original document.

21           The one labeled "Repositioning Train," you're

22   familiar with that one, right?

23   A.  Yes.

24   Q.  Is that an announcement that's supposed to be given when

25   the train stops short on the platform and the operator has

1    to reposition the train to announce it to the customers that

2    the train will be moving forward?

3    A.   Yes.   This is the announcement that they make to the

4    customers when repositioning the train.

5    Q.   Okay.   A few minutes ago I thought you told us that it's

6    "Trains moving, stand clear," something like that.   Did I

7    misunderstand?

8    A.   Well, I believe I also said that that was a version of

9    what is said.   Most operators don't stick to those exact

10   words.

11   Q.   Okay.   Pursuant to Metro's SOPs, this is what is

12   required to be stated before the train moves forward when it

13   stops short of the platform, right?

14   A.   This is what they would like said.

15   Q.   Okay.   And the purpose of that is so they can hold on --

16   "they" being the passengers can hold on -- if they need to,

17   right?

18   A.   Yes.

19   Q.   Because they might fall if they're not warned and

20   they're not holding on, right?

21   A.   If they're not holding on, there could be an incident.

22   Q.   An incident where they fall and get hurt, right?

23   A.   Or bump into someone.

24   Q.   And hurt that person?

25   A.   That necessarily may not be the outcome.

1    Q.  Let me ask it this way.  Is the only reason for this

2    warning passenger safety?

3    A.  It's safety for -- yes, passenger safety, absolutely.

4              MR. C. REGAN:  Your Honor, I'd like to show I

5    think just the witness Plaintiff's Exhibit 14 for a moment.

6              THE COURT:  Okay.

7              MR. WATERS:  Same objection, Your Honor.

8              THE COURT:  Noted.

9    BY MR. C. REGAN:

10   Q.  Ms. Henry, on your screen are you able to see a video

11   screen?

12   A.  Yes.

13   Q.  Okay.  It's only about 20 seconds.  I'd like to just run

14   through it one time, and then I'll ask you a question or two

15   afterwards.  Okay?

16   A.  Uh-huh.

17   Q.  And I should mention this is a video from WMATA's

18   website.

19   A.  Okay.

20              (Video playing)

21   Q.  Ms. Henry, that shows -- that video shows a train

22   stopping consistent with how Metro trains were expected to

23   berth at a station under manual operation back in 20 -- in

24   September 2019?

25   A.  Uh-huh.

```
 1                    THE COURT REPORTER:  Yes or no, please.
 2                    THE WITNESS:  I'm sorry, yes.
 3                    MR. C. REGAN:  Your Honor, I move to admit
 4       Plaintiff's 14.
 5                    THE COURT:  So moved.  Your objection's noted.
 6       Q.  Ms. Henry, I'd like to go over one more time here --
 7                    MR. C. REGAN:  Can we publish to the full
 8       courtroom, please?
 9       Q.  Okay.  Ms. Henry, I'm going to play it one more time,
10       okay?
11       A.  Sure.
12       Q.  And I'd like to -- if I may, please pay attention to the
13       movements of the passengers inside the train because that's
14       what we're going to focus on for a minute.  Okay?
15       A.  Okay.
16                    (Video playing)
17       Q.  All right.  Ms. Henry, so I'm going to pause it right
18       there where the timer on the bottom says 15 seconds.
19       A.  Uh-huh.
20       Q.  That's 15 seconds between the time the train came to a
21       stop and the doors opened, right?
22       A.  Okay, yeah.
23       Q.  And inside the train did you notice what the passengers
24       were doing?
25       A.  They were standing up preparing to get off the train.
```

1    Q.  Understood.  And did you notice whether they were

2    holding on to anything?

3    A.  No, I didn't.

4    Q.  Okay.  Do you want me to play it again?

5    A.  Sure.

6    Q.  Okay.  Let's start with this person right here who is

7    getting off the doors right now, okay, sort of in the

8    foreground, closest person to the camera inside the train.

9              (Video playing)

10   Q.  You saw that person adjusting their coat?

11   A.  Uh-huh.

12   Q.  Standing there, I think hands in pockets maybe, right?

13   A.  I saw them adjusting their coat preparing to exit the

14   train.

15   Q.  Okay.  You certainly didn't see that person holding on

16   to anything, right?

17   A.  No.

18   Q.  That person, by all appearances, was just standing there

19   thinking it's a safe time that the train is berthed and the

20   doors are about to open in a couple of seconds, right?

21   A.  I can't assume what the person thought.

22   Q.  Fair enough.

23              Let me just ask you what Metro's expectations are

24   then.  Does Metro understand that that's a perfectly

25   reasonable thing for passengers to do on a train once it's

1    stopped at a station?

2    A.  I don't understand your question.  Say it again.

3    Q.  Sure.

4    A.  Uh-huh.

5    Q.  Does Metro think that all passengers are required to

6    hold on to something even after the train has stopped at a

7    station and they think the doors will open soon?

8    A.  I wouldn't use the word "think."  I would use the word

9    "assume."

10   Q.  Metro would assume that all passengers will hold on to

11   something the whole time after the train stops until the

12   moment the doors open?

13   A.  Yes.  That's an individual preference.  It's not a

14   requirement for you to hold on.  That's what you would do.

15          They can't control what all customers do on the

16   train.

17   Q.  Okay.  Fair to say that Metro understands that not all

18   customers are required to do that, first of all, to use your

19   word, right?

20   A.  I said assume that customers are going to do it or not

21   do it.

22   Q.  Yes, ma'am, so I want to be clear.  Metro understands

23   that customers are not required to hold on to something in

24   that time period that we just talked about between when the

25   train stops and the doors open, right?

1    A.  When you say "required," do you mean that they are -- it

2    is like paying your fare?  You are required to do that, or

3    is it an option?

4    Q.  Sure.

5    A.  Because people are required to pay their fare.  Also

6    they don't.  So it's an option.  It's a personal option

7    obviously.

8    Q.  Okay.  And fair to say, based on WMATA's own video, that

9    WMATA at least understands that some people, when the train

10   stops at the platform and they think the doors are going to

11   open soon, will stand there and feel safe doing it and not

12   have to hold on to something?

13   A.  Okay.  Well, was there audio to this as well so --

14   Q.  There's no audio.

15   A.  So we're not aware that all -- everything was followed

16   as that train was approaching the platform because we can't

17   hear.

18   Q.  Okay.  No, we can't hear.

19   A.  Uh-huh.

20   Q.  Why don't we look at the people towards the back of the

21   train, too, okay, just to make sure we've covered all our

22   bases here.

23   A.  Okay.

24   Q.  You can sort of see in this window towards the back.

25   You can see people as well.  Okay?

```
 1                    (Video playing)
 2    Q.  Do you see those two gentlemen just walking around not
 3    holding anything either?
 4    A.  Well, when it first started I did see the gentleman in
 5    the red holding on.
 6    Q.  Okay.  Did you see the two that I was talking about in
 7    that back window?
 8    A.  The ones that walked up behind the gentleman holding on,
 9    is that who you're referring to?
10    Q.  Do you want to go back to -- there were two gentlemen
11    who were walking to the back.
12    A.  Okay.  You can play it again.
13              I saw two gentlemen walk up behind the one holding
14    on because in the front -- in front of me this is a female,
15    I assume.
16    Q.  Okay.  Let's look one more time.  Okay?  Watch the back
17    window.
18              And if you don't see it, you don't see it.
19                    (Video playing)
20    Q.  The man in the white shirt I'm looking at, Ms. Henry.
21    A.  Uh-huh.
22    Q.  And then the gentleman right behind him with the
23    backpack.
24    A.  Uh-huh.
25    Q.  You saw those gentlemen, right?
```

1    A.  Yeah.

2    Q.  Okay.

3           THE COURT:  Counsel, move on.

4           MR. C. REGAN:  The Court's indulgence for one

5    moment, Your Honor.

6           (Pause)

7           MR. C. REGAN:  Your Honor, those are all the

8    questions I have for this witness.

9           THE COURT:  Okay.  Mr. Waters.

10           MR. C. REGAN:  Thank you, Ms. Henry.

11           MR. WATERS:  Yes, Your Honor, one brief redirect.

12                    REDIRECT EXAMINATION

13    BY MR. WATERS:

14    Q.  Ms. Henry, the video that counsel showed you depicted

15    somebody who was getting off the train when it stopped.  Did

16    you see that person carrying a cane?

17    A.  No.

18    Q.  Or any type of assisted device?

19    A.  No.

20    Q.  Wouldn't you agree that it's WMATA's expectation that

21    passengers will use Metro in accordance to their own

22    abilities and support themselves as appropriate based on

23    their own abilities?

24    A.  Yes.

25           MR. WATERS:  That's all I have.  Thank you,

1    Ms. Henry.

2                THE WITNESS:  Okay.

3                THE COURT:  All right.  Ms. Henry, thank you very

4    much for your testimony.

5                THE WITNESS:  Thank you.

6                THE COURT:  You're excused.  Please don't discuss

7    your testimony with anyone until the case is over.  Thank

8    you.  Have a good day.

9                MR. WATERS:  Your Honor, may we go to the phones

10   before we call the next witness?

11               THE COURT:  Sure.

12               (The following is a bench conference

13                held outside the hearing of the jury)

14               MR. WATERS:  Your Honor, pursuant to our

15   stipulation, based on the cross-examination of Ms. Henry

16   being incorporated into plaintiff's case-in-chief, we'd like

17   to renew our motion for judgment as a matter of law.

18               THE COURT:  Push the button.

19               MR. WATERS:  Oh, sorry.  Was that heard?

20               THE COURT:  Yes.  So you've preserved your motion

21   on the same grounds as stated --

22               MR. WATERS:  Yes.

23               THE COURT:  -- yesterday.  Okay.

24               (This is the end of the bench conference)

25               MR. WATERS:  Your Honor, WMATA calls Dr. Denis

```
1    Harris as its next witness.
2                THE COURT:  Very well.
3                (Pause)
4                THE COURT:  Good morning, sir.  If you could step
5    right up and have a seat -- or remain standing and raise
6    your right hand before you have a seat.
7                THE WITNESS:  Thank you.
8                THE COURT:  Come on up.  There you go.
9                THE COURTROOM DEPUTY:  Please raise your right
10   hand.
11                   DENIS HARRIS, M.D., Sworn
12                        DIRECT EXAMINATION
13   BY MS. GILMAN:
14   Q.  Good afternoon.  Can you please introduce yourself to
15   the jury and state your full name for the record.
16   A.  I'm Denis Harris.  Name and address?  3301 New Mexico
17   Avenue.
18   Q.  Thank you.  And when you speak to the jury, can you just
19   make sure that the mic is close to your mouth.
20   A.  I'm sorry.
21   Q.  Thank you.
22                Dr. Harris, what is your current title?
23   A.  I'm an M.D.  I'm a doctor.
24   Q.  And what is your specialty?
25   A.  I'm an orthopedic surgeon.
```

1    Q.   Where do you currently work?

2    A.   I practice in Northwest D.C.

3    Q.   Which institution?

4    A.   I'm part of Sibley Hospital, which is part of Johns

5    Hopkins.

6    Q.   And how long have you been in this role?

7    A.   Well, I've been practicing medicine for almost 50 years.

8    I can give my whole background, or would you like just

9    whatever?

10   Q.   Please.  If you could explain your educational training

11   and background first.

12   A.   So it's 14 years of education.  I had my bachelor of

13   science from Madison, Wisconsin; stayed on for medical

14   school at Wisconsin; went to Northwestern for my internship;

15   went to George Washington for my general surgery and then

16   orthopedic surgery.

17          And basically I've taught throughout my career.  I

18   went to USC.  I taught there in Los Angeles.  Came back and

19   taught at Georgetown.  I was head of orthopedic research, a

20   sports medicine guy at Georgetown.

21          And then I changed allegiances.  I became a Sibley

22   doctor, and I've been there for a long time, 40 years.  I am

23   a Sibley Hopkins chair.

24          I still teach residents Wednesday mornings.

25          I stopped doing surgery in 2017, but I've been

```
 1    practicing otherwise.

 2              Is that -- that's a quick background of my

 3    education.

 4    Q.  Thank you.  Do you hold any licenses currently?

 5    A.  I'm licensed in Washington, D.C.

 6    Q.  And what is that license?

 7    A.  I'm an M.D.

 8    Q.  Are you board-certified?

 9    A.  I'm board-certified.

10    Q.  Are you a member of any professional societies?

11    A.  The American Academy of Orthopedic Surgeons, and then

12    there's a local group called the Clinical Pathologic

13    Society, which are pretty much the chairmen of a variety of

14    the hospitals in the area and people from different parts of

15    the practice.  We meet monthly to discuss interesting cases.

16    Q.  Have you won any awards professionally?

17    A.  I have a research award, Theobald Smith.  If you Google

18    me, I have lots of things that say I'm a nice guy.  You

19    know, whatever.  And, again, the Hopkins chair, I guess, for

20    practicing orthopedics.

21    Q.  Turning to your involvement in this case, I'd like you

22    to talk about the review that you conducted without getting

23    into your opinions.

24              Did you review any records or documents in

25    connection with this case?
```

```
1    A.  I did, and I'm pulling out the records right now.

2    Q.  You don't need to.

3    A.  I don't need to?

4    Q.  No, thank you.

5    A.  Okay, great.

6    Q.  What records did you review?

7    A.  Well, if you can give me the records I can be more

8    exact.  If I pull out my list of things in my pocket --

9            THE COURT:  Generally speaking, sir.

10   A.  Well, I reviewed the -- her treatment records, and

11   basically her treatment records are fine.  Those from GW

12   were -- well, you know, her ambulance ride to GW, GW care

13   there.  Dr. Rao's care with her.  Her subsequent care at a

14   nursing home.  And then I examined her.

15   Q.  And when did you examine Ms. Scott?

16   A.  You'll have to give me that date in front of me in the

17   records, unless I can pull my pocket out where I have

18   everything written down.

19   Q.  Generally was it within the past year?

20   A.  In the last -- yeah, last year or two I examined her,

21   yes.

22   Q.  In connection with your record review and examination

23   of Ms. Scott, have you formulated any opinions concerning

24   Ms. Scott's injuries and the treatment she received?

25   A.  I have.
```

 1    Q.  And were all of those opinions formulated to a

 2    reasonable degree of medical certainty in orthopedic

 3    surgery?

 4    A.  Yes.

 5            MS. GILMAN:  Your Honor, at this time I submit

 6    Dr. Harris as an expert in the field of orthopedic surgery.

 7            MR. P. REGAN:  Absolutely no objection.

 8            THE COURT:  Okay.  The Court will qualify

 9    Dr. Harris to provide expert testimony in the field of

10    orthopedic surgery.

11    BY MS. GILMAN:

12    Q.  Dr. Harris, based on your review and examination of

13    Ms. Scott, what are your professional opinions?

14    A.  Well, she fractured her hip.  And for the jury, I can

15    elaborate on that if you'd like or just --

16    Q.  Please.

17    A.  So quick anatomy lesson.  The thigh bone comes up, makes

18    a bend, ball goes into a socket.  There are basically two

19    types of fractures; intracapsular, which is the ball part,

20    or extracapsular, which is right below.  She had the

21    secondary, and it's a major bone, and it was actually very

22    well-treated by Dr. Rao.

23            What you do is you put the bone back where it

24    belongs, and you have a skewer to hold it together, and you

25    lock the skewer on the top and the bottom so it stays put.

1    And the big things you look for is did he achieve anatomic

2    restoration, which in English means did he put it back the

3    way it's supposed to be, and he did.  And that was

4    corroborated with my evaluation when I examined her.

5          The leg links were the same, so he didn't make it

6    too short.  We have x-rays that show it's healed.  The

7    technical point is you want to restore the calcar.  Again, a

8    ball goes into a socket.  The inside of the bone has a

9    thickening to make it stronger; and if you restore that, the

10   bone is more stable.  And he achieved that.

11         So she broke her hip, and she had it put back

12   together again very nicely.  And when I examined her, the

13   bone was healed.

14   Q.  You spoke about reviewing Dr. Rao's notes.  Do you

15   remember what time -- when was the last time Ms. Scott saw

16   Dr. Rao?

17   A.  Again, records are much nicer for me to look at.

18   Somewhere within the last year and a half, maybe two years.

19   Q.  And at that time do you remember what Dr. Rao's

20   impression of her was?

21   A.  Well, he discharged her at that point.  He was looking

22   at her knees and her hip, so he was not thinking in a legal

23   manner.  He was looking at had she -- had she healed and did

24   she need any more treatment, and he released her at that

25   time.

1    Q.  Was Ms. Scott taking any pain medication when she was

2    discharged from Dr. Rao?

3    A.  I do not believe so, no.

4    Q.  And was any additional treatment recommended?

5    A.  For her hip, no.

6    Q.  And all of these opinions are to a reasonable degree of

7    medical certainty?

8    A.  Yes.

9            MR. C. REGAN:  Thank you.  I have no further

10   questions.

11           THE COURT:  Mr. Regan.

12                      CROSS-EXAMINATION

13   BY MR. P. REGAN:

14   Q.  Good morning, Dr. Harris.

15   A.  Good morning, sir.

16   Q.  And I agree with those people on Google.  You are a heck

17   of a nice guy.

18           I promise I'm going to be short.

19           This is the skewer.  The members of the jury have

20   seen it.  It's Plaintiff's Exhibit No. 8.  That's what

21   you're talking about, right?

22   A.  TFN, yes.  Yes.

23   Q.  Okay.  Do you know Dr. Rao?

24   A.  Yes.

25   Q.  Do you consider him an outstanding surgeon?

1    A.  I do.

2    Q.  And he did a great job on this patient, right?

3    A.  Excellent job.

4    Q.  You agree she needed this surgery?

5    A.  Correct.

6    Q.  When you saw her, did she mention to you that one of the

7    issues that she's had as a result of the rod being placed is

8    that the screw that goes into the top prevents her from

9    sleeping on her left side?

10   A.  Yes.  She has it's called heterotopic bone formation.

11   Translated to English, soft tissues have bone formation

12   about the side of your hip, and you can get a bursitis.

13        You can get a bursitis simply with aging, but she

14   probably has it because of the fracture.

15   Q.  I have a hard copy, if you want it, of your report, but

16   the -- you noted in there that four -- when you saw her it

17   was four years after the incident that Ms. Scott continued

18   to suffer left leg weakness, correct?

19   A.  Yes.

20   Q.  And by the way, you agree she doesn't need any future

21   treatment for it.  There's nothing else that can be done,

22   correct?

23   A.  Correct.

24   Q.  You understand she went through a rigorous -- literally

25   an eight-month rehabilitation period afterwards including

1    physical therapy, correct?

2    A.  She went to -- so she had the fracture, and then she was

3    in the nursing home getting physical therapy, and then she

4    had physical therapy afterwards.

5              The exact length of time I'm -- whatever you tell

6    me.  Probably eight months is fine.

7    Q.  Okay.  And you don't dispute that she has -- that the

8    surgery has left her with permanent pain and weakness in

9    that leg?

10   A.  Well, she has weakness.  When I examined her, what you

11   look for to check for that is both atrophy and a test called

12   the Trendelenburg.  She didn't have a lot of atrophy; I

13   didn't see that.

14             So when you stand on one leg and balance, your

15   pelvis is going to fall on the opposite side.  So if I were

16   to stand on my left leg and I had no muscles, my right

17   pelvis will fall, but hopefully it doesn't because my

18   muscles pull me back up.  And those muscles hook up where

19   there's the heterotopic bone formation.

20             I'm sorry.  I'm talking doctor talk.

21             And if the muscles are a little weak, your pelvis

22   will fall.

23             Well, she had mild falling of the pelvis, so there

24   is weakness.  Doctors say mild, moderate, severe; and mild

25   is not too bad.

```
1              So she did have weakness, but it wasn't
2    pronounced.
3    Q.  And the surgery that she had, the hardware, that's never
4    coming out, correct?
5    A.  Correct.
6              MR. P. REGAN:  Thank you.
7              MR. WATERS:  No redirect, Your Honor.
8              THE COURT:  Okay.  Dr. Harris, thank you very much
9    for your testimony.
10             THE WITNESS:  Thank you, sir.
11             THE COURT:  Have a great day.  Please don't
12   discuss your testimony until the case is over.
13             THE WITNESS:  Thank you.
14             MR. WATERS:  At this time, Your Honor, defendant
15   rests.
16             THE COURT:  Okay.  Any rebuttal case, Mr. Regan?
17             MR. P. REGAN:  No rebuttal, Your Honor.
18             THE COURT:  Okay.  At this stage the defense has
19   rested.  The plaintiff has rested as well, which means that
20   the evidentiary portion of the case is now complete.
21             The next step is jury instructions.  These are the
22   detailed instructions that I will give you for use in your
23   deliberations.
24             Now, because these folks have done a great job at
25   streamlining their cases and we've been efficient, we've
```

1    ended a little bit earlier than I anticipated.  We will need

2    a little bit to finalize the jury instructions and to give

3    each side an opportunity to respond to the proposed

4    instructions that the Court has provided them.  We're going

5    to work through that as efficiently as possible.

6         So we're going to take our break, our morning

7    break, a little bit early.  And why don't you plan to be

8    back and ready to go in 30 minutes, at about 10:35.

9         We may be done then.  It may take us a little bit

10    longer, but at the very least 10:35.  Okay?  Thank you very

11    much.

12         No discussions about the case.  No research about

13    the case.

14         (Jury exits courtroom)

15         THE COURT:  All right.

16         MR. WATERS:  Your Honor, with the close of

17    evidence, both the plaintiff's case and the defense case and

18    no rebuttal, we, again, renew our motion under Rule 50 of

19    the Federal Rules of Civil Procedure.

20         THE COURT:  Very well.

21         All right.  So I take it that both sides received

22    the proposed final jury instructions by email last night; is

23    that correct?

24         MR. WATERS:  Yes, Your Honor.

25         THE COURT:  What I'd like to do -- why don't we do

 1     this from counsel's table.  Just bring the microphones

 2     closer to you.

 3              And, Natasha, if you could come up here.  I like

 4     my counsel close in these situations.

 5              Okay.  So obviously what we've done is we've taken

 6     your joint proposed instructions and each side's individual

 7     proposed instructions -- and there was a lot of overlap.  We

 8     tried to, you know, take care of all the duplication and

 9     come up with a fair set of combined instructions.

10              What I'd like to do first is just go through.

11     There are some bracketed instructions where I have some

12     questions as to whether we need them or not and would like

13     your input on that.  And then we'll give you an opportunity

14     to either object or propose additions or deletions as each

15     side sees fit.

16              So the first one that I flagged, Instruction 20 on

17     stipulations.  I don't believe there was any stipulation as

18     to testimony.

19              MR. P. REGAN:  Judge, actually go back -- if you

20     go back a page, I think No. 18 is bracketed.

21              THE COURT:  Yes.  Redaction of exhibits.  I don't

22     think we'll send back any redacted exhibits.

23              MR. P. REGAN:  Correct.

24              MR. C. REGAN:  Your Honor, Exhibit 14 is actually

25     redacted.  It does display awkwardly as a video.  14, the

1    one that we just watched today, Your Honor, that is sort of

2    -- it displays with something like two-thirds or three-

3    quarters of the screen blacked out.  It's not a very obvious

4    redaction, but it is, in fact, redacted; so I would offer

5    that.

6              MR. P. REGAN:  I don't think we need it though.

7              THE COURT:  Okay.  Mr. Waters.

8              MR. WATERS:  I don't think we need it as long

9    as --

10             THE COURT:  It wasn't clear from the video that

11   there were actually redactions since so much of it was --

12   since it was sort of a standalone video, so let's get rid of

13   Instruction 18.

14             Instruction 20, there were some stipulated

15   facts -- the tables, the life span tables -- but I don't

16   believe there was stipulation of testimony.  Okay to get rid

17   of that?

18             MR. P. REGAN:  I agree with you -- yes, plaintiff

19   agrees.

20             THE COURT:  Mr. Waters?

21             MR. WATERS:  Defense agrees.

22             THE COURT:  Okay.

23             Okay.  25, exceptional skill not required,

24   specialized skill.  How does that relate to this case?  Do

25   we need it?  And if so, do we need both paragraphs?

1           Mr. Regan?  Are we talking about the driver who

2      does not have to act with exceptional skill or caution?

3           MR. P. REGAN:  Judge, the notes that I made when I

4      looked at it, I said this is covered by the common carrier

5      instruction.

6           THE COURT:  Okay.  So you're fine with getting rid

7      of this one?

8           MR. P. REGAN:  Deleting this one.

9           THE COURT:  Okay.  Mr. Waters?

10          MR. WATERS:  We agree.

11          THE COURT:  Okay.  So we'll delete No. 25.

12          28, "Assessment of Circumstances."  And I guess

13     the question is whether this is duplicative of the

14     assumption of risk instruction at 31.  What work does this

15     instruction do --

16          MR. P. REGAN:  I agree with that, Your Honor.

17          THE COURT:  -- that 31 does not do?

18          MR. P. REGAN:  I agree.

19          THE COURT:  Mr. Waters?

20          MR. WATERS:  We would actually prefer Instruction

21     28 to be given, Your Honor.  I think it's appropriate.  I

22     don't think it's duplicative.  I think the critical point on

23     this one is a person cannot ignore a known risk or obvious

24     danger.  I think it differs slightly -- it enhances on the

25     assumption of risk charge.  We'd like 28 to be included.

```
 1              MR. P. REGAN:  I think it's duplicative of

 2    assumption of risk, and assumption of risk sets forth what

 3    they have to prove.  It will only complicate matters.

 4              MR. WATERS:  I disagree.  I think it actually

 5    enhances the instruction.

 6              THE COURT:  All right.  I'll think about that one,

 7    but I'm inclined to leave it in.

 8              MR. P. REGAN:  Judge --

 9              THE COURT:  Would you object to it being left in?

10    Do you object to the substance of the instruction other than

11    duplicative?

12              MR. P. REGAN:  Yes.  I object to the substance of

13    it because I think it's confusing.  I think the only thing

14    that it relates to is assumption of risk, which is clearly

15    spelled out on the next page in No. 31.  I think that it's

16    not relevant to any issue with assumption of risk being

17    given.  It's not relevant to anything.

18              THE COURT:  All right.

19              MR. WATERS:  Your Honor, I disagree.  It's not

20    just only about assumption of risk.  It's about her primary

21    duty with regard to exercising due care for the contributory

22    negligence issue.  It's also about our driver.

23              THE COURT:  Okay.

24              MR. P. REGAN:  Contributory negligence is being

25    given, so it's duplicative of whether it's contrib or
```

1    assumption of risk.  Those are both on the next page.

2             MR. WATERS:  Both of those issues relate to a duty

3    that both -- that the plaintiff would have, but it also

4    relates to the duty that WMATA would have as the operator.

5    So I think it actually enhances and explains those

6    instructions in a way that puts them in context, and

7    appropriately advises them with regard to the duty to

8    observe circumstances under the -- in the situation that's

9    involved.

10            THE COURT:  Okay.  We'll make a decision on this

11   one; and whichever way we do, both sides' objections are

12   noted.

13            All right.  Instruction 36, "30(b)(6) Testimony."

14   Mr. Regan, the younger, requested this after Mr. Clev

15   Bernard's testimony.  Neither of the parties suggested it in

16   their proposals.  There isn't, as far as I can tell a

17   standard Red Book instruction on 30(b)(6) witnesses, so we

18   sort of came up with this on our own.

19            Any objection to including this?

20            MR. P. REGAN:  No, Judge, and it would be two in

21   light of today.

22            THE COURT:  Excuse me?

23            MR. P. REGAN:  No, no objection, and it would be

24   two.

25            THE COURT:  Yes.

1          MR. WATERS:  We do object to this, Your Honor.  I

2     think it is inappropriate.  It's not a standard instruction.

3     I don't think that it's necessarily -- appropriate or

4     necessary under the circumstances.  They were identified as

5     corporate designees.

6          What counsel is --

7          THE COURT:  Is it a misstatement of the law?

8          MR. WATERS:  I don't think it's a misstatement of

9     the law, Your Honor.

10          THE COURT:  Okay.

11          MR. WATERS:  But it's actually telling the jury to

12     give greater weight to certain witnesses' testimony than to

13     other witnesses' testimony.  And I think, to the extent that

14     it's essentially telling the jurors that these witnesses are

15     different, right -- tells them that their testimony's more

16     important than others; that they should give more credence

17     to that than others -- I don't think that's appropriate.

18          THE COURT:  Okay.  We'll instruct them that they

19     should not give greater or lesser weight to a corporate

20     representative.

21          MR. P. REGAN:  Right.  As long as the second

22     sentence is there, we're fine.

23          THE COURT:  Okay.

24          MR. WATERS:  Just noting for 51 -- Rule 51

25     purposes, we do object to the charge in its entirety.

1          THE COURT:  Very well.

2          MR. P. REGAN:  And, Judge, at the top of the next

3     page it says "bus driver" because that's the standard

4     instruction, but I should say we should substitute "train

5     operator."

6          THE COURT:  Any objection to that, Mr. Waters?

7     It's "for example," so it's not suggesting that it's related

8     to this case.

9          MR. WATERS:  That's why I was okay with the

10    original charge, because it was using "bus driver" as an

11    example.  Saying a train operator, for example, is putting

12    that I think a lot more closer to the issues in this case in

13    a way that's kind of directing the jury's attention to that

14    particular example.

15         I would prefer the charge to be given as it's

16    stated in the instructions.

17         THE COURT:  I don't think it matters one way or

18    the other.  We'll consider that.

19         Okay.  Instruction 41, has there been evidence of

20    lack of mitigation, Mr. Waters?  I didn't hear any.

21         MR. WATERS:  I'm sorry, Your Honor, indulgence one

22    minute.  I'm just going through the testimony in my head.

23         THE COURT:  I'm not sure that's an issue here.

24         MR. P. REGAN:  No.

25         MR. WATERS:  I don't believe it is, Your Honor.

```
 1              THE COURT:  Okay.  Any objection to omitting a

 2    duty to mitigate instruction?

 3              MR. P. REGAN:  Not from plaintiff.

 4              MR. WATERS:  None, Your Honor.

 5              THE COURT:  Okay.  We'll strike that one.

 6         Okay.  And just going over these, I also noted

 7    some other changes that are more sort of line changes.  Let

 8    me just review those with you.

 9         Okay.  No. 14, second sentence, "if any medical

10    illustration does not correctly reflect fact or figures,"

11    we'll delete "figures" because there are no figures at

12    issue.

13              MR. P. REGAN:  We agree.

14              MR. WATERS:  No objection.

15              THE COURT:  Okay.

16              MR. WATERS:  I think -- if the third sentence does

17    not directly reflect facts or figures, the word "figures" is

18    going to be stricken?

19              THE COURT:  The third sentence, yes.

20              MR. WATERS:  Okay.

21              THE COURT:  Just "facts," not "figures."

22         Okay.  Instruction No. 22, "Plaintiff's

23    Allegations," on the second page where it says "WMATA denies

24    that the train operator acted negligently and contends that

25    Ms. Scott's own negligence contributed to any injuries she
```

1      suffered," I would propose adding "and that she assumed the

2      risk of being harmed" since there are really two defenses.

3                  MR. WATERS:  Yes, Your Honor, we do -- we were

4      going to make the same request.

5                  THE COURT:  Okay.

6                  MR. WATERS:  I would also just note as kind of an

7      editorial, the train operator's female.  The male pronoun

8      appears in the instruction; "when she repositioned the

9      train."

10                 MR. P. REGAN:  Oh, yeah, when "she."

11                 THE COURT:  Yes.

12                 Okay.  And in Instruction 38, "Damages Elements,"

13     it begins, "If you find that WMATA's negligence caused

14     Ms. Scott to suffer injury," and I would then include a

15     hyphen "and that Ms. Scott was not contributorily negligent

16     and did not assume the risk of harm," hyphen, "then you must

17     consider whether she is entitled to damages."

18                 MR. WATERS:  We agree.

19                 THE COURT:  And that incorporates both the

20     plaintiff's case and the two affirmative defenses.

21                 MR. P. REGAN:  No objection.

22                 THE COURT:  Okay.

23                 MR. WATERS:  On that same charge, Your Honor, I

24     think Mr. Regan submitted some proposed changes with regard

25     to elements of damages that are included in the instruction

1      that are not being sought in the case.

2                 THE COURT:  Okay.  And we talked about those this

3      morning.  I'm not sure -- so which numbers should come out?

4                 MR. P. REGAN:  So, Judge, at the bottom of that

5      page, if you're on -- if you have the same draft we do, just

6      put a period after "past."

7                 THE COURT:  So 6, "Any medical expenses incurred

8      by Ms. Scott in the past" period?

9                 MR. P. REGAN:  Yes, and then I guess -- and before

10     6.

11                THE COURT:  And then delete everything in that

12     paragraph?

13                MR. P. REGAN:  Correct.  Well, everything -- those

14     top two lines on Page 18.

15                THE COURT:  Got it.

16                Okay.  Instruction 39, "Extent of Damages Caused."

17     It says, "Ms. Scott is entitled to compensation for any harm

18     that WMATA's negligent or wrongful conduct caused."  I would

19     propose striking "wrongful" because it's not -- the only

20     issue in this case is negligence, and who knows whether they

21     might come up with some other conduct that they think is

22     wrong in some respect?

23                MR. P. REGAN:  That's fine.

24                MR. WATERS:  We agree.

25                THE COURT:  Got it.

1          Okay.  There are a few other minor wordsmithing

2     things, but that was all on my list.  Anything else?

3          MR. P. REGAN:  And, Judge, we're fine.  Nothing

4     else.  But I would like a verdict form before we go to

5     closing.

6          THE COURT:  We have to do that.

7          Before we get there, Mr. Waters, anything else on

8     the instructions?

9          MR. WATERS:  Yes, Your Honor.  We had requested

10    the no comparative negligence charge to be given.  That's

11    D.C. 5.06.  I think that that is an appropriate charge, an

12    explanation of the contributory negligence --

13         THE COURT:  I'm sorry, my real-time is down.

14    5.06, what was the charge?

15         MR. WATERS:  Yes, sir.  It was a charge on no

16    comparative negligence, explaining the difference between

17    contributory and comparative negligence in a way that the

18    jury can understand it, indicating that they may not

19    apportion fault between the defendants or -- I'm sorry,

20    between the parties as we do in other jurisdictions, but

21    they may -- but highlighting the importance of the

22    contributory negligence rule, that if they find plaintiff

23    contributorily negligent, the result is a defense verdict.

24         THE COURT:  Was that one -- that was in your

25    proposed instructions.

```
1                    MR. WATERS:  Yes, Your Honor.

2                    THE COURT:  Mr. Regan.

3                    MR. P. REGAN:  Which one is it?

4                    MR. WATERS:  5.06.

5                    MR. P. REGAN:  It's not listed in the pretrial.

6                    THE COURT:  I see it.  It's in the -- it's

7      actually in the jointly requested section.

8                    MR. P. REGAN:  Oh.

9                    THE COURT:  I'm not sure why we did not include

10     that one.  Mr. Regan?

11                   MR. P. REGAN:  All right.  Well, I'm trying to

12     find it.

13                   THE COURT:  Page 2 of the parties' proposed jury

14     instructions.

15                   MR. P. REGAN:  Which page is it, Your Honor?  I'm

16     sorry.

17                   THE COURT:  Page 2.

18                   MR. P. REGAN:  Well, I don't think that applies --

19     that applies in a joint and several situation clearly.  It

20     doesn't apply between plaintiff and defendant.

21                   MR. WATERS:  I think -- if you review the charge,

22     I think it clearly does apply.

23                   Do you have the charge?

24                   THE COURT:  Okay.

25                   MS. GILMAN:  If you find that more than one party
```

1    to this action was negligent, you must not weigh one

2    person's negligence against another's.  You must not compare

3    their negligent conduct to decide which is more or less at

4    fault.

5            MR. WATERS:  I think that is appropriate here,

6    Your Honor, given that any confusion that may arise from a

7    contributory negligence situation, that between the two

8    parties -- Ms. Scott's claiming that we're at fault.  We

9    have an argument with regard to her own failure to exercise

10   due care.  The jury needs to be instructed that they can't

11   assign percentages or essentially give a compromised

12   verdict.

13           THE COURT:  Mr. Regan, A, why was it jointly

14   proposed?  That was an oversight?

15           MR. P. REGAN:  It is.  It confuses the burden of

16   proof, too.  I mean, that's -- if they find contributory

17   negligence, they don't have to compare anything.  That's --

18   there is no -- this applies when there's two defendants

19   and --

20           THE COURT:  Well, it doesn't say, "if you find

21   that more than one defendant to this action was negligent."

22   It says, "if you find more than one party to this action."

23   That's quintessential comparative, which is not the law in

24   this jurisdiction.

25           MR. P. REGAN:  Well, then there's no reason to

1    give it.

2            THE COURT:  All right.  I'm inclined -- let me

3    consult with my counsel, but I'm inclined to include this

4    one because I think it is a natural impulse for jurors to

5    wonder whether they can split the baby.

6            MR. WATERS:  We have two others, Your Honor.

7            THE COURT:  Okay.

8            MR. WATERS:  One of the ones that we had requested

9    -- I think we requested or was it jointly? -- was 5.12, and

10   it's "Cause Defined."  This was a joint request.

11           THE COURT:  Hold on.

12           MR. P. REGAN:  I'm sorry, which number?

13           MR. WATERS:  5.12, "Cause Defined."

14           MR. P. REGAN:  5.12.

15           THE COURT:  Okay.  Again, that was a jointly

16   requested one.  I believe we did not...

17           (Pause)

18           MR. P. REGAN:  Judge, I'm fine with it.

19           THE COURT:  I'm pretty sure that we didn't include

20   it because we thought it was repetitive or duplicative.

21           MR. P. REGAN:  I also agree with that.  But either

22   way, it's okay.

23           THE COURT:  All right.  No objection to including

24   some variant of 5.12, Mr. Regan?

25           All right.  We'll work that into the cause element

1     of the negligence claim.

2                     MR. WATERS:  Thank you, Your Honor.

3                     THE COURT:  The bracketed section about violating

4     a statute or regulation is not relevant, correct?

5                     MR. WATERS:  I'm sorry?

6                     THE COURT:  The bracketed section of 5.12 in your

7     jointly proposed, that's not relevant here, correct?

8                     MR. WATERS:  Not relevant.

9                     THE COURT:  Okay.

10                     MR. WATERS:  So I also wanted to raise the request

11     that we had made that the -- forgive my shorthand -- the

12     jerk/jolt instruction, 8.05, we believe should be given.  I

13     think one of the critical issues in Your Honor's summary

14     judgment decision related to the reasonableness of the

15     passenger expecting to alight at the moment.  I think that

16     the testimony here at trial indicated that was something

17     very, very significantly different than what we had at the

18     summary judgment motion.

19                     As Your Honor may recall, at summary judgment,

20     Ms. Scott had testified that there was an announcement that

21     the doors were opening between the time the train stopped

22     and when the train repositioned.  Now she's testified that

23     that announcement was not made at that time.  The

24     announcement was made as the train was coming into the

25     station.  I think that that changes the dynamic

1    significantly with respect to the bases for Your Honor's

2    decision to deny our motion for summary judgment with

3    respect to jerk and jolt.

4            So while I understand --

5            THE COURT:  Okay.  I'm sorry?

6            MR. WATERS:  I'm sorry?

7            THE COURT:  Where is the instruction that you all

8    proposed?

9            MR. WATERS:  It's 8.05, the standard instruction.

10           THE COURT:  Which page of the proposed joint jury

11   instructions?

12           MR. WATERS:  It does not appear in the jury

13   instructions.  That was omitted from Your Honor's --

14           THE COURT:  No, in the pretrial submission joint

15   proposed -- or proposed jury instructions, where is that

16   instruction so that I can look at it?

17           MR. P. REGAN:  It's on Page 19, Your Honor.

18           MR. WATERS:  Thank you, Counsel.

19           THE COURT:  Okay.  8.05, sudden starts, stops,

20   jerks, or jars.

21           MR. P. REGAN:  And, Judge, that clearly relates to

22   the operation of a bus, and a situation here where even

23   Metro's employee agrees -- Metro's employees, plural, agree

24   that coming into the station and stopping and then moving to

25   reposition requires a warning.  So it's not a sudden -- it's

```
 1    not a risk here.  That's not --
 2              THE COURT:  Okay.  So in the summary judgment
 3    ruling, correct me if I'm wrong, but we rejected WMATA's
 4    argument that the standard rule that common carriers are not
 5    responsible for ordinary jerks and jars did not -- we
 6    rejected your argument that that rule applied in this
 7    situation where a train stops and says it's at the station,
 8    and then after it stops it restarts without warning.
 9              We said that that scenario falls outside of the
10    standard rule for common carriers, that there's no liability
11    for standard jerks and jolts.
12              MR. WATERS:  At great peril to myself, Your Honor,
13    quoting yourself back to you.
14              THE COURT:  Okay.
15              MR. WATERS:  "The Court need not decide whether
16    this evidence is enough to pass the unusual and
17    extraordinary force test, however, because the Court is
18    unconvinced that this rule applies when passengers are
19    reasonably attempting to alight from a train that has
20    stopped at a station."
21              THE COURT:  Okay.
22              MR. WATERS:  It's the "reasonably attempting to
23    alight from the station" issue that I think has changed with
24    the testimony that we heard because in the summary judgment
25    motion we were basing that on the deposition testimony we
```

 1      had.  The deposition testimony we had was that the train

 2      stopped and the announcement was "McPherson Square, doors

 3      opening left side," and then the train moved.  I think that

 4      changes the dynamic.

 5              THE COURT:  I don't know what depositions you're

 6      referring to, but I think, if you read the factual section

 7      of the summary judgment ruling, the fact that I took from

 8      the record was that there was an announcement made, "Train

 9      approaching McPherson Square, doors opening on the left,"

10      and based on that announcement Ms. Scott got up -- and then

11      the train stopped, she got up, and it then moved without

12      warning.

13              I think our ruling was based on that factual

14      finding.

15              MR. WATERS:  I don't -- with respect, Your Honor,

16      I don't believe there was any evidence in the record at the

17      summary judgment stage that the announcement was made at any

18      time before the train stopped.  Her testimony was that the

19      train stopped and then the announcement was made.

20              THE COURT:  Okay.  And --

21              MR. WATERS:  And the testimony at trial is

22      different.

23              THE COURT:  And tell me why that is determinative

24      and relevant to this instruction.

25              MR. WATERS:  I dare not speculate as to Your

1    Honor's thinking in the summary judgment.

2         THE COURT:  Not determinative for summary

3    judgment --

4         MR. WATERS:  Right.

5         THE COURT:  -- but determinative in the context of

6    this instruction.

7         MR. WATERS:  From a passenger's perspective, the

8    passenger's arriving on the train.  The operator makes the

9    announcement as they're arriving.  Right?  That's different

10   from when the train stops and then the operator makes the

11   announcement.  I think that that -- making the announcement

12   is a considerable part about whether it was reasonably --

13   whether a passenger reasonably expected to alight from the

14   train at that time.  And the point here is without -- with

15   that change in testimony, right, it's no longer -- it takes

16   it outside of the reasonable expectation of alighting from

17   the train.

18        And I'm not saying it's as a matter of law.  I

19   think it is a question for the jury to decide.  But because

20   it's a question for the jury to decide, I think that 8.05

21   should be given, and that it's appropriate for them to hear

22   that because it's the law in the District of Columbia.

23        I would also note, to Mr. Regan's point, the

24   charge does not relate specifically to buses.  It talks

25   about common carriers.

```
 1                THE COURT:  Mr. Regan?
 2                MR. P. REGAN:  Judge, with all due respect -- and
 3     I don't think I need to belabor this point because the Court
 4     appreciates it -- that is a distinction without a
 5     difference.  Okay?  Everybody agrees the announcement was
 6     made before she fell.  When it was made before she fell is
 7     immaterial to the dispute here.  Every single witness in
 8     this trial has said that the train came to a stop, a
 9     complete stop, at the McPherson Square.  Every single
10     witness has said that no announcement was made before the
11     train started.  That's the facts of this case.
12                It doesn't matter if the announcement was made
13     about the doors opening on the left or wasn't made about it.
14     The train came to a stop at McPherson Square, was stopped
15     for a period of time, and then jerked forward.  That is
16     undisputed.  Nobody disputes those facts.
17                And an hour ago we had a designated representative
18     of Metro say that a warning must always be given under that
19     scenario.  "Always" was the word she used.
20                THE COURT:  So your position as a matter of law,
21     in effect, is that if giving a warning after the train stops
22     is the national standard of care, and no warning is given,
23     and the train moves at all after no warning is given, then
24     WMATA is liable for any resulting injuries regardless of
25     whether that movement is a common jerk or jolt or an
```

 1    extraordinary jerk or jolt.

 2            MR. P. REGAN:  Exactly.  And they have agreed with

 3    it.  Their witness agreed to it; said that the -- it must be

 4    given.  I mean, I wrote it down.  It said -- actually,

 5    "absolutely must warn passengers before moving the train

 6    again."  And that's in quotes, "absolutely must warn

 7    passengers before moving the train again."  That's

 8    Ms. Henry.

 9            So those are the facts.  This is not --

10            THE COURT:  So the severity of the resulting jolt

11    is immaterial in this case under these facts to liability.

12            MR. P. REGAN:  Correct.  And this is not -- this

13    is not what is anticipated in the instruction that's being

14    given because that's where, you know, a bus hits a pothole

15    or a bus slams the brakes on.  Those are inherent risks, if

16    you will.

17            But this is not.  This is -- the facts here are

18    undisputed.

19            MR. WATERS:  Your Honor, I'd point to your opinion

20    on Page 12 where you indicated that "From the Court's

21    vantage, the central question is whether a reasonable person

22    in Ms. Scott's shoes would have believed it was safe to

23    begin alighting the train after the train had come to a

24    complete stop at the station and announced, 'McPherson

25    Square, doors opening on the left.'"

```
1                    So I think it was a key part of the rationale --

2                    THE COURT:  Okay.

3                    MR. WATERS:  -- with respect to jerk/jolt on

4      summary judgment motion.  I think that the testimony here

5      from Ms. Scott does change that dynamic in such a way that

6      the jerk/jolt charge would be appropriate to be given to the

7      jury as part of the assumption instructions.

8                    THE COURT:  Okay.  We'll take a look at that.  And

9      we'll do a revision; give you the final version; let you

10     lodge any final objections to it; bring the jury in, and

11     read them.  Okay?

12                   MR. P. REGAN:  Yes.  So, Judge, what's the --

13     before you leave, what's the plan?  Instruct and then go

14     right to closing, or instruct and then take a break?

15                   THE COURT:  Yes, good question.  20 pages, this

16     shouldn't take -- this should take 40 minutes, probably, to

17     read; a couple of minutes a page.  So we probably should, if

18     you're ready, do closings -- at least your closing -- before

19     lunch.

20                   MR. P. REGAN:  I'd prefer not to split closings,

21     but, you know, you decide.  But that's my preference.

22                   THE COURT:  How long do you plan?

23                   MR. P. REGAN:  It could be 40 minutes, but I hope

24     not.

25                   THE COURT:  40 minutes.
```

```
 1                    Mr. Waters?

 2                    MR. WATERS:  25, 30.

 3                    Your Honor, one minor --

 4                    THE COURT:  I'll tell you what.  Let's give the

 5       plaintiff -- both sides 45 minutes total for closing and

 6       rebuttal.  Okay?

 7                    MR. P. REGAN:  Okay.

 8                    THE COURT:  All right.  And then, Mr. Waters, you

 9       take as much of 45 minutes as you like.

10                    MR. WATERS:  I won't require it.

11                    THE COURT:  All right.

12                    MR. WATERS:  One thing I would note on Instruction

13       19.  Dr. Harris was omitted from the --

14                    THE COURT:  Yes, thank you.  Thank you.

15                    MR. WATERS:  Okay.

16                    THE COURT:  Any other small typos, nits?

17                    MR. WATERS:  I'm checking right now, Your Honor.

18                    MR. P. REGAN:  But we will -- before we start

19       closing, we'll have the verdict form, right?

20                    THE COURT:  Yes.

21                    MR. P. REGAN:  Okay.

22                    THE COURT:  There didn't seem like -- there were

23       sort of stylistic differences, but there didn't seem to be

24       any substantive differences between the two proposed verdict

25       forms.
```

```
 1              MR. WATERS:  Oh, yes, Your Honor.  I think that

 2    based on how the case has progressed, one thing that we did

 3    -- one thing, I think, that was in our proposed, I guess,

 4    juror interrogatories that we should have included was an

 5    interrogatory with regard to assumption.

 6              THE COURT:  I'm sorry, I didn't catch that.

 7              MR. WATERS:  With regard to assumption of the

 8    risk.  We'd included one on contributory negligence.  Since

 9    they're separate defenses, I think there should be separate

10    interrogatories to the jurors; one for contributory

11    negligence, one for assumption of the risk.

12              THE COURT:  Mr. Regan?

13              MR. P. REGAN:  I think he's right.

14              THE COURT:  Okay.

15              Okay.  We'll tinker with that, and we'll be back.

16    So we'll take a 15-minute break, reconvene at 10 -- five

17    until 11:00.

18              (Recess taken)

19              THE COURT:  Okay.  You should all have a copy of

20    the final instructions that I will read to the jury.  Just

21    for the record, you will see that -- all right, the Court

22    included what is now Instruction No. 24, "Cause Defined."

23    We also included Instruction No. 27, "Assessment of the

24    Circumstances."  We included that.  I think it does do at

25    least some additional work to the assumption of risk and
```

 1    contributory negligence assumptions, and it is not

 2    confusing.  So your objection, Mr. Regan, is noted, but we

 3    will include that instruction.

 4            I noticed that there's a gap between 27 and 29.

 5    We will correct that when we send the instructions back to

 6    the jury.

 7            We included the "No Comparative Negligence"

 8    instruction.  I think that's a standard D.C. instruction,

 9    which probably explains why it was jointly proposed in the

10    first place, and that, as I said before, will eliminate any

11    invitation for the jury to split the baby on comparative

12    negligence.  I think it makes sense probably to have that

13    instruction read after the contributory negligence

14    instruction.  So we'll -- I'll read them in that order, and

15    we'll change the order in the version that goes back to the

16    jury.

17            On Page 16, the italicized language is still

18    there.  We will get rid of that.  And we decided not to give

19    the proposed instruction 8.05 "Sudden Starts, Stops, Jerks

20    or Jars" instruction.  The Court's summary judgment opinion

21    made clear that, "The Court is unconvinced that this rule

22    applies when passengers are reasonably attempting to alight

23    from a train that has stopped from the station.  As the

24    Court explained, when a reasonably prudent person would

25    think it's safe to begin exiting the vehicle, negligence may

1    be inferred from the mere fact that the vehicle moved when

2    passengers were heading for the exits, and those passengers

3    do not necessarily assume the risk that the vehicle will

4    move forward after the operator has given the impression

5    that it is safe to stand up and make one's way towards the

6    doors.  Thus, it might be unnecessary for the plaintiff to

7    prove that the subsequent acceleration was especially

8    forceful to make her case."

9           So consistent with that ruling, I don't think

10    we're in the sudden jerk or jar world.

11           All right.  And your objection is noted.

12           MR. WATERS:  Yes, Your Honor.

13           THE COURT:  All right.  Are we ready?

14           Your objection to that instruction is noted.

15           MR. WATERS:  Oh, I'm sorry, I thought you were

16    asking for our 51(b)(2) objections.

17           THE COURT:  We've ruled.

18           MR. WATERS:  Okay.

19           THE COURT:  Anything else from these --

20           MR. WATERS:  Yes, Your Honor, I understand the

21    Court removed or is including "Corporate Party

22    Representative" Instruction 37.

23           THE COURT:  Hold on.  Hold on.  Hold on.

24           No, no, just the italicized language.  The Court

25    will keep that instruction with the final sentence included,

1    which was your suggestion.

2              MR. WATERS:  I'm sorry, it was 37, not 36 in

3    italicized language.  It was 37 that we objected to.

4              THE COURT:  I understand.  You'll see a colon

5    after the italicized language, which points you to 37.

6    We're going to remove the italicized language but keep the

7    instruction.

8              MR. WATERS:  Right, but we object to that

9    instruction.  I just wanted to be clear.

10              THE COURT:  Okay.

11              MR. WATERS:  And I just wanted if -- for the

12    Court's purposes, I think there was one issue that we found

13    that -- I think there was a repeated phrase --

14              THE COURT:  Yes, I caught that.

15              MR. WATERS:  -- in 21.

16              THE COURT:  I caught that.

17              MR. WATERS:  Thank you.

18              Does Your Honor want to take any issues with the

19    verdict form at this point, or do we want to do that after

20    we charge and summarize?

21              THE COURT:  Let's take that up after instructions.

22    Basically it's on -- it was plaintiff's format, but we tried

23    to borrow some language from the defense's version as well.

24    We included the assumption of risk interrogatory.  We'll

25    reformat it on our standard format before it goes back to

1    the jury or before openings so that if you want to show it

2    to the jury, but why don't we -- why don't we take that up

3    at the break after I instruct.

4              MR. WATERS:  Very well.

5              MR. P. REGAN:  So at this point do you anticipate

6    taking a lunch break or just a short break?

7              THE COURT:  Let's take our lunch break.  We'll

8    take an early lunch and close after lunch.

9              MR. P. REGAN:  Okay.

10             (Jury enters courtroom)

11             THE COURT:  Okay.  Thank you for your patience,

12   ladies and gentlemen.  I don't necessarily like to hear

13   myself talk, but I am required by law to read you the

14   instructions that will govern your deliberations.  I'll tell

15   you, though, that you will each have a written copy of the

16   instructions in the jury room with you.

17             Ladies and gentlemen, you have now heard all of

18   the evidence in this case.  Before you begin your

19   deliberations, I'm going to instruct you on the law.  I will

20   start with some general rules of law and then talk about the

21   specific claims alleged here and some of the specific issues

22   in this case.  Some of these rules will repeat what I told

23   you in my preliminary instructions.  You will also be

24   allowed to take a copy of these instructions with you into

25   the jury room to consult during your deliberations, if you'd

1      like.

2              My duty at this point is to instruct you as to the

3      law and the legal principles that apply to this case.  It is

4      your duty to accept the law as I state it to you without

5      questioning the wisdom of these instructions.  Regardless of

6      any opinion that you may have as to what the law may be or

7      ought to be, it would violate your sworn duty as jurors to

8      base a verdict upon any other view of the law than is stated

9      in these instructions.  In addition, if any of the lawyers

10     have stated a legal principle differently than I state in my

11     instructions, it is my instructions that you must follow.

12             You must treat and consider all of these

13     instructions as a whole.  You must not single out any

14     particular one instruction or sentence while ignoring

15     others.  You must give each instruction equal importance and

16     consider each one equally with all other instructions.

17             As I told you, your function as jurors is to

18     decide the facts, and you, as members of the jury, are the

19     sole and exclusive judges of the facts.  You must pass upon

20     the evidence.  You must determine the credibility and

21     believability of witnesses.  You must resolve any conflicts

22     that you might have heard in the testimony.  You draw

23     whatever reasonable inferences you decide to draw from the

24     facts as you have determined them, and you determine the

25     weight, effect, and value of the evidence.

1          In determining the facts, you are reminded that

2     you took an oath to render your verdict impartially and

3     fairly without prejudice, sympathy, fear, or favor based

4     solely upon the facts as you determine them to be from the

5     evidence and the applicable law as I state it.

6          During the course of the trial, you have heard

7     references to the term "plaintiff" and "defendant."  To put

8     it as simply as possible, the plaintiff is the person who

9     initiates a lawsuit, and the defendant is the person who is

10    sued by the plaintiff.  During your deliberations, you must

11    not attach any significance to the term "plaintiff" and

12    "defendant" when weighing the evidence.

13         In other words, the fact that the plaintiff here

14    has filed a lawsuit against the defendant does not mean that

15    the plaintiff is entitled to a favorable verdict or that her

16    evidence is entitled to greater weight than the defendant's

17    evidence.  The plaintiff may not prevail on any claim

18    against the defendant unless she proves every element of

19    that claim by a preponderance of the evidence.

20         During the course of the trial, I may have asked a

21    question of a witness to obtain information, to bring out

22    facts, or to expedite the trial.  You should not interpret

23    my questions to any witness as an indication of my opinion

24    about how you should determine the facts.

25         Likewise, if I have said anything or done anything

1     at any time during this case -- including giving you these

2     instructions -- that seemed to indicate my opinions on any

3     of these matters, then I instruct you to disregard that

4     indication.  Nothing I have said or done should influence or

5     suggest to you that I favor either party in this case.  I've

6     not meant to express or to suggest any opinion about which

7     witnesses should be believed or which facts are established.

8             Our system of justice requires that you decide the

9     facts in this case in an impartial manner.  You must not be

10    influenced by bias, sympathy, prejudice, or public opinion.

11    It is a violation of your sworn duty to base your verdict

12    upon anything other than the evidence in the case.  In

13    reaching a just verdict, you must consider and decide this

14    case as an action between persons of equal standing in the

15    community and of equal worth.  All persons stand equal

16    before the law and must be treated as equals in this Court.

17            There were times during the trial when a lawyer

18    made an objection to a question asked by another lawyer or

19    to an answer given by a witness.  The lawyers have also

20    occasionally asked the Court to make rulings of law and

21    requested conferences on our closed-circuit phones outside

22    the hearing of the jury.  It is the lawyers' right and duty

23    to make objections or to request bench conferences if the

24    lawyers believe something improper is being done.  You

25    should not be influenced by any lawyer's objections no

1    matter how I ruled upon them.

2         When I sustained an objection to a question, the

3    witness was not allowed to answer it.  Do not attempt to

4    guess what the answer might have been had I allowed the

5    question to be answered.  Likewise, when I told you to

6    disregard a particular answer, you should have put that

7    statement out of your mind, and you may not refer to that

8    stricken answer during your deliberations.

9         If certain testimony or other evidence was

10   received for a limited purpose, then you must follow the

11   applicable limiting instructions I have given you.

12   Likewise, if I have sustained an objection to any exhibits

13   or ordered them stricken, then those stricken exhibits are

14   not evidence, and you must not consider them.

15         Other than any facts I instruct you to accept as

16   true during these instructions, you may consider only the

17   evidence properly admitted at the trial.  Evidence includes

18   the sworn testimony of witnesses, exhibits admitted into

19   evidence, and facts stipulated and agreed to by the parties.

20   You may consider any facts as to which all counsel have

21   agreed or stipulated to be undisputed evidence.

22         When you are considering the evidence, however,

23   you are not limited solely to the statements of the

24   witnesses.  You are permitted to draw from the evidence any

25   inferences or conclusions that reason, common sense, and

1    experience lead you to make.  However, you should not engage

2    in speculation or make a decision based simply upon

3    conjecture.

4          There are times when different inferences may be

5    drawn from facts, whether proved by direct or circumstantial

6    evidence.  A plaintiff may ask you to draw one set of

7    inferences while the defendant may ask you to draw another.

8    It is up to you, and you alone, to decide what inferences,

9    if any, to draw.

10         Statements and arguments of the lawyers, such as

11   their opening statements and closing arguments, are not

12   evidence.  They are intended only to help you understand and

13   interpret the evidence from each party's perspective.  The

14   questions that the lawyers ask are not evidence either.  A

15   lawyer's question that contains an assertion of fact does

16   not provide evidence of that fact unless a witness responded

17   to the question in the affirmative.

18         During the case, the lawyers may have called your

19   attention to certain evidence.  If you remember that

20   evidence differently from the way the lawyers stated it,

21   then you should disregard their characterization of the

22   evidence and rely on your own memory.

23         There are two types of evidence:  direct and

24   circumstantial.  Direct evidence is the direct proof of a

25   fact, such as the testimony of an eyewitness.

1    Circumstantial evidence is indirect evidence of a fact which

2    is established or logically inferred from a chain of other

3    facts or circumstances.  For example, direct evidence of

4    when an animal was running in the snow might be the

5    testimony of a person who actually saw the animal in the

6    snow.  Circumstantial evidence might be the testimony of a

7    person who saw tracks of the animal in the snow rather than

8    the animal itself.

9          You may consider both types of evidence equally.

10   The law makes no distinction between the weight to be given

11   to either direct or circumstantial evidence.  The law does

12   not require a greater degree of certainty for circumstantial

13   evidence than for direct evidence.  You should weigh all the

14   evidence in the case, both direct and circumstantial, and

15   find the facts in accordance with those -- with that

16   evidence.

17         A party who makes a claim has the burden of

18   proving it.  The burden of proof on all the plaintiffs

19   claims in this case is that she must prove every element of

20   her claim by a preponderance of the evidence.  In this case,

21   you have heard -- WMATA argues in this case that Ms. Scott

22   was contributorily negligent and that she assumed the risk

23   of harm.  I will instruct you in a minute about those

24   defenses, but with respect to those two defenses, WMATA

25   bears the burden of proof.

1          To establish a fact by a preponderance of the

2    evidence is to prove that it is more likely so than not so.

3    In other words, a preponderance of the evidence means that

4    the evidence produces in your mind the belief that the thing

5    in question is more likely true than not true.  If, after

6    considering all of the evidence, you believe the evidence

7    favoring the plaintiff's side of an issue is more convincing

8    to you and causes you to believe that the probability of

9    truth favors the plaintiff on that issue, then the plaintiff

10   will have succeeded in carrying the burden of proof on that

11   issue.

12          If, on the other hand, you believe that the

13   evidence is equally balanced on an issue the plaintiff has

14   to prove, then the plaintiff will not have carried the

15   burden of proof, and your finding on that issue must be for

16   the defendant.  The same is true for any issue as to which

17   the defendant has the burden of proof.

18          The term "preponderance of the evidence" does not

19   mean that the proof must produce absolute or mathematical

20   certainty.  For example, it does not mean proof beyond a

21   reasonable doubt as is required in criminal cases.  When

22   there is a preponderance of the evidence -- whether there is

23   a preponderance of the evidence depends on the quality and

24   not the quantity of the evidence.  In other words, merely

25   having a greater number of witnesses or documents bearing on

1      a certain version of the facts does not necessarily

2      constitute a preponderance of the evidence.

3              In determining whether any fact has been proved by

4      a preponderance of the evidence, you should consider all the

5      evidence bearing upon that fact regardless of who produced

6      it.  A party is entitled to benefit from all favorable

7      evidence whether or not he or she produced it.

8              In evaluating the evidence and deciding what the

9      facts are, you must consider and weigh the testimony of all

10     the witnesses who have appeared before you.  You are the

11     sole judges of the credibility of those witnesses.  In other

12     words, you alone are to determine whether to believe any

13     witness and to what extent any witness should be believed.

14     If there is any conflict in the testimony between a

15     witness's testimony and other evidence, it is your duty to

16     resolve the conflict and to determine where the truth lies.

17             In deciding the credibility of any witness, you

18     may consider any matter that you may have -- that may have a

19     bearing on the subject.  You may consider the demeanor and

20     the behavior of the witness on the witness stand; whether

21     the witness impresses you as a truthful person; whether the

22     witness impresses you as having an accurate memory and

23     recollection; whether the witness has any motive for not

24     telling the truth; whether the witness has had a full

25     opportunity to observe the matters about which he or she has

1    testified; whether the witness has any interest in the

2    outcome of the case; or whether the witness has any

3    friendship or animosity toward other persons concerned in

4    the case.

5            You may consider the reasonableness or the

6    unreasonableness and the probability or improbability of the

7    testimony of a witness in determining whether to accept it

8    as true and accurate.  You may consider whether the

9    witness's testimony has been contradicted or corroborated by

10    other credible evidence.

11            If you believe that any witness has shown himself

12    to be biased or prejudiced, either for or against either

13    side in this case, you may consider and decide whether that

14    bias or prejudice has colored the testimony of the witness

15    so as to affect that witness's desire and capability to tell

16    the truth.  You should give the testimony of each witness as

17    much weight as you believe it is fairly entitled to receive.

18            The lawyers in the case have shown you a number of

19    medical illustrations to help explain the facts.  Medical

20    illustrations themselves, however, are not evidence or proof

21    of any facts.  If any medical illustration does not

22    correctly reflect the facts shown by the evidence in the

23    case, then you should disregard that illustration.  In other

24    words, the medical illustrations are used only as a

25    convenience.  You should disregard any illustration that

1    does not state the truth based on the evidence.

2         The relative weight of the evidence on a

3    particular issue is not to be determined by the number of

4    witnesses testifying for each side.  You should consider all

5    the facts and circumstances in evidence to determine which

6    of the witnesses are worthy of greater belief.  You may find

7    that the testimony of a smaller number of witnesses on one

8    side is more believable than the testimony of a greater

9    number of witnesses on the other.  Indeed, the testimony of

10   a single witness which you believe to be the truth is enough

11   to prove any fact.

12        If, after considering all of the evidence in this

13   case, you hold a greater belief in the accuracy and

14   reliability of one or a few witnesses' testimony, then you

15   may base your verdict on that testimony even though a larger

16   number of witnesses may have testified to the contrary.  The

17   law does not require either party to call as witnesses all

18   persons who may have been present at the time or place

19   involved in the case or who may appear to have some

20   knowledge of the matters at issue in this trial.

21        The testimony of a witness may be discredited or

22   impeached by showing that he or she has previously made

23   statements that are inconsistent with his or her present

24   courtroom testimony.  It is for you to decide whether a

25   witness made a statement on an earlier occasion and whether

1    it was, in fact, inconsistent with the witness's testimony

2    at trial.  If a witness at trial has been confronted with a

3    prior statement that the witness made, and that prior

4    statement is inconsistent with testimony here in court, then

5    you may consider the prior statement when you assess the

6    truthfulness of the testimony in court.

7            If the witness made the prior inconsistent

8    statement under oath subject to the penalty of perjury or at

9    a deposition, then you may treat that prior statement as

10   evidence in the case.  That is, you may treat what the

11   witness said in that prior statement as evidence like any

12   other evidence that you've heard.

13           If the witness was not under oath subject to the

14   penalty of perjury or at a deposition when he or she made

15   the statement, then you may not treat the prior statement as

16   evidence of the facts in the statement.  You may consider

17   the statement only to evaluate the witness's credibility.

18   That is, you may use the prior statement only to determine

19   whether to believe the witness's present testimony in court.

20           If you believe that any witness has been

21   discredited or impeached, then you should give his or her

22   testimony the weight, if any, that you judge it to be fairly

23   entitled to receive.

24           If a witness testifies that a prior inconsistent

25   statement is the truth, then you may consider the prior

1    statement both to evaluate that witness's credibility and as

2    evidence of the truth of any fact contained in that

3    statement.

4            You've heard testimony from a number of expert

5    witnesses in this case -- Dr. Berkowitz, Dr. Bishop, Dr.

6    Rao, and Dr. Harris -- who were deemed qualified to provide

7    opinions concerning their respective areas of professional

8    expertise.  If scientific, technical, or other specialized

9    knowledge might assist the jury in understanding the

10   evidence or in determining a fact at issue, a witness who

11   possesses knowledge, skill, experience, training, or

12   education may testify and state an opinion concerning such

13   matters.  You are not bound to accept this witness's --

14   these witnesses' opinions.

15           If you find that the opinion is not based on

16   sufficient education or experience, or that the reasons

17   supporting the opinion are not sound, or that the opinion is

18   outweighed by other evidence, you may completely or

19   partially disregard the opinion.  You should not consider

20   opinion evidence with -- you should consider opinion

21   evidence with all the other evidence in the case and give it

22   as much weight as you think it fairly deserves.

23           The parties have made at least one, maybe more,

24   stipulations of fact.  The parties may stipulate or agree to

25   certain facts.  You should consider any stipulation of fact

1    to be undisputed evidence.

2             A deposition is the testimony of a person taken

3    before trial.  A witness is placed under oath and swears to

4    tell the truth, and lawyers for each side may ask questions.

5    A court reporter is present and records the questions and

6    answers.

7             During the trial, you have heard deposition

8    testimony from a number of witnesses presented by videotape.

9    You should give deposition testimony the same fair and

10   impartial consideration you give any other testimony.  You

11   should not give more weight or less weight to deposition

12   testimony just because the witness did not testify in court.

13            All right.  I'm now going to give you a number of

14   instructions that relate to the specific law in this case.

15            Plaintiff, Carol Wild Scott, brings this civil

16   action against WMATA.  Ms. Scott alleges that on September

17   23, 2019, a WMATA train operator acted negligently when she

18   repositioned the train without warning after stopping at the

19   McPherson Square Metro stop.  Ms. Scott further alleges that

20   she was injured because the train suddenly moved.

21            WMATA denies that the train operator acted

22   negligently and contends that Ms. Scott's own negligence

23   contributed to any injury she suffered and that she assumed

24   the risk of being harmed.

25            I will now instruct you more fully on the legal

1    standards that apply to Ms. Scott's claims.

2         Ms. Scott alleges that WMATA was negligent and is

3    liable for the harm she suffered.  A negligence claim has

4    three elements.  First, the defendant did not use ordinary

5    care; second, that the defendant's failure to use ordinary

6    care caused plaintiff's harm; and third, that the plaintiff

7    is entitled to damages as compensation for that harm.

8         Ms. Scott must prove each element by a

9    preponderance of the evidence.  That is, she must prove that

10   each element is more likely so than not so.

11        A person is negligent if he or she does something

12   that a person using ordinary care would not do or fails to

13   do something that a person using ordinary care would do.

14        A person uses ordinary care when he or she uses

15   the same level of skill, caution, and attention that a

16   reasonable person would use under similar circumstances.

17        With respect to the second element of negligent

18   causation, Ms. Scott must prove by a preponderance of the

19   evidence that it is more likely than not that WMATA's acts

20   or failure to act caused her harm.  An act or a failure to

21   act causes harm if it played a substantial part in bringing

22   about the harm.  In addition, the harm must be either a

23   direct result or a reasonably probable consequence of the

24   act or the failure to act.

25        There may be more than one cause of harm.  Several

1  factors or circumstances or the acts or omissions of two or

2  more persons may cause the same harm.  Each of the acts or

3  omissions that played a substantial part in the harm is a

4  cause.  This is true even if one of the acts or omissions

5  contributed more than another to cause her harm so long as

6  each act or omission played a substantial part in the harm.

7          A defendant whose negligent act or omission caused

8  harm is responsible for the harm if an act or omission by

9  another person who is not a defendant in this case was

10  another harm -- cause of the harm even if the act or

11  omission of that person was greater than the act or omission

12  of WMATA.

13          The mere fact that an accident happened does not

14  mean that any party to this case was negligent.  The law

15  presumes that each party used reasonable care unless and

16  until one party proves otherwise.  The burden of proof is on

17  the party alleging negligence to overcome this presumption

18  of reasonable care.  To carry this burden, the party

19  alleging negligence must prove that it is more likely than

20  not that the negligence was caused by the accident.

21          A reasonable person changes his or her conduct

22  according to the circumstances.  If the risk or danger is

23  greater, a reasonable person acts more carefully.  A person

24  must use ordinary care to avoid an accident.  The law does

25  not try to regulate in detail what a person should do or

1    observe for his or her own safety.  The law does require,

2    however, that a person pay reasonable attention.

3              One who looks and does not see what is plainly

4    there to be seen is as negligent as one who never looked at

5    all.  A person may not ignore a known risk or obvious

6    danger.  A person should change his or her conduct according

7    to a known or obvious risk or danger even if the risk or

8    danger is created by another's physical condition or

9    misconduct.

10             When an expert witness is required, the expert

11    must clearly articulate and reference a standard of care by

12    which the defendant's actions can be measured, especially in

13    cases involving safety standards.  The expert must also show

14    that the particular practice at issue reflects a national

15    standard of care.  An expert's personal opinions or

16    unsupported assertions as to the national standard of care

17    are insufficient.

18             Although internal agency manuals, such as WMATA's

19    standard operating procedures, may provide evidence bearing

20    on the standard of care, they do not on their own establish

21    a national standard of care.  Rather, the expert must show

22    that the practices to which the agency has committed reflect

23    the national standard of care and not a higher, more

24    demanding one.

25             WMATA alleges that Ms. Scott was negligent.  WMATA

1    is not liable for Ms. Scott's harms if Ms. Scott's own

2    negligence is a cause of her harms.  The same rules you use

3    to decide whether WMATA was negligent apply when you decide

4    whether Ms. Scott was negligent.  To establish the defense

5    of what's called contributory negligence, WMATA must prove

6    that it is more likely than not both that, one, Ms. Scott

7    was negligent, and, two, Ms. Scott's negligence was a cause

8    of her own harm.  If WMATA proved these two elements, then

9    your verdict must be for WMATA.

10          If you find that more than one of the parties to

11   this action was negligent, you must not weigh one person's

12   negligence against another's.  You must not compare their

13   negligent conduct to decide which is more or less at fault.

14          WMATA also contends that Ms. Scott assumed the

15   risk of harm by standing up before the train doors opened

16   and not holding on to a pole or a handrail.  If you find

17   that Ms. Scott assumed the risk of harm, she is not entitled

18   to damages to compensate for harms caused by the risk that

19   she assumed.

20          You may find that Ms. Scott assumed the risk of

21   harm if WMATA proves by a preponderance of the evidence both

22   of the following:  one, Ms. Scott actually knew and

23   understood the full scope and magnitude of the danger

24   arising from WMATA's conduct; and two, Ms. Scott voluntarily

25   exposed herself to that danger.

1          The duty of assumption -- the defense of

2     assumption of risk does not apply if you find that Ms. Scott

3     had the duty or the legal right to expose herself to any of

4     the dangers arising from WMATA's conduct.  Also, the

5     assumption of risk defense does not apply if you find that

6     WMATA's conduct forced Ms. Scott into a position which left

7     her no reasonable choice other than to do what she did.

8          A person ordinarily has the right to assume that

9     other people will exercise ordinary care.  A person also

10    ordinarily has the right to assume that other people have

11    normal abilities, intelligence, sight, and hearing.  A

12    person does not have the right to assume that another person

13    will exercise ordinary care if the person observes or should

14    reasonably have observed that the other person either lacks

15    one or more of the normal senses or is not going to act

16    reasonably.

17         WMATA is responsible for Ms. Scott's injury even

18    if a prior injury, disability, or other condition made

19    Ms. Scott more likely than a normal person to suffer injury

20    because of WMATA's negligence.  WMATA may not avoid

21    responsibility for its negligent actions by showing that the

22    injury would have been less serious if it had happened to

23    someone else.

24         As you've already heard, the parties have

25    stipulated that according to the official life tables

 1    published by the United States Department of Health and

 2    Human Services, which the Court took judicial notice of, the

 3    statistical life expectancy of a person aged 64 -- excuse

 4    me, 84 years -- and I think that should be a woman aged 84

 5    years -- is 7.1 years.  This statistical life expectancy,

 6    however, does not by itself conclusively prove Ms. Scott's

 7    actual life expectancy.  To determine Ms. Scott's actual

 8    life expectancy you should consider the statistical life

 9    expectancy estimate along with any other evidence relating

10    to her health, habits, and activity.

11         In this case, WMATA admits that Dominic Johnson's

12    acts or failures to act were committed in furtherance of the

13    business of her employer, WMATA; therefore, WMATA is

14    responsible for any of Ms. Johnson's negligent acts or

15    failures to act.

16         During the course of the trial you heard

17    deposition testimony of two witnesses who were designated as

18    WMATA corporate representatives.  The testimony of these

19    witnesses is binding on WMATA, but you should not give

20    greater or lesser weight to the testimony of a corporate

21    representative.

22         WMATA offers public transportation of passengers,

23    and therefore is what's called a common carrier.  As a

24    common carrier, WMATA must use ordinary care in carrying its

25    passengers.  The use of ordinary care means to act as a

1    reasonable person would under the circumstances.  For

2    example, a bus driver or a train operator must exercise all

3    the care and caution which a bus or train operator of

4    reasonable skill, foresight, and prudence could be fairly

5    expected to exercise under the circumstances.

6          What is reasonable under the circumstances depends

7    upon the dangerousness of the situation or activity

8    involved.  The greater the danger, the greater care the

9    driver must exercise.  However, the law does not require a

10   common carrier, like WMATA, to guarantee the safety of its

11   passengers.  To hold the defendant liable for plaintiff's

12   injuries, you must first find that the defendant was

13   negligent.

14         Okay.  Damages.  If you find that WMATA's

15   negligence caused Ms. Scott to suffer injury and that

16   Ms. Scott was not contributorily negligent and she did

17   not assume the risk of harm, then you must consider whether

18   Ms. Scott is entitled to any damages.  You may award damages

19   for the following harms that you find WMATA's negligent

20   conduct caused:

21         1, the extent and duration of any physical

22   injuries sustained by Ms. Scott;

23         2, the effects that any physical injuries have on

24   the overall physical and emotional well-being of Ms. Scott;

25         3, any physical pain and emotional distress that

1    Ms. Scott has suffered in the past or may suffer in the

2    future;

3         4, any disfigurement or deformity suffered by

4    Ms. Scott as well as any humiliation or embarrassment

5    associated with that disfigurement or deformity;

6         5, any inconvenience Ms. Scott has experienced in

7    the past or may experience in the future;

8         And 6, any medical expenses incurred by Ms. Scott

9    in the past.

10        You may not award punitive damages; that is,

11   damages designed to punish or deter future negligence by

12   WMATA.  You should not adjust the amount of damages you

13   award, if any, based on whether or not those damages may be

14   subject to taxation.

15        Ms. Scott is entitled to compensation for any harm

16   that WMATA's negligent conduct caused.  Conduct causes harm

17   if it plays a substantial part in bringing about the harm.

18   In addition, the harm must be either a direct result or

19   reasonably probable consequence of the conduct.  WMATA is

20   liable to pay damages only for the harm that its conduct

21   caused.  If you find that its conduct caused only part of

22   Ms. Scott's harm, then you should award compensation only

23   for that part.

24        Finally, Ms. Scott must prove that it is more

25   likely than not that she is entitled to damages.  The

 1    evidence must establish the amount of Ms. Scott's damages

 2    with reasonable certainty.  You may award Ms. Scott only

 3    those damages that are based on a just and reasonable

 4    estimate based on relevant evidence.  Reasonable certainty

 5    does not require exact or mathematically precise proof of

 6    damages or that future damages are absolutely certain to

 7    occur.

 8         You may award damages for future harm so long as

 9    Ms. Scott shows that injuries will probably continue.

10    However, you may not award damages that are speculative

11    based on guesswork or dependent upon merely remote

12    possibilities that are reasonably certain to occur.

13         Okay.  That concludes the reading of the

14    instructions.  It's about 12:10.  I think we're going to

15    take an early lunch break, give these folks an opportunity

16    to finalize and prepare their closing arguments, and so that

17    we don't interrupt closings with a lunch break, we're going

18    to take our lunch before so that we can get both sets of

19    closings in at the same time, back to back.  So why don't we

20    reconvene at 1:15, and we will proceed with closing

21    statements.

22         No discussions about the case.  No research about

23    the case.

24         All right.  See you at 1:15.

25         (Jury exits courtroom)

1          THE COURT:  Okay.  So a couple of issues from

2    opening.  I don't know about the iceberg chart, Mr. Regan,

3    but I think it's fine without the percentage.

4          MR. P. REGAN:  I heard you loud and clear.

5          THE COURT:  So no ratios, no percentages, no

6    fractions.

7          MR. P. REGAN:  No.  I heard you.

8          THE COURT:  And we also -- we had the discussion

9    about the absence of a defense expert.  You know, how I come

10   out on that is I think that the plaintiff can discuss what

11   witnesses are here, what witnesses were not here, but you

12   did not move for any sort of adverse inference instruction.

13        I think adverse inference instructions, when it

14   comes to failure to call an expert, I think, turns out to be

15   a pretty tricky issue, so no discussions or no suggestions

16   as to what the jury should or should not infer from the fact

17   that WMATA did not call an expert.  I think you can point

18   out the fact that you did not hear from an expert.  That's

19   just what happened at trial.

20        And, Mr. Waters, you should be free to respond to

21   that; that, you know, as the Court has instructed, you know,

22   it's their burden.  You don't have to call a witness, so,

23   you know, I'd like to leave it at that.  Okay?

24        Any other issues before we break?

25        MR. P. REGAN:  No, sir.

1          MR. WATERS:  Briefly, Your Honor.

2          THE COURT:  Sure.

3          MR. WATERS:  I understand a PowerPoint is going to

4   be shown.  I'm sure that it consists of nothing more than

5   what's in evidence already, but we have not had an

6   opportunity to review that.

7          THE COURT:  Yes, for closings I'm not going to

8   require a preview.  I will trust both sides to stick to what

9   evidence has been presented and not to go any farther than

10  that.

11         MR. WATERS:  Very well.

12         THE COURT:  Okay.

13         MR. WATERS:  Your Honor, just -- it may be overly

14  formalistic, but I do want to make sure that I repeat my

15  objections to the charge that we previously stated during

16  our conference under Rule 51 for -- just to make the record

17  that I made, the objection following the instruction.

18         THE COURT:  Very well.

19         MR. WATERS:  And the only thing I had with the

20  verdict form that was a concern --

21         THE COURT:  Yes, hold on.

22         Okay.

23         MR. WATERS:  Just, one, I wanted to state an

24  objection to Question No. 1.  I think it conflates "national

25  standard of care" and "breach."  We had a version that the

1    first question was have they established that a national

2    standard of care exists, and the second question was whether

3    there was a breach.  I think the way No. 1 is written it's a

4    little confusing because it conflates those two issues.

5            THE COURT:  Well, it doesn't conflate them.  It

6    doesn't say that they're the same thing.  It just -- it's

7    telling them that they have to find both that WMATA was

8    negligent and that it breached a national standard of care.

9            MR. WATERS:  I understand.  But my point is that I

10    think it's separate inquiries.  Have they proven that

11    there's a national standard of care?  Have they proven that

12    there's a breach of that national standard of care?

13            And then --

14            THE COURT:  Wait.  Okay, how about we say "and

15    that it breached"?  So, in other words, do you find that

16    WMATA was negligent and that it breached a national standard

17    of care?  That's two different things.

18            MR. WATERS:  Yes.  Yes, Your Honor.

19            THE COURT:  I'm just trying to keep --

20            MR. WATERS:  The problem is, I think then the next

21    question, No. 2, is asking the same thing.

22            THE COURT:  Ah, I see.

23            MR. WATERS:  And then my problem with 2 is it says

24    the standard of care but not national standard of care.

25            THE COURT:  I see.  So in this case the definition

```
 1    of "negligence" is breaching a national standard of care.

 2              MR. P. REGAN:  They're synonymous.

 3              THE COURT:  So maybe we can just get rid of

 4    Question 2.

 5              MR. P. REGAN:  Well, no, Question 2 --

 6              THE COURT:  This is your proposal, Mr. Regan.

 7              MR. P. REGAN:  Yes, and Question 2 --

 8              MR. WATERS:  Oh, you're right, I'm sorry.  I

 9    apologize.

10              MR. P. REGAN:  And Question 2 is cause, proximate

11    cause.

12              MR. WATERS:  You're right.  I apologize.  But I do

13    think Question 2 should say "breach of the national standard

14    of care."

15              THE COURT:  Fair enough.

16              MR. P. REGAN:  I'm fine with that.

17              I think the first --

18              THE COURT:  Can we -- in Question 2, instead of

19    saying that the breach of the national standard of care was

20    a cause, can we just say that WMATA's negligence was a

21    cause?

22              MR. P. REGAN:  Yes, because you're right, they're

23    synonymous here.

24              THE COURT:  Right.

25              MR. P. REGAN:  I think the first -- I don't mind
```

1    the revision that you made to the first sentence, but I

2    think it could say -- it could just say "through its train

3    operator breached the national standard of care regarding

4    berthing."  That is the definition of "negligence" here.

5    Breach the standard -- national standard of care is the

6    definition of negligence.

7              But I don't mind it.  I mean, I think it might

8    help the jury.

9              MR. WATERS:  I think No. 2 is okay if we just

10   include the word "national."

11             THE COURT:  Okay.  And, Mr. Waters, how about in 1

12   just deleting "was negligent" and just say "breached the

13   national standard of care" since that's the definition of

14   negligence?

15             MR. WATERS:  That would be fine.

16             THE COURT:  Okay.

17             Anything else?

18             MR. WATERS:  Just one request, if we may?  If we

19   may have a clean copy of the instructions and a new verdict

20   form as charged?

21             THE COURT:  I also caught a couple of typos as I

22   was reading them, and we'll correct those and give you a

23   clean copy before openings.

24             MR. WATERS:  It would be fine -- my intention is

25   to bring them up on the screen, but I could use the ELMO

1    just as easily so paper or email is fine.

2              THE COURT:  Okay.  Great.

3              All right.  See you at 1:15.

4              MR. P. REGAN:  Thank you, Your Honor.

5                (Lunch recess taken)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A F T E R N O O N   S E S S I O N

 2              THE COURT:  Mr. Regan, are we ready?

 3              MR. P. REGAN:  Yes, Your Honor.

 4              THE COURT:  We can bring the jury in.

 5              (Jury enters courtroom)

 6              THE COURT:  All right.  Welcome back, everyone.

 7    We will now proceed to closing arguments beginning with

 8    Mr. Regan.

 9              MR. P. REGAN:  Thank you, Your Honor.  Can I get

10    the monitors on?

11              THE COURTROOM DEPUTY:  Yes.

12              MR. P. REGAN:  Good afternoon.  We're getting

13    there, okay?  It's almost -- the case is almost to you.

14              When you go back to the jury room, you're going to

15    have three jobs.

16              The first job is to select a foreperson.  You'll

17    talk amongst yourselves, select a foreperson.

18              The second job will be to explain and discuss your

19    thoughts with each other.

20              And the third job will be to make sure that all of

21    you collectively follow the judge's rules that he has given

22    in the instructions.

23              So what I'd like to do for the next little while

24    is to talk to you about some things that you can answer when

25    folks are asking questions back there about certain issues
```

1    in the case.

2            When you go back to deliberate, you'll have a jury

3    verdict form that looks like this.  Okay?  There will be a

4    number of questions on it, and you'll be asked in the first

5    -- the first five questions you'll be asked yes or no

6    questions.  Okay?  And what I'll do right now is explain a

7    little bit, but you'll have this back in there with you.

8            The first question deals with has the plaintiff

9    established by the preponderance of the evidence that the

10   defendant breached the national standard of care.  Okay?

11   Should that warning have been given?  And then you have a

12   choice, yes or no.  We submit the evidence warrants a yes.

13           Then you go to the next question, which is:  Has

14   the plaintiff established that the breach of the standard of

15   care was a cause -- it doesn't have to be the cause; was a

16   cause -- of the injuries?  Again, we submit the answer is

17   yes.

18           Then you get to Questions 3, 4, and 5, which go

19   to the defendant's arguments in this case that somehow

20   Ms. Scott is to blame for what happened to her.  So Question

21   3 is about contributory negligence.  We submit the answer to

22   that is no.

23           Question 4 is also about proximate cause on

24   contributory negligence.  Again, you won't even have to

25   answer that.  If you answer no to 3, you skip to 5; but we

1    submit the answer to 4 would be no.  And the answer to 5 is

2    assumption of the risk, and we'll talk about those, all of

3    those, today.  Okay?  But on the first two, we submit yes,

4    yes; and then no's to the rest on 3, 4, 5.

5           And then you get to the final question.  It is

6    "What amount do you award in damages?"  It's one figure,

7    and, again, I'll talk to you about that.

8           But so six questions.  The first five deal with

9    the various liability issues, and then the last question

10   deals with damages.  And I'm going to talk about all of that

11   with you this afternoon.

12          Here's one thing that all of you, all of us, come

13   into this courtroom with, right?  And that is common sense.

14          You heard Dr. Berkowitz say yesterday that the

15   national standard of care with respect to this one issue is

16   just common sense.  Should a warning be given to passengers

17   when you're about to move the train?  Does that make sense

18   or not?  Common sense.

19          When we -- when Chris talked to you earlier on

20   Monday, this was a safety rule, one of the safety rules.

21   Once a subway train has pulled into a station and stopped at

22   the platform, if the driver wants to move the train again

23   before opening the doors, she must first warn the

24   passengers.

25          The national standard of care that we're talking

1   about is at its heart a safety rule.  There's no other

2   purpose for it.  It's not designed to help the trains run

3   better or faster.  It's simply to protect the safety of the

4   passengers.  It's the national standard of care, okay?

5   Safety rule.

6          When Mr. Waters stood up before you in his opening

7   statement a few days ago, he said accidents happen when

8   you're moving people.  We know that.  And sometimes Metro is

9   responsible for those accidents.  Here's what I submit to

10  you.  If not here, then when?  Okay?

11         You heard all the witnesses testify to a number of

12  things that are undisputed.  In fact, many of the things

13  that you have to decide are undisputed.  It's undisputed no

14  warning given.  It's undisputed that a warning was required.

15         What did Ms. Henry say this morning?  And she's a

16  designated representative for WMATA.  We'll talk about that.

17  She said absolutely must give it.  That was her word,

18  absolutely must give it.

19         The national standard of care.  You heard

20  Dr. Berkowitz talk about Philadelphia, New York, Washington,

21  Chicago, Boston all follow the same rule.  And why wouldn't

22  they, right?  I mean, can you imagine getting on a subway

23  somewhere where they don't follow that rule?  It's common

24  sense, right?  It's designed for the safety of the

25  passengers.

 1          Here it is.  You've seen the WMATA thing.  You're

 2     probably tired of looking at that.  I bet every one of you

 3     is going to be able to recite that tomorrow if somebody

 4     asked you.  Okay?  It's simple.  What does it say?  This is

 5     required.  Look up here at the top.  It's highlighted,

 6     "Train operator shall."  Okay.  We all know what "shall"

 7     means, right?  "Shall" isn't maybe, sometimes, if you feel

 8     like it.  "Shall" is all the time.

 9          "Attention customers, this train will move

10     forward; please hold on."

11          Ms. Henry this morning, what did she say?  Yes,

12     that's what they're supposed to give.  Sometimes they change

13     it, but we want them to give that message.

14          What's important about that?  Two things.  We're

15     about to move forward, hold on.  Okay?  Safety.

16          We went through the slide, who we're suing.  You

17     remember that.  Metro, because they violated the national

18     standard of care.

19          You heard the judge's instruction to you, and,

20     again, as he mentioned, when you go back to deliberate

21     you'll have a printed copy.  I guess each of you will have a

22     printed copy to look at.  This is an undisputed fact.  WMATA

23     has said this was our employee.  If she was negligent, we're

24     responsible.

25          What evidence?  Let's talk about the evidence that

1    you had in here that WMATA broke the safety rule.

2           Carol Scott, Al Emondi, Stacy Swain.  All

3    passengers on the train.

4           And then we have Mr. Bennett, who explicitly

5    admits -- and you heard the testimony that was read in

6    yesterday, and I'll read it to you again today -- that a

7    warning was required, and then Ms. Johnson said she has no

8    memory one way or another.  And her report picks up when

9    somebody pushes the emergency button.  That's when her

10   report picked up.

11          You're going to see, when you get back there,

12   Instruction No. 13.  You heard the judge read it to you.

13   It's the credibility of the witnesses.  No one else.  Not

14   me.  Not any of the lawyers.  Not the judge.  You all are

15   the judge of the credibility of the witnesses.  Who struck

16   you as coming in here and testifying sincerely?  Who

17   appeared truthful?  Who had nothing to gain?

18          There was a reason the first witness who came in

19   here was Ms. Swain.  She's the first person we brought in.

20   And the reason for that was she has no horse in this race.

21   She was there.  She witnessed.  She stayed with this person.

22   She had not seen Carol Scott from September 13, 2019, until

23   April 21, 2025.  Don't know her, knew her that day and felt

24   sorry for her, so she stayed with her that day.

25          And what did Ms. Swain tell us?  And I apologize

1    that there's -- that there's a lot on there.  The train

2    pulled into McPherson Square and then all of the sudden it

3    violently jerked forward and caught everyone off guard.

4          Everyone flew forward because the train jerked so

5    violently.  And people had risen to -- in anticipation of

6    getting off at McPherson Square...  And then I heard a loud

7    thump and a crash, and as a mother, you know, et cetera.

8    That's her sworn testimony.

9          She also said:  "Before the violent jerk that you

10   have described, was there any announcement by the train

11   operator that the train was going to move forward and to

12   please hold on?"

13         "No, no.  There was just the announcement that

14   McPherson Square was coming up.  But we had already arrived

15   -- you know, and after we had arrived at McPherson Square

16   and were siting idle, and then it just lurched violently

17   forward."

18         This is the last one.  See, this is why I put 3 of

19   3, so you know, on Ms. Swain.

20         "And were passengers at that point getting up to

21   get off when the violent jerk happened?

22         "Some had already stood up, and that's why I said

23   they were all thrown that way."

24         So when you evaluate credibility, you have to say,

25   okay, did Ms. Swain strike you as someone who appeared

1    candid and truthful?  What did she testify to that was

2    important?

3              Number one, they pulled into McPherson Square and

4    they stopped.  And I highlighted McPherson Square station

5    because yesterday Mr. Waters was asking questions about some

6    of the witness -- some of the Metro witnesses about what

7    happens when a train stops in a tunnel or all those things.

8              Look.  That's nice, okay?  Good.  They've got some

9    procedures if it stops in the tunnel.  But that's not this

10   case.

11             In this case, this train had pulled into McPherson

12   Square.  It had stopped.  It had been stopped.  Long enough

13   for people to begin to get up and get ready to get to the

14   doors and then, instead of giving the announcement, it

15   violently jerked forward.

16             Also, Al Emondi, remember, we took his deposition.

17   He lives in Charleston, South Carolina, now; had been here

18   on work at the time.  What do you recall that happened that

19   day?  Is the train came into the station -- again, in the

20   station, not somewhere in the tunnel -- to stop, and then

21   everyone stood up.  And then the train lurched forward and

22   that is when, I believe, Ms. Scott fell.

23             Question to Mr. Emondi:  After the train had

24   stopped but before it drove forward again, did you ever hear

25   the train driver come on over the intercom to warn

1     passengers that the train was about to move again?

2              "Not that I recall, no."

3              This is what I was talking about a few minutes

4     ago.  You heard Ms. Henry come in here today.  She candidly

5     admitted that once a train is in the station, absolutely

6     must warn passengers before moving the train again.  No

7     exceptions.  It's not like, well, if you're in a hurry or

8     you're only a little bit short.

9              What do we know from Ms. Swain?

10             Mr. Waters asked her, "Well, how far did it move

11    when it needed to reposition?"  And she said half a car --

12    half a subway car length or maybe a full car length.  It

13    doesn't matter.  Right here we have from Ms. Henry, if

14    you've got to move it, and it's in the station, and folks

15    are thinking that they're getting up to get off, you've got

16    to warn them.  You've got to tell them.

17             And then Mr. Bennett -- and we read this into the

18    record yesterday.  This is from his deposition.  And

19    remember both Ms. Henry and Mr. Bennett are corporate

20    representatives, and you'll have back there the judge's

21    instructions.  You'll have the instruction that says that

22    testimony is binding on Metro.  Okay?

23             What did he say yesterday?  He said -- the

24    question was:  "Is there any evidence that WMATA is aware of

25    that the train operator announced the train would be moving

1    before she moved it forward again?

2            "No."

3            When was that given?  You'll see over there,

4    February 9, 2023.  So literally four and a half years, or

5    whatever that math works out to, three and a half years

6    afterwards.  No evidence that they had -- the warning was

7    ever given.  Okay?

8            Pretty simple, right?  Here's this.  What evidence

9    is there that WMATA followed the safety rule?  What evidence

10   is there?

11           So remember I said to you a few minutes ago, if

12   they're not accepting responsibility here, when are they

13   ever going to accept responsibility?  There's no evidence.

14   They have made every single person in this courtroom right

15   now come here, and there's no evidence that the warning was

16   given.

17           MR. WATERS:  Objection, Your Honor; move to

18   strike.

19           THE COURT:  We'll deal with it.

20           MR. P. REGAN:  What did the national safety

21   rule -- what did it say?  Who did you hear from on that?

22           Dr. Berkowitz, decades in the transportation

23   industry, qualified by the Court to talk about the

24   issues in this case as a transportation safety engineer.

25   Dr. Berkowitz said it's obvious.  It's common sense.  And

1    then he talked to you about Chicago and New York,

2    Philadelphia, et cetera.

3         Here we go.  We've got this again.  This is shall,

4    putting it in here.  This is Metro's own standard operating

5    procedure, which you'll see in the jury instructions that

6    the Court instructs you is evidence of the standard of care.

7    Okay?  It's consistent with the standard of care.

8         And, again, why?  Common sense, right?  You've got

9    to warn people.

10        This is Instruction No. 37, and you'll have it

11   back there.  And it's called "Common Carrier."  Metro is a

12   common carrier.  What is reasonable under the circumstances

13   depends on the dangerousness of the circumstance -- of the

14   situation or activity involved.  The greater the danger, the

15   greater the care the driver must exercise.  That's the

16   obligation of a train operator for a common carrier.  That's

17   the law of the District of Columbia.

18        Okay.  I talked to you that, you know, we have the

19   -- all this evidence about what the national standard of

20   care is, and you did not hear from a single expert from

21   Metro that disputes that the national standard of care

22   requires a warning.  Not a single one.

23        What can the public reasonably expect from Metro?

24   The public accepts the risk of ordinary starts, stops, and

25   rattles that are unavoidable on a subway or a train.  Right?

1    But not something that is avoidable.  This is a man-made

2    condition.  They stopped the train for whatever reason.

3             And, again, it doesn't matter why the train

4    stopped.  The train could have stopped because there was one

5    farther down the track.  It could have stopped because the

6    train operator was, you know, repositioning the train.  They

7    weren't close enough to the 8-track -- 8 -- what was it?

8    Not 8-track, but whatever it was.  8, you know, trains.  The

9    8-train mark.

10            It doesn't matter what the reason was that they

11   stopped.  What matters is they were going to move it again,

12   and they're going to create a hazard, and that's when the

13   warning's required.

14            What can the public reasonably expect from Metro?

15   Once the train is stopped at a station platform, passengers

16   are allowed to get off the train without fear that it will

17   abruptly jerk forward with no warning.

18            And how does Metro choose to operate the trains?

19   There's a reason that we played that video for you this

20   morning.  Okay?  You saw it took 15 seconds.  That video is

21   from the WMATA website, and Ms. Henry said that that was --

22   they were being manually operated in September of 2019, and

23   that's what would happen.  It would be up to that -- up to

24   15 seconds.

25            And what do people do?  The train stops.  It's

1    waiting there.  You see people waiting outside.  People are

2    standing there.  Are they supposed to hold on?  Does that

3    make any sense?  They fully expect people to get up and go

4    to get off.  That's how it works.  Okay?  That's how the

5    subway works.

6            Okay.  What did Ms. Scott tell us?  She said on

7    that ride there were five or six instances of unwarned

8    repositionings during her trip that day.  As a result, she

9    was extra on guard.  She didn't have to be extra on guard.

10   The law doesn't require that.  You'll see that in the

11   instructions.  She was extra on guard and intentionally

12   waited a couple more seconds.  Okay?  She waited a couple

13   more seconds before getting up.

14           When you get to Question 6 here, in determining

15   the amount -- because this is just one figure.   In

16   determining the amount, there's only one thing that

17   matters in this case, and that is the harms and losses that

18   Ms. Scott has suffered.

19           There is a jury instruction back there I'm going

20   to read to you in a minute.  There's a jury instruction that

21   lets -- that sets out the elements of the claim that are

22   the -- the damage claim that are relevant in this case.

23   Okay?

24           It's a verdict form, and those are -- you'll see

25   it.  I'll give you the instruction number in a minute.

1          MR. WATERS:  May I, Your Honor?

2          MR. P. REGAN:  These are the same things that are

3     on your screen, okay?  The reason that I put this up here --

4     now, you'll have that instruction, and I think it's six or

5     seven -- I think it's six or seven elements, and you'll have

6     it back there.  Okay?  But as part of your deliberations,

7     you'll see from the judge's instruction that you're to

8     consider all of these items.

9          One, the extent and duration of physical injuries.

10    Well, the duration is forever.  Right?  She's had -- it's

11    been five-plus years, and that hip piece is never coming

12    out.  The pain that she experiences, the stiffness, et

13    cetera, the effects of her injuries on her physical and

14    emotional well-being.  We'll talk about that.

15         This is her past physical pain.  Again, I'm going

16    to show you a couple of things to talk about how you divide

17    the past and future.

18         This next one is future physical pain and

19    emotional distress.  And then we have past inconvenience,

20    future inconvenience, and medical expenses.  Okay?  Nobody

21    disputes that.  I've rounded it off, okay?  $229,000 of

22    medical expenses.

23         By the way, that goes to other people.  Okay?

24    That doesn't go to Carol Scott.  That goes to doctors,

25    therapists, hospitals, all the others.

1          MR. WATERS:  Objection, Your Honor.

2          THE COURT:  We'll deal with it.

3          MR. P. REGAN:  You heard from Dr. Rao.  Remember?

4   He had been an orthopedic surgeon at GW.  He saw her the

5   next day, did emergency surgery on her, treated her for

6   about 18 months or so, and then at some point in 2021 he

7   moved to the Veterans Administration in West Palm, Florida,

8   and then ultimately recently moved to Delaware.

9          We took his deposition when he was in Delaware,

10  okay, a couple of weeks ago.  The lawyers were on a Zoom

11  with him, and that's how you saw that testimony.  All right.

12         What did he say?  Successful surgery.  Very

13  serious injury.  Difficult surgery.  Successful.  And she's

14  got permanent injuries and restrictions.  It's never going

15  to change.  They're permanent.  Five years later they're

16  permanent.  Even my friend, Dr. Harris, this morning

17  admitted that.  He said they're permanent.  It's not

18  changing.

19         Look, you saw these medical illustrations.  You

20  will not have these back there.  These are -- and the Court

21  mentions it in the instructions.  These are for illustrative

22  purposes only to show you what was done, but they won't be

23  back there.  You don't need them.  You saw this -- I mean,

24  imagine if the doctor's on the stand and is saying, well, we

25  had to make an incision, and then we stuck a drill into the

1    top of the femur head, and we drilled out, and we bored it

2    out, and we stuck a rod down, and we put a couple of screws

3    in.  Right?  It doesn't make a whole lot of sense.  But when

4    you look at this, you can see the progress of the surgery.

5          And then, of course, the third one is just how it

6    looked the day after with the rod in it, and that's, you

7    know, where you see those x-rays over on the left side of

8    that illustration.  Those x-rays are essentially identical.

9    Those were taken a few months afterwards.  That's what it

10   looks like today.  Okay?  That rod, Dr. Harris admitted

11   today, it's forever.  Not coming out.

12         You also heard from Dr. Bishop yesterday.  He was

13   the orthopedic surgeon who had treated -- had been the

14   orthopedic surgeon for the Atlanta Falcons in the NFL for 15

15   years.  He's been treating Carol since 2017; first for the

16   knees, saw her once for the hip in 2021, and he essentially

17   had the same information that Dr. Rao did.

18         We wanted him to come in so that you could see

19   firsthand and have an explanation for how the surgery's

20   done.  Okay?  It was done on the video, which is not as

21   good as having somebody in person, right?  Okay.  That's why

22   Dr. Bishop came in.

23         Dr. Harris, he agrees with everything.  Right?

24   There was no dispute.  There's really no daylight between he

25   and Dr. Rao and Dr. Bishop.  They all agree; serious injury,

1    needed surgery, difficult recovery, made a good recovery,

2    has permanent injuries.  None of the doctors have any

3    material difference with any of that.  She's as good as

4    she's going to get.

5            And by the way, folks, you're seeing Carol Scott

6    almost six years later.  Okay?  So I don't know if the

7    defendant's going to try to argue -- if WMATA is going to

8    try to argue that somehow she had to take extra care as a

9    78-year-old who used a cane sometimes.  I don't know.  I

10   don't know why he was asking those questions.

11           But this is the condition she's in because of what

12   they did to her, so they can't come in here and say, "Well,

13   you saw Ms. Scott" -- anyway, I don't know what that point

14   was about it.

15           Carol Scott is owed the same duty of care as

16   the person sitting across the aisle, as Ms. Swain, as

17   Mr. Emondi.  They all are owed that duty.  Okay?  It's not

18   -- it's not a 78-year-old.  It's a 78-year-old.  It's an

19   18-year-old.  It's an 8-year-old.  It's a 28-year-old.  All

20   owed that duty.  It doesn't -- that national standard of

21   care doesn't say maybe, sometimes, depending on who's in the

22   train you give it.

23           All right.  So in my experience, it's always

24   helpful to sort of give you a visual in terms of -- I mean,

25   that's frankly -- until you heard the judge explain it an

1    hour or so ago, I suspect most of you, if somebody said

2    well, describe, preponderance of the evidence, well, that's

3    like legal gobblety gook.  Okay?  It is.  I mean, you think

4    that we could talk as normal humans.

5         But here's how it works.  Picture the scales of

6    justice, okay, just like this, and they're in equal poise

7    right now.  The preponderance of the evidence is if the

8    evidence that we produce ever so slightly tips the scales --

9    ever so slightly tips the scales -- that meets our burden.

10        Another way of looking at it is more likely than

11   not, so 51 percent.  It doesn't have to be 99 percent.  It

12   doesn't have to be 90 percent.  It doesn't have to be.

13   Preponderance of the evidence, which, if somebody's life or

14   liberty was at stake, that's what it is in a criminal case.

15        So preponderance of the evidence sounds like oh,

16   my God, this is crazy.  It's really more likely than not.

17   Okay?  The scales of justice.

18        And the important thing is that we have that

19   burden every issue, so it's not only on who ran the red

20   light here, okay, who's at fault; but what are the damages?

21   Every element of damages are judged by preponderance of the

22   evidence.

23        We don't have to prove that, you know, she's going

24   to have a limp for the rest of her life.  We don't have to

25   prove that 100 percent.

1          We have the doctors in here.  If it's

2    preponderance of the evidence, we meet our burden on that

3    issue.

4          So it's more likely so than not so; more probable

5    than not, the greater weight of the evidence.  And these are

6    all synonymous.  Okay?  Tipping the scales ever so slightly;

7    greater than 50 percent.

8          What about this?  Here's the question for you on

9    Question No. 1 on the jury verdict form.  Is it more likely

10   so than not so that WMATA's train driver did not give the

11   required safety warning.

12         Well, okay, so remember I showed you this, right?

13   And this is more likely than not, all right.  What does the

14   real evidence show?  Right?  There's no evidence over here.

15   None, zero, that she gave that warning.

16         WMATA must prove -- here's what WMATA must prove.

17   So what have they done?  They've come in here to deny

18   responsibility.  They say the passenger's at fault, too.

19   But what do they have to prove?

20         They have to prove that it's more likely so than

21   not so that no reasonable person -- reasonable person; not a

22   super cautious person -- no reasonable person would stand

23   and move to the doors as Ms. Scott did.  That's what they

24   have to prove for contributory negligence.

25         Now, the reason we put that video on today was to

1    show that Metro knows that people are going to get up and go

2    to that door.  And they're not holding on to anything.  They

3    don't need to be holding on to anything.  The door -- the

4    train has stopped.  It's getting ready to do it.  And then

5    you're going to hear the chimes.

6           I don't know, they asked about the chimes.  Of

7    course the chimes never went off before Ms. Scott was hurt.

8    The doors never opened until after she was hurt, so of

9    course the chimes never went off.

10          I'm not sure why that was relevant, but you all

11   can figure it out.  Everybody's taken Metro.

12          Here, preponderance of the evidence, more likely

13   so than not so, that Ms. Scott will suffer future pain,

14   limited range of motion, permanent injury and limitations as

15   a result of her femur fracture.  Again, that applies on all

16   these issues.  Okay?  More likely so than not.

17          We talked about the past medical bills.

18          Here is the way to look at the damages in this

19   case, and they all relate to what I showed you earlier.

20   Okay?  All of these are all -- well, this one we know

21   because they know the amount of medical expenses.

22          These are the ones that you have to decide

23   collectively, and then that's the number down here that goes

24   on the jury verdict form in Question No. 6.

25          THE COURT:  You're at about 30 minutes, Mr. Regan.

```
 1                MR. P. REGAN:  I'm sorry, Your Honor?

 2                THE COURT:  You're at about 30 minutes.

 3                MR. P. REGAN:  30 minutes, thank you.

 4                We're on the clock.  It's for your benefit.  It's

 5      probably for mine, too.

 6                Okay.  What's your job?  Your job is to balance

 7      out the harms.  Okay?  When we talk about compensation,

 8      compensation is designed to balance out the harm.  The more

 9      serious the harm, the more the compensation.  Right?

10      Logically dictate that.

11                In other words, another way of putting it is what

12      is fair trade value?  What's fair trade value for what

13      happened to Ms. Scott?  That's your job.  What amount of

14      money balances out the harms?

15                So you can think of the scales of justice again,

16      and when you have the harms on my right side and the scales

17      over here, what is the amount of money that brings that into

18      equipoise.  Fair trade value.

19                What amount of money to reasonable people would be

20      fair trade to go through what she's gone through?  What

21      she's gone through and what she will go through.

22                Let me show you -- I'm going to get to the dates

23      in a minute.

24                Your job -- you're the justice system's

25      appraisers, right?  Our job is to provide you the
```

1    information.  You remember this slide from the other day.

2    This is it, okay?  Ms. Scott doesn't get to come back next

3    year or two years from now or three years from now.  This is

4    it.  You're the only jury that will hear her case.  Here's

5    the time.

6         This is why that slide is important.  Okay?  So

7    look at that.  2,037 days.  That's past physical pain.

8    Okay?  Right here.  That's past.  So when we talk about

9    past, we're talking about September 23, 2019, to April 23,

10   2025.  Okay?

11        Future is that next one; 2,591, 7.1 years.

12        So 2,037 days is what you have to factor in for

13   the pain.  What is that worth?  The future pain is almost

14   2,600 hours.

15        Now, here's an important thing, and you'll have

16   this in your instruction when you get back there on the life

17   expectancy.  7.1 years is the Health and Human Services

18   statistical figure for someone who is 84 years old.  As

19   you'll see in the instruction, the instruction says well,

20   some people are healthier at, you know, 84, and some people

21   aren't so healthy at 84.  You have to use your own judgment.

22   You might decide she's only going to live another three

23   years.  You might decide she's going to live another 15

24   years.  Your job is to compensate her for the rest of her

25   life for the future damages.

1          This is an average.  50 percent of the people will
2     not make it there, and 50 percent will live longer than 7.1
3     years.  Okay?  Is she going to be in the 50 percent who
4     lives longer?  She's pretty tough, right?  You guys -- you
5     got that.  She's done a lot.  One of three women who started
6     law school in 1967.
7          So the total here is about 4,600-and-some days,
8     which, as we put on there, is forever for her.  Okay?
9     That's it.  That's her life.  It doesn't get better tomorrow
10     or next week.  It's forever.
11          What is a fair verdict?  So you've got her bodily
12     integrity, and it's the wrongful and unnatural taking of the
13     right to health and safety.  When Ms. Scott got on that
14     train on September 23rd, she had every right to her health
15     and safety.  Every right to it.
16          And what's happened is it's been taken from her,
17     and that's part of what each of you, all eight of you, must
18     consider.
19          How are we doing?
20          I get to save a little bit of time, so I'm going
21     to run through this very quickly and go over a couple of
22     points with you.
23          Okay.  We've talked about -- you'll see
24     Instruction 29 when you go back there is what I talked
25     about, negligence.

1          Instruction 30 is contribute -- we talked about

2     that, and I said WMATA has to prove that no reasonable

3     person would have stood up.  No reasonable person would have

4     stood up, and yet you heard from Ms. Swain, Mr. Emondi, that

5     other people were standing up, too.  And Ms. Scott said,

6     "Well, I don't know.  People may have been standing up

7     behind me.  I didn't see anybody."  But those two people who

8     were on the train said other people were standing up getting

9     ready.  Were those people unreasonable?

10          Assumption of the risk.  Okay.  WMATA has to prove

11     that Ms. Scott, by merely riding the Metro, assumed the risk

12     of a sudden jerk forward after the train had stopped at

13     McPherson Square.

14          Did she have a right to assume that the train

15     operator was going to follow the national standard of care,

16     follow the safety warning?  If she did, she didn't assume

17     the risk.

18          These are things we talked about in opening, and

19     here are the things that -- I'm going to sit down in one

20     minute, okay?

21          When Mr. Waters gets up here, or Ms. Gilman, see

22     if they seriously contest this.  Does WMATA acknowledge the

23     national standard of care?  Do they agree that that's a

24     sensible rule?  Do they acknowledge that their driver

25     violated it even though they've got no evidence that she

1    didn't violate it, and does WMATA still argue to you that

2    its passengers take their lives into their hands if they

3    dare to try to stand up and exit a train that is stopped at

4    a platform without clinging to hand-holds the entire time?

5    That's what they've got to prove.

6                    Thank you.

7                    Thank you, Your Honor.

8                    THE COURT:  Okay.  All right, Counsel, can we go

9    to the phones very quickly.

10                   (The following is a bench conference

11                    held outside the hearing of the jury)

12                   THE COURT:  All right.  There were two objections.

13                   The first one was to the statement "they had made

14   every person come in here," and "there is no evidence of

15   compliance with the announcement rule."  What's wrong with

16   that?

17                   MR. WATERS:  Judge, he's implying that we had no

18   right to defend ourselves.

19                   THE COURT:  Why do you say that?

20                   MR. WATERS:  "Made everybody come here."  We have

21   a right to defend our case, Your Honor.  It's an

22   inappropriate statement to suggest otherwise to the jury.

23   It's outrageous.

24                   THE COURT:  Mr. Regan.

25                   MR. P. REGAN:  Judge, I don't think I need to even

```
 1    answer that.  There is no evidence.  That's a very fair

 2    statement of what happened in this courtroom.

 3              THE COURT:  I'll overrule that.

 4              The second one regarding reference to the medical

 5    bills that will go to someone.

 6              MR. WATERS:  He's opening collateral source.

 7              THE COURT:  Okay.  So, Mr. Regan, I know -- you

 8    can't refer to the fact that she has any insurance.

 9              MR. P. REGAN:  I didn't.  I never used that word.

10    Doctors, therapists.

11              THE COURT:  No evidence in the record as to

12    where -- who may have paid her medical bills.

13              MR. P. REGAN:  Judge, I said they go to other

14    people.  It doesn't go to her.  That's a fair statement.

15              MR. WATERS:  It's not an accurate statement.

16              THE COURT:  Any evidence of that?

17              MR. P. REGAN:  Yes, it is an accurate statement.

18    Those bills were all submitted --

19              THE COURT:  I think your mic is still on.

20              Okay.  There's no evidence in the record as to who

21    paid her medical bills, where they've been paid, whether the

22    proceeds will go to her insurance company or to the doctors

23    themselves, and so I'm going to -- I'm going to instruct the

24    jury to disregard that statement.  Okay?

25              MR. WATERS:  Thank you, Your Honor.
```

```
 1                 MR. P. REGAN:  I mean, the point is it doesn't go

 2        to her.  That's the point.

 3                 THE COURT:  How do they know that?

 4                 MR. P. REGAN:  Well, because --

 5                 THE COURT:  It may be true, but there's no

 6        evidence of that.

 7                 MR. P. REGAN:  Because the bills came from other

 8        people.  The bills came from other people.  They got bills

 9        from doctors and hospitals and everybody else.  I mean,

10        that's not money that goes to her.

11                 MR. WATERS:  He's opening the question of who pays

12        for it, and it may be Medicare or insurance or some other

13        benefit.

14                 THE COURT:  I agree with that.

15                 (This is the end of the bench conference)

16                 THE COURT:  All right.  Ladies and gentlemen, in

17        Mr. Regan's closing argument there was a reference to where

18        any damages for medical expenses might ultimately go.  The

19        Court's going to strike that reference, and you should not

20        speculate as to where, if anyplace, any amount of damages

21        that you give in this case will ultimately wind up.  All

22        right?

23                 Mr. Waters.

24                 MR. WATERS:  Thank you, Your Honor.

25                 Good afternoon, ladies and gentlemen.  You've now
```

1    heard all of the evidence and the judge's instructions on

2    the law.  Pretty soon it's going to be your time to decide

3    this case and to decide the facts according to the law that

4    the judge instructed you.

5            I want to be clear with regard to closing

6    statement.  This is my opportunity to summarize the evidence

7    and to make my client's arguments --

8            THE COURT:  Hold on, Counsel.

9            If we could remove plaintiff's slides from the

10    screens, please.  Thank you.

11            MR. WATERS:  Oh, yes, please.  Thank you.

12            So while this is my opportunity to present my

13    arguments for Metro and to summarize the evidence as we

14    see it, it's not my role to trespass on your exclusive

15    right to decide the facts of this case.  That is your role.

16    It's not appropriate for me -- and it's not appropriate for

17    Mr. Regan -- to stand up here and tell you how you have to

18    decide.  Okay?  And that is not my intention in any way.

19            So what I intend to do is outline the evidence as

20    we saw it, our disagreements with counsel, and to put the

21    case in your hands to deliberate and decide.

22            At the outset of the trial we talked about this,

23    and I think the evidence that you've heard and the testimony

24    and argument that has be borne out is that this case really

25    is about responsibility and fairness, right?

 1          Metro's responsibility, of course -- Metro's the

 2     defendant in the case; Metro operates rail transit in D.C.;

 3     operates a very large rail transit system -- and the

 4     passenger's responsibilities when the passengers are riding

 5     Metro.  What are their duties with regard to listening for

 6     instructions, announcements, following operator

 7     instructions, and taking care of their own safety while

 8     they're using Metro?

 9          Remember, Metro's not like a car where we have

10     seat belts and air bags.  In a transit system people stand

11     up sometimes.  They use poles.  Sometimes they're seated.

12     There's a variety of different ways of using Metro, and

13     people have to make their own educated, informed decisions

14     about that based on their own personal circumstances.

15          Mr. Regan was up here criticizing me for raising

16     the issue with regard to Mrs. Scott's circumstances being 78

17     years old and walking with a cane and having knee issues.  I

18     don't think that's appropriate because as she is on the

19     train in the condition she was, she has to take

20     consideration of her own circumstances under those

21     circumstance -- for using Metro.

22          We've talked a lot about Metro issues with regard

23     to the trains and how Metro operates and a couple of

24     particular issues that relate to this case.

25          We've talked about berthing, as you may recall.

1    You've heard testimony from Ms. Johnson and Ms. Henry this

2    morning about how Metro berths a train.  The train arrives

3    at the station.  As the operator is coming into the station,

4    the operator gives an announcement:  "Metro Center, doors

5    opening," right or left side.  The train slows to a stop at

6    the 8-car marker.  We know the 8-car marker is important

7    because when the operator hits the 8-car marker they know

8    that all of their doors will open to the platform where

9    they're perfectly aligned so passengers can get on and off.

10         We also heard about repositioning quite a bit.

11    When a train is repositioned, when a train stops short of

12    the 8-car marker and has to move forward, the operator gives

13    an announcement to tell passengers that the train is moving

14    forward.

15         I submit to you that the evidence that Mr. Regan

16    summarized is not as clear as he would like you to think it

17    is.  I think, to be honest with the testimony we heard,

18    Counsel may have overpromised and underdelivered a bit.

19         So let's talk a little bit about the national

20    standard of care issue.

21         Now, Mr. Regan wants to characterize this as a

22    matter of common sense.  Everybody knows this, right?

23    Except the judge's instruction to you is very specific about

24    national standard of care.  The judge's instruction to you

25    was that an expert must establish the national standard of

1    care.  Okay?  And that's plaintiff's burden.  Plaintiff has

2    the obligation of producing an expert to testify what the

3    national standard of care is.

4         That's not WMATA's burden.  That is an issue that

5    is squarely on Mr. Regan and his partner.

6         So WMATA doesn't have the burden on that.  So if

7    he wants to cast aspersions because we didn't retain an

8    expert, keep in mind that's his burden.  It's not our

9    burden.

10        And also, please remember, of the many rail

11   transit systems that Mr. Berkowitz or Dr. Berkowitz is

12   talking about one of them was WMATA, and WMATA's one of the

13   largest rail transit systems in the United States.  And you

14   heard from three individuals from WMATA:  Clev Bennett,

15   Keisha Henry, and Dominic Johnson.

16        Now, Dr. Berkowitz was the plaintiff's retained

17   expert.  Right?  Whenever they talk about Dr. Harris and

18   their slides, they have him "defense retained expert" all in

19   red.  Dr. Berkowitz is their retained expert, okay, in the

20   same way that Dr. Harris was our retained expert.

21        Dr. Berkowitz, think back on his testimony.  He

22   talked about -- and he admitted on the stand -- that there

23   are 16 national rail transit operators.  Right?  But he only

24   gave evidence about five or six of them:  New York, Chicago,

25   Boston, San Francisco, SEPTA, WMATA.

1          As you may recall from the judge's instructions

2     just a little while ago, WMATA's SOPs are not the national

3     standard of care.  They're WMATA's SOPs.  So let's talk

4     about what a national standard of care means.

5          A national standard of care means that all of the

6     rail transit agencies throughout the United States have a

7     consensus and agree that this is the standard.

8          Now, I submit to you operating a massive rail

9     transit system in a metropolitan area is not common sense.

10    There are complicating factors with regard to a variety of

11    the issues that some of our witnesses barely hinted at.  So

12    while this one announcement may seem like a simple thing, it

13    falls in the context of the operation of a very, very

14    complicated transit system of when an operator makes

15    announcements, what they make, when they do it, and under

16    what circumstances they do it.

17         So, first, Dr. Berkowitz talked about only a few

18    rail transit agencies and not all of them.  He could not

19    establish that there was a consensus among the rail transit

20    agencies.

21         One of the things he talked about -- I was

22    interested in this -- is he talked about the fact that of

23    the rail transit agencies and obtaining copies of their SOPs

24    -- do you remember this? -- he said, "Well, I don't get them

25    because they don't share them.  They don't share their SOPs

1    because they think they're proprietary and confidential."

2         Well, wait a minute.  How is there a national

3    standard of care, a national consensus among rail operators,

4    if they don't share their SOPs with each other, or with

5    somebody like Dr. Berkowitz with decades of experience in

6    transportation safety?  I submit to you, Dr. Berkowitz has

7    failed to establish a national standard of care because,

8    one, what he did was not national, and two, he did not rely

9    on any documents from these agencies.

10        He said he had the SOPs from WMATA because he got

11   them in this case.  He had the SOPs from New York transit

12   because he got them from Mr. Jiminez.  But he had no other

13   SOPs from any of the other agencies.

14        So he's not basing his testimony on, yes, SEPTA

15   SOP says this, CTA SOP says this, MBTA says this, that's

16   what you do under these different circumstances.

17        So it's not a national standard of care that he's

18   developed.

19        So what is it he's basing his opinions on?

20   Remember, in my opening I asked you to listen carefully to

21   his testimony and consider what it is he's basing his

22   opinions on.  At the end of the day what do we have?

23        We have Orlando Jiminez, okay?  Mr. Jiminez did

24   not appear before you.  Mr. Jiminez is a retired operator

25   and union rep.  We don't know when he retired.  When was he

1    operating trains?  How long did he operate trains?  We know

2    that he never wrote policies for New York transit.

3         But Jiminez also referred Dr. Berkowitz to his

4    counterpart at CTA.  Who was that?  Dr. Berkowitz didn't

5    remember.  He didn't remember his name.  All he knew is that

6    he had a similar background of being an operator and a union

7    rep.  Again, not somebody who wrote policy for CTA with

8    regard to standard operating procedures for rail operators.

9         They may have experience as rail operators.  We

10   don't know who they are because they didn't testify.  And

11   Dr. Berkowitz couldn't remember the guy from Chicago's name.

12        So what are we really relying on here with

13   Dr. Berkowitz to establish the existence of a national

14   standard of care.  His experience and his say-so.  Okay?

15        And, remember, Mr. Regan asked you -- invited you

16   to consider the parties' motives.  Dr. Berkowitz is hired by

17   the plaintiffs to testify about the national standard of

18   care here.  So consider that factor when you're evaluating

19   whether his say-so is good enough for you to say that, yes,

20   this is a national standard of care.

21        So once you get past the national standard of care

22   issue, and I submit to you that my colleagues have not

23   established that there's a national standard of care with

24   regard to these issues -- and again, that's their burden to

25   establish it.  And the judge's instruction is that they must

1    establish this with an expert.  And if you find, as we do,

2    that Dr. Berkowitz's testimony is insufficiently based

3    without proper documentation or support or deep enough

4    research into the issue, then they have not established

5    their standard of care.

6          But if you get past the question of national

7    standard of care, the question becomes more factually what

8    happened on this day?  Okay?  And why are we having the

9    disputes that we have?

10          I submit to you that the evidence is not as clear

11    as Mr. Regan has wanted to suggest from opening until close

12    today.  He said that WMATA has no evidence that the

13    announcement was made.  I don't think that's true.

14          You'll recall Dominic Johnson's testimony.

15    Dominic Johnson testified -- I think very honestly -- she

16    did not remember giving the announcement on that day.  But

17    she also testified "I know that this is our policy.  I know

18    that I have to make that announcement before I make the --

19    move the train, and I make that announcement before I move

20    the train."  There is evidence that Dominic Johnson made

21    that announcement.  There is evidence.

22          So when they put up their slide and say nothing or

23    none, that's not true.  There is evidence, and that's

24    Dominic Johnson's, I think, very credible acknowledgement

25    that she doesn't remember making it on this particular stop,

1     but that she knows that she makes that announcement when she

2     stops and repositions a train.

3          There's also Ms. Scott's testimony, and I submit

4     to you that there are some inconsistencies with her

5     testimony.  You may recall, when we were cross-examining

6     her, before we came to court -- and by the way, contrary to

7     any other suggestion, we have every right to be in court.

8     All right?  My client stands equally before the law.  It

9     doesn't matter that we're Metro.  We have every right to put

10    on our defense, and we have a defense to put on.

11         But before we came to court, Ms. Scott gave a

12    deposition, and she gave a very specific sequence of events.

13    The train arrived at McPherson Square and stopped.  The

14    operator then makes an announcement, "McPherson Square,

15    doors opening," left or right side.  She began to get up,

16    and then the train moved, and she fell.

17         On the stand she gave a different version of

18    events.  On the stand she testified the train made the

19    announcement as it was coming into the station, stopped,

20    there was no further announcement, and then the train moved.

21         Why is that important in terms of the sequencing

22    of when the announcements were made with regard to the

23    arrival?

24         I encourage you to think about this from the

25    perspective of the passenger.  The passenger is seated.  The

1   passenger hears "Doors opening."  The passenger believes

2   that the doors are about to open and gets up, and then the

3   train moves.

4           Or the announcement's made as the train is

5   arriving.  The train stops.  And on this train it had

6   repositioned several times at several earlier stops, and we

7   also heard Ms. Scott testify, "I knew the train would stop

8   and jerk forward.  I knew the train would stop and jerk

9   forward."

10          So this inconsistency is, I think, very

11  significant when we are considering those factors.  She

12  definitely doesn't remember hearing that there was an

13  announcement that the train was going to move.

14          And Ms. Swain doesn't remember that, either.

15          Also, Mr. Emondi, if you recall his testimony, he

16  says that he was reading his emails at the time.  It wasn't

17  his stop.

18          And Ms. Swain, it wasn't her stop either.

19          And they could offer no other observations of the

20  plaintiff because their recollection of this began when the

21  plaintiff fell.

22          Now, Counsel referred to the audio testimony that

23  you heard from Clev Bennett and made the point that his

24  testimony is binding on WMATA as a corporate designee.  That

25  is correct.  That was part of the judge's instruction to

1    you.  But if you remember, the other part of the judge's

2    instruction is that you can't give that testimony any more

3    weight or credibility or authority than you would other

4    testimony.

5          Clev Bennett was not a witness to these events.

6    He was basing his testimony on the accident report as a

7    corporate designee.

8          The witnesses to these events are the witnesses

9    you've heard:  Mr. Emondi, Ms. Swain, Ms. Johnson, and

10   Ms. Scott.

11         I want to pause for a minute on the video that

12   counsel showed you.  The video that they showed with regard

13   to the person who was getting off, I think it shows a normal

14   stop.  And, again, nobody denies that people are allowed to

15   stand on Metro, and the person that they showed was standing

16   when the train arrived.  People regularly stand on Metro

17   when trains arrive or when they're traveling.  That's

18   nothing new or dispositive here.  So I don't think it's

19   really all that relevant.  And to be honest, I wondered why

20   they were showing you that, but, I mean, we've all seen a

21   Metro train stop before.

22         Can we bring up Instruction -- I think it's 11.

23   Go down to "Burden of Proof."

24         May I show this?  Okay.  Thank you.

25         Mr. Regan did his balancing scale to illustrate

1    preponderance of the evidence, and he indicated that if it

2    weighs in his favor -- 51 percent to 49 percent -- it's

3    something that they have carried the burden on.  I want to

4    point out something about this instruction as well.

5          If, on the other hand, you believe that the

6    evidence is evenly balanced on an issue the plaintiff had to

7    prove, then the plaintiff will not have carried the burden

8    of proof, and your finding on that issue must be for the

9    defendant.

10          The same is true as to any issue as to which the

11    defendant has the burden of proof.

12          You can bring that down, please.

13          So Mr. Regan's scales.  On burden -- on a proof --

14    on an issue that they have the burden of proof on, if it

15    tips in their favor, they have shown the preponderance.  But

16    if it's evenly balanced, they have not.  Okay?  I would

17    submit to you that they have not made their burden with

18    respect to establishing the issue with regard to

19    announcements.

20          You've heard conflicting testimony between

21    Ms. Scott in her trial testimony and her deposition.

22    Ms. Scott's deposition testimony was inconsistent with

23    Ms. Swain's testimony.  Mr. Emondi couldn't remember or

24    didn't recall because he was on the phone.  You also heard

25    Dominic Johnson who testified "I give that announcement.  I

1    know that I make that announcement when I move the train."

2            So I believe, if anything else, it's evenly

3    balanced, and that, under the judge's instruction, calls for

4    a result in favor of the defendant, we submit.

5            With regard to Ms. Johnson, one other point I'd

6    like to make, I think it's important to consider perspective

7    with regard to her testimony and what her memory of this

8    was.  If you remember, Mr. Christopher Regan, during his

9    opening statement, suggested it was shocking to him that

10   Ms. Johnson wouldn't have a better recollection of this.

11           I'll ask you to consider this.  If you remember

12   her testimony, Ms. Johnson stopped her train, received a

13   call in her cab that someone was hurt, called her

14   supervisor, and then received instructions to stay in her

15   cab.  She didn't go back to see Ms. Scott because she was

16   instructed to stay in her cab, and she did stay in her cab,

17   and she didn't know how seriously Ms. Scott was hurt.  She

18   knew that her train had to stay in place while EMTs came,

19   but she didn't have any of the other details about what

20   happened to Ms. Scott at that time.

21           So when you consider that in the context of also

22   her testimony that it's not uncommon for trains to stop

23   short and reposition, and that happens frequently, and you

24   consider that also in the context of a long career as a

25   rail operator making hundreds and hundreds, thousands of

1    stops over her career, it's not altogether surprising that

2    Ms. Johnson would not be able to say yes, that one stop,

3    that one stop at Ballston on one date four years ago, I do

4    remember exactly the announcements I made.

5            But also remember this, too.  The announcements

6    that she made would have been made or not made before she

7    received the call in her cab about somebody being hurt.

8            So you've heard that WMATA is asserting two

9    defenses in this case.  And Mr. Regan characterizes our

10   defense as blaming Ms. Scott.  I would put it differently.

11           The law, as the judge just instructed you, told

12   you that a person who contributes -- who's negligent and

13   contributes to their own accident is not allowed to recover.

14   This is not about blaming Ms. Scott.  All right?  This is

15   about the law and the facts of the case and asking you to

16   consider, because it's exclusively in your province to

17   consider, whether she in any small way contributed to her

18   own accident.

19           And I know this is hard to hear.  I mean, she's a

20   passenger.  She's an individual.  She had a significant

21   injury.  I know that that's hard to hear.  But it is the

22   facts of this case.  Okay?

23           Ms. Scott got on in Vienna; travels 11 stations to

24   McPherson Square.  At five or six of those stations -- maybe

25   four to six of those stations -- the train stops and

1    repositions.  As the train was coming into -- as the train

2    was coming into McPherson Square, do you remember her

3    testimony?  "I knew it would stop and jerk forward."

4         So she appreciated -- she knew -- that there was a

5    hazard that the train -- to her that the train might move

6    forward when it stopped at McPherson Square.

7         She said that she was seated in the front row next

8    to -- not in the accessible seating, but in the first row

9    from the accessible seating near the door of the train.  She

10    waited, but she did not hear the chimes.  The doors did not

11    open.

12         She got up.  As she was moving forward, she was

13    reaching for the pole, but she was not holding on to any

14    overhead.  She was not holding on to the bench of the seat

15    or any of the rails that are on there.  And as she was

16    reaching for the pole, the train moved forward, and she

17    fell.

18         Mr. Regan was rather dismissive of the chimes, but

19    I think the chimes are significant.  Ms. Scott testified

20    that she did not remember anybody standing between her and

21    the door, so she had direct access to the door to be able to

22    get off of the train once it did open its doors.  And the

23    chimes are important because the chimes tell us that the

24    doors are about to open.

25         You heard Ms. Henry explain that as soon as the

1    button is pushed, okay, the chimes go off, and then the door

2    opens.  And while the doors open, the operator is looking

3    outside watching people getting on and off the platform to

4    make sure they're safe.

5            So it's very important that Ms. Scott, one, as she

6    testified here, did not hear the "Doors opening"

7    announcement from the operator when they were stopped.

8    Right?  That's her testimony here at trial.  She did not

9    hear that announcement when the train was stopped.  She

10   heard that before as they were coming into the station.

11           While they were stopped and before the doors

12   opened, she gets up.  She's not holding on to anything.

13   She's not supporting herself.  She does not -- she gets up

14   before she hears the chimes and before the doors open

15   knowing that this train, as she admitted, would stop and

16   move forward.  Before the chimes had announced the doors are

17   opening, before the doors open, she gets up, and she falls.

18           Ladies and gentlemen, that is the crux of a

19   contributory negligence argument.  That's what this defense

20   means; that she failed to exercise due care for her own

21   health and safety and contributed to her accident.

22           Now, the judge instructed you on causation, and

23   Mr. Regan brought this up as well, about the difference

24   between a cause and the cause.  Her contributory negligence

25   does not need to be the cause.  It needs to be a cause.

1    Okay?

2              And the other part of this, too, that is important

3    is that -- and this may seem to be a harsh rule of law, but

4    this is the instruction that the Court gave you, and as my

5    colleague pointed out, this is the law in the District of

6    Columbia -- if she contributed to her accident in any

7    degree.

8              One of the instructions that the Court gave you

9    related to comparing negligence.  We don't do that in D.C.

10   We're not assigning, weighing, balancing who is more at

11   fault or not.  In this instance we're asking if in any small

12   degree -- any small degree -- Ms. Scott contributed,

13   negligently contributed, to her own injury, then the law in

14   the District of Columbia compels a finding for WMATA on the

15   contributory negligence defense.

16             Again, that may seem like a harsh rule to some

17   people.  Right?  It's especially difficult here where we

18   have a remarkable woman who has had an incredible career who

19   sustained a significant fracture undeniably and what that

20   means when you have to return a defense verdict on that

21   rule.  But that is the law in the District of Columbia as

22   the Court charged you, and that is the law that you have

23   taken an oath to uphold.

24             Just as a reminder -- can we bring up Charge 31?

25   I'm sorry -- I'm looking for contributory negligence.

1          Okay.  So looking at 29 and 30, these are the --

2     we're calling them 29 and 30.  I don't think they were

3     numbered for you, but they may be when you get them in the

4     jury room.

5          "Contributory Negligence.  To establish the

6     defense of contributory negligence WMATA must prove that it

7     is more likely than not both that Ms. Scott was negligent

8     and that Ms. Scott's negligence was the cause of her own

9     harm.  If WMATA proves these two elements, then your verdict

10    must be for WMATA."

11         And also with comparative negligence:  If you find

12    that more than one party to this action was negligent --

13    meaning Ms. Scott and WMATA -- you must not weigh one

14    person's negligence against another's.  You must not compare

15    their negligent conduct to decide which is more or less at

16    fault.

17         These were the points that I was just making.  We

18    don't weigh and balance.  If Ms. Scott contributed in any

19    small degree to her injury, then the Court's instructions to

20    you, and the law in the District of Columbia, is that you

21    find that we have sustained our burden on contributory

22    negligence, which results in a defense verdict for WMATA.

23    That's the law on contributory negligence, and I ask you to

24    keep that instruction in your mind as you're deliberating on

25    the case.

1              THE COURT:  Mr. Waters, you're at about 30.

2              MR. WATERS:  I'm at 30?

3              THE COURT:  Yes.

4              MR. WATERS:  Okay.  Thank you, Your Honor.

5              THE COURT:  You're welcome.

6              MR. WATERS:  We've also asserted the assumption of

7     the risk defense in this case.  Assumption of the risk is

8     similar to contributory negligence.  It's, again, a defense

9     that we have the burden on, so using the scales on

10    contributory negligence and assumption, we have the burden

11    of tipping it ever so slightly in our favor.  And if we

12    don't do that, then we have failed to meet our burden on

13    that.

14             The same is true for assumption of the risk.

15    Assumption of the risk involves somebody who voluntarily

16    assumes a risk to their own health and safety being fully

17    cognizant of the risk that they're assuming.

18             We're not arguing that taking Metro itself is an

19    assumption of risk, but there are risks pertinent to riding

20    mass transit.  These risks involve the normal anticipated

21    movements of the train, the accelerations of the train, the

22    decelerations of the train, the train stopping, the trains

23    repositioning, movement of the train that may be in the

24    ordinary course of operation.

25             As you've heard, many of the witnesses testified

1    that they're familiar with trains stopping and

2    repositioning.  We submit to you that the -- that when

3    Ms. Scott chose to get up before the doors opened, before

4    the doors chimed, when she got up at that point, knowing

5    that the train stopped and jerked forward -- that was her

6    testimony -- that when she did that, she assumed certain

7    risks, and one of those risks was a risk that she might

8    fall.

9         So, ladies and gentlemen, just wrapping up on

10    liability issues.  Who's responsible?  I believe this case

11    isn't as conclusive or as certain as my colleagues would

12    have you believe.  There is evidence on both sides with

13    regard to announcements that were made and what

14    announcements were made and when they were made.  There's

15    also inconsistencies of the testimony of the people who

16    actually remember what announcements were made because they

17    were there.

18         I submit to you that the -- this is not an

19    absolutely clear situation like the day we presented it to

20    you.  I think it's a lot more ambiguous and that the

21    evidence is disputed and that, as a result, the plaintiffs

22    have not met their burden.

23         I know that, again, it may be difficult to find

24    for a defendant in a case where you have a sympathetic

25    plaintiff and you have a large Metrorail operation.  But,

1    again, as I said repeatedly in my opening, and as the Court

2    has instructed, we stand equally before you as our jury and

3    in this Court before the law.

4        It doesn't matter that we're an organization -- a

5    government agency and that she's an individual.  Both

6    parties stand equally before the law before you.  And we ask

7    that you, consistent with Judge Cooper's instructions, not

8    base your verdict on sympathy, but you base it on the facts,

9    the evidence, and the law.

10        So if the evidence does not convince you that

11    there's a national standard of care, meaning if you're not

12    satisfied that Dr. Berkowitz is testifying from a sufficient

13    factual basis or from research or knowledge of other

14    agencies' SOPs, then we submit to you that they have not

15    established a national standard of care.

16        And this is not a matter of common sense.  It is a

17    matter of their obligation to produce an expert who can

18    establish an industry consensus, and they haven't done that.

19        If the evidence doesn't convince you that Metro's

20    operator failed to announce the movement, then we ask you to

21    rule in WMATA's favor on the first and second questions of

22    the case on the verdict sheet that Mr. Regan referred to.

23        And if the evidence convinces you that Ms. Scott

24    knew the train would move and that she put herself in danger

25    by getting out of her seat and not holding on too soon,

1    again, we ask you to rule in favor of WMATA on those issues.

2         Touching briefly on the damages issues.  As you

3    may recall -- I agree with Mr. Regan on this point -- we had

4    three very well-qualified orthopedic surgeons who testified

5    about Ms. Scott's condition.  Yes, this is a serious

6    fracture.  There's no doubt.  Okay?  We're not here to deny

7    that.

8         She had an outstanding surgeon who did an

9    incredible job in fixating her injury.  The bone was well

10   placed.  The surgical instrumentation went in well.  She had

11   an excellent result, and all three of the orthopedic

12   surgeons agree.

13        Dr. Rao, I think, is perhaps the most significant

14   of the three experts because he is the surgeon who operated

15   on her, and he's also the surgeon who followed up with her.

16   And Dr. Rao, if you recall, indicated that he -- that when

17   he last saw her she was not taking pain medication.  She was

18   able to stand and ambulate on her own in small distances.

19   She was using her cane as she was before but more now than

20   before.  She used a scooter for longer distances, but she

21   was also encouraged to return to exercise, which she did.

22        And essentially Dr. Bishop and Dr. Harris agree

23   that there is, in their view, minimal permanent impairment,

24   but, yes, there is some permanent impairment for a fracture

25   like this, and that is not unexpected.

1          I'd also ask you to consider, if you remember back

2     in opening statements when Mr. Christopher Regan was talking

3     about the impacts on Ms. Scott's life, they were talking

4     about the advocacy work she did.  If you remember her

5     testimony, if you remember, she got out of PT around April

6     of 2020 right when the world shut down for the pandemic and

7     while nobody was going to conferences and the things that

8     she was doing beforehand because of the circumstances of the

9     global pandemic.  But she did continue to do her advocacy,

10    and she did testify about how she continued to work with

11    indigenous veterans.

12         So ultimately we ask, as we did before, if you get

13    to the issue of awarding damages -- and we submit you should

14    not -- but if you do get to that, we ask that you be fair to

15    WMATA and that your damages award reflect fair and just

16    compensation based on all of the facts, especially keeping

17    in mind how well her surgery went and the excellent surgical

18    outcome she's had.

19         I began my opening statement by thanking you, and

20    I want to end my closing statement with the same.  You have

21    been an incredibly attentive jury.  We have -- I have

22    enjoyed trying this case with my colleagues, Patrick and

23    Christopher Regan, before you.  You serve, as I said before,

24    a vitally important role in helping us resolve a dispute,

25    and this dispute is important to the parties.

1           We appreciate your efforts, your attention to this

2    matter, and we trust that you'll render a fair and just

3    verdict.

4           Thank you.

5           THE COURT:  Thank you.

6           Okay.  Ladies and gentlemen, the plaintiff in the

7    case is entitled to a brief rebuttal argument, so I believe

8    Mr. Christopher Regan is going to -- which one?

9           MR. C. REGAN:  Not me, Your Honor.  I was just

10   helping set that up.  Thank you, though.

11          THE COURT:  All right.  You've got about seven

12   minutes, Mr. Regan.

13          MR. P. REGAN:  I won't need it.

14          THE COURT:  Okay.

15          MR. P. REGAN:  I hope.

16          Mr. Waters is a fine lawyer, but I'm not sure what

17   courtroom he's been in.  All right?  When he tells you that

18   there's evidence that that announcement was given, it sure

19   as heck didn't come from the witness stand.  It didn't come

20   from depositions.  There was none.  And he didn't even point

21   to it.  Okay?  This slide --

22          Are we up?  Yes.  Working?  Okay.  That's it.

23          We've been waiting all this time, and he's right.

24   He's absolutely right.  Metro has a right to defend any case

25   they want.  Okay?  Any case they want.  But he's the one who

1    said in opening statement fairness, and there are cases

2    where we're responsible, and we accept responsibility.  And

3    that's why I say to you if not this case, which case?

4         All right.  So -- literally in about four minutes

5    I'm sitting down, okay, and then it's your job -- cases like

6    this are how the citizens of the District insist that Metro

7    obey national safety laws with respect to operating the

8    subway.  Okay?  Let me repeat that.  Cases like this are how

9    citizens of the District insist that Metro obey national

10    safety laws.

11         Okay.  They want to criticize Dr. Berkowitz

12    because he didn't talk to all 16 of them, and they want to

13    try to run from the national standard of care that he

14    testified to.  And he was qualified by Judge Cooper to give

15    testimony on the national standard of care.  This wasn't

16    make believe.

17         What was make believe, what was Alice In

18    Wonderland, was that closing argument you just heard about

19    there's evidence on both sides.  There's no evidence here

20    that that announcement was given.

21         Can you imagine a national standard of care that

22    did not require a warning when you're about to move a subway

23    train like this?  What kind of national standard of care

24    would that be?  Would we get on -- would anybody get on a

25    subway like that?

1          Okay.  I asked you, I said, "Does WMATA

2     acknowledge the national standard of care?"  Well, he sure

3     as heck didn't just now.

4          Did they acknowledge a violation?  No.  He said

5     there was evidence she gave the warning.  There's no

6     evidence.  Ms. Swain didn't say there was.  Mr. Emondi

7     didn't say there was.  Ms. Scott didn't say there was.  But

8     more importantly, Metro didn't say there was, and I'll show

9     you that in a minute.

10         Okay.  This morning we had this, and Mr. Waters

11    says, well, yeah, that's the Metro person, but we can

12    disagree with them.  Go back and read Instruction 37.  The

13    testimony of these witnesses is binding on WMATA.  The

14    testimony of these witnesses is binding on WMATA.  They

15    can't run from it.  Okay?

16         This is what Ms. Henry said.  This is what

17    Mr. Bennett said.  This is important.

18         "Is there any evidence that WMATA is aware that

19    the train operator announced that the train would be moving

20    before she moved it forward again?

21         "No."

22         That is binding on them.  They can't run from it.

23    That's three years later.  They still didn't have any

24    evidence as of February 9, 2023.

25         Okay.  They want a get-out-of-jail-free card.

1    That's what Metro wants here.  They want a get-out-of-jail-

2    free card.  They want to blame Ms. Scott.  Okay?

3          Here's what they're saying.  On the one hand

4    they're saying our train operator did nothing wrong.  But

5    then they're saying, wait a minute, she assumed the risk.

6    What did she assume?  Our train operator was so unsafe that

7    Ms. Scott should have known that by standing up she was

8    taking her life in her hands.  She didn't do anything wrong,

9    but she was so unsafe that she's at fault.  Think about

10   that, okay?

11         So, you know, when you talk about fairness and

12   responsibility and coming in here and, yeah, they have a

13   right to defend themselves.  Of course they do.  But it's

14   indefensible.  They don't have any facts.  They don't have

15   any evidence.  They don't have anything.

16         The defense says WMATA's conduct forced Ms. Scott

17   into a position which left her with no reasonable

18   choice...  This defense doesn't apply if WMATA's conduct

19   forced Ms. Scott into a position which left her with no

20   reasonable choice other than to do what she did.  That's in

21   the instructions that you'll have.  Okay?

22         What does WMATA expect its passengers to do?  I

23   mean, what are they supposed to do?  You wait there?  You

24   wait?  She waited what she felt was a reasonable period of

25   time, started -- and she wasn't alone.  You heard the

1   testimony from Ms. Swain and from Mr. Emondi.  Both of them

2   said other passengers were getting up and going.  Were they

3   all unreasonable?

4          You are the justice system's appraisers.

5   Determine the measure of harms and losses.  As we said, our

6   job is to provide you with all the evidence.  You're meeting

7   Carol only after.  Okay?  You see her now.  But now they're

8   saying -- well, you know, this is the condition they put her

9   in.  When you see her limping in the hallway and walking

10  with a cane, that's not the way she was on the morning of

11  September 23, 2019.

12         What can the public reasonably expect from WMATA?

13  Once a train is stopped at a station platform, passengers

14  are allowed to get off the train without fear that it will

15  abruptly jerk.  Okay?  That's what they're entitled to feel.

16         I'm done.  I also want to thank you.  Ms. Scott

17  doesn't get a chance to talk to you other than from the

18  stand, but I can tell you right now she very much

19  appreciates the fact that eight of you have taken three days

20  out of your lives to sit here and listen to her case.  It

21  took six years to get here, okay, and some of that's COVID

22  related, but we're here, and we thank you.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.

25         All right.  Ladies and gentlemen, that concludes

1      our closing arguments.  Before you retire to deliberate, the

2      Court has just a few minutes of concluding instructions

3      regarding your deliberations.

4              When you return back to the jury room, the first

5      thing that you should set about doing is to select a

6      foreperson to preside over your deliberations and to be your

7      spokesperson here in court.  There are no specific rules

8      about how you should go about selecting a foreperson.  That

9      is entirely up to you.  However, be mindful of your mission

10     in this case, which is to reach a fair and just verdict

11     based simply on the evidence.  Consider selecting someone

12     who will be able to facilitate your discussions, who can

13     help you organize the evidence, who will encourage civility

14     and mutual respect amongst all of you, who will invite each

15     juror to speak up regarding his or her views about the

16     evidence, and who will promote a fair and full consideration

17     of the evidence.

18              I'd like to remind you of an instruction that I've

19     repeated throughout the trial.  You may not communicate with

20     anyone not on the jury about the case.  This includes any

21     electronic communication or social media.  You shall also

22     not conduct any independent investigation during your

23     deliberations.

24              During the trial I have permitted those jurors who

25     wanted to take notes to do so.  You may take your notes with

1    you back to the jury room and use them in your deliberations

2    as you see fit.  As I told you at the beginning, your notes

3    are only to be an aid to your memory.  They should not

4    replace your memory.

5            Those jurors who have not taken notes should rely

6    on their own memory of the evidence and should not be

7    influenced by another juror's notes if the notes do not

8    coincide with their own memory.  Notes are intended to be

9    for the note-taker's own personal use.

10           Again, do not take your notes home with you at the

11   end of the deliberations.  We will collect and destroy them.

12           If it becomes necessary during your deliberations

13   to communicate with me, you may send me a note via the

14   courtroom deputy signed by your foreperson or another member

15   of the jury.  No member of the jury should try to

16   communicate with me except through a signed note.  And I

17   will not communicate with any member of the jury on any

18   matter concerning the merits of the case except in writing

19   or orally here in court.

20           Under no circumstances should you reveal to

21   anyone -- not to the deputy, not to the clerk, not to me,

22   not in your note -- how the jurors are voting until after

23   you have reached a unanimous verdict.  So, in other words,

24   don't tell me that you're 4 to 4 or 7 to 1 on any particular

25   issue.

1          It is your duty as jurors to consult with one

2     another and to deliberate and to expect to reach an

3     agreement.  You must decide the case for yourself, but you

4     should do so only after thoroughly discussing it with your

5     fellow jurors.  You should not hesitate to change an opinion

6     when convinced it is wrong.  You should not be influenced to

7     vote in any way on any question just because another juror

8     favors a particular decision or holds an opinion different

9     from your own.  You should reach an agreement only if you

10    can do so in good conscience.  In other words, you should

11    not surrender your honest beliefs about the effect or weight

12    of evidence merely to return a verdict or solely because of

13    other jurors' opinions.

14          The attitude and conduct of jurors at the

15    beginning of their deliberations are matters of considerable

16    importance.  It may not be useful for a juror upon entering

17    the jury room to voice a strong expression of an opinion on

18    the case or to announce a determination to stand for a

19    certain verdict.  When one does that at the outset, a sense

20    of pride may cause that juror to hesitate to back away from

21    an announced opinion after a discussion of the case.

22          Furthermore, many jurors find it useful to avoid

23    an initial vote upon retiring to the jury room.  Calmly

24    reviewing and discussing the case at the beginning of the

25    deliberations is often a more useful way to proceed.

1    Remember that you are partisans -- you are not partisans or

2    advocates in this matter, but you are judges of the facts.

3    All of that said, it is up to you to determine how to

4    organize your deliberations and set about your

5    deliberations.

6            A verdict must represent the considered judgment

7    of each juror, and in order to return a verdict, each juror

8    must agree on the verdict.  In other words, your verdict

9    must be unanimous.

10           We will be sending back with you to the jury room

11   all of the exhibits that have been admitted into evidence in

12   the case.  They will be on a thumb drive.  You will have a

13   laptop computer that the courtroom deputy will instruct you

14   as to how to use and display the exhibits.  You may examine

15   any or all of the exhibits as you consider your verdict.

16           Please keep in mind that only exhibits that were

17   marked for -- that were admitted into evidence will be sent

18   back, not the exhibits that were marked only for

19   identification purposes or for demonstrative purposes.

20           As I said, we'll also provide you copies of the

21   instructions.  You may refer to these instructions as you

22   wish.  While you may refer to any particular instruction,

23   you must consider the instructions as a whole, as I've

24   already instructed you.

25           If you have any questions about the instructions,

1    you should feel free to send me a signed note, and when you

2    do send out a note, unless it's something pretty

3    straightforward, if it's something that requires

4    consultation with the lawyers, it sometimes takes a while

5    for us to formulate a proper response to your note so it may

6    take a little bit if it's not something that's pretty

7    straightforward, so just bear with us.

8            Please return your instructions to me when your

9    verdict is rendered.

10           When you have reached a verdict, just send me a

11   note informing me of that fact, again, without telling me

12   whether you're split in some way, and have your foreperson

13   sign the note.  Do not tell me what your verdict is.  The

14   foreperson should fill out and sign that verdict form that

15   we've been talking about.

16           As the lawyers indicated, there are a series of

17   questions.  It should be straightforward.  There are yes or

18   no questions.  It tells you how to progress through the

19   form.  But if there are any questions about that, please

20   send out a note, and we'll answer them to the best that we

21   can.

22           Once you've delivered or given me a note, I will

23   call you back into the courtroom.  We will inspect the

24   verdict form.  I will then ask the foreperson to stand up

25   and I will go through the form, and the foreperson will

1    answer the questions as they appear on the verdict form in

2    open court.

3         So, with that, thank you very much, and please

4    retire to the jury room.  Do not begin your deliberations

5    until the thumb drive with the evidence and the copies of

6    the jury instructions have been delivered to the jury room.

7         We, as you know, usually knock off about 4:30.  If

8    you want to leave at 4:30 today and you have not reached a

9    verdict, that's fine.  If you'd like to stay a little

10   longer, just send out a note letting us know that you would

11   like to stay longer, and we can arrange for that.  Okay?

12        All right.  Please retire to the jury room.

13        (Jury exits courtroom)

14        THE COURT:  All right.  Congratulations.  Well

15   tried, both sides.  Stick around.

16        MR. P. REGAN:  Thank you.

17        THE COURT:  Stay close in case we get a note.

18        (Recess taken)

19        THE COURT:  Okay.  The Court received a note at

20   4:31 that the jury has reached a verdict, signed by -- Juror

21   2, Ms. Jenkins?

22        THE COURTROOM DEPUTY:  I'm not quite sure, Your

23   Honor.

24        THE COURT:  I'm not quite sure whose signature it

25   is, but let's bring them in.

```
1              THE COURTROOM DEPUTY:  Okay.

2              (Jury enters courtroom)

3              THE COURT:  Okay.  Please be seated, everyone.

4              All right.  I understand that the jury has reached

5     a unanimous verdict; is that correct?

6              THE FOREPERSON:  We have.

7              THE COURT:  And which of you is our foreperson?

8     Juror No. 8.

9              If you could hand your verdict form to the

10    courtroom deputy, please.

11             Okay.  Madam Foreperson, if I could ask you to

12    please stand.

13             Question 1:  Do you find that the plaintiff, Carol

14    Scott, has proved by a preponderance of the evidence that

15    defendant, WMATA, through its train operator, breached a

16    national standard of care regarding berthing announcements?

17             THE FOREPERSON:  Yes, we do.

18             THE COURT:  Question 2:  Do you find that

19    plaintiff, Carol Scott, has established by a preponderance

20    of the evidence that the breach of the national standard of

21    care was a cause of her injuries?

22             THE FOREPERSON:  Yes, we do.

23             THE COURT:  Question 3:  Do you find that

24    defendant, WMATA, has proved by a preponderance of the

25    evidence that Ms. Scott was contributorily negligent?
```

```
 1                 THE FOREPERSON:  No, we do not.

 2                 THE COURT:  Question 4:  Does the jury find that

 3      defendant, WMATA, has established by a preponderance of the

 4      evidence that the contributory negligence -- I'm sorry.

 5                 Question 5:  Do you find that defendant, WMATA,

 6      has proved by a preponderance of the evidence that Ms. Scott

 7      assumed the risk of harm?

 8                 THE FOREPERSON:  No, we do not.

 9                 THE COURT:  Question 6:  What amount of damages do

10      you award to plaintiff, Carol Scott?

11                 THE FOREPERSON:  $1.6 million.

12                 THE COURT:  Okay.

13                 Poll, Mr. Waters?

14                 MR. WATERS:  Yes, Your Honor.

15                 THE COURT:  Okay.  Please be seated.

16                 Juror 1, is that your verdict?

17                 JUROR NO. 1:  Yes.

18                 THE COURT:  Juror 2, is that your verdict?

19                 JUROR NO. 2:  Yes.

20                 THE COURT:  Juror 3, is that your verdict?

21                 JUROR NO. 3:  Yes.

22                 THE COURT:  Juror 4, is that you are verdict?

23                 JUROR NO. 4:  Yes.

24                 THE COURT:  And Juror 5, is that your verdict?

25                 JUROR NO. 5:  Yes.
```

```
 1                THE COURT:  Juror 6, is that your verdict?

 2                JUROR NO. 6:  Yes.

 3                THE COURT:  Juror 7, is that your verdict?

 4                JUROR NO. 7:  Yes.

 5                THE COURT:  And finally, Madam Foreperson, is that

 6     your verdict?

 7                THE FOREPERSON:  Yes.

 8                THE COURT:  The clerk is directed to record the

 9     jury's verdict.

10                Ladies and gentlemen, you are discharged from

11     service in this trial.  Please retire back to the jury

12     deliberation room.  It's my practice to come back and thank

13     all my juries personally and have a few words with you

14     before you leave for today.

15                Feel free to stick around for that.  If not, feel

16     free to go home.

17                Again, thank you for your service.

18                MR. P. REGAN:  Thank you, members of the jury, on

19     behalf of Ms. Scott.

20                (Jury exits courtroom)

21                THE COURT:  Okay.  Mr. Waters, pretrial motions

22     within 30 days, and if you need an extension, please just

23     file for it.

24                MR. WATERS:  I appreciate that, Your Honor.  My

25     understanding of the rules is 28 days.
```

1           THE COURT:  30 days.

2           MR. WATERS:  Great.  Thank you very much.

3           THE COURT:  All right.  We're adjourned.

4           MR. P. REGAN:  Thank you, Your Honor.

5           MR. WATERS:  Thank you, Your Honor.

6                  (Whereupon the hearing was

7                   adjourned at 5:02 p.m.)

8

9               **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11           I, LISA A. MOREIRA, RDR, CRR, do hereby

12   certify that the above and foregoing constitutes a true and

13   accurate transcript of my stenographic notes and is a full,

14   true and complete transcript of the proceedings to the best

15   of my ability.

16       Dated this 6th day of May, 2025.

17

18                           /s/Lisa A. Moreira, RDR, CRR

19                           Official Court Reporter
                             United States Courthouse
20                           Room 6718
                             333 Constitution Avenue, NW
21                           Washington, DC 20001

22

23

24

25

599

## $

**$229,000** [1] - 547:21

## '

**'McPherson** [1] - 498:24

## /

**/s/Lisa** [1] - 598:18

## 1

**1** [12] - 456:10, 457:1, 457:3, 525:21, 529:24, 530:3, 532:11, 552:9, 590:24, 595:13, 596:16, 596:17
**1.6** [1] - 596:11
**10** [1] - 501:16
**100** [1] - 551:25
**10:35** [2] - 477:8, 477:10
**11** [2] - 571:22, 574:23
**11:00** [1] - 501:17
**12** [1] - 498:20
**12:10** [1] - 527:14
**13** [2] - 539:12, 539:22
**14** [7] - 444:20, 459:5, 460:4, 468:12, 478:24, 478:25, 485:9
**15** [10] - 441:13, 441:23, 442:9, 444:20, 460:18, 460:20, 545:20, 545:24, 549:14, 555:23
**15-minute** [1] - 501:16
**16** [3] - 502:17, 564:23, 585:12
**18** [4] - 478:20, 479:13, 487:14, 548:6
**18-year-old** [1] - 550:19
**19** [2] - 493:17, 500:13
**1919** [1] - 438:14
**1967** [1] - 556:6
**1:15** [3] - 527:20, 527:24, 533:3
**1:22-cv-00601-CRC** [1] - 438:3

## 2

**2** [17] - 456:14, 489:13, 489:17, 525:23, 530:21, 530:23,

531:4, 531:5, 531:7, 531:10, 531:13, 531:18, 532:9, 594:21, 595:18, 596:18, 596:19
**2,037** [2] - 555:7, 555:12
**2,591** [1] - 555:11
**2,600** [1] - 555:14
**20** [8] - 441:20, 447:25, 448:1, 459:13, 459:23, 478:16, 479:14, 499:15
**20001** [2] - 438:24, 598:21
**20036** [1] - 438:15
**2007** [1] - 448:10
**2013** [1] - 448:10
**2017** [2] - 468:25, 549:15
**2019** [14] - 444:16, 448:21, 450:4, 451:12, 455:3, 457:6, 457:7, 457:12, 459:24, 518:17, 539:22, 545:22, 555:9, 588:11
**202** [2] - 438:15, 438:25
**2020** [1] - 583:6
**2021** [2] - 548:6, 549:16
**2023** [3] - 444:15, 543:4, 586:24
**2025** [4] - 438:5, 539:23, 555:10, 598:16
**21** [2] - 504:15, 539:23
**22** [1] - 485:22
**22-601** [1] - 440:3
**22102** [1] - 438:20
**23** [5] - 438:5, 518:17, 555:9, 588:11
**23rd** [1] - 556:14
**24** [1] - 501:22
**245-9300** [1] - 438:20
**25** [3] - 479:23, 480:11, 500:2
**27** [2] - 501:23, 502:4
**28** [4] - 480:12, 480:21, 480:25, 597:25
**28-year-old** [1] - 550:19
**29** [4] - 502:4, 556:24, 578:1, 578:2

## 3

**3** [11] - 456:16, 525:25, 535:18, 535:21, 535:25, 536:4, 540:18, 540:19, 595:23, 596:20, 596:21
**30** [12] - 477:8, 500:2, 553:25, 554:2, 554:3, 557:1, 578:1, 578:2, 579:1, 579:2, 597:22, 598:1
**30(b)(6** [2] - 482:13, 482:17
**31** [4] - 480:14, 480:17, 481:15, 577:24
**3301** [1] - 467:16
**333** [2] - 438:24, 598:20
**350** [1] - 438:14
**354-3187** [1] - 438:25
**36** [2] - 482:13, 504:2
**37** [6] - 503:22, 504:2, 504:3, 504:5, 544:10, 586:12
**38** [1] - 486:12
**39** [1] - 487:16

## 4

**4** [11] - 456:19, 526:3, 535:18, 535:23, 536:1, 536:4, 590:24, 596:2, 596:22, 596:23
**4,600-and-some** [1] - 556:7
**40** [4] - 468:22, 499:16, 499:23, 499:25
**403** [1] - 443:6
**41** [1] - 484:19
**45** [2] - 500:5, 500:9
**463-3030** [1] - 438:15
**49** [1] - 572:2
**4:30** [1] - 594:7, 594:8
**4:31** [1] - 594:20

## 5

**5** [8] - 526:6, 535:18, 535:25, 536:1, 536:4, 596:5, 596:24, 596:25
**5.06** [3] - 488:11, 488:14, 489:4
**5.12** [5] - 491:9, 491:13, 491:14, 491:24, 492:6

## 50

**50** [9] - 457:4, 457:6, 457:11, 468:7, 477:18, 552:7, 556:1, 556:2, 556:3
**51** [5] - 483:24, 529:16, 551:11, 572:2
**51(b)(2** [1] - 503:16
**510** [1] - 438:19
**5:02** [1] - 598:7

## 6

**6** [8] - 487:7, 487:10, 526:8, 546:14, 553:24, 596:9, 597:1, 597:2
**64** [1] - 524:3
**6718** [2] - 438:23, 598:20
**6th** [1] - 598:16

## 7

**7** [4] - 444:4, 590:24, 597:3, 597:4
**7.1** [4] - 524:5, 555:11, 555:17, 556:2
**703** [1] - 438:20
**78** [1] - 562:16
**78-year-old** [3] - 550:9, 550:18

## 8

**8** [4] - 473:20, 545:7, 545:8, 595:8
**8-car** [13] - 449:6, 449:8, 449:13, 449:17, 450:10, 450:19, 451:4, 455:5, 456:14, 563:6, 563:7, 563:12
**8-track** [2] - 545:7, 545:8
**8-train** [1] - 545:9
**8-year-old** [1] - 550:19
**8.05** [5] - 492:12, 493:9, 493:19, 496:20, 502:19
**84** [5] - 524:4, 555:18, 555:20, 555:21
**8444** [1] - 438:19

## 9

**9** [2] - 543:4, 586:24
**90** [1] - 551:12
**99** [1] - 551:11
**9:20** [1] - 438:5

## A

**a.m** [1] - 438:5
**abilities** [3] - 465:22, 465:23, 523:11
**ability** [1] - 598:15
**able** [9] - 444:8, 447:17, 455:9, 459:10, 538:3, 574:2, 575:21, 582:18, 589:12
**abruptly** [2] - 545:17, 588:15
**absence** [1] - 528:9
**absolute** [1] - 512:19
**absolutely** [11] - 455:5, 459:3, 471:7, 498:5, 498:6, 527:6, 537:17, 537:18, 542:5, 580:19, 584:24
**Academy** [1] - 469:11
**acceleration** [1] - 503:7
**accelerations** [1] - 579:21
**accept** [6] - 506:4, 509:15, 514:7, 517:13, 543:13, 585:2
**accepting** [1] - 543:12
**accepts** [1] - 544:24
**access** [1] - 575:21
**accessible** [2] - 575:8, 575:9
**accident** [8] - 520:13, 520:20, 520:24, 571:6, 574:13, 574:18, 576:21, 577:6
**accidents** [2] - 537:7, 537:9
**accordance** [2] - 465:21, 511:15
**according** [4] - 520:22, 521:6, 523:25, 561:3
**accuracy** [1] - 515:13
**accurate** [6] - 456:10, 513:22, 514:8, 559:15, 559:17, 598:13
**achieve** [1] - 472:1
**achieved** [1] - 472:10
**acknowledge** [4] - 557:22, 557:24, 586:2, 586:4
**acknowledgement** [1] - 568:24
**act** [15] - 480:2,

519:20, 519:21, 519:24, 520:6, 520:7, 520:8, 520:10, 520:11, 523:15, 524:12, 524:15, 524:25
**acted** [3] - 485:24, 518:17, 518:21
**action** [7] - 490:1, 490:21, 490:22, 508:14, 518:16, 522:11, 578:12
**actions** [3] - 442:4, 521:12, 523:21
**activity** [3] - 524:10, 525:7, 544:14
**acts** [7] - 519:19, 520:1, 520:2, 520:4, 520:23, 524:12, 524:14
**actual** [2] - 524:7
**adding** [1] - 486:1
**addition** [3] - 506:9, 519:22, 526:18
**additional** [2] - 473:4, 501:25
**additions** [1] - 478:14
**address** [2] - 447:10, 467:16
**addressing** [1] - 441:9
**adjourned** [2] - 598:3, 598:7
**adjust** [1] - 526:12
**adjusting** [2] - 461:10, 461:13
**Administration** [1] - 548:7
**admissibility** [1] - 442:14
**admit** [1] - 460:3
**admits** [2] - 524:11, 539:5
**admitted** [9] - 509:17, 509:18, 542:5, 548:17, 549:10, 564:22, 576:15, 592:11, 592:17
**adverse** [2] - 528:12, 528:13
**advises** [1] - 482:7
**advocacy** [2] - 583:4, 583:9
**advocates** [1] - 592:2
**affect** [1] - 514:15
**afternoon** [4] - 467:14, 534:12, 536:11, 560:25
**afterwards** [5] - 459:15, 474:25, 475:4, 543:6, 549:9

**aged** [2] - 524:3, 524:4
**agencies** [6] - 565:6, 565:18, 565:20, 565:23, 566:9, 566:13
**agencies'** [1] - 581:14
**agency** [3] - 521:18, 521:22, 581:5
**aging** [1] - 474:13
**ago** [10] - 448:2, 458:5, 497:17, 537:7, 542:4, 543:11, 548:10, 551:1, 565:2, 574:3
**agree** [22] - 465:20, 473:16, 474:4, 474:20, 479:18, 480:10, 480:16, 480:18, 485:13, 486:18, 487:24, 491:21, 493:23, 517:24, 549:25, 557:23, 560:14, 565:7, 582:3, 582:12, 582:22, 592:8
**agreed** [4] - 498:2, 498:3, 509:19, 509:21
**agreement** [2] - 591:3, 591:9
**agrees** [5] - 479:19, 479:21, 493:23, 497:5, 549:23
**ahead** [2] - 446:3, 456:9
**aid** [1] - 590:3
**air** [1] - 562:10
**aisle** [1] - 550:16
**AI** [2] - 539:2, 541:16
**alert** [1] - 449:19
**alerting** [1] - 453:6
**Alice** [1] - 585:17
**alight** [5] - 492:15, 494:19, 494:23, 496:13, 502:22
**alighting** [2] - 496:16, 498:23
**aligned** [1] - 563:9
**Allegations** [1] - 485:23
**alleged** [1] - 505:21
**alleges** [4] - 518:16, 518:19, 519:2, 521:25
**allegiances** [1] - 468:21
**alleging** [2] - 520:17, 520:19
**allowed** [7] - 505:24,

509:3, 509:4, 545:16, 571:14, 574:13, 588:14
**almost** [5] - 468:7, 534:13, 550:6, 555:13
**alone** [3] - 510:8, 513:12, 587:25
**altogether** [1] - 574:1
**ambiguous** [1] - 580:20
**ambulance** [1] - 470:12
**ambulate** [1] - 582:18
**American** [1] - 469:11
**amount** [2] - 526:12, 527:1, 536:6, 546:15, 546:16, 553:21, 554:13, 554:17, 554:19, 560:20, 596:9
**anatomic** [1] - 472:1
**anatomy** [1] - 471:17
**Angeles** [1] - 468:18
**animal** [4] - 511:4, 511:5, 511:7, 511:8
**animosity** [1] - 514:3
**announce** [5] - 448:25, 456:11, 458:1, 581:20, 591:18
**announced** [5] - 498:24, 542:25, 576:16, 586:19, 591:21
**announcement** [43] - 451:7, 453:6, 453:21, 453:25, 457:24, 458:3, 492:20, 492:23, 492:24, 495:2, 495:8, 495:10, 495:17, 495:19, 496:9, 496:11, 497:5, 497:10, 497:12, 540:10, 540:13, 541:14, 558:15, 563:4, 563:13, 565:12, 568:13, 568:16, 568:18, 568:19, 568:21, 569:1, 569:14, 569:19, 569:20, 570:13, 572:25, 573:1, 576:7, 576:9, 584:18, 585:20
**announcement's** [1] - 570:4
**announcements** [13] -

444:4, 453:19, 457:17, 562:6, 565:15, 569:22, 572:19, 574:4, 574:5, 580:13, 580:14, 580:16, 595:16
**another's** [4] - 490:2, 521:8, 522:12, 578:14
**answer** [17] - 447:16, 450:24, 508:19, 509:3, 509:4, 509:6, 509:8, 534:24, 535:16, 535:21, 535:25, 536:1, 559:1, 593:20, 594:1
**answered** [1] - 509:5
**answers** [1] - 518:6
**anticipate** [1] - 505:5
**anticipated** [3] - 477:1, 498:13, 579:20
**anticipation** [1] - 540:5
**anyplace** [1] - 560:20
**anyway** [1] - 550:13
**apologize** [3] - 531:9, 531:12, 539:25
**appear** [4] - 493:12, 515:19, 566:24, 594:1
**APPEARANCES** [1] - 438:12
**appearances** [1] - 461:18
**appeared** [3] - 513:10, 539:17, 540:25
**applicable** [2] - 507:5, 509:11
**applied** [1] - 494:6
**applies** [6] - 489:18, 489:19, 490:18, 494:18, 502:22, 553:15
**apply** [8] - 489:20, 489:22, 506:3, 519:1, 522:3, 523:2, 523:5, 587:18
**apportion** [1] - 488:19
**appraisers** [2] - 554:25, 588:4
**appreciate** [2] - 584:1, 597:24
**appreciated** [1] - 575:4
**appreciates** [2] - 497:4, 588:19
**approach** [2] - 448:24, 450:19

**approaching** [5] - 445:25, 448:25, 453:23, 463:16, 495:9
**appropriate** [11] - 465:22, 480:21, 483:3, 483:17, 488:11, 490:5, 496:21, 499:6, 561:16, 562:18
**appropriately** [1] - 482:7
**April** [4] - 438:5, 539:23, 555:9, 583:5
**area** [2] - 469:14, 565:9
**AREA** [1] - 438:6
**areas** [1] - 517:7
**argue** [5] - 442:3, 442:10, 550:7, 550:8, 558:1
**argued** [1] - 442:3
**argues** [1] - 511:21
**arguing** [1] - 579:18
**argument** [8] - 490:9, 494:4, 494:6, 560:17, 561:24, 576:19, 584:7, 585:18
**arguments** [8] - 510:10, 510:11, 527:16, 534:7, 535:19, 561:7, 561:13, 589:1
**arise** [1] - 490:6
**arising** [2] - 522:24, 523:4
**arrange** [1] - 594:11
**arrival** [1] - 569:23
**arrive** [1] - 571:17
**arrived** [4] - 540:14, 540:15, 569:13, 571:16
**arrives** [1] - 563:2
**arriving** [4] - 453:22, 496:8, 496:9, 570:5
**articulate** [1] - 521:11
**aspersions** [1] - 564:7
**asserted** [1] - 579:6
**asserting** [1] - 574:8
**assertion** [1] - 510:15
**assertions** [1] - 521:16
**assess** [1] - 516:5
**Assessment** [2] - 480:12, 501:23
**assign** [1] - 490:11
**assigning** [1] - 577:10
**assist** [1] - 517:9
**assistant** [4] - 447:5,

601

447:18, 448:5, 448:6
**assisted** [1] - 465:18
**associated** [1] - 526:5
**assume** [14] - 461:21,
462:9, 462:10,
462:20, 464:15,
486:16, 503:3,
523:8, 523:10,
523:12, 525:17,
557:14, 557:16,
587:6
**assumed** [11] - 486:1,
511:22, 518:23,
522:14, 522:17,
522:19, 522:20,
557:11, 580:6,
587:5, 596:7
**assumes** [1] - 579:16
**assuming** [1] - 579:17
**assumption** [25] -
480:14, 480:25,
481:2, 481:14,
481:16, 481:20,
482:1, 499:7, 501:5,
501:7, 501:11,
501:25, 504:24,
523:1, 523:2, 523:5,
536:2, 557:10,
579:6, 579:7,
579:10, 579:14,
579:15, 579:19
**assumptions** [1] -
502:1
**Atlanta** [1] - 549:14
**ATO** [7] - 442:20,
442:21, 442:22,
442:23, 443:8,
443:14, 444:2
**atrophy** [2] - 475:11,
475:12
**attach** [1] - 507:11
**attempt** [1] - 509:3
**attempting** [3] -
494:19, 494:22,
502:22
**attention** [8] - 453:23,
460:12, 484:13,
510:19, 519:15,
521:2, 538:9, 584:1
**attentive** [1] - 583:21
**attitude** [1] - 591:14
**audio** [4] - 443:17,
463:13, 463:14,
570:22
**Authority** [2] - 440:4,
440:14
**authority** [1] - 571:3
**AUTHORITY** [1] -
438:7
**automated** [1] -

444:10
**automatic** [2] -
442:20, 444:2
**automatically** [4] -
443:12, 444:3,
452:1, 453:10
**Avenue** [2] - 438:24,
467:17, 598:20
**average** [1] - 556:1
**avoid** [3] - 520:24,
523:20, 591:22
**avoidable** [1] - 545:1
**award** [11] - 469:17,
525:18, 526:10,
526:13, 526:22,
527:2, 527:8,
527:10, 536:6,
583:15, 596:10
**awarding** [1] - 583:13
**awards** [1] - 469:16
**aware** [3] - 463:15,
542:24, 586:18
**awkwardly** [1] -
478:25

# B

**baby** [2] - 491:5,
502:11
**bachelor** [1] - 468:12
**background** [4] -
468:8, 468:11,
469:2, 567:6
**backpack** [1] - 464:23
**bad** [1] - 475:25
**bags** [1] - 562:10
**balance** [4] - 475:14,
554:6, 554:8, 578:18
**balanced** [4] - 512:13,
572:6, 572:16, 573:3
**balances** [1] - 554:14
**balancing** [2] - 571:25,
577:10
**ball** [3] - 471:18,
471:19, 472:8
**Ballston** [1] - 574:3
**barely** [1] - 565:11
**base** [5] - 506:8,
508:11, 515:15,
581:8
**based** [19] - 463:8,
465:22, 466:15,
471:12, 495:10,
495:13, 501:2,
507:3, 510:2, 515:1,
517:15, 526:13,
527:3, 527:4,
527:11, 562:14,
568:2, 583:16,
589:11

**baseline** [1] - 457:16
**bases** [2] - 463:22,
493:1
**basing** [5] - 494:25,
566:14, 566:19,
566:21, 571:6
**basis** [1] - 581:13
**bear** [1] - 593:7
**bearing** [4] - 512:25,
513:5, 513:19,
521:19
**bears** [1] - 511:25
**became** [1] - 468:21
**becomes** [2] - 568:7,
590:12
**BEFORE** [1] - 438:11
**beforehand** [1] - 583:8
**began** [4] - 448:3,
569:15, 570:20,
583:19
**begin** [6] - 448:1,
498:23, 502:25,
505:18, 541:13,
594:4
**beginning** [4] - 534:7,
590:2, 591:15,
591:24
**begins** [1] - 486:13
**behalf** [1] - 597:19
**behavior** [1] - 513:20
**behind** [5] - 443:22,
464:8, 464:13,
464:22, 557:7
**belabor** [1] - 497:3
**belief** [3] - 512:4,
515:6, 515:13
**beliefs** [1] - 591:11
**believability** [1] -
506:21
**believable** [1] - 515:8
**believes** [1] - 570:1
**belongs** [1] - 471:24
**below** [1] - 471:20
**belts** [1] - 562:10
**bench** [6] - 466:12,
466:24, 508:23,
558:10, 560:15,
575:14
**bend** [1] - 471:18
**benefit** [3] - 513:6,
554:4, 560:13
**Bennett** [10] - 440:25,
441:1, 445:14,
539:4, 542:17,
542:19, 564:14,
570:23, 571:5,
586:17
**Berkowitz** [20] - 517:5,
536:14, 537:20,
543:22, 543:25,

564:11, 564:16,
564:19, 564:21,
565:17, 566:5,
566:6, 567:3, 567:4,
567:11, 567:13,
567:16, 581:12,
585:11
**Berkowitz's** [1] - 568:2
**Bernard's** [1] - 482:15
**berth** [2] - 451:21,
459:23
**berthed** [5] - 449:1,
451:13, 451:17,
451:20, 461:19
**berthing** [5] - 448:21,
455:24, 532:4,
562:25, 595:16
**berths** [1] - 563:2
**best** [2] - 593:20,
598:14
**bet** [1] - 538:2
**better** [4] - 446:25,
537:3, 556:9, 573:10
**between** [20] - 442:20,
443:8, 448:10,
460:20, 462:24,
488:16, 488:19,
488:20, 489:20,
490:7, 492:21,
500:24, 502:4,
508:14, 511:10,
513:14, 549:24,
572:20, 575:20,
576:24
**beyond** [1] - 512:20
**bias** [2] - 508:10,
514:14
**biased** [1] - 514:12
**big** [1] - 472:1
**bills** [8] - 553:17,
559:5, 559:12,
559:18, 559:21,
560:7, 560:8
**binding** [6] - 524:19,
542:22, 570:24,
586:13, 586:14,
586:22
**Bishop** [5] - 517:5,
549:12, 549:22,
549:25, 582:22
**bit** [14] - 447:11,
453:19, 454:5,
477:1, 477:2, 477:7,
477:9, 535:7, 542:8,
556:20, 563:10,
563:18, 563:19,
593:6
**blacked** [1] - 479:3
**blacks** [1] - 444:11
**blame** [2] - 535:20,

587:2
**blaming** [2] - 574:10,
574:14
**board** [2] - 469:8,
469:9
**board-certified** [2] -
469:8, 469:9
**bodily** [1] - 556:11
**bone** [10] - 471:17,
471:21, 471:23,
472:8, 472:10,
472:13, 474:10,
474:11, 475:19,
582:9
**Book** [1] - 482:17
**bored** [1] - 549:1
**borne** [1] - 561:24
**borrow** [1] - 504:23
**Boston** [2] - 537:21,
564:25
**bottom** [4] - 441:25,
460:18, 471:25,
487:4
**bound** [1] - 517:13
**box** [1] - 457:19
**boxes** [1] - 457:19
**bracketed** [4] -
478:11, 478:20,
492:3, 492:6
**brakes** [1] - 498:15
**breach** [8] - 529:25,
530:3, 530:12,
531:13, 531:19,
532:5, 535:14,
595:20
**breached** [7] - 530:8,
530:15, 530:16,
532:3, 532:12,
535:10, 595:15
**breaching** [1] - 531:1
**break** [11] - 477:6,
477:7, 499:14,
501:16, 505:3,
505:6, 505:7,
527:15, 527:17,
528:24
**brief** [2] - 465:11,
584:7
**briefly** [2] - 529:1,
582:2
**bring** [11] - 447:11,
450:1, 478:1,
499:10, 507:21,
532:25, 534:4,
571:22, 572:12,
577:24, 594:25
**bringing** [2] - 519:21,
526:17
**brings** [3] - 450:7,
518:15, 554:17

**broke** [2] - 472:11, 539:1
**brought** [2] - 539:19, 576:23
**bump** [1] - 458:23
**burden** [30] - 490:15, 511:17, 511:18, 511:25, 512:10, 512:15, 512:17, 520:16, 520:18, 528:22, 551:9, 551:19, 552:2, 564:1, 564:4, 564:6, 564:8, 564:9, 567:24, 572:3, 572:7, 572:11, 572:13, 572:14, 572:17, 578:21, 579:9, 579:10, 579:12, 580:22
**Burden** [1] - 571:23
**bursitis** [2] - 474:12, 474:13
**bus** [8] - 448:3, 484:3, 484:10, 493:22, 498:14, 498:15, 525:2, 525:3
**buses** [1] - 496:24
**business** [1] - 524:13
**button** [11] - 452:1, 452:2, 452:3, 453:13, 453:14, 453:15, 453:16, 466:18, 539:9, 576:1
**BY** [8] - 446:20, 454:25, 455:22, 459:9, 465:13, 467:13, 471:11, 473:13

## C

**CA** [1] - 438:3
**cab** [5] - 573:13, 573:15, 573:16, 574:7
**calcar** [1] - 472:7
**calmly** [1] - 591:23
**camera** [1] - 461:8
**candid** [1] - 541:1
**candidly** [1] - 542:4
**cane** [5] - 465:16, 550:9, 562:17, 582:19, 588:10
**cannot** [1] - 480:23
**capability** [1] - 514:15
**car** [4] - 542:11, 542:12, 562:9
**card** [2] - 586:25, 587:2

**care** [86] - 470:12, 470:13, 478:8, 481:21, 490:10, 497:22, 519:5, 519:6, 519:12, 519:13, 519:14, 520:15, 520:18, 520:24, 521:11, 521:15, 521:16, 521:20, 521:21, 521:23, 523:9, 523:13, 524:24, 524:25, 525:3, 525:8, 529:25, 530:2, 530:8, 530:11, 530:12, 530:17, 530:24, 531:1, 531:14, 531:19, 532:3, 532:5, 532:13, 535:10, 535:15, 536:15, 536:25, 537:4, 537:19, 538:18, 544:6, 544:7, 544:15, 544:20, 544:21, 550:8, 550:15, 550:21, 557:15, 557:23, 562:7, 563:20, 563:24, 564:1, 564:3, 565:3, 565:4, 565:5, 566:3, 566:7, 566:17, 567:14, 567:18, 567:20, 567:21, 567:23, 568:5, 568:7, 576:20, 581:11, 581:15, 585:13, 585:15, 585:21, 585:23, 586:2, 595:16, 595:21
**career** [6] - 448:1, 448:3, 468:17, 573:24, 574:1, 577:18
**carefully** [2] - 520:23, 566:20
**CAROL** [1] - 438:3
**Carol** [13] - 440:3, 440:8, 518:15, 539:2, 539:22, 547:24, 549:15, 550:5, 550:15, 588:7, 595:13, 595:19, 596:10
**Carolina** [1] - 541:17
**carried** [2] - 512:14, 572:3, 572:7
**carrier** [6] - 480:4,

524:23, 524:24, 525:10, 544:12, 544:16
**Carrier** [1] - 544:11
**carriers** [3] - 494:4, 494:10, 496:25
**carry** [1] - 520:18
**carrying** [3] - 465:16, 512:10, 524:24
**case** [101] - 442:22, 445:8, 448:15, 454:6, 454:13, 454:19, 466:7, 466:16, 469:21, 469:25, 476:12, 476:16, 476:20, 477:12, 477:13, 477:17, 479:24, 484:8, 484:12, 486:20, 487:1, 487:20, 497:11, 498:11, 501:2, 503:8, 505:18, 505:22, 506:3, 508:1, 508:5, 508:9, 508:12, 508:14, 510:18, 511:14, 511:19, 511:20, 511:21, 514:2, 514:4, 514:13, 514:18, 514:23, 515:13, 515:19, 516:10, 517:5, 517:21, 518:14, 520:9, 520:14, 524:11, 527:22, 527:23, 530:25, 534:13, 535:1, 535:19, 541:10, 541:11, 543:24, 546:17, 546:22, 551:14, 553:19, 555:4, 558:21, 560:21, 561:3, 561:15, 561:21, 561:24, 562:2, 562:24, 566:11, 574:9, 574:15, 574:22, 578:25, 579:7, 580:10, 580:24, 581:22, 583:22, 584:7, 584:24, 584:25, 585:3, 588:20, 589:10, 589:20, 590:18, 591:3, 591:18, 591:21, 591:24, 592:12, 594:17
**case-in-chief** [2] -

445:8, 466:16
**cases** [7] - 469:15, 476:25, 512:21, 521:13, 585:1, 585:5, 585:8
**cast** [1] - 564:7
**catch** [1] - 501:6
**caught** [5] - 452:17, 504:14, 504:16, 532:21, 540:3
**causation** [2] - 519:18, 576:22
**caused** [12] - 486:13, 487:18, 519:6, 519:20, 520:7, 520:20, 522:18, 525:15, 525:20, 526:16, 526:21
**Caused** [1] - 487:16
**causes** [3] - 512:8, 519:21, 526:16
**caution** [2] - 480:2, 519:15, 525:3
**cautious** [1] - 552:22
**caveat** [1] - 445:21
**Center** [2] - 563:4
**central** [1] - 498:21
**certain** [7] - 483:12, 509:9, 510:19, 513:1, 517:25, 527:6, 527:12, 534:25, 580:6, 580:11, 591:19
**certainly** [3] - 441:20, 445:23, 461:15
**certainty** [6] - 471:2, 473:7, 511:12, 512:20, 527:2, 527:4
**CERTIFICATE** [1] - 598:9
**certified** [2] - 469:8, 469:9
**certify** [1] - 598:12
**cetera** [3] - 540:7, 544:2, 547:13
**chain** [1] - 511:2
**chair** [2] - 468:23, 469:19
**chairmen** [1] - 469:13
**chance** [1] - 588:17
**change** [7] - 496:15, 499:5, 502:15, 521:6, 538:12, 548:15, 591:5
**changed** [2] - 468:21, 494:23
**changes** [6] - 485:7, 486:24, 492:25, 495:4, 520:21
**changing** [1] - 548:18

**characterization** [1] - 510:21
**characterize** [1] - 563:21
**characterizes** [1] - 574:9
**charge** [15] - 480:25, 483:25, 484:10, 484:15, 486:23, 488:10, 488:11, 488:14, 488:15, 489:21, 489:23, 496:24, 499:6, 504:20, 529:15
**Charge** [1] - 577:24
**charged** [2] - 532:20, 577:22
**Charleston** [1] - 541:17
**chart** [1] - 528:2
**check** [1] - 475:11
**checking** [1] - 500:17
**Chicago** [3] - 537:21, 544:1, 564:24
**Chicago's** [1] - 567:11
**chief** [2] - 445:8, 466:16
**chime** [3] - 449:2, 452:6, 453:17
**chimed** [1] - 580:4
**chimes** [12] - 553:5, 553:6, 553:7, 553:9, 575:10, 575:18, 575:19, 575:23, 576:1, 576:14, 576:16
**choice** [3] - 523:7, 535:12, 587:20
**choice..** [1] - 587:18
**choose** [1] - 545:18
**chose** [1] - 580:3
**Chris** [1] - 536:19
**CHRISTOPHER** [2] - 438:11, 438:13
**Christopher** [5] - 440:8, 573:8, 583:2, 583:23, 584:8
**circuit** [6] - 443:13, 443:17, 443:19, 443:20, 508:21
**circuits** [1] - 443:16
**circumstance** [2] - 544:13, 562:21
**circumstances** [19] - 442:25, 482:8, 483:4, 511:3, 515:5, 519:16, 520:1, 520:22, 525:1, 525:5, 525:6, 544:12, 562:14,

562:16, 562:20,
565:16, 566:16,
583:8, 590:20
**Circumstances** [2] -
480:12, 501:24
**circumstantial** [7] -
510:5, 510:24,
511:1, 511:6,
511:11, 511:12,
511:14
**citizens** [2] - 585:6,
585:9
**civil** [1] - 518:15
**Civil** [2] - 440:3,
477:19
**civility** [1] - 589:13
**claim** [8] - 492:1,
507:17, 507:19,
511:17, 511:20,
519:3, 546:21,
546:22
**claiming** [1] - 490:8
**claims** [3] - 505:21,
511:19, 519:1
**clean** [2] - 532:19,
532:23
**clear** [14] - 449:20,
451:9, 452:18,
454:3, 458:6,
462:22, 479:10,
502:21, 504:9,
528:4, 561:5,
563:16, 568:10,
580:19
**clearly** [5] - 481:14,
489:19, 489:22,
493:21, 521:11
**clerk** [2] - 590:21,
597:8
**Clev** [4] - 482:14,
564:14, 570:23,
571:5
**client** [1] - 569:8
**client's** [1] - 561:7
**clinging** [1] - 558:4
**Clinical** [1] - 469:12
**clock** [1] - 554:4
**close** [14] - 446:23,
452:16, 452:18,
453:2, 453:10,
453:11, 453:18,
467:19, 477:16,
478:4, 505:8, 545:7,
568:11, 594:17
**Closed** [1] - 452:22
**closed** [4] - 452:25,
453:5, 453:8, 508:21
**closed-circuit** [1] -
508:21
**closer** [3] - 447:11,

478:2, 484:12
**closes** [3] - 452:10,
452:11, 453:9
**closest** [1] - 461:8
**closing** [15] - 442:3,
488:5, 499:14,
499:18, 500:5,
500:19, 510:11,
527:16, 527:20,
534:7, 560:17,
561:5, 583:20,
585:18, 589:1
**closings** [5] - 499:18,
499:20, 527:17,
527:19, 529:7
**coat** [2] - 461:10,
461:13
**code** [1] - 452:24
**cognizant** [1] - 579:17
**coincide** [1] - 590:8
**collateral** [1] - 559:6
**colleague** [1] - 577:5
**colleagues** [3] -
567:22, 580:11,
583:22
**collect** [1] - 590:11
**collectively** [2] -
534:21, 553:23
**colon** [1] - 504:4
**colored** [1] - 514:14
**COLUMBIA** [1] - 438:1
**Columbia** [6] - 496:22,
544:17, 577:6,
577:14, 577:21,
578:20
**combined** [1] - 478:9
**coming** [16] - 443:22,
448:23, 449:24,
476:4, 492:24,
493:24, 539:16,
540:14, 547:11,
549:11, 563:3,
569:19, 575:1,
575:2, 576:10,
587:12
**commands** [7] -
443:18, 443:23,
443:24, 449:24,
450:18, 450:20,
450:23
**committed** [2] -
521:22, 524:12
**Common** [1] - 544:11
**common** [20] - 480:4,
494:4, 494:10,
496:25, 497:25,
509:25, 524:23,
524:24, 525:10,
536:13, 536:16,
536:18, 537:23,

543:25, 544:8,
544:12, 544:16,
563:22, 565:9,
581:16
**communicate** [4] -
589:19, 590:13,
590:16, 590:17
**communication** [1] -
589:21
**community** [1] -
508:15
**company** [1] - 559:22
**comparative** [6] -
488:10, 488:16,
488:17, 490:23,
502:11, 578:11
**Comparative** [1] -
502:7
**compare** [4] - 490:2,
490:17, 522:12,
578:14
**comparing** [1] - 577:9
**compels** [1] - 577:14
**compensate** [2] -
522:18, 555:24
**compensation** [8] -
487:17, 519:7,
526:15, 526:22,
554:7, 554:8, 554:9,
583:16
**complete** [4] - 476:20,
497:9, 498:24,
598:14
**completely** [1] -
517:18
**compliance** [1] -
558:15
**complicate** [1] - 481:3
**complicated** [1] -
565:14
**complicating** [1] -
565:10
**compromised** [1] -
490:11
**computer** [1] - 592:13
**concern** [1] - 529:20
**concerned** [1] - 514:3
**concerning** [4] -
470:23, 517:7,
517:12, 590:18
**concludes** [2] -
527:13, 588:25
**concluding** [1] - 589:2
**conclusions** [1] -
509:25
**conclusive** [1] -
580:11
**conclusively** [1] -
524:6
**condition** [7] - 521:8,

523:18, 545:2,
550:11, 562:19,
582:5, 588:8
**conduct** [20] - 487:18,
487:21, 490:3,
520:21, 521:6,
522:13, 522:24,
523:4, 523:6,
525:20, 526:16,
526:19, 526:20,
526:21, 578:15,
587:16, 587:18,
589:22, 591:14
**conducted** [1] -
469:22
**conference** [6] -
441:16, 466:12,
466:24, 529:16,
558:10, 560:15
**conferences** [3] -
508:21, 508:23,
583:7
**confidential** [1] -
566:1
**conflate** [1] - 530:5
**conflates** [2] - 529:24,
530:4
**conflict** [2] - 513:14,
513:16
**conflicting** [1] -
572:20
**conflicts** [1] - 506:21
**confronted** [1] - 516:2
**confuse** [2] - 443:5,
445:4
**confuses** [1] - 490:15
**confusing** [3] -
481:13, 502:2, 530:4
**confusion** [1] - 490:6
**congestion** [1] -
443:13
**congratulations** [1] -
594:14
**conjecture** [1] - 510:3
**connection** [2] -
469:25, 470:22
**conscience** [1] -
591:10
**consensus** [4] - 565:7,
565:19, 566:3,
581:18
**consequence** [2] -
519:23, 526:19
**consider** [41] - 473:25,
484:18, 486:17,
506:12, 506:16,
508:13, 509:14,
509:16, 509:20,
511:9, 513:4, 513:9,
513:18, 513:19,

514:5, 514:8,
514:13, 515:4,
516:5, 516:16,
516:25, 517:19,
517:20, 517:25,
524:8, 525:17,
547:8, 556:18,
566:21, 567:16,
567:18, 573:6,
573:11, 573:21,
573:24, 574:16,
574:17, 583:1,
589:11, 592:15,
592:23
**considerable** [2] -
496:12, 591:15
**consideration** [3] -
518:10, 562:20,
589:16
**considered** [1] - 592:6
**considering** [4] -
509:22, 512:6,
515:12, 570:11
**consistent** [5] -
445:24, 459:22,
503:9, 544:7, 581:7
**consists** [1] - 529:4
**constitute** [1] - 513:2
**constitutes** [1] -
598:12
**Constitution** [2] -
438:24, 598:20
**consult** [3] - 491:3,
505:25, 591:1
**consultation** [1] -
593:4
**contained** [1] - 517:2
**contains** [1] - 510:15
**contends** [3] - 485:24,
518:22, 522:14
**contest** [1] - 557:22
**context** [5] - 482:6,
496:5, 565:13,
573:21, 573:24
**continue** [3] - 442:3,
527:9, 583:9
**continued** [2] -
474:17, 583:10
**contradicted** [1] -
514:9
**contrary** [2] - 515:16,
569:6
**contrib** [1] - 481:25
**contribute** [1] - 557:1
**contributed** [9] -
485:25, 518:23,
520:5, 574:17,
576:21, 577:6,
577:12, 577:13,
578:18

604

contributes [2] - 574:12, 574:13
contributorily [5] - 486:15, 488:23, 511:22, 525:16, 595:25
contributory [26] - 481:21, 481:24, 488:12, 488:17, 488:22, 490:7, 490:16, 501:8, 501:10, 502:1, 502:13, 522:5, 535:21, 535:24, 552:24, 576:19, 576:24, 577:15, 577:25, 578:5, 578:6, 578:21, 578:23, 579:8, 579:10, 596:4
control [3] - 443:21, 444:2, 462:15
controllers [2] - 447:9, 447:22
convenience [1] - 514:25
convince [2] - 581:10, 581:19
convinced [1] - 591:6
convinces [1] - 581:23
convincing [1] - 512:7
Cooper [1] - 585:14
COOPER [1] - 438:11
Cooper's [1] - 581:7
copies [3] - 565:23, 592:20, 594:5
copy [8] - 474:15, 501:19, 505:15, 505:24, 532:19, 532:23, 538:21, 538:22
corporate [9] - 445:22, 448:16, 483:5, 483:19, 524:18, 524:20, 542:19, 570:24, 571:7
Corporate [1] - 503:21
correct [23] - 443:7, 445:17, 450:7, 455:7, 455:21, 474:5, 474:18, 474:22, 474:23, 475:1, 476:4, 476:5, 477:23, 478:23, 487:13, 492:4, 492:7, 494:3, 498:12, 502:5, 532:22, 570:25, 595:5
correctly [2] - 485:10,

514:22
corroborated [2] - 472:4, 514:9
Counsel [6] - 456:1, 493:18, 558:8, 561:8, 563:18, 570:22
counsel [10] - 440:5, 442:19, 465:3, 465:14, 478:4, 483:6, 491:3, 509:20, 561:20, 571:12
counsel's [1] - 478:1
counterpart [1] - 567:4
couple [11] - 461:20, 499:17, 528:1, 532:21, 546:12, 547:16, 548:10, 549:2, 556:21, 562:23
course [10] - 457:19, 507:6, 507:20, 524:16, 549:5, 553:7, 553:9, 562:1, 579:24, 587:13
court [11] - 516:4, 516:6, 516:19, 518:5, 518:12, 569:6, 569:7, 569:11, 589:7, 590:19, 594:2
COURT [233] - 438:1, 440:10, 440:16, 440:21, 440:25, 441:2, 441:5, 441:11, 441:17, 442:1, 442:14, 443:3, 443:6, 443:10, 444:1, 444:5, 444:13, 444:18, 444:22, 445:2, 445:5, 445:13, 445:19, 445:21, 446:6, 446:9, 446:14, 454:23, 455:15, 455:19, 456:9, 457:2, 459:6, 459:8, 460:1, 460:5, 465:3, 465:9, 466:3, 466:6, 466:11, 466:18, 466:20, 466:23, 467:2, 467:4, 467:8, 470:9, 471:8, 473:11, 476:8, 476:11, 476:16, 476:18, 477:15, 477:20, 477:25,

478:21, 479:7, 479:10, 479:20, 479:22, 480:6, 480:9, 480:11, 480:17, 480:19, 481:6, 481:9, 481:18, 481:23, 482:10, 482:22, 482:25, 483:7, 483:10, 483:18, 483:23, 484:1, 484:6, 484:17, 484:23, 485:1, 485:5, 485:15, 485:19, 485:21, 486:5, 486:11, 486:19, 486:22, 487:2, 487:7, 487:11, 487:15, 487:25, 488:6, 488:13, 488:24, 489:2, 489:6, 489:9, 489:13, 489:17, 489:24, 490:13, 490:20, 491:2, 491:7, 491:11, 491:15, 491:19, 491:23, 492:3, 492:6, 492:9, 493:5, 493:7, 493:10, 493:14, 493:19, 494:2, 494:14, 494:21, 495:5, 495:20, 495:23, 496:2, 496:5, 497:1, 497:20, 498:10, 499:2, 499:8, 499:15, 499:22, 499:25, 500:4, 500:8, 500:11, 500:14, 500:16, 500:20, 500:22, 501:6, 501:12, 501:14, 501:19, 503:13, 503:17, 503:19, 503:23, 504:4, 504:10, 504:14, 504:16, 504:21, 505:7, 505:11, 528:1, 528:5, 528:8, 529:2, 529:7, 529:12, 529:18, 529:21, 530:5, 530:14, 530:19, 530:22, 530:25, 531:3, 531:6, 531:15, 531:18, 531:24, 532:11, 532:16, 532:21, 533:2, 534:2, 534:4, 534:6,

543:19, 548:2, 553:25, 554:2, 558:8, 558:12, 558:19, 558:24, 559:3, 559:7, 559:11, 559:16, 559:19, 560:3, 560:5, 560:14, 560:16, 561:8, 579:1, 579:3, 579:5, 584:5, 584:11, 584:14, 588:24, 594:19, 594:17, 594:19, 594:24, 595:3, 595:7, 595:18, 595:23, 596:2, 596:9, 596:12, 596:15, 596:18, 596:20, 596:22, 596:24, 597:1, 597:3, 597:5, 597:8, 597:21, 598:1, 598:3, 598:9
Court [30] - 438:22, 438:23, 441:15, 441:20, 444:9, 471:8, 477:4, 494:15, 494:17, 497:3, 501:21, 502:21, 502:24, 503:21, 503:24, 508:16, 508:20, 524:2, 528:21, 543:23, 544:6, 548:20, 577:4, 577:8, 577:22, 581:1, 581:3, 589:2, 594:19, 598:19
Court's [7] - 455:16, 465:4, 498:20, 502:20, 504:12, 560:19, 578:19
Courthouse [2] - 438:23, 598:19
courtroom [18] - 446:5, 460:8, 477:14, 505:10, 515:24, 527:25, 534:5, 536:13, 543:14, 559:2, 584:17, 590:14, 592:13, 593:23, 594:13, 595:2, 595:10, 597:20
COURTROOM [5] - 440:2, 467:9, 534:11, 594:22, 595:1
covered [2] - 463:21, 480:4

COVID [1] - 588:21
crash [1] - 540:7
crazy [1] - 551:16
create [1] - 545:12
created [2] - 441:14, 521:8
credence [1] - 483:16
credibility [9] - 506:20, 513:11, 513:17, 516:17, 517:1, 539:13, 539:15, 540:24, 571:3
credible [2] - 514:10, 568:24
cregan@reganfirm. com [1] - 438:16
criminal [2] - 512:21, 551:14
critical [2] - 480:22, 492:13
criticize [1] - 585:11
criticizing [1] - 562:15
CROSS [1] - 454:24
cross [5] - 444:23, 445:7, 466:15, 473:12, 569:5
CROSS-EXAMINATION [1] - 454:24
cross-examination [2] - 466:15, 473:12
cross-examining [1] - 569:5
CRR [3] - 438:22, 598:11, 598:18
crux [1] - 576:18
CTA [3] - 566:15, 567:4, 567:7
current [1] - 467:22
curtain [1] - 452:19
customers [10] - 449:19, 453:6, 453:23, 458:1, 458:4, 462:15, 462:18, 462:20, 462:23, 538:9

## D

D.C [7] - 438:4, 468:2, 469:5, 488:11, 502:8, 562:2, 577:9
damage [1] - 546:22
Damages [2] - 486:12, 487:16
damages [31] - 486:17, 486:25, 519:7, 522:18, 525:14, 525:18,

526:10, 526:11, 526:12, 526:13, 526:20, 526:25, 527:1, 527:3, 527:6, 527:8, 527:10, 536:6, 536:10, 551:20, 551:21, 553:18, 555:25, 560:18, 560:20, 582:2, 583:13, 583:15, 596:9

**danger** [10] - 480:24, 520:22, 521:6, 521:7, 521:8, 522:23, 522:25, 525:8, 544:14, 581:24

**dangerousness** [2] - 525:7, 544:13

**dangers** [1] - 523:4

**dare** [2] - 495:25, 558:3

**date** [2] - 470:16, 574:3

**Dated** [1] - 598:16

**dates** [1] - 554:22

**day-to-day** [2] - 447:7, 447:20

**daylight** [1] - 549:24

**days** [8] - 537:7, 555:7, 555:12, 556:7, 588:19, 597:22, 597:25, 598:1

**DC** [3] - 438:15, 438:24, 598:21

**deal** [3] - 536:8, 543:19, 548:2

**deals** [2] - 535:8, 536:10

**decades** [2] - 543:22, 566:5

**decelerations** [1] - 579:22

**decide** [26] - 490:3, 494:15, 496:19, 496:20, 499:21, 506:18, 506:23, 508:8, 508:13, 510:8, 514:13, 515:24, 522:3, 522:13, 537:13, 553:22, 555:22, 555:23, 561:2, 561:3, 561:15, 561:18, 561:21, 578:15, 591:3

**decided** [1] - 502:18

**deciding** [2] - 513:8, 513:17

**decision** [5] - 482:10, 492:14, 493:2, 510:2, 591:8

**decisions** [1] - 562:13

**deemed** [1] - 517:6

**deep** [1] - 568:3

**defend** [4] - 558:18, 558:21, 584:24, 587:13

**defendant** [26] - 476:14, 489:20, 490:21, 507:7, 507:9, 507:12, 507:14, 507:18, 510:7, 512:16, 512:17, 519:4, 520:7, 520:9, 525:11, 525:12, 535:10, 562:2, 572:9, 572:11, 573:4, 580:24, 595:15, 595:24, 596:3, 596:5

**Defendant** [2] - 438:8, 438:18

**defendant's** [5] - 507:16, 519:5, 521:12, 535:19, 550:7

**defendants** [2] - 488:19, 490:18

**defense** [21] - 476:18, 477:17, 479:21, 488:23, 522:4, 523:1, 523:5, 528:9, 564:18, 569:10, 574:10, 576:19, 577:15, 577:20, 578:6, 578:22, 579:7, 579:8, 587:16, 587:18

**defense's** [1] - 504:23

**defenses** [6] - 486:2, 486:20, 501:9, 511:24, 574:9

**Defined** [3] - 491:10, 491:13, 501:22

**definite** [1] - 450:24

**definitely** [1] - 570:12

**definition** [4] - 530:25, 532:4, 532:6, 532:13

**deformity** [2] - 526:3, 526:5

**degree** [7] - 471:2, 473:6, 511:12, 577:7, 577:12, 578:19

**Delaware** [2] - 548:8, 548:9

**delete** [3] - 480:11,

485:11, 487:11

**deleting** [2] - 480:8, 532:12

**deletions** [1] - 478:14

**deliberate** [5] - 535:2, 538:20, 561:21, 589:1, 591:2

**deliberating** [1] - 578:24

**deliberation** [1] - 597:12

**deliberations** [18] - 476:23, 505:14, 505:19, 505:25, 507:10, 509:8, 547:6, 589:3, 589:6, 589:23, 590:1, 590:11, 590:12, 591:15, 591:25, 592:4, 592:5, 594:4

**delivered** [2] - 593:22, 594:6

**demanding** [1] - 521:24

**demeanor** [1] - 513:19

**demonstrative** [1] - 592:19

**denies** [3] - 485:23, 518:21, 571:14

**Denis** [3] - 440:22, 466:25, 467:16

**DENIS** [2] - 439:6, 467:11

**deny** [3] - 493:2, 552:17, 582:6

**Department** [1] - 524:1

**department** [2] - 447:8, 447:20

**dependent** [1] - 527:11

**depicted** [1] - 465:14

**deposition** [17] - 448:16, 454:14, 494:25, 495:1, 516:9, 516:14, 518:2, 518:7, 518:9, 518:11, 524:17, 541:16, 542:18, 548:9, 569:12, 572:21, 572:22

**depositions** [2] - 495:5, 584:20

**DEPUTY** [5] - 440:2, 467:9, 534:11, 594:22, 595:1

**deputy** [4] - 590:14, 590:21, 592:13, 595:10

**describe** [2] - 448:20,

551:2

**described** [1] - 540:10

**deserves** [1] - 517:22

**designated** [3] - 497:17, 524:17, 537:16

**designed** [4] - 526:11, 537:2, 537:24, 554:8

**designee** [3] - 448:17, 570:24, 571:7

**designees** [1] - 483:5

**desire** [1] - 514:15

**destroy** [1] - 590:11

**detail** [1] - 520:25

**detailed** [1] - 476:22

**details** [1] - 573:19

**detects** [1] - 452:20

**deter** [1] - 526:11

**determination** [1] - 591:18

**determinative** [3] - 495:23, 496:2, 496:5

**determine** [11] - 506:20, 506:24, 507:4, 507:24, 513:12, 513:16, 515:5, 516:18, 524:7, 588:5, 592:3

**determined** [2] - 506:24, 515:3

**determines** [2] - 453:2, 454:1

**determining** [6] - 507:1, 513:3, 514:7, 517:10, 546:14, 546:16

**developed** [1] - 566:18

**device** [1] - 465:18

**dictate** [1] - 554:10

**difference** [6] - 442:20, 443:8, 488:16, 497:5, 550:3, 576:23

**differences** [2] - 500:23, 500:24

**different** [16] - 443:14, 443:15, 453:13, 453:14, 453:15, 469:14, 483:15, 492:17, 495:22, 496:9, 510:4, 530:17, 562:12, 566:16, 569:17, 591:8

**differently** [5] - 454:10, 454:11, 506:10, 510:20, 574:10

**differs** [1] - 480:24

**difficult** [4] - 548:13,

550:1, 577:17, 580:23

**DIRECT** [2] - 446:19, 467:12

**direct** [15] - 444:23, 444:24, 445:7, 445:9, 510:5, 510:23, 510:24, 511:3, 511:11, 511:13, 511:14, 519:23, 526:18, 575:21

**directed** [1] - 597:8

**directing** [1] - 484:13

**directive** [1] - 451:22

**directly** [1] - 485:17

**director** [3] - 447:5, 447:19, 448:6

**disability** [1] - 523:18

**disagree** [3] - 481:4, 481:19, 586:12

**disagreements** [1] - 561:20

**discharged** [3] - 472:21, 473:2, 597:10

**discredited** [2] - 515:21, 516:21

**discuss** [5] - 466:6, 469:15, 476:12, 528:10, 534:18

**discussing** [2] - 591:4, 591:24

**discussion** [2] - 528:8, 591:21

**discussions** [4] - 477:12, 527:22, 528:15, 589:12

**disfigurement** [2] - 526:3, 526:5

**dismissive** [1] - 575:18

**display** [3] - 455:8, 478:25, 592:14

**displays** [1] - 479:2

**dispositive** [1] - 571:18

**dispute** [5] - 475:7, 497:7, 549:24, 583:24, 583:25

**disputed** [1] - 580:21

**disputes** [4] - 497:16, 544:21, 547:21, 568:9

**disregard** [7] - 508:3, 509:6, 510:21, 514:23, 514:25, 517:19, 559:24

**distances** [2] - 582:18, 582:20

**distinction** [2] - 497:4, 511:10
**distress** [2] - 525:25, 547:19
**DISTRICT** [3] - 438:1, 438:1, 438:11
**District** [8] - 496:22, 544:17, 577:5, 577:14, 577:21, 578:20, 585:6, 585:9
**divide** [1] - 547:16
**doctor** [3] - 467:23, 468:22, 475:20
**doctor's** [1] - 548:24
**doctors** [7] - 475:24, 547:24, 550:2, 552:1, 559:10, 559:22, 560:9
**document** [1] - 457:20
**documentation** [1] - 568:3
**documents** [3] - 469:24, 512:25, 566:9
**Dominic** [7] - 524:11, 564:15, 568:14, 568:15, 568:20, 568:24, 572:25
**done** [14] - 474:21, 476:24, 477:9, 478:5, 507:25, 508:4, 508:24, 548:22, 549:20, 552:17, 556:5, 581:18, 588:16
**door** [10] - 449:2, 451:24, 451:25, 452:16, 553:2, 553:3, 575:9, 575:21, 576:1
**Doors** [3] - 452:22, 570:1, 576:6
**doors** [68] - 441:24, 442:5, 442:9, 446:1, 449:1, 449:2, 449:16, 451:12, 451:18, 451:25, 452:1, 452:4, 452:8, 452:9, 452:10, 452:11, 452:13, 452:17, 452:18, 452:19, 452:20, 452:25, 453:2, 453:3, 453:5, 453:7, 453:9, 453:10, 453:17, 453:18, 453:24, 456:12, 456:17, 456:19, 460:21, 461:7, 461:20, 462:7,

462:12, 462:25, 463:10, 492:21, 495:2, 495:9, 497:13, 498:25, 503:6, 522:15, 536:23, 541:14, 552:23, 553:8, 563:4, 563:8, 569:15, 570:2, 575:10, 575:22, 575:24, 576:2, 576:11, 576:14, 576:16, 576:17, 580:3, 580:4
**doors'** [1] - 449:14
**doubt** [3] - 442:4, 512:21, 582:6
**down** [15] - 452:15, 453:1, 457:14, 457:17, 470:18, 488:13, 498:4, 545:5, 549:2, 553:23, 557:19, 571:23, 572:12, 583:6, 585:5
**Dr** [54] - 440:22, 466:25, 467:22, 470:13, 471:6, 471:9, 471:12, 471:22, 472:14, 472:16, 472:19, 473:2, 473:14, 473:23, 476:8, 500:13, 517:5, 517:6, 536:14, 537:20, 543:22, 543:25, 548:3, 548:16, 549:10, 549:12, 549:17, 549:22, 549:23, 549:25, 564:11, 564:16, 564:17, 564:19, 564:20, 564:21, 565:17, 566:5, 566:6, 567:3, 567:4, 567:11, 567:13, 567:16, 568:2, 581:12, 582:13, 582:16, 582:22, 585:11
**draft** [1] - 487:5
**draw** [6] - 506:22, 506:23, 509:24, 510:6, 510:7, 510:9
**drawn** [1] - 510:5
**drill** [1] - 548:25
**drilled** [1] - 549:1
**Drive** [1] - 438:19
**drive** [2] - 592:12, 594:5

**driver** [11] - 480:1, 481:22, 484:3, 484:10, 525:2, 525:9, 536:22, 541:25, 544:15, 552:10, 557:24
**drove** [1] - 541:24
**due** [4] - 481:21, 490:10, 497:2, 576:20
**duplication** [1] - 478:8
**duplicative** [6] - 480:13, 480:22, 481:1, 481:11, 481:25, 491:20
**duration** [3] - 525:21, 547:9, 547:10
**during** [17] - 505:25, 507:6, 507:10, 507:20, 508:1, 508:17, 509:8, 509:16, 510:18, 518:7, 524:16, 529:15, 546:8, 573:8, 589:22, 589:24, 590:12
**duties** [1] - 562:5
**duty** [17] - 481:21, 482:2, 482:4, 482:7, 485:2, 506:2, 506:4, 506:7, 508:11, 508:22, 513:15, 523:1, 523:3, 550:15, 550:17, 550:20, 591:1
**dynamic** [3] - 492:25, 495:4, 499:5

---

# E

**early** [3] - 477:7, 505:8, 527:15
**easily** [1] - 533:1
**editorial** [1] - 486:7
**educated** [1] - 562:13
**education** [4] - 468:12, 469:3, 517:12, 517:16
**educational** [1] - 468:10
**effect** [5] - 457:6, 457:11, 497:21, 506:25, 591:11
**effectively** [2] - 455:24, 456:10
**effects** [2] - 525:23, 547:13
**efficient** [1] - 476:25
**efficiently** [1] - 477:5
**efforts** [1] - 584:1

**eight** [5] - 446:6, 474:25, 475:6, 556:17, 588:19
**eight-month** [1] - 474:25
**either** [16] - 440:23, 443:18, 464:3, 478:14, 491:21, 508:5, 510:14, 511:11, 514:12, 515:17, 519:22, 523:14, 526:18, 570:14, 570:18
**elaborate** [1] - 471:15
**electronic** [1] - 589:21
**element** [7] - 491:25, 507:18, 511:19, 519:8, 519:10, 519:17, 551:21
**Elements** [1] - 486:12
**elements** [6] - 486:25, 519:4, 522:8, 546:21, 547:5, 578:9
**eliminate** [1] - 502:10
**ELMO** [1] - 532:25
**ELSER** [1] - 438:19
**email** [2] - 477:22, 533:1
**emails** [1] - 570:16
**embarrassment** [1] - 526:4
**emergency** [2] - 539:9, 548:5
**Emondi** [10] - 539:2, 541:16, 541:23, 550:17, 557:4, 570:15, 571:9, 572:23, 586:6, 588:1
**emotional** [4] - 525:24, 525:25, 547:14, 547:19
**employed** [1] - 447:4
**employee** [2] - 493:23, 538:23
**employees** [1] - 493:23
**employer** [1] - 524:13
**EMTs** [1] - 573:18
**encourage** [2] - 569:24, 589:13
**encouraged** [1] - 582:21
**end** [8] - 443:17, 449:6, 466:24, 560:15, 566:22, 583:20, 590:11
**ended** [1] - 477:1
**engage** [1] - 510:1
**engineer** [1] - 543:24
**English** [2] - 472:2,

474:11
**enhances** [3] - 480:24, 481:5, 482:5
**enjoyed** [1] - 583:22
**enter** [1] - 443:19
**Entering** [1] - 456:11
**entering** [1] - 591:16
**enters** [4] - 446:5, 505:10, 534:5, 595:2
**entire** [2] - 444:3, 558:4
**entirely** [1] - 589:9
**entirety** [1] - 483:25
**entitled** [14] - 486:17, 487:17, 507:15, 507:16, 513:6, 514:17, 516:23, 519:7, 522:17, 525:18, 526:15, 526:25, 584:7, 588:15
**equal** [5] - 506:15, 508:14, 508:15, 551:6
**equally** [6] - 506:16, 511:9, 512:13, 569:8, 581:2, 581:6
**equals** [1] - 508:16
**equipment** [1] - 450:25
**equipoise** [1] - 554:18
**especially** [4] - 503:7, 521:12, 577:17, 583:16
**ESQ** [4] - 438:13, 438:13, 438:18, 438:18
**essentially** [5] - 483:14, 490:11, 549:8, 549:16, 582:22
**establish** [12] - 512:1, 521:20, 522:4, 527:1, 563:25, 565:19, 566:7, 567:13, 567:25, 568:1, 578:5, 581:18
**established** [10] - 508:7, 511:2, 530:1, 535:9, 535:14, 567:23, 568:4, 581:15, 595:19, 596:3
**establishing** [1] - 572:18
**estimate** [2] - 524:9, 527:4
**et** [3] - 540:7, 544:2, 547:12
**evaluate** [3] - 516:17,

517:1, 540:24
**evaluating** [2] - 513:8, 567:18
**evaluation** [1] - 472:4
**evening** [1] - 446:7
**evenly** [3] - 572:6, 572:16, 573:2
**events** [4] - 569:12, 569:18, 571:5, 571:8
**evidence** [160] - 455:19, 457:1, 477:17, 484:19, 494:16, 495:16, 505:18, 506:20, 506:25, 507:5, 507:12, 507:16, 507:17, 507:19, 508:12, 509:9, 509:14, 509:17, 509:19, 509:21, 509:22, 509:24, 510:6, 510:12, 510:13, 510:14, 510:16, 510:19, 510:20, 510:22, 510:23, 510:24, 511:1, 511:3, 511:6, 511:9, 511:11, 511:13, 511:14, 511:16, 511:20, 512:2, 512:3, 512:4, 512:6, 512:13, 512:18, 512:22, 512:23, 512:24, 513:2, 513:4, 513:5, 513:7, 513:8, 513:15, 514:10, 514:20, 514:22, 515:1, 515:2, 515:5, 515:12, 516:10, 516:11, 516:12, 516:16, 517:2, 517:10, 517:18, 517:20, 517:21, 518:1, 519:9, 519:19, 521:19, 522:21, 524:9, 527:1, 527:4, 529:5, 529:9, 535:9, 535:12, 538:25, 542:24, 543:6, 543:8, 543:9, 543:13, 543:15, 544:6, 544:19, 551:2, 551:7, 551:8, 551:13, 551:15, 551:22, 552:2, 552:5, 552:14, 553:12, 557:25, 558:14, 559:1,

559:11, 559:16, 559:20, 560:6, 561:1, 561:6, 561:13, 561:19, 561:23, 563:15, 564:24, 568:10, 568:12, 568:20, 568:21, 568:23, 572:1, 572:6, 580:12, 580:21, 581:9, 581:10, 581:19, 581:23, 584:18, 585:19, 586:5, 586:6, 586:18, 586:24, 587:15, 588:6, 589:11, 589:13, 589:16, 589:17, 590:6, 591:12, 592:11, 592:17, 594:5, 595:14, 595:20, 595:25, 596:4, 596:6
**evidentiary** [1] - 476:20
**exact** [5] - 454:9, 458:9, 470:8, 475:5, 527:5
**exactly** [4] - 441:22, 442:7, 498:2, 574:4
**examination** [3] - 466:15, 470:22, 471:12
**EXAMINATION** [5] - 446:19, 454:24, 465:12, 467:12, 473:12
**examine** [2] - 470:15, 592:14
**examined** [5] - 470:14, 470:20, 472:4, 472:12, 475:10
**examining** [1] - 569:5
**example** [4] - 450:17, 450:18, 484:7, 484:11, 484:14, 511:3, 512:20, 525:2
**excellent** [4] - 474:3, 582:11, 583:17
**except** [3] - 563:23, 590:16, 590:18
**exceptional** [2] - 479:23, 480:2
**exceptions** [1] - 542:7
**exclusive** [2] - 506:19, 561:14
**exclusively** [1] - 574:16
**excuse** [2] - 482:22, 524:3

**excused** [1] - 466:6
**exercise** [9] - 490:9, 523:9, 523:13, 525:2, 525:5, 525:9, 544:15, 576:20, 582:21
**exercising** [1] - 481:21
**exhibit** [2] - 441:9, 441:13
**Exhibit** [6] - 441:13, 457:1, 457:3, 459:5, 473:20, 478:24
**exhibits** [10] - 478:21, 478:22, 509:12, 509:13, 509:18, 592:11, 592:14, 592:15, 592:16, 592:18
**existence** [1] - 567:13
**exists** [1] - 530:2
**exit** [2] - 461:13, 558:3
**exiting** [1] - 502:25
**exits** [5] - 477:14, 503:2, 527:25, 594:13, 597:20
**expect** [9] - 440:23, 441:12, 442:7, 544:23, 545:14, 546:3, 587:22, 588:12, 591:2
**expectancy** [6] - 524:3, 524:5, 524:7, 524:8, 524:9, 555:17
**expectation** [2] - 465:20, 496:16
**expectations** [1] - 461:23
**expected** [3] - 459:22, 496:13, 525:5
**expecting** [1] - 492:15
**expedite** [1] - 507:22
**expenses** [6] - 487:7, 526:8, 547:20, 547:22, 553:21, 560:18
**experience** [9] - 448:11, 510:1, 517:11, 517:16, 526:7, 550:23, 566:5, 567:9, 567:14
**experienced** [1] - 526:6
**experiences** [1] - 547:12
**expert** [21] - 471:6, 471:9, 517:4, 521:10, 521:13, 521:21, 528:9, 528:14, 528:17, 528:18, 544:20,

563:25, 564:2, 564:8, 564:17, 564:18, 564:19, 564:20, 568:1, 581:17
**expert's** [1] - 521:15
**expertise** [1] - 517:8
**experts** [1] - 582:14
**explain** [7] - 449:8, 468:10, 514:19, 534:18, 535:6, 550:25, 575:25
**explained** [1] - 502:24
**explaining** [1] - 488:16
**explains** [2] - 482:5, 502:9
**explanation** [2] - 488:12, 549:19
**explicitly** [1] - 539:4
**expose** [1] - 523:3
**exposed** [1] - 522:25
**express** [1] - 508:6
**expression** [1] - 591:17
**extension** [1] - 597:22
**extent** [4] - 483:13, 513:13, 525:21, 547:9
**Extent** [1] - 487:16
**extra** [4] - 546:9, 546:11, 550:8
**extracapsular** [1] - 471:20
**extraordinary** [2] - 494:17, 498:1
**eyewitness** [1] - 510:25

---

# F

**facilitate** [1] - 589:12
**fact** [30] - 442:11, 442:12, 442:24, 479:4, 485:10, 495:7, 503:1, 507:13, 510:15, 510:16, 510:25, 511:1, 512:1, 513:3, 513:5, 515:11, 516:1, 517:2, 517:10, 517:24, 517:25, 520:13, 528:16, 528:18, 537:12, 538:22, 559:8, 565:22, 588:19, 593:11
**factor** [2] - 555:12, 567:18
**factors** [3] - 520:1, 565:10, 570:11

**facts** [39] - 479:15, 485:17, 485:21, 497:11, 497:16, 498:9, 498:11, 498:17, 506:18, 506:19, 506:24, 507:1, 507:4, 507:22, 507:24, 508:7, 508:9, 509:15, 509:19, 509:20, 510:5, 511:3, 511:15, 513:1, 513:9, 514:19, 514:21, 514:22, 515:5, 516:16, 517:25, 561:3, 561:15, 574:15, 574:22, 581:8, 583:16, 587:14, 592:2
**factual** [2] - 495:6, 495:13, 581:13
**factually** [1] - 568:7
**failed** [4] - 566:7, 576:20, 579:12, 581:20
**fails** [1] - 519:12
**failure** [6] - 490:9, 519:5, 519:20, 519:24, 528:14
**failures** [2] - 524:12, 524:15
**fair** [21] - 446:2, 451:3, 455:3, 461:22, 462:17, 463:8, 478:9, 518:9, 531:15, 554:12, 554:18, 554:20, 556:11, 559:1, 559:14, 583:14, 583:15, 584:2, 589:10, 589:16
**fairly** [5] - 507:3, 514:17, 516:22, 517:22, 525:4
**fairness** [3] - 561:25, 585:1, 587:11
**Falcons** [1] - 549:14
**fall** [6] - 458:19, 458:22, 475:15, 475:17, 475:22, 580:8
**falling** [1] - 475:23
**falls** [3] - 494:9, 565:13, 576:17
**familiar** [4] - 454:12, 457:4, 457:22, 580:1
**far** [2] - 482:16, 542:10
**fare** [2] - 463:2, 463:5
**fast** [1] - 449:23

608

**faster** [1] - 537:3
**fault** [9] - 488:19, 490:4, 490:8, 522:13, 551:20, 552:18, 577:11, 578:16, 587:9
**favor** [8] - 507:3, 508:5, 572:2, 572:15, 573:4, 579:11, 581:21, 582:1
**favorable** [2] - 507:15, 513:6
**favoring** [1] - 512:7
**favors** [2] - 512:9, 591:8
**fear** [3] - 507:3, 545:16, 588:14
**February** [1] - 543:4, 586:24
**Federal** [1] - 477:19
**fell** [6] - 497:6, 541:22, 569:16, 570:21, 575:17
**fellow** [1] - 591:5
**felt** [2] - 539:23, 587:24
**female** [2] - 464:14, 486:7
**femur** [2] - 549:1, 553:15
**few** [10] - 458:5, 488:1, 515:14, 537:7, 542:3, 543:11, 549:9, 565:17, 589:2, 597:13
**field** [2] - 471:6, 471:9
**figure** [4] - 536:6, 546:15, 553:11, 555:18
**figures** [6] - 485:10, 485:11, 485:17, 485:21
**file** [1] - 597:23
**filed** [1] - 507:14
**fill** [1] - 593:14
**final** [6] - 477:22, 499:9, 499:10, 501:20, 503:25, 536:5
**finalize** [2] - 477:2, 527:16
**finally** [2] - 526:24, 597:5
**fine** [15] - 455:19, 470:11, 475:6, 480:6, 483:22, 487:23, 488:3, 491:18, 528:3, 531:16, 532:15,

532:24, 533:1, 584:16, 594:9
**first** [29] - 441:6, 441:7, 462:18, 464:4, 468:11, 478:10, 478:16, 502:10, 519:4, 525:12, 530:1, 531:17, 531:25, 532:1, 534:16, 535:4, 535:5, 535:8, 536:3, 536:8, 536:23, 539:18, 539:19, 549:15, 558:13, 565:17, 575:8, 581:21, 589:4
**firsthand** [1] - 549:19
**fit** [2] - 478:15, 590:2
**five** [13] - 451:22, 456:16, 456:21, 456:23, 501:16, 535:5, 536:8, 546:7, 547:11, 548:15, 564:24, 574:24
**five-plus** [1] - 547:11
**fixating** [1] - 582:9
**flagged** [1] - 478:16
**flew** [1] - 540:4
**Florida** [1] - 548:7
**focus** [1] - 460:14
**folks** [5] - 476:24, 527:15, 534:25, 542:14, 550:5
**follow** [7] - 506:11, 509:10, 534:21, 537:21, 537:23, 557:15, 557:16
**followed** [3] - 463:15, 543:9, 582:15
**following** [6] - 466:12, 522:22, 525:19, 529:17, 558:10, 562:6
**FOR** [1] - 438:1
**force** [1] - 494:17
**forced** [3] - 523:6, 587:16, 587:19
**forceful** [1] - 503:8
**foregoing** [1] - 598:12
**foreground** [1] - 461:8
**FOREPERSON** [7] - 595:6, 595:17, 595:22, 596:1, 596:8, 596:11, 597:7
**foreperson** [10] - 534:16, 534:17, 589:6, 589:8, 590:14, 593:12, 593:14, 593:24, 593:25, 595:7

**Foreperson** [2] - 595:11, 597:5
**foresight** [1] - 525:4
**forever** [4] - 547:10, 549:11, 556:8, 556:10
**forgive** [1] - 492:11
**form** [15] - 488:4, 500:19, 504:19, 529:20, 532:20, 535:3, 546:24, 552:9, 553:24, 593:14, 593:19, 593:24, 593:25, 594:1, 595:9
**formalistic** [1] - 529:14
**format** [2] - 504:22, 504:25
**formation** [3] - 474:10, 474:11, 475:19
**forms** [1] - 500:25
**formulate** [1] - 593:5
**formulated** [2] - 470:23, 471:1
**forth** [1] - 481:2
**forward** [30] - 449:20, 451:9, 454:3, 458:2, 458:12, 497:15, 503:4, 538:10, 538:15, 540:3, 540:4, 540:11, 540:17, 541:15, 541:21, 541:24, 543:1, 545:17, 557:12, 563:12, 563:14, 570:8, 570:9, 575:3, 575:6, 575:12, 575:16, 576:16, 580:5, 586:20
**four** [6] - 474:16, 474:17, 543:4, 574:3, 574:25, 585:4
**fractions** [1] - 528:6
**fracture** [6] - 474:14, 475:2, 553:15, 577:19, 582:6, 582:24
**fractured** [1] - 471:14
**fractures** [1] - 471:19
**frame** [1] - 451:19
**Francisco** [1] - 564:25
**frankly** [1] - 550:25
**free** [6] - 528:20, 586:25, 587:2, 593:1, 597:15, 597:16
**frequency** [1] - 443:17
**frequently** [1] - 573:23

**friend** [1] - 548:16
**friendship** [1] - 514:3
**front** [6] - 451:1, 455:9, 464:14, 470:16, 575:7
**full** [9] - 441:23, 442:9, 460:7, 467:15, 513:24, 522:23, 542:12, 589:16, 598:13
**fully** [3] - 518:25, 546:3, 579:16
**function** [1] - 506:17
**furtherance** [1] - 524:12
**furthermore** [1] - 591:22
**future** [13] - 474:20, 526:2, 526:7, 526:11, 527:6, 527:8, 547:17, 547:18, 547:20, 553:13, 555:11, 555:13, 555:25

### G

**gain** [1] - 539:17
**game** [1] - 446:2
**gap** [1] - 502:4
**general** [2] - 468:15, 505:20
**generally** [4] - 445:24, 448:20, 470:9, 470:19
**gentleman** [3] - 464:4, 464:8, 464:22
**gentlemen** [13] - 464:2, 464:10, 464:13, 464:25, 505:12, 505:17, 560:16, 560:25, 576:18, 580:9, 584:6, 588:25, 597:10
**George** [1] - 468:15
**Georgetown** [2] - 468:19, 468:20
**get-out-of-jail** [1] - 587:1
**get-out-of-jail-free** [1] - 586:25
**GILMAN** [5] - 438:18, 467:13, 471:5, 471:11, 489:25
**Gilman** [3] - 440:13, 444:14, 557:21
**Gilman)......................**
**..............467** [1] - 439:6

**given** [29] - 457:24, 480:21, 481:17, 481:25, 484:15, 488:10, 490:6, 492:12, 496:21, 497:18, 497:22, 497:23, 498:4, 498:14, 499:6, 503:4, 508:19, 509:11, 511:10, 534:21, 535:11, 536:16, 537:14, 543:3, 543:7, 543:16, 584:18, 585:20, 593:22
**global** [1] - 583:9
**gobblety** [1] - 551:3
**God** [1] - 551:16
**Google** [2] - 469:17, 473:16
**gook** [1] - 551:3
**govern** [1] - 505:14
**governing** [1] - 457:11
**government** [1] - 581:5
**great** [8] - 447:1, 470:5, 474:2, 476:11, 476:24, 494:12, 533:2, 598:2
**greater** [17] - 483:12, 483:19, 507:16, 511:12, 512:25, 515:6, 515:8, 515:13, 520:11, 520:23, 524:20, 525:8, 544:14, 544:15, 552:5, 552:7
**grounds** [1] - 466:21
**group** [1] - 469:12
**guarantee** [1] - 525:10
**guard** [4] - 540:3, 546:9, 546:11
**guess** [6] - 469:19, 480:12, 487:9, 501:3, 509:4, 538:21
**guesswork** [1] - 527:11
**guide** [1] - 449:11
**guy** [4] - 468:20, 469:18, 473:17, 567:11
**guys** [1] - 556:4
**GW** [4] - 470:11, 470:12, 548:4

### H

**habits** [1] - 524:10
**half** [6] - 444:11, 472:18, 542:11,

542:12, 543:4, 543:5
**hallway** [1] - 588:9
**hand** [8] - 446:15, 467:6, 467:10, 512:12, 558:4, 572:5, 587:3, 595:9
**Hand** [1] - 440:14
**hand-holds** [1] - 558:4
**handrail** [1] - 522:16
**hands** [4] - 461:12, 558:2, 561:21, 587:8
**hard** [3] - 474:15, 574:19, 574:21
**hardware** [1] - 476:3
**harm** [35] - 486:16, 487:17, 511:23, 519:3, 519:6, 519:7, 519:20, 519:21, 519:22, 519:25, 520:2, 520:3, 520:5, 520:6, 520:8, 520:10, 522:8, 522:15, 522:17, 522:21, 525:17, 526:15, 526:16, 526:17, 526:18, 526:20, 526:22, 527:8, 554:8, 554:9, 578:9, 596:7
**harmed** [2] - 486:2, 518:24
**harms** [9] - 522:1, 522:2, 522:18, 525:19, 546:17, 554:7, 554:14, 554:16, 588:5
**Harris** [19] - 440:22, 441:6, 441:7, 467:1, 467:16, 467:22, 471:6, 471:9, 471:12, 473:14, 476:8, 500:13, 517:6, 548:16, 549:10, 549:23, 564:17, 564:20, 582:22
**HARRIS** [2] - 439:6, 467:11
**harsh** [1] - 577:3, 577:16
**hazard** [2] - 545:12, 575:5
**head** [5] - 451:15, 451:22, 468:19, 484:22, 549:1
**heading** [1] - 503:2
**healed** [3] - 472:6, 472:13, 472:23
**Health** [2] - 524:1, 555:17

**health** [5] - 524:10, 556:13, 556:14, 576:21, 579:16
**healthier** [1] - 555:20
**healthy** [1] - 555:21
**hear** [18] - 446:24, 447:17, 463:17, 463:18, 484:20, 496:21, 505:12, 528:18, 541:24, 543:21, 544:20, 553:5, 555:4, 574:19, 574:21, 575:10, 576:6, 576:9
**heard** [42] - 466:19, 494:24, 505:17, 506:22, 507:6, 511:21, 516:12, 517:4, 518:7, 523:24, 524:16, 528:4, 528:7, 536:14, 537:11, 537:19, 538:19, 539:5, 539:12, 540:6, 542:4, 548:3, 549:12, 550:25, 557:4, 561:1, 561:23, 563:1, 563:10, 563:17, 564:14, 570:7, 570:23, 571:9, 572:20, 572:24, 574:8, 575:25, 576:10, 579:25, 585:18, 587:25
**hearing** [6] - 466:13, 508:22, 523:11, 558:11, 570:12, 598:6
**hears** [2] - 570:1, 576:14
**heart** [1] - 537:1
**heck** [3] - 473:16, 584:19, 586:3
**held** [2] - 466:13, 558:11
**HELD** [1] - 438:11
**help** [5] - 510:12, 514:19, 532:8, 537:2, 589:13
**helpful** [1] - 550:24
**helping** [2] - 583:24, 584:10
**Henry** [34] - 440:19, 445:18, 446:13, 446:21, 447:3, 454:12, 455:1, 455:9, 455:23, 456:10, 457:3, 457:9, 459:10,

459:21, 460:6, 460:9, 460:17, 464:20, 465:10, 465:14, 466:1, 466:3, 466:15, 498:8, 537:15, 538:11, 542:4, 542:13, 542:19, 545:21, 563:1, 564:15, 575:25, 586:16
**HENRY** [2] - 439:3, 446:18
**hereby** [1] - 598:11
**herself** [7] - 450:2, 450:7, 452:11, 522:25, 523:3, 576:13, 581:24
**hesitate** [2] - 591:5, 591:20
**heterotopic** [2] - 474:10, 475:19
**hi** [1] - 447:3
**higher** [1] - 521:23
**highlight** [1] - 442:20
**highlighted** [2] - 538:5, 541:4
**highlighting** [3] - 442:19, 443:8, 488:21
**highly** [1] - 442:6
**himself** [1] - 514:11
**hinted** [1] - 565:11
**hip** [7] - 471:14, 472:11, 472:22, 473:5, 474:12, 547:11, 549:16
**hired** [1] - 567:16
**hits** [2] - 498:14, 563:7
**hold** [21] - 458:15, 458:16, 462:6, 462:10, 462:14, 462:23, 463:12, 469:4, 471:24, 491:11, 503:23, 515:13, 525:11, 529:21, 538:10, 538:15, 540:12, 546:2, 561:8
**holding** [18] - 441:23, 442:8, 442:11, 458:20, 458:21, 461:2, 461:15, 464:3, 464:5, 464:8, 464:13, 522:16, 553:2, 553:3, 575:13, 575:14, 576:12, 581:25
**holds** [2] - 558:4, 591:8

**home** [4] - 470:14, 475:3, 590:10, 597:16
**honest** [3] - 563:17, 571:19, 591:11
**honestly** [1] - 568:15
**Honor** [87] - 440:7, 440:11, 440:12, 441:8, 441:13, 441:19, 442:2, 442:17, 443:2, 443:16, 444:7, 444:15, 444:19, 445:1, 446:4, 446:12, 454:22, 455:12, 455:18, 455:25, 456:25, 459:4, 459:7, 460:3, 465:5, 465:7, 465:11, 466:9, 466:14, 466:25, 471:5, 476:7, 476:14, 476:17, 477:16, 477:24, 478:24, 479:1, 480:16, 480:21, 481:19, 483:1, 483:9, 484:21, 484:25, 485:4, 486:3, 486:23, 488:9, 489:1, 489:15, 490:6, 491:6, 492:2, 492:19, 493:17, 494:12, 495:15, 498:19, 500:3, 500:17, 501:1, 503:12, 503:20, 504:18, 529:1, 529:13, 530:18, 533:4, 534:3, 534:9, 543:17, 547:1, 548:1, 554:1, 558:7, 558:21, 559:25, 560:24, 579:4, 584:9, 588:23, 594:23, 596:14, 597:24, 598:4, 598:5
**Honor's** [4] - 492:13, 493:1, 493:13, 496:1
**HONORABLE** [1] - 438:11
**hook** [1] - 475:18
**hope** [3] - 455:23, 499:23, 584:15
**hopefully** [1] - 475:17
**Hopkins** [3] - 468:5, 468:23, 469:19
**horse** [1] - 539:20
**Hospital** [1] - 468:4

**hospitals** [3] - 469:14, 547:25, 560:9
**hour** [2] - 497:17, 551:1
**hours** [1] - 555:14
**Human** [2] - 524:2, 555:17
**humans** [1] - 551:4
**humiliation** [1] - 526:4
**hundreds** [1] - 573:25
**hurry** [1] - 542:7
**hurt** [7] - 458:22, 458:24, 553:7, 553:8, 573:13, 573:17, 574:7
**hyphen** [2] - 486:15, 486:16

## I

**iceberg** [1] - 528:2
**identical** [1] - 549:8
**identification** [1] - 592:19
**identified** [1] - 483:4
**identify** [1] - 440:5
**idle** [1] - 540:16
**ignore** [2] - 480:23, 521:5
**ignoring** [1] - 506:14
**illustrate** [1] - 571:25
**illustration** [5] - 485:10, 514:21, 514:23, 514:25, 549:8
**illustrations** [4] - 514:19, 514:20, 514:24, 548:19
**illustrative** [1] - 548:21
**imagine** [3] - 537:22, 548:24, 585:21
**immaterial** [2] - 497:7, 498:11
**impacts** [1] - 583:3
**impairment** [2] - 582:23, 582:24
**impartial** [2] - 508:9, 518:10
**impartially** [1] - 507:2
**impeached** [2] - 515:22, 516:21
**implying** [1] - 558:17
**importance** [3] - 488:21, 506:15, 591:16
**important** [15] - 483:16, 538:14, 541:2, 551:18, 555:6, 555:15,

563:6, 569:21,
573:6, 575:23,
576:5, 577:2,
583:24, 583:25,
586:17
**importantly** [1] - 586:8
**impresses** [2] -
513:21, 513:22
**impression** [2] -
472:20, 503:4
**improbability** [1] -
514:6
**improper** [1] - 508:24
**impulse** [1] - 491:4
**IN** [2] - 438:1, 446:8
**inappropriate** [2] -
483:2, 558:22
**incident** [5] - 454:16,
455:4, 458:21,
458:22, 474:17
**incision** [1] - 548:25
**inclined** [3] - 481:7,
491:2, 491:3
**include** [6] - 486:14,
489:9, 491:3,
491:19, 502:3,
532:10
**included** [10] - 480:25,
486:25, 501:4,
501:8, 501:22,
501:23, 501:24,
502:7, 503:25,
504:24
**includes** [2] - 509:17,
589:20
**including** [6] - 444:3,
474:25, 482:19,
491:23, 503:21,
508:1
**inconsistencies** [2] -
569:4, 580:15
**inconsistency** [1] -
570:10
**inconsistent** [6] -
515:23, 516:1,
516:4, 516:7,
516:24, 572:22
**inconvenience** [3] -
526:6, 547:19,
547:20
**incorporated** [1] -
466:16
**incorporates** [1] -
486:19
**incredible** [2] -
577:18, 582:9
**incredibly** [1] - 583:21
**incurred** [2] - 487:7,
526:8
**indeed** [1] - 515:9

**indefensible** [1] -
587:14
**independent** [1] -
589:22
**indicate** [1] - 508:2
**indicated** [5] - 492:16,
498:20, 572:1,
582:16, 593:16
**indicating** [1] - 488:18
**indication** [2] -
507:23, 508:4
**indigenous** [1] -
583:11
**indirect** [1] - 511:1
**individual** [4] - 462:13,
478:6, 574:20, 581:5
**individuals** [1] -
564:14
**indulgence** [2] -
465:4, 484:21
**industry** [2] - 543:23,
581:18
**infer** [1] - 528:16
**inference** [2] - 528:12,
528:13
**inferences** [5] -
506:23, 509:25,
510:4, 510:7, 510:8
**inferred** [2] - 503:1,
511:2
**influence** [1] - 508:4
**influenced** [4] -
508:10, 508:25,
590:7, 591:6
**information** [3] -
507:21, 549:17,
555:1
**informed** [1] - 562:13
**informing** [1] - 593:11
**inherent** [1] - 498:15
**initial** [1] - 591:23
**initiates** [1] - 507:9
**injured** [1] - 518:20
**injuries** [13] - 470:24,
485:25, 497:24,
525:12, 525:22,
525:23, 527:9,
535:16, 547:9,
547:13, 548:14,
550:2, 595:21
**injury** [14] - 486:14,
518:23, 523:17,
523:18, 523:19,
523:22, 525:15,
548:13, 549:25,
553:14, 574:21,
577:13, 578:19,
582:9
**input** [1] - 478:13
**inquiries** [1] - 530:10

**inside** [5] - 441:24,
460:13, 460:23,
461:8, 472:8
**insist** [2] - 585:6,
585:9
**insofar** [1] - 454:19
**inspect** [1] - 593:23
**instance** [1] - 577:11
**instances** [1] - 546:7
**instead** [2] - 531:18,
541:14
**institution** [1] - 468:3
**instruct** [12] - 483:18,
499:13, 499:14,
505:3, 505:19,
506:2, 508:3,
509:15, 511:23,
518:25, 559:23,
592:13
**instructed** [8] -
490:10, 528:21,
561:4, 573:16,
574:11, 576:22,
581:2, 592:24
**Instruction** [13] -
478:16, 479:13,
480:20, 486:12,
500:12, 501:22,
501:23, 503:22,
539:12, 544:10,
556:24, 571:22,
586:12
**instruction** [60] -
479:14, 480:5,
480:14, 480:15,
481:5, 481:10,
482:13, 482:17,
483:2, 484:4,
484:19, 485:2,
485:22, 486:8,
486:25, 487:16,
492:12, 493:7,
493:9, 493:16,
495:24, 496:6,
498:13, 502:3,
502:8, 502:13,
502:14, 502:19,
502:20, 503:14,
503:25, 504:7,
504:9, 506:14,
506:15, 528:12,
529:17, 538:19,
542:21, 546:19,
546:20, 546:25,
547:4, 547:7,
555:16, 555:19,
557:1, 563:23,
563:24, 567:25,
570:25, 571:2,
572:4, 573:3, 577:4,

578:24, 589:18,
592:22
**instructions** [59] -
476:21, 476:22,
477:2, 477:4,
477:22, 478:6,
478:7, 478:9,
478:11, 482:6,
484:16, 488:8,
488:25, 489:14,
493:11, 493:13,
493:15, 499:7,
501:20, 502:5,
504:21, 505:14,
505:16, 505:23,
505:24, 506:5,
506:9, 506:11,
506:13, 506:16,
508:2, 509:11,
509:16, 518:14,
527:14, 528:13,
532:19, 534:22,
542:21, 544:5,
546:11, 548:21,
561:1, 562:6, 562:7,
565:1, 573:14,
577:8, 578:19,
581:7, 587:21,
589:2, 592:21,
592:23, 592:25,
593:8, 594:6
**instructs** [1] - 544:6
**instrumentation** [1] -
582:10
**insufficient** [1] -
521:17
**insufficiently** [1] -
568:2
**insurance** [3] - 559:8,
559:22, 560:12
**integrity** [1] - 556:12
**intelligence** [1] -
523:11
**intend** [2] - 444:13,
561:19
**intended** [2] - 510:12,
590:8
**intention** [2] - 532:24,
561:18
**intentionally** [1] -
546:11
**intercom** [1] - 541:25
**interest** [1] - 514:1
**interested** [1] - 565:22
**interesting** [1] -
469:15
**interlocking** [2] -
447:9, 447:21
**internal** [1] - 521:18
**internship** [1] - 468:14

**interpret** [2] - 507:22,
510:13
**interrogatories** [2] -
501:4, 501:10
**interrogatory** [2] -
501:5, 504:24
**interrupt** [2] - 455:25,
527:17
**intracapsular** [1] -
471:19
**introduce** [2] - 447:2,
467:14
**investigation** [1] -
589:22
**invitation** [1] - 502:11
**invite** [1] - 589:14
**invited** [1] - 567:15
**involve** [1] - 579:20
**involved** [4] - 482:9,
515:19, 525:8,
544:14
**involvement** [1] -
469:21
**involves** [1] - 579:15
**involving** [1] - 521:13
**irrelevant** [1] - 442:23
**issue** [38] - 441:9,
442:22, 443:12,
443:13, 481:16,
481:22, 484:23,
485:12, 487:20,
494:23, 504:12,
512:7, 512:9,
512:11, 512:13,
512:15, 512:16,
515:3, 515:20,
517:10, 521:14,
528:15, 536:15,
551:19, 552:3,
562:16, 563:20,
564:4, 567:22,
568:4, 572:6, 572:8,
572:10, 572:14,
572:18, 583:13,
590:25
**issues** [22] - 448:15,
474:7, 482:2,
484:12, 492:13,
504:18, 505:21,
528:1, 528:24,
530:4, 534:25,
536:9, 543:24,
553:16, 562:17,
562:22, 562:24,
565:11, 567:24,
580:10, 582:1, 582:2
**italicized** [5] - 502:17,
503:24, 504:3,
504:5, 504:6
**items** [1] - 547:8

**itself** [3] - 511:8, 524:6, 579:18

## J

**jail** [2] - 586:25, 587:1
**jar** [1] - 503:10
**jars** [2] - 493:20, 494:5
**Jars** [1] - 502:20
**JASON** [1] - 438:18
**Jason** [1] - 440:12
**jason.waters@ wilsonelser.com** [1] - 438:21
**Jenkins** [1] - 594:21
**jerk** [12] - 493:3, 497:25, 498:1, 503:10, 540:9, 540:21, 545:17, 557:12, 570:8, 575:3, 588:15
**jerk/jolt** [3] - 492:12, 499:3, 499:6
**jerked** [5] - 497:15, 540:3, 540:4, 541:15, 580:5
**Jerks** [1] - 502:19
**jerks** [3] - 493:20, 494:5, 494:11
**Jiminez** [5] - 566:12, 566:23, 566:24, 567:3
**job** [15] - 474:2, 474:3, 476:24, 534:16, 534:18, 534:20, 554:6, 554:13, 554:24, 554:25, 555:24, 582:9, 585:5, 588:6
**jobs** [1] - 534:15
**Johns** [1] - 468:4
**Johnson** [12] - 443:11, 539:7, 563:1, 564:15, 568:15, 568:20, 571:9, 572:25, 573:5, 573:10, 573:12, 574:2
**Johnson's** [4] - 524:11, 524:14, 568:14, 568:24
**joint** [5] - 478:6, 489:19, 491:10, 493:10, 493:14
**jointly** [6] - 489:7, 490:13, 491:9, 491:15, 492:7, 502:9
**jolt** [4] - 493:3, 497:25, 498:1, 498:10
**jolts** [1] - 494:11

**Judge** [8] - 482:20, 484:2, 487:4, 488:3, 493:21, 499:12, 581:7, 585:14
**judge** [17] - 445:6, 478:19, 480:3, 481:8, 491:18, 497:2, 516:22, 539:12, 539:14, 539:15, 550:25, 558:17, 558:25, 559:13, 561:4, 574:11, 576:22
**JUDGE** [1] - 438:11
**judge's** [12] - 534:21, 538:19, 542:20, 547:7, 561:1, 563:23, 563:24, 565:1, 567:25, 570:25, 571:1, 573:3
**judged** [1] - 551:21
**judges** [3] - 506:19, 513:11, 592:2
**judgment** [15] - 466:17, 492:14, 492:18, 492:19, 493:2, 494:2, 494:24, 495:7, 495:17, 496:1, 496:3, 499:4, 502:20, 555:21, 592:6
**judicial** [1] - 524:2
**juries** [1] - 597:13
**jurisdiction** [1] - 490:24
**jurisdictions** [1] - 488:20
**Juror** [4] - 594:20, 595:8, 596:24, 597:1
**JUROR** [7] - 596:17, 596:19, 596:21, 596:23, 596:25, 597:2, 597:4
**juror** [12] - 501:4, 589:15, 591:7, 591:16, 591:20, 592:7, 596:16, 596:18, 596:20, 596:22, 597:3
**juror's** [1] - 590:7
**jurors** [14] - 443:5, 447:10, 483:14, 491:4, 501:10, 506:7, 506:17, 589:24, 590:5, 590:22, 591:1, 591:5, 591:14, 591:22
**jurors'** [1] - 591:13

**JURY** [2] - 438:10, 446:8
**jury** [76] - 441:5, 446:5, 447:2, 456:3, 466:13, 467:15, 467:18, 471:14, 473:19, 476:21, 477:2, 477:14, 477:22, 483:11, 488:18, 489:13, 490:10, 493:10, 493:12, 493:15, 496:19, 496:20, 499:7, 499:10, 501:20, 502:6, 502:11, 502:16, 505:1, 505:2, 505:10, 505:16, 505:25, 506:18, 508:22, 517:9, 527:25, 528:16, 532:8, 534:4, 534:5, 534:14, 535:2, 544:5, 546:19, 546:20, 552:9, 553:24, 555:4, 558:11, 558:22, 559:24, 578:4, 581:2, 583:21, 589:4, 589:20, 590:1, 590:15, 590:17, 591:17, 591:23, 592:10, 594:4, 594:6, 594:12, 594:13, 594:20, 595:2, 595:4, 596:2, 597:11, 597:18, 597:20
**jury's** [2] - 484:13, 597:9
**justice** [6] - 508:8, 551:6, 551:17, 554:15, 554:24, 588:4

## K

**keep** [6] - 503:25, 504:6, 530:19, 564:8, 578:24, 592:16
**keeping** [1] - 583:16
**Keisha** [4] - 440:19, 446:12, 447:3, 564:15
**KEISHA** [2] - 439:3, 446:18
**key** [1] - 499:1
**kind** [5] - 443:25, 452:19, 484:13,

486:6, 585:23
**knee** [1] - 562:17
**knees** [2] - 472:22, 549:16
**knock** [1] - 594:7
**knowing** [2] - 576:15, 580:4
**knowledge** [5] - 454:18, 515:20, 517:9, 517:11, 581:13
**known** [4] - 480:23, 521:5, 521:7, 587:7
**knows** [4] - 487:20, 553:1, 563:22, 569:1

## L

**labeled** [1] - 457:21
**lack** [1] - 484:20
**lacks** [1] - 523:14
**ladies** [9] - 505:12, 505:17, 560:16, 560:25, 576:18, 580:9, 584:6, 588:25, 597:10
**language** [8] - 454:4, 454:8, 502:17, 503:24, 504:3, 504:5, 504:6, 504:23
**laptop** [1] - 592:13
**large** [2] - 562:3, 580:25
**larger** [1] - 515:15
**largest** [1] - 564:13
**last** [9] - 447:24, 470:20, 472:15, 472:18, 477:22, 536:9, 540:18, 582:17
**Lauren** [1] - 440:13
**LAUREN** [1] - 438:18
**lauren.gilman@ wilsonelser.com** [1] - 438:21
**Laurie** [1] - 440:14
**law** [43] - 466:17, 483:7, 483:9, 490:23, 496:18, 496:22, 497:20, 505:13, 505:19, 505:20, 506:3, 506:4, 506:6, 506:8, 507:5, 508:16, 508:20, 511:10, 511:11, 515:17, 518:14, 520:14, 520:24, 521:1, 525:9, 544:17, 546:10, 556:6,

561:2, 561:3, 569:8, 574:11, 574:15, 577:3, 577:5, 577:13, 577:21, 577:22, 578:20, 578:23, 581:3, 581:6, 581:9
**laws** [2] - 585:7, 585:10
**lawsuit** [2] - 507:9, 507:14
**lawyer** [3] - 508:17, 508:18, 584:16
**lawyer's** [2] - 508:25, 510:15
**lawyers** [13] - 506:9, 508:19, 508:24, 510:10, 510:14, 510:18, 510:20, 514:18, 518:4, 539:14, 548:10, 593:4, 593:16
**lawyers'** [1] - 508:22
**lead** [1] - 510:1
**least** [7] - 456:8, 456:21, 463:9, 477:10, 499:18, 501:25, 517:23
**leave** [5] - 481:7, 499:13, 528:23, 594:8, 597:14
**left** [18] - 451:16, 451:23, 453:24, 474:9, 474:18, 475:8, 475:16, 481:9, 495:3, 495:9, 497:13, 498:25, 523:6, 549:7, 563:5, 569:15, 587:17, 587:19
**leg** [5] - 472:5, 474:18, 475:9, 475:14, 475:16
**legal** [6] - 472:22, 506:3, 506:10, 518:25, 523:3, 551:3
**legible** [1] - 456:8
**length** [4] - 442:11, 475:5, 542:12
**less** [6] - 456:23, 490:3, 518:11, 522:13, 523:22, 578:15
**lesser** [2] - 483:19, 524:20
**lesson** [1] - 471:17
**letting** [1] - 594:10
**level** [1] - 519:15
**liability** [4] - 494:10, 498:11, 536:9,

580:10

**liable** [5] - 497:24, 519:3, 522:1, 525:11, 526:20
**liberty** [1] - 551:14
**license** [1] - 469:6
**licensed** [1] - 469:5
**licenses** [1] - 469:4
**lies** [1] - 513:16
**life** [14] - 479:15, 523:25, 524:3, 524:5, 524:7, 524:8, 551:13, 551:24, 555:16, 555:25, 556:9, 583:3, 587:8
**light** [4] - 443:12, 452:19, 482:21, 551:20
**likely** [18] - 452:21, 512:2, 512:5, 519:10, 519:19, 520:19, 522:6, 523:19, 526:25, 551:10, 551:16, 552:4, 552:9, 552:13, 552:20, 553:12, 553:16, 578:7
**likewise** [3] - 507:25, 509:5, 509:12
**limitations** [1] - 553:14
**limited** [4] - 445:8, 509:10, 509:23, 553:14
**limiting** [1] - 509:11
**limp** [1] - 551:24
**limping** [1] - 588:9
**line** [1] - 485:7
**lines** [1] - 487:14
**links** [1] - 472:5
**LISA** [1] - 598:11
**Lisa** [1] - 438:22
**list** [4] - 455:13, 455:23, 470:8, 488:2
**listed** [1] - 489:5
**listen** [2] - 566:20, 588:20
**listening** [1] - 562:5
**literally** [4] - 444:12, 474:24, 543:4, 585:4
**live** [3] - 555:22, 555:23, 556:2
**lives** [4] - 541:17, 556:4, 558:2, 588:20
**local** [1] - 469:12
**location** [1] - 449:4
**lock** [1] - 471:25
**lodge** [1] - 499:10
**logically** [2] - 511:2,

554:10

**LONG** [1] - 438:14
**look** [20] - 451:16, 451:20, 451:23, 453:1, 457:16, 457:18, 463:20, 464:16, 472:1, 472:17, 475:11, 493:16, 499:8, 538:5, 538:22, 541:8, 548:19, 549:4, 553:18, 555:7
**looked** [3] - 480:4, 521:4, 549:6
**looking** [10] - 452:15, 456:16, 464:20, 472:21, 472:23, 538:2, 551:10, 576:2, 577:25, 578:1
**looks** [3] - 521:3, 535:3, 549:10
**Los** [1] - 468:18
**lose** [4] - 443:22, 443:23, 450:18, 450:23
**loses** [1] - 450:20
**losses** [2] - 546:17, 588:5
**loud** [2] - 528:4, 540:6
**lunch** [8] - 499:19, 505:6, 505:7, 505:8, 527:15, 527:17, 527:18
**Lunch** [1] - 533:5
**lurched** [2] - 540:16, 541:21

## M

**M.D** [4] - 439:6, 467:11, 467:23, 469:7
**ma'am** [3] - 446:14, 451:14, 462:22
**madam** [1] - 595:11
**Madam** [1] - 597:5
**Madison** [1] - 468:13
**magnitude** [1] - 522:23
**major** [1] - 471:21
**male** [1] - 486:7
**man** [2] - 464:20, 545:1
**man-made** [1] - 545:1
**managers** [1] - 447:21
**manner** [2] - 472:23, 508:9
**manual** [6] - 442:21, 443:8, 443:25, 444:17, 451:12,

459:23

**manually** [3] - 453:10, 453:12, 545:22
**manuals** [1] - 521:18
**mark** [1] - 545:9
**marked** [2] - 592:17, 592:18
**marker** [13] - 449:6, 449:8, 449:14, 449:18, 450:10, 450:19, 451:4, 455:5, 456:14, 563:6, 563:7, 563:12
**mass** [1] - 579:20
**massive** [1] - 565:8
**material** [1] - 550:3
**math** [1] - 543:5
**mathematical** [1] - 512:19
**mathematically** [1] - 527:5
**matter** [20] - 441:16, 444:9, 446:14, 466:17, 496:18, 497:12, 497:20, 509:1, 513:18, 542:13, 545:3, 545:10, 563:22, 569:9, 581:4, 581:16, 581:17, 584:2, 590:18, 592:2
**Matter** [1] - 440:3
**matters** [9] - 481:3, 484:17, 508:3, 513:25, 515:20, 517:13, 545:11, 546:17, 591:15
**MBTA** [1] - 566:15
**McLean** [1] - 438:20
**McPherson** [19] - 456:12, 495:2, 495:9, 497:9, 497:14, 518:19, 540:2, 540:6, 540:14, 540:15, 541:3, 541:4, 541:11, 557:13, 569:13, 569:14, 574:24, 575:2, 575:6
**mean** [22] - 447:6, 449:13, 449:14, 450:20, 452:23, 463:1, 490:16, 498:4, 507:14, 512:19, 512:20, 520:14, 532:7, 537:22, 548:23, 550:24, 551:3, 560:1, 560:9, 571:20, 574:19,

587:23

**meaning** [3] - 443:20, 578:13, 581:11
**means** [12] - 443:23, 449:9, 450:21, 472:2, 476:19, 512:3, 524:25, 538:7, 565:4, 565:5, 576:20, 577:20
**meant** [1] - 508:6
**measure** [1] - 588:5
**measured** [1] - 521:12
**media** [1] - 589:21
**medical** [19] - 468:13, 471:2, 473:7, 485:9, 487:7, 514:19, 514:21, 514:24, 526:8, 547:20, 547:22, 548:19, 553:17, 553:21, 559:4, 559:12, 559:21, 560:18
**Medicare** [1] - 560:12
**medication** [2] - 473:1, 582:17
**medicine** [2] - 468:7, 468:20
**meet** [3] - 469:15, 552:2, 579:12
**meeting** [1] - 588:6
**meets** [1] - 551:9
**member** [4] - 469:10, 590:14, 590:15, 590:17
**members** [3] - 473:19, 506:18, 597:18
**memory** [8] - 510:22, 513:22, 539:8, 573:7, 590:3, 590:4, 590:6, 590:8
**mention** [3] - 444:10, 459:17, 474:6
**mentioned** [2] - 453:20, 538:20
**mentions** [1] - 548:21
**mere** [2] - 503:1, 520:13
**merely** [4] - 512:24, 527:11, 557:11, 591:12
**merits** [1] - 590:18
**message** [1] - 538:13
**met** [1] - 580:22
**Metro** [47] - 440:15, 440:20, 441:14, 444:17, 448:21, 459:22, 461:24, 462:5, 462:10, 462:17, 462:22, 465:21, 497:18,

518:19, 537:8, 538:17, 541:6, 542:22, 544:11, 544:21, 544:23, 545:14, 545:18, 553:1, 553:11, 557:11, 561:13, 562:2, 562:5, 562:8, 562:12, 562:21, 562:22, 562:23, 563:2, 563:4, 569:9, 571:15, 571:16, 571:21, 579:18, 584:24, 585:6, 585:9, 586:8, 586:11, 587:1
**Metro's** [9] - 458:11, 461:23, 493:23, 544:4, 562:1, 562:9, 581:19
**metropolitan** [1] - 565:9
**METROPOLITAN** [1] - 438:6
**Metropolitan** [2] - 440:4, 440:14
**Metrorail** [1] - 580:25
**Mexico** [1] - 467:16
**mic** [2] - 467:19, 559:19
**MICHAEL** [1] - 438:13
**microphone** [2] - 446:23, 447:11
**microphones** [1] - 478:1
**might** [16] - 441:9, 444:8, 458:19, 487:21, 503:6, 506:22, 509:4, 511:4, 511:6, 517:9, 532:7, 555:22, 555:23, 560:18, 575:5, 580:7
**mild** [3] - 475:23, 475:24
**million** [1] - 596:11
**mind** [8] - 509:7, 512:4, 531:25, 532:7, 564:8, 578:24, 583:17, 592:16
**mindful** [1] - 589:9
**mine** [2] - 457:19, 554:5
**minimal** [1] - 582:23
**minor** [2] - 488:1, 500:3
**minute** [11] - 460:14, 484:22, 511:23, 546:20, 546:25,

613

554:23, 557:20,
566:2, 571:11,
586:9, 587:5
**minutes** [16] - 458:5,
477:8, 499:16,
499:17, 499:23,
499:25, 500:5,
500:9, 542:3,
543:11, 553:25,
554:2, 554:3,
584:12, 585:4, 589:2
**misconduct** [1] -
521:9
**mission** [1] - 589:9
**misspoke** [1] - 444:20
**misstatement** [2] -
483:7, 483:8
**misunderstand** [1] -
458:7
**mitigate** [1] - 485:2
**mitigation** [1] - 484:20
**mode** [1] - 456:1
**moderate** [1] - 475:24
**moment** [5] - 456:4,
459:5, 462:12,
465:5, 492:15
**Monday** [1] - 536:20
**money** [4] - 554:14,
554:17, 554:19,
560:10
**monitors** [1] - 534:10
**month** [1] - 474:25
**monthly** [1] - 469:15
**months** [3] - 475:6,
548:6, 549:9
**Moreira** [2] - 438:22,
598:18
**MOREIRA** [1] - 598:11
**morning** [24] - 440:7,
440:10, 440:11,
440:12, 440:16,
440:17, 440:23,
446:14, 446:21,
446:22, 455:1,
455:2, 467:4,
473:14, 473:15,
477:6, 487:3,
537:15, 538:11,
545:20, 548:16,
563:2, 586:10,
588:10
**mornings** [1] - 468:24
**most** [4] - 452:21,
458:9, 551:1, 582:13
**mother** [1] - 540:7
**motion** [8] - 466:17,
466:20, 477:18,
492:18, 493:2,
494:25, 499:4,
553:14

**motions** [1] - 597:21
**motive** [1] - 513:23
**motives** [1] - 567:16
**mouth** [1] - 467:19
**move** [28] - 442:5,
450:22, 451:23,
453:3, 460:3, 465:3,
503:4, 528:12,
536:17, 536:22,
538:9, 538:15,
540:11, 542:1,
542:10, 542:14,
543:17, 545:11,
552:23, 563:12,
568:19, 570:13,
573:1, 575:5,
576:16, 581:24,
585:22
**moved** [12] - 460:5,
495:3, 495:11,
503:1, 518:20,
543:1, 548:7, 548:8,
569:16, 569:20,
575:16, 586:20
**movement** [3] -
497:25, 579:23,
581:20
**movements** [2] -
460:13, 579:21
**moves** [3] - 458:12,
497:23, 570:3
**moving** [16] - 449:20,
449:23, 451:9,
454:3, 455:6, 458:2,
458:6, 493:24,
498:5, 498:7, 537:8,
542:6, 542:25,
563:13, 575:12,
586:19
**MR** [253] - 440:7,
440:11, 440:12,
440:19, 440:22,
441:1, 441:4, 441:6,
441:7, 441:8,
441:12, 441:19,
442:2, 442:16,
443:4, 443:7,
443:15, 444:2,
444:7, 444:14,
444:19, 445:1,
445:3, 445:6,
445:15, 445:17,
446:4, 446:12,
446:20, 454:22,
454:25, 455:8,
455:12, 455:16,
455:18, 455:21,
455:22, 455:25,
456:4, 456:6, 456:7,
456:25, 459:4,

459:7, 459:9, 460:3,
460:7, 465:4, 465:7,
465:10, 465:11,
465:13, 465:25,
466:9, 466:14,
466:19, 466:22,
466:25, 471:7,
473:9, 473:13,
476:6, 476:7,
476:14, 476:17,
477:16, 477:24,
478:19, 478:23,
478:24, 479:6,
479:8, 479:18,
479:21, 480:3,
480:8, 480:10,
480:16, 480:18,
480:20, 481:1,
481:4, 481:8,
481:12, 481:19,
481:24, 482:2,
482:20, 482:23,
483:1, 483:8,
483:11, 483:21,
483:24, 484:2,
484:9, 484:21,
484:24, 484:25,
485:3, 485:4,
485:13, 485:14,
485:16, 485:20,
486:3, 486:6,
486:10, 486:18,
486:21, 486:23,
487:4, 487:9,
487:13, 487:23,
487:24, 488:3,
488:9, 488:15,
489:1, 489:3, 489:4,
489:5, 489:8,
489:11, 489:15,
489:18, 489:21,
490:5, 490:15,
490:25, 491:6,
491:8, 491:12,
491:13, 491:14,
491:18, 491:21,
492:2, 492:5, 492:8,
492:10, 493:6,
493:9, 493:12,
493:17, 493:18,
493:21, 494:12,
494:15, 494:22,
495:15, 495:21,
495:25, 496:4,
496:7, 497:2, 498:2,
498:12, 498:19,
499:3, 499:12,
499:20, 499:23,
500:2, 500:7,
500:10, 500:12,
500:15, 500:17,

500:18, 500:21,
501:1, 501:7,
501:13, 503:12,
503:15, 503:18,
503:20, 504:2,
504:8, 504:11,
504:15, 504:17,
505:4, 505:5, 505:9,
528:4, 528:7,
528:25, 529:1,
529:3, 529:11,
529:13, 529:19,
529:23, 530:9,
530:18, 530:20,
530:23, 531:2,
531:5, 531:7, 531:8,
531:10, 531:12,
531:16, 531:22,
531:25, 532:9,
532:15, 532:18,
532:24, 533:4,
534:3, 534:9,
534:12, 543:17,
543:20, 547:1,
547:2, 548:1, 548:3,
554:1, 554:3,
558:17, 558:20,
558:25, 559:6,
559:9, 559:13,
559:15, 559:17,
559:25, 560:1,
560:4, 560:7,
560:11, 560:24,
561:11, 579:2,
579:4, 579:6, 584:9,
584:13, 584:15,
594:16, 596:14,
597:18, 597:24,
598:2, 598:4, 598:5
**MS** [4] - 467:13, 471:5,
471:11, 489:25
**muscles** [4] - 475:16,
475:18, 475:21
**must** [66] - 455:6,
486:16, 490:1,
490:2, 497:18,
498:3, 498:9, 498:6,
506:11, 506:12,
506:13, 506:15,
506:19, 506:20,
506:21, 507:10,
508:9, 508:13,
508:16, 509:10,
509:14, 511:19,
512:15, 512:19,
513:9, 519:8, 519:9,
519:18, 519:22,
520:19, 520:24,
521:11, 521:13,
521:21, 522:5,
522:9, 522:11,

522:12, 524:24,
525:2, 525:9,
525:12, 525:17,
526:18, 526:24,
527:1, 536:23,
537:17, 537:18,
542:6, 544:15,
552:16, 556:17,
563:25, 567:25,
572:8, 578:6,
578:10, 578:13,
578:14, 591:3,
592:6, 592:8, 592:9,
592:23
**mutual** [1] - 589:14

# N

**name** [5] - 447:3,
467:15, 467:16,
567:5, 567:11
**Natasha** [1] - 478:3
**national** [61] - 497:22,
521:14, 521:16,
521:21, 521:23,
529:24, 530:1,
530:8, 530:11,
530:12, 530:16,
530:24, 531:1,
531:13, 531:19,
532:3, 532:5,
532:10, 532:13,
535:10, 536:15,
536:25, 537:4,
537:19, 538:17,
543:20, 544:19,
544:21, 550:20,
557:15, 557:23,
563:19, 563:24,
563:25, 564:3,
564:23, 565:2,
565:4, 565:5, 566:2,
566:3, 566:7, 566:8,
566:17, 567:13,
567:17, 567:20,
567:21, 567:23,
568:6, 581:11,
581:15, 585:7,
585:9, 585:13,
585:15, 585:21,
585:23, 586:2,
595:16, 595:20
**natural** [1] - 491:4
**nature** [1] - 444:4
**near** [1] - 575:9
**necessarily** [5] -
458:25, 483:3,
503:3, 505:12, 513:1
**necessary** [2] - 483:4,
590:12
**need** [21] - 451:4,

614

457:17, 458:16,
470:2, 470:3,
472:24, 474:20,
477:1, 478:12,
479:6, 479:8,
479:25, 494:15,
497:3, 548:23,
553:3, 558:25,
576:25, 584:13,
597:22
**needed** [3] - 474:4,
542:11, 550:1
**needs** [2] - 490:10,
576:25
**Negligence** [2] -
502:7, 578:5
**negligence** [55] -
481:22, 481:24,
485:25, 486:13,
487:20, 488:10,
488:12, 488:16,
488:17, 488:22,
490:2, 490:7,
490:17, 492:1,
501:8, 501:11,
502:1, 502:12,
502:13, 502:25,
518:22, 519:3,
520:17, 520:19,
520:20, 522:2,
522:5, 522:7,
522:12, 523:20,
525:15, 526:11,
531:1, 531:20,
532:4, 532:6,
532:14, 535:21,
535:24, 552:24,
556:25, 576:19,
576:24, 577:9,
577:15, 577:25,
578:6, 578:8,
578:11, 578:14,
578:22, 578:23,
579:8, 579:10, 596:4
**negligent** [34] -
486:15, 487:18,
488:23, 490:1,
490:3, 490:21,
511:22, 519:2,
519:11, 519:17,
520:7, 520:14,
521:4, 521:25,
522:3, 522:4, 522:7,
522:11, 522:13,
523:21, 524:14,
525:13, 525:16,
525:19, 526:16,
530:8, 530:16,
532:12, 538:23,
574:12, 578:7,

578:12, 578:15,
595:25
**negligently** [4] -
485:24, 518:17,
518:22, 577:13
**never** [9] - 476:3,
521:4, 547:11,
548:14, 553:7,
553:8, 553:9, 559:9,
567:2
**New** [6] - 467:16,
537:20, 544:1,
564:24, 566:11,
567:2
**new** [2] - 532:19,
571:18
**next** [20] - 443:19,
446:10, 453:3,
453:7, 466:10,
467:1, 476:21,
481:15, 482:1,
484:2, 530:20,
534:23, 535:13,
547:18, 548:5,
555:2, 555:11,
556:10, 575:7
**NFL** [1] - 549:14
**nice** [3] - 469:18,
473:17, 541:8
**nicely** [1] - 472:12
**nicer** [1] - 472:17
**night** [1] - 477:22
**nits** [1] - 500:16
**NO** [7] - 596:17,
596:19, 596:21,
596:23, 596:25,
597:2, 597:4
**no's** [1] - 536:4
**nobody** [4] - 497:16,
547:20, 571:14,
583:7
**none** [5] - 485:4,
550:2, 552:15,
568:23, 584:20
**normal** [6] - 523:11,
523:15, 523:19,
551:4, 571:13,
579:20
**Northwest** [1] - 468:2
**Northwestern** [1] -
468:14
**not..** [1] - 491:16
**note** [18] - 452:21,
486:6, 496:23,
500:12, 590:9,
590:13, 590:16,
590:22, 593:1,
593:2, 593:5,
593:11, 593:13,
593:20, 593:22,

594:10, 594:17,
594:19
**note-taker's** [1] -
590:9
**noted** [8] - 459:8,
460:5, 474:16,
482:12, 485:6,
502:2, 503:11,
503:14
**notes** [11] - 472:14,
480:3, 589:25,
590:2, 590:5, 590:7,
590:8, 590:10,
598:13
**nothing** [8] - 474:21,
488:3, 508:4, 529:4,
539:17, 568:22,
571:18, 587:4
**notice** [3] - 460:23,
461:1, 524:2
**noticed** [1] - 502:4
**noting** [1] - 483:24
**number** [17] - 442:16,
448:7, 491:12,
512:25, 514:18,
515:3, 515:7, 515:9,
515:16, 517:4,
518:8, 518:13,
535:4, 537:11,
541:3, 546:25,
553:23
**numbered** [1] - 578:3
**numbers** [2] - 487:3
**nursing** [2] - 470:14,
475:3
**NW** [3] - 438:14,
438:24, 598:20

---

## O

**oath** [5] - 507:2, 516:8,
516:13, 518:3,
577:23
**obey** [2] - 585:7, 585:9
**object** [7] - 478:14,
481:9, 481:10,
481:12, 483:1,
483:25, 504:8
**objected** [2] - 441:15,
504:3
**objection** [24] -
442:15, 443:13,
444:25, 446:3,
455:18, 459:7,
471:7, 482:19,
482:23, 484:6,
485:1, 485:14,
486:21, 491:23,
502:2, 503:11,
503:14, 508:18,
509:2, 509:12,

529:17, 529:24,
543:17, 548:1
**objection's** [1] - 460:5
**objections** [8] -
442:17, 482:11,
499:10, 503:16,
508:23, 508:25,
529:15, 558:12
**obligation** [3] -
544:16, 564:2,
581:17
**observations** [1] -
570:19
**observe** [3] - 482:8,
513:25, 521:1
**observed** [1] - 523:14
**observes** [1] - 523:13
**obtain** [1] - 507:21
**obtaining** [1] - 565:23
**obvious** [5] - 479:3,
480:23, 521:5,
521:7, 543:25
**obviously** [2] - 463:7,
478:5
**occasion** [2] - 450:9,
515:25
**occasionally** [1] -
508:20
**occur** [2] - 527:7,
527:12
**OF** [3] - 438:1, 438:10,
598:9
**offer** [2] - 479:4,
570:19
**offers** [1] - 524:22
**official** [2] - 523:25,
598:19
**Official** [1] - 438:23
**OFFICIAL** [1] - 598:9
**often** [2] - 450:12,
591:25
**old** [2] - 555:18,
562:17
**omission** [5] - 520:6,
520:7, 520:8, 520:11
**omissions** [3] - 520:1,
520:3, 520:4
**omitted** [2] - 493:13,
500:13
**omitting** [1] - 485:1
**once** [2] - 451:13,
453:5, 461:25,
536:21, 542:5,
545:15, 549:16,
567:21, 575:22,
588:13, 593:22
**one** [105] - 441:8,
443:17, 448:19,
450:18, 452:16,
457:21, 457:22,

459:14, 460:6,
460:9, 464:13,
464:16, 465:4,
465:11, 474:6,
475:14, 478:16,
479:1, 480:7, 480:8,
480:23, 481:6,
482:11, 484:17,
484:21, 485:5,
488:24, 489:3,
489:10, 489:25,
490:1, 490:21,
490:22, 491:4,
491:8, 491:16,
492:13, 500:3,
500:12, 501:2,
501:3, 501:8,
501:10, 501:11,
504:12, 506:14,
506:16, 510:6,
515:7, 515:14,
517:23, 519:25,
520:4, 520:16,
521:3, 521:4,
521:24, 522:6,
522:10, 522:11,
522:22, 523:15,
529:23, 532:18,
536:6, 536:12,
536:15, 536:20,
538:2, 539:8,
539:13, 540:18,
541:3, 544:22,
545:4, 546:15,
546:16, 547:9,
547:18, 549:5,
553:20, 555:11,
556:5, 557:19,
558:13, 559:4,
564:12, 565:12,
565:21, 566:8,
573:5, 574:2, 574:3,
576:5, 577:8,
578:12, 578:13,
580:7, 584:8,
584:25, 587:3,
591:1, 591:19
**one's** [2] - 442:8,
503:5
**ones** [3] - 464:8,
491:8, 553:22
**open** [30] - 442:9,
446:1, 449:3,
451:11, 451:17,
451:24, 451:25,
452:1, 452:4, 452:8,
452:9, 452:13,
453:7, 453:17,
456:19, 461:20,
462:7, 462:12,
462:25, 463:11,

615

563:8, 570:2,
575:11, 575:22,
575:24, 576:2,
576:14, 576:17,
594:2
**opened** [6] - 453:2,
460:21, 522:15,
553:8, 576:12, 580:3
**opening** [28] - 449:1,
453:24, 456:12,
456:17, 492:21,
495:3, 495:9,
497:13, 498:25,
510:11, 528:2,
536:23, 537:6,
557:18, 559:6,
560:11, 563:5,
566:20, 568:11,
569:15, 570:1,
573:9, 576:6,
576:17, 581:1,
583:2, 583:19, 585:1
**openings** [2] - 505:1,
532:23
**opens** [1] - 576:2
**operate** [3] - 445:25,
545:18, 567:1
**operated** [2] - 545:22,
582:14
**operates** [4] - 443:16,
562:2, 562:3, 562:23
**operating** [10] -
442:22, 444:3,
449:10, 454:6,
521:19, 544:4,
565:8, 567:1, 567:8,
585:7
**operation** [10] - 443:9,
443:25, 444:17,
451:12, 454:19,
459:23, 493:22,
565:13, 579:24,
580:25
**operations** [9] -
442:20, 442:21,
442:23, 447:7,
447:20, 447:21,
448:4, 457:12
**operator** [61] - 443:23,
448:3, 448:4, 448:9,
448:12, 448:22,
448:24, 449:19,
449:23, 449:25,
450:2, 450:6,
451:11, 451:15,
452:10, 452:11,
452:13, 452:21,
452:23, 453:4,
453:5, 453:9,
453:10, 454:1,

455:5, 457:25,
482:4, 484:5,
484:11, 485:24,
496:8, 496:10,
503:4, 518:17,
518:21, 525:2,
525:3, 532:3, 538:6,
540:11, 542:25,
544:16, 545:6,
557:15, 562:6,
563:3, 563:4, 563:7,
563:12, 565:14,
566:24, 567:6,
569:14, 573:25,
576:2, 576:7,
581:20, 586:19,
587:4, 587:6, 595:15
**operator's** [1] - 486:7
**operators** [10] - 449:4,
451:7, 453:1, 454:4,
454:9, 458:9,
564:23, 566:3,
567:8, 567:9
**opinion** [17] - 498:19,
502:20, 506:6,
507:23, 508:6,
508:10, 517:12,
517:15, 517:17,
517:19, 517:20,
591:5, 591:8,
591:17, 591:21
**opinions** [12] - 469:23,
470:23, 471:1,
471:13, 473:6,
508:2, 517:7,
517:14, 521:15,
566:19, 566:22,
591:13
**opportunity** [7] -
477:3, 478:13,
513:25, 527:15,
529:6, 561:6, 561:12
**opposite** [1] - 475:15
**option** [3] - 463:3,
463:6
**orally** [1] - 590:19
**order** [3] - 502:14,
502:15, 592:7
**ordered** [1] - 509:13
**ordinarily** [2] - 523:8,
523:10
**ordinary** [14] - 455:24,
494:5, 519:4, 519:5,
519:12, 519:13,
519:14, 520:24,
523:9, 523:13,
524:24, 524:25,
544:24, 579:24
**organization** [1] -
581:4

**organize** [2] - 589:13,
592:4
**original** [2] - 457:20,
484:10
**Orlando** [1] - 566:23
**Orthopedic** [1] -
469:11
**orthopedic** [11] -
467:25, 468:16,
468:19, 471:2,
471:6, 471:10,
548:4, 549:13,
549:14, 582:4,
582:11
**orthopedics** [1] -
469:20
**otherwise** [3] - 469:1,
520:16, 558:22
**ought** [1] - 506:7
**ourselves** [1] - 558:18
**outcome** [3] - 458:25,
514:2, 583:18
**outline** [1] - 561:19
**outrageous** [1] -
558:23
**outset** [2] - 561:22,
591:19
**outside** [7] - 466:13,
494:9, 496:16,
508:21, 546:1,
558:11, 576:3
**outstanding** [2] -
473:25, 582:8
**outweighed** [1] -
517:18
**overall** [1] - 525:24
**overcome** [1] - 520:17
**overhead** [1] - 575:14
**overlap** [1] - 478:7
**overly** [1] - 529:13
**overpromised** [1] -
563:18
**overrule** [1] - 559:3
**overruled** [1] - 446:3
**oversee** [2] - 447:7,
447:19
**overshooting** [1] -
449:12
**oversight** [1] - 490:14
**owed** [3] - 550:15,
550:17, 550:20
**own** [32] - 442:7,
442:12, 454:4,
463:8, 465:21,
465:23, 482:18,
485:25, 490:9,
510:22, 518:22,
521:1, 521:20,
522:1, 522:8, 544:4,
555:21, 562:7,

562:13, 562:14,
562:20, 574:13,
574:18, 576:20,
577:13, 578:8,
579:16, 582:18,
590:6, 590:8, 590:9,
591:9

## P

**p.m** [1] - 598:7
**Page** [6] - 487:14,
489:13, 489:17,
493:17, 498:20,
502:17
**page** [10] - 457:14,
478:20, 481:15,
482:1, 484:3,
485:23, 487:5,
489:15, 493:10,
499:17
**PAGE** [1] - 439:2
**pages** [1] - 499:15
**paid** [3] - 559:12,
559:21
**pain** [11] - 473:1,
475:8, 525:25,
547:12, 547:15,
547:18, 553:13,
555:7, 555:13,
582:17
**Palm** [1] - 548:7
**pandemic** [2] - 583:6,
583:9
**paper** [1] - 533:1
**paragraph** [1] - 487:12
**paragraphs** [1] -
479:25
**part** [19] - 443:25,
445:7, 468:4,
471:19, 496:12,
499:1, 499:7,
519:21, 520:3,
520:6, 526:17,
526:21, 526:23,
547:6, 556:17,
570:25, 571:1, 577:2
**partially** [1] - 517:19
**particular** [11] - 449:4,
484:14, 506:14,
509:6, 515:3,
521:14, 562:24,
568:25, 590:24,
591:8, 592:22
**particularly** [2] -
440:23, 442:17
**parties** [10] - 482:15,
488:20, 490:8,
509:19, 517:23,
517:24, 522:10,
523:24, 581:6,

583:25
**parties'** [2] - 489:13,
567:16
**partisans** [2] - 592:1
**partner** [1] - 564:5
**parts** [1] - 469:14
**Party** [1] - 503:21
**party** [12] - 489:25,
490:22, 508:5,
511:17, 513:6,
515:17, 520:14,
520:15, 520:16,
520:17, 520:18,
578:12
**party's** [1] - 510:13
**pass** [2] - 494:16,
506:19
**passenger** [2] - 459:2,
459:3, 492:15,
496:13, 569:25,
570:1, 574:20
**passenger's** [4] -
496:7, 496:8,
552:18, 562:4
**passengers** [33] -
455:6, 458:16,
460:13, 460:23,
461:25, 462:5,
462:10, 465:21,
494:18, 498:5,
498:7, 502:22,
503:2, 524:22,
524:25, 525:11,
536:16, 536:24,
537:4, 537:25,
539:3, 540:20,
542:1, 542:6,
545:15, 558:2,
562:4, 563:9,
563:13, 587:22,
588:2, 588:13
**past** [15] - 470:19,
487:6, 487:8, 526:1,
526:7, 526:9,
547:15, 547:17,
547:19, 553:17,
555:7, 555:8, 555:9,
567:21, 568:6
**Pathologic** [1] -
469:12
**patience** [1] - 505:11
**patient** [1] - 474:2
**Patrick** [2] - 440:8,
583:22
**PATRICK** [1] - 438:13
**pause** [2] - 460:17,
571:11
**Pause** [4] - 445:20,
465:6, 467:3, 491:17
**pay** [4] - 460:12,

463:5, 521:2, 526:20
**paying** [1] - 463:2
**pays** [1] - 560:11
**pelvis** [4] - 475:15, 475:17, 475:21, 475:23
**penalty** [2] - 516:8, 516:14
**people** [40] - 441:23, 442:8, 445:25, 463:5, 463:9, 463:20, 463:25, 469:14, 473:16, 523:9, 523:10, 537:8, 540:5, 541:13, 544:9, 545:25, 546:1, 546:3, 547:23, 553:1, 554:19, 555:20, 556:1, 557:5, 557:6, 557:7, 557:8, 557:9, 559:14, 560:8, 562:10, 562:13, 571:14, 571:16, 576:3, 577:17, 580:15
**percent** [10] - 551:11, 551:12, 551:25, 552:7, 556:1, 556:2, 556:3, 572:2
**percentage** [1] - 528:3
**percentages** [2] - 490:11, 528:5
**perfectly** [3] - 443:21, 461:24, 563:9
**perhaps** [1] - 582:13
**peril** [1] - 494:12
**period** [6] - 462:24, 474:25, 487:6, 487:8, 497:15, 587:24
**perjury** [2] - 516:8, 516:14
**permanent** [9] - 475:8, 548:14, 548:15, 548:16, 548:17, 550:2, 553:14, 582:23, 582:24
**permission** [1] - 455:16
**permitted** [2] - 509:24, 589:24
**person** [56] - 458:24, 461:6, 461:8, 461:10, 461:15, 461:18, 461:21, 465:16, 480:23, 498:21, 502:24, 507:8, 507:9, 511:5,

511:7, 513:21, 518:2, 519:11, 519:12, 519:13, 519:14, 519:16, 520:9, 520:11, 520:21, 520:23, 520:25, 521:2, 521:5, 521:6, 523:8, 523:9, 523:12, 523:13, 523:14, 523:19, 524:3, 525:1, 539:19, 539:21, 543:14, 549:21, 550:16, 552:21, 552:22, 557:3, 558:14, 571:13, 571:15, 574:12, 586:11
**person's** [3] - 490:2, 522:11, 578:14
**personal** [5] - 454:18, 463:6, 521:15, 562:14, 590:9
**personally** [1] - 597:13
**persons** [5] - 508:14, 508:15, 514:3, 515:18, 520:2
**perspective** [4] - 496:7, 510:13, 569:25, 573:6
**pertinent** [2] - 443:11, 579:19
**Philadelphia** [2] - 537:20, 544:2
**phone** [1] - 572:24
**phones** [3] - 466:9, 508:21, 558:9
**phrase** [1] - 504:13
**physical** [3] - 475:1, 475:3, 475:4, 521:8, 525:21, 525:23, 525:24, 525:25, 547:9, 547:13, 547:15, 547:18, 555:7
**picked** [1] - 539:10
**picks** [1] - 539:8
**picture** [1] - 551:5
**piece** [1] - 521:3
**place** [3] - 502:10, 515:18, 573:18
**placed** [3] - 474:7, 518:3, 582:10
**plainly** [1] - 521:3
**Plaintiff** [2] - 438:4, 438:13
**plaintiff** [37] - 440:8, 445:22, 476:19, 479:18, 482:3,

485:3, 488:22, 489:20, 500:5, 503:6, 507:7, 507:8, 507:10, 507:11, 507:13, 507:15, 507:17, 510:6, 512:9, 512:13, 512:14, 518:15, 519:6, 528:10, 535:8, 535:14, 564:1, 570:20, 570:21, 572:6, 572:7, 580:25, 584:6, 595:13, 595:19, 596:10
**Plaintiff's** [8] - 441:12, 444:20, 456:25, 457:3, 459:5, 460:4, 473:20, 485:22
**plaintiff's** [11] - 440:5, 466:16, 477:17, 486:20, 504:22, 512:7, 519:6, 525:11, 561:9, 564:1, 564:16
**plaintiffs** [3] - 511:18, 567:17, 580:21
**plan** [3] - 477:7, 499:13, 499:22
**platform** [20] - 449:2, 449:7, 449:12, 449:15, 449:16, 449:22, 451:11, 451:17, 452:15, 453:1, 457:25, 458:13, 463:10, 463:16, 536:22, 545:15, 558:4, 563:8, 576:3, 588:13
**play** [7] - 441:19, 444:5, 444:13, 445:23, 460:9, 461:4, 464:12
**played** [4] - 519:21, 520:3, 520:6, 545:19
**playing** [6] - 444:21, 459:20, 460:16, 461:9, 464:1, 464:19
**plays** [1] - 526:17
**PLLC** [1] - 438:14
**plural** [1] - 493:23
**plus** [1] - 547:11
**pocket** [2] - 470:8, 470:17
**pockets** [1] - 461:12
**point** [27] - 442:6, 442:23, 445:6, 445:9, 472:7, 472:21, 480:22, 496:14, 496:23,

497:3, 498:19, 504:19, 505:5, 506:2, 528:17, 530:9, 540:20, 548:6, 550:13, 560:1, 560:2, 570:23, 572:4, 573:5, 580:4, 582:3, 584:20
**pointed** [2] - 444:14, 577:5
**points** [3] - 504:5, 556:22, 578:17
**poise** [1] - 551:6
**pole** [3] - 522:16, 575:13, 575:16
**poles** [1] - 562:11
**policies** [1] - 567:2
**policy** [1] - 567:7, 568:17
**poll** [1] - 596:13
**portion** [1] - 476:20
**position** [6] - 447:18, 447:24, 497:20, 523:6, 587:17, 587:19
**positions** [1] - 448:7
**possesses** [1] - 517:11
**possibilities** [1] - 527:12
**possible** [2] - 477:5, 507:8
**posted** [1] - 444:15
**pothole** [1] - 498:14
**PowerPoint** [1] - 529:3
**practice** [4] - 468:2, 469:15, 521:14, 597:12
**practices** [1] - 521:22
**practicing** [3] - 468:7, 469:1, 469:20
**preceding** [1] - 443:20
**precise** [1] - 527:5
**prefer** [3] - 480:20, 484:15, 499:20
**preference** [2] - 462:13, 499:21
**pregan@reganfirm. com** [1] - 438:16
**prejudice** [3] - 507:3, 508:10, 514:14
**prejudiced** [1] - 514:12
**preliminary** [1] - 505:23
**prepare** [1] - 527:16
**preparing** [2] - 460:25, 461:13
**preponderance** [27] -

507:19, 511:20, 512:1, 512:3, 512:18, 512:22, 512:23, 513:2, 513:4, 519:9, 519:18, 522:21, 535:9, 551:2, 551:7, 551:13, 551:15, 551:21, 552:2, 553:12, 572:1, 572:15, 595:14, 595:19, 595:24, 596:3, 596:6
**present** [5] - 515:18, 515:23, 516:19, 518:5, 561:12
**presentation** [1] - 456:1
**presented** [3] - 518:8, 529:9, 580:19
**preserved** [1] - 466:20
**preside** [1] - 589:6
**press** [1] - 453:16
**presumes** [1] - 520:15
**presumption** [1] - 520:17
**pretrial** [4] - 441:16, 489:5, 493:14, 597:21
**pretty** [8] - 469:13, 491:19, 528:15, 543:8, 556:4, 561:2, 593:2, 593:6
**prevail** [1] - 507:17
**prevents** [1] - 474:8
**preview** [1] - 529:8
**previously** [2] - 515:22, 529:15
**pride** [1] - 591:20
**primary** [1] - 481:20
**principle** [1] - 506:10
**principles** [1] - 506:3
**printed** [2] - 538:21, 538:22
**probability** [2] - 512:8, 514:6
**probable** [3] - 519:23, 526:19, 552:4
**probative** [1] - 443:1
**problem** [2] - 530:20, 530:23
**Procedure** [1] - 477:19
**procedure** [1] - 544:5
**procedures** [5] - 454:6, 455:24, 521:19, 541:9, 567:8
**proceed** [3] - 527:20, 534:7, 591:25
**proceedings** [1] - 598:14

617

**proceeds** [1] - 559:22
**process** [1] - 448:20
**produce** [3] - 512:19, 551:8, 581:17
**produced** [2] - 513:5, 513:7
**produces** [1] - 512:4
**producing** [1] - 564:2
**professional** [3] - 469:10, 471:13, 517:7
**professionally** [1] - 469:16
**progress** [2] - 549:4, 593:18
**progressed** [1] - 501:2
**promise** [1] - 473:18
**promote** [1] - 589:16
**pronoun** [1] - 486:7
**pronounced** [1] - 476:2
**proof** [16] - 490:16, 510:24, 511:18, 511:25, 512:10, 512:15, 512:17, 512:19, 512:20, 514:20, 520:16, 527:5, 572:8, 572:11, 572:13, 572:14
**Proof** [1] - 571:23
**propensity** [1] - 443:4
**proper** [2] - 568:3, 593:5
**properly** [6] - 449:1, 451:13, 451:17, 451:20, 451:21, 509:17
**proposal** [1] - 531:6
**proposals** [1] - 482:16
**propose** [3] - 478:14, 486:1, 487:19
**proposed** [17] - 477:3, 477:22, 478:6, 478:7, 486:24, 488:25, 489:13, 490:14, 492:7, 493:8, 493:10, 493:15, 500:24, 501:3, 502:9, 502:19
**proprietary** [1] - 566:1
**protect** [1] - 537:3
**prove** [25] - 481:3, 503:7, 511:19, 512:2, 512:14, 515:11, 519:8, 519:9, 519:18, 520:19, 522:5, 524:6, 526:24, 551:23, 551:25,

552:16, 552:19, 552:20, 552:24, 557:2, 557:10, 558:5, 572:7, 578:6
**proved** [6] - 510:5, 513:3, 522:8, 595:14, 595:24, 596:6
**proven** [2] - 530:10, 530:11
**proves** [4] - 507:18, 520:16, 522:21, 578:9
**provide** [7] - 471:9, 510:16, 517:6, 521:19, 554:25, 588:6, 592:20
**provided** [1] - 477:4
**province** [1] - 574:16
**proving** [1] - 511:18
**proximate** [2] - 531:10, 535:23
**prudence** [1] - 525:4
**prudent** [1] - 502:24
**PT** [1] - 583:5
**public** [6] - 508:10, 524:22, 544:23, 544:24, 545:14, 588:12
**publish** [3] - 455:17, 455:20, 460:7
**published** [1] - 524:1
**pull** [4] - 446:23, 470:8, 470:17, 475:18
**pulled** [4] - 536:21, 540:2, 541:3, 541:11
**pulling** [1] - 470:1
**pulls** [1] - 441:22
**punish** [1] - 526:11
**punitive** [1] - 526:10
**purpose** [4] - 442:1, 458:15, 509:10, 537:2
**purposes** [5] - 483:25, 504:12, 548:22, 592:19
**pursuant** [2] - 458:11, 466:14
**push** [6] - 452:1, 452:2, 452:3, 452:5, 453:13, 466:18
**pushed** [1] - 576:1
**pushes** [1] - 539:9
**put** [22] - 441:14, 442:12, 456:1, 471:23, 471:25, 472:2, 472:11, 487:6, 507:7, 509:6, 540:18, 547:3,

549:2, 552:25, 556:8, 561:20, 568:22, 569:9, 569:10, 574:10, 581:24, 588:8
**puts** [1] - 482:6
**putting** [3] - 484:11, 544:4, 554:11

## Q

**qualified** [4] - 517:6, 543:23, 582:4, 585:14
**qualify** [1] - 471:8
**quality** [3] - 447:5, 447:19, 512:23
**quantity** [1] - 512:24
**quarters** [1] - 479:3
**question's** [1] - 442:14
**questioning** [1] - 506:5
**questions** [20] - 465:8, 473:10, 478:12, 507:23, 510:14, 518:4, 518:5, 534:25, 535:4, 535:5, 535:6, 536:8, 541:5, 550:10, 581:21, 592:25, 593:17, 593:18, 593:19, 594:1
**Questions** [1] - 535:18
**quick** [2] - 469:2, 471:17
**quickly** [3] - 449:25, 556:21, 558:9
**quintessential** [1] - 490:23
**quite** [3] - 563:10, 594:22, 594:24
**quotes** [1] - 498:6
**quoting** [1] - 494:13

## R

**race** [1] - 539:20
**rail** [23] - 447:5, 447:8, 447:9, 447:19, 447:22, 448:4, 448:9, 448:11, 451:7, 562:2, 562:3, 564:10, 564:13, 564:23, 565:6, 565:8, 565:18, 565:19, 565:23, 566:3, 567:8, 567:9, 573:25
**rails** [1] - 575:15
**raise** [4] - 446:15, 467:5, 467:9, 492:10

**raising** [1] - 562:15
**ran** [1] - 551:19
**range** [1] - 553:14
**Rao** [10] - 471:22, 472:16, 473:2, 473:23, 517:6, 548:3, 549:17, 549:25, 582:13, 582:16
**Rao's** [3] - 470:13, 472:14, 472:19
**rather** [3] - 511:7, 521:21, 575:18
**rationale** [1] - 499:1
**ratios** [1] - 528:5
**rattles** [1] - 544:25
**rays** [3] - 472:6, 549:7, 549:8
**RDR** [3] - 438:22, 598:11, 598:18
**reach** [3] - 589:10, 591:2, 591:9
**reached** [5] - 590:23, 593:10, 594:8, 594:20, 595:4
**reaching** [3] - 508:13, 575:13, 575:16
**read** [13] - 495:6, 499:11, 499:17, 501:20, 502:13, 502:14, 505:13, 539:5, 539:6, 539:12, 542:17, 546:20, 586:12
**reading** [3] - 527:13, 532:22, 570:16
**readouts** [1] - 450:21
**ready** [10] - 441:3, 441:4, 446:9, 477:8, 499:18, 503:13, 534:2, 541:13, 553:4, 557:9
**real** [2] - 488:13, 552:14
**real-time** [1] - 488:13
**realizing** [1] - 444:19
**really** [10] - 443:1, 443:8, 450:13, 456:21, 486:2, 549:24, 551:16, 561:24, 567:12, 571:19
**reason** [11] - 455:5, 459:1, 490:25, 509:25, 539:18, 539:20, 545:2, 545:10, 545:19, 547:3, 552:25
**reasonable** [30] - 461:25, 471:2,

473:6, 496:16, 498:21, 506:23, 512:21, 519:16, 520:15, 520:18, 520:21, 520:23, 521:2, 523:7, 525:1, 525:4, 525:6, 527:2, 527:3, 527:4, 544:12, 552:21, 552:22, 554:19, 557:2, 557:3, 587:17, 587:20, 587:24
**reasonableness** [2] - 492:14, 514:5
**reasonably** [14] - 494:19, 494:22, 496:12, 496:13, 502:22, 502:24, 519:23, 523:14, 523:16, 526:19, 527:12, 544:23, 545:14, 588:12
**reasons** [3] - 450:14, 451:3, 517:16
**rebuttal** [5] - 476:16, 476:17, 477:18, 500:6, 584:7
**receive** [3] - 452:21, 514:17, 516:23
**received** [8] - 443:21, 470:24, 477:21, 509:10, 573:12, 573:14, 574:7, 594:19
**receives** [1] - 452:23
**recently** [1] - 548:8
**recess** [1] - 533:5
**Recess** [2] - 501:18, 594:18
**recite** [1] - 538:3
**recollection** [3] - 513:23, 570:20, 573:10
**recommended** [1] - 473:4
**reconvene** [2] - 501:16, 527:20
**record** [12] - 440:2, 440:6, 467:15, 470:22, 495:8, 495:16, 501:21, 529:16, 542:18, 559:11, 559:20, 597:8
**records** [9] - 469:24, 470:1, 470:6, 470:7, 470:10, 470:11, 470:17, 472:17, 518:5

618

**recover** [1] - 574:13
**recovery** [2] - 550:1
**red** [6] - 443:12,
457:19, 464:5,
551:19, 564:19
**Red** [1] - 482:17
**redacted** [4] - 444:10,
478:22, 478:25,
479:4
**redaction** [2] - 478:21,
479:4
**redactions** [1] -
479:11
**redirect** [2] - 465:11,
476:7
**REDIRECT** [1] -
465:12
**refer** [4] - 509:7,
559:8, 592:21,
592:22
**reference** [4] - 521:11,
559:4, 560:17,
560:19
**references** [1] - 507:7
**referred** [3] - 567:3,
570:22, 581:22
**referring** [2] - 464:9,
495:6
**reflect** [5] - 485:10,
485:17, 514:22,
521:22, 583:15
**reflects** [1] - 521:14
**reformat** [1] - 504:25
**Regan** [41] - 440:8,
445:17, 445:19,
473:11, 476:16,
480:1, 482:14,
486:24, 489:2,
489:10, 490:13,
491:24, 497:1,
501:12, 502:2,
528:2, 531:6, 534:2,
534:8, 553:25,
558:24, 559:7,
561:17, 562:15,
563:15, 563:21,
564:5, 567:15,
568:11, 571:25,
573:8, 574:9,
575:18, 576:23,
581:22, 582:3,
583:2, 583:23,
584:8, 584:12
**REGAN** [120] - 438:13,
438:13, 438:14,
440:7, 440:11,
441:6, 441:8,
441:12, 441:19,
442:2, 444:7,
444:19, 445:6,

445:15, 454:25,
455:8, 455:12,
455:16, 455:21,
455:22, 456:4,
456:7, 456:25,
459:4, 459:9, 460:3,
460:7, 465:4, 465:7,
465:10, 471:7,
473:9, 473:13,
476:6, 476:17,
478:19, 478:23,
478:24, 479:6,
479:18, 480:3,
480:8, 480:16,
480:18, 481:1,
481:8, 481:12,
481:24, 482:20,
482:23, 483:21,
484:2, 484:24,
485:3, 485:13,
486:10, 486:21,
487:4, 487:9,
487:13, 487:23,
488:3, 489:3, 489:5,
489:8, 489:11,
489:15, 489:18,
490:15, 490:25,
491:12, 491:14,
491:18, 491:21,
493:17, 493:21,
497:2, 498:2,
498:12, 499:12,
499:20, 499:23,
500:7, 500:18,
500:21, 501:13,
505:5, 505:9, 528:4,
528:7, 528:25,
531:2, 531:5, 531:7,
531:10, 531:16,
531:22, 531:25,
533:4, 534:3, 534:9,
534:12, 543:20,
547:2, 548:3, 554:1,
554:3, 558:25,
559:9, 559:13,
559:17, 560:1,
560:4, 560:7, 584:9,
584:13, 584:15,
594:16, 597:18,
598:4
**Regan's** [3] - 496:23,
560:17, 572:13
**Regan)**......................
............**454** [1] - 439:4
**Regan)**......................
............**473** [1] - 439:7
**regard** [20] - 442:17,
481:21, 482:7,
486:24, 490:9,
501:5, 501:7, 561:5,

562:5, 562:16,
562:22, 565:10,
567:8, 567:24,
569:22, 571:12,
572:18, 573:5,
573:7, 580:13
**regarding** [5] - 532:3,
559:4, 589:3,
589:15, 595:16
**regardless** [4] - 445:7,
497:24, 506:5, 513:5
**regularly** [1] - 571:16
**regulate** [1] - 520:25
**regulation** [1] - 492:4
**rehabilitation** [1] -
474:25
**rejected** [2] - 494:3,
494:6
**relate** [6] - 479:24,
482:2, 496:24,
518:14, 553:19,
562:24
**related** [4] - 484:7,
492:14, 577:9,
588:22
**relates** [5] - 447:21,
454:19, 481:14,
482:4, 493:21
**relating** [1] - 524:9
**relationship** [1] -
449:15
**relative** [1] - 515:2
**released** [1] - 472:24
**relevance** [5] - 442:17,
443:3, 443:4,
444:25, 445:3
**relevant** [12] - 442:6,
448:15, 481:16,
481:17, 492:4,
492:7, 492:8,
495:24, 527:4,
546:22, 553:10,
571:19
**reliability** [1] - 515:14
**rely** [3] - 510:22,
566:8, 590:5
**relying** [1] - 567:12
**remain** [2] - 446:15,
467:5
**remarkable** [1] -
577:18
**remember** [36] - 445:7,
472:15, 472:19,
510:19, 538:17,
541:16, 542:19,
543:11, 548:3,
552:12, 555:1,
562:9, 564:10,
565:24, 566:20,
567:5, 567:11,

567:15, 568:16,
568:25, 570:12,
570:14, 571:1,
572:23, 573:8,
573:11, 574:4,
574:5, 575:2,
575:20, 580:16,
583:1, 583:4, 583:5,
592:1
**remind** [2] - 441:17,
589:18
**reminded** [1] - 507:1
**reminder** [1] - 577:24
**remote** [1] - 527:11
**remove** [2] - 504:6,
561:9
**removed** [1] - 503:21
**render** [2] - 507:2,
584:2
**rendered** [1] - 593:9
**renew** [2] - 466:17,
477:18
**rep** [2] - 566:25, 567:7
**repeat** [4] - 447:16,
505:22, 529:14,
585:8
**repeated** [2] - 504:13,
589:19
**repeatedly** [1] - 581:1
**repetitive** [1] - 491:20
**replace** [1] - 590:4
**report** [4] - 474:15,
539:8, 539:10, 571:6
**reporter** [1] - 518:5
**REPORTER** [2] -
460:1, 598:9
**Reporter** [3] - 438:22,
438:23, 598:19
**reposition** [8] -
450:10, 451:5,
451:8, 454:1, 458:1,
493:25, 542:11,
573:23
**repositioned** [5] -
486:8, 492:22,
518:18, 563:11,
570:6
**Repositioning** [1] -
457:21
**repositioning** [5] -
458:4, 545:6,
563:10, 579:23,
580:2
**repositionings** [1] -
546:8
**repositions** [2] -
569:2, 575:1
**represent** [1] - 592:6
**representation** [1] -
455:13

**Representative** [1] -
503:22
**representative** [5] -
445:22, 483:20,
497:17, 524:21,
537:16
**representatives** [2] -
524:18, 542:20
**request** [5] - 486:4,
491:10, 492:10,
508:23, 532:18
**requested** [7] -
482:14, 488:9,
489:7, 491:8, 491:9,
491:16, 508:21
**require** [10] - 443:18,
500:10, 511:12,
515:17, 521:1,
525:9, 527:5, 529:8,
546:10, 585:22
**required** [16] - 458:12,
462:5, 462:18,
462:23, 463:1,
463:2, 463:5,
479:23, 505:13,
512:21, 521:10,
537:14, 538:5,
539:7, 545:13,
552:11
**requirement** [1] -
462:14
**requires** [4] - 493:25,
508:8, 544:22, 593:3
**research** [6] - 468:19,
469:17, 477:12,
527:22, 568:4,
581:13
**residents** [1] - 468:24
**resolve** [3] - 506:21,
513:16, 583:24
**respect** [15] - 445:14,
445:15, 445:18,
487:22, 493:1,
493:3, 495:15,
497:2, 499:3,
511:24, 519:17,
536:15, 572:18,
585:7, 589:14
**respective** [1] - 517:7
**respond** [2] - 477:3,
528:20
**responded** [2] -
454:15, 510:16
**response** [1] - 593:5
**responsibilities** [1] -
562:4
**responsibility** [8] -
523:21, 543:12,
543:13, 552:18,
561:25, 562:1,

585:2, 587:12
**responsible** [8] - 494:5, 520:8, 523:17, 524:14, 537:9, 538:24, 580:10, 585:2
**rest** [3] - 536:4, 551:24, 555:24
**restarts** [1] - 494:8
**rested** [2] - 476:19
**restoration** [1] - 472:2
**restore** [2] - 472:7, 472:9
**restrictions** [1] - 548:14
**rests** [1] - 476:15
**result** [9] - 474:7, 488:23, 519:23, 526:18, 546:8, 553:15, 573:4, 580:21, 582:11
**resulting** [2] - 497:24, 498:10
**results** [1] - 578:22
**retain** [1] - 564:7
**retained** [4] - 564:16, 564:18, 564:19, 564:20
**retire** [4] - 589:1, 594:4, 594:12, 597:11
**retired** [2] - 566:24, 566:25
**retiring** [1] - 591:23
**return** [6] - 577:20, 582:21, 589:4, 591:12, 592:7, 593:8
**reveal** [1] - 590:20
**review** [8] - 469:22, 469:24, 470:6, 470:22, 471:12, 485:8, 489:21, 529:6
**reviewed** [1] - 470:10
**reviewing** [2] - 472:14, 591:24
**revision** [2] - 499:9, 532:1
**rid** [5] - 479:12, 479:16, 480:6, 502:18, 531:3
**ride** [2] - 470:12, 546:7
**riding** [3] - 557:11, 562:4, 579:19
**rigorous** [1] - 474:24
**risen** [1] - 540:5
**risk** [45] - 480:14, 480:23, 480:25, 481:2, 481:14, 481:16, 481:20, 482:1, 486:2,

486:16, 494:1, 501:8, 501:11, 501:25, 503:3, 504:24, 511:22, 518:24, 520:22, 521:5, 521:7, 522:15, 522:17, 522:18, 522:20, 523:2, 523:5, 525:17, 536:2, 544:24, 557:10, 557:11, 557:17, 579:7, 579:14, 579:15, 579:16, 579:17, 579:19, 580:7, 587:5, 596:7
**risks** [5] - 498:15, 579:19, 579:20, 580:7
**rod** [4] - 474:7, 549:2, 549:6, 549:10
**role** [4] - 468:6, 561:14, 561:15, 583:24
**room** [14] - 443:22, 505:16, 505:25, 534:14, 578:4, 589:4, 590:1, 591:17, 591:23, 592:10, 594:4, 594:6, 594:12, 597:12
**Room** [2] - 438:23, 598:20
**rounded** [1] - 547:21
**row** [2] - 575:7, 575:8
**Rule** [3] - 477:18, 483:24, 529:16
**rule** [21] - 488:22, 494:4, 494:6, 494:10, 494:18, 502:21, 536:20, 537:1, 537:5, 537:21, 537:23, 539:1, 543:9, 543:21, 557:24, 558:15, 577:3, 577:16, 577:21, 581:21, 582:1
**ruled** [2] - 503:17, 509:1
**rules** [7] - 505:20, 505:22, 522:2, 534:21, 536:20, 589:7, 597:25
**Rules** [1] - 477:19
**ruling** [5] - 444:23, 494:3, 495:7, 495:13, 503:9
**rulings** [1] - 508:20

**run** [6] - 459:13, 537:2, 556:21, 585:13, 586:15, 586:22
**running** [2] - 452:16, 511:4

**S**

**safe** [6] - 461:19, 463:11, 498:22, 502:25, 503:5, 576:4
**safely** [1] - 449:16
**safety** [27] - 459:2, 459:3, 521:1, 521:13, 525:10, 536:20, 537:1, 537:3, 537:5, 537:24, 538:15, 539:1, 543:9, 543:20, 543:24, 552:11, 556:13, 556:15, 557:16, 562:7, 566:6, 576:21, 579:16, 585:7, 585:10
**San** [1] - 564:25
**satisfied** [1] - 581:12
**save** [1] - 556:20
**saw** [18] - 461:10, 461:13, 464:13, 464:25, 472:15, 474:6, 474:16, 511:5, 511:7, 545:20, 548:4, 548:11, 548:19, 548:23, 549:16, 550:13, 561:20, 582:17
**say-so** [2] - 567:14, 567:19
**scale** [1] - 571:25
**scales** [9] - 551:5, 551:8, 551:9, 551:17, 552:6, 554:15, 554:16, 572:13, 579:9
**scenario** [2] - 494:9, 497:19
**school** [2] - 468:14, 556:6
**science** [1] - 468:13
**scientific** [1] - 517:8
**scooter** [1] - 582:20
**scope** [1] - 522:23
**Scott** [94] - 440:3, 440:9, 470:15, 470:23, 471:13, 472:15, 473:1, 474:17, 486:14, 486:15, 487:8,

487:17, 492:20, 495:10, 499:5, 511:21, 518:15, 518:16, 518:19, 519:2, 519:8, 519:18, 521:25, 522:4, 522:6, 522:14, 522:17, 522:20, 522:22, 522:24, 523:2, 523:6, 523:19, 525:15, 525:16, 525:18, 525:22, 525:24, 526:1, 526:4, 526:6, 526:8, 526:15, 526:24, 527:2, 527:9, 535:20, 539:2, 539:22, 541:22, 546:6, 546:18, 547:24, 550:5, 550:13, 550:15, 552:23, 553:7, 553:13, 554:13, 555:2, 556:13, 557:5, 557:11, 569:11, 570:7, 571:10, 572:21, 573:15, 573:17, 573:20, 574:10, 574:14, 574:23, 575:19, 576:5, 577:12, 578:7, 578:13, 578:18, 580:3, 581:23, 586:7, 587:2, 587:7, 587:16, 587:19, 588:16, 595:14, 595:19, 595:25, 596:6, 596:10, 597:19
**SCOTT** [1] - 438:3
**Scott's** [23] - 442:4, 454:12, 454:18, 470:24, 485:25, 490:8, 498:22, 518:22, 519:1, 522:1, 522:7, 523:17, 524:6, 524:7, 526:22, 527:1, 562:16, 569:3, 572:22, 578:8, 582:5, 583:3
**screen** [8] - 444:11, 455:23, 457:3, 459:10, 459:11, 479:3, 532:25, 547:3
**screens** [1] - 561:10
**screw** [1] - 474:8
**screws** [1] - 549:2

**script** [1] - 454:5
**scrolling** [1] - 457:18
**seat** [6] - 453:6, 467:5, 467:6, 562:10, 575:14, 581:25
**seated** [5] - 562:11, 569:25, 575:7, 595:3, 596:15
**seating** [2] - 575:8, 575:9
**second** [11] - 441:21, 457:14, 483:21, 485:9, 485:23, 519:5, 519:17, 530:2, 534:18, 559:4, 581:21
**secondary** [1] - 471:21
**seconds** [15] - 441:23, 442:9, 451:23, 456:16, 456:21, 456:22, 456:23, 459:13, 460:18, 460:20, 461:20, 545:20, 545:24, 546:12, 546:13
**section** [4] - 489:7, 492:3, 492:6, 495:6
**securely** [1] - 452:25
**see** [45] - 441:24, 444:6, 444:13, 444:23, 449:11, 455:9, 459:10, 461:15, 463:24, 463:25, 464:2, 464:4, 464:6, 464:18, 465:16, 475:13, 489:6, 501:21, 504:4, 521:3, 527:24, 530:22, 530:25, 533:3, 539:11, 540:18, 543:3, 544:5, 546:1, 546:10, 546:24, 547:7, 549:4, 549:7, 549:18, 555:19, 556:23, 557:7, 557:21, 561:14, 573:15, 588:7, 588:9, 590:2
**seeing** [1] - 550:5
**seem** [5] - 500:22, 500:23, 565:12, 577:3, 577:16
**sees** [1] - 478:15
**select** [3] - 534:16, 534:17, 589:5
**selecting** [2] - 589:8, 589:11
**send** [8] - 478:22,

502:5, 590:13,
593:1, 593:2,
593:10, 593:20,
594:10
**sending** [1] - 592:10
**sense** [16] - 444:9,
502:12, 509:25,
536:13, 536:16,
536:17, 536:18,
537:24, 543:25,
544:8, 546:3, 549:3,
563:22, 565:9,
581:16, 591:19
**senses** [1] - 523:15
**sensible** [1] - 557:24
**sent** [1] - 592:17
**sentence** [7] - 483:22,
485:9, 485:16,
485:19, 503:25,
506:14, 532:1
**separate** [3] - 501:9,
530:10
**SEPTA** [2] - 564:25,
566:14
**September** [12] -
444:15, 448:20,
450:4, 451:12,
457:7, 459:24,
518:16, 539:22,
545:22, 555:9,
556:14, 588:11
**sequence** [1] - 569:12
**sequencing** [1] -
569:21
**series** [2] - 444:4,
593:16
**serious** [5] - 523:22,
548:13, 549:25,
554:9, 582:5
**seriously** [2] - 557:22,
573:17
**serve** [1] - 583:23
**service** [2] - 597:11,
597:17
**Services** [2] - 524:2,
555:17
**set** [5] - 478:9, 510:6,
584:10, 589:5, 592:4
**sets** [3] - 481:2,
527:18, 546:21
**seven** [4] - 448:11,
547:5, 584:11
**several** [4] - 489:19,
519:25, 570:6
**severe** [1] - 475:24
**severity** [1] - 498:10
**shall** [6] - 538:6,
538:7, 538:8, 544:3,
589:21
**share** [3] - 565:25,

566:4
**sheet** [1] - 581:22
**shirt** [1] - 464:20
**shocking** [1] - 573:9
**shoes** [1] - 498:22
**short** [12] - 449:17,
450:9, 451:4, 455:4,
457:25, 458:13,
472:6, 473:18,
505:6, 542:8,
563:11, 573:23
**shorthand** [1] - 492:11
**show** [12] - 459:4,
472:6, 505:1,
521:13, 521:21,
547:16, 548:22,
552:14, 553:1,
554:22, 571:24,
586:8
**showed** [6] - 465:14,
552:12, 553:19,
571:12, 571:15
**showing** [6] - 442:7,
442:23, 442:25,
515:22, 523:21,
571:20
**shown** [5] - 514:11,
514:18, 514:22,
529:4, 572:15
**shows** [5] - 441:21,
459:21, 527:9,
571:13
**shunted** [1] - 443:20
**shut** [1] - 583:6
**Sibley** [3] - 468:4,
468:21, 468:23
**sick** [1] - 445:12
**side** [19] - 448:25,
449:3, 453:7,
456:12, 474:9,
474:12, 475:15,
477:3, 478:15,
495:3, 512:7,
514:13, 515:4,
515:8, 518:4, 549:7,
554:16, 563:5,
569:15
**side's** [1] - 478:6
**sides** [6] - 477:21,
500:5, 529:8,
580:12, 585:19,
594:15
**sides'** [1] - 482:11
**sight** [1] - 523:11
**sign** [2] - 593:13,
593:14
**signal** [1] - 443:21
**signature** [1] - 594:24
**signed** [4] - 590:14,
590:16, 593:1,

594:20
**significance** [1] -
507:11
**significant** [5] -
570:11, 574:20,
575:19, 577:19,
582:13
**significantly** [2] -
492:17, 493:1
**similar** [3] - 519:16,
567:6, 579:8
**SIMONE** [1] - 439:3,
446:18
**Simone** [3] - 440:19,
446:13, 447:3
**simple** [3] - 538:4,
543:8, 565:12
**simplify** [1] - 444:8
**simply** [5] - 474:13,
507:8, 510:2, 537:3,
589:11
**sincerely** [1] - 539:16
**single** [7] - 497:7,
497:9, 506:13,
515:10, 543:14,
544:20, 544:22
**sit** [2] - 557:19, 588:20
**siting** [1] - 540:16
**sitting** [2] - 550:16,
585:5
**situation** [8] - 482:8,
489:19, 490:7,
493:22, 494:7,
525:7, 544:14,
580:19
**situations** [1] - 478:4
**six** [11] - 448:11,
536:8, 546:7, 547:4,
547:5, 550:6,
564:24, 574:24,
574:25, 588:21
**skewer** [3] - 471:24,
471:25, 473:19
**skill** [6] - 479:23,
479:24, 480:2,
517:11, 519:15,
525:4
**skip** [1] - 535:25
**slams** [1] - 498:15
**sleeping** [1] - 474:9
**slide** [5] - 538:16,
555:1, 555:6,
568:22, 584:21
**slides** [3] - 456:2,
561:9, 564:18
**slightly** [5] - 480:24,
551:8, 551:9, 552:6,
579:11
**slow** [1] - 457:17
**slows** [1] - 563:5

**small** [6] - 500:16,
574:17, 577:11,
577:12, 578:19,
582:18
**smaller** [1] - 515:7
**Smith** [1] - 469:17
**snow** [3] - 511:4,
511:6, 511:7
**social** [1] - 589:21
**societies** [1] - 469:10
**Society** [1] - 469:13
**socket** [2] - 471:18,
472:8
**soft** [1] - 474:11
**sole** [2] - 506:19,
513:11
**solely** [3] - 507:4,
509:23, 591:12
**someone** [7] - 458:23,
523:23, 540:25,
555:18, 559:5,
573:13, 589:11
**sometimes** [7] -
454:10, 454:11,
456:22, 537:8,
538:7, 538:12,
550:9, 550:21,
562:11, 593:4
**somewhere** [3] -
472:18, 537:23,
541:20
**soon** [5] - 462:7,
463:11, 561:2,
575:25, 581:25
**SOP** [5] - 457:4, 457:6,
457:11, 566:15
**SOPs** [10] - 458:11,
565:2, 565:3,
565:23, 565:25,
566:4, 566:10,
566:11, 566:13,
581:14
**sorry** [23] - 449:24,
455:25, 457:10,
460:2, 466:19,
467:20, 475:20,
484:21, 488:13,
488:19, 489:16,
491:12, 492:5,
493:5, 493:6, 501:6,
503:15, 504:2,
531:8, 539:24,
554:1, 577:25, 596:4
**sort** [9] - 461:7,
463:24, 479:1,
479:12, 482:18,
485:7, 500:23,
528:12, 550:24
**sought** [1] - 487:1
**sound** [2] - 449:2,

517:17
**sounds** [2] - 452:6,
551:15
**source** [1] - 559:6
**South** [1] - 541:17
**span** [1] - 479:15
**speaking** [1] - 470:9
**specialized** [2] -
479:24, 517:8
**specialty** [1] - 467:24
**specific** [7] - 448:14,
505:21, 518:14,
563:23, 569:12,
589:7
**specifically** [1] -
496:24
**speculate** [2] - 495:25,
560:20
**speculation** [1] -
510:2
**speculative** [1] -
527:10
**speed** [8] - 443:18,
443:22, 443:24,
449:24, 450:18,
450:20, 450:21,
450:23
**spelled** [1] - 481:15
**split** [4] - 491:5,
499:20, 502:11,
593:12
**spokesperson** [1] -
589:7
**sports** [1] - 468:20
**Square** [19] - 456:12,
495:2, 495:9, 497:9,
497:14, 498:25,
518:19, 540:2,
540:14, 540:15,
541:3, 541:4,
541:12, 557:13,
569:13, 569:14,
574:24, 575:2, 575:6
**Square..** [1] - 540:6
**squarely** [1] - 564:5
**stable** [1] - 472:10
**Stacy** [1] - 539:2
**stage** [2] - 476:18,
495:17
**stake** [1] - 551:14
**stand** [32] - 441:10,
441:23, 442:5,
446:13, 449:19,
451:9, 454:3, 458:6,
463:11, 475:14,
475:16, 503:5,
508:15, 513:20,
548:24, 552:22,
558:3, 561:17,
562:10, 564:22,

569:17, 569:18,
571:15, 571:16,
581:2, 581:6,
582:18, 584:19,
588:18, 591:18,
593:24, 595:12
**standalone** [1] -
479:12
**standard** [77] - 454:6,
457:16, 482:17,
483:2, 484:3, 493:9,
494:4, 494:10,
494:11, 497:22,
502:8, 504:25,
521:11, 521:15,
521:16, 521:19,
521:20, 521:21,
521:23, 529:25,
530:2, 530:8,
530:11, 530:12,
530:16, 530:24,
531:1, 531:13,
531:19, 532:3,
532:5, 532:13,
535:10, 535:14,
536:15, 536:25,
537:4, 537:19,
538:18, 544:4,
544:6, 544:7,
544:19, 544:21,
550:20, 557:15,
557:23, 563:20,
563:24, 563:25,
564:3, 565:3, 565:4,
565:5, 565:7, 566:3,
566:7, 566:17,
567:8, 567:14,
567:17, 567:20,
567:21, 567:23,
568:5, 568:7,
581:11, 581:15,
585:13, 585:15,
585:21, 585:23,
586:2, 595:16,
595:20
**standards** [2] - 519:1,
521:13
**standing** [14] - 446:15,
460:25, 461:12,
461:18, 467:5,
508:14, 522:15,
546:2, 557:5, 557:6,
557:8, 571:15,
575:20, 587:7
**stands** [1] - 569:8
**start** [3] - 461:6,
500:18, 505:20
**started** [5] - 446:9,
464:4, 497:11,
556:5, 587:25

**starting** [1] - 440:5
**starts** [2] - 493:19,
544:24
**Starts** [1] - 502:19
**state** [7] - 467:15,
506:4, 506:10,
507:5, 515:1,
517:12, 529:23
**statement** [29] - 509:7,
515:25, 516:3,
516:4, 516:5, 516:8,
516:9, 516:11,
516:15, 516:16,
516:17, 516:18,
516:25, 517:1,
517:3, 537:7,
558:13, 558:22,
559:2, 559:14,
559:15, 559:17,
559:24, 561:6,
573:9, 583:19,
583:20, 585:1
**statements** [6] -
509:23, 510:10,
510:11, 515:23,
527:21, 583:2
**STATES** [2] - 438:1,
438:11
**States** [4] - 524:1,
564:13, 565:6,
598:19
**station** [34] - 441:22,
445:25, 447:21,
448:21, 448:23,
448:24, 448:25,
453:3, 453:7,
453:22, 453:23,
456:11, 459:23,
462:1, 462:7,
492:25, 493:24,
494:7, 494:20,
494:23, 498:24,
502:23, 536:21,
541:4, 541:19,
541:20, 542:5,
542:14, 545:15,
563:3, 569:19,
576:10, 588:13
**stations** [4] - 447:9,
574:23, 574:24,
574:25
**statistical** [4] - 524:3,
524:5, 524:8, 555:18
**statute** [1] - 492:4
**stay** [7] - 573:14,
573:16, 573:18,
594:9, 594:11,
594:17
**stayed** [3] - 468:13,
539:21, 539:24

**stays** [1] - 471:25
**stenographic** [1] -
598:13
**Step** [2] - 456:10,
456:19
**step** [4] - 456:14,
456:16, 467:4,
476:21
**stick** [6] - 451:15,
451:22, 458:9,
529:8, 594:15,
597:15
**stiffness** [1] - 547:12
**still** [7] - 444:16,
452:15, 468:24,
502:17, 558:1,
559:19, 586:23
**stipulate** [1] - 517:24
**stipulated** [4] -
479:14, 509:19,
509:21, 523:25
**stipulation** [6] -
445:11, 445:13,
466:15, 478:17,
479:16, 517:25
**stipulations** [2] -
478:17, 517:24
**stood** [5] - 537:6,
540:22, 541:21,
557:3, 557:4
**stop** [34] - 443:12,
443:19, 443:24,
448:22, 449:5,
449:11, 449:17,
450:1, 450:2, 450:7,
450:9, 450:22,
451:4, 456:14,
460:21, 497:8,
497:9, 497:14,
498:24, 518:19,
541:20, 563:5,
568:25, 570:7,
570:8, 570:17,
570:18, 571:14,
571:21, 573:22,
574:2, 574:3, 575:3,
576:15
**stopped** [36] - 451:10,
462:1, 462:6,
465:15, 468:25,
492:21, 494:20,
495:2, 495:11,
495:18, 495:19,
497:14, 502:23,
536:21, 541:4,
541:12, 541:24,
545:2, 545:4, 545:5,
545:11, 545:15,
553:4, 557:12,
558:3, 569:13,

569:19, 573:12,
575:6, 576:7, 576:9,
576:11, 580:5,
588:13
**stopping** [6] - 442:25,
459:22, 493:24,
518:18, 579:22,
580:1
**Stops** [1] - 502:19
**stops** [26] - 441:22,
444:4, 446:1,
449:13, 455:3,
455:4, 457:25,
458:13, 462:11,
462:25, 463:10,
493:19, 494:7,
494:8, 496:10,
497:21, 541:7,
541:9, 544:24,
545:25, 563:11,
569:2, 570:5, 570:6,
574:1, 574:25
**straightforward** [3] -
593:3, 593:7, 593:17
**streamlining** [1] -
476:25
**Street** [1] - 438:14
**stricken** [4] - 485:18,
509:8, 509:13
**strike** [5] - 450:1,
485:5, 540:25,
543:18, 560:19
**striking** [1] - 487:19
**strong** [1] - 591:17
**stronger** [1] - 472:9
**struck** [1] - 539:15
**stuck** [2] - 548:25,
549:2
**stuff** [1] - 442:12
**stylistic** [1] - 500:23
**subject** [4] - 513:19,
516:8, 516:13,
526:14
**submission** [1] -
493:14
**submit** [19] - 471:5,
535:12, 535:16,
535:21, 536:1,
536:3, 537:9,
563:15, 565:8,
566:6, 567:22,
568:10, 569:3,
572:17, 573:4,
580:2, 580:18,
581:14, 583:13
**submitted** [2] -
486:24, 559:18
**subsequent** [2] -
470:13, 503:7
**substance** [2] -

481:10, 481:12
**substantial** [4] -
519:21, 520:3,
520:6, 526:17
**substantially** [1] -
456:22
**substantive** [1] -
500:24
**substitute** [1] - 484:4
**subway** [8] - 536:21,
537:22, 542:12,
544:25, 546:5,
585:8, 585:22,
585:25
**succeeded** [1] -
512:10
**successful** [2] -
548:12, 548:13
**Sudden** [1] - 502:19
**sudden** [5] - 493:19,
493:25, 503:10,
540:2, 557:12
**suddenly** [1] - 518:20
**sued** [1] - 507:10
**suffer** [6] - 474:18,
486:14, 523:19,
525:15, 526:1,
553:13
**suffered** [6] - 486:1,
518:23, 519:3,
526:1, 526:3, 546:18
**sufficient** [2] - 517:16,
581:12
**suggest** [4] - 508:5,
508:6, 558:22,
568:11
**suggested** [2] -
482:15, 573:9
**suggesting** [1] - 484:7
**suggestion** [2] -
504:1, 569:7
**suggestions** [1] -
528:15
**suing** [1] - 538:16
**Suite** [2] - 438:14,
438:19
**summarize** [3] -
504:20, 561:6,
561:13
**summarized** [1] -
563:16
**summary** [12] -
492:13, 492:18,
492:19, 493:2,
494:2, 494:24,
495:7, 495:17,
496:1, 496:2, 499:4,
502:20
**super** [1] - 552:22
**superintendent** [1] -

448:5
**supervisor** [4] - 448:5, 454:15, 573:14
**support** [2] - 465:22, 568:3
**supporting** [2] - 517:17, 576:13
**supposed** [7] - 449:5, 451:19, 457:24, 472:3, 538:12, 546:2, 587:23
**surgeon** [8] - 467:25, 473:25, 548:4, 549:13, 549:14, 582:8, 582:14, 582:15
**surgeons** [2] - 582:4, 582:12
**Surgeons** [1] - 469:11
**surgery** [15] - 468:15, 468:16, 468:25, 471:3, 471:6, 471:10, 474:4, 475:8, 476:3, 548:5, 549:4, 550:1, 583:17
**surgery's** [1] - 549:19
**surgical** [2] - 582:10, 583:17
**surprising** [1] - 574:1
**surrender** [1] - 591:11
**suspect** [1] - 551:1
**sustained** [5] - 509:2, 509:12, 525:22, 577:19, 578:21
**Swain** [13] - 539:2, 539:19, 539:25, 540:19, 540:25, 542:9, 550:16, 557:4, 570:14, 570:18, 571:9, 586:6, 588:1
**Swain's** [1] - 572:23
**swears** [1] - 518:3
**sworn** [5] - 446:15, 506:7, 508:11, 509:18, 540:8
**Sworn** [2] - 446:18, 467:11
**sympathetic** [1] - 580:24
**sympathy** [3] - 507:3, 508:10, 581:8
**synonymous** [3] - 531:2, 531:23, 552:6
**system** [8] - 444:3, 444:17, 448:22, 508:8, 562:3, 562:10, 565:9, 565:14

**system's** [2] - 554:24, 588:4
**systems** [2] - 564:11, 564:13

**T**

**table** [1] - 478:1
**tables** [3] - 479:15, 523:25
**taker's** [1] - 590:9
**talks** [1] - 496:24
**taught** [3] - 448:17, 468:18, 468:19
**taxation** [1] - 526:14
**teach** [1] - 468:24
**technical** [2] - 472:7, 517:8
**tends** [1] - 445:3
**term** [3] - 507:7, 507:11, 512:18
**terms** [3] - 449:14, 550:24, 569:21
**test** [2] - 475:11, 494:17
**testified** [14] - 456:11, 492:20, 492:22, 514:1, 515:16, 568:15, 568:17, 569:18, 572:25, 575:19, 576:6, 579:25, 582:4, 585:14
**testifies** [1] - 516:24
**testify** [10] - 443:11, 517:12, 518:12, 537:11, 541:1, 564:2, 567:10, 567:17, 570:7, 583:10
**testifying** [3] - 515:4, 539:16, 581:12
**Testimony** [1] - 482:13
**testimony** [90] - 455:13, 466:4, 466:7, 471:9, 476:9, 476:12, 478:18, 479:16, 482:15, 483:12, 483:13, 484:22, 492:16, 494:24, 494:25, 495:1, 495:18, 495:21, 496:15, 499:4, 506:22, 509:9, 509:18, 510:25, 511:5, 511:6, 513:9, 513:14, 513:15, 514:7, 514:9, 514:14, 514:16,

515:7, 515:8, 515:9, 515:14, 515:15, 515:21, 515:24, 516:1, 516:4, 516:6, 516:19, 516:22, 517:4, 518:2, 518:8, 518:9, 518:10, 518:12, 524:17, 524:18, 524:20, 539:5, 540:8, 542:22, 548:11, 561:23, 563:1, 563:17, 564:21, 566:14, 566:21, 568:2, 568:14, 569:3, 569:5, 570:15, 570:22, 570:24, 571:2, 571:4, 571:6, 572:20, 572:21, 572:22, 572:23, 573:7, 573:12, 573:22, 575:3, 576:8, 580:6, 580:15, 583:5, 585:15, 586:13, 586:14, 588:1
**testimony's** [1] - 483:15
**TFN** [1] - 473:22
**thanking** [1] - 583:19
**THE** [253] - 438:1, 438:1, 438:11, 440:2, 440:10, 440:16, 440:21, 440:25, 441:2, 441:5, 441:11, 441:17, 442:1, 442:14, 443:3, 443:6, 443:10, 444:1, 444:5, 444:13, 444:18, 444:22, 445:2, 445:5, 445:13, 445:19, 445:21, 446:6, 446:9, 446:14, 446:17, 454:23, 455:15, 455:19, 456:9, 457:2, 459:6, 459:8, 460:1, 460:2, 460:5, 465:3, 465:9, 466:2, 466:3, 466:5, 466:6, 466:11, 466:18, 466:20, 466:23, 467:2, 467:4, 467:7, 467:8, 467:9, 470:9, 471:8, 473:11, 476:8, 476:10, 476:11, 476:13, 476:16, 476:18,

477:15, 477:20, 477:25, 478:21, 479:7, 479:10, 479:20, 479:22, 480:6, 480:9, 480:11, 480:17, 480:19, 481:6, 481:9, 481:18, 481:23, 482:10, 482:22, 482:25, 483:7, 483:10, 483:18, 483:23, 484:1, 484:6, 484:17, 484:23, 485:1, 485:5, 485:15, 485:19, 485:21, 486:5, 486:11, 486:19, 486:22, 487:2, 487:7, 487:11, 487:15, 487:25, 488:6, 488:13, 488:24, 489:2, 489:6, 489:9, 489:13, 489:17, 489:24, 490:13, 490:20, 491:2, 491:7, 491:11, 491:15, 491:19, 491:23, 492:3, 492:6, 492:9, 493:5, 493:7, 493:10, 493:14, 493:19, 494:2, 494:14, 494:21, 495:5, 495:20, 495:23, 496:2, 496:5, 497:1, 497:20, 498:10, 499:2, 499:8, 499:15, 499:22, 499:25, 500:4, 500:8, 500:11, 500:14, 500:16, 500:20, 500:22, 501:6, 501:12, 501:14, 501:19, 503:13, 503:17, 503:19, 503:23, 504:4, 504:10, 504:14, 504:16, 504:21, 505:7, 505:11, 528:1, 528:5, 528:8, 529:2, 529:7, 529:12, 529:18, 529:21, 530:5, 530:14, 530:19, 530:22, 530:25, 531:3, 531:6, 531:15, 531:18, 531:24, 532:11, 532:16,

532:21, 533:2, 534:2, 534:4, 534:6, 534:11, 543:19, 548:2, 553:25, 554:2, 558:8, 558:12, 558:19, 558:24, 559:3, 559:7, 559:11, 559:16, 559:19, 560:3, 560:5, 560:14, 560:16, 561:8, 579:1, 579:3, 579:5, 584:5, 584:11, 584:14, 588:24, 594:14, 594:17, 594:19, 594:22, 594:24, 595:1, 595:3, 595:6, 595:7, 595:17, 595:18, 595:22, 595:23, 596:1, 596:2, 596:8, 596:9, 596:11, 596:12, 596:15, 596:18, 596:20, 596:22, 596:24, 597:1, 597:3, 597:5, 597:7, 597:8, 597:21, 598:1, 598:3
**themselves** [4] - 465:22, 514:20, 559:23, 587:13
**Theobald** [1] - 469:17
**therapists** [2] - 547:25, 559:10
**therapy** [3] - 475:1, 475:3, 475:4
**therefore** [2] - 524:13, 524:23
**they've** [6] - 442:12, 541:8, 552:17, 557:25, 558:5, 559:21
**thickening** [1] - 472:9
**thigh** [1] - 471:17
**thinking** [4] - 461:19, 472:22, 496:1, 542:15
**third** [5] - 485:16, 485:19, 519:6, 534:20, 549:5
**thirds** [1] - 479:2
**thoroughly** [1] - 591:4
**thoughts** [1] - 534:19
**thousands** [1] - 573:25
**three** [13] - 479:2, 519:4, 534:15, 543:5, 555:3, 555:22, 556:5,

623

564:14, 582:4,
582:11, 582:14,
586:23, 588:19
**throughout** [3] -
468:17, 565:6,
589:19
**thrown** [1] - 540:23
**thumb** [2] - 592:12,
594:5
**thump** [1] - 540:7
**timer** [2] - 441:25,
460:18
**tinker** [1] - 501:15
**tipping** [1] - 552:6,
579:11
**tips** [3] - 551:8, 551:9,
572:15
**tired** [1] - 538:2
**tissues** [1] - 474:11
**title** [1] - 467:22
**today** [13] - 442:3,
448:14, 479:1,
482:21, 536:3,
539:6, 542:4,
549:10, 549:11,
552:25, 568:12,
594:8, 597:14
**together** [2] - 471:24,
472:12
**tomorrow** [2] - 538:3,
556:9
**took** [8] - 441:15,
495:7, 507:2, 524:2,
541:16, 545:20,
548:9, 588:21
**top** [6] - 471:25, 474:8,
484:2, 487:14,
538:5, 549:1
**tops** [1] - 441:21
**total** [2] - 500:5, 556:7
**totally** [1] - 444:11
**touching** [1] - 582:2
**tough** [1] - 556:4
**toward** [1] - 514:3
**towards** [4] - 442:5,
463:20, 463:24,
503:5
**track** [4] - 443:13,
443:16, 443:18,
545:5
**tracks** [1] - 511:7
**trade** [4] - 554:12,
554:18, 554:20
**traffic** [2] - 447:9,
447:22
**Train** [3] - 457:21,
495:8, 538:6
**train** [193] - 441:22,
442:21, 442:25,
443:16, 443:21,

444:2, 445:25,
446:1, 447:21,
448:4, 448:21,
448:22, 449:10,
449:11, 449:13,
449:17, 449:20,
449:23, 449:25,
450:2, 450:6, 450:7,
450:20, 450:21,
450:23, 451:1,
451:4, 451:9,
451:10, 451:11,
451:13, 452:4,
453:22, 454:2,
454:3, 454:19,
455:3, 455:4, 455:5,
455:6, 456:14,
457:12, 457:25,
458:1, 458:2, 458:4,
458:12, 459:21,
460:13, 460:20,
460:23, 460:25,
461:8, 461:14,
461:19, 461:25,
462:6, 462:11,
462:16, 462:25,
463:9, 463:16,
463:21, 465:15,
484:4, 484:11,
485:24, 486:7,
486:9, 492:21,
492:22, 492:24,
494:7, 494:19,
495:1, 495:3,
495:11, 495:18,
495:19, 496:8,
496:10, 496:14,
496:17, 497:8,
497:11, 497:14,
497:21, 497:23,
498:5, 498:7,
498:23, 502:23,
518:17, 518:18,
518:20, 518:21,
522:15, 525:2,
525:3, 532:2,
536:17, 536:21,
536:22, 538:9,
539:3, 540:1, 540:4,
540:10, 540:11,
541:7, 541:11,
541:19, 541:21,
541:23, 541:25,
542:1, 542:5, 542:6,
542:25, 544:16,
544:25, 545:2,
545:3, 545:4, 545:6,
545:15, 545:16,
545:25, 550:22,
552:10, 553:4,
556:14, 557:8,

557:12, 557:14,
558:3, 562:19,
563:2, 563:5,
563:11, 563:13,
568:19, 568:20,
569:2, 569:13,
569:16, 569:18,
569:20, 570:3,
570:4, 570:5, 570:7,
570:8, 570:13,
571:16, 571:21,
573:1, 573:12,
573:18, 574:25,
575:1, 575:5, 575:9,
575:16, 575:22,
576:9, 576:15,
579:21, 579:22,
579:23, 580:5,
581:24, 585:23,
586:19, 587:4,
587:6, 588:13,
588:14, 595:15
**training** [8] - 447:5,
447:7, 447:19,
447:20, 448:6,
468:10, 517:11
**trains** [19] - 443:12,
443:22, 443:24,
444:16, 447:9,
449:5, 450:6, 450:9,
459:22, 537:2,
545:8, 545:18,
562:23, 567:1,
571:17, 573:22,
579:22, 580:1
**Trains** [1] - 458:6
**transcript** [2] - 598:13,
598:14
**TRANSCRIPT** [1] -
438:10
**Transit** [2] - 440:4,
440:14
**TRANSIT** [1] - 438:7
**transit** [15] - 562:2,
562:3, 562:10,
564:11, 564:13,
564:23, 565:6,
565:9, 565:14,
565:18, 565:19,
565:23, 566:11,
567:2, 579:20
**transitioned** [1] -
448:4
**translated** [1] - 474:11
**transportation** [4] -
524:22, 543:22,
543:24, 566:6
**traveling** [1] - 571:17
**travels** [1] - 574:23
**treat** [1] - 506:12,

516:9, 516:10,
516:15
**treated** [4] - 471:22,
508:16, 548:5,
549:13
**treating** [1] - 549:15
**treatment** [6] - 470:10,
470:11, 470:24,
472:24, 473:4,
474:21
**Trendelenburg** [1] -
475:12
**trespass** [1] - 561:14
**trial** [21] - 492:16,
495:21, 497:8,
507:6, 507:20,
507:22, 508:17,
509:17, 515:20,
516:2, 518:3, 518:7,
524:16, 528:19,
561:22, 572:21,
576:8, 589:19,
589:24, 597:11
**TRIAL** [1] - 438:10
**tricky** [1] - 528:15
**tried** [3] - 478:8,
504:22, 594:15
**trip** [1] - 546:8
**true** [12] - 509:16,
512:5, 512:16,
514:8, 520:4, 560:5,
568:13, 568:23,
572:10, 579:14,
598:12, 598:14
**trust** [2] - 529:8, 584:2
**truth** [9] - 512:9,
513:16, 513:24,
514:16, 515:1,
515:10, 516:25,
517:2, 518:4
**truthful** [3] - 513:21,
539:17, 541:1
**truthfulness** [1] -
516:6
**try** [6] - 520:25, 550:7,
550:8, 558:3,
585:13, 590:15
**trying** [3] - 489:11,
530:19, 583:22
**tunnel** [3] - 541:7,
541:9, 541:20
**turning** [2] - 447:10,
447:22
**turns** [1] - 528:14
**two** [36] - 447:24,
459:14, 464:2,
464:6, 464:10,
464:13, 470:20,
471:18, 472:18,
479:2, 482:20,

482:24, 486:2,
486:20, 487:14,
490:7, 490:18,
491:6, 500:24,
510:23, 511:24,
520:1, 522:7, 522:8,
522:24, 524:17,
530:4, 530:17,
536:3, 538:14,
555:3, 557:7,
558:12, 566:8,
574:8, 578:9
**two-thirds** [1] - 479:2
**type** [1] - 465:18
**types** [3] - 471:19,
510:23, 511:9
**typos** [2] - 500:16,
532:21

## U

**U.S** [1] - 438:23
**ultimately** [4] - 548:8,
560:18, 560:21,
583:12
**unanimous** [3] -
590:23, 592:9, 595:5
**unavoidable** [1] -
544:25
**uncommon** [1] -
573:22
**unconvinced** [2] -
494:18, 502:21
**undeniably** [1] -
577:19
**under** [25] - 442:25,
447:8, 447:18,
447:19, 459:23,
477:18, 482:8,
483:4, 497:18,
498:11, 516:8,
516:13, 518:3,
519:16, 525:1,
525:5, 525:6,
529:16, 544:12,
562:20, 565:15,
566:16, 573:3,
590:20
**underdelivered** [1] -
563:18
**understood** [2] -
461:1, 522:23
**undisputed** [9] -
497:16, 498:18,
509:21, 518:1,
537:12, 537:13,
537:14, 538:22
**unexpected** [1] -
582:25
**union** [2] - 566:25,
567:6

**UNISON** [1] - 446:8
**United** [4] - 524:1, 564:13, 565:6, 598:19
**UNITED** [2] - 438:1, 438:11
**unless** [5] - 470:17, 507:18, 510:16, 520:15, 593:2
**unnatural** [1] - 556:12
**unnecessary** [1] - 503:6
**unreasonable** [3] - 442:4, 557:9, 588:3
**unreasonableness** [1] - 514:6
**unsafe** [2] - 587:6, 587:9
**unsupported** [1] - 521:16
**unusual** [1] - 494:16
**unwarned** [1] - 546:7
**up** [72] - 441:15, 442:5, 451:15, 460:25, 464:8, 464:13, 467:5, 467:8, 471:17, 475:18, 478:3, 478:9, 482:18, 487:21, 495:10, 495:11, 503:5, 504:21, 505:2, 510:8, 522:15, 532:25, 537:6, 538:5, 539:8, 539:10, 540:14, 540:20, 540:22, 541:13, 541:21, 542:15, 545:23, 546:3, 546:13, 547:3, 553:1, 557:3, 557:4, 557:5, 557:6, 557:8, 557:21, 558:3, 560:21, 561:17, 562:11, 562:15, 568:22, 569:15, 570:2, 571:22, 575:12, 576:12, 576:13, 576:17, 576:23, 577:24, 580:3, 580:4, 580:9, 582:15, 584:10, 584:22, 587:7, 588:2, 589:9, 589:15, 592:3, 593:24
**uphold** [1] - 577:23
**USC** [1] - 468:18
**useful** [3] - 591:16,

591:22, 591:25
**uses** [2] - 519:14

**V**

**VA** [1] - 438:20
**value** [4] - 506:25, 554:12, 554:18
**vantage** [1] - 498:21
**variant** [1] - 491:24
**variety** [4] - 451:3, 469:13, 562:12, 565:10
**various** [3] - 536:9
**vehicle** [3] - 502:25, 503:1, 503:3
**verdict** [54] - 488:4, 488:23, 490:12, 500:19, 500:24, 504:19, 506:8, 507:2, 507:15, 508:11, 508:13, 515:15, 522:9, 529:20, 532:19, 535:3, 546:24, 552:9, 553:24, 556:11, 577:20, 578:9, 578:22, 581:8, 581:22, 584:3, 589:10, 590:23, 591:12, 591:19, 592:6, 592:7, 592:8, 592:15, 593:9, 593:10, 593:13, 593:14, 593:24, 594:1, 594:9, 594:20, 595:5, 595:9, 596:16, 596:18, 596:20, 596:22, 596:24, 597:1, 597:3, 597:6, 597:9
**version** [11] - 444:10, 457:6, 457:11, 457:13, 458:8, 499:9, 502:15, 504:23, 513:1, 529:25, 569:17
**veterans** [1] - 583:11
**Veterans** [1] - 548:7
**via** [1] - 590:13
**video** [29] - 441:13, 441:17, 441:21, 442:6, 442:7, 442:12, 442:18, 442:19, 442:23, 442:25, 444:5, 444:15, 445:23, 459:10, 459:17, 459:21, 463:8,

465:14, 478:25, 479:10, 479:12, 545:19, 545:20, 549:20, 552:25, 571:11, 571:12
**Video** [6] - 444:21, 459:20, 460:16, 461:9, 464:1, 464:19
**videotape** [1] - 518:8
**Vienna** [1] - 574:23
**view** [3] - 444:9, 506:8, 582:23
**views** [1] - 589:15
**violate** [2] - 506:7, 558:1
**violated** [2] - 538:17, 557:25
**violating** [1] - 492:3
**violation** [2] - 508:11, 586:4
**violent** [2] - 540:9, 540:21
**violently** [4] - 540:3, 540:5, 540:16, 541:15
**visible** [2] - 456:2, 456:7
**visual** [2] - 455:13, 550:24
**vitally** [1] - 583:24
**voice** [1] - 591:17
**voluntarily** [2] - 522:24, 579:15
**vote** [2] - 591:7, 591:23
**voting** [1] - 590:22

**W**

**wait** [7] - 451:22, 456:16, 530:14, 566:2, 587:5, 587:23, 587:24
**waited** [4] - 546:12, 575:10, 587:24
**waiting** [4] - 446:1, 546:1, 584:23
**waits** [1] - 441:22
**walk** [1] - 464:13
**walked** [1] - 464:8
**walking** [4] - 464:2, 464:11, 562:17, 588:9
**wants** [5] - 442:19, 536:22, 563:21, 564:7, 587:1
**warn** [8] - 455:6, 498:5, 498:6, 536:23, 541:25, 542:6, 542:16, 544:9

**warned** [1] - 458:19
**warning** [23] - 459:2, 493:25, 494:8, 495:12, 497:18, 497:21, 497:22, 497:23, 518:18, 535:11, 536:16, 537:14, 539:7, 543:6, 543:15, 544:22, 545:17, 552:11, 552:15, 557:16, 585:22, 586:5
**warning's** [1] - 545:13
**warrants** [1] - 535:12
**Washington** [9] - 438:4, 438:15, 438:24, 440:3, 440:13, 468:15, 469:5, 537:20, 598:21
**WASHINGTON** [1] - 438:6
**watch** [1] - 464:16
**watched** [1] - 479:1
**watching** [1] - 576:3
**WATERS** [137] - 438:18, 440:12, 440:19, 440:22, 441:1, 441:4, 441:7, 442:16, 443:4, 443:7, 443:15, 444:2, 444:14, 445:1, 445:3, 445:17, 446:4, 446:12, 446:20, 454:22, 455:18, 455:25, 456:6, 459:7, 465:11, 465:13, 465:25, 466:9, 466:14, 466:19, 466:22, 466:25, 476:7, 476:14, 477:16, 477:24, 479:8, 479:21, 480:10, 480:20, 481:4, 481:19, 482:2, 483:1, 483:8, 483:11, 483:24, 484:9, 484:21, 484:25, 485:4, 485:14, 485:16, 485:20, 486:3, 486:6, 486:18, 486:23, 487:24, 488:9, 488:15, 489:1, 489:4, 489:21, 490:5, 491:6, 491:8,

491:13, 492:2, 492:5, 492:8, 492:10, 493:6, 493:9, 493:12, 493:18, 494:12, 494:15, 494:22, 495:15, 495:21, 495:25, 496:4, 496:7, 498:19, 499:3, 500:2, 500:10, 500:12, 500:15, 500:17, 501:1, 501:7, 503:12, 503:15, 503:18, 503:20, 504:2, 504:8, 504:11, 504:15, 504:17, 505:4, 529:1, 529:3, 529:11, 529:13, 529:19, 529:23, 530:9, 530:18, 530:20, 530:23, 531:8, 531:12, 532:9, 532:15, 532:18, 532:24, 543:17, 547:1, 548:1, 558:17, 558:20, 559:6, 559:15, 559:25, 560:11, 560:24, 561:11, 579:2, 579:4, 579:6, 596:14, 597:24, 598:2, 598:5
**Waters** [28] - 440:13, 440:16, 440:18, 441:14, 446:10, 456:5, 465:9, 479:7, 479:20, 480:9, 480:19, 484:6, 484:20, 488:7, 500:1, 500:8, 528:20, 532:11, 537:6, 541:5, 542:10, 557:21, 560:23, 579:1, 584:16, 586:10, 596:13, 597:21
**Waters)**.................
.............**446** [1] - 439:4
**Waters)**.................
.............**465** [1] - 439:5
**ways** [1] - 562:12
**wayside** [1] - 450:25
**weak** [1] - 475:21
**weakness** [5] - 474:18, 475:8,

475:10, 475:24, 476:1
**website** [4] - 441:14, 442:13, 459:18, 545:21
**Wednesday** [2] - 438:5, 468:24
**week** [1] - 556:10
**weeks** [1] - 548:10
**weigh** [6] - 490:1, 511:13, 513:9, 522:11, 578:13, 578:18
**weighing** [2] - 507:12, 577:10
**weighs** [1] - 572:2
**weight** [15] - 483:12, 483:19, 506:25, 507:16, 511:10, 514:17, 515:2, 516:22, 517:22, 518:11, 524:20, 552:5, 571:3, 591:11
**welcome** [3] - 446:9, 534:6, 579:5
**well-being** [2] - 525:24, 547:14
**well-qualified** [1] - 582:4
**well-treated** [1] - 471:22
**West** [1] - 548:7
**Westpark** [1] - 438:19
**whichever** [1] - 482:11
**white** [1] - 464:20
**whiteboard** [1] - 455:13
**whole** [5] - 462:11, 468:8, 506:13, 549:3, 592:23
**WILD** [1] - 438:3
**Wild** [2] - 440:3, 518:15
**WILSON** [1] - 438:19
**wind** [1] - 560:21
**window** [7] - 451:16, 451:20, 451:22, 456:16, 463:24, 464:7, 464:17
**windows** [1] - 441:25
**Wisconsin** [2] - 468:13, 468:14
**wisdom** [1] - 506:5
**wish** [1] - 592:22
**WITNESS** [8] - 439:2, 446:17, 460:2, 466:2, 466:5, 467:7, 476:10, 476:13
**witness** [52] - 441:10, 445:12, 445:16,

445:23, 446:11, 455:14, 459:5, 465:8, 466:10, 467:1, 497:7, 497:10, 498:3, 507:21, 507:23, 508:19, 509:3, 510:16, 513:13, 513:17, 513:20, 513:21, 513:22, 513:23, 513:24, 514:1, 514:2, 514:7, 514:11, 514:14, 514:16, 515:10, 515:21, 515:25, 516:2, 516:3, 516:7, 516:11, 516:13, 516:20, 516:24, 517:10, 518:3, 518:12, 521:10, 528:22, 539:18, 541:6, 571:5, 584:19
**witness's** [8] - 513:15, 514:9, 514:15, 516:1, 516:17, 516:19, 517:1, 517:13
**witnessed** [1] - 539:21
**witnesses** [31] - 482:17, 483:14, 506:21, 508:7, 509:18, 509:24, 512:25, 513:10, 513:11, 515:4, 515:6, 515:7, 515:9, 515:16, 515:17, 517:5, 518:8, 524:17, 524:19, 528:11, 537:11, 539:13, 539:15, 541:6, 565:11, 571:8, 579:25, 586:13, 586:14
**witnesses'** [4] - 483:12, 483:13, 515:14, 517:14
**WMATA** [86] - 441:21, 442:2, 445:22, 445:23, 446:12, 447:3, 447:4, 447:18, 447:25, 448:1, 448:17, 463:9, 466:25, 482:4, 485:23, 497:24, 511:21, 511:24, 518:16, 518:17, 518:21, 519:2, 520:12, 521:25, 522:3, 522:5, 522:8, 522:9,

522:14, 522:21, 523:17, 523:20, 524:11, 524:13, 524:18, 524:19, 524:22, 524:24, 525:10, 526:12, 526:19, 528:17, 530:7, 530:16, 537:16, 538:1, 538:22, 539:1, 542:24, 543:9, 545:21, 550:7, 552:16, 557:2, 557:10, 557:22, 558:1, 564:6, 564:12, 564:14, 564:25, 566:10, 568:12, 570:24, 574:8, 577:14, 578:6, 578:9, 578:10, 578:13, 578:22, 582:1, 583:15, 586:1, 586:13, 586:14, 586:18, 587:22, 588:12, 595:15, 595:24, 596:3, 596:5
**WMATA's** [26] - 442:6, 457:4, 459:17, 463:8, 465:20, 486:13, 487:18, 494:3, 519:19, 521:18, 522:24, 523:4, 523:6, 523:20, 525:14, 525:19, 526:16, 531:20, 552:10, 564:4, 564:12, 565:2, 565:3, 581:21, 587:16, 587:18
**woman** [2] - 524:4, 577:18
**women** [1] - 556:5
**won** [1] - 469:16
**wonder** [1] - 491:5
**wondered** [1] - 571:19
**Wonderland** [1] - 585:18
**word** [8] - 462:8, 462:19, 485:17, 497:19, 532:10, 537:17, 559:9
**words** [13] - 454:9, 458:10, 507:13, 512:3, 512:24, 513:12, 514:24, 530:15, 554:11, 590:23, 591:10, 592:8, 597:13

**wordsmithing** [1] - 488:1
**works** [5] - 442:13, 543:5, 546:4, 546:5, 551:5
**world** [2] - 503:10, 583:6
**worth** [3] - 441:9, 508:15, 555:13
**worthy** [1] - 515:6
**wrapping** [1] - 580:9
**writing** [1] - 590:18
**written** [3] - 470:18, 505:15, 530:3
**wrongful** [3] - 487:18, 487:19, 556:12
**wrote** [3] - 498:4, 567:2, 567:7

### X

**x-rays** [3] - 472:6, 549:7, 549:8

### Y

**year** [4] - 470:19, 470:20, 472:18, 555:3
**years** [31] - 447:24, 447:25, 448:1, 448:11, 468:7, 468:12, 468:22, 472:18, 474:17, 524:4, 524:5, 543:4, 543:5, 547:11, 548:15, 549:15, 550:6, 555:3, 555:11, 555:17, 555:18, 555:23, 555:24, 556:3, 562:17, 574:3, 586:23, 588:21
**yesterday** [9] - 443:11, 445:11, 466:23, 536:14, 539:6, 541:5, 542:18, 542:23, 549:12
**York** [5] - 537:20, 544:1, 564:24, 566:11, 567:2
**younger** [1] - 482:14
**yourself** [4] - 447:2, 467:14, 494:13, 591:3
**yourselves** [2] - 440:6, 534:17

### Z

**ZAMBRI** [1] - 438:14

**zero** [2] - 450:21, 552:15
**Zoom** [1] - 548:10