## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAROL W. SCOTT,**<br>          **Plaintiff,**<br><br>**v.**<br><br>**WASHINGTON METROPOLITAN<br>AREA TRANSIT AUTHORITY,**<br>          **Defendant.** | **Case No.: 1:22-cv-00601 CRC** |

## DEFENDANT WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL

Defendant Washington Metropolitan Area Transit Authority ("WMATA"), by and through undersigned counsel, moves for judgment in favor of Defendant on Plaintiff's claim of negligence pursuant to Federal Rule of Civil Procedure 50 and, in the alternative, moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a). As grounds for this motion, Defendant asserts that both parties, having been heard fully on the matter, there is no sufficient evidentiary basis upon which a reasonable jury could find for Plaintiff on this claim. For the reasons stated in greater detail in the accompanying Memorandum, Defendant respectfully requests that this Motion be granted and that judgment be entered for Defendant, or in the alternative, that the Court grants a new trial.

Date: May 21, 2025

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,<br>EDELMAN & DICKER, LLP**

_/s/ Jason R. Waters_
Jason R. Waters, Esq. (D.C. Bar No.: 491066)
Lauren Gilman, Esq. (D.C. Bar.: 90008050)
8444 Westpark Drive - Suite 510
McLean, VA 22102-5102
Telephone: (703) 245-9300

Facsimile: (703) 245-9301
Jason.Waters@wilsonelser.com
Lauren.Gilman@wilsonelser.com

Patricia H. Beall, Esq. (D.C. Bar No.: 992515)
1500 K Street, NW, Suite 330
Washington, D.C. 20005
Telephone: (202) 626-7660
Facsimile: (202) 628-3606
Patricia.Beall@wilsonelser.com
*Counsel for Defendant Washington*
*Metropolitan Area Transit Authority*

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY**

*/s/ Laurie Hand*
Laurie Hand, Esq. (DC Bar No.: 435095)
Washington Metropolitan Area Transit Authority
Legal Department 7E
P.O. Box 23768
Washington, D.C. 20026
Telephone.: (202) 962-5063
Facsimile: (202) 962-2550
LAHand@wmata.com
*Counsel for Defendant Washington*
*Metropolitan Area Transit Authority*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of May, 2025 I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system.

*/s/ Jason R. Waters*

Jason R. Waters

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROL W. SCOTT,<br><br>           **Plaintiff,**<br><br>**v.**<br><br>WASHINGTON METROPOLITAN<br>AREA TRANSIT AUTHORITY,<br>           **Defendant.** | Case No.: 1:22-cv-00601 CRC |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE,
MOTION FOR A NEW TRIAL**

## I.      Background

On September 23, 2019, Plaintiff Carol Wild Scott sustained an injury while aboard a

WMATA Orange Line Train at the McPherson Square Station. Ms. Scott filed a Complaint on

March 4, 2022 alleging one count of negligence against the Washington Metropolitan Area

Transit Authority ("WMATA"). ECF 1. In particular, Ms. Scott alleged that WMATA breached its

duty of care "by failing to properly use the in-train communication devices to inform the

passengers when it is safe to get up from their seats and exit the WMATA Metro train in

question." ECF 1 ¶ 22(b).

Following discovery, WMATA moved for summary judgment arguing that there is no

evidence that the train's acceleration was anything more than a routine jerk which should be

expected while traveling on public transit, and as such, there is no evidence that the train was

operated in a negligent manner. ECF 24. The Court denied WMATA's motion for summary

judgment, finding that the "unusual and extraordinary force" test may not apply when passengers

are reasonably attempting to alight from a train that has stopped at a station. July 1, 2024 Mem.

Opinion and Order, ECF 34, at 9. In addition, the Court denied Plaintiff Scott's cross-motion

from summary judgment, finding that Dr. Carl Berkowitz's expert report failed to establish a

national standard of care. *Id.* at 14. On December 2, 2024, the Court briefly reopened discovery

to allow Plaintiff Scott to supplement her expert report.

Ultimately, a three-day jury trial was held on April 21, 2025 through April 23, 2025.

Following the close of Plaintiff's case-in-chief, Defendant WMATA moved for judgment as a

matter of law on the grounds outlined below. The Court took the motion under advisement,

reserved its ruling, submitted the case to the jury, and instructed WMATA that it was allowed to

renew its motion in the event of an adverse jury verdict. On April 23, 2025, the jury found

Defendant WMATA liable for negligence and made an award to Ms. Scott.

Defendant WMATA now renews its motion for judgment as a matter of law or, in the

alternative, moves for a new trial.

## II.    Legal Standard

### A.  Rule 50

Federal Rule of Civil Procedure 50(a) provides that after one party has fully presented its

case in a jury trial, the court may grant a motion for judgment as a matter of law if it finds that "a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that

issue." Fed. R. Civ. P. 50(a)(1). A party may move for judgment as a matter of law at any time

before the case goes to the jury. Fed. R. Civ. P. 50(a)(2). The court may defer ruling on the

motion and submit the case to the jury to render a verdict. Fed. R. Civ. P. 50(b). A party may file

a renewed motion for judgment as a matter of law within twenty-eight days after the entry of

judgment. *Id.* When presented with a Rule 50(b) motion, the court may "direct the entry of

judgment as a matter of law." Fed. R. Civ. P. 50(b)(3).

Although jury verdicts are not to be "lightly disturb[ed]," *McGill v. Muñoz*, 203 F. 843, 845 (D.C. Cir. 2000), such a motion should be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue," *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 149 (2000). A court ruling on a 50(b) motion "must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence." *Rice v. District of Columbia*, 818 F. Supp. 2d 47, 54 (D.D.C. 2011). But it must also "give credence to . . . evidence supporting the moving party that is uncontradicted and unimpeached, a[t] least to the extent that the evidence comes from disinterested witnesses." *Id.* (quoting *Reeves*, 530 U.S. at 151).

## B. Rule 59

Federal Rule of Civil Procedure 59 authorizes the Court to grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The D.C. Circuit has explained that a "jury verdict stands unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict." *Youssef v. F.B.I.*, 687 F.3d 397, 403 (D.C. Cir. 2012) (internal quotation marks and citations omitted). "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon*, Inc., 449 U.S. 33, 36 (1980); *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 646 (D.C. Cir. 1988) ("The decision whether to grant a motion for a new trial is ordinarily 'entrusted to the sound discretion of the trial court.'" (quoting *Grogan v. Gen. Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C. Cir. 1985))). "That authority is large," encompassing the district court's discretion "to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence," or if the verdict is excessive. *Gasperini v. Ctr.*

*for Humanities*, 518 U.S. 415, 433 (1996) (alteration in original; internal quotation and citations omitted).

A new trial is warranted if the trial error is not harmless. *Caudle v. Dist. of Columbia*, 707 F.3d 354, 359 (D.C. Cir. 2013) (citing *United States v. Whitmore*, 359 F.3d 609, 624 (D.C. Cir. 2004)). To determine whether an error is harmless, a court must:

> measure[ ] the harm in terms of whether the error had substantial and injurious effect or influence in determining the jury's verdict, not merely whether the record evidence is sufficient absent the error to warrant [the jury verdict]. Consequently, an evidentiary error is harmless if "(1) the case is not close, (2) the issue not central, or (3) effective steps were taken to mitigate the effects of the error."

*Ashcraft & Gerel v. Coady*, 244 F.3d 948, 953 (D.C. Cir. 2001)(citations omitted).

## III.    Argument

### A.  Plaintiff Did Not Establish a National Standard of Care

D.C. law required Plaintiff to establish a national standard of care. July 1, 2024 Mem. Opinion & Order, ECF 34, at 14-15 (citing Robinson v. WMATA, 941 F. Supp. 2d 61, 67 (D.D.C. 2013)). Operating a Metrorail train is not within a layperson's knowledge, as the average juror does not know how to start, drive, or stop a train. *See Frick v. Amtrak*, 54 F. Supp. 3d 1, 4 (D.D.C. 2014) (requiring expert testimony regarding whether a train's speed was "excessive" because "the standards governing the operation of [train operators] are distinctly related to an occupation that is 'beyond the ken of the average layperson'" (quoting *Robinson v. Wash. Metro. Area Transit Auth.*, 941 F. Supp. 3d 61, 67 (D.D.C. 2013)). Thus, Plaintiff here was required to establish the applicable national standard of care through expert testimony.

As this court discussed in *Montgomery v. Washington Metropolitan Area Transit Authority*, "jurors may have experience as train passengers, but their understanding of what is expected from a train operator would be speculation." *Montgomery v. Wash. Metro. Area Transit Auth.,* No. 23-463, 2025 U.S. Dist. LEXIS 42101, at *11 (D.D.C. March 6, 2025) (citing

*Tripmacher v. Starwood Hotels & Resorts*, 277 F. Supp. 3d 104, 109-10 (D.D.C. 2017) (requiring expert testimony on the standard of care where, "[w]ithout expert testimony, . . . the jury would be left with nothing but 'sheer speculation'")). WMATA's internal policies cannot provide the national standard of care—they may provide evidence of it, but on their own, they do not establish it. *Id.* at *12-13. In *Montgomery*, the court found that expert testimony is required to establish a national standard of care for announcements on trains. *Id.* at *6-11. The court clarified:

> "The D.C. Court of Appeals has required expert testimony in a number of cases that, on first blush, appear to be within the realm of common knowledge." *Briggs*, 481 F.3d at 845. Indeed, at first blush the issue of whether the train operator should have warned passengers of train movement could appear to be a matter of common sense. Yet it is important to consider the context here. This is a safety issue intertwined with the complicated job of running a metrorail train. Jurors do not routinely operate metrorail trains, let along [sic] grapple with safety issues involved in operating those trains. The need for expert testimony is particularly acute in cases involving safety standards.

*Id.* at *8(citations omitted).

In this case, while denying WMATA's Motion for Summary Judgment, the Court noted the D.C. Circuit Court's dicta "doubting whether safety standards for public transit are always 'outside the realm of common knowledge and everyday experience of average jurors.'" ECF 34 at 15 (citing *Robinson*, 744 F.3d at 39). "The Court agree[d] that, in some cases, jurors can decide whether a common carrier acted negligently without input from experts." ECF 34 at 15. This is not one of those cases. In *Robinson*, the D.C. Circuit Court was considering whether a bus driver should have checked his rearview mirror before starting the bus. *Robinson*, 744 F.3d at 40. While a juror is likely to have driven a care before and is familiar with the importance of checking one's rearview mirror, the average juror is not likely to have experience with operating a train and making announcements. While jurors may have enjoyed the benefits of traveling on Metrorail and the train's announcements, the operation of those services is outside the realm of

common knowledge. Therefore, expert testimony is required to establish a national standard of care regarding announcements on trains.

### i. Dr. Carl Berkowitz's Opinions Do Not Satisfy Federal Rule of Evidence 702.

At trial, Ms. Scott offered Dr. Carl Berkowitz as an expert in "transportation safety engineering with respect to whether the national standard of care requires Metro to provide a safety warning under the circumstances of Ms. Scott's injury on September 23, 2019." Ex. E, Testimony of Dr. Carl Berkowitz, Trial Tr. vol. 2 at 334:24-335:4. Dr. Berkowitz's testimony at trial demonstrated that his opinions do not satisfy the requirements of Federal Rule of Evidence 702. Rule 702 governs the admissibility of expert testimony. Rule 702 provides:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify . . . if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court identified various factors that can inform the reliability analysis under Rule 702. Those factors include whether the expert's "theory or technique" (i) "can be (and has been) tested," (ii) "has been subjected to peer review and publication," (iii) has a high "known or potential rate of error," and (iv) enjoys "'general acceptance' within a relevant scientific community." *Id.* at 593-94 (internal citation omitted). But the *Daubert* factors "do not constitute a definitive checklist or test" applicable in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Rather, under *Daubert*, courts have a "gatekeeping responsibility" of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Supreme Court stressed that "nothing in either *Daubert* or the Federal Rules of Evidence

requires a district court to admit opinion evidence that is connected to existing data only by the

*ipse dixit* of the expert." *Kumho*, 526 U.S. at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

146 (1997)).

In denying, in part, WMATA's motion to exclude Dr. Berkowitz as an expert, this Court

noted that

> "an expert may be qualified on the basis of his or her practical experience."
> *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 11 (D.D.C. 2011). "[I]f experience or
> training enables a proffered expert witness to form an opinion which would aid the
> jury, in the absence of some countervailing consideration, his testimony will be
> received." *Jenkins v. United States*, 307 F.2d 637, 644 (D.C. Cir. 1962).

ECF 52 at 5. However,

> "If the witness is relying solely or primarily on experience, then the witness must
> explain how that experience leads to the conclusion reached, why that experience
> is a sufficient basis for the opinion, and how that experience is reliably applied to
> the facts." Fed. R. Evid. 702 advisory committee's note (2000).

*Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 11 (D.D.C. 2011).

Dr. Berkowitz's reports and his testimony in this case did not provide a sufficient basis

for his findings and opinions. His reports included "facts" that are not from this incident,

misstated statutes and regulations, and overarchingly failed to provide specific citations or

references to the information on which he bases his opinions. *See, generally,* ECF 43. Despite

being instructed to bring "all documents he reviewed, referred to or relied upon in arriving at any

opinions or conclusions concerning the issues involved in the lawsuit, including, but not limited

to all scientific and technical articles, publications, codes, standards and other literature" to the

deposition, Dr. Berkowitz did not produce these documents and was unable to clarify the basis of

his expert testimony during his deposition beyond his own say-so. At trial, when asked again if

he examined the Standard Operating Procedures for the New York, Philadelphia, San Francisco,

Boston, and Chicago transit systems, all of which Dr. Berkowitz testified required train operators

make announcements every time they move the train, Dr. Berkowitz admitted that the only

operating procedures he reviewed were New York's and WMATA's. Ex. E, Trial Tr. vol. 2 at

355:9-359:7. Dr. Berkowitz could not connect his general experience to his specific opinion that

the other transit systems required announcements. Rather, his testimony clarified that his opinion

was based on his belief that WMATA, as a common carrier, is the guarantor of safety of

everybody in its transit system. Ex. E, Trial Tr. vol. 2 at 352:7-20. Instead of demonstrating

experience with each transit system, or specialized knowledge on standards while reberthing

trains, Dr. Berkowitz based his opinions on

> *a premise in engineering* that if there's a hazard, you have to eliminate it. If you
> can't eliminate it, then you have to remediate it. And if you can't remediate it,
> then you have to provide enough information so a person can personally protect
> themselves. And one way a person can protect themselves is by having
> information. And we know that announcements on the trains are very key to
> ensuring the safety of passengers on the train.

Ex. E, Trial Tr. vol. 2 at 337:21-338-4.

Dr. Berkowitz's explanations for the basis of his opinions on "whether the national

standard of care requires Metro to provide a safety warning under the circumstances of Ms.

Scott's injury on September 23, 2019" were wholly insufficient to satisfy the requirements of

Rule 702. Ex. E, Trial Tr. vol. 2 at 334:24-335:4.  As such, his opinions and testimony should not

be taken into consideration as a matter of law.

### ii.  Dr. Carl Berkowitz Did Not Establish a National Standard of Care

To establish a standard of care through expert testimony, the plaintiff's expert is required

to "identify a 'concrete [national] standard upon which a finding of negligence could be based.'"

*Robinson v. Wash. Metro. Area Transit. Auth.*, 858 F. Supp. 2d 33, 39 (D.D.C. 2012) (quoting

*District of Columbia v. Carmichael*, 577 A.2d 312, 315 (D.C. 1990) (noting expert must proffer

"a specific, articulable (and articulated) standard of care")). The expert must "clearly relate the

standard of care to the practices in fact followed by other comparable governmental facilities or to some standard nationally recognized by such units." *Id.* (quoting *Clark*, 708 A.2d 632, 635 (D.C. 1997)). "Neither personal opinions nor unsupported generalizations provide a permissible basis for the expert's articulation of the applicable standard of care." *Liser v. Smith*, 254 F. Supp. 2d 89, 103 (D. D.C. 2003).

At trial, Dr. Berkowitz provided an opinion on the national standard of care:

**Q.** Doctor, what is your opinion about what the national standard of care requires with respect to announcements under the circumstances in this case?

**A.** That you should always make an announcement to ensure that passengers are always safe.

**Q.** Okay.

**A.** Without exception.

Ex. E, Trial Tr. vol. 2 at 336:21-337:2.

Dr. Berkowitz did not establish that this standard of care was followed by other comparable transit systems. As an initial matter, according to Dr. Berkowitz, there are sixteen comparable subway systems in the United States. Ex. E, Trial Tr. vol. 2 at 331:2-14. Of those sixteen, Dr. Berkowitz asserted that this standard is followed by at least New York, Philadelphia, San Francisco, Boston, and Chicago. Ex. E, Trial Tr. vol. 2 at 355:9-359:7. In drawing this conclusion, Dr. Berkowitz spoke with Orlando Jimenez, a retired train operator for the New York City Transit System and a union representative, who provided copies of the New York Transit System Standard Operating Procedures. Ex. E, Trial Tr. vol. 2 at 341: 12-342:8. Despite WMATA continued requests for copies of all of the documents Dr. Berkowitz relied on, and specifically requesting the Standard Operating Procedures he relied on, he never provided New York's Standard Operating Procedures to WMATA. Additionally, these were not presented to the jury at trial. Dr. Berkowitz testified that he was unable to obtain the standard operating procedures for

Philadelphia, San Francisco, Boston, and Chicago. Ex. E, Trial Tr. vol. 2 at 355:9-359:7.

According to Dr. Berkowitz, this is because the operating procedures are proprietary information.

*Id.*

- Boston: Without reviewing the systems operating procedures, Dr. Berkowitz based his opinion that Boston adopted the purported national standard of care on his "own personal experience" where he "rode the trains quite a bit" and heard these types of announcements being made. Ex. E, Trial Tr. vol. 2 at 342:10-22. This is akin to a lay person's observation and understanding of train announcements, and insufficient as a factual basis for an expert opinion that the Boston transit system adopted a specific national standard of care that requires announcements.

- Chicago: Without reviewing the systems operating procedures, Dr. Berkowitz based his opinion that Chicago adopted his national standard of care on a conversation with "people at CTA" who were Orlando Jimenez's "counterpart at the CTA." Ex. E, Trial Tr. vol. 2 at 344:9-14. Essentially, Dr. Berkowitz based his opinion for Chicago on a single conversation with an unnamed retired union representative at CTA. This is also an insufficient factual basis for the expert opinion that the Chicago transit system adopted a specific national standard of care that requires announcements.

- San Francisco/BART: Without reviewing the systems operating procedures, Dr. Berkowitz based his opinion that San Francisco adopted his national standard of care on a conversation with a friend who "retired from them." Ex. E, Trial Tr. vol. 2 at 356:11-24. Dr. Berkowitz testified that the San Francisco system is

automated, which is different than the WMATA system, and did not provide any

factual basis for the expert opinion that the San Francisco transit system adopted a

specific national standard of care that requires announcements.

- <u>Philadelphia</u>: Dr. Berkowitz did not review Philadelphia's operating procedures
  and provided no testimony or support for his opinion the Philadelphia transit
  system adopted a specific national standard of care that requires announcements.
  Ex. E, Trial Tr. vol. 2 at 356:4-10.

Ultimately, Dr. Berkowitz admitted that he knew "that if Washington Metro and New

York City Transit both have the exact same documentation, that it's pretty guaranteed that all the

other systems are going to follow suit because New York City Transit and Washington Metro are

among the leaders in innovation in transportation." Ex. E, Trial Tr. vol. 2 at 344:18-22. Relying

on two transit systems out of sixteen is entirely insufficient to establish a *national* standard of

care. Dr. Berkowitz's testimony demonstrates a gross generalization of facts rather than an

expert's scientific, technical, or other specialized knowledge. Therefore, this Court should find

that Dr. Berkowitz did not establish a national standard of care. Because Ms. Scott did not

establish at trial a national standard of care that WMATA could have breached, Ms. Scott is

barred from relief and WMATA is entitled to judgment as a matter of law.

### iii.  Dr. Carl Berkowitz's Opinions at Trial Were Untimely

This Court previously found that Dr. Berkowitz's Rule 26 expert report did not establish a

national standard of care in ruling on the parties' motions for summary judgment. ECF 34 at 16.

In that report, Dr. Berkowitz failed to cite to other transit systems or their specific policies as part

of his requirement to set forth a national standard of care with respect to reberthing a train. After

the close of discovery, WMATA identified the insufficiencies in Dr. Berkowitz's report and

argued that Dr. Berkowitz did not establish a national standard of care. In response, Ms. Scott

then attached a supplemental affidavit from Dr. Berkowitz to her reply brief in support of her own motion for summary judgment. ECF 29 at 39-40. In this affidavit, Dr. Berkowitz stated, without support, that transit authorities in New York, Philadelphia, and Chicago adhere to the same standard of care that WMATA follows with respect to announcements when reberthing a train. *Id.* This Court found in its July 1, 2024, Memorandum Opinion and Order that his affidavit only highlighted that the initial report did not provide a concrete national standard of care from which to measure WMATA's actions. ECF 34 at 17-18. Over WMATA's objection, ECF 40, the Court granted Ms. Scott the opportunity to re-open discovery and submit a supplemental report. ECF 41.

Dr. Berkowitz submitted a supplemental report and asserted that the New York City Metropolitan Transportation Authority, Chicago Transit Authority, and Massachusetts Bay Transit Authority adhere to the same standards as WMATA for reberthing. *See* Dr. Berkowitz's Supp. Report, Ex. F at 8-10. However, Dr. Berkowitz failed to cite a single specific policy document from any of those transit systems in support of this assertion. He did not provide any excerpts or specific references to the operating procedures of any of the named transit systems, or any transit system. *Id.* During his deposition, Dr. Berkowitz testified, with respect to the New York City Transit, Massachusetts Bay Transit Authority and Chicago Transit Authority, that he did not consult any specific documents to prepare his supplemental report. Ex. G, Berkowitz Dep. at 147:3-11. Instead, he merely proffered that "there are documents, but I didn't refer to them because I was very familiar with their procedures," Ex. G at 139:17-140:2, or that he "remember[s] reading, you know, in the past various operating procedures and training manuals which also covered these areas which I couldn't get my hands on, couldn't find, but I do remember." Ex. G at 148:2-6.

At trial, this Court precluded Dr. Berkowitz from testifying about jerk rates, the OSH Act, any section of the United States Code that Dr. Berkowitz asserts establish common carrier duties, or hazard management. ECF 52 at 9. This effectively precluded all of Dr. Berkowitz's *timely* opinions in this matter. However, the Court allowed Dr. Berkowitz to testify about the policies of other transit systems. ECF 52 at 7-8. None of these opinions were identified to WMATA before the initial close of discovery. Dr. Berkowitz's trial testimony that he had read the New York standard operating procedures was further untimely and prejudicial as this constituted a new development since his deposition— about which WMATA was never informed. Ultimately, this Court only allowed Dr. Berkowitz to testify at trial about opinions that he failed to timely disclose in accordance with the Court's scheduling order and rules and that the Court allowed him to supplement, over Defendant's objection, after the close of discovery and after the parties filed and briefed summary judgment. WMATA was unfairly prejudiced by the Court's decision to allow Dr. Berkowitz to supplement his opinions in a way that substantively addressed the deficiency of his disclosure, and this error profoundly impacted the trial of this case. Therefore, WMATA is entitled to a new trial.

### iv. WMATA was Unfairly Precluded from Cross-Examining Dr. Berkowitz About Prior Testimony

In its Motion in Limine as to Plaintiff's Expert, Dr. Carl Berkowitz, ECF 42, WMATA cited a litany of cases in which his testimony was excluded, stricken, limited or criticized.  ECF 42 at 16-18. In denying-in-part WMATA's motion to prelude Dr. Berkowitz from testifying based on his deposition testimony and insufficient expert report, the Court stated that WMATA's concerns about the weak factual basis for Dr. Berkowitz's testimony is appropriately challenged on cross examination. ECF 52 at 6. At trial, Dr. Berkowitz was asked about his background testifying as an expert in other cases, Ex. E, Trial Tr. Vol. 2 at 325; 20-327:5, concluding with

the following exchange:

> Q. On how many occasions have you been retained as an expert on transportation safety issues in your career?
>
> A. Nationally? Internationally?
>
> Q. Career.
>
> A. A couple of hundred maybe. I don't keep track.
>
> Ex. E, Trial Tr. Vol. 2 at 327:1-5.

The Court prohibited WMATA from cross-examining Dr. Berkowitz, Ex. E, Trial Tr. vol. 2 at 302:18-23., about the many times "other Courts repeatedly have excluded him or limited him, characterized his testimony and his opinions as speculative and conclusory" despite WMATA's argument that it was "fair game for cross-examination in terms of his overall qualifications as an expert as well as his credibility as an expert."  Ex. E, Trial Tr. 298:6-10. As such, WMATA was unduly prejudiced by the Court's ruling curtailing this area of cross-examination. Ms. Scott was permitted to present Dr. Berkowitz's long career as an expert witness, bolstering his credibility to the jury without an opportunity for WMATA to fairly cross Dr. Berkowitz on that history and the number of times the court has questioned the reliability of his opinions. This error was not harmless: the issue of whether a national standard of care existed is central to the case, and effective steps were not taken to mitigate the effects of the error.

### B. *Plaintiff Scott Assumed the Risk of Jerks, Jars, Sudden Starts and Stops as an Incident of Her Travel on a Common Carrier.*

#### i. The "Unusual and Extraordinary Force" Test Applies in this Circumstance.

"WMATA is not liable under District law for the normal jerks and jolts commonly associated with" the ordinary operation of a common carrier. *Robinson v. Wash. Metro. Area Transit Auth.*, 774 F.3d 33, 41 (D.C. Cir. 2014). Plaintiffs instead must show "that the 'jerk' or 'sudden start' was of such unusual and extraordinary force that it could not reasonably be said to

have happened in the ordinary operation of the vehicle." *Id.* at 42(quoting *Boyko v. Wash. Metro. Area Transit Auth.*, 468 A.2d 582, 583–84 (D.C. 1983)).

As this Court noted,

> The rationale behind this rule is simple and sensible: Because sudden jerks and jolts are commonplace in city transit, "evidence of a jerk that resulted in injury is not usually enough for a jury to infer negligence." *Johnson v. WMATA,* 946 F.2d 127 (D.C. Cir. 1991) (per curiam) Only when the movement is "of such unusual and extraordinary force" is it fair to assume, under the doctrine of *res ipsa loquitor*, that it could not "have happened in the ordinary operation of the vehicle." *Wiggins v. Cap. Transit Co.*, 122 A.2d 117, 118 (D.C. 1956). By the same token, "[p]assengers are said to assume" the risks of usual lurches "as an incident of their travel" and therefore cannot ground a negligence claim on such quotidian movements. *Id.*

July 1. 20204 Mem. Opinion and Order, ECF 34 at 6-7.

The District is not alone in imposing this restriction; it mirrors the general rule that lurches or jerks that occur in the normal operation of a common carrier do not give rise to liability. *See, e.g.*, Negligence Case: Res Ipsa Loquitur § 12:19 ("A presumption or inference of negligence from the sudden jerking or jolting of a conveyance arises only in the event the movement is of such violence that it would not be one likely to occur in the ordinary operation of the conveyance, as where the start or stop of a conveyance is unusually sudden or the jerk or jolt is of unusual severity or violence."); *Grant v. N.Y.C. Transit Auth.*, 61 A.D. 3d 422, 422 (N.Y. 2009) (applying the "unusual and violent force" test).

However, in denying WMATA's Motion for Summary Judgment, this Court was "unconvinced that this rule applies when passengers are reasonably attempting to alight from a train that has stopped at a station." ECF 34 at 9. The Court noted that courts often look at whether the "acts or representations of the operator or conduct have made it appear safe and proper to alight." *Id.* At the summary judgment stage, the Court was presented with Ms. Scott's deposition testimony that the operator announced "McPherson Square, doors opening on the left side" *after* the train came to a complete stop at the station. ECF 34 at 12. The Court found this

testimony sufficient to create a genuine issue of fact for the jury regarding whether a reasonable person in Ms. Scott's shoes would have believed it was safe to alight. *Id.*

First, trial testimony established that the announcement concerning the doors was made before the train stopped, not after.  After listening to Ms. Swain's testimony that the announcement was made as the train was moving toward the station, Ms. Scott changed her testimony. She testified that the announcement was made as the train approached the station *before* it stopped. Ex. A, Testimony of Stacey Swain, Trial Tr. vol. 1 at 167:18-168:11; Ex. B, Testimony of Carol Wild Scott, Trial Tr. vol. 2 at 255:10-21. Ms. Swain further testified that she rides Metro every day to and from work and the announcement regarding the doors opening is always made before the train stops at the station. Ex. A, Trial Tr. vol. 1 at 164:24-165:3, 167:18-24. As such, a reasonable person could not find that the announcement concerning the doors opening on a specific side indicated that it was safe to exit the train because the train has not stopped yet.

Second, the trial testimony clarified that metrotrains frequently reposition at the platform in their ordinary operation.  Ms. Dominic Johnson, the operator of the train in question, and now a rail supervisor, testified that trains stop short at stations for a variety of reasons, including automatically stopping when the train ahead is too close. Ex. C, Testimony of Dominic Johnson, Trial Tr. vol. 2 at 393:13-394:4, 398:19-399:7. A train is "short" when it stops before the 8-car marker. Ex. C, Trial Tr. vol. 2 at 392:22-393:6. She explained that the train doors cannot open until the train is properly positioned at the 8-car marker. Ex. C, Trial Tr. vol. 2 at 393:1-2. This ensures that all the train doors open at the platform and none of the doors open in the tunnel. Ex. C, Trial Tr. vol. 2 at 393:3-6. These automatic stops prior to the 8-car marker, and subsequent repositioning of the train, occur in the ordinary train operation. Ex. C, Trial Tr. vol. 2 at 399:2-7.

Additionally, passengers are aware that trains frequently need to reposition after stopping at the platform. Ms. Swain testified that Metro trains stop and reposition at the platform "frequently." Ex. A, Trial Tr. vol. 1 at 165:4-10. Ms. Johnson testified that trains stop short and need to reposition "often." Ex. C, Trial Tr. vol. 2 at 393:7-12.

Third, it was established that the doors chime to indicate that they are opening, and the doors did not chime prior to the train repositioning in this instance. Ms. Scott testified that the doors chime before they open and "[t]hey did not chime" while she was waiting to leave the train. Ex. B, Trial Tr. vol. 2 at 251:24-252:8.

> **Q.** Okay. Are you familiar with the chimes when the doors are opening, correct, and closing?
> **A.** Yes.
> **Q.** And you didn't hear those on September 23[rd] before you got out of your seat, correct?
> **A.** No.

Ex. B, Trial Tr. vol. 2 at 261:14-19. Ms. Swain also testified that she did not hear the door chimes after the train stopped. Ex. A, Trial Tr. vol. 1 at 168:18-19. This testimony established that it is common knowledge that the door chimes signal when the doors will safely open and passengers may alight the train. Before the doors close, the doors chime again to notify passengers that the period to safely alight or board the train is ending. This is similar to the "common knowledge" that the conductor gives the signal to the motorman to start the car by ringing a bell in *Connor v. Wash. Ry. & Elec. Co.*, 43 app. D.C. 329 (D.C. Cir. 1915). Prior to the door chimes, a reasonable person cannot assume that the train is at its final position and will not move again. Rather, if a passenger stands and moves about the train prior to the door chimes, they assume the risk that the train may move again.

Fourth and finally, Ms. Scott was aware this specific train would likely reposition after arriving at the platform. She testified that the train had stopped short at multiple stations during her trip, and she expected the train to stop short at McPherson Square. Ex. B, Trial Tr. vol. 2 at 250:14-20. Ms. Scott's testimony at trial was that, while the train was in motion, an announcement was made about the doors opening. Ex. B, Trial Tr. vol. 2 at 255:10-21. After the train stopped at McPherson Square, she expected the train to reposition because it had stopped short and repositioned at approximately four to six prior stations along the way from Vienna. Ex. B, Trial Tr. vol. 2 at 250:14-251:13. Ms. Scott waited "between six and ten seconds" before standing up, despite not hearing the door chimes. Ex. B, Trial Tr. vol. 2 at 251:14-252:8. No evidence was presented to the jury that waiting six to ten seconds was sufficient to establish that it is safe to begin alighting. Rather, the jury was only presented with evidence indicating that the door chimes signal when it is safe to leave the train.

In the ordinary operation of the trains, especially during rush hour when more trains are running, trains frequently stop short of the 8-car marker to maintain the required space between trains. Ex. C, Trial Tr. vol. 2 at 399:2-7. When trains stop short, they must reposition at the platform. Passengers, including Ms. Scott and Ms. Swain, are aware that trains frequently reposition at the platform. Passengers, including Ms. Scott, are also aware that the announcement "doors opening on the left side," made while the train is in motion, is not an indicator that it is safe to alight the train. Rather, the doors will not open until the train is properly positioned on the platform, and the door chimes indicate when the doors will open. Until the doors chime, a reasonable person assumes the risk that the train may move forward again in its ordinary operation. Here, Ms. Scott testified she was aware that this specific train frequently stopped short of the 8-car marker and repositioned at the platform. She testified that she did not hear the door

chimes. Therefore, a reasonable person in Ms. Scott's shoes could not find it safe to alight the train, and the "unusual and extraordinary force" test is applicable in this circumstance pursuant to D.C. law. *See Robinson v. Wash. Metro. Area Transit Auth.*, 774 F.3d 33, 42 (D.C. Cir. 2014); *Boyko v. Wash. Metro. Area Transit Auth.*, 468 A.2d 582, 583-84 (D.C. 1983); *Wiggins v. Cap. Transit Co.*, 122 A.2d 117, 118 (D.C. 1956).

> ### ii. There is No Legally Sufficient Evidentiary Basis for a Reasonable Jury to Find the "Jerk" or "Sudden Start" Was of an Unusual and Extraordinary Force.

Given that WMATA is not liable under District of Columbia law for the normal jerks and jolts commonly associated with the ordinary operation of a common carrier, *Robinson v. Wash. Metro. Area Transit Auth.*, 774 F.3d 33, 42 (D.C. Cir. 2014), Ms. Scott was required to show at trial "that the 'jerk' or 'sudden start' was of such unusual and extraordinary force that it could not reasonably be said to have happened in the ordinary operation of the vehicle." *Id.* (quoting *Boyko v. Wash. Metro. Area Transit Auth.*, 468 A.2d 582, 583-84 (D.C. 1983); Standardized Civil Jury Instruction for the District of Columbia, Chapter 8.05 Sudden Starts, Stops, Jerks, or Jars; *see also* Joint Pretrial Statement, ECF 50, at 14 (WMATA requesting Standardized Civil Jury Instruction for the District of Columbia 8.05). Ms. Scott failed to do so.

Ms. Scott did not present any expert testimony regarding the "unusual" or "extraordinary" movement of the train. The only evidence Ms. Scott presented in support of her argument that the train moved with unusual or extraordinary force was her own testimony and the testimony of Ms. Swain. The D.C. Court of Appeals has held that "'unusual and extraordinary force' . . . cannot be inferred from 'mere descriptive adjectives and conclusions' alone." *Boyko*, 468 A.2d at 584 (quoting *Wiggins*, 122 A.2d at 118). Despite Ms. Swain and Ms. Scott using adjectives such as "violent" to describe the movement of the train, their testimony was contradicted by the testimony of Mr. Al Emondi, who said that it was only enough to "knock you

off balance. . . if you were not ready for it. Ex. D, Al Emondi *De Bene Esse* Dep. at 10:5-11. The

jury was presented no further evidence regarding the force of movement, or evidence to support a

finding that the force was unusual or extraordinary.

Therefore, the Court should find that Defendant WMATA is entitled to judgment as a

matter of law because the "unusual and extraordinary force" test applies in this circumstance, and

based on the evidence at trial no reasonable jury could find that the force was unusual or

extraordinary.  Moreover, the failure to include the "jerk jolt" jury instruction proffered by

WMATA was error and WMATA is entitled to a new trial for the failure to so instruct the jury.

Joint Pretrial Statement, ECF 50, at 14 (WMATA requesting Standardized Civil Jury Instruction

for the District of Columbia 8.05); Ex. H, Trial Tr. Vol. 3 at 492:10-499:11; 502:18-503:11.

### C.  Plaintiff Scott is Barred from Recovery Due to Her Own Contributory Negligence

There was no legally sufficient basis for the jury in this matter to find that Ms. Scott was

not contributorily negligent, and thus not barred from recovery in this matter. The jury's verdict

should be overturned, in light of the clear, uncontradicted, evidence that was presented.

"Contributory negligence is 'the failure to act with the prudence demanded of an ordinary

reasonable person under like circumstances.'" *Lipnick v. United States*, 717 F. Supp. 902, 907 (D.

D.C. 1989) (quoting *Jeffries v. Potomac Development Corp*., 822 F.2d 87, 91 (D.C.Cir. 1987)). In

this matter, the jury was instructed,

> WMATA alleges that Ms. Scott as negligent. WMATA is not liable for Ms. Scott's
> harms if Ms. Scott's own negligence is a cause of her harms, the same rules you use
> to decide whether WMATA was negligent apply when you decide whether Ms.
> Scott was negligent. To establish the defense of contributory negligence, WMATA
> must prove that it is more likely than not both that (1) Ms. Scott was negligence;
> and (2) Ms. Scott's negligence as a cause of her own harm. If WMATA proves these
> two elements, then your verdict must be for WMATA.

ECF 57, Instruction No. 29. "[W]here the facts are undisputed and where but one reasonable inference can be drawn, is the trial court justified in holding that negligence or contributory negligence has been established as a matter of law." *Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 786 (D.C. Cir. 1998) (quoting *Singer v. Doyle*, 236 A.2d 436, 437 (D.C. 1967)).

The evidence here is clear and uncontradicted and comes from Ms. Scott herself. Ms. Scott testified that the train had previously stopped and then repositioned several times at various stations along her route that day.

> **Q.** Okay. So based on your experience riding in on the Orange Line that day, you expected that the operator would stop short and then reposition the train, correct?
>
> **A.** I thought that there was a possibility of that happening because intermittently - - she had not done it at every stop. So every once in a while. So I thought, well, she just may do the same mistake this time.

Ex. B, Testimony of Carol Wild Scott, Trial Tr. vol. 2 at 250:14-20. She stated that she was aware that such movement might occur at her own stop on the Metrorail line.

> **A.** I knew that she, or whoever was running the train, would stop and then jerk, and I wanted to be sure that, when I got up, I would be safe. And I just sat there for a bit waiting until I was pretty sure I was okay, and I got up, and I had my cane, and my purse was on this shoulder.

Ex. B, Trial Tr. vol. 1 at 185:13-17. Plaintiff testified that as the train was approaching the station, and prior to the first stop, while it was still moving, that an announcement was made. Ex. B, Trial Tr. vol. 2 at 255:17-19. She stated that once the train stopped there were no further announcements – including no announcement or chimes indicating that the doors were to open. Ex. B, Trial Tr. vol. 2 at 251:24-252:1 ("When you were sitting there waiting before you got up, though, did you hear the chimes?" "I heard nothing."). Nor did she see the doors start to open. Ex. B, Trial Tr. vol. 2 at 265:6-8. However, she still decided to stand up on the train prior to it fully berthing at the station. She did not secure herself in any way – whether to grab one of the many grab bars in the train or simply hold on to the back of her own previously occupied seat.

Ex. B, Trial Tr. vol. 2 at 253:15-17 ("So were you holding on to any of the poles on the back rest -- or the back rest of any of the chairs? A. No."); Ex. B, Trial Tr. vol. 2 at 265:9-11("Q. And you weren't holding on to the rest of the chair or an overhead pole, if there was one, correct? A. Yeah.").

While it is not "per se" negligence to stand on a common carrier while it is in motion, *see Washington R. & E. Co. v. Kramer*, 44 App. D.C. 154B, 157-59 (D.C. Cir. 1915), it can be contributorily negligent with the presence of certain situational factors. *See Scott v. Wash. Metro. Area Transit Auth.*, No. 22-cv-601, 2024 U.S. Dist. LEXIS 115204, at *21 (D.C. 2024) ("[F]rom her own experience riding the Orange Line that day, perhaps she should have been on notice that the train might move forward even after it had stopped at McPherson Square and, as a result, taken greater precautions while making her way to the door.").

Here, there is no legally sufficient basis to find that Ms. Scott was not contributorily negligent. She knew that the train would reposition. She was aware that the doors were not yet opening, nor had they indicated that they were about to open. Knowing that the train was not fully berthed at the station, Ms. Scott still stood, and did not use or avail herself to any of the supports or handholds within the train. Ms. Scott also made such movements and decisions knowing her advanced age and physical state. *See* 52 A.L.R.2d 585 ("In a number of the cases wherein the question of the plaintiff's contributory negligence in leaving his seat before the conveyance on which he was riding came to a stop was held to be one for the jury, the age and physical condition of the plaintiff have been considered along with other factors as bearing on the determination of this question."). The Court should, in light of the clear and uncontradicted evidence regarding Ms. Scott's contributory negligence, disturb the jury's verdict, find that Ms. Scott is barred from recovery in this matter, and return a verdict in favor of WMATA.

### D.  Defendant is Entitled to a Partial Judgment Regarding Damages

Given the failure of Ms. Scott to introduce any medical bills or medical records into evidence in this case, there was no legally sufficient basis for the jury's award of damages. Ms. Scott only referred to and referenced a summary of the medical damages when attempting to demonstrate the medical costs that she allegedly incurred. This summary, purported to meet the requirements of Federal Rule of Evidence 1006(a), was never admitted as an exhibit, although Plaintiff herself testified to the contents of the summary. This summary was improperly proffered as it was not based on admissible, authenticated evidence. Rule 1006 states that "[t]he court may admit as evidence a summary, chart, or calculation offered to prove the content *of voluminous admissible* writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed. R. Evid. 1006 (emphasis added). The summary that Plaintiff repeatedly referred to at trial was improperly used and referred to, since the underlying documents on which the summary was allegedly based were inadmissible hearsay and Plaintiff failed to satisfy the foundational requirements for an exception to hearsay. *See also* ECF 56. In addition, the summary did not meet the requirements of Rule 1006 because there was no showing that the underlying records, had they been authenticated or admissible, were voluminous.

Damages are an essential element of a negligence claim. And as the Court stated while instructing the jury, "[t]he evidence must establish the amount of Ms. Scott's damages with *reasonable certainty*. You may award Ms. Scott only those damages that are based on a just and reasonable estimate *based on relevant evidence*. Reasonable certainty does not require exact or mathematically precise proof of damages or that future damages are absolutely certain to occur." ECF 57, Instruction No. 40 (emphasis added). "'While damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to

estimate damages. . . .  Damages may not be based on mere speculation and guesswork." *SEIU Nat'l Indus. Pension Fund v. Jersey City Healthcare Providers*, LLC, 358 F. Supp. 3d 12, 23 (D.D.C. 2019) (internal citations omitted).

Here, there was no admissible evidence on which the jury could base any damages. They never saw a medical bill. No expert or medical provider testified either to what they charged or to authenticity of any bills. Ms. Scott herself only testified as to a total amount, based off unknown medical bills, and without herself creating the summary or having knowledge as to its accuracy.

There is no legally sufficient basis for the jury to find that any damages were established with reasonable certainty without the underlying costs. Therefore, there was no basis for the jury's award of damages. The Court should disturb the jury's verdict, given that Plaintiff failed to present any admissible evidence as to damages, and therefore failed to assert any damages with reasonable certainty, and return a verdict in favor of WMATA, given that damages are an essential element of Plaintiff's claim.

### E.  Defendant is Entitled to Remittitur

The jury's damages award was unconscionably excessive. The only monetary damages admitted at trial (improperly, as argued in Section III. D. *supra*) was a summary discussion of medical bills of $229,541.63.  Ex I, Trial Tr. At 249: 11-15.  The jury award of $1,600,000 is nearly seven times that amount.  This is so high that it undoubtedly includes a punitive element, and punitive damages are not recoverable against WMATA.

As an alternative to a new trial, the court may also grant remittitur to correct an excessive verdict. *George Washington University v. Lawson*, 745 A.2d 323, 330-31 (D.C. 2000); *Louison v. Crockett*, 546 A.2d 400, 404-07 (D.C. 1988). The general standard for a remittitur is whether the

verdict is so large that "it is beyond all reason or is so great as to shock the conscience." *Phillips v. District of Columbia*, 458 A.2d 722, 7214 (D.C. 1983). Remittitur is appropriate where the verdict is "so large as to indicate the jury was swayed by passion, prejudice, corruption, or other improper influences or considerations." *Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204, 1220 (D.C. 1991). Critically, if the verdict is excessive the Court is required to award a remittitur. *See Linn v. Plant Guard Workers*, 383 U.S. 53, 65-66 (1966). Excessiveness "refers not merely to the amount of the verdict but to whether, in light of all the facts and circumstances, the verdict appears to have been the product of passion, prejudice, mistake or consideration of improper factors rather than a measured assessment of the degree of injury suffered by the plaintiff." *Moss v. Stockard*, 580 A.2d 1011, 1035 (D.C. 1990). It is the Court's role to reduce an excessive verdict to prevent a "miscarriage of justice." *Liberatore v. CVS N.Y., Inc.*, 160 F. Supp. 2d 114, 119 (D.D.C. 2001).

In the District of Columbia, assessment of the amount of non-economic damages is exclusively within the province of the jury, so "improper for counsel to suggest to the jury that it award a specific dollar amount." *See District of Columbia v. Colston*, 468 A.2d 954, 957 (D.C. 1983) (citing *Purpura v. Public Service Electric & Gas Co.*, 147 A.2d 591, (N.J. Super. 1959)). Likewise, it is improper for counsel to argue that non-economic damages should be a multiple of compensatory damages. *Waldorf v. Shuta*, 896 F.2d 723, 743-44 (3d Cir. 1990). Despite this, Plaintiff's Counsel in it's opening presented the jury with an equation to calculate damages, suggesting that the total award equal "$229,000 plus 90%." Ex. I, Trial Tr., Vol. 1 at 173:23-6. The Court aptly noted that the jury "can do math, can't they?" *Id.* WMATA objected to the use of Plaintiff's counsel's opening statement power point which displayed the suggested calculation. Ex. I, Trial Tr., Vol. 1 at 122:3-10. Despite this, the Court gave no curative instruction.

**WHEREFORE**, for the reasons set forth above, Defendant Washington Metropolitan Area Transit Authority respectfully requests that the Court grant this Motion and enter judgment in favor of Defendant, or in the alternative, grant a new trial.

Date: May 21, 2025                    Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP**

*/s/ Jason R. Waters*
Jason R. Waters, Esq. (D.C. Bar No.: 491066)
Lauren Gilman, Esq. (D.C. Bar.: 90008050)
8444 Westpark Drive - Suite 510
McLean, VA 22102-5102
Telephone: (703) 245-9300
Facsimile: (703) 245-9301
Jason.Waters@wilsonelser.com
Lauren.Gilman@wilsonelser.com

Patricia H. Beall, Esq. (D.C. Bar No.: 992515)
1500 K Street, NW, Suite 330
Washington, D.C. 20005
Telephone: (202) 626-7660
Facsimile: (202) 628-3606
Patricia.Beall@wilsonelser.com
*Counsel for Defendant Washington*
*Metropolitan Area Transit Authority*

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**

*/s/ Laurie Hand*
Laurie Hand, Esq. (DC Bar No.: 435095)
Washington Metropolitan Area Transit Authority
Legal Department 7E
P.O. Box 23768
Washington, D.C. 20026
Telephone: (202) 962-5063
Facsimile: (202) 962-2550
LAHand@wmata.com
*Counsel for Defendant Washington*
*Metropolitan Area Transit Authority*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of May, 2025 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

*/s/ Jason R. Waters*

Jason R. Waters

## CERTIFICATE OF COURTESY COPY

Pursuant to the Court's Instruction in the scheduling order, a bound and tabbed courtesy copy shall be mailed to chambers.

*/s/ Jason R. Waters*

Jason R. Waters