## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CAROL WILD SCOTT,** | : | |
| **Plaintiff,** | : | |
| v. | : | **Case No. 22-cv-00601 (CRC)** |
| **WMATA,** | : | |
| **Defendant.** | : | |

### PLAINTIFF'S OPPOSITION TO
### DEFENDANT'S POST-TRIAL MOTIONS (ECF NO. 71)

On September 23, 2019, a WMATA subway train operator stopped her train at the McPherson Square station platform, then—after passengers including Carol Scott had begun standing up to disembark—violently jerked the train forward without providing any warning to her passengers. In doing so, she violated the national standard of care, as well as WMATA's own explicit Standard Operating Procedures, which require that if a train operator intends to reposition a train after it has stopped at a station platform, she must first warn all passengers of the impending movement via intercom announcement: "Attention customers, this train will move forward; please hold on." Ms. Scott was thrown to the floor, suffering severe injuries that have left her with permanent disfigurement, pain, and disability.

After a three-day trial, on April 23, 2025, the jury returned a verdict for Ms. Scott and assigned damages in the amount of $1,600,000.

WMATA moves for judgment in its favor or for a new trial. For the reasons set forth herein, WMATA's Motion should be denied.

## I.     Factual Background

### A.     *WMATA knows the danger of repositioning trains at station platforms without warning passengers.*

As of September 2019, the ordinary (and required) berthing practice of WMATA's train operators was to stop at the station platform, then wait **at least** 5 seconds before opening the doors.  (Ex. 3, Trial Tr. Vol. III, at 455:23-456:23).  Frequently, the wait was longer than that, as reflected in Plaintiff's Exhibit 14, a video published by WMATA on its website that showed a train stopping consistent with how Metrorail trains were expected to berth as of September 2019.  (Ex. 3, Trial Tr. Vol. III, at 459:4-460:21) (reflecting 15-second wait between stop and doors opening)).  Plaintiff's Exhibit 14 can be viewed here:



Plaintiff's Exhibit 14, as redacted and introduced into evidence at trial, can be viewed here:

https://www.dropbox.com/scl/fi/78r9mdlwiio54gozycenh/14-Video_ISOLATED.mp4?rlkey=bg6qb253mep0q262wt5cobh58&st=whoqcrio&dl=0.[1]

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

---

[1]     The original video, MetroForward, "Auto Doors: How fast do they open?": https://www.youtube.com/watch?v=ANkwtF2hT7A; also available on WMATA's website: https://www.wmata.com/initiatives/plans/Automatic-Train-Operation-ATO/ATO-Videos.cfm.

As also evidenced by Plaintiff's Exhibit 14, WMATA fully understood that in that 5- to 15-second waiting period between the train stopping and the doors opening, passengers would ordinarily stand and move towards the doors in preparation to disembark:

> Q. All right. Ms. Henry, so I'm going to pause it right there where the timer on the bottom says 15 seconds.
>
> A. Uh-huh.
>
> Q. That's 15 seconds between the time the train came to a stop and the doors opened, right?
>
> A. Okay, yeah.
>
> Q. And inside the train did you notice what the passengers were doing?
>
> A. They were standing up preparing to get off the train.

(Ex. 3, Trial Tr. Vol. III, at 460:17-25).

If instead of opening the doors (in line with reasonable passenger expectations) the train operator instead found it necessary to move the train forward before opening the doors, then WMATA's Standard Operating Procedures—**in line with the national standard of care**[2]—mandated that the train operator first warn all passengers of the impending movement via intercom announcement: "Attention customers, this train will move forward; please hold on." (Ex. 4, WMATA SOP 50.5.1.1; Ex. 3, Trial Tr. Vol. III, at 457:3-458:14). The explicit purpose of the announcement is the obvious one. As discussed in the preceding paragraph, passengers are expected to be standing and moving towards the doors during this period; if the train is going to be moved, then the passengers must be warned in order to allow them to grab ahold of something beforehand, so they are not knocked down and hurt. (Ex. 3, Trial Tr. Vol. III, at 458:15-459:2).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

---

[2]   *See infra*, Sec. II.A.

### B.   WMATA train operator does not give required warning, jerks train forward, injures passenger Carol Scott.

At approximately 6:30 PM on September 23, 2019, Carol Scott was a passenger on an Orange Line train pulling into the McPherson Square station.  After the train came to a stop at the station platform, Ms. Scott stood up to exit the train.  After Ms. Scott had stood up, the train operator suddenly "jerked," "launched," or "lurched" the train forward.  One of Ms. Scott's fellow passengers, a stranger to her before the incident, remembered it as follows:

> But I was sitting right back there, tired; long day at work.
>
> The train slowly pulled into McPherson Square station, and then it sat there for a few minutes; and **then all of a sudden it violently jerked forward and caught everyone off guard, even me sitting there.**
>
> And the reason why I remember this is because I had spinal surgery the year before so I was, you know, trying to brace myself.
>
> **Everyone flew forward because the train jerked so violently.**  And people had risen to -- in anticipation of getting off at McPherson Square and trying to grab poles, you know, the bars on the top of the seats, anything to steady themselves.
>
> And then I heard a loud thump and a crack, and as a mother, you know when something -- when you hear something, you hear -- and then I heard a loud scream, and I think my mother ears perked up, and then I -- when I heard the scream -- the thud and the crack were sickening, but when I heard the scream, I immediately jumped up because people are moving around now. People -- the doors finally opened. People are disembarking, but other people are staying there trying to help who I found to be Ms. Scott. And, you know, she's screaming because she's in pain.

(Ex. 1, Trial Tr. Vol. I, at 160:7-161:5 (emphasis added)).

Before violently jerking the train forward, WMATA's train operator did **not** warn the train passengers that she was going to move the train forward, let alone do so violently.  At its

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

corporate deposition (pursuant to FED. R. CIV. P. 30(b)(6)), WMATA explicitly admitted that it is not aware of any evidence that the required safety warning was made:

> Q.  Is WMATA aware of any evidence that would contradict that; in other words, is there any evidence that WMATA is aware of that the train operator announced the train would be moving before she moved it forward again?
>
> A.  No.

(Ex. 5, WMATA Dep. (Bennett), at 32:2-7).[3]

### C.    Ms. Scott's Injuries

As a result of WMATA's negligent operation of the train, Ms. Scott suffered severe, painful injuries that required an intensive surgery to implant permanent orthopedic hardware, as the jurors saw in Plaintiff's Exhibits 5, 6, and 7:[4]

---

[3]    This testimony was played for the jurors at trial (as the testimony of a party opponent); however, it appears not to have been transcribed as part of the trial transcript. (Ex. 2, Trial Tr. Vol. II, at 372:7-8). The undersigned has reached out to the court reporter and hopes to obtain a fuller transcript in the near future. However, the Court and parties discussed the relevant portions of WMATA's 30(b)(6) testimony, as well as WMATA's requested counter-designations, at length on the record, which makes clear that it was played. (*See* Ex. 2, Trial Tr. Vol. II, at 303:9-313:11).

Ultimately Plaintiff played for the jurors this short exchange (32:2-7) as well as the full counter-designation requested by WMATA (10:6-12:7), in line with the Court's ruling. (Ex. 2, Trial Tr. Vol. II, at 313:9-11).

[4]    Exs. 5, 6, & 7 were accepted for use at trial as illustrative aids pursuant to FED. R. EVID. 107. (Ex. 2, Trial Tr. at 279:21-280:1).

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030







Ms. Scott endured a long, grueling recovery process that included a roughly five-week stint at an inpatient rehabilitation facility, followed by a long course of outpatient physical therapy during which time she graduated from walker to scooter to cane, using a wheelchair when necessary.  (Ex. 1, Trial Tr. at 189:191:8).  Despite excellent care from her medical

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

providers, Ms. Scott has been left with permanent disfigurement, pain, and disability. Her injured leg healed a half-inch shorter than her good leg; as a result, she walks with a pronounced limp and poor balance and must use a cane at all times (except inside her house). (Ex. 1, Trial Tr. at 191:9-11, 194:7-10). She cannot sleep (or lie for extended periods) on her left side, because she feels the metal hardware digging into her flesh. (Ex. 1, Trial Tr. at 193:25-194:4).

Before she was hurt, Ms. Scott was in great physical shape—she was "determined to keep [herself] in somewhat decent shape" as she aged; she did "old lady CrossFit" to stay strong. (Ex. 1, Trial Tr. at 191:14-192:4). Tending her hillside garden at her home in the Virginia foothills, eating fresh vegetables and canning jams and jellies, was a source of simple joy for Ms. Scott; now she cannot navigate it. (Ex. 1, Trial Tr. at 192:5-193:21). She has also been drastically restricted in terms of what she is able to do in furtherance of her life's work, advocating for Native American veterans. (Ex. 1, Trial Tr. at 190:19-191:5, 194:14-195:1, 181:6-184:22).

## II.  Argument

### A.  *The jurors were entitled to conclude that the evidence established the national standard of care that governs a train operator's movement of a berthed train without warning passengers.*

In support of its argument that Plaintiff did not introduce evidence from which the jurors were entitled to conclude that the national standard of care had been established, WMATA advances four sub-arguments. (Def.'s Mot. at Sec. III.A). Each will be addressed in turn.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

7

### 1. The Court did not err in qualifying Dr. Berkowitz as an expert.

The Court qualified Dr. Berkowitz as an "expert in the field of transportation and safety engineering and, in particular, the question that Mr. Regan just posed regarding national standard of care related to the relevant warnings in this case [whether the national standard of care requires Metro to provide a safety warning under the circumstances of Ms. Scott's injury on September 23, 2019]." (Ex. 2, Trial Tr. Vol. II, at 335:7-13). WMATA argues that the Court should not have so qualified him.

As the Court noted in denying WMATA's motion *in limine* regarding Dr. Berkowitz (ECF No. 52): "A district court has 'broad discretion in determining whether to admit or exclude expert testimony.'" *Heller v. District of Columbia*, 952 F. Supp. 2d 133, 139 (D.D.C. 2013) (citing *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010)) (cleaned up). Here, prior to qualifying Dr. Berkowitz as an expert, the Court heard extensive evidence regarding Dr. Berkowitz's education, training, and experience both in the broad field of transportation and safety engineering and specifically on the issue of the national standard of care applicable to the negligence in this case. (Ex. 2, Trial Tr. Vol. II, at 315:12-334:23 (yes—19 PAGES of trial transcript)). As the Court held in ruling on WMATA's motion *in limine* regarding Dr. Berkowitz, Dr. Berkowitz

> "set forth concrete bases for his expert testimony[.]" Sherrod v. McHugh, 334 F. Supp. 3d 219, 259 (D.D.C. 2018). And other courts in this district have qualified experts whose opinions are based in part on "consultation with personnel" from relevant agencies. Id. Indeed, courts in this district have deemed reliable "a variety of types of experience-based experts, including fire investigators, accident-reconstruction experts, and, most notably, law-enforcement officials." Heller, 952 F. Supp. 2d at 141 (citing cases). In the Court's view, Dr. Berkowitz is of the same ilk as these experts. And he has justified his opinion

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

8

enough that the Court cannot conclude it is "rampant speculation." <u>Id</u>. at 140. The Court's conclusion in this regard is bolstered by the fact that WMATA has apparently been "unable to name a single" transit authority that does not require prior warning before restarting or repositioning an improperly berthed subway train. <u>Novak v. Cap. Mgmt. & Dev. Corp.</u>, 570 F.3d 305, 313 (D.C. Cir. 2009). WMATA's objections, at best, may suggest "a weak factual basis for [Dr. Berkowitz's] testimony[,]" which "is appropriately challenged on cross examination[,]" rather than excluded altogether as unreliable. <u>Heller</u>, 952 F. Supp. 2d at 140.

(4/15/2025 Opinion and Order (ECF No. 52) at 5-6). Those words are as true now as they were then. The Court did not abuse its discretion by qualifying Dr. Berkowitz as an expert.

## 2. *The jurors were entitled to conclude that the national standard of care was sufficiently proven by the evidence.*

At trial, Dr. Berkowitz explained to the jurors what the national standard of care requires with respect to warning passengers before repositioning a berthed subway train:

> Q. Doctor, what is your opinion about what the national standard of care requires with respect to announcements under the circumstances of this case?
>
> A. That you always should make an announcement to ensure that passengers are always safe.
>
> Q. Okay.
>
> A. Without exception.
>
> Q. So before a train operator -- well, let me ask you this question.
>
> Do you have an opinion within a reasonable degree of certainty in your field as to whether the national standard of care requires a train operator, such as Ms. Johnson on September 23, 2019, to provide an audible warning to passengers if she stops the train at the wrong spot and has to move it forward in order to get to the place where the doors will open? Does the national standard of care require an audible warning in your opinion?
>
> A. Yes.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

(Ex. 2, Trial Tr. Vol. II, at 336:21-337:13).   Dr. Berkowitz further testified that WMATA Standard Operating Procedure 50's requirement that train operators warn passengers before repositioning berthed trains ("Attention customers, this train will move forward; please hold on.") was consistent with the national standard of care.   (Ex. 2, Trial Tr. Vol. II, at 339:16-19; Ex. 4).   Dr. Berkowitz's testimony was the only testimony the jurors heard on the subject of the national standard of care, because WMATA did not put forth any expert to testify on its behalf by claiming otherwise.[5]

> ### 3.    With regard to the timeliness of Dr. Berkowitz's opinions, the Court did not abuse the discretion afforded it to manage its own docket and WMATA suffered no unfair prejudice.

WMATA next takes issue with the Court's decision, after denying the parties' dueling summary-judgment motions, to permit Dr. Berkowitz to supplement his initial report and allow Defendant to take related discovery and designate an expert to rebut his opinions if it so desired.   The Court did not err, and WMATA suffered no prejudice.

"[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."  *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016).   More specifically, as this Court has explained, "it is clear that the Court has inherent authority to modify pre-trial procedural deadlines to serve the best interests of justice."  *Gomez v. Trs. of Harvard Univ.*, 676 F. Supp. 13, 15 (D.D.C. 1987) (citing *Link v.*

---

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

[5]    And at some point, it is hard to ignore the obvious.  WMATA is a sophisticated "quasi-governmental entity" engaged exclusively in the business of operating a mass transit system, which maintains its own general counsel's office (representatives of which signed the pleadings in this case an attended trial) and was represented by a large, capable law firm in a case in which it was obvious from the severity of the injuries that WMATA faced substantial exposure.  If there existed a reputable expert who would have denied the existence of this commonsense national standard of care, wouldn't WMATA—of all litigants—found and retained him?

*Wabash R. Co.,* 370 U.S. 626, 630-31 (1962); *United States v. Morgan,* 307 U.S. 183, 197 (1939); *United States v. Burton,* 584 F.2d 485, 489 (D.C. Cir. 1978); *Page Communications Eng'rs, Inc. v. Froehlke,* 475 F.2d 994, 996 (D.C. Cir. 1973); FED. R. CIV. P. 1. The Court did not abuse its discretion in its management of this case.

Furthermore, it should be noted that WMATA suffered no unfair prejudice as a result of the Court's decision to permit Dr. Berkowitz to supplement his initial report. WMATA was afforded an opportunity to take his deposition and obtain any other related discovery, as well as to designate an expert to rebut Dr. Berkowitz's opinions if it so wished. Under the circumstances, it cannot be said that WMATA even suffered any prejudice as a result of the Court's exercise of its discretion in managing pre-trial deadlines.

### 4. The Court did not abuse its discretion by precluding WMATA from attempting to smear Dr. Berkowitz in front of the jurors by injecting evidence of his testimony having been limited in other case.

As a final argument, WMATA complains that it was not permitted to inject into evidence, under the guise of examining Dr. Berkowitz's qualifications to testify in this case, questions designed to smear him in front of the jurors on the grounds that his testimony has been limited in other cases on other topics. "[A]buse of discretion is the proper standard of review of a district court's evidentiary rulings." *General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) (quoted with approval in *United States v. Tsarnaev*, 595 U.S. 302, 322 n.3 (2022)).

As the Court explained in its ruling on WMATA's motion *in limine* regarding Dr. Berkowitz, "that courts have limited Dr. Berkowitz's testimony on unrelated topics is not relevant to the present question." (4/15/2025 Opinion and Order (ECF No. 52) at 6). When counsel for WMATA indicated that he intended to question Dr. Berkowitz about those

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

unrelated topics, not relevant to his qualifications to opine as to the national standard of care

in this case, the Court asked the logical questions:

> THE COURT: Are you seeking to voir dire Dr. Berkowitz to establish that he's not qualified to testify about the national standard of care?
>
> MR. WATERS: Yes, and part of that --
>
> THE COURT: Would your questions be limited to that issue?

(Ex. 2, Trial Tr. Vol. II, at 297:9-14).  After some discussion, the Court ruled as follows:

> Mr. Waters, if you would like to voir dire him using whatever information you'd like as to whether he should be qualified as an expert in the field of X, you're entitled to do that obviously, but that's outside the presence of the jury. Okay?
>
> So if you want to do it to make your record, whatever, you can do it. The Court will make a ruling as to whether Dr. Berkowitz is qualified to testify as an expert in his field, the relevant field, and then we -- if the Court rules that he is, he would come in and testify as to the national standard of care on direct, and your cross would be limited to the scope of the direct.
>
> MR. WATERS: So, just to be clear, I will not be permitted to cross-examine him on credibility grounds based on the prior exclusions from other courts?
>
> THE COURT: No. I think that goes to whether he's qualified as an expert or not.
>
> MR. WATERS: Okay.
>
> THE COURT: I think the -- it depends on what Mr. Regan gets into, but if other Courts have found that he has lied -- I mean, if there's something that goes to his credibility or truthfulness, I think that's fair game. But if we're just dealing with Courts that have found his --have not qualified him to testify as an expert on certain topics, I think that goes to the voir dire.

(Ex. 2, Trial Tr. Vol. II, at 302:6-303:5).  The fact that WMATA did not take the Court up on

its offer makes clear that the intended line of questioning was never about voir dire or Dr.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

Berkowitz's qualifications; it was merely an attempt to smear him in front of the jurors. The Court did not abuse its discretion in ruling as it did.

### B.    Contending that Ms. Scott assumed the risk of her injuries as a matter of law, WMATA misapprehends both law and facts.

#### 1.    The Court did not err in holding that this case was not a run-of-the-mill "jerk/jolt" case.

As the Court summarized it in denying WMATA's summary-judgment motion (ECF No. 34):

> WMATA relies on the longstanding and widespread rule that a common carrier is not liable for sudden movements that are "no more than the necessary or usual incidents of [its] operation." **But this line of precedent does not resolve whether it is "necessary" or "usual" for a train to surge forward after it has arrived at a station and indicated to passengers that it is safe to alight.**

(7/1/2024 Order at 5 (emphasis added) (quoting *D.C. Transit Sys., Inc. v. Perry*, 337 A.2d 224, 225 (D.C. 1975)). The Court further explained the relevant law as follows:

> Although D.C. courts have not addressed this issue, other jurisdictions that follow the general law for common-carrier liability—including the "unusual and extraordinary force" test—have fashioned more specific rules governing operators' duties when passengers are alighting. As leading treatises show, courts often look first to whether the "acts or representations of the operator or conduct" have made it appear "safe and proper to alight at that time." 38 Am. Jur. Proof of Facts 2d 677. As usual, this is measured by "what an ordinarily prudent person would do under the circumstances." 14 Am. Jur. 2d Carriers § 954. If a reasonably prudent person would believe it is safe to alight, these jurisdictions have held that common carriers may be liable for sudden and unexpected movements because passengers should be able to disembark from the train without fear that it will abruptly pull forward. See, e.g., Duty of Carrier as to Notifying Passenger of Approach to or Arrival at Destination, 58 A.L.R. 1064 (listing cases across jurisdictions); 38 Am. Jur. Proof of Facts 2d 677 ("The [*res ipsa*] doctrine has been applied in some cases to hold a carrier liable for injuries sustained by the

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

passenger when, as the passenger was alighting from the carrier's stationary conveyance, the conveyance moved forward, causing the passenger to fall.")

This more specific rule for alighting makes sense when viewed against the policy concerns animating the doctrine. As discussed, the general rule that a jerk or lurch must be "unusual and extraordinary" to support a negligence claim is built on the dual theory that (1) there is no basis for inferring negligence unless the movement was dramatic and atypical and (2) passengers assume the risk of ordinary lurches when boarding a bus or train. The calculus changes when a reasonably prudent person would think that it safe to begin exiting the vehicle, however. In those instances, negligence may be inferred from the mere fact that the vehicle moved when passengers were heading for the exits, and those passengers do not necessarily assume the risk that the vehicle will move forward after the operator has given the impression that it is safe to stand up and make one's way toward the doors.

A starker example proves the point. If a train suddenly moved forward after it had arrived at the station and opened its doors, a passenger who fell to the ground while trying to exit should not have to show that the jerk was especially forceful to prove negligence. The fact that the train moved forward with its doors open is itself sufficient evidence that something had gone wrong. The present case, of course, is less clear cut because the doors remained closed as Scott headed to the exit. But the principle remains: If a reasonable person would have believed that it was safe to alight, it might be unnecessary for the plaintiff to prove that the subsequent acceleration was especially forceful to make her case. Depending on the standard practices, as understood by the reasonable passenger, the train suddenly moving forward without prior notice could be enough to prove negligence.

(7/1/2024 Order at 9-10).

### 2. Even if "jerk/jolt" law governed, it would not have mattered, because the jurors still would have been justified in finding that the train's movement was of an unusual and extraordinary nature.

It might also be observed that even if the law were as WMATA urges, it would in all likelihood not have impacted the outcome. Reasonable jurors **still** would have been entitled

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

to find WMATA liable, because Ms. Scott was injured not by one of the "normal jerks and jolts commonly associated with" the ordinary operation of a common carrier, but instead by a violent lurch of "unusual and extraordinary force."[6]  Among the testimony of the various witnesses, that of neutral eyewitness Stacey Swain offers perhaps the cleanest example of testimony from which the jurors could rightfully have concluded as much:

> But I was sitting right back there, tired; long day at work.
>
> The train slowly pulled into McPherson Square station, and then it sat there for a few minutes; and **then all of a sudden it violently jerked forward and caught everyone off guard, even me sitting there.**
>
> And the reason why I remember this is because I had spinal surgery the year before so I was, you know, trying to brace myself.
>
> **Everyone flew forward because the train jerked so violently.** And people had risen to -- in anticipation of getting off at McPherson Square and trying to grab poles, you know, the bars on the top of the seats, anything to steady themselves.
>
> And then I heard a loud thump and a crack, and as a mother, you know when something -- when you hear something, you hear -- and then I heard a loud scream, and I think my mother ears perked up, and then I -- when I heard the scream -- the thud and the crack were sickening, but when I heard the scream, I immediately jumped up because people are moving around now. People -- the doors finally opened. People are disembarking, but other people are staying there trying to help who I found to be Ms. Scott. And, you know, she's screaming because she's in pain.

(Ex. 1, Trial Tr. at 160:7-161:5 (emphasis added)).  On cross-examination by counsel for WMATA, Ms. Swain re-emphasized the violent and unusual nature of the lurch forward, as well as the fact that she is a daily Metrorail commuter and should therefore be in a good position to know:

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

---

[6]  *Robinson v. WMATA*, 774 F.3d 33, 42 (D.C. Cir. 2014).

15

Q. So with regard to Metro in specific, did you ride Metro every day?

A. Yes.

Q. Okay. To and from work?

A. Yes.

\*\*\*

Q. Okay. Are you aware that Ms. Scott has testified in this case that the train stopped on five or six prior occasions before McPherson Square?

A. Yes. That's what I said. It was creeping along and, you know, slowly jerking, **but nothing like the violent nature when it got to McPherson Square.** But it always does it.

(Ex. 1, Trial Tr. at 164:24-165:3, 166:18-24 (emphasis added)).

### C. The jurors were justified in concluding that WMATA did not prove that Ms. Scott was contributorily negligent.

In its Motion, WMATA argues that it is contributory negligence as a matter of law for a passenger disembarking a subway train to (1) to stand up before hearing door chimes or (2) at any point in the process not be clinging to a handhold. (Def.'s Mot. At 21-22). The jurors— the proper audience for such arguments—resoundingly rejected those arguments. The Court must not disturb their judgment.

WMATA cites no authority in support of its argument that either or both actions constitute contributory negligence as a matter of law. There is a reason for that: contributory negligence is a quintessential jury issue.

The Court may hold a plaintiff contributorily negligent as a matter of law only where "reasonable persons . . . can draw but one inference from the facts, and there that one inference points unerringly to the conclusion that the plaintiff failed to act reasonably under the

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

circumstances." *Phillips v. Fujitec Am., Inc.*, 3 A.3d 324, 330 n.16 (2010). This Court has

also described the calculus as follows:

> The court therefore denies [defendant's] motion for summary
> judgment. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438,
> 450 n. 12 (stating that "the jury's unique competence in applying
> the 'reasonable man' standard is thought ordinarily to preclude
> summary judgment in negligence cases"); *Gracyalny v.
> Westinghouse Elec. Corp.*, 723 F.2d 1311 (7th Cir. 1983)
> (stating that, "[i]n negligence cases, questions concerning the
> reasonableness of the parties' conduct, foreseeability and
> proximate cause particularly lend themselves to decision by a
> jury. Thus, summary judgment is rarely appropriate in
> negligence cases") (internal citations omitted); *Brandstetter v.
> National R.R. Passenger Corp.*, 1987 WL 25664, *4 n.4 (D.D.C.
> 1987) (stating that "[i]ssues of conformity with applicable
> standards of care, proximate cause and foreseeability are
> peculiarly fact-specific and contextual, and invariably concern
> considerations of reasonableness and credibility of evidentiary
> sources that are best left to the sound discretion of the trier of
> fact. Hence it is exceedingly rare for a negligence case ... to be
> resolved on summary judgment"); *cf. Paraskevaides v. Four
> Seasons Washington,* 292 F.3d 886, 893 (D.C. Cir. 2002)
> (stating that **"[w]hether a plaintiff is contributorily negligent
> is usually a question for the jury"**) (citation omitted).

*Wilson v. Prudential Fin.*, No. CIV.A. 03-2313(RMU), 2004 WL 2451412, at *5 (D.D.C. Oct.

18, 2004) (emphasis added).

      This is not a case in which all reasonable persons must agree with WMATA's argument

that Ms. Scott acted negligently by attempting to disembark as she did. As the District of

Columbia Court of Appeals has explained:

> A reasonable person need not go through life timidly, seeking to
> guard against that which is only remotely probable and not to be
> feared except by the overly cautious.
>
> "As a general proposition, a plaintiff is not bound to anticipate
> negligent conduct on the part of others. Rather, he may assume
> that others will fulfill their duties."

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

*Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985) (quoting J. DOOLEY, MODERN TORT LAW § 4.18 at 115 & n. 1 (1982)).  The jury was entitled to find as it did.

What WMATA asks of the Court would amount to a usurpation of the jury's proper role.  The Court should decline WMATA's invitation.

### D.   WMATA has not demonstrated an entitlement to a partial judgment regarding damages.

The logic of this portion of WMATA's Motion is not easy to unpack.   WMATA summarizes its argument as follows:

> There is no legally sufficient basis for the jury to find that any damages were established with reasonable certainty without the underlying costs. Therefore, there was no basis for the jury's award of damages. The Court should disturb the jury's verdict, given that Plaintiff failed to present any admissible evidence as to damages, and therefore failed to assert any damages with reasonable certainty, and return a verdict in favor of WMATA, given that damages are an essential element of Plaintiff's claim.

(Def.'s Mot. at 24).  More concisely: "Plaintiff did not move medical billing documents into evidence; therefore, Plaintiff did not prove **any** damages at all at trial; therefore, Defendant wins on liability, too, and should have judgment entered in its favor."  The logical and legal infirmities of that argument are myriad.

A plaintiff in a personal-injury case is competent to testify to the amount of her own medical bills.  A plaintiff is competent to authenticate her own medical bills for purposes of admitting them into evidence, and she need not introduce any additional testimony to establish that they are reasonable and necessary.  *Green v. U.S.P.S.*, 589 F. Supp. 2d 58, 68 n.2 (D.D.C. 2008).  It stands to reason, then, that instead of moving her bills into evidence, a plaintiff may

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

also simply testify to the amount of the bills.  Testimony is evidence[7]; once that testimony has been given, the jurors may rely on it.

Here, Ms. Scott testified to the amount of her bills.  (Ex. 2, Trial Tr. Vol. II, at 249:15).  The jury returned a round-number verdict ($1.6 million) from which it was not even clear what value (if any) was assigned to reimbursement for medical expenses.  It might also be noted—as was explicitly discussed at trial[8]—that there was absolutely zero dispute as to the authenticity or dollar amount of the bills in question.  With respect to Ms. Scott's testimony to the dollar amount of her medical bills, WMATA has nothing of which to complain in good faith; it certainly is not entitled to judgment in its favor, as it requests without explanation.

### E.    WMATA has not demonstrated an entitlement to remittitur.

It is a bedrock principle of our justice system that a jury's decision regarding an issue entrusted to it must not be lightly disturbed.  *See, e.g.*, *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000) ("We do not, however, lightly disturb a jury verdict.").  Remittitur is only appropriate when a jury verdict "is beyond all reason or is so great as to shock the conscience."[9]  *Phillips v. District of Columbia*, 458 A.2d 722, 724 (D.C. 1983).

---

[7]    "'Testimony' is evidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition."  29 Am. Jur. 2d Evidence § 5.

[8]    Trial Tr. at 240:16-18.

[9]    WMATA's argument regarding a slide in Plaintiff's opening statement is not only unavailing; it also neglects to mention that counsel for WMATA did not timely object to it.  WMATA attempts to paper over this fatal deficiency by fuzzily asserting that "WMATA objected to the use of Plaintiff's counsel's opening statement [PowerPoint] which displayed the suggested calculation."  (Def.'s Mot. at 25).

WMATA's argument is disingenuous.  WMATA's objection in question was to the use of a PowerPoint in opening statement without first permitting counsel for WMATA to view it.  (Ex. 1, Trial Tr. Vol I, at 120:14-121:4).  Over the objection of the undersigned, the Court ordered the undersigned to permit counsel for WMATA to review the entire PowerPoint slideshow prior to

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

In the context of a woman who suffered a horrifically painful injury, worked hard through a grueling rehabilitation journey to recover the best possible function, but has been left with permanent disfigurement, pain, and disability, can it **really** be said that the jurors' verdict of $1,600,000 was "beyond all reason or is so great as to shock the conscience"? *Phillips*, 458 A.2d at 724 (D.C. 1983). Respectfully, it cannot. WMATA is not entitled to remittitur.

## III.  Conclusion

For the reasons set forth above, Ms. Scott respectfully requests that the Court DENY Defendant's Motion.

---

opening statements; the Court took a recess while counsel for WMATA did so. (Ex. 1, Trial Tr. Vol I, at 121:5-122:1).

Having reviewed the slideshow, counsel for WMATA spouted a long list of objections:

> MR. WATERS: Your Honor, having had the opportunity to review the PowerPoint, I have a number of concerns. It includes slides that define safety rules, define legal standards, includes several slides that are more geared toward argument than summarizing the anticipated evidence. The PowerPoint, in my review of it, appears mostly geared towards a closing statement as opposed to an opening.
>
> To the extent that they're setting up legal standards that this Court has not yet advised the jury, I don't think it is appropriate and should not be used in the openings.

(Ex. 1, Trial Tr. Vol I, at 122:3-14). The complaint WMATA now makes regarding the use of a slide with an iceberg on it was not among those objections.

Had WMATA objected to it before or even during the undersigned's opening statement, the Court could have ruled as it deemed appropriate and WMATA would have preserved its objection. WMATA did not do that.

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030

Respectfully submitted,

REGAN ZAMBRI LONG PLLC

By:  /s/ *Christopher J. Regan*
        Patrick M. Regan      #336107
        pregan@reganfirm.com
        Christopher J. Regan   #1018148
        cregan@reganfirm.com
        1919 M Street, N.W., Suite 600
        Washington, D.C. 20036
        PH: (202) 463-3030
        FX: (202) 463-0667
        *Counsel for Plaintiff*

Regan Zambri Long
1919 M Street, NW
Suite 600
Washington, DC 20036

202-463-3030