```
                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
CAROL WILD SCOTT,
                                       CA No:  1:22-cv-00601-CRC
          Plaintiff,
                                       Washington, D.C.
                                       Monday, April 21, 2025
v.                                     9:41 a.m.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY,

          Defendant.
- - - - - - - - - - - - - - - - x
_____
                        TRANSCRIPT OF JURY TRIAL
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                      UNITED STATES DISTRICT JUDGE
_____
APPEARANCES:
For the Plaintiff:         PATRICK MICHAEL REGAN, ESQ.
                           CHRISTOPHER REGAN, ESQ.
                           REGAN ZAMBRI & LONG, PLLC
                           1919 M Street, NW, Suite 350
                           Washington, DC 20036
                           (202) 463-3030
                           pregan@reganfirm.com
                           cregan@reganfirm.com


For the Defendant:         JASON R. WATERS, ESQ.
                           LAUREN GILMAN, ESQ.
                           WILSON ELSER
                           8444 Westpark Drive, Suite 510
                           McLean, VA 22102
                           (703) 245-9300
                           jason.waters@wilsonelser.com
                           lauren.gilman@wilsonelser.com

Court Reporter:               Lisa A. Moreira, RDR, CRR
                              Official Court Reporter
                              U.S. Courthouse, Room 6718
                              333 Constitution Avenue, NW
                              Washington, DC  20001
                              (202) 354-3187
```

```
 1                          I N D E X

 2

 3    WITNESS                                                  PAGE

 4     STACY SWAIN
           (By Mr. P. Regan)...................................158
 5         (By Mr. Waters)....................................164

 6     CAROL WILD SCOTT
           (By Mr. P. Regan)...................................177
 7
```

| | |
|---|---|
| 1 | A F T E R N O O N   S E S S I O N |
| 2 | THE COURTROOM DEPUTY:  Your Honor, we're back on |
| 3 | the record for Civil Case 22-601, *Carol Wild Scott v.* |
| 4 | *Washington Metropolitan Transit Authority.* |
| 5 | THE COURT:  All right.  Welcome back, everybody. |
| 6 | I hope everybody had a good lunch. |
| 7 | MR. WATERS:  Thank you, Your Honor. |
| 8 | THE COURT:  So what do you think, Mr. Waters? |
| 9 | Decent way to pick a jury? |
| 10 | MR. WATERS:  Very impressed, Your Honor.  After |
| 11 | years of doing it in New York and the Commonwealth, I |
| 12 | thought it went very smoothly. |
| 13 | THE COURT:  Got it in in the morning, not bad. |
| 14 | MR. WATERS:  No, not too bad. |
| 15 | Before we call in the jury, we had a discussion |
| 16 | with counsel about the PowerPoint that they intend to use in |
| 17 | their opening.  He shared with me the illustrative exhibits |
| 18 | that I have seen before; however, I understand that there |
| 19 | are text slides that are going to be included and I think |
| 20 | some image or something.  I'm not sure of what.  Counsel |
| 21 | declined to share that with me. |
| 22 | So I haven't seen the PowerPoint that they're |
| 23 | intending to use in their opening statement.  My |
| 24 | understanding is that we usually exchange those if we intend |
| 25 | to use them in an opening statement. |

```
 1              THE COURT:  Okay.
 2              MR. WATERS:  So to the extent that we have not had
 3    an opportunity to review that, we would object to its use in
 4    the opening.
 5              THE COURT:  Mr. Regan.
 6              MR. C. REGAN:  Yes, Your Honor.  So I did show
 7    Mr. Waters the illustrative exhibits and the demonstrative
 8    exhibits within it and also mentioned, Your Honor, that I
 9    was happy to show him any other images in it -- there was
10    the iceberg, the scales of justice, little things like
11    that -- but not the text.  I did not --
12              THE COURT:  Show him the PowerPoint.
13              MR. C. REGAN:  All the texts and everything, Your
14    Honor?
15              THE COURT:  Well, what's in the text?
16              MR. C. REGAN:  Sort of what Your Honor might
17    expect for any visual presentation, the main points of a
18    presentation --
19              THE COURT:  Show him the whole presentation.
20              MR. C. REGAN:  -- written on a whiteboard
21    historically.
22              THE COURT:  Show him the whole presentation.
23              MR. C. REGAN:  Okay.  Your Honor.
24              THE COURT:  We'll take five minutes.
25              MR. WATERS:  Thank you, Your Honor.
```

```
 1                    (Recess taken)
 2              THE COURT:  We okay?
 3              MR. WATERS:  Your Honor, having had the
 4    opportunity to review the PowerPoint, I have a number of
 5    concerns.  It includes slides that define safety rules,
 6    define legal standards, includes several slides that are
 7    more geared toward argument than summarizing the anticipated
 8    evidence.  The PowerPoint, in my review of it, appears
 9    mostly geared towards a closing statement as opposed to an
10    opening.
11              To the extent that they're setting up legal
12    standards that this Court has not yet advised the jury, I
13    don't think it is appropriate and should not be used in the
14    openings.
15              MR. C. REGAN:  Yes, Your Honor.  It does not set
16    up legal standards.  I don't know what Mr. Waters is talking
17    about with that.  I would basically disagree with his full
18    characterization of it.  The PowerPoint does help illustrate
19    my opening statement where we've framed the issues for the
20    jury and talk about what we believe the evidence is going to
21    show them.
22              THE COURT:  Okay.
23              MR. C. REGAN:  Of course, it does reference the
24    safety rule that will be testified to.
25              I don't know how else to frame the case --
```

1           THE WITNESS:  Oh, I'm sorry.
2    Q.  About -- did you give a statement to the Metro
3    investigators about what you witnessed?
4    A.  Yes.
5    Q.  And did you tell them, the Metro people, that there had
6    been no warning before the train jerked forward?
7    A.  Yes.
8    Q.  Okay.
9           MR. REGAN:  Your Honor, I have no further
10   questions of Ms. Swain.
11          THE COURT:  Thank you.
12          Mr. Waters.
13                     CROSS-EXAMINATION
14   BY MR. WATERS.
15   Q.  Good afternoon, Ms. Swain.
16   A.  Good afternoon.
17   Q.  We met a little bit earlier.  My name is Jason Waters.
18   I represent Metro.
19   A.  Yes.
20   Q.  Were you an experienced Metro rider?
21   A.  Yes.  I'm originally from Brooklyn, New York, and I've
22   never had a license; so I'm familiar with all train systems
23   basically.
24   Q.  So with regard to Metro in specific, did you ride Metro
25   every day?

1  A. Yes.
2  Q. Okay. To and from work?
3  A. Yes.
4  Q. Okay. So had you had prior experiences where trains
5  would stop and then reposition?
6  A. Yes. Still.
7  Q. Okay. So there was -- in your experience, was it an
8  uncommon experience for the train to reposition?
9  A. It's hard to say with Metro. It depends on the line.
10 You know, it's hard to say, but yes, it happens frequently.
11 Q. Okay. Would you agree that it's important to keep
12 yourself stable on the train to make sure that you're
13 holding on to something or seated while the train's moving
14 or if the train's about to move to protect yourself?
15 A. Sometimes that's not always an option.
16 Q. Would you agree that that's a particularly important
17 option if you are somebody who is perhaps unable to ambulate
18 without a cane?
19 A. Because the train was already stopped and the doors were
20 about to open.
21 Q. I'm asking you more generally.
22 A. Uh-huh.
23 Q. Would you agree that if you were a passenger who walks
24 with a cane or uses a cane, that it's important to make sure
25 that you put yourself in a position on Metro that's stable?

1   A.   I came back to the D.C. area.  And I was not real happy
2   with appellate judges, so I started my own business doing,
3   believe it or not, insurance physicals.  And I trained and
4   became a nationally registered paramedic.
5   Q.   Okay.  And how long did you do that?
6   A.   Until 1995, when I joined the VVA chapter and discovered
7   nobody had any benefits.  So I went to a training session
8   here in Washington and went -- during that, somebody, the
9   person giving the talk about the veterans consortium pro
10  bono program, I stuck my hand up and said, "Where do you
11  find the books?"
12         And he hired me to be his deputy.  He needed an
13  XO.
14  Q.   Okay.  And what were you doing?  When you were working
15  with the veterans, what were you doing?
16  A.   With the consortium or on my own?  I had a double
17  practice.
18         I did pro bono work for the members of my VVA
19  chapter, and on the job with the consortium I placed cases
20  with attorneys that were volunteers, all of them, all over
21  the country.  And while I was there, I placed somewhere
22  between 9,000 and 10,000 cases.
23  Q.   And what were the cases generally?  In other words, just
24  tell us what you were doing.
25  A.   The cases were all appellate cases before the Court of

1   Appeals for Veterans Claims.  And other people in the shop
2   evaluated them, figured out what to do with them, and I
3   placed the cases.
4   Q.  All right.  So, in other words, you're helping veterans
5   get benefits.
6   A.  Oh, yes.  I never stopped doing that.
7   Q.  And at some point you started working with Native
8   American veterans?
9   A.  Yes.
10  Q.  Okay.
11  A.  That would have been about 2004.
12         My husband is a Native American veteran from a --
13  he's Assiniboine from Fortville Map, Montana.  And I
14  discovered the Indians were getting no benefits.  They were
15  getting not proper care.  They were getting nothing.  So I
16  -- I had already been going up on the Hill advocating as
17  part of my federal bar work, and I just switched gears and
18  determined that the rest of my career would be working for
19  indigenous veterans.
20  Q.  Now, in the months before you got hurt in September
21  2019, you were traveling -- tell us what you were doing.
22  A.  I was working with the firm of Bergmann & Moore as an
23  independent contractor, and basically I and a colleague,
24  Paul Sullivan, who worked for them at the time, we went to
25  the -- to various places.  We went to reservations in

1   Minnesota, North and South Dakota, and Montana and New
2   Mexico.
3   Q.  And what were you doing?  Tell us what you were doing
4   doing this work.  What did it involve?
5   A.  We made arrangements to do veterans benefits workshops
6   at each reservation.  And they were usually one-day
7   workshops, and we went from 8:00 in the morning until
8   sometimes past 6:00.
9   Q.  And was this during the summer of 2019?
10  A.  Yes.
11  Q.  Okay.  And you traveled all around to the reservations,
12  and you would do workshops for veterans?
13  A.  Right.  To teach them what their benefits were and what
14  the regulations and the law was.  And the biggest thing was
15  to try and encourage the development of tribal veterans
16  service officers who could properly represent them.
17  Q.  Okay.  Let's talk about September 23, 2019.
18  A.  Fine.
19  Q.  What was your work schedule like at that time?
20  A.  I was basically in between assignments.  We were due to
21  go to Navajo Nation and had the honor of being permitted to
22  meet with Navajo leadership, and that was due to start the
23  following week.
24  Q.  So the week after September 19th?
25  A.  Right.

1  Q.  All right.  So on this particular day, we know you were
2  coming downtown.  Take us through what happened that day.
3  Where did you -- did you start at home?  How did you get to
4  Metro?  All of that.
5          Tell us what happened.
6  A.  I drove from Linden to Vienna, parked, and got on a
7  Metro train to go to McPherson Square.  I was meeting some
8  of my native contacts for dinner at Georgia Brown's.
9  Q.  And the -- I know that -- I jumped over one thing a
10 minute ago when you were talking about your background.
11         Tell us about the work that you were doing on
12 Capitol Hill when you were lobbying House and Senate
13 committees.
14 A.  I was advising them on the needs of indigenous veterans
15 and trying to get them to incorporate into legislation
16 things like traditional healing, which the VA did not
17 recognize, and to make sure that they had things -- adequate
18 healthcare, particularly mental health care, and that's
19 where traditional healing came in -- and what their
20 educational benefits were and to put legislation that would
21 encourage the VA to do the right thing.
22 Q.  So on September 19th you were heading downtown to
23 dinner.
24         What happened when you got to McPherson Square?
25 A.  All the way in -- not every station, but enough of

1    A.   Until sometime towards the end of April.

2    Q.   So April 2020?

3    A.   Right.

4    Q.   Okay.  So just about the beginning of COVID?

5    A.   Exactly.

6    Q.   Okay.  And how were you doing at that point?  When you

7    finished physical therapy, how were you doing?

8    A.   I was doing much better.

9    Q.   When you say "much better," describe for us what you

10   were doing.

11   A.   Well, I could navigate with a cane.

12        And I couldn't do the grocery store.  I was

13   limited in that.  I couldn't go shopping.  I couldn't do

14   anything like that.  So I wound up getting a scooter, one of

15   those little things, and I did the scooter to the grocery

16   store and so forth.

17        And I used that for some period of time.  I even

18   tried to travel with it, and that was a disaster.

19        But I finally just got to the point where I could

20   use only the cane.  And I guess it was later -- in fact, it

21   was the end of November -- no, it was the following

22   November, but I was pretty mobile.  I was able to do a few

23   things.  I couldn't go to the Hill.

24   Q.   You're talking about Capitol Hill?

25   A.   Well, I was negotiating with the staffers in the Senate

1  committee and House committee on those same topics as
2  always.  And the one time I went, I was a member of the
3  Speaker leader -- at that point Pelosi's -- veterans
4  roundtable.  I was the only non-VSO in it, and I went in a
5  wheelchair.
6  　　　　　My daughter, Rebecca, took me up there in a
7  wheelchair.  That was awkward.  It was difficult, but I was
8  able to do that.
9  Q.  Now, do you use your cane all the time now?
10 A.  Pretty much, yes.  Except in the house.  I don't use it
11 in the house.
12 Q.  But when you're outside, do you use it?
13 A.  Yeah.
14 Q.  Before your femur got fractured, what was your activity
15 level?  Tell the members of the jury what you did in terms
16 of your activities.
17 A.  Well, I knew I was getting older.  I was unhappy at
18 getting older, but I knew that was inevitable.  And I knew
19 that what I was doing was important to me, so I was
20 determined to keep myself in somewhat decent shape; and I
21 had been in and out of the gym, and I had been into what I
22 call old lady cross-fit.  I had -- the local cross-fit gym
23 had a program worked out just for me.
24 　　　　　And then I was taking up space that other people
25 needed, so I went to the regular gym in Front Royal, Silver

1    Slippers, whatever that means, and I spent -- three days a
2    week I would go to the gym to keep myself fit.
3             And if I hadn't gone, I wouldn't have survived
4    this fall.  I would not.
5    Q.  All right.  And what about in your yard, in your garden?
6    What were you doing?
7    A.  Nothing.
8    Q.  No, no, no --
9    A.  Before?
10   Q.  -- before --
11   A.  Before I had a vegetable garden that was about 20 feet
12   by 50 feet, half of which I dug myself with a mattock.
13            And I grew basically every -- all the vegetables
14   and things that we ate, they came out of the garden.  I
15   froze.  I canned almost all of it.
16            And, of course, I enjoyed the things that didn't
17   can well, but I put up -- we had berry bushes, so I put up
18   jams and jellies.
19   Q.  How about around your property?  I understand there's a
20   mountain.  Did you hike that regularly before?
21   A.  I walked the mountain a lot.  I'm on top of the
22   mountain.
23   Q.  Okay.
24   A.  And I would spend time going into the woods looking for
25   native plants to move to my yard and just walking the

1  mountain. I mean, we had --
2  Q. Have you been able to do that since your leg was
3  fractured?
4  A. No. When they came to fix the broadband station, which
5  is up in a tree, I tried to go into the woods to talk to the
6  guys that were doing it, and I almost fell. I had my cane,
7  but between the cane and hanging on to a tree was about the
8  only way I could do it, so I just gave it up. I haven't
9  been in the woods since.
10 Q. How about gardening? Are you able to do the gardening
11 that you do?
12 A. No.
13 Q. And why not? Just explain why not.
14 A. The garden is down about a 20-degree slope, and then I
15 put a fence around it to keep the bears out of it, and
16 there's a gate, and then there's -- the first garden is a
17 top garden, and then there are -- there's stone steps that
18 go down to the next garden, but they're big rocks like this,
19 and they're kind of graduated down. And it's very awkward
20 to try and do that with a cane. It's just too treacherous
21 so I can't do it.
22 Q. Do you have any pain or stiffness or lack of motion in
23 your left leg now?
24 A. I can pretty much use it, but it gets tired on occasion
25 if I'm doing too much. And I can't sleep on that side at

1  all because that pin that they put at the top of the leg
2  kind of sticks into the rest -- into my hip, and it's very
3  uncomfortable.  So I have to sleep on my side, on my right
4  side.
5  Q.  Okay.  Any other problems that you're having currently,
6  Ms. Scott?
7  A.  My balance because the left leg wound up a half an inch
8  shorter than the right leg, and when you have that
9  imbalance, it throws the whole spinal column out, and you
10 wind up with back issues.
11        And over the years, particularly the last year or
12 two, I've increasingly had problems with my lower back.  It
13 gets tired, and I can't do as much as I did.
14 Q.  How about your work with the Native American veterans?
15 Have you been able to travel the reservations at all since
16 this happened?
17 A.  No.  I wasn't able to do any more of that, and it was --
18 it made -- it really hurt because those people need so much,
19 and Capitol Hill is very slow in doing what they need to do
20 for them.
21        The only thing I've been able to do is to drive.
22 My husband and I drive to Illinois, to the National
23 Gathering of American Indian Veterans.  They come from all
24 over the country, and they do programs, and I've been doing
25 the programs there for the last five or six years.  I think

1  we missed one year.
2  Q. Okay.
3        MR. P. REGAN: Your Honor, I only have one more
4  question or area. I'd like to approach the witness with
5  Plaintiff's Exhibit No. 16 in the notebook. It's the
6  itemization of medical expenses.
7        THE COURT: Okay. You can approach.
8        MR. P. REGAN: Okay.
9  Q. Ms. Scott, looking at Plaintiff's Exhibit No. 16 in the
10 exhibit notebook, would you tell us what that is, please.
11 A. These are the medical bills, transport, Manassas --
12 Q. Are these the medical expenses --
13 A. -- and my family doctor, and it's just -- I was appalled
14 when I saw this, when I started getting those bills.
15 Q. All right. And what is the total on the medical bills?
16       MR. WATERS: Objection, Your Honor.
17       THE COURT: Overruled.
18 Q. Ms. Scott, what is the total on Plaintiff's Exhibit No.
19 16?
20 A. $229,541.63.
21       MR. P. REGAN: Okay. Your Honor, I have no
22 further questions. Thank you.
23       I would move in Plaintiff's Exhibit No. 16.
24       MR. WATERS: Objection, Your Honor.
25       THE COURT: Okay. We'll reserve on your

```
 1    -- it was the older trains, and I was sitting on the right-
 2    hand side in the back.
 3            And I don't know if you remember.  The older
 4    trains had two seats like back there, and then the call box
 5    is right there, and the door, and they had a pole.  When you
 6    came into the train, it had a pole right there.
 7            But I was sitting right back there, tired; long
 8    day at work.
 9            The train slowly pulled into McPherson Square
10    station, and then it sat there for a few minutes; and then
11    all of a sudden it violently jerked forward and caught
12    everyone off guard, even me sitting there.
13            And the reason why I remember this is because I
14    had spinal surgery the year before so I was, you know,
15    trying to brace myself.
16            Everyone flew forward because the train jerked so
17    violently.  And people had risen to -- in anticipation of
18    getting off at McPherson Square and trying to grab poles,
19    you know, the bars on the top of the seats, anything to
20    steady themselves.
21            And then I heard a loud thump and a crack, and as
22    a mother, you know when something -- when you hear
23    something, you hear -- and then I heard a loud scream, and I
24    think my mother ears perked up, and then I -- when I heard
25    the scream -- the thud and the crack were sickening, but
```

1   when I heard the scream, I immediately jumped up because
2   people are moving around now.  People -- the doors finally
3   opened.  People are disembarking, but other people are
4   staying there trying to help who I found to be Ms. Scott.
5   And, you know, she's screaming because she's in pain.
6          And I see them trying to move her, and my instinct
7   just kicked in, and I scream out.  And you can see I'm a big
8   woman.  I'm bossy.  And I was like, "Don't move her.  Nobody
9   touch her.  Don't move her because you don't know what's
10  wrong, and you could hurt her more."
11         And then, like I said, the call box is right
12  there, you know, behind your head, so I hit the call box and
13  called the station manager and said we had an injured person
14  on the train, and we needed an ambulance immediately.
15         And then I -- Ms. Carol was still laying there
16  screaming in pain, and I took my jacket off, and I went over
17  to her to try to comfort her just to calm her down because
18  she was really screaming and really in pain, and, you know,
19  I was just holding her hand.  I put my jacket -- flattened
20  it a little bit but just so her head wasn't on that floor,
21  the dirty floor.
22         And I just held her hand and talked to her and
23  just tried to calm her down, you know, "What's your name,
24  darling?  Who can I call?"  And I just tried to keep her
25  calm and out of pain as much as I could until the ambulance