```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
       - - - - - - - - - - - - - - - x
3      CAROL WILD SCOTT,
                                        CA No:  1:22-cv-00601-CRC
4                  Plaintiff,
                                        Washington, D.C.
5      v.                               Tuesday, April 22, 2025
                                        9:10 a.m.
6
       WASHINGTON METROPOLITAN AREA
7      TRANSIT AUTHORITY,

8                  Defendant.
       - - - - - - - - - - - - - - - x
9

10     _____

11                      TRANSCRIPT OF JURY TRIAL
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
12                   UNITED STATES DISTRICT JUDGE
       _____
       APPEARANCES:
13     For the Plaintiff:        PATRICK MICHAEL REGAN, ESQ.
                                 CHRISTOPHER REGAN, ESQ.
14                               REGAN ZAMBRI & LONG, PLLC
                                 1919 M Street, NW, Suite 350
15                               Washington, DC 20036
                                 (202) 463-3030
16                               pregan@reganfirm.com
                                 cregan@reganfirm.com
17

18     For the Defendant:        JASON R. WATERS, ESQ.
                                 LAUREN GILMAN, ESQ.
19                               WILSON ELSER
                                 8444 Westpark Drive, Suite 510
20                               McLean, VA 22102
                                 (703) 245-9300
21                               jason.waters@wilsonelser.com
                                 lauren.gilman@wilsonelser.com
22
       Court Reporter:           Lisa A. Moreira, RDR, CRR
23                               Official Court Reporter
                                 U.S. Courthouse, Room 6718
24                               333 Constitution Avenue, NW
                                 Washington, DC  20001
25                               (202) 354-3187
```

```
 1                    I N D E X

 2

 3      WITNESS                                          PAGE

 4      CAROL WILD SCOTT, Resumed
             (By Mr. P. Regan)...................................246
 5           (By Mr. Waters)....................................250

 6      ANDREW BISHOP, M.D.
             (By Mr. P. Regan)...................................275
 7           (By Mr. Waters)....................................286

 8      CARL M. BERKOWITZ, Ph.D.
             (By Mr. P. Regan)...................................315
 9           (By Mr. Waters)....................................347
             (By Mr. P. Regan)...................................359
10           (By Mr. Waters)....................................362

11      RAJKUMA RAO, M.D. (by video)

12      CLEV BERNARD IBANEZ BENNETT (by video)

13      ALFRED EMONDI (by video)

14      DOMINIC JOHNSON
             (By Mr. Waters)....................................389
15           (By Mr. C. Regan)..................................397

16

17

18

19

20

21

22

23

24

25
```

```
 1    A.  Yes, sir.

 2    Q.  Okay.  And let me ask.  A minute ago on the left-hand

 3    column we have every single provider that treated you,

 4    correct, on Page 1 and Page 2?

 5    A.  Yes, that's everybody.

 6    Q.  Okay.  If you look at the total on Page 2, would you

 7    please tell us the precise figure as to how much medical --

 8              THE COURT:  Mr. Regan, let me.

 9              Ma'am.

10              THE WITNESS:  Yes, sir.

11              THE COURT:  After having read that summary, does

12    it refresh your recollection what the precise number is?

13              THE WITNESS:  Yes.

14              THE COURT:  And what is that number?

15              THE WITNESS:  $229,541.63.

16              THE COURT:  Okay.  Thank you.

17              MR. P. REGAN:  Okay.  Your Honor, I have no

18    further questions of the witness.

19              THE COURT:  Mr. Waters.

20              MR. P. REGAN:  I renew my motion, but we can

21    discuss it later to admit it, to admit the exhibit.

22              MR. WATERS:  And renew our objection.

23              THE COURT:  Excuse me?

24              MR. WATERS:  And renew our objection to the

25    admission of the summary.
```

1    A.  Yeah, I'd have to look at my notes, to be honest with

2    you.  I meant to bring them.  I forgot.

3    Q.  October -- I'm sorry, August 4, 2021, is what the

4    records indicate.  Does that sound consistent?

5    A.  That sounds right, yes.

6    Q.  What was her condition at that time when you saw her?

7    A.  She had sustained what's called a subtrochanteric femur

8    fracture, which was treated surgically, and she came to see

9    me for follow-up care.

10   Q.  Okay.  And at my request, did you review certain medical

11   illustrations that have been prepared by a medical

12   illustrator?

13   A.  I did.

14   Q.  And the illustrations are Exhibits 5, 6, and 7 in the

15   binder in front of you.  I'm just going to ask you a

16   question.  Are those the illustrations you reviewed?

17   A.  Yes.

18   Q.  Will those medical illustrations help you explain your

19   testimony to the jury?

20   A.  Yes, I believe they will.

21          MR. P. REGAN:  Your Honor, at this time, pursuant

22   to Rule 107, I would ask that the Court accept for

23   illustrative purposes Plaintiff's Exhibits 5, 6, and 7.

24          MR. WATERS:  The same objection that we previously

25   raised with regard to the authentication.

1              THE COURT:  Overruled, and so moved.

2              MR. P. REGAN:  Judge, if I can, I'd like to set up

3      the easel with the illustrations and have Dr. Bishop come

4      down with a portable mic and explain the surgeries.

5              THE COURT:  You don't have them electronically?

6              MR. P. REGAN:  We do have them electronically.

7              THE COURT:  I see.  Go ahead.

8              MR. P. REGAN:  They're very small.  They're very

9      small.

10             May I have him come down with the microphone?

11             THE COURT:  Sure.

12             MR. P. REGAN:  Okay.

13             MR. WATERS:  Your Honor, may I position myself so

14     I can see what's being shown to the jury?

15             THE COURT:  Yes, if we could do that in a way that

16     Mr. Waters can observe.

17             THE WITNESS:  Upside down.

18             THE COURT:  They're upside down.

19             THE WITNESS:  Upside down.

20     BY MR. P. REGAN:

21     Q.  All right.  Doctor, what I'm going to do is have you

22     come down and stand in a way that you're not blocking

23     anybody's view and explain this.  I'm going to have you put

24     this microphone on.

25             THE COURTROOM DEPUTY:  It's currently muted, so

1    was where counsel proffering Mr. Berkowitz was not offering

2    him that way.

3              So, in other words, in your ruling, I don't think

4    it's proper to grant a motion that now could be used on

5    cross-examination to say you weren't allowed to testify to

6    jerk rates.  We didn't even try to qualify him that way.

7              MR. WATERS:  No, no, I need to clarify, Mr. Regan.

8    I apologize.

9              THE COURT:  Are you seeking to voir dire

10   Dr. Berkowitz to establish that he's not qualified to

11   testify about the national standard of care?

12             MR. WATERS:  Yes, and part of that --

13             THE COURT:  Would your questions be limited to

14   that issue?

15             MR. WATERS:  The cross-examination was going to be

16   based on not the ruling in this case, Your Honor.  I wasn't

17   going to cross-examine him on your ruling with regard to

18   jerk rates.

19             Now, I disagree with counsel.  He's very much

20   offered on jerk rates.  It's very much a part of his initial

21   disclosure.  But I accept Your Honor's ruling with regard to

22   the exclusion of that portion of his testimony.

23             THE COURT:  Well, just to be clear, I believe the

24   ruling was denied in part --

25             MR. WATERS:  Granted.

1              THE COURT:  -- granted in part on mootness grounds

2      because the testimony on that issue had been withdrawn.

3              MR. WATERS:  Right.  My point is --

4              THE COURT:  I never made any findings as to the

5      validity of his conclusions on jerk rates, et cetera.

6              MR. WATERS:  What I think is fair game on cross-

7      examination and voir dire of the witness is the fact that

8      other Courts repeatedly have excluded him or limited him,

9      characterized his testimony and his opinions as speculative

10     and conclusory.

11             And that is something I think is fair game for

12     cross-examination both in terms of his overall credibility

13     or his overall qualifications as an expert as well as his

14     credibility as an expert.

15             THE COURT:  On that issue, Mr. Regan, what's your

16     position?

17             MR. P. REGAN:  And I stand by what I said before.

18     I knew that's what he was going to do, and that is not

19     proper.  He is not -- he's being offered on one thing here,

20     and that is the national standard of care.

21             This isn't a criticism, Your Honor, but as written

22     your ruling could be used --

23             THE COURT:  He's not going to use my ruling.  This

24     is a different issue.

25             MR. P. REGAN:  No, no, I understand.  I'm using a

1    hypothetical.

2          I'm saying, two weeks from now, when we try this

3    exact same thing before Judge Porter, hypothetically on

4    cross-examination he could use your ruling to say "you were

5    excluded in federal court" because while we all know it was

6    denied on mootness, it's not clear in the order.  And so

7    what I'm saying is it's also not clear in those other orders

8    that have nothing to do with the national standard of care

9    in this case.

10         I would agree that if some Court had ruled that he

11   could not testify on the issue in this case, it would be

12   relevant.  It is not relevant when another Court excludes

13   him on a jerk rate that's not relevant in this case.  All

14   that's going to do is confuse the jury, and it's not proper.

15   And that's why I raised it a week ago.

16         So if it's on the national standard of care as it

17   pertains to giving warnings before moving a subway or light

18   rail train, fine.  Fair game, because that's the issue in

19   this case.

20         But if it's on anything else, it's not because

21   -- we don't know.  We don't know what the lawyer did in that

22   case --

23         THE COURT:  Well, you could, you know, ask him

24   about that and he could be prepared to respond or you could

25   rehabilitate him certainly.

```
1              MR. P. REGAN:  Excellent point.  Excellent point.
2    In his deposition Mr. Waters offered to send him the
3    opinions because he had no idea about 90 percent of them,
4    and he never received them.
5              So yes, hypothetically he could, but he doesn't
6    have them.  Counsel said he would send them to him.  He
7    doesn't have those opinions --
8              THE COURT:  Okay.  But let's take a step back.
9              MR. P. REGAN:  -- so --
10             THE COURT:  In a normal situation, if an expert is
11   proffered to give an opinion on an area of technical or
12   medical expertise, all right, and there's a voir dire to
13   challenge the qualification of the expert, in general, the
14   opponent of the evidence is able to go into the times that
15   Courts have excluded that expert.  Right?
16             And the question is, is it on that exact question
17   that it's going to be at issue, or generally in the field
18   that the expert is being proffered on, which is
19   transportation?
20             MR. P. REGAN:  And I would say -- well, I would
21   say --
22             THE COURT:  Or somewhere in between, right?  It's
23   a judgment call.
24             MR. P. REGAN:  Well, when this Court has already
25   ruled he's qualified, it's not proper to go into that
```

1    because it has no bearing on this issue.

2         He is qualified, by this Court's ruling, to offer

3    an opinion on what's relevant in this case.  He is not

4    offered as an accident reconstructionist, which he was asked

5    about.  He's not offered as a biomechanical engineer, which

6    he was asked about in his deposition.  He was asked about

7    literally 10 different fields that have nothing to do with

8    what is involved in this case.

9         THE COURT:  All right.  So he's next up?

10        MR. P. REGAN:  He's next up, but I just want to

11   make sure it's not in front of the jury.

12        He can -- if he wants to waste all our time in

13   doing it outside the presence of the jury, that's fine.

14        THE COURT:  All right.  Let us take a look.  We'll

15   come back and give a ruling.

16        MR. P. REGAN:  Okay.

17        (Recess taken)

18        THE COURT:  Before we bring the jury back, the

19   subject of the Court's ruling was whether there was a

20   sufficient factual basis in Dr. Berkowitz's supplemental

21   report to support testimony, expert testimony, that the

22   failure to make an announcement before repositioning

23   violated a national standard of care.  That's all I believe

24   the ruling held.  It did not qualify Dr. Berkowitz or say

25   that Dr. Berkowitz would be qualified as an expert in the

1    general field of public transport or whatever field he's

2    being offered as an expert in.  Okay?

3              Mr. Regan obviously can seek to admit him as an

4    expert in that field and then to offer the opinion on

5    national standard of care.

6              Mr. Waters, if you would like to voir dire him

7    using whatever information you'd like as to whether he

8    should be qualified as an expert in the field of X, you're

9    entitled to do that obviously, but that's outside the

10   presence of the jury.  Okay?

11             So if you want to do it to make your record,

12   whatever, you can do it.  The Court will make a ruling as to

13   whether Dr. Berkowitz is qualified to testify as an expert

14   in his field, the relevant field, and then we -- if the

15   Court rules that he is, he would come in and testify as to

16   the national standard of care on direct, and your cross

17   would be limited to the scope of the direct.

18             MR. WATERS:  So, just to be clear, I will not be

19   permitted to cross-examine him on credibility grounds based

20   on the prior exclusions from other courts?

21             THE COURT:  No.  I think that goes to whether he's

22   qualified as an expert or not.

23             MR. WATERS:  Okay.

24             THE COURT:  I think the -- it depends on what

25   Mr. Regan gets into, but if other Courts have found that he

1    has lied -- I mean, if there's something that goes to his

2    credibility or truthfulness, I think that's fair game.  But

3    if we're just dealing with Courts that have found his --

4    have not qualified him to testify as an expert on certain

5    topics, I think that goes to the voir dire.

6            MR. WATERS:  Very well, Your Honor.

7            THE COURT:  Okay.

8            MR. C. REGAN:  Your Honor --

9            THE COURT:  We're going to start with the

10    30(b)(6)?

11            MR. C. REGAN:  I'd like to, Your Honor, and if I

12    could just briefly summarize, it seems like there actually

13    is some dispute.  I don't think it will take more than three

14    minutes.

15            THE COURT:  What's the dispute, Mr. Waters?

16            MR. C. REGAN:  Thank you, Your Honor.

17            Does the Court have the plaintiff's submission of

18    depositions, the binder?  I think it will make things easier

19    to be able to refer to that, Your Honor.  And we'll be

20    looking at the deposition of WMATA's 30(b)(6)

21    representative, Clev Bennett.

22            THE COURT:  Yes.

23            MR. C. REGAN:  Okay.  So the only portion of that

24    that the plaintiff would put in right now by audio

25    recording -- and that's one of the things I can talk about.

```
 1    We've tried to remove any problems here.

 2            There was an exhibit on the screen of the video

 3    recording, so we will play only the audio recording with

 4    just a still frame sort of title page, nothing -- not -- no

 5    exhibits in the video, Your Honor.

 6            But it's only Lines -- it's Page 32, Lines 2

 7    through 7, Your Honor.  And that is a clean exchange --

 8            THE COURT:  Wait.  Hold on.

 9            MR. C. REGAN:  Sure.

10            THE COURT:  32.

11            MR. C. REGAN:  2 through 7, Your Honor.

12            THE COURT:  Okay.

13            MR. C. REGAN:  I know the Court's just read it

14    right now, but I think that is a pretty clean exchange.

15            The defense has taken the position -- so initially

16    we had also designated -- in the pretrial statement we had

17    also designated Page 12, Line 8, through Page 17, Line 5.

18    If the Court feels it's necessary --

19            THE COURT:  One more time.

20            MR. C. REGAN:  Of course, Your Honor.

21            THE COURT:  12.

22            MR. C. REGAN:  12:8 through 17:5.  In that portion

23    Mr. Waters pointed out to me that it's sort of --

24            MS. GILMAN:  That's not us.  That's not the

25    correct --
```

1          MR. C. REGAN:  No, that's what I designated

2     previously in the pretrial statement, Your Honor.

3          MR. WATERS:  Oh, yes.

4          MR. C. REGAN:  And Mr. Waters pointed out that

5     that does -- my questions refer to statements that are not

6     coming into evidence in this case based on the Court's

7     pretrial ruling, so the questions are problematic.

8          We've withdrawn that portion, but the defense had

9     also counter-designated the two pages leading into that

10    portion.  They counter-designated 10:6 through 12:7, Your

11    Honor, in which the WMATA witness talks about the incident

12    report and specifies which pages are part of it, which pages

13    are not, whether the witness statements are part of it.

14          I obviously was unaware -- because of my

15    representations to the Court ten minutes ago, I did not

16    think this counter-designation could be interpreted to apply

17    to our designation at Page 32, 2 through 7, but that is the

18    position the defense has now taken.

19          My position, of course, Your Honor, is that 32, 2

20    through 7, is about as clean a statement of the critical

21    issue in this case as exists.  And this business about what

22    different pages of an incident report that is not coming

23    into evidence concern just has no bearing on it.

24          Of course, WMATA can call Mr. Bennett back

25    tomorrow live to the witness stand, if it wants to, in its

1    case-in-chief.  It can try to run from this.  But he

2    testified under oath that they're not aware of any evidence.

3              THE COURT:  Okay.  Mr. Waters.

4              MR. WATERS:  Your Honor, this entire exchange

5    concerns the incident report; the witness statements that

6    were taken and the substance of WMATA's knowledge of this

7    accident.

8              THE COURT:  Let's start with what Mr. Regan says

9    he wants to ask.

10             "Is WMATA aware of any evidence that would

11   contradict that?  In other words, is there any evidence that

12   WMATA is aware of that the train operator announced the

13   train would be moving before she moved it forward again.

14             "ANSWER:  No."

15             Okay.  So is there anything under the rule of

16   completeness, I guess is the question, that you would want

17   to cross-designate now --

18             MR. WATERS:  Yes.

19             THE COURT:  -- given that you're going to be able

20   to call the witness live and clarify any -- or ask him or

21   her anything you want to tomorrow?

22             MR. WATERS:  Yes, Your Honor.  And I think that

23   that's the portion from 10:6 through 12:7, because this

24   entire --

25             THE COURT:  Wait, 10:6.

```
1                MR. WATERS:  Yes, Your Honor.

2                THE COURT:  Okay.  It starts -- I'm not going to

3     read the whole thing, but it talks about an incident report.

4     What in the incident report contradicts what -- the answer

5     that Mr. Bernard gave at the deposition?

6                MR. WATERS:  I think it gives context to the

7     answer that he gives later, and the context is that WMATA's

8     knowledge is based on the incident report.  And I think the

9     critical part of that exchange is:

10               "Is this incident report that is Exhibit 2

11    supposed to basically be the record on what happened that

12    day?

13               "ANSWER:  It is the record by one employee."

14               So I think it puts it into context.

15               THE COURT:  And that's all you want to play?

16               MR. WATERS:  That's all I want to play, is 10:6

17    through 12:7.

18               THE COURT:  Okay.  Well, 12:7 goes on another two

19    pages.

20               So is your point that Mr. Bernard's answer in the

21    clip that Mr. Regan wants to play in context qualified by

22    the fact that the only evidence he's referring to or that he

23    has knowledge of is the incident report, so therefore

24    there's no evidence in the incident reports that an

25    announcement was made?
```

1          MR. WATERS:  That's correct, Your Honor.  And I

2     think, in the absence of that context, the answer is going

3     to be presented to the jury that's going to be misleading

4     and unfairly prejudicial.

5          THE COURT:  Okay.  Mr. Regan.

6          MR. C. REGAN:  Thank you, Your Honor.

7          If that is true, then WMATA has violated its

8     discovery obligations.  Mr. Bennett was a 30(b)(6) witness.

9     He was designated on topic -- I think it's Area of Testimony

10    1, Your Honor, which would be, I think, Exhibit 2 in your --

11    Exhibit 1 to the deposition in the binder in front of Your

12    Honor.  He was designated to testify as to all information

13    available to WMATA about this incident.

14         We have the right to ask WMATA, the party, through

15    its designated representatives, what knowledge do you

16    possess?  He can't say it's limited to this.

17         And I would also say it's clear from his answer

18    there, Your Honor, my question was not limited.  My question

19    doesn't say "Does the incident report say anything?"  The

20    question, of course, that Mr. Waters just referenced saying

21    "Is this incident report supposed to be basically the

22    record?"  That is -- that's not a full -- I hope I asked

23    more questions, but that's establishing the fact that it's a

24    business record.  It's completely contemporaneously by the

25    people with the requisite knowledge, and it's attempting to

1    be an authoritative source of what happened that day.

2    That's unrelated.

3                THE COURT:  Okay.

4                MR. C. REGAN:  So he doesn't -- you know, the

5    witness here at Page 32, that is not intended to be a

6    question for the witness.  That is me asking WMATA does

7    WMATA have any information.  Because there is nothing in the

8    incident report.  That's what Pages 12 through 15 concern,

9    Your Honor.  That is me going step by step through every

10   incident -- every part of that incident report asking am I

11   missing something.

12               What is being contested here?  WMATA doesn't

13   seriously dispute this, do they?

14               And by the way, all the answers come back no, we

15   don't dispute that witness statement.  We don't dispute this

16   one.  We don't dispute this one.  We don't have any

17   knowledge outside that.

18               But at Page 32, Your Honor, we are entitled, as

19   the plaintiff in this case, to ask the defendant do you have

20   any evidence that this critical piece of the case, that this

21   warning, was actually given?  And he's speaking as the voice

22   of WMATA designated on that topic and says no.

23               They can't come back now and say, no --

24               THE COURT:  Now, look, if he were here live and

25   you asked him that question and Mr. Waters cross-examined

1    him, Mr. Waters could say, "What's the basis for that

2    answer?  You know, are you referring to the incident report

3    or anything else?"  And if he says the incident report, then

4    that's the answer.

5         So if you want to -- if you want to ask him that

6    question, I'm going to give Mr. Waters an opportunity to

7    place it in context to allow him to explain in a sense

8    what's the basis for your answer.  Okay?

9         If you want to, you know, withdraw it, and we'll

10   deal with it all live tomorrow, then we can do that, too.

11   So your choice.

12        MR. C. REGAN:  I guess -- and just to make sure,

13   Your Honor, I want to make sure that I'm not

14   misunderstanding or that I haven't confused the issue for

15   the Court.

16        If we can't rely on the under oath testimony of

17   WMATA's representative on that point, he can't limit -- as I

18   understand the rules, Your Honor, and of course I defer to

19   the Court, but he can't limit that to saying, "Well, I

20   actually only talked about one document."  He has to show

21   up to that deposition understanding the full body of

22   knowledge --

23        THE COURT:  But he did limit it in the deposition,

24   right?

25        MR. C. REGAN:  Respectfully, Your Honor, no.  That

1    is not how the deposition reads.  I could not disagree with

2    that more strongly.

3            THE COURT:  Well, why is there a problem if he

4    didn't limit it to that?

5            MR. C. REGAN:  Because, Your Honor, I think that

6    if we're forced to play this portion that Mr. Waters wants

7    ahead of time, it makes it sound like he's allowed to do

8    that, unless the Court is going to explain and say as a

9    30(b)(6) he can say he only knows about the incident report.

10   But WMATA has an obligation, under our rules of discovery,

11   to produce someone with its full knowledge, and I don't --

12   if the Court wanted to give an instruction like that, I

13   suppose there's a way around it, but otherwise, it

14   drastically waters down the --

15           THE COURT:  Well, the witness -- he wasn't

16   required to go out and conduct a new investigation, right?

17           MR. C. REGAN:  Well, Your Honor, I think he is

18   obligated to be aware of all information available to WMATA

19   on the subject.  So he doesn't have to go out there and

20   measure the train station or something, but he does have to

21   show up competently prepared by WMATA's counsel.  At that

22   point staff counsel, not Mr. Waters, but he has to be

23   competently prepared, and he has to have reviewed any and

24   all information that would be relevant so that when that --

25   and as I say, Your Honor, it's there.  The deposition notice

1    is Exhibit 1.  All information available --

2             THE COURT:  I know what a 30(b)(6) is.

3             Mr. Waters, do you want to respond briefly?

4             MR. WATERS:  This is gotcha litigation, right?  He

5    wants to play one question and one answer without any

6    context.

7             The witness was prepared, answered the question,

8    and those questions, including the one that counsel wants to

9    play, falls in the context of a discussion about this

10   incident report and the bases of information that form his

11   knowledge.

12            THE COURT:  Okay.

13            MR. WATERS:  And what we want to have designated

14   is just the bases of that information.  So playing one

15   question and one answer is a gotcha game that puts this out

16   of context.

17            THE COURT:  Address his response, which is that,

18   as I understand it, he was required to go beyond the

19   incident report; and therefore his answer to Mr. Regan's

20   question ought to have been -- ought to have encompassed

21   everything he was required to learn as a 30(b)(6) witness

22   and not simply the investigation report.

23            MR. WATERS:  As Mr. Regan pointed out, this was

24   handled by prior counsel, but my understanding is he

25   prepared with the information that was available to him.

```
 1            THE COURT:  Okay.

 2            MR. WATERS:  And that information includes the

 3   accident report and the witness statements, and the portion

 4   that we designate puts that information into the universe

 5   context.

 6            THE COURT:  Okay.

 7            MR. WATERS:  So to say that he had an additional

 8   obligation I think is inappropriate.

 9            THE COURT:  All right.  I'll stand by my ruling.

10   If you want to play that clip, I'll give the defense an

11   opportunity to put it in context with the cross-designation.

12            So if you want to consult for a minute.

13            MR. P. REGAN:  Yes, Your Honor.

14            (Pause)

15            MR. C. REGAN:  WMATA had previously offered to

16   produce the witness.  Can you have him here this afternoon

17   still?

18            MR. WATERS:  He was released yesterday, Mr. Regan.

19   I could have him here tomorrow.

20            THE COURT:  And WMATA's going to call him

21   tomorrow?

22            MR. C. REGAN:  We would call him in our case-in-

23   chief, Your Honor.  We'll take him first thing in the

24   morning.  If that's the soonest WMATA will provide him now,

25   that's what we'd like to do, Your Honor.
```

```
 1              THE COURT:  Okay.  We'll do that.

 2              Are we ready?

 3              MR. P. REGAN:  I will go get the witness while

 4    you're doing that.

 5              THE COURT:  So we're ready for Dr. Berkowitz.  Are

 6    we going to do a voir dire outside the presence of the jury?

 7              MR. WATERS:  Your Honor, I'm satisfied with the

 8    record that we made on our motion --

 9              THE COURT:  Okay.

10              MR. WATERS:  -- with respect to the bases for our

11    challenges for Dr. Berkowitz.

12              THE COURT:  Very well.

13              MR. WATERS:  I'd note my objection to the Court's

14    ruling, and if the Court's satisfied with that, I don't

15    think the voir dire is necessary.  When he's offered as an

16    expert, I will object simply for the reasons previously

17    stated.

18              THE COURT:  And I'll just say "subject to your

19    prior objection," if I decide to qualify him.

20              MR. WATERS:  Yes.

21              THE COURT:  Very well.  Okay.  Thank you.

22              Let's get the jury.

23              (Jury enters courtroom)

24              THE COURT:  All right.  Welcome back, ladies and

25    gentlemen.  We're ready to get started.
```

```
 1              Mr. Regan.

 2              MR. P. REGAN:  Yes, Your Honor.  At this point

 3     we'd call one of our expert witnesses, Dr. Carl Berkowitz.

 4              THE COURT:  Dr. Berkowitz, come on up.

 5              THE WITNESS:  Thank you, sir.

 6              THE COURT:  If you could step up and remain

 7     standing and raise your right hand.

 8              THE WITNESS:  Thank you, Your Honor.

 9                    CARL BERKOWITZ, Ph.D., Sworn

10                        DIRECT EXAMINATION

11     BY MR. P. REGAN:

12     Q.  So, Dr. Berkowitz, if you would, just get that

13     microphone.  You need to be fairly close to it, okay, so

14     just adjust it properly.  There you go.

15              Dr. Berkowitz, if you would, please introduce

16     yourself to the jury and state your address.

17     A.  My name is Carl Berkowitz, and I live at 239 Lands End

18     Court, Miroches, New York.

19     Q.  Okay.  And what is your area of expertise that brings

20     you into the courtroom today?

21     A.  Transportation engineering with a focus on safety.

22     Q.  How long have you -- well, first of all, tell us what a

23     transportation safety engineer does.

24     A.  Well, that's kind of a misnomer because in

25     transportation engineering, like in real estate, it's
```

1    location, location, location, and transportation engineering

2    it's safety, safety, safety.  So it's just an integral --

3    everything we do, safety is the key component.

4    Q.  Keep the microphone as close to you as you can so

5    everybody can hear it.  There you go.

6            Who do you currently work for?

7    A.  Myself.

8    Q.  You have your own consulting firm?

9    A.  Yes.

10   Q.  Where do you work out of?

11   A.  I work out of my home, and the name of the firm is me,

12   Carl Berkowitz.

13   Q.  Let me show you what we've previously marked as

14   Plaintiff's Exhibit No. 20.

15           MR. P. REGAN:  May I approach the witness?

16           THE COURT:  You may.

17   Q.  Is that your current curriculum vitae?

18   A.  Yes.  I believe so, yes.

19   Q.  All right.  It's approximately 30 pages long.  What's

20   included in your CV?

21   A.  Well, it's just a summary because of -- I would need an

22   Encyclopedia Britannica to put everything in that I've

23   worked on.  It has my work experience, places I've worked,

24   the schools I went to, where I taught, the research I've

25   done, the organizations I belong to, the awards that I've

1    received, my public service, my community service.

2            It doesn't mention that I'm a grandfather of 11.

3    I didn't put that in.

4            All the papers and articles that I've written, the

5    TV stations that I've appeared on, things -- you know,

6    everything.

7            The reason it's so long is, when I was a college

8    professor, to apply for tenure you had to write your life

9    experience, so this is actually my tenure application, and

10    it became my CV.

11            MR. P. REGAN:  Your Honor, at this point, rather

12    than go through the 30 pages, I would offer the exhibit,

13    Plaintiff's Exhibit No. 20, and that way I can do a summary

14    of it.  But if it's going to be a problem, I'll go through

15    it in detail.

16            THE COURT:  It's inadmissible hearsay.

17            MR. P. REGAN:  Okay.

18            THE COURT:  So hit a few of the highlights

19    sufficient to meet your burden.

20            MR. P. REGAN:  All right.

21    Q.  So, Doctor, let's go through that in a little bit of

22    chronological order, if we can.

23    A.  Sure.

24    Q.  You have your undergraduate degree in civil engineering,

25    correct?

1   A.  It's kind of unusual.  I went to City College School of

2   Engineering.  In those days there were four engineering

3   degrees; so I have a major in civil engineering, a minor in

4   mechanical engineering, and a minor in electrical

5   engineering.  It was a five-year program, and I was an ROTC

6   so I also have military engineering training as well.

7   Q.  And when did you receive your engineering degree, your

8   initial engineering degree?

9   A.  You're going to know how old I am.  1963.

10  Q.  Okay.  And then what -- so you received that degree.

11  What was the next degree you received?

12  A.  Well, I was in a joint degree program.  It was a

13  sequential program where I was also -- from engineering I

14  went into an MBA program at that time at Baruch College.  It

15  was part of City College, and they had a joint degree

16  program.  Very early -- I think it was the first MBA for

17  engineers, and it was called Industrial Management for

18  Engineers, and it was -- I loved it because it was easy

19  compared to engineering school.  I loved business school.

20          And then from there I went on to pursue a PhD in

21  transportation engineering and planning at Polytech --

22  Brooklyn Polytech, which has changed its name, and now it's

23  part of NYU.  And I earned a PhD in transportation

24  engineering and planning.

25  Q.  Let's talk about that.  So transportation planning and

1    engineering.  Explain to the members of the jury, if you

2    would, what is that field?

3    A.  It's really simple.  It's to -- it's to move people and

4    goods safely.  That's our goal.  We call it intermodal

5    transportation.  That's all modes, ALANC, safely.

6    Q.  Does it include automobiles, trains, buses, airplanes?

7    A.  Everything, balloons.

8    Q.  Let's talk about your consulting business.  When did you

9    first go into the field of safety -- transportation safety

10    consulting?

11    A.  When I -- I got a -- could I mention where I worked?

12    Q.  Yes, I was going to say -- never mind.  I jumped ahead.

13    A.  Okay.  When I graduated from City College with the

14    engineering degree, I was recruited by the State Department

15    of Transportation because they were starting the Eisenhower,

16    you know, Defense Highway System.  And there was like a

17    60,000 shortage of engineers.

18          So I went to work for them, and I spent my first

19    two and a half years in training, because when you go to

20    engineering school you really don't know much about

21    practical stuff.  So I spent two and a half years in

22    training -- so I'm a perpetual student, as you can see --

23    learning all about transportation, all aspects of

24    transportation, including railroad.  I even worked in the

25    legal department, and I also had like the third chair on

1    condemnation cases.  It was really great experience, even

2    building docks and groins on beaches, everything you can

3    think of.

4         And from there I was recruited by Governor Nelson

5    Rockefeller, who was the governor at the time, to be his

6    assistant in transportation.  And I'm in my 20s.  I was

7    ecstatic.  And that was his -- not for the whole state, but

8    from Dutchess County in New York, both sides of the Hudson

9    River, including New York City and all the way out to

10   Montauk Point.  And it was a great experience to represent

11   the governor at meetings and things of that nature.  I got

12   to meet people like Robert Moses.  I got to meet everybody.

13   It was -- because I was the governor's right hand in his

14   office.

15        And from there, I was recruited by the city of New

16   York.  They were starting a department of transportation.

17   They had a transportation administration.  They were going

18   to start a department of transportation, and they wanted to

19   set up a planning department and a recent planning, and they

20   recruited me to head that up because they wanted to get rid

21   of me because working for the governor I was a thorn in

22   their side.  They wanted to build a highway in the middle of

23   Manhattan; I stopped it.  They wanted to build a highway

24   through Chinatown; I stopped it.  Things like that.  These

25   were all Robert Moses projects.  And so I went to work for

1     the governor, and that was quite a great experience.

2            And then to the city of New York, and there was a

3     great experience where I got involved in every aspect of

4     transportation, approving the budget.  In the city of New

5     York, the transit system is operated by an authority, but

6     the authority doesn't own the property.  It's the only place

7     where the city owns the property, and the authority does the

8     management.  And any expenditure related to our property,

9     the city's property, had to go through my office.

10           So I was intimately involved in all aspects of the

11    New York City -- oh, I forgot to mention.  When I was in

12    college, I was given an internship with the New York City

13    Transit Authority, so my first introduction to subways was

14    when I was in college as an intern.  Any time I was off from

15    school, I worked as an engineer for transit.

16           Sorry for jumping around.

17    Q.  I'm sorry, let me put some dates on this.

18           So you were -- the period you're talking about

19    with the New York City Department of Transportation was 1970

20    to 1988, right, for those?

21    A.  About that time.  I also was the executive director of

22    the Staten Island Ferry.  I was also the head of the Bureau

23    of Transit.

24           New York City had five bus lines.  They went

25    bankrupt on the same day, if you could believe it, and we

1    had no choice but to take it over, and I was -- I was a very

2    -- I was a grants person.  I had a very good relationship

3    with the USDOT and the secretary of transportation from my

4    days working for the governor, and I was able to get grants,

5    $50 million, to save the bus lines.  So I became a bus

6    operator; ferry operator, a bus operator.

7            Then I was offered -- during this process I was

8    getting my PhD.  It took me about 17 years.  Slow learner.

9    My alma mater invited me back as a visiting professor, so I

10   retired from government and I became the IBM visiting

11   professor at my alma mater, which was just a great honor,

12   and that began my education career.

13           One of the requirements -- when you're an educator

14   in engineering, Friday is not a class day.  It's a

15   consulting day, so you have to go out and do consulting work

16   or research.  It's compulsory.  You know, it's not an

17   option.  So that's why I started consulting work.  The

18   school forced me into it.

19   Q.  All right.  Well, let me talk about schools for a

20   minute.  So on your resume you list --

21           THE COURT:  Counsel, can we go to the phones

22   briefly?

23           (The following is a bench conference

24            held outside the hearing of the jury)

25           THE COURT:  All right.  I don't mean to cut you

1    off, Mr. Regan, but Mr. Waters, any objection to his

2    qualifications and experience and prior work in terms of

3    being qualified as an expert in transportation safety

4    engineering?

5              MR. WATERS:  In terms of educational experience,

6    employment history, no.

7              THE COURT:  So, I mean, are your only objections

8    the ones that you've previously lodged about his reception

9    by other courts and whatnot?

10             MR. WATERS:  Those that we -- and those that we

11   raised -- those that we raised in our motion.

12             THE COURT:  Okay.

13             MR. WATERS:  Yes.

14             THE COURT:  Mr. Regan, I don't want to cut you

15   off, and you can, you know, establish whatever you want to

16   establish, but in light of the fact that there are no

17   objections to some of these things, why don't you lead him a

18   little bit more efficiently.

19             MR. P. REGAN:  My pleasure.

20             THE COURT:  Okay.

21             (This is the end of the bench conference)

22   BY MR. P. REGAN:

23   Q.  We're going to try to do this a little quicker,

24   Dr. Berkowitz, in terms of getting to this case.

25   A.  I'm sorry about it.

1   Q.  No, that's all right.  Not your fault.

2           On your resume, you list about six or seven

3   colleges or universities that you've taught.  Have these all

4   been in the field of transportation safety?

5   A.  Engineering and safety, yes, all of them.

6   Q.  And that's over the period from -- well, from the 1970s

7   until the last ten years or so?

8   A.  Yes.  It's about ten years I stopped.  About ten years

9   ago.

10  Q.  You also list, you know, about 30 or 40 professional

11  affiliations.  What are those?  Not naming them

12  individually, but what are the professional affiliations?

13  Just describe for the jury's --

14  A.  They're engineering societies in civil, mechanical,

15  electrical, biomechanics, biomedical, all the fields that I

16  worked in, assisted transportation for the accessibility of

17  the disabled.  And I was honored to be appointed to --

18  elected to memberships in foreign organizations.

19          The UITP, which is the European -- the world

20  organization in transit, I was elected to their academic

21  committee.  So I'm -- and the CILT in England, I was elected

22  to membership in their transportation national society.

23          I can put all these initials after my name, but I

24  don't.

25  Q.  Okay.  You list -- again, I just want you to describe

1   what they are.  The scholarly activities, publications, and

2   presentations -- and there's about 70 of those -- what are

3   those?

4   A.  My focus from graduate school, I worked with Dr. John

5   Fruin, who is the father of pedestrian safety.  He

6   unfortunately passed away in February.  But everything I

7   focused on was pedestrian, bicycle safety.

8             I was like an environmentalist in a sense.  I

9   resented the fact that everything we did in engineering was

10  motor vehicle oriented, and I wanted to see the pedestrian

11  and the bicyclists get equal treatment, and so I was even a

12  president of a national organization that was focused on

13  that, an engineering organization.

14  Q.  And have you continued to take continuing legal

15  education -- sorry, continuing education programs over

16  the -- over your career in engineering?

17  A.  It's compulsory.  I have to do 16 hours of continuing

18  education to maintain my license every year.  I do more.  I

19  do maybe 50 to 100 hours.

20  Q.  Let's talk about your consulting business.

21             When you're testifying in cases like this

22  involving someone who is getting injured on a subway or

23  train system, do you work for both the injured person, like

24  Ms. Scott, as well as the transit system like Metro?

25  A.   Well, I've worked for the MTA in New York, the New

1    Jersey transit in New Jersey, Cleveland in Cleveland, in

2    Seattle, in Oregon, in Los Angeles.  Probably other -- a

3    couple of other -- in Boston.  I've worked on both sides,

4    and with their knowledge, they know I'm involved in suits

5    against them, and they also retain me to help them on

6    matters that they have on the defense side.

7    Q.  Have you also been contacted by WMATA, the Washington

8    Metropolitan Transit Authority, to serve as an expert in

9    their cases?

10   A.  Several times, but every time I told -- in fact, one

11   time was a case that I was working against them that they

12   asked me if I would be interested in working for them.  But

13   every time I indicate to them that I'm working, you know,

14   cases against them, they decline.  Other transit companies

15   don't decline, but they have declined.

16   Q.  In this case, Mr. Waters and Ms. Gilman are with the

17   firm of Wilson Elser.  Have you worked for that law firm?

18   A.  Yes, for many years.

19              MR. WATERS:  Objection.

20              THE COURT:  Sustained.

21   A.  Yes, for many years.

22              MR. WATERS:  Objection.

23              MR. P. REGAN:  Withdrawn.

24              THE COURT:  The jury will disregard

25   Dr. Berkowitz's last answer.

1    Q.  On how many occasions have you been retained as an

2    expert on transportation safety issues in your career?

3    A.  Nationally?  Internationally?

4    Q.  Career.

5    A.  A couple of hundred maybe.  I don't keep track.

6    Q.  You know, Dr. Berkowitz, this case involves a subway

7    train and the issue of whether a safety warning is required

8    by the national standard of care.  Let's talk about your

9    experience with respect to that.

10          With respect to subway systems, explain to the

11    jury your experience over your career with issues that

12    involve transportation engineering safety only with subways.

13    A.  Well, it started when I worked for the city of New York.

14    I was involved in the design of the R-140 -- I think it was

15    called the new technology car -- back in the '70s.  I was

16    intimately involved in train operations in the city of New

17    York because any funding that came from the -- from the city

18    in terms of capital investments I had to approve that

19    expenditure.  So I had to be very familiar with, you know,

20    what was going on.  Some of the projects that I approved

21    hadn't been even built yet.

22          But I've been involved in almost every aspect of

23    transportation in my career.  I've worked for all the major

24    -- for and against every major transit company in the United

25    States except for Skyline in Hawaii.  I'd love to, but

1    nobody's invited me to work there, in Skyline.

2              I've worked for Tren Urbano in San Juan, Puerto

3    Rico.  I've been involved in Boston, Chicago, Philadelphia,

4    New Jersey, New York, Washington, Atlanta, Miami,

5    Cleveland -- I don't know if I mentioned Chicago -- Los

6    Angeles.  Just about every major transit company.

7              And internationally I've worked for London

8    transport.  I've worked for the train systems in China.  I

9    worked at the train -- Light Rail in Dubai and in Abu Dhabi

10   and Qatar in the Middle East.  In fact, I received an award

11   for innovation, third place.  First place was a million;

12   third place was only $20,000.  But I won an award for

13   innovation in transportation.

14   Q.  When were you first contacted about this case?

15   A.  I think it was around '22/'23.

16   Q.  Okay.  What were you asked to do generally?

17   A.  I was asked to look at the file, look at the records,

18   and see if that -- whether or not WMATA followed the

19   national standard of care in terms of providing information

20   to passengers in terms of passenger safety.

21   Q.  All right.  Did you review certain deposition

22   transcripts that were taken in the case?

23   A.  Yes.  I remember there was Mr. Harris, Mrs. -- I can't

24   -- whether it was Ms. -- it was Harris, Johnson, the train

25   driver, Mr. Bennett, I think.  Mrs. Bennett?  I forget.

1    Pardon me for not remembering the genders.  Ms. Scott.  And

2    also there was an incident report where there were

3    eyewitnesss that I reviewed.

4    Q.  Okay.  And you reviewed the incident report, witness

5    statements, everything in Metro's incident report?

6    A.  Yes, I did, as well as their SOPs, standard operating

7    procedures.

8    Q.  As you know, in this case the issue is when a train

9    operator stops the train too short in a station and then has

10   to reposition it in the proper location so that the doors

11   are in the proper place, whether an audible warning is

12   required to the passengers by the national standard of care,

13   correct?  You understand that issue?

14   A.  Yes, and that is the standard of care.

15   Q.  When we talk about the national standard of care,

16   explain to the members of the jury what we're talking about.

17   A.  It's not something that's aspiration --

18            MR. WATERS:  Objection, Your Honor.

19            THE COURT:  Counsel, do you want to qualify him

20   first, before we start getting into the substance?

21            MR. P. REGAN:  Your Honor, I'm happy to do that.

22   I was going to have him describe in general what he did, but

23   I can save that for the direct, if you prefer.  I can

24   qualify him right now, if you want.

25            THE COURT:  Why don't you -- if you think you have

1   a foundation for record purposes, why don't you qualify him

2   before -- if you're going to get into the --

3            MR. P. REGAN:  I was going to ask him what he did

4   in order to determine the standard of care; not what it was,

5   but --

6            THE COURT:  Okay.  Fine.

7            MR. P. REGAN:  Okay.

8   Q.  Okay.  I don't know, did you finish that answer?

9            When we were talking about the national standard

10  of care, just -- I don't want to be repetitive here, but

11  just explain to the members of the jury what is the national

12  standard of care when we're talking about this issue?  And

13  that is subway train safe operation.

14  A.  It doesn't matter what the area is, the national

15  standard of care is what the industry has chosen as the

16  correct way of doing things, and everybody does it that way,

17  or very close to that way, because every transit system is a

18  little different.  So they have to modify it a little bit to

19  their -- you know, to their particular situation.

20           But it's what we accept in the industry is what --

21  and it's based upon studies, research, lots of work.  The

22  national standard doesn't -- you know, somebody doesn't flip

23  a coin.  It's the result of hard work, volunteer work, on

24  the part of engineers.

25  Q.  Explain to the jury, if you would, what are the major

```
 1   subway systems in the country.  You sort of described it --
 2   A.  Well, we have 16 subway systems.  I think 11 are subways
 3   and five are what we call elevated subways.  The biggest
 4   ones are -- I have to do it looking at the map in my mind.
 5   That's MBTA in Boston; New York City's and -- New York City
 6   Transit Authority, which is the biggest.  Then we have
 7   Philadelphia, SEPTA; and we have Washington, WMATA.  We have
 8   Miami; it's called Miami Transit.  Then we have Chicago,
 9   CTA, and then we have Cleveland, C -- I forget if it's
10   CLAMTA.  Then we have San Francisco, BART, and we have Los
11   Angeles, LACMTA, and we have Skyline in Hawaii, which is
12   elevated, beautiful.  I keep asking to go.  Nobody sends me.
13   And then Tren Urbano, which is a kind of outdoor kind of
14   service with some portions underground that serves San Juan.
15          I think that's -- did I hit 16?  I'm not sure.
16   Q.  All right.  So let me ask you this.  When we talk about
17   the national standard of care for subway systems, can I go
18   to Google and ask that question?
19   A.  No.
20   Q.  Okay.  Why not?
21   A.  Well, because -- I don't understand it, but the transit
22   companies consider all their internal documents top secret,
23   and most of the time when I get to review them I have to
24   sign a nondisclosure agreement.  And sometimes they say it
25   has to do with Homeland Security, but I don't -- I don't
```

1    understand that.

2              I worked for Homeland Security, so I don't

3    understand that at all.

4    Q.  So what are standard operating procedures?  What do they

5    cover?

6    A.  They cover everything.

7              MR. WATERS:  Objection, Your Honor.  We're getting

8    into opinion here.

9              THE COURT:  Hold on.  Excuse me?

10             MR. WATERS:  We're getting into opinion.  He

11   hasn't been qualified.

12             MR. P. REGAN:  I don't mean to -- I was asking

13   generally.

14             THE COURT:  Generally speaking, describe to the

15   jury what --

16   A.  Yes. Well, generally speaking --

17             THE COURT:  -- standard operating procedures are.

18             THE COURT REPORTER:  The judge is still speaking.

19             THE WITNESS:  I'm sorry.

20             THE COURT:  Go ahead.  What are standard operating

21   procedures?

22   A.  Everything.  As mundane as overtime and sick leave to

23   how do you maintain the elevator, the escalator; how do you

24   change the oil; how do you sweep the station; how do you

25   clean the bathroom; how do you operate the trains; how do

1   you train the train drivers; how do you train the personnel.

2   Anything you can imagine that an agency has to do.

3           In the transportation industry we leave nothing to

4   chance because we have an organization called the American

5   Public Transportation Association, and we set up standards

6   for everything you can think of.  You pick a subject, and we

7   have a document on that subject and the best way, you know,

8   to handle that particular subject.  It's kind of universal.

9   Q.  Can I go to Metro's website and get their standard

10  operating procedures?

11  A.  No.

12  Q.  All right.  As part of your work in this case, did you

13  determine the standard operating procedures with respect to

14  the issue in this case; that is, the safety warning that has

15  to be provided to passengers when the operator fails to stop

16  the train at the right position in the station and has to

17  move it forward?

18  A.  Well, as part of your discovery, we received the SOPs,

19  which I indicated are very difficult to get unless you get

20  them through some legal matter.  And in there they clearly

21  spell out and even they give a sample of what you should

22  say.  In the standard operating procedure, they say that if

23  you misstop at the station, you say this, or you could say

24  more.  It's a minimum.

25          Standard operating procedures in terms of safety

1    are minimum standards.  You could always do more, but we

2    don't want you to do less.  But you could always do more.

3    You could always be safer.  We don't want you to be less

4    safe.

5    Q.  So with respect to this case, did you determine what the

6    standard operating procedures were for the subway systems in

7    New York, Chicago, Philadelphia, Washington?

8    A.  I tried to, and I did.  As you pointed out, you can't go

9    to AI or Google or any search engine to find that

10   information, so I went to people I know who work in these

11   agencies.

12        And I started off with a colleague of mine, whose

13   name is Orlando Jiminez, who started off working as a

14   conductor for the New York City Transit, then became a train

15   driver, and then became a trainer of train drivers, and

16   became a national rep, labor rep, for the New York City

17   Transit Authority.  And he provided me with copies --

18   Q.  We're not going to get into that yet, but you talked to

19   someone who got information to you, and then we're going to

20   get to your opinions in one minute.  Okay?  I'm sorry to

21   cut you off --

22   A.  I'm sorry.

23   Q.  -- but we've got to do this in order.

24        MR. P. REGAN:  Your Honor, at this time I would

25   offer Dr. Berkowitz as an expert in transportation safety

1   engineering with respect to the particular issue in this

2   case, whether the national standard of care requires Metro

3   to provide a safety warning under the circumstances of

4   Ms. Scott's injury on September 23, 2019.

5          MR. WATERS:  We object for the reasons previously

6   stated, Your Honor.

7          THE COURT:  Very well.  Subject to your

8   objections, which are noted, the Court will qualify

9   Dr. Berkowitz to testify as an expert in the field of

10  transportation and safety engineering and, in particular,

11  the question that Mr. Regan just posed regarding national

12  standard of care related to the relevant warnings in this

13  case.

14         MR. P. REGAN:  Okay.  Thank you, Your Honor.

15  BY MR. P. REGAN:

16  Q.  Is there an exhibit notebook up there, Doctor?  I can't

17  see behind there.  No?

18  A.  No.  I don't see one.  Just I have my CV.

19  Q.  Okay.  Let's do this.  Dr. Berkowitz, let me show you

20  what we've marked as -- previously --

21         MR. P. REGAN:  May I approach the witness?

22         THE COURT:  You may.

23  Q.  -- marked as Exhibit No. 19 and ask you if that's your

24  supplemental report dated sometime last year?  I don't know,

25  November.

 1   A.  Yes, November 21st of last year.

 2   Q.  Okay.  And is that your supplemental report concerning

 3   your opinions and conclusions in this case?

 4   A.  Yes, it is.

 5   Q.  Are you prepared to talk about those today?

 6   A.  Pardon me?

 7   Q.  Sorry, that's my fault.  And you're prepared to discuss

 8   those opinions with us today?

 9   A.  Yes.

10   Q.  All right.

11        Let me ask you, Doctor, if you would, to -- let's

12   go back for a minute.  I was right the first time.  Let me

13   ask you to turn to Page 5 under Section 5 and read the

14   caption and the first paragraph in your supplemental report.

15        MR. WATERS:  Objection, Your Honor.

16        THE COURT:  Sustained.  He's not going to read in

17   the report.  You can ask him his opinions and refer to the

18   report.

19        MR. P. REGAN:  Okay.

20        THE COURT:  Okay.

21   Q.  Doctor, what is your opinion about what the national

22   standard of care requires with respect to announcements

23   under the circumstances of this case?

24   A.  That you always should make an announcement to ensure

25   that passengers are always safe.

1    Q.  Okay.

2    A.  Without exception.

3    Q.  So before a train operator -- well, let me ask you this

4    question.

5           Do you have an opinion within a reasonable

6    degree of certainty in your field as to whether the

7    national standard of care requires a train operator, such as

8    Ms. Johnson on September 23, 2019, to provide an audible

9    warning to passengers if she stops the train at the wrong

10   spot and has to move it forward in order to get to the place

11   where the doors will open?  Does the national standard of

12   care require an audible warning in your opinion?

13   A.  Yes.

14           MR. WATERS:  Objection; leading.

15           THE COURT:  Overruled.

16   Q.  Okay.  Explain why an audible warning is required to

17   passengers under those circumstances.

18   A.  Safety -- remember I said engineering is safety, safety,

19   safety, and people will have accidents if they don't have

20   themselves prepared to avoid a particular situation.

21           We have a premise in engineering that if there's a

22   hazard, you have to eliminate it.  If you can't eliminate

23   it, then you have to remediate it.  And if you can't

24   remediate it, then you have to provide enough information so

25   a person can personally protect themselves.

```
1              And one way a person can protect themselves is by

2     having information.  And we know that announcements on the

3     trains are very key to ensuring the safety of passengers on

4     the train.

5     Q.  And as part of the work in this case, did you review

6     Metro's Standard Operating Procedure 50?

7     A.  50, others as well; 50.5, yes.

8     Q.  All right.  And that standard operating procedure

9     requires a standard audible warning before repositioning a

10    train?

11    A.  They spell out a minimum -- you can do more, but they

12    have a minimum recommended announcement.

13              MR. P. REGAN:  Your Honor, with your permission

14    may we put that exhibit, which I will give you in a minute,

15    on the screen?  It's Plaintiff's Exhibit No. 1.

16              THE COURT:  Sure.

17              THE WITNESS:  That's pretty.

18              MR. P. REGAN:  Just one second.  It will be there

19    in one second.

20              THE WITNESS:  Your Honor, I'm sorry, I don't

21    hear --

22              THE COURT:  You're fine.  You're doing fine.

23    Q.  You can see at the top.  Is this one of the standard

24    operating procedures that you --

25    A.  Yes, it is.
```

1          MR. P. REGAN:  That's Plaintiff's Exhibit No. 1.

2     If you could go to Page 2, please, and if you scroll up.

3     Well, am I seeing the same thing?  Yes, scroll up to the

4     announcements.

5          All right.  So I'm going to ask if we can

6     highlight the repositioning of the train.

7     Q.  All right.  While we're doing that, Dr. Berkowitz,

8     you've seen this before, right?

9     A.  Yes.

10    Q.  What does the Metro standard operating procedure require

11    the train operator to say before repositioning a train?

12    A.  They should say at least this:  "Attention customers,

13    this train will move forward; please hold on."

14         They can say more than that, but that's the

15    minimum.

16    Q.  And is that consistent with the national standard of

17    care based upon your research in this case?

18    A.  Each system uses slightly different language, but in

19    general, it's the same message.

20    Q.  So the message is -- and why do you give that message?

21    What's the reason?

22    A.  When a train stops at a station, the inclination of

23    people on the train is that they're going to get off,

24    especially if an announcement is made "We're coming into

25    McPherson Station.  Doors will open on the left."  The train

1    stops.  What do you expect?  You're going to get up, and

2    you're going to start walking towards the train doors.

3            And so if that -- if the train -- now you're

4    walking, with no place to hold on or anything, and if the

5    train suddenly starts to move, you're going to start moving

6    at what you were walking at.  And if the train is moving at

7    a faster speed, you know, this can create a situation where

8    a person could lose their balance and fall.

9            So this is why the statement's important.  You

10   know, you want people to either stay in their seats, if

11   there's enough seats for everybody.  If there are not enough

12   seats for everybody, you want to ask people to hold on to

13   something, hold on to a pole, hold on to a strap, hold on to

14   something.

15           But you want people to be prepared.  When people

16   are prepared, we avoid these kinds of unsafe situations.

17   Q.  And is Metro's standard operating -- Exhibit No. 1, is

18   that consistent with the national standard of care?

19   A.  Yes, it is.  Like I said, that every system uses

20   different terminology.  For example, like some systems say

21   "Mind the gap," some say "Watch the gap."  The same message,

22   but different format.

23           MR. P. REGAN:  Your Honor, at this point I'd move

24   in Plaintiff's Exhibit No. 1.

25           MR. WATERS:  Objection.  Same objection we

1    previously articulated.

2            THE COURT:  Okay.  So moved.

3    Q.  Okay.  All right.  Let's talk about the work that you

4    did in terms of determining what the standard of care was in

5    New York, in Chicago, in Boston, et cetera.  And it's

6    discussed in your report on Page 8, but I'm going to ask you

7    about it, if you will.

8            What did you do to determine -- explain to the

9    Court, if you would, what you did to determine the type of

10   warnings that were given in those transit organization --

11   systems that I just described.

12   A.  As we pointed out earlier, I can't go to Google or to AI

13   or to any search engine to find out what's the internal

14   documents, but I'm very fortunate to have this colleague who

15   works with me on other cases, Orlando Jiminez, who started

16   off as a conductor, then he worked his way up to a train

17   driver, then he became a train driver trainer, then he

18   became the union representative where he got to meet all the

19   other metro systems' in the United States people.

20           So my first effort was to try to find out what the

21   MTA, you know, the New York City transit is doing, so I

22   contacted him, and he told me what they were doing.

23           MR. WATERS:  Objection as to what he said, Your

24   Honor.

25           THE COURT:  Sustained.

1    Q.   Okay.  Just don't mention what he told you, okay?

2    A.   Pardon me?

3    Q.   Don't mention what people told you.  It's hearsay.  In

4    other words, just describe what you did.

5    A.   Anyway, I asked him for whatever the internal documents

6    were for the New York City transit, and he sent me like the

7    SOPs for Washington Metro.  He sent me them for the New York

8    City transit.  And then he also gave me names of people that

9    he worked with in other transit systems.

10           In the MBTA in Boston, I had my own personal

11   experiences because I worked for the MBTA and also cases in

12   opposition to them, so I rode the trains quite a bit and was

13   very familiar, and I accidentally heard, you know, these

14   types of announcements being made.  You know, unfortunately

15   one of them was a bad one.  We went too far.  The train

16   overshot the station, and they made an announcement that the

17   train overshot the station and we can't go backwards.  But,

18   you know, they were now going to go to the next station, and

19   if you have to come back to this station, you know, you have

20   to take the train in the next direction.  So I had

21   familiarity, personal experience and familiarity with the

22   Boston system.

23           I spoke to people at CTA, and they confirmed to

24   me --

25           MR. WATERS:  Objection.

1    A.  -- that they do factually the same thing.

2             THE COURT:  Hold on.  Hold on, sir.  Go to the

3    phones for a second.

4             (The following is a bench conference

5              held outside the hearing of the jury)

6             THE COURT:  All right.  So experts can rely on

7    hearsay.  The question is whether he can directly convey

8    what he was told.

9             MR. WATERS:  Your Honor, experts can rely on

10   hearsay if it's the type of hearsay that is -- or the

11   information that is ordinarily used by experts in their

12   field.  A foundation has not been laid.

13            I also think that it's inappropriate for him to be

14   talking about agencies when we cannot cross-examine them.

15            THE COURT:  All right.  Lay a better foundation,

16   but I think he can say what he relied on even if it's

17   hearsay, and if what he relied on is what he was told by

18   other people, then, you know, I think that's fair game.

19            MR. WATERS:  Your Honor, I think it's -- not to be

20   argumentative, I think he can say he can -- he relied on

21   conversations with other people, but getting into the

22   content of what specific information they shared I think is

23   inappropriate.

24            MR. P. REGAN:  Yes, but he's able to go one step

25   further, who confirmed what the --

1          THE COURT:  I'll tell you what, just to stay on

2     the safe course ask him who he spoke to based on your

3     conversations with that person, what did you conclude the

4     policies were of Boston, San Francisco, New York, et cetera.

5     Is that fair?

6          MR. P. REGAN:  Okay.

7          (This is the end of the bench conference)

8     BY MR. P. REGAN:

9     Q.  You spoke to the gentleman you just mentioned.  Who were

10    the people that you spoke to I think you were saying in

11    Chicago?  I don't remember where you were, though, in that

12    -- don't talk about what they told you, but just who they

13    were.

14    A.  They were his counterpart at the CTA.

15    Q.  And is this the type of information that experts in your

16    field typically rely upon in terms of determining what the

17    standard operating procedures are in transit systems?

18    A.  Well, I know that if Washington Metro and New York City

19    Transit both have the exact same documentation, that it's

20    pretty guaranteed that all the other systems are going to

21    follow suit because New York City Transit and Washington

22    Metro are among the leaders in innovation in transportation,

23    although they've had a bad rap lately in terms of safety.

24    But they still have been a very innovative -- their station

25    designs, their train designs, everything, have been very

1    innovative.

2    Q.  And the other people that you spoke with in the

3    industry, did they confirm for you what the standard

4    operating procedure was in each of these jurisdictions?

5    A.  That I spoke to, yes.  And also I had contacts of my

6    own.  I'm active in the American Public Transportation

7    Association, and I'm on the safety committees, and there's a

8    work -- I'm not a member of it, but there's a working group

9    on berthing, and I spoke to some of those members as well.

10   Q.  Explain what that committee is.  I'm sorry, I know I

11   should have asked you that earlier.  But explain.  That is

12   an important committee.  Tell us what that is.

13   A.  The American Publication Transportation Committee back

14   in I guess it was 1995, early '90s, formed a working group

15   to study train berthing.  The problem wasn't this particular

16   problem they're talking about.  That wasn't the main

17   problem.

18        The main problem was trains were stopping at

19   stations, and the doors were not platformed, and doors are

20   open and people stepped off the trains into the oblivion.

21   Very serious problem.  So this was the concern.

22        So when we started addressing that concern, all

23   these other secondary concerns came up about mis -- you

24   know, misstopping, overshooting, things of that nature.  So

25   the working group was formed.

```
 1              In fact, I remember there were -- on that group

 2      there were at least five people from WMATA.  It was like 50

 3      transit people from, you know, CTA, all the ones that I

 4      mentioned, all those railroads are reps on this working

 5      committee.  And then they -- and by 1999 they published --

 6      before a standard is approved, it's circulated to all the

 7      membership.  You know, we get a chance to review it, make

 8      comment.

 9              So in 1999 [sic], about the time of this incident,

10      the standard, which would eventually come out, was sent

11      around to the professionals in the organization because

12      every -- none of us are paid; it's all volunteer work -- to

13      review and offer comment.  And we -- I had an opportunity to

14      review and offer comment, and the following year it was made

15      an official standard of the American Public Transportation

16      Association, and it's called berthing.

17              Not children, trains.

18      Q.  B-E-R?

19      A.  Hmm?

20      Q.  B-E-R?

21      A.  Right.

22      Q.  Yes, not B-I-R.

23              Dr. Berkowitz, based upon your work on this case,

24      did you make -- did you form an opinion within a reasonable

25      degree of engineering safety as to whether the WMATA train
```

1    operator violated this national standard of care by failing

2    to give the safety warning under the circumstances of the

3    incident which resulted in Ms. Scott's injury on September

4    23, 2019?

5    A.  Yes.

6    Q.  And what is that opinion?

7            MR. WATERS:  Objection, Your Honor.

8            THE COURT:  Overruled.

9    A.  That the national standard of care for the care of

10   passengers on trains when there's a misberthing was

11   violated.

12   Q.  Okay.

13           MR. P. REGAN:  Your Honor, if I can have one

14   minute, actually less?

15           (Pause)

16           MR. P. REGAN:  No further questions.

17           THE COURT:  Mr. Waters.

18           MR. WATERS:  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20   BY MR. WATERS:

21   Q.  It's still morning.  Good morning, Dr. Berkowitz.

22   A.  Good morning again.  We met in the hall.

23   Q.  We have.

24   A.  Live this time.  First time was on Zoom.

25   Q.  I just met you in the hallway.  It was a pleasure to

1   meet you.

2   A.  Yes.

3   Q.  So I want to ask you some specifics of your familiarity

4   with this particular accident.

5           You indicated that you read some deposition

6   transcripts.

7   A.  Yes.

8   Q.  And you read the WMATA accident report?

9   A.  I'm sorry?  I didn't hear.

10  Q.  The WMATA accident report?

11  A.  Incident report?

12  Q.  Yes.

13  A.  Yes.

14  Q.  And you read WMATA's SOPs?

15  A.  Yes.

16  Q.  Is that correct?

17          Okay.  Did you read Ms. Scott's testimony with

18  regard to how the incident happened?

19  A.  Her deposition?

20  Q.  Yes.

21  A.  Yes.

22  Q.  And you understood that she was coming in on the Orange

23  Line?

24  A.  Yes.  She came from Vienna to McPherson.

25  Q.  And along the ride from Vienna to McPherson the train

1    was stopping short at several of the platforms and then

2    repositioning?

3    A.  I know there were 11 stops between Vienna and McPherson.

4    Q.  Do you recall reading the testimony where she indicated

5    that the train had stopped short and then repositioned on

6    several prior stops?

7    A.  I don't recall that.

8    Q.  Okay.  Do you recall Ms. Scott indicating at her

9    deposition that the train stopped at McPherson and then the

10   operator made an announcement indicating "McPherson Square,

11   doors opening left side," before the train moved?

12   A.  She mentioned that there was an announcement that the

13   train was coming into McPherson and the doors are going to

14   open; and I forget whether it's the right or the left side,

15   but on one of the two sides.

16   Q.  And do you recall her testimony where she indicated she

17   was a forward-facing passenger seated in the direction of

18   travel of the train up until McPherson Square?

19   A.  Yes.

20   Q.  And that she got up from her seat, correct?

21   A.  Yes.

22   Q.  She got up from her seat before the doors opened,

23   correct?

24   A.  That's correct.

25   Q.  She was not holding on to a pole or any overhead

```
 1    support?
 2    A.  Well, from what I remember, that the pole was ahead of
 3    her.  When she got up, there was no pole within the vicinity
 4    where she got up.
 5    Q.  Okay.  And do you understand she wasn't holding onto the
 6    chair that she had just gotten up from to support herself?
 7    A.  She was past that point.
 8    Q.  Okay.  So at the time when Ms. Scott fell, you do
 9    understand that, at least based on her deposition testimony,
10    the train came to McPherson, stopped at McPherson; the
11    operator made an announcement announcing the station, and
12    that the doors were opening; and then she got up before the
13    doors opened, before any of the chimes go off on the doors;
14    and then, when the train repositioned, she fell, correct?
15    A.  Yes.
16    Q.  And she wasn't holding on to anything, correct?
17    A.  That's correct.
18    Q.  And she was carrying a cane?
19    A.  Yes.
20    Q.  And she also had with her a purse?
21    A.  Over her shoulder, yes.
22    Q.  All right.  Would you agree with me, Doctor, that it is
23    important for passengers on public transit to make sure that
24    they are ensuring their own safety?
25    A.  Yes.
```

1    Q.   That they need to hold on to something to make sure that

2    they're keeping themselves stable?

3    A.   If they're -- if the train is moving, of course.

4    Q.   And they need to be cognizant of their own physical

5    capabilities, whether they're able to stand on a train, for

6    example, when it's moving or whether they need to be seated?

7    A.   I don't understand the question.

8    Q.   Well, would you agree that a passenger needs to be aware

9    of their own physical capabilities and limitations as to how

10    they're using public transit?

11    A.   Yes.

12    Q.   And the passengers have responsibilities too, correct?

13    A.   Everybody has responsibilities, yes.

14    Q.   All right.  Do you recall testifying in this case that

15    it was your -- well, do you recall giving a deposition in

16    this case?

17    A.   Yes.

18    Q.   Doctor, is it your opinion generally for public transit

19    that any time somebody is injured on public transit that the

20    public transit authority is responsible for that injury?

21    A.   It depends on what we're talking about.

22    Q.   Okay.

23    A.   If somebody jumps in front of a train, I don't know if I

24    could say that the train was responsible.  If somebody walks

25    between cars and jumps between the two cars to the -- I

```
1    don't think the train -- you know, it depends on the
2    situation.
3    Q.  I'm looking at your testimony from your deposition on
4    Page 103, Line 19.
5               THE COURT:  Hold on, Counsel.
6               Go ahead.
7    Q.  So do you remember this testimonial exchange?
8               My question:  "Is it your opinion that WMATA, as a
9    common carrier, is the guarantor of safety of everybody in
10   its transit system?"
11              And you answered:  "In terms of whatever they do
12   in their operation, as long as they operate safely, then
13   nobody gets hurt.  If they do something in their operation
14   to cause injury to somebody, they're responsible, yes."
15              Do you recall that question and answer?
16   A.  No, but if it's in my deposition, I guess I said it.  I
17   don't recall.
18   Q.  Okay.  Is it an accurate summary of your opinion with
19   regard to the responsibilities of public transit?
20   A.  I don't -- I have that same opinion, yes.
21   Q.  Okay.  So if somebody -- if the public transit authority
22   is doing something in its operation to cause injury, then
23   they're responsible?
24   A.  Yes, if they cause injury to somebody.  If I cause
25   injury to somebody, I'm responsible.  If a person causes
```

1    injury to somebody, they're responsible for that injury.

2    Q.  Okay.  So any time somebody gets hurt on public transit,

3    the Authority's responsible?

4    A.  I'm sorry?

5    Q.  I'm sorry, I apologize.

6         So any time somebody gets hurt on public transit,

7    the Authority is responsible?

8    A.  That's -- I didn't say that.  I said if somebody causes

9    somebody to be injured, they should be responsible.

10   Q.  Okay.

11   A.  If somebody injures themselves, you know, and inflicts

12   an injury upon themselves, how can you blame anybody?

13   That's self-imposed -- a self-imposed injury.

14   Q.  But you stand by the opinion that you gave in your

15   deposition testimony, correct?

16   A.  Yes.

17   Q.  Okay.

18        All right.  So you were asked a number of

19   questions about your investigation into this matter.

20   A.  Yes.

21   Q.  And one of the things you mentioned is that the -- well,

22   first of all, you agree that WMATA's standard operating

23   procedures are consistent with the national standard of

24   care, correct?

25   A.  I'm sorry, every time you walk away from the

1    microphone --

2    Q.  I apologize.  It's a bad habit.

3    A.  It's senior ears, you know.  Sorry.

4    Q.  You agreed in your direct examination that WMATA's

5    standard operating procedures are consistent with the

6    national standard of care.

7    A.  Yes.

8    Q.  All right.  But you understand that they don't set the

9    national standard of care themselves, right?

10   A.  No, but they were party to setting the national standard

11   -- all the transit agencies in the country, through the

12   various committees that we have, that's -- they were part of

13   setting the national standard.  They were --

14   Q.  Now, are you aware that WMATA considers its standard

15   operating procedures to be aspirational?

16   A.  They're definitely not aspirational.  They're -- to be

17   aspirational, it has to be something that's higher than a

18   national standard of care.  You can always be higher.

19          But in general, everything I've read that's in

20   WMATA's standard of care, in their SOPs, is the national

21   standard of care, which is not aspirational.  It's what

22   everybody in the industry does.

23   Q.  Sir, I'm asking you if you WMATA considers its SOPs

24   aspirational.  Are you aware of that?

25   A.  They can consider anything they want.  I can't speak for

1    WMATA.  If they want to call themselves aspirational, I

2    can't -- from the professional side, if you asked the people

3    on the APTA committees, they will tell you that their

4    national standard of care is consistent with the industry's

5    standards of care.

6    Q.  Okay.  But you agree that WMATA's SOPs are consistent

7    with the national standard of care?

8    A.  Yes.

9    Q.  Okay.  You indicated that you -- let's be clear.  You

10   talked about several different transit authorities.  I think

11   specifically for the purpose of this case that you were

12   looking at -- let me know if I'm missing any of them --

13   Philadelphia, San Francisco, Boston, Chicago, and WMATA.

14   Those are the ones you looked at for this case?

15   A.  Well, WMATA I had the SOPs.

16   Q.  Sure.

17   A.  Did you mention New York?

18   Q.  Oh, I'm sorry, New York as well.

19          So New York, Philadelphia, San Francisco, Boston,

20   Chicago, and Metro, correct?

21   A.  Yes.  I contacted each of those, yes.

22   Q.  Okay.  So you saw the Metro SOPs, right?

23   A.  Right.

24   Q.  You indicated that -- have you seen the current New York

25   transit SOPs?

1    A.  Yes.  It was given to me, yes.

2    Q.  And those were given to you by Mr. Jiminez?

3    A.  Yes.

4    Q.  Okay.  Have you seen the Philadelphia SEPTA?

5    A.  No, I couldn't -- they said I couldn't have it, you

6    know; that I wasn't entitled to it.

7    Q.  Okay.  Because they consider them to be --

8    A.  Confidential.

9    Q.  -- confidential, proprietary, right?

10   A.  Yes.

11   Q.  And same for San Francisco, did you see theirs?

12   A.  San Francisco never got back to me.  Basically I spoke

13   to a friend of mine who retired from them.  He said that --

14   Q.  I'm not asking what he said.

15   A.  Okay.  Anyway, they have -- they're sort of automated

16   when they come into the station, so the likelihood of not

17   berthing correctly is almost impossible.

18   Q.  I'm going to get to that.  I promise.

19   A.  Oh, okay.

20   Q.  But my question is, did you see their SOPs?

21   A.  No.

22   Q.  And because they consider them proprietary and

23   confidential?

24   A.  Yes.

25   Q.  Boston, did you see Boston's SOPs?

1    A.  On the ones that they -- sections related to the cases I

2    worked on.

3    Q.  Okay.  But not as part of your work for this particular

4    case?

5    A.  No.

6    Q.  Okay.  Chicago, did you see Chicago's SOPs?

7    A.  No.

8    Q.  Okay.  And the SOPs that you didn't see, you didn't see

9    them because the agencies considered them to be proprietary,

10   confidential to themselves, correct?

11   A.  Correct.

12   Q.  Okay.  You indicated, in terms of the work that you did

13   to determine the national standard of care, you spoke with

14   Orlando Jiminez.

15   A.  Jiminez, yes.

16   Q.  Mr. Jiminez was a driver or an operator?

17   A.  He started off as a conductor, then got promoted to

18   train driver, then got promoted to in charge of training,

19   and then he became the union representative for all the

20   train drivers.

21   Q.  Is he retired?

22   A.  Yes.

23   Q.  How long has he been retired?

24   A.  I don't recall.

25   Q.  Okay.  Has it been more than 10 years?  More than 20?

1    A.  I'm not sure.  I don't know.

2    Q.  Okay.  Was Mr. Jiminez ever in management at New York

3    Transit?

4    A.  Blue collar management in terms of union representative.

5    Q.  Was he ever a policy-setting officer of New York

6    Transit?

7    A.  No.

8    Q.  Okay.  And when was your conversation with him?

9    A.  I don't remember the exact date.  It was in preparation

10   for this supplement, so it was sometime before November.

11   Q.  Okay.  You said that you spoke to a counterpart at CTA.

12   A.  He gave me the name of a person he knew at the CTA.

13   Q.  Do you remember the name of that person?

14   A.  I probably do, but I don't have it with me.

15   Q.  Okay.  Did you speak to that person?  Not getting into

16   what you spoke with him about, did you speak to that person?

17   A.  Yes, I did speak to that person.

18   Q.  When you say he was a counterpart, what was the person's

19   role?

20   A.  He was a union rep for the train drivers.

21   Q.  He was a union rep for the train drivers.  Was he ever a

22   policy-setting individual at CTA?

23   A.  No, he worked his way up; conductor, train driver,

24   trainer.  You know, same as Orlando.  He worked his way up.

25   Q.  So neither the individual at CTA or Mr. Jiminez would

1    have written SOPs for the authorities?

2    A.  No, they did not write SOPs.

3    Q.  Okay.  I'm sorry if I asked this.  Do you recall when

4    Mr. Jiminez retired?

5    A.  Pardon me?

6    Q.  Do you recall when Mr. Jiminez retired?

7    A.  No, I don't.

8              MR. WATERS:  Indulgence, Your Honor.

9              (Pause)

10             MR. WATERS:  Those are all my questions, Your

11   Honor.  Thank you.

12             THE COURT:  All right.  Mr. Regan.

13             MR. P. REGAN:  Thank you, Your Honor.

14             I promise just a few questions, Dr. Berkowitz.

15                     REDIRECT EXAMINATION

16   BY MR. P. REGAN:

17   Q.  Mr. Waters asked you a number of questions about

18   Ms. Scott's actions.  I've put a statement up on the screen

19   right now, or I will in a second.

20             THE COURTROOM DEPUTY:  Which document number,

21   Counsel?

22             MR. P. REGAN:  I don't have it written.  It's from

23   opening statement yesterday.

24             THE COURTROOM DEPUTY:  Sorry, a demonstrative?

25             MR. P. REGAN:  It's a slide.  I want to ask him a

1   question about it.

2           THE COURT:  I don't see the document.  I don't

3   hear an objection.

4           MR. P. REGAN:  I can't help that.  It's not

5   working.

6           THE COURTROOM DEPUTY:  It does work, but you have

7   to let me know what's happening so I can --

8           MR. P. REGAN:  Oh, I know.  I have it here, Your

9   Honor.

10          MR. WATERS:  We object, Your Honor.  I think this

11  was a slide that was used in support of the opening

12  statement.

13          MR. P. REGAN:  Judge, this is the type of

14  statement I could write on a whiteboard.

15          THE COURT:  Overruled.  Go ahead.

16          MR. P. REGAN:  Okay.

17  BY MR. P. REGAN:

18  Q.  So, Dr. Berkowitz, do you have it in front of you?

19  A.  Yes.

20  Q.  Okay.  So it says, "What can public reasonably expect

21  from WMATA?"

22          "Once a train is stopped at a train" -- "at a

23  station platform, passengers are allowed to get off the

24  train without fear that it will abruptly jerk forward again

25  with no warning."

1            In your experience, are passengers allowed to get

2     off the train without worrying about it jerking forward?

3            MR. WATERS:  Objection; scope of direct.

4            THE COURT:  I'll give you an opportunity.

5            You can answer, Dr. Berkowitz.

6            THE WITNESS:  Pardon me?  I'm sorry.

7            THE COURT:  You can answer.

8            THE WITNESS:  Thank you.

9     A.  This is a true statement.

10    Q.  Okay.  You agree with this statement?

11    A.  Absolutely.

12    Q.  By the way, is there anything about WMATA's Standard

13    Operating Procedure 50 with respect to the warning that you

14    read that is not common sense?

15    A.  Everything in --

16           MR. WATERS:  Objection as to common sense, Your

17    Honor.

18           THE COURT:  Sustained.

19    Q.  Mr. Waters asked you about whether Ms. Scott was holding

20    on to anything at the time that the train violently jerked

21    forward.  Can passengers exit a Metro train and always be

22    holding on to something until they're out on the platform?

23           MR. WATERS:  Objection.

24           THE COURT:  Sustained.

25           THE WITNESS:  Can I answer?

```
 1              THE COURT:  Sustained.
 2              MR. P. REGAN:  No.
 3              THE COURT:  No.
 4   Q.  Let me rephrase that.  Is it possible, in your
 5   experience, for passengers to exit a subway train and always
 6   be holding on to something until they get out to the
 7   platform?
 8              MR. WATERS:  Objection.
 9              THE COURT:  I think you opened the door, so
10   overruled.
11   Q.  You can answer that one.
12   A.  It's impossible because the way the train is designed
13   it's -- there is -- we don't have handrails in the train.
14   The only way that somebody can have something to hold on is
15   when you're going down a staircase or a ramp, we have a
16   handrail.  It would be impossible to put handrails on the
17   train.
18              MR. P. REGAN:  No further questions, Judge.
19              MR. WATERS:  Cross?
20              THE COURT:  Do you want a brief recross?
21              MR. WATERS:  Very briefly.
22                      RECROSS EXAMINATION
23   BY MR. WATERS:
24   Q.  Sir, you are aware that there are rails above --
25   overhead on a Metro train?
```

1    A.  Yes.

2    Q.  And there's a pole that's in the middle of the entry/

3    exitway?

4    A.  Yes.

5    Q.  Sir, do you have any understanding of how far the train

6    moved when it repositioned?

7    A.  Pardon me?

8    Q.  Do you have any understanding of how far the train moved

9    when it repositioned?

10   A.  No.

11   Q.  It wouldn't be more than the length of the platform,

12   would it?  Because the train, we know, stopped at the

13   platform and repositioned.

14   A.  It could be -- it could not be -- a couple of car

15   lengths maybe.

16   Q.  Okay.

17          MR. WATERS:  That's all I have.  Thank you.

18          THE COURT:  Okay.  Dr. Berkowitz, thank you for

19   your testimony.  You are excused.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Please don't discuss your testimony in

22   this case until the case is over.  Okay?

23          THE WITNESS:  Whoops.  I almost took the

24   microphone with me.

25          THE COURT:  Have a good day.

```
 1              MR. P. REGAN:  Depending on what the Court
 2      would like to do, we can call another witness or take a
 3      break.
 4              THE COURT:  How are you folks doing?  It's only
 5      12:15.  Next witness?
 6              Next witness.
 7              MR. P. REGAN:  All right.  We're going to play
 8      Dr. Rao, and then we can just break whenever the Court
 9      wants.  I think it's about 40 minutes, 45 minutes.
10              THE COURT:  Okay.  Ladies and gentlemen, the next
11      witness's testimony will be presented via video from a
12      deposition that he sat for.
13              Is that correct?
14              MR. P. REGAN:  About a week ago.
15              THE COURT:  Okay.
16              All right.  And why don't we plan on -- it's how
17      long?  It's about 45 minutes?
18              MR. P. REGAN:  I think so.
19              MR. WATERS:  I don't think it was that long.
20              MR. P. REGAN:  It might not be that long.
21              THE COURT:  Okay.  Why don't we go for 15 or 20
22      minutes, then we'll take our lunch break, and then we'll
23      finish it after lunch.  Does that make sense?
24              Mr. Waters, does that make sense?
25              MR. WATERS:  Oh, absolutely.
```

```
 1                    (Whereupon the deposition of Dr. Rajkumar

 2                 Rao was played to the jury)

 3              THE COURT:  All right.  This is a good stopping

 4      point for our lunch break.  Have a nice lunch.  No

 5      discussion about the case.  No research about the case.

 6      We'll see you back here at 1:45.

 7                    (Jury exits courtroom)

 8              THE COURT:  All right.

 9              MR. P. REGAN:  In case you're interested --

10              THE COURT:  Yes.

11              MR. P. REGAN:  -- we probably have -- we have two

12      short witnesses after this, and then we're done subject to

13      the Metro people.  So, you know, depending on what defense

14      goes on this afternoon, we will -- we're very close to done.

15              THE COURT:  Okay.  Hold on.  So who is after this?

16      One of the witnesses?

17              Mr. Regan, so who are the two short witnesses?

18              MR. P. REGAN:  Okay.  We've got Rebecca, the

19      daughter, and we have Mr. Emondi by deposition.  And I think

20      that's it.  And then we -- the WMATA people are apparently

21      coming tomorrow, but, you know, any of the witnesses that go

22      today, we don't need to do direct of them.  We'll just

23      cross-examine.

24              MR. WATERS:  We were asked -- may I, Your Honor?

25              THE COURT:  Yes.  There was an objection to the
```

1    daughter, correct?

2         MR. WATERS:  Actually, Lauren is going to handle

3    that, and we were asking to have the operator, Dominic

4    Johnson, available today.

5         THE COURT:  So you're going to call her in your

6    case?

7         MR. WATERS:  My understanding is the plaintiffs

8    wanted her so they could call her.

9         MR. P. REGAN:  We won't do that, but she'll

10   testify.

11        THE COURT:  So either you'll rest and WMATA will

12   call her, or you will call her in your case?

13        MR. P. REGAN:  Correct.

14        MR. WATERS:  There was one scheduling issue, and

15   my appreciation to my colleagues.  We were asked to have

16   Keisha Henry available this morning.  Ms. Henry reported to

17   me around 6:30 this morning that she was experiencing an

18   illness, various symptoms, allergies and nausea.  Counsel

19   agreed to put her on tomorrow.

20        My question is whether -- I was going to put her

21   on, too -- whether they would like to reopen their case-in-

22   chief and then put her on as part of their case-in-chief, or

23   we put her on in our case?  I'll defer to counsel.

24        MR. P. REGAN:  I think in all likelihood we'll

25   rest subject to Mrs. Bennett -- no, who was -- Henry, three

1    names, but one way or the other.  We'll figure -- if we

2    rest, it will be subject to her coming in when she's feeling

3    better.

4              THE COURT:  Okay.  I mean, I would prefer not to

5    reopen the plaintiff's case to call a witness that the

6    defense is going to call anyway.  That doesn't make much

7    sense to me.  So we'll work that out.

8              MR. P. REGAN:  Okay.

9              THE COURT:  The daughter?

10             MS. GILMAN:  Yes, Your Honor.  We would just renew

11   our objection to the daughter testifying.  She was not

12   disclosed to defendant's counsel during discovery and

13   pursuant to 26(a)(1), pursuant to 26(e), there was no

14   supplement to that disclosure, so under 37(c) she should be

15   not allowed to testify.

16             THE COURT:  Okay.  Did I reserve on this at the

17   pretrial?  Remind me.

18             MS. GILMAN:  Yes, Your Honor.

19             THE COURT:  Okay.

20             MS. GILMAN:  You did ask if she -- if we asked

21   anything in our interrogatories.  We did not ask about the

22   daughters in our answers -- questions to interrogatories to

23   the plaintiff.

24             And she did come up during the deposition, but in

25   one question to plaintiff, which was "Where do you live and

1   who do you live with?"  And she gave the address and the

2   people in her household, but that did not indicate to

3   defense counsel that she had discoverable information and

4   that they intended to call her.

5          THE COURT:  Okay.  Mr. Regan.

6          MR. P. REGAN:  Judge, we did not name her in an

7   initial disclosure.  We were not asked in interrogatory

8   about her.  She did come up in the deposition.  I don't

9   think there's any prejudice to WMATA, but the Court has all

10  the facts.

11         THE COURT:  Okay.  The Court will exclude the

12  daughter because there was no disclosure.  WMATA was not on

13  notice that she would be appearing as a witness.  Okay?

14         MR. P. REGAN:  Okay.

15         THE COURT:  So we're down to one.

16         MR. P. REGAN:  That shortens us.

17         THE COURT:  That shortens us.  So we'll take stock

18  when we get back as to where things stand.  Okay?

19         (Lunch recess taken)

20

21

22

23

24

25

```
 1                A F T E R N O O N   S E S S I O N
 2              THE COURT:  All right.  Are you folks ready for
 3    the jury?
 4              MR. WATERS:  Yes, sir.
 5              THE COURTROOM DEPUTY:  Your Honor, I think the
 6    laptop isn't connected.  It's not showing on the screen.
 7              MR. C. REGAN:  Yes, one second.
 8              (Jury enters courtroom)
 9              THE COURT:  All right.  Welcome back, everybody.
10    Did you have a nice lunch?  Everybody get outside and enjoy
11    this nice weather?
12              All right.  We will continue with Dr. Rao's
13    videotaped deposition testimony.
14              (Whereupon the videotaped deposition of
15               Dr. Rao was played before the jury)
16              THE COURT:  All right.  We've concluded Dr. Rao's
17    video testimony, and the testimony is now in evidence just
18    as if he were to have testified live.  Again, you heard a
19    lot of bantering back and forth amongst the lawyers on the
20    video.  The statements of the lawyers are not evidence,
21    although Dr. Rao's testimony is.  Fair enough?  Okay.
22              MR. P. REGAN:  Judge, we have two other witnesses.
23    They're short.
24              THE COURT:  Very well.
25              MR. P. REGAN:  Also same way.
```

1           THE COURT:  By video?

2           Okay.  Two more video witnesses.

3           MR. P. REGAN:  Judge, do you want to explain the

4    Rule 30(b)(6), or have us explain it?

5           THE COURT:  Hold on.  Let's go to the phones.

6           (The following is a bench conference

7            held outside the hearing of the jury)

8           THE COURT:  Okay.  Mr. Waters, any objection to

9    this 30(b)(6) witness?  I did not understand that we were

10   going to do --

11          MR. WATERS:  Yes, this is news to me.  We had a

12   brief conversation about this over lunch, whether this was

13   going to happen or not.  This is the witness that we were

14   talking about before with regard to the designation that we

15   had.

16          MR. C. REGAN:  I apologize, Your Honor.  I can

17   update the Court very quickly.

18          I hadn't realized that that was covered when

19   everybody came back.  We talked about it at length.  I told

20   Mr. Waters this includes all the portions that he had

21   requested, so we said in lieu of bringing Mr. Bennett,

22   trying to rush him in here today, or something like that, we

23   will just play it exactly the modifications that you --

24          THE COURT:  I thought you said before you weren't

25   going to do that, but you've now changed your mind.

```
 1              MR. C. REGAN:  I know, Your Honor.

 2              THE COURT:  So it's with the full designations

 3    that we discussed prior to the break?

 4              MR. C. REGAN:  Correct, Your Honor.  Every single

 5    line that Mr. Waters requested be read with it.

 6              And I apologize for not updating the Court prior

 7    to now.  Thank you, Your Honor.

 8              THE COURT:  Okay.

 9              (This is the end of the bench conference)

10              THE COURT:  Instead of playing his entire

11    deposition, the parties have selected a limited number of

12    excerpts from the deposition, which will be played.  This is

13    a witness who I understand is a corporate representative of

14    WMATA, and his deposition was taken prior to trial in that

15    capacity.  I understand that we may hear from this witness

16    in WMATA's case, but the plaintiff has elected to admit

17    certain statements within his deposition, and we're playing

18    the following excerpts from the deposition, and it should be

19    relatively brief.

20              Is that fair?

21              Mr. Waters, anything to add?

22              MR. WATERS:  I'm sorry, Your Honor?

23              THE COURT:  Anything to add?

24              MR. WATERS:  No.

25              MR. C. REGAN:  Your Honor, could the plaintiff
```

1    just request, would the Court like to provide a brief

2    instruction about the significance of a 30(b)(6) party

3    deposition of WMATA?

4              THE COURT:  Why don't you play it first.  Okay?

5              MR. C. REGAN:  Understood.

6              THE COURT:  And then we'll talk about that.

7              (Whereupon the video deposition of Clev Bernard

8               Ibanez Bennett was played to the jury)

9              MR. C. REGAN:  Your Honor, that concludes the

10    testimony of Mr. Bennett as a representative of WMATA.

11             THE COURT:  Okay.  Next witness.

12             MR. C. REGAN:  Your Honor, the plaintiff's next

13    witness is also by video.  Unfortunately that's Al Emondi, a

14    fellow passenger on the train.

15             MR. WATERS:  Your Honor, may we go to the phones?

16             THE COURT:  Sure.

17             (The following is a bench conference

18              held outside the hearing of the jury)

19             MR. WATERS:  Thank you, Your Honor.

20             During the redirect of Al Emondi, Counsel read

21    into the record a portion of the accident report that

22    consisted of I think Mr. Emondi's statement that he gave to

23    WMATA.  I think that that statement is hearsay, and I think

24    it was improper essentially bolstering a prior consistent

25    statement in how counsel is using it.  I don't think it's

1    appropriate to use that portion of Mr. Emondi's deposition

2    at this time.

3            MR. C. REGAN:  Yes, Your Honor.  Mr. Waters

4    touched on the important question, which is basically just

5    whether it is a proper or improper, as he just asserted,

6    prior consistent statement, evidence of a prior consistent

7    statement.  So pursuant to Rule 801.1, it is admissible,

8    Your Honor, because Mr. Waters insinuated that the witness

9    had been untruthful during his cross-examination of the

10   witness.  If the Court will bear with me for one moment, I

11   can try to find those pages.

12           And in addition to what Mr. Waters noted, I'm

13   confident this is something we should talk about at this

14   point.  I believe that in addition to reading it through

15   with the witness, the plaintiff also -- I move that it be

16   admitted into the record, and I think it's shown on the

17   screen at the end, Your Honor.  So it's certainly worth our

18   time to discuss.

19           MR. WATERS:  I don't believe that I was

20   insinuating that he was being dishonest, only that a

21   statement or an assertion that Mr. Regan was making was not

22   in the report.

23           MR. C. REGAN:  Okay.

24           THE COURT:  All right.  So, fellows, how can I

25   possibly rule on what is in the indirect based on -- or the

1    redirect based on what you all are saying happened at the

2    depo without the transcript, without -- I mean, we should

3    have teed this up beforehand, you know.

4              MR. WATERS:  I believe, Your Honor --

5              THE COURT:  I have no basis to rule on this.  I

6    mean, if he's reading in a hearsay statement -- for what

7    purpose is he reading in the hearsay statement?

8              MR. WATERS:  In my opinion, he was bolstering and

9    improperly trying to rehabilitate the witness.

10             MR. C. REGAN:  And, Your Honor, insofar as he says

11   bolstering, yes, that is accurate because, as I mentioned

12   before, it's because Mr. Waters's line of questions

13   suggested that the witness had not been honest in his

14   statement or that he omitted something.

15             THE COURT:  Okay.  So for me to rule on this, I

16   need to look at the transcript.  I need time to do that, all

17   right?

18             MR. C. REGAN:  I think that's correct, Your Honor.

19             THE COURT:  Okay.

20             All right.  We're going to take a brief break.

21             (This the end of the bench conference)

22             THE COURT:  Ladies and gentlemen, we have to

23   resolve an evidentiary issue so we're going to take a brief

24   break.  If you could retire to the jury room, it shouldn't

25   take too long.  We'll let you know when we're ready for you.

```
 1                    (Jury exits courtroom)

 2            THE COURT:  All right.  For me to hit it, you guys

 3     have got to tee it up.  Right?

 4            MR. WATERS:  I apologize, Your Honor.  We had

 5     addressed this with Mr. Bennett, but I think we left out

 6     Mr. Emondi when we were having that same conversation.

 7            THE COURT:  Okay.  What is the --

 8            MR. WATERS:  I can --

 9            THE COURT:  So first of all, would we be

10     playing the entirety of Mr. Emondi's deposition, or just

11     excerpts?

12            MR. C. REGAN:  We would be playing the entirety,

13     Your Honor, but I think the entirety -- I think my direct

14     was seven minutes and Mr. Waters's might have been ten

15     minutes.

16            THE COURT:  Okay.  So what is the relevant part

17     for -- for just this evidentiary ruling, what is the

18     relevant portion of the direct?

19            MR. C. REGAN:  Well, it was actually -- it was

20     never brought up on direct.  It's all in response to cross-

21     examination by Mr. Waters.

22            The first time the issue comes up is on Page 18,

23     Line 11.  And then, Your Honor, you could effectively read

24     straight to the end.  I think that was the end of his cross,

25     and that's the only thing I did on redirect.
```

```
1              THE COURT:  Okay.

2              MR. C. REGAN:  So, again, that's Page 18 --

3              THE COURT:  And the defense's position is that

4    this is inappropriate hearsay because it's reading in his

5    statement from the investigation report and the plaintiff's

6    position that this is a proper consistent statement --

7              MR. C. REGAN:  Correct, Your Honor.

8              THE COURT:  -- coincident with a consistent

9    statement under 803 -- what's the letter?

10             MR. C. REGAN:  Your Honor, I believe it's actually

11   801(a)(1)(B).

12             THE COURT:  801.

13             MR. C. REGAN:  A witness's prior statement that is

14   consistent with his prior testimony and is offered to rebut

15   an express or implied charge --

16             THE COURT:  Okay.  We'll take a look.

17             MR. C. REGAN:  Understood.

18             MR. WATERS:  One point is I believe the video

19   actually brings up the actual statement and would show it to

20   the jury.  Counsel, correct me if I'm wrong.

21             MR. C. REGAN:  No, that's correct.

22             MR. WATERS:  The actual statement that he hand

23   wrote --

24             THE COURT:  Okay.

25             MR. WATERS:  -- would be actually shown.
```

```
1              THE COURT:  Okay.  Well -- and he's reading from
2     it?
3              MR. WATERS:  Yes.  Counsel was asking him about
4     that and having him read that.
5              THE COURT:  Okay.  So in the depo that will be
6     shown?
7              MR. C. REGAN:  Correct, Your Honor.
8              THE COURT:  The statement comes up as an exhibit,
9     not as an -- it's not being introduced at trial, but it
10    comes up on the screen, and he reads from it; is that right?
11             MR. C. REGAN:  Correct, Your Honor.  I would say
12    plaintiff moved to admit it into evidence at this
13    deposition.  It's a trial deposition from last week.
14             So yes, it is not --
15             THE COURT:  So you're moving to introduce the
16    writing.
17             MR. C. REGAN:  Correct, Your Honor.
18             THE COURT:  Not just a deposition where he reads
19    from the writing.
20             MR. C. REGAN:  Correct, Your Honor.
21             THE COURT:  Okay.  All right.
22             (Recess taken)
23             THE COURT:  Okay.  I don't think the statement
24    comes in.  All right?  It doesn't strike me as being a prior
25    consistent statement admissible under 801(d)(1)(B) because I
```

1    don't -- from the context of the transcript, I didn't

2    understand Mr. Waters to be suggesting that the witness was

3    fabricating his testimony, and so for that witness I think

4    it falls under that hearsay rule.

5         I take it -- I didn't read the first part of the

6    direct, but Mr. Emondi said what he basically says in the

7    statement.  Is that fair?

8         MR. C. REGAN:  That's fair, Your Honor.

9         THE COURT:  So you're going to get that in.

10         So the question then is what to do with this

11    deposition if the statement is going to -- is embedded in

12    the video.  We could stop at that point, and you can read

13    the rest in without showing the video.

14         MR. C. REGAN:  I was going to suggest something,

15    Your Honor.  I also, I guess -- just to make sure that

16    the point -- so the point is that the question by

17    Mr. Waters suggests that there's something not quite right

18    about the statement or that further information was supplied

19    that's not been relayed to them in the deposition, but I

20    understand --

21         THE COURT:  The Court ruled.

22         MR. C. REGAN:  Understood.

23         THE COURT:  So how are we going to deal with this

24    logistically?

25         MR. C. REGAN:  I'm not a very high-tech person,

1    but if we minimize the video window would be a way to let

2    the audio keep playing while the video is no longer on the

3    screen.

4            THE COURT:  Are you okay with that, Mr. Waters?

5            MR. WATERS:  Yes, I'm fine with that.

6            THE COURT:  Okay.  Let's do it that way.

7            MR. WATERS:  As long as that shot doesn't come up.

8            MR. C. REGAN:  And, Your Honor, the Court may be

9    planning to do this already, but it might be helpful to let

10   the jurors know, either before or after, just that the final

11   portion of the video is not a tech problem, but that it's

12   pursuant to the ruling of the Court.

13           THE COURT:  I will do that.

14           (Jury enters courtroom)

15           THE COURT:  All right.  Ladies and gentlemen, we

16   have sorted that out.  Apologies for the delay.

17           We will proceed with the videotaped deposition

18   testimony of the next witness, and towards the end I believe

19   that the video will cease and the remainder will be audio

20   only.  That is not a technical glitch.  The video had an

21   exhibit that the Court has ruled inadmissible, and so we're

22   going to conceal that exhibit and proceed with the audio.

23   And there we go.

24           Mr. Regan.

25           MR. C. REGAN:  Thank you, Your Honor.

```
 1                    (Whereupon the videotaped deposition of

 2                 Mr. Al Emondi was played to the jury)

 3                THE COURT:  Okay.  I believe that concludes

 4       Mr. Emondi's testimony.

 5                Mr. Regan.

 6                MR. P. REGAN:  Judge, we have just a couple of

 7       loose ends to take up with the Court, and otherwise we are

 8       resting.

 9                THE COURT:  Okay.  Do you want to take up the

10       loose ends first, or do you want to rest first?

11                MR. P. REGAN:  Well, I think I -- we need to take

12       up the loose ends to make sure that everybody's comfortable

13       with the testimony tomorrow coming in from Ms. Henry.

14                THE COURT:  Okay.  Ladies and gentlemen, the

15       defense is prepared to rest.  We're going to wrap up a

16       couple of loose ends before we do that technically, so we're

17       going to send you back to the jury room, and I believe that

18       we will begin the -- sorry, the plaintiff is prepared to

19       rest.  I believe we will begin the defense's case, okay?  So

20       just give us a few minutes.  All right?

21                    (Jury exits courtroom)

22                THE COURT:  All right.  What do we have?

23                MR. P. REGAN:  All right.  So, Judge, the first

24       thing is just judicial notice of life expectancy.  I think

25       we have an agreement that a woman 84 years old has a future
```

```
 1    life expectancy -- I have the HHS -- well, I don't think
 2    they're called "HHS" anymore.  They're called whatever they
 3    are.  Yeah, they are HHS tables, 7.1 years.
 4              THE COURT:  Okay.  So you want me to read that as
 5    a stipulated --
 6              MR. P. REGAN:  In the jury instructions.
 7              THE COURT:  -- fact -- well, a fact of judicial
 8    notice that will be admissible, and then include it in the
 9    jury instruction?
10              MR. P. REGAN:  Correct.
11              THE COURT:  Mr. Waters?
12              MR. WATERS:  Counsel gave me a chart, but I don't
13    think it shows her age cohort.
14              MR. C. REGAN:  There's two pages.
15              MR. WATERS:  Ah, very well.  Thank you, Chris.
16              No objection to that, Your Honor.
17              THE COURT:  Okay.  If you could pass it up to me,
18    and I'll read it for the jury when they come back.
19              MR. P. REGAN:  And the only other loose end,
20    Judge, is that we're fine with Ms. Henry coming on tomorrow,
21    and we don't have to reopen the plaintiff's case, but we do
22    want this stipulation, that our cross-examination of her is
23    included in our case-in-chief for appellate purposes.
24              So -- I mean, we can do it two ways.  We can have
25    that stipulation, and we'll just go forward with it, or we
```

```
 1    would reopen.  As you know, she was going to come today.
 2    She got sick --
 3              Do I have the sex right, the gender?  Okay.
 4              She was going to come today, got sick.  We said
 5    fine.  Tomorrow's fine.  We would just put her on out of
 6    order.  But if it's cleaner, we're fine with that as long as
 7    it's understood that her cross-examination is counted for
 8    appellate purposes as part of our case-in-chief.
 9              THE COURT:  Mr. Waters?
10              MR. WATERS:  I don't have a problem with that,
11    Your Honor, and I'm appreciative of the courtesy of counsel
12    with my witness's illness.  My only kind of procedural
13    question is if they're going to formally rest now, will the
14    Court like to take up our Rule 50 motion at this time?
15              THE COURT:  I was going to allow you to make a
16    Rule 50 motion orally, and I would reserve on it so that you
17    could -- that it's preserved.
18              MR. WATERS:  Okay.
19              THE COURT:  I mean, I think the rule says any time
20    after the close of the opponent's -- let's see exactly what
21    the rule says.
22              MR. WATERS:  I wouldn't want to play it close,
23    Your Honor.  I really want to make it as close as --
24              THE COURT:  Maybe you should, you know, make it
25    now and then renew it after the cross-examination given the
```

1    stipulation we've just made for appellate purposes.

2                MR. P. REGAN:  We're fine with that.

3                MR. WATERS:  Okay.  That would be fine.

4                THE COURT:  Just to be safe.

5                Would you like to take up the Rule 50 motion now,

6    or do you want to do it after counsel formally rests?

7                Why don't we do it after counsel rests.  We can

8    just do it on the phone.  Just be brief.  Hit the high

9    points.  You know, just preserve it.  That's all.

10               MR. WATERS:  Very well, Your Honor.

11               THE COURT:  Okay.  You can get the jury.

12               (Jury enters courtroom)

13               Okay.  Welcome back, ladies and gentlemen.  Again,

14   thank you for your patience.

15               In addition to the facts that are in evidence

16   through testimony or documents, the rules allow Courts to

17   take what's called judicial notice of facts that are

18   essentially beyond dispute, okay?  And the parties have

19   agreed that the Court can take judicial notice of the

20   following fact.

21               Based on the official life tables published by the

22   United States Department of Health and Human Services, as an

23   84-year-old woman, Carol Scott has a future life expectancy

24   of 7.1 years.

25               Okay.  So that fact is in evidence as are the

1      other facts that have been shown through the testimony and

2      the documents.  Okay?

3                  With that...

4                  MR. P. REGAN:  Your Honor, at this point the

5      plaintiff rests subject to what we discussed earlier.

6                  THE COURT:  Okay.  The plaintiff has now rested

7      its case.  We're going to go to the phones briefly.

8                  (The following is a bench conference

9                   held outside the hearing of the jury)

10                 MR. WATERS:  Yes, thank you, Your Honor.

11                 Defendant moves for a directed verdict pursuant to

12     Rule 50 of the Federal Rules of Civil Procedure.  We believe

13     plaintiffs have failed to make their prima facie case of

14     liability against WMATA.  I think we have four primary bases

15     that I would like to assert and make sure that we make a

16     record on.

17                 The first and most important is the jerk/jolt

18     defense assumption of the risk that we argued in our motion

19     for summary judgment.  I think it's particularly notable

20     that there is an absence of any evidence that there was any

21     reasonable belief or basis to believe that it was safe to

22     alight at the time when Ms. Scott stood up.  There were --

23     she testified that there were no other individuals that she

24     can recall who were about to leave, and she changed her

25     testimony from her deposition where she had previously

1    indicated that the train stopped, the operator made the

2    announcement, and then she got up.  And now she's testifying

3    that she recalls hearing that announcement as the train was

4    arriving and that there was no announcement for when it

5    stopped until it moved.  I think all of that changes the

6    dynamic and Your Honor's ruling with regard to summary

7    judgment on that issue.  We move for directed verdict on

8    that ground.

9          We also move for a directed verdict on

10   contributory negligence.  Ms. Scott testified specifically

11   that she knew that the train would move again.  She

12   testified that she did not hear the chimes.  She did not see

13   the door open.  Even knowing that the door was going -- that

14   the train would move again, she still got up and failed to

15   secure herself, and I think that that's contributory

16   negligence as a matter of law.

17         Another important ground here is with regard to

18   the testimony with regard to the announcement.  I believe

19   the testimony in that regard was rather inconsistent with

20   regard to whether an announcement was made or not made.  I

21   think it's -- and with regard to when the announcement was

22   made.  We just heard Al Emondi, who did not recall the

23   announcement, and the question I had was with regard to

24   that particular issue is the consistency with regard to

25   Ms. Scott's testimony at first saying there was an

1    announcement made and then saying the announcement was made

2    at a different time.  I think that that raises a question of

3    whether this made their burden with regard to that

4    particular issue.

5         I think the next ground relates to Dr. Carl

6    Berkowitz.  We believe the Court should have excluded him

7    for all the reasons stated in our motion in limine.  The

8    only thing that the Court allowed him to testify to in this

9    case was the testimony regarding the national standard of

10   care.  And as Your Honor remembers, the national standard of

11   care, the evidence that he offered, only came into play in

12   opposition to our motion for summary judgment.  The

13   testimony that was allowed in this courtroom was not what he

14   had disclosed previously, and it was not disclosed to us

15   prior to the close of discovery.  It was only raised in

16   response to the summary judgment motion.

17        The disclosure that he did give timely was

18   entirely excluded, and for all of the reasons with regard to

19   the -- I think the insufficiency of his efforts, we believe

20   that he should have been excluded, and summary judgment

21   would have followed.  And for that reason I think there is a

22   basis for the Court to grant our JOV, I'm sorry, directed

23   verdict.

24        And the final issue I would raise is that we would

25   ask for a partial directed verdict on the issue with regard

1    to the summary of damages.  Medical bills have not been

2    offered.  The medical records have not been offered.  I

3    believe that the arguments that we made this morning with

4    regard to those issues indicate that the evidence has not

5    been waived with regard to that particular component of the

6    case, and to that extent, we would ask for a partial

7    directed verdict.

8              THE COURT:  Okay.  The Court will take the motion

9    under advisement and reserve on it, submit the case to the

10   jury, and you may renew the motion in the event of an

11   adverse jury verdict.

12             MR. WATERS:  Very well.  Thank you, Your Honor.

13             (This is the end of the bench conference)

14             THE COURT:  All right.  The floor is all yours.

15             MR. WATERS:  Your Honor, at this time we would

16   like to call Dominic Johnson.  May we step out to get our

17   witness?

18             THE COURT:  You may.

19             (Pause)

20             MR. WATERS:  Your Honor, it appears our witness,

21   who was here, is not at the office where we -- may I propose

22   that we take the afternoon break while we try to

23   ascertain --

24             THE COURT:  My apologies, ladies and gentlemen.

25   It appears that the defense's first witness is not here

```
1    presently.  Let's see what we can do about that as soon as
2    we can.  Okay?
3              So we'll take our -- we'll take a ten-minute break
4    and give you further instructions.
5              (Jury exits courtroom)
6              MR. WATERS:  My apologies to the Court, Your
7    Honor.  She was in the building two hours ago.
8              THE COURT:  Why did she leave?
9              MR. WATERS:  We're trying to figure that out right
10   now.
11             (Pause)
12             MR. P. REGAN:  I know you want to get off and out
13   of here.  This is the only witness today, so if it makes
14   sense -- I don't know what your plans are, but if we wanted
15   to spend a little bit of time doing instructions, I think we
16   have somewhere around two or two and a half hours of
17   testimony tomorrow, and then we can jump to closing.
18             THE COURT:  Hold on.  Do we have our witness?
19             MR. WATERS:  We have our witness.
20             THE COURT:  Well, we're in the process of coming
21   up with a set of proposed instructions to give you folks to
22   review before we have our charge conference.  We had thought
23   that we would have it tomorrow at some point, but let's see
24   where we are.  And we might be able to get it to you today,
25   but let's see how long this witness takes.
```

```
 1                    MR. WATERS:  I don't expect to be long with the
 2        witness.
 3                    THE COURT:  Okay.  Well, let's take stock once we
 4        are done with the witness.  We can dismiss the jury after
 5        this witness.
 6                    MR. WATERS:  Okay.  We're still on break, Your
 7        Honor?  May I step out for one moment?
 8                    (Recess taken)
 9                    THE COURT:  Ms. Johnson, you can approach.
10                    Good afternoon.
11                    THE WITNESS:  How are you doing?
12                    THE COURT:  Come on up.  You can have a seat.
13        Just stand up when the jury comes in.  Okay?
14                    THE WITNESS:  Okay.
15                    (Jury enters courtroom)
16                    THE COURT:  All right.  Welcome back, everyone.
17                    Mr. Waters.
18                    MR. WATERS:  Thank you, Your Honor.
19                            DOMINIC JOHNSON
20                          DIRECT EXAMINATION
21        BY MR. WATERS:
22        Q.  Good afternoon.
23        A.  Good afternoon.
24        Q.  Would you please introduce yourself to our jurors.
25                    THE COURT:  Before we do that, could you stand and
```

```
1    raise your right hand.
2              MR. WATERS:  Oh, right.  Sorry.
3              (Witness sworn).
4    BY MR. WATERS:
5    Q.  Good afternoon.
6    A.  Good afternoon.  Hello, I'm Dominic Johnson.
7    Q.  And, Ms. Johnson, how are you employed?
8    A.  By WMATA.
9    Q.  And how long have you been employed by Metro?
10   A.  Since 2016.
11   Q.  Okay.  How did you first start to work for Metro?
12   A.  As a bus operator.
13   Q.  And how long were you a bus operator?
14   A.  About a year, a year and a -- a year and a couple of
15   months.
16   Q.  Okay.  And then what did you do after you were a bus
17   operator?
18   A.  A train operator.
19   Q.  You were a train operator?
20   A.  Correct.
21   Q.  And how long were you a train operator?
22   A.  Roughly around five years, five, six years.
23             THE COURT:  Can everyone hear Ms. Johnson?
24             Ms. Johnson, if you could keep your voice up just
25   a little bit so that the jurors can hear you, that would be
```

```
 1    great.
 2              MR. WATERS:  Can you pull the mic closer to you.
 3    It may help.
 4              THE COURT:  There you go.
 5              MR. WATERS:  Is that better?  Can you speak up?
 6    A.  Roughly around -- a train operator, roughly around five
 7    and a half, six years.
 8    Q.  Okay.  So just to rewind.  You started as a bus
 9    operator?
10    A.  Yes, in 2016.
11    Q.  In 2016.  And then in 2017 was it when you became a rail
12    operator?
13    A.  It was 2018.
14    Q.  Okay.  And then you did that for five or six years?
15    A.  Correct.
16    Q.  Okay.  And after you were -- and how are you currently
17    employed at WMATA?
18    A.  As a rail supervisor.
19    Q.  Okay.  And what is involved in being a rail supervisor?
20    A.  Assisting with emergency situations, responding to
21    incidents, dealing with customers that have complaints or
22    issues with station managers or to alleviate anything that
23    goes on with the trains.  If a train breaks down, if an
24    operator needs a personal, we would leave trains and operate
25    when needed.
```

1    Q.  And how long have you been in that role?

2    A.  Since June of last year.

3    Q.  Okay.  Have you had any other employments at WMATA?

4    A.  No.

5    Q.  Okay.  This case involves an accident that happened on

6    September 23, 2019.  At that time what were you -- how were

7    you employed or how were you working at WMATA?

8    A.  As a train operator.

9    Q.  Okay.  And do you recall what line you were working on

10   at that time?

11   A.  The Orange Line.

12   Q.  Okay.  So can you walk me through the process.

13            One of the issues in this case relates to train

14   operation and the berthing procedures and announcements that

15   are made.  Can you walk me through the process of berthing a

16   train and announcements that you make as a rail operator.

17   A.  Okay.  As you enter a station, you make an announcement

18   of this station's name, which side the platform doors will

19   open on.  If you're -- when we're properly berthing the

20   8-car marker and the doors open, you make the announcement

21   of which line it is and what the next stop would be.

22   Q.  What does "properly berth at the 8-car marker" mean?

23   A.  When the train is at the gate.

24   Q.  What does it mean in terms of the doors with respect to

25   the location -- their location on the platform?

1    A.  We can't open the doors without the train being at the

2    8-car marker.

3    Q.  Okay.  And is that so to ensure that all of the doors

4    are opening to the platform and none of the doors are

5    opening, say, into the tunnel?

6    A.  Correct.

7    Q.  Okay.  Have there been any circumstances as an operator

8    when you may -- the train may stop short of the 8-car marker

9    and you have to reposition the train?

10    A.  Correct.

11    Q.  How often does that happen?

12    A.  Often.

13    Q.  What are the types of reasons why the train might stop

14    short of the 8-car marker and require repositioning?

15    A.  It can be a red signal.  It can be a train that's in the

16    same circuit as that train, which will cause the train to

17    stop behind it.  It could be a track circuit.  It could be

18    various reasons.

19    Q.  What do you mean by it could be a track circuit or a red

20    signal?

21    A.  A red signal is like if you have a red light, and the

22    trains -- once -- when you have a red signal, the train is

23    going to stop so far away from the signal to avoid running a

24    red signal, so the train automatically stops.

25    Q.  Okay.  And what does it mean when you have a track

1    circuit issue?

2    A.  If you have a track circuit issue, the train loses

3    readouts.  And when you don't have readouts, your train

4    stops as well.

5    Q.  Okay.  What are you supposed to do when you reposition

6    the train?  If the train stops for a red signal or a track

7    circuit issue, and the train stops short of the 8-car

8    marker, what are you supposed to do as the operator?

9    A.  We contact central control and request permission to

10   continue on to properly berth at the 8-car or wherever

11   you're trying to get to next.

12   Q.  Do you make any announcements to customers?

13   A.  Yes.

14   Q.  And what are the announce -- what's the announcement you

15   make to the customer?

16   A.  "Stand clear, train moving."

17   Q.  Okay.  And you make that before you move the train?

18   A.  Yes.

19   Q.  Do you recall the events of September 23, 2019, when

20   Ms. Scott was injured?

21   A.  I don't recall the events, but I am refreshed on the

22   incident report that was completed at that time.

23   Q.  Okay.  You were operating --

24         THE COURT:  I'm sorry, just for the record,

25   Mr. Waters asked you what the announcement was that you make

1    to the customer if the train stopped short.  Could you

2    repeat your answer.

3              THE WITNESS:  The announcement is "Stand clear,

4    train moving."

5              THE COURT:  "Stand clear, train moving."

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  Thank you.

8    BY MR. WATERS:

9    Q.  And is that something that's part of a standard

10   operating procedure for WMATA rail operators?

11   A.  Yes.

12   Q.  Okay.  What do you recall, having refreshed your

13   recollection, about the events of September 23rd?

14   A.  Per my incident report, I recall being -- a customer

15   used the emergency button to contact the operator, which was

16   me, and informed me that someone had injured theirself in

17   the train.

18              I contacted central, and I believe I stayed in my

19   cab because the supervisor was already at the station.

20   Q.  Okay.

21   A.  So I never left my cab.

22   Q.  Do you recall the events leading up to that particular

23   station stop, meaning anything particular about that station

24   stop that you remember?

25   A.  No.

1    Q.  Do you remember stopping short of the 8-car marker and

2    repositioning at that station stop?

3    A.  I don't remember it, but it was -- I don't remember it,

4    but it happens.

5    Q.  Okay.  Does it happen regularly as you're operating?

6    A.  It can.

7    Q.  Okay.  You said that there was a supervisor already on

8    scene at McPherson Square?

9    A.  Correct.

10   Q.  So you were instructed to stay in the cab?

11   A.  Correct.

12   Q.  Did you ever have any contact with Ms. Scott?

13   A.  No.

14   Q.  The person who rang you up in the cab using the phone in

15   the train, did they tell you anything about Ms. Scott's

16   injury, or did they just say somebody was hurt?

17   A.  I don't remember what was said verbatim.  I don't recall

18   them mentioning any injury per se; just that I believe

19   someone was hurt or someone had fallen.

20   Q.  Okay.  And what did you do when you learned that

21   somebody had fallen?

22   A.  I contacted central control.

23   Q.  Okay.  But you stayed in your cab.  Did you have any

24   contact with Ms. Scott or any of the EMTs?

25   A.  No.

1    Q.  Okay.  Do you -- you indicated that you don't recall

2    stopping short and then repositioning at that particular

3    stop.

4    A.  No.

5    Q.  Do you have any recollection of making an announcement,

6    "Stay clear, train's about to move"?

7    A.  I don't have a recollection of it, but I know that it's

8    the policy to -- what we usually do.

9    Q.  And do you follow that policy?

10   A.  Yes.

11   Q.  Okay.  Do you have any specific recollection of not

12   making that announcement or not following that policy?

13   A.  No.

14   Q.  Okay.  On the way in that night, there's been testimony

15   that the train stopped short of the 8-car marker at several

16   different platforms along the Orange Line.  Do you have a

17   recollection of that, of whether the train was stopping

18   short at five or six platforms from Vienna to McPherson

19   Square?

20   A.  No.

21   Q.  Okay.

22           MR. WATERS:  Thank you, ma'am.  Those are all of

23   the questions I have.

24                    CROSS-EXAMINATION

25   BY MR. C. REGAN:

1    Q.  Good afternoon, Ms. Johnson.  Nice to see you again.

2    A.  How are you doing?

3    Q.  I'd just like to clarify at least a couple of quick

4    things.

5            Mr. Waters asked questions about your memory that

6    day.  Fair to say you have absolutely no memory of what

7    happened that day as we sit here today other than what

8    had written down in your statement to WMATA back then?

9    A.  Correct.

10   Q.  In your statement to WMATA, it starts with the push of

11   the button notifying you there had been an emergency, right?

12   A.  Correct.

13   Q.  You didn't write anything in your statement about what

14   caused the incident that day, right?

15   A.  No.

16   Q.  So still, as we sit here today, you don't know why the

17   train stopped short that day at all, right?  We can agree on

18   that?

19   A.  A direct reason, no.  I don't -- it happens pretty

20   often, so it doesn't really stand out when it does happen.

21   Q.  Okay.

22   A.  If there's a train's too close or anything, the train

23   will stop.

24   Q.  Do you know what the most likely reason is?  Is there a

25   prevailing reason why the train stops short in your

1    experience?

2    A.   It could have been we were in rush hour, and there were

3    more frequent trains, so the train ahead of me may not have

4    been cleared if it was stopping at several stations prior.

5    It could have been the fact that we were just too close to

6    another train.  But I can't say that that's what was the

7    issue.

8    Q.   Ordinarily speaking, are you supposed to stop two times

9    at a station, or just the one time?

10   A.   One time.

11   Q.   At the 8-car marker, right?

12   A.   Correct.

13   Q.   And we can agree that any time the train has to be

14   repositioned, you have to not only warn the people outside

15   the train, I think you mentioned "Stand clear, train's

16   moving," right?

17   A.   Correct.

18   Q.   That's a warning for people outside the train, right?

19   A.   The announcement is played throughout the train, and you

20   can hear it on the outside as well.  It's announced over the

21   PA in the train.

22            MR. WATERS:  Your Honor, may I request that

23   counsel use the microphone?  I'd appreciate it.

24            THE COURT:  I'll give it a boost.  Fair enough?

25   He's a tall guy.

```
 1              MR. WATERS:  Thank you, Counsel.
 2              MR. C. REGAN:  It doesn't come up, Your Honor,
 3      does it?
 4      BY MR. C. REGAN:
 5      Q.  The announcement you mentioned was "Stand clear, trains
 6      moving," right?
 7      A.  Yes.
 8      Q.  Who is supposed to stand clear of what?
 9      A.  Any customers, anyone that's near the train, or anyone
10      that's standing or anything.  It's just an announcement that
11      the train is moving.
12      Q.  Understood.  So that would be people outside the train
13      then, right?
14      A.  Outside and inside the train.
15      Q.  And so I don't want to belabor the point, but what do
16      the people inside the train -- they can't stand clear of the
17      train, right?
18      A.  They can't stand clear of the train, but if they're
19      standing or doing anything, it's just to let them know that
20      the train is about to move.
21      Q.  Okay.  Is it your understanding that there's a separate
22      obligation to provide a warning to the people inside the
23      train --
24      A.  No.
25      Q.  -- before the train moves?
```

```
 1    A.   No.  It's one announcement.

 2    Q.   Okay.

 3    A.   That goes for inside and outside.

 4    Q.   So your understanding is there's no second announcement,

 5    for example -- well, strike that.

 6              Your understanding is there's no second

 7    announcement that needs to be made before the train is

 8    repositioned on a platform?

 9    A.   No.

10              MR. WATERS:  Objection.

11    Q.   Only "Stand clear, trains moving"?

12    A.   Correct.

13              THE COURT:  Overruled.

14              MR. C. REGAN:  I apologize, Your Honor.

15    Q.   As a train operator, Ms. Johnson, you're familiar with

16    Metro's SOP 50, right?

17    A.   Correct.

18    Q.   All train operators get their own set of the SOPs, full

19    set?

20    A.   Correct.

21    Q.   Do you know whether SOP 50 requires a specific

22    announcement to warn people, passengers on the train, before

23    the train starts moving again once it's berthed at a

24    platform?

25    A.   Yes.  "Stand clear, train moving."
```

1    Q.   Okay.  No other announcement that you're aware of?

2    A.   No.

3              MR. P. REGAN:  The Court's indulgence one moment.

4              (Pause)

5              MR. C. REGAN:  Can I put up the video feed for a

6    moment?

7    BY MR. C. REGAN:

8    Q.  Ms. Johnson, on the screen in front of you is WMATA's

9    SOP 50, the red mark --

10             THE COURT:  Hold on, is this in evidence?

11             MR. C. REGAN:  I'm sorry, Your Honor, Exhibit 1.

12   It is in evidence, Your Honor, SOP 50.

13   Q.  The red markings are mine just to help direct a couple

14   of questions.  So the red markings are not on the document.

15   They're there to guide us for the next couple of minutes.

16   Okay?

17   A.  Okay.

18   Q.  And this is a procedure I believe that you stated that

19   you're familiar with, right, SOP 50?

20   A.  Correct.

21   Q.  The purpose of this procedure is to provide train

22   operators, among others, guidance on the PA announcements

23   that shall be made when performing standard operational

24   procedures regarding routine communications to the

25   customers, right?

1    A.  Right.

2    Q.  And then if we come down together to Page 2, SOP

3    50.5.1.1 here in the red box, it's the intro to a table of

4    announcements the train operators shall give, right?

5    A.  Correct.

6    Q.  In other words, they must be given.  These are not

7    optional?

8    A.  Correct.

9    Q.  If we come down here to reposition the train at the

10   platform, there's an announcement, a standard baseline

11   announcement, that says:  "Attention customers, this train

12   will move forward; please hold on."

13           Is that an announcement that you believe must be

14   given to passengers on a train before it's repositioned at a

15   platform, or no?

16   A.  This is the announcement that is made on the 7K.  It's

17   just the automatic announcement that's already programmed.

18           But when we verbally make announcements, every --

19   you can tell -- several operator -- every operator has a

20   different announcement.  We just have to make an

21   announcement that the train is moving.

22   Q.  Help me understand what you just said.  You're telling

23   me this is an automated announcement.  Not one that

24   operators have to give?

25   A.  Correct.

1   Q.   Okay.  When does this automated announcement get made?

2   A.   When you push the button on a newer series train.

3   Q.   On a which series train?

4   A.   The newer series train.

5   Q.   Are those the 8000 series now?

6   A.   The 7000.

7   Q.   7000.

8        All right.  And what about on older trains?

9   A.   You had to physically make an announcement.

10  Q.   Okay.  Do you have to still physically make this

11  announcement?

12  A.   My announcement would have been, "Stand clear, train

13  moving."  I wouldn't have -- I would have never said this

14  announcement.  It would have been "Stand clear, train

15  moving."

16  Q.   Okay.  Is it -- well, you don't know whether you gave

17  that announcement just before Ms. Scott was injured, right?

18  A.   I can't say I made it clearly, but per policy I would

19  have made an announcement.  But I can't say that I recall

20  anything about that day to say if I did or didn't, if that

21  makes any sense.

22  Q.   I think I understand.

23       On that same basis, would it be your belief, based

24  on your usual practice, that you would have given that

25  announcement at all the stations coming in on the Orange

1    Line that day prior to McPherson Square if the train had had

2    to be repositioned at the platform?

3    A.  Correct.

4    Q.  Has anybody from WMATA told you that in this case WMATA

5    doesn't think you made those announcements?

6    A.  No.

7    Q.  Would you agree that whichever announcement is given,

8    it's critical that passengers on the train receive warning

9    before a train is repositioned once it's stopped for the

10   first time at a platform?

11   A.  Yes.

12   Q.  Why is it critical?

13   A.  So that they're aware that the train is about to move.

14   Q.  And if they're not aware, what's the fear of what would

15   happen?

16   A.  Anything.

17   Q.  And help me understand that.

18   A.  I mean, anything can happen.  You can have someone

19   standing too close to the train.  You can have -- some

20   people like to stand in between the doors on the train, and

21   they can fall off the train or they can fall on the train.

22   Q.  Is one of the fears that if people on the train are

23   waiting for the doors to open, and they don't realize that

24   the train is about to move under their feet, they could get

25   knocked down?

```
1    A.  Is that one of my fears?

2    Q.  Yes, ma'am.

3    A.  Yes.

4    Q.  One of the reasons that the announcement is critical?

5    A.  Yes.

6              MR. C. REGAN:  Thank you, Ms. Johnson.  Those are

7    all the questions I have for you.

8              MR. WATERS:  No redirect.

9              THE COURT:  Okay.  Ms. Johnson, just a point of

10   clarification.  When the train approaches the station and a

11   short stop is required because of one of those conditions

12   you mentioned, a red signal, the train ahead is too close,

13   or there's a track circuit issue, does the train stop on its

14   own automatically, or does the operator have to physically

15   stop it?

16             THE WITNESS:  It stops on its own.

17             THE COURT:  It stops on its own.

18             THE WITNESS:  You'll lose readouts, and it will

19   automatically go into a braking mode.

20             THE COURT:  Okay.  And when the train starts again

21   in order to be repositioned so that people can get off, is

22   that automatic, or does the driver, the operator, do that?

23             THE WITNESS:  The operator does that.  That's

24   manual.

25             THE COURT:  And depending on whether it's a 7000
```

1    series train or an older train, that's either a verbal

2    announcement by SOP or an automated announcement that you

3    hit with a button?

4                    THE WITNESS:  Correct.

5                    THE COURT:  Okay.

6                    Any follow-up, Counsel?

7                    MR. WATERS:  No, Your Honor.

8                    THE COURT:  Okay.  Thank you very much.

9                    You are excused.  Thank you very much for your

10   testimony.  Please don't discuss your testimony with anyone

11   until the case is over.

12                   THE WITNESS:  Thank you.

13                   THE COURT:  All right.  Have a good day.

14                   MR. WATERS:  Your Honor, I believe that concludes

15   the witnesses we have available for the day.

16                   THE COURT:  Okay.  Ladies and gentlemen, that was

17   our last witness today.  I know that there were some stops

18   and starts today, but I want to assure you that we are on

19   schedule, and we are still planning to conclude the evidence

20   tomorrow, perhaps as early as midday depending on where

21   things stand.  So I'm going to excuse you for the evening.

22                   Have a great evening.  No discussions about the

23   case.  No research about the case.  And we'll see you at

24   9:00 tomorrow morning, and we're going to try to use this

25   time as efficiently as we can to resolve any legal issues

```
 1    that may come up tomorrow.  Okay?

 2              All right.  Have a good evening.

 3              (Jury exits courtroom)

 4              THE COURT:  Okay.  So who do we have tomorrow?

 5              MR. WATERS:  Judge, we have -- Dr. Harris will be

 6    testifying in the morning.  We also have Keisha Henry.  The

 7    open question for me to decide tonight is whether we're

 8    going to call Mr. Bennett, but I'm leaning toward leaving it

 9    to Keisha Henry and Dr. Harris.

10              THE COURT:  Okay.

11              All right.  We are pretty close on the

12    instructions.  I think it's probably too late in the day to

13    do a charge conference.  We will polish those up and then

14    probably by email send you proposed final jury instructions,

15    and we can do our charge conference probably -- let's see

16    when we finish up.  Maybe before lunch.  And then probably

17    do instructions -- any rebuttal case?

18              You don't know, but probably no rebuttal case?

19              MR. P. REGAN:  Correct.

20              THE COURT:  We will instruct after lunch, so if we

21    do that you should be prepared to close tomorrow afternoon.

22              MR. P. REGAN:  Judge, that's fine.  I think that

23    we've talked, and it's probably an hour and a half of

24    testimony in the morning; so if that helps you, we --

25              THE COURT:  So probably concluding the testimony
```

1    and the charge conference before lunch, instructions after

2    lunch, closings in the afternoon.

3              MR. P. REGAN:  Yes.  We can take an early lunch

4    and start and --

5              THE COURT:  Let's see how it goes.

6              MR. P. REGAN:  Okay.

7              THE COURT:  All right.  Have a good night.

8              MR. P. REGAN:  Thank you.

9              MR. WATERS:  Thank you, Your Honor.

10             MR. P. REGAN:  You too.

11                  (Whereupon the hearing was

12                   adjourned at 4:09 p.m.)

13

14        **CERTIFICATE OF OFFICIAL COURT REPORTER**

15

16             I, LISA A. MOREIRA, RDR, CRR, do hereby

17   certify that the above and foregoing constitutes a true and

18   accurate transcript of my stenographic notes and is a full,

19   true and complete transcript of the proceedings to the best

20   of my ability.

21        Dated this 6th day of May, 2025.

22

23

24                            /s/Lisa A. Moreira, RDR, CRR
                              Official Court Reporter
                              United States Courthouse
25                            Room 6718
                              333 Constitution Avenue, NW

1    Washington, DC 20001

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$20,000** [1] - 328:12
**$229,000** [1] - 248:11
**$229,541.63** [1] - 249:15
**$50** [1] - 322:5

## '

**'22/'23** [1] - 328:15
**'70s** [1] - 327:15
**'90s** [1] - 345:14
**'96** [1] - 257:21

## /

**/s/Lisa** [1] - 409:23

## 1

**1** [9] - 249:4, 308:10, 308:11, 312:1, 338:15, 339:1, 340:17, 340:24, 402:11
**10** [3] - 257:21, 301:7, 357:25
**100** [2] - 238:12, 325:19
**1006** [3] - 235:18, 236:19, 236:21
**103** [1] - 352:4
**107** [1] - 279:22
**10:35** [1] - 294:22
**10:50** [1] - 294:24
**10:6** [4] - 305:10, 306:23, 306:25, 307:16
**11** [5] - 251:1, 317:2, 331:2, 349:3, 375:23
**12** [3] - 304:17, 304:21, 309:8
**12:15** [1] - 364:5
**12:7** [4] - 305:10, 306:23, 307:17, 307:18
**12:8** [1] - 304:22
**15** [5] - 257:21, 276:8, 294:23, 309:8, 364:21
**157** [1] - 244:13
**16** [9] - 234:22, 239:8, 240:5, 247:2, 248:25, 250:2, 325:17, 331:2, 331:15
**17** [5] - 239:9, 239:13, 239:16, 304:17, 322:8
**17:5** [1] - 304:22

## 2

**18** [5] - 292:19, 292:23, 293:1, 375:22, 376:2
**19** [2] - 335:23, 352:4
**1919** [1] - 232:14
**1963** [1] - 318:9
**1970** [1] - 321:19
**1970s** [1] - 324:6
**1988** [1] - 321:20
**1991** [1] - 276:22
**1995** [2] - 257:21, 345:14
**1999** [2] - 346:5, 346:9
**1:22-cv-00601-CRC** [1] - 232:3
**1:45** [1] - 365:6

## 2

**2** [11] - 249:4, 249:6, 292:15, 304:6, 304:11, 305:17, 305:19, 307:10, 308:10, 339:2, 403:2
**20** [7] - 254:4, 257:22, 267:16, 316:14, 317:13, 357:25, 364:21
**200** [1] - 241:13
**2000** [1] - 271:14
**20001** [2] - 232:24, 410:1
**20036** [1] - 232:15
**2005** [1] - 244:14
**2006** [1] - 276:22
**2008** [1] - 276:24
**2016** [3] - 390:10, 391:10, 391:11
**2017** [7] - 267:9, 267:20, 268:7, 277:3, 277:24, 290:10, 391:11
**2018** [1] - 391:13
**2019** [11] - 284:10, 292:15, 292:19, 292:23, 293:1, 335:4, 337:8, 347:4, 392:6, 394:19
**202** [2] - 232:15, 232:25
**2020** [6] - 268:22, 269:1, 272:1, 272:5, 274:12, 287:11
**2021** [9] - 274:5, 274:11, 279:3, 285:10, 285:12, 285:16, 286:6, 286:25, 287:25
**2022** [2] - 238:3, 241:8
**2025** [2] - 232:5,

409:21
**20s** [1] - 320:6
**21st** [1] - 336:1
**22** [1] - 232:5
**22-601** [1] - 234:3
**22102** [1] - 232:20
**23** [5] - 335:4, 337:8, 347:4, 392:6, 394:19
**239** [1] - 315:17
**23rd** [2] - 261:17, 395:13
**24** [3] - 284:10, 292:15, 293:1
**245-9300** [1] - 232:20
**25** [1] - 274:5
**26** [2] - 267:20, 272:1
**26(a)(1** [1] - 367:13
**26(e** [1] - 367:13
**27** [2] - 256:1, 256:7

## 3

**30** [4] - 267:16, 316:19, 317:12, 324:10
**30(b)(6** [10] - 295:8, 303:10, 303:20, 308:8, 311:9, 312:2, 312:21, 370:4, 370:9, 372:2
**300** [2] - 237:1, 241:13
**30th** [1] - 241:7
**32** [6] - 304:6, 304:10, 305:17, 305:19, 309:5, 309:18
**333** [2] - 232:24, 409:25
**350** [1] - 232:14
**354-3187** [1] - 232:25
**37(c** [1] - 367:14
**38** [1] - 276:5

## 4

**4** [1] - 279:3
**40** [2] - 324:10, 364:9
**45** [2] - 364:9, 364:17
**463-3030** [1] - 232:15
**4:09** [1] - 409:12

## 5

**5** [6] - 279:14, 279:23, 281:20, 304:17, 336:13
**50** [15] - 261:5, 325:19, 338:6, 338:7, 346:2, 361:13, 382:14, 382:16, 383:5, 384:12, 401:16, 401:21, 402:9,

402:12, 402:19
**50.5** [1] - 338:7
**50.5.1.1** [1] - 403:3
**510** [1] - 232:19
**518** [1] - 248:11

## 6

**6** [4] - 279:14, 279:23, 281:23, 281:24
**60** [1] - 293:10
**60,000** [1] - 319:17
**63** [1] - 248:11
**6718** [2] - 232:23, 409:25
**6:30** [1] - 366:17
**6th** [1] - 409:21

## 7

**7** [11] - 244:13, 256:2, 256:7, 279:14, 279:23, 283:20, 291:22, 304:7, 304:11, 305:17, 305:20
**7.1** [2] - 381:3, 383:24
**70** [1] - 325:2
**7000** [3] - 404:6, 404:7, 406:25
**703** [1] - 232:20
**7K** [1] - 403:16

## 8

**8** [3] - 282:24, 304:17, 341:6
**8-car** [10] - 392:20, 392:22, 393:2, 393:8, 393:14, 394:7, 394:10, 396:1, 397:15, 399:11
**8000** [1] - 404:5
**801** [1] - 376:12
**801(a)(1)(B)** [1] - 376:11
**801(d)(1)(B** [1] - 377:25
**801.1** [1] - 373:7
**803** [1] - 376:9
**84** [1] - 380:25
**84-year-old** [1] - 383:23
**8444** [1] - 232:19

## 9

**90** [1] - 300:3
**9:00** [1] - 407:24
**9:10** [1] - 232:5

## A

**a.m** [1] - 232:5
**ability** [2] - 290:4, 409:20
**able** [10] - 240:1, 242:13, 291:7, 300:14, 303:19, 306:19, 322:4, 343:24, 351:5, 388:24
**abruptly** [1] - 360:24
**absence** [2] - 308:2, 384:20
**absolutely** [5] - 259:10, 269:10, 361:11, 364:25, 398:6
**Abu** [1] - 328:9
**abuse** [1] - 245:7
**academic** [1] - 324:20
**accelerate** [1] - 260:1
**accept** [3] - 297:22, 297:21, 330:20
**accessibility** [1] - 324:16
**accessible** [5] - 253:21, 262:17, 262:22, 263:12, 263:15
**accessibles** [1] - 263:1
**accident** [19] - 265:22, 266:20, 267:8, 288:17, 288:22, 289:11, 291:8, 291:12, 291:13, 291:16, 294:5, 301:4, 306:7, 313:3, 348:4, 348:8, 348:10, 372:21, 392:5
**accidentally** [1] - 342:13
**accidents** [1] - 337:19
**according** [1] - 242:23
**accountant** [1] - 242:8
**accuracy** [1] - 238:24
**accurate** [3] - 352:18, 374:11, 409:18
**Action** [1] - 234:3
**actions** [1] - 359:18
**active** [2] - 289:14, 345:6
**activities** [1] - 325:1
**activity** [2] - 289:7, 289:12
**actual** [5] - 236:2, 236:15, 293:20, 376:19, 376:22

412

**acute** [2] - 294:1, 294:3
**add** [2] - 371:21, 371:23
**addition** [3] - 373:12, 373:14, 383:15
**additional** [1] - 313:7
**additionally** [1] - 244:19
**address** [3] - 312:17, 315:16, 368:1
**addressed** [1] - 375:5
**addressing** [1] - 345:22
**adequate** [1] - 270:11
**adjourned** [1] - 409:12
**adjust** [1] - 315:14
**administration** [1] - 320:17
**admissibility** [2] - 236:22, 243:4
**admissible** [4] - 236:20, 373:7, 377:25, 381:8
**admission** [3] - 234:24, 235:17, 249:25
**admit** [6] - 240:24, 249:21, 302:3, 371:16, 377:12
**admitted** [4] - 246:8, 250:1, 373:16
**adverse** [1] - 387:11
**advised** [1] - 259:9
**advisement** [1] - 387:9
**advising** [1] - 270:6
**advocacy** [2] - 268:16, 270:16
**advocate** [1] - 269:21
**advocating** [1] - 271:3
**affect** [1] - 290:4
**affecting** [1] - 289:8
**affiliations** [2] - 324:11, 324:12
**afternoon** [11] - 313:16, 365:14, 387:22, 389:10, 389:22, 389:23, 390:5, 390:6, 398:1, 408:21, 409:2
**age** [4] - 268:5, 289:21, 290:17, 381:13
**agencies** [4] - 334:11, 343:14, 354:11, 357:9
**agency** [1] - 333:2
**agent** [1] - 242:7
**ago** [8] - 248:22, 249:2, 267:16,

299:15, 305:15, 324:9, 364:14, 388:7
**agree** [16] - 255:10, 256:17, 257:15, 258:23, 259:1, 287:21, 293:25, 299:10, 350:22, 351:8, 353:22, 355:6, 361:10, 398:17, 399:13, 405:7
**agreed** [4] - 272:24, 354:4, 366:19, 383:19
**agreement** [2] - 331:24, 380:25
**ahead** [13] - 260:7, 271:23, 280:7, 285:7, 295:22, 311:7, 319:12, 332:20, 350:2, 352:6, 360:15, 399:3, 406:12
**AI** [2] - 334:9, 341:12
**airplanes** [1] - 319:6
**AI** [4] - 372:13, 372:20, 380:2, 385:22
**ALANC** [1] - 319:5
**ALFRED** [1] - 233:13
**alight** [1] - 384:22
**allergies** [1] - 366:18
**alleviate** [1] - 391:22
**allow** [4] - 246:13, 310:7, 382:15, 383:16
**allowed** [7] - 297:5, 311:7, 360:23, 361:1, 367:15, 386:8, 386:13
**alluded** [1] - 257:19
**alma** [2] - 322:9, 322:11
**almost** [5] - 257:21, 258:20, 327:22, 356:17, 363:23
**ambulate** [1] - 289:2, 289:5, 290:4, 291:7
**ambulating** [1] - 272:13
**American** [8] - 268:17, 269:17, 269:22, 271:6, 333:4, 345:6, 345:13, 346:15
**amount** [2] - 235:1, 247:18
**anatomy** [1] - 281:5
**Andrew** [2] - 275:8, 275:18
**ANDREW** [2] - 233:6, 275:13

**Angeles** [3] - 326:2, 328:6, 331:11
**animation** [1] - 292:22
**announce** [2] - 261:3, 394:14
**announced** [3] - 263:23, 306:12, 399:20
**announcement** [74] - 253:24, 254:2, 254:3, 254:9, 254:15, 254:21, 254:25, 255:11, 255:14, 255:18, 256:9, 256:11, 256:15, 256:19, 256:24, 257:4, 257:10, 257:12, 257:13, 259:19, 301:22, 307:25, 336:24, 338:12, 339:24, 342:16, 349:10, 349:12, 350:11, 385:2, 385:3, 385:4, 385:18, 385:20, 385:21, 385:23, 386:1, 392:17, 392:20, 394:14, 394:25, 395:3, 397:5, 397:12, 399:19, 400:5, 400:10, 401:1, 401:4, 401:7, 401:22, 402:1, 403:10, 403:11, 403:13, 403:16, 403:17, 403:20, 403:21, 403:23, 404:1, 404:9, 404:11, 404:12, 404:14, 404:17, 404:19, 404:25, 405:7, 406:4, 407:2
**announcements** [14] - 259:5, 259:6, 261:12, 336:22, 338:2, 339:4, 342:14, 392:14, 392:16, 394:12, 402:22, 403:4, 403:18, 405:5
**announcing** [1] - 350:11
**answer** [23] - 235:17, 246:12, 256:12, 307:4, 307:7, 307:20, 308:2, 308:17, 310:2, 310:4, 310:8, 312:5,

312:15, 312:19, 326:25, 330:8, 352:15, 361:5, 361:7, 361:25, 362:11, 395:2
**ANSWER** [3] - 256:10, 306:14, 307:13
**answered** [3] - 286:23, 312:7, 352:11
**answers** [2] - 309:14, 367:22
**anti** [1] - 291:5
**anti-inflammatory** [1] - 291:5
**anticipate** [1] - 296:4
**anyway** [4] - 269:12, 342:5, 356:15, 367:6
**apologies** [3] - 379:16, 387:24, 388:6
**apologize** [10] - 242:25, 266:7, 295:19, 297:8, 353:5, 354:2, 370:16, 371:6, 375:4, 401:14
**appealed** [1] - 244:15
**appearance** [1] - 234:6
**APPEARANCES** [1] - 232:12
**appeared** [1] - 317:5
**appearing** [1] - 368:13
**appellate** [3] - 381:23, 382:8, 383:1
**Appendix** [1] - 244:13
**application** [1] - 317:9
**apply** [2] - 305:16, 317:8
**appointed** [1] - 324:17
**appreciate** [2] - 237:5, 399:23
**appreciation** [1] - 366:15
**appreciative** [1] - 382:11
**approach** [4] - 234:5, 316:15, 335:21, 389:9
**approaches** [1] - 406:10
**appropriate** [1] - 373:1
**approve** [1] - 327:18
**approved** [2] - 327:20, 346:6
**approving** [1] - 321:4
**April** [5] - 232:5, 268:22, 268:23, 268:25, 273:4
**APTA** [1] - 355:3
**Archives** [2] - 258:13,

258:14
**Area** [1] - 308:9
**area** [6] - 261:22, 263:18, 284:4, 300:11, 315:19, 330:14
**AREA** [1] - 232:6
**argue** [1] - 244:23
**argued** [2] - 244:22, 384:18
**argument** [1] - 245:3
**argumentative** [1] - 343:20
**arguments** [2] - 244:21, 387:3
**arm** [2] - 264:18, 293:22
**arms** [1] - 253:8
**arrest** [1] - 278:23
**arrived** [1] - 251:15
**arriving** [5] - 254:21, 254:25, 255:12, 256:25, 385:4
**arthritic** [2] - 289:13, 289:16, 289:24
**arthritis** [2] - 278:7, 278:9
**articles** [1] - 317:4
**articulated** [1] - 341:1
**ascertain** [1] - 387:23
**aspect** [2] - 321:3, 327:22
**aspects** [2] - 319:23, 321:10
**aspiration** [1] - 329:17
**aspirational** [6] - 354:15, 354:16, 354:17, 354:21, 354:24, 355:1
**assert** [1] - 384:15
**asserted** [1] - 373:5
**assertion** [1] - 373:21
**assessment** [1] - 287:11
**assistant** [1] - 320:6
**assisted** [1] - 324:16
**assisting** [1] - 391:20
**Association** [3] - 333:5, 345:7, 346:16
**assumption** [1] - 384:18
**assure** [1] - 407:18
**Atlanta** [2] - 276:9, 328:4
**attach** [1] - 281:10
**attached** [1] - 236:14
**attempt** [1] - 247:19
**attempting** [1] - 308:25
**attention** [3] - 245:14,

413

339:12, 403:11
**audible** [5] - 329:11, 337:8, 337:12, 337:16, 338:9
**audio** [5] - 303:24, 304:3, 379:2, 379:19, 379:22
**August** [6] - 267:9, 274:5, 274:11, 279:3, 286:25, 287:25
**authenticate** [1] - 243:8
**authenticated** [1] - 240:9
**authenticating** [1] - 235:21
**authentication** [1] - 279:25
**authenticity** [11] - 236:5, 236:9, 236:10, 237:3, 237:6, 238:22, 239:1, 240:14, 240:16, 243:3, 243:5
**authoritative** [1] - 309:1
**authorities** [2] - 355:10, 359:1
**AUTHORITY** [1] - 232:7
**Authority** [7] - 234:4, 234:13, 321:13, 326:8, 331:6, 334:17, 353:7
**authority** [5] - 321:5, 321:6, 321:7, 351:20, 352:21
**Authority's** [1] - 353:3
**automated** [4] - 356:15, 403:23, 404:1, 407:2
**automatic** [3] - 261:11, 403:17, 406:22
**automatically** [3] - 393:24, 406:14, 406:19
**automobiles** [1] - 319:6
**availability** [1] - 270:11
**available** [7] - 308:13, 311:18, 312:1, 312:25, 366:4, 366:16, 407:15
**Avenue** [2] - 232:24, 409:25
**avoid** [4] - 296:11, 337:20, 340:16,

393:23
**award** [2] - 328:10, 328:12
**awards** [1] - 316:25
**aware** [17] - 262:6, 287:10, 287:13, 287:15, 290:12, 290:21, 306:2, 306:10, 306:12, 311:18, 351:8, 354:14, 354:24, 362:24, 402:1, 405:13, 405:14

# B

**B-I-R** [1] - 346:22
**background** [2] - 275:18, 285:1
**backwards** [1] - 342:17
**bad** [3] - 342:15, 344:23, 354:2
**balance** [1] - 340:8
**balancing** [1] - 252:19
**balloons** [1] - 319:7
**bankrupt** [1] - 321:25
**bantering** [1] - 369:19
**BART** [1] - 331:10
**Baruch** [1] - 318:14
**based** [18] - 250:14, 284:25, 292:19, 293:1, 296:2, 297:16, 302:19, 305:6, 307:8, 330:21, 339:17, 344:2, 346:23, 350:9, 373:25, 374:1, 383:21, 404:23
**baseline** [1] - 403:10
**bases** [5] - 236:7, 312:10, 312:14, 314:10, 384:14
**basis** [8] - 266:8, 301:20, 310:1, 310:8, 374:5, 384:21, 386:22, 404:23
**Bates** [1] - 241:14
**Bates-stamped** [1] - 241:14
**bathroom** [1] - 332:25
**beaches** [1] - 320:2
**bear** [1] - 373:10
**bearing** [2] - 301:1, 305:23
**beautiful** [1] - 331:12
**became** [10] - 317:10, 322:5, 322:10,

334:14, 334:15, 334:16, 341:17, 341:18, 357:19, 391:11
**become** [1] - 278:15
**BEFORE** [1] - 232:11
**beforehand** [1] - 374:3
**beg** [1] - 253:3
**began** [3] - 277:3, 277:23, 322:12
**begin** [2] - 380:18, 380:19
**begins** [1] - 259:19
**behind** [5] - 262:7, 263:14, 265:3, 335:17, 393:17
**belabor** [1] - 400:15
**belief** [2] - 384:21, 404:23
**belong** [1] - 316:25
**below** [4] - 281:13, 281:17, 284:6, 292:18
**bench** [12] - 247:13, 247:24, 322:23, 323:21, 343:4, 344:7, 370:6, 371:9, 372:17, 374:21, 384:8, 387:13
**bending** [1] - 283:9
**BENNETT** [1] - 233:12
**Bennett** [11] - 303:21, 305:24, 308:8, 328:25, 366:25, 370:21, 372:8, 372:10, 375:5, 408:8
**BER** [2] - 346:18, 346:20
**Berkowitz** [31] - 295:5, 295:8, 295:19, 295:25, 296:21, 297:1, 297:10, 301:24, 301:25, 302:13, 314:5, 314:11, 315:3, 315:4, 315:12, 315:15, 315:17, 316:12, 323:24, 327:6, 334:25, 335:9, 335:19, 339:7, 346:23, 347:21, 359:14, 360:18, 361:5, 363:18, 386:6
**BERKOWITZ** [2] - 233:8, 315:9
**Berkowitz's** [2] - 301:20, 326:25
**Bernard** [2] - 307:5, 372:7

**BERNARD** [1] - 233:12
**Bernard's** [1] - 307:20
**berth** [2] - 392:22, 394:10
**berthed** [1] - 401:23
**berthing** [7] - 345:9, 345:15, 346:16, 356:17, 392:14, 392:15, 392:19
**best** [2] - 333:7, 409:19
**better** [4] - 245:12, 343:15, 367:3, 391:5
**between** [9] - 251:18, 261:24, 262:3, 278:17, 300:22, 349:3, 351:25, 405:20
**beyond** [2] - 312:18, 383:18
**bicycle** [1] - 325:7
**bicyclists** [1] - 325:11
**big** [2] - 281:10, 282:9
**biggest** [2] - 331:3, 331:6
**bills** [34] - 235:1, 235:22, 237:9, 237:18, 237:23, 238:3, 238:7, 238:8, 238:12, 239:3, 239:9, 239:20, 240:3, 240:7, 240:9, 240:11, 240:12, 240:18, 241:7, 241:9, 241:20, 242:16, 242:17, 243:8, 247:5, 247:16, 248:4, 248:8, 248:9, 248:10, 248:21, 387:1
**binder** [4] - 248:1, 279:15, 303:18, 308:11
**biomechanical** [1] - 301:5
**biomechanics** [1] - 324:15
**biomedical** [1] - 324:15
**Bishop** [18] - 267:1, 267:9, 273:13, 273:14, 274:11, 275:8, 275:16, 275:18, 275:24, 276:8, 277:14, 277:17, 280:3, 281:21, 285:2, 286:19, 292:2, 294:16

**BISHOP** [2] - 233:6, 275:13
**bit** [9] - 257:19, 265:16, 278:15, 317:21, 323:18, 330:18, 342:12, 388:15, 390:25
**blame** [1] - 353:12
**blessed** [1] - 264:10
**blocking** [1] - 280:22
**blue** [1] - 358:4
**board** [2] - 276:6, 290:3
**board-certified** [1] - 276:6
**body** [3] - 289:18, 289:21, 310:21
**bolstering** [3] - 372:24, 374:8, 374:11
**bone** [13] - 267:15, 268:4, 278:20, 282:12, 283:15, 285:23, 286:3, 288:7, 289:17, 289:19, 293:13, 293:20, 294:9
**bones** [4] - 278:14, 278:15, 293:16
**book** [1] - 248:25
**boost** [1] - 399:24
**Boston** [10] - 326:3, 328:3, 331:5, 341:5, 342:10, 342:22, 344:4, 355:13, 355:19, 356:25
**Boston's** [1] - 356:25
**bottom** [3] - 235:3, 242:11, 246:9
**box** [1] - 403:3
**brake** [1] - 260:3
**braking** [1] - 406:19
**break** [12] - 294:23, 295:20, 364:3, 364:8, 364:22, 365:4, 371:3, 374:20, 374:24, 387:22, 388:3, 389:6
**breaks** [1] - 391:23
**brief** [7] - 362:20, 370:12, 371:19, 372:1, 374:20, 374:23, 383:8
**briefed** [1] - 244:9
**briefly** [7] - 234:19, 244:11, 303:12, 312:3, 322:22, 362:21, 384:7
**bring** [7] - 243:12, 243:20, 265:18,

414

265:22, 279:2,
301:18
**bringing** [2] - 291:22,
370:21
**brings** [2] - 315:19,
376:19
**Britannica** [1] - 316:22
**brittle** [1] - 278:15
**broke** [2] - 282:18,
293:22
**Brooklyn** [1] - 318:22
**brought** [3] - 265:17,
266:2, 375:20
**Brown's** [1] - 266:4
**bruised** [1] - 268:13
**budget** [1] - 321:4
**build** [2] - 320:22,
320:23
**building** [3] - 271:22,
320:2, 388:7
**built** [1] - 327:21
**burden** [6] - 240:20,
244:23, 245:1,
245:4, 317:19, 386:3
**Bureau** [1] - 321:22
**bus** [8] - 321:24,
322:5, 322:6,
390:12, 390:13,
390:16, 391:8
**buses** [1] - 319:6
**business** [5] - 305:21,
308:24, 318:19,
319:8, 325:20
**button** [4] - 395:15,
398:11, 404:2, 407:3
**BY** [24] - 246:20,
248:2, 250:6,
260:23, 275:15,
277:22, 280:20,
285:8, 286:18,
292:1, 315:11,
323:22, 335:15,
344:8, 347:20,
359:16, 360:17,
362:23, 389:21,
390:4, 395:8,
397:25, 400:4, 402:7

### C

**CA** [1] - 232:3
**cab** [5] - 395:19,
395:21, 396:10,
396:14, 396:23
**calcium** [1] - 278:15
**camps** [1] - 276:18
**cane** [22] - 252:16,
252:19, 264:2,
264:3, 264:20,
265:17, 266:7,

266:17, 272:13,
272:15, 272:18,
289:1, 289:4, 291:7,
291:11, 291:13,
291:14, 291:15,
350:18
**cannot** [1] - 343:14
**capabilities** [2] -
351:5, 351:9
**capacity** [1] - 371:15
**capital** [1] - 327:18
**caption** [1] - 336:14
**car** [3] - 261:24,
327:15, 363:14
**care** [45] - 270:9,
270:10, 276:17,
277:9, 279:9,
297:11, 298:20,
299:8, 299:16,
301:23, 302:5,
302:16, 327:8,
328:19, 329:12,
329:14, 329:15,
330:4, 330:10,
330:12, 330:15,
331:17, 335:2,
335:12, 336:22,
337:7, 337:12,
339:17, 340:18,
341:4, 347:1, 347:9,
353:24, 354:6,
354:9, 354:18,
354:20, 354:21,
355:4, 355:5, 355:7,
357:13, 386:10,
386:11
**career** [7] - 283:17,
322:12, 325:16,
327:2, 327:4,
327:11, 327:23
**Carl** [4] - 315:3,
315:17, 316:12,
386:5
**CARL** [2] - 233:8,
315:9
**CAROL** [3] - 232:3,
233:4, 246:18
**Carol** [5] - 234:3,
234:8, 277:4,
292:14, 383:23
**carrier** [1] - 352:9
**carrying** [2] - 264:18,
350:18
**cars** [2] - 351:25
**cartilage** [2] - 289:17,
289:18
**case** [78] - 236:1,
240:21, 242:4,
242:7, 244:13,
245:5, 245:8, 256:5,

265:4, 277:4, 294:4,
294:19, 296:17,
297:16, 299:9,
299:11, 299:13,
299:19, 299:22,
301:3, 301:8, 305:6,
305:21, 306:1,
309:19, 309:20,
313:22, 323:24,
326:11, 326:16,
327:6, 328:14,
328:22, 329:8,
333:12, 333:14,
334:5, 335:2,
335:13, 336:3,
336:23, 338:5,
339:17, 346:23,
351:14, 351:16,
355:11, 355:14,
357:4, 363:22,
365:5, 365:9, 366:6,
366:12, 366:21,
366:22, 366:23,
367:5, 371:16,
380:19, 381:21,
381:23, 382:8,
384:7, 384:13,
386:9, 387:6, 387:9,
392:5, 392:13,
405:4, 407:11,
407:23, 408:17,
408:18
**case-in** [2] - 313:22,
366:21
**case-in-chief** [4] -
306:1, 366:22,
381:23, 382:8
**cases** [9] - 240:25,
244:19, 320:1,
325:21, 326:9,
326:14, 341:15,
342:11, 357:1
**cast** [1] - 293:23
**Caucasian** [1] -
290:14
**caused** [1] - 398:14
**causes** [2] - 352:25,
353:8
**caution** [1] - 272:25
**cautions** [1] - 259:3
**cease** [1] - 379:19
**center** [4] - 252:22,
252:23, 253:7, 253:9
**central** [3] - 394:9,
395:18, 396:22
**cents** [1] - 248:11
**certain** [8] - 270:6,
277:8, 279:10,
285:4, 289:22,
303:4, 328:21,

371:17
**certainly** [3] - 242:15,
299:25, 373:17
**certainty** [4] - 277:9,
286:6, 286:11, 337:6
**certificate** [1] - 240:23
**CERTIFICATE** [1] -
409:14
**certified** [1] - 276:6
**certify** [1] - 409:17
**cetera** [6] - 248:5,
248:6, 276:18,
298:5, 341:5, 344:4
**chair** [3] - 265:9,
319:25, 350:6
**chairs** [1] - 253:16
**challenge** [1] - 300:13
**challenges** [1] -
314:11
**chance** [4] - 244:12,
247:1, 333:4, 346:7
**change** [1] - 332:24
**changed** [3] - 318:22,
370:25, 384:24
**changes** [1] - 385:5
**characterized** [1] -
298:9
**charge** [6] - 357:18,
376:15, 388:22,
408:13, 408:15,
409:1
**chart** [1] - 381:12
**Chicago** [9] - 328:3,
328:5, 331:8, 334:7,
341:5, 344:11,
355:13, 355:20,
357:6
**Chicago's** [1] - 357:6
**chicken** [1] - 289:19
**chief** [6] - 306:1,
313:23, 366:22,
381:23, 382:8
**children** [1] - 346:17
**chime** [2] - 252:3,
252:5
**chimes** [8] - 251:19,
251:25, 261:14,
261:21, 264:22,
265:6, 350:13,
385:12
**China** [1] - 328:8
**Chinatown** [1] -
320:24
**choice** [2] - 310:11,
322:1
**chosen** [1] - 330:15
**Chris** [1] - 381:15
**Christmas** [1] - 268:9
**CHRISTOPHER** [2] -
232:11, 232:13

**Christopher** [1] -
234:8
**chronological** [1] -
317:22
**Cigna** [1] - 238:13
**CILT** [1] - 324:21
**circle** [1] - 286:9
**circuit** [7] - 393:16,
393:17, 393:19,
394:1, 394:2, 394:7,
406:13
**Circuit** [3] - 244:12,
244:14, 245:6
**circulated** [1] - 346:6
**circumstances** [5] -
335:3, 336:23,
337:17, 347:2, 393:7
**cited** [1] - 242:4
**cites** [1] - 236:1
**city** [7] - 320:15,
321:2, 321:4, 321:7,
327:13, 327:16,
327:17
**City** [16] - 318:1,
318:15, 319:13,
320:9, 321:11,
321:12, 321:19,
321:24, 331:5,
334:14, 334:16,
341:21, 342:6,
342:8, 344:18,
344:21
**City's** [1] - 331:5
**city's** [1] - 321:9
**Civil** [2] - 234:3,
384:12
**civil** [4] - 244:19,
317:24, 318:3,
324:14
**CLAMTA** [1] - 331:10
**clarification** [2] -
284:21, 406:10
**clarified** [1] - 244:25
**clarify** [3] - 297:7,
306:20, 398:3
**clarity** [1] - 240:2
**class** [1] - 322:14
**clean** [4] - 304:7,
304:14, 305:20,
332:25
**cleaner** [1] - 382:6
**clear** [25] - 239:5,
252:11, 254:7,
257:9, 270:20,
296:4, 297:23,
299:6, 299:7,
302:18, 308:17,
355:9, 394:16,
395:3, 395:5, 397:6,
399:15, 400:5,

400:8, 400:16, 400:18, 401:11, 401:25, 404:12, 404:14
**cleared** [1] - 399:4
**clearly** [2] - 333:20, 404:18
**CLEV** [1] - 233:12
**Clev** [2] - 303:21, 372:7
**Cleveland** [4] - 326:1, 328:5, 331:9
**client** [1] - 241:23
**clinics** [2] - 269:6, 269:17
**clip** [2] - 307:21, 313:10
**close** [17] - 247:25, 264:10, 268:23, 315:13, 316:4, 330:17, 365:14, 382:20, 382:22, 382:23, 386:15, 398:22, 399:5, 405:19, 406:12, 408:11, 408:21
**closed** [2] - 282:3, 282:6
**closer** [3] - 263:21, 275:25, 391:2
**closing** [2] - 261:15, 388:17
**closings** [1] - 409:2
**clutter** [1] - 241:15
**cognizant** [1] - 351:4
**cohort** [1] - 381:13
**coin** [1] - 330:23
**coincident** [1] - 376:8
**collar** [1] - 358:4
**collateral** [1] - 238:10
**colleague** [2] - 334:12, 341:14
**colleagues** [1] - 366:15
**college** [3] - 317:7, 321:12, 321:14
**College** [4] - 318:1, 318:14, 318:15, 319:13
**colleges** [1] - 324:3
**COLUMBIA** [1] - 232:1
**column** [1] - 249:3
**comfortable** [1] - 380:12
**coming** [11] - 305:6, 305:22, 339:24, 348:22, 349:13, 365:21, 367:2, 380:13, 381:20, 388:20, 404:25

**comment** [4] - 244:17, 346:8, 346:13, 346:14
**commented** [2] - 234:25, 295:23
**Committee** [1] - 345:13
**committee** [6] - 270:3, 270:4, 324:21, 345:10, 345:12, 346:5
**committees** [3] - 345:7, 354:12, 355:3
**common** [3] - 352:9, 361:14, 361:16
**communications** [1] - 402:24
**community** [1] - 317:1
**companies** [2] - 326:14, 331:22
**company** [2] - 327:24, 328:6
**compare** [1] - 239:20
**compared** [1] - 318:19
**comparison** [1] - 291:10
**competent** [2] - 270:10, 270:16
**competently** [2] - 311:21, 311:23
**complaints** [2] - 285:25, 391:21
**complete** [1] - 409:19
**completed** [1] - 394:22
**completely** [2] - 282:13, 308:24
**completeness** [1] - 306:16
**component** [2] - 316:3, 387:5
**compulsory** [2] - 322:16, 325:17
**conceal** [1] - 379:22
**concern** [4] - 305:23, 309:8, 345:21, 345:22
**concerning** [1] - 336:2
**concerns** [2] - 306:5, 345:23
**conclude** [2] - 344:3, 407:19
**concluded** [1] - 369:16
**concludes** [3] - 372:9, 380:3, 407:14
**concluding** [2] - 272:4, 408:25
**conclusions** [2] - 298:5, 336:3

**conclusory** [1] - 298:10
**condemnation** [1] - 320:1
**condition** [2] - 279:6, 285:18
**conditions** [1] - 406:11
**conduct** [1] - 311:16
**conductor** [4] - 334:14, 341:16, 357:17, 358:23
**conference** [17] - 247:13, 247:24, 295:24, 322:23, 323:21, 343:4, 344:7, 370:6, 371:9, 372:17, 374:21, 384:8, 387:13, 388:22, 408:13, 408:15, 409:1
**confident** [1] - 373:13
**confidential** [4] - 356:8, 356:9, 356:23, 357:10
**confirm** [1] - 345:3
**confirmed** [2] - 342:23, 343:25
**confuse** [1] - 299:14
**confused** [1] - 310:14
**Congress** [1] - 271:6
**connected** [1] - 369:6
**connection** [6] - 271:7, 274:13, 274:14, 278:25, 285:10, 285:12
**consider** [7] - 239:12, 240:4, 259:2, 331:22, 354:25, 356:7, 356:22
**considered** [1] - 357:9
**considers** [2] - 354:14, 354:23
**consist** [1] - 270:5
**consisted** [2] - 270:6, 372:22
**consistency** [1] - 385:24
**consistent** [16] - 242:6, 279:4, 286:2, 339:16, 340:18, 353:23, 354:5, 355:4, 355:6, 372:24, 373:6, 376:6, 376:8, 376:14, 377:25
**Consortium** [1] - 258:14
**constitutes** [1] - 409:17

**Constitution** [2] - 232:24, 409:25
**consult** [1] - 313:12
**consulting** [8] - 292:11, 316:8, 319:8, 319:10, 322:15, 322:17, 320:20
**contact** [4] - 394:9, 395:15, 396:12, 396:24
**contacted** [6] - 326:7, 328:14, 341:22, 355:21, 395:18, 396:22
**contacts** [1] - 345:5
**contain** [1] - 247:4
**contemporaneously** [1] - 308:24
**content** [1] - 343:22
**contested** [1] - 309:12
**context** [12] - 307:6, 307:7, 307:14, 307:21, 308:2, 310:7, 312:6, 312:9, 312:16, 313:5, 313:11, 378:1
**continue** [6] - 269:21, 270:1, 273:9, 287:23, 369:12, 394:10
**continued** [2] - 273:3, 325:14
**Continued** [1] - 246:19
**continuing** [4] - 270:23, 325:14, 325:15, 325:17
**contractor** [1] - 269:4
**contradict** [1] - 306:11
**contradicts** [1] - 307:4
**contributory** [2] - 385:10, 385:15
**control** [2] - 394:9, 396:22
**conversation** [3] - 358:8, 370:12, 375:6
**conversations** [2] - 343:21, 344:3
**convey** [1] - 343:7
**cooked** [1] - 289:20
**COOPER** [1] - 232:11
**copies** [1] - 334:17
**copy** [1] - 241:9
**corporate** [1] - 371:13
**correct** [111] - 235:19, 239:2, 249:4, 250:16, 250:24, 250:25, 251:16, 252:7, 252:9, 252:11, 253:10,

254:18, 255:20, 256:25, 257:13, 257:14, 258:5, 258:25, 259:5, 259:7, 259:8, 259:12, 259:16, 261:6, 261:15, 261:18, 264:2, 264:22, 264:24, 265:2, 265:7, 265:10, 265:14, 272:7, 272:19, 274:19, 276:7, 277:2, 277:6, 277:19, 277:20, 284:11, 285:13, 285:14, 285:17, 286:25, 287:1, 288:10, 288:12, 288:15, 288:16, 292:4, 292:19, 292:23, 292:24, 293:2, 293:3, 293:8, 294:5, 304:25, 308:1, 317:25, 329:13, 330:16, 348:16, 349:20, 349:23, 349:24, 350:14, 350:16, 350:17, 351:12, 353:15, 353:24, 355:20, 357:10, 357:11, 364:13, 366:1, 366:13, 371:4, 374:18, 376:7, 376:20, 376:21, 377:7, 377:11, 377:17, 377:20, 381:10, 390:20, 391:15, 393:6, 393:10, 396:9, 396:11, 398:9, 398:12, 399:12, 399:17, 401:12, 401:17, 401:20, 402:20, 403:5, 403:8, 403:25, 405:3, 407:4, 408:19
**correctly** [3] - 266:14, 292:16, 356:17
**cortisone** [1] - 278:11
**counsel** [35] - 234:5, 234:9, 239:5, 239:11, 240:24, 244:21, 244:25, 245:13, 247:12, 256:1, 286:23, 296:5, 296:17, 296:25, 297:1, 297:19, 300:6,

416

311:21, 311:22,
312:8, 312:24,
322:21, 329:19,
366:18, 366:23,
367:12, 368:3,
372:25, 376:20,
377:3, 381:12,
382:11, 383:6,
383:7, 399:23
**Counsel** [5] - 352:5,
359:21, 372:20,
400:1, 407:6
**counsel's** [1] - 275:3
**counted** [2] - 251:2,
382:7
**counter** [3] - 305:9,
305:10, 305:16
**counter-designated**
[2] - 305:9, 305:10
**counter-designation**
[1] - 305:16
**counterpart** [3] -
344:14, 358:11,
358:18
**country** [2] - 331:1,
354:11
**County** [1] - 320:8
**couple** [11] - 242:1,
271:18, 326:3,
327:5, 363:14,
380:6, 380:16,
390:14, 398:3,
402:13, 402:15
**course** [12] - 241:20,
251:23, 272:11,
283:17, 293:10,
304:20, 305:19,
305:24, 308:20,
310:18, 344:2, 351:3
**COURT** [299] - 232:1,
234:10, 234:15,
235:8, 235:10,
235:13, 235:15,
235:23, 236:4,
237:3, 237:13,
237:16, 237:18,
237:21, 237:23,
238:1, 238:5,
238:11, 238:15,
238:20, 238:23,
238:25, 239:10,
240:11, 240:14,
241:4, 241:25,
242:3, 242:19,
243:2, 243:11,
243:13, 243:16,
243:19, 243:24,
244:2, 244:10,
245:11, 245:17,
245:19, 245:25,

247:12, 247:15,
247:25, 248:19,
249:8, 249:11,
249:14, 249:16,
249:19, 249:23,
250:1, 255:23,
259:24, 260:18,
260:21, 275:2,
275:6, 275:9,
275:11, 275:24,
277:16, 277:21,
280:1, 280:5, 280:7,
280:11, 280:15,
280:18, 284:17,
284:20, 285:7,
286:15, 294:16,
294:21, 295:1,
295:6, 295:10,
295:21, 296:12,
296:14, 296:20,
297:9, 297:13,
297:23, 298:1,
298:4, 298:15,
298:23, 299:23,
300:8, 300:10,
300:22, 301:9,
301:14, 301:18,
302:21, 302:24,
303:7, 303:9,
303:15, 303:22,
304:8, 304:10,
304:12, 304:19,
304:21, 306:3,
306:8, 306:19,
306:25, 307:2,
307:15, 307:18,
308:5, 309:3,
309:24, 310:23,
311:3, 311:15,
312:2, 312:12,
312:17, 313:1,
313:6, 313:9,
313:20, 314:1,
314:5, 314:9,
314:12, 314:18,
314:21, 314:24,
315:4, 315:6,
316:16, 317:16,
317:18, 322:21,
322:25, 323:7,
323:12, 323:14,
323:20, 326:20,
326:24, 329:19,
329:25, 330:6,
332:9, 332:14,
332:17, 332:18,
332:20, 335:7,
335:22, 336:16,
336:20, 337:15,
338:16, 338:22,
341:2, 341:25,

343:2, 343:6,
343:15, 344:1,
347:8, 347:17,
352:5, 359:12,
360:2, 360:15,
361:4, 361:7,
361:18, 361:24,
362:1, 362:3, 362:9,
362:20, 363:18,
363:21, 363:25,
364:4, 364:10,
364:15, 364:21,
365:3, 365:8,
365:10, 365:15,
365:25, 366:5,
366:11, 367:4,
367:9, 367:16,
367:19, 368:5,
368:11, 368:15,
368:17, 369:2,
369:9, 369:16,
369:24, 370:1,
370:5, 370:8,
370:24, 371:2,
371:8, 371:10,
371:23, 372:4,
372:6, 372:11,
372:16, 373:24,
374:5, 374:15,
374:19, 374:22,
375:2, 375:7, 375:9,
375:16, 376:1,
376:3, 376:8,
376:12, 376:16,
376:24, 377:1,
377:5, 377:8,
377:15, 377:18,
377:21, 377:23,
378:9, 378:21,
378:23, 379:4,
379:6, 379:13,
379:15, 380:3,
380:9, 380:14,
380:22, 381:4,
381:7, 381:11,
381:17, 382:9,
382:15, 382:19,
382:24, 383:4,
383:11, 384:6,
387:8, 387:14,
387:18, 387:24,
388:8, 388:18,
388:20, 389:3,
389:9, 389:12,
389:16, 389:25,
390:23, 391:4,
394:24, 395:5,
395:7, 399:24,
401:13, 402:10,
406:9, 406:17,
406:20, 406:25,

407:5, 407:8,
407:13, 407:16,
408:4, 408:10,
408:20, 408:25,
409:5, 409:7, 409:14
**court** [2] - 244:16,
299:5
**Court** [48] - 232:22,
232:23, 235:4,
241:23, 244:18,
244:20, 245:5,
245:12, 246:11,
279:22, 295:19,
296:3, 299:10,
299:12, 300:24,
302:12, 302:15,
303:17, 304:18,
305:15, 310:15,
310:19, 311:8,
311:12, 315:18,
335:8, 341:9, 364:1,
364:8, 368:9,
368:11, 370:17,
371:6, 372:1,
373:10, 378:21,
379:8, 379:12,
379:21, 380:7,
382:14, 383:19,
386:6, 386:8,
386:22, 387:8,
388:6, 409:24
**Court's** [9] - 245:6,
281:19, 301:2,
301:19, 304:13,
305:6, 314:13,
314:14, 402:3
**courtesy** [1] - 382:11
**courthouse** [1] - 236:2
**Courthouse** [2] -
232:23, 409:24
**courtroom** [17] -
234:18, 239:24,
245:24, 260:14,
294:25, 314:23,
315:20, 365:7,
369:8, 375:1,
379:14, 380:21,
383:12, 386:13,
388:5, 389:15, 408:3
**COURTROOM** [8] -
234:2, 280:25,
291:21, 291:24,
359:20, 359:24,
360:6, 369:5
**courts** [3] - 270:19,
302:20, 323:9
**Courts** [5] - 298:8,
300:15, 302:25,
303:3, 383:16
**cover** [2] - 332:5,

332:6
**covered** [2] - 289:21,
370:18
**creaky** [2] - 266:24,
274:3
**create** [1] - 340:7
**credibility** [5] - 296:8,
298:12, 298:14,
302:19, 303:2
**cregan@reganfirm.
com** [1] - 232:16
**critical** [6] - 305:20,
307:9, 309:20,
405:8, 405:12, 406:4
**criticism** [1] - 298:21
**cross** [22] - 296:1,
296:6, 297:5,
297:15, 297:17,
298:6, 298:12,
299:4, 302:16,
302:19, 306:17,
309:25, 313:11,
343:14, 362:19,
365:23, 373:9,
375:20, 375:24,
381:22, 382:7,
382:25
**CROSS** [4] - 250:5,
286:17, 347:19,
397:24
**cross-designate** [1] -
306:17
**cross-designation** [1]
- 313:11
**cross-examination** [9]
- 296:1, 297:5,
297:15, 298:12,
299:4, 373:9,
381:22, 382:7,
382:25
**CROSS-
EXAMINATION** [4] -
250:5, 286:17,
347:19, 397:24
**cross-examine** [5] -
296:6, 297:17,
302:19, 343:14,
365:23
**cross-examined** [1] -
309:25
**crowded** [1] - 258:2
**CRR** [3] - 232:22,
409:16, 409:23
**CTA** [8] - 331:9,
342:23, 344:14,
346:3, 358:11,
358:12, 358:22,
358:25
**cultural** [1] - 270:9
**culturally** [2] - 270:10,

270:16
**cured** [1] - 244:20
**current** [3] - 278:2,
316:17, 355:24
**curriculum** [1] -
316:17
**custodian** [2] -
236:17, 243:7
**customary** [1] -
294:23
**customer** [3] - 394:15,
395:1, 395:14
**customers** [6] -
339:12, 391:21,
394:12, 400:9,
402:25, 403:11
**cut** [4] - 271:23,
322:25, 323:14,
334:21
**cuts** [1] - 245:8
**CV** [3] - 316:20,
317:10, 335:18

## D

**D.C** [1] - 232:4
**daily** [1] - 266:8
**damages** [1] - 387:1
**date** [4] - 241:7, 272:3,
277:6, 358:9
**dated** [1] - 335:24
**Dated** [1] - 409:21
**dates** [1] - 321:17
**daughter** [5] - 365:19,
366:1, 367:9,
367:11, 368:12
**daughters** [1] - 367:22
**days** [3] - 293:10,
318:2, 322:4
**DC** [3] - 232:15,
232:24, 410:1
**deal** [2] - 310:10,
378:23
**dealing** [3] - 278:5,
303:3, 391:21
**December** [1] - 268:7
**decide** [2] - 314:19,
408:7
**decided** [1] - 241:14
**decline** [2] - 326:14,
326:15
**declined** [1] - 326:15
**deep** [1] - 272:8
**defendant** [4] -
234:12, 291:24,
309:19, 384:11
**Defendant** [2] - 232:8,
232:18
**defendant's** [1] -
367:12

**defendants** [3] -
244:22, 245:1
**defense** [13] - 236:1,
239:14, 244:17,
304:15, 305:8,
305:18, 313:10,
326:6, 365:13,
367:6, 368:3,
380:15, 384:18
**Defense** [1] - 319:16
**defense's** [3] - 376:3,
380:19, 387:25
**defer** [2] - 310:18,
366:23
**definitely** [1] - 354:16
**degenerative** [4] -
266:21, 267:10,
278:5, 288:18
**degree** [15] - 277:9,
278:23, 286:5,
286:11, 287:24,
317:24, 318:7,
318:8, 318:10,
318:11, 318:12,
318:15, 319:14,
337:6, 346:25
**degrees** [1] - 318:3
**delay** [1] - 379:16
**demonstration** [1] -
294:2
**demonstrative** [1] -
359:24
**denied** [2] - 297:24,
299:6
**Denied** [1] - 296:22
**density** [2] - 267:15,
268:4
**Department** [3] -
319:14, 321:19,
383:22
**department** [4] -
319:25, 320:16,
320:18, 320:19
**depo** [2] - 374:2, 377:5
**deposition** [52] -
253:23, 256:2,
256:4, 256:17,
256:23, 257:9,
257:16, 295:16,
296:25, 300:2,
301:6, 303:20,
307:5, 308:11,
310:21, 310:23,
311:1, 311:25,
328:21, 348:5,
348:19, 349:9,
350:9, 351:15,
352:3, 352:16,
353:15, 364:12,
365:1, 365:19,

367:24, 368:8,
369:13, 369:14,
371:11, 371:12,
371:14, 371:17,
371:18, 372:3,
372:7, 373:1,
375:10, 377:13,
377:18, 378:11,
378:19, 379:17,
380:1, 384:25
**depositions** [1] -
303:18
**DEPUTY** [8] - 234:2,
280:25, 291:21,
291:24, 359:20,
359:24, 360:6, 369:5
**describe** [5] - 324:13,
324:25, 329:22,
332:14, 342:4
**described** [3] - 246:6,
331:1, 341:11
**description** [1] - 268:8
**design** [1] - 327:14
**designate** [4] - 237:18,
237:23, 306:17,
313:4
**designated** [13] -
236:16, 237:19,
237:24, 304:16,
304:17, 305:1,
305:9, 305:10,
308:9, 308:12,
308:15, 309:22,
312:13
**designation** [4] -
305:16, 305:17,
313:11, 370:14
**designations** [1] -
371:2
**designed** [1] - 362:12
**designs** [2] - 344:25
**detail** [1] - 317:15
**determine** [6] - 330:4,
333:13, 334:5,
341:8, 341:9, 357:13
**determining** [2] -
341:4, 344:16
**devices** [1] - 282:5
**DEXA** [5] - 267:12,
267:15, 267:19,
290:9, 290:12
**Dhabi** [1] - 328:9
**diagnosed** [3] -
266:21, 266:23,
267:22
**difference** [2] - 255:8,
278:17
**different** [12] - 237:8,
298:24, 301:7,
305:22, 330:18,

339:18, 340:20,
340:22, 355:10,
386:2, 397:16,
403:20
**difficult** [3] - 271:20,
271:25, 333:19
**difficulty** [1] - 269:11
**dire** [9] - 296:1, 296:9,
297:9, 298:7,
300:12, 302:6,
303:5, 314:6, 314:15
**direct** [12] - 302:16,
302:17, 329:23,
354:4, 361:3,
365:22, 375:13,
375:18, 375:20,
378:6, 398:19,
402:13
**DIRECT** [4] - 246:19,
275:14, 315:10,
389:20
**directed** [6] - 384:11,
385:7, 385:9,
386:22, 386:25,
387:7
**direction** [3] - 263:9,
342:20, 349:17
**directly** [4] - 263:14,
270:24, 296:7, 343:7
**director** [1] - 321:21
**disabled** [1] - 324:17
**disagree** [2] - 254:24,
297:19, 311:1
**disclosed** [3] - 367:12,
386:14
**disclosure** [5] -
297:21, 367:14,
368:7, 368:12,
386:17
**discomfort** [4] -
289:14, 289:25,
290:2, 290:8
**discoverable** [1] -
368:3
**discovery** [7] - 238:4,
240:13, 308:8,
311:10, 333:18,
367:12, 386:15
**discretion** [1] - 245:7
**discuss** [9] - 249:21,
287:16, 288:2,
289:7, 294:18,
336:7, 363:21,
373:18, 407:10
**discussed** [4] -
289:12, 341:6,
371:3, 384:5
**discussing** [4] -
234:19, 291:6,
291:9, 291:10

**discussion** [2] - 312:9,
365:5
**discussions** [1] -
407:22
**disease** [4] - 266:21,
267:10, 278:5,
288:18
**dishonest** [1] - 373:20
**dismiss** [1] - 389:4
**dispute** [11] - 240:14,
240:16, 243:5,
243:17, 303:13,
303:15, 309:13,
309:15, 309:16,
383:18
**disputed** [1] - 238:24
**disregard** [2] - 246:12,
326:24
**distances** [1] - 291:7
**DISTRICT** [2] - 232:1,
232:1, 232:11
**District** [1] - 245:6
**DJD** [1] - 266:23
**docks** [1] - 320:2
**doctor** [6] - 276:15,
277:23, 284:13,
286:9, 336:21,
351:18
**Doctor** [5] - 280:21,
317:21, 335:16,
336:11, 350:22
**document** [10] -
242:15, 246:7,
247:20, 247:22,
250:1, 310:20,
333:7, 359:20,
360:2, 402:14
**documentation** [1] -
344:19
**documents** [5] -
331:22, 341:14,
342:5, 383:16, 384:2
**dollar** [1] - 237:12
**DOMINIC** [2] - 233:14,
389:19
**Dominic** [3] - 366:3,
387:16, 390:6
**done** [8] - 238:8,
250:18, 267:17,
284:1, 316:25,
365:12, 365:14,
389:4
**door** [8] - 252:4,
252:5, 261:24,
262:3, 281:2, 362:9,
385:13
**Doors** [1] - 254:16
**doors** [39] - 251:19,
251:20, 252:9,
252:12, 253:21,

254:9, 254:16, 255:9, 259:21, 261:14, 261:21, 261:22, 262:10, 262:17, 262:19, 263:3, 263:24, 264:24, 265:7, 329:10, 337:11, 339:25, 340:2, 345:19, 349:11, 349:13, 349:22, 350:12, 350:13, 392:18, 392:20, 392:24, 393:1, 393:3, 393:4, 405:20, 405:23
doubt [1] - 291:4
down [22] - 269:10, 269:12, 269:13, 280:4, 280:10, 280:17, 280:18, 280:19, 280:22, 281:13, 282:16, 282:25, 283:13, 283:24, 311:14, 362:15, 368:15, 391:23, 398:8, 403:2, 403:9, 405:25
Dr [67] - 241:17, 267:1, 267:9, 267:19, 268:8, 271:7, 272:4, 273:13, 273:14, 274:11, 274:12, 275:8, 275:16, 275:18, 276:8, 277:14, 277:17, 280:3, 281:21, 285:2, 286:19, 287:4, 287:8, 287:10, 287:16, 290:20, 292:2, 294:16, 295:5, 295:8, 295:19, 295:25, 296:21, 297:10, 301:20, 301:24, 301:25, 302:13, 314:5, 314:11, 315:3, 315:4, 315:12, 315:15, 323:24, 325:4, 326:25, 327:6, 334:25, 335:9, 335:19, 339:7, 346:23, 347:21, 359:14, 360:18, 361:5, 363:18, 364:8, 365:1, 369:12, 369:15, 369:16, 369:21, 386:5, 408:5, 408:9

drastically [1] - 311:14
drill [2] - 282:10, 282:11
Drive [1] - 232:19
driver [8] - 328:25, 334:15, 341:17, 357:16, 357:18, 358:23, 406:22
drivers [5] - 333:1, 334:15, 357:20, 358:20, 358:21
Dubai [1] - 328:9
during [13] - 269:3, 269:22, 269:25, 270:21, 270:24, 271:4, 283:17, 295:24, 322:7, 367:12, 367:24, 372:20, 373:9
Dutchess [1] - 320:8
dynamic [1] - 385:6

E

early [6] - 278:9, 289:17, 318:16, 345:14, 407:20, 409:3
earned [1] - 318:23
ears [1] - 354:3
easel [1] - 280:3
easier [1] - 303:18
easily [1] - 274:9
East [1] - 328:10
easy [1] - 318:18
ecstatic [1] - 320:7
education [5] - 270:10, 322:12, 325:15, 325:18
educational [1] - 323:5
educator [1] - 322:13
effectively [1] - 375:23
efficiently [2] - 323:18, 407:25
effort [1] - 341:20
efforts [1] - 386:19
eight [1] - 251:17
Eisenhower [1] - 319:15
either [8] - 270:24, 274:13, 281:11, 295:5, 340:10, 366:11, 379:10, 407:1
elderly [3] - 285:21, 290:15
elected [4] - 324:18, 324:20, 324:21, 371:16

electrical [2] - 318:4, 324:15
electronically [3] - 280:5, 280:6, 291:23
element [1] - 240:21
elements [1] - 240:25
elevated [2] - 331:3, 331:12
elevator [1] - 332:23
eliminate [2] - 337:22
Elser [1] - 326:17
ELSER [1] - 232:19
email [2] - 236:14, 408:14
embedded [1] - 378:11
emergency [4] - 248:5, 391:20, 395:15, 398:11
Emondi [7] - 365:19, 372:13, 372:20, 375:6, 378:6, 380:2, 385:22
EMONDI [1] - 233:13
Emondi's [4] - 372:22, 373:1, 375:10, 380:4
employed [4] - 390:7, 390:9, 391:17, 392:7
employee [1] - 307:13
employment [1] - 323:6
employments [1] - 392:3
EMTs [1] - 396:24
encompassed [1] - 312:20
encouragement [1] - 287:16
Encyclopedia [1] - 316:22
end [20] - 238:12, 238:16, 243:5, 246:4, 247:24, 268:23, 273:4, 289:19, 293:11, 294:18, 323:21, 344:7, 371:9, 373:17, 374:21, 375:24, 379:18, 381:19, 387:13
End [1] - 315:17
ends [4] - 380:7, 380:10, 380:12, 380:16
engine [2] - 334:9, 341:13
engineer [3] - 301:5, 315:23, 321:15
engineering [31] - 315:21, 315:25,

316:1, 317:24, 318:2, 318:3, 318:4, 318:5, 318:6, 318:7, 318:8, 318:13, 318:19, 318:21, 318:24, 319:1, 319:14, 319:20, 322:14, 323:4, 324:5, 324:14, 325:9, 325:13, 325:16, 327:12, 335:1, 335:10, 337:18, 337:21, 346:25
Engineering [1] - 318:2
engineers [3] - 318:17, 319:17, 330:24
Engineers [1] - 318:18
England [1] - 324:21
enjoy [1] - 369:10
ensure [2] - 336:24, 393:3
ensuring [2] - 338:3, 350:24
enter [1] - 392:17
enters [7] - 245:24, 260:14, 314:23, 369:8, 379:14, 383:12, 389:15
entire [4] - 259:12, 306:4, 306:24, 371:10
entirely [1] - 386:18
entirety [3] - 375:10, 375:12, 375:13
entitled [3] - 302:9, 309:18, 356:6
entry [1] - 363:2
environmentalist [1] - 325:8
equal [1] - 325:11
err [1] - 244:16
escalator [1] - 332:23
especially [1] - 339:24
ESQ [4] - 232:13, 232:13, 232:18, 232:18
essentially [2] - 372:24, 383:18
establish [3] - 297:10, 323:15, 323:16
establishing [1] - 308:23
estate [1] - 315:25
estimate [1] - 248:22
et [6] - 248:5, 276:18, 298:5, 341:5, 344:4
European [1] - 324:19

evaluating [1] - 276:17
evening [5] - 234:16, 246:2, 407:21, 407:22, 408:2
event [2] - 284:24, 387:10
events [4] - 394:19, 394:21, 395:13, 395:22
eventually [2] - 276:15, 346:10
evidence [26] - 236:20, 244:21, 245:14, 246:8, 250:2, 300:14, 305:6, 305:23, 306:2, 306:10, 306:11, 307:22, 307:24, 309:20, 369:17, 369:20, 373:6, 377:12, 383:15, 383:25, 384:20, 386:11, 387:4, 402:10, 402:12, 407:19
evidentiary [4] - 239:25, 240:10, 374:23, 375:17
exact [7] - 241:6, 281:15, 283:25, 299:3, 300:16, 344:19, 358:9
exactly [2] - 370:23, 382:20
examination [12] - 296:1, 297:5, 297:15, 298:7, 298:12, 299:4, 354:4, 373:9, 375:21, 381:22, 382:7, 382:25
EXAMINATION [10] - 246:19, 250:5, 275:14, 286:17, 315:10, 347:19, 359:15, 362:22, 389:20, 397:24
examinations [1] - 241:18
examine [5] - 296:6, 297:17, 302:19, 343:14, 365:23
examined [2] - 285:9, 309:25
example [4] - 281:15, 340:20, 351:6, 401:5
excellent [3] - 288:5, 300:1
except [2] - 235:7, 327:25

**exception** [2] - 290:19, 337:2
**excerpts** [3] - 371:12, 371:18, 375:11
**exchange** [5] - 304:7, 304:14, 306:4, 307:9, 352:7
**exclude** [1] - 368:11
**excluded** [6] - 298:8, 299:5, 300:15, 386:6, 386:18, 386:20
**excludes** [1] - 299:12
**exclusion** [1] - 297:22
**exclusions** [3] - 296:2, 296:7, 302:20
**excuse** [3] - 249:23, 332:9, 407:21
**excused** [4] - 275:2, 294:17, 363:19, 407:9
**executive** [1] - 321:21
**exercise** [5] - 272:22, 273:2, 287:17, 287:19, 287:22
**Exhibit** [28] - 234:22, 234:23, 239:8, 239:9, 239:13, 239:16, 240:5, 247:1, 248:24, 250:2, 281:20, 281:23, 281:24, 282:24, 283:20, 291:22, 307:10, 308:10, 308:11, 312:1, 316:14, 317:13, 335:23, 338:15, 339:1, 340:17, 340:24, 402:11
**exhibit** [20] - 234:24, 235:7, 235:8, 239:18, 240:2, 240:19, 241:22, 247:10, 247:17, 248:1, 248:25, 249:21, 291:21, 304:2, 317:12, 335:16, 338:14, 377:8, 379:21, 379:22
**Exhibits** [2] - 279:14, 279:23
**exhibits** [2] - 239:7, 304:5
**exists** [1] - 305:21
**exit** [3] - 263:18, 361:21, 362:5
**exits** [6] - 294:25, 365:7, 375:1,

380:21, 388:5, 408:3
**exitway** [1] - 363:3
**expect** [5] - 237:7, 294:10, 340:1, 360:20, 389:1
**expectancy** [3] - 380:24, 381:1, 383:23
**expectation** [1] - 239:19
**expected** [1] - 250:15
**expenditure** [2] - 321:8, 327:19
**expenses** [3] - 234:23, 246:7, 247:4
**experience** [17] - 238:9, 250:14, 284:25, 316:23, 317:9, 320:1, 320:10, 321:1, 321:3, 323:2, 323:5, 327:9, 327:11, 342:21, 361:1, 362:5, 399:1
**experienced** [1] - 257:20
**experiences** [1] - 342:11
**experiencing** [6] - 274:1, 289:25, 290:7, 290:17, 293:11, 366:17
**expert** [30] - 244:18, 244:24, 245:4, 260:17, 277:14, 277:18, 284:25, 285:4, 296:10, 298:13, 298:14, 300:10, 300:13, 300:15, 300:18, 301:21, 301:25, 302:2, 302:4, 302:8, 302:13, 302:22, 303:4, 314:16, 315:3, 323:3, 326:8, 327:2, 334:25, 335:9
**expertise** [2] - 300:12, 315:19
**experts** [4] - 343:6, 343:9, 343:11, 344:15
**explain** [20] - 278:5, 279:18, 280:4, 280:23, 281:24, 283:20, 289:16, 310:7, 311:8, 319:1, 327:10, 329:16, 330:11, 330:25, 337:16, 341:8, 345:10, 345:11,

370:3, 370:4
**express** [1] - 376:15
**extent** [1] - 387:6
**extraordinary** [1] - 272:9
**extremely** [4] - 271:19, 271:25, 272:5, 287:14
**eyewitnesss** [1] - 329:3

## F

**fabricating** [1] - 378:3
**facie** [1] - 384:13
**facing** [2] - 263:9, 349:17
**fact** [17] - 255:9, 257:25, 285:15, 296:23, 298:7, 307:22, 308:23, 323:16, 325:9, 326:10, 328:10, 346:1, 381:7, 383:20, 383:25, 399:5
**facts** [4] - 368:10, 383:15, 383:17, 384:1
**factual** [1] - 301:20
**factually** [1] - 343:1
**failed** [2] - 384:13, 385:14
**failing** [1] - 347:1
**fails** [1] - 333:15
**failure** [3] - 244:17, 245:3, 301:22
**fair** [15] - 236:8, 251:4, 272:18, 298:6, 298:11, 299:18, 303:2, 343:18, 344:5, 369:21, 371:20, 378:7, 378:8, 398:6, 399:24
**fairly** [3] - 285:20, 293:17, 315:13
**Falcons** [1] - 276:10, 276:11
**fall** [6] - 268:7, 273:16, 273:21, 340:8, 405:21
**fallen** [1] - 396:19, 396:21
**falls** [2] - 312:9, 378:4
**familiar** [7] - 257:25, 261:11, 261:14, 327:19, 342:13, 401:15, 402:19
**familiarity** [3] - 342:21, 348:3

**far** [6] - 262:7, 263:22, 342:15, 363:5, 363:8, 393:23
**fashion** [1] - 282:6
**fast** [1] - 261:7
**faster** [1] - 340:7
**father** [1] - 325:5
**fatigued** [1] - 274:9
**fault** [2] - 324:1, 336:7
**Fauquier** [1] - 267:19
**fear** [2] - 360:24, 405:14
**fears** [2] - 405:22, 406:1
**February** [1] - 325:6
**Federal** [2] - 244:13, 384:12
**federal** [1] - 299:5
**feed** [1] - 402:5
**feet** [2] - 264:2, 405:24
**fell** [4] - 252:15, 253:11, 350:8, 350:14
**fellow** [1] - 372:14
**fellows** [1] - 373:24
**females** [1] - 290:15
**femoral** [3] - 283:6, 283:23
**femur** [12] - 247:7, 274:5, 279:7, 281:16, 282:1, 282:19, 282:25, 285:10, 285:12, 285:16, 286:25, 293:11
**Ferry** [1] - 321:22
**ferry** [1] - 322:6
**few** [6] - 251:13, 264:2, 264:14, 317:18, 359:14, 380:20
**field** [16] - 277:14, 277:18, 300:17, 302:1, 302:4, 302:8, 302:14, 319:2, 319:9, 324:4, 335:9, 337:6, 343:12, 344:16
**fields** [2] - 301:7, 324:15
**figure** [12] - 235:2, 237:12, 238:7, 241:12, 246:9, 248:16, 248:18, 248:22, 249:7, 367:1, 388:9
**file** [2] - 296:18, 328:17
**filed** [2] - 235:15, 235:24

**final** [3] - 379:10, 386:24, 408:14
**findings** [1] - 298:4
**fine** [14] - 242:25, 299:18, 301:13, 330:6, 338:22, 379:5, 381:20, 382:5, 382:6, 383:2, 383:3, 408:22
**fingers** [3] - 253:12, 253:13
**finish** [3] - 330:8, 364:23, 408:16
**finished** [3] - 268:23, 268:25, 284:9
**firm** [5] - 269:4, 316:8, 316:11, 326:17
**first** [40] - 236:1, 236:24, 255:16, 255:17, 262:17, 262:24, 263:12, 271:9, 271:18, 277:23, 277:25, 278:8, 278:24, 281:4, 313:23, 315:22, 318:16, 319:9, 319:18, 321:13, 328:11, 328:14, 329:20, 336:12, 336:14, 341:20, 347:24, 353:22, 372:4, 375:9, 375:22, 378:5, 380:10, 380:23, 384:17, 385:25, 387:25, 390:11, 405:10
**firsthand** [1] - 284:24
**fits** [1] - 282:16
**five** [12] - 251:6, 251:12, 295:16, 318:5, 321:24, 331:3, 346:2, 390:22, 391:6, 391:14, 397:18
**five-year** [1] - 318:5
**fixation** [10] - 282:2, 282:7, 282:9, 282:21, 283:4, 283:7, 283:8, 293:17, 293:21
**flat** [1] - 251:21
**flip** [1] - 330:22
**floor** [2] - 246:15, 387:14
**focus** [2] - 315:21, 325:4
**focused** [2] - 325:7, 325:12
**folks** [6] - 284:23,

420

285:21, 364:4,
369:2, 388:21
**follow** [5] - 271:16,
279:9, 344:21,
397:9, 407:6
**follow-up** [3] - 271:16,
279:9, 407:6
**followed** [2] - 328:18,
386:21
**following** [12] -
247:13, 256:3,
293:10, 322:23,
343:4, 346:14,
370:6, 371:18,
372:17, 383:20,
384:8, 397:12
**FOR** [1] - 232:1
**forced** [2] - 311:6,
322:18
**foregoing** [1] - 409:17
**foreign** [1] - 324:18
**forensic** [1] - 242:7
**forget** [2] - 253:13,
328:25, 331:9,
349:14
**forgot** [2] - 279:2,
321:11
**form** [4] - 278:19,
312:10, 346:24
**formally** [2] - 382:13,
383:6
**format** [1] - 340:22
**formed** [2] - 345:14,
345:25
**formulated** [1] - 277:8
**forth** [1] - 369:19
**fortunate** [1] - 341:14
**forward** [11] - 263:9,
306:13, 333:17,
337:10, 339:13,
349:17, 360:24,
361:2, 361:21,
381:25, 403:12
**forward-facing** [2] -
263:9, 349:17
**foundation** [11] -
235:21, 236:5,
236:9, 241:5, 242:3,
242:12, 242:14,
242:24, 330:1,
343:12, 343:15
**foundational** [1] -
240:25
**four** [3] - 251:13,
318:2, 384:14
**fracture** [23] - 274:5,
279:8, 281:16,
281:17, 281:18,
282:8, 282:17,
282:18, 282:20,

283:3, 284:2,
285:12, 285:16,
285:19, 285:20,
286:24, 286:25,
293:9, 293:10,
293:19, 294:1, 294:3
**fractured** [2] - 247:7,
285:10
**fractures** [4] - 281:10,
282:1, 282:2, 282:6
**frame** [1] - 304:4
**Francisco** [6] -
331:10, 344:4,
355:13, 355:19,
356:11, 356:12
**frequent** [1] - 399:3
**frequently** [3] -
240:25, 258:1, 268:5
**Friday** [1] - 322:14
**friend** [1] - 356:13
**front** [1] - 247:17,
277:7, 278:1,
279:15, 283:9,
292:2, 301:11,
308:11, 351:23,
360:18, 402:8
**Fruin** [1] - 325:5
**full** [6] - 308:22,
310:21, 311:11,
371:2, 401:18,
402:8
**fully** [2] - 264:11,
296:6
**funding** [1] - 327:17
**furnished** [1] - 241:7
**future** [2] - 380:25,
383:23

## G

**game** [7] - 276:17,
298:6, 298:11,
299:18, 303:2,
312:15, 343:18
**gap** [2] - 340:21
**garden** [1] - 266:14
**gardening** [3] -
266:12, 266:15,
266:17
**gate** [1] - 392:23
**gender** [1] - 382:3
**genders** [1] - 329:1
**general** [7] - 242:6,
289:12, 300:13,
302:1, 329:22,
339:19, 354:19
**generally** [6] - 300:17,
328:16, 332:13,
332:14, 332:16,
351:18

**gentleman** [2] -
260:14, 344:9
**gentlemen** [11] -
246:1, 284:20,
294:22, 314:25,
364:10, 374:22,
379:15, 380:14,
383:13, 387:24,
407:16
**Georgia** [1] - 266:4
**Gilman** [2] - 234:12,
326:16
**GILMAN** [5] - 232:18,
304:24, 367:10,
367:18, 367:20
**given** [11] - 306:19,
309:21, 321:12,
341:10, 356:1,
356:2, 382:25,
403:6, 403:14,
404:24, 405:7
**glistening** [1] - 289:20
**glitch** [1] - 379:20
**goal** [1] - 319:4
**goods** [1] - 319:4
**Google** [3] - 331:18,
334:9, 341:12
**gotcha** [2] - 312:4,
312:15
**government** [1] -
322:10
**Governor** [1] - 320:4
**governor** [5] - 320:5,
320:11, 320:21,
321:1, 322:4
**governor's** [1] -
320:13
**grabbed** [1] - 264:5
**graduate** [1] - 325:4
**graduated** [1] - 319:13
**grandfather** [1] -
317:2
**grant** [2] - 297:4,
386:22
**granted** [2] - 297:25,
298:1
**Granted** [1] - 296:22
**grants** [2] - 322:2,
322:4
**gray** [1] - 289:23
**great** [9] - 261:1,
272:10, 320:1,
320:10, 321:1,
321:3, 322:11,
391:1, 407:22
**greater** [1] - 281:9
**groins** [1] - 320:2
**ground** [2] - 385:8,
385:17, 386:5
**grounds** [5] - 236:9,

237:6, 298:1, 302:19
**group** [4] - 345:8,
345:14, 345:25,
346:1
**guaranteed** [1] -
344:20
**guarantor** [1] - 352:9
**guess** [9] - 236:19,
248:13, 262:1,
269:4, 306:16,
310:12, 345:14,
352:16, 378:15
**guidance** [1] - 402:22
**guide** [2] - 283:4,
402:15
**guy** [2] - 276:14,
399:25
**guys** [1] - 375:2
**GW** [2] - 248:5, 271:11
**gym** [2] - 267:24,
273:6

## H

**habit** [1] - 354:2
**hair** [1] - 289:23
**half** [8] - 251:9,
251:10, 265:25,
319:19, 319:21,
388:16, 391:7,
408:23
**hall** [1] - 347:22
**halls** [1] - 265:25
**hallway** [2] - 286:21,
347:25
**Hand** [1] - 234:13
**hand** [13] - 247:10,
249:2, 264:3, 264:5,
264:9, 264:18,
264:20, 275:12,
315:7, 320:13,
376:22, 390:1
**handle** [2] - 333:8,
366:2
**handled** [1] - 312:24
**handling** [1] - 239:6
**handrail** [1] - 362:16
**handrails** [2] - 362:13,
362:16
**happy** [2] - 238:2,
329:21
**hard** [2] - 282:14,
330:23
**harder** [1] - 284:3
**Harris** [4] - 328:23,
328:24, 408:5, 408:9
**Hawaii** [2] - 327:25,
331:11
**hazard** [1] - 337:22
**head** [5] - 251:22,

276:11, 283:6,
320:20, 321:22
**healed** [3] - 285:20,
286:3, 288:7
**healing** [9] - 293:12,
293:15, 293:16,
293:18, 293:20,
293:23, 293:24,
294:9, 294:10
**health** [2] - 270:9,
270:10
**Health** [1] - 383:22
**healthcare** [1] - 270:9
**healthy** [1] - 278:20
**hear** [17] - 251:19,
251:25, 254:2,
254:3, 254:20,
261:17, 265:6,
276:1, 316:5,
338:21, 348:9,
360:3, 371:15,
385:12, 390:23,
390:25, 399:20
**heard** [12] - 251:21,
252:1, 253:24,
254:3, 254:9,
254:11, 254:21,
264:22, 284:23,
342:13, 369:18,
385:22
**hearing** [11] - 247:14,
254:4, 254:15,
257:3, 322:24,
343:5, 370:7,
372:18, 384:9,
385:3, 409:11
**hearsay** [11] - 317:16,
342:3, 343:7,
343:10, 343:17,
372:23, 374:6,
374:7, 376:4, 378:4
**heavily** [1] - 238:9
**held** [8] - 247:14,
293:19, 301:24,
322:24, 343:5,
370:7, 372:18, 384:9
**HELD** [1] - 232:11
**hello** [1] - 390:6
**help** [7] - 279:18,
326:5, 360:4, 391:3,
402:13, 403:22,
405:17
**helped** [1] - 253:7
**helpful** [1] - 379:9
**helps** [1] - 408:24
**Henry** [7] - 366:16,
366:25, 380:13,
381:20, 408:6, 408:9
**hereby** [1] - 409:16
**herself** [2] - 350:6,

385:15
**HHS** [3] - 381:1, 381:2, 381:3
**high** [2] - 378:25, 383:8
**high-tech** [1] - 378:25
**higher** [2] - 354:17, 354:18
**highlight** [1] - 339:6
**highlights** [1] - 317:18
**highly** [1] - 282:20
**Highway** [1] - 319:16
**highway** [2] - 320:22, 320:23
**Hill** [2] - 265:24, 269:12
**himself** [1] - 234:24
**hip** [17] - 268:20, 274:8, 274:14, 274:19, 278:25, 281:6, 281:7, 281:10, 285:20, 286:1, 286:24, 289:9, 290:21, 290:25, 291:3, 293:9
**history** [1] - 323:6
**hit** [5] - 317:18, 331:15, 375:2, 383:8, 407:3
**Hmm** [1] - 346:19
**hold** [24] - 241:25, 253:2, 254:5, 257:7, 259:10, 286:10, 304:8, 332:9, 339:13, 340:4, 340:12, 340:13, 343:2, 351:1, 352:5, 362:14, 365:15, 370:5, 388:18, 402:10, 403:12
**holding** [1] - 253:4, 253:11, 253:15, 259:7, 265:9, 349:25, 350:5, 350:16, 361:19, 361:22, 362:6
**hole** [5] - 282:10, 282:11, 283:2, 283:5, 283:12
**hollow** [1] - 282:13
**home** [3] - 258:16, 276:17, 316:11
**Homeland** [2] - 331:25, 332:2
**honest** [2] - 279:1, 374:13
**Honor** [149] - 234:7, 234:11, 235:19, 235:25, 237:25, 239:4, 243:22,

244:6, 244:7, 245:16, 245:18, 245:20, 246:17, 248:13, 249:17, 255:22, 259:22, 260:15, 260:22, 274:25, 275:1, 275:7, 277:13, 279:21, 280:13, 286:14, 286:16, 291:19, 294:14, 294:15, 295:3, 295:4, 295:14, 295:18, 296:10, 297:16, 298:21, 303:6, 303:8, 303:11, 303:16, 303:19, 304:5, 304:7, 304:11, 304:20, 305:2, 305:11, 305:19, 306:4, 306:22, 307:1, 308:1, 308:6, 308:10, 308:12, 308:18, 309:9, 309:18, 310:13, 310:18, 310:25, 311:5, 311:17, 311:25, 313:13, 313:23, 313:25, 314:7, 315:2, 315:8, 317:11, 329:18, 329:21, 332:7, 334:24, 335:6, 335:14, 336:15, 338:13, 338:20, 340:23, 341:24, 343:9, 343:19, 347:7, 347:13, 347:18, 359:8, 359:11, 359:13, 360:9, 360:10, 361:17, 363:20, 365:24, 367:10, 367:18, 369:5, 370:16, 371:1, 371:4, 371:7, 371:22, 371:25, 372:9, 372:12, 372:15, 372:19, 373:3, 373:8, 373:17, 374:4, 374:10, 374:18, 375:4, 375:13, 375:23, 376:7, 376:10, 377:7, 377:11, 377:17, 377:20, 378:8, 378:15, 379:8, 379:25, 381:16, 382:11, 382:23,

383:10, 384:4, 384:10, 386:10, 387:12, 387:15, 387:20, 388:7, 389:7, 389:18, 399:22, 400:2, 401:14, 402:11, 402:12, 407:7, 407:14, 409:9
**honor** [1] - 322:11
**Honor's** [2] - 297:21, 385:6
**HONORABLE** [1] - 232:11
**honored** [1] - 324:17
**hope** [3] - 234:15, 246:2, 308:22
**Hospital** [1] - 267:20
**hospital** [1] - 271:10
**hour** [3] - 261:6, 399:2, 408:23
**hours** [4] - 325:17, 325:19, 388:7, 388:16
**House** [2] - 270:4, 270:18
**household** [1] - 368:2
**Hoyle** [1] - 242:23
**Hudson** [1] - 320:8
**Human** [1] - 383:22
**hundred** [1] - 327:5
**hurt** [5] - 352:13, 353:2, 353:6, 396:16, 396:19
**hypothetical** [1] - 299:1
**hypothetically** [2] - 299:3, 300:5

---

# I

**IBANEZ** [1] - 233:12
**Ibanez** [1] - 372:8
**IBM** [1] - 322:10
**idea** [10] - 258:6, 261:7, 261:13, 261:23, 265:13, 267:25, 268:1, 272:20, 272:24, 300:3
**identified** [2] - 239:7, 239:20
**illness** [2] - 366:18, 382:12
**illustrated** [1] - 293:25
**illustration** [9] - 283:22, 284:1, 292:5, 292:6, 292:8, 292:12, 292:14, 292:21, 293:6

**illustrations** [5] - 279:11, 279:14, 279:16, 279:18, 280:3
**illustrative** [1] - 279:23
**illustrator** [1] - 279:12
**image** [1] - 292:5
**images** [1] - 292:3
**imagine** [1] - 333:2
**immediately** [2] - 273:3, 284:8
**impermissibly** [1] - 245:4
**implants** [1] - 283:22
**implied** [1] - 376:15
**important** [8] - 258:23, 287:18, 340:9, 345:12, 350:23, 373:4, 384:17, 385:17
**imposed** [1] - 353:13
**impossible** [3] - 356:17, 362:12, 362:16
**improper** [2] - 372:24, 373:5
**improperly** [1] - 374:9
**IN** [1] - 232:1
**inadmissible** [2] - 317:16, 379:21
**inappropriate** [5] - 235:20, 313:8, 343:13, 343:23, 376:4
**inch** [1] - 253:13
**inches** [1] - 253:14
**incident** [30] - 305:11, 305:22, 306:5, 307:3, 307:4, 307:8, 307:10, 307:23, 307:24, 308:13, 308:19, 308:21, 309:8, 309:10, 310:2, 310:3, 311:9, 312:10, 312:19, 329:2, 329:4, 329:5, 346:9, 347:3, 348:11, 348:18, 394:22, 395:14, 398:14
**incidents** [1] - 391:21
**inclination** [1] - 339:22
**include** [3] - 259:4, 319:6, 381:8
**included** [3] - 239:13, 316:20, 381:23
**includes** [2] - 313:2, 370:20

**including** [7] - 239:16, 242:20, 247:19, 296:1, 312:8, 319:24, 320:9
**inconsistent** [2] - 257:16, 385:19
**incorrect** [2] - 256:22, 256:24
**independent** [1] - 269:4
**Indians** [1] - 271:6
**indicate** [5] - 279:4, 290:24, 326:13, 368:2, 387:4
**indicated** [15] - 250:23, 253:24, 268:19, 268:21, 274:7, 287:13, 333:19, 348:5, 349:4, 349:16, 355:9, 355:24, 357:12, 385:1, 397:1
**indicates** [1] - 292:22
**indicating** [2] - 349:8, 349:10
**indication** [1] - 278:4
**indigenous** [5] - 268:17, 269:18, 269:22, 270:7, 270:23
**indirect** [1] - 373:25
**individual** [3] - 248:9, 358:22, 358:25
**individually** [1] - 324:12
**individuals** [1] - 384:23
**indulgence** [4] - 255:22, 291:19, 359:8, 402:3
**Industrial** [1] - 318:17
**industry** [5] - 330:15, 330:20, 333:3, 345:3, 354:22
**industry's** [1] - 355:4
**inflammatory** [1] - 291:5
**inflicts** [1] - 353:11
**information** [22] - 238:10, 302:7, 308:12, 309:7, 311:18, 311:24, 312:1, 312:10, 312:14, 312:25, 313:2, 313:4, 328:19, 334:10, 334:19, 337:24, 338:2, 343:11, 343:22, 344:15, 368:3, 378:18

**informed** [1] - 395:16
**initial** [3] - 297:20, 318:8, 368:7
**initials** [1] - 324:23
**injection** [3] - 267:11, 273:17, 273:24
**injections** [3] - 266:25, 267:3, 288:21
**injured** [8] - 294:5, 325:22, 325:23, 351:19, 353:9, 394:20, 395:16, 404:17
**injures** [1] - 353:11
**injuries** [4] - 271:8, 276:17, 285:22, 285:24
**injuring** [1] - 268:11
**injury** [17] - 268:20, 272:14, 281:14, 286:2, 335:4, 347:3, 351:20, 352:14, 352:22, 352:24, 352:25, 353:1, 353:12, 353:13, 396:16, 396:18
**innovation** [3] - 328:11, 328:13, 344:22
**innovative** [2] - 344:24, 345:1
**inside** [7] - 282:13, 282:16, 282:25, 400:14, 400:16, 400:22, 401:3
**insinuated** [1] - 373:8
**insinuating** [1] - 373:20
**insofar** [1] - 374:10
**instance** [1] - 296:16
**instances** [1] - 296:24
**Instead** [1] - 371:10
**instead** [1] - 240:2
**instruct** [1] - 408:20
**instructed** [3] - 244:20, 245:13, 396:10
**instruction** [3] - 311:12, 372:2, 381:9
**instructions** [8] - 381:6, 388:4, 388:15, 388:21, 408:12, 408:14, 408:17, 409:1
**instrumentation** [2] - 288:9, 293:7
**insufficiency** [1] - 386:19
**insurance** [1] - 273:19
**integral** [1] - 316:2

**intend** [1] - 296:6
**intended** [3] - 241:19, 309:5, 368:4
**interested** [2] - 326:12, 365:9
**intermittently** [1] - 250:18
**intermodal** [1] - 319:4
**intern** [1] - 321:14
**internal** [8] - 282:2, 282:7, 293:17, 293:21, 331:22, 341:13, 342:5
**internationally** [2] - 327:3, 328:7
**internship** [1] - 321:12
**interpreted** [2] - 290:13, 305:16
**interrogatories** [2] - 367:21, 367:22
**interrogatory** [1] - 368:7
**intertroch** [1] - 281:12
**intervention** [1] - 281:18
**intimately** [2] - 321:10, 327:16
**Intramedullary** [1] - 292:15
**intro** [1] - 403:3
**introduce** [3] - 242:5, 275:16, 315:15, 377:15, 389:24
**introduced** [1] - 377:9
**introduction** [1] - 321:13
**investigation** [4] - 311:16, 312:22, 353:19, 376:5
**investments** [1] - 327:18
**invited** [2] - 322:9, 328:1
**invoices** [2] - 236:12, 236:18
**involve** [1] - 327:12
**involved** [10] - 292:11, 301:8, 321:3, 321:10, 326:4, 327:14, 327:16, 327:22, 328:3, 391:19
**involves** [2] - 327:6, 392:5
**involving** [1] - 325:22
**Island** [1] - 321:22
**issue** [40] - 237:6, 239:23, 243:4, 244:8, 244:14, 246:14, 295:19,

296:3, 296:4, 296:10, 297:14, 298:2, 298:15, 298:24, 299:11, 299:18, 300:17, 301:1, 305:21, 310:14, 327:7, 329:8, 329:13, 330:12, 333:14, 335:1, 366:14, 374:23, 375:22, 385:7, 385:24, 386:4, 386:24, 386:25, 394:1, 394:2, 394:7, 399:7, 406:13
**issues** [7] - 285:1, 327:2, 327:11, 387:4, 391:22, 392:13, 407:25
**itemization** [5] - 234:22, 246:6, 247:5, 248:15, 248:20

## J

**JASON** [1] - 232:18
**Jason** [1] - 234:12
**jason.waters@ wilsonelser.com** [1] - 232:21
**jerk** [8] - 250:12, 296:23, 297:6, 297:18, 297:20, 298:5, 299:13, 360:24
**jerk/jolt** [1] - 384:17
**jerked** [2] - 253:14, 361:20
**jerking** [1] - 361:2
**Jersey** [3] - 326:1, 328:4
**Jiminez** [10] - 334:13, 341:15, 356:2, 357:14, 357:15, 357:16, 358:2, 358:25, 359:4, 359:6
**job** [2] - 272:10, 288:7
**John** [1] - 325:4
**JOHNSON** [2] - 233:14, 389:19
**Johnson** [14] - 328:24, 337:8, 366:4, 387:16, 389:9, 390:6, 390:7, 390:23, 390:24, 398:1, 401:15, 402:8, 406:6, 406:9
**joined** [1] - 276:14

**joint** [10] - 266:21, 267:10, 278:5, 281:7, 288:18, 289:18, 289:21, 318:12, 318:15
**joints** [1] - 289:22
**JOV** [1] - 386:22
**Juan** [2] - 328:2, 331:14
**Judge** [7] - 236:24, 237:8, 285:6, 299:3, 362:18, 380:23, 381:20
**JUDGE** [1] - 232:11
**judge** [11] - 241:6, 280:2, 296:15, 332:18, 360:13, 368:6, 369:22, 370:3, 380:6, 408:5, 408:22
**judgment** [7] - 237:20, 300:23, 384:19, 385:7, 386:12, 386:16, 386:20
**judicial** [4] - 380:24, 381:7, 383:17, 383:19
**Judiciary** [1] - 258:13
**jump** [1] - 388:17
**jumped** [1] - 319:12
**jumping** [1] - 321:16
**jumps** [2] - 351:23, 351:25
**June** [5] - 238:3, 241:7, 267:20, 290:10, 392:2
**jurisdictions** [1] - 345:4
**jurors** [3] - 379:10, 389:24, 390:25
**jury** [60] - 244:20, 245:13, 245:24, 247:14, 275:17, 278:6, 279:19, 280:14, 294:25, 295:12, 296:12, 296:13, 299:14, 301:11, 301:13, 301:18, 302:10, 308:3, 314:6, 314:22, 314:23, 315:16, 319:1, 322:24, 326:24, 327:11, 329:16, 330:11, 330:25, 332:15, 343:5, 365:2, 365:7, 369:3, 369:8, 369:15, 370:7, 372:8, 372:18, 374:24,

375:1, 376:20, 379:14, 380:2, 380:17, 380:21, 381:6, 381:9, 381:18, 383:11, 383:12, 384:9, 387:10, 387:11, 388:5, 389:4, 389:13, 389:15, 408:3, 408:14
**JURY** [1] - 232:10
**jury's** [1] - 324:13

## K

**kabob** [1] - 283:10
**kabobs** [1] - 282:17
**Kaiser** [2] - 267:17, 267:23
**keep** [8] - 258:24, 259:1, 283:9, 316:4, 327:5, 331:12, 379:2, 390:24
**keeping** [1] - 351:2
**Keisha** [3] - 366:16, 408:6, 408:9
**key** [2] - 316:3, 338:3
**kind** [6] - 315:24, 318:1, 331:13, 333:8, 382:12
**kinds** [2] - 285:2, 340:16
**knee** [12] - 267:11, 268:12, 273:17, 273:22, 274:2, 278:1, 278:9, 288:19, 288:20, 289:13, 289:16, 289:24
**knees** [13] - 266:21, 266:25, 267:3, 268:11, 288:15, 288:18, 288:21, 288:23, 289:8, 289:10, 289:11, 290:7, 290:8
**knocked** [1] - 405:25
**knowing** [1] - 385:13
**knowledge** [11] - 284:24, 306:6, 307:8, 307:23, 308:15, 308:25, 309:17, 310:22, 311:11, 312:11, 326:4
**knows** [2] - 261:10, 311:9
**Koenig** [1] - 267:19

# L

labeled [1] - 292:20
labor [1] - 334:16
lack [2] - 270:11, 270:18
LACMTA [1] - 331:11
ladies [11] - 246:1, 284:20, 294:22, 314:24, 364:10, 374:22, 379:15, 380:14, 383:13, 387:24, 407:16
laid [3] - 242:12, 242:23, 343:12
Lands [1] - 315:17
language [1] - 339:18
laptop [1] - 369:6
last [16] - 244:9, 272:2, 272:16, 273:12, 273:14, 273:21, 274:4, 278:22, 285:15, 324:7, 326:25, 335:24, 336:1, 377:13, 392:2, 407:17
lasted [1] - 268:20
late [2] - 239:15, 408:12
lately [1] - 344:23
Lauren [2] - 234:12, 366:2
LAUREN [1] - 232:18
lauren.gilman@ wilsonelser.com [1] - 232:21
Laurie [1] - 234:13
law [2] - 326:17, 385:16
lawyer [2] - 236:3, 239:14, 299:21
lawyers [2] - 369:19, 369:20
lay [2] - 242:14, 343:15
laying [1] - 235:21
lead [1] - 323:17
leaders [1] - 344:22
leading [3] - 305:9, 337:14, 395:22
leaned [1] - 252:21
leaning [3] - 252:23, 252:25, 408:8
learn [1] - 312:21
learned [2] - 269:13, 396:20
learner [1] - 322:8
learning [1] - 319:23
least [7] - 264:16, 272:16, 288:5,

339:12, 346:2, 350:9, 398:3
leave [7] - 255:4, 275:6, 332:22, 333:3, 384:24, 388:8, 391:24
leaving [1] - 408:8
left [21] - 234:17, 247:10, 249:2, 254:17, 255:3, 255:8, 263:25, 264:5, 264:9, 264:18, 264:19, 274:9, 278:25, 281:6, 339:25, 349:11, 349:14, 375:5, 395:21
left-hand [2] - 247:10, 249:2
legal [4] - 319:25, 325:14, 333:20, 407:25
length [2] - 363:11, 370:19
lengths [1] - 363:15
less [5] - 273:5, 291:11, 334:2, 334:3, 347:14
lessening [1] - 268:4
lesser [1] - 281:9
letter [1] - 376:9
levels [2] - 289:7, 289:13
liability [1] - 384:14
license [1] - 325:18
lie [1] - 274:8
lied [1] - 303:1
lieu [1] - 370:21
life [5] - 317:8, 380:24, 381:1, 383:21, 383:23
Light [1] - 328:9
light [3] - 299:17, 323:16, 393:21
lights [1] - 268:9
likelihood [2] - 356:16, 366:24
likely [1] - 398:24
limine [1] - 386:7
limit [4] - 310:17, 310:19, 310:23, 311:4
limitations [2] - 296:7, 351:9
limited [6] - 297:13, 298:8, 302:17, 308:16, 308:18, 371:11
Line [11] - 250:15, 256:2, 256:7,

304:17, 348:23, 352:4, 375:23, 392:11, 397:16, 405:1
line [8] - 242:11, 251:3, 282:6, 284:2, 371:5, 374:12, 392:9, 392:21
Lines [2] - 304:6
lines [3] - 295:16, 321:24, 322:5
Lisa [1] - 232:22
LISA [1] - 409:16
list [4] - 322:20, 324:2, 324:10, 324:25
listening [2] - 259:4, 259:6
literally [3] - 253:12, 295:9, 301:7
litigation [1] - 312:4
live [9] - 305:25, 306:20, 309:24, 310:10, 315:17, 347:24, 367:25, 368:1, 369:18
living [1] - 275:21
location [6] - 316:1, 329:10, 392:25
lodged [3] - 235:3, 236:5, 323:8
logistically [1] - 378:24
London [1] - 328:7
LONG [1] - 232:14
look [15] - 238:10, 244:11, 244:12, 245:9, 247:1, 248:24, 249:6, 279:1, 294:6, 301:14, 309:24, 328:17, 374:16, 376:16
looked [1] - 355:14
looking [6] - 256:1, 281:19, 303:20, 331:4, 352:3, 355:12
loose [5] - 380:7, 380:10, 380:12, 380:16, 381:19
Los [3] - 326:2, 328:5, 331:10
lose [2] - 278:14, 340:8, 406:18
loses [1] - 394:2
loss [1] - 286:1
lost [2] - 241:9, 287:20
love [1] - 327:25
loved [2] - 318:18, 318:19
lower [1] - 283:15

Lunch [1] - 368:19
lunch [11] - 364:22, 364:23, 365:4, 369:10, 370:12, 408:16, 408:20, 409:1, 409:2, 409:3

# M

M.D [3] - 233:6, 233:11, 275:13
ma'am [8] - 243:25, 249:9, 254:7, 255:25, 257:9, 273:15, 397:22, 406:2
main [2] - 345:16, 345:18
maintain [2] - 325:18, 332:23
major [6] - 270:14, 318:3, 327:23, 327:24, 328:6, 330:25
Management [1] - 318:17
management [2] - 321:8, 358:2, 358:4
managers [1] - 391:22
Manhattan [1] - 320:23
manual [1] - 406:24
map [1] - 331:4
mark [1] - 402:9
marked [5] - 282:23, 283:19, 316:13, 335:20, 335:23
marker [9] - 392:20, 392:22, 393:2, 393:8, 393:14, 394:8, 396:1, 397:15, 399:11
markings [2] - 402:13, 402:14
mater [2] - 322:9, 322:11
matter [6] - 244:5, 278:23, 330:14, 333:20, 353:19, 385:16
matters [1] - 326:6
MBA [2] - 318:14, 318:16
MBTA [3] - 331:5, 342:10, 342:11
McGrath [1] - 244:13
McLean [1] - 232:20
McPherson [26] - 250:10, 250:24, 251:1, 251:16,

254:9, 254:16, 258:9, 258:11, 262:2, 262:14, 263:24, 265:18, 266:3, 339:25, 348:24, 348:25, 349:3, 349:9, 349:10, 349:13, 349:18, 350:10, 396:8, 397:18, 405:1
mean [25] - 243:4, 257:24, 259:2, 259:17, 262:20, 269:10, 286:3, 289:12, 290:1, 294:10, 303:1, 322:25, 323:7, 332:12, 367:4, 374:2, 374:6, 381:24, 382:19, 392:22, 392:24, 393:19, 393:25, 405:18
meaning [2] - 263:9, 395:23
means [3] - 268:1, 268:4, 289:16
meant [1] - 279:2
measure [1] - 311:20
mechanical [2] - 318:4, 324:14
medical [38] - 235:21, 236:11, 237:2, 237:9, 237:10, 237:11, 238:8, 239:1, 239:9, 239:13, 239:15, 239:17, 239:22, 240:3, 240:7, 240:22, 241:12, 241:15, 241:20, 246:6, 247:4, 247:6, 248:4, 248:21, 249:7, 271:22, 277:9, 279:10, 279:11, 279:18, 285:1, 286:6, 286:11, 300:12, 387:1, 387:2
medications [4] - 290:21, 290:25, 291:2, 291:5
meet [5] - 317:19, 320:12, 341:18, 348:1
meetings [1] - 320:11
member [1] - 345:8
members [5] - 278:6, 319:1, 329:16, 330:11, 345:9

**membership** [2] - 324:22, 346:7
**memberships** [1] - 324:18
**memory** [4] - 247:20, 247:21, 398:5, 398:6
**mental** [2] - 270:9, 270:10
**mention** [6] - 317:2, 319:11, 321:11, 342:1, 342:3, 355:17
**mentioned** [9] - 328:5, 344:9, 346:4, 349:12, 353:21, 374:11, 399:15, 400:5, 406:12
**mentioning** [1] - 396:18
**Merced** [1] - 244:13
**message** [4] - 339:19, 339:20, 340:21
**met** [4] - 270:7, 286:21, 347:22, 347:25
**metro** [1] - 341:19
**Metro** [26] - 234:14, 257:20, 257:21, 258:1, 258:21, 258:24, 259:11, 259:25, 261:9, 261:12, 265:15, 265:19, 265:23, 325:24, 335:2, 339:10, 342:7, 344:18, 344:22, 355:20, 355:22, 361:21, 362:25, 365:13, 390:9, 390:11
**Metro's** [5] - 329:5, 333:9, 338:6, 340:17, 401:16
**METROPOLITAN** [1] - 232:6
**Metropolitan** [3] - 234:4, 234:13, 326:8
**Miami** [3] - 328:4, 331:8
**mic** [2] - 280:4, 391:2
**MICHAEL** [1] - 232:13
**microphone** [8] - 275:25, 280:10, 280:24, 315:13, 316:4, 354:1, 363:24, 399:23
**midday** [1] - 407:20
**middle** [4] - 263:18, 263:20, 320:22, 363:2
**Middle** [1] - 328:10

**Middleburg** [1] - 275:22
**might** [8] - 247:21, 291:5, 295:3, 364:20, 375:14, 379:9, 388:24, 393:13
**mild** [2] - 278:7, 278:9
**mile** [1] - 266:1
**miles** [1] - 261:6
**military** [1] - 318:6
**million** [2] - 322:5, 328:11
**mind** [3] - 319:12, 331:4, 370:25
**Mind** [1] - 340:21
**mine** [3] - 334:12, 356:13, 402:13
**minimize** [1] - 379:1
**minimum** [5] - 333:24, 334:1, 338:11, 338:12, 339:15
**minor** [2] - 318:3, 318:4
**minute** [11] - 248:22, 249:2, 295:7, 295:9, 313:12, 322:20, 334:20, 336:12, 338:14, 347:14, 388:3
**minutes** [12] - 294:24, 295:17, 303:14, 305:15, 364:9, 364:17, 364:22, 375:14, 375:15, 380:20, 402:15
**Miroches** [1] - 315:18
**mis** [1] - 345:23
**misberthing** [1] - 347:10
**misleading** [1] - 308:3
**misnomer** [1] - 315:24
**misrepresented** [1] - 296:25
**missing** [2] - 309:11, 355:12
**mission** [1] - 268:18
**misstop** [1] - 333:23
**misstopping** [1] - 345:24
**mistake** [1] - 250:20
**misunderstanding** [1] - 310:14
**mode** [1] - 406:19
**modes** [1] - 319:5
**modifications** [1] - 370:23
**modify** [1] - 330:18
**moment** [5] - 295:4, 373:10, 389:7,

402:3, 402:6
**Montauk** [1] - 320:10
**months** [3] - 293:4, 294:9, 390:15
**mootness** [2] - 298:1, 299:6
**Moreira** [2] - 232:22, 409:23
**MOREIRA** [1] - 409:16
**morning** [31] - 234:7, 234:10, 234:11, 234:15, 235:16, 235:24, 243:25, 244:1, 246:1, 246:17, 246:21, 246:22, 250:7, 250:8, 275:9, 275:10, 275:16, 286:19, 286:20, 286:21, 294:23, 313:24, 347:21, 347:22, 366:16, 366:17, 387:3, 407:24, 408:6, 408:24
**Moses** [2] - 320:12, 320:25
**most** [6] - 257:24, 285:21, 290:14, 331:23, 384:17, 398:24
**motion** [16] - 236:15, 249:20, 286:1, 296:18, 297:4, 314:8, 323:11, 382:14, 382:16, 383:5, 384:18, 386:7, 386:12, 386:16, 387:8, 387:10
**motivation** [1] - 258:6
**motor** [1] - 325:10
**mountain** [1] - 266:12
**move** [32] - 234:23, 241:5, 241:22, 242:3, 254:5, 259:8, 259:9, 259:12, 259:13, 259:22, 260:2, 260:9, 260:10, 275:24, 276:23, 319:3, 333:17, 337:10, 339:13, 340:5, 340:23, 373:15, 385:7, 385:9, 385:11, 385:14, 394:17, 397:6, 400:20, 403:12, 405:13, 405:24
**moved** [11] - 253:25,

257:13, 277:16, 280:1, 306:13, 341:2, 349:11, 363:6, 363:8, 377:12, 385:5
**moves** [2] - 384:11, 400:25
**moving** [24] - 257:7, 258:1, 261:5, 261:8, 264:21, 299:17, 306:13, 340:5, 340:6, 351:3, 351:6, 377:15, 394:16, 395:4, 395:5, 399:16, 400:6, 400:11, 401:11, 401:23, 401:25, 403:21, 404:13, 404:15
**MR** [348] - 234:7, 234:11, 235:7, 235:9, 235:11, 235:14, 235:19, 235:25, 236:24, 237:8, 237:14, 237:17, 237:19, 237:22, 237:24, 238:2, 238:6, 238:12, 238:16, 238:21, 238:24, 239:4, 239:11, 240:12, 240:16, 241:6, 242:1, 242:18, 242:25, 243:10, 243:12, 243:15, 243:18, 243:22, 244:6, 245:10, 245:16, 245:18, 245:20, 246:16, 246:20, 248:2, 248:13, 248:17, 249:17, 249:20, 249:22, 249:24, 250:4, 250:6, 255:22, 256:1, 259:22, 260:15, 260:17, 260:20, 260:22, 260:23, 274:24, 275:1, 275:7, 275:15, 277:13, 277:15, 277:20, 277:22, 279:21, 279:24, 280:2, 280:6, 280:8, 280:12, 280:13, 280:20, 281:2, 284:15, 284:18, 285:6, 285:8, 286:13, 286:16, 286:18, 291:19,

291:22, 291:25, 292:1, 294:13, 294:15, 295:3, 295:7, 295:14, 295:18, 295:23, 296:13, 296:15, 296:21, 297:7, 297:12, 297:15, 297:25, 298:3, 298:6, 298:17, 298:25, 300:1, 300:9, 300:20, 300:24, 301:10, 301:16, 302:18, 302:23, 303:6, 303:8, 303:11, 303:16, 303:23, 304:9, 304:11, 304:13, 304:20, 304:22, 305:1, 305:3, 305:4, 306:4, 306:18, 306:22, 307:1, 307:6, 307:16, 308:1, 308:6, 309:4, 310:12, 310:25, 311:5, 311:17, 312:4, 312:13, 312:23, 313:2, 313:7, 313:13, 313:15, 313:18, 313:22, 314:3, 314:7, 314:10, 314:13, 314:20, 315:2, 315:11, 316:15, 317:11, 317:17, 317:20, 323:5, 323:10, 323:13, 323:19, 323:22, 326:19, 326:22, 326:23, 329:18, 329:21, 330:3, 330:7, 332:7, 332:10, 332:12, 334:24, 335:5, 335:14, 335:15, 335:21, 336:15, 336:19, 337:14, 338:13, 338:18, 339:1, 340:23, 340:25, 341:23, 342:25, 343:9, 343:19, 343:24, 344:6, 344:8, 347:7, 347:13, 347:16, 347:18, 347:20, 359:8, 359:10, 359:13, 359:16, 359:22, 359:25, 360:4, 360:8, 360:10, 360:13,

425

360:16, 360:17,
361:3, 361:16,
361:23, 362:2,
362:8, 362:18,
362:19, 362:21,
362:23, 363:17,
364:1, 364:7,
364:14, 364:18,
364:19, 364:20,
364:25, 365:9,
365:11, 365:18,
365:24, 366:2,
366:7, 366:9,
366:13, 366:14,
366:24, 367:8,
368:6, 368:14,
368:16, 369:4,
369:7, 369:22,
369:25, 370:3,
370:11, 370:16,
371:1, 371:4,
371:22, 371:24,
371:25, 372:5,
372:9, 372:12,
372:15, 372:19,
373:3, 373:19,
373:23, 374:4,
374:8, 374:10,
374:18, 375:4,
375:8, 375:12,
375:19, 376:2,
376:7, 376:10,
376:13, 376:17,
376:18, 376:21,
376:22, 376:25,
377:3, 377:7,
377:11, 377:17,
377:20, 378:8,
378:14, 378:22,
378:25, 379:5,
379:7, 379:8,
379:25, 380:6,
380:11, 380:23,
381:6, 381:10,
381:12, 381:14,
381:15, 381:19,
382:10, 382:18,
382:22, 383:2,
383:3, 383:10,
384:4, 384:10,
387:12, 387:15,
387:20, 388:6,
388:9, 388:12,
388:19, 389:1,
389:6, 389:18,
389:21, 390:2,
390:4, 391:2, 391:5,
395:8, 397:22,
397:25, 399:22,
400:1, 400:2, 400:4,
401:10, 401:14,

402:3, 402:5, 402:7,
402:11, 406:6,
406:8, 407:7,
407:14, 408:5,
408:19, 408:22,
409:3, 409:6, 409:8,
409:9, 409:10
**MS** [4] - 304:24,
367:10, 367:18,
367:20
**MTA** [2] - 325:25,
341:21
**mundane** [1] - 332:22
**muscles** [1] - 281:10
**must** [2] - 403:6,
403:13
**muted** [1] - 280:25

## N

**nail** [5] - 282:10,
282:16, 282:22,
282:25, 283:23
**name** [9] - 315:17,
316:11, 318:22,
324:23, 334:13,
358:12, 358:13,
368:6, 392:18
**name's** [1] - 275:18
**names** [2] - 342:8,
367:1
**naming** [1] - 324:11
**national** [41] - 271:6,
297:11, 298:20,
299:8, 299:16,
301:23, 302:5,
302:16, 324:22,
325:12, 327:8,
328:19, 329:12,
329:15, 330:9,
330:11, 330:14,
330:22, 331:17,
334:16, 335:2,
335:11, 336:21,
337:7, 337:11,
339:16, 340:18,
347:1, 347:9,
353:23, 354:6,
354:9, 354:10,
354:13, 354:18,
354:20, 355:4,
355:7, 357:13,
386:9, 386:10
**nationally** [1] - 327:3
**nature** [2] - 320:11,
345:24
**nausea** [1] - 366:18
**NCA** [1] - 271:3
**NCAI** [2] - 271:4, 271:5
**near** [1] - 400:9

**nearly** [1] - 265:25
**necessary** [3] -
243:14, 304:18,
314:15
**neck** [3] - 281:12,
283:6, 283:23
**need** [13] - 281:1,
282:19, 295:12,
297:7, 315:13,
316:21, 351:1,
351:4, 351:6,
365:22, 374:16,
380:11
**needed** [3] - 241:16,
270:13, 391:25
**needs** [4] - 270:7,
351:8, 391:24, 401:7
**negligence** [2] -
385:10, 385:16
**Nelson** [1] - 320:4
**never** [17] - 238:6,
238:8, 238:22,
240:6, 240:18,
241:10, 253:13,
262:22, 296:19,
296:23, 298:4,
300:4, 319:12,
356:12, 375:20,
395:21, 404:13
**new** [2] - 311:16,
327:15
**New** [35] - 315:18,
320:8, 320:9,
320:15, 321:2,
321:4, 321:11,
321:12, 321:19,
321:24, 325:25,
326:1, 327:13,
327:16, 328:4,
331:5, 334:7,
334:14, 334:16,
341:5, 341:21,
342:6, 342:7, 344:4,
344:18, 344:21,
355:17, 355:18,
355:19, 355:24,
358:2, 358:5
**newer** [2] - 404:2,
404:4
**news** [1] - 370:11
**next** [25] - 253:21,
262:17, 262:25,
275:7, 281:2, 295:1,
295:2, 295:3, 301:9,
301:10, 318:11,
342:18, 342:20,
364:5, 364:6,
364:10, 372:11,
372:12, 379:18,
386:5, 392:21,

394:11, 402:15
**NFL** [1] - 276:9
**nice** [3] - 234:16,
282:16, 288:7,
365:4, 369:10,
369:11, 398:1
**nicely** [2] - 285:20,
286:3
**night** [3] - 244:9,
397:14, 409:7
**Ninth** [3] - 244:12,
244:13, 245:5
**nobody** [7] - 262:9,
262:10, 265:1,
267:17, 270:1,
331:12, 352:13
**nobody's** [2] - 237:1,
328:1
**nondisclosure** [1] -
331:24
**none** [4] - 270:14,
346:12, 393:4
**nonresponsive** [1] -
259:23
**normal** [5] - 239:23,
278:20, 281:4,
282:11, 300:10
**normally** [1] - 253:19
**Northern** [2] - 276:23,
276:25
**notable** [1] - 384:19
**note** [1] - 314:13
**notebook** [1] - 335:16
**noted** [2] - 335:8,
373:12
**notes** [5] - 241:17,
277:7, 278:1, 279:1,
409:18
**nothing** [12] - 237:11,
243:8, 252:1,
254:14, 257:8,
270:15, 274:22,
299:8, 301:7, 304:4,
309:7, 333:3
**notice** [6] - 311:25,
368:13, 380:24,
381:8, 383:17,
383:19
**notifying** [1] - 398:11
**November** [6] -
292:19, 292:23,
293:1, 335:25,
336:1, 358:10
**nowhere** [1] - 258:3
**number** [9] - 235:3,
243:14, 246:10,
249:12, 249:14,
353:18, 359:17,
359:20, 371:11
**nursing** [1] - 237:15

**NW** [3] - 232:14,
232:24, 409:25
**NYU** [1] - 318:23

## O

**oath** [2] - 306:2,
310:16
**object** [6] - 236:8,
241:3, 296:15,
314:16, 335:5,
360:10
**objected** [1] - 295:17
**objection** [40] - 235:4,
235:16, 236:5,
237:3, 237:6, 238:6,
239:1, 239:2,
242:13, 246:11,
248:17, 249:22,
249:24, 277:15,
279:24, 314:13,
314:19, 323:1,
326:19, 326:22,
329:18, 332:7,
336:15, 337:14,
340:25, 341:23,
342:25, 347:7,
360:3, 361:3,
361:16, 361:23,
362:8, 365:25,
367:11, 370:8,
381:16, 401:10
**objections** [6] - 236:7,
295:11, 295:24,
323:7, 323:17, 335:8
**obligated** [1] - 311:18
**obligation** [3] -
311:10, 313:8,
400:22
**obligations** [1] - 308:8
**oblivion** [1] - 345:20
**observe** [1] - 280:16
**obvious** [1] - 284:2
**obviously** [8] - 235:15,
236:16, 257:18,
259:15, 284:1,
302:3, 302:9, 305:14
**occasionally** [1] -
266:11
**occasions** [2] -
239:12, 327:1
**occur** [1] - 281:11
**occurred** [1] - 281:17
**October** [6] - 271:15,
272:1, 272:5,
274:12, 279:3,
287:11
**OF** [3] - 232:1, 232:10,
409:14
**offer** [9] - 235:7,

426

235:8, 241:19,
301:2, 302:4,
317:12, 334:25,
346:13, 346:14
**offered** [14] - 240:19,
297:20, 298:19,
300:2, 301:4, 301:5,
302:2, 313:15,
314:15, 322:7,
376:14, 386:11,
387:2
**offering** [4] - 269:17,
296:19, 296:23,
297:1
**office** [6] - 238:19,
289:2, 289:5,
320:14, 321:9,
387:21
**officer** [1] - 358:5
**officers** [1] - 270:12
**Official** [1] - 232:23
**OFFICIAL** [1] - 409:14
**official** [3] - 346:15,
383:21, 409:24
**officious** [1] - 239:6
**often** [6] - 261:1,
266:6, 266:7,
393:11, 393:12,
398:20
**oil** [1] - 332:24
**old** [3] - 268:5, 318:9,
380:25
**older** [2] - 404:8, 407:1
**Olson** [1] - 268:8
**omitted** [1] - 374:14
**once** [9] - 234:11,
247:20, 250:19,
261:1, 360:22,
389:3, 393:22,
401:23, 405:9
**one** [77] - 236:25,
238:3, 238:22,
241:12, 244:4,
253:20, 259:1,
259:2, 259:13,
259:17, 262:5,
263:12, 264:16,
265:10, 265:14,
266:25, 267:17,
268:5, 271:19,
272:16, 276:8,
278:8, 281:11,
283:13, 288:19,
288:24, 292:3,
295:18, 298:19,
303:25, 304:19,
307:13, 309:16,
310:20, 312:5,
312:8, 312:14,
312:15, 315:3,

322:13, 326:10,
334:20, 335:18,
338:1, 338:18,
338:19, 338:23,
342:15, 343:24,
347:13, 349:15,
353:21, 362:11,
365:16, 366:14,
367:1, 367:25,
368:15, 369:7,
373:10, 376:18,
389:7, 392:13,
399:9, 399:10,
401:1, 402:3,
403:23, 405:22,
406:1, 406:4, 406:11
**ones** [8] - 241:19,
269:15, 269:16,
323:8, 331:4, 346:3,
355:14, 357:1
**oneself** [1] - 259:1
**ongoing** [4] - 268:21,
270:21, 270:22,
286:1
**open** [18] - 244:8,
252:9, 252:12,
252:13, 259:21,
264:24, 265:7,
282:4, 337:11,
339:25, 345:20,
349:14, 385:13,
392:19, 392:20,
393:1, 405:23, 408:7
**opened** [7] - 251:21,
252:13, 261:21,
262:10, 349:22,
350:13, 362:9
**opening** [15] - 244:8,
251:20, 252:6,
254:10, 254:16,
255:6, 255:9,
261:15, 263:24,
349:11, 350:12,
359:23, 360:11,
393:4, 393:5
**opens** [1] - 252:4
**operate** [3] - 332:25,
352:12, 391:24
**operated** [2] - 287:6,
321:5
**operating** [21] - 329:6,
332:4, 332:17,
332:20, 333:10,
333:13, 333:22,
333:25, 334:6,
338:8, 338:24,
339:10, 340:17,
344:17, 345:4,
353:22, 354:5,
354:15, 394:23,

395:10, 396:5
**Operating** [2] - 338:6,
361:13
**operation** [5] - 330:13,
352:12, 352:13,
352:22, 392:14
**operational** [1] -
402:23
**operations** [1] -
327:16
**operative** [2] - 237:14,
241:17
**operatively** [1] - 287:5
**operator** [42] - 250:11,
250:15, 251:14,
253:24, 254:15,
261:2, 306:12,
322:6, 329:9,
333:15, 337:3,
337:7, 339:11,
347:1, 349:10,
350:11, 357:16,
366:3, 385:1,
390:12, 390:13,
390:17, 390:18,
390:19, 390:21,
391:6, 391:9,
391:12, 391:24,
392:8, 392:16,
393:7, 394:8,
395:15, 401:15,
403:19, 406:14,
406:22, 406:23
**operators** [5] - 395:10,
401:18, 402:22,
403:4, 403:24
**opinion** [17] - 286:5,
300:11, 301:3,
302:4, 332:8,
332:10, 336:21,
337:5, 337:12,
346:24, 347:6,
351:18, 352:8,
352:18, 352:20,
353:14, 374:8
**opinions** [10] - 277:8,
286:9, 286:10,
298:9, 300:3, 300:7,
334:20, 336:3,
336:8, 336:17
**opponent** [1] - 300:14
**opponent's** [1] -
382:20
**opportunity** [4] -
310:6, 313:11,
346:13, 361:4
**opposed** [4] - 239:3,
245:14, 248:22,
293:22
**opposing** [1] - 296:17

**opposite** [2] - 261:24,
263:2
**opposition** [2] -
342:12, 386:12
**Optima** [1] - 238:14
**option** [1] - 322:17
**optional** [1] - 403:7
**orally** [1] - 382:16
**Orange** [5] - 250:15,
348:22, 392:11,
397:16, 404:25
**order** [7] - 299:6,
317:22, 330:4,
334:23, 337:10,
382:6, 406:21
**orders** [1] - 299:7
**ordinarily** [2] - 343:11,
399:8
**Oregon** [1] - 326:2
**organization** [6] -
324:20, 325:12,
325:13, 333:4,
341:10, 346:11
**organizations** [3] -
269:5, 316:25,
324:18
**oriented** [1] - 325:10
**Orlando** [4] - 334:13,
341:15, 357:14,
358:24
**orthopedic** [8] -
274:19, 275:21,
276:3, 276:6, 276:9,
277:14, 277:18,
283:17
**Osteopenia** [1] -
278:19
**osteopenia** [7] -
267:22, 268:1,
278:13, 278:14,
278:18, 278:21,
290:17
**osteopenic** [3] -
267:23, 267:24,
290:13
**osteoporosis** [3] -
278:17, 278:19,
278:21
**otherwise** [6] - 265:5,
266:10, 270:25,
288:14, 311:13,
380:7
**ought** [2] - 312:20
**ourselves** [4] - 239:19,
239:25, 240:17,
240:22
**outcome** [1] - 288:6
**outdoor** [1] - 331:13
**outpatient** [3] -
268:24, 268:25,

273:3
**outset** [1] - 239:4
**outside** [21] - 234:18,
247:14, 260:19,
282:14, 286:21,
301:13, 302:9,
309:17, 314:6,
322:24, 343:5,
369:10, 370:7,
372:18, 384:9,
399:14, 399:18,
399:20, 400:12,
400:14, 401:3
**overall** [2] - 298:12,
298:13
**overhead** [7] - 253:2,
253:4, 253:6,
265:10, 265:12,
349:25, 362:25
**overruled** [8] - 235:4,
248:19, 280:1,
337:15, 347:8,
360:15, 362:10,
401:13
**overshooting** [1] -
345:24
**overshot** [2] - 342:16,
342:17
**overtime** [1] - 332:22
**own** [12] - 235:21,
316:8, 321:6,
342:10, 345:6,
350:24, 351:4,
351:9, 401:18,
406:14, 406:16,
406:17
**owns** [1] - 321:7

**P**

**p.m** [1] - 409:12
**PA** [2] - 399:21, 402:22
**paces** [1] - 240:15
**Page** [18] - 249:4,
249:6, 256:1, 256:7,
304:6, 304:17,
305:17, 309:5,
309:18, 336:13,
339:2, 341:6, 352:4,
375:22, 376:2, 403:2
**page** [1] - 304:4
**PAGE** [1] - 233:3
**pages** [12] - 237:1,
238:12, 241:13,
305:9, 305:12,
305:22, 307:19,
316:19, 317:12,
373:11, 381:14
**Pages** [1] - 309:8
**paid** [1] - 346:12

**pain** [7] - 274:8, 286:1, 289:25, 290:21, 290:25, 291:2, 291:4
**pandemic** [5] - 269:3, 269:22, 270:1, 270:21, 271:4
**papers** [1] - 317:4
**paragraph** [1] - 336:14
**paralegal** [2] - 238:18, 242:8
**paranoid** [1] - 239:14
**pardon** [7] - 253:3, 329:1, 336:6, 342:2, 359:5, 361:6, 363:7
**parking** [2] - 271:20, 271:21
**part** [25] - 259:13, 282:15, 293:25, 297:12, 297:20, 297:24, 298:1, 305:12, 305:13, 307:9, 309:10, 318:15, 318:23, 330:24, 333:12, 333:18, 338:5, 354:12, 357:3, 366:22, 375:16, 378:5, 382:8, 395:9
**Part** [3] - 292:15, 296:22
**partial** [2] - 386:25, 387:6
**participating** [1] - 269:14
**particular** [17] - 282:8, 282:18, 283:3, 330:19, 333:8, 335:1, 335:10, 337:20, 345:15, 348:4, 357:3, 385:24, 386:4, 387:5, 395:22, 395:23, 397:2
**particularly** [4] - 266:24, 270:11, 285:20, 384:19
**parties** [2] - 371:11, 383:18
**partition** [1] - 253:20
**party** [3] - 308:14, 354:10, 372:2
**pass** [1] - 381:17
**passed** [2] - 235:5, 325:6
**passenger** [5] - 262:14, 328:20, 349:17, 351:8, 372:14
**passengers** [18] - 257:25, 328:20,

329:12, 333:15, 336:25, 337:9, 337:17, 338:3, 347:10, 350:23, 351:12, 360:23, 361:1, 361:21, 362:5, 401:22, 403:14, 405:8
**past** [2] - 273:16, 350:7
**patch** [1] - 266:14
**patience** [1] - 383:14
**patient** [2] - 289:25, 293:9
**PATRICK** [1] - 232:13
**Patrick** [1] - 234:8
**Pause** [8] - 255:24, 291:20, 313:14, 347:15, 359:9, 387:19, 388:11, 402:4
**pavement** [1] - 266:3
**pay** [1] - 242:16
**pedestrian** [3] - 325:5, 325:7, 325:10
**people** [41] - 236:18, 258:2, 261:22, 261:23, 262:7, 290:1, 290:2, 308:25, 319:3, 320:12, 334:10, 337:19, 339:23, 340:10, 340:12, 340:15, 341:19, 342:3, 342:8, 342:23, 343:18, 343:21, 344:10, 345:2, 345:20, 346:2, 346:3, 355:2, 365:13, 365:20, 368:2, 399:14, 399:18, 400:12, 400:16, 400:22, 401:22, 405:20, 405:22, 406:21
**per** [3] - 395:14, 396:18, 404:18
**percent** [1] - 300:3
**percipient** [1] - 284:22
**performed** [2] - 272:7, 283:16
**performing** [1] - 402:23
**perhaps** [2] - 267:23, 407:20
**period** [5] - 256:11, 276:20, 278:21, 321:18, 324:6
**permanent** [1] - 286:7
**permission** [2] -

338:13, 394:9
**permit** [1] - 236:8
**permitted** [2] - 277:17, 302:19
**permitting** [1] - 244:16
**perpetual** [1] - 319:22
**person** [17] - 236:2, 242:5, 271:9, 322:2, 325:23, 337:25, 338:1, 340:8, 344:3, 352:25, 358:12, 358:13, 358:15, 358:16, 358:17, 378:25, 396:14
**person's** [1] - 358:18
**personal** [3] - 342:10, 342:21, 391:24
**personally** [1] - 337:25
**personnel** [1] - 333:1
**perspective** [1] - 288:5
**pertains** [1] - 299:17
**Ph.D** [2] - 233:8, 315:9
**PhD** [3] - 318:20, 318:23, 322:8
**Philadelphia** [6] - 328:3, 331:7, 334:7, 355:13, 355:19, 356:4
**phone** [3] - 236:11, 383:8, 396:14
**phones** [6] - 247:12, 322:21, 343:3, 370:5, 372:15, 384:7
**physical** [6] - 272:22, 273:2, 287:17, 287:22, 351:4, 351:9
**physically** [3] - 404:9, 404:10, 406:14
**physician** [3] - 276:11, 277:19, 285:3
**pick** [2] - 283:13, 333:6
**picture** [1] - 284:8
**piece** [2] - 283:15, 309:20
**pieces** [1] - 282:4
**pitch** [1] - 266:15
**place** [12] - 238:13, 258:17, 262:23, 283:23, 310:7, 321:6, 328:11, 328:12, 329:11, 337:10, 340:4
**placed** [1] - 288:9
**placement** [1] - 293:7
**places** [3] - 247:17, 281:11, 316:23
**Plaintiff** [2] - 232:4,

232:13
**plaintiff** [13] - 242:9, 277:4, 303:24, 309:19, 367:23, 367:25, 371:16, 371:25, 373:15, 377:12, 380:18, 384:5, 384:6
**plaintiff's** [10] - 234:5, 240:20, 244:24, 291:24, 291:25, 303:17, 367:5, 372:12, 376:5, 381:21
**Plaintiff's** [13] - 234:22, 247:1, 248:24, 250:2, 279:23, 281:20, 282:24, 283:20, 316:14, 317:13, 338:15, 339:1, 340:24
**plaintiffs** [2] - 239:8, 366:7, 384:13
**plan** [1] - 364:16
**planning** [8] - 262:5, 318:21, 318:24, 318:25, 320:19, 379:9, 407:19
**plans** [1] - 388:14
**platform** [16] - 254:22, 255:1, 360:23, 361:22, 362:7, 363:11, 363:13, 392:18, 392:25, 393:4, 401:8, 401:24, 403:10, 403:15, 405:2, 405:10
**platformed** [1] - 345:19
**platforms** [3] - 349:1, 397:16, 397:18
**play** [14] - 242:22, 304:3, 307:15, 307:16, 307:21, 311:6, 312:5, 312:9, 313:10, 364:7, 370:23, 372:4, 382:22, 386:11
**played** [6] - 365:2, 369:15, 371:12, 372:8, 380:2, 399:19
**player** [1] - 276:17
**playing** [6] - 312:14, 371:10, 371:17, 375:10, 375:12, 379:2
**pleased** [1] - 272:6
**pleasure** [2] - 323:19,

347:25
**PLLC** [1] - 232:14
**plot** [1] - 266:15
**podium** [1] - 234:6
**Point** [1] - 320:10
**point** [40] - 240:6, 244:7, 262:9, 262:11, 264:17, 264:22, 266:8, 268:21, 269:3, 269:12, 274:7, 274:22, 277:3, 278:4, 278:23, 282:21, 283:4, 283:8, 293:16, 296:24, 298:3, 300:1, 307:20, 310:17, 311:22, 315:2, 317:11, 340:23, 350:7, 365:4, 373:14, 376:18, 378:12, 378:16, 384:4, 388:23, 400:15, 406:9
**pointed** [5] - 304:23, 305:4, 312:23, 334:8, 341:12
**points** [2] - 282:9, 383:9
**pole** [24] - 252:22, 252:24, 253:7, 253:9, 253:12, 253:14, 263:6, 263:17, 263:18, 263:22, 264:1, 264:7, 264:10, 264:12, 264:14, 264:21, 265:10, 265:16, 266:6, 340:13, 349:25, 350:2, 350:3, 363:2
**poles** [4] - 253:2, 253:4, 253:15, 263:20
**policies** [1] - 344:4
**policy** [6] - 358:5, 358:22, 397:8, 397:9, 397:12, 404:18
**policy-setting** [2] - 358:5, 358:22
**polish** [1] - 408:13
**Polytech** [2] - 318:21, 318:22
**portable** [1] - 280:4
**Porter** [1] - 299:3
**portion** [12] - 297:22, 303:23, 304:22, 305:8, 305:10,

306:23, 311:6,
313:3, 372:21,
373:1, 375:18,
379:11
**portions** [2] - 331:14,
370:20
**posed** [1] - 335:11
**position** [11] - 240:22,
241:2, 263:9,
280:13, 298:16,
304:15, 305:18,
305:19, 333:16,
376:3, 376:6
**positioned** [1] - 263:8
**possess** [1] - 308:16
**possibility** [2] -
250:17, 259:8
**possible** [6] - 251:13,
262:24, 287:19,
288:23, 288:24,
362:4
**possibly** [3] - 288:8,
288:11, 373:25
**post** [1] - 287:4
**potential** [3] - 284:21,
296:4, 296:11
**practical** [1] - 319:21
**practice** [6] - 239:23,
242:7, 276:14,
276:19, 276:25,
404:24
**practices** [1] - 276:18
**practicing** [1] - 276:3
**precautions** [1] -
259:4
**precipitously** [1] -
242:12
**precise** [5] - 248:16,
248:18, 248:22,
249:7, 249:12
**prefer** [3] - 296:8,
329:23, 367:4
**pregan@reganfirm.
com** [1] - 232:16
**prejudice** [2] - 244:20,
368:9
**prejudicial** [1] - 308:4
**preliminary** [2] -
244:4, 295:18
**premise** [1] - 337:21
**preparation** [1] - 358:9
**prepare** [1] - 292:5
**prepared** [22] - 236:2,
236:18, 242:5,
242:9, 248:20,
277:10, 279:11,
292:12, 299:24,
311:21, 311:23,
312:7, 312:25,
336:5, 336:7,

337:20, 340:15,
340:16, 380:15,
380:18, 408:21
**prescribed** [1] - 291:4
**prescribing** [1] - 291:2
**presence** [5] - 296:12,
296:13, 301:13,
302:10, 314:6
**presentations** [2] -
269:14, 325:2
**presented** [2] - 308:3,
364:11
**presently** [1] - 388:1
**preserve** [1] - 383:9
**preserved** [1] - 382:17
**president** [1] - 325:12
**presume** [2] - 287:6,
293:8
**presuming** [1] - 277:6
**pretrial** [9] - 236:6,
236:16, 237:4,
239:7, 295:24,
304:16, 305:2,
305:7, 367:17
**pretty** [7] - 267:25,
268:23, 304:14,
338:17, 344:20,
398:19, 408:11
**prevailing** [1] - 398:25
**previously** [13] -
239:15, 251:5,
279:24, 305:2,
313:15, 314:16,
316:13, 323:8,
335:5, 335:20,
341:1, 384:25,
386:14
**prima** [1] - 384:13
**primary** [2] - 274:17,
384:14
**private** [3] - 276:14,
276:18, 276:25
**problem** [14] - 240:8,
274:1, 278:1, 278:2,
296:11, 311:3,
317:14, 345:15,
345:16, 345:17,
345:18, 345:21,
379:11, 382:10
**problematic** [1] -
305:7
**problems** [3] - 286:4,
286:6, 304:1
**procedural** [1] -
382:12
**procedure** [7] -
333:22, 338:8,
339:10, 345:4,
395:10, 402:18,
402:21

**Procedure** [3] - 338:6,
361:13, 384:12
**procedures** [16] -
285:5, 329:7, 332:4,
332:17, 332:21,
333:10, 333:13,
333:25, 334:6,
338:24, 344:17,
353:23, 354:5,
354:15, 392:14,
402:24
**proceed** [3] - 260:21,
379:17, 379:22
**proceedings** [1] -
409:19
**process** [4] - 322:7,
388:20, 392:12,
392:15
**produce** [2] - 311:11,
313:16
**produced** [2] - 238:3,
241:14
**professional** [3] -
324:10, 324:12,
355:2
**professionals** [1] -
346:11
**professor** [3] - 317:8,
322:9, 322:11
**proffered** [2] - 300:11,
300:18
**proffering** [1] - 297:1
**program** [5] - 318:5,
318:12, 318:13,
318:14, 318:16
**programmed** [1] -
403:17
**programs** [1] - 325:15
**progress** [1] - 272:6
**projects** [2] - 320:25,
327:20
**promise** [2] - 356:18,
359:14
**promoted** [2] - 357:17,
357:18
**proof** [4] - 240:21,
244:23, 245:1, 245:4
**prop** [1] - 262:25
**proper** [12] - 242:23,
259:2, 259:4, 293:7,
297:4, 298:19,
299:14, 300:25,
329:10, 329:11,
373:5, 376:6
**properly** [5] - 288:9,
315:14, 392:19,
392:22, 394:10
**properties** [1] - 269:7
**property** [4] - 321:6,
321:7, 321:8, 321:9

**propose** [1] - 387:21
**proposed** [2] - 388:21,
408:14
**proprietary** [3] -
356:9, 356:22, 357:9
**prosecution** [1] -
244:17
**protect** [2] - 337:25,
338:1
**prove** [1] - 240:20
**provide** [7] - 313:24,
335:3, 337:8,
337:24, 372:1,
400:22, 402:21
**provided** [5] - 240:11,
240:12, 248:15,
333:15, 334:17
**provider** [1] - 249:3
**providers** [2] - 242:16,
248:5
**providing** [1] - 328:19
**proximal** [1] - 293:11
**PT** [3] - 268:24,
268:25, 273:3
**Public** [3] - 333:5,
345:6, 346:15
**public** [12] - 302:1,
317:1, 350:23,
351:10, 351:18,
351:19, 351:20,
352:19, 352:21,
353:2, 353:6, 360:20
**Publication** [1] -
345:13
**publications** [1] -
325:1
**published** [2] - 346:5,
383:21
**Puerto** [1] - 328:2
**pull** [2] - 259:19, 391:2
**pulling** [1] - 256:16
**purpose** [5] - 259:12,
293:6, 355:11,
374:7, 402:21
**purposes** [7] - 279:23,
281:19, 294:2,
330:1, 381:23,
382:8, 383:1
**purse** [2] - 264:18,
350:20
**pursuant** [6] - 279:21,
367:13, 373:7,
379:12, 384:11
**pursue** [1] - 318:20
**push** [2] - 398:10,
404:2
**pushed** [1] - 264:4
**put** [29] - 238:18,
240:15, 241:15,
241:23, 243:1,

262:23, 280:23,
281:23, 282:4,
282:22, 283:5,
283:14, 291:5,
293:22, 303:24,
313:11, 316:22,
317:3, 321:17,
324:23, 338:14,
359:18, 362:16,
366:19, 366:20,
366:22, 366:23,
382:5, 402:5
**puts** [1] - 307:14,
312:15, 313:4
**putting** [1] - 238:8

## Q

**Qatar** [1] - 328:10
**qualification** [1] -
300:13
**qualifications** [2] -
298:13, 323:2
**qualified** [12] - 285:4,
297:10, 300:25,
301:2, 301:25,
302:8, 302:13,
302:22, 303:4,
307:21, 323:3,
332:11
**qualify** [7] - 297:6,
301:24, 314:19,
329:19, 329:24,
330:1, 335:8
**questions** [25] - 242:1,
246:5, 246:23,
249:18, 274:24,
275:1, 286:14,
294:13, 297:13,
305:5, 305:7,
308:23, 312:8,
347:16, 353:19,
359:10, 359:14,
359:17, 362:18,
367:22, 374:12,
397:23, 398:5,
402:14, 406:7
**quick** [2] - 246:23,
398:3
**quicker** [1] - 323:23
**quickly** [3] - 252:14,
261:8, 370:17
**quite** [3] - 321:1,
342:12, 378:17
**quote** [1] - 278:14

## R

**R-140** [1] - 327:14
**radically** [1] - 260:11
**radiographic** [1] -

293:12
**radiographically** [1] - 285:19
**radiographs** [1] - 294:11
**rail** [6] - 299:18, 391:11, 391:18, 391:19, 392:16, 395:10
**Rail** [1] - 328:9
**railroad** [1] - 319:24
**railroads** [1] - 346:4
**rails** [3] - 253:6, 260:6, 362:24
**raise** [5] - 275:12, 296:10, 315:7, 386:24, 390:1
**raised** [6] - 279:25, 295:25, 299:15, 323:11, 386:15
**raises** [1] - 386:2
**RAJKUMA** [1] - 233:11
**Rajkumar** [1] - 365:1
**ramp** [1] - 362:15
**rang** [1] - 396:14
**range** [1] - 270:8
**RAO** [1] - 233:11
**Rao** [9] - 241:17, 271:7, 272:4, 274:12, 287:4, 290:20, 364:8, 365:2, 369:15
**Rao's** [6] - 287:8, 287:10, 287:16, 369:12, 369:16, 369:21
**rap** [1] - 344:23
**rate** [1] - 299:13
**rates** [5] - 296:23, 297:6, 297:18, 297:20, 298:5
**rather** [5] - 248:13, 290:19, 295:12, 317:11, 385:19
**ray** [8] - 237:15, 281:15, 282:6, 283:5, 283:24, 285:24, 292:22, 293:1
**rays** [2] - 292:18, 292:19
**RDR** [3] - 232:22, 409:16, 409:23
**re** [1] - 246:13
**re-question** [1] - 246:13
**reach** [2] - 253:7, 264:14
**reached** [5] - 239:11, 252:21, 252:23, 253:9, 264:7
**reaching** [2] - 253:10, 264:12
**read** [20] - 249:11, 292:16, 304:13, 307:3, 336:13, 336:16, 348:5, 348:8, 348:14, 348:17, 354:19, 361:14, 371:5, 372:20, 375:23, 377:4, 378:5, 378:12, 381:4, 381:18
**reading** [6] - 349:4, 373:14, 374:6, 374:7, 376:4, 377:1
**readouts** [3] - 394:3, 406:18
**reads** [3] - 311:1, 377:10, 377:18
**ready** [10] - 245:17, 245:18, 246:3, 262:2, 294:24, 314:2, 314:5, 314:25, 369:2, 374:25
**real** [1] - 315:25
**realize** [3] - 284:15, 284:18, 405:23
**realized** [1] - 370:18
**really** [11] - 243:5, 263:20, 271:21, 278:2, 282:9, 285:24, 319:3, 319:20, 320:1, 382:23, 398:20
**ream** [1] - 282:15
**reamers** [1] - 282:15
**reason** [7] - 237:25, 317:7, 339:21, 386:21, 398:19, 398:24, 398:25
**reasonable** [6] - 277:9, 286:5, 286:11, 337:5, 346:24, 384:21
**reasonably** [1] - 360:20
**reasons** [8] - 268:5, 314:16, 335:5, 386:7, 386:18, 393:13, 393:18, 406:4
**Rebecca** [1] - 365:18
**rebut** [1] - 376:14
**rebuttal** [3] - 244:25, 408:17, 408:18
**receive** [4] - 242:16, 248:4, 318:7, 405:8
**received** [9] - 247:6, 247:7, 247:16, 300:4, 317:1, 318:10, 318:11, 328:10, 333:18
**receiving** [1] - 248:3
**recent** [1] - 320:19
**reception** [1] - 323:8
**Recess** [3] - 301:17, 377:22, 389:8
**recess** [1] - 368:19
**recite** [1] - 254:4
**recognized** [1] - 234:25
**recollection** [8] - 248:16, 248:21, 249:12, 395:13, 397:5, 397:7, 397:11, 397:17
**recommended** [1] - 338:12
**reconsideration** [1] - 296:18
**reconstructionist** [1] - 301:4
**record** [18] - 234:2, 234:6, 234:20, 239:15, 241:15, 243:9, 245:12, 302:11, 307:11, 307:13, 308:22, 308:24, 314:8, 330:1, 372:21, 373:16, 384:16, 394:24
**recording** [3] - 303:25, 304:3
**records** [25] - 236:11, 236:15, 236:17, 236:23, 236:25, 237:2, 237:10, 237:11, 237:15, 239:2, 239:3, 239:9, 239:13, 239:17, 240:3, 240:23, 241:12, 241:16, 279:4, 287:8, 328:17, 387:2
**recross** [1] - 362:20
**RECROSS** [1] - 362:22
**recruited** [4] - 319:14, 320:4, 320:15, 320:20
**red** [12] - 393:15, 393:19, 393:21, 393:22, 393:24, 394:6, 402:9, 402:13, 402:14, 403:3, 406:12
**redacted** [2] - 238:9, 238:13
**redirect** [5] - 294:15, 372:20, 374:1, 375:25, 406:8
**REDIRECT** [1] - 359:15
**redrawing** [1] - 245:14
**reduction** [1] - 282:3
**refer** [3] - 303:19, 305:5, 336:17
**reference** [1] - 245:3
**referenced** [1] - 308:20
**referring** [2] - 307:22, 310:2
**refresh** [5] - 242:20, 247:19, 248:16, 248:21, 249:12
**refreshed** [3] - 247:21, 394:21, 395:12
**refreshing** [1] - 243:14
**regain** [1] - 287:19
**REGAN** [204] - 232:13, 232:13, 232:14, 234:7, 235:7, 235:9, 235:11, 235:14, 235:25, 236:24, 237:8, 237:14, 237:17, 237:19, 237:22, 237:24, 238:2, 238:6, 238:12, 238:16, 238:21, 238:24, 241:6, 242:1, 242:18, 242:25, 243:10, 243:12, 243:15, 243:18, 243:22, 245:18, 245:20, 246:16, 246:20, 248:2, 248:13, 249:17, 249:20, 260:17, 260:20, 275:1, 275:7, 275:15, 277:13, 277:20, 277:22, 279:21, 280:2, 280:6, 280:8, 280:12, 280:20, 284:15, 284:18, 285:6, 285:8, 286:13, 294:15, 295:3, 295:7, 295:14, 296:15, 296:21, 298:17, 298:25, 300:1, 300:9, 300:20, 300:24, 301:10, 301:16, 303:8, 303:11, 303:16, 303:23, 304:9, 304:11, 304:13, 304:20, 304:22, 305:1, 305:4, 308:6, 309:4, 310:12, 310:25, 311:5, 311:17, 313:13, 313:15, 313:22, 314:3, 315:2, 315:11, 316:15, 317:11, 317:17, 317:20, 323:19, 323:22, 326:23, 329:21, 330:3, 330:7, 332:12, 334:24, 335:14, 335:15, 335:21, 336:19, 338:13, 338:18, 339:1, 340:23, 343:24, 344:6, 344:8, 347:13, 347:16, 359:13, 359:16, 359:22, 359:25, 360:4, 360:8, 360:13, 360:16, 360:17, 362:2, 362:18, 364:1, 364:7, 364:14, 364:18, 364:20, 365:9, 365:11, 365:18, 366:9, 366:13, 366:24, 367:8, 368:6, 368:14, 368:16, 369:7, 369:22, 369:25, 370:3, 370:16, 371:1, 371:4, 371:25, 372:5, 372:9, 372:12, 373:3, 373:23, 374:10, 374:18, 375:12, 375:19, 376:2, 376:7, 376:10, 376:13, 376:17, 376:21, 377:7, 377:11, 377:17, 377:20, 378:8, 378:14, 378:22, 378:25, 379:8, 379:25, 380:6, 380:11, 380:23, 381:6, 381:10, 381:14, 381:19, 383:2, 384:4, 388:12, 397:25, 400:2, 400:4, 401:14, 402:3, 402:5, 402:7, 402:11, 406:6, 408:19, 408:22,

430

409:3, 409:6, 409:8,
409:10
**Regan** [34] - 234:8,
234:22, 235:5,
235:23, 239:2,
244:11, 246:5,
246:6, 246:8,
246:13, 249:8,
260:18, 295:23,
296:14, 297:7,
298:15, 302:3,
302:25, 306:8,
307:21, 308:5,
312:23, 313:18,
315:1, 323:1,
323:14, 335:11,
359:12, 365:17,
368:5, 373:21,
379:24, 380:5
**Regan's** [1] - 312:19
**Regan)** ......................
............**246** [1] - 233:4
**Regan)** ......................
............**275** [1] - 233:6
**Regan)** ......................
............**315** [1] - 233:8
**Regan)** ......................
............**359** [1] - 233:9
**Regan)** ......................
............**397** [1] -
233:15
**regard** [27] - 240:7,
240:24, 244:8,
269:16, 269:20,
279:25, 289:8,
295:24, 295:25,
297:17, 297:21,
348:18, 352:19,
370:14, 385:6,
385:17, 385:18,
385:19, 385:20,
385:21, 385:23,
385:24, 386:3,
386:18, 386:25,
387:4, 387:5
**regarding** [3] - 335:11,
386:9, 402:24
**regularly** [1] - 396:5
**rehab** [2] - 248:5,
278:12
**rehabilitate** [2] -
299:25, 374:9
**reiterating** [1] - 235:16
**relate** [1] - 236:20
**related** [4] - 244:14,
321:8, 335:12, 357:1
**relates** [2] - 386:5,
392:13
**relationship** [1] -
322:2

**relatively** [1] - 371:19
**relayed** [1] - 378:19
**released** [1] - 313:18
**relevant** [11] - 247:16,
268:15, 299:12,
299:13, 301:3,
302:14, 311:24,
335:12, 375:16,
375:18
**relied** [3] - 343:16,
343:17, 343:20
**relieve** [1] - 289:14
**rely** [4] - 310:16,
343:6, 343:9, 344:16
**remain** [2] - 275:11,
315:6
**remainder** [1] - 379:19
**remediate** [2] -
337:23, 337:24
**remember** [25] - 248:8,
248:9, 253:22,
258:22, 267:18,
272:3, 273:16,
274:4, 278:8, 287:7,
287:18, 291:2,
328:23, 337:18,
344:11, 346:1,
350:2, 352:7, 358:9,
358:13, 395:24,
396:1, 396:3, 396:17
**remembering** [1] -
329:1
**remembers** [1] -
386:10
**remind** [1] - 367:17
**remodeling** [2] -
293:12, 293:14
**remove** [3] - 238:10,
238:13, 304:1
**rendered** [1] - 277:10
**renew** [7] - 245:9,
249:20, 249:22,
249:24, 367:10,
382:25, 387:10
**reopen** [4] - 366:21,
367:5, 381:21, 382:1
**rep** [4] - 334:16,
358:20, 358:21
**repeat** [1] - 395:2
**repeatedly** [1] - 298:8
**repetitive** [1] - 330:10
**rephrase** [1] - 362:4
**report** [37] - 301:21,
305:12, 305:22,
306:5, 307:3, 307:4,
307:8, 307:10,
307:23, 308:19,
308:21, 309:8,
309:10, 310:2,
310:3, 311:9,

312:10, 312:19,
312:22, 313:3,
329:2, 329:4, 329:5,
335:24, 336:2,
336:14, 336:17,
336:18, 341:6,
348:8, 348:10,
348:11, 372:21,
373:22, 376:5,
394:22, 395:14
**reported** [1] - 366:16
**Reporter** [2] - 232:22,
232:23, 409:24
**REPORTER** [2] -
332:18, 409:14
**reports** [3] - 237:15,
307:24
**reposition** [6] -
250:16, 261:3,
329:10, 393:9,
394:5, 403:9
**repositioned** [18] -
253:10, 254:18,
257:3, 257:11,
260:25, 264:11,
264:15, 349:5,
350:14, 363:6,
363:9, 363:13,
399:14, 401:8,
403:14, 405:2,
405:9, 406:21
**repositioning** [10] -
251:6, 251:15,
301:22, 338:9,
339:6, 339:11,
349:2, 393:14,
396:2, 397:2
**repositions** [1] -
255:15
**represent** [1] - 320:10
**representations** [1] -
305:15
**representative** [7] -
303:21, 310:17,
341:18, 357:19,
358:4, 371:13,
372:10
**representatives** [1] -
308:15
**reps** [1] - 346:4
**request** [4] - 279:10,
372:1, 394:9, 399:22
**requested** [2] -
370:21, 371:5
**requests** [1] - 240:24
**require** [4] - 282:2,
337:12, 339:10,
393:14
**required** [10] - 244:24,
269:24, 269:25,

311:16, 312:18,
312:21, 327:7,
329:12, 337:16,
406:11
**requirements** [1] -
322:13
**requires** [7] - 281:18,
282:8, 335:2,
336:22, 337:7,
338:9, 401:21
**requisite** [1] - 308:25
**res** [1] - 270:15
**research** [6] - 316:24,
322:16, 330:21,
339:17, 365:5,
407:23
**resented** [1] - 325:9
**reservations** [1] -
269:7
**reserve** [3] - 367:16,
382:16, 387:9
**reserved** [2] - 235:13,
241:24
**resolve** [4] - 237:4,
295:12, 374:23,
407:25
**resources** [1] - 269:17
**respect** [11] - 286:24,
288:17, 314:10,
327:9, 327:10,
333:13, 334:5,
335:1, 336:22,
361:13, 392:24
**respectfully** [1] -
310:25
**respond** [4] - 235:23,
244:12, 299:24,
312:3
**responding** [1] -
391:20
**response** [4] - 239:18,
312:17, 375:20,
386:16
**responsibilities** [3] -
351:12, 351:13,
352:19
**responsible** [10] -
276:16, 351:20,
351:24, 352:14,
352:23, 352:25,
353:1, 353:3, 353:7,
353:9
**rest** [11] - 253:16,
265:9, 366:11,
366:25, 367:2,
378:13, 380:10,
380:15, 380:19,
393:14
**rested** [1] - 384:6
**resting** [1] - 380:8

**restrictions** [2] -
272:25, 273:1
**rests** [3] - 383:6,
383:7, 384:5
**result** [3] - 243:16,
247:6, 330:23
**resulted** [1] - 347:3
**resulting** [1] - 244:19
**results** [1] - 290:9
**resume** [5] - 246:3,
284:13, 287:22,
322:20, 324:2
**Resumed** [2] - 233:4,
246:18
**retain** [1] - 326:5
**retained** [1] - 327:1
**retire** [1] - 374:24
**retired** [6] - 322:10,
356:13, 357:21,
357:23, 359:4, 359:6
**return** [2] - 272:22,
287:22
**review** [10] - 239:20,
279:10, 292:8,
328:21, 331:23,
338:5, 346:7,
346:13, 346:14,
388:22
**reviewed** [4] - 279:16,
311:23, 329:3, 329:4
**rewind** [1] - 391:8
**Rico** [1] - 328:3
**rid** [1] - 320:20
**ride** [1] - 348:25
**rider** [2] - 257:20,
261:9
**riding** [2] - 250:14,
258:24
**rigid** [2] - 293:17,
293:21
**risk** [2] - 262:23,
384:18
**River** [1] - 320:9
**Robert** [2] - 320:12,
320:25
**Rockefeller** [1] - 320:5
**rod** [2] - 282:9, 282:25
**Rodding** [1] - 292:15
**rode** [3] - 251:2,
257:21, 342:12
**role** [2] - 358:19, 392:1
**Room** [2] - 232:23,
409:25
**room** [2] - 248:5,
374:24, 380:17
**rotation** [2] - 283:10,
283:14
**rotational** [1] - 283:24
**ROTC** [1] - 318:5
**roughly** [3] - 390:22,

431

391:6
**routine** [1] - 402:24
**row** [3] - 262:17,
262:24, 263:12
**rows** [1] - 263:14
**rule** [10] - 235:10,
235:11, 290:19,
306:15, 373:25,
374:5, 374:15,
378:4, 382:19,
382:21
**Rule** [8] - 235:18,
279:22, 370:4,
373:7, 382:14,
382:16, 383:5,
384:12
**ruled** [5] - 242:12,
299:10, 300:25,
378:21, 379:21
**rules** [4] - 302:15,
310:18, 311:10,
383:16
**Rules** [1] - 384:12
**ruling** [27] - 236:22,
245:6, 296:3,
296:17, 296:20,
296:21, 296:22,
296:25, 297:3,
297:16, 297:17,
297:21, 297:24,
298:22, 298:23,
299:4, 301:2,
301:15, 301:19,
301:24, 302:12,
305:7, 313:9,
314:14, 375:17,
379:12, 385:6
**run** [1] - 306:1
**rung** [1] - 261:21
**running** [1] - 393:23
**rush** [2] - 370:22,
399:2

**S**

**safe** [6] - 330:13,
334:4, 336:25,
344:2, 383:4, 384:21
**safely** [3] - 319:4,
319:5, 352:12
**safer** [1] - 334:3
**safety** [33] - 315:21,
315:23, 316:2,
316:3, 319:9, 323:3,
324:4, 324:5, 325:5,
325:7, 327:2, 327:7,
327:12, 328:20,
333:14, 333:25,
334:25, 335:3,
335:10, 337:18,
337:19, 338:3,

344:23, 345:7,
346:25, 347:2,
350:24, 352:9
**sample** [1] - 333:21
**San** [8] - 328:2,
331:10, 331:14,
344:4, 355:13,
355:19, 356:11,
356:12
**sandbag** [1] - 239:5
**sat** [3] - 265:4, 268:6,
364:12
**satisfied** [2] - 314:7,
314:14
**save** [2] - 322:5,
329:23
**saw** [25] - 262:6,
271:9, 272:2,
272:16, 273:12,
273:14, 273:21,
274:4, 277:25,
279:6, 284:23,
285:15, 285:16,
286:6, 286:24,
287:25, 288:4,
288:20, 289:4,
289:9, 289:11,
290:20, 290:24,
355:22
**scan** [6] - 267:13,
267:15, 267:19,
290:9, 290:12
**scene** [1] - 396:8
**schedule** [1] - 407:19
**scheduling** [1] -
366:14
**scholarly** [1] - 325:1
**School** [1] - 318:1
**school** [6] - 318:19,
319:20, 321:15,
322:18, 325:4
**schools** [2] - 316:24,
322:19
**scientific** [1] - 285:1
**scope** [3] - 296:1,
302:17, 361:3
**SCOTT** [3] - 232:3,
233:4, 246:18
**Scott** [38] - 234:3,
234:8, 234:18,
236:3, 243:23,
245:22, 246:5,
246:8, 246:10,
246:14, 246:21,
247:25, 248:3,
250:7, 256:3,
268:16, 275:2,
277:4, 277:10,
277:24, 278:24,
285:9, 285:11,

286:24, 290:6,
290:20, 325:24,
329:1, 349:8, 350:8,
361:19, 383:23,
384:22, 385:10,
394:20, 396:12,
396:24, 404:17
**Scott's** [10] - 246:12,
256:2, 290:17,
292:14, 335:4,
347:3, 348:17,
359:18, 385:25,
396:15
**screaming** [1] -
251:22
**screen** [6] - 304:2,
338:15, 359:18,
369:6, 373:17,
377:10, 379:3, 402:8
**screw** [5] - 283:5,
283:12, 283:14,
283:23, 283:24
**scroll** [2] - 339:2,
339:3
**se** [1] - 396:18
**search** [2] - 334:9,
341:13
**seat** [13] - 254:6,
258:8, 259:18,
261:18, 263:25,
264:1, 264:4, 275:3,
295:6, 295:21,
349:20, 349:22,
389:12
**seated** [8] - 234:9,
245:25, 262:13,
262:16, 263:8,
349:17, 351:6
**seating** [2] - 253:21,
262:17
**seats** [12] - 261:24,
262:22, 262:25,
263:5, 263:12,
263:13, 263:15,
263:21, 340:10,
340:11, 340:12
**Seattle** [1] - 326:2
**second** [10] - 282:21,
283:4, 283:5,
338:18, 338:19,
343:3, 359:19,
369:7, 401:4, 401:6
**secondary** [1] - 345:23
**seconds** [1] - 251:18
**secret** [1] - 331:22
**secretary** [1] - 322:3
**Section** [1] - 336:13
**sections** [1] - 357:1
**secure** [2] - 283:7,
385:15

**Security** [2] - 331:25,
332:2
**see** [43] - 241:19,
247:21, 262:1,
265:7, 274:17,
276:22, 278:24,
279:8, 280:7,
280:14, 281:3,
283:2, 284:2, 284:3,
285:24, 290:9,
293:16, 293:23,
293:24, 294:11,
319:22, 325:10,
328:18, 335:17,
335:18, 338:23,
356:11, 356:20,
356:25, 357:6,
357:8, 360:2, 365:6,
382:20, 385:12,
388:1, 388:23,
388:25, 398:1,
407:23, 408:15,
409:5
**seeing** [6] - 271:7,
271:14, 272:1,
274:11, 293:15,
339:3
**seek** [2] - 234:23,
302:3
**seeking** [1] - 297:9
**sees** [1] - 244:18
**selected** [1] - 371:11
**self** [2] - 353:13
**self-imposed** [2] -
353:13
**Senate** [2] - 270:3,
270:18
**Send** [1] - 241:8
**send** [4] - 300:2,
300:6, 380:17,
408:14
**sends** [1] - 331:12
**senior** [1] - 354:3
**sense** [9] - 310:7,
325:8, 361:14,
361:16, 364:23,
364:24, 367:7,
388:14, 404:21
**sent** [5] - 241:10,
278:11, 342:6,
342:7, 346:10
**separate** [3] - 241:18,
241:21, 400:21
**SEPTA** [2] - 331:7,
356:4
**September** [10] -
261:17, 284:10,
292:15, 292:25,
335:4, 337:8, 347:3,
392:6, 394:19,

395:13
**sequential** [1] - 318:13
**series** [6] - 246:5,
404:2, 404:3, 404:4,
404:5, 407:1
**serious** [3] - 285:22,
291:4, 345:21
**seriously** [1] - 309:13
**serve** [1] - 326:8
**served** [1] - 276:9
**serves** [1] - 331:14
**service** [5] - 270:12,
292:11, 317:1,
331:14
**Services** [1] - 383:22
**set** [8] - 269:19, 280:2,
320:19, 333:5,
354:8, 388:21,
401:18, 401:19
**setting** [5] - 239:24,
354:10, 354:13,
358:5, 358:22
**seven** [3] - 251:17,
324:2, 375:14
**several** [10] - 251:11,
283:13, 294:8,
326:10, 349:1,
349:6, 355:10,
397:15, 399:4,
403:19
**severe** [2] - 278:19,
290:5
**sex** [1] - 382:3
**shall** [2] - 402:23,
403:4
**share** [1] - 277:10
**shared** [2] - 290:6,
343:22
**shifted** [1] - 245:4
**shish** [2] - 282:17,
283:10
**short** [20] - 250:16,
251:14, 291:7,
329:9, 349:1, 349:5,
365:12, 365:17,
369:23, 393:8,
393:14, 394:7,
395:1, 396:1, 397:2,
397:15, 397:18,
398:17, 398:25,
406:11
**shortage** [1] - 319:17
**shortens** [2] - 368:16,
368:17
**shot** [2] - 278:11,
379:7
**shoulder** [2] - 264:19,
350:21
**show** [8] - 282:23,
283:19, 293:6,

310:20, 311:21, 316:13, 335:19, 376:19
**showed** [1] - 234:22
**showing** [4] - 281:25, 293:12, 369:6, 378:13
**shown** [7] - 246:6, 280:14, 292:3, 373:16, 376:25, 377:6, 384:1
**shows** [6] - 281:24, 283:22, 284:9, 294:1, 294:2, 381:13
**shut** [3] - 269:10, 269:12
**sic** [1] - 346:9
**sick** [3] - 332:22, 382:2, 382:4
**side** [19] - 247:10, 254:17, 255:5, 259:20, 260:9, 262:18, 262:20, 263:5, 274:9, 283:9, 320:22, 326:6, 349:11, 349:14, 355:2, 392:18
**sides** [3] - 320:8, 326:3, 349:15
**sign** [1] - 331:24
**signal** [8] - 393:15, 393:20, 393:21, 393:22, 393:23, 393:24, 394:6, 406:12
**signaling** [2] - 251:19, 252:5
**significance** [1] - 372:2
**significant** [4] - 281:17, 281:21, 285:22, 293:10
**signs** [1] - 293:12
**silly** [2] - 238:10, 259:18
**simple** [1] - 319:3
**simply** [2] - 312:22, 314:16
**single** [4] - 237:12, 241:12, 249:3, 371:4
**sit** [8] - 258:3, 258:7, 258:17, 260:18, 262:22, 262:24, 398:7, 398:16
**sitting** [5] - 251:24, 252:6, 259:18, 263:14, 277:4
**situation** [8] - 240:1, 240:17, 245:2, 300:10, 330:19,

337:20, 340:7, 352:2
**situations** [2] - 340:16, 391:20
**six** [9] - 251:6, 251:12, 251:17, 251:18, 324:2, 390:22, 391:7, 391:14, 397:18
**Skyline** [3] - 327:25, 328:1, 331:11
**slid** [2] - 263:25, 264:1
**slide** [2] - 359:25, 360:11
**slightly** [1] - 339:18
**slow** [1] - 322:8
**slower** [2] - 293:18, 293:21
**small** [2] - 280:8, 280:9
**snug** [1] - 282:16
**so..** [1] - 291:14
**societies** [1] - 324:14
**society** [1] - 324:22
**soft** [3] - 278:16, 282:13, 285:23
**softening** [1] - 278:14
**softer** [1] - 282:15
**solid** [1] - 282:2
**solution** [1] - 243:2
**solves** [1] - 243:3
**someone** [7] - 311:11, 325:22, 334:19, 395:16, 396:19, 405:18
**sometime** [4] - 273:4, 273:16, 335:24, 358:10
**sometimes** [5] - 258:4, 258:22, 261:5, 265:24, 331:24
**somewhat** [1] - 293:21
**somewhere** [2] - 300:22, 388:16
**soon** [1] - 388:1
**sooner** [1] - 293:23
**soonest** [1] - 313:24
**SOP** [7] - 401:16, 401:21, 402:9, 402:12, 402:19, 403:2, 407:2
**SOPs** [17] - 329:6, 333:18, 342:7, 348:14, 354:20, 354:23, 355:6, 355:15, 355:22, 355:25, 356:20, 356:25, 357:6, 357:8, 359:1, 359:2, 401:18
**sorry** [33] - 254:7,

258:12, 265:17, 266:6, 271:5, 276:2, 279:3, 284:17, 321:16, 321:17, 323:25, 325:15, 332:19, 334:20, 334:22, 336:7, 338:20, 345:10, 348:9, 353:4, 353:5, 353:25, 354:3, 355:18, 359:3, 359:24, 361:6, 371:22, 380:18, 386:22, 390:2, 394:24, 402:11
**sort** [11] - 236:17, 242:22, 243:3, 278:20, 281:4, 282:15, 282:17, 304:4, 304:23, 331:1, 356:15
**sorted** [1] - 379:16
**sound** [2] - 279:4, 311:7
**sounds** [2] - 274:6, 279:5
**source** [2] - 238:10, 309:1
**speaking** [5] - 309:21, 332:14, 332:16, 332:18, 399:8
**specific** [3] - 343:22, 397:11, 401:21
**specifically** [5] - 270:8, 288:3, 291:9, 355:11, 385:10
**specifics** [1] - 348:3
**specifies** [1] - 305:12
**speculative** [1] - 298:9
**speed** [1] - 340:7
**speeds** [1] - 261:5
**spell** [2] - 333:21, 338:11
**spend** [1] - 388:15
**spent** [2] - 319:18, 319:21
**spin** [1] - 283:11
**spoken** [1] - 265:16
**spot** [1] - 337:10
**Square** [18] - 250:10, 250:24, 251:1, 251:16, 254:9, 254:16, 258:10, 258:11, 262:2, 262:14, 263:24, 265:18, 266:3, 349:10, 349:18, 396:8, 397:19, 405:1
**stable** [4] - 258:24, 259:1, 293:19, 351:2

**staff** [1] - 311:22
**staffers** [1] - 270:3
**staffs** [1] - 270:17
**staircase** [1] - 362:15
**stamped** [1] - 241:14
**Stand** [6] - 395:3, 399:15, 400:5, 401:11, 404:12, 404:14
**stand** [27] - 238:18, 243:23, 243:24, 258:1, 258:4, 258:21, 280:22, 281:2, 284:13, 298:17, 305:25, 313:9, 351:5, 353:14, 368:18, 389:13, 389:25, 394:16, 395:5, 398:20, 400:8, 400:16, 400:18, 401:25, 405:20, 407:21
**Standard** [2] - 338:6, 361:12
**standard** [66] - 297:11, 298:20, 299:8, 299:16, 301:23, 302:5, 302:16, 327:8, 328:19, 329:6, 329:12, 329:14, 329:15, 330:4, 330:9, 330:12, 330:15, 330:22, 331:17, 332:4, 332:17, 332:20, 333:9, 333:13, 333:22, 333:25, 334:6, 335:2, 335:12, 336:22, 337:7, 337:11, 338:8, 338:9, 338:23, 339:10, 339:16, 340:17, 340:18, 341:4, 344:17, 345:3, 346:6, 346:10, 346:15, 347:1, 347:9, 353:22, 353:23, 354:5, 354:6, 354:9, 354:10, 354:13, 354:14, 354:18, 354:20, 354:21, 355:4, 355:7, 357:13, 386:9, 386:10, 395:9, 402:23, 403:10
**standards** [3] - 333:5, 334:1, 355:5

**standing** [7] - 258:2, 261:22, 275:11, 315:7, 400:10, 400:19, 405:19
**stands** [1] - 245:12
**start** [11] - 234:17, 281:4, 289:22, 303:9, 306:8, 320:18, 329:20, 340:2, 340:5, 390:11, 409:4
**started** [9] - 314:25, 322:17, 327:13, 334:12, 334:13, 341:15, 345:22, 357:17, 391:8
**starting** [3] - 234:5, 319:15, 320:16
**starts** [6] - 307:2, 340:5, 398:10, 401:23, 406:20, 407:18
**State** [1] - 319:14
**state** [4] - 234:6, 236:6, 315:16, 320:7
**statement** [38] - 236:6, 236:14, 244:8, 252:11, 304:16, 305:2, 305:20, 309:15, 359:18, 359:23, 360:12, 360:14, 361:9, 361:10, 372:22, 372:23, 372:25, 373:6, 373:7, 373:21, 374:6, 374:7, 374:14, 376:5, 376:6, 376:9, 376:13, 376:19, 376:22, 377:8, 377:23, 377:25, 378:7, 378:11, 378:18, 398:8, 398:10, 398:13
**statement's** [1] - 340:9
**statements** [9] - 244:21, 245:13, 305:5, 305:13, 306:5, 313:3, 329:5, 369:20, 371:17
**Staten** [1] - 321:22
**States** [4] - 327:25, 341:19, 383:22, 409:24
**STATES** [2] - 232:1, 232:11
**station** [27] - 255:12, 256:16, 259:19, 259:20, 262:6, 311:20, 329:9,

433

332:24, 333:16,
333:23, 339:22,
342:16, 342:17,
342:18, 342:19,
344:24, 350:11,
356:16, 360:23,
391:22, 392:17,
395:19, 395:23,
396:2, 399:9, 406:10
**Station** [1] - 339:25
**station's** [1] - 392:18
**stations** [7] - 251:7,
251:9, 260:3, 317:5,
345:19, 399:4,
404:25
**stay** [3] - 340:10,
344:1, 396:10
**Stay** [1] - 397:6
**stayed** [4] - 254:6,
268:6, 395:18,
396:23
**steady** [2] - 253:1,
264:6
**stenographic** [1] -
409:18
**step** [10] - 234:18,
264:16, 275:11,
300:8, 309:9, 315:6,
343:24, 387:16,
389:7
**stepped** [1] - 345:20
**steps** [1] - 264:14
**still** [16] - 240:20,
265:6, 269:5, 274:8,
286:4, 294:1, 304:4,
313:17, 332:18,
344:24, 347:21,
385:14, 389:6,
398:16, 404:10,
407:19
**stipulate** [1] - 240:1
**stipulated** [2] -
239:22, 381:5
**stipulation** [10] -
236:10, 236:13,
237:7, 240:7,
240:18, 240:23,
243:7, 381:22,
381:25, 383:1
**stock** [2] - 368:17,
389:3
**stood** [3] - 264:11,
264:21, 384:22
**stop** [25] - 238:25,
250:11, 250:16,
250:18, 251:5,
260:4, 260:6,
283:10, 283:14,
333:15, 378:12,
392:21, 393:8,

393:13, 393:17,
393:23, 395:23,
395:24, 396:2,
397:3, 398:23,
399:8, 406:11,
406:13, 406:15
**stopped** [28] - 250:11,
253:25, 254:17,
255:14, 255:16,
255:17, 256:8,
256:10, 256:18,
257:10, 257:12,
260:24, 261:20,
269:20, 320:23,
320:24, 324:8,
349:5, 349:9,
350:10, 360:22,
363:12, 385:1,
385:5, 395:1,
397:15, 398:17,
405:9
**stopping** [8] - 251:14,
345:18, 349:1,
365:3, 396:1, 397:2,
397:17, 399:4
**stops** [16] - 251:1,
257:3, 329:9, 337:9,
339:22, 340:1,
349:3, 349:6,
393:24, 394:4,
394:6, 394:7,
398:25, 406:16,
406:17, 407:17
**straight** [1] - 375:24
**strap** [1] - 340:13
**straps** [2] - 265:12,
265:15
**Street** [1] - 232:14
**strength** [1] - 287:20
**strike** [3] - 259:22,
377:24, 401:5
**strong** [1] - 267:25
**strongly** [1] - 311:2
**stuck** [1] - 274:22
**student** [1] - 319:22
**studies** [1] - 330:21
**study** [1] - 345:15
**stuff** [2] - 289:20,
319:21
**subject** [12] - 235:14,
301:19, 311:19,
314:18, 333:6,
333:7, 333:8, 335:7,
365:12, 366:25,
367:2, 384:5
**submission** [2] -
239:8, 303:17
**submit** [2] - 277:13,
387:9
**substance** [2] - 306:6,

329:20
**subtroch** [2] - 281:13,
284:5
**subtrochanteric** [4] -
279:7, 281:16,
282:1, 282:20
**subway** [10] - 299:17,
325:22, 327:6,
327:10, 330:13,
331:1, 331:2,
331:17, 334:6, 362:5
**subways** [4] - 321:13,
327:12, 331:2, 331:3
**suddenly** [1] - 340:5
**sufficient** [3] - 240:10,
301:20, 317:19
**suggest** [1] - 378:14
**suggested** [1] -
374:13
**suggesting** [1] - 378:2
**suggests** [1] - 378:17
**suit** [1] - 344:21
**Suite** [2] - 232:14,
232:19
**suits** [1] - 326:4
**summaries** [1] -
236:20
**summarize** [1] -
303:12
**summary** [23] -
235:18, 236:21,
237:19, 237:24,
239:8, 239:21,
239:22, 242:5,
242:6, 242:21,
243:3, 248:20,
249:11, 249:25,
316:21, 317:13,
352:18, 384:19,
385:6, 386:12,
386:16, 386:20,
387:1
**superimposes** [1] -
292:22
**supervisor** [4] -
391:18, 391:19,
395:19, 396:7
**supplement** [2] -
358:10, 367:14
**supplemental** [4] -
301:20, 335:24,
336:2, 336:14
**supplied** [1] - 378:18
**support** [4] - 301:21,
350:1, 350:6, 360:11
**suppose** [2] - 235:17,
311:13
**supposed** [6] -
307:11, 308:21,
394:5, 394:8, 399:8,

400:8
**surgeon** [6] - 271:12,
272:9, 275:21,
276:4, 276:9, 287:2
**surgeons** [4] - 274:13,
274:19, 284:9
**surgeries** [1] - 280:4
**Surgery** [1] - 292:15
**surgery** [11] - 272:7,
272:10, 276:6,
277:14, 277:18,
283:16, 283:17,
284:8, 284:9, 294:6,
294:8
**surgical** [5] - 281:18,
281:25, 285:4,
288:5, 288:6
**surgically** [2] - 279:8,
287:4
**surprise** [2] - 290:14,
295:16
**surprised** [1] - 235:1
**surprises** [1] - 295:10
**sustain** [1] - 246:11
**sustained** [8] - 259:24,
279:7, 326:20,
336:16, 341:25,
361:18, 361:24,
362:1
**Swain** [2] - 255:11,
255:20
**Swain's** [2] - 254:20,
254:24
**sweep** [1] - 332:24
**switched** [1] - 258:13
**Sworn** [2] - 275:13,
315:9
**sworn** [1] - 390:3
**symptoms** [1] - 366:18
**system** [9] - 261:12,
321:5, 325:23,
325:24, 330:17,
339:18, 340:19,
342:22, 352:10
**System** [1] - 319:16
**systems** [11] - 327:10,
328:8, 331:1, 331:2,
331:17, 334:6,
340:20, 341:11,
342:9, 344:17,
344:20
**systems'** [1] - 341:19

## T

**table** [4] - 234:9,
275:3, 277:5, 403:3
**tables** [2] - 381:3,
383:21
**tad** [1] - 263:21

**talks** [2] - 305:11,
307:3
**tall** [1] - 399:25
**taught** [2] - 316:24,
324:3
**team** [1] - 276:11
**tech** [2] - 378:25,
379:11
**technical** [2] - 300:11,
379:20
**technically** [2] - 243:6,
380:16
**technology** [1] -
327:15
**tee** [1] - 375:3
**teed** [1] - 374:3
**ten** [7] - 251:18,
305:15, 324:7,
324:8, 375:14, 388:3
**ten-minute** [1] - 388:3
**tendered** [2] - 250:3,
296:9
**tenure** [2] - 317:8,
317:9
**terminology** [1] -
340:20
**terms** [16] - 295:25,
298:12, 323:2,
323:5, 323:24,
327:18, 328:19,
328:20, 333:25,
341:4, 344:16,
344:23, 352:11,
357:12, 358:4,
392:24
**testified** [17] - 241:17,
248:18, 250:9,
251:5, 253:23,
255:2, 255:11,
255:20, 268:16,
286:10, 292:9,
306:2, 369:18,
384:23, 385:10,
385:12
**testify** [15] - 242:9,
277:17, 284:25,
285:4, 297:5,
297:11, 299:11,
302:13, 302:15,
303:4, 308:12,
335:9, 366:10,
367:15, 386:8
**testifying** [6] - 285:2,
325:21, 351:14,
367:11, 385:2, 408:6
**testimonial** [1] - 352:7
**Testimony** [1] - 308:9
**testimony** [58] -
234:19, 236:17,
243:13, 250:10,

434

250:12, 254:8,
254:20, 254:24,
255:13, 256:3,
256:8, 256:18,
256:23, 257:2,
257:15, 257:16,
279:19, 294:17,
294:18, 297:22,
298:2, 298:9,
301:21, 310:16,
348:17, 349:4,
349:16, 350:9,
352:3, 353:15,
363:19, 363:21,
364:11, 369:13,
369:17, 369:21,
372:10, 376:14,
378:3, 379:18,
380:4, 380:13,
383:16, 384:1,
384:25, 385:18,
385:19, 385:25,
386:9, 386:13,
388:17, 397:14,
407:10, 408:24,
408:25

**that..** [1] - 384:3
**THE** [339] - 232:1,
232:1, 232:11,
234:2, 234:10,
234:15, 235:8,
235:10, 235:13,
235:15, 235:23,
236:4, 237:3,
237:13, 237:16,
237:18, 237:21,
237:23, 238:1,
238:5, 238:11,
238:15, 238:20,
238:23, 238:25,
239:10, 240:11,
240:14, 241:4,
241:25, 242:3,
242:19, 243:2,
243:11, 243:13,
243:16, 243:19,
243:24, 244:1,
244:2, 244:10,
245:11, 245:17,
245:19, 245:23,
245:25, 247:12,
247:15, 247:25,
248:19, 249:8,
249:10, 249:11,
249:13, 249:14,
249:15, 249:16,
249:19, 249:23,
250:1, 255:23,
259:24, 260:18,
260:21, 275:2,
275:4, 275:6, 275:9,

275:10, 275:11,
275:24, 276:2,
277:16, 277:21,
280:1, 280:5, 280:7,
280:11, 280:15,
280:17, 280:18,
280:19, 280:25,
281:3, 284:17,
284:20, 285:7,
286:15, 291:21,
291:24, 294:16,
294:20, 294:21,
295:1, 295:6,
295:10, 295:21,
296:12, 296:14,
296:20, 297:9,
297:13, 297:23,
298:1, 298:4,
298:15, 298:23,
299:23, 300:8,
300:10, 300:22,
301:9, 301:14,
301:18, 302:21,
302:24, 303:7,
303:9, 303:15,
303:22, 304:8,
304:10, 304:12,
304:19, 304:21,
306:3, 306:8,
306:19, 306:25,
307:2, 307:15,
307:18, 308:5,
309:3, 309:24,
310:23, 311:3,
311:15, 312:2,
312:12, 312:17,
313:1, 313:6, 313:9,
313:20, 314:1,
314:5, 314:9,
314:12, 314:18,
314:21, 314:24,
315:4, 315:5, 315:6,
315:8, 316:16,
317:16, 317:18,
322:21, 322:25,
323:7, 323:12,
323:14, 323:20,
326:20, 326:24,
329:19, 329:25,
330:6, 332:9,
332:14, 332:17,
332:18, 332:19,
332:20, 335:7,
335:22, 336:16,
336:20, 337:15,
338:16, 338:17,
338:20, 338:22,
341:2, 341:25,
343:2, 343:6,
343:15, 344:1,
347:8, 347:17,

352:5, 359:12,
359:20, 359:24,
360:2, 360:6,
360:15, 361:4,
361:6, 361:7, 361:8,
361:18, 361:24,
361:25, 362:1,
362:3, 362:9,
362:20, 363:18,
363:20, 363:21,
363:23, 363:25,
364:4, 364:10,
364:15, 364:21,
365:3, 365:8,
365:10, 365:15,
365:25, 366:5,
366:11, 367:4,
367:9, 367:16,
367:19, 368:5,
368:11, 368:15,
368:17, 369:2,
369:5, 369:9,
369:16, 369:24,
370:1, 370:5, 370:8,
370:24, 371:2,
371:8, 371:10,
371:23, 372:4,
372:6, 372:11,
372:16, 373:24,
374:5, 374:15,
374:19, 374:22,
375:2, 375:7, 375:9,
375:16, 376:1,
376:3, 376:8,
376:12, 376:16,
376:24, 377:1,
377:5, 377:8,
377:15, 377:18,
377:21, 377:23,
378:9, 378:21,
378:23, 379:4,
379:6, 379:13,
379:15, 380:3,
380:9, 380:14,
380:22, 381:4,
381:7, 381:11,
381:17, 382:9,
382:15, 382:19,
382:24, 383:4,
383:11, 384:6,
387:8, 387:14,
387:18, 387:24,
388:8, 388:18,
388:20, 389:3,
389:9, 389:11,
389:12, 389:14,
389:16, 389:25,
390:23, 391:4,
394:24, 395:3,
395:5, 395:6, 395:7,
399:24, 401:13,

402:10, 406:9,
406:16, 406:17,
406:18, 406:20,
406:23, 406:25,
407:4, 407:5, 407:8,
407:12, 407:13,
407:16, 408:4,
408:10, 408:20,
408:25, 409:5, 409:7
**theirs** [1] - 356:11
**theirself** [1] - 395:16
**themselves** [9] -
337:20, 337:25,
338:1, 351:2,
353:11, 353:12,
354:9, 355:1, 357:10
**therapist** [1] - 273:5
**therefore** [2] - 307:23,
312:19
**they've** [1] - 344:23
**thigh** [1] - 281:10
**third** [4] - 283:8,
319:25, 328:11,
328:12
**thorn** [1] - 320:21
**three** [5] - 265:21,
281:11, 282:9,
303:13, 366:25
**threshold** [1] - 236:19
**throughout** [2] -
283:16, 399:19
**timely** [1] - 386:17
**tissue** [1] - 285:23
**title** [3] - 292:14,
292:25, 304:4
**titled** [1] - 296:22
**today** [21] - 252:16,
257:2, 257:11,
257:15, 277:11,
286:10, 292:9,
315:20, 336:5,
336:8, 365:22,
366:4, 370:22,
382:1, 382:4,
388:13, 388:24,
398:7, 398:16,
407:17, 407:18
**together** [2] - 282:5,
403:2
**tomorrow** [16] -
305:25, 306:21,
310:10, 313:19,
313:21, 365:21,
366:19, 380:13,
381:20, 388:17,
388:23, 407:20,
407:24, 408:1,
408:4, 408:21
**tomorrow's** [1] - 382:5
**tonight** [1] - 408:7

**took** [2] - 322:8,
363:23
**top** [3] - 282:10,
331:22, 338:23
**topic** [2] - 308:9,
309:22
**topics** [1] - 303:5
**total** [6] - 242:19,
246:9, 247:18,
248:8, 248:9, 249:6
**touched** [1] - 373:4
**toward** [2] - 264:21,
408:8
**towards** [3] - 273:4,
340:2, 379:18
**town** [3] - 259:13,
259:14, 266:9
**track** [8] - 255:5,
327:5, 393:17,
393:19, 393:25,
394:2, 394:6, 406:13
**tracks** [2] - 255:4,
260:10
**traction** [1] - 282:5
**traffic** [2] - 236:14,
260:7
**train** [207] - 250:11,
250:16, 252:17,
253:10, 253:14,
253:25, 254:5,
254:17, 254:21,
254:25, 255:12,
255:14, 256:8,
256:10, 256:18,
256:25, 257:3,
257:7, 257:10,
257:12, 257:13,
258:2, 258:16,
258:24, 259:8,
259:9, 259:12,
259:19, 259:25,
260:6, 261:3,
261:20, 261:23,
262:9, 262:18,
262:21, 263:10,
263:19, 264:11,
264:15, 265:1,
299:18, 306:12,
306:13, 311:20,
325:23, 327:7,
327:16, 328:8,
328:9, 328:24,
329:8, 329:9,
330:13, 333:1,
333:16, 334:14,
334:15, 337:3,
337:7, 337:9, 338:4,
338:10, 339:6,
339:11, 339:13,
339:22, 339:23,

339:25, 340:2,
340:3, 340:5, 340:6,
341:16, 341:17,
342:15, 342:17,
342:20, 344:25,
345:15, 346:25,
348:25, 349:5,
349:9, 349:11,
349:13, 349:18,
350:10, 350:14,
351:3, 351:5,
351:23, 351:24,
352:1, 357:18,
357:20, 358:20,
358:21, 358:23,
360:22, 360:24,
361:2, 361:20,
361:21, 362:5,
362:12, 362:13,
362:17, 362:25,
363:5, 363:8,
363:12, 372:14,
385:1, 385:3,
385:11, 385:14,
390:18, 390:19,
390:21, 391:6,
391:23, 392:8,
392:13, 392:16,
392:23, 393:1,
393:8, 393:9,
393:13, 393:15,
393:16, 393:22,
393:24, 394:2,
394:3, 394:6, 394:7,
394:16, 394:17,
395:1, 395:4, 395:5,
395:17, 396:15,
397:15, 397:17,
398:17, 398:22,
398:25, 399:3,
399:6, 399:13,
399:15, 399:18,
399:19, 399:21,
400:9, 400:11,
400:12, 400:14,
400:16, 400:17,
400:18, 400:20,
400:23, 400:25,
401:7, 401:15,
401:18, 401:22,
401:23, 401:25,
402:21, 403:4,
403:9, 403:11,
403:14, 403:21,
404:2, 404:3, 404:4,
404:12, 404:14,
405:1, 405:8, 405:9,
405:13, 405:19,
405:20, 405:21,
405:22, 405:24,
406:10, 406:12,

406:13, 406:20,
407:1
train's [5] - 260:2,
260:3, 397:6,
398:22, 399:15
trainer [3] - 334:15,
341:17, 358:24
training [6] - 270:12,
276:18, 318:6,
319:19, 319:22,
357:18
trains [22] - 253:20,
255:4, 258:13,
260:9, 260:24,
261:5, 261:11,
319:6, 332:25,
338:3, 342:12,
345:18, 345:20,
346:17, 347:10,
391:23, 391:24,
393:22, 399:3,
400:5, 401:11, 404:8
TRANSCRIPT [1] -
232:10
transcript [6] - 234:21,
374:2, 374:16,
378:1, 409:18,
409:19
transcripts [2] -
328:22, 348:6
TRANSIT [1] - 232:7
Transit [13] - 234:4,
234:13, 321:13,
321:23, 326:8,
331:6, 331:8,
334:14, 334:17,
344:19, 344:21,
358:3, 358:6
transit [30] - 321:5,
321:15, 324:20,
325:24, 326:1,
326:14, 327:24,
328:6, 330:17,
331:21, 341:10,
341:21, 342:6,
342:8, 342:9,
344:17, 346:3,
350:23, 351:10,
351:18, 351:19,
351:20, 352:10,
352:19, 352:21,
353:2, 353:6,
354:11, 355:10,
355:25
transport [2] - 302:1,
328:8
Transportation [6] -
319:15, 321:19,
333:5, 345:6,
345:13, 346:15

transportation [30] -
300:19, 315:21,
315:23, 315:25,
316:1, 318:21,
318:23, 318:25,
319:5, 319:9,
319:23, 319:24,
320:6, 320:16,
320:17, 320:18,
321:4, 322:3, 323:3,
324:4, 324:16,
324:22, 327:2,
327:12, 327:23,
328:13, 333:3,
334:25, 335:10,
344:22
travel [3] - 263:10,
269:11, 349:18
traveling [1] - 269:11
treated [6] - 249:3,
267:1, 267:8, 268:8,
279:8, 287:4
treating [7] - 267:9,
274:18, 277:3,
277:19, 277:24,
285:3
treatment [6] - 247:6,
248:4, 268:19,
270:19, 281:25,
325:11
Tren [2] - 328:2,
331:13
TRIAL [1] - 232:10
trial [6] - 240:8,
244:16, 246:3,
371:14, 377:9,
377:13
tribal [2] - 270:12,
270:18
tried [2] - 304:1, 334:8
tripped [1] - 268:9
tripping [1] - 262:23
trochanter [7] - 281:9,
282:10, 282:11,
284:6, 284:7
trochanters [3] -
281:8, 281:13,
281:17
trouble [1] - 272:8
true [5] - 244:19,
308:7, 361:9,
409:17, 409:19
truthfulness [1] -
303:2
try [12] - 271:21,
287:18, 287:19,
289:14, 297:6,
299:2, 306:1,
323:23, 341:20,
373:11, 387:22,

407:24
trying [5] - 239:5,
370:22, 374:9,
388:9, 394:11
tube [1] - 282:12
Tuesday [1] - 232:5
tunnel [1] - 393:5
turn [1] - 336:13
turns [2] - 260:9,
260:12
TV [1] - 317:5
two [31] - 239:7,
239:12, 253:13,
255:4, 263:14,
265:21, 272:16,
282:8, 284:21,
293:4, 294:8, 295:7,
295:9, 295:17,
299:2, 305:9,
307:18, 319:19,
319:21, 349:15,
351:25, 365:11,
365:17, 369:22,
370:2, 381:14,
381:24, 388:7,
388:16, 399:8
two-minute [2] -
295:7, 295:9
type [4] - 341:9,
343:10, 344:15,
360:13
types [3] - 284:21,
342:14, 393:13
typically [2] - 281:11,
344:16

U

U.S [1] - 232:23
UITP [1] - 324:19
unaware [1] - 305:14
uncommon [1] -
290:16
under [16] - 235:18,
306:2, 306:15,
310:16, 311:10,
335:3, 336:13,
336:23, 337:17,
347:2, 367:14,
376:9, 377:25,
378:4, 387:9, 405:24
undergraduate [1] -
317:24
underground [1] -
331:14
underlying [1] -
236:22
Understood [1] -
378:22
understood [6] -

238:15, 348:22,
372:5, 376:17,
382:7, 400:12
uneven [1] - 266:4
unfairly [1] - 308:4
unfortunately [3] -
325:6, 342:14,
372:13
union [5] - 341:18,
357:19, 358:4,
358:20, 358:21
UNITED [2] - 232:1,
232:11
United [4] - 327:24,
341:19, 383:22,
409:24
universal [1] - 333:8
universe [1] - 313:4
universities [1] -
324:3
unless [2] - 311:8,
333:19
unmute [1] - 281:1
unproduced [1] -
239:15
unrelated [2] - 278:2,
309:2
unsafe [1] - 340:16
unstable [3] - 282:1,
282:20, 283:3
untruthful [1] - 373:9
unusual [2] - 240:17,
318:1
up [93] - 238:12,
244:7, 244:10,
244:14, 245:21,
251:16, 251:25,
252:6, 252:9,
252:12, 252:15,
252:20, 252:21,
255:6, 258:2,
261:20, 264:2,
264:4, 264:11,
264:21, 265:4,
269:19, 271:10,
271:16, 275:11,
279:9, 280:2,
281:23, 282:4,
282:6, 283:5,
291:23, 295:1,
295:3, 301:9,
301:10, 310:21,
311:21, 315:4,
315:6, 320:19,
320:20, 333:5,
335:16, 339:2,
339:3, 340:1,
341:16, 345:23,
349:18, 349:20,
349:22, 350:3,

350:4, 350:6, 350:12, 358:23, 358:24, 359:18, 367:24, 368:8, 374:3, 375:3, 375:20, 375:22, 376:19, 377:8, 377:10, 379:7, 380:7, 380:9, 380:12, 380:15, 381:17, 382:14, 383:5, 384:22, 385:2, 385:14, 388:21, 389:12, 389:13, 390:24, 391:5, 395:22, 396:14, 400:2, 402:5, 407:6, 408:1, 408:13, 408:16
**update** [1] - 370:17
**updating** [1] - 371:6
**upside** [3] - 280:17, 280:18, 280:19
**Urbano** [2] - 328:2, 331:13
**USDOT** [1] - 322:3
**uses** [2] - 339:18, 340:19
**usual** [1] - 404:24

## V

**VA** [3] - 232:20, 258:15, 270:8
**validity** [1] - 298:5
**various** [5] - 248:4, 269:6, 354:12, 366:18, 393:18
**vehemently** [1] - 296:15
**vehicle** [1] - 325:10
**verbal** [1] - 407:1
**verbally** [1] - 403:18
**verbatim** [1] - 396:17
**verdict** [7] - 384:11, 385:7, 385:9, 386:23, 386:25, 387:7, 387:11
**veteran** [1] - 270:12
**veterans** [5] - 268:17, 269:22, 270:7, 270:19, 270:24
**via** [3] - 269:14, 270:24, 364:11
**vicinity** [1] - 350:3
**video** [24] - 233:11, 233:12, 233:13, 295:8, 295:9, 295:11, 304:2, 304:5, 364:11,

369:17, 369:20, 370:1, 370:2, 372:7, 372:13, 376:18, 378:12, 378:13, 379:1, 379:2, 379:11, 379:19, 379:20, 402:5
**videotaped** [4] - 369:13, 369:14, 379:17, 380:1
**Vienna** [10] - 250:23, 251:1, 255:4, 258:8, 258:9, 262:14, 348:24, 348:25, 349:3, 397:18
**view** [2] - 280:23, 284:3
**violated** [4] - 301:23, 308:7, 347:1, 347:11
**violently** [1] - 361:20
**Virginia** [2] - 276:23, 276:25
**visiting** [2] - 322:9, 322:10
**vitae** [1] - 316:17
**voice** [2] - 309:21, 390:24
**voir** [9] - 296:1, 296:9, 297:9, 298:7, 300:12, 302:6, 303:5, 314:6, 314:15
**volume** [1] - 240:4
**voluminous** [1] - 236:11
**volunteer** [2] - 330:23, 346:12
**VSOs** [1] - 270:14

## W

**wait** [3] - 243:21, 304:8, 306:25
**waited** [4] - 250:12, 250:22, 251:15, 251:17
**waiting** [3] - 251:24, 252:6, 405:23
**waived** [1] - 387:5
**walk** [3] - 353:25, 392:12, 392:15
**walking** [4] - 265:25, 340:2, 340:4, 340:6
**walks** [1] - 351:24
**wants** [11] - 241:19, 244:7, 295:20, 301:12, 305:25, 306:9, 307:21, 311:6, 312:5, 312:8, 364:9
**warn** [2] - 399:14,

401:22
**warning** [15] - 309:21, 327:7, 329:11, 333:14, 335:3, 337:9, 337:12, 337:16, 338:9, 347:2, 360:25, 361:13, 399:18, 400:22, 405:8
**warnings** [3] - 299:17, 335:12, 341:10
**Washington** [13] - 232:4, 232:15, 232:24, 234:3, 234:12, 326:7, 328:4, 331:7, 334:7, 342:7, 344:18, 344:21, 410:1
**WASHINGTON** [1] - 232:6
**waste** [2] - 238:17, 301:12
**Watch** [1] - 340:21
**water** [1] - 245:20
**WATERS** [148] - 232:18, 234:11, 235:19, 239:4, 239:11, 240:12, 240:16, 244:6, 245:10, 245:16, 248:17, 249:22, 249:24, 250:4, 250:6, 255:22, 256:1, 259:22, 260:15, 260:22, 260:23, 274:24, 277:15, 279:24, 280:13, 281:2, 286:16, 286:18, 291:19, 291:22, 291:25, 292:1, 294:13, 295:18, 295:23, 296:13, 297:7, 297:12, 297:15, 297:25, 298:3, 298:6, 302:18, 302:23, 303:6, 305:3, 306:4, 306:18, 306:22, 307:1, 307:6, 307:16, 308:1, 312:4, 312:13, 312:23, 313:2, 313:7, 313:18, 314:7, 314:10, 314:13, 314:20, 323:5, 323:10, 323:13, 326:19, 326:22, 329:18, 332:7, 332:10,

335:5, 336:15, 337:14, 340:25, 341:23, 342:25, 343:9, 343:19, 347:7, 347:18, 347:20, 359:8, 359:10, 360:10, 361:3, 361:16, 361:23, 362:8, 362:19, 362:21, 362:23, 363:17, 364:19, 364:25, 365:24, 366:2, 366:7, 366:14, 369:4, 370:11, 371:22, 371:24, 372:15, 372:19, 373:19, 374:4, 374:8, 375:4, 375:8, 376:18, 376:22, 376:25, 377:3, 379:5, 379:7, 381:12, 381:15, 382:10, 382:18, 382:22, 383:3, 383:10, 384:10, 387:12, 387:15, 387:20, 388:6, 388:9, 388:19, 389:1, 389:6, 389:18, 389:21, 390:2, 390:4, 391:2, 391:5, 395:8, 397:22, 399:22, 400:1, 401:10, 406:8, 407:7, 407:14, 408:5, 409:9
**Waters** [49] - 234:12, 235:3, 235:15, 235:24, 236:6, 241:8, 242:4, 243:6, 244:4, 249:19, 250:3, 280:16, 286:15, 295:15, 300:2, 302:6, 303:15, 304:23, 305:4, 306:3, 308:20, 309:25, 310:1, 310:6, 311:6, 311:22, 312:3, 323:1, 326:16, 347:17, 359:17, 361:19, 364:24, 370:8, 370:20, 371:5, 371:21, 373:3, 373:8, 373:12, 375:21, 378:2, 378:17, 379:4, 381:11, 382:9, 389:17, 394:25, 398:5

**waters** [1] - 311:14
**Waters's** [3] - 236:14, 374:12, 375:14
**waters)**.....................
..............**250** [1] -
233:5
**Waters)**.....................
..............**286** [1] -
233:7
**Waters)**.....................
..............**347** [1] -
233:9
**Waters)**.....................
..............**362** [1] -
233:10
**Waters)**.....................
............**389** [1] -
233:14
**ways** [1] - 381:24
**weakness** [1] - 286:1
**wear** [1] - 289:17
**wearing** [1] - 289:22
**weather** [1] - 369:11
**website** [1] - 333:9
**week** [3] - 299:15, 364:14, 377:13
**weeks** [1] - 299:2
**weird** [2] - 239:19, 239:25
**welcome** [5] - 244:3, 314:24, 369:9, 383:13, 389:16
**well-performed** [1] -
272:7
**Westpark** [1] - 232:19
**whatnot** [1] - 323:9
**whatsoever** [1] - 257:4
**wheelchair** [1] -
271:19
**whichever** [1] - 405:7
**white** [1] - 289:20
**whiteboard** [1] -
360:14
**whole** [4] - 265:5, 270:8, 307:3, 320:7
**whoops** [1] - 363:23
**WILD** [3] - 232:3, 233:4, 246:18
**Wild** [1] - 234:3
**WILSON** [1] - 232:19
**Wilson** [1] - 326:17
**window** [6] - 262:16, 262:25, 263:1, 263:25, 264:1, 379:1
**winds** [1] - 255:5
**withdraw** [2] - 239:18, 310:9
**withdrawn** [6] -
236:15, 236:25, 240:2, 298:2, 305:8,

326:23

**withdrew** [1] - 241:18

**WITNESS** [32] - 233:3, 244:1, 245:23, 249:10, 249:13, 249:15, 275:4, 275:10, 276:2, 280:17, 280:19, 281:3, 294:20, 315:5, 315:8, 332:19, 338:17, 338:20, 361:6, 361:8, 361:25, 363:20, 363:23, 389:11, 389:14, 395:3, 395:6, 406:16, 406:18, 406:23, 407:4, 407:12

**witness** [65] - 235:5, 235:20, 242:4, 244:18, 248:14, 248:17, 249:18, 250:3, 260:16, 275:7, 284:16, 284:19, 295:8, 296:8, 296:9, 298:7, 305:11, 305:13, 305:25, 306:5, 306:20, 308:8, 309:5, 309:6, 309:15, 311:15, 312:7, 312:21, 313:3, 313:16, 314:3, 316:15, 329:4, 335:21, 364:2, 364:5, 364:6, 367:5, 368:13, 370:9, 370:13, 371:13, 371:15, 372:11, 372:13, 373:8, 373:10, 373:15, 374:9, 374:13, 378:2, 378:3, 379:18, 387:17, 387:20, 387:25, 388:13, 388:18, 388:19, 388:25, 389:2, 389:4, 389:5, 390:3, 407:17

**witness's** [3] - 364:11, 376:13, 382:12

**witnesses** [13] - 284:21, 284:22, 284:23, 284:25, 285:3, 315:3, 365:12, 365:16, 365:17, 365:21, 369:22, 370:2,

407:15

**WMATA** [48] - 236:5, 305:11, 305:24, 306:10, 306:12, 308:7, 308:13, 308:14, 309:6, 309:7, 309:12, 309:22, 311:10, 311:18, 313:15, 313:24, 326:7, 328:18, 331:7, 346:2, 346:25, 348:8, 348:10, 352:8, 354:14, 354:23, 355:1, 355:13, 355:15, 360:21, 365:20, 366:11, 368:9, 368:12, 371:14, 372:3, 372:10, 372:23, 384:14, 390:8, 391:17, 392:3, 392:7, 395:10, 398:8, 398:10, 405:4

**WMATA's** [14] - 303:20, 306:6, 307:7, 310:17, 311:21, 313:20, 348:14, 353:22, 354:4, 354:20, 355:6, 361:12, 371:16, 402:8

**woke** [1] - 271:10

**woman** [2] - 380:25, 383:23

**won** [1] - 328:12

**word** [1] - 287:7

**words** [6] - 245:2, 254:4, 297:3, 306:11, 342:4, 403:6

**workdays** [1] - 257:24

**works** [1] - 341:15

**world** [1] - 324:19

**worrying** [1] - 361:2

**worth** [1] - 373:17

**wrap** [1] - 380:15

**wrinkles** [1] - 289:23

**write** [4] - 317:8, 359:2, 360:14, 398:13

**writing** [2] - 377:16, 377:19

**written** [5] - 298:21, 317:4, 359:1, 359:22, 398:8

**wrote** [1] - 376:23

### X

**x-ray** [8] - 237:15, 281:15, 282:6, 283:5, 283:24, 285:24, 292:22, 293:1

**x-rays** [2] - 292:18, 292:19

### Y

**year** [9] - 318:5, 325:18, 335:24, 336:1, 346:14, 390:14, 392:2

**years** [25] - 251:2, 254:4, 257:22, 265:21, 267:16, 276:5, 276:8, 276:12, 319:19, 319:21, 322:8, 324:7, 324:8, 326:18, 326:21, 357:25, 380:25, 381:3, 383:24, 390:22, 391:7, 391:14

**yesterday** [8] - 234:17, 236:7, 246:4, 246:23, 250:9, 254:20, 313:18, 359:23

**York** [32] - 315:18, 320:8, 320:9, 320:16, 321:2, 321:5, 321:11, 321:12, 321:19, 321:24, 325:25, 327:13, 327:17, 328:4, 331:5, 334:7, 334:14, 334:16, 341:5, 341:21, 342:6, 342:7, 344:4, 344:18, 344:21, 355:17, 355:18, 355:19, 355:24, 358:2, 358:5

**yourself** [6] - 245:11, 252:19, 258:24, 275:17, 315:16, 389:24

### Z

**ZAMBRI** [1] - 232:14

**Zoom** [5] - 269:13, 269:14, 270:22, 270:24, 347:24

1    general field of public transport or whatever field he's

2    being offered as an expert in.  Okay?

3              Mr. Regan obviously can seek to admit him as an

4    expert in that field and then to offer the opinion on

5    national standard of care.

6              Mr. Waters, if you would like to voir dire him

7    using whatever information you'd like as to whether he

8    should be qualified as an expert in the field of X, you're

9    entitled to do that obviously, but that's outside the

10   presence of the jury.  Okay?

11             So if you want to do it to make your record,

12   whatever, you can do it.  The Court will make a ruling as to

13   whether Dr. Berkowitz is qualified to testify as an expert

14   in his field, the relevant field, and then we -- if the

15   Court rules that he is, he would come in and testify as to

16   the national standard of care on direct, and your cross

17   would be limited to the scope of the direct.

18             MR. WATERS:  So, just to be clear, I will not be

19   permitted to cross-examine him on credibility grounds based

20   on the prior exclusions from other courts?

21             THE COURT:  No.  I think that goes to whether he's

22   qualified as an expert or not.

23             MR. WATERS:  Okay.

24             THE COURT:  I think the -- it depends on what

25   Mr. Regan gets into, but if other Courts have found that he

```
 1    has lied -- I mean, if there's something that goes to his
 2    credibility or truthfulness, I think that's fair game.  But
 3    if we're just dealing with Courts that have found his --
 4    have not qualified him to testify as an expert on certain
 5    topics, I think that goes to the voir dire.
 6              MR. WATERS:  Very well, Your Honor.
 7              THE COURT:  Okay.
 8              MR. C. REGAN:  Your Honor --
 9              THE COURT:  We're going to start with the
10    30(b)(6)?
11              MR. C. REGAN:  I'd like to, Your Honor, and if I
12    could just briefly summarize, it seems like there actually
13    is some dispute.  I don't think it will take more than three
14    minutes.
15              THE COURT:  What's the dispute, Mr. Waters?
16              MR. C. REGAN:  Thank you, Your Honor.
17              Does the Court have the plaintiff's submission of
18    depositions, the binder?  I think it will make things easier
19    to be able to refer to that, Your Honor.  And we'll be
20    looking at the deposition of WMATA's 30(b)(6)
21    representative, Clev Bennett.
22              THE COURT:  Yes.
23              MR. C. REGAN:  Okay.  So the only portion of that
24    that the plaintiff would put in right now by audio
25    recording -- and that's one of the things I can talk about.
```

1    has lied -- I mean, if there's something that goes to his

2    credibility or truthfulness, I think that's fair game.  But

3    if we're just dealing with Courts that have found his --

4    have not qualified him to testify as an expert on certain

5    topics, I think that goes to the voir dire.

6              MR. WATERS:  Very well, Your Honor.

7              THE COURT:  Okay.

8              MR. C. REGAN:  Your Honor --

9              THE COURT:  We're going to start with the

10    30(b)(6)?

11             MR. C. REGAN:  I'd like to, Your Honor, and if I

12    could just briefly summarize, it seems like there actually

13    is some dispute.  I don't think it will take more than three

14    minutes.

15             THE COURT:  What's the dispute, Mr. Waters?

16             MR. C. REGAN:  Thank you, Your Honor.

17             Does the Court have the plaintiff's submission of

18    depositions, the binder?  I think it will make things easier

19    to be able to refer to that, Your Honor.  And we'll be

20    looking at the deposition of WMATA's 30(b)(6)

21    representative, Clev Bennett.

22             THE COURT:  Yes.

23             MR. C. REGAN:  Okay.  So the only portion of that

24    that the plaintiff would put in right now by audio

25    recording -- and that's one of the things I can talk about.

```
 1    We've tried to remove any problems here.
 2            There was an exhibit on the screen of the video
 3    recording, so we will play only the audio recording with
 4    just a still frame sort of title page, nothing -- not -- no
 5    exhibits in the video, Your Honor.
 6            But it's only Lines -- it's Page 32, Lines 2
 7    through 7, Your Honor.  And that is a clean exchange --
 8            THE COURT:  Wait.  Hold on.
 9            MR. C. REGAN:  Sure.
10            THE COURT:  32.
11            MR. C. REGAN:  2 through 7, Your Honor.
12            THE COURT:  Okay.
13            MR. C. REGAN:  I know the Court's just read it
14    right now, but I think that is a pretty clean exchange.
15            The defense has taken the position -- so initially
16    we had also designated -- in the pretrial statement we had
17    also designated Page 12, Line 8, through Page 17, Line 5.
18    If the Court feels it's necessary --
19            THE COURT:  One more time.
20            MR. C. REGAN:  Of course, Your Honor.
21            THE COURT:  12.
22            MR. C. REGAN:  12:8 through 17:5.  In that portion
23    Mr. Waters pointed out to me that it's sort of --
24            MS. GILMAN:  That's not us.  That's not the
25    correct --
```

1           MR. C. REGAN:  No, that's what I designated

2     previously in the pretrial statement, Your Honor.

3           MR. WATERS:  Oh, yes.

4           MR. C. REGAN:  And Mr. Waters pointed out that

5     that does -- my questions refer to statements that are not

6     coming into evidence in this case based on the Court's

7     pretrial ruling, so the questions are problematic.

8           We've withdrawn that portion, but the defense had

9     also counter-designated the two pages leading into that

10    portion.  They counter-designated 10:6 through 12:7, Your

11    Honor, in which the WMATA witness talks about the incident

12    report and specifies which pages are part of it, which pages

13    are not, whether the witness statements are part of it.

14          I obviously was unaware -- because of my

15    representations to the Court ten minutes ago, I did not

16    think this counter-designation could be interpreted to apply

17    to our designation at Page 32, 2 through 7, but that is the

18    position the defense has now taken.

19          My position, of course, Your Honor, is that 32, 2

20    through 7, is about as clean a statement of the critical

21    issue in this case as exists.  And this business about what

22    different pages of an incident report that is not coming

23    into evidence concern just has no bearing on it.

24          Of course, WMATA can call Mr. Bennett back

25    tomorrow live to the witness stand, if it wants to, in its

1    case-in-chief.  It can try to run from this.  But he

2    testified under oath that they're not aware of any evidence.

3            THE COURT:  Okay.  Mr. Waters.

4            MR. WATERS:  Your Honor, this entire exchange

5    concerns the incident report; the witness statements that

6    were taken and the substance of WMATA's knowledge of this

7    accident.

8            THE COURT:  Let's start with what Mr. Regan says

9    he wants to ask.

10           "Is WMATA aware of any evidence that would

11   contradict that?  In other words, is there any evidence that

12   WMATA is aware of that the train operator announced the

13   train would be moving before she moved it forward again.

14           "ANSWER:  No."

15           Okay.  So is there anything under the rule of

16   completeness, I guess is the question, that you would want

17   to cross-designate now --

18           MR. WATERS:  Yes.

19           THE COURT:  -- given that you're going to be able

20   to call the witness live and clarify any -- or ask him or

21   her anything you want to tomorrow?

22           MR. WATERS:  Yes, Your Honor.  And I think that

23   that's the portion from 10:6 through 12:7, because this

24   entire --

25           THE COURT:  Wait, 10:6.

1          MR. WATERS:  Yes, Your Honor.

2          THE COURT:  Okay.  It starts -- I'm not going to

3    read the whole thing, but it talks about an incident report.

4    What in the incident report contradicts what -- the answer

5    that Mr. Bernard gave at the deposition?

6          MR. WATERS:  I think it gives context to the

7    answer that he gives later, and the context is that WMATA's

8    knowledge is based on the incident report.  And I think the

9    critical part of that exchange is:

10         "Is this incident report that is Exhibit 2

11   supposed to basically be the record on what happened that

12   day?

13         "ANSWER:  It is the record by one employee."

14         So I think it puts it into context.

15         THE COURT:  And that's all you want to play?

16         MR. WATERS:  That's all I want to play, is 10:6

17   through 12:7.

18         THE COURT:  Okay.  Well, 12:7 goes on another two

19   pages.

20         So is your point that Mr. Bernard's answer in the

21   clip that Mr. Regan wants to play in context qualified by

22   the fact that the only evidence he's referring to or that he

23   has knowledge of is the incident report, so therefore

24   there's no evidence in the incident reports that an

25   announcement was made?

1          MR. WATERS:  That's correct, Your Honor.  And I

2     think, in the absence of that context, the answer is going

3     to be presented to the jury that's going to be misleading

4     and unfairly prejudicial.

5          THE COURT:  Okay.  Mr. Regan.

6          MR. C. REGAN:  Thank you, Your Honor.

7          If that is true, then WMATA has violated its

8     discovery obligations.  Mr. Bennett was a 30(b)(6) witness.

9     He was designated on topic -- I think it's Area of Testimony

10    1, Your Honor, which would be, I think, Exhibit 2 in your --

11    Exhibit 1 to the deposition in the binder in front of Your

12    Honor.  He was designated to testify as to all information

13    available to WMATA about this incident.

14         We have the right to ask WMATA, the party, through

15    its designated representatives, what knowledge do you

16    possess?  He can't say it's limited to this.

17         And I would also say it's clear from his answer

18    there, Your Honor, my question was not limited.  My question

19    doesn't say "Does the incident report say anything?"  The

20    question, of course, that Mr. Waters just referenced saying

21    "Is this incident report supposed to be basically the

22    record?"  That is -- that's not a full -- I hope I asked

23    more questions, but that's establishing the fact that it's a

24    business record.  It's completely contemporaneously by the

25    people with the requisite knowledge, and it's attempting to

 1   be an authoritative source of what happened that day.

 2   That's unrelated.

 3              THE COURT:  Okay.

 4              MR. C. REGAN:  So he doesn't -- you know, the

 5   witness here at Page 32, that is not intended to be a

 6   question for the witness.  That is me asking WMATA does

 7   WMATA have any information.  Because there is nothing in the

 8   incident report.  That's what Pages 12 through 15 concern,

 9   Your Honor.  That is me going step by step through every

10   incident -- every part of that incident report asking am I

11   missing something.

12              What is being contested here?  WMATA doesn't

13   seriously dispute this, do they?

14              And by the way, all the answers come back no, we

15   don't dispute that witness statement.  We don't dispute this

16   one.  We don't dispute this one.  We don't have any

17   knowledge outside that.

18              But at Page 32, Your Honor, we are entitled, as

19   the plaintiff in this case, to ask the defendant do you have

20   any evidence that this critical piece of the case, that this

21   warning, was actually given?  And he's speaking as the voice

22   of WMATA designated on that topic and says no.

23              They can't come back now and say, no --

24              THE COURT:  Now, look, if he were here live and

25   you asked him that question and Mr. Waters cross-examined

1    him, Mr. Waters could say, "What's the basis for that

2    answer?  You know, are you referring to the incident report

3    or anything else?"  And if he says the incident report, then

4    that's the answer.

5         So if you want to -- if you want to ask him that

6    question, I'm going to give Mr. Waters an opportunity to

7    place it in context to allow him to explain in a sense

8    what's the basis for your answer.  Okay?

9         If you want to, you know, withdraw it, and we'll

10   deal with it all live tomorrow, then we can do that, too.

11   So your choice.

12        MR. C. REGAN:  I guess -- and just to make sure,

13   Your Honor, I want to make sure that I'm not

14   misunderstanding or that I haven't confused the issue for

15   the Court.

16        If we can't rely on the under oath testimony of

17   WMATA's representative on that point, he can't limit -- as I

18   understand the rules, Your Honor, and of course I defer to

19   the Court, but he can't limit that to saying, "Well, I

20   actually only talked about one document."  He has to show

21   up to that deposition understanding the full body of

22   knowledge --

23        THE COURT:  But he did limit it in the deposition,

24   right?

25        MR. C. REGAN:  Respectfully, Your Honor, no.  That

1    is not how the deposition reads.  I could not disagree with

2    that more strongly.

3            THE COURT:  Well, why is there a problem if he

4    didn't limit it to that?

5            MR. C. REGAN:  Because, Your Honor, I think that

6    if we're forced to play this portion that Mr. Waters wants

7    ahead of time, it makes it sound like he's allowed to do

8    that, unless the Court is going to explain and say as a

9    30(b)(6) he can say he only knows about the incident report.

10   But WMATA has an obligation, under our rules of discovery,

11   to produce someone with its full knowledge, and I don't --

12   if the Court wanted to give an instruction like that, I

13   suppose there's a way around it, but otherwise, it

14   drastically waters down the --

15           THE COURT:  Well, the witness -- he wasn't

16   required to go out and conduct a new investigation, right?

17           MR. C. REGAN:  Well, Your Honor, I think he is

18   obligated to be aware of all information available to WMATA

19   on the subject.  So he doesn't have to go out there and

20   measure the train station or something, but he does have to

21   show up competently prepared by WMATA's counsel.  At that

22   point staff counsel, not Mr. Waters, but he has to be

23   competently prepared, and he has to have reviewed any and

24   all information that would be relevant so that when that --

25   and as I say, Your Honor, it's there.  The deposition notice

1    is Exhibit 1.  All information available --

2              THE COURT:  I know what a 30(b)(6) is.

3              Mr. Waters, do you want to respond briefly?

4              MR. WATERS:  This is gotcha litigation, right?  He

5    wants to play one question and one answer without any

6    context.

7              The witness was prepared, answered the question,

8    and those questions, including the one that counsel wants to

9    play, falls in the context of a discussion about this

10   incident report and the bases of information that form his

11   knowledge.

12             THE COURT:  Okay.

13             MR. WATERS:  And what we want to have designated

14   is just the bases of that information.  So playing one

15   question and one answer is a gotcha game that puts this out

16   of context.

17             THE COURT:  Address his response, which is that,

18   as I understand it, he was required to go beyond the

19   incident report; and therefore his answer to Mr. Regan's

20   question ought to have been -- ought to have encompassed

21   everything he was required to learn as a 30(b)(6) witness

22   and not simply the investigation report.

23             MR. WATERS:  As Mr. Regan pointed out, this was

24   handled by prior counsel, but my understanding is he

25   prepared with the information that was available to him.

```
 1              THE COURT:  Okay.

 2              MR. WATERS:  And that information includes the

 3   accident report and the witness statements, and the portion

 4   that we designate puts that information into the universe

 5   context.

 6              THE COURT:  Okay.

 7              MR. WATERS:  So to say that he had an additional

 8   obligation I think is inappropriate.

 9              THE COURT:  All right.  I'll stand by my ruling.

10   If you want to play that clip, I'll give the defense an

11   opportunity to put it in context with the cross-designation.

12              So if you want to consult for a minute.

13              MR. P. REGAN:  Yes, Your Honor.

14              (Pause)

15              MR. C. REGAN:  WMATA had previously offered to

16   produce the witness.  Can you have him here this afternoon

17   still?

18              MR. WATERS:  He was released yesterday, Mr. Regan.

19   I could have him here tomorrow.

20              THE COURT:  And WMATA's going to call him

21   tomorrow?

22              MR. C. REGAN:  We would call him in our case-in-

23   chief, Your Honor.  We'll take him first thing in the

24   morning.  If that's the soonest WMATA will provide him now,

25   that's what we'd like to do, Your Honor.
```

```
 1                    Mr. Regan.

 2                    MR. P. REGAN:  Yes, Your Honor.  At this point

 3      we'd call one of our expert witnesses, Dr. Carl Berkowitz.

 4                    THE COURT:  Dr. Berkowitz, come on up.

 5                    THE WITNESS:  Thank you, sir.

 6                    THE COURT:  If you could step up and remain

 7      standing and raise your right hand.

 8                    THE WITNESS:  Thank you, Your Honor.

 9                    CARL BERKOWITZ, Ph.D., Sworn

10                         DIRECT EXAMINATION

11      BY MR. P. REGAN:

12      Q.  So, Dr. Berkowitz, if you would, just get that

13      microphone.  You need to be fairly close to it, okay, so

14      just adjust it properly.  There you go.

15                    Dr. Berkowitz, if you would, please introduce

16      yourself to the jury and state your address.

17      A.  My name is Carl Berkowitz, and I live at 239 Lands End

18      Court, Miroches, New York.

19      Q.  Okay.  And what is your area of expertise that brings

20      you into the courtroom today?

21      A.  Transportation engineering with a focus on safety.

22      Q.  How long have you -- well, first of all, tell us what a

23      transportation safety engineer does.

24      A.  Well, that's kind of a misnomer because in

25      transportation engineering, like in real estate, it's
```

1    location, location, location, and transportation engineering

2    it's safety, safety, safety.  So it's just an integral --

3    everything we do, safety is the key component.

4    Q.  Keep the microphone as close to you as you can so

5    everybody can hear it.  There you go.

6              Who do you currently work for?

7    A.  Myself.

8    Q.  You have your own consulting firm?

9    A.  Yes.

10   Q.  Where do you work out of?

11   A.  I work out of my home, and the name of the firm is me,

12   Carl Berkowitz.

13   Q.  Let me show you what we've previously marked as

14   Plaintiff's Exhibit No. 20.

15             MR. P. REGAN:  May I approach the witness?

16             THE COURT:  You may.

17   Q.  Is that your current curriculum vitae?

18   A.  Yes.  I believe so, yes.

19   Q.  All right.  It's approximately 30 pages long.  What's

20   included in your CV?

21   A.  Well, it's just a summary because of -- I would need an

22   Encyclopedia Britannica to put everything in that I've

23   worked on.  It has my work experience, places I've worked,

24   the schools I went to, where I taught, the research I've

25   done, the organizations I belong to, the awards that I've

1    received, my public service, my community service.

2            It doesn't mention that I'm a grandfather of 11.

3    I didn't put that in.

4            All the papers and articles that I've written, the

5    TV stations that I've appeared on, things -- you know,

6    everything.

7            The reason it's so long is, when I was a college

8    professor, to apply for tenure you had to write your life

9    experience, so this is actually my tenure application, and

10   it became my CV.

11           MR. P. REGAN:  Your Honor, at this point, rather

12   than go through the 30 pages, I would offer the exhibit,

13   Plaintiff's Exhibit No. 20, and that way I can do a summary

14   of it.  But if it's going to be a problem, I'll go through

15   it in detail.

16           THE COURT:  It's inadmissible hearsay.

17           MR. P. REGAN:  Okay.

18           THE COURT:  So hit a few of the highlights

19   sufficient to meet your burden.

20           MR. P. REGAN:  All right.

21   Q.  So, Doctor, let's go through that in a little bit of

22   chronological order, if we can.

23   A.  Sure.

24   Q.  You have your undergraduate degree in civil engineering,

25   correct?

1    A.  It's kind of unusual.  I went to City College School of

2    Engineering.  In those days there were four engineering

3    degrees; so I have a major in civil engineering, a minor in

4    mechanical engineering, and a minor in electrical

5    engineering.  It was a five-year program, and I was an ROTC

6    so I also have military engineering training as well.

7    Q.  And when did you receive your engineering degree, your

8    initial engineering degree?

9    A.  You're going to know how old I am.  1963.

10   Q.  Okay.  And then what -- so you received that degree.

11   What was the next degree you received?

12   A.  Well, I was in a joint degree program.  It was a

13   sequential program where I was also -- from engineering I

14   went into an MBA program at that time at Baruch College.  It

15   was part of City College, and they had a joint degree

16   program.  Very early -- I think it was the first MBA for

17   engineers, and it was called Industrial Management for

18   Engineers, and it was -- I loved it because it was easy

19   compared to engineering school.  I loved business school.

20         And then from there I went on to pursue a PhD in

21   transportation engineering and planning at Polytech --

22   Brooklyn Polytech, which has changed its name, and now it's

23   part of NYU.  And I earned a PhD in transportation

24   engineering and planning.

25   Q.  Let's talk about that.  So transportation planning and

1    engineering.  Explain to the members of the jury, if you

2    would, what is that field?

3    A.  It's really simple.  It's to -- it's to move people and

4    goods safely.  That's our goal.  We call it intermodal

5    transportation.  That's all modes, ALANC, safely.

6    Q.  Does it include automobiles, trains, buses, airplanes?

7    A.  Everything, balloons.

8    Q.  Let's talk about your consulting business.  When did you

9    first go into the field of safety -- transportation safety

10   consulting?

11   A.  When I -- I got a -- could I mention where I worked?

12   Q.  Yes, I was going to say -- never mind.  I jumped ahead.

13   A.  Okay.  When I graduated from City College with the

14   engineering degree, I was recruited by the State Department

15   of Transportation because they were starting the Eisenhower,

16   you know, Defense Highway System.  And there was like a

17   60,000 shortage of engineers.

18          So I went to work for them, and I spent my first

19   two and a half years in training, because when you go to

20   engineering school you really don't know much about

21   practical stuff.  So I spent two and a half years in

22   training -- so I'm a perpetual student, as you can see --

23   learning all about transportation, all aspects of

24   transportation, including railroad.  I even worked in the

25   legal department, and I also had like the third chair on

1    condemnation cases.  It was really great experience, even

2    building docks and groins on beaches, everything you can

3    think of.

4          And from there I was recruited by Governor Nelson

5    Rockefeller, who was the governor at the time, to be his

6    assistant in transportation.  And I'm in my 20s.  I was

7    ecstatic.  And that was his -- not for the whole state, but

8    from Dutchess County in New York, both sides of the Hudson

9    River, including New York City and all the way out to

10   Montauk Point.  And it was a great experience to represent

11   the governor at meetings and things of that nature.  I got

12   to meet people like Robert Moses.  I got to meet everybody.

13   It was -- because I was the governor's right hand in his

14   office.

15         And from there, I was recruited by the city of New

16   York.  They were starting a department of transportation.

17   They had a transportation administration.  They were going

18   to start a department of transportation, and they wanted to

19   set up a planning department and a recent planning, and they

20   recruited me to head that up because they wanted to get rid

21   of me because working for the governor I was a thorn in

22   their side.  They wanted to build a highway in the middle of

23   Manhattan; I stopped it.  They wanted to build a highway

24   through Chinatown; I stopped it.  Things like that.  These

25   were all Robert Moses projects.  And so I went to work for

1    the governor, and that was quite a great experience.

2            And then to the city of New York, and there was a

3    great experience where I got involved in every aspect of

4    transportation, approving the budget.  In the city of New

5    York, the transit system is operated by an authority, but

6    the authority doesn't own the property.  It's the only place

7    where the city owns the property, and the authority does the

8    management.  And any expenditure related to our property,

9    the city's property, had to go through my office.

10           So I was intimately involved in all aspects of the

11   New York City -- oh, I forgot to mention.  When I was in

12   college, I was given an internship with the New York City

13   Transit Authority, so my first introduction to subways was

14   when I was in college as an intern.  Any time I was off from

15   school, I worked as an engineer for transit.

16           Sorry for jumping around.

17   Q.  I'm sorry, let me put some dates on this.

18           So you were -- the period you're talking about

19   with the New York City Department of Transportation was 1970

20   to 1988, right, for those?

21   A.  About that time.  I also was the executive director of

22   the Staten Island Ferry.  I was also the head of the Bureau

23   of Transit.

24           New York City had five bus lines.  They went

25   bankrupt on the same day, if you could believe it, and we

 1    had no choice but to take it over, and I was -- I was a very

 2    -- I was a grants person.  I had a very good relationship

 3    with the USDOT and the secretary of transportation from my

 4    days working for the governor, and I was able to get grants,

 5    $50 million, to save the bus lines.  So I became a bus

 6    operator; ferry operator, a bus operator.

 7              Then I was offered -- during this process I was

 8    getting my PhD.  It took me about 17 years.  Slow learner.

 9    My alma mater invited me back as a visiting professor, so I

10    retired from government and I became the IBM visiting

11    professor at my alma mater, which was just a great honor,

12    and that began my education career.

13              One of the requirements -- when you're an educator

14    in engineering, Friday is not a class day.  It's a

15    consulting day, so you have to go out and do consulting work

16    or research.  It's compulsory.  You know, it's not an

17    option.  So that's why I started consulting work.  The

18    school forced me into it.

19    Q.  All right.  Well, let me talk about schools for a

20    minute.  So on your resume you list --

21              THE COURT:  Counsel, can we go to the phones

22    briefly?

23              (The following is a bench conference

24               held outside the hearing of the jury)

25              THE COURT:  All right.  I don't mean to cut you

1    off, Mr. Regan, but Mr. Waters, any objection to his

2    qualifications and experience and prior work in terms of

3    being qualified as an expert in transportation safety

4    engineering?

5            MR. WATERS:  In terms of educational experience,

6    employment history, no.

7            THE COURT:  So, I mean, are your only objections

8    the ones that you've previously lodged about his reception

9    by other courts and whatnot?

10           MR. WATERS:  Those that we -- and those that we

11   raised -- those that we raised in our motion.

12           THE COURT:  Okay.

13           MR. WATERS:  Yes.

14           THE COURT:  Mr. Regan, I don't want to cut you

15   off, and you can, you know, establish whatever you want to

16   establish, but in light of the fact that there are no

17   objections to some of these things, why don't you lead him a

18   little bit more efficiently.

19           MR. P. REGAN:  My pleasure.

20           THE COURT:  Okay.

21           (This is the end of the bench conference)

22   BY MR. P. REGAN:

23   Q.  We're going to try to do this a little quicker,

24   Dr. Berkowitz, in terms of getting to this case.

25   A.  I'm sorry about it.

1    Q.  No, that's all right.  Not your fault.

2            On your resume, you list about six or seven

3    colleges or universities that you've taught.  Have these all

4    been in the field of transportation safety?

5    A.  Engineering and safety, yes, all of them.

6    Q.  And that's over the period from -- well, from the 1970s

7    until the last ten years or so?

8    A.  Yes.  It's about ten years I stopped.  About ten years

9    ago.

10   Q.  You also list, you know, about 30 or 40 professional

11   affiliations.  What are those?  Not naming them

12   individually, but what are the professional affiliations?

13   Just describe for the jury's --

14   A.  They're engineering societies in civil, mechanical,

15   electrical, biomechanics, biomedical, all the fields that I

16   worked in, assisted transportation for the accessibility of

17   the disabled.  And I was honored to be appointed to --

18   elected to memberships in foreign organizations.

19           The UITP, which is the European -- the world

20   organization in transit, I was elected to their academic

21   committee.  So I'm -- and the CILT in England, I was elected

22   to membership in their transportation national society.

23           I can put all these initials after my name, but I

24   don't.

25   Q.  Okay.  You list -- again, I just want you to describe

1    what they are.  The scholarly activities, publications, and

2    presentations -- and there's about 70 of those -- what are

3    those?

4    A.  My focus from graduate school, I worked with Dr. John

5    Fruin, who is the father of pedestrian safety.  He

6    unfortunately passed away in February.  But everything I

7    focused on was pedestrian, bicycle safety.

8            I was like an environmentalist in a sense.  I

9    resented the fact that everything we did in engineering was

10   motor vehicle oriented, and I wanted to see the pedestrian

11   and the bicyclists get equal treatment, and so I was even a

12   president of a national organization that was focused on

13   that, an engineering organization.

14   Q.  And have you continued to take continuing legal

15   education -- sorry, continuing education programs over

16   the -- over your career in engineering?

17   A.  It's compulsory.  I have to do 16 hours of continuing

18   education to maintain my license every year.  I do more.  I

19   do maybe 50 to 100 hours.

20   Q.  Let's talk about your consulting business.

21           When you're testifying in cases like this

22   involving someone who is getting injured on a subway or

23   train system, do you work for both the injured person, like

24   Ms. Scott, as well as the transit system like Metro?

25   A.  Well, I've worked for the MTA in New York, the New

1    Jersey transit in New Jersey, Cleveland in Cleveland, in

2    Seattle, in Oregon, in Los Angeles.  Probably other -- a

3    couple of other -- in Boston.  I've worked on both sides,

4    and with their knowledge, they know I'm involved in suits

5    against them, and they also retain me to help them on

6    matters that they have on the defense side.

7    Q.  Have you also been contacted by WMATA, the Washington

8    Metropolitan Transit Authority, to serve as an expert in

9    their cases?

10   A.  Several times, but every time I told -- in fact, one

11   time was a case that I was working against them that they

12   asked me if I would be interested in working for them.  But

13   every time I indicate to them that I'm working, you know,

14   cases against them, they decline.  Other transit companies

15   don't decline, but they have declined.

16   Q.  In this case, Mr. Waters and Ms. Gilman are with the

17   firm of Wilson Elser.  Have you worked for that law firm?

18   A.  Yes, for many years.

19            MR. WATERS:  Objection.

20            THE COURT:  Sustained.

21   A.  Yes, for many years.

22            MR. WATERS:  Objection.

23            MR. P. REGAN:  Withdrawn.

24            THE COURT:  The jury will disregard

25   Dr. Berkowitz's last answer.

1    Q.  On how many occasions have you been retained as an

2    expert on transportation safety issues in your career?

3    A.  Nationally?  Internationally?

4    Q.  Career.

5    A.  A couple of hundred maybe.  I don't keep track.

6    Q.  You know, Dr. Berkowitz, this case involves a subway

7    train and the issue of whether a safety warning is required

8    by the national standard of care.  Let's talk about your

9    experience with respect to that.

10            With respect to subway systems, explain to the

11    jury your experience over your career with issues that

12    involve transportation engineering safety only with subways.

13    A.  Well, it started when I worked for the city of New York.

14    I was involved in the design of the R-140 -- I think it was

15    called the new technology car -- back in the '70s.  I was

16    intimately involved in train operations in the city of New

17    York because any funding that came from the -- from the city

18    in terms of capital investments I had to approve that

19    expenditure.  So I had to be very familiar with, you know,

20    what was going on.  Some of the projects that I approved

21    hadn't been even built yet.

22            But I've been involved in almost every aspect of

23    transportation in my career.  I've worked for all the major

24    -- for and against every major transit company in the United

25    States except for Skyline in Hawaii.  I'd love to, but

1    nobody's invited me to work there, in Skyline.

2           I've worked for Tren Urbano in San Juan, Puerto

3    Rico.  I've been involved in Boston, Chicago, Philadelphia,

4    New Jersey, New York, Washington, Atlanta, Miami,

5    Cleveland -- I don't know if I mentioned Chicago -- Los

6    Angeles.  Just about every major transit company.

7           And internationally I've worked for London

8    transport.  I've worked for the train systems in China.  I

9    worked at the train -- Light Rail in Dubai and in Abu Dhabi

10   and Qatar in the Middle East.  In fact, I received an award

11   for innovation, third place.  First place was a million;

12   third place was only $20,000.  But I won an award for

13   innovation in transportation.

14   Q.  When were you first contacted about this case?

15   A.  I think it was around '22/'23.

16   Q.  Okay.  What were you asked to do generally?

17   A.  I was asked to look at the file, look at the records,

18   and see if that -- whether or not WMATA followed the

19   national standard of care in terms of providing information

20   to passengers in terms of passenger safety.

21   Q.  All right.  Did you review certain deposition

22   transcripts that were taken in the case?

23   A.  Yes.  I remember there was Mr. Harris, Mrs. -- I can't

24   -- whether it was Ms. -- it was Harris, Johnson, the train

25   driver, Mr. Bennett, I think.  Mrs. Bennett?  I forget.

1    Pardon me for not remembering the genders.  Ms. Scott.  And

2    also there was an incident report where there were

3    eyewitnesss that I reviewed.

4    Q.  Okay.  And you reviewed the incident report, witness

5    statements, everything in Metro's incident report?

6    A.  Yes, I did, as well as their SOPs, standard operating

7    procedures.

8    Q.  As you know, in this case the issue is when a train

9    operator stops the train too short in a station and then has

10   to reposition it in the proper location so that the doors

11   are in the proper place, whether an audible warning is

12   required to the passengers by the national standard of care,

13   correct?  You understand that issue?

14   A.  Yes, and that is the standard of care.

15   Q.  When we talk about the national standard of care,

16   explain to the members of the jury what we're talking about.

17   A.  It's not something that's aspiration --

18           MR. WATERS:  Objection, Your Honor.

19           THE COURT:  Counsel, do you want to qualify him

20   first, before we start getting into the substance?

21           MR. P. REGAN:  Your Honor, I'm happy to do that.

22   I was going to have him describe in general what he did, but

23   I can save that for the direct, if you prefer.  I can

24   qualify him right now, if you want.

25           THE COURT:  Why don't you -- if you think you have

1    a foundation for record purposes, why don't you qualify him

2    before -- if you're going to get into the --

3              MR. P. REGAN:  I was going to ask him what he did

4    in order to determine the standard of care; not what it was,

5    but --

6              THE COURT:  Okay.  Fine.

7              MR. P. REGAN:  Okay.

8    Q.  Okay.  I don't know, did you finish that answer?

9              When we were talking about the national standard

10   of care, just -- I don't want to be repetitive here, but

11   just explain to the members of the jury what is the national

12   standard of care when we're talking about this issue?  And

13   that is subway train safe operation.

14   A.  It doesn't matter what the area is, the national

15   standard of care is what the industry has chosen as the

16   correct way of doing things, and everybody does it that way,

17   or very close to that way, because every transit system is a

18   little different.  So they have to modify it a little bit to

19   their -- you know, to their particular situation.

20             But it's what we accept in the industry is what --

21   and it's based upon studies, research, lots of work.  The

22   national standard doesn't -- you know, somebody doesn't flip

23   a coin.  It's the result of hard work, volunteer work, on

24   the part of engineers.

25   Q.  Explain to the jury, if you would, what are the major

1    subway systems in the country.  You sort of described it --

2    A.  Well, we have 16 subway systems.  I think 11 are subways

3    and five are what we call elevated subways.  The biggest

4    ones are -- I have to do it looking at the map in my mind.

5    That's MBTA in Boston; New York City's and -- New York City

6    Transit Authority, which is the biggest.  Then we have

7    Philadelphia, SEPTA; and we have Washington, WMATA.  We have

8    Miami; it's called Miami Transit.  Then we have Chicago,

9    CTA, and then we have Cleveland, C -- I forget if it's

10   CLAMTA.  Then we have San Francisco, BART, and we have Los

11   Angeles, LACMTA, and we have Skyline in Hawaii, which is

12   elevated, beautiful.  I keep asking to go.  Nobody sends me.

13   And then Tren Urbano, which is a kind of outdoor kind of

14   service with some portions underground that serves San Juan.

15        I think that's -- did I hit 16?  I'm not sure.

16   Q.  All right.  So let me ask you this.  When we talk about

17   the national standard of care for subway systems, can I go

18   to Google and ask that question?

19   A.  No.

20   Q.  Okay.  Why not?

21   A.  Well, because -- I don't understand it, but the transit

22   companies consider all their internal documents top secret,

23   and most of the time when I get to review them I have to

24   sign a nondisclosure agreement.  And sometimes they say it

25   has to do with Homeland Security, but I don't -- I don't

1    understand that.

2            I worked for Homeland Security, so I don't

3    understand that at all.

4    Q.  So what are standard operating procedures?  What do they

5    cover?

6    A.  They cover everything.

7            MR. WATERS:  Objection, Your Honor.  We're getting

8    into opinion here.

9            THE COURT:  Hold on.  Excuse me?

10           MR. WATERS:  We're getting into opinion.  He

11    hasn't been qualified.

12           MR. P. REGAN:  I don't mean to -- I was asking

13    generally.

14           THE COURT:  Generally speaking, describe to the

15    jury what --

16    A.  Yes. Well, generally speaking --

17           THE COURT:  -- standard operating procedures are.

18           THE COURT REPORTER:  The judge is still speaking.

19           THE WITNESS:  I'm sorry.

20           THE COURT:  Go ahead.  What are standard operating

21    procedures?

22    A.  Everything.  As mundane as overtime and sick leave to

23    how do you maintain the elevator, the escalator; how do you

24    change the oil; how do you sweep the station; how do you

25    clean the bathroom; how do you operate the trains; how do

1    you train the train drivers; how do you train the personnel.

2    Anything you can imagine that an agency has to do.

3             In the transportation industry we leave nothing to

4    chance because we have an organization called the American

5    Public Transportation Association, and we set up standards

6    for everything you can think of.  You pick a subject, and we

7    have a document on that subject and the best way, you know,

8    to handle that particular subject.  It's kind of universal.

9    Q.  Can I go to Metro's website and get their standard

10   operating procedures?

11   A.  No.

12   Q.  All right.  As part of your work in this case, did you

13   determine the standard operating procedures with respect to

14   the issue in this case; that is, the safety warning that has

15   to be provided to passengers when the operator fails to stop

16   the train at the right position in the station and has to

17   move it forward?

18   A.  Well, as part of your discovery, we received the SOPs,

19   which I indicated are very difficult to get unless you get

20   them through some legal matter.  And in there they clearly

21   spell out and even they give a sample of what you should

22   say.  In the standard operating procedure, they say that if

23   you misstop at the station, you say this, or you could say

24   more.  It's a minimum.

25            Standard operating procedures in terms of safety

1    are minimum standards.  You could always do more, but we

2    don't want you to do less.  But you could always do more.

3    You could always be safer.  We don't want you to be less

4    safe.

5    Q.  So with respect to this case, did you determine what the

6    standard operating procedures were for the subway systems in

7    New York, Chicago, Philadelphia, Washington?

8    A.  I tried to, and I did.  As you pointed out, you can't go

9    to AI or Google or any search engine to find that

10   information, so I went to people I know who work in these

11   agencies.

12           And I started off with a colleague of mine, whose

13   name is Orlando Jiminez, who started off working as a

14   conductor for the New York City Transit, then became a train

15   driver, and then became a trainer of train drivers, and

16   became a national rep, labor rep, for the New York City

17   Transit Authority.  And he provided me with copies --

18   Q.  We're not going to get into that yet, but you talked to

19   someone who got information to you, and then we're going to

20   get to your opinions in one minute.  Okay?  I'm sorry to

21   cut you off --

22   A.  I'm sorry.

23   Q.  -- but we've got to do this in order.

24           MR. P. REGAN:  Your Honor, at this time I would

25   offer Dr. Berkowitz as an expert in transportation safety

1    engineering with respect to the particular issue in this

2    case, whether the national standard of care requires Metro

3    to provide a safety warning under the circumstances of

4    Ms. Scott's injury on September 23, 2019.

5              MR. WATERS:  We object for the reasons previously

6    stated, Your Honor.

7              THE COURT:  Very well.  Subject to your

8    objections, which are noted, the Court will qualify

9    Dr. Berkowitz to testify as an expert in the field of

10   transportation and safety engineering and, in particular,

11   the question that Mr. Regan just posed regarding national

12   standard of care related to the relevant warnings in this

13   case.

14             MR. P. REGAN:  Okay.  Thank you, Your Honor.

15   BY MR. P. REGAN:

16   Q.  Is there an exhibit notebook up there, Doctor?  I can't

17   see behind there.  No?

18   A.  No.  I don't see one.  Just I have my CV.

19   Q.  Okay.  Let's do this.  Dr. Berkowitz, let me show you

20   what we've marked as -- previously --

21             MR. P. REGAN:  May I approach the witness?

22             THE COURT:  You may.

23   Q.  -- marked as Exhibit No. 19 and ask you if that's your

24   supplemental report dated sometime last year?  I don't know,

25   November.

1    A.  Yes, November 21st of last year.

2    Q.  Okay.  And is that your supplemental report concerning

3    your opinions and conclusions in this case?

4    A.  Yes, it is.

5    Q.  Are you prepared to talk about those today?

6    A.  Pardon me?

7    Q.  Sorry, that's my fault.  And you're prepared to discuss

8    those opinions with us today?

9    A.  Yes.

10   Q.  All right.

11        Let me ask you, Doctor, if you would, to -- let's

12   go back for a minute.  I was right the first time.  Let me

13   ask you to turn to Page 5 under Section 5 and read the

14   caption and the first paragraph in your supplemental report.

15        MR. WATERS:  Objection, Your Honor.

16        THE COURT:  Sustained.  He's not going to read in

17   the report.  You can ask him his opinions and refer to the

18   report.

19        MR. P. REGAN:  Okay.

20        THE COURT:  Okay.

21   Q.  Doctor, what is your opinion about what the national

22   standard of care requires with respect to announcements

23   under the circumstances of this case?

24   A.  That you always should make an announcement to ensure

25   that passengers are always safe.

1    Q.  Okay.

2    A.  Without exception.

3    Q.  So before a train operator -- well, let me ask you this

4    question.

5            Do you have an opinion within a reasonable

6    degree of certainty in your field as to whether the

7    national standard of care requires a train operator, such as

8    Ms. Johnson on September 23, 2019, to provide an audible

9    warning to passengers if she stops the train at the wrong

10   spot and has to move it forward in order to get to the place

11   where the doors will open?  Does the national standard of

12   care require an audible warning in your opinion?

13   A.  Yes.

14           MR. WATERS:  Objection; leading.

15           THE COURT:  Overruled.

16   Q.  Okay.  Explain why an audible warning is required to

17   passengers under those circumstances.

18   A.  Safety -- remember I said engineering is safety, safety,

19   safety, and people will have accidents if they don't have

20   themselves prepared to avoid a particular situation.

21           We have a premise in engineering that if there's a

22   hazard, you have to eliminate it.  If you can't eliminate

23   it, then you have to remediate it.  And if you can't

24   remediate it, then you have to provide enough information so

25   a person can personally protect themselves.

```
1              And one way a person can protect themselves is by
2    having information.  And we know that announcements on the
3    trains are very key to ensuring the safety of passengers on
4    the train.
5    Q.  And as part of the work in this case, did you review
6    Metro's Standard Operating Procedure 50?
7    A.  50, others as well; 50.5, yes.
8    Q.  All right.  And that standard operating procedure
9    requires a standard audible warning before repositioning a
10   train?
11   A.  They spell out a minimum -- you can do more, but they
12   have a minimum recommended announcement.
13              MR. P. REGAN:  Your Honor, with your permission
14   may we put that exhibit, which I will give you in a minute,
15   on the screen?  It's Plaintiff's Exhibit No. 1.
16              THE COURT:  Sure.
17              THE WITNESS:  That's pretty.
18              MR. P. REGAN:  Just one second.  It will be there
19   in one second.
20              THE WITNESS:  Your Honor, I'm sorry, I don't
21   hear --
22              THE COURT:  You're fine.  You're doing fine.
23   Q.  You can see at the top.  Is this one of the standard
24   operating procedures that you --
25   A.  Yes, it is.
```

1          MR. P. REGAN:  That's Plaintiff's Exhibit No. 1.

2     If you could go to Page 2, please, and if you scroll up.

3     Well, am I seeing the same thing?  Yes, scroll up to the

4     announcements.

5          All right.  So I'm going to ask if we can

6     highlight the repositioning of the train.

7     Q.  All right.  While we're doing that, Dr. Berkowitz,

8     you've seen this before, right?

9     A.  Yes.

10    Q.  What does the Metro standard operating procedure require

11    the train operator to say before repositioning a train?

12    A.  They should say at least this:  "Attention customers,

13    this train will move forward; please hold on."

14          They can say more than that, but that's the

15    minimum.

16    Q.  And is that consistent with the national standard of

17    care based upon your research in this case?

18    A.  Each system uses slightly different language, but in

19    general, it's the same message.

20    Q.  So the message is -- and why do you give that message?

21    What's the reason?

22    A.  When a train stops at a station, the inclination of

23    people on the train is that they're going to get off,

24    especially if an announcement is made "We're coming into

25    McPherson Station.  Doors will open on the left."  The train

1    just request, would the Court like to provide a brief

2    instruction about the significance of a 30(b)(6) party

3    deposition of WMATA?

4             THE COURT:  Why don't you play it first.  Okay?

5             MR. C. REGAN:  Understood.

6             THE COURT:  And then we'll talk about that.

7             (Whereupon the video deposition of Clev Bernard

8              Ibanez Bennett was played to the jury)

9             MR. C. REGAN:  Your Honor, that concludes the

10   testimony of Mr. Bennett as a representative of WMATA.

11            THE COURT:  Okay.  Next witness.

12            MR. C. REGAN:  Your Honor, the plaintiff's next

13   witness is also by video.  Unfortunately that's Al Emondi, a

14   fellow passenger on the train.

15            MR. WATERS:  Your Honor, may we go to the phones?

16            THE COURT:  Sure.

17            (The following is a bench conference

18             held outside the hearing of the jury)

19            MR. WATERS:  Thank you, Your Honor.

20            During the redirect of Al Emondi, Counsel read

21   into the record a portion of the accident report that

22   consisted of I think Mr. Emondi's statement that he gave to

23   WMATA.  I think that that statement is hearsay, and I think

24   it was improper essentially bolstering a prior consistent

25   statement in how counsel is using it.  I don't think it's